UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHARLES DEMPSEY, individually, and
L.D., by her father and natural guardian,
CHARLES DEMPSEY,

Plaintiff,

-against-

THE CITY OF ROCHESTER, a municipal entity,
JAVIER ALGARIN, ADAM GORMAN, "JOHN
DOE" RPD OFFICER RESPONSIBLE FOR
TRAINING JAVIER ALGARIN,

Defendants.

Case no. 19-cv-6780 (EAW)(MWP)

_____

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD ...................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.    THE COURT MUST EITHER DISMISS OR ENTER SUMMARY JUDGMENT
ON PLAINTIFFS' SEARCH CLAIMS ................................................................... 2

    A.    PLAINTIFF FAILED TO PLEAD ADEQUATE FACTS FOR UNLAWFUL SEARCH CLAIM ........ 2

    B.    NO UNREASONABLE SEARCH OF THE CURTILAGE OCCURRED ..................................... 2

        1.    The search was permitted by hot pursuit and the imminent destruction
of evidence exceptions to the warrant requirement ............................................ 3

        2.    The search was reasonable ................................................................................. 5

II.    THE COURT SHOULD GRANT SUMMARY JUDGMENT ON THE UNLAWFUL
SEIZURE CLAIM OF THE DOG, BECAUSE OFFICER ALGARIN ACTED
REASONABLY WHEN HE SHOT A DOG THAT WAS CHARGING HIM ................. 7

    A.    OFFICER ALGARIN ACTED OBJECTIVELY REASONABLY IN DISCHARGING HIS
FIREARM TO PREVENT IMMINENT HARM ................................................................. 7

    B.    OFFICER GORMAN HAD NO ROLE IN AND WAS NOT NEAR THE DOG ENCOUNTER. ......... 11

III.    OFFICER ALGARIN DID NOT SEIZE EITHER PLAINTIFF ...................................... 12

    A.    CHARLES DEMPSEY WAS FREE TO GO—AND INSTRUCTED TO WITHDRAW—
SO THE COURT MUST ENTER JUDGMENT AGAINST HIM ON HIS UNLAWFUL
SEIZURE CLAIM ...................................................................................................... 12

    B.    L.D. COULD NOT HAVE BEEN SEIZED, BECAUSE OFFICER ALGARIN WAS
UNAWARE OF HER DURING THE ENCOUNTER WITH THE DOG AND MR.
DEMPSEY. ............................................................................................................. 14

IV.    OFFICER GORMAN DID NOT HAVE THE OPPORTUNITY OT INTERVENE,
SO SUMMARY JUDGMENT MUST BE ENTERED ................................................... 15

    A.    LIABILITY ONLY EXISTS IF A CONSTITUTIONAL VIOLATIONS EXISTS .................... 15

    B.    OFFICER GORMAN HAD NO OPPORTUNITY TO INTERVENE PRIOR TO ANY
PURPORTED CONSTITUTIONAL VIOLATION ............................................................ 15

        1.    Officer Gorman was not aware of how Officer Algarin would search the
yard. ............................................................................................................... 15

2.   Officer Gorman was facing in the opposite direction and in the adjacent yard when the dog was shot, so he had no opportunity to intervene in the dog shooting. ............................................................................................ 16

3.   Officer Gorman did not arrive until halfway through Mr. Dempsey's and Officer Algarin's interaction .............................................................. 16

4.   Officer Gorman did not know that L.D. was present ..................................... 17

V.   OFFICER ALGARIN IS ENTITLED TO QUALIFIED IMMUNITY FOR THE DOG SEIZURE AND SEARCH.............................................................. 17

A.   OFFICER ALGARIN IS ENTITLED TO QUALIFIED IMMUNITY FOR THE SEIZURE OF PERSONAL PROPERTY, BECAUSE IT WAS OBJECTIVELY REASONABLE TO BELIEVE THAT HE COULD PROTECT HIMSELF FROM IMMINENT HARM.................. 17

B.   OFFICER ALGARIN IS ENTITLED TO QUALIFIED IMMUNITY FOR THE PURPORTED UNLAWFUL SEARCH, BECAUSE THE PERMISSIBLE SCOPE AND NATURE OF SEARCHES INCIDENT TO AND FOLLOWING HOT PURSUIT HAS NOT BEEN CLEARLY ESTABLISHED ........................................................................ 18

VI.   THE COURT MUST ALSO ENTER SUMMARY JUDGMENT ON THE STATE LAW CLAIMS .......................................................................... 19

A.   OFFICER ALGARIN CANNOT BE LIABLE FOR TRESPASS, BECAUSE IT IS WELL ESTABLISHED THAT LAW ENFORCEMENT OFFICERS ARE PERMITTED TO ENGAGE IN OTHERWISE-TRESPASSORY ACTS. ..................................... 19

B.   OFFICER ALGARIN DID NOT ASSAULT PLAINTIFF ................................. 20

VII.   THE COURT MUST GRANT SUMMARY JUDGMENT FOR DEFENDANTS ON ALL THEORIES FOR MUNICIPAL LIABILITY ...................... 20

A.   THE COURT MUST ENTER SUMMARY JUDGMENT ON MUNICIPAL LIABILITY IF NO CONSTITUTIONAL VIOLATION OCCURRED ....................................... 21

B.   THE COURT MUST ENTER SUMMARY JUDGMENT PURSUANT TO THE POLICY THEORY OF MUNICIPAL LIABILITY, BECAUSE THE CITY'S POLICY REGARDING DOG SEIZURES IS NOT UNCONSTITUTIONAL............................................ 21

C.   THE CITY IS NOT DELIBERATELY INDIFFERENT TOWARDS DOG OWNER'S RIGHTS, EVIDENCED IN PART BY THE CITY'S TRAINING OF ITS POLICE OFFICERS ON DOG ENCOUNTERS ............................................................. 22

1.   Plaintiffs have not identified any City policymaker.................................... 22

2.   Residents' constitutional rights are not frequently violated via dog shootings......................................................................................... 23

3.   The City's training regarding dog encounters is sufficient .......................... 24

D.  THE CITY ADEQUATELY SUPERVISES AND DISCIPLINES ITS OFFICERS
REGARDING DOG ENCOUNTERS ............................................................................ 26

1.  Plaintiffs failed to sufficiently please a failure to discipline or
supervise ..................................................................................................... 26

2.  Plaintiffs failed to identify any particular policymaker who was aware
of a need for corrective action .................................................................. 27

3.  The City supervises its officers and plaintiff
cannot prove to the contrary, i.e., a failure to discipline or supervise ....... 27

E.  THE CITY IS NOT DELIBERATELY INDIFFERENT TO THE RIGHTS OF RESIDENTS
VIS-À-VIS ENTRY AND SEARCHES INTO CURTILAGES ........................................... 28

1.  Plaintiffs again failed to identify any particular policymaker who had
notice of unconstitutional conduct and yet continued with the same
training ...................................................................................................... 28

2.  The City has trained its officers on searches of curtilage and Plaintiffs
have not gathered sufficient evidence to dispute as much ......................... 29

CONCLUSION ............................................................................................................... 31

iii

## TABLE OF AUTHORITIES

**Cases**

*Aljoe v. Adams*, No. 18-cv-01043, 2020 WL 12188842 (W.D.N.Y. Nov. 5, 2020) ..........................8

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004)..................................27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................1, 15

*Anniszkiewicz v. City of Rochester* (20-cv-6629-FPG-MWP) ........................................30

*Azurdia v. City of New York*, no. 18-cv-4189, 2021 WL 4480655
(W.D.N.Y. September 30, 2021) ..............................................................................1

*Barnes v. City of Rochester* (22-cv-6524-EAW-MWP)...................................................30

*Brigham City v. Stuart*, 547 U.S. 398 (2006) ....................................................................3

*Brower v. County of Inyo*, 489 U.S. 593 (1989)................................................................12

*Cabisca v. City of Rochester*, No. 14-cv-6485, 2019 WL 5691897 (W.D.N.Y. Nov. 4, 2019).........11

*California v. Hodari D.*, 499 U.S. 621 (1991) ................................................................12

*Carroll v. County of Monroe,* 712 F.3d 649 (2d Cir. 2013).........................................7, 11

*City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015) .......................4, 19

*Connick v. Thompson*, 563 U.S. 51 (2011) ...............................................................21, 22

*Cox v. Village of Pleasantville*, 271 F.Supp.3d 591 (S.D.N.Y. 2017) ........................14, 30

*Ellis v. Washington*, 409 F. Supp. 3d 148 (W.D.N.Y. 2019) ............................................22

*Fernandez v. City of New York*, 457 F. Supp. 3d 364 (S.D.N.Y 2020)..............................20

*Florida v. Jimeno*, 500 U.S. 248 (1991)............................................................................3

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219 (2d Cir. 1994) ..............1

*Graham v. Connor*, 490 U.S. 386 (1989)..........................................................................8

*Gursslin v. City of Rochester* (20-cv-6508-EAW-MJP) ..................................................30

*Hickey v. City of New York*, No. 01-cv-6506, 2004 WL 2724079 (S.D.N.Y. Nov. 29, 2004)..........14

*Kentucky v. King*, 563 U.S. 452 (2011)..............................................................................3

*Matteson v. Hall*, no. 18-cv-6772, 2019 WL 219502 (W.D.N.Y. May 21, 2019) ...............8

*McGill v. City of Rochester* (22-cv-6523, EAW-MWP) ...................................................30

*Medeiros v. O'Connell*, 150 F.3d, 164 (2d Cir. 1998) ....................................................14

*Naumovski v. Norris*, 934 F.3d 200 (2d Cir. 2019) ................................................17, 18

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) ...................................................................17

*Preston v. City of Rochester* (22-cv-6525-EAW-MJP) ..................................................30

*Raiser v. City of Buffalo*, No. 17-cv-0639, 2020 U.S. Dist. LEXIS 181597
(W.D.N.Y Sept. 29, 2020) ............................................................................................1

*Reynolds v. Giuliani*, 506 F.3d 183 (2d Cir. 2007) .......................................................26

*Reynolds v. United States*, 927 F. Supp. 91 (W.D.N.Y. 1996) ................................20, 29

*Rodriguez v. City of New York*, 607 F. Supp. 3d 285 (E.D.N.Y. 2022). ..........................20

*Tennessee v. Garner*, 471 U.S. 1 (1985) .......................................................................7

*U.S. v. Mendenhall*, 446 U.S. 544 (1980) ....................................................................12

*U.S. v. Swindle*, 407 F.3d 562 (2d Cir. 2005) ..............................................................12

*United States v. Campbell*, 342 F. Supp. 3d 375 (W.D.N.Y. 2018) .................................5

*United States v. Jones*, 565 U.S. 400 (2012) .........................................................19, 30

*United States v. Lovelock*, 170 F.3d 339 (2d Cir. 1999) .................................................2

*United States v. Weaver*, 9 F.4th 129 (2d Cir. 2021) ...................................................12

*Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 299 (1987) ...........................3, 5, 19

*White v. Pauly*, 580 U.S. 73 (2017) .............................................................................17

**Statutes**

FED. R. CIV. P. 56(a) .......................................................................................................1

## INTRODUCTION

After detaining a fleeing suspect, Rochester Police Department ("RPD") Officer Algarin reentered a backyard intending to find discarded contraband in the detainee's flight path. While doing so, the resident opened the back door and a dog charged Officer Algarin. Officer Algarin shot the dog, and then ordered the purported dog owner to stop yelling at and approaching him. Plaintiffs, the dog owner and his minor daughter, brought suit for various claims arising out of this situation, and Defendants herein move for summary judgment. The Court should award summary judgment for Defendants on the entire case for the reasons set forth below.

## LEGAL STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists where the evidence could support a reasonable jury deciding in the non-movant's favor. *Raiser v. City of Buffalo*, No. 17-cv-0639, 2020 U.S. Dist. LEXIS 181597, at \*4 (W.D.N.Y Sept. 29, 2020); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).

A court should award summary judgment to the moving party if "little or no evidence" supports the non-moving party's case (*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994)), even when the court decides all ambiguities and all factual inferences in favor of the non-moving party *Azurdia v. City of New York*, no. 18-cv-4189, 2021 WL 4480655, at \*3 (W.D.N.Y. September 30, 2021) (denying summary judgment on seizure of dog).

## ARGUMENT

## I.   THE COURT MUST EITHER DISMISS OR ENTER SUMMARY JUDGMENT ON PLAINTIFFS' SEARCH CLAIMS.

### A.   PLAINTIFF FAILED TO PLEAD ADEQUATE FACTS FOR UNLAWFUL SEARCH CLAIM.

Despite entitling the second claim "unlawful search of curtilage" (Second Amended ("Third') Complaint, pg. 25), Plaintiffs mention search only thrice. Third Complaint ¶¶ 38, 158, 165). The Plaintiffs complain about entries, not searches. Third Complaint ¶ 156 (entering  the Plaintiffs' backyard); *id. at ¶* 157 (the fence warned people to not enter); *id.* at ¶ 165 (claiming the officer's entry into the curtilage was an unreasonable search). Because Plaintiffs did not allege that a search occurred, they fail to state a claim, and their second claim must be dismissed.

### B.   NO UNREASONABLE SEARCH OF THE CURTILAGE[1] OCCURRED.

The Fourth Amendment to the Constitution does not prohibit all government searches—only unreasonable ones. *United States v. Lovelock*, 170 F.3d 339, 343-344 (2d Cir. 1999). Here, no unreasonable search occurred.

At the outset, let's be clear on the search at issue, since Officer Algarin was in Plaintiffs' yard twice. He first entered in pursuit of two suspects. Algarin Tr. 36:19-25. After realizing that both men had been detained by his fellow officers (Algarin Tr. 27:12-18,[2] 37:17 - 38:8), Officer Algarin jumped the fence (from Plaintiffs' yard) into the adjacent yard to assist Officer Gorman with his detainee. Third Complaint ¶ 33, 37; Algarin Tr. 9-13. Shortly thereafter, Officer Algarin reentered Plaintiffs' backyard. Third Complaint ¶ 38; Algarin Tr. 40:13-17. This second time in

---

[1] Defendants do not contest that the particular area was curtilage.

[2] Plaintiff's counsel corrects the house number later in the deposition. When he said 57 Kosciusko Street, he should have said 53 Kosciusko Street. Algarin Tr. 34:2-13.

Plaintiffs' yard is the subject of Plaintiffs' Complaint. Third Complaint ¶¶ 38- 40. Plaintiffs do not sue over the first entry or search by Officer Algarin in(to) the yard.

        1.    <u>The search was permitted by hot pursuit and the imminent destruction of evidence exceptions to the warrant requirement.</u>

While a warrantless search is per se unreasonable, there are exceptions. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). After all, "[t]he touchstone of the Fourth Amendment is reasonableness." *Lovelock*, 170 F.3d at 344 (quoting *Florida v. Jimeno*, 500 U.S. 248 (1991)).

Courts, for example, have recognized multiple types of exigent circumstances, and accordingly have permitted searches (1) to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury", (2) to prevent imminent destruction of evidence, and (3) for the "hot pursuit" of a fleeing suspect. *Kentucky v. King*, 563 U.S. 452, 460 (2011) (citations omitted); *Brigham City*, 547 U.S. at 403. Both the prevention of imminent destruction of evidence and hot pursuit are relevant here, because of the circumstances the officers found themselves in.

The U.S. Supreme Court has permitted warrantless searches that "occurred prior to or immediately contemporaneous with" a fleeing suspect's arrest detainment. *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 299 (1987). In *Warden*, police received a report that an armed robber fled into a house. *Warden*, 387 U.S. at 297. Upon arrival, officers searched the basement, first, and second floors of the house and found the man, clothes matching the robber's description, a shotgun, and a pistol. *Id.* at 298. Finding the entry and search valid, the Supreme Court said that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Id.* at 298-299. The Court agreed that the officers needed to confirm those present in the house and secure any weapons that could be used against them. *Warden*, 387 U.S. at 299. While *Warden* does not use the term "hot pursuit," it is cited for that express principle in *U.S. v. Santana* (427. U.S. 38, 42-43 (1976)).

On this occasion, RPD responded to a call for a group of men selling drugs outside. Exh. Q, Algarin Affidavit ¶ 3. (RPD officers responded to this particular location, on average, twice a shift in response to calls for males selling drugs. Horowitz Tr. 20:25 - 21:10.) Upon the officers' arrival, two men fled from 61 Kosciusko Street through the backyard. Algarin Tr. 35:18 - 36:21. Officer Algarin ran from the front of the property through the backyard in pursuit. Algarin Tr. 35:25 - 36:21.

Thus Officer Algarin's first entry and search was permitted pursuant to the "hot pursuit' doctrine. Officer Algarin ran from 61 Kosciusko Street and pursued the men to 53 Kosciusko Street. Algarin Tr. 35:25 - 36:21; Algarin Affidavit ¶¶ 9-13.

Given other Supreme Court precedent, the second search was also justified by hot pursuit, as it was reasonable to believe that a different warrant exception was not required for the second entry. In *Sheehan*, officers twice entered the room of an unstable woman with schizophrenia, who was armed and threatened to kill three people, in an attempt to take her into custody. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 605 (2015). In reaching its decision to grant qualified immunity, the Court reasoned that the first warrantless entry was permissible as an attempt to render aid to an injured occupant, and the second entry did not require a separate justification, because "the two entries were part of a single, continuous search or seizure[.]" *Sheehan*, 575 U.S. at 612. Officer Algarin's second search or entry was part of the single search and seizure of the drug dealers, so it was also authorized by hot pursuit.

The second entry is also justified by the exceptions of imminent destruction of evidence and the protection of the public. Officer Algarin returned to the individual's flight path, in order to find any discarded weapons or other contraband that may have been discarded. Algarin Tr. 40:6-8.

First, the Fourth Amendment does not require the officers to ignore the destruction of evidence. In *Kentucky v. King*, the U.S. Supreme Court affirmed that "the need to prevent the imminent destruction of evidence" justifies a warrantless search. 563 U.S. 452, 460 (2021). As long

4

as "the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment[,]" the exigent circumstances rule can apply. *King*, 563 U.S. at 462.

Here, the officers lawfully chased fleeing individuals, as permitted under the "hot pursuit" exception to the warrant requirement. Because the officers did not gain entry [to the yard] through a Fourth Amendment violation, it was permissible for them to search for and seize evidence pursuant to exigent circumstances, such as the drugs being imminently destroyed. As Officer Horowitz said, this evidence "could grow feet and walk away" if not promptly preserved. Horowitz Tr. 62:10-12. Indeed, the dog could have eaten the drugs by the time Officer Algarin had reached the front door—the precise type of imminent destruction the officers sought to prevent.

Warrantless entries are also permitted to protect people from dangers. *Michigan v. Clifford*, 464 U.S. 287, 293 (1984)(permitting entry to burning building). Weapons, if obtained by ill-equipped or maliciously-minded individuals, could result in serious harm to the officers and others. Given the likelihood that these individuals possessed and/or discarded a gun (Algarin Affidavit ¶ 17; Horowitz Tr. 35:22 - 36:22), the Fourth Amendment "[did] not require [the] police officers to delay" searching for and securing firearms. *Warden*, 387 U.S. at 298-299.

        2.      The search was reasonable.

If the Court finds that the search is not justified by these exigent circumstances, the Court must still find that the search was reasonable. The "reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *United States v. Campbell*, 342 F. Supp. 3d 375, 390 (W.D.N.Y. 2018).

Officer Algarin describes his actions as a search. Algarin Tr. 28:15 - 29:3. Indeed, "physically occup[ying] private property for the purpose of obtaining information" is a search.

*United States v. Jones*, 565 U.S. 400, 404–05 (2012). As he was climbing the fence into the yard, Algarin was thinking about looking for contraband: drugs or a gun. Algarin Tr. 40:21-23; 70: 2-10

Plaintiffs, however, questioned Officer Algairn extensively on his *entrance* into the yard Algarin Tr. 69:32; 70:5; 74:6, 10, 14, 20), but not on any search. As such, we derive most of what else we know of the search from Officer Algarin's Body Worn Camera. ("BWC") Video: Officer Algarin jumped the fence, took approximately five steps in the backyard towards and in the vicinity of the back porch before Plaintiffs' dog exited the house. Exh. N,[3] Algarin BWC at 17:09:30 - 17:09:35. Officer Algarin was in Plaintiffs' yard for only five seconds before the dog appeared and began to charge him. Officer Algarin had only a "brief time" *for actual searching*, and did not complete any search. Algarin Tr. 28:15 - 29:3.

Further facts add to the totality of the circumstances to be considered. The officers were familiar with these people from the day before. Gorman Tr. 172: 16-20. The previous day, the individuals ran south to Sobieski Street upon the officers' arrival to 61 Kosciusko Street. Gorman Tr. 172:21 - 173:18. As such, after receiving this 911 call regarding open-air drug activity that day (Algarin Tr. 11:5-7; Exh. Q, Algarin Affidavit ¶ 3), Officers Algarin and DiSabatino arrived to 61 Kosciusko Street while Officers Horowitz and Gorman were present on Sobieski Street and positioned to apprehend them once/after the individuals fled south to Sobieski Street, followed by Officers Algarin and DiSabatino. Algarin Tr. 11:8-21.

Officer Gorman was familiar with the man that he ultimately detained and knew he sold drugs at that location. Gorman Tr. 180:14 - 181:2. Accordingly, Officer Gorman suspected that the man he detained possessed drugs. Gorman Tr. 150:7-11. Officer Horowitz suspected that his

---

[3] In the deposition, Exh. A [enclosed here as Exh. N] was described as having 883_816772 in the lower righthand corner. Algarin Tr. 63:10 - 64:25.

detainee would have a gun (Horowitz Tr. 35:22 - 36:22), because he knows individuals that sell drug often carry firearms (Horowitz Tr. 36:2-3). He did not, however, recover a gun. Horowitz Tr. 35:22 - 36:22. Instead, Officer Horowitz recouped a black bag that the man [detained by Officer Horowitz] discarded as he was running. Horowitz Tr. 43:13-18. It contained marijuana packed for sale. Horowitz Tr. 40:11-22. Officer Gorman pointed out the flight path of his detainee (Algarin Tr. 39:6-7; 40:6-8), and asked Officer Algarin to backtrack (Gorman Tr. 175:3-6). Officer Algarin went there to search. Algarin Tr. 28:15 - 29:3.

Given the officers' familiarity with these individuals and the area as drug-involved, that one detainee discarded drugs, and Officer Algarin's attempt to search the flight path of the other detainee, and limited scope and duration of searches, the search was reasonable.

## II.   THE COURT SHOULD GRANT SUMMARY JUDGMENT ON THE UNLAWFUL SEIZURE CLAIM OF THE DOG, BECAUSE OFFICER ALGARIN ACTED REASONABLY WHEN HE SHOT A DOG THAT WAS CHARGING HIM.

### A.   Officer Algarin acted objectively reasonably in discharging his firearm to prevent imminent harm.

In *Carroll v. County of Monroe,* the Second Circuit held that the unreasonable killing of a companion animal constitutes an unconstitutional seizure of personal property under the Fourth Amendment. *Carroll v. County of Monroe,* 712 F.3d 649, 651 (2d Cir. 2013). To determine reasonableness, the court "balance[s] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion and determine[s] whether the totality of the circumstances justified [the] particular sort of . . . seizure." *Carroll,* 712 F.3d at 651, quoting *Tennessee v. Garner,* 471 U.S. 1, 8-9 (1985) (internal quotation marks omitted). The *killing* of a pet dog is an intrusion and usually severe given the emotional attachment between dog and owner. *Carroll,* 712 F.3d at 651. On the other hand, the

safety of officers and residents is undeniably a significant governmental interest. *Carroll*, 712 F.3d at 651.

The reasonableness inquiry "is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them" at the time, and not with "the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396-397 (1989).

The Second Circuit recognized that courts will find the seizure of a dog displaying aggressive behavior—or that the officer believes to be a threat to himself or the community—to be reasonable. *Carroll*, 712 F.3d at 651. However, an "officer may not utilize deadly force against a dog unless there is an actual basis to believe that the dog posed an imminent threat." *Azurdia v. City of New York*, No. 18-cv-4189, 2019 WL 1406647, at *8 (E.D.N.Y. March 28, 2019) (deciding motion to dismiss)(quotations and citations omitted).

Courts have considered many factors in assessing the totality of the circumstances and reasonableness of a seizure of a dog: the dog's breed; whether the dog was roaming or inside a residence; whether the officer knew a dog was present prior to the encounter; whether the owner was available and willing to control the dog; whether police presence was known; whether the police had instructed the owner to restrain the dog; the manner and speed of the dog's approach; whether the dog was barking, growling, and/or baring its teeth; whether there was time to utilize other solutions to control the dog; whether nonlethal means were available; and whether the dog posed a danger to the officer or the public. *Matteson*, 2019 WL 2192502, at *7-8; *Aljoe v. Adams*, No. 18-cv-01043, 2020 WL 12188842, at *5-7 (W.D.N.Y. Nov. 5, 2020); *Azurdia*, 2021 WL 4480655, at *4-5 (denying summary judgment on seizure of dog).

Because Officer Algarin first learned about the dog as the dog ran down the steps and at him (Exh. Q, Algarin Affidavit ¶¶ 30, 36), Officer Algarin did not have the opportunity to plan any response to an aggressive dog. The dog exited the house, ran down the steps, circled towards the

8

officer, and charged to cover the distance between the dog and Officer Algarin. Officer Algarin Tr. 114:8-10; Algarin Affidavit, ¶¶ 30-36. Notably, when the dog would chase squirrels in the yard, the dog would usually run towards and around the chestnut tree at the back of the yard. C. Dempsey Tr. 55:5-24; Chestnut tree visible at Exh. N, BWC Video at 3:43 per C. Dempsey Tr. 56:16 - 57:7. On this occasion, instead of the regular routine of running towards the chestnut tree (Charles ("C.") Dempsey. Tr. 54:25), the dog charged directly towards the officer "approaching [the] stranger in the yard" (C. Dempsey Tr. 73:20 - 74:7). The Body Worn Camera video of the dog encounter confirms that the dog quickly descended the stairs, circles nearly 180 degrees, and ran towards Officer Algarin. Exh. N, BWC at17:09:32 – 17:09:35; Exh. O, screenshot of Algarin BWC.

Although a Labrador (Exh. N, BWC video at 17:09:50), Tesla was a "big dog." C. Dempsey Tr. 74:16; Algarin Tr. 114:8.

Charles Dempsey first saw the officer after the dog had already descended the stairs and was at the bottom, and rounding the corner of the porch. C. Dempsey. Tr. 53:6-11. The dog named Teslas was trained to respond to commands, such as sit, lay, roll over, and heel. C. Dempsey Tr. 36:5-19. Mr. Dempsey, however, did not use any commands on this occasion. C. Dempsey Tr. 53:14-20. Mr. Dempsey shouted to the officer something to the effect of, "[s]he's fine. It will be okay." C. Dempsey. Tr. 53:14-20.

The dog barked or growled while approaching Officer Algarin. C. Dempsey Tr. 73:2-8.[4] Officer Algarin testified that it "was an aggressive dog that was coming to attack [him]." Algarin Tr. 110:10-13. Plaintiff Charles Dempsey, however, interpreted the dog's barking as "[i]nquisitive,"

---

[4] Mr. Dempsey initially testified that the dog did not bark at Officer Algarin while descending the stairs and running into the yard. After watching the BWC video, however, Mr. Dempsey confirmed that the dog did bark. C. Dempsey Tr. 58:10-12.

as if to say "who are you," and that the dog could have made noises "in an intimidating, louder manner." C. Dempsey Tr. 74:11, 15, 17-18.

Officer Algarin is familiar with dogs. Algarin Tr. 107:9-11. He has owned at least seven dogs in his lifetime and currently owns a pit bill. Algarin Tr. 107:9 - 108:7. Officer Algarin was also trained, less than a year earlier during the Academy (Algarin Tr. 84:5 - 85:10), on dog interactions and tactics to use in those circumstances (Algarin Tr. 85:11 - 86:10). With this familiarity and training, he "could recognize when to be worried that the dog was going to bit [him and] attack [him]." Algarin Tr. 113:21-23.

Upon seeing the dog, Officer Algarin immediately backpedaled and yelled "whoa whoa whoa" to give the dog and the man notice that he was present in the yard. Exh. Q, Algarin Affidavit ¶¶ 31, 33; BWC at 17:09:32 - 17:09:35. Officer Algarin hoped the man would "call off the dog" (Algarin Affidavit, ¶ 33), because Officer Algarin knew he could not outrun the dog or retreat over the fence given it "was charging [him] far too quickly" (*id* at ¶ 35).

Officer Algarin had a baton and pepper/OC spray on his person, but decided against using them. To use the baton, Officer Algarin would have had to reach across to his left hip (where it was kept on his belt), bring out the baton, whip it to expand it to full length, and then position himself to use it. Algarin Tr. 139:3-14. Taking out the [expandable] baton took more time than Officer Algarin had in the circumstances with the dog. Algarin Tr. 139:17-20. Officer Algarin did not believe pepper/OC spray would be effective on the dog, so he opted not to use it. Algarin Tr. 145:17-23. Kicking the dog, moreover, may have resulted in "giv[ing] Tesla [his] leg to bite [him]." Algarin Tr. 146:15-21. (Indeed, RPD Officer Leach kicked a charging dog before deciding to discharge his firearm, and the dog bit him. Leach Tr. 118:17-20, 117:9-14. Because the "large dog [was] coming at [him] at a high rate of speed, barking aggressively, [and] not stopping" (Algarin Tr. 114:8-10), Officer Algarin discharged two shots at the dog (Algarin Affidavit ¶ 36).

Given the totality of the circumstances—the dog's large size, the dog's undisputed barking while approaching Officer Algarin, the speed and directness at which the dog descended the stairs and charged at Officer Algarin, that the dog did not go towards her normal spot in the yard, the Plaintiff's undisputed failure to restrain or command the dog to stop, Officer Algarin's belief that the dog was about to bite or attack him, the ineffectiveness of other less lethal options, and the absence of a retreat option—Officer Algarin was in imminent risk of harm and his shooting of the dog was objectively reasonable. *Cabisca v. City of Rochester*, No. 14-cv-6485, 2019 WL 5691897, at *11 (W.D.N.Y. Nov. 4, 2019). The Court should enter summary judgment for Defendants on Plaintiffs' claim of unlawful seizure of personal property, because there is no genuine dispute that Officer Algarin acted reasonably and consistent with *Carroll v. County of Monroe* (712 F.3d 649 (2d Cir. 2013)).

B.     OFFICER GORMAN HAD NO ROLE IN AND WAS NOT NEAR THE DOG ENCOUNTER.

Plaintiffs also brought an unlawful seizure claim against Officer Gorman (Third Complaint, heading, pg. 7), but no materials facts support it.

Officer Gorman was in the adjacent yard (with a detained individual) when Officer Algarin shot the dog in Mr. Dempsey's yard. The screenshot of Officer Gorman's Body Worn Camera video at 17:09:39 depicts him facing a man whose hands are behind his back. Exh. P, Screenshot of Gorman BWC, pg. 1. (Officer Algarin confirmed in his testimony that the dog cage was located in the adjacent yard (of 49 Kosciusko), not Mr. Dempsey's (at 53 Kosciusko). Algarin Tr. 34:4-5, 38:24 - 39:14. Moreover, Officer Gorman is not even facing the chain link fence dividing the 49 Kosciusko Street from Mr. Dempsey's property. Exh. P, pg. 1 (vs. pg. 2). Clearly, Officer Gorman was not a participant in or even near the situation, so the Court must enter summary judgment for Defendants on any claim against Officer Gorman for unlawful seizure of the dog.

## III.     OFFICER ALGARIN DID NOT SEIZE EITHER PLAINTIFF.

A person has been seized when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980), quoted in *United States v. Weaver*, 9 F.4th 129 (2d Cir. 2021). A seizure must necessarily involve either the application of physical force or submission to a show of authority. *U.S. v. Swindle*, 407 F.3d 562, 571-573 (2d Cir. 2005)(discussing multiple cases). A "show of authority" can include "flashing lights and continuing pursuit" (*Brower v. County of Inyo*, 489 U.S. 593, 597 (1989), or pursuit and "calling upon [the person] to halt" (*California v. Hodari D.*, 499 U.S. 621, 625-626 (1991)) did not occur here.

### A.     CHARLES DEMPSEY WAS FREE TO GO—AND INSTRUCTED TO WITHDRAW—SO THE COURT MUST ENTER JUDGMENT AGAINST HIM ON HIS UNLAWFUL SEIZURE CLAIM.

Plaintiff Charles Dempsey pled Officer Algarin "pointed his firearm at Mr. Dempsey" [...and] yelled at him to "get back[.]" Third Complaint, ¶¶ 55-56. These allegations and the full circumstances known to the litigants do not constitute elements of a seizure—and certainly not an unreasonable one. No reasonable jury would conclude that Mr. Dempsey was not free to go, when Officer Algarin was *instructing Mr. Dempsey to leave* the immediate vicinity. The Court must enter summary judgment for Defendants on the alleged seizure of Plaintiff Dempsey.

After Officer Algarin shot the dog, Mr. Dempsey described himself as putting himself between the officer and gun, trying to figure out what was going on, and diffusing the situation. C. Dempsey Tr. 57:13-20. Notably, he did not at first mention obeying officer orders, having a gun pointed at him, or being unable to leave, which might be indicative of a seizure.

Mr. Dempsey *subsequently* explained that after the dog shooting, he asked the officer questions, "was held at gunpoint," stopped walking because the officer purportedly "showed the

intent to fire," and told the second officer to both stop the [first] officer and to call a supervisor.  C. Dempsey Tr. 58:19 - 59:21.

The BWC video shows that firearm was pointed at Mr. Dempsey for only a second or two. When Officer Algarin shifts his attention from the dog to the approaching Mr. Dempsey, such that Officer Algarin's gaze and gun are directed at Mr. Dempsey momentarily before Officer Algarin holsters his firearm (BWC video at 17:09:41 - 17:09:44; Algarin Tr.  132:6 - 12, 184:24 - 184:5.

Mr. Dempsey said that after Officer Algarin holstered his gun, he pulled out a *different* weapon and pointed it at him, until the second officer told him to stop. C. Dempsey Tr. 59:18-21, 62:11. This weapon was black, small, and not much larger than the officer's hand. C. Dempsey Tr. 80:9-10. This second weapon was not visible on the BWC video, but Mr. Dempsey testified that Officer Algarin had the weapon in his hand at 2 minutes and 29 seconds in the video. C. Dempsey Tr. 79:6 (or 78:10 - 80:2).[5] Officer Algarin had in fact put his gun away and brought out pepper spray (Algarin Tr. 131:9-10), because Officer Algarin considered Mr. Dempsey to be a potential threat when he was charging at Officer Algarin (Algarin Tr. 130:22 – 131:6, 184:6-8). The fact that you cannot see it in the BWC video evidences the retracted positioning of the pepper spray.

Over the same time period that Officer Algarin had his pepper spray out (BWC video 17:09:42 - 17:09:55), Officer Algarin repeatedly instructs Mr. Dempsey to "back" and "get back," while his [Officer Algarin's] left hand is outstretched in a protective stance and he is retreating. *Id.* at 17:09:41 - 17:09:44. Officer Algarin continues to retreat while shouting "get back" as Mr. Dempsey shouts questions at Officer Algarin: such as "What the hell is wrong with you? What the f--- is wrong with you? Why did you do that?" Algarin BWC at 17:09:44 - 17:09:48. Mr. Dempsey takes eight to ten paces towards Officer Algarin as he is yelling, before finally walking backwards

---

[5] This corresponds to the video time stamp of 17:09:47.

and continuing to yell. Algarin BWC at 17:09:44 - 17:09:4; Exh. Q, Algarin Affidavit ¶ 38. After Mr. Dempsey distances himself somewhat from the officer, he repeatedly insists that the officers leave his property. Algarin BWC at 17:09:53 - 17:10:07. During all this, Officer Algarin never told Mr. Dempsey to stay put or that we was under arrest. Algarin Affidavit ¶ 39.

No reasonable jury would interpret these circumstances as seizing Mr. Dempsey. Officer Algarin *retreated* while instructing Mr. Dempsey to retreat as well. Contrary to telling Mr. Dempsey to remain stationary or cooperate with being taken into custody, Officer Algarin repeatedly ordered Mr. Dempsey to *move* and to *put distance between them*. He *was* free to leave, and the officers wanted him to do so. Contrary to submitting to an officer's authority, Mr. Dempsey initially disregarded the demands and then attempted to assert control over the situation by advancing towards the officers and demanding they leave. Mr. Dempsey was never seized, and the Court should enter summary judgment for Defendants on the claim of unlawful seizure of Mr. Dempsey.

B.   L.D. COULD NOT HAVE BEEN SEIZED, BECAUSE OFFICER ALGARIN WAS UNAWARE OF HER DURING THE ENCOUNTER WITH THE DOG OR MR. DEMPSEY.

Summary judgment for Defendants is also appropriate on Plaintiffs' claim that Officer Algarin also seized Plaintiff L.D., Mr. Dempsey's minor daughter. Third Complaint ¶¶ 190-197.

A plaintiff must produce "actual evidence indicating that [the officer] was attempting to restrain her when he fired [a gun]. [Plaintiff's] proximity to [the intended target] does not in of itself give rise to the inference that the officers intended to restrain her." *Hickey v. City of New York*, No. 01-cv-6506, 2004 WL 2724079, at *14 (S.D.N.Y. Nov. 29, 2004), *aff'd,* 173 F. App'x 893 (2d Cir. 2006). The Second Circuit held that no Fourth Amendment seizure occurred when a hostage was struck by a bullet intended for the captor, "because the police did not intend to restrain [the victim]." *Medeiros v. O'Connell*, 150 F.3d, 164, 168 (2d Cir. 1998)(discussed in *Cox v. Village of Pleasantvill*e, 271 F.Supp.3d 591, 603-606 (S.D.N.Y. 2017)).

14

Plaintiffs cannot prove that Officer Algarin intend to restrain L.D. Because Officer Algarin did not know L.D. was present (Exh. Q, Algarin Affidavit ¶ 40), Officer Algarin could not have intended to restrain her. Without any intent to restrain, L.D. could not have been seized, and the Court must enter summary judgment for Defendants on the claim that Officer Algarin seized L.D.

## IV. OFFICER GORMAN DID NOT HAVE THE OPPORTUNITY TO INTERVENE, SO SUMMARY JUDGMENT MUST BE ENTERED.

Federal law imposes "an affirmative duty [on law enforcement officers] to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). If an officer fails to intervene, the officer is also liable for the constitutional violation that was committed if the officer observes or has reason to know that a constitutional violation was being committed and had "a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557.

### A. LIABILITY ONLY EXTENDS IF A CONSTITUTIONAL VIOLATION EXISTS.

Because officers can only be liable for *committed* constitutional violations (*Anderson*, 17 F.3d at 557), the Court must grant summary judgment on failure to intervene if/when the Court grants summary judgment for Defendants on the underlying alleged constitutional violation. Without a constitutional violation, there is nothing into which an officer should have interceded.

### B. OFFICER GORMAN HAD NO OPPORTUNITY TO INTERVENE PRIOR TO ANY PURPORTED CONSTITUTIONAL VIOLATION.

Plaintiffs do not identify which constitutional violations in which Officer Gorman should have intervened, so Defendants address them all. Third Complaint ¶¶ 198-202.

#### 1. Officer Gorman was not aware of how Officer Algarin would search the yard.

Officer Gorman suggested Officer Algarin to backtrack and indicated the individual's flight path. Gorman Depo. 175:3-6; Algarin Depo. 40:6-8. He did not, however, dictate a particular method or entry point. Officer Gorman was not a sergeant and had neither the authority to dictate

the actions of a fellow officer nor the obligation to tell Officer Algarin the best way to proceed. For all Officer Gorman knew, Officer Algarin was going to knock on the back porch door. At the time that Officer Algarin climbed the fence, Officer Gorman was searching his detainee—with his back to the Dempsey yard. Exh. P, Gorman Screenshot, pg. 1. Officer Algarin confirmed in his testimony that the dog cage was located in the adjacent yard of 49 Kosciusko, not Mr. Dempsey's (at 53 Kosciusko) (Algarin Tr. 34:4-5, 38:24 - 39:14) and the screen shot of Officer Gorman's Body Worn Camera video at 17:09:39 depicts him facing a man whose hands are behind his back. Exh. P, pg. 1. Moreover, Officer Gorman is not facing the chain link fence dividing the 49 Kosciusko Street from Mr. Dempsey's property. Exh. P, pg. 1. Plaintiffs do not have any evidence that Officer Gorman knew how Officer Algarin would commence his search, or that Officer Gorman had the opportunity to intervene. Summary judgement is appropriate for Defendants.

   2.   <u>Officer Gorman was facing in the opposite direction and in the adjacent yard when the dog was shot, so he had no opportunity to intervene in the dog shooting.</u>

Officer Gorman did not have an opportunity to intervene in the dog seizure, because he was still in the adjacent yard with his detainee—and facing the opposite direction—when Officer Algarin shot the dog in Mr. Dempsey's yard. Exh. P, Gorman Screenshot, pg. 1. Because Officer Gorman was not in the yard or facing that general direction, he did not see the dog encounter as it occurred. (Even if he had been facing the yard, five-seconds, the length of entire dog encounter, is not a reasonable amount of time for Officer Gorman to have assessed unfolding circumstances and intervened (from the adjacent yard) to prevent any unconstitutional behavior.) Accordingly, the Court should enter summary judgment on any failure to intervene liability regarding the dog seizure.

   3.   <u>Officer Gorman did not arrive until halfway during Mr. Dempsey's and Officer Algarin's interaction.</u>

16

Mr. Dempsey asserts that Officer Algarin seized him when he pulled out his weapon—later identified as pepper spray—and pointed it at him. C. Dempsey Depo. 59:18-21, 62:11. However, he also states that he backed up only after the second officer arrived [Officer Gorman]. Mr. Dempsey testified that Officer Algarin pointed the weapon at him "until that [the second] officer told him to stop" (C. Dempsey Tr. 59:19-21, 62:11), thereby acknowledging the second officer took action to stop Officer Algarin from continuing to point his pepper spray at him [Mr. Dempsey].  Officer Gorman's actions are the essence of intervention: he arrived on scene and deescalated the situation. Summary judgment is merited on failure to intervene liability.

4.    Officer Gorman did not know that L.D. was present.

Officer Gorman also did not know that L.D. was present. Gorman Tr. 192:24 - 193:3. Assuming, *arguendo*, Officer Algarin seized L.D., Officer Gorman cannot be liable for failure to intervene, because he would not have been aware of any constitutional violation pertaining to L.D., because he did not know she was present. The Court must, therefore, enter summary judgment for Defendants on any claim that Officer Gorman failed to intervene on L.D.'s behalf.

**V.    OFFICER ALGARIN IS ENTITLED TO QUALIFIED IMMUNITY FOR THE DOG SEIZURE AND SEARCH.**

"A government official is entitled to immunity from suit whenever (1) his conduct did not violate clearly established law, or (2) it was objectively reasonable for the official to believe that his action did not violate such law." *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019); *Plumhoff v. Rickard*, 572 U.S. 765, 766-777 (2014). Clearly established law must be "particularized" to the facts of the case; precedent must establish that an officer acting under similar circumstances had violated the Constitution. *White v. Pauly*, 580 U.S. 73, 793 (2017).

A.    OFFICER ALGARIN IS ENTITLED TO QUALIFIED IMMUNITY FOR THE SEIZURE OF PERSONAL PROPERTY, BECAUSE IT WAS OBJECTIVELY REASONABLE TO BELIEVE THAT HE COULD PROTECT HIMSELF FROM IMMINENT HARM.

17

The Second Circuit—with (only) the U.S. Supreme Court defines "clearly established" law in this circuit (*Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019))—has held that the unreasonable killing of a companion animal constitutes an unconstitutional seizure of personal property under the Fourth Amendment. *Carroll,* 712 F.3d at 651. The Second Circuit noted that courts will find the seizure of a dog displaying aggressive behavior, or that the officer believes to be an imminent threat to himself or the community, to be reasonable. *Carroll*, 712 F.3d at 651.

Officer Algarin is entitled to qualified immunity, because he did not violate *Carroll v. County of Monroe*, and it was objectively reasonable for Officer Algarin to believe he would not violate the law by discharging his firearm to protect himself against imminent harm from a dog. The dog's large size, high rate of speed, direct path to Officer Algarin, and aggressive barking led Officer Algarin to conclude the dog "was an aggressive dog that was coming to attack [him]." Algarin Tr. 110:10-13, 114:8-10. Officer Algarin was justified in being "definitely worried that the dog was going to bite [him and] attack [him]." Algarin Tr. 113:21-23. Indeed, it is undisputed that the dog was large (C. Dempsey Tr. 74:16; Algarin Tr. 114:8) and barked and/or growled as he approached Officer Algarin (C. Dempsey Tr. 73:2-8; Algarin Tr. 114:8-10). These are the exact types of circumstances—imminent harm—in which the Second Circuit noted it reasonable and thus lawful to shoot a dog. *Carroll*, 712 F.3d at 651.

In light of Second Circuit precedent, it was objectively reasonable for Officer Algarin to believe it was lawful to shoot a dog that was aggressively charging him, and the Court should grant qualified immunity to Officer Algarin for the unlawful seizure claim.

B.   OFFICER ALGARIN IS ALSO ENTITLED TO QUALIFIED IMMUNITY FOR THE PURPORTED UNLAWFUL SEARCH, BECAUSE THE PERMISSIBLE SCOPE AND NATURE OF SEARCHES INCIDENT TO AND FOLLOWING HOT PURSUIT HAS NOT BEEN CLEARLY ESTABLISHED.

It was not clearly established at the time of this incident that an officer could not twice search the flight path of a fleeing individual that was being detained.

In *Warden*, multiple officers searched the entire house of an armed robber who had fled inside. 387 U.S. at 298. In that case, the U.S. Supreme Court permitted this warrantless search that "occurred prior to or immediately contemporaneous with" a fleeing suspect's detainment. *Warden*, 387 U.S. at 299. In *Sheehan*, officers twice entered the room of an unstable woman with schizophrenia who was armed and threatened to kill three people, in an attempt to take her into custody. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 605 (2015). In reaching its decision to grant qualified immunity, the U.S. Supreme Court reasoned that the first warrantless entry was permissible as an attempt to render aid to an injured occupant, and the second entry did not require a separate justification, because "the two entries were part of a single, continuous search or seizure[.]" *Sheehan*, 575 U.S. at 612.

In light of this precedent, it was objectively reasonable for Officer Algarin to have believed that the second entry was justified as part of the officers' pursuit. It was also objectively reasonable for Officer Algarin to believe that he could execute a limited search—along the flight path through a yard and curtilage (Algarin Tr. 39:6-7; 40:6-8)—to recover discarded contraband, while Officer Gorman was searching the detainee in conjunction with his arrest. Officer Algarin is entitled to qualified immunity for the alleged unlawful search.

## VI.   THE COURT MUST ALSO ENTER SUMMARY JUDGMENT ON THE STATE LAW CLAIMS.

### A.   OFFICER ALGARIN CANNOT BE LIABLE FOR TRESPASS, BECAUSE IT IS WELL ESTABLISHED THAT LAW ENFORCEMENT OFFICERS ARE PERMITTED TO ENGAGE IN OTHERWISE-TRESPASSORY ACTS.

Officer Algarin did not trespass. A search is not a trespass, just as trespass is not a search (*United States v. Jones*, 565 U.S. 400, 406-407 (2012)). Because Officer Algarin searched the yard, his actions cannot be considered trespass.

Assuming, *arguendo,* that a trespass occurred, Officer Algarin cannot be liable, because law enforcement officers are permitted to commit otherwise-trespassory acts when in furtherance of their duties. *Reynolds v. United States*, 927 F. Supp. 91, 96 (W.D.N.Y. 1996)("Law enforcement officers have a privilege to enter private property to perform their legal duties.")(dismissing trespass claim because federal officer entered private property to investigate unauthorized hunting); *Fernandez v. City of New York*, 457 F. Supp. 3d 364, 380 (S.D.N.Y 2020).

B.   OFFICER ALGARIN DID NOT ASSAULT PLAINTIFF.

Assault is "physical conduct placing the plaintiff in imminent apprehension of harmful contact." *Bastein v. Sotto*, 299 A.D.2d 432, 433 (2d Dept. 2002). Although Plaintiff Charles Dempsey believed Officer Algarin held a weapon, there was no threat of imminent injury. Officer Algarin was retreating and demanding that Plaintiff similarly withdraw—for several seconds. BWC Exh. N, BWC Video at 17:09:41 – 17:09:48; Exh. Q, Algarin Affidavit ¶ 38. Moreover, the pepper spray was not raised or aimed (it was not visible via the BWC), and therefore, not poised to be utilized. Summary judgment is, therefore, appropriate on the assault claim.

## VII.   THE COURT MUST GRANT SUMMARY JUDGMENT FOR DEFENDANS ON ALL THEORIES FOR MUNICIPAL LIABILITY.

Plaintiffs seek to establish municipal liability for the both unlawful search (pursuant to theory of failure to train (Third Complaint ¶¶ 10, 12)), and unlawful seizure of their personal property (under the theories of policy, failure to train, and failure to discipline (e.g., Third Complaint ¶¶ 127, 134-136 (policy); 110-111, 118, 124, 136 (failure to train); 148-149 (failure to discipline)).

The failure to train or failure to supervise or discipline theories are subsets in establishing municipal liability by showing the municipality's deliberate indifference to the constitutional rights of residents. *Rodriguez v. City of New York*, 607 F. Supp. 3d 285, 293 (E.D.N.Y. 2022). Both options

are "stringent standard of fault," because a litigant must show a policy maker "disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51 (2011).

A. THE COURT MUST ENTER SUMMARY JUDGMENT ON MUNICIPAL LIABILITY IF NO CONSTITUTIONAL VIOLATION OCCURRED.

Plaintiffs must prevail on a constitutional violation before attempting to establish municipal liability. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). "*Monell* does not provide a separate cause of action[…]; it extends liability to a municipal organization where that organization's failure[s…] led to an independent constitutional violation."). *Segal*, 459 F.3d at 219. If/when the Court enters summary judgment against Plaintiff's unlawful seizure and unlawful search claims, the Court must also enter summary judgment on the related municipal liability claim. Without any unconstitutional conduct, there is nothing for which to hold the municipality liable.

B. THE COURT MUST ENTER SUMMARY JUDGMENT PURSUANT TO THE POLICY THEORY OF MUNICIPAL LIABILITY, BECAUSE THE CITY'S POLICY REGARDING DOG SEIZURES IS NOT UNCONSTITUTIONAL.

Plaintiff alleges, in various ways, that the City has an unconstitutional policy regarding when an officer may shoot a dog. Exh. R, Third Complaint ¶¶ 107, 124, 127, 134, 135, 136. The City's policy, however, is not unconstitutional. The City's use of force policy states that officers may discharge their firearms at animals if/when the animal is "attacking or presenting an imminent danger to any person." Exh. W, General Order 340, pg. 3, III(B)(1). The policy does not permit officers to shoot without reason or justification, or in clear violation of constitutional rights. Officer safety is a "significant governmental interest"—and the Second Circuit has recognized that "courts have held that, at least in some circumstances, it is reasonable for an officer to shoot a dog that he believes poses a threat to his safety or the safety of the community." *Carroll v. County of Monroe*, 712 F.3d 649, 651 (citation omitted)). No dispute, therefore, exists that the City's policy is facially

constitutional, so the Court must enter summary judgment for the Defendants on the policy theory of municipal liability.

C.   THE CITY IS NOT DELIBERATELY INDIFFERENT TOWARDS DOG OWNERS' RIGHTS, EVIDENCED IN PART BY THE CITY'S TRAINING OF ITS POLICE OFFICERS ON DOG ENCOUNTERS.

Plaintiff cannot establish deliberate indifference towards dog owners' rights via a failure to train, and therefore, the Court must enter summary judgment for Defendants for these theories of municipal liability.

> "The Second Circuit has identified four requirements for demonstrating that a municipality's failure to train amounted to deliberate indifference. First, the municipal policymaker must know to a moral certainty that employees will confront a given situation. Second, the situation must either present employees with the type of difficult choices ... that training or supervision would make less difficult, or employees must have a history of mishandling the situation. Third, the wrong choice by employees must frequently cause the deprivation of a citizen's constitutional rights. And fourth, at the summary judgment stage, plaintiffs must identify a specific deficiency in the municipality's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation."

*Ellis v. Washington*, 409 F. Supp. 3d 148, 154 (W.D.N.Y. 2019)(internal citations and quotations omitted).

### 1.   Plaintiffs have not identified any City policymaker.

It is well established that *a specific municipal policymaker* must know to a moral certainty that employees will confront a given situation." *Ellis v. Washington*, 409 F. Supp. 3d 148, 154 (W.D.N.Y. 2019). It is the policymaker's choice to continue utilizing a training program (for which the policymaker is on notice causes constitutional violations) that constitutes deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Yet Plaintiff has not identified any specific individual policymaker who purportedly received notice of any [training program] deficiency and subsequently chose to retain the same training program. Plaintiff did not depose or issue interrogatories to the RPD Chief or any Deputy Chief, or the commanding officer of the Professional Standards Section

or the Professional Development Section.[6] Jones Decl. ¶ 7. In a related case, Plaintiff's counsel went

so far as to erroneously declare that they did not need to identify any particular policymaker to

support "deliberate indifference." Exh. S, Plaintiff's Interrogatory Responses in *Cox*, pg. 2-3, no. 3.

Because, Plaintiffs cannot establish a required element of deliberate indifference, the Court must

enter summary judgment under the failure to train theory of municipal liability regarding seizure.

2.     Residents' constitutional rights are not frequently violated via dog shootings.

Unconstitutional seizures of dogs do not readily occur in the City of Rochester. Let's assume

for the sake of argument that Plaintiff's data is accurate: (1) "[b]etween 2013 and 2018, RPD officers

shot and killed approximately 50 dogs" (Third Complaint ¶ 9); and (2) "dogs reside in more than

50% of households in Rochester" (*id.* at ¶ 111). We know that RPD responded to over 650,000 calls

for service from July 1, 2016 to June 30, 2018. Exh. T, RPD calls for service.[7] Assuming half of

those calls involved households with dogs (i.e., 336, 774) and officers shot fifty dogs,[8] RPD officers

shot dogs in 0.01% of those dog encounters. The percentage of fatal dog encounters rises only to

0.02% if one-third of those calls involved dog encounters (i.e., 224,516). It is therefore undisputed

that a minuscule percentage[9] of residents potentially have their pet dogs[10] shot in RPD encounters,

_____

[6] The City designated the Commanding Officer of PDS, Lt. Michael Ciulla, for the deposition of the City, pursuant to Fed. R. Civ. P. 30(b)(6). Lt. Ciulla spoke for the City and not for himself.

[7] RPD responded to 339,630 calls for service in the 2016-2017 budget year (Exh. T, pg. 1) and 333,918 in 2017-2018 (*id.* at pg. 2), which totals to 673,548.

[8] Defendants acknowledge that they only have data of calls for service for July 2016 until June 2019, but have nevertheless utilized the number of dog shootings from 2014-2019.

[9] We could also perform those calculating using only the non-discretionary calls. RPD non-discretionary calls from July 1, 2016 to June 30, 2018 totaled 396,475. RPD would have shot dogs in 0.025% of dog encounters if one-half (i.e., 198,238) of households had dogs and 0.038% if one-third (i.e., 132,158) of households had dogs.

[10] Not all of the dogs shot were pets, as at least one appeared to be abandoned and was found in a vacant building.

and no frequent deprivation exists that would support a failure to train argument. Summary judgment for Defendants on municipal liability pursuant to failure to train is required.

            3.        <u>The City's training regarding dog encounters is sufficient.</u>

The City has adequately trained its officers regarding encounters with dogs. In 2014, Rochester Police Department ("RPD") devoted an entire in-service training to appropriate responses to aggressive dogs. Exh. U, "Dog Bite Prevention for Law Enforcement"; City Tr. 145:10-14 (in-service), 141:7-21. All department officers were required to receive the training. City Tr. 145:10-14, 146:2-19.

Mr. Reno DiDomenico, a twenty-two-year veteran of the Monroe County Sheriff's Office (DiDomenico Tr. 13:21-25), developed the training at the request of the Monroe County Sheriff's Office (*id.* at 28:12 - 29:16) and in conjunction with Monroe County Sheriff's Deputy Sheriff Dave Phelps and the Humane Society/Lollypop Farm Behaviorist Rebecca Lohnes[11] (*id.* at 29:9-14, 27:14-25). The DiDomenico-Phelps-Lohnes team incorporated information from the U.S. Department of Justice ("US DOJ") Office of Community Oriented Policing Services booklet "It's the Problem of Dog-Related Incidents and Encounters" (DiDomenico Tr. 32:16 - 34:19, 36:9-13) and a training provided by animal behavior expert Robert Lockwood (DiDomenico Tr. 31:9-25). They created a PowerPoint Presentation (Exh. U) and a handout with dog postures, both of which were provided to trainees to permit them to take notes and keep a copy. DiDomenico Depo Tr. 8:22 - 9:11, 38:15.

Mr. DiDomenico recognized that officers revert to training (DiDomenico Tr. 35:15), so he wanted to provide officers with options in dealing with dogs besides shooting (*id.* at 35:14-20, 43:3-17) and get them to rethink how they approach a dog situation (*id.* at 45:21 - 46:11). Mr.

---

[11] Mr. DiDomenico believed her name was spelled Lohoes, but it is spelled Lohnes.

DiDomenico instructed officers on dog behaviors. DiDomenico Tr. 32:23 - 34:9, 43:10-17, 51:12-13; City Tr. 151:9-11; Laureano Tr. 43:3-21 (indicia of aggressiveness, e.g., growls and posture). RPD officers reported that they were taught how to identify an aggressive dog and mitigate risk (Romig Tr. 67:9 - 68:8; Laureano Tr. 131:9-20),  provided with non-lethal responses to an aggressive dog (Laureano Tr. 44:15-22; Nellist Tr. 161:19-23); instructed on dog behaviors and how you can escape a dog (Horowitz Tr. 80:18 - 82:13) taught tactics to use in dog interactions (Algarin Tr. 85:11 - 86:2), and taught how to recognize different dog behaviors in dog encounters and utilize the tools on their belt to respond (Rudolph Tr. 124:7 - 125:22). The training was a PowerPoint presentation with videos. Horowitz Tr. 80:18 - 82:13.

RPD subsequently incorporated this training into the Police Academy, so that all newly hired police officers would receive the training. City Tr. 230:1-22. Indeed, Officer Algarin received this training in the Academy. Algarin Tr. 84:5 - 85:10. The City also retrained its officers in December 2019, when the Aggressive Dog training was the subject of a roll call training.[12] City Depo Tr. 141:22 - 142:9.

Plaintiff has retained an expert to establish how the City's training was deficient, but the expert fails to do so. Plaintiffs' proposed expert James Crosby stated that the City both violated best practices, good and accepted police practices, and professional standards of care and exhibited deliberate indifference by failing to provide any of the free and effective trainings that were available and accessible. Exh. V, Crosby Report, Opinions 10-14 and 16, pgs. 19-21. The evidence establishes, however, that Mr. DiDomenico did incorporate information from one "free and effective

---

[12] During roll call, all officers are presented with a condensed version of previous training and/or reminded of important principles and points for exercising their duties. Roll calls are repeated until every officer on a given shift receives the training. City Tr. 218:15-20.

training," "It's the Problem of Dog-Related Incidents and Encounters" into his training. DiDomenico Tr. 32:16 - 34:19, 36:9-13; Crosby Tr. 73:5-19.

Mr. Crosby takes issue with the (short) length of the training, and the absence of any opportunities to practice taught techniques or interact with the content (Crosby Tr. 74:2-25; 81:18-25). Mr. Crosby, therefore, argues that the City should have provided more (i.e., longer) or better (i.e., more interactive) training on dog encounters than it did—which does not satisfy the deliberate indifference standard (*Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007). "A training program must be quite deficient in order for the deliberate indifference standard to be met; the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." *Id.* (citation omitted).

Furthermore, the above DiDomenico training is not the only training that RPD officers receive. The City also instructs its officers of best practices regarding dog encounters during field training. City Tr. 176:3-5. Defensive tactics and firearms training also contain instruction on how to create distance, place objects between the dog and officer, and if a dog is an imminent threat, how to use the firearm to shoot the dog. City Tr. 148:17 - 150:6.

This evidence of repeated and department-wide training on dog encounters in no way reflects an agency that is deliberately indifferent to the constitutional rights of residents. Summary judgment for Defendants is appropriate under the failure to train theory.

### D. THE CITY ADEQUATELY SUPERVISES AND DISCIPLINES ITS OFFICERS REGARDING DOG ENCOUNTERS.

#### 1. Plaintiff failed to sufficiently plead a failure to discipline or supervise.

The Court must enter summary judgment for Defendants under the failure to discipline or supervise theory of municipal liability, because Plaintiffs failed to plead that a specific policymaker declined to act after notice of problematic misconduct. *Amnesty Am. v. Town of W. Hartford*, 361

F.3d 113, 128 (2d Cir. 2004). In the few paragraphs that Plaintiffs addressed a failure to supervise or discipline for unlawful seizures (Third Complaint ¶¶ 148-149), they never allege that any particular individual—let alone, a policymaker—had notice of unconstitutional conduct and that the policymaker chose to ignore or permit the situation. Because they failed to meet the pleading standard, this claim must be dismissed.

        2.    <u>Plaintiff failed to identify any particular policymaker who was aware of a need for corrective action.</u>

Plaintiffs similarly failed to prove a failure to discipline or supervise. They cannot and have not established that *any particular policymaker* knew or had notice of problematic unconstitutional conduct and that said policymaker failed to investigate or address the situation. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004). In response to an interrogatory asking plaintiff to identify relevant policymakers, Plaintiff's counsel[13] objected and said the claim "is based on the inaction of the 'City' and not any individual official." Exh. S, Plaintiff's Response to Defendants' First Set of Interrogatories in *Cox*, Interrogatory no. 3, pgs. 2-3. Without an individual policymaker, Plaintiffs cannot establish the failure to supervise and summary judgment is appropriate.

        3.    <u>The City supervises its officers and Plaintiff cannot to prove the contrary, i.e., a failure to discipline or supervise.</u>

Even if, *arguendo*, Plaintiff had identified an individual policymaker, the evidence does not support a failure to supervise or discipline.

Sgt. Rudolph spoke with at least RPD Officer Algarin and Plaintiff C. Dempsey at the scene, and watched the BWC video before writing the Incident Report. Rudolph Tr. 33:19 - 35:16. No policy violations were identified from the initial supervisory review of the incident. Algarin Tr.

---

[13] The *Dempsey* Plaintiffs have the same counsel as the *Cox* Plaintiff: Elliot Shields.

119:2-17. Sgt. Rudolph nevertheless reported the incident to Lt. Person, the commanding officer on patrol at the time, and Lt. Tordai, commanding officer of Professional Standard Section, that same day. Rudolph Tr. 49:22 - 51:4. PSS reviews these incidents. Rudolph Tr. 59:12-18.

In the City, supervisors review the BWC recordings and relevant incident reports to "determine if there's any need for remedial training or if that there were any violations of policy." City Tr. 195:23 - 196:6. In this incident, at least two supervisors reviewed the BWC videorecording, as demonstrated by the View History of Officer Algarin's BWC video (Exh. Y): (1) Sgt. Rudolph, Officer Algarin's supervisor Rudolph Tr. 33:19 - 35:16); and (2) Lt. Montinarelli, who was in the chain of command (*id.* at 58:22 - 59:11). Multiple levels of review and supervision is the essence of supervision.

Incident Reports documenting firearm discharges at dogs in the same time period demonstrate that RPD sergeants notify PSS and a more senior officer in most, if not all, dog shooting situations. See Exh. Z, pg. 3 (PSS notified in November 2017 incident), pg. 6 (PSS and captain notified in January 2018 incident), pg. 10 (PSS and lieutenant in June 2018 incident[14]), pg. 13 (PSS[15] and lieutenant notified in July 2018 incident), and pg. 19 (PSS notified in November 2018 incident). A more temporally-distant incident continue the practice of notifying PSS. See Exh. Z, pg. 21 (PSS interviewed witness re: July 2019 incident). It is undisputed that the City adequately reviews and supervises firearm discharges at dogs, and therefore, summary judgment is appropriate.

E.   **THE CITY IS NOT DELIBERATELY INDIFFERENT TO THE RIGHTS OF RESIDENTS VIS-À-VIS ENTRY AND SEARCHES INTO CURTILAGES.**

1.   Plaintiffs again failed to identify any particular policymaker who had notice of unconstitutional conduct and yet continued with the same training.

---

[14] This incident is the basis of the *Anniszkiewicz* matter (20-cv-6629-FPG-MWP).

[15] Lt. Favor is identified as PSS personnel on page 3 of the Exhibit Z.

As explained above, Plaintiffs must identify a municipal policy maker that demonstrated deliberate indifference. The Plaintiffs have not identified any such person, so summary judgement is appropriate on any failure to train theory of municipal liability for unconstitutional searches.

      2.    <u>The City has trained its officers on searches of curtilage and Plaintiffs have not gathered sufficient evidence to dispute as much.</u>

RPD officers received training in the Academy on search and seizure as prescribed by the Department of Criminal Justice Services. E.g., City Tr. 215:15-21 (Officer Cala). Officer Algarin received training on curtilage in the Academy. City Tr. 60:14-18, 61:2-16. Officer Horowitz described a roll call training in 2019 or 2020 about searching yards and curtilages, in which he was reminded that the "same rules apply to searching a house" as to curtilage. Horowitz 63:14 - 64:11. The City uses roll call trainings as a refresher of prior training and instruction. City Tr. 143:5-6. While roll call training is only five to ten minutes, roll call trainings are repeated until all officers receive that roll call training. City Tr. 217:2-25. As refresher training, it is, by definition, not the first time that officers were trained on a given topic, here, curtilage and searches therein. The City also disseminated a Training Bulletin in 2019, "Warrantless Searches of Curtilage." City Tr. 22:25-24:8.

Plaintiffs cannot establish a failure to train, both in light of the above evidence and because they give weight to inapplicable discovery gathered when they conflate(d) entries with searches.

Plaintiffs' misunderstanding of what constitutes a search led to inadequate discovery of Defendants' training regarding searches in curtilage.[16] Plaintiffs repeatedly and principally asked

---

[16]    An entry into curtilage, without more, is at best a trespass. Not only are law enforcement excused for otherwise-trespassory acts (*Reynolds v. United States*, 927 F. Supp. 91, 96 (W.D.N.Y. 1996)), but trespass is not a constitutional violation for which a municipality may be held liable.

    An entry (or trespass) must be coupled with information-gathering, inspection, or seeking in order to constitute a search. *United States v. Jones*, 565 U.S. 400, 406-407 (2012). In *United States v. Jones*, the United States Supreme Court held that "the Government's installation of a GPS device

for information on "entries," and rarely inquired into "searches." In January 2023, Plaintiffs outlined the status of *Monell* discovery in the four dog seizure cases,[17] which conveniently provides a single place for all discovery requests for municipal liability. Exh. X, Attachment to January 20, 2023 Letter. For example, RFPs nos. 38, 41, 44, 51 on pg. 2; and 58 on pg. 3 pertain to entries, while RFPs nos. 52 on pg. 2 and 53 on pg. 3, pertain to searches (and entries). This pattern repeats throughout discovery in the *Anniszkiewicz*, *Cox*, and *Gursslin* matters. See RFPs no. 55 on pg. 9, 58 on pg. 10, and 45 on pg. 18, in addition to Interrogatories no. 8 on pg. 11, and 3 and 4 (both on top) of pg. 19 regarding entries, versus RFP no. 63 on pg. 10 regarding search (and entry).

Since two of those three search-related RFPs are identical, the documents Plaintiffs requested to prove *Monell* liability for a failure to train regarding searches of curtilage consisted of "[a]ll training and policy documents regarding 'exigent circumstances' to enter and/or search property" and "[a]ll training and policy documents regarding the entry onto and/or search of the curtilage around a dwelling and/or other privately-owned land." Despite possessing General Order 415 on searches, Plaintiffs did not request information on searches generally. Plaintiffs asked for PSS files regarding unlawful entry complaints (ECF 62-1, RFP 38 on pg. 2), but did not ask for PSS files regarding complaints of unlawful search. Plaintiff will likely rely on this paucity of discovery

---

on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a search[,]" because the government had "trespassorily inserted the information-gathering device[.]"*Jones*, 565 U.S. at 404.

[17]       Those four cases are: *Anniszkiewicz v. City of Rochester* (20-cv-6629-FPG-MWP), *Cox v. City of Rochester* (22-cv-6207-FPG-MJP), *Dempsey v. City of Rochester et al* (19-cv-6780-EAW-MWP), and *Gursslin v. City of Rochester* (20-cv-6508-EAW-MJP).

       Three additional cases utilized the same *Monell* discovery, even though case-specific discovery occurred after that of the first four: *Barnes v. City of Rochester* (22-cv-6524-EAW-MWP), *McGill v. City of Rochester* (22-cv-6523, EAW-MWP), and *Preston v. City of Rochester* (22-cv-6525-EAW-MJP).

to assert that the City has failed to appropriately train its officers on when they may search the curtilage of residential properties, while it has not been proven at all.

Plaintiffs also failed to ask most, if not all,[18] officers about *searching* curtilage, opting instead to ask them about *entries* into curtilage or general backtracking. For example, neither Sgt. Rudolph nor Sgt. Kelly were aware of trainings on entering curtilage (Rudolph Tr. 198:19-24; Kelly Tr. 176:14-18), and Plaintiffs did not ask about trainings regarding searching curtilage. Plaintiffs asked Officer Algarin about how often officers backtrack through "residential properties (including those with fences) (Algarin Tr. 116:7-18), apparently ignoring that residential properties do not consist of solely curtilage. Properties include fully- or partially-enclosed front, back, and side yards of all sizes surrounding single and multi-family dwellings. In a similarly non-broad fashion, Plaintiffs asked Officer Gorman about backtracking through the flight "route" of detainees. Gorman Tr. 220:4-14. Plaintiffs' omissions should not be construed as evidence of Defendants' failure to train. Summary judgment should be awarded to Defendants on all theories of municipal liability.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment on the entire Complaint, and award Defendants such other relief as the Court deems proper.

Date: August 9, 2024

PATRICK BEATH
CORPORATION COUNSEL

By: _____

Peachie L. Jones, Esq., Of Counsel
*Attorneys for Defendants*

---

[18] Officer Horowitz is one of the few, if not the only officer, who testified regarding the trainings or in-services about searching curtilages. Horowitz Tr. 106:8-11. Even though Plaintiffs asked about "training on entering the curtilage of a property" (Horowitz Tr. 63:14-15),  Officer Horowitz remembered a roll call training in 2019 or 2020 about searching yards and curtilages, in that the "same rules apply to searching a house" as to yard. Horowitz Tr. 63:14 - 64:11.

30 Church Street, Room 400A
Rochester, NY 14614
(585) 428-7992
Peachie.Jones@CityofRochester.gov

To the following via ECF:

Elliot Dolby Shields
ROTH AND ROTH LLP
192 Lexington Avenue, Suite 802
New York, NY 10016
(212) 425-1020   |  eshields@rothandrothlaw.com
*Counsel for Plaintiff*