Exhibit D

1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x
CHARLES DEMPSEY, individually, and
L.D., by her Father and Natural
Guardian, Charles Dempsey,

                Plaintiffs,

    -against-

THE CITY OF ROCHESTER, a Municipal
entity, et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - x

                Video Conference
                June 3, 2022
                9:45 a.m.

    EXAMINATION BEFORE TRIAL of P.O. ADAM
GORMAN, a Defendant in the above-entitled action,
taken by the Plaintiff, held at the above
time and place, pursuant to Court Order,
taken before Robyn Lehrmann, a Notary Public
in and for the State of New York.

Enright Court Reporting    (631) 589-7788

```
                                                              2
 1
 2   A P P E A R A N C E S :
 3
 4   ROTH & ROTH, LLP
             Attorneys for Plaintiffs
 5           192 Lexington Avenue, Suite 802
             New York, New York 10016
 6
     BY:   ELLIOT SHIELDS, ESQ.
 7
 8   LINDA KINGSLEY, CORPORATION COUNSEL
             Attorney for CITY OF ROCHESTER
 9           30 Church Street
             Rochester, New York 14614
10
     BY:   PEACHIE JONES, ESQ.
11
12
13
14
15
16
17
18             S T I P U L A T I O N S
19
20        IT IS HEREBY STIPULATED AND AGREED by
21   and among counsel for the respective parties
22   hereto, that the sealing and certification of
23   the within deposition shall be and the same
24   are hereby waived;
25        IT IS FURTHER STIPULATED AND AGREED
```

```
                                                      5
 1                    P.O. Adam Gorman
 2    P.O.  A D A M   G O R M A N,
 3            Having been first duly sworn by a Notary
 4            Public of  the State of New York, was
 5            examined and testified as follows:
 6                    THE COURT REPORTER: Please
 7            state your name for the record.
 8                    THE WITNESS:  P.O. Adam
 9            Gorman.
10                    THE COURT REPORTER:  Please
11            state your precinct address for
12            the record.
13                    THE WITNESS:  185 Exchange
14            Boulevard, Rochester, New York
15            14614.
16    EXAMINATION BY
17    MR. SHIELDS:
18        Q     Good morning, Officer Gorman.
19        A     Good morning.
20        Q     My name is Elliot Shields.  I
21    represent a father and daughter whose dog was
22    shot and killed and I am going to ask you
23    some questions today.
24              If there is anything that I ask
25    you that you don't understand, please say so
```

35

```
 1                    P.O. Adam Gorman
 2              for production of those
 3              certificates of those, please,
 4              Ms. Jones.  And we'll follow up
 5              in writing about that.
 6                    MS. JONES:  Yes.  I thought
 7              he said he didn't know if there
 8              were certificates.
 9                    MR. SHIELDS:  I believe that
10              is what he said.  That is why
11              the production called for to the
12              extent that there is anything
13              else.
14        Q     I will go over some of your
15   evaluation again from bottom to top.
16              So this one is for the period
17   November 2017, to November 1st to the 30th.
18              So my first question is, this is
19   only a one-month period.  Is that because you
20   were on probation still?
21        A     This looks like a -- oh, okay.
22   Yes.  This is a monthly probation, yes.  When
23   you're on probation, they do monthly
24   evaluations.
25        Q     So my question is about the
```

150

```
 1                    P.O. Adam Gorman
 2   assault.  Is that what you are saying?
 3         A       Based on the penal law, simple
 4   marijuana, no.  But a large amount of
 5   Fentanyl, yes, it is more serious under the
 6   penal law.
 7         Q       Did you suspect that the person
 8   that you were facing on October 19th, 2018,
 9   possessed Fentanyl or marijuana or something
10   else?
11         A       I believe they possessed drugs.
12         Q       Are all drugs the same?
13         A       They are not.
14         Q       There is not a nationwide
15   epidemic of marijuana overdosing right now?
16         A       There is not.
17         Q       But there is a nationwide,
18   specifically in Monroe County, of Fentanyl
19   overdoses?
20         A       Yes, there is.
21         Q       So, at the time, you know, if
22   you suspected this person had Fentanyl, that
23   might have been a more serious drug crime
24   than suspicion of marijuana, correct?
25         A       That is correct.
```

Enright Court Reporting    (631) 589-7788

172
1                P.O. Adam Gorman
2    run through the backyard and Kosciusko Street
3    as you anticipated that is what they would do
4    and as they came through the yard your plan
5    was to go and apprehend them?
6        A     Correct.
7        Q     So that is what we thought with
8    you running through this yard here and
9    apprehending this guy right here, right?
10       A     Correct.
11       Q     We hit pause, for the record, at
12   1707 and 13 seconds.  There is activity 15
13   seconds into the video.  And I will hit play
14   again.  So I am just going to pause there.
15   So you said you did it yesterday too.
16             Did you guys do a similar thing
17   the day before?
18       A     Similar, yes.  We were familiar
19   with these individuals at the time selling on
20   that corner, correct.  Yes.
21       Q     What happened on the day before?
22             MS. JONES:  Objection.
23       A     From my recollection, on our
24   arrival they had ran south to Sobieski Street
25   through the same yards.

173

1           P.O. Adam Gorman
2       Q    So that is how you guys devised
3   a plan on this day?
4       A    Correct.
5       Q    Do you know what the officers on
6   Kosciusko Street did?
7       A    I do not.
8       Q    On the previous day, had you
9   arrived on Kosciusko Street and witnessed
10  them running?
11      A    Yes.
12      Q    So on the previous day, what
13  happened?  Did you drive your car and then
14  park and they ran or something else?
15           MS. JONES:  Objection.
16      A    I vaguely remember just pulling
17  up and upon police arrival it was immediate
18  flight.
19      Q    Did you chase them through the
20  yards on the previous day as well?
21           MS. JONES:  Objection.
22      A    I don't recall.
23      Q    So you might have, but you don't
24  recall?
25      A    Correct.

```
                                                              175
 1                    P.O. Adam Gorman
 2        A     Yes.
 3        Q     Right before I paused, did you
 4   hear yourself ask Officer Algarin to
 5   backtrack?
 6        A     Yes.
 7        Q     So if it took you about 15
 8   seconds to get from Sobieski Street to the
 9   back of that fence, would it be fair to say
10   that it probably would take a similar amount
11   of time to get from the backyard to the front
12   of the house on Kosciusko Street?
13                 MS. JONES:  Objection.
14        A     Similar time frame, yes.
15        Q     So for at least a minute and 45
16   seconds, right, we know that the individual
17   that you apprehended was present in this
18   backyard, correct?
19        A     Correct.
20        Q     So for at least a minute and 45
21   seconds, there would have been any potential
22   contraband located in the backyard at the
23   house next door that was owned by my client,
24   correct?
25        A     Correct.
```

Enright Court Reporting    (631) 589-7788

```
                                                         180
 1                   P.O. Adam Gorman
 2   noticed, the doghouse?
 3        A    Not particularly, no.
 4        Q    You didn't really think about
 5   that before you came into this yard?
 6        A    No.
 7        Q    I will hit play.  We're at two
 8   minutes and three seconds into the video, or
 9   170903.  Let me ask you about that statement
10   that you just made.
11             Do you know who his cousins are?
12                MS. JONES:  Objection.
13        A    Not by name.
14        Q    Were you familiar with that guy
15   that you had stopped?
16        A    Yes.  I've seen him in the area
17   before.
18        Q    Did you know his name?
19        A    Not offhand, no.
20        Q    Do you know who his cousins
21   were?
22                MS. JONES:  Objection.
23        A    Again, all the personnel hanging
24   out in that area that day were all familiar
25   faces and known to stand there and sell
```

Enright Court Reporting    (631) 589-7788

                                                                    181

 1                      P.O. Adam Gorman
 2    drugs.
 3         Q     Do you know what his cousins
 4    look like?
 5         A     Not anymore.
 6         Q     Do you know why you said to him
 7    whether it is you or your cousins?
 8         A     Just to talk.
 9         Q     Do you think his cousins were
10    other, I don't know, black men?
11               MS. JONES:  Objection.
12         A     Do I think or do I know?
13         Q     Sure.  Do you know?  I mean, I
14    asked you if you knew who his cousins were.
15         A     Yes.  I know that people I seen
16    on that day were male blacks.
17         Q     Do you know if the other guy
18    that was stopped was his cousin?
19         A     The term I'd identify for
20    everyone here, the term "cousin" is very
21    commonly used as pal, friend, buddy,
22    acquaintance in the City of Rochester.  It
23    does not have to be direct familial
24    relationship to be a cousin or aunt or uncle.
25         Q     Did you ever review this

```
                                                           192
 1                    P.O. Adam Gorman
 2    individual and other people ran from the
 3    police when you pulled up.
 4               Is that fair to say?
 5        A      Correct.
 6        Q      The fact that that happened two
 7    days in a row, does that go under the
 8    totality of the circumstances evaluation of
 9    whether you had suspicion to stop him or
10    suspicion or probable cause to conduct a
11    search?
12        A      That it does.
13        Q      I will keep playing now.
14               In the moment when he was
15    screaming about his daughter, what were you
16    thinking?
17        A      I didn't hear daughter.  I heard
18    dog.
19        Q      I am going to rewind a little
20    bit.
21               Did you hear him say "my
22    daughter"?
23        A      I did.
24        Q      Were you aware that his daughter
25    was watching the entire incident from right
```

                                                                    193
 1                       P.O. Adam Gorman
 2     inside the back door there?
 3          A      No, I was not.
 4          Q      Did you ever come to learn that
 5     after the incident?
 6          A      I did.
 7          Q      I just want to rewind a little
 8     bit and ask you a couple of other questions.
 9     We are rewinding to 259 in the video, or
10     170958 seconds.  He asked you to leave his
11     property, but did you ever do that?  Did you
12     ever leave his property?
13          A      No.
14          Q      And why not?
15          A      It was an active scene at this
16     point.
17          Q      By active scene you mean because
18     Officer Algarin had shot Tesler two times?
19          A      Correct.
20                 I am assuming by Tesler you mean
21     the dog.
22          Q      His pet dog, Tesler, yes.
23                 So is that like a police
24     department policy, once a firearm is
25     discharged, that makes it like an active

217

```
 1                    P.O. Adam Gorman
 2                 MR. SHIELDS:  Yes.  Let's
 3           keep going, so we can,
 4           hopefully, finish this up after
 5           they get back.
 6        Q     Officer Gorman, in this
 7   situation, right, that we watched in the
 8   body-worn camera video where Officer Algarin
 9   jumped the fence in my client's yard, you
10   guys obviously didn't have a warrant, right?
11        A     Correct.
12        Q     The exception for the other
13   warrants would have had to apply what we
14   covered earlier, right?
15        A     Correct.
16        Q     Why didn't you just ask Officer
17   Algarin to walk to the front door to ask for
18   permission and knock on the door?  Did you
19   ever think about that?
20        A     At the time, it did not cross my
21   mind.
22        Q     So earlier you had described
23   that on a prior day you had run a similar
24   operations where these same individuals had
25   run from you on Koskusco Street.
```

                                                                    220
 1                          P.O. Adam Gorman
 2          A      No, I don't think so, not during
 3     the foot chase.
 4          Q      How often during those foot
 5     chances did you end up backtracking and going
 6     through the route that you chase the person
 7     to look for any discarded contraband?
 8          A      On my personal foot chases are
 9     you asking?
10          Q      Yes.  I am just asking about
11     your experience, you know, what you have
12     done.
13          A      I would say the majority of the
14     time.
15          Q      Would it be fair to say that a
16     majority of the time some of those times at
17     least would require you to jump over a fence
18     similar to what happened in this instance?
19          A      Yes.
20          Q      In any of those other instances,
21     have you ever gone to the property owner's
22     front door and asked for consent to enter
23     their property?
24          A      Prior to this date, not that
25     comes to mind.