Exhibit E

```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -
CHARLES DEMPSEY, individually, and L.D. by her
father and natural guardian, CHARLES DEMPSEY,

        Plaintiffs,

                          Index No. 19-cv-6780 (EAW)
v.

THE CITY OF ROCHESTER, a municipal entity, JAVIER
ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER
RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - -


Remote Deposition Upon Oral Examination of:

              Officer Jason Horowitz




Date:         February 8, 2023


Time:         10:00 a.m.



Reported By:  Jayme C. Wintish

              Alliance Court Reporting, Inc.

              109 South Union Street, Suite 400

              Rochester, New York 14607
```



Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

2

```
 1
 2                    A P P E A R A N C E S
 3   Appearing Remotely on Behalf of Plaintiffs:
 4   Elliot D. Shields, Esq.
 5      Roth & Roth LLP
 6      192 Lexington Avenue, Suite 802
 7      New York, New York  10016
 8      eshields@rothandrothlaw.com
 9
10   Appearing Remotely on Behalf of Defendants:
11   Peachie L. Jones, Esq.
12      City of Rochester Law Department
13      City Hall, Room 400A
14      30 Church Street
15      Rochester , New York  14614
16      peachie.jones@cityofrochester.gov
17                     *     *     *
18
19
20
21
22
23
24
25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

                                                                    4

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2     for their certified transcript charge, including any
 3     expedite or other related production charges;
 4              AND IT IS FURTHER STIPULATED, that the
 5     Notary Public, JAYME C. WINTISH, may administer the
 6     oath to the witness.
 7                         *     *     *
 8              THE COURT REPORTER:  Will counsel please
 9     stipulate to me remotely swearing in the witness
10     located in New York State; that counsel will not
11     object to the admissibility of the transcript based on
12     proceeding in this way; and that the witness has
13     verified that he is, in fact, Officer Jason Horowitz.
14              MS. JONES:  Yes.
15              MR. SHIELDS:  Yes.
16     OFFICER JASON HOROWITZ,
17          called herein as a witness, first being sworn,
18          testified as follows:
19          EXAMINATION BY MR SHIELDS:
20          Q.  Good morning, Officer Horowitz.  My name
21     is Elliot Shields.  I represent the plaintiffs in this
22     lawsuit, and I'm going to be asking you some questions
23     today.
24              First, I'm just going to go over the
25     ground rules for the deposition.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2     field trip at the Hall of Justice where we met with an
 3     ADA and they kind of put us through some scenarios.
 4          Q.   Okay.  And was that during the academy?
 5          A.   Yes.
 6          Q.   Since the academy have you gotten any
 7     training about testifying?
 8          A.   No.
 9          Q.   Okay.  I'm going to switch gears and ask
10     you questions about the incident.
11               Do you remember the date of the incident?
12          A.   Not off the top of my head.
13          Q.   If I said it was October 19th, 2018, does
14     that sound right to you?
15          A.   Yes.
16          Q.   Okay.  Can you just tell me everything you
17     remember about the incident?
18          A.   I remember responding to a vice call.
19     Essentially a vice call could be drug activity,
20     prostitution, drinking, people with handguns.
21          Q.   Okay.  So you responded.
22               Then what happened next?
23          A.   When we were responding, the officers that
24     were on the job, we all communicated together.
25          Q.   And how did you communicate?
```



20

```
 1             OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2             MS. JONES:  Objection.
 3             But go ahead.
 4         A.  I don't remember.
 5         Q.  Okay.  And when you say it was a vice
 6  call, do you remember that from looking at your
 7  paperwork previously in preparation for the
 8  deposition?
 9         A.  Yes.  Yes.  It was a vice call.  I don't
10  remember the description of the call or the -- the
11  complaint.
12         Q.  And this was your section that you'd
13  worked for some period of time before the incident;
14  right?
15         A.  Yes.
16         Q.  How long had you worked in the Clinton
17  section before the incident?
18         A.  I transferred from Lake section to Clinton
19  in, I think, January -- yes -- January 2018.  So
20  approximately nine months prior to the incident.
21         Q.  Okay.  And had you responded to this, I
22  guess, specific block of Kosciusko Street and Sobieski
23  Street more than once prior to this incident?
24         A.  Yes.
25         Q.  Can you estimate how many times?
```



```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2           A.   We would respond to that location -- a
 3   call would come in, I would say, twice a shift for the
 4   males selling drugs, among other things.  Sometimes
 5   they had other details about the job.  It all depends
 6   on the caller.  But that's been a main trouble of that
 7   street, that certain location.  So I would say I
 8   probably responded to that location over 50 times.
 9           Q.   Prior to this incident?
10           A.   Yes.
11           Q.   In the nine or ten months prior to this
12   incident?
13           A.   Yes.
14           Q.   Okay.  And had you ever interacted with
15   these specific individuals who were arrested on the
16   date of the incident, previously?
17           A.   I've never -- prior to this incident, I
18   was never able to ID the individuals.  So no, I'm not
19   positive that I dealt with specifically them.
20           Q.   In the 50 or so times that you responded
21   to this location previously, on how many prior
22   occasions had they run through the yards on Kosciusko
23   Street?
24           A.   I would say about half of the times that
25   I've responded they've fled south of the location.
```



                                                                    34

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   at 17 minutes -- 17 hours, 7 minutes, and 39 seconds.
 3   And I'm going to hit play again now.
 4                   (Video was played.)
 5              MR. SHIELDS:  Okay.  So I'm pausing at 17
 6   hours, 8 minutes, and 15 seconds.
 7        Q.   Can you just generally describe your
 8   interaction and what happened since the last time that
 9   we had paused?
10        A.   I was searching the suspect that I had
11   there and asking him typical questions we would have
12   for the suspect while we're searching.
13        Q.   Okay.  And did you find anything?
14        A.   Not on his person.  But in the area in
15   which he was running I did find that black bag.
16        Q.   Okay.  So he dropped that black bag?
17        A.   Yes.  When he hopped the fence, I could
18   see him discard it as he ran up towards me.
19        Q.   Okay.  And as we're paused right here, do
20   you see another officer in the, I guess, kind of north
21   part of the picture -- to your north in the middle of
22   the screen?
23        A.   Yes.
24        Q.   And do you know who that is?
25        A.   Officer Algarin.
```



```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2       Q.   Okay.  And he's standing on the other side
 3  of that chain-link fence; is that fair to say?
 4       A.   Yes.
 5       Q.   So that was the backyard in one of the
 6  houses on Kosciusko Street?
 7       A.   Yes.
 8       Q.   Okay.  And are you talking to him, or
 9  what's going on?
10       A.   Not yet.
11       Q.   Okay.  Okay.  I'm going to hit play again.
12            MR. SHIELDS:  We're at 17 hours, 8
13  minutes, and 15 seconds.
14                 (Video was played.)
15            MR. SHIELDS:  Okay.  So I'm going to pause
16  again at 17 hours, 8 minutes, and 30 seconds.
17       Q.   You guys were talking about whether the
18  suspect that you had stopped had a gun; is that right?
19            MS. JONES:  Objection.
20            But go ahead.
21       A.   Yes.
22       Q.   Did you suspect that he had a gun?
23       A.   Yes.
24       Q.   And why did you suspect that he might have
25  a gun?
```


ALLIANCE COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1             OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2        A.   Because it's a known area for the
 3   individuals that are selling drugs to carry firearms.
 4        Q.   Okay.  Did you see him with a gun?
 5        A.   I did not.
 6        Q.   Okay.  Did you guys recover a gun?
 7        A.   No.
 8        Q.   Okay.  Would it be a typical question that
 9   you'd ask a suspect that you'd stop in that area?
10        A.   Yes.
11        Q.   Especially after a foot chase where you'd
12   seen them discard something from their person?
13        A.   Yes.
14        Q.   And Officer Algarin was also asking about
15   the gun?
16        A.   Yes.
17        Q.   And to your knowledge, Officer Algarin
18   never found a gun either?
19             MS. JONES:  Objection.
20             But go ahead.
21        A.   There was not a gun recovered by any of
22   the officers in that accident.
23        Q.   Okay.  And where we're paused right now,
24   do you know what Officer Algarin is doing?
25        A.   Based on my camera footage, it shows him
```



40

```
 1             OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   before we paused you're looking through a black
 3   plastic bag; is that right?
 4          A.   Yes.
 5          Q.   And did you say, "What's that, weed?" or
 6   you said something like that?
 7          A.   Yes.
 8               MS. JONES:  Objection.
 9               Go ahead.
10          A.   Yes.
11          Q.   All right.  So you located marijuana in
12   the bag?
13          A.   Yes.
14          Q.   Anything else?
15          A.   It was packaged to sell.
16          Q.   Okay.  So just some marijuana that was
17   packaged to sell?
18          A.   Yes.
19          Q.   Okay.  But no weapons?
20          A.   No weapons.
21          Q.   Okay.  And no other drugs?
22          A.   No other drugs.
23          Q.   Okay.
24               MR. SHIELDS:  So we're at 17 hours, 9
25   minutes, and 37 seconds.  And I'm going to hit play
```



```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   incident after the incident?
 3        A.   No.
 4        Q.   Okay.  You never spoke with Sergeant
 5   Rudolph?
 6        A.   I spoke to him later that day about it.
 7   But after the day of the incident, we haven't spoken
 8   about it.
 9        Q.   Okay.  Did you speak with any other
10   supervisors in the department?
11        A.   No.
12        Q.   Did you ever speak with anybody from PSS?
13        A.   No.
14             MR. SHIELDS:  And for the record, PSS is
15   the Professional Standards Section.
16        Q.   Did you ever speak with anybody from the
17   Professional Development Section or PDS?
18        A.   No.
19        Q.   Are the only people within the department
20   that you spoke about the incident with -- did that
21   occur only on the day of the incident?
22             MS. JONES:  Objection.
23             But go ahead.
24             MR. SHIELDS:  That was a bad question.
25   Let me withdraw that.
```



```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2            A.   We would knock on the door after the
 3   evidence has been secured.
 4            Q.   Okay.  So first you would secure the
 5   evidence, and then you would talk to the property
 6   owner?
 7            A.   Correct.
 8            Q.   Okay.  And why would you do it in that
 9   order?
10            A.   Because if we leave the evidence behind,
11   for lack of better words, it could grow feet and walk
12   away.  Somebody may come by and take it.  Just the
13   preservation of the evidence.  We would typically have
14   to have a technician come down if it was a handgun.
15   And from there they would be able to lift prints and
16   do their procedures for the handgun.  If it's just
17   narcotics, we'd be able to collect it right away.
18            Q.   Okay.  Did you get any training on that?
19            A.   Training on collecting evidence?
20            Q.   Training on entering someone's yard while
21   backtracking to look for evidence?
22            A.   No.  We did not get training.
23            Q.   Okay.  No training at the academy?
24                 MS. JONES:  Objection.
25                 But go ahead.
```



63

OFFICER JASON HOROWITZ - BY MR. SHIELDS

A. Up until this incident we did not get training on backtracking a person's flight path.

Q. After this incident did you get training on backtracking a person's flight path?

A. We got training on -- what's the word I'm thinking of?  I believe it's "curtilage."  I believe it's areas of property that's not part of the house.

THE WITNESS:  I don't want to sound silly, but I think it's "curtilage"?

MS. JONES:  I can't answer for you.

Q. Curtilage.

A. I was right.  I was right.

Q. When did you receive training on entering the curtilage of a property?

A. I don't remember, but it was either 2019 or 2020.  I don't remember though.

Q. Tell me everything you remember about the training.

A. It had to do with searching somebody's yard.  It's -- it -- I believe the policy that they -- or training covered that we treat the yard as a building or a house.  So that kind of encompasses all of it.  So same rules apply to searching a house as it does the yard.  And that's the training that we got



64

1        OFFICER JASON HOROWITZ - BY MR. SHIELDS
2   later after the incident.
3        Q.   Was that a required training for everyone
4   in the department?
5        A.   That was roll call training.  There wasn't
6   any type of record of who received it.  It was an
7   overall PowerPoint presentation during our roll call.
8   Roll call is when all the officers meet at the
9   beginning of shift.  And we go over post assignments
10  and any updated news in our section and our
11  department.
12       Q.   Okay.  So just so I am getting this right,
13  2019 or '20, you don't remember when it was, but
14  around that period?
15       A.   Yes.
16            MS. JONES:  Objection.
17       Q.   And that occurred in a roll call, which is
18  the beginning of your shift; is that right?
19       A.   Yes.
20       Q.   And how long would this training have
21  lasted?
22       A.   Training to go through the whole
23  PowerPoint during roll call was around five minutes
24  long, presentation.
25       Q.   Okay.  So it was a PowerPoint that was



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   case, and I have time to look at the policy or
 3   procedure or the roll call to get a better idea of --
 4   or to refresh my memory.
 5         Q.   Do you have to like be at a computer to do
 6   that?
 7         A.   Yes.  You can't access it through your
 8   phone, not to my knowledge.  You can be inside your
 9   vehicle.  You can be at the office.
10         Q.   So if you're in your vehicle and you get a
11   call.  You say, "I'm going to respond to a call," and
12   then you have a question about RPD policy, you can
13   look that policy up on the computer in your vehicle?
14         A.   Depends on the scenario.  If it's a hot
15   call, no.  You don't have time for it.  But if you
16   have time to pull over, open up the website, and click
17   on the policy, you can do that from the vehicle, yes.
18         Q.   Okay.  Okay.  Can you tell me all the
19   training that you've received regarding interactions
20   with dogs?
21         A.   We receive training in the academy about
22   dog behaviors and animal control and what duties and
23   responsibilities they have.
24         Q.   Okay.  Tell me everything you remember
25   about the training.
```



81

```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2            A.   I remember talking about dogs' behaviors
 3   and different ways that you can escape from a dog
 4   or...
 5            Q.   Okay.  Like what?
 6            A.   Running away from them.  I know they
 7   covered what animal control can do as far as -- if the
 8   dog is contained, and it's safe, we can have an animal
 9   control officer come out to retrieve the dog.
10                 Typically, bite reports.  If the dog has
11   bitten somebody, animal control has to come out and do
12   the report for that.  That's not handled by police
13   officers.
14                 And then, you know, obviously, they taught
15   us about aggressive dogs.  They can be playful at one
16   moment and be aggressive the next moment.  Just things
17   that you always have to be aware of, dog behaviors
18   and -- you know, they can be sporadic and...
19            Q.   Okay.  Do you remember anything else about
20   dog behavior from the academy?
21            A.   No.
22            Q.   Do you remember who provided that training
23   or taught that course at the academy?
24            A.   Somebody from Rochester Animal Services --
25   I'm sorry.  The animal control unit, which is based
```



82

1        OFFICER JASON HOROWITZ - BY MR. SHIELDS
2    out of Rochester Animal Services.  One of the officers
3    came out to teach the class -- or employees.  I don't
4    remember who specifically though.
5           Q.  Okay.  You said someone from animal
6    control?
7           A.  Yes.
8           Q.  And how did that course about animal
9    behavior get taught?  By which I mean, did they show
10   videos?  Was it a PowerPoint?  Something else?
11          A.  It was both.  It was both.  They came out.
12   They did their PowerPoint presentation.  They showed a
13   couple of videos of different scenarios with dogs.
14              You don't mind if I take a quick break to
15   use the bathroom?
16          Q.  No.  That's fine.
17              MR. SHIELDS:  Let's do five, ten minutes?
18   What do you guys need?
19              MS. JONES:  That's fine.
20              MR. SHIELDS:  All right.  Let's come back
21   at 12:10.  It's 12 o'clock right now.
22              MS. JONES:  Sounds good.
23          (The proceeding recessed at 12:01 p.m.)
24          (The proceeding reconvened at 12:15 p.m.;
25          appearances as before noted.)



```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   drills and searching -- they call it "dynamic
 3   searches" -- building searches.
 4            Q.  Okay.  Since you've been an officer, those
 5   educational in-service trainings have never included
 6   anything about interactions with dogs?
 7            A.  No.
 8            Q.  Since you've been an RPD officer, have any
 9   of those educational in-service trainings ever had
10   anything to do with the search of a curtilage?
11            A.  No.
12            Q.  What voluntary trainings have you done?
13            A.  Well, all the ones that I mentioned
14   earlier were voluntary.
15            Q.  Okay.
16            A.  TASER operator, DT instructor, field
17   training officer.  That's all voluntarily.  It wasn't
18   mandated for me to go there.
19            Q.  Got it.
20                So like defensive tactics training isn't
21   something that's required?  That's voluntary?
22            A.  I was trained to be an instructor for
23   defensive tactics.  So when a police academy goes
24   through, I'll be assisting with the recruits being
25   trained in defensive tactics.
```

