UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

------------------------------------------X

CHARLES DEMPSEY, individually, and L.D. by her

father and natural guardian, CHARLES DEMPSEY,

                    Plaintiffs,

                                        Docket No.

          - against -                   20-CV-6780

                                        (EAW)(MWP)

THE CITY OF ROCHESTER, a municipal entity, JAVIER

ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER

RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

                    Defendants.

------------------------------------------X

                    Zoom Conference

                    Long Island, New York

                    August 22, 2023

                    9:10 a.m.


          VIDEOTAPED DEPOSITION of LIEUTENANT

MICHAEL CUILLA, Witness, taken by Plaintiff,

pursuant to Federal Rules of Civil Procedure, and

Notice, held at the above-noted time and place,

before Emma Badger-DeRienzis, a Stenotype Reporter

and Notary Public within and for the State of New

York.

```
(1)
(2)     A P P E A R A N C E S:
(3)
(4)        ROTH & ROTH LLP
                Attorneys for Plaintiffs
(5)             192 Lexington Avenue, Suite 802
                New York, New York 10016
(6)
           BY:  ELLIOT DOLBY SHIELDS, ESQ.
(7)
(8)
           MUNICIPAL ATTORNEY
(9)        CITY OF ROCHESTER LAW DEPARTMENT
                Attorneys for Defendants
(10)            30 Church Street, Room 400A
                Rochester, New York 14614
(11)
           BY:  PEACHIE JONES, ESQ.
(12)
(13)
      ALSO PRESENT:
(14)
           KEVIN GONZALEZ - Videographer
(15)       NELLIE KLUZ - Videographer intern
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

(1)

(2)                    **MR. SHIELDS:  Elliot Shields**

(3)             **representing the plaintiffs, Roth & Roth,**

(4)             **LLP.**

(5)                    **MS. JONES:  Peachie Jones with the**

(6)             **City of Rochester representing all of the**

(7)             **defendants.**

(8)                    **THE VIDEOGRAPHER:  Thank you,**

(9)             **Counsels.**

(10)                   **The court reporter is Emma DeRienzis**

(11)            **with Lexitas, who may now swear in the**

(12)            **witness.**

(13)                   **(Witness sworn in by court reporter.)**

(14)   **L I E U T E N A N T   M I C H A E L   C U I L L A,**

(15)         **Witness, having first been duly sworn by the**

(16)         **Notary Public, was examined and testified as**

(17)         **follows:**

(18)   **EXAMINATION BY**

(19)   **MR. SHIELDS:**

(20)        Q    Good morning.  My name is Elliot Shields.

(21)   I represent several people whose dogs were shot by

(22)   PD officers.  I'm going to ask you some questions

(23)   today, okay, Lieutenant?

(24)        **A    Yes.**

(25)        Q    If there's anything I ask of you that you

(1)                    **Lieutenant Michael Cuilla**

(2)        Q    Do you know the number?

(3)        **A    I do not recall the number.**

(4)        Q    Were there any other documents that were

(5)   provided to you to prepare you to testify about

(6)   Topic 1-A, other than that one general order about

(7)   searches?

(8)        **A    Not that I recall.**

(9)        Q    Now in 2019, after the Dempsey and Gerslin

(10)  incidents, the RPD issued a new policy entitled

(11)  "Warrantless Searches on Curtilage," correct?

(12)                    **MS. JONES:  Objection.**

(13)                    **You can answer.**

(14)       **A    I'm afraid I don't understand what you**

(15)  **mean by "new policy."**

(16)       Q    I'm going to put up what we'll mark as

(17)  Exhibit 2 for this deposition.  This is a

(18)  document -- can you see this document on your screen

(19)  entitled "Rochester Police Department Training

(20)  Bulletin"?  It's dated 5/30/2019.  The training

(21)  bulletin numbers L-65-19 and it says the subject is

(22)  "Warrantless Searches on Curtilage."  Can you see

(23)  that document on your screen, Lieutenant?

(24)       **A    Yes.**

(25)                    **MS. JONES:  Can you zoom in a little**

(1)                    **Lieutenant Michael Cuilla**

(2)          **for me, please?**

(3)               **MR. SHIELDS:  Sure.  One second.**

(4)               **MS. JONES:  Thank you.**

(5)     Q    Lieutenant, this training bulletin says

(6)   "new," correct?

(7)     **A    Yes.**

(8)     Q    And so if there was a training bulletin

(9)   that had existed on the subject prior to the

(10)  issuance of this specific training bulletin, it

(11)  would specify that it was rescinding that prior

(12)  training bulletin; is that correct?

(13)    **A    Yes.**

(14)    Q    So my question is, this was issued in May

(15)  of 2019, correct?

(16)    **A    Yes.**

(17)    Q    And the two of the cases that we're here

(18)  to speak about today, the Charles Dempsey case and

(19)  the Erin Gerslin case, those both occurred in

(20)  September and October of 2018, correct?

(21)              **MS. JONES:  Objection.**

(22)              **You can answer.  Answer unless I tell**

(23)         **you not to.**

(24)    **A    Yes.**

(25)    Q    My original question was, in 2019, after

[Page 23]
August 22, 2023

(1)              Lieutenant Michael Cuilla
(2)    the Dempsey and Gerslin incidents, the RPD issued a
(3)    new policy entitled "Warrantless Searches on
(4)    Curtilage," correct?
(5)              **MS. JONES:  Objection.**
(6)        **A    A training bulletin is not always new**
(7)    **policy.  It can simply be a clarification of current**
(8)    **policy.  It is considered training.**
(9)        Q    Now, prior to the issuance of this
(10)   training bulletin, the RPD did not have a written
(11)   policy specifically concerning warrantless searches
(12)   on curtilage, true?
(13)             **MS. JONES:  Objection.**
(14)       **A    Warrantless searches are covered under**
(15)   **state law.**
(16)       Q    Please just listen to my specific question
(17)   and answer it.  If you can't, tell me that you can't
(18)   answer it, okay?
(19)             Prior to the issuance of this training
(20)   bulletin, the RPD didn't have a specific written
(21)   policy concerning warrantless searches on curtilage,
(22)   true?
(23)             **MS. JONES:  Objection.**
(24)       **A    Not one that I'm aware of.**
(25)       Q    This new training bulletin or policy was

(1)              Lieutenant Michael Cuilla

(2)    disseminated to officers at a roll call training,

(3)    true?

(4)              **MS. JONES:   Objection.**

(5)         **A    Yes.**

(6)         Q    Roll call training was provided in 2019,

(7)    true?

(8)         **A    Yes.**

(9)         Q    And can you just tell me what the

(10)   definition of curtilage is according to RPD policy?

(11)        **A    Curtilage is the area around a building or**

(12)   **home that is considered to be within the property's**

(13)   **lines.**

(14)        Q    That's codified in General Order 415; is

(15)   that correct?

(16)        **A    I apologize.  I'm not great with the**

(17)   **numbering of the general orders, just their content.**

(18)   **If that is the general order on searches, then that**

(19)   **would be correct.**

(20)        Q    Does the RPD teach its officers the

(21)   definition of curtilage?

(22)        **A    Yes.**

(23)        Q    Now, before 2019, did the RPD teach its

(24)   officers that people have a reasonable expectation

(25)   of privacy in the curtilage to their property?

(1)              Lieutenant Michael Cuilla

(2)    to a residential property.  Was he mistaken?

(3)         A    Yes.

(4)         Q    When did Officer Jason Horowitz receive

(5)    training about the legal requirements to enter the

(6)    curtilage to a residential property?

(7)              MS. JONES:  Jason Horowitz is not a

(8)              named defendant so we didn't specifically

(9)              look up the training offered to Jason

(10)             Horowitz.  We only focused on the named

(11)             defendants.  So if you're going to ask him

(12)             about the named defendants, he can speak

(13)             to that.

(14)        Q    When did Officer Javier Algarin receive

(15)    any training about the legal requirements to enter

(16)    the curtilage to a residential property?

(17)        A    In late 2017 and early 2018 when he

(18)    attended the police academy.

(19)        Q    What did they teach him specifically?

(20)        A    The rights to privacy for a person under

(21)    the Fourth Amendment, what is and is not in a legal

(22)    search and seizure as well as exceptions to the

(23)    search warrant, the requirements of a search warrant

(24)    including what is and is not personal property and

(25)    curtilage.

(1)            **Lieutenant Michael Cuilla**

(2)        Q    Did you review those documents that he was

(3)    provided in the police academy in preparation for

(4)    your deposition today?

(5)        **A    No.**

(6)        Q    So how do you know sitting here today that

(7)    those are the things that he received in his

(8)    training at the police academy?

(9)        **A    In consultation with Lieutenant Michael**

(10)    **Cuilla, who has attended the police academy and**

(11)    **taught at the police academy for several years as**

(12)    **well as currently overseeing the police academy for**

(13)    **the Rochester Police Department.  That is why I, as**

(14)    **the City, am aware of the topics covered in the**

(15)    **Fourth Amendment search and seizure portion of the**

(16)    **academy.**

(17)        Q    Do you teach the Fourth Amendment search

(18)    and seizure portion of the academy?

(19)        **A    No.  I am the City of Rochester.**

(20)            **MR. SHIELDS:  Peachie, you got to be**

(21)        **kidding me.  Like, this is ridiculous.**

(22)        **You obviously produced somebody who has a**

(23)        **specific knowledge background to testify**

(24)        **on behalf of the City.  I have to ask him**

(25)        **background questions.  We could have just**

(1)             **Lieutenant Michael Cuilla**

(2)        Q    Mr. DiDomenico testified at his deposition

(3)    that the 2014 training was a two-hour awareness

(4)    course to give some tools to officers for how to

(5)    interact with dogs that they might encounter during

(6)    their police duties.  Is that an accurate recitation

(7)    of Mr. DiDomenico's training that he put together?

(8)             **MS. JONES:  Objection.**

(9)        **A    Yes, that seems accurate.**

(10)       Q    This two-hour training that was given to

(11)   officers in 2014, was that a training that was

(12)   required department-wide?

(13)       **A    Yes.  It's part of our -- one of our**

(14)   **inservice.**

(15)       Q    You testified earlier that you had

(16)   gathered the -- I guess it would be more accurate to

(17)   call it a list, that was an Excel spreadsheet of the

(18)   officers who were assigned to go to that specific

(19)   training on specific days?

(20)       **A    Yes.**

(21)       Q    And then when officers attend the

(22)   training, they would be a written sign-in sheet

(23)   where they would sign their name?

(24)            **MS. JONES:  Objection.**

(25)       **A    Yes.  That is the common practice.**

(1)                Lieutenant Michael Cuilla

(2)   manuals or written policies about defensive tactics

(3)   that specifically reference encounters with dogs?

(4)        **A    So they are, again, just to be taken into**

(5)   **account in the totality of circumstances when it**

(6)   **comes to the decisions by uses of force.**

(7)        Q    I want to put up what we'll mark as

(8)   Exhibit 5 for this deposition and that's going to be

(9)   the 2014 training.  Lieutenant, on your screen, do

(10)  you see the document entitled "Dog Bite Prevention

(11)  for Law Enforcement" from the Humane Society of

(12)  Greater Rochester and then down at the bottom, it

(13)  says "Humane Society of Greater Rochester 2014"?

(14)       **A    Yes.**

(15)       Q    This is -- is this the training document

(16)  that you referenced earlier?

(17)       **A    Yes.**

(18)       Q    Was 2014 the first time that the Rochester

(19)  Police Department provided this training to its

(20)  officers?

(21)       **A    This particular PowerPoint, yeah.**

(22)       Q    Since 2014, has this PowerPoint been

(23)  provided to its officers again?

(24)       **A    It was provided again as a roll call**

(25)  **training.**

(1)                    **Lieutenant Michael Cuilla**

(2)        Q    I'm going to put up what's going to be

(3)    marked as Exhibit 6 for this deposition.  So that's

(4)    going to be the roll call training document and it's

(5)    dated December 2019 and it says "Roll Call Training

(6)    December 2019 LE Dog Bite Prevention Humane Society

(7)    of Greater Rochester."  Do you see that document on

(8)    your screen, Lieutenant?

(9)        **A    I do.**

(10)       Q    If we go to -- go back to Exhibit 5, I

(11)   just want to do some comparison between Exhibit 5

(12)   and Exhibit 6.  Do you see the page count here on

(13)   the right?  Can you see my cursor on your screen?

(14)       **A    One second, I'm sorry.  I can, yes.**

(15)       Q    This looks like it's a 51-page document;

(16)   is that right?

(17)       **A    Yes, that's correct.**

(18)       Q    Then if we go to Exhibit 6 and we go down

(19)   to the page count, that's a 24-page document; is

(20)   that right?

(21)       **A    That's correct.**

(22)       Q    If we go back to Exhibit 5 -- well, before

(23)   I scroll through it and stuff, let me just ask you,

(24)   other than the difference in the number of slides or

(25)   pages between these two documents, are there any

(1)              Lieutenant Michael Cuilla

(2)   other substantive differences in these two

(3)   trainings?

(4)       **A     Other than some information has been**

(5)   **removed as the roll call training is considered a**

(6)   **refresher and not a full training, no, I don't**

(7)   **believe so.**

(8)       Q     Do you know what information was removed

(9)   from the roll call training that was present in the

(10)  2014 training?

(11)      **A     I would have to take a look at the slides.**

(12)  **I didn't memorize which ones were.**

(13)      Q     Did you review both of these training

(14)  documents in preparation for your deposition today?

(15)      **A     I did.**

(16)      Q     Through your review of those two documents

(17)  in preparation for the deposition, is there anything

(18)  that stands out to you that was removed from the

(19)  2019 training?

(20)      **A     Nothing stands out, no.**

(21)      Q     The 2019 training that was put together by

(22)  Mr. Reno DiDomenico, who's here on the second page

(23)  of that document; is that right?

(24)          **MS. JONES:   Objection.**

(25)      **A     That's correct.**

(1)              **Lieutenant Michael Cuilla**

(2)      Q    Mr. DiDomenico testified at his deposition

(3)  that the 2014 training was a two-hour awareness

(4)  course to give some tools to officers for how to

(5)  interact with dogs that they might encounter during

(6)  their police duties.  Is that an accurate recitation

(7)  of Mr. DiDomenico's training that he put together?

(8)              **MS. JONES:  Objection.**

(9)      **A    Yes, that seems accurate.**

(10)     Q    This two-hour training that was given to

(11) officers in 2014, was that a training that was

(12) required department-wide?

(13)     **A    Yes.  It's part of our -- one of our**

(14) **inservice.**

(15)     Q    You testified earlier that you had

(16) gathered the -- I guess it would be more accurate to

(17) call it a list, that was an Excel spreadsheet of the

(18) officers who were assigned to go to that specific

(19) training on specific days?

(20)     **A    Yes.**

(21)     Q    And then when officers attend the

(22) training, they would be a written sign-in sheet

(23) where they would sign their name?

(24)              **MS. JONES:  Objection.**

(25)     **A    Yes.  That is the common practice.**

(1)          **Lieutenant Michael Cuilla**

(2)          Q     What happens if an officer has an

(3)     emergency and can't attend the training on their

(4)     assigned day?  For emergency or whatever reason,

(5)     they don't make the training on that assigned day,

(6)     are they required to make up the training on another

(7)     day?

(8)          **A     Yes.  They should be rescheduled by their**

(9)     **supervisor.**

(10)         Q     Let's say an officer misses a specific

(11)    training about a specific topic, so here, the dog

(12)    bite prevention training, do they have to make up

(13)    that specific training about dog bite prevention or

(14)    do they just have to simply make up like hours of

(15)    training that they missed?  Could they make it up by

(16)    attending a different training?

(17)         **MS. JONES:  Objection.**

(18)         **A     No.  They have to make up the exact**

(19)    **training.**

(20)         Q     Now, this Humane Society training, it was

(21)    an awareness course, so does that mean that it did

(22)    not train RPD officers about the policies of the

(23)    Rochester Police Department?

(24)         **A     The course is provided by the Humane**

(25)    **Society regarding specifically dog behavior and**

(1)                    Lieutenant Michael Cuilla

(2)     correct?

(3)          A     **Those tactics fall within the policy of**

(4)     **the Rochester Police Department, but the policy does**

(5)     **not require for those tactics to be utilized, no.**

(6)          Q     For example -- and I'm not trying to trick

(7)     you, so let's put this back up.  So putting back up

(8)     Exhibit 5, if we fast forward to some less lethal

(9)     options.  So, for example, if we fast forward to

(10)    page 45 and it says "bite prevention tools" and one

(11)    of them displayed on this page is chemical

(12)    repellants such as OC spray, the question is, in an

(13)    interaction with a dog, officers are not required to

(14)    use OC spray prior to resorting to their firearm,

(15)    correct?

(16)         A     **That is correct.**

(17)         Q     Other than the Humane Society training

(18)    from 2014 and the roll call training in 2019, does

(19)    the RPD provide any other training to its officers

(20)    about how to safely deal with dogs they might

(21)    encounter on residential properties?

(22)         A     **Yes.  It's discussed in the defensive**

(23)    **tactics training, as I previously mentioned, as well**

(24)    **as firearms training.**

(25)         Q     How in firearms training does the RPD --

(1)                Lieutenant Michael Cuilla

(2)    well, let me withdraw that question.

(3)              Just tell me everything about firearms

(4)    training about how officers are taught to deal with

(5)    dogs, other than shooting them.

(6)      A    So officers -- in firearms training,

(7)    officers are trained to deal with aggressive dogs.

(8)    Dogs that either are an imminent threat to

(9)    themselves, others or attacking, are destructive,

(10)   injured or threatened.  If dogs meet that threshold,

(11)   the officers are trained on how to use their firearm

(12)   to stop them.

(13)     Q    Okay, so I guess I was confused.  So let

(14)   me just ask you this, in firearms training, are

(15)   officers taught how to deal with dogs in any other

(16)   way than using their firearm against the dog?

(17)     A    Firearms training specifically, they are

(18)   taught to try to create distance prior to an attack.

(19)   They are taught to put objects between themselves

(20)   and the animal if possible.  The training in

(21)   firearms regarding dogs equates dogs closer to a

(22)   person with a knife, as that is the level of threat

(23)   to the officer.  A large dog with sharp teeth is

(24)   similar to what the damage that can be done by a

(25)   person with a knife.  They're just much faster.  So

(1)                   **Lieutenant Michael Cuilla**

(2)     **that's a lot of the training regarding dogs that are**

(3)     **attacking or an imminent threat or destructive,**

(4)     **injured or threatening is regarding -- is similar to**

(5)     **how an officer would react being charged by a person**

(6)     **with a knife.**

(7)         Q    Does the RPD teach its officers that in

(8)     the history of the RPD, there has never been an

(9)     officer that was seriously injured as a result of a

(10)    dog attack?

(11)        **A    No.   That does not come up in the**

(12)    **training.**

(13)        Q    Has the RPD ever taught any of its

(14)    officers in the training that since 1932, no officer

(15)    in the entire United States has ever been killed as

(16)    a result of a dog attack?

(17)                  **MS. JONES:   Objection.**

(18)        **A    No.   That has not come up in the training.**

(19)        Q    Can you tell me -- going back to less

(20)    lethal options, what are officers trained with

(21)    regard to the use of OC spray against a dog?

(22)        **A    Officers are not trained to utilize OC**

(23)    **spray against a dog specifically.   They are made**

(24)    **aware that it could be an option if the dog has not**

(25)    **yet become an imminent threat.**

(1)              **Lieutenant Michael Cuilla**

(2)       Q    We'll talk about imminent threat in a

(3)   minute here, but I want to just follow up on what

(4)   you just said a little bit.  Are officers taught at

(5)   the dog bite prevention course by Mr. DiDomenico

(6)   that OC spray is a viable option to use against a

(7)   dog that either appears like it might begin

(8)   attacking or is attacking?

(9)       **A    So possibly, DiDomenico gives officers**

(10)  **options to deal with animals that may be at**

(11)  **different levels of aggression.  However, once**

(12)  **officers determine that the animal was attacking or**

(13)  **an imminent threat to a person or destructive,**

(14)  **injured or threatening, then the officers are**

(15)  **trained to utilize their firearm.**

(16)      Q    Are officers taught about the use of a

(17)  beanbag gun against dogs?

(18)      **A    No.**

(19)      Q    Have you ever been trained or taught -- or

(20)  has the RPD ever trained or taught it officers, you

(21)  included, that a beanbag gun is a potential less

(22)  lethal option that could be used against a dog?

(23)      **A    A beanbag gun is, for the most part, not**

(24)  **readily available to officers when encountering**

(25)  **dogs.  If a plan were to be made and enough time was**

(1)                **Lieutenant Michael Cuilla**

(2)   **comes to search warrants as well and preparation for**

(3)   **warrants.  Other than that, there's training that's**

(4)   **been given and then the training in best practices**

(5)   **is passed down by officers through field training.**

(6)        Q    But the training in best practices down

(7)   through field training, that's not written policies

(8)   of the City, correct?

(9)        **A    That's correct.  That's not codified.**

(10)       Q    It sounded like you listed three written

(11)  policies, deadly physical force, response to animal

(12)  scenes and you said the search warrant policy?

(13)       **A    Yes.**

(14)       Q    So I want to put up first the response to

(15)  animal scenes and just ask you some questions about

(16)  that document, which will be marked as Exhibit 11

(17)  for this deposition.  Lieutenant, on your screen, do

(18)  you see the document entitled "Police Response to

(19)  Animal Scenes"?

(20)       **A    Yes.**

(21)       Q    And this is training bulletin that looks

(22)  like it was issued on May 16, 2017?

(23)       **A    Yes.**

(24)       Q    Do you know if it has been updated in any

(25)  way since 2017, if there's a more recent version of

(1)                    Lieutenant Michael Cuilla

(2)     for changes in training" and then in parentheses,

(3)     "including any specific changes that have been

(4)     made."  So my follow-up question is, after reviewing

(5)     any body-worn camera videos of incidents involving

(6)     officers discharging their firearms at a dog, has

(7)     the City of Rochester made any specific changes to

(8)     its training?

(9)          **A    Not that I'm aware of.**

(10)         Q    Has the City of Rochester utilized

(11)    body-worn camera recordings of incidents where

(12)    officers discharged their firearms at dogs to review

(13)    the incidents to determine whether the officer's

(14)    actions were objectively reasonable under the

(15)    circumstances?

(16)         **A    Yes.**

(17)         Q    Can you explain to me what the policy is

(18)    for the Rochester Police Department in terms of

(19)    reviewing the body-worn camera recordings of the

(20)    incidents where officers have shot dogs to determine

(21)    whether or not the officer's actions were

(22)    objectively reasonable under the circumstances?

(23)         **A    The policy on the body-worn camera review**

(24)    **is to review the body-worn camera as well as the**

(25)    **subject resistance report or incident report**

(1)             **Lieutenant Michael Cuilla**

(2)    **depending on if it's a firearm incident against a**

(3)    **dog.  That's all to be reviewed by the supervisor to**

(4)    **determine if there's any need for remedial training**

(5)    **or if that there were any violations of policy.**

(6)         Q    So other than the supervisor, is anyone

(7)    else required to review the body-worn camera video?

(8)         **A    When it is submitted to PSS, PSS may**

(9)    **choose to review the body-worn camera footage as**

(10)   **well.**

(11)        Q    Is there a requirement when an officer

(12)   discharges their firearm at a dog that PSS review

(13)   the body-worn camera video?

(14)        **A    Not that I'm aware of.**

(15)        Q    Is there a requirement that the supervisor

(16)   must review the body-worn camera video within a

(17)   certain period of time?

(18)        **A    Not that I'm aware of.  They have to**

(19)   **review the incident within a certain period of time**

(20)   **and body-worn camera review would be part of that.**

(21)        Q    What periods of time do they have to

(22)   review the incident?

(23)        **A    For just the general use of force,**

(24)   **department policy is 10 days.**

(25)        Q    When you say just a general use of force,

(1)                 Lieutenant Michael Cuilla

(2)     The next topic is "training received by each of

(3)     individually named defendant police officers

(4)     relevant to the claims and defenses in this action."

(5)     Were you prepared, before coming to testify to this

(6)     deposition today, to testify about that topic?

(7)         A    I was.

(8)         Q    Let's go up through each case, defendant

(9)     by defendant.  In the Marianne Anniszkiewicz case,

(10)    the two named defendant officers are Jennifer

(11)    Trenton and Brian Cala.  And so can you tell me, in

(12)    terms of the claim for unreasonable search of the

(13)    curtilage, what is the training that both of those

(14)    officers received about that topic?

(15)        A    They received the search and seizure

(16)    training as dictated in the academy by DCJS.  They

(17)    would receive refreshers throughout their field

(18)    training as well as any relevant inservice training

(19)    that has touched upon that topic, a roll call

(20)    training that touched upon that topic since their

(21)    hire date.

(22)        Q    What are the dates of all of the inservice

(23)    trainings that they received on those topics?

(24)        A    I am unaware of the exact dates of all of

(25)    the inservice trainings that Brian Cala has received

(1)                   **Lieutenant Michael Cuilla**

(2)        **A     It was a roll call training.**

(3)        Q     On average, how long do roll call

(4)   trainings last for?

(5)                   **MS. JONES:  Objection.**

(6)                   **You can answer now.**

(7)        **A     Eight to ten minutes.**

(8)        Q     Is that something that's like a policy

(9)   about roll call training, the length of time that

(10)  they're supposed to last?

(11)                  **MS. JONES:  I'm sorry, can you repeat**

(12)                  **that?**

(13)       Q     Is there a policy about how long a roll

(14)  call training is supposed to last for?

(15)       **A     Roll call itself lasts for 15 minutes.**

(16)  **The training has to fit within that timeframe.**

(17)  **However, multiple days can be utilized for that**

(18)  **training.  So you might run a training with several**

(19)  **compartments to it.  The last time we did the De**

(20)  **Bour training was split up into several parts and**

(21)  **part one, which was eight to ten minutes, was**

(22)  **delivered in -- within the first week.  We try to**

(23)  **catch every officer that applied to that roll call.**

(24)  **Part two was delivered the next week and part three**

(25)  **delivered the third week and so on and so forth.  So**

(1)                    **Lieutenant Michael Cuilla**

(2)      the training can actually be rather lengthy over

(3)      time.

(4)          Q    The training bulletin that we marked as

(5)      Exhibit 2 from 2019 that was entitled "Warrantless

(6)      Searches on Curtilage."  It was a two-page document.

(7)      Is that the type of roll call that would have been

(8)      more like eight minutes or more like a series of

(9)      days like you just testified to about the De Bour

(10)     training?

(11)         **A    That would be up to the supervisors.  If**

(12)     **they believe that the officers understood the**

(13)     **training within the eight to ten minutes, then they**

(14)     **wouldn't bring it up in roll call again other than**

(15)     **to reiterate it.  However, really, any roll call**

(16)     **training officers are going to get at least more**

(17)     **than once, however many times the supervisors do the**

(18)     **roll calls, however many times it takes to hit all**

(19)     **of the officers as well as make sure the officers**

(20)     **have an understanding.**

(21)         Q    Officer Cala, before the 2019 roll call

(22)     training, when is the last time before that that he

(23)     had received any training regarding the search of a

(24)     curtilage?

(25)         **A    For a specific search to curtilage, again,**

(1)                 Lieutenant Michael Cuilla

(2)        **A     I'm going to have to reference the sheet**

(3)   **for the hire date.  I do not have them memorized.**

(4)        Q     That is more than fine.

(5)        **A     2017.**

(6)        Q     If he was hired in 2017 --

(7)        **A     Then he received the training in 2017 or**

(8)   **early 2018 when he received it in the academy and it**

(9)   **was touched upon in the field training.**

(10)       Q     I forget what your answer was to my

(11)  question earlier if you know when Officer DiDomenico

(12)  began doing the Humane Society training at the

(13)  academy.  Do you remember what year that happened

(14)  in?

(15)             **MS. JONES:  Objection.**

(16)       **A     I would have to check with the academy as**

(17)  **to when that started.**

(18)       Q     Is there a possibility that there might

(19)  have been a gap there and then Officer Algarin maybe

(20)  didn't receive that training at the academy?

(21)       **A     As of 2017, no.  The training definitely**

(22)  **had started prior to 2014.**

(23)       Q     Prior to the incident in October of 2018,

(24)  when is the last time that Officer Algarin received

(25)  any training about a search of the curtilage to a