Exhibit H

[Page 1]
May 31, 2023

```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------x
CHARLES DEMPSEY, Individually, and
L.D., by Her Father and Natural
guardian, CHARLES DEMPSEY,
              Plaintiffs,
                                     Case No.
  - against -                       6:19-cv-6780


THE CITY OF ROCHESTER, a Municipal
Entity, JAVIER ALGARIN, "JOHN DOE"
RPD Officer Responsible For Training
Javier Algarin,
          Defendants.
------------------------------------------x
              Zoom Recorded Videoconference
              May 31, 2023
              10:01 a.m.


       RECORDED VIA ZOOM - EXAMINATION
BEFORE TRIAL of RENO DiDOMENICO, taken by
Plaintiffs, pursuant to Article 31 of the
Civil Practice Law and Rules of Testimony,
and Order, held at the above-noted time and
place, before Michelle Conero, a Stenotype
Reporter and Notary Public within and for the
State of New York.
```

Lexitas Court Reporting
800-678-0166

```
(1)
(2)   A P P E A R A N C E S:
(3)
(4)      ROTH & ROTH, LLP
              Attorneys for Plaintiff
(5)           192 Lexington Avenue, Suite 802
              New York, New York  10016
(6)           Phone:  212-425-1020
              E-mail:  eshields@rothandrothlaw.com
(7)      BY: ELIOT DOLBY SHIELDS, ESQ.
(8)
(9)
(10)     CITY OF ROCHESTER LAW DEPARTMENT
              Attorneys for the Defendants
(11)          30 Church Street, Room 400a
              Rochester, New York 14614-1224
(12)          Phone:  585-428-7992
              E-mail:  peachie.jones@cityofrochester.gov
(13)     BY: PEACHIE L. JONES, ESQ.
(14)
(15)
(16)
(17)  A L S O   P R E S E N T:
(18)     JAMES CROSBY
(19)     BLESSING IKWUNZE
(20)
(21)
(22)
(23)
(24)
(25)
```

[Page 5]
May 31, 2023

(1)   RENO DiDOMENICO
(2)            THE REPORTER:  Good morning.
(3)   Today is May 31, 2023.  The time is
(4)   10:01 a.m.  We're on the record.
(5)            If counsel would state their
(6)   appearances, please.
(7)            MR. SHIELDS:  Eliot Shields of
(8)   Roth & Roth, LLP for the Plaintiff,
(9)   Charles Dempsey and his daughter, L.D.
(10)           MS. JONES:  Peachie Jones for the
(11)  City of Rochester and all named
(12)  Defendants.
(13)
(14)  R E N O   D i D O M E N I C O,
(15)       having first been duly sworn by the
(16)       Notary Public, was examined and
(17)       testified as follows:
(18)
(19)           THE REPORTER:  If you would state
(20)  your full name, please.
(21)           THE WITNESS:  Reno DiDomenico.
(22)           THE REPORTER:  And what is your
(23)  business address?
(24)           THE WITNESS:  99 Victor Road,
(25)  Fairport, New York 14450.

[Page 8]
May 31, 2023

(1)  RENO DiDOMENICO
(2)  tell me anything that you did to prepare for
(3)  today's deposition?
(4)      A    **Besides talking to yourself,**
(5)  **nothing really.**
(6)      Q    Okay.  And just for the record, can
(7)  you remind us of what we talked about, you and
(8)  I?
(9)      A    **You just wanted to know about my**
(10) **lesson and to send the material to you,**
(11) **including some videos I used during my lesson.**
(12)     Q    Okay.  And did you ever speak with
(13) the City Attorney, Ms. Jones?
(14)     A    **Not in a long conversation.  Just**
(15) **briefly to let her know that you called me.**
(16)     Q    Okay.  And did you ever send Ms.
(17) Jones or anyone else at the City any materials?
(18)     A    **Just this morning.**
(19)     Q    Okay.  And what did you send them
(20) this morning?
(21)     A    **The same stuff that I sent you.**
(22)     Q    Okay.  And so would that be the
(23) three videos and the lesson?
(24)     A    **Correct.**
(25)     Q    And there were --

```
(1)   RENO DiDOMENICO
(2)         A     And a handout.
(3)         Q     And a handout.  So the handout was
(4)   the lesson with the lines to write on the
(5)   side --
(6)         A     Yes.
(7)         Q     -- the notes on the side?
(8)         A     Yes.
(9)         Q     And then there was the dog posture
(10)  handout also?
(11)        A     Correct.
(12)        Q     Anything else or was that it?
(13)        A     That was it.
(14)        Q     Okay.  And did you review any other
(15)  documents or was that it?
(16)        A     That was it.
(17)        Q     Okay.  All right.  So I want to ask
(18)  some background questions.  I'll start with
(19)  your educational background.  Can you tell me
(20)  what your highest level of education was?
(21)        A     I have a two-year associate's
(22)  degree in criminal justice.
(23)        Q     Okay.  And where did you get that
(24)  from?
(25)        A     Monroe Community College.
```

(1)  RENO DiDOMENICO

(2)  **I don't even know the circumstances of this**

(3)  **case.  It could be the same case.  I don't know**

(4)  **when this took place or -- I don't know -- even**

(5)  **know the circumstances involved.**

(6)       Q    Sure.  So let me ask you, as of

(7)  2018, is everything on this resume completely

(8)  updated and accurate?

(9)       **A    To the best of my knowledge, yes.**

(10)      Q    Okay.  You've listed, for example,

(11) all of the various relevant trainings that

(12) you've attended?

(13)      **A    Correct.**

(14)      Q    Okay.  Any like certifications you

(15) might have?

(16)      **A    Correct.**

(17)      Q    Okay.  So I'm going to just take

(18) this down for now, but I might have a few

(19) questions on that a little bit later.  Okay?

(20)      **A    Okay.**

(21)      Q    Can you give me an overview of your

(22) work experience as it relates to law

(23) enforcement?

(24)      **A    I was a sheriff's deputy for**

(25) **twenty-two years in Monroe County.  In 2007 I**

```
(1)   RENO DiDOMENICO
(2)       Q    Okay.  And so we talked about that
(3)   PowerPoint being something that you put
(4)   together for the Rochester Police Department in
(5)   2014.  Right?
(6)       A    Correct.
(7)       Q    Okay.  So I'm going to ask you just
(8)   some general questions about the training
(9)   first.  When you put together the training, did
(10)  you consult with any experts in dog behavior,
(11)  when you designed the training?
(12)      A    Yes.
(13)      Q    Okay.  And who was that?
(14)      A    Rebecca Lohnes.  She was our
(15)  behaviorist here.  As a matter of fact, most of
(16)  the pictures in there came from her.
(17)      Q    Okay.  Could you spell her last
(18)  name for me?
(19)      A    I think it's L-O -- don't hold me
(20)  to it.  She hasn't been here in a few years.
(21)  L-O-H -- let me write it.  L-O-H-E-S -- O-S, I
(22)  think.
(23)      Q    L-O-H-E-S?
(24)      A    I think there's an O in there.
(25)  L-O-H-E-O-S, I think.
```

(1) RENO DiDOMENICO
(2)     Q    Thank you.  So you said she was an
(3) employee of Lollypop Farm?
(4)     A    Yes.
(5)     Q    Anyone else?
(6)     **A    Not in the -- there was a**
(7) **behaviorist -- outside behaviorist when we**
(8) **first sat down with the sheriff's office, but**
(9) **that was it.  She was there for one meeting and**
(10) **she was not involved with the actual writing of**
(11) **anything.**
(12)    Q    Okay.  So you said when you first
(13) sat down with the sheriff's office.  So is this
(14) a training that you put together for law
(15) enforcement generally?
(16)    **A    Yes.**
(17)    Q    Okay.
(18)    **A    You want the story on that?**
(19)    Q    Yeah.  That would be great.
(20) Thanks.
(21)    **A    Okay.  So in 2013, 2012 -- 2013 the**
(22) **sheriff's office approached me and asked me to**
(23) **do a training because they were -- just got out**
(24) **of a lawsuit for shooting a dog on a warrant,**
(25) **and they just had shot a dog again in the Town**

[Page 29]
May 31, 2023

(1) **RENO DiDOMENICO**
(2) **of Perinton, and they wanted to do some**
(3) **training for their officers, so there was a**
(4) **civilian group who came to the sheriff and**
(5) **asked them to put on some sort of training for**
(6) **the officers. That's where this other**
(7) **behaviorist was part of. We sat down with**
(8) **them, they told us what we wanted -- they**
(9) **wanted. We said we could do it. So I worked**
(10) **with the commander of the sheriffs at the time,**
(11) **Dave Phelps, who also was a -- some type of**
(12) **tactics instructor, and with the help of**
(13) **Rebecca, myself and him, we put together this**
(14) **PowerPoint, and then it was given to the**
(15) **sheriff's office first and then the city**
(16) **police.**
(17)     Q    Okay. You said one name from the
(18) sheriff's office, a commander. Dave Phelps you
(19) said?
(20)     **A    Dave Phelps.  Yup.**
(21)     Q    F-E-L-T-S?
(22)     **A    P-H-E-L-P-S.**
(23)     Q    Great. Thanks. Okay. So -- and
(24) do you remember if that lawsuit was Carroll
(25) versus the County of Monroe?

(1) **RENO DiDOMENICO**
(2) **between the sheriff's version and that version**
(3) **is I added implied immunity.**
(4)     Q    You added the slides about
(5) immunity?
(6)     **A    Yes.**
(7)     Q    Okay.  I'm going to go back up and
(8) ask you some more kind of background questions
(9) about that stuff.  In addition to what you
(10) already told me, did you use any other
(11) resources to learn about dog behavior to design
(12) the training?
(13)    **A    Yes.**
(14)    Q    Okay.  What was that?
(15)    **A    Commander Phelps and myself**
(16) **actually attended a training down at Alfred**
(17) **University that was given by Randall Lockwood**
(18) **from the ASPCA, and it was a seminar for law**
(19) **enforcement and first responders on how to**
(20) **recognize dog behavior.**
(21)    Q    Okay.  And who is Randall Lockwood?
(22)    **A    Well, at the time he was the head**
(23) **behaviorist for the ASPCA.  He's the one who**
(24) **pretty much in the animal world was the expert**
(25) **in animal behavior, especially shelter animals,**

(1) RENO DiDOMENICO
(2) but they also did the -- he did a program for
(3) law enforcement and first responders.
(4)     Q    Okay.  You said that program was at
(5) Alfred?
(6)     A    Correct.
(7)     Q    And did that program -- was it
(8) specific to dogs or did it include other
(9) animals as well?
(10)    A    It was pretty much dogs, if I
(11) remember correctly.  I mean, you're talking
(12) like the summer, maybe, of 2013.
(13)    Q    Okay.  Did you attend any other
(14) trainings about dog behavior?
(15)    A    For this course, no.
(16)    Q    Okay.  Did you use any other
(17) resources, like written materials or research?
(18)    A    Yeah.  Well, the only other thing
(19) was the Department of Defense was also pretty
(20) hot on teaching law enforcement about dog
(21) encounters and they came out with a handbook.
(22) Do you want the title of it?
(23)    Q    That would be great, if you have it
(24) handy.
(25)    A    It's The Problem of Dog-Related

(1)  RENO DiDOMENICO
(2)  Incidents and Encounters.
(3)      Q    Okay.  And can you tell me about
(4)  that?
(5)      A    It's just a handbook for law
(6)  enforcement.  It discusses how to, you know --
(7)  why it's important to understand the importance
(8)  of not just shooting a dog, that there's ways
(9)  to calm a dog down.  They give statistics on --
(10) some of those are in the PowerPoint, but they
(11) give statistics on, you know, how many dog
(12) bites there are and how many people actually
(13) die from dog bites a year.  So it's kind of
(14) trying to tell the officer, or whoever is
(15) reading the book, that, you know, it's not
(16) going to be the worst thing if you get bit by a
(17) dog.  It's basically a buildup of trying to
(18) change the mentality of officers from just
(19) shooting the dog and that there's other options
(20) you can do.
(21)     Q    And how did you incorporate that
(22) into the PowerPoint?
(23)     A    So in the first part -- so
(24) basically what I did -- and again, this was
(25) just an awareness course.  This isn't -- I'm

(1)  RENO DiDOMENICO
(2)  not going to make anybody an expert in dog
(3)  behavior. This was, hey, these are some things
(4)  you can do out there. It wasn't -- I say this
(5)  right from the beginning, this is not a do not
(6)  shoot the dog. This is a there's options,
(7)  because everyone is usually trained to just
(8)  shoot dogs. There are some options to think
(9)  about. So basically knowing cops, you have to
(10) make -- get them on the same page as you to
(11) make them reassured. So that's how that was
(12) used. So I used a portion of that pamphlet to
(13) show them that, you know, you're going to be
(14) encountering dogs out there, that there are dog
(15) bites out there and, you know, it's not going
(16) to be the worst thing in the world if you do
(17) get bit, but, you know, shooting a dog in a
(18) nonemergency-type situation is not beneficial
(19) for you. There's other options you can do.
(20)         Q    Did you -- so I have some follow-
(21) ups on that. You said that usually everyone is
(22) just trained to just shoot the dog. Is that
(23) what you said?
(24)         A    Correct.
(25)         Q    So is it your understanding that

(1) RENO DiDOMENICO

(2) that was your training at the sheriff's

(3) department?

(4)     A     Well, I mean, I shouldn't really

(5) have said that.  But basically that's the

(6) mentality.  The mentality is if there's a dog

(7) attacking or acting aggressive, you shoot it.

(8) I mean, that's -- now, is that what actually

(9) happens out in the real world?  No.  Cops can

(10) use common sense.  But for certain situations

(11) -- like for myself and even some people that

(12) I've taught, they would say, I would take a

(13) bite before I shot a dog.  So, you know, not

(14) every cop thinks that way, but for the main

(15) part, you revert to training.  You're trained

(16) to do something.  If you're trained, hey, a dog

(17) comes at you or a dog attacks you, you shoot

(18) the dog.  My thing was, well, before that dog

(19) attacks you, there's things you can do before

(20) you shoot the dog.  So basically it's an

(21) awareness course for officers.  I'm not

(22) teaching them to be experts in dog behavior or

(23) handling dogs.  I'm teaching them how to be

(24) safe in the field.

(25)     Q     So basically you're teaching them

(1) RENO DiDOMENICO
(2) how to be safe in the field and tools for
(3) avoiding shooting the dog?
(4)     **A    Mm'hm'.  Correct.**
(5)          **MS. JONES:  Objection.**
(6)     Q    Okay.  I'm going to come back to
(7) that a little more later.  Based on the
(8) trainings that you attended -- well, let me
(9) back up, actually.  I'll withdraw that.  Now,
(10) you said Department of Defense.  I think it
(11) might have been the Department of Justice.  Is
(12) that right?
(13)     **A    Yeah, probably.**
(14)     Q    Okay.  And did you ever watch the
(15) videos that the Department of Justice released
(16) with that --
(17)     **A    Yes.**
(18)     Q    -- encounter training?  Are those
(19) videos incorporated into your PowerPoint at all
(20) or any of your trainings?
(21)     **A    No.**
(22)     Q    Okay.  Do you give the handouts
(23) from the Department of Justice with any of your
(24) trainings?
(25)     **A    No.**

(1) RENO DiDOMENICO
(2)     A    Repeat the question again.
(3)     Q    What aspects of dog behavior do you
(4) think are most important for police officers to
(5) understand?
(6)          MS. JONES:  Objection.
(7)     A    The most important is the first
(8) initial reaction, what they're observing when
(9) they first encounter the dog.  You know, what
(10) signs are they showing you.  There's a portion
(11) in the thing about loose and wiggly and stiff
(12) and still.  You have to identify what you're
(13) dealing with.  Okay.  And that's what's most
(14) important, because you can identify a playful
(15) dog if you use that little handout I give.  You
(16) can identify a playful dog and you can tell
(17) what dog is attacking you and being aggressive.
(18) It's the other ones, the other four that I have
(19) in there.  And again, there's many other
(20) postures a dog can give.  I'm not going to go
(21) into all that with them.  I'm doing basic.  So
(22) those other ones are what we talk about.
(23) Basically I usually refer to those dogs as more
(24) of a standoff.  It's kind of like having a
(25) person with a knife and you have a standoff

(1) RENO DiDOMENICO
(2) part of the stuff I used in my course.
(3)     Q    Got it.  And can you give us some
(4) more details about what your goals were when
(5) you created the training?
(6)     A    My goals were to reduce the dog
(7) shootings in Monroe County, and whether it was
(8) with the sheriff's office or the city police.
(9) Of course the City had more encounters at that
(10) time with dogs than the county did.  So my goal
(11) was to kind of change perception and training
(12) that they probably would have had in the past,
(13) but just reverting to pulling your gun and
(14) shooting a dog and trying to give them other
(15) options to do besides just shoot the dog.  The
(16) goal was to reduce the amount of shootings,
(17) which it did.  It did help.
(18)     Q    And did you feel that there was a
(19) lack of training or resources available to
(20) officers when it came to interacting with dogs?
(21)         MS. JONES:  Objection.
(22)     A    At that time I don't necessarily
(23) think there was a lack of training.  I think --
(24) you know, I've been doing this, you know, since
(25) mid 2000, so fifteen, sixteen years, seventeen

(1)  RENO DiDOMENICO

(2)  **in your power to defend yourself.  That's what**

(3)  **I tell the officers.  I also tell them about my**

(4)  **personal experience with dogs being here, you**

(5)  **know, and one being that I was actually**

(6)  **attacked by two pit bulls and I defended myself**

(7)  **with a baton and never shot them.  So, you**

(8)  **know, it goes to that.  Again, each officer has**

(9)  **to make their own decision, but they also have**

(10) **to -- just like anything else, they have to be**

(11) **able to justify their actions.  That's why we**

(12) **also talk about that.  That's why the implied**

(13) **immunity is in there.  That's why the body**

(14) **postures are in there.  They have to justify**

(15) **their action as to why they did what they did.**

(16)      Q    Have you ever heard of an officer

(17) being disciplined or required to get retraining

(18) as a result of an incident where they shot a

(19) dog?

(20)      A    No, I have not.

(21)      Q    You might have gone over this a

(22) little bit before, but was there anything else

(23) that you hoped officers would take away from

(24) the training?

(25)      A    No.  Not -- I mean, I think it

(1)  RENO DiDOMENICO
(2)  pretty much covered it.  Like I said, it's an
(3)  awareness course.  I wanted them to rethink.  I
(4)  wanted them to think about not just shooting a
(5)  dog because it's a pit bull.  You know, we go
(6)  over that too, different types of breeds.  Just
(7)  because you're dealing with a golden retriever
(8)  doesn't mean that dog is not going to bite you.
(9)  So, I mean, just -- again, like I said, it's an
(10) awareness course to give them things to think
(11) about.  There's some officer safety stuff I put
(12) in there.  That's what the Nampa video is.
(13) It's kind of like their final -- they call it
(14) final test, but -- because they have to tell me
(15) the danger signs and stuff that are in that
(16) video and things they could have done better
(17) after they've gone through the whole training.
(18) One of the things in that video is the backup
(19) officer is pointing a gun at the officer that's
(20) being attacked, because that guy reverts to his
(21) original training which is to pull a gun and
(22) point and shoot the dog.  Again, across the
(23) country there's a number of incidents where
(24) officers have shot each other because they're
(25) shooting at a dog.  So I try to send that

(1) RENO DiDOMENICO
(2)     A    **Basically what's written in the Ag**
(3) **& Markets Law about encountering dogs and**
(4) **shooting dogs.**
(5)     Q    Okay.  And what does that say?
(6)     A    **Well, that you can shoot a dog**
(7) **that's posing an imminent threat to a person or**
(8) **another animal.  That's basically what it is.**
(9) **Euthanasia of a dog is only supposed to be**
(10) **through sodium pentobarbital under state law.**
(11) **So those are the ones -- again, that was to let**
(12) **them know that, you know, you just can't go**
(13) **shoot a dog.  There's other options.**
(14)     Q    And do you feel that the training
(15) emphasizes deescalation and avoidance of lethal
(16) force against dogs?
(17)     **A    Yes.**
(18)     Q    And that was your intention, right,
(19) to emphasize deescalation and avoidance of
(20) lethal force?
(21)     **A    Correct.**
(22)     MS. JONES:  Objection.
(23)     Q    And how do you think the training
(24) encourages officers to avoid using lethal
(25) force?