Exhibit Q

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CHARLES DEMPSEY, individually, and L.D. by her
father and natural guardian, CHARLES DEMPSEY,

                  Plaintiffs,

v.

THE CITY OF ROCHESTER, a municipal entity,
JAVIER ALGARIN, "JOHN DOE" RPD OFFICER
RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

                  Defendants.

AFFIDAVIT OF
JAVIER ALGARIN

Case No. 19-cv-6780 (EAW)

**STATE OF NEW YORK)**
**COUNTY OF MONROE) ss:**

**JAVIER ALGARIN**, being first duly sworn, deposes and says as follows:

    1.    I am a Police Officer with the Rochester Police Department.

    2.    I submit this Affidavit in opposition to Plaintiffs' Motion for Summary Judgment.

    3.    On October 19, 2018, at approximately 4:33 p.m., the RPD received a 911 call reporting a group of black males in front of 61 Kosciusko Street engaging in open-air drug transactions.

    4.    At that time, I was already familiar with 61 Kosciusko Street, which was a recurring location of open-air drug activity.

    5.    On prior occasions that I had responded to 61 Kosciusko Street in response to complaints of drug sales, the suspects ran from the location upon police arrival. Those who fled from the police would run through the back yards behind the houses on the south side of Kosciusko Street, then towards Sobieski Street, one block to the south.

    6.    Upon learning of the October 19, 2018 911 call, I discussed the situation with

fellow RPD Officers Ryan DiSabatino, Adam Gorman and Jason Horowitz. Considering that, on prior occasions, those selling drugs at 61 Kosciusko Street had run south through the Kosciusko backyards and to Sobieski Street, we decided that two officers would respond directly to 61 Kosciusko Street while two other officers would set up on Sobieski Street, to head off the suspects if they ran south again.

7. We decided that Officers Gorman and Horowitz would go to Sobieski Street and that Officer DiSabatino and I would go to Kosciusko Street.

8. I and the other three officers each drove his own marked Rochester Police Department vehicle, which displayed the Rochester Police Department insignia and the words "Rochester NY POLICE" prominently on the sides of the vehicles.

9. As Officer DiSabatino and I arrived at Kosciusko Street, I saw a group of four black males in front of 61 Kosciusko Street, consistent with the description provided by the 911 caller. As soon as the group of males saw the marked police cars coming down the street, they fled down a driveway between 61 Kosciusko Street and the neighboring house to the west, 57 Kosciusko Street.

10. Officer DiSabatino and I both quickly exited our cars and pursued the suspects down the driveway to the back yard of 57 Kosciusko Street, which was surrounded by a tall wooden stockade fence.

11. I did not see anyone else in the back yard of 57 Kosciusko Street, but I could hear noises on the other side of the fence, leading me to believe that the perpetrators had scaled the fence and continued to flee.

12. I climbed the west wall of the stockade fence and saw one of the perpetrators fleeing to the west, so I immediately jumped over the fence into the property immediately to the west, 53

Kosciusko Street. I later learned that this was the property where the plaintiff in this action, Charles Dempsey, resided.

13. After I had jumped the fence and landed in the back yard of 53 Kosciusko Street, I saw that Officer Gorman had detained the suspect that I had seen fleeing west in the back yard of 49 Kosciusko Street, the property immediately west of the property that I was in.

14. Unlike the property at 57 Kosciusko Street, the back yard of which was surrounded by a high stockade fence, the back yard of 53 Kosciusko Street was bordered to its south and west by a three- or four-foot high chain link fence that allowed me to see the properties to the west and south (the east side of the property was bordered by 57 Kosciusko Street's stockade fence).

15. Once I was in the 53 Kosciusko Street yard, I could see that Officer Horowitz had detained one of the perpetrators in the vacant lot at 54 Sobieski Street, to the south of where I was.

16. I spoke to Officer Horowitz from over the chain link fence at the south end of the 53 Kosciusko Street back yard, and asked the individual that he had detained whether he had a gun or if he had thrown a gun during his flight from the police.

17. I asked about a gun because, in my experience, criminals who engage in drug transactions are sometimes also in possession of firearms.

18. In fact, just four days after the incident at issue here, on October 23, 2018, I responded to 61 Kosciusko Street along with Officer DiSabatino after receiving a 911 report of vice activity. On that occasion, one of the individuals who we stopped and arrested was found to be in possession of a handgun.

19. The individual that Officer Horowitz had detained on October 19, 2018 denied being in possession of a gun.

20. I then began to look around the yard at 53 Kosciusko Street to see if there were any

weapons, drugs or other contraband that had been discarded by the perpetrators as they fled from the police.

21.     The back yard of 53 Kosciusko Street was overgrown with weeds and small trees. There were also overturned chairs and rain gutters or downspouts lying on the ground. The unkempt and overgrown nature of the back yard made it difficult to discern whether there was any discarded contraband on the ground.

22.     I then went to see if Officer Gorman needed any assistance with the individual that he had apprehended, climbing the chain link fence from 53 Kosciusko Street to 49 Kosciusko Street.

23.     After speaking briefly with Officer Gorman, he suggested that I "back track" over the path of flight of the individual he had stopped, who I understood to have run from 57 Kosciusko Street, through 53 Kosciusko Street and then to 49 Kosciusko Street.

24.     Back tracking is an important part of the pursuit of a suspect because perpetrators—and particularly those suspected of being involved in drug dealing—will commonly discard drugs or other contraband during flight, including weapons, in the hopes that they are not caught with evidence of the crime.

25.     Back tracking is also important to ensure that no dangerous items—such as illegal drugs or weapons—are left behind, which would potentially put at risk innocent members of the public that might come across them.

26.     I understood the back tracking that I engaged in on October 19, 2018, as Officer Gorman was securing and searching his suspect, to be a part of the hot pursuit and directly related to the crime of drug dealing that was under investigation.

27.     I also wanted to make sure that no contraband was left in the back yards of people

who were innocent of the criminal activity.

28. I began my backtracking in the back yard of 49 Kosciusko Street, walking and visually scanning the lawn as Officer Gorman continued to search the man he had detained.

29. I then climbed the fence and crossed back into the back yard of 53 Kosciusko Street, where the hot pursuit had originally led me.

30. Within seconds of my reentering the back yard of 53 Kosciusko Street, I saw the back door to the house open, and a large black dog ran out of the house.

31. As soon as I saw the dog I began yelling "whoa, whoa, whoa" multiple times.

32. I yelled this to give notice to the dog that I was present, hoping that the dog would slow or stop.

33. I also saw a man exit the house, who I later learned was Charles Dempsey. I had hoped that yelling "whoa" multiple times would also get his attention and get him to call off the dog.

34. Despite my yelling "whoa" multiple times, the dog did not stop, and it ran down the back porch stairs of the house then turned nearly 180 degrees to run directly at me very rapidly, barking aggressively.

35. In order to put some additional space between myself and the dog, I began to walk backwards. I realized, however, that the dog was charging me far too quickly for me to turn and outrun it, or for me to climb back over the fence to safety.

36. Within seconds of my seeing the dog, it had already come to within just feet from me and was continuing to advance quickly and bark aggressively. I did not believe that I could successfully flee from the dog and I did not believe that the dog was going to stop its attack. Therefore, I removed my firearm and fired two shots at the dog, stopping its forward motion.

37. At no point was Mr. Dempsey in the line of fire of my gun. At the time that I discharged the two shots, my firearm was pointed down towards the dog that was charging at me. I have since viewed my body worn camera video of this incident. At the point in the video that the dog is shot, Mr. Dempsey can be seen on the back porch to his house. This is because the body camera is worn at chest level. Though Mr. Dempsey was in the field of view of my camera, he was not in the line of fire when I discharged my firearm.

38. Mr. Dempsey then became very upset and emotional, he began to yell and came very close to me. With my gun still drawn, I instructed Mr. Dempsey to get back. I then holstered my firearm and took out my pepper spray, continuing to tell Mr. Dempsey to get back. After a number of instructions, Mr. Dempsey did get back.

39. At no time did I tell Mr. Dempsey that he was under arrest, I did not tell him he would be cuffed, I did not tell him that he could not leave or that he had to stay at his home, and I did not attempt to put him in handcuffs.

40. At no point did I see any child present while I was in the back yard of 53 Kosciusko Street on October 19, 2018.

41. After I discharged my firearm, additional police came to the scene to investigate the firearm discharge in accordance with police procedures.

42. I was informed that the individual who Officer Horowitz had detained in the vacant lot on Sobieski Street was in possession of a number of baggies of marijuana.

43. At no point did I inspect the integrity of the fencing at the back yard of 53 Kosciusko Street and I cannot say whether there were any holes or gaps in the fencing.

_____
JAVIER ALGARIN

Sworn to before me this

16th day of June, 2020

_____
Notary Public

MICHELLE BRADBURY
Notary Public State of New York
Qualified in Monroe County – 01BR6315209
Commission Expires November 24, 2022