Exhibit R

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CHARLES DEMPSEY, individually, and L.D. by her father and natural guardian, CHARLES DEMPSEY, <br><br>                               Plaintiffs, <br><br> -against- <br><br> THE CITY OF ROCHESTER, a municipal entity, JAVIER ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER RESPONSIBLE FOR TRAINING JAVIER ALGARIN, <br><br>                            Defendants. | **SECOND AMENDED COMPLAINT** <br><br> **CASE NO.: 19-cv-6780 (EAW)** |

"Properly trained, a man can be dog's best friend."

    -- Corey Ford

## I.    <u>PRELIMINARY STATEMENT</u>

Plaintiff CHARLES DEMPSEY and his daughter, L.D., by their attorneys, ROTH & ROTH, LLP, complaining of the defendants, respectfully allege as follows:

1.    Plaintiff's Charles Dempsey and his daughter L.D. bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of their civil rights, and under New York State law.

2.    On October 19, 2018, at approximately 5:00 p.m., Rochester Police Department ("RPD") Officer Javier Algarin, shot and killed Tesla, Plaintiffs' four-year-old Black Labrador Retriever, while Algarin was trespassing in their back yard.



*Tesla, age four.*

3.      Algarin shot and killed Tesla after he unlawfully jumped a fence and entered Plaintiffs' back yard without a warrant, consent or exigent circumstances. Algarin also failed to knock and announce his presence before entering the yard.

4.      Algarin shot Tesla twice as Mr. Dempsey watched in horror. Algarin then pointed the gun at Mr. Dempsey and his ten-year-old daughter, L.D., who was standing behind Mr. Dempsey just inside the back door. Tesla died of her injuries. Mr. Dempsey and L.D. suffered and continue to suffer extreme emotional and psychological distress from the incident.

5.     According to the City, approximately 45,000 dogs reside in the City's approximately 86,000 households. Thus, it was reasonably foreseeable that Algarin would encounter a dog when he unlawfully entered Plaintiffs' back yard, and the shooting was a reasonably foreseeable consequence of the unlawful entry.

6.     The Fourth Amendment requires that officers not conduct "unreasonable searches and seizures." The point of the Fourth Amendment's prohibition against trespass into property was in part to prevent damage done by the trespassers. The Fourth Amendment was ratified out of a concern that governmental trespass to property could lead to subsequent physical harms.

7.     Algarin knew that there was a one-in-two chance that he would encounter a dog before he trespassed into Plaintiffs' back yard. He jumped the fence anyways. It is foreseeable that such reckless behavior can lead to tragic accidents like the one that occurred here.

8.     Police officers rightly remind the public that they are required to make split-second decisions in very difficult situations. These split-second decisions cannot in every case be made reliably so as to avoid harm to innocents. But these imperfect life-or-death decisions demonstrate that entry by an officer, on alert, with weapon drawn, can foreseeably result in shooting deaths, as happened here.

9.     RPD officers shoot and kill dogs at a shocking rate. From 2004 to 2009, RPD officers fired their guns 217 times at 87 dogs, killing 35. Between 2013 and 2018, RPD officers shot and killed approximately 50 dogs, including Tesla.

10. Tesla was killed because the City fails to train its officers not to trespass in residential properties and because the City fails to train its officers how to safely interact with the dogs.

11. Instead, the City appears to train its officers to trespass in residents' properties as a matter of course, without announcing their presence, and then to shoot and kill any dog they may encounter while trespassing on the innocent person's property.

12. Moreover, the City appears to train its officers that if they subjectively feel fear, however minor the cause of that fear may be, they are entitled to kill anyone or anything who makes them have that subjective feeling. The City does not train its officers that they have a duty to question whether there is a rational basis for their fear before using deadly force.

13. This is a bad policy, that kills innocent people and dogs. In this case, it killed Tesla. It could have killed Mr. Dempsey or his ten-year-old daughter, L.D. The City should take responsibility for the bullets fired by Algarin.

14. Mr. Dempsey and L.D. have brought this lawsuit to challenge the City's unlawful policies, and to seek justice for themselves and for Tesla.

## II.    Venue and Jurisdiction

15. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

16.     Venue is proper for because the events occurred in this district.

17.     Plaintiffs, in furtherance of their cause of action brought pursuant to New York State law, filed timely a Notice of Claim against the CITY, in compliance with the Municipal Law Section 50.

18.     They CITY held a 50-h hearing on April 16, 2019 for Mr. Dempsey, and waived the hearing for L.D.

19.     More than thirty (30) days have elapsed since said Notice of Claim was filed and the CITY has failed to pay or adjust the claim.

20.     This action is being brought within a year and 90 days of the event giving rise to Plaintiffs' State causes of action.

21.     This action falls within one or more of the exceptions as set forth in CPLR Section 1602, involving intentional actions, as well as the defendant, and/or defendants, having acted in reckless disregard for the safety of others, as well as having performed intentional acts.

### III. JURY DEMAND

22.     The plaintiff respectfully demands a trial by jury of all issues in this matter.

### VI. PARTIES

23.     Plaintiff, CHARLES DEMPSEY, is a citizen of the United States and a resident of the County of Monroe, State of New York.

24.     Plaintiff, L.D., is the minor daughter of CHARLES DEMPSEY, and is a citizen of the United States and a resident of the County of Monroe, State of New York.

25.     Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

26.     Defendants Rochester Police Department ("RPD") POLICE OFFICER ("P.O.") JAVIER ALGARIN ("ALGARIN") (IBM No. 2725), P.O. ADAM GORMAN ("GORMAN"), "JOHN DOE" RPD OFFICER RESPONSIBLE FOR TRAINING JAVIER ALGARIN ("DOE TRAINING OFFICER") (collectively, "Defendant RPD OFFICERS," individually, "Defendant RPD OFFICER"), are and were at all times relevant herein, officers, employees and agents of the Defendant CITY and the RPD.

27.     The Defendant RPD Officers are being sued in their individual and official capacities.

28.     DOE TRAINING OFFICER was an officer of the RPD. This defendant is the officer or officers responsible for ensuring that, on and before the date of the incident, ALGARIN was properly trained in entering onto private property, the use of firearms and in dealing with domestic animals.

29.     At all times relevant herein, the individual Defendant RPD OFFICERS were acting under color of state law in the course and scope of their

- 6 -

duties and functions as agents, servants, employees and officers of the Defendant CITY OF ROCHESTER, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the RPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the RPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the RPD.

30.     The individual Defendant RPD OFFICERS' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of plaintiff's rights.

31.     At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence in support and the authority of their offices to one another.

## V.  STATEMENT OF FACTS

32.     On October 19, 2018, Mr. Dempsey lived at 53 Kosciusko Street, Rochester, New York, with his 10-year-old daughter, L.D., and their four-year-old black Labrador retriever, Tesla.

33.     October 19, 2018 at approximately 5:00 p.m., Gorman detained a man in the back yard of 49 Kosciusko Street, Rochester, New York—which is directly next to Mr. Dempsey's back yard.

34. Gorman searched the man that he detained in the back yard of 49 Kosciusko Street.

35. Gorman did not locate any drugs, weapons, or contraband on the man.

36. At no time prior to detaining the man in the back yard of 49 Kosciusko Street was the man present in Mr. Dempsey's back yard at 53 Kosciusko Street.

37. Shortly after Gorman detained and searched the man, Algarin also arrived in the back yard of 49 Kosciusko Street.

38. Despite knowing that the man had never been present in Mr. Dempsey's back yard, Gorman instructed Algarin to jump the fence and search Mr. Dempsey's back yard at 53 Kosciusko Street.

39. On October 19, 2018 at approximately 5:00 p.m., Algarin entered Mr. Dempsey's fenced-in back yard without his consent, without exigent circumstances, without a warrant, and without probable cause or any other legal justification.

40. Algarin entered Mr. Dempsey's yard by jumping over a chain-linked fence from the neighboring back yard of 49 Kosciusko Street, Rochester, New York.

41. Prior to jumping the fence, Algarin did not announce that he was entering Mr. Dempsey's back yard, or otherwise alert Mr. Dempsey to the fact that he was entering his yard.

42. Algarin created a danger to Mr. Dempsey, L.D. and Tesla by trespassing into Plaintiffs' back yard without announcing his presence.

43. Prior to entering Plaintiffs' property, Algarin knew there was a greater than one-in-two chance that a dog resided at Plaintiff's house.

44.    Prior to entering Plaintiffs' property, Algarin had no plan for what to do if he encountered a dog on Plaintiffs' property, other than to shoot and kill the dog.

45.    Not knowing that Algarin was present in his yard, Mr. Dempsey opened the door to exit into his back yard with Tesla.

46.    Mr. Dempsey had no way of knowing that Algarin was in his yard before he opened the door to let Tesla out, since Algarin chose not to knock and announce his presence.

47.    When Tesla entered the backyard, Algarin immediately drew his gun and pointed it at her.

48.    Tesla, unaware of the danger, descended the stairs from the porch into the back yard and headed towards the vicinity of where Algarin was standing.

49.    Mr. Dempsey told Algarin that Tesla was friendly and would not hurt him.

50.    Upon information and belief, before Algarin shot and killed her, Tesla was not exhibiting any signs that any dog owner, properly trained police officer, or reasonable person exercising common sense could interpret as threatening.

51.    Having not been trained on canine behavior or how to safely interact with canines, Algarin became unreasonably fearful of Tesla as she approached to greet him.

52.    Algarin's *subjective* fear, however, was not *objectively* reasonable, as Tesla had not exhibited aggressive behavior towards Algarin.

- 9 -

53.     Inexplicably, for no lawful reason, Algarin fired two rounds from his department-issued service weapon, striking Tesla in the head and torso, killing her.

54.     After Algarin shot Tesla, he then pointed his firearm at Mr. Dempsey, without lawful purpose or justification.

55.     As Algarin pointed his gun at Mr. Dempsey he yelled at him to "get back" in a threatening manner, despite the fact that Mr. Dempsey was not threatening Algarin in any way.

56.     When Algarin pointed his firearm at Mr. Dempsey and screamed at him, L.D. was standing inside the door to the back yard, which was behind Mr. Dempsey in the direction that Algarin was pointing his gun.

57.     Mr. Dempsey ordered Algarin to leave his property, but Algarin refused.

58.     Mr. Dempsey saw Algarin fire his gun and saw Tesla bleeding out from her wounds.

59.     L.D. was standing in the kitchen when Algarin fired his gun and shot Tesla.

60.     When L.D. heard Algarin fire his gun and shoot Tesla, she immediately ran to the back door and saw him pointing his gun and Mr. Dempsey.

61.     L.D. was overwhelmed with grief that her dog and best friend, Tesla, had been shot by a police officer.

62.     L.D. was overwhelmed with terror that her father would also be shot by a police officer.

- 10 -

63.    After she was shot, Tesla ran up to the back porch to the back door near where L.D. had been standing.

64.    Tesla then went to the side of the house and lay by the gate, whimpering in pain and bleeding out.

65.    Mr. Dempsey ordered the officers, to leave his yard, but they refused to do so.

66.    Mr. Dempsey then went and held Tesla, applying pressure to her gunshot wounds to try to stop her from bleeding out.

67.    Mr. Dempsey was overwhelmed with grief.

68.    After Algarin shot Tesla, numerous additional RPD officers arrived and detained Mr. Dempsey for a period of time.

69.    During this time, none of the officers helped Mr. Dempsey care for Tesla as she lay on the ground bleeding to death.

70.    Instead, P.O. Adam Brodsky referred to Mr. Dempsey as a "fucking asshole."

71.    Eventually, the RPD officers allowed Mr. Dempsey to take Tesla to a veterinary hospital; however, by the time they arrived at the veterinary hospital, it was too late, and Tesla died from the gunshot wounds she sustained when Algarin shot her.

72.    Tesla was beloved by Mr. Dempsey, was L.D.'s best friend, and was known to their friends, family and neighbors as their loving companion and a friendly dog that would never hurt anyone.

73.     While the loss of Tesla's companionship is the most important thing to Mr. Dempsey and L.D., they understand that the defendants may claim that Tesla was nothing more than a piece of property, and not the third member of their family. Even viewed so cold-bloodedly, Mr. Dempsey lost a great deal when Tesla was taken away from him and L.D. Mr. Dempsey had gotten Tesla when she was a puppy as a birthday present for L.D., and they had Tesla for approximately four years. During that time the claimant invested significant money in Tesla's care and maintenance. In addition to the emotion loss of being deprived of a member of their family, Mr. Dempsey lost the amount he invested in Tesla over these years, which equals or exceeds $10,000. In addition, Mr. Dempsey and L.D. lost the anticipated future companionship, love and value of ownership of Tesla for her normal lifespan.

74.     Algarin and Gorman were clearly inadequately trained in conducting investigations into VICE activities.

75.     Algarin clearly had insufficient training, or incorrect training, in the legal requirements to enter onto residential property.

76.     Algarin clearly had insufficient training, or incorrect training, in dealing with domestic animals and the use of firearms.

77.     Algarin drew his firearm as soon as Tesla began to exit from the back door of Mr. Dempsey's apartment onto the back porch.

78.     At that time there was no threat.

79.     Yet Algarin had already apparently committed himself to the use of deadly force.

- 12 -

80.     The City and John Doe Training Officer either trained Algarin to make such hasty deadly force decisions, or it failed to provide him sufficient and correct training so that he might not commit to killing before a threat even materialized.

81.     Algarin's failure to pause to assess the situation is conduct that is inherently dangerous, which the City and John Doe Training Officer should have addressed through training.

82.     When Algarin fired his gun, Mr. Dempsey was present in the enclosed back yard, and L.D. was standing just inside the back door of the house—both within range of being shot by Algarin.

83.     Firing his weapon put both Mr. Dempsey and his ten-year-old daughter L.D. at unreasonable risk of danger.

84.     Algarin failed to assess the situation properly.

85.     Algarin unreasonably risked shooting and otherwise harming people when it was unnecessary to do so.

86.     The City and RPD never implemented a policy regarding the safe handling of dogs encountered during law enforcement activities.

87.     The City and RPD never provided any training to its law enforcement officers regarding the handling of dogs encountered during law enforcement activities.

88.     The City and RPD knew that dogs were often encountered during law enforcement activity.

- 13 -

89. Algarin knew the City and RPD did not provide him with a policy or training regarding how to safely interact with and/or secure a dog while engaging in law enforcement activity.

90. Despite Algarin and other law enforcement officers previously planning and discussing the policing of VICE activity in the area of Mr. Dempsey's residence, Algarin did not request a plan for the safe handling of any dog encountered during the policing activities.

91. The Defendants' only plan during the attempted policing of the VICE activities in the neighborhood was to wing it and/or kill any dog that they encountered.

92. Algarin should have reasonably expected that when he jumped the fence and entered a fenced-in back yard to a residential property, a dog would likely approach him, as more than one-in-two households in Rochester have dogs.

93. Algarin's shooting of Tesla constitutes an unreasonable Fourth Amendment seizure.

94. Algarin's shooting of Tesla constitutes an unreasonable Fourteenth Amendment deprivation of property without due process of law.

95. The City appears to train its officers that if they subjectively feel fear, however minor the cause of that fear may be, they are entitled to kill anyone or anything who makes them have that subjective feeling. The City does not train its officers that they have a duty to question whether there is a rational basis for their fear before using deadly force.

96.     This is a bad policy, that kills innocent people and dogs. In this case, it killed Tesla. It could have killed Mr. Dempsey or his ten-year-old daughter, L.D. The City should take responsibility for the bullets fired by Algarin.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### MUNICIPAL LIABILITY UNDER *MONELL*
### UNDER 42 U.S.C. § 1983
### (Against the City)

97.     Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

98.     A municipal entity can be held liable to a Plaintiff if it can be established that a constitutional injury resulted from the implementation of "official municipal policy." *Lozman* v. *City of Riviera Beach, Florida*, 585 U.S. ___ (2018).

99.     Pursuant to *Monell*, municipal liability exists only if "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okl.* v. *Brown*, 520 U.S. 397, 400 (1997) (*citing Monell* v. *Department of Social Services of New York*, 436 U.S. at 658, 694 (1978)).

100.     Thus, to establish municipal liability, a Plaintiff must establish that the municipality acted or failed to act in any one of three ways.

101.     First, the municipality adopted an official policy that deprives citizens of their constitutional rights.

102.     Second, the municipality tolerated or adopted an unofficial custom that results in the unlawful stripping of constitutional rights.

103.    Third, the municipality failed to train, supervise, or discipline its employees so as to prevent them from unlawfully depriving citizens of their constitutional rights.

104.    Notably, "[a] municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *See Connick* v. *Thompson*, 131 S.Ct. 1350, 1359 (2011).

105.    RPD officers shoot and kill dogs at a shocking rate. From 2004 to 2009, RPD officers fired their guns 217 times at 87 dogs, killing 35. Between 2013 and 2018, RPD officers shot and killed approximately 50 dogs.

106.    For RPD officers, shooting dogs is so deeply engrained its instinctive.

107.    The City's "shoot-first" policy is unreasonable, because according to the industry standards, long standing documentation and records of injuries from dogs in the United States, dog bites that cause "serious bodily injury" are extremely rare, and fatalities are even rarer.

108.    According to the industry standards, the perception that a single dog presents a life-threatening danger to a healthy adult male who is wearing a thick uniform and bullet-proof vest, is objectively unreasonable, and it has been well-documented to be a false perception.

109.    The City is deliberately indifferent to the fact that its police officers shoot and kill dogs at such an alarmingly high rate, in situations where neither the officer not any other person is in danger of physical harm.

110.    Upon information and belief, the City and the RPD do not provide any training to officers on how to properly and lawfully interact with dogs they encounter at residential properties.

111.    The City's failure to train its officers on how to safely interact with dogs is unreasonable because dogs reside in more than 50% of households in Rochester.

112.    The City estimates that there are approximately 45,000 dogs residing in households in the City. *See* Sarah Traddeo and Brian Sharp, *Dog Census helps track population, safety*, DEMOCRAT & CHRONICLE (Feb. 21, 2017).

113.    According to Census data, there are approximately 86,000 households in the City. *See* https://www.census.gov/quickfacts/fact/table/rochestercitynewyork/HSD410217#HSD410217.

114.    Thus, the City and RPD knows that any time a police officer enters a residential property, there is greater than 50% chance the officer will encounter a dog.

115.    Nevertheless, the City fails to provide any training whatsoever to its police officers on how to safely interact with dogs.

116.    Well prior to the date of the incident in question, the U.S. Department of Justice, through its Community Oriented Policing Services (COPS) Learning Portal, in conjunction with the Center for Public Safety and Justice (CPSJ) Institute of Government and Public Affairs at the University of Illinois, provided (and

continues to provide) free training videos and manuals to law enforcement officials and the general public regarding how to safely interact with dogs while engaging in law enforcement activities. *See, e.g.*, https://cops.usdoj.gov/html/dispatch/12-2013/police_and_dog_encounters.asp.

117. The City and RPD chose not to avail themselves of this free training.

118. The City and RPD's failure to train its officers on how to safely interact with dogs was unreasonable not only because there is a greater than 50% chance that officers will encounter dogs any time they enter a residential property, but also because shortly before this incident, the Second Circuit Court of Appeals admonished law enforcement agencies in Monroe County to train their officers better, stating: "Deputy Carroll, in particular, has apparently killed two other dogs in the course of executing no-knock search warrants, which indicates that officers in the County encounter these situations more frequently than they would probably prefer and that planning and training—while not always constitutionally required—may be advisable to avoid future tragedies and future litigation." *Carroll* v. *County of Monroe*, 712 F.3d 649 (2d Cir. 2013).

119. The City's decision not to heed this warning has indeed led to approximately 50 dog-shooting incidents by RPD officers since 2013, including Algarin's tragic shooting of Tesla and the instant litigation.

120. The City's Search and Seizure Policy, General Order 415, provides the City's policy with respect to the search of people, vehicles, dwellings, and buildings,

but is silent with respect to the search of the curtilage around a dwelling and/or other privately owned land.

121. The City knew that its officers routinely are required to make decisions regarding whether they are permitted by law to enter and/or search a citizen's private land/property.

122. The City knew that its officers routinely climbed fences and entered the backyards of private properties without a lawful basis on which to do so.

123. Despite it being plainly obvious to the City that additional or different training would stop the practice of its officers engaging in the aforementioned unlawful conduct, the City did not provide the training.

124. The City knew that officers routinely encountered domesticated canines on patrol without necessary and appropriate policies and training that meets the standard in the industry.

125. The standard in the industry is evidenced by US DOJ free training for law enforcement and the public regarding canine behavior and how to safely interact with canines without unnecessarily injuring them.

126. The regularity of such encounters while operating below the industry standard made the potential for constitutional violations to occur plainly obvious to the City.

127. The City did not adopt appropriate policies to govern how officers could safely interact with domesticated canines without unnecessarily injuring the animals.

128. The City knew that its officers were not properly trained regarding how to safely interact with domesticated canines without unnecessarily injuring the animals.

129. The City knew (or should have known) that the US DOJ publishes free training for law enforcement and the public regarding canine behavior and how to safely interact with canines without unnecessarily injuring them.

130. The City, however, did not provide this free and readily available training to its officers or even make them aware of its existence.

131. The City knew that its officers routinely misidentified friendly canines as threats; as happened in this matter.

132. The City knew that it had not provided police officers with a non-lethal plan regarding how to interact with domesticated canines while on patrol without unnecessarily injuring the animals.

133. The City knew that it had not provided police officers with non-lethal options regarding how to safely interact with domesticated canines while on patrol without unnecessarily injuring the animals.

134. As a direct result of the City's deficient policy and training, City officers have routinely used excessive force, including deadly force, when encountering non-threatening dogs; as happened in this matter.

135. In the alternative, as a direct result of the City's deficient policy, when City officers encountered aggressive dogs, they routinely used excessive force, often

- 20 -

immediately resorting to the use of deadly force, instead of lesser objectively reasonable force, as happened in this matter.

136. Based on the pattern of past excessive force incidents involving canines, the City was on notice that absent additional and/or different policies and training, City officers would routinely use excessive and/or deadly force against non-threatening canines or aggressive canines when not objectively reasonable.

137. For example, on September 6, 2018, two RPD officers unlawfully entered the back yard at 1747 St. Paul Street, Rochester, New York, by jumping a fence, without a warrant, consent or exigent Circumstances. The officers also did not knock or announce their presence. After jumping the fence, they encountered a four-year-old pit bull. The officers had the time and opportunity to avoid using lethal force, but instead, the officers shot the dog three times, killing it. But for the officer's trespass, they would not have shot and killed the dog. But for the officer's failure to knock and announce, they would not have killed the dog.

138. On June 10, 2018, Officers Brian Cala and Jen Trenton unlawfully entered the fenced-in yard at 236 Belknap Street, Rochester, New York, without a warrant, consent or exigent circumstances. The officers failed to knock and announce their presence. Upon entering the yard, they encountered a friendly dog named Sampson. The officers had the time and opportunity to avoid using lethal force, but instead, Cala shot Sampson in the head, killing him. But for the officer's trespass, they would not have shot and killed the dog. But for the officer's failure to knock and announce, they would not have killed the dog.

139. On September 16, 2016, Officer Tito Batson entered the backyard of 39 Lenox Street, Rochester, New York without a warrant, exigent circumstances, or consent. While trespassing in the yard, Baston encountered a dog from approximately 30 feet away, and fired a total of seven shots from his department-issued firearm, while a resident of the property was on the back porch in the yard. Luckily, as a result of this reckless conduct, neither the dog nor the person were shot, but either easily could have been.

140. On July 21, 2018, Officer James Breen, while executing a warrant at 14 Bauer Street, Rochester, New York fired two shots at a dog, striking it once. Officer Breen had the time and opportunity to use pepper spray or other non-lethal force but chose instead to shoot the dog with his department-issued glock semi-automatic handgun.

141. On June 20, 2018, Officer Derek Sterling shot a dog while responding to a 911 call in the vicinity of 105 Ambrose Street, Rochester, New York. Sterling first saw the dog from approximately 50 feet away and had the time and opportunity to avoid using any force against the dog and could have used non-lethal force. Instead, Sterling chose not to retreat to safety or use non-lethal force, but and fired two rounds from his department-issued Glock semi-automatic handgun, striking the dog at least once.

142. On April 22, 2018, Officer Justin Whitmore shot a dog while responding to a 911 call in the vicinity of 339 First Street, Rochester, New York. Whitmore had the time and opportunity to avoid using any force against the dog,

and could have used non-lethal force. Instead, Whitmore chose shoot the dog with his department-issued glock semi-automatic handgun, striking the dog in the head.

143. On March 9, 2018, Officer Connor Edwards responded to a report of an abandoned dog at 222 Spencer Street, Rochester, New York, a vacant property. The only reason the officers were at the property is because of the report of an abandoned dog. Nevertheless, the officers apparently devised no plan for what to do when they encountered the dog, other than to shoot it. Upon entering and searching the property, Edwards encountered the dog and fired three rounds of buckshot with his department-issued shotgun at the dog, hitting the dog with one round. Edwards could have easily avoided using lethal force by devising a plan of what to do when they encountered the dog, but the officers chose to enter the property with no plan other than to simply shoot the dog. Moreover, Edwards had the time and opportunity to avoid using any force against the dog and could have used non-lethal force.

144. On January 18, 2018, Investigator Burgoon and Sergeant Lee shot a dog while executing a search warrant at 856 North Plymouth Avenue, Rochester, New York. Investigator Burgoon shot the dog once with a shotgun, and Sergeant Lee shot the dog once with his handgun. Prior to executing the warrant, the officers did not develop a plan for how to safely handle any dog they might encounter upon entering the property, despite knowing there was a one-in-two chance that they would encounter a dog.

145.     Between 2013 and 2018, there were at least 40 other incidents where RPD officers discharged their firearms at dogs in various scenarios in the line of duty. Numerous times these incidents involved officers responding to calls of loose dogs, but yet the officers devised no plan for interacting with the dog other than shooting it. At least 10 of those incidents involved officers who entered a property to execute a warrant, who apparently lacked any plan for how to safely deal with any dog they encountered during the execution of the warrant.

146.     Despite it being plainly obvious to the City that additional and/or different policies and training was necessary to protect civil rights, the City did not adopt or implement the additional and/or different policies and training.

147.     Furthermore, the City did not adopt, implement, or enforce, an effective internal affairs or disciplinary procedure/program to promote and require lawful conduct from its police officers, ensure accountability to citizens, and protect the rights of citizens.

148.     The City's policy of having a deficient internal affairs/disciplinary procedure/program, was also a moving force behind Algarin's unlawful conduct because he learned that City officers were permitted to use excessive force against canines and that he would not suffer any negative employment or criminal consequence as a result of same.

149.     Despite committing a trespass, using unlawful force, and intentionally submitting a false and/or misleading official report to a law enforcement agency, the

- 24 -

City has not criminally charged Algarin, disciplined him, and/or terminated his employment.

150.    Despite the fact that RPD officers committed a trespass, used unlawful force, and intentionally submitted false and/or misleading official reports to a law enforcement agency, the City did not retrain any of its police officers.

151.    These are bad policies that kill innocent people and dogs. In this case, it killed Tesla. It could have killed Mr. Dempsey or his ten-year-old daughter, L.D. The City should take responsibility for the bullets fired by Algarin.

152.    As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed.

153.    The Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorney's fees and costs.

**SECOND CLAIM FOR RELIEF**
**UNREASONABLE SEARCH OF CURTILAGE**
**UNDER 42 U.S.C. § 1983**
**(Against Algarin and Gorman)**

154.    Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

155.    The Fourth Amendment provides, in relevant part, that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

156.    When Algarin jumped the privacy fence and entered the Plaintiffs' backyard, he did not have consent, a warrant, or the probable cause *and* exigent circumstances required to lawfully do so.

157.    Algarin is not entitled to immunity, as an objectively reasonable police officer would have understood that it was unlawful for him to jump a privacy fence to enter a private person's backyard without consent, a warrant, or probable cause _and_ exigent circumstances.

158.    Algarin's unlawful entry and search of Plaintiff's backyard is the proximate cause of the unlawful injury to Plaintiffs' property, *i.e.*, the shooting injuries inflicted on Tesla, and the resulting mental anguish that Plaintiffs suffered as a result. *See County of Los Angeles* v. *Mendez*, 581 U.S. ——, 137 S.Ct. 1539 (2017).

159.    This is because the locked fence surrounding the property is a clear warning and notice that persons other than the owner of the property should not enter without permission, and importantly, that the owner of the property is not expecting unauthorized persons to be within the locked enclosure.

160.    Moreover, commonsense dictates that the very purpose of a fence is to keep persons/animals on their respective sides.

161.    Furthermore, it is common knowledge that dogs are frequently found in the backyards of private residences in Rochester, where the City has acknowledged that more than fifty percent of households have dogs.

162.    Finally, it is common knowledge that dogs generally protect their owners and homes.

163.    There was no life/death exigency that required Algarin to immediately enter Plaintiffs' locked backyard, and had Algarin announced himself (by obtaining

- 26 -

consent or during the service of a warrant), Tesla could have been further confined before he entered.

164. Algarin entered Plaintiffs' property without a search warrant or other legal justification. Gorman instructed Algarin to enter Plaintiff's property. The property was surrounded by a sturdy fence on all sides. The gate was closed. By jumping the fence into Plaintiffs' back yard and approaching within feet of Plaintiffs' home, therefore, Algarin entered the home's curtilage.

165. Algarin's entry into the curtilage without a warrant constituted an unreasonable search in violation of Plaintiffs' rights as guaranteed by the Fourth Amendment to the United States Constitution.

166. This violation of Plaintiffs' constitutional rights caused the loss of Tesla and the other harms identified herein.

167. As a result, the Plaintiffs suffered physical and emotional injuries, monetary losses, and loss of the present and future value of their property, as well as other damages to be set forth and proved at trial.

168. The plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorney's fees and costs.

### THIRD CLAIM FOR RELIEF
### UNLAWFUL SEIZURE OF PERSONAL PROPERTY
### FOURTH AND FOURTEENTH AMENDMENTS
### UNDER 42 U.S.C. § 1983
### (Against Algarin, Gorman)

169. Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

170.    The Fourth Amendment provides, in relevant part, that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

171.    "Effects," as referenced in the Fourth Amendment, includes, personal property. *See United States* v. *Place*, 462 U.S. 696, 701 (1983).

172.    A Fourth Amendment "seizure" of personal property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States* v. *Jacobsen*, 466 U.S. 109, 113 (1984).

173.    The destruction of personal property has been determined to be a meaningful interference with an individual's possessory interest in that property. *See id.* at 124–25.

174.    As such, the Second Circuit has held that "the unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Carroll* v. *Cty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013).

175.    Tesla was allegedly regarded as property under the law, even though the Plaintiffs' loved Tesla like a member of the family.

176.    Therefore, to determine if Tesla's warrantless seizure was objectively reasonable, we "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States* v. *Place*, 462 U.S. 696, 703 (1983).

177.    It is undisputed that Algarin was trespassing in Plaintiff's yard when he shot Tesla.

178.    The violent shooting and killing of Tesla, a friendly family pet dog, in the vicinity of her family, while Algarin was trespassing in Plaintiff's yard,  is a significant intrusion on Mr. Dempsey's and LD's, Fourth Amendment interests.

179.    Algarin had no legitimate interest in trespassing in Plaintiff's yard.

180.    The unlawful entry and failure to knock and announce created the circumstances giving rise to the subsequent shooting of Tesla.

181.    Algarin's unlawful entry into Plaintiffs' property without a warrant, consent, or exigent circumstances was the proximate cause of the subsequent shooting and injuries to the Plaintiffs.

182.    The point of the Fourth Amendment's prohibition against trespass into property was in part to prevent damage done by the trespassers.  The Fourth Amendment was ratified not just to protect privacy interests, but also out of a concern that governmental trespass to property could lead to subsequent physical harms.

183.    Algarin knew that there was a one-in-two chance that a dog resided at Plaintiff's home, and that if he trespassed onto Plaintiff's property, he would encounter a dog.

184.    Under the totality of the circumstances, Algarin acted unreasonably.

185.    Algarin is not entitled to qualified immunity, as it was obviously unreasonable for him to have trespassed into Plaintiffs' back yard without a plan

for how to safely deal with any dog, when there was a 50% chance he would encounter a dog when entering the property.

186. Algarin is not entitled to qualified immunity because he violated General Order 415, "Searches/Seizures: By Raids, Search Warrant, Arrest Warrant, Without Warrant," which required him to, at the least, seek Mr. Dempsey's consent to enter his property.

187. Algarin deprived Plaintiffs of Tesla by killing her, in violation of their Fourth Amendment rights.

188. As a result, the Plaintiffs suffered physical and emotional injuries, monetary losses, and loss of the present and future value of their property, as well as other damages to be set forth and proved at trial.

189. Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorney's fees and costs.

**FOURTH CLAIM FOR RELIEF**
**UNLAWFUL SEIZURE OF MR. DEMPSEY AND L.D.**
**FOURTH AND FOURTEENTH AMENDMENTS**
**<u>UNDER 42 U.S.C. § 1983</u>**
**(Against Algarin)**

190. Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

191. The Defendants, individually and collectively, were acting under color of state law when they performed the acts complained of herein.

192. The point of the Fourth Amendment's prohibition against trespass into property was in part to prevent damage done by the trespassers. The Fourth

Amendment was ratified not just to protect privacy interests, but also out of a concern that governmental trespass to property could lead to subsequent physical harms.

193.    Algarin seized Mr. Dempsey by shooting at Tesla in his presence.

194.    Algarin seized Mr. Dempsey by pointing his gun at Mr. Dempsey.

195.    Algarin seized L.D. by shooting Tesla and pointing his gun at her as she stood in the doorway behind Mr. Dempsey.

196.    As a result, the Plaintiffs suffered physical and emotional injuries, monetary losses, and loss of the present and future value of their property, as well as other damages to be set forth and proved at trial.

197.    The plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorney's fees and costs.

### FIFTH CLAIM FOR RELIEF
### FAILURE TO INTERVENE
### UNDER 42 U.S.C. §1983
### (Against Gorman)

198.    Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

199.    Gorman had an affirmative duty to intercede on Plaintiffs' behalf to prevent and stop the violation of their constitutional rights by Algarin.

200.    Gorman failed to intervene on Plaintiffs' behalf despite having had a realistic opportunity to do so, and despite having substantially contributed to the circumstances within which Plaintiffs' rights were violated by his affirmative conduct.

201.    As a result of Gorman's aforementioned conduct, Plaintiffs' constitutional rights were violated.

202.    The plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorney's fees and costs.

## SIXTH CLAIM FOR RELIEF
## ASSAULT
### (Against Algarin)

203.    Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

204.    Algarin engaged in physical conduct which placed Mr. Dempsey in immediate fear of harmful contact.

205.    Algarin engaged in physical conduct which placed L.D. in immediate fear of harmful contact.

206.    As a result, the Plaintiffs suffered physical and emotional injuries, as well as other damages to be set forth and proved at trial.

207.    The Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorneys' fees and costs.

208.    Defendants were at all times agents, servants, and employees acting within the scope of their employment by the CITY, which is therefore responsible for their conduct.

209.    The CITY, as the employer of individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

210.    As a result of Defendants' assault and impermissible conduct, Plaintiffs were injured and harmed. Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial, together with attorney's fees and costs.

### SEVENTH CLAIM FOR RELIEF
### TRESPASS
### (Against Algarin and Gorman)

211.    Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

212.    Plaintiffs had the exclusive right to possession of their back yard.

213.    Algarin intentionally entered Plaintiff's back yard without justification or permission.

214.    Gorman instructed Algarin to enter Plaintiff's back yard without justification or permission.

215.    As a result, the Plaintiffs suffered physical and emotional injuries, as well as other damages to be set forth and proved at trial.

216.    Algarin and Gorman were at all times agents, servants, and employees acting within the scope of their employment by the CITY, which is therefore responsible for their conduct.

217.    The CITY, as the employer of individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

218.    Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial, together with attorney's fees and costs.

**WHEREFORE and in light of the foregoing**, Plaintiffs respectfully requests

that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.
[b] Award appropriate compensatory and punitive damages.
[d] Empanel a jury.
[e] Award attorney's fees and costs.
[f] Award such other and further relief as the Court deems to be in the interest of justice.

Dated: New York, New York
    December 21, 2020

Respectfully Submitted,

ROTH & ROTH, LLP

By: _____~//s//~_____
    Elliot D. Shields
    Roth & Roth, LLP
    Counsel for Plaintiff
    192 Lexington Avenue, Suite 802
    New York, New York 10016
    Phone:    (212) 425 1020
    Fax:    (212) 532 3801
    Email eshields@rothandrothlaw.com