# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Exhibit V

Elliot Shields, Esq.
Roth & Roth, LLP
192 Lexington Ave., Suite 802
New York, New York 10016

EXPERT REPORT

RE:

CHARLES DEMPSEY, individually, and L.D. by her
father and natural guardian, CHARLES DEMPSEY,

vs.

THE CITY OF ROCHESTER, a municipal entity, JAVIER
ALGARIN, ADAM GORMAN, "JOHN DOE" RPD
OFFFICER RESPONSIBLE FOR TRAINING JAVIER
ALGARIN,

Case number: 19-cv-6780 (EAW)(MWP)

January 31, 2024

All my opinions herein are rendered to a reasonable degree of professional certainty, and are informed by the type of evidence on which professionals in my field typically rely. I have been retained in the case of Dempsey et ano. vs. The City of Rochester et al, where a pet dog known as Tesla was shot by Defendant Javier Algarin during police action in the back yard of the home of Charles Dempsey.

To summarize my qualifications: I have been recognized as an expert on dog behavior, dog aggression, and dog bite investigation in many courts based on my extensive experience and training. I hold a Ph.D. in Veterinary Medical Science from the College of Veterinary Medicine, University of Florida, with specialization in Veterinary Forensics; a Master of Science degree from the College of Veterinary Medicine, University of Florida, with specialization in Veterinary Forensics. I am a Certified Behavior Consultant-Canine-Knowledge Assessed. I have been working with aggressive and dangerous dogs for over ten years. I provide training for police departments and animal control agencies regarding dangerous dogs, dog aggression, use of force in canine encounters and the investigation of dog-related incidents. Agencies that I have instructed have included the Florida Animal Control Association, the Alabama Animal Control Association, the National Animal Control Association, the Alberta Animal Control and Bylaw Officers' Association, the London Metropolitan Police and their Status Dog Unit, and other public and

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

private conferences. My sworn reports and testimony have been accepted as expert materials in many states, US Federal Courts, and in the Crown Court of the United Kingdom.

I have attended many seminars and training sessions addressing canine behavior. These are listed in the attached CV and include, but are not limited to, advanced canine behavior training, obedience instructor training, dog behavior evaluation, Bite Prevention for Law Enforcement Officers, and course work taken through the University of Florida on Forensic Animal Behavior Analysis.

I have trained police departments in the proper and effective use of less- and non-lethal force; recognition of canine body language, behavior, and dog bite risk analysis; and methods for safe engagement with domestic dogs across the United States. Most recently I trained academy staff for the Miami-Dade County Police Department (2023) so they could disseminate the training within their agency.

During my studies at the College of Veterinary Medicine, University of Florida, I completed coursework in Forensic Animal Behavior Analysis, Animal Crime Scenes/Clandestine Grave Investigation, Bite Mark Analysis, Interpersonal Violence and Animal Abuse, Veterinary Forensic Pathology, Veterinary Forensic Osteology, Animal Law, Scientific and Legal Principles of Evidence, Veterinary Pathology in Practice (Advanced), and Forensic Crime Scene Analysis. I have taught canine behavior and assessing canine behavior problems and aggression across the United States, England, Italy, Poland, Australia, and Canada.

I served as the acting Chief of Animal Care and Protective Services for the City of Jacksonville, Florida from March through December of 2016. My duties included, but were not limited to, overall management and oversight of Jacksonville Animal Care and Protective Services (ACPS); supervision of all Animal Control Enforcement personnel; oversight and approval of criminal investigations; oversight of the Veterinary Department of ACPS; oversight and supervision of the behavior section of ACPS; sitting as Special Hearing Officer for any and all appeals of Dangerous Dog declarations for the City of Jacksonville; interaction with other City divisions and outside agencies, civil and Law Enforcement; accountability and responsibility for the lawful and proper operation of the agency, and other duties as they arose. I still serve as Division Management Consultant as needed for Jacksonville ACPS. I am a Certified Animal Control Officer in the State of Florida, and I served as the Animal Control Division Manager for Bay County, Florida, from February 2008 to September 2010. During my tenure at Bay County Animal Control, my duties included daily shelter management, assuring the safe handling and humane treatment of animals in the care of Bay County Animal Control, investigating complaints of animal neglect and cruelty, overseeing and assisting in animal rescue and capture, response to calls to assist police in animal related calls, and performing investigations and making findings of fact regarding the declaration of Dangerous Dogs under Florida Statute. My training and experience also includes certification, training, and experience in humane euthanasia of animals and the legal restrictions on methods and reasons for such euthanasia. I have investigated many complaints about dogs and dog behavior

2

# James W. Crosby M.S.
1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

My agencies were members of the Florida Animal Control Officers' Association. I taught portions of the Florida Animal Control Association curriculum for the certification of Animal Control Officers including perception of threat and use of force in animal cases. I was a member of the Board of Directors of the Florida Animal Control Association and, as such, was privy to the discussions regarding establishment of Standards regarding the curriculum. I continue to provide training to members of the Florida Animal Control Association and other agencies. I am a Charter Member of the International Veterinary Forensic Science Association and an Associate Member of the American Academy of Forensic Sciences.

I served as a Police Officer with the Jacksonville Sheriff's Office from 1977 to 1999, performing twenty-two years of active service. During my career, I served as a Patrolman, a Sergeant, and a Lieutenant. My duties as a Patrolman included patrol duties, emergency response, and investigations.

As a Sergeant, my duties involved day to day on-scene supervision of call response, major calls and investigations, allegations of misconduct, critical incident response and accountability, and investigating complaints regarding use of force by my officers. Some of these investigations did result in administering or recommending disciplinary action against officers for violating Departmental guidelines and proper procedures for said use of force.

As a Lieutenant, my immediate span of control as a Watch Commander ranged up to four (4) Sergeants and forty (40) officers, plus officers in training, at any one time. I served on the Firearms Review Board for the Jacksonville Sheriff's Office, the designated Board that determined whether a discharge of firearms case was justified and reasonable under legal requirements and Department guidelines. I have attached a CV to this report detailing my work experience.

As both a Sergeant and a Lieutenant, I was trained and designated as a Field Training Officer Supervisor and had day to day responsibility to oversee the training of new officers and new supervisors in Department procedures, job tasks, and supervisory issues including the use of force and investigating cases thereof. During my career, I have made many arrests and have had many occasions to make on-scene decisions as to what level of force would be necessary under the totality of the circumstances.

## MATERIAL REVIEWED:

In forming my opinions about this case, I have reviewed the documents, videos, photographs, deposition transcripts, and items listed in Appendix "A", which include pleadings, motions and discovery materials exchanged in:

1. Dempsey v. City Of Rochester, et al., 19-cv-6780 (EAW)(MWP)
2. Gursslin v. City of Rochester, 20-cv-6508 (EAW)(MJP)
3. Anniszkiewicz v. City of Rochester, 20-cv-6629 (FPG)(MWP)
4. Cox v. City of Rochester, 22-cv-6207 (FPG)(MJP)

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

5. McGill v. City of Rochester, 22-cv-6523 (EAW)(MWP)
6. Barnes v. City of Rochester, 22-cv-6524 (EAW)(MWP)
7. Preston v. City of Rochester, 22-cv-6525 (EAW)(MWP)
8. Strong v. Perrone, 17-CV-6183 (FPG)

## SUMMARY OF INCIDENT:

Tesla Dempsey was a healthy, spayed, vaccinated three-and-a-half-year old, companion Black Labrador Retriever dog. Tesla was healthy and no significant health history is noted.

Photographs of Tesla show her to be well-nourished, well groomed, and free of signs of neglect or mistreatment leading up to her death.

At approximately 5:00 PM on October 19, 2018, Defendants Javier Algarin and Adam Gorman, and Officers Jason Horowitz and Ryan DiSabatino were dispatched to a call for what a 911 dispatcher categorized possible drug sales on the street in the vicinity of 61 Kosciusko Street, Rochester, New York.

The officers had previously responded to the same area (the vicinity of 61 Kosciusko Street) in response to complaints about open air drug sales. When officers arrived previously, the suspects escaped by running down a driveway on Kosciusko Street and through the backyards of homes on Kosciusko Street and Sobieski Street.

Thus, on the day of the incident, when the officers received the call from dispatch, they devised a plan where Algarin and DiSabatino would respond directly to 61 Kosciusko Street while Gorman and Horowitz would set up near a vacant lot at 54 Sobieski Street and wait for the suspects to run through the back yards towards them.

When the officers executed their plan, Algarin and DiSabatino pulled up to the two suspects in the vicinity of 61 Kosciusko Street, and the suspects indeed ran down the driveway and through the backyards, where Horowitz apprehended one suspect in the vacant lot at 54 Sobieski Street and Gorman apprehended another suspect in the back yard of 49 Kosciusko Street.

After the suspects ran down the driveway at 57 Kosciusko Street, Algarin's body worn camera shows that he walked down the driveway into the back yard and then jumped over a tall wooden fence into Mr. Dempsey's backyard at 53 Kosciusko Street. Algarin then searched the alleged flight path of the suspects in the rear of Mr. Dempsey's yard, near the rear fence, for contraband. When he did not find anything, while still in Mr. Dempsey's backyard, Algarin called out to the suspect Horowitz had detained in the yard at 54 Sobieski Street and asked him "where's the gun"? The man responded that he didn't have a gun. Algarin then searched Mr. Dempsey's yard further, and then jumped a chain link fence from Mr. Dempsey's yard into the back yard of 49 Kosciusko Street, where Gorman had detained the second suspect. According to Algarin's body worn camera recording, he was present in Mr. Dempsey's yard for approximately one minute and ten seconds before he jumped the fence to 49 Kosciusko Street.

4

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Gorman had searched the suspect in the yard of 49 Kosciusko Street and did not find any contraband on his person. When Algarin approached, he asked the suspect why he ran when the officers approached, and the suspect answered that he ran because he was scared, but stated he did not have any contraband. Gorman then directed Algarin to "backtrack" through Mr. Dempsey's yard at 53 Kosciusko Street to again look for any possibly discarded contraband.

When Gorman directed Algarin to backtrack through Mr. Dempsey's yard, there was no emergency. The hot pursuit had concluded, and both suspects had been apprehended and placed in handcuffs by Gorman and Horowitz. Moreover, Horowitz had located a bag that contained the marijuana that was the subject of the original 911 call. The body worn camera recordings also show that Algarin and Gorman could clearly see Mr. Dempsey's entire back yard from the back yard at 49 Kosciusko Street, and there was no gun or other contraband visible on the ground that needed to be secured immediately.

Moreover, DiSabatino was on the sidewalk in front of Mr. Dempsey's home attempting to speak with people in the neighborhood. Algarin or Gorman could have radioed to DiSabatino to ask him to knock on Mr. Dempsey's door to explain the situation and request permission to enter his back yard to search for possibly discarded contraband. Alternatively, Algarin could have walked to the front door and requested permission himself; the body worn cameras demonstrate it would have only taken him approximately 15 seconds to walk to Mr. Dempsey's front door.

Instead of seeking Mr. Dempsey's consent and assistance, which Mr. Dempsey testified he would have readily provided, Algarin walked towards the back of the house at 49 Kosciusko Street, where he located a children's picnic table, which he used to jump over the fence into Mr. Dempsey's back yard. Prior to jumping the fence into Mr. Dempsey's back yard, Algarin did not announce his presence or otherwise warn Mr. Dempsey that he was entering his yard.

When he jumped into Mr. Dempsey's backyard, he was just feet from Mr. Dempsey's back porch—nowhere near the flight path of the suspects, which was towards the rear of Mr. Dempsey's back yard, closer to fence by Sobieski Street. Algarin then proceeded to walk even closer to Mr. Dempsey's back porch.

Not knowing that Algarin was in his back yard and just feet from his back porch, an extremely unusual occurrence that Mr. Dempsey could not have anticipated, Mr. Dempsey opened the door onto his back porch to have a cigarette and let Tesla out to use the bathroom. Tesla immediately descended the stairs and quickly approached Algarin.

Defendant Algarin saw Tesla and immediately deployed deadly force: to wit, Algarin, immediately, upon sight of the dog Tesla, fired his service weapon several times at Tesla in the residential backyard that Tesla was lawfully occupying. Algarin did not attempt to deploy either of the less-lethal means of defense directly available to him, those being oleoresin capsicum spray and an expandable baton.

Tesla, within her own backyard, was struck by Algarin's gunfire. Mr. Dempsey then descended

5

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

the stairs into his backyard and asked why Algarin was in his yard and why he shot Tesla. In response, Algarin briefly pointed his service weapon at Mr. Dempsey. At the time, Mr. Dempsey's 10-year-old daughter, L.D., was standing at the back door and observed the entire interaction.

While L.D. was standing at the back door, Tesla walked onto the porch outside the back door, where L.D. observed Tesla's bullet wounds and saw her bleeding onto the porch. Tesla then walked to the side of the house, and Mr. Dempsey went and held her as she bled. L.D. and Mr. Dempsey described Tesla showing clear behavior that they recognized as behavior typical of a dog suffering from severe pain.

After Algarin shot Tesla, numerous other police officers arrived at Mr. Dempsey's home. Neither Algarin nor any of the other officers attempted to provide first aid despite having simple access to first aid/bleeding control methods such as paper towels, cloth material from the Dempsey home, or call for Veterinary care for Tesla.

Eventually, the officers told Mr. Dempsey that Animal Control could not help him and that he had to drive Tesla to the Animal Hospital on his own. After being detained and delayed by the officers for approximately 50 minutes after Algarin shot Tesla, during which time Tesla continued to exhibit behavior consistent with suffering pain and trauma, Mr. Dempsey was permitted to place Tesla in the back of his SUV and transport her to the Animal Hospital, which summarized their medical findings:

> "Gunshot wounds - one bullet in the right cranial lung lobe causing a hemothorax, one over the point of the shoulder, several large puncture wounds at exit and entrance sites. Discussed with O that I felt the first step was to take radiographs. One bullet could be visualized, but according to an officer who had spoken to the hospital manager, two shots had been fired. An X-ray could show us if the second bullet was present, and if so, where. Discussed also that there was concern for orthopedic injuries given how painful she was on shoulder manipulation.

> Informed O that Tesla's radiographs had revealed that the second bullet was in one of her lung lobes, and that this was causing her to bleed into her chest cavity, and also causing her to have arrhythmias most likely. Discussed that exploratory thoracotomy with a lung lobectomy would be indicated, but Tesla would have to be as stable as possible first. There was also significant risk associated with this procedure and explained that her arrhythmias were getting worse and could become a significant factor perioperatively. Ultimately, the unfortunate logistics of this situation were that O would have to take financial responsibility for the surgery, which would likely be $10,000+. Ultimately, due to prognosis and cost, O elected for humane euthanasia."

6

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

## OBSERVATIONS IN POLICY, TRAINING, AND SUPERVISION:

In Rochester, RPD officers are trained to "backtrack" through the curtilage to residential properties after the conclusion of a "hot pursuit" to check if the suspects discarded weapons or drugs while traversing the property.

Algarin and his supervisor, Sergeant Jason Rudolph, both testified that his entry into Mr. Dempsey's yard was consistent with his training on "backtracking" through residential properties. Algarin, however, did not remember when he received training about backtracking and did not remember if he was trained on backtracking at the police academy.

Algarin was trained on backtracking during his Field Training (the four-month on-the-job training following the police academy), and had engaged in backtracking prior to this incident during his Field Training.

Algarin testified that he commonly backtracks through the yards to residential properties like he did on the day of the incident, including jumping fences to enter residential back yards, without a warrant or the homeowner's consent. Algarin testified that he backtracks through yards to residential properties approximately once per week.

Notably, in the case of *Gursslin* v. *City Of Rochester, et al.*, 19-cv-6780 (EAW)(MWP), which involves an incident that occurred in September 2018—just one month before the incident in this case—Officers Jeremy Nellist and Joshua Kelly similarly entered the fenced-in back yard of the plaintiff's property, where they similarly encountered the plaintiff's dog, Nina, after the plaintiff let her dog out in the back yard to use the bathroom. Tragically, just like this case, when Nina approached Nellist and Kelly, they immediately resorted to the use of deadly force and shot Nina directly in front of the plaintiff, Erin Gursslin. Just like this case, the proximate cause of Nellist and Kelly shooting and killing Nina was their unlawful entry into Ms. Gursslin's back yard.

In my professional opinion, the RPD does not properly train its officers on the Fourth Amendment's prohibition against Fourth Amendment intrusions on the curtilage to residential properties. This is particularly troubling, because the RPD acknowledges that 1/3 to 1/2 of the homes in Rochester have dogs, and many interactions between police officers and dogs occur in the yards or curtilage of residential properties.

In this case, if Algarin had not unlawfully entered Mr. Dempsey's back yard, then he would not have shot and killed Tesla directly in front of Mr. Dempsey when he went into the back yard with her to have a cigarette and to let her use the bathroom. Thus, Algarin's unlawful entry into Mr. Dempsey's back yard was a direct and proximate cause of him shooting and killing Tesla.

## A. Training on interactions with dogs.

Between 2014 and 2022, RPD officers have shot and killed at least 66 pet dogs. Since officers' judgment is relied on to determine when it is necessary to shoot a dog, because they reasonably

7

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

fear for their own safety or the safety of another person, and they regularly must make split-second, decisions in highly stressful situations, they need proper training to evaluate each dog encounter. Many dog shootings occur when officers mistake the behavior of a friendly, curious dog for aggression. In many of these cases, if the officers had been properly trained in animal behavior and nonlethal tactics, they instead may have been able to manage the perceived threats without causing harm to any of the dogs or humans involved.

The only training provided to RPD officers on interactions with dogs is a one and a half to two hour "awareness course"[1] designed by Reno DiDomenico—a former Monroe County Sheriff's Deputy who is now employed by the Humane Society of Greater Rochester—entitled Dog Bite Prevention for Law Enforcement.[2] DiDomenico developed the training in 2013 at the request of the Monroe County Sheriff's Office after the Second Circuit's decision in *Caroll v. County of Monroe*. The training was first given to the RPD at an in-service in November 2014. The training was added to the RPD's police academy in approximately 2017.

DiDomenico has no specialized training for conducting any kind of law enforcement training; is not certified by any organizations as a dog trainer; is not a certified animal behavior consultant; is not a certified applied animal behaviorist; is not a certified animal welfare administrator; and is not a member of any of the leading national dog training organizations like the Association of Professional Dog Trainers, the International Association of Canine Professionals, the Pet Professional Guild, the Animal Behavior Society, the International Veterinary Forensic Science Association, or a scientific organization specializing in forensic science like the American Academy of Forensic Scientists.

DiDomenico testified that officers are "usually trained to just shoot dogs", and that his training was not a "do not shoot the dog" training, or a "dog behavior" training, but instead a "police survival tactics" training.

Only about 40 minutes, or less than half of the training, is devoted to using nonlethal force against a dog. DiDomenico emphasizes that putting a barrier between the officer and the dog is the most effective option, but that they also talk about the use of batons, flashlights, poles, sticks, CapStun or Pepper Spray, and Tasers.

DiDomenico teaches officers that most of the time when a dog charges them, it is a "bluff charge" and not an attack, so the dog does not pose an imminent threat. However, he does not teach officers how to tell the difference between a "bluff charge" and an "attack", and he does not teach officers to use non-lethal options if a dog is charging at them.

Thus, DiDomenico teaches officers that if they perceive that a dog is attacking them, then they can shoot the dog, which is what the department already trains them to do. This is despite the fact

---

[1] DiDomenico Tr. 33:21-34:3 ("[T]his was just an awareness course. This isn't – I'm not going to make anybody an expert in dog behavior."); 35:20-21 ("So basically it's an awareness course for officers."); 56:20-57:9.
[2] A condensed 10-15 minute version of this training was also provided to officers at roll call in 2019.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

that officers are almost never seriously injured if they are bitten by a dog, no officer has been killed in the United States by a dog attack since 1932, and that a dog charging at them is "a nonemergency-type situation."

DiDomenico explained that when officers do shoot a dog, they must justify their actions, and that is why he added slides to his PowerPoint about qualified immunity and dog body postures.

Notably, none of the RPD officers who testified in these seven cases could remember specifics about DiDomenico's training—other than the dog body postures. (See e.g., Cala Tr. 71:17-94:20; Trenton Tr. 128:20-1293; Brock Tr. 9:13-12:21; Leach Tr. 42:25-43:6; Alexander Tr. 114:16-23, 146:13-24, 149:18-150:5, 152:8-153:15, 157:8-14; Horowitz Tr. 108:13-113:24; Romig Tr. 67:9-68:8). Generally, most officers could remember that nonlethal options were discussed, but they could not remember specifics about the nonlethal options that were taught. For example, Defendant Javier Algarin (who took the class as part of his police academy training), remembered that the training discussed using a baton against a dog, but did not remember that the training included a discussion of using OC (Oleoresin capsicum or pepper spray) against a dog.  (Algarin Tr. 85:17-86:14, 91:15-21) Between his academy training in 2017 and the date of the deposition in July 2022, Algarin testified that he had not received any additional training whatsoever on interactions with dogs. (Algarin Tr. 91:22-92:1).

Algarin testified that he did not remember any training about how to avoid shooting a dog. (Algarin Tr. 92:19-93:24) Algarin testified that he was taught that officers were permitted to shoot a dog if it posed an imminent threat of serious bodily injury or death to the officer, but that he was not taught that a dog running at him constituted an imminent threat, and that he was unaware of any RPD officer ever being seriously injured as a result of a dog attack. (86:24-88:7) Notably, other than the Humane Society training at the academy, Algarin testified that the only other training he received about interactions with dogs was in firearms training. (Algarin Tr. 90:8-91:4)

Similarly, Vanbrederode testified that he received the Humane Society training designed by DiDomenico at the police academy, but that he was never specifically trained on the use of OC spray on a dog. Vanbrederode testified that the only training he ever received regarding an approaching or attacking dog was in firearms training—i.e., the only thing he was ever trained to do to deal with a dog that he perceived to be approaching him in an aggressive manner was to shoot the dog.

Jeremy Nellist (who shot the plaintiff's dog in *Gursslin*) testified that he took the DiDomenico training in 2014, but that he did not remember many specifics about the training, just that it discussed how to identify an aggressive dog versus a nonaggressive dog. (Nellist Tr. 154:2-19) He testified that he never received any training about how to avoid shooting a dog that was charging at him. (Nellist Tr. 145:20-23) He testified that if there is time and space, he was taught he could use OC spray, or could use a baton "as a shield". (Nellist Tr. 146:3-10) But he did not have either of these options available to him on the night of the incident; he only had his Sniper bag, which he did not attempt to use as a shield.

9

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Notably, prior to this incident, between 2008 and 2013, Nellist discharged his service weapon at dogs on three occasions. (Nellist Tr. 122:23-124:4, 159:19-21) Nellist was never required to undergo any additional training and was never disciplined in connection with this incident or those other three occasions where he discharged his firearm at dogs; instead, on each of those occasions, the entirety of the incident review only involved him speaking with the supervisor who completed the incident report, and the shootings were found to be justified. (Nellist Tr. 123:8-16, 159:22-160:12)

Similarly, Joshua Kelly (who also shot the plaintiff's dog in *Gursslin*) has also shot a dog on one other occasion in 2022. (Kelly Tr. 163:25-164:6, 166:10-169:10) Kelly had several non-lethal options on his person at the time, including pepper spray and a baton, and maybe a Taser, but he never considered using any of those non-lethal options and instead immediately resorted to discharging his firearm. (Kelly Tr. 169:14-22) The entirety of the review of the 2022 incident consisted of Kelly speaking with his Lieutenant who filled out the incident report. (Kelly Tr. 170:11-171:14)

Most officers testified that the RPD should provide additional training on how to safely interact with dogs, such as a training simulator like the one offered by Virtra, which includes the Law Enforcement Dog Encounter Training simulation.[3] (See, e.g., Horowitz Tr. 120:4-9, 129:19-130:3; Cala Tr. 134:11-17; Algarin Tr. 175:22-176:8; Gorman 158:22-24; Leach Tr. 213:15-21; Clark Tr. 117:9-14).

In Rochester, no officer has ever been disciplined or required to undergo any additional training on how to safely and lawfully interact with dogs following an incident where they discharged their firearm at a dog. This includes the August 11, 2019 incident where officer Kenneth Pinckney shot a dog in the vicinity of 755 Cedarwood Terrace. Officer Pinckney discharge his department issued shotgun at the dog from a distance of approximately 10-15 feet away in response to the dog barking in what Pinckney perceived to be an aggressive manner. However, Pinckney testified that the dog was not charging at him or even approaching him when he shot the dog. Instead, the dog had never even left the front yard area and entered the street, where Officer Pinckney was using his police cruiser as a barrier between himself and the loose dog. Numerous officers and supervisors testified that it would be unlawful and a violation of RPD policy to shoot a dog under these circumstances; yet officer Pinckney was not required to undergo any additional training or disciplined in any way after this incident. This is just one example of many bad shootings where the officers should have been required to undergo additional training and/or been disciplined.

This evidences a deliberate indifference of the Rochester Police Department to the numerous examples of officers shooting dogs in situations where the dog did not objectively pose a threat of serious bodily injury or death to the officer, as demonstrated by the numerous body worn

---

[3] See, **360° Video Inside VirTra's V-300 LE Simulator | Dog Encounter Training**, https://www.youtube.com/watch?v=xcOudK8HWwU; Paul Peluso, *Preparing for the Bark*, OFFICER.COM (Apr. 26, 2022), https://www.officer.com/training-careers/training-simulators/article/21260885/preparing-for-the-bark.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

camera recordings and other evidence exchanged in this case and the related dog shooting cases.

In Rochester, the training provided was insufficient and fell below good or best accepted practices for law enforcement training on dog interactions.

Best practices are established by the US Department of Justice Community Oriented Policing Services (COPS) division, which, in August of 2011, issued a publication The Problem of Dog-Related Incidents and Encounters, a document that recommended best professional policing practices for officer encounters with pet dogs (Dempsey 1578-1629). This was issued over seven (7) years prior to the shooting of Tesla and was made available at no cost by the COPS Office to Law Enforcement agencies across the United States. Good and accepted police practices and professional standards of care required the RPD to provide this free training to its officers and thereby establish low-cost humane training for dog encounters. The RPD violated good and accepted police practices and professional standards of care by failing to provide this free training to its officers.

In 2013, COPS also released a five-part video series, "Police and Dog Encounters", as an example of best practices in police dog encounters. That program was also widely known in police training circles and was available at no cost over five (5) years prior to the shooting of Tesla. Good and accepted police practices and professional standards of care required the RPD to provide this free training to its officers and thereby establish low-cost humane training for dog encounters. The RPD violated good and accepted police practices and professional standards of care by failing to provide this free training to its officers.

In 2015 and also available at no cost to law enforcement agencies was the training program "Dog Encounters: Keeping Officers Safe" sponsored and approved by the California Commission on POST. That program was also widely known in police training circles and was available at no cost over three (3) years prior to the shooting of Tesla. Good and accepted police practices and professional standards of care required the RPD to provide this free training to its officers and thereby establish low-cost humane training for dog encounters. The RPD violated good and accepted police practices and professional standards of care by failing to provide this free training to its officers.

The US Department of Justice Community Oriented Policing Services (COPS) Division also recognizes the training "Law Enforcement Dog Encounter Training" (LEDET)—authored by this expert—as embodying best practices and best training for Law Enforcement Officers of any level. The LEDET training was published in 2019 and is available for free to law enforcement agencies. Good and accepted police practices and professional standards of care required the RPD to provide this free training to its officers and thereby establish low-cost humane training for dog encounters. The RPD violated good and accepted police practices and professional standards of care by failing to provide this free training to its officers.

DiDomenico acknowledged that the free training published by DOJ, and the related 5-part video series (Dempsey 6479-6483), established best practices for training law enforcement officers

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

regarding dog encounters; however, he did not include any of the DOJ's materials as handouts and did not show any of the videos at his trainings. (DiDomenico Tr. 36:14-25) Good and accepted police practices and professional standards of care required DiDomenico to provide this free DOJ training to RPD officers. Because DiDomenico's training failed to incorporate this free DOJ training, the RPD violated good and accepted police practices and professional standards of care by only presenting DiDomenico's 1 ½ to 2 hour "awareness" course to its officers.

RPD Commander Fabian Rivera also acknowledged that the DOJ training established best practices nationally and in New York State—particularly where, as here, there is no State-mandated training by the Division of Criminal Justice Services or the Municipal Police Training Counsel. In fact, Rivera testified that the DOJ establishes a baseline for the foundation of what training requires, and that the RPD is not permitted to go below their standard. (Rivera Tr. 88:11-18, 191:7-24). Rivera testified that in the absence of State mandated training, the DOJ training "would be a course that … if offered, it should be taken." (Rivera Tr. 106:21-107:25). Nevertheless, the RPD never offered the DOJ training to its officers. (Rivera Tr. 108:2-5). Thus, Rivera confirmed that the RPD violated good and accepted police practices and professional standards of care by failing to provide this free training to its officers.

RPD officers also do not have any scenario-based training where they must decide whether to use a firearm or a less lethal weapon against a dog; don't have any "shoot / don't shoot" training involving dogs; and the RPD does not utilize any simulation-based training involving dogs. (Leach Tr. 41:3-12; Laureano Tr. 146:25-147:12; Rivera Tr. 188:23-189:17; Cala Tr. 133:21-134:7; Springer Tr. 210:19-211:16) Moreover, differentiating between situations where it is appropriate to shoot versus where officers should use less lethal force is not something that DiDomenico emphasizes in the training he provides to RPD officers. (DiDomenico Tr. 226:19-227:21)

As statistics from several major cities now demonstrate, when police officers are equipped with such training, they are more likely to react in ways that preserve public safety without incurring the significant emotional, physical, and financial costs associated with unnecessarily using deadly force against dogs they encounter in the line of duty.

For example, in Buffalo, in 2014, in response to a similar epidemic of police shooting pet dogs, the Buffalo Police Department implemented department-wide training on best practices for law enforcement encounters with pet dogs. At this simple day-long in service training, the Buffalo Police Department showed its officers the five short training videos regarding how to safely interact with dogs while engaging in law enforcement activities, that were developed by the DOJ. After the training, there was an immediate precipitous drop in the number of pet dogs shot by police in Buffalo: the number of dogs shot by police dropped 62%—with 10 dogs shot in 2017, down from 26 in 2013.[4] Notably, Buffalo implemented this training four (4) years prior to the shooting of Tesla and the Rochester Police Department. Good and accepted police practices and

---

[4] Danny Spewak, *As training expands, BPD shooting fewer dogs*, WRGZ 2 NEWS (Nov. 14, 2017), https://www.wgrz.com/article/home/as-training-expands-bpd-shooting-fewer-dogs/71-491804514.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

professional standards of care required the RPD to take notice of the effectiveness of the DOJ training in Buffalo and to provide this same free training to its officers. The RPD violated good and accepted police practices and professional standards of care by failing to take notice of the effectiveness of this training in Buffalo and provide this same free training to its officers.

Similarly, in Milwaukee, the number of dogs killed by police fell from 48 to 28 within just the first year of training officers to interpret dogs' behavior and use less-lethal force.[5] Notably, the City of Chicago achieved a 67% drop in the number of police officers shooting at dogs after it finally instituted comprehensive animal encounter training along with updated policies and procedures— falling from 73 incidents in 2014 to 24 in 2017.[6]

After Texas passed statewide legislation in 2015 requiring officers to have 4 hours of animal encounter training, the number of dogs shot by police in that state fell from 281 in 2014 to 32 in 2018—a drop of over 90%.[7]

The Los Angeles Police Department, a leader in advancing police methodology and contemporary police practices, recognized in 2009 that proper training and procedures for officer encounters with pet dogs was essential for the safety of its officers and the protection of pets from excessive force. They issued Directive 7 (Dempsey 1684-1686), instructing their officers on proper use of less- and non-lethal force options with pets. This occurred nine (9) years prior to the shooting of Tesla and good and accepted best police practices and professional standards of care required the Rochester Police Department to be aware of such policy from a leading department in the field, and implement similar policies, as was done by many other police departments. For example, other police departments have implemented similar policies to the LAPD include: the Austin Police Department (Policy 202, see Dempsey 1687); the Baltimore Police Department (Policy 1115, see Dempsey 1688); the Chicago Police Department (Policy G03-02, see Dempsey 1688); the Las Vegas Metropolitan Police Department (Policy 6/002.00, see Dempsey 1689-90); and the Denver Sheriff's Department (Policy 5011, see Dempsey 1690); among others.  Many states require similar policies of their police departments.

The International Association of Chiefs of Police (IACP) is a well-recognized and well-respected organization that recommends best practices for Law Enforcement agencies. The IACP provides general and specific guidance for Police Departments regarding important legal and procedural

---

[5] Dinesh Ramde, *Milwaukee Police No Longer Shooting as Many Dogs, Thanks in Part to Training*, ST. PAUL PIONEER PRESS (June 14, 2014), https://www.twincities.com/2014/06/14/milwaukee-police-no-longer-shooting-as-many-dogs-thanks-in-part-to-training/.
[6] Dawn Turner Trice & Jeremy Gorner, *Are police too quick on the draw against dogs?*, CHICAGO TRIB. (Aug. 6, 2013), https://www.chicagotribune.com/news/ct-xpm-2013-08-06-ct-met-cops-shooting-dogs-20130806-story.html. One Chicago police officer candidly credited the new training and scrutiny for the dramatic drop in the number of dogs shot in 2017, stating, "In the past, you saw a dog, you shot it. Now, there is a thought process." *Id.*
[7] Resolution 103A, Report of the Tort Trial and Insurance Practice Section, American Bar Association at 11 (Feb. 17, 2020), https://www.americanbar.org/content/dam/aba/directories/policy/midyear-2020/2020-midyear-103a.pdf

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

issues. (See Dempsey 1654).

The International Association of Chiefs of Police (IACP) has published a Model Policy on canine encounters. In their Model Policy, the IACP puts forth procedures for force escalation as it applies specifically for canines.  It states in part:

> *"C.  Force Mitigation*
>
> *...*
>
> *If the foregoing does not appear effective, officers should do the following:*
>
> *Say "Stop" in a deep, low, and loud voice.*
>
> *If the canine continues to move aggressively, use OC spray to the eyes and mouth.  OC spray is extremely effective for stopping and stunning canines.*
>
> *Use electronic control weapons fired horizontally and at a distance of less than 10 feet, to ensure the best chances of making contact with the canine's body mass.*
>
> *If the canine comes within arm's reach, present a target, such as a baton, night stick, or flashlight held sideways, and allow the canine to bite on it while moving away.*
>
> *Provide distractions such as food, which may also help by providing time to move away from the canine to a safe location.*
>
> *Utilize commonly available items, such as clipboards, to block or redirect an attack.*
>
> *Consider the use of any position, location, or physical object that creates a barrier between the officers and the canine.*
>
> *Take advantage of the patrol vehicle's fire extinguisher to effectively repel an aggressive canine."*

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Peer reviewed literature and training provides that dog teeth should not be considered as weapons.  The Problem of Dog-Related Incidents and Encounters, published by the Community Oriented Policy Services U.S. Department of Justice, states, on page 27:

> *"Officers should understand that no single dog presents a plausible risk of fatality to an able-bodied adult accompanied by other humans.  In fact, only a very few dogs of the very largest types can match the force potential of even an unarmed human.  A dog's teeth can only be characterized as "weapons" in the sense that human fists can be so characterized."*

The Problem of Dog-Related Incidents and Encounters also states that even when a dog bites, the "overwhelming majority of dog bites are minor, causing either no injury at all or injuries so minor that no medical care is required."  (p. 3.)  This opinion is supported by many sources and peer-reviewed studies across the United States and other countries.

It is widely recognized within the Police profession, and clearly and widely accepted as proper contemporary police practices, that deadly force should be a **last resort** for multiple reasons, not the least of which is that every time a firearm is discharged, unintended injury or death may result.

As statistics from several major cities now demonstrate, when police officers are equipped with such training, they are more likely to react in ways that preserve public safety without incurring the significant emotional, physical, and financial costs associated with unnecessarily using deadly force against dogs they encounter in the line of duty.

> *The Los Angeles Police Department, a leader in advancing police methodology and contemporary police practices, recognized in 2009 that proper training and procedures for officer encounters with pet dogs was essential for the safety of its officers and the protection of pets from excessive force. They issued Directive 7 (Dempsey 1684-1686), instructing their officers on proper use of less- and non-lethal force options with pets. This occurred nine (9) years prior to the shooting of Tesla, and the Rochester Police Department, as a professional organization, should have been expected to be aware of such policy from a leading department in the field.  Other police departments have followed suit, including the Austin Police Department (Policy 202, see Dempsey 1687); the Baltimore Police Department (Policy 1115, see Dempsey 1688); the Chicago Police Department (Policy G03-02, see Dempsey 1688); the Las Vegas Metropolitan Police Department (Policy 6/002.00, see Dempsey 1689-90); and the*

15

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

> *Denver Sheriff's Department (Policy 5011, see Dempsey 1690); among others. Many states require similar policies of their police departments.*
>
> *The US Department of Justice Community Oriented Policing Services (COPS) division issued, in August of 2011, a publication* The Problem of Dog-Related Incidents and Encounters, *a document that recommended best professional policing practices for officer encounters with pet dogs (Dempsey 1578-1629). This was issued over* seven (7) *years prior to the shooting of Tesla and was made available at no cost by the COPS Office to Law Enforcement agencies across the United States. The Rochester Police Department should have been expected to take advantage of this free material and thereby establish low-cost humane training for dog encounters.*
>
> *The International Association of Chiefs of Police (IACP) is a well-recognized and well-respected organization that recommends best practices for Law Enforcement agencies. The IACP provides general and specific guidance for Police Departments regarding important legal and procedural issues. (See Dempsey 1654).*

These statistics and policy changes from other major cities and leading national policing organizations were all available to the Rochester Police Department prior to the incident in this case where Algarin shot Tesla. Good and accepted police practices and professional standards of care required the RPD to be aware of trends in law enforcement policies and training around the country, particularly training that was so effective and available at no cost. The RPD violated good and accepted police practices and professional standards of care by failing to stay abreast of these trends in training and policy practices around the country and statistics regarding their effectiveness, and by failing to implement similar policy changes and to provide this same free training to its officers.

## EFFECTIVENESS OF LESS- AND NON-LETHAL TOOLS:

Oleoresin capsicum (OC or "pepper spray") spray is a highly effective tool to use on dogs. The Baltimore Police Department conducted a study wherein OC spray was used in 20 incidents where dogs posed a danger to officers, including large dogs that weighed more than 50 lbs. OC spray was effective nearly 100% of the time, and no officers using this method were injured. (The Problem of Dog-Related Incidents and Encounters, p. 29). Yet, despite the recognized effectiveness of O.C. spray, Algarin never attempted to use that or any other less- or non-lethal strategy in his encounter with Tesla.

16

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Notably, as mentioned above, The International Association of Chiefs of Police (IACP) recommends the use of OC spray as a safe and effective force mitigation tool, and notes that "OC spray is extremely effective for stopping and stunning canines." Similarly, the National Animal Care & Control Association (NACCA) recommends the use of OC spray as a defensive tool that officers can use against aggressive dogs.

Use of a baton, either collapsible or rigid, is also widely recognized as an effective less-lethal tool for ensuring officer safety from an approaching dog. Although they may be used in extremis as impact weapons, in dog encounters they are better and more reasonably used to maintain safe space between an officer and a dog.

Again, IACP and NACCA both recommend that officers use collapsible batons in interactions with aggressive dogs, and suggest that officers should be trained on presenting it to the dog when it is within arm's reach as a target for the dog to bite.

Tasers are also widely recognized as an effective less-lethal tool for ensuring officer safety from an approaching dog. Taser International even makes a model that offers features to make it more effective when used on dogs and other animals. (Dempsey 2487-88). In its user training manual, Taser includes an entire section and a video about how to properly use Tasers against dogs.

Notably, as mentioned above, IACP recommends the use of Taser's as a safe and effective force mitigation tool that can and should be used against aggressive dogs that are within 10 feet of an officer. Similarly, the NACCA recommends the use of Tasers as a defensive tool that officers can use against aggressive dogs.

Nevertheless, the Rochester Police Department tells its Taser-certified officers to ignore this training, and instead in situations where a Taser could be effectively deployed, the RPD directs its officers not to use a Taser and to instead use their firearm to shoot the dog. This is a violation of good and accepted best practices.

The fact that the Rochester Police Department directs its officers to ignore good and accepted best practices with respect to using Tasers as a safe and effective non-lethal tool to use against aggressive dogs—as established by respected national policing and animal welfare organizations, ICAP and NACCA—demonstrates that the RPD does not place any value or emphasis on the use of non-lethal or less lethal weapons against dogs, and underscores the RPD's shoot first policy.

## SUMMARY OF OPINIONS:

The opinions that I render in this matter are based on my professional experience, training, education and personal observations, and my application of those items to my review of the materials from this case.

1) According to Algarin's responses to his deposition questions and his interrogatory responses, and the numerous other deposition testimony

17

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

reviewed, the RPD did not appropriately train its officers on the criteria for rendering a determination as to when an exigency existed that would justify the entry into a private residential yard, as Algarin did. From the standpoint of any reasonable officer, the fact that two suspects had been detained and handcuffed on neighboring properties after a short pursuit, and that they possibly discarded contraband in Mr. Dempsey's back yard, would not serve as an exigent circumstance that would validate an Officer's decision to enter a private yard, and thereby inviting all the risks that come from jumping the fence into a strange private residential yard in such a manner.

2)  Algarin's entry into the Plaintiffs' fully enclosed residential back yard—the curtilage to his property—was without the sort of exigency that would need to exist to justify such an entry. The entry itself into the yard was objectively improper and reckless from the standpoint of any reasonable, well-trained police officer. The entry into the yard violated good and accepted police practices and professional standards of care.

3)  Algarin failed to request consent or provide any warning whatsoever to Mr. Dempsey prior to entering his property. The evidence shows that Algarin could have radioed to DiSabatino to request that he knock on Mr. Dempsey's front door to request his consent for officers to search his yard. The body worn cameras also show that it would have only taken Algarin approximately 10-15 seconds to walk from the back yard of 49 Kosciusko Street to Mr. Dempsey's front door to knock and request permission to search his back yard. And Mr. Dempsey stated at his deposition that he would have consented to the officer's request. Any reasonable officer in 2018 would have known that because exigent circumstances did not exist to justify entry into the yard, they should request permission prior to entering the yard to search for possibly discarded contraband. At the very least, Algarin should have announced his presence and intent to enter Mr. Dempsey's yard prior to jumping the fence by, for example, yelling in a loud voice, "Rochester Police Department, we are entering your yard, please remain inside of your home." Algarin's failure to request consent or announce his presence prior to entering the yard violated good and accepted police practices and professional standards of care.

4)  Algarin had no plan for the use of less-lethal or non-lethal force regarding encountering any dog, including Tesla, in this incident. On the day of the incident, Algarin and his partners devised a plan to force the suspected drug dealers to run through residential back yards on Kosciusko Street and Sobieski Street. They acknowledge that a high percentage of residential properties in this neighborhood—between 1/3 and 1/2 of homes—have a dog. Yet they did not do anything to check whether Tesla or any dog resided at 53 Kosciusko Street, or whether any dogs resided at any of the other

18

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

neighboring properties, prior to executing their plan and entering these residential back yards. However, the fact that the yard at 53 Kosciusko Street was completely fenced in was a clear sign that a dog may reside at that property. In 2018, no reasonable and well-trained officer would fail to make and implement such a non-lethal plan for dealing with a dog they may encounter, and the lack of any plan directly led to the needless shooting of the dog Tesla. Failure to recognize the availability of, or to attempt to use less- or non-lethal methods in his encounter with Tesla constituted objectively reckless and unjustified action by Algarin, and violated good and accepted police practices and professional standards of care.

5) Defendant Algarin immediately opened fire on sight of Tesla rather than attempting, even momentarily, an alternative control measure, such as talking to the dog or using his baton or pepper spray. The body worn camera video and Algarin's testimony about the dog charging suggests he shot the Tesla out of surprise and fear as opposed to making any kind of determination that the dog posed an actual threat to him. If Algarin had received proper training in accordance with good and accepted best practices, he would have realized that Tesla in fact did not pose a threat of serious physical injury or death to him. Without the establishment of a credible and immediate threat of serious bodily injury or death, there was no justification for Algarin to fire his sidearm.

6) Algarin was firing without regard for any potential collateral risk to person(s) that might have been behind Tesla. Defendant Algarin never checked for other occupants in the home, nor did he contact the Plaintiffs to ascertain whether there were other animals or persons within the home lawfully. Algarin fired his sidearm in Mr. Dempsey's back yard while standing just feet from Mr. Dempsey's back porch, where Mr. Dempsey was present. Mr. Dempsey's daughter was inside of the house. Algarin should have recognized that a distinct possibility existed that a human or other animal subject could have been within the home and thereby needlessly and recklessly exposed to injury or death from one or more of the bullets fired.

7) In my professional opinion, Algarin's entry into the Plaintiffs' fully enclosed residential back yard—the curtilage to his property—was without the sort of exigency that would need to exist to justify such an entry and was objectively unjustified from the standpoint of any reasonable police officer. The entry was contrary to what any reasonable, well-trained officer would do in such a circumstance, and was in conflict with recognized professional practice.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

8) The use of immediate deadly force against Tesla in this instance was objectively unreasonable from the standpoint of any reasonable police officer. The deployment of deadly force was contrary to what any reasonable, well-trained officer would do in such a circumstance, and was in conflict with recognized professional practices.

9) In my professional opinion, the use of immediate deadly force against the dog Tesla was needless and reckless as seen from the standpoint of any reasonable police officer. The deployment of deadly force was contrary to what any reasonable, well-trained officer would or should do in such a circumstance, and was in conflict with recognized professional practices and statutes that require a clear and valid threat before the implementation of deadly force.

10) In my professional opinion, the City of Rochester exhibited deliberate indifference by failing to provide any of the free and effective trainings that were widely available and easily accessible regarding how to safely and lawfully interact with dogs. As detailed herein, years before this incident, data from cities nationwide that implemented this training demonstrated its effectiveness in reducing the number of dogs shot by officers. It was objectively unreasonable for the Rochester Police Department to ignore these national best practices, as implemented by the Buffalo Police Department and numerous other departments nationwide.

11) Despite recognized, nationally respected professional policing organizations that have produced training materials to establish awareness of the need for proper handling of officer-canine encounters and the duty to protect the property rights of companion animal owners, the Rochester Police Department and in particular Defendant Algarin, has failed to recognize contemporary police practices and has instead used deadly force against a companion animal despite the presence of effective less-lethal and non-lethal means. Best professional policing practices are established by the US Department of Justice Community Oriented Policing Services (COPS) division, which, in August of 2011, issued a publication The Problem of Dog-Related Incidents and Encounters, a document that recommended best professional policing practices for officer encounters with pet dogs (Dempsey 1578-1629). This was issued over seven (7) years prior to the shooting of Tesla and was made available at no cost by the COPS Office to Law Enforcement agencies across the United States. Good and accepted police practices and professional standards of care required the RPD to provide this free training to its officers and thereby establish low-cost humane training for dog encounters. The RPD violated good and accepted police practices and professional standards of care by failing to provide this free training to its officers.

20

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

12) The US Department of Justice Community Oriented Policing Services (COPS) Division did, prior to the time of this incident, recognize "Police and Dog Encounters", released in 2013, as being an example of best practices in police dog encounters. That program was also widely known in police training circles and was available at no cost. The RPD did not avail itself of this information and training, which was a deficient act not in accord with police best practices. Good and accepted police practices and professional standards of care required the RPD to provide this free training to its officers and thereby establish low-cost humane training for dog encounters. The RPD violated good and accepted police practices and professional standards of care by failing to provide this free training to its officers.

13) Released in 2015 and available at no cost was the training program "Dog Encounters: Keeping Officers Safe" sponsored and approved by the California Commission on POST. The RPD likewise did not avail itself of this information and training, which was a deficient act not in accord with police best practices. Good and accepted police practices and professional standards of care required the RPD to provide this free training to its officers and thereby establish low-cost humane training for dog encounters. The RPD violated good and accepted police practices and professional standards of care by failing to provide this free training to its officers.

14) The Rochester Police Department did not take advantage of any of these examples of best police practices on police dog encounters despite them being no-cost and easily available to train RPD officers. The fact that the Buffalo Police Department availed itself of the DOJ training in 2014, four years before Algarin shot Tesla, and saw an immediate precipitous drop in the number of dogs shot by police, demonstrates that the Rochester Police Department could and should have availed itself of the same or similar training. Good and accepted police practices and professional standards of care required the RPD to take notice of the effectiveness of the DOJ training in Buffalo and to provide this same free training to its officers. The RPD violated good and accepted police practices and professional standards of care by failing to take notice of the effectiveness of this training in Buffalo and provide this same free training to its officers.

15) In my professional opinion, this evidences an abrogation of the RPD's responsibility to provide safe and effective services to their citizens. It is suggested that such abrogation was a factor in Algarin shooting/killing Tesla. Certainly, in this instance, his objectively unreasonable and dangerous conduct was what directly led to the death of, from all accounts, a very beloved and friendly companion animal, aka Tesla.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

16) The Rochester Police Department still fails to adequately train, supervise and discipline its officers regarding how to safely and lawfully interact with dogs on residential properties. The training provided by Reno DiDomenico through the Humane Society falls short of good and accepted best practices. First, the training is only 1 ½ to 2 hours long; best practices require at least a four-hour training. Second, the training does not emphasize how to safely interact with dogs, for example, by using less lethal tools such as OC spray, beanbag guns, batons, etc. At a minimum, the RPD should have provided its officers with the same training that the Buffalo Police Department provided to its officers in 2014—the free training published by the U.S. Department of Justice, through its Community Oriented Policing Services (COPS) Learning Portal, The Problem of Dog-Related Incidents and Encounters, and the five-part video series, along with the other available programs listed above and other trainings that may have since been developed..

17) The Rochester Police Department still fails to adequately supervise and discipline its officers when there is a bad shooting of a dog.  The fact that the RPD has never required an officer to undergo additional training and has never disciplined an officer for shooting a dog, including the August 11, 2019 incident where officer Kenneth Pinckney shot a dog in the vicinity of 755 Cedarwood Terrace, demonstrates the RPD's deliberate indifference to the longstanding and widespread problem of RPD officers shooting dogs when they do not pose an immediate threat of causing serious bodily harm or death to the officer or any other person.

18) In my professional opinion, the Rochester Police Department's failure to adequately train its officers regarding how to safely interact with dogs was a proximate cause of Algarin shooting and killing Tesla.

## OTHER DOCUMENTS AND PUBLICATIONS CONSULTED DURING THIS CASE:

1. Beaver, B. et al, AVMA Task Force on Canine Aggression and Human-Canine Interactions. A community approach to dog bite prevention. JAVMA 2001; 218: 1732-1749.
2. Pets Advisor Special Report "Gunned Down: Why Are So Many Dogs Being Shot By Police", petadvisor.com, May 2013
3. Maddox, Gary P. PhD "Officer Safety Corner: Dogs and the Police Response: A Guide for Safe, Successful, and Humane Encounters", Police Chief Magazine, July 2014.
4. Bathhurst, Cynthia et al, The Problem of Dog Related Incidents and Encounters, US Department of Justice Publication, Community Oriented Policing Services, 2011
5. Los Angeles Police Department Use of Force Tactics Directive, Directive Number 7, "Dog Encounters" July, 2009
6. International Association of Chiefs of Police "IACP Model Policy, Law Enforcement

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Interactions with Canines", IACP Policy Center, 2015.
7. Haag, Lucien, Shooting Incident Reconstruction, Library of Congress Cataloging-in-Publication Data, 2006.
8. NACA Guidelines, National Animal Care & Control Association, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.nacanet.org/wp-content/uploads/2019/03/NACA_Guidelines.pdf

## COMPENSATION

In this case, I have applied the following fee structure. That is:

Fatal dog bite investigations, bite consultation, use of force review: cases are billed as follows:

Initial investigation, review of facts, consultations, and all other duties through the issuance of a final incident/investigation report except for travel and lodging if needed, is at a flat rate of $3000.00, to be paid at a rate of $1500.00 at acceptance of the case and $1500.00 at case conclusion.

Deposition testimony is billed at $200.00 per hour, three (3) hour minimum payment regardless of time actually in deposition less than three (3) hours. Further hours are billed at $200.00 per hour or part thereof. Payment for deposition by opposing counsel is expected at the time of the deposition, or payable in full no more than thirty (30) days after the conclusion of the deposition.

Travel time is billed as travel expense plus the hourly rate for airline listed flight time.

## LIST OF PUBLICATIONS AUTHORED BY Dr. JAMES W. CROSBY

Canine Aggression Blog-online at canineaggression.blogspot.com

Public Service announcements broadcast on WKGC Radio, Panama City, Florida, as part of a recurring program giving pet advice from 2008 through 2009.

"The Specific Use of Evidence in the Investigation of Dog Bite Related Human Fatalities", (2016) submitted in partial fulfillment of the Degree of Master of Science to the University of Florida.

Chapters "Investigating Serious and Fatal Dog Attacks" and "Bite Mark Analysis and Interpretation" for the book Dog Aggression, (2017) edited by Mills and Westgarth, 5M Publishing, Benchmark House, Sheffield, England

"Review of the Literature: Law Enforcement Use of Deadly Force Against Domestic Dogs"

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

(2018), United States Department of Justice Publications, Office of Community Oriented Policing Services (in print).

"Law Enforcement Dog Encounter Training", 2018, National Law Enforcement Center on Animal Abuse/National Sheriffs' Association/United States Department of Justice, Office of Community Oriented Policing Services.

"Dangerous Dog Investigations", in Humane Animal Control: Effective Enforcement, Shelter Management, Local Government Support and Community Engagement, (2018) Best Friends Animal Society, Kanab, Utah

## PREVIOUS EXPERT TESTIMONY

Court cases Dr. James W. Crosby has testified in or provided expert opinion over the past 4 years are all contained and listed in Dr. Crosby's full CV.

I explicitly reserve the right and ability to amend, modify, or expand this opinion based on the introduction of additional evidence or items not in my possession. I also reserve the right to research and examine other materials not listed above to assist in establishing further opinions as such may become known or necessary.

Respectfully submitted,

James W. Crosby, CBCC-KA, Consultant

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

## APPENDIX A: MATERIALS REVIEWED

1. The following deposition transcripts:
   a. Anniszkiewicz - Corey Clark transcript.pdf
   b. Anniszkiewicz v City of Rochester et al - Officer Brian Cala_full_ex.pdf
   c. Anniszkiewicz v City of Rochester et al - Sergeant Jennifer Trenton_full_ex.pdf
   d. Barnes - Celentano transcript 704512-001.pdf
   e. Cox - Brock transcript 714669-001[33].pdf
   f. Cox - Caruso transcript (cox) 711632-001.pdf
   g. COX - Paszko 10-5-23 Job 717065[42].pdf
   h. Cox - Vanbrederode deposition 701583-001.pdf
   i. Cox v City of Rochester et al - Officer Kenneth A Pinckney_full_ex.pdf
   j. Dempsey - 30b6 Lt Michael Cuilla- hardcopy-25954.pdf
   k. Dempsey - PO Adam Gorman-23806.pdf
   l. Dempsey - Rudolph Transcript 677795-001[83].pdf
   m. Dempsey v City of Rochester et al - Officer Jason Horowitz_Full_ex.pdf
   n. Dempsey v City of Rochester et al - Officer Javier Algarin_full_ex.pdf
   o. Di Domenico transcript.pdf
   p. Gursslin - Nigrelli transcript 162516 11-1 SP).pdf
   q. Gursslin v City of Rochester et al - Chief Fabian Rivera_full_ex.pdf
   r. Gursslin v City of Rochester et al - Deputy Chief Aaron Springer_Full_ex.pdf
   s. Gursslin v City of Rochester et al - Officer Herbert McClellan_full_ex.pdf
   t. Gursslin v City of Rochester et al - Officer Jeremy Nellist_Full_ex.pdf
   u. Gursslin v City of Rochester et al - Officer Jonathan Kent_full_ex.pdf
   v. Gursslin v City of Rochester et al - Officer Jonathan P Laureano_Full_ex.pdf
   w. Gursslin v City of Rochester et al - Sergeant Eric Alexander_full_ex.pdf
   x. Gursslin v City of Rochester et al - Sergeant Joshua Paul Kelly_Full_ex.pdf
   y. Gursslin v City of Rochester et al - Sergeant Ryan J Romig_full_ex.pdf
   z. Preston -  Mitchell Leach ebt trancript-25872.pdf
   aa. Strong - Joseph Perrone Deposition Testimony.pdf
   bb. Cabisca v City of Rochester et al - Jason Prinzi
   cc. Plaintiff Charles Dempsey
   dd. Plaintiff Leona Dempsey

9. Documents Produced by the Plaintiff in Dempsey:

   a. Dempsey 1369 to 1530 (Gursslin 481 to 642).pdf
   b. Dempsey 1531 to 1826 (policies etc).pdf
   c. Dempsey 1827 to 1900 (50 h transcript).pdf
   d. Dempsey 1901 to 1915 (reciepts).pdf
   e. Dempsey 1916 to 1918 (Riverside Vet).pdf
   f. Dempsey 1919 (FB post).pdf
   g. Dempsey 1920-2386 (FDRs 2015 to 2022).pdf

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

    h.    Dempsey 2387-2440 (Perrone transcript).pdf
    i.    Dempsey 2441-2499 (LeePolice-PetsArticle-FINAL).pdf
    j.    Dempsey 2500-2502 (SH14_05_Blaney_Officer involved Shooting with Dogs).pdf
    k.    Dempsey 2503-2538 (Canine Encounters August 2021 (Texas instructor guide)).pdf
    l.    Dempsey 2539-2559 (gunned-down-report-new).pdf
    m.    Dempsey 2560-2563 (Dog census helps track population, safety).pdf
    n.    Dempsey 6378 - 6478 (More Monell documents).pdf
    o.    Dempsey 6484 (Buffalo Subpoena response dogshootings).pdf
    p.    Dempsey 6479 (An Overview Assessing the Situation)
    q.    Dempsey 6480 (Communicating with Dogs and Police and Dog Body Language)
    r.    Dempsey 6481 (Legal Considerations and Liability, Reporting and Documentation)
    s.    Dempsey 6482 (Tactical Considerations)
    t.    Dempsey 6483 (Use of Force Considerations)
    u.    6522 - 6596 (DEMPSEY) M26 Animal Certification.pdf
    v.    6597 - 6781 (DEMPSEY) M26 User V18.ppt
    w.    6782-7015 (DEMPSEY) X2 User V19.ppt
    x.    7016 - 7237 (DEMPSEY) X2 User Course V20.ppt
    y.    7238 - 7394 (DEMPSEY) X26P User Course v21.pptx
    z.    7395-7551 (DEMPSEY) X26 User Course_Embedded Videos Version v22.pptx
    aa.  7552 - 7887 (DEMPSEY) V23 - TASER Energy Weapon Instructor - All Weapons.pptx

10. Documents produced by the City in Dempsey:
    a.    COR 1-58
    b.    COR 109 - COR000243 (Dog IRs Aug 2016-Feb 2021 (Dempsey # 31 and 35)) Redacted.pdf
    c.    COR 000244 - COR000580 (Person shot when shooting at dog - PSS 2016-0974 (Dempsey # 36 and 37) CONFIDENTIAL.pdf
    d.    COR 000581 - COR00753 (Complaints and NOCs (Dempsey #40 and 41).pdf
    e.    COR 000754 - COR000822 (Bites by dogs (Dempsey #42) CONFIDENTIAL).pdf
    f.    COR 000823 - COR000976 (Search policies (Dempsey #49)).pdf
    g.    COR 000977 – COR 001168 (PDS files Gorman and Algarin (Dempsey #50)).pdf
    h.    COR 001169 – COR 001243 (Search policies 2 (Dempsey #51, 53, 58)).pdf
    i.    COR 001244 - COR001267 (Dog bite prevention training (Dempsey #55-59 and 62)).pdf
    j.    COR 001268 - (Licensed Dogs in the City of Rochester (Dempsey #39, 60 and 61)).pdf

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

    k.   COR 1268-1291 (48 - Dog IRs Aug 2021-May 2022).pdf
    l.
    m.  COR 2943-2985 (21-153129 photos)
    n.   COR 2986 – 3039 (21-167110 photos)
    o.   COR 3040 – 3111 (21-182525 photos)
    p.   COR 3112-3114 (22-088233 photos)
    q.   COR 3115 - 3128 (2 - CR 21-1531299 - CONFIDENTIAL).pdf
    r.   COR 3129 - 3131 (6 - Perrone IR).pdf
    s.   COR 3132 - 3141 (2nd RFP #7 - Cala IRs) CONFIDENTIAL.pdf
    t.   COR 3132 - 3141 (7 - Cala IRs).pdf
    u.   COR 3142 - 3145 (11 - Laureano).pdf
    v.   COR 3146-3148 (12 - Leach (IR 20-032660).pdf
    w.  COR 3149 - 3175 (14 - GOs).pdf
    x.   COR 3176-3179 (Calls for Service 2016 to 2020).pdf
    y.   COR DEM 3384 -3410 – Gos
    z.   COR DEM 3411 - 3414 - Calls for Service 2016 to 2020
    aa. COR DEM 3411 - 3420 Supporting Depos
    bb. COR DEM 3421 - 3424 - Calls for Service 2016 to 2020
    cc. COR DEM 3425 - 3427 re Inservice
    dd. COR DEM 3524 - 3528 -  Debour + GO Discipline
    ee. COR DEM 3529 - 3534  - Taser training re dogs
    ff.  COR DEM 3535 - 3538 - Tesla Emergency Vet Records
    gg. COR DEM 3539 - 3689 Incident Reports (Reviewed By) – CONFIDENTIAL

11. Body Worn Camera Recordings of various incidents produced by the City in Dempsey:
    a.   17-118125
    b.   17-231172
    c.   18-1330 CR2018-00308639
    d.   18-1354 CR2018-00312631
    e.   18-053628
    f.   18-090117 bwc
    g.   18-136420
    h.   18-146235
    i.   18-175296
    j.   18-175299
    k.   18-182525
    l.   18-308639
    m.  19-0802 CR2019-00178495
    n.   19-0864 CR2019-00189267
    o.   19-1162 CR2019-00258580
    p.   19-1354 CR2019-00297233
    q.   19-015118
    r.   19-112122

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

    s.   19-178373 and 19-178495
    t.   19-00258580
    u.   19-297233
    v.   20-018706
    w.   20-023354 bwc (Barnes)
    x.   20-025684
    y.   20-032660 bwc (Preston)
    z.   20-082217 (Celentano other incident)
    aa. 20-082740 (domestic)
    bb. 20-183239
    cc. 20-269976
    dd. 21-00025684
    ee. 21-153129
    ff. 21-153129 and 21-273883 (dog jumped out window)
    gg. 21-167110 (McGill)
    hh. 21-171271
    ii. 21-182525
    jj. 21-182525
    kk. 21-189988
    ll. 22-088233 2019-00112122
    mm.      RPD BWC FOIL RR19-05553 2

12. Documents produced by the Plaintiff in Gursslin:
    a. Gursslin - 1-379.pdf
    b. Gursslin - 380-737.pdf
    c. Gursslin - 738-824 042616 Cabisca v City of Rochester et al - Jason Prinzi_full.pdf

13. Documents produced by the City in Gursslin:
    a. COR 1-3 (1747 St. Paul IR).pdf
    b. COR 4-27 (SWAT Plan) [12-14-22][49]
    c. COR 28-32 (Tech Docs).pdf
    d. COR 33-43 (Photos).pdf
    e. COR 44-92 (Entry-Search Policies).pdf
    f. COR 93-108 (GO 340).pdf
    g. COR 109-112 (SWAT HRSW 1771 St Paul AAR)[97]
    h. COR 113-117 (ECD Job Card)
    i. 48 - More IRs (COR 1268-1291).pdf
    j. 55, 58 Trespass + Unlawful Entry Claims COR 188-254 + CONFIDENTIAL.pdf
    k. 57 Strong v Perrone File - COR 118-177.pdf
    l. 72 SWAT Training - COR 178-187.pdf
    m. 2 - CR 21-273883 (Gursslin COR 1268-1291) - CONFIDENTIAL.pdf
    n. 2 - CR 21-1531299 - CONFIDENTIAL ( COR DEM 3115 - 3128).pdf

28

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

o. 6 - Perrone IR (COR DEM 3129 - 3131).pdf
p. 7 - Cala IRs (COR DEM 3132 - 3141).pdf
q. 11 - Laureano (COR DEM 3142 - 3145).pdf
r. 12 - Leach (IR 20-032660) - COR DEM 3146-3148.pdf
s. 14 - GOs (COR DEM 3149 - 3175).pdf
t. COR GUR 1655 - 1668  View History + 2014 Rosters
u. COR 1669 - 1710 - SWAT PPT Observ Surveill Communic [redacted]
v. COR 1713 - 1724 - GO 465 + SIS Attendees
w. RFP 2-12 SWAT Plans [Confidential] COR GUR 1292 – 1381

14. Documents produced by the Plaintiff in Anniszkiewicz:
    a. Anniszkiewicz 1-230

15. Documents produced by the City in Anniszkiewicz
    a. [Audio A1] 01 - TC08  00027.mp3
    b. [Audio A2] 02 - RPD W Primary Dispatch 00027.mp3
    c. [Audio A3] 03 - RPD W Admin Dispatch 00027.mp3
    d. [Audio A4] 04 - RPD TAC 00027.mp3
    e. [BWC A1] 00119_JT165020180610114145_0005.MP4
    f. [BWC A2] 00507_BC109420180610114152_0004.MP4
    g. [BWC A3] 00111_EL207520180610115026_0007.MP4
    h. [BWC A4] 00111_EL207520180610115506_0008.MP4
    i. [BWC A5] 00111_EL207520180610120655_0009.MP4
    j. [BWC A6] 00111_EL207520180610122153_0010.MP4
    k. [BWC A7] 00742_CC145920180610115926_0001.MP4
    l. [BWC A8] 00750_JI092720180610115014_0001.MP4
    m. [BWC A9] 00750_JI092720180610120506_0002.MP4
    n. [BWC A10] 00750_JI092720180610124159_0003.MP4
    o. [BWC A11] 00768_MR092820180610115536_0006.MP4
    p. [BWC A12] 00768_MR092820180610120850_0007.MP4
    q. [BWC A13] 00781_BS184920180610115537_0008.MP4
    r. [BWC A14] 00804_MT059320180610115226_0003.MP4
    s. 02-25-2022 Discovery Produced.pdf
    t. COR ANN 0309-404  [01-27-2023].pdf
    u. Photo A0001.JPG
    v. Photo A0002.JPG
    w. Photo A0003.JPG
    x. Photo A0004.JPG
    y. Photo A0005.JPG
    z. Photo A0006.JPG
    aa. Photo A0007.JPG
    bb. COR ANN 411 - 412 DiDomenico Resume

16. Documents produced by the Plaintiff in Cox:

29

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

      a.  Cox 1-84

17. Documents produced by the City in Cox
      a.  COR Cox 1-81
18. Documents produced by the Plaintiff in Barnes:
      a.  Barnes 1-23

19. Documents produced by the City in Barnes
      a.  COR BARN 1-37

20. Documents produced by the Plaintiff in McGill:
      a.  McGill 1-7

21. Documents produced by the City in McGill

      a.  COR McG 1-136

22. Documents produced by the Plaintiff in Preston:
      a.  Preston 1-77

23. Documents produced by the City in Preston
      a.  COR PRE 1-61

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

**APPENDIX C: CURRICULUM VITAE**

# James W. Crosby M.S., PhD.

*Jacksonville FL USA *
canineaggression@gmail.com

---

Dr. James W. Crosby is a Certified Behavior Consultant, a recognized expert in canine behavior, dog bites and attacks, and shelter management and operations. His primary wok has been focused on human fatalities from dog bite related causes. He is a retired Police Lieutenant from Jacksonville, Florida, and former Animal Control Division Manager in Bay County, Florida. He has combined his police experience and his animal specific experience to train Animal Control and Police agencies on animal issues, including dangerous dog cases and criminal cruelty investigations. Dr. Crosby has taught the Florida Animal Control Certification curriculum and, as Director for Canine Encounters for the National Law Enforcement Center on Animal Abuse, has developed a nation-wide curriculum for Police and Law Enforcement regarding the proper use of force in canine encounters. He is a regular consultant and expert witness regarding legal cases in local, State, and US Federal Courts.

Dr. Crosby taught the Florida Animal Control Certification curriculum and is the Director for Canine Encounters for the National Law Enforcement Center on animal abuse. Dr. Crosby developed a nation-wide curriculum for Police and Law Enforcement addressing police encounters with domestic dogs and the proper and proportionate use of force.

Dr. Crosby has served as an expert witness in multiple local, State, and US Federal Courts.

Dr. Crosby earned a Master of Science in Veterinary Medical Science specializing in Veterinary Forensics from the College of Veterinary Medicine at the University of Florida. His peer-reviewed and accepted Masters thesis is titled "The Specific Use of Evidence in the Investigation of Fatal Dog Attacks" and is available through the library at the University of Florida.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Dr. Crosby also earned a PhD in Veterinary Medical Science from the Graduate School of the College of Veterinary Medicine at the University of Florida. His peer reviewed dissertation titled "A Scientific Study of Human Dog-Bite Related Fatalities" is likewise available through the University library. Dr. Crosby has received appointment as a Research Associate in the Canine Brain Project being conducted within the Department of Human Evolutionary Biology at Harvard University.

Professionally, Dr. Crosby served under contract as the Division Management Consultant for the City of Jacksonville Animal Care and Protective Services from March 2016 until December 31, 2016. Dr. Crosby trains Animal Control and Police Officers across the US, and has done so in Canada, Italy, and Australia. Dr. Crosby has assisted various investigative agencies including the U.S. Marshall's office, the United States Attorney's Office and Homeland Security on animal behavior and other legal animal issues.

As specifically listed below, Dr. Crosby has been accepted and testified as an expert in local, State, and United States District Courts for both the prosecution and the defense.

## EMPLOYMENT

**Director, Canine Encounter Training, National Law Enforcement Center on Animal Abuse, Current, and Subject Matter Expert for the National Sheriffs' Association on Canine Issues, Canine Aggression, and Canine interaction with police officers and agency, 2013 to present.**

Duties include development and implementation of a national curriculum for Law Enforcement Canine Encounters, presentation of the training to Law Enforcement command and staff, and informing Law Enforcement and governmental agencies of the need for a consistent response by working Law Enforcement to canine encounters. The program stresses safety of Officers, animals, and the public. Serve as a subject matter expert for collaborative efforts to develop commercial training products to be included in widely used police Law Enforcement use of force training, including virtual simulations.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com


**Division Management Consultant, Animal Care and Protective Services, City of Jacksonville, Florida.**
**March 21, 2016 – 31 December 2016.**

Duties included overall operation and management of the agency, including Shelter Operations, Adoptions and Placement, Behavior and Outreach Services, and Investigation and Enforcement activities. Enforcement activities include municipal Code violations, civil enforcement of State Statutes, and criminal cases that include animal cruelty, abuse, and animal fighting. Current duties include providing expert consulting for the Animal Care and Protective Services Division on the City of Jacksonville on an as-needed basis.

**Professional Dog Trainer/Behavior Consultant/Expert in Dog Aggression and Dog Related Fatalities, Jacksonville, FL, 1999 - present.**

Certified Behavior Consultant-Canine-Knowledge Assessed (CCPDT). Certified Dog Behavior Consultant (IAABC). Works with dog owners on behavior and aggression issues in pet dogs.  Acts as Consultant to owners, Veterinarians and Animal Control agencies on various matters such as training and obedience.  Train dogs for obedience, hunting and tracking. Expert witness in cases of dog bite, dog attack, and dog related fatalities. Consulting on dog aggression and dangerous dog cases in US, UK, Canada and India.  Expert evaluation of dangerous and potentially dangerous dogs for civil, criminal, and other cases. Consultant to Bahamas Humane Society, Nassau, The Bahamas. Member, Board of Consultants, National Dog Trainers' Federation (Australia).

**Bay County Animal Control, Division Manager, Panama City, FL**
**2008-2010**
Daily oversight of all Animal Control Operations for Bay County and contracted municipalities within Bay County.    Lead investigator for all criminal cruelty cases.  Issued findings regarding Dangerous Dogs as defined by local Ordinance Codes and Florida Statutes.  Prepared and presented court cases for Dangerous Dog Hearings and appeals. Interfaced with local Law

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Enforcement agencies on criminal cases and otherwise assisted Law
Enforcement with animal related issues.

**Jacksonville Sheriff's Office, Police Officer/Sergeant/Lieutenant,
Jacksonville, FL        1977-1999**
1977-1987, Police Officer, Patrol Division
1987-1993, Police Sergeant, Patrol Division
1993-1999, Police Lieutenant and Midnight Watch Commander, Zone 4,
Patrol Division

Conducted daily police patrol duties; investigated violations of local
ordinances and State Statutes; responded to emergency calls; supervised
Patrol Squad (as Sergeant), served as Patrol Watch Commander (Lieutenant),
including performing employee evaluations and training, investigating
complaints on employees, counseling employees, overseeing day-to-day
operations and coordinating and scheduling training, administering discipline
and serving on disciplinary boards.  Ensured employee compliance with
Departmental Regulations and guided employee action within the Mission
Statement of the Jacksonville Sheriff's Office; responded to and directed
critical incident responses.  Extensive experience and training in securing and
controlling crime scenes, collection of evidence, evidence submission
procedures, and evaluating crime scenes for investigative purposes.

## ACADEMIC EDUCATION:

Bachelor of Science Degree, Charter Oak State College (Psychology)
Master's Degree in Veterinary Medical Science, specializing in Veterinary
Forensics, from the Graduate School, College of Veterinary Medicine,
University of Florida.
PhD in Veterinary Medical Science, University of Florida College of
Veterinary Medicine/Graduate School.

## PROFESSIONAL ORGANIZATIONS:

Associate Member, American Academy of Forensic Sciences (2018-current)
Charter Member, International Veterinary Forensic Science Association
Full Member, International Society for Animal Forensic Science (current)

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Board of Directors, Council for Certification of Professional Dog Trainers
(current)
Member, National Sheriffs' Association
Member, President's Committee on Animal Abuse, National Sheriffs'
Association
Member, National Animal Care and Control Association
Member, Training Advisory Committee, National Animal Control
Association
Member, International Association of Animal Behavior Consultants
Member, Animal Behavior Society
Professional Member, Association of Pet Dog Trainers (APDT)
Professional Member, Animal Behavior Management Alliance
Member, Florida Association for Behavior Analysis
Working Groups Chair, Police Dog Encounter Training section, National
Coalition Against Violence Against Animals.
Board of Directors, Florida Animal Control Association (2008-2010)
Chairman, Board of Directors, Gertrude Maxwell Save-a-Pet Direct Service
Organization (Dept. of Agriculture, State of Florida, 2008-2012)
Member, Curly-Coated Retriever Club of America
President, Curly-Coated Retriever Club of America, 2000-2006
Former professional member, Professional Retriever Trainers' Association

## CERTIFICATIONS AND TRAINING:

Certified Dog Behavior Consultant (2022 – present)
Certified Behavior Consultant Canine-Knowledge Assessed (2011-current)
Certified Animal Control Officer (Florida)
Certified Euthanasia Technician (Florida)
Certified Pet Dog Trainer (2005-2008)
American Kennel Club Canine Good Citizen Evaluator # 15403 (current)
American Kennel Club Temperament Testing Evaluator #107364 (current)
Federal Emergency Management Agency certificate, Disaster
Response/Animals in Disaster: Awareness and Preparedness, Community
Planning
Federal Emergency Management Agency certificate, Livestock in Disasters

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Federal Emergency Management Agency certificate, Emergency Program
Manager
Federal Emergency Management Agency certificate, Disaster Mitigation
HSUS, Dog Bite Prevention for Law Enforcement
Certificate, HSUS "Evaluating your shelter".
Certificate, Advanced Obedience Instructor
Certificate, "Behavior Evaluation", Puppyworks/Sue Sternberg
Certificate, "Muzzling Dangerous Dogs-Is Canine Profiling Effective",
PetSmart Charities/ASPCA
American Temperament Testing Society
"Psychological Aspects of Maltreatment of Animals", ASPCA (April 2012)


## PUBLICATIONS AUTHORED BY DR. CROSBY THROUGH JANUARY 2024

Public Service announcements broadcast on WKGC Radio, Panama City, Florida, as part
of a recurring program giving pet advice from 2008 through 2009.

Contributor/subject matter expert, California Commission on Peace Officer Standards
and Training, training program "Dog Encounters: Keeping Officers Safe" video course,
2015.

Master's Thesis Research (2016) "The Use of Specific Evidence in the Investigation of
Human Dog Bite Related Fatalities".

Chapter "Investigation of Human Dog Bite Related Fatalities" in Dog Bites: A
Multidisciplinary Approach, Carri Westgarth PhD and Daniel Mills, PhD, editors, The
University of Lincoln Press, Lincoln, Lincolnshire, England, 2017.

Chapter "Anatomy and Morphology of Dog Bites", in Dog Bites: A Multidisciplinary
Approach, Carri Westgarth Ph.D. and Daniel Mills, Ph.D., editors, The University of
Lincoln Press, Lincoln, Lincolnshire, England, 2017.

Blog "Canine Aggression Blog", canineaggression.blogspot.com

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Crosby, James W., and Chelsea Rider. 2017. *Changing the Narrative: Improving Law Enforcement and Dog Encounters to Reduce Lethal Incidents and Improve Community Relations with Pet Owners: Literature Review.* Washington, DC: Office of Community Oriented Policing Services.

"*Final Report: Independent Review into the Management of Dogs in the ACT*", April 2018, Transport Canberra and City Services, Canberra, Australian Capital Territory.

 "Law Enforcement Dog Encounters Training", a full instruction course on safe interactions between police officers and domestic dogs, supported by the National Sheriffs' Association and the National Law Enforcement Center on Animal Abuse approved by the Department of Justice-Office of Community Oriented Policing Services (COPS).

"Dangerous Dog Investigations" in Humane Animal Control: Effective Enforcement, Shelter Management, Local Government Support and Community Engagement, Best Friends Animal Society Publications, Kanab, Utah, 2018.

"Dog Bite Investigations for the Animal Control Officer", Animal Care and Control Today, National Animal Control Association (2022).

Doctoral dissertation "Dog Bite Related Human Fatalities: A Scientific Study", University of Florida, Graduate School, College of Veterinary Medicine (2023).


## COURT CASES IN WHICH DR. JAMES W. CROSBY HAS TESTIFIED IN OR PROVIDED EXPERT OPINION.

### 2019

*Bradshaw v. Moreton Bay Regional Council* QCATA 140 Queensland, Australia            Queensland Civil and Administrative Tribunal Dog Bite


*Villalpando v. Don Bell D/B/A Pencils etc., et al* Texas Civil/County Plaintiff            Dog Attack

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

*James v. Maricopa County Animal Services*  Arizona Federal Defendant Dog
Bite

*Travis County Texas v. Hector Luis Guzman* Texas Circuit Plaintiff (State
Prosecutor)  Criminal Deadly Conduct-Dangerous Dog

*State of Texas v. Peter Scott Lucas* Texas Circuit Defendant (Public
Defender)          Negligent Homicide

*City of Aurora v. Tracy Prim* Colorado Municipal Defendant Dangerous
Dog

*Zorich v. Zavorka and St. Louis County Police* Missouri Federal Plaintiff
Police shooting

*Medieros v. Albert Duperre*, Chief of Police of the City of Fall River
        Massachusetts District Court Plaintiff Dangerous Dog

*Azurdia v. City of New York Police Department* New York Federal Plaintiff
Police Shooting

*Wilk v. the City of Concord Animal Services* New York    Municipal
        Defendant    Dangerous Dog

*McAfee v. Town of Marlborough*, Massachusetts County Defendant
Dangerous Dog

*Barbara Schneider, as custodian of the estate of Klonda Richey, v. Mark
Kumpf, Montgomery Animal Service Center* Ohio Federal Plaintiff Fatal Dog
Attack

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com


*Alvarez v. City of Philadelphia Animal Care and Control Team*
Pennsylvania                  Circuit Defendant Dog Bite


**2020**

*Jensen v. Douglas County*, Colorado   Colorado County Defendant
Dangerous Dog


*McAfee v Douglas County*, Colorado   Colorado County Defendant
        Dangerous Dog


*State of Georgia vs. Samuel Brown and Angel Brown* Georgia Circuit
        Prosecution  Fatal Dog Attack (Criminal Homicide)


*Karen May v. The Town of Abington*, MA Massachusetts Municipal Defense
        Dangerous Do


*Meer, Meer, and Meer v. County of Erie, Erie County Sheriff's Office et.al.*
        New York    Circuit Plaintiff Police Shooting

*Friedel vs. Park Place Community* Florida Circuit Defendant Dangerous
Dog/Civil Eviction

*Boring v. City of Worthington*, Dubuque Regional Humane Society Iowa
District                  Cruelty


*Vaseleros-Stevenson v. Calvert County*, Maryland  Maryland Federal
Plaintiff                 Police Shooting


*Marie v. Aldritch and Deryckx*  Washington Superior Plaintiff Dog bite.


*Ressler v. Heisel*    Florida Circuit Plaintiff Dangerous Dog/Dog Bite

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

*Paradise Island Property vs. George* Circuit Plaintiff Dangerous Dog/Civil Eviction

**2021**

*Ruslander v. Randolph Towers Condominium Association* Maryland Circuit
    Defendant    Dangerous Dog/Dog Bite

*Villar v. City of San Diego Animal Services et. al.* California Superior
Plaintiff                Fatality/Animal Services Practices and Policy

*Wendy Love and Jay Ham v. Officer Matthew Grashorn and the City of Loveland,* Colorado Federal Plaintiff Police Shooting

*Munson v. Contra Costa County Animal Services* California Superior
Defendant    Dangerous Dog

**2022**

*Lavergne v. The Princeton and Excess Lines Insurance* (for Rapides Parish Sheriff's Department) Louisiana Federal        Plaintiff Police Shooting

*Jones and Tinsley v. City of North Las Vegas* Nevada Federal Plaintiff Police Shooting

*Kabir v. City of Elk Grove*, California California Municipal Defendant
    Dangerous dog

*Jacobsen v. Deaterly* Florida Circuit Plaintiff Civil

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

*Sarah Clark v. Dewitt* Clark Florida Circuit Plaintiff Dangerous Dog/Child Custody

**2023**

*Prosser v El Dorado County Animal Services* California County Defendant Dangerous Dog

*Sonoma County (CA) v. Reid* California Superior Defendant Dangerous Dog

*Regional Animal Services of King County, Washington v Lisa Peyer, and the dog "Wonder"* Washington County Defendant Dangerous Dog

*Goode v. D. Smith and the Boston Police Department* Massachusetts Federal Plaintiff Police Shooting

**2024**

*Anne Arundel County Maryland v. Janet Koletty*    Maryland    County Appellant    Dangerous Dog

These are cases that include cases in which I have appeared both for and against the owners of dogs.

## SPEAKING ENGAGEMENT HISTORY FOR DR. CROSBY 2019 THROUGH JANUARY 2024

2023: Presenter, two class sessions, Animal Control Association of Massachusetts, "Dog Bite Investigations", Dedham Massachusetts and N. Grafton Massachusetts.

2023: Presenter, "Forensics of Aggression", Glenelg, South Australia, Australia

2023: Keynote speaker and presenter, "Big Hairy People and Pets Summit", Gold Coast, Queensland, Australia, sponsored by the Australian Institute of Animal Management and Animal Management in Rural and Remote Indigenous Communities

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

2023: Present two-day course "The Forensics of Aggression", Dublin, Ireland.

2023: Lecture, University of Liverpool, Liverpool, England on "Investigation of Serious and Fatal Dog Bite Incidents".

2023: Panelist/speaker, "Multi-species Families on the Streets Symposium", University of Victoria, Victoria, British Colombia, Canada.

2023: Featured speaker, International Association of Animal Behavior Consultants 2023 Conference, Houston, Texas.

2022: Featured speaker, Association of Professional Dog Trainers 2022 Conference, Daytona Beach, FL

2022: Presenter, Animal Law Source/Georgia Bar Association/Georgia Veterinary Medical Association 2022 Conference, Atlanta, GA.

2022: Seminar instructor, "Veterinary Forensics", Virginia Tech/Virginia-Maryland College of Veterinary Medicine

2022: Train Miami-Dade Police Department, "Law Enforcement Dog Encounter Training" certification class, Miami-Dade Police Training Academy.

2022: Presenter, Georgia Animal Control Association 2022 Conference.

2021: Presenter, Florida Association of Medical Examiners Annual Conference

2020: Presenter, International Association of Animal Behavior Consultants, "Aggression and Dog Bite Investigations".

2020: Presentation, Animal Behavior Society, "Efficacy of the use of the "fake dog" in evaluating dog-dog aggression."

2019: Presenter, National Animal Care and Control Association 2019 Conference, Orlando, FL.

# James W. Crosby M.S.

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

2019: Presenter, 2019 Annual Conference, International Association of Animal Behavior Consultants, Houston, Texas.

2019: Consult with and provide training regarding aggressive dogs and investigations, Philadelphia Animal Care and Control, Philadelphia, PA.

2019: Instructor, LEDET, Converse County Sheriff's Office, Converse County, WY.

2019: Presenter, National Animal Care and Control Association 2019 Conference, Orlando, FL.

## SUMMARY, SELECTED CONSULTING DUTIES, THROUGH JANUARY 2024

2024: Consult on criminal homicide, Norwalk District Attorney's Office, Norwalk, Massachusetts.

2023: Consult, on scene, criminal homicide investigation with Miami-Dade Animal Services and Office of the Medical Examiner, Miami-Dade.

2023: Consult on criminal homicide investigation, Deschutes County District Attorney, Bend, Oregon.

2020: Consult on scene with Crawford County GA Sheriff's Office on dog bite related homicide investigation.

2019: Shelter Review and Assessment, Desert Haven Animal Society, Pahrump, NV.

2019: On-site consult with Bahamas Humane Society, Nassau, Bahamas, regarding training staff, oversight, and shelter improvements.

2019: Hurricane response, Bahamas Humane Society, Nassau, Bahamas (Hurricane Dorian).

2019: Dangerous Dog Evaluation, Chicago Animal Control Department, Chicago, IL