**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| CHARLES DEMPSEY, individually, and L.D. by her father and natural guardian, CHARLES DEMPSEY, | NO.: 19-cv-6780 (EAW)(MWP) |
| | **PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS PURSUANT TO RULE 56.1** |
| Plaintiffs, | |
| -against- | |
| THE CITY OF ROCHESTER, a municipal entity, JAVIER ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER RESPONSIBLE FOR TRAINING JAVIER ALGARIN, | |
| Defendants. | |

---

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Plaintiffs,

CHARLES DEMPSEY, individually, and L.D. by her father and natural guardian,

CHARLES DEMPSEY, submit that there does not exist any genuine issues to be tried

with respect to the facts set forth below and they are therefore entitled to summary

judgment as a matter of law as to liability on their Unlawful Entry and Trespass claims,

and the portion of the *Monell* claim regarding unlawful entry onto residential properties.

**I.**     **Algarin trespassed in Plaintiffs' fenced in back yard – the curtilage to his property – on October 19, 2018.**

1.     On October 19, 2018, Plaintiff Charles Dempsey ("Mr. Dempsey") lived at 53

Kosciusko Street, Rochester, New York, with his 10-year-old daughter, L.D., and their

four-year-old black Labrador retriever, Tesla. (Exhibit. 1, Mr. Dempsey 50h transcript at 4–9).

2.      Mr. Dempsey owns his home at 53 Kosciusko Street, Rochester, New York. (Ex. 1 at 6–7; Exhibit. 2 (Deed)).

3.      On October 19, 2018, at approximately 5:00 p.m., RPD Officers Javier Algarin, Ryan Disabatino, Jason Horowitz and Officer Adam Gorman responded a report of drug activity at 61 Kosciusko Street. (Exhibit. 3 (arrest report); Ex 4, Algarin Dep. 11:5-7).

4.      After receiving the 911 call, Officers Jason Horowitz, Adam Gorman, Javier Algarin, and Officer DiSabatino devised a plan to intercept the suspects. The officers anticipated that the suspects would attempt to flee south through the backyards of Kosciusko Street properties based on their prior experience responding to similar calls in the area (Exhibit 5, Horowitz Dep. 17:12-19; Ex. 6, Gorman Dep. 45:8-16; Ex 4, Algarin Dep. 36:14-22)

5.      Officer Horowitz and Officer Gorman decided to position themselves on Sobieski Street, one block south of Kosciusko Street, where they expected the suspects to flee. This decision was made because the officers had observed on prior occasions that suspects involved in vice or drug activity on Kosciusko Street would run through backyards and driveways towards Sobieski Street when police arrived (Ex 5, Horowitz Dep. 18:6-14; Ex 6, Gorman Dep. 46:4-11)

6.      Officers Algarin and DiSabatino were assigned to drive up Kosciusko Street, creating a police presence that would prompt the suspects to flee south towards Sobieski Street, where Horowitz and Gorman were waiting to apprehend them (Ex 5, Horowitz Dep. 18:15-19:3; Ex 6, Gorman Dep. 47:2-9; Ex 4, Algarin Dep. 37:5-11).

7.      The officers based this plan on their prior experience responding to similar calls in the area. Officer Gorman, who had worked in the area the day before, testified that the suspects had fled in a similar manner, running from Kosciusko Street to Sobieski Street (Ex 5, Horowitz Dep. 19:4-12; Ex 6, Gorman Dep. 49:15-22; Ex 4, Algarin Dep. 38:10-17) .

8.      The plan was executed as intended. Upon arrival, Gorman and Horowitz went to 54 Sobieski Street, which is a vacant lot. (Ex 5, Horowitz Dep. 26:12-17).

9.      Officers Javier Algarin and Ryan DiSabatino drove up to 61 Kosciusko Street. Upon their arrival, they observed two black males on the property (Ex 4, Algarin Dep. 23:15-18).

10.     As Officers Algarin and DiSabatino arrived, the two black males fled south down the driveway and through the backyard of 57 Kosciusko Street, heading towards Sobieski Street. (Ex 4, Algarin Dep. 24:3-10).

11.     Officer Adam Gorman detained a man wearing a red sweatshirt in the backyard of 49 Kosciusko Street, Rochester, New York. This detention occurred after the man fled south from Kosciusko Street, consistent with the officers' expectations based on prior experiences in the area (Ex 6, Gorman Dep. 60:11-18; Ex 5, Horowitz Dep. 59:8-13, 69:9-12; Ex 7, Gorman BWC at 17:07:10-40)

12.     The property at 49 Kosciusko Street, Rochester, New York, is located one property west of Mr. Dempsey's home at 53 Kosciusko Street (Ex 5, Horowitz Dep. 56:25-57:4).

13.     Officer Gorman proceeded to search the man in the red sweatshirt in the backyard of 49 Kosciusko Street, conducting a pat-down search to ensure the man was not in

possession of any weapons or contraband (Ex 6, Gorman Dep. 61:3-10; Ex 5, Horowitz

Dep. 59:14-18; Ex 7, Gorman BWC at 17:07:40-17:09:30)

14.     During the search, Officer Gorman did not locate any drugs, weapons, or

contraband on the man (Ex 6, Gorman Dep. 61:11-14; 143:21-24; Ex 5, Horowitz Dep.

59:19-22; Ex 7, Gorman BWC at 17:07:40-17:09:30)

15.     Gorman told the man, "whether its you or your cousins, you're dealing [drugs]

out here." (Ex 7, Gorman BWC at 17:09:09–17:09:13).

16.     Officer Jason Horowitz detained a man wearing a black sweatshirt in the vacant

lot located at 54 Sobieski Street. This detention occurred after the man fled south from

Kosciusko Street. The moment of detention can be seen in Horowitz's body-worn camera

footage (Ex 5, Horowitz Dep. 69:6-8; Ex 8, Horowitz BWC video at 17:07:01–17:07:15).

17.     The vacant lot at 54 Sobieski Street is located directly south of Mr. Dempsey's

backyard. (Ex 5, Horowitz Dep. 57:20-24).

18.     Mr. Dempsey's backyard and the vacant lot at 54 Sobieski Street are separated by

a chain-link fence. This fence served as a physical barrier during the incident, as observed

in Horowitz's body-worn camera footage (Ex 8, Horowitz BWC video at 17:07:01–

17:07:15).

19.     Officer Javier Algarin entered the backyard of 57 Kosciusko Street after

observing the suspects fleeing south from Kosciusko Street. His entry into the backyard is

documented in his body-worn camera footage (Ex 4, Algarin Dep. 25:10-13; Ex 9,

Algarin BWC video at 17:07:17).

20.     The property at 57 Kosciusko Street, Rochester, New York, is located

immediately to the east of Mr. Dempsey's property at 53 Kosciusko Street, on the

opposite side from 49 Kosciusko Street (Ex 5, Horowitz Dep. 56:25-57:4; Ex 4, Algarin Dep. 26:5-8).

21.     The properties at 53 Kosciusko Street and 49 Kosciusko Street are separated by a chain-link fence, which was a key feature during the police pursuit and search (Ex 4, Algarin Dep. 35:11-13).

22.     The properties at 57 Kosciusko Street and 53 Kosciusko Street are separated by a tall wooden fence, which is approximately six feet high (Ex 10, Dempsey Dep. 24:10-17).

23.     At approximately 17:07:17, Officer Javier Algarin jumped over the six-foot wooden fence from the backyard of 57 Kosciusko Street into Mr. Dempsey's backyard at 53 Kosciusko Street. This action was captured on Algarin's body-worn camera footage (Ex 9, Algarin BWC video at 17:07:17).

24.     When Officer Algarin jumped over the six-foot wooden fence from the backyard of 57 Kosciusko Street into Mr. Dempsey's backyard at 53 Kosciusko Street, Officers Horowitz and Gorman had already detained the two suspects. This sequence of events was confirmed by Officer Algarin in his deposition and observed on the body-worn camera footage (Ex 4, Algarin Dep. 27:3-10; Ex 9, Algarin BWC video at 17:07:17-17:08:30)

25.     After jumping over the six-foot wooden fence into Mr. Dempsey's backyard at 53 Kosciusko Street, Officer Javier Algarin began walking around the yard, assessing the situation. He observed the suspect who had been detained by Officer Horowitz and approached him to inquire about the presence of a gun. This interaction is captured on the

body-worn camera footage (Ex 9, Algarin BWC video at 17:07:17-17:08:30; Ex 4, Algarin Dep. 27:10-15)

26.    Officer Algarin spent approximately one minute in Mr. Dempsey's backyard. During this time, he continued to question the suspect detained by Horowitz about the potential presence of a firearm, and the suspect repeatedly told him that he did not have a gun. (Ex 9, Algarin BWC video at 17:07:17-17:08:30; Ex 4, Algarin Dep. 27:16-22)

27.    After spending about a minute in Mr. Dempsey's backyard, Officer Algarin jumped over the chain-link fence from 53 Kosciusko Street into the backyard of 49 Kosciusko Street. This action is documented on the body-worn camera footage at approximately 17:08:30 (Ex 9, Algarin BWC video at 17:08:30; Ex 4 Algarin Dep. 38:9-13).

28.    Following his entry into the backyard of 49 Kosciusko Street, Officer Algarin spoke with Officer Gorman. Their conversation involved discussing the situation with the suspect and the ongoing search. (Ex 9, Algarin BWC video at 17:08:30; Ex 4, Algarin Dep. 38-39:24-25, 2-6).

29.    During their conversation, Officer Gorman instructed Officer Algarin, "to backtrack," directing Algarin to retrace the suspects' flight path through Mr. Dempsey's back yard. This instruction can be seen and heard on the body-worn camera footage (Ex 9, Algarin BWC video at 17:08:57–17:08:58; Ex 4, Algarin Dep. 40:9-12; Ex 6, Gorman Dep. 175:3-6).

30.    Instead of jumping the chain-link fence to enter Mr. Dempsey's yard at the back of the yard -- which aligned with the suspects' flight path -- Officer Algarin walked towards the front of the house. He then retrieved a small child's picnic table from the

yard, positioning it closer to the fence to assist in his jump. This action is clearly documented in the body-worn camera footage (Ex 9, Algarin BWC video at 17:08:30–17:09:15)

31.     The body-worn camera footage shows that the fence Officer Algarin approached was a chain-link fence, through which he had a clear and unobstructed view of the other side. Despite this, he did not pause to look over the fence or inspect the area for any potential threats, such as a gun, contraband, or anything else dangerous (Ex 9, Algarin BWC video at 17:08:30–17:09:15; Ex 4, Algarin Dep. 39:10-17).

32.     When asked about his decision to jump the fence, Officer Algarin testified that his primary justification was to continue pursuing the suspects' flight path and to ensure there was no additional threat. He stated that he was looking for "contraband" that may have been discarded. However, the body-worn camera footage and deposition testimony reveal that both suspects had already been detained, and no immediate threat was present (Ex 4, Algarin Dep. 25:25-26:21; 40:13-17; Ex 5, Horowitz Dep. 69:6-8; Ex 6, Gorman Dep. 143:21-24).

33.     After positioning the picnic table, Officer Algarin jumped over the chain-link fence from 49 Kosciusko Street into Mr. Dempsey's backyard at 53 Kosciusko Street. This action is captured on the body-worn camera footage at approximately 17:09:29 (Ex 9, Algarin BWC video at 17:09:29; Ex 4, Algarin Dep. 40:13-17).

34.     Mr. Dempsey's backyard at 53 Kosciusko Street is completely fenced in, with no holes or gaps in the fence, which would have allowed anyone to enter or exit the property without using a gate or jumping the fence (Ex 4, Algarin Dep. 67:12-14; Ex 10, Dempsey Dep. 24:10-17).

35.     Prior to jumping the fence, Officer Algarin did not announce that he was entering Mr. Dempsey's backyard. (Ex 4, Algarin Dep. 40:18-21).

36.     In addition to not announcing his entry, Officer Algarin did not otherwise notify Mr. Dempsey that he was entering his yard. This lack of communication contributed to the unexpected and unauthorized intrusion into Mr. Dempsey's property (Ex 4, Algarin Dep. 40:22-25).

37.     When Officer Algarin jumped the fence into Mr. Dempsey's backyard, both suspects had already been detained by other officers. Officer Horowitz had detained a man wearing a black sweatshirt in the vacant lot located at 54 Sobieski Street (Ex 5, Horowitz Dep. 69:6-8), and Officer Gorman had detained the man wearing a red sweatshirt in the backyard of 49 Kosciusko Street (Ex 6, Gorman Dep. 143:21-24).

38.     From his position at 49 Kosciusko Street, Officer Javier Algarin had a clear and unobstructed line of sight into Mr. Dempsey's backyard at 53 Kosciusko Street before deciding to jump the fence. Despite this vantage point, Officer Algarin did not observe any guns, drugs, or other contraband in Mr. Dempsey's backyard that would have justified an immediate entry (Ex 4, Algarin Dep. 38:9-13; Ex 6, Gorman Dep. 143:21-24).

39.     At the time of Officer Algarin's entry into Mr. Dempsey's backyard, there was no emergency or immediate threat that required him to enter without a warrant or consent. The suspects had already been detained by other officers, and there was no probable cause to believe that a crime was occurring at Mr. Dempsey's property (Ex 4, Algarin Dep. 74:5-12; Ex 6, Gorman Dep. 220:20-25). The Crosby Report supports this, stating that Algarin's entry into Mr. Dempsey's fully enclosed backyard was without the

exigency required to justify such an action and was objectively improper (Ex 11, Crosby Report, p. 7).

40.      Officer Algarin's entry into Mr. Dempsey's backyard, without meeting any of the legal warrant exceptions, constituted an unlawful trespass. The entry was objectively unjustified from the standpoint of any reasonable police officer and violated good and accepted police practices (Ex 11, Crosby Report, p. 7)

41.      Prior to jumping the fence, Officer Algarin did not announce his intention to enter Mr. Dempsey's backyard, nor did he request consent from Mr. Dempsey to do so. (Ex 6, Gorman Dep. 175:3-6; Ex 4, Algarin Dep. 40:13-17).

42.      Approximately three to four seconds after Officer Algarin entered Mr. Dempsey's backyard, Mr. Dempsey opened the door on his back porch, and Tesla, the family dog, exited through the door. (Ex 9, Algarin BWC video at 17:09:29-17:09:33).

43.      Tesla immediately descended the steps from the back porch into the yard and began to approach Officer Algarin. The dog's approach was direct and purposeful, yet without signs of aggression (Ex 9, Algarin BWC video at 17:09:33–35)

44.      As Tesla approached Officer Algarin, she was not baring her teeth, growling, or exhibiting any other menacing behavior. The body-worn camera footage shows that Tesla's demeanor was not aggressive at the time she advanced toward the officer (Ex 9, Algarin BWC video at 17:09:33–35; Ex 11, Crosby Report, p. 8).

45.      Without any attempt to retreat or assess the situation further, Officer Algarin immediately unholstered his firearm and fired two shots at Tesla, striking her. This action occurred within seconds of Tesla entering the backyard, and is visible in the body-worn camera footage (Ex 9, Algarin BWC video at 17:09:33–35; Ex 4, Algarin Dep. 132:6-12).

46.     Officer Algarin did not attempt to flee from the yard or distance himself from Tesla before resorting to lethal force. (Ex 9, Algarin BWC video at 17:09:33–35).

47.     Officer Algarin also did not attempt to jump back over the fence to exit the yard and avoid confrontation with Tesla. His immediate decision was to use his firearm rather than seeking an alternative means of escape (Ex 9, Algarin BWC video at 17:09:33–35).

48.     Prior to firing his weapon, Officer Algarin did not attempt to use any less-lethal methods to subdue Tesla, such as verbal commands, a baton, or pepper spray. The body-worn camera footage and Crosby's expert report highlight this lack of de-escalation efforts before resorting to lethal force (Ex 9, Algarin BWC video at 17:09:33–35; Ex 11, Crosby Report, p. 8).

49.     When Officer Algarin shot Tesla, Mr. Dempsey was standing on the back porch, within clear view of the incident. The body-worn camera footage captures Mr. Dempsey's presence and proximity to the line of fire (Ex 9, Algarin BWC video at 17:09:37; Ex 12, BWC Screenshot)

50.     At the time of the shooting, Mr. Dempsey was standing in the line of fire, as shown in the body-worn camera footage. This positioning raised significant concerns regarding the safety and risk to Mr. Dempsey during the incident (Ex 9, Algarin BWC video at 17:09:37; Ex 12, Screenshot)

51.     After the shots were fired, Mr. Dempsey descended the stairs into the backyard, approaching the scene where Tesla had been shot. This movement is documented in the body-worn camera footage and corroborated by screenshots taken from the video (Ex 9, Algarin BWC video at 17:09:37–17:09:42; Exs 12 and 13, Screenshots Exs. 9, 10, and 11).

52.     After Mr. Dempsey entered the backyard, Officer Algarin pointed his gun at Mr. Dempsey and screamed at him. This intense exchange occurred immediately following the shooting of Tesla, as captured in the body-worn camera footage (Ex 9, Algarin BWC video at 17:09:37–17:09:42; Ex 13, Screenshots; Ex 4, Algarin Dep. 183:21-23).

53.     When Mr. Dempsey screamed, L.D. immediately ran to the back door. From her position at the doorway, L.D. had a clear view of the incident. She observed the officer in the backyard, saw her father in distress, she saw Tesla and knew she had been shot, and witnessed Algarin point the gun at her dad (Ex 14, L.D. Dep. 36:13-25; 37:1-7; 206:21-207:25).

54.     L.D. observed the officers pointing their guns at her father, Mr. Dempsey, as he attempted to assist Tesla after she was shot. This added to her distress, as she feared for her father's safety while trying to process the fact that her dog had just been shot (Ex 14, L.D. Dep. 207:16-25)

55.     While standing in the back doorway, L.D. witnessed Tesla walk up onto the porch after being shot by Officer Algarin. L.D. saw that Tesla was bleeding but, despite her distress, she did not let Tesla into the house. This moment added to the emotional weight of the incident for L.D., as she saw her beloved pet injured and bleeding, yet felt powerless to help (Ex 14, L.D. Dep. 208:16-210:19)

56.     The traumatic nature of these events left L.D. momentarily shocked and unsure of what to do. She remained at the doorway for a short time, processing the scene she had just witnessed (Ex 14, L.D. Dep. 207:13-25; 208:1-10)

57.     After witnessing these events, L.D. was visibly shaken and emotionally distressed. She testified that she experienced a panic attack, during which she cried,

slammed doors, and felt overwhelmed by the situation. The officers on the scene, including those who had entered the house, attempted to calm her down, but the emotional impact of the event was significant and long-lasting (Ex 14, L.D. Dep. 207:5–210:19)

58.     After Officer Algarin shot Tesla, Officer Gorman jumped over the chain-link fence into Mr. Dempsey's property, joining Officer Algarin in the backyard. (Ex 7, Gorman BWC video at 17:09:51).

59.     In response to the officers' presence in his yard, Mr. Dempsey ordered Officers Algarin and Gorman to "get out of my yard, get out of my yard! Leave my property!" Mr. Dempsey's commands were clearly captured on both officers' body-worn camera footage (Ex 7, Gorman BWC video at 17:10:06–17:10:12; Ex 9, Algarin BWC video at 17:10:00–17:10:06).

60.     Despite Mr. Dempsey's repeated orders, Officers Algarin and Gorman did not leave his property. Their continued presence is recorded in the body-worn camera footage, highlighting their refusal to comply with Mr. Dempsey's demands (Ex 7, Gorman BWC video at 17:10:12; Ex 9, Algarin BWC video at 17:10:06–17:10:12; Gorman Dep. 193:10-13).

61.     At no time prior to entering Mr. Dempsey's yard did Officer Algarin request Mr. Dempsey's consent or otherwise notify him that he was going to enter his yard. (Ex 9, Algarin BWC video at 17:07:19–17:09:29; Ex 4, Algarin Dep. 40:18-25).

62.     Similarly, Officer Gorman did not request Mr. Dempsey's consent or notify him that either he or Officer Algarin was going to enter his yard before doing so. (Ex 7, Gorman BWC video at 17:05:59–17:09:51; Ex 6, Gorman Dep. 193:10-13).

63.     At no time prior to Officers Algarin and Gorman entering Mr. Dempsey's yard did Officer Horowitz request Mr. Dempsey's consent or otherwise notify him that the officers would be entering his property. (Ex 8, Horowitz BWC video at 17:06:36–17:09:40; Ex 5, Horowitz Dep. 69:6-8).

64.     Officer DiSabatino also did not request Mr. Dempsey's consent or notify him that either Officer Algarin or Officer Gorman would be entering his yard. (DiSabatino BWC video at 17:06:44–17:09:45).

65.     At no time prior to entering Mr. Dempsey's yard did either Officer Algarin or Officer Gorman possess or obtain a warrant permitting entry into Mr. Dempsey's backyard. Officer Algarin confirmed in his deposition that no warrant was obtained or even sought before the entry (Ex 4, Algarin Dep. 74:5-12; Ex 11, Crosby Report, p. 7).

66.     It would have taken Officer Algarin approximately 15 seconds to walk from the backyard of 49 Kosciusko Street to the front door of 53 Kosciusko Street to properly notify Mr. Dempsey and seek consent before entering the yard. This brief amount of time underscores the lack of exigency and the failure to follow proper procedure (Ex 16, Lindauer BWC video at 17:12:45–17:13:00; Ex 11, Crosby Report, p. 8).

67.     There were no exigent circumstances that justified Officer Algarin's entry into Mr. Dempsey's backyard. The situation did not present any immediate danger, urgency, or probable cause that would have warranted such an entry without a warrant or consent. Officer Algarin confirmed during his deposition that exigent circumstances require both probable cause and an emergency situation, neither of which were present in this case. (Ex 4, Algarin Dep. 50:1-25; 55:6-19; 56:1-25; Ex 11, Crosby Report, p. 7; Ex 9, Algarin BWC, Ex 7, Gorman BWC, Ex 8, Horowitz BWC, and Ex 15, DiSabatino BWC)

68.     The non-criminal incident report, CR # 2018-00258730, confirms that there were no exigent circumstances justifying Officer Algarin's entry into Mr. Dempsey's backyard. The report does not document any immediate threat or emergency that would have warranted such an entry without prior consent or a warrant (Ex 17, Non Criminal Incident Report).

69.     Officer Adam Brodsky arrived on the scene at approximately 17:13:25. His arrival is captured in his body-worn camera footage, which documents the ongoing situation following the shooting of Tesla (Ex 18, Brodsky BWC video at 17:13:25).

70.     During a conversation with Officer Brodsky, Officer Algarin admitted that Mr. Dempsey "did not know I was in the backyard" at the time of the incident. This statement further confirms that Algarin entered the property without notifying Mr. Dempsey or seeking his consent (Ex 18, Brodsky BWC video at 17:15:32).

71.     Officer Algarin acknowledged that Mr. Dempsey did not know he was in the backyard when he let Tesla out the backdoor. This admission highlights the lack of communication between the officers and Mr. Dempsey, which ultimately led to the tragic events that unfolded (Ex 18, Brodsky BWC video at 17:15:32).

72.     Officer Javier Algarin admitted during his deposition that the incident could have been avoided had he taken alternative actions. Specifically, he acknowledged that he could have walked to Mr. Dempsey's front door, knocked, and requested permission to enter the backyard before deciding to jump the fence. He confirmed that it would have taken only 15 to 20 seconds to walk from the backyard of 49 Kosciusko Street to Mr. Dempsey's front door, where he could have informed Mr. Dempsey of the situation (Ex 4, Algarin Dep. 69:14-15; 74:5-19)

73.     Algarin further admitted that there was no emergency requiring him to immediately jump the fence into Mr. Dempsey's yard without first seeking consent. In hindsight, he agreed that the best course of action would have been to go to Mr. Dempsey's front door, inform him of the situation, and obtain his consent before entering the yard. This admission highlights the lack of exigent circumstances justifying his immediate entry into the backyard (Ex 4, Algarin Dep. 148:15-149:19)

74.     The Crosby report supports this admission, noting that a reasonable officer in 2018 would have known that exigent circumstances did not exist to justify entry into Mr. Dempsey's yard. Crosby emphasizes that Algarin could have radioed another officer or walked to the front door to request consent. Failure to seek Mr. Dempsey's consent or at least announce his presence before entering violated good and accepted police practices and professional standards of care (Ex 11, Crosby Report, p. 17)

75.     Eventually, the RPD officers allowed Mr. Dempsey to take Tesla to a veterinary hospital. Despite the efforts made, Tesla succumbed to the gunshot wounds she sustained when Officer Algarin shot her. Mr. Dempsey's testimony recounts the emotional toll this event took on him and his family (Ex 10, Dempsey Dep. 47-52).

**II.     The RPD's official policy permits officers to "backtrack" through the curtilage of a residential property after the conclusion of a hot pursuit based merely on an officer's "suspicion" that a suspect may have discarded something that could be dangerous to the public.**

### A. Official Policy: testimony of the City's Rule 30(b)(6) witness, Michael Cuilla

76.     Lieutenant Michael Cuilla, serving as the City's Rule 30(b)(6) witness, testified about the Rochester Police Department's official policy regarding backtracking through residential properties. (See generally, Ex 19, Cuilla Dep. 76-103)

77. Backtracking is a common practice in the RPD. (Id. at 96:17-19)

78. Cuilla explained it is the RPD's policy and practice to backtrack through the curtilage of residential properties after a hot pursuit has concluded, based on "reasonable suspicion" that a suspect may have discarded something "that is dangerous to the public" (Id. at 96-97:17-25, 98:10-22).

79. Cuilla clarified that RPD policy does not require officers to "know that something has been discarded", but instead can enter the curtilage after the conclusion of a hot pursuit based on "reasonable suspicion" that something may have been discarded on that property. (Id. at 99:5-7).

80. Cuilla testified that officers can enter the curtilage following a hot pursuit, without a warrant or consent, if there is "an exigency", and explained that under the RPD's policy, an officer's suspicion that a suspect may have discarded a something on the property that could harm the public, like gun or syringe, could satisfy the "exigency" requirement. (Id. at 99:5-25)

81. Cuilla testified that the RPD's policy is based on the alleged "public safety" exception to the Fourth Amendment's warrant requirement. (Id. at 99:22-100:12)

82. Cuilla's testimony established that the RPD's policy allows officers to enter the curtilage to private residential properties, such as backyards, if they believe there is a public safety concern, which could be based merely on speculation rather than concrete evidence to support probable cause. (Id. at 76:23-78:7; 99:5-7).

83. Cuilla explained that RPD policy permits officers to enter the curtilage to a residential property in the absence of any "emergency" if the officer "reasonably

believes" the suspect may have discarded something "dangerous for the public" on the property. (Id. at 83:4-20).

84.     Cuilla testified that Algarin's actions in jumping the fence from the back yard of 49 Kosciusko Street into the Dempesey's back yard at 53 Kosciusko Street was proper and consistent with the RPD's backtracking policy. (Id. 102:23-103:10; see also Ex 4, Algain Dep 114:11-17)

85.     Cuilla confirmed that the RPD's policy does not require officers to consider Fourth Amendment constraints when deciding to enter the curtilage of a property during backtracking. (Id. at 103:7-10, 102-103:23-25, 2-6).

**III.     The RPD's longstanding and widespread practice, and improper training regarding permitting officers to "backtrack" through the curtilage of a residential property after the conclusion of a hot pursuit.**

86.     The Rochester Police Department has a longstanding and widespread policy and practice, consistent with police academy training, that requires and/or permits officers to backtrack through the curtilage of residential properties even after a hot pursuit has concluded. This policy has been confirmed through the testimony of multiple officers. (Ex 19, Cuilla Dep. 96:17-25, 97:2-9; Ex 20, Rudolph Dep. 22:15-19; Ex 5, Horowitz Dep. 60:14-25, 61:2-5; Ex 4, Algarin Dep. 114:11-25, 115:2-9; Ex 21, Laureano Dep. 94:12-95:6; 12:26:23-25)

87.     Lieutenant Michael Cuilla testified that officers are trained to backtrack through yards and other private areas as part of their investigative procedures (Ex 19, Cuilla Dep. 96:17-25, 97:2-9).

88.    Sergeant Jason Rudolph also acknowledged that officers are permitted to enter the curtilage of properties following a pursuit without needing additional legal justification (Ex 20, Rudolph Dep. 22:15-19).

89.    Officers Jason Horowitz and Javier Algarin further corroborated this practice, stating that it was consistent with their training and experience within the department (Ex 5, Horowitz Dep. 60:14-25, 61:2-5; Ex 4, Algarin Dep. 114:18-25, 115:2-9).

90.    Additionally, Officer Jonathan Laureano provided testimony affirming that RPD officers are not required to request consent to enter the curtilage of residential properties while backtracking, as they believe the "hot pursuit" exception still applies even after the pursuit has concluded (Ex 21, Laureano Dep. 94:12-95:6; 12:26:23-25) .

91.    RPD Officer Javier Algarin testified that it was consistent with his training to backtrack through the curtilage of residential properties, even after suspects were apprehended. He indicated that this was a common practice within the RPD. Specifically, he stated, "We were trained to backtrack through yards to look for discarded contraband without needing to seek consent from the property owners" (Ex 4, Algarin Dep. 54:18-21)

92.    Algarin testified that he chases suspects through the curtilage to residential properties approximately once per week, and that he backtracks through the curtilage every time. (Ex 4, Algarin Dep. 116:11-21)

93.    Officer Jonathan Laureano testified that RPD officers are not required to request consent to enter the curtilage of residential properties while backtracking, as they believe the "hot pursuit" exception still applies even after the pursuit has concluded. Laureano stated, "I do not believe the Fourth Amendment applies at that point because there's still

18

an ongoing investigation and because hot pursuit applies" (Ex 21, Laureano Dep. 72:5-74:9, 74:10-17). Laureano described this as a "public safety exception" to the Fourth Amendment (Ex 21, Laureano Dep. 50-52).

94.    Officer Jason Horowitz further confirmed that officers routinely conducted backtracking searches without probable cause or exigent circumstances, operating under the assumption that the "hot pursuit" doctrine justified such actions. He testified that this was standard practice and part of the training officers received at the RPD (Ex 5, Horowitz Dep. 71:11-20, 60-61:14-25).

95.    Sergeant Rudolph, who reviewed and approved Officer Algarin's actions, reinforced that these practices are not only part of RPD's training but also endorsed by supervisory personnel. He testified that the RPD's general policy allowed officers to enter the curtilage of residential properties without the requisite legal justification (Ex 20, Rudolph Dep. 66:3-14, 103:7-10).

96.    Algarin's testimony shows a clear misunderstanding of the Fourth Amendment; for example, he testified that officers can enter a residential property in the absence of a warrant, consent, or an emergency that would support exigent circumstances. (Ex 4, Algarin Dep. 53:25-54:21).

97.    Officer Algarin's decision to enter Mr. Dempsey's backyard was consistent with the policies and practices of the Rochester Police Department (RPD). Both Lieutenant Michael Cuilla and Sergeant Jason Rudolph confirmed that RPD officers are trained and expected to conduct such backtracking during investigations, which aligns with department practices (Ex 19, Cuilla Dep. 103:7-10; Ex 20, Rudolph Dep. 22:15-19).

98.    Supervisors within the RPD are aware of and have endorsed the practice of entering residential curtilage without obtaining a warrant or consent. There is no record

of officers being disciplined for engaging in this practice, reflecting the department's tacit

approval. Lieutenant Cuilla and Officer Algarin both testified that supervisors have

consistently supported this approach, and Sergeant Rudolph acknowledged that no

disciplinary action has been taken against officers for such entries (Ex 19, Cuilla Dep.

102:23-103:6, 133:22-134:3; Ex 4, Algarin Dep. 118:22-119:17; Ex 20, Rudolph Dep.

66:3-9).

99.     RPD officers regularly and frequently backtrack through residential properties as

part of their investigative procedures. Officer Algarin testified that this practice is

commonplace, and Officer Horowitz confirmed that backtracking is a standard method

used during investigations, often without seeking consent (Ex 4, Algarin Dep. 76:22-

77:5; Ex 5, Horowitz Dep. 71:11-20).

100.    It has been a normal and longstanding practice of the RPD for officers to jump

over fences and traverse across the curtilage of residential properties during backtracking.

Officer Gorman testified that this practice is ingrained in the department's operational

procedures, as demonstrated by Officer Algarin's actions in this case when he jumped

over the fence and entered Mr. Dempsey's yard (Ex 6, Gorman Dep. 220:15-19).

101.    Prior to the date of the incident on October 19, 2018, it was common practice for

RPD officers not to obtain a warrant or consent before entering the curtilage of a property

during foot chases. Officer Gorman confirmed that this approach was standard practice,

reflecting the department's operational norms (Ex 6, Gorman Dep. 220:20-25).

**B. Lack of training and policies about entry onto the curtilage of residential properties.**

102.    Prior to the incident in October 2018, the Rochester Police Department (RPD) did

not provide any training to its officers explicitly advising them that the Fourth

Amendment prohibited them from traversing the curtilage of residential properties without a warrant, consent, or exigent circumstances. Lieutenant Michael Cuilla, Sergeant Jason Rudolph, and Officer Jason Horowitz all testified that the RPD did not address these specific Fourth Amendment restrictions in their training programs (Ex 19, Cuilla Dep. 29:17-25; Ex 20, Rudolph Dep. 70:12-24; Ex 5, Horowitz Dep. 66:4-9). The lack of training left officers with the impression that such actions were permissible as part of standard investigative procedures.

103.    In addition to the absence of training, the RPD did not have a specific written policy concerning warrantless searches on the curtilage of residential properties prior to this incident. Lieutenant Cuilla and Sergeant Rudolph confirmed that no such policy was in place, leaving officers without clear guidance on how to handle these situations in accordance with constitutional requirements (Ex 19, Cuilla Dep. 23:19-24; Ex 20, Rudolph Dep. 70:12-24). This absence of policy contributed to the widespread practice of backtracking through private properties without securing the necessary legal justifications.

104.    Following the incident, Officer Algarin was neither disciplined nor required to undergo any additional training for his actions, including his entry into Mr. Dempsey's yard without a warrant, consent, or the necessary probable cause and exigent circumstances. This lack of accountability was confirmed by both Officer Algarin and Sergeant Rudolph, who testified that the department took no corrective action in response to the incident (Ex 4, Algarin Dep. 118:22-24; Ex 20, Rudolph Dep. 66:3-14). The absence of post-incident discipline or training further underscores the RPD's failure to address constitutional violations.

105.    In 2019, after the incident involving Mr. Dempsey, the RPD issued a written

training bulletin specifically addressing warrantless searches on the curtilage of

residential properties. This bulletin was an acknowledgment of the need for clear

guidance and training on the constitutional limitations of such actions. Lieutenant Cuilla

and Officer Horowitz testified that the bulletin was intended to clarify the requirements

for conducting searches on residential curtilage, emphasizing the need for a warrant,

consent, or exigent circumstances (Ex 19, Cuilla Dep. 22:25-23:24; Ex 5, Horowitz Dep.

63:4-17).

106.    The Crosby report highlights the significant deficiencies in the RPD's training

and policies regarding the entry onto the curtilage of residential properties. Crosby notes

that the lack of proper training and the absence of a clear policy prior to the incident

directly contributed to the officers' unconstitutional actions. He asserts that any

reasonable police department would have provided comprehensive training on the Fourth

Amendment's restrictions to prevent such violations (Ex 11, Crosby Report, pp. 15-17)



Dated: New York, New York                    Respectfully Submitted,
       August 9, 2024                                  ROTH & ROTH LLP




                                   By: _____~/s/~_____
                                     Elliot Dolby Shields, Esq.
                                   *Counsel for Plaintiffs*
                                   192 Lexington Ave, Suite 802
                                   New York, New York 10016
                                   Ph: (212) 425-1020


To:    All parties (via ECF)