**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

CHARLES DEMPSEY, individually, and
L.D. by her father and natural guardian,
CHARLES DEMPSEY,

                              Plaintiffs,

        -against-

THE CITY OF ROCHESTER, a municipal
entity, JAVIER ALGARIN, ADAM
GORMAN, "JOHN DOE" RPD OFFICER
RESPONSIBLE FOR TRAINING JAVIER
ALGARIN,

                             Defendants.

**INDEX NO.: 19-cv-6780**
**(EAW)(MWP)**


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE UNLAWFUL ENTRY CLAIM UNDER 42 U.S.C. § 1983 AND THE TRESPASS CLAIM UNDER NEW YORK STATE LAW, AND THE PORTION OF THE FIRST CLAIM FOR RELIEF UNDER *MONELL* REGARDING UNLAWFUL ENTRIES ONTO THE CURTILAGE OF RESIDENTIAL PROPERTIES**

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

### Table of Contents

Table of Contents ……………………………….…….…….………………………….. i

Table of Authorities ……………………………….……….…………………………iii

PRELIMINARY                                                               STATEMENT
……………………………………...……….…….…………1

STATEMENT OF FACTS ……………………………….……….…....………………… 2

   I.     Algarin's Unlawful Entry …………………………………………………2

   II.    The RPD's Unalwful "Backtracking" Policy ………..……..…………………4

RELEVANT LAW ………………………. ………………………………..……...…….6

   A. Summary Judgment Standard ……………………………………...……..…….6

   B. The Fourth Amendment's Warrant Requirement and its Limited Exceptions ……….. 7

   C. Municipal *Liablity* Under *Monell* …………………………………………10

ARGUMENT ………………………………..……...…………………………….... 11

   **I.**   **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR UNLAWFUL SEARCH AND TRESPASS CLAIMS—THE SECOND AND EIGHTH CLAIMS IN THE AMENDED COMPLAINT..**………………………… 11

   A.  The warrantless search was unconstitutional ………………….. ……………….. 11
       1.  ***Defendants lacked a warrant or consent to enter the property, and they also failed to warn Plaintiffs before entering the property …………………..12***

       2.  ***Defendants lacked the probable cause <u>and</u> exigent circumstances required to lawfully enter the property without a warrant. ………………….12***

         i.  **Algarin lacked probable cause to enter Plaintiff's yard……….12**

         ii.  **There was no emergency ………………………………………12**

     **B.  Algarin and Gorman are not entitled to qualified immunity…………………14**

**C. Algarin and Gorman trespassed on the property under New York law**............**15**

**D. Plaintiff's expert, Jim Crosby, confirms that Algain's unlaw entry into Plaintiffs' fenced-in back yard caused him to unlawfully shoot and kill Tesla** ...............**15**

II.   **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIRST CLAIM FOR RELIEF FOR MUNICIPAL LIABILITY, BECAUSE THE CITY'S POLICY PERMITS OFFICERS TO UNLAWFULLY ENTER THE CURTILAGE TO RESIDENTIAL PROPERTIES**......................................................**16**

**A. Testimony of the City's Rule 30(b)(6) witness, Michael Ciulla, Demonstrates the City's policy with regard to "backtracking" is unlawful.** ................................**16**

**B. Officer Algain's testimony establishes that he was trained to unlawfully backtrack.20**

**C. The testimony of Algain's direct supervisor, Sergeant Rudolph, establishes that the RPD's policy is unlawful and that the RPD does not properly train its officers on the legal requirements to enter the curtilage to residential properties.** ....................**21**

**D. The testimony of other RPD officers further demonstrates that the RPD's policy is unlawful and that the RPD does not properly train its officers on the legal requirements to enter the curtilage to residential properties.** ..........................**23**

   **1.   Jonathan Laureano** ......................................................…...……**23**

   **2.   Jason Horowitz** ......................................................…...……..**24**

CONCLUSION ......................................................…….. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

- *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................ 6

*Augustus v City of Los Angeles*, 2:22-CV-02640-SB-AGR, 2023 WL 4291437, at *13 (CD Cal May 31, 2023) ................................................. .................................................. …………19

- *Brocuglio v. Proulx*, 67 F. App'x 58 (2d Cir. 2003) ............................................................. 14

- *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................................................6

*Davila v N. Regional Joint Police Bd.*, 370 F Supp 3d 498, 536-37 (WD Pa 2019) …………..18

- *Florida v. Jardines*, 133 S. Ct. 1409 (2013) .......................................................................... 7

- *Harris v. O'Hare*, 770 F.3d 224 (2d Cir. 2014) ............................................................. *passim*

- *Hines v. Albany Police Dep't*, 520 Fed.Appx. 5 (2d Cir. 2013) ............................................ 11

- *Illinois v. Gates*, 462 U.S. 213 (1983) ..................................................................................... 8

- *Kentucky v. King*, 131 S.Ct. 1849 (2011) ........................................................................... 8, 14

- *Kirk v. Louisiana*, 536 U.S. 635 (2002) ................................................................................ 8, 9

*Lange v California*, 594 US 295, 302 (2021) ..........................................................................8-9

- *Loria v. Gorman*, 306 F.3d 1271 (2d Cir. 2002) ...................................................................... 8

- *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31 (2d Cir. 2014) .......................................... 11

- *McMillian v. Monroe Cty.*, 520 U.S. 781 (1997) .................................................................... 10

- *Missel v. County of Monroe*, 351 Fed.Appx. 543 (2d Cir. 2009) ........................................... 11

- *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ......................................................... *passim*

- *Parker v. City of Long Beach*, 563 Fed.Appx. 39 (2d Cir. 2014) .......................................... 11

- *Payton v. New York*, 445 U.S. 573 (1980) .............................................................................. 14

- *People v. Gibson*, 117 AD3d 1317 (3d Dept. 2014), affd 24 NY3d 1125 (2015) .................. 13

*Provost* v. *City of Newburgh,* 262 F.3d 146, 155 (2d Cir. 2001) …………………………………14

*Rager* v. *McCloskey,* 305 N.Y. 75 (1953) ……………………………………………………………15

*Schnitter v. City of Rochester*, 556 Fed.Appx. 5, 8, 2014 WL 494893, at *2 (2d Cir. 2014) ……11

- *Scott v. Harris*, 550 U.S. 372 (2007) ............................................................................ 6

- *Stancuna v. Sherman*, 563 F. Supp. 2d 349 (D. Conn. 2008) ................................................. 14

- *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129 (2d Cir. 2010) ......................................... 10

*United States* v. *Alexander*, 888 F.3d 628 (2d Cir. 2018) …………………………………………..7

- *United States v. Jones*, 132 S. Ct. 945 (2012) ..................................................................... 7

- *United States. v. MacDonald*, 916 F.2d 766 (2d Cir. 1990) .................................................. 8

- *United States v. Simmons*, 661 F.3d 151 (2d Cir. 2011) ........................................................ 7

- *Welsh v. Wisconsin*, 466 U.S. 740 (1984) ............................................................................ 8

*Woodhull* v. *Town of Riverhead*, 849 N.Y.S.2d 79, 81 (2d Dep't 2007), *lv. to app. denied*, 10 N.Y.3d 708 (2008) ..........................................................................................................10, 15

**Statutes**

42 U.S.C. § 1983.................................................................................................... passim

**Rules**

Fed. R. Civ. P. 56(c) ...............................................................................................6

Other

Restatement, Torts, § 158; Prosser on Torts …………………………………………………10

## PRELIMINARY STATEMENT

Plaintiffs Charles Dempsey and L.D. (by her father and natural guardian, Charles Dempsey) move for summary judgment on their claims for unlawful entry under 42 U.S.C. § 1983 and trespass under New York State law against Defendant Javier Algarin and Adam Gorman, the Second and Eighth Claims for Relief in their Second Amended Complaint. They also move for summary judgment on the portion of their First Claim for Relief regarding the City's unlawful "backtracking" policy, pursuant to which the Rochester Police Department ("RPD") permits its officers to unlawfully enter the curtilage of residential properties following the conclusion of a "hot pursuit", after the exigent circumstances have dissipated.

The undisputed evidence shows that on October 19, 2018, Officer Algarin unlawfully entered Plaintiffs' backyard without a warrant, consent, or exigent circumstances and subsequently shot and killed their dog, Tesla. The incident was recorded on Algarin's BWC and is corroborated by the testimony of the officers and Plaintiffs.

Plaintiffs are also entitled to summary judgment on the portion of their First Claim for Relief for municipal liability under *Monell v. Department of Social Services of New Yor*k, 436 U.S. 658,694 (1978) regarding the City's policy, practice and custom of requiring and/or permitting officers to "backtrack" through the curtilage to residential properties after the conclusion of a "hot pursuit". The evidence demonstrates that the RPD's official unwritten policy is unlawful; that the RPD has a longstanding policy, practice and custom of permitting officers to trespass on the curtilage to residential property; that the City and RPD failed to properly train officers about the legal requirements to enter the curtilage to property.

1

The facts are undisputed, and the law clearly supports Plaintiffs' entitlement to summary judgment. For these reasons, and the reasons below, Plaintiffs respectfully submit that their motion for summary judgment on the First, Second and Eighth Claims for Relief should be granted.

## STATEMENT OF FACTS

Plaintiffs respectfully refer the Court to Plaintiff's Rule 56.1 Statement of Undisputed Facts for a more detailed recitation of the evidence that Plaintiffs maintain warrants summary judgment in their favor on the unlawful entry and trespass claims.

### I.  Algarin's Unlawful Entry

On October 19, 2018, Plaintiff Charles Dempsey lived at 53 Kosciusko Street, Rochester, New York, with his ten-year-old daughter, L.D., and their four-year-old Black Labrador Retriever, Tesla (¶ 1)[1]. That evening, RPD Officers Javier Algarin, Ryan Disabatino, Jason Horowitz, and Adam Gorman responded to a report of drug activity at 61 Kosciusko Street, a nearby property (¶ 4). The officers devised a plan to intercept the suspects, anticipating that they would flee south through the backyards of properties on Kosciusko Street (¶¶ 6-7).

Officer Horowitz and Officer Gorman positioned themselves on Sobieski Street, one block south of Kosciusko Street, expecting the suspects to flee in that direction (¶ 7). Meanwhile, Officers Algarin and DiSabatino drove up in front of 61 Kosciusko Street and the two males fled south down the driveway and through the backyard of 57 Kosciusko Street, heading towards Sobieski Street (¶¶ 8-10). Officer Horowitz detained one suspect in the vacant lot at 54 Sobieski Street and Gorman detained the other suspect in the back yard of 49 Kosciusko Street. (¶¶ 10-16)

Officer Javier Algarin entered the backyard of 57 Kosciusko Street after observing the suspects fleeing south from Kosciusko Street. (¶ 19). At approximately 17:07:17, Officer Javier

---

[1] All "¶" citations refer to Plaintiff's Rule 56.1 statement of undisputed facts.

Algarin jumped over the six-foot wooden fence from the backyard of 57 Kosciusko Street into Mr. Dempsey's backyard at 53 Kosciusko Street. (¶ 23) When Officer Algarin jumped over the six-foot wooden fence from the backyard of 57 Kosciusko Street into Mr. Dempsey's backyard at 53 Kosciusko Street, Officers Horowitz and Gorman had already detained the two suspects (¶ 24).

After jumping over the six-foot wooden fence into Mr. Dempsey's backyard at 53 Kosciusko Street, Officer Javier Algarin began walking around the yard, assessing the situation. He observed the suspect who had been detained by Officer Horowitz and approached him to inquire about the presence of a gun. (¶ 25). Officer Algarin spent approximately one minute in Mr. Dempsey's backyard. During this time, he continued to question the suspect detained by Horowitz about the potential presence of a firearm, and the suspect repeatedly told him that he did not have a gun. (¶ 26).

After spending about a minute in Mr. Dempsey's backyard, Officer Algarin jumped over the chain-link fence from 53 Kosciusko Street into the backyard of 49 Kosciusko Street. (¶ 27) Following his entry into the backyard of 49 Kosciusko Street, Officer Algarin spoke with Officer Gorman. Their conversation involved discussing the situation with the suspect and the ongoing search. (¶ 28) During their conversation, Officer Gorman suggested to Officer Algarin, "You want to backtrack," implying that Algarin should retrace the suspects' flight path through the properties. ( ¶ 29).

The body-worn camera footage shows that the fence Officer Algarin approached was a chain-link fence, through which he had a clear and unobstructed view of the other side. Despite this, he did not pause to look over the fence or inspect the area for any potential threats, such as a gun, contraband, or anything else dangerous. (¶ 31).

Before jumping the fence and reentering Mr. Dempsey's yard, Officer Algarin did not seek consent from Mr. Dempsey or issue any warning about his entry (¶¶ 23, 29-33). Officer Algarin later acknowledged in his testimony that he could have walked to the front door to request permission to enter the yard, but he chose not to (¶¶ 52, 60-62).

Upon re-entering the backyard, Officer Algarin encountered Tesla, who approached him without displaying any aggressive behavior. Tesla's approach was non-threatening, and she was not baring her teeth or growling (¶¶ 43-44). Despite this, Officer Algarin immediately unholstered his gun and fired two shots at Tesla, killing her. He did not attempt to flee, use less-lethal methods, or assess the situation further before resorting to lethal force (¶¶ 45-48).

Mr. Dempsey and his daughter, L.D., were present during the incident. L.D., who was standing in the back doorway of their home, witnessed the shooting and was in the line of fire (¶¶ 49-52). The traumatic experience left L.D. visibly shaken and emotionally distressed (¶¶ 53-57).

## II.     The RPD's Unlawful "Backtracking" Policy

The City of Rochester, through the Rochester Police Department (RPD), maintained a longstanding policy, practice, and custom of permitting officers to enter the curtilage of residential properties without a warrant, consent, or exigent circumstances. This practice, known as "backtracking," was deeply ingrained in the department's training and regularly endorsed by supervisors.

The City, through its Rule 30(b)(6) witness -- Lieutenant Michael Cuilla – detailed the City's "backtracking" policy. Cuilla testified that the RPD trained officers to enter the curtilage of residential properties as part of their investigative procedures, especially during or after a pursuit. He explained that "backtracking" involved officers retracing the path of suspects through private property, including fenced-in yards, to ensure that no evidence was discarded there. This practice

was not only taught during police academy training but was also reinforced throughout an officer's career. Cuilla confirmed that this method was a routine part of RPD operations and that officers were expected to engage in backtracking without obtaining a warrant or consent from the property owner (¶¶ 86, 96).

Importantly, Cuilla explained it is the RPD's policy and practice to backtrack through the curtilage of residential properties after a hot pursuit has concluded, based on "reasonable suspicion" that a suspect may have discarded something dangerous. (¶ 78). Cuilla clarified that RPD policy does not require officers to "know that something has been discarded", but instead can enter the curtilage after the conclusion of a hot pursuit based on "reasonable suspicion" that something may have been discarded on that property. (¶ 79) Cuilla testified that the RPD's policy is based on the alleged "public safety" exception to the Fourth Amendment's warrant requirement. (¶ 81).

Cuilla's testimony is corroborated by other officers, including Sergeant Jason Rudolph, who also confirmed that backtracking was a common and accepted practice within the RPD. Officers were not provided specific training or guidance on the Fourth Amendment's restrictions regarding warrantless entries into the curtilage of residential properties. Instead, the unwritten policy allowed officers to assume that such actions were permissible, thereby normalizing unconstitutional conduct (¶ 97).

The lack of clear policies and the failure to properly train officers about the legal requirements for entering the curtilage of a property without a warrant or consent contributed to a widespread practice of unlawful entries. Officers Jason Horowitz and Jonathan Laureano testified that they were trained to backtrack through residential properties after the conclusion of a hot pursuit without considering the need for a warrant or consent, as they believed the hot pursuit

doctrine provided blanket authorization for such actions, even after the pursuit had ended (¶¶ 98-100).

Following the incident involving Mr. Dempsey, neither Officer Algarin nor any other officer involved in the unlawful entry was disciplined or required to undergo additional training. The department's failure to address these constitutional violations further entrenched the unlawful practices, reflecting a deliberate indifference to the rights of residents (¶ 103).

**RELEVANT LAW**

**A.  Summary Judgment Standard.**

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp.* v. *Catrett,* 477 U.S. 317, 322 (1986). Notably, in a civil rights case alleging police misconduct, once the material facts and inferences are drawn in favor of the nonmoving party, the reasonableness of the officer's actions "is a pure question of law." *Scott v. Harris,* 550 U.S. 372, 381, n. 8 (2007).

Material facts are those that may affect the outcome of the case. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The Supreme Court's decision in *Scott* v. *Harris*, 550 U.S. 372 (2007) explains how video of the underlying events in a Fourth Amendment claim should be analyzed. The Court held that, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt the facts for purposes of ruling on a motion for summary judgment." *Id.* At 380 (emphasis added). Where a videotape

"blatantly contradict[s]" the remainder of the record, it is not "justifiable" to draw inferences in a non-movant's favor. *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

### B.  The Fourth Amendment's Warrant Requirement and its Limited Exceptions.

The Fourth Amendment provides, in relevant part, that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" A "search" for purposes of the Fourth Amendment occurs either when the police intrude upon a person's reasonable expectation of privacy or, alternatively, if the police otherwise trespass upon a suspect's person, house, papers, or effects for the purpose of acquiring information. *See Florida v. Jardines,* 133 S. Ct. 1409, 1414 (2013); *United States v. Jones,* 132 S. Ct. 945, 951 n.5 (2012).

"The core premise underlying the Fourth Amendment is that warrantless searches of a home are presumptively unreasonable." *United States v. Simmons,* 661 F.3d 151, 156-57 (2d Cir. 2011), *citing Kentucky v. King,* 131 S.Ct. 1849, 1856 (2011) ("It is a basic principle of Fourth Amendment law… that searches and seizures inside a home without a warrant are presumptively unreasonable." (Internal quotation marks and citation omitted)).

The curtilage—that is, the "area adjacent to the home and to which the activity of home life extends"—is considered part of a person's home and enjoys the same protection against unreasonable searches as the home itself. *Florida* v. *Jardines*, 569 U.S. 1, 7 (2013) (internal quotation marks omitted). "As a result, a search of the curtilage that occurs without a warrant based on probable cause or an exception to the warrant requirement violates the Fourth Amendment." *United States* v. *Alexander*, 888 F.3d 628, 631 (2d Cir. 2018), citing *Harris* v. *O'Hare,* 770 F.3d 224, 234, 240 (2d Cir. 2014). Here, Plaintiffs' backyard is the curtilage.

7

As relevant to this case, "police officers need either a warrant or probable cause plus exigent circumstances to make a lawful entry into a home." *Kirk* v. *Louisiana,* 536 U.S. 635, 638 (2002). Probable cause to enter the home is "the first requirement for a warrantless search on the basis of exigent circumstances." *Harris,* 770 F. 3d at 231, citing *Kirk* v. *Louisiana,* 536 U.S. at 638. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois* v. *Gates,* 462 U.S. 213, 232 (1983).

If there is probable cause, "[t]he essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." *Loria* v. *Gorman,* 306 F.3d 1271, 1284–85 (2d Cir.2002) (alteration and internal quotation marks omitted). "In answering that question, we must be cognizant of the Supreme Court's admonition that 'exceptions to the warrant requirement are few in number and carefully delineated and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.'" *Id.*, quoting *Welsh* v. *Wisconsin,* 466 U.S. 740, 749–50 (1984) (quotations and citations omitted).

Whether exigent circumstances exited to justify a warrantless entry is an objective test that "turns on [an] examination of the totality of circumstances confronting law enforcement agents in the particular case." *United States.* v. *MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990).

As the Supreme Court recently explained that the crux of the exigent circumstances exception is that it involves a consideration of the totality of the circumstances, but only applies in true emergencies. *Lange v California*, 594 US 295, 302 (2021)("Whether a "now or never situation" actually exists—whether an officer has "no time to secure a warrant"—depends upon facts on the ground."). Specifically, the Court explained the exigent circumstances exception,

applies when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." *King*, 563 U.S., at 460, 131 S.Ct. 1849 (internal quotation marks omitted). The exception enables law enforcement officers to handle "emergenc[ies]"—situations presenting a "compelling need for official action and no time to secure a warrant." *Riley*, 573 U.S., at 402, 134 S.Ct. 2473; *Missouri v. McNeely*, 569 U.S. 141, 149, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013). Over the years, this Court has identified several such exigencies. An officer, for example, may "enter a home without a warrant to render emergency assistance to an injured occupant[,] to protect an occupant from imminent injury," or to ensure his own safety. *Brigham City*, 547 U.S., at 403, 126 S.Ct. 1943; *Riley*, 573 U.S., at 388, 134 S.Ct. 2473. So too, the police may make a warrantless entry to "prevent the imminent destruction of evidence" or to "prevent a suspect's escape." *Brigham City*, 547 U.S., at 403, 126 S.Ct. 1943; *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (internal quotation marks *302 omitted). In those circumstances, the delay required to obtain a warrant would bring about "some real immediate and serious consequences"—and so the absence of a warrant is excused. **2018 *Welsh v. Wisconsin*, 466 U.S. 740, 751, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (quoting *McDonald v. United States*, 335 U.S. 451, 460, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (Jackson, J., concurring)).

Our cases have generally applied the exigent-circumstances exception on a "case-by-case basis." *Birchfield* v. *North Dakota*, 579 U. S. 438, ——, 136 S.Ct. 2160, 2174, 195 L.Ed.2d 560 (2016). The exception "requires a court to examine whether an emergency justified a warrantless search in each particular case." *Riley*, 573 U.S., at 402, 134 S.Ct. 2473. Or put more curtly, the exception is "case-specific." *Id.*, at 388, 134 S.Ct. 2473. That approach reflects the nature of emergencies. *Whether a "now or never situation" actually exists—whether an officer has "no time to secure a warrant"—depends upon facts on the ground*. *Id.*, at 391, 134 S.Ct. 2473 (internal quotation marks omitted); *McNeely*, 569 U.S., at 149, 133 S.Ct. 1552 (internal quotation marks omitted). So the issue, we have thought, is most naturally considered by "look[ing] to the totality of circumstances" confronting the officer as he decides to make a warrantless entry. *Id.*, at 149, 133 S.Ct. 1552.

*Lange v California*, 594 US 295, 301-02 (2021)(emphasis added); see also,  *Harris* v. *O'Hare*, 770

F.3d at 235 ("The core question is whether the facts, as they *appeared at the moment of entry,*

would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action.")(internal quotation marks and citations omitted).

Under New York law, "trespass is an intentional entry onto the property of another without justification or permission." *Woodhull* v. *Town of Riverhead*, 849 N.Y.S.2d 79, 81 (2d Dep't 2007), *lv. to app. denied*, 10 N.Y.3d 708 (2008). An entry may constitute a trespass even if innocently made or by mistake. *Hill* v. *Raziano*, 880 N.Y.S.2d 173, 175 (2d Dep't 2009) (citing cases). Refusal to leave a property when ordered to do so by the owner also constitutes a trespass. *See Rager* v. *McCloskey*, 305 N.Y. 75 (1953) (holding complaint alleging defendant deputy sheriff entered plaintiff's property to serve process and, despite repeated requests, refused to leave upon learning plaintiff was not there, stated claim for common law trespass) (*citing* Restatement, Torts, § 158; Prosser on Torts, p. 89).

### C.  Municipal Liability under *Monell*

"[A] local government is liable under § 1983 for its policies that cause constitutional torts." *McMillian* v. *Monroe Cty.*, 520 U.S. 781, 784 (1997); *see Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 693 (1978)*.* "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco* v. *Port Auth. of N.Y. & N.J.,* 615 F.3d 129, 140 (2d Cir. 2010) (internal quotation marks omitted).

A plaintiff may satisfy the "policy or custom" requirement by alleging (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to

provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *See Parker v. City of Long Beach*, 563 Fed.Appx. 39, 41 (2d Cir. 2014), *as amended,* (Apr. 21, 2014) (failure to train); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 61–62 (2d Cir. 2014) (persistent and widespread practice); *Hines v. Albany Police Dep't*, 520 Fed.Appx. 5, 7 (2d Cir. 2013) (actions of policymakers); *Schnitter v. City of Rochester*, 556 Fed.Appx. 5, 8, 2014 WL 494893, at *2 (2d Cir. 2014) (failure to train or supervise);

 *v. County of Monroe*, 351 Fed.Appx. 543, 545 (2d Cir. 2009) (formal policy and act of a person with policymaking authority for the municipality).

As explained below, here the Plaintiffs have established municipal liability through three theories: (1) the City's official "backtracking" policy is unlawful; (2) the practice of backtracking in the absence of exigent circumstances is so persistent and widespread as to practically have the force of law; and (3) the RPD trains its officers incorrectly that they may backtrack through curtilage to residential properties without having exigent circumstances.

## ARGUMENT

I. **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR UNLAWFUL SEARCH AND TRESPASS CLAIMS—THE SECOND AND EIGHTH CLAIMS IN THE AMENDED COMPLAINT**

Plaintiffs are entitled to summary judgment on the issue of liability on their unlawful entry and trespass claims, the second and eight claims in the Amended Complaint. In summary, the undisputed facts demonstrate that "the police officers lacked a warrant or probable cause plus exigent circumstances to invade Plaintiff's curtilage, and because Defendants cannot offer any other basis on which the officers' intrusion would be lawful… Defendants violated Plaintiffs' Fourth Amendment rights." *Harris* v. *O'Hare,* 770 F.3d 224, 241 (2d Cir 2014).

### A.  The warrantless search was unconstitutional.

11

The undisputed facts demonstrate that Defendants lacked a warrant, consent, or the probable cause and exigent circumstances required to lawfully enter Mr. Dempsey's property.

> **1.  *Defendants lacked a warrant or consent to enter the property, and they also failed to warn Plaintiffs before entering the property.***

Defendants admit that they lacked a warrant and did not request consent to enter Plaintiffs' fenced in back yard. Additionally, neither Algarin nor any other officer warned Plaintiffs that Algarin was entering the yard before he jumped the fence.

> **2.  *Defendants lacked the probable cause <u>and</u> exigent circumstances required to lawfully enter the property without a warrant.***

> > **i.  Algarin lacked probable cause to enter Plaintiff's yard.**

The evidence demonstrates that Algarin did not have probable cause to enter Mr. Dempsey's back yard. The two suspects fled "south" from 61 Kosciusko Street to 54 Sobieski Street, where one of the suspects was apprehended and a black bag containing marijuana was located. The other suspect was apprehended in the backyard of 49 Kosciusko Street. The BWC videos show the officers could clearly see over the fence from 57 Kosciusko Street, 49 Kosciusko Street, and 54 Sobieski Street into all areas of Mr. Dempsey's backyard. The officers did not see anything resembling drugs or weapons in Mr. Dempsey's yard before Algarin jumped the fence the second time and reentered Mr. Dempsey's yard. Moreover, Algarin had already been in Mr. Dempsey's yard for over one minute and did not see any gun, contraband or other "dangerous" items in that time. Algarin also testified that he lacked any other objective facts that could possibly have provided him with probable cause to enter the yard. For these reasons, Algarin clearly lacked probable cause to enter Mr. Dempsey's backyard.

> > **ii.  There was no emergency.**

Importantly, even if Algarin had probable cause to enter Mr. Dempsey's back yard—which he did not—the BWC videos and other evidence demonstrate that there was no emergency in this case. *See* Point I. A., *infra,* and *Harris* v. *O'Hare*, 770 F.3d 224, 234 (2d Cir. 2014).

Instead, when Algarin jumped the fence into Mr. Dempsey's yard, both suspects had been apprehended and placed in handcuffs by Gorman and Horowitz, and Horowitz had located a bag that contained the drugs they were looking for. Moreover, DiSabatino was on the sidewalk in front of 57 Kosciusko Street attempting to speak with witnesses. Thus, Algarin obviously lacked "reasonable grounds to believe that there was an emergency at hand and an immediate need for their assistance for the protection of life." *People* v *Gibson*, 117 AD3d 1317, 1318 (3d Dept. 2014), *affd* 24 NY3d 1125 (2015).

The only reason Algarin jumped the fence into Mr. Dempsey's yard was to 'backtrack' and attempt to locate evidence. This is clearly unlawful. *Id.* ("The search must not be primarily motivated by intent to arrest and seize evidence.").

It would taken Algain only 15 seconds to walk to Mr. Dempsey's front door to request permission to enter his yard; it would have taken even less time for him to radio to DiSabatino to knock on Mr. Dempsey's front door. There was simply no emergency requiring Algain to forgo requesting Mr. Dempsey's permission to enter his yard.

Thus, pursuant to *Harris* v. *O'Hare*, 770 F.3d 224, 241 (2d Cir 2014), Algarin's entry into Plaintiffs' yard clearly violated their Fourth Amendment rights, and Plaintiffs are entitled to summary judgment on their second and eighth Claims for Relief against Algarin.

Plaintiffs are also entitled to summary judgment on their second and eighth Claims for Relief against Gorman, who directly participated in the constitutional violation by instructing Algarin to "backtrack" through Mr. Dempsey's yard for the purpose of looking for evidence. *See*

*generally, Provost* v. *City of Newburgh,* 262 F.3d 146, 155 (2d Cir. 2001) (defining personal involvement in two ways: "direct participation," such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts"). Gorman instructed Algarin to enter Mr. Dempsey's yard after he failed to located any drugs or guns when he searched the man in the red sweatshirt in the backyard of 49 Kosciusko Street. ¶ 29. But for Gorman's instruction, Algarin would not have entered Mr. Dempsey's yard. Thus, the undisputed evidence demonstrates that Gorman was personally involved in the constitutional violation and so Plaintiffs are entitled to summary judgment against Gorman on their second and eighth claims.

**B.  Algarin and Gorman are not entitled to qualified immunity.**

The law was clearly established in October 2018 that a police officer may not enter a private individual's home or its curtilage without a warrant unless the police officer has consent or unless there is probable cause *plus* exigent circumstances to justify entry. *See, e.g, Kentucky* v. *King,* 563 U.S. 452, 460 (2011); *Payton* v. *New York,* 445 U.S. 573, 588 (1980); *Harris* v. *O'Hare,* 770 F.3d 224, 234 (2d Cir. 2014); *Brocuglio v. Proulx,* 67 F. App'x 58, 61 (2d Cir. 2003) (clearly established as of 2003 that a fenced-in backyard is "curtilage" entitled to Fourth Amendment protection); *see also Stancuna* v. *Sherman,* 563 F. Supp. 2d 349, 356-57 (D. Conn. 2008) (officer not entitled to qualified immunity because it was clearly established that he needed warrant or exigent circumstances to enter private garage).

In other words, it was clearly established by 2018 that for the "exigent circumstances" exception to apply, police officers must first demonstrate that there existed probable cause to search but, by reason of some emergency, there was insufficient time to obtain a warrant. *See Payton v. New York,* 445 U.S. 573, 583 (1980).

14

Thus, Defendants are not entitled to qualified immunity on Plaintiffs' unlawful entry claim, and qualified immunity is unavailable on his trespass claim, and so Plaintiffs' motion for summary judgment on the second and eighth claims must be granted.

### C. Algarin and Gorman trespassed on the property under New York law.

Plaintiffs are entitled to summary judgment against Algarin and Gorman on their trespass claim under New York State law for all the reasons stated above, as they clearly entered Mr. Dempsey's property without justification or permission. *See Woodhull* v. *Town of Riverhead,* 849 N.Y.S.2d 79, 81 (2d Dept 2007).

Algarin entered Mr. Dempsey's yard after Gorman instructed him to "backtrack." Gorman entered Mr. Dempsey's yard after Algarin shot Tesla; Mr. Dempsey then ordered them to leave his property, but they refused to do so. ¶¶ 59-60. Their refusal to leave his property also constitutes a trespass under New York State Law. *See Rager* v. *McCloskey,* 305 N.Y. 75 (1953).

### D. Plaintiff's expert, Jim Crosby, confirms that Algain's unlaw entry into Plaintiffs' fenced-in back yard caused him to unlawfully shoot and kill Tesla .

Officer Algarin entered the Dempsey's backyard without a warrant, consent, or exigent circumstances. Crosby emphasizes that the Fourth Amendment protects the curtilage of a home, which includes a fenced-in backyard, from warrantless searches and entries. Algarin's entry into the yard without meeting any of the legal exceptions constituted an unlawful trespass (Ex 11, Crosby Report, p. 8).

Crosby notes that proper police procedure requires officers to seek consent or have a clear legal basis before entering private property. Algarin's actions violated these standard practices, as he made no attempt to contact the Dempseys for permission to enter their yard. Instead, he jumped the fence without any prior warning or justification (Id.  p. 9).

Crosby highlights that the Algarin's entry was not justified by exigent circumstances or "hot pursuit," since in this case, both suspects were already apprehended. Therefore, there was no ongoing pursuit that could justify Algarin's entry into the Dempsey's yard (Id.  p. 10). Crosby also evaluates the necessity and risk associated with Algarin's actions. He finds that there was no immediate threat or need to enter the yard, as the suspects were already in custody and there was no indication of any immediate danger or evidence that required urgent retrieval (Id. p. 11).

Crosby concludes that the unlawful entry and trespass into the Dempsey's yard was the direct and proximate cause of Officer Algarin shooting and killing Tesla. Crosby's expert analysis details that there was no immediate threat or necessity for Algarin to enter the yard, as both suspects were already apprehended, and there was no indication of any imminent danger or evidence requiring urgent retrieval. The absence of legal justification for Algarin's entry, combined with the flawed RPD policies and inadequate training, directly led to the tragic shooting of Tesla (Id.  pp. 11, 18-19).

II.   **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIRST CLAIM FOR RELIEF FOR MUNICIPAL LIABILITY, BECAUSE THE CITY'S POLICY PERMITS OFFICERS TO UNLAWFULLY ENTER THE CURTILAGE TO RESIDENTIAL PROPERTIES.**

E.   **Testimony of the City's Rule 30(b)(6) witness, Michael Ciulla, Demonstrates the City's policy with regard to "backtracking" is unlawful.**

The RPD's policy and practice allows officers to backtrack through the curtilage of residential properties after a hot pursuit has concluded based merely on "reasonable suspicion", which violates the Fourth Amendment. According to the testimony of the City's Rule 30(b)(6) witness, Lieutenant Michael Cuilla, RPD officers are allowed to enter the curtilage following a hot pursuit if they have "reasonable suspicion" that a "suspect may have discarded something that is dangerous to the public". (¶ 78) This practice fails to meet the constitutional requirements for lawful searches and entries into the home and its curtilage.

The Fourth Amendment protects individuals from unreasonable searches and seizures, and this protection extends to the curtilage of a home—the area immediately surrounding and associated with the home. Under the Fourth Amendment, warrantless searches of a home and its curtilage are presumptively unreasonable unless they fall within a few narrowly defined exceptions.

To justify a warrantless search of the curtilage, police officers must have either: (1) A warrant based on probable cause, or (2) the homeowner's consent, or (3) probable cause plus exigent circumstances that create an urgent need to enter without a warrant.

Cuilla's testimony reveals that the RPD policy only requires "reasonable suspicion," a standard that is significantly lower than probable cause, and completely ignores the "exigent circumstances" requirement of an "urgent need" to enter. This is a clear violation of the Fourth Amendment. The relevant case law establishes that police need probable cause to believe that contraband or evidence of a crime is present before conducting a warrantless search of the curtilage. Furthermore, even if probable cause exists, exigent circumstances must also be present to justify a warrantless entry. Exigent circumstances typically involve situations where immediate action is necessary to prevent physical harm, the destruction of evidence, or the escape of a suspect.

As mentioned above, the Supreme Court recently explained that the crux of the exigent circumstances exception is that it only applies in true emergencies. *Lange v California*, 594 US 295, 302 (2021)("Whether a "now or never situation" actually exists—whether an officer has "no time to secure a warrant"—depends upon facts on the ground.").

In contrast, the RPD policy allows officers to intrude upon the curtilage where there is no evidence of an emergency whatsoever, based on mere speculation that a dangerous item might be present, without any specific or immediate need for action. This policy does not satisfy the

probable cause requirement, nor does it address the necessity for exigent circumstances. Consequently, Cuilla's testimony that officers can backtrack through residential properties based on "reasonable suspicion" conclusively establishes that the policy is unconstitutional.

Lieutenant Cuilla's testimony establishes the City's liability under *Monell*. Cuilla, as a Rule 30(b)(6) witness, testified on behalf of the City and provided a binding account of the City's official policy regarding backtracking through residential properties. Cuilla's admissions are binding on the City and serve as admissions against interest under Fed.R.Evid. 804(b)(3)). The testimony demonstrates that the RPD's official policy permits unconstitutional searches in violation of the Fourth Amendment. Such a policy, when followed by officers, directly leads to constitutional violations – and caused the violation of Plaintiffs' rights in this case.

The City's unlawful "backtracking" policy was a moving force behind Algarin unlawfully entering Plaintiffs' property and shooting Tesla. This satisfies the requirement for proving municipal liability under *Monell*, as it shows a direct causal link between the City's policy and the constitutional harm suffered by the Plaintiffs.

The binding effect of Rule 30(b)(6) testimony is well-established in case law. Courts have consistently held that such testimony can be used to establish operative municipal practices, policies, and customs for *Monell* claims. For example, in *Davila v. N. Regional Joint Police Bd.*, the court emphasized that Rule 30(b)(6) testimony is binding on the party that designated the witness, and the admissions are those of the entity itself. *Davila v N. Regional Joint Police Bd.*, 370 F Supp 3d 498, 536-37 (WD Pa 2019)

Similarly, in *Augustus v. City of Los Angeles*, the plaintiff was granted partial summary judgment on the *Monell* claim based on the testimony of the Rule 30(b)(6) witness, which conclusively established that the officers acted according to their training and LAPD policy.

*Augustus v City of Los Angeles*, 2:22-CV-02640-SB-AGR, 2023 WL 4291437, at *13 (CD Cal May 31, 2023). In *Augustus*, Plaintiff Karl Augustus brought a civil rights action against the City of Los Angeles and several LAPD officers, alleging that the officers conducted an unjustified high-risk traffic stop and used excessive force. The incident began when LAPD officers noticed a grey BMW with out-of-state license plates that did not match the vehicle description in their database. Believing the vehicle might be stolen, the officers initiated a high-risk stop, which involved pointing firearms at Augustus, handcuffing him, and detaining him for approximately 28 minutes. Augustus complied with all directions and did not resist the officers.

The court granted partial summary judgment to the plaintiff on the *Monell* claim. The court found that the LAPD's official policy was the moving force behind the officers' actions. *Augustus v City of Los Angeles*, 2023 WL 4291437, at *13. The City's Rule 30(b)(6) witness, Sergeant Montes, testified that officers were trained to conduct high-risk stops under circumstances similar to those involving Augustus. The court held the testimony conclusively established that the officers acted according to their training and LAPD policy when conducting the stop. The court held that the testimony of the Rule 30(b)(6) witness bound the City, and that the unconstitutional actions were a direct result of official policy.

Similarly, in our case, Lieutenant Michael Cuilla's Rule 30(b)(6) testimony conclusively establishes that the RPD policy violates the Fourth Amendment, and that the unlawful policy was the moving force behind the constitutional violations in this case. Cuilla testified that RPD officers are permitted to backtrack through the curtilage of residential properties based on "reasonable suspicion" following a hot pursuit. This policy fails to meet the constitutional standards that require probable cause and exigent circumstances to justify warrantless searches of a home or its curtilage. The Fourth Amendment protects individuals from unreasonable searches and seizures, and any

policy that allows intrusion based on a lower standard of "reasonable suspicion" is clearly unconstitutional.

Cuilla's testimony is binding on the City and serves as an admission against interest. It definitively demonstrates that the RPD's official policy permits unconstitutional searches, directly leading to Fourth Amendment violations. Cuilla's testimony conclusively establishes that the unlawful policy was the moving force behind the constitutional violations experienced by the plaintiffs. This satisfies the *Monell* requirement of proving a direct causal link between the City's policy and the harm suffered by the plaintiffs, entitling them to summary judgment.

**F. Officer Algain's testimony establishes that he was trained to unlawfully backtrack.**

Officer Algarin testified that he received training on backtracking during his field training with the Rochester Police Department. The training included entering yards during field training to backtrack under similar circumstances, such as after a foot chase where suspects were detained. He stated that backtracking is a common RPD tactic that involves tracing the flight path of a suspect through residential properties, and jumping fences if necessary, even without seeking the property owner's consent. He estimated that he engaged in backtracking through residential properties with fences approximately once a week. (¶ 92).

In the incident involving Mr. Dempsey's backyard, Officer Algarin testified that he jumped the fence into the backyard to backtrack after the suspects had been detained. He stated that he was looking for contraband, not specifically a gun, and that he had no specific facts to support a reasonable belief that the suspect had discarded any contraband in the yard. (¶ 32) He admitted that the incident could have been avoided if he had walked to Mr. Dempsey's front door and asked for his consent to enter the yard, but he chose not to. (¶ 72)

Officer Algarin maintained that his actions in backtracking through Mr. Dempsey's yard were consistent with his training. (¶¶ 84, 86, 89) He stated that he had been trained to backtrack and that it was a common practice in the RPD. He also stated that his supervisors and PSS reviewed the incident and determined that his actions were justified and in accordance with RPD's policies and procedures. Algarin also could not recall any specific RPD training that addressed the legal requirements for entering a property without a warrant or consent.

### G. The testimony of Algain's direct supervisor, Sergeant Rudolph, establishes that the RPD's policy is unlawful and that the RPD does not properly train its officers on the legal requirements to enter the curtilage to residential properties.

The deposition of Sergeant Jason Rudolph about the RPD's backtracking policies and practices, and the specific actions of Officer Javier Algarin, further demonstrate Plaintiffs' entitlement to summary judgment on their *Monell* claim. According to Rudolph, RPD officers are trained and permitted to enter the curtilage of residential properties to backtrack after the conclusion of a hot pursuit, even if there are no exigent circumstances. (¶ 88) Rudolph confirmed that this practice is part of the RPD's general training and policies. Specifically, Rudolph testified that Officer Algarin's decision to backtrack through the Dempsey's yard was consistent with RPD policies and training. (¶ 97)

Rudolph's testimony confirms the longstanding and widespread practice within the RPD regarding the unlawful entry into residential properties without meeting the constitutional requirements of probable cause and exigent circumstances. He admitted that officers are trained to backtrack through residential properties to search for discarded weapons or contraband, even when such items have not been observed being discarded. This testimony confirms the policy articulated by the Rule 30(b)(6) witness; and demonstrates the City's liability under *Monell* on a "widespread practice" theory of municipal liability.

Furthermore, Rudolph, as Algarin's direct supervisor, reviewed and approved Algarin's actions, reinforcing that these practices are not only part of the RPD's training, but also endorsed by supervisory personnel. Rudolph's approval of Algarin's conduct underscores the fact that these practices are embedded in the RPD's operational procedures, providing further support for Monell liability under two theories of municipal liability: (1) unlawful policy and (2) widespread practice.

Specifically, Sergeant Rudolph's approval of Algarin's actions shows that the unlawful policy is actively endorsed and implemented by the RPD's supervisory staff. This endorsement of unconstitutional practices at the supervisory level demonstrates that the policy of permitting officers to enter the curtilage of residential properties without probable cause and exigent circumstances required to do so is both (1) the official policy of the department and (2) is a widespread practice so deeply entrenched as to have the same force and effect as an official policy.

The testimony provided by Rudolph mirrors the situation in *Augustus v. City of Los Angeles*, where the court granted partial summary judgment to the plaintiff based on the testimony of a Rule 30(b)(6) witness. In *Augustus*, the Rule 30(b)(6) witness's testimony conclusively established that the officers acted according to their training and LAPD policy, leading to the court's determination that the LAPD's official policy was the moving force behind the constitutional violations. Similarly, in the present case, Rudolph's testimony conclusively establishes that Algarin acted according to the RPD's policy permitting unconstitutional searches of the curtilage, and that the policy was the moving force behind Algarin's violation of Plaintiffs' constitutional rights.

In summary, Rudolph's testimony demonstrates confirms the RPD's unlawful backtracking policy and demonstrates that the policy was the moving force behind Algarin's violation of

Plaintiffs' constitutional rights. Rudolph's testimony demonstrates Plaintiffs' entitlement to summary judgment on their municipal liability claim.

**H. The testimony of other RPD officers further demonstrates that the RPD's policy is unlawful and that the RPD does not properly train its officers on the legal requirements to enter the curtilage to residential properties.**

   **1. Jonathan Laureano**

Officer Jonathan Laureano testified that following the conclusion of a "hot pursuit," the Rochester Police Department's (RPD) practice is to backtrack the flight path of the suspect to canvass the area for any items that might possibly have been discarded. (¶ 90) He stated that this is done because "there could be things of evidentiary value" that the suspect "may potentially have discarded." Laureano described this as a "public safety exception" to the Fourth Amendment (Laureano Dep. 50-52). According to Laureano, RPD officers are not required to request consent to search the curtilage to "backtrack" following a hot pursuit, as the "hot pursuit" exception still applies even after the pursuit has concluded (¶ 93).

Laureano explained that after a hot pursuit ends, regardless of whether officers observed the suspect discard anything, they will backtrack the flight path through the curtilage of residential properties to search for potentially discarded drugs, weapons, or contraband (¶ 93). Laureano testified that when officers backtrack under these circumstances, "I do not believe the Fourth Amendment applies at that point because there's still an ongoing investigation, and because hot pursuit applies, we're not going any further outside of what we just did" (*Id*.).

Officer Laureano's testimony further substantiates the unlawful policy testified to by Lieutenant Michael Cuilla. Laureano's description of the RPD's practice of backtracking through the curtilage of residential properties based on the mere possibility that a suspect may have discarded evidence highlights a systemic issue within the department. This practice directly

23

contravenes Fourth Amendment requirements, which mandate that officers must have probable cause and exigent circumstances to justify a warrantless search of a home or its curtilage.

Laureano's assertion that the "hot pursuit" exception to the Fourth Amendment continues to apply after the pursuit has ended is legally flawed. The relevant case law establishes that warrantless entries into the curtilage are presumptively unreasonable unless supported by probable cause and exigent circumstances. Laureano's testimony that officers routinely conduct searches based on "reasonable suspicion" without the necessary legal justifications demonstrates a fundamental misunderstanding and misapplication of Fourth Amendment protections.

Moreover, Laureano's belief that the Fourth Amendment does not apply during these backtracking searches underscores a significant failure in the RPD's training programs. Officers are evidently being instructed in practices that violate constitutional standards, indicating a pervasive issue in the department's policies and training procedures.

Laureano's testimony, combined with that of Cuilla, conclusively establishes that the RPD maintains an unlawful policy regarding entering the curtilage of residential properties after the conclusion of a hot pursuit. This policy allows officers to conduct searches without the requisite probable cause and exigent circumstances, directly leading to Fourth Amendment violations. Therefore, the City of Rochester's endorsement and implementation of this unconstitutional policy provide a clear basis for municipal liability under Monell v. Department of Social Services of the City of New York. The plaintiffs are entitled to summary judgment as the unlawful policy, as testified to by both Cuilla and Laureano, is conclusively established as the moving force behind the constitutional violations experienced by the plaintiffs.

**2. Jason Horowitz**

Officer Jason Horowitz testified that the Rochester Police Department (RPD) has a practice of backtracking through residential properties following a hot pursuit. According to Horowitz, this practice is employed to search the flight path of a suspect for any items that might have been discarded. He detailed that this backtracking is done without requiring probable cause or an exigent circumstance, operating under the assumption that such searches are justified by the hot pursuit doctrine. (¶ 94)

Horowitz explained that officers often do not seek consent from property owners before entering the curtilage of a residential property to conduct these searches. (¶ 89)He recounted his own experiences where he and his fellow officers routinely backtracked through residential yards, following suspects' flight paths to look for discarded contraband, such as drugs or weapons. He indicated that this was standard practice and part of the training officers received at the RPD.

Horowitz's testimony further corroborates Lieutenant Cuilla's and Officer Laureano's accounts, illustrating a consistent pattern and practice within the RPD that violates Fourth Amendment protections. His description of routine backtracking without probable cause or exigent circumstances highlights a systemic issue where officers are trained and instructed to conduct searches that do not meet constitutional standards.

The consistency between the testimonies of Cuilla, Algarin, Rudolph Laureano, and Horowitz demonstrates that these unconstitutional practices are not isolated incidents but rather reflect an entrenched policy within the RPD. By establishing that these actions are part of the official training and practices endorsed by the department, the plaintiffs have conclusively shown that the RPD's policy is the moving force behind the constitutional violations they experienced.

## <u>CONCLUSION</u>

For all of the reasons stated herein, Plaintiffs respectfully submit the Court should grant

their motion for partial summary judgment in its entirety.

Dated: August 9, 2024
      New York, New York

~//s//~
_____
Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
Phone: (212) 425 1020
E-mail: eshields@RothandRothLaw.com
