- - - - - - - - - - - - - - - - - - - - - - - - -

CHARLES DEMPSEY, individually and as the father and natural guardian of his minor daughter, L.D.,

Claimant,

v.

CITY OF ROCHESTER,

Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - -

50-h Hearing in the Above-Titled Matter:

Sworn Testimony of:

Charles Dempsey

Location: City of Rochester Department of Law
City Hall
30 Church Street, Room 008 A
Rochester, New York 14614

Date: April 16, 2019

Time: 10:00 a.m.

Reported By: JAYME C. WINTISH
Alliance Court Reporting, Inc.
120 East Avenue, Suite 200
Rochester, New York 14604

A P P E A R A N C E S

Appearing on Behalf of Claimant:

Elliot Dolby Shields, Esq.
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
eshields@rothandrothlaw.com

Appearing on Behalf of Respondent:

John M. Campolieto, Esq.
City of Rochester Department of Law
City Hall
30 Church Street, Room 400 A
Rochester, New York 14614
campolj@cityofrochester.gov

* * *

CHARLES DEMPSEY - BY MR. CAMPOLIETO

TUESDAY, APRIL 16, 2019;

(Proceedings in the above-titled matter commencing at 10:18 a.m.)

* * *

(The following exhibit was marked for identification: EXH Letter A.)

CHARLES DEMPSEY,

called herein as a witness, first being sworn, testified as follows:

EXAMINATION BY MR. CAMPOLIETO:

Q. Mr. Dempsey, good morning. My name is John Campolieto. I'm an attorney for the City of Rochester, and I'm going to be asking you some questions today for -- regarding the incident that occurred at your property on October 19th, 2018.

And before we get started I just want to let you know if you need to go to the bathroom, if you need a drink, go. Just let me know. Also, if you don't understand what I'm saying, if I'm speaking too fast, just stop me in the middle of anything I'm asking and say, can you repeat that? I didn't get it. And I'll try to rephrase my question or repeat it for you so it's more clear.

I'm going to ask some background questions

regarding your pedigree, your name and things like that. And then I'm going to get into the incident at your property on October 19th. It should be pretty quick and won't be too in depth. And so we can start.

If you could just state your name -- your full name for the record?

A. Charles Dempsey.

Q. And do you go by any other names, or have you gone by any other names?

A. Short, Chuck.

Q. I'm sorry?

A. Chuck.

Q. Chuck. Okay. And Mr. Dempsey, what is your address?

A. It's 53 Kosciusko Street which is in Rochester, New York 14621.

Q. And if you just speak up and speak in verbal answers instead of hand gestures so the court reporter can get everything. And then we'll be good to go.

And what is your age?

A. 33.

Q. And your marital status?

A. Single.

Q. And have you been married in the past?

A. No.

Q. And do you have children?

A. Yes.

Q. And how many children?

A. One.

Q. And do you have a relationship with the child's mother?

A. I mean, not directly, no.

Q. Okay. So it's a former girlfriend?

A. Yes.

Q. Okay. And do you split custody with that woman?

A. We have a custody agreement.

Q. You have a custody agreement. And how often is she -- does she spend time with the mother?

A. Three times a month.

Q. Three times a month. And are you the full-time custodian of the child? Do you have full custody?

A. Yes.

Q. And when your daughter spends time with the mother, is it on the weekends or is it a full week or...

CHARLES DEMPSEY - BY MR. CAMPOLIETO

A. It's from Saturday to Sunday.

Q. Saturday to Sunday. So weekends?

A. Yes.

Q. And where does that woman live?

A. Presently she lives in, I guess, that would be Henrietta -- Rush.

Q. Okay. And you live at, as you said, 53 Kosciusko Street?

A. Yes.

Q. Where did you -- what was your previous address?

A. 117 Cedar Terrace in Hilton.

Q. And when did you live at Cedar Terrace in Hilton?

A. 2005.

Q. And when did you move to 53 Kosciusko Street?

A. 2007.

Q. Okay. And you've lived there since?

A. Yes.

Q. Do you own the house?

A. Yes.

Q. And do you own it in your name only?

A. Yes.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. And has it always been in your name only, since you've owned it?

A. Since I paid off the bank, yes.

Q. And when was that?

A. 2 -- I don't recall the exact date that I paid off the bank.

Q. It was after 2007 though?

A. Yeah. Yeah.

Q. So you did have a mortgage on the property?

A. Yes.

Q. Is the backyard fenced in on this property?

A. Yes.

Q. Okay. Is there any gaps in the fence that you know of?

A. No.

Q. How long has it been fenced in without gaps?

A. As long as I've been there.

Q. Okay. And on October 19th, 2018, did you have a dog?

A. Yes.

Q. And what was your dog's name?

CHARLES DEMPSEY - BY MR. CAMPOLIETO

A. Tesla.

Q. Do you currently have a dog?

A. Yes.

Q. Okay. And did you have a dog prior to Tesla?

A. No.

Q. Was Tesla your first dog that you -- the first dog that you owned?

A. As an adult, yes.

Q. As a child you had a dog with your parents?

A. Yes.

Q. And where do your parents live?

A. Cedar Terrace.

Q. So in 2005 when you lived at 117 Cedar Terrace, that was your parents' house?

A. Yes.

Q. Okay. And I don't know if I asked this, but you had mentioned that you have a daughter. How old is your daughter?

A. She's 11.

Q. Okay. Where does she go to school?

A. ROC Achieve.

Q. And what is ROC A...

A. ...Chieve.

Q. ...Chieve?

A. Yeah.

Q. What is that?

A. Charter school.

Q. What grade is she in?

A. Sixth grade.

Q. And how long has she gone to "Rocket Chieve"?

A. The last two school years.

Q. Where did she go before that?

A. Rochester City School District, Number 33, John James Audubon.

Q. And what's the furthest level of education that you've achieved?

A. A diploma -- high school diploma, Regents.

Q. Okay. And where did you go to high school?

A. Hilton.

Q. Hilton. And sir, are you employed?

A. Yes.

Q. And where do you work?

A. United Parcel Service.

Q. And what do you do for UPS?

CHARLES DEMPSEY - BY MR. CAMPOLIETO

A. Work in the warehouse.

Q. And how long have you done that job?

A. Going on 13 years now.

Q. Okay. What's your title?

A. Preloader.

Q. Is that your -- was that your first job?

A. No.

Q. Okay. What was -- well, let me rephrase that question.

Was that your first job out of high school -- after high school?

A. No.

Q. Okay. What was your first job after high school?

A. I was working at McDonald's while I was in high school, as I graduated.

Q. And then you went to UPS?

A. Yeah.

Q. Who is your superior at UPS, the person who is directly in charge of you -- your performance at work?

A. His first name's Todd. That's all I know.

(The following exhibit was identified for the record: EXH Letter A.)

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. Take a look at Exhibit A. And generally if you know what that is -- let me know if you know what that is.

MR. SHIELDS: So just look over each page and then tell John when you've read through it.

(There was a pause in the proceeding.)

A. This is a notice of claim.

Q. Okay. And what does it contain, if you know?

(There was a pause in the proceeding.)

Q. I mean, look at page 4. Tell me what that -- what it contains. What's written there, generally? I'm not trying to tie you to anything.

A. The nature, and time, and place, and manner of which the claim arose.

Q. Okay. And the claim is against the City of Rochester; is that correct?

A. Yes.

Q. Okay. And this is something you and your attorneys served on the City of Rochester?

A. Yes.

Q. Okay. And the claim involves an incident that took place on October 19th, 2018; is that correct?

CHARLES DEMPSEY - BY MR. CAMPOLIETO

A. Yes.

Q. Okay. Do you remember that day?

A. Yes.

Q. Okay. And what -- why do you remember that day?

A. An officer murdered my best friend.

Q. So your dog was killed on that day by a police officer?

A. Yes.

Q. Okay. Do you recall the day, prior to what happened with the police officer and your dog? Do you recall what happened before that?

A. Earlier in the day?

Q. Yes, earlier in the day.

A. Yes.

Q. Okay. And do you recall what day it was of the week?

A. It was a Friday.

Q. It was a Friday. And do you recall what time the incident arose on October 19th?

A. Approximately after -- just after 5 o'clock p.m.

Q. Okay. Did you work on this Friday?

A. Yes.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. You recall working that day?

A. Yes.

Q. And did your daughter go to school that day?

A. Yes.

Q. And what time does your daughter normally get home from school?

A. After 3 p.m.

Q. And did that occur on this day, October 19th?

A. Yes.

Q. What time do you normally get home from work?

A. Approximately 4 a.m.

Q. Okay. So what are your work hours generally?

A. From about midnight to about 3:45, 4 a.m.

Q. Midnight to 4 a.m.?

A. Approximately.

Q. So it's a four-hour shift?

A. Yes.

Q. Are you part-time or are you full-time?

A. I'm part-time.

Q. Okay. And did you go to work on the date

CHARLES DEMPSEY - BY MR. CAMPOLIETO

of October 20th?

A. No. That's a Saturday.

Q. Okay. So you work -- so you work only weekdays, Sunday through Friday?

A. Yes.

Q. You were scheduled to have this day off, October 20th?

A. October 20th, yes. It's a Saturday, yes.

Q. When was the next time you worked after October 19th, 2018?

A. I was unable to get back to work for over a week. I tried to work in the middle of the next week and it didn't go well.

Q. So you tried to go in in the middle of the week, but you didn't. But you took the first couple days of the week off, the following week of October 19th?

A. Yes.

Q. Do you recall what you were doing prior to encountering a police officer on October 19th, 2018?

A. I was in my house.

Q. Do you recall what you were doing?

A. Cooking.

Q. Cooking what?

CHARLES DEMPSEY - BY MR. CAMPOLIETO

A. Those tiny little hot dogs, beef sausage things.

Q. Were you cooking dinner or -- was it dinner?

A. It was a pre-shopping snack.

Q. Yeah.

A. Pre-dinner food.

Q. So you initially said "pre-shopping." Does that mean you were intending to go shopping?

A. I was intending to go shopping with my daughter.

Q. With your daughter. Was this -- this -- on October 19th, was that a weekend that your daughter was going to spend with her mother?

A. That was her birthday weekend, and she was going to be spending it with both.

Q. What is the day of -- if you can just tell me her -- the day of -- when was her birthday?

A. Her birthday is October --

Q. I don't need to know the date. I just want to know the day. So we're talking about Friday, October 19th. How many -- I mean, just tell me the day of the week she was going to celebrate her birthday.



Let's go -- let's just go off the record.

(There was a discussion off the record.)

Q. So we're back on the record. This was the weekend of your daughter's birthday, and so my question was, was she spending the weekend with her mother? And then you can answer that question. Was this one of the weekends she had scheduled to stay with her mother?

MR. SHIELDS: And I'm just going to object. Asked and answered because I think he did answer, but you can go ahead and answer it.

A. She was going to visit her mother, yes.

Q. Okay. And did you have -- let me ask you this. When she visited her mother, did Tesla go with her or stay at the house?

A. The weekend we're speaking of or --

Q. No. Generally, when she would go to visit her mother, did Tesla go with her, or did Tesla stay home?

A. Tesla lived at my home.

Q. And Tesla was your dog?

A. Our dog.

Q. You would consider it your dog?

A. Yes.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. When did you get Tesla? When did you purchase Tesla or adopt Tesla?

A. It was in July of 2014 I believe. 2014.

Q. And how did you acquire Tesla?

A. A Facebook friend was at -- had the availability.

Q. I'm sorry?

A. An offer from a friend on Facebook.

Q. Did you obtain Tesla as a puppy?

A. Yes.

Q. Do you know how old she was when you obtained her?

A. Approximately ten weeks.

Q. And did you pay for Tesla?

A. Not -- no.

Q. So it was adoption, so she didn't cost anything to you?

A. Pretty much.

Q. What's "pretty much"?

A. I mean, I gave him a few dollars out of my pocket, but he did not ask me for money.

Q. How did he -- and who is "he"? We're talking about the person you got Tesla from?

A. Like his name?

Q. Yeah. Do you have his name?
A. Jake.
Q. Jake. And do you know his last name?
A. Maloney.
Q. And this is someone you know on Facebook?
A. Yes.
Q. And are you still friends with him on Facebook?
A. Yes.
Q. And what type of dog is Tesla?
A. A Labrador retriever.
Q. Do you know if she's a purebred -- do you know if she was a purebred Labrador retriever?
A. I don't believe her to be a purebred retriever.
Q. And was she -- did you know what other type of dog she was mixed with?
A. I believed her to be mixed with a boxer.
Q. And her whole life was lived at the house you currently own at 33 Kosciusko Street? I think I'm saying that right.
A. Yes.
Q. Okay. And did you put Tesla through any type of training classes or training for any type of

skill or activity -- specific activity, meaning a guide dog, or was she especially trained in any way?

A. Not a paid program, no.

Q. Was there an unpaid program?

A. Just raising her.

Q. Just your yourself?

A. Right.

Q. So you trained her?

A. Yeah.

Q. Does your former -- your former girlfriend, your daughter's mother, have any animals or dogs?

A. I don't -- I don't know.

Q. Okay. Would she ever have been considered an owner of Tesla?

A. No.

Q. And at the time of the incident on October 19th, 2018, and prior to that you mentioned you were making a pre-shopping snack, a dinner -- a pre-dinner snack. Where was your daughter?

A. Inside the home.

Q. Do you know what room she was in?

A. The kitchen.

Q. With you?

CHARLES DEMPSEY - BY MR. CAMPOLIETO

A. Yes.

Q. Okay. And your kitchen -- does your kitchen have a door to the backyard?

A. Yes.

Q. And is it directly off the kitchen, or do you have to go downstairs or...

A. Right on the wall.

Q. Right on the wall. Right off of the kitchen. And, you know, when I talk about the incident, I'm talking about the police officer discharging his firearm at your dog -- shooting your dog.

What I'm asking in the next question is do you know if there were any neighbors outside that you saw that saw the incident with the police officer and your dog?

A. Not that I'm aware of.

Q. Have you talked to any of your neighbors about the incident?

A. Yes.

Q. And which neighbors did you talk to?

A. Those that came to give me sympathy.

Q. What are their names?

A. I don't have any names.

Q. You don't know who you talked to?

A. I don't really keep up with all of their names, as far as my neighbors.

Q. Do you know any of your neighbors?

A. By face and friendly neighbor --

Q. You don't know them by name?

A. -- but I don't know all my neighbors by name, no.

Q. Do you know any of them by name?

A. Yeah.

Q. Who?

A. Tony.

Q. Do you know his last name?

A. Tony Starr.

Q. Anybody else?

A. No.

Q. Did Tony Starr come and help -- talk to you about the incident?

A. We spoke about it.

Q. Did Tony Starr see the incident?

A. I don't believe so.

Q. Do you know a woman named Donna Schott?

A. No.

Q. How about Siavaija Lewis?

A. No.

Q. Do you know a woman named Mrs. Lewis -- or Ms. Lewis on your street?

A. No.

Q. And do you recall where your dog, Tesla, was immediately prior to the incident before being let outside?

A. In the kitchen.

Q. With you, with your daughter in the kitchen?

A. Yes.

Q. And did there come a time when you let the dog out of the back door into her yard?

A. Yes.

Q. Okay. And do you recall why you did that at that time?

A. So that she could use the bathroom so that...

Q. Was she barking prior to being let outside?

A. No.

Q. And prior to letting her outside had you seen a uniformed police officer in your backyard?

A. No.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. Was the dog barking in any way prior to being let outside?

A. No.

Q. Was she standing -- was the dog, Tesla, standing by the door prior to being let outside?

A. No.

Q. Did Tesla alert in any way to the presence of somebody in your backyard --

A. No.

Q. -- prior to being let outside?

A. No.

Q. And did you open the door to let Tesla out?

A. Yes.

Q. Did you look outside?

MR. SHIELDS: Objection to the form of the question.

Q. I'll rephrase it just so it's a little more accurate.

When you were letting Tesla outside -- opening the door to let her outside, did you observe anything in the backyard?

A. As -- as I walked out with her?

Q. Okay. Okay. When you let Tesla outside,

did you walk outside with her?

A. Yes.

Q. And can you tell me what you saw when you walked outside?

A. As I came outside I saw a man which -- in my yard which was unexpected. That man ended up being a police officer.

Q. Uh-huh.

A. Which was unexpected and...

Q. When did you first realize that the man you saw was a police officer?

A. A few moments after having come outside.

Q. Okay.

A. Seeing his uniform.

Q. And what did Tesla do when you let her outside?

A. The same thing she did every time I let her outside.

Q. What's that?

A. Came down the stairs which is immediately next to the door --

Q. Uh-huh.

A. -- came around the corner of the porch --

Q. Uh-huh.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

A. -- and she headed towards the fence of my yard which she did every single time and --

Q. Headed toward the fence on the -- if you're facing the front yard, on the left side of the house?

A. What would that be? The -- the west side of the house, yes.

Q. So straight down the stairs towards the fence?

A. Down the stairs, around 180 degrees because there's a wall there. My neighbors -- the other house is like right there.

Q. Okay.

A. So she went around and then across the yard widthwise.

Q. So coming down the stairs and the stairs come down towards the left side of your house; is that correct? And then she did 180 degrees going towards the right side?

A. From my perspective, yes. Left and right, the way you described.

Q. Okay. And what happened when she got down off of the stairs?

A. She got off the stairs. I noticed that

that was an officer in my yard, and I tried to alert him of her presence and --

Q. How did you try to do that -- alert the officer of her presence?

A. Verbally.

Q. And how many police officers did you see in your yard?

A. There was the one officer.

Q. Did you see any other police officers anywhere in the vicinity? Any other police officers?

A. Later on in the situation.

Q. Sure. Okay. I'm sorry. You can go ahead. What happened? You said you tried to alert the police officer as to Tesla's presence.

A. Tried. His reaction was to draw his weapon. I tried to, at that point, move towards -- I tried -- I tried -- I wish I could have prevented it, but he shot her and then...

Q. Where was Tesla in relationship to the officer, prior to him shooting the dog?

A. In front of him. I mean...

Q. I mean, do you recall how far he was when -- I mean, again, this is on video. I'm not trying to -- I'm not trying to tie anybody into a

recounting of the --

A. Roughly a couple yards.

Q. Okay. A couple yards in front of him. Okay. And do you recall if the officer said anything to Tesla prior to shooting Tesla?

A. No.

Q. Has Tesla ever bitten anybody before? Any person?

A. No.

Q. Okay. Has Tesla ever been issued any animal control tickets prior to the events of October 19th, 2018 -- Rochester Animal Control tickets?

A. No.

Q. Has she ever bitten any other animal prior to October 19th, 2018?

A. No.

Q. Has animal control ever been to your house on 53 Kosciusko Street to speak to you regarding Tesla?

A. No.

Q. Okay. And did you -- you witnessed the officer shoot Tesla. What did you do -- what did Tesla do after she was shot?

A. She yelped in a way I've never heard her

yelp before and fell to the ground.

Q. Did she move away from the officer at that -- after she fell to the ground?

A. She went behind me and then to my door.

Q. Okay. The door that she came out of?

A. Yes.

Q. And what did you do?

A. I was concerned with the active shooter in my yard for the safety of, not just my dog -- myself, my daughter.

Q. Okay. You said "active shooter." You're referring to the police officer?

A. Yes.

Q. Okay. And what did the police officer do?

A. Killed my girl.

Q. Okay. Now I understand he killed -- he shot the dog, but what did he do after he shot the dog, immediately?

A. Immediately after he shot the dog he pointed his weapon at me and --

Q. And when you say he pointed the weapon at you, he pointed the gun at you?

A. He pointed the gun at me.

Q. Did he point the gun at anybody else?

CHARLES DEMPSEY - BY MR. CAMPOLIETO

A. My daughter was standing behind me while he was aiming his weapon at me.

Q. Outside of the house behind you?

A. She was standing in the doorway of which the dog had retreated to.

Q. Okay. And he pointed the gun at the doorway?

A. Which was behind me.

Q. So he pointed it at you and then raised it up to point at the doorway where your daughter was standing?

A. He held it -- he held his gun up at me.

Q. And at the door?

A. Which was behind me.

Q. Okay. So did he move it up, or did he stay trained on you?

A. I don't -- my dog was behind me as well. I don't --

Q. What I'm asking is did he raise his gun up towards the doorway above the stairs -- or where you come out of?

A. Like above me?

Q. Yeah. It would be above you; correct? The doorway?

CHARLES DEMPSEY - BY MR. CAMPOLIETO

A. Behind -- there's stairs between the doorway and the ground level.

Q. So if he's pointing the gun at you when you're on the ground, the doorway would be some measurement of feet higher than you; right?

A. The distance of the three stairs.

Q. Did he move his gun up or -- when you say he pointed it at your daughter, are you saying because she's directly behind you? Since he had the gun trained on you that he was in effect also pointing it at your daughter?

A. Yeah. I felt like she was at risk.

Q. But he didn't move his gun? He stayed right on you?

A. He was moving while he had his gun.

Q. Okay. Did he talk to your daughter at all or yell anything to your daughter?

A. No.

Q. Did he yell anything to you?

A. Yes.

Q. What did he yell?

A. To get on the ground.

Q. And did you get on the ground?

A. No. I was concerned.



CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. Did you move towards him?

A. I was moving towards him trying to get my dog, and he had already shot her. And as I said, I was worried about what he was going to do next.

Q. And what did your daughter do?

A. My daughter came to the door to figure out why she heard her -- why she heard her best friend crying like that, and me screaming. And she tried to figure out what was happening so she came to the door to witness -- witness her best friend bleeding out at the doorway and the officer holding me at gunpoint.

Q. Okay. Did your daughter see the -- see her dog being shot?

A. Did she see him fire the rounds?

Q. Did your officer [sic] see the police officer fire his gun at Tesla?

A. No.

Q. What did you do -- did there come a time when the officer put his gun down, meaning holster his gun?

A. Eventually.

Q. Okay. How long would you say?

A. I would have to approximate that it was a few minutes into the situation.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. Did he pick up another weapon?

A. Yes.

Q. What?

A. I'm not familiar with what he drew on me. I didn't recognize it.

Q. Okay. And did there come a time when he put that weapon back in his holster?

A. Eventually.

Q. And how long would you say from the time he pointed the gun at you to the time he put his second weapon back into his holster, how much time elapsed?

A. Again, it was approximately a few minutes.

Q. Two? Three? Could it have been ten?

A. Roughly two. I don't...

Q. What did you do after that?

A. I went to address my dog's wounds.

Q. And where was your dog at the time you went to address her wounds for the first time?

A. At the north side of my yard.

Q. And that would be towards the house?

A. Yes. In between my house and the neighbor's house.

Q. And what's the neighbor's name that lives

directly next to you?

A. In the house that I'm referring to?

Q. Yes.

A. There's current -- currently I don't know what the name of -- who lives there.

Q. Is it a rental?

A. There's two apartments in the building.

Q. And in the area where you're referring to where you went to tend to the dog, is that almost like a corridor towards the front yard next to the fence?

A. Yes. I guess, I mean --

Q. Like your house is here and the fence is here, so creating a narrow passageway?

A. No. That's house, house --

Q. No fence?

A. -- fence.

Q. Fence before that area?

A. There's a fence before you get to the front of the property --

Q. Okay.

A. -- in between the two houses.

Q. Do they have a fence in their yard?

A. Yes.

Q. Does it create any kind of gap where a dog

CHARLES DEMPSEY - BY MR. CAMPOLIETO

could get out --

A. No.

Q. -- in between the houses?

A. No.

Q. I don't really need it right now but is it two separate fences in between?

A. No. That's one fence.

Q. One fence. So your fence goes up to the gate and then there's the front of the house; is that correct? And then that separates the neighbor's yard from yours?

(There was a pause in the proceeding.)

Q. Maybe you could -- what I'm trying to do is just get a sense of what we're talking about. You have your house, the neighbor's house, and there's a fence between your yard and the neighbor's yard; is that correct?

A. That's correct.

Q. Okay. And then there's a gate, for your yard only, that enters -- that cuts off your backyard to your front yard?

A. Yes.

Q. Okay. And so the neighbor's house is completely separate except you share a fence in

between the yards?

A. Yes.

Q. Okay. Am I misstating something?

A. In -- just my visual of it is that there's house then fence.

Q. Sure.

A. That's -- I'm just trying to --

Q. Have you seen the police officer's body cam footage video in this case?

A. Yes.

Q. Does that depict the area where Tesla was being helped by you prior to being taken to a vet?

A. No.

Q. It does not. Okay. Why does it not depict the area?

A. Because she ran along in between the side of the two houses, and the officer's cam stayed in the back of the yard.

Q. Okay. Does there come a time when -- so did Tesla move from the area where you were helping her next to the house?

A. No.

Q. Okay. She did not move. So she stayed in that place, and you assisted her and stayed with her



before you took her to the vet?

A. Yes.

Q. Okay. Does there come a time in the video where that area is depicted, and you were shown helping Tesla?

A. Not in what I have seen.

Q. How long did you stay with Tesla to try to assist her?

A. Approximately 40 minutes.

Q. Okay. Why did you stay with her for 40 minutes?

A. I needed help.

Q. What did you need in terms of help?

A. I'm not trained in bullet first aid. I needed bandages. I needed some sort of assistance and...

MR. SHIELDS: You want to take a break?

THE WITNESS: No. I'm all right. I'm all right.

A. I was afraid of what was going on for my daughter, as well as what was going on with my dog.

Q. Okay. And what do you mean by that?

A. That was terribly traumatic for her -- her, my daughter.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. Uh-huh. Was she outside with Tesla at this time that we're referring to -- the time you were assisting Tesla?

A. She was inside.

Q. Who was with her, or was she by herself?

A. She was by herself.

Q. Did you have any conversations with your daughter at that time -- from the time Tesla was shot to the time you took Tesla to the -- to the hospital -- vet?

A. No.

Q. Okay. Did your daughter come out to be with Tesla at any time during that period?

A. She came to the window.

Q. And where is the window in relationship to where you were sitting with Tesla?

A. Above the officer that was sitting over me, so above me.

Q. Who was your normal vet for Tesla?

A. The Bay Street Animal Clinic.

Q. Is that -- and that's in the City of Rochester; right?

A. Yes.

Q. And do you have a special veterinarian



that works with you only?

A. I can't remember her name. I just...

Q. Did you call Bay Street Animal Hospital that day to tell them that you were coming?

A. They were closed.

Q. And how did you find that out?

A. The -- when animal control finally arrived, I was informed that there was only one animal hospital open at that time.

Q. And who told you that?

A. The animal control, I guess, person. I don't what their title would be.

Q. Officer -- probably animal control officer. How many animal control officers came to your yard that day?

A. One.

Q. Okay. And were you waiting for Rochester Animal Control officers to come and assist you?

A. Yes.

Q. And why were you waiting for them?

A. I am not trained in first aid for an animal. I did not know what to do.

Q. Did you call animal control?

A. No.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. Do you know who did?

A. No.

Q. Did you know that they were coming?

A. Yes.

Q. And who told you that?

A. One of the officers on the scene.

Q. Do you know which officer?

A. No.

Q. Do you know the names of any of the officers that were in your yard that day? Do you recall the names of any of the officers?

A. The officer -- Officer Algarin.

Q. And was he the officer that shot your dog?

A. Yes.

Q. Did Officer Algarin at any time between the first time you saw him and the last time you saw him on that day October 19, 2018, touch you in any way?

A. Like with his hands?

Q. Yes.

A. No.

Q. Did any police officer touch you with his hands that day? And I mean anything besides just patting you on the back or something affectionate.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

A. I'm just trying to recall what had happened when I got up, but I would -- I would answer no.

Q. Did any officer during that day touch your daughter in any manner?

A. I don't know.

(There was a discussion off the record.)

MR. CAMPOLIETO: I'll try to wrap this up or move the operation.

THE WITNESS: Busy around here.

MR. CAMPOLIETO: It's like treading -- busy like treading-water-busy.

Q. Okay. Mr. Dempsey, how did you come -- did you -- who was the vet that you took Tesla to?

A. The animal hospital that's on East Henrietta Road.

Q. And do you know what it's called?

MR. CAMPOLIETO: I'm not going to be able to finish this up. Sorry guys.

A. I don't recall.

MR. CAMPOLIETO: Let's pause for a second.

(The proceeding recessed at 11:07 a.m.)

(The proceeding reconvened at 11:16 a.m.; appearances as before noted.)

CHARLES DEMPSEY, resumes;

CONTINUING EXAMINATION BY MR. CAMPOLIETO:

Q. What was the name -- my last question was what was the name -- or close to my last question was what was the name of the animal hospital that you ended up taking Tesla to?

A. I'm not positive of the name of it. I do recall it was the animal hospital on East Henrietta Road near Monroe Community College.

Q. Had you ever been there before?

A. No.

Q. Okay. And who took Tesla to the animal hospital on East Henrietta Road?

A. I had to.

Q. Who told you that you had to take her?

A. The officers when -- when I was holding her wounds asking for help, eventually they -- eventually when they were done cleaning up their scene, they basically told me that it was up to me to -- that -- they didn't help me.

They held me there. And when animal control finally arrived, that was when it finally processed for me that -- that they weren't -- that it was up to me. I did -- it was on me.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. And you had -- had you thought prior to that that there was going to be assistance from animal control or from the police officers?

A. I thought so.

Q. Okay. Why did you think so?

A. I thought that those people are in the service -- they -- the officers, you know, they held me there holding my dog for some time, and I assumed that was for my benefit.

Q. What were the officers doing during this time -- the time you were waiting for animal control to the time that you took Tesla to the hospital?

A. There were many officers on the scene. Two of the officers stood over me and my dog. I felt like they were keeping me from doing anything. Several officers came in and out of the yard.

Q. Were they marking off the area where the gun was discharged?

A. I was unable to see that area from where I was laying in the dirt.

Q. When you say "laying in the dirt," what do you --

A. I was laying over -- my dog had many wounds, and I was using my body as well as my hands to

CHARLES DEMPSEY - BY MR. CAMPOLIETO

prevent the bleeding out.

Q. Now you were in the area -- is it -- are there bricks or pavers there? It's the ground; correct?

A. Okay. Yes. Yes. There's -- there is in between the two houses. It goes house -- there's the sidewalk -- dirt, other house.

Q. Okay. You were in the dirt area?

A. And I was laying in the dirt section.

Q. Okay. Did the officers speak to you during the time you were holding your dog in the area between the houses and the time animal control came?

A. Yes.

Q. Okay. Do you recall the substance of that conversation?

A. There was many, many things that came up in terms of -- I was awfully distraught at the time, but I do recall I felt like the one officer was still sort of threatening me by standing over me and -- when you look up at an officer, the first thing you see is his tool belt or however you're going to put that.

And I questioned him as to why he was threatening me. And another officer, I questioned him as to where the -- where the officer that was shooting

with the technicians unit or so.

Q. Okay. And the officer that you said was standing over you, and you were looking at his tool belt because you were on the ground, and he was standing over you, was that the officer that shot Tesla?

A. No.

Q. Okay. What was the first time you saw this officer?

A. Looking up -- he showed up. He had opened my fence -- the gate of the fence. He had opened the gate of my fence, and stepped in, and stepped over me. And there was another officer standing right next to him and -- and they...

Q. Did you see any officers in the neighbor's yard, the next yard over?

A. Yes.

Q. And when did you first see them -- those officers?

A. A while -- while the -- not long after the officer had shot my dog.

Q. Do you know what they were doing over there?

A. It appeared that he had somebody on the

ground.

Q. Did you ever see that person?

A. No.

Q. Did you ever talk to that person?

A. No.

Q. When you were tending to your dog in that area of the dirt on the ground, did you see Officer Algarin in any capacity?

A. No.

Q. Have you seen him since he shot your dog? Have you seen -- strike that.

Have you seen Officer Algarin since you saw him shoot your dog?

A. I often worry that I may, but no, I have not.

Q. When you witnessed Officer Algarin shoot your dog, how many times did he fire his weapon?

A. Twice.

Q. Two times?

(There was a pause in the proceeding.)

Q. Is that correct?

A. Yes.

Q. Okay. Did you see him fire his weapon again or more than two times? Did he fire it at any

47

CHARLES DEMPSEY - BY MR. CAMPOLIETO

other time that you saw him?

A. No.

Q. Did your daughter go with you to the veterinarian's office?

A. No. Fortunately.

Q. Did anyone go with you to the vet's office?

A. No.

Q. Okay. Where did you put Tesla when you drove to the vet's office?

A. Inside of my vehicle.

Q. Where inside of your vehicle?

A. Through the back end, the --

Q. She stayed in the back --

A. The lift.

Q. -- area?

A. Yes.

Q. The trunk, if you will?

A. Yeah. Yes.

Q. Back?

A. The rear -- the trunk space.

Q. What kind of car do you have?

A. A Journey.

Q. What is a Journey? What kind of car is

ALLIANCE
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920 · www.alliancecourtreporting.net · 800.724.0836

it?

A. It's a Dodge.

Q. Did the vet -- when you got to the vet, did the vet, or vet staff help you bring Tesla into the hospital?

A. Yes.

Q. And how many people were assisting you at the hospital -- the vet animal hospital?

A. Multiple people.

Q. Okay. And were you able to stay with Tesla during the time that they were working on her at the vet's office?

A. No.

Q. How long did you spend at the vet's office?

A. Approximately a few hours.

Q. And during that few hours were you able to talk to any of the staff to know how Tesla was doing?

A. Yes.

Q. Were you given updates?

A. That -- yes.

Q. And who was -- while you were at the vet, who was with your daughter?

A. My brother.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. Okay. What's your brother's name?

A. Ben.

Q. And same last name, Dempsey?

A. Dempsey.

Q. Where does your brother Ben live?

A. My brother Ben lives in Naples.

Q. Do you have any other siblings?

A. Yes.

Q. How many?

A. I have another brother Tim Dempsey.

Q. Are they older than you or younger than you?

A. They're both younger.

Q. And do they both -- and where do they live? I'm sorry. You answered. Geneva you said? Naples?

A. My brother Ben lives in Naples.

Q. Okay. And Tim?

A. And Tim lives in the City of Rochester.

Q. Do they own dogs?

A. My brother Ben does.

Q. Were the doctors -- from the moment you arrived at the veterinarian hospital were the doctors optimistic, or did they temper your expectations for

Tesla's survival?

A. My -- the doctor that -- or the staff member that was consoling with me at first was assuring that they would do what they could.

Q. Did the person -- the staff member that you said was telling you that they would do what they could, did she mention any costs to you?

A. Eventually that did come up.

Q. Did you have to sign a waiver that you would pay for any costs?

A. I did have to sign paperwork at the animal hospital.

Q. When did they tell you that Tesla was not going to survive?

A. After they got the x-rays of the bullet that was lodged in the lung.

Q. And how long was that before -- since you had brought Tesla to the hospital?

A. It felt like a -- approximately a few hours into that.

Q. Did anybody at the hospital, staff members, doctors, vets, talk to you about the Rochester Police Department?

A. There was one lady, that staff member,

that had mentioned an officer had called.

Q. Anybody -- any staff members talk to you about previous incidents with Rochester Police Department and dogs being brought in shot?

A. No.

Q. When you said the one lady mentioned to you that somebody had called, what was she referring to?

A. She was referring to -- that maybe it was animal control or the person that called animal control had gave them a heads up basically.

Q. Did they -- were you able to leave Tesla there with the vet staff, or did you have to take her out of the hospital?

A. They took her into the back.

Q. Where you --

A. Where I was not allowed to follow.

Q. Were you able to see Tesla before she died?

A. No.

Q. So when you dropped her off at the hospital with the staff and the doctors, you weren't able to see her again after that?

A. Not until she was in a box.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. Okay. Did she give you the option to bury Tesla or cremate -- or take her remains back?

A. They gave -- yeah. They gave me her remains.

Q. Okay. So did you -- okay. So they gave you her remains. Were you obligated to pay for that?

A. The staff member who was -- I was speaking to the most told me that they would use donated funds to help me.

Q. So the cremation was not something that you had to pay for?

A. Yes.

Q. Okay. Did Tesla have any health problems that she had to go to the vet for?

A. No.

Q. Okay. Had Tesla ever run away from you?

A. No.

Q. And did the -- the bills for the hospital that worked on Tesla, were they paid for?

A. Through that donation.

Q. Okay. So you didn't have any bills whatsoever from the hospital?

A. The hospital bills were funded by donated funds.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. Do you know what the amount of those bills were -- the amount of the donated funds used?

A. I'm unaware of that.

MR. CAMPOLIETO: Okay. Elliot, the name of the hospital's not in this -- this notice of claim, is it.

MR. SHIELDS: I don't think so.

THE WITNESS: I don't believe it is either.

(Document request - name of veterinary hospital)

MR. CAMPOLIETO: At some point can you guys just give me the name of the hospital? I'll make a request for that. I just want to know the name of the hospital that worked on her and used donated funds. That's all.

MR. SHIELDS: Just follow up in writing, and I'll be happy to provide that.

MR. CAMPOLIETO: Sure. Yeah. Absolutely.

Q. After the hospital where did you go?

A. I went back home to clean up the blood and then spend the evening at a friend's.

Q. Who was the friend?

A. A friend Ralph.

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. And where does Ralph live?
A. He lives in Greece.
Q. What -- where did your daughter go?
A. She went to my mother's.
Q. And that's in Hilton?
A. Yes.
Q. What time did you return home after the vet's office?
A. I don't recall. I remember it was dark. It was late.
Q. Was it after midnight?
A. I don't believe so.
Q. And did you speak to Ralph about the incident?
A. Yes.
Q. After October 19th, 2018, you know, and going forward to today, did you have any discussions with the Rochester Police Department in any way -- any person employed by the Rochester Police Department about the incident on October 19th, 2018?
A. I went to the Public Safety Building --
Q. Okay.
A. -- a few days later in order to obtain paperwork pertaining to the incident --


Q. Uh-huh.

A. -- and there was a police officer there that I had -- you know, was requesting paperwork from because I was only given a partial report.

Q. At the scene at your house?

A. At the Public Safety Building. I was given no paperwork at my house.

Q. Okay. So when you went to the public safety building a few days later, you received some partial report?

A. I received two out of the three pages of the incident report.

Q. Okay. Did you -- and after that did you have any conversation with any member of the Rochester Police Department?

A. No.

Q. How about any representative of the city from any department?

A. No -- or I'm sorry. I did make a FOIL request.

Q. Okay. That's fine. That's not what I'm -- what I mean more is did you have any face-to-face interaction or talk to somebody on the phone?

                    A. No.

Q. Okay. Did you fill out any insurance or accident report or any form of the Rochester Police Department regarding the October 19th incident?

A. I did not. Other -- no.

Q. Okay. Other than, you were going to say?

A. The notice of claim.

Q. The notice of claim. Thank you. That's fine. It's not kind of what I was looking for. More like a -- you know, accounting of the incident besides that.

Did you take photographs of the area where Tesla was shot, after the incident?

A. Like immediately after or...

Q. Any time. A few days after.

A. I had.

MR. SHIELDS: I'm just going to object to the form of the question.

MR. CAMPOLIETO: Sure.

MR. SHIELDS: I mean, you can answer if you have anything else to say but...

A. I mean, there were. I did take photographs.

Q. You did. Do you still have those?

CHARLES DEMPSEY - BY MR. CAMPOLIETO

A. Not in my presence. I'm sure there's a form of them somewhere.

Q. And you took photographs of the grassy area where the dog was shot and fell? Or are you talking about somewhere else on the property?

A. I took a photograph of the yard as a whole but it was sort of traumatic, and I ended up deleting it from the device I took it on. That's why I said, "I had."

Q. You had mentioned that you -- you got another dog. What kind of dog is that?

A. She's -- she's a mix between a Lab and a Shepherd.

Q. And where did you get this dog?

A. Family member.

Q. Which family member?

A. My mom's youngest brother.

Q. When did you get the dog?

A. Christmas Eve.

Q. And how old is the dog?

A. The dog is approximately five months old.

Q. And it was a gift?

A. Yes.

Q. Was it a gift to your daughter?

A. Specifically.

Q. Okay. What's the name of the dog?

A. Savannah.

(There was a pause in the proceeding.)

A. Banana fo fanna, meeny miny mo manna.

Q. Okay. So could you take a look at Exhibit A please?

(There was a pause in the proceeding.)

Q. And paragraph 4. Do you see that paragraph?

A. I do.

Q. Have you seen it before?

A. Yes.

Q. Can you tell me what it contains?

A. It's items of damage and injuries on the notice of claim.

Q. So you're familiar with that paragraph?

A. Yes.

Q. Okay. And could you read it to yourself for a second now.

A. Out loud?

Q. No, to yourself.

A. Oh, okay.

(There was a pause in the proceeding.)

Q. Let me know when you're done.

A. I've completed reading it.

Q. What -- oh, you have?

A. Yeah.

Q. And is your daughter a co-claimant with you in this claim?

A. Yes.

Q. Okay. And the first thing that's mentioned is (as read): Claimants sustained severe mental and emotional injury and anguish associated with Algarin shooting and killing Tesla and pointing a gun at them.

Can you tell me what -- if you were diagnosed with mental or emotional injuries by any medical professional?

A. My -- I've been told that I had adjustment disorder.

Q. And who told you this?

A. A therapist that I've been seeing since the incident.

Q. Okay. And what's the name of the therapist?

A. Her name is Melissa.

Q. And last name?

A. Woodworth.

Q. And what office is she associated with?

A. Rochester Regional mental health.

Q. Okay. Had you seen her prior to this incident?

A. No.

Q. And has your daughter seen a therapist?

A. Yes.

Q. Okay. And what -- what therapist has she seen?

A. She also sees a therapist at Rochester Regional mental health.

Q. And had she seen a therapist before this incident?

A. No.

Q. How many times have you seen this therapist?

A. Two times a month since.

Q. And your daughter, how many times has she seen a therapist?

A. She's been seeing a therapist at the same rate.

Q. Okay. And have you seen any other medical professional regarding any mental or emotional

injuries?

A. My primary care physician.

Q. Who is that?

A. I couldn't say his name. I say Dr. B. He --

Q. Where is -- who is he associated with?

A. Again, Rochester --

Q. Regional Health?

A. -- Regional Health.

Q. And has your daughter seen anyone else besides this Melissa -- I'm sorry. You mentioned that she had seen a therapist at Rochester Regional Health. Has she seen anybody else -- any other medical professional?

A. That's -- no. Not for...

Q. Who is her primary care physician, if you know?

A. It's -- I can't even say the name. But again, we use the Rochester Regional Health -- the RGH Pediatrics.

Q. Where is that facility located?

A. They have that new facility on East Ridge Road, the Riedman Health Center. Are you referring to the pediatrics?

CHARLES DEMPSEY - BY MR. CAMPOLIETO

Q. Yes. Did you have any other -- besides mental and emotional injuries did you have any physical injuries regarding that incident?

A. The loss of life.

Q. Your dog's loss of life. That's correct. I'm wondering about your injuries. Did you have any physical manifestations of any kind of injuries?

A. I felt -- to shake and a lot of -- a lot of anxiety and just loss of -- man. I sort of like lost a lot of presence of self. I don't know how to describe it.

Q. If you look at paragraph 4, you'll notice after the -- what I read to you before there's a -- notations of the loss of liberty, loss and/or deprivations of civil rights.

Do you know what that means?

A. That I was violated.

Q. Okay. By the shooting of your dog?

A. By -- the man entered my property and then just fired -- open his fire -- his weapon at my family.

Q. At your dog; correct?

A. Right. Who I consider to be my family.

Q. I have no objection to you saying that.

If you look back in the notice of claim, Exhibit A. If you look at paragraph 3, number 3, and the third paragraph under that number and look to the end -- and I'm going to read this to you (as read): Algarin and other RPD officers then detained Charles Dempsey for approximately 30 to 60 minutes without lawful purpose of justification.

When you say "detained," what do you mean?

A. They didn't let me -- it wasn't like I could just get up and leave.

Q. And why do you say that?

A. They stood over me and surrounded me and...

Q. Did anyone tell you that you were not free to move or leave?

A. That first officer that stood over me mentioned that his superior was on her way and that animal control would be 20 minutes away from...

Q. Is that in response to a question by you, or did he just tell you that?

A. I was pleading for help and that was the response, that animal control was...

Q. Help for your dog?

A. That was what he said as I was asking



for -- what are you guys going to do to help me?

Q. But it wasn't in response to a question of, can I leave; is that right?

A. Yeah. It was a response to, how can you help me?

Q. Did you ask at any time to leave the area?

A. I had asked them to leave as well.

Q. You had asked them to leave, but I'm asking, did you ask if you could leave, or did you attempt to leave?

A. I don't recall asking for permission to leave.

Q. Do you recall being told not to leave?

A. I do -- I do recall them telling me that I couldn't -- I was concerned that if I was to let my dog go, that they would shoot her again.

Q. Why were you concerned about that?

A. Because she was still alive, and they were all surrounding her with their weapons.

Q. Did they have their weapons drawn?

A. Drawn? No.

Q. Did you have any damage to your house or yard from the shooting?

A. Just bloodstains on both the exterior of

the house and the porch. I tried to pressure wash them a couple days later because I couldn't -- because it was really, really -- I was crying whenever I seen them and the pressure washer I had was unable to remove the stains entirely.

Q. Did you -- did it cost any money to have the bloodstains removed?

A. It was something I did myself, and I didn't do -- I didn't do a good enough job. It's still there.

Q. Did your daughter miss any school because of this incident?

A. Yes.

Q. How many days?

A. She missed the entire next week of school.

Q. Was that under any doctor's orders or anything like that?

A. She was not emotionally stable enough to be in school.

Q. And how did you know that?

A. The crying, the breaking down, just the emotion that was running through her.

Q. Did she have to stay at her mother's house due to this event for any extended period of time?

A. No.

MR. CAMPOLIETO: Thank you very much. I don't have any further questions.

MR. SHIELDS: Thanks, John.

MR. CAMPOLIETO: Thanks.

(TIME: 1:50 p.m.)

* * *

67

W I T N E S S

| Name | Examination by | Page |
| --- | --- | --- |
| Charles Dempsey | Mr. Campolieto | 3-66 |

* * *

COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920 · www.alliancecourtreporting.net · 800.724.0836

68

E X H I B I T S

| Exhibit | Description | Marked | ID'ed |
| --- | --- | --- | --- |
| EXH A | Notice of claim | 3 | 10 |

* * *

EXHIBITS PREVIOUSLY MARKED

| Exhibit | Description | Page |
| --- | --- | --- |
| EXH | | |

(No Previously Marked Exhibits Presented)

* * *

ALLIANCE

COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920 · www.alliancecourtreporting.net · 800.724.0836

69

D O C U M E N T  R E Q U E S T S

| Request | Page |
| --- | --- |
| The name of the veterinary hospital that worked on Tesla and used donated funds (Mr. Campolieto) | 53 |

* * *

C E R T I F I E D  Q U E S T I O N S

| Question | Page |
| --- | --- |

(No Certified Questions)

* * *

COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920 · www.alliancecourtreporting.net · 800.724.0836

C E R T I F I C A T I O N

STATE OF NEW YORK:

COUNTY OF MONROE:

I, JAYME C. WINTISH, do hereby certify that I reported in machine shorthand the above-styled cause; and that the foregoing pages were produced by computer-aided transcription (CAT) under my personal supervision and constitute a true and accurate record of the testimony in this proceeding;

I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action;

WITNESS my hand in the City of Rochester, County of Monroe, State of New York.

Jayme C Wintish

---------------------------

Jayme C. Wintish
Freelance Court Reporter and
Notary Public No. 01WI6361272
in and for Monroe County, New York

# Full Word Index

(Condensed Transcript Provided via digital *e*Bundle PDF)

ALLIANCE
COURT REPORTING, INC.

*Video Conferencing and Videography Center*

120 East Avenue, Suite 200
Rochester, New York 14604

585.546.4920 · www.alliancecourtreporting.net · 800.724.0836

## 0

**008** [1] - 1:13
**01WI6361272** [1] - 70:24

## 1

**10** [1] - 68:5
**10016** [1] - 2:7
**10:00** [1] - 1:18
**10:18** [1] - 3:4
**11** [1] - 8:22
**117** [2] - 6:13, 8:16
**11:07** [1] - 40:23
**11:16** [1] - 40:24
**120** [1] - 1:23
**13** [1] - 10:4
**14604** [1] - 1:24
**14614** [2] - 1:14, 2:15
**14621** [1] - 4:17
**16** [2] - 1:16, 3:2
**180** [2] - 25:11, 25:19
**19** [1] - 39:18
**192** [1] - 2:6
**19th** [17] - 3:16, 4:4, 7:22, 11:24, 12:21, 13:11, 14:11, 14:18, 14:21, 15:14, 15:23, 19:19, 27:13, 27:16, 54:17, 54:21, 56:5
**1:50** [1] - 66:7

## 2

**2** [1] - 7:6
**20** [1] - 63:19
**200** [1] - 1:23
**2005** [2] - 6:16, 8:16
**2007** [2] - 6:19, 7:8
**2014** [2] - 17:4
**2018** [11] - 3:16, 7:22, 11:24, 14:11, 14:21, 19:19, 27:13, 27:16, 39:18, 54:17, 54:21
**2019** [2] - 1:16, 3:2
**20th** [3] - 14:2, 14:8, 14:9

## 3

**3** [5] - 13:9, 63:3, 67:5, 68:5
**30** [3] - 1:13, 2:14, 63:7
**33** [3] - 4:23, 9:13, 18:21
**3:45** [1] - 13:18

## 4

**4** [6] - 11:12, 13:15, 13:18, 13:19, 58:10, 62:13
**40** [2] - 36:10, 36:11
**400** [1] - 2:14

## 5

**5** [1] - 12:22
**50-h** [1] - 1:9
**53** [5] - 4:16, 6:8, 6:17, 27:19, 69:6

## 6

**60** [1] - 63:7
**66** [1] - 67:5

## 8

**802** [1] - 2:6

## A

**A..** [1] - 8:25
**a.m** [7] - 1:18, 3:4, 13:15, 13:18, 13:19, 40:23, 40:24
**able** [6] - 40:19, 48:11, 48:18, 51:13, 51:19, 51:24
**above-styled** [1] - 70:6
**Above-Titled** [1] - 1:9
**above-titled** [1] - 3:3
**absolutely** [1] - 53:20
**accident** [1] - 56:4
**accounting** [1] - 56:11
**accurate** [2] - 23:20, 70:9
**Achieve** [1] - 8:24
**achieved** [1] - 9:16
**acquire** [1] - 17:5
**action** [2] - 70:14
**active** [2] - 28:9, 28:12
**activity** [2] - 19:2
**address** [4] - 4:15, 6:12, 32:18, 32:20
**adjustment** [1] - 59:17
**adopt** [1] - 17:3
**adoption** [1] - 17:17
**adult** [1] - 8:10
**affectionate** [1] - 39:25
**afraid** [1] - 36:21
**age** [1] - 4:22
**agreement** [2] - 5:15, 5:16
**ahead** [2] - 16:12, 26:14
**aid** [2] - 36:15, 38:22
**aided** [1] - 70:8
**aiming** [1] - 29:3
**alert** [4] - 23:8, 26:2, 26:4, 26:14
**algarin** [1] - 63:6
**Algarin** [6] - 39:13, 39:16, 46:9, 46:13, 46:17, 59:12
**alive** [1] - 64:19
**Alliance** [1] - 1:22
**allowed** [1] - 51:18
**almost** [1] - 33:10
**amount** [2] - 53:2, 53:3
**and..** [3] - 24:10, 36:17, 63:14
**anguish** [1] - 59:11
**animal** [24] - 27:12, 27:15, 27:18, 38:8, 38:9, 38:12, 38:14, 38:15, 38:23, 38:24, 40:16, 41:6, 41:9, 41:13, 41:22, 42:3, 42:12, 43:13, 48:9, 50:12, 51:11, 63:19, 63:23
**Animal** [4] - 27:13, 37:21, 38:4, 38:19
**animals** [1] - 19:12
**answer** [6] - 16:7, 16:12, 40:3, 44:12, 56:21
**answered** [2] - 16:11, 49:16
**answers** [1] - 4:19
**anxiety** [1] - 62:10
**apartments** [1] - 33:8
**appearances** [1] - 40:25
**appeared** [1] - 45:25
**Appearing** [2] - 2:3, 2:10
**approximate** [1] - 31:24
**APRIL** [1] - 3:2
**April** [1] - 1:16
**area** [16] - 33:9, 33:18, 35:12, 35:16, 35:21, 36:5, 42:18, 42:20, 43:3, 43:9, 43:12, 46:8, 47:17, 56:13, 57:5, 64:7
**arose** [2] - 11:16, 12:21
**arrived** [4] - 38:9, 41:23, 44:20, 49:24
**assist** [2] - 36:9, 38:19
**assistance** [2] - 36:16, 42:3
**assisted** [1] - 35:25
**assisting** [2] - 37:4, 48:8
**associated** [3] - 59:11, 60:3, 61:7
**assumed** [1] - 42:9
**assuring** [1] - 50:5
**attempt** [1] - 64:11
**attorney** [3] - 3:13, 70:12, 70:13
**attorneys** [1] - 11:21
**Audubon** [1] - 9:14
**availability** [1] - 17:7
**Avenue** [2] - 1:23, 2:6
**aware** [1] - 20:18
**awfully** [1] - 43:18

## B

**background** [1] - 3:25
**backyard** [6] - 7:13, 20:4, 22:24, 23:9, 23:23, 34:21
**Banana** [1] - 58:6
**bandages** [1] - 36:16
**bank** [2] - 7:4, 7:7
**barking** [2] - 22:20, 23:2
**bathroom** [2] - 3:18, 22:18
**Bay** [2] - 37:21, 38:4
**beef** [1] - 15:2
**Behalf** [2] - 2:3, 2:10
**behind** [8] - 28:5, 29:2, 29:4, 29:9, 29:15, 29:18, 30:2, 30:10
**belt** [2] - 43:22, 45:5
**Ben** [5] - 49:3, 49:6, 49:7, 49:18, 49:22
**benefit** [1] - 42:10
**best** [3] - 12:7, 31:8, 31:11
**between** [12] - 30:2, 32:23, 33:22, 34:4, 34:7, 34:17, 35:2, 35:17, 39:16, 43:7, 43:13, 57:13
**bills** [4] - 52:19, 52:22, 52:24, 53:2
**birthday** [5] - 15:16, 15:19, 15:20, 15:25, 16:5
**bitten** [2] - 27:8, 27:15
**bleeding** [2] - 31:11, 43:2
**blood** [1] - 53:22
**bloodstains** [2] - 64:25, 65:8
**body** [2] - 35:9, 42:25
**box** [1] - 51:25
**boxer** [1] - 18:19
**break** [1] - 36:18
**breaking** [1] - 65:22
**bricks** [1] - 43:4
**bring** [1] - 48:5
**brother** [7] - 48:25, 49:6, 49:7, 49:11, 49:18, 49:22, 57:18
**brother's** [1] - 49:2
**brought** [2] - 50:19, 51:5
**building** [2] - 33:8, 55:10
**Building** [2] - 54:22, 55:7
**bullet** [2] - 36:15, 50:16
**bury** [1] - 52:2
**busy** [3] - 40:11, 40:13
**but..** [1] - 56:22
**BY** [2] - 3:11, 41:3

## C

**cam** [2] - 35:10, 35:18
**Campolieto** [4] - 2:11, 3:13, 67:5, 69:6
**CAMPOLIETO** [12] - 3:11, 40:9, 40:12, 40:19, 40:22, 41:3, 53:5, 53:13, 53:20, 56:20, 66:3, 66:6
**campolj@cityofrochester.gov** [1] - 2:16
**capacity** [1] - 46:9

14:21
end [2] - 47:14, 63:5
ended [3] - 24:7, 41:7, 57:8
entered [1] - 62:20
enters [1] - 34:21
entire [1] - 65:16
entirely [1] - 65:6
eshields @ rothandrothlaw .com [1] - 2:8
especially [1] - 19:3
Esq [2] - 2:4, 2:11
Eve [1] - 57:20
evening [1] - 53:23
event [1] - 65:25
events [1] - 27:12
eventually [5] - 31:22, 32:9, 41:18, 41:19, 50:9
exact [1] - 7:6
exactly [1] - 44:25
EXAMINATION [2] - 3:11, 41:3
Examination [1] - 67:3
except [1] - 34:25
EXH [4] - 3:7, 10:25, 68:5, 68:13
Exhibit [5] - 11:2, 58:7, 63:3, 68:3, 68:11
exhibit [2] - 3:6, 10:24
EXHIBITS [1] - 68:10
Exhibits [1] - 68:15
expectations [1] - 49:25
extended [1] - 65:25
exterior [1] - 64:25

F

face [3] - 21:6, 55:24
face-to-face [1] - 55:24
Facebook [4] - 17:6, 17:9, 18:6, 18:9
facility [2] - 61:22, 61:23
facing [1] - 25:5
familiar [2] - 32:5, 58:18
family [4] - 57:16, 57:17, 62:22, 62:24
fanna [1] - 58:6
far [3] - 21:4, 26:23, 44:10
fast [1] - 3:21
father [1] - 1:2
feet [1] - 30:6
fell [3] - 28:2, 28:4, 57:5
felt [8] - 30:13, 42:15, 43:19, 44:6, 44:17, 44:18, 50:20, 62:9
fence [20] - 7:16, 25:2, 25:4, 25:10, 33:11, 33:13, 33:16, 33:17, 33:18, 33:19, 33:23, 34:8, 34:9, 34:17, 34:25, 35:6, 45:12, 45:13
fenced [2] - 7:13, 7:19
fences [1] - 34:7
few [10] - 17:21, 24:13, 31:25, 32:14, 48:17, 48:18, 50:20, 54:24, 55:10, 56:16
figure [2] - 31:7, 31:10
fill [1] - 56:3
finally [3] - 38:8, 41:23
financially [1] - 70:14
fine [2] - 55:22, 56:10
finish [1] - 40:20
fire [6] - 31:15, 31:17, 46:18, 46:24, 46:25, 62:21
firearm [1] - 20:12
fired [1] - 62:21
first [19] - 3:9, 8:8, 8:9, 10:7, 10:11, 10:14, 10:23, 14:16, 24:11, 32:20, 36:15, 38:22, 39:17, 43:21, 45:9, 45:19, 50:4, 59:9, 63:17
five [1] - 57:22
fo [1] - 58:6
FOIL [1] - 55:20
follow [2] - 51:18, 53:18
following [3] - 3:6, 10:24, 14:17
follows [1] - 3:10
food [1] - 15:8
footage [1] - 35:10
for.. [1] - 61:16
foregoing [1] - 70:7
form [4] - 23:17, 56:4, 56:19, 57:3
former [3] - 5:11, 19:11
fortunately [1] - 47:6
forward [1] - 54:18
four [1] - 13:21
four-hour [1] - 13:21
free [1] - 63:15
Freelance [1] - 70:23
Friday [5] - 12:19, 12:20, 12:24, 14:5, 15:22
friend [7] - 12:7, 17:6, 17:9, 31:8, 31:11, 53:24, 53:25
friend 's [1] - 53:23
friendly [1] - 21:6
friends [1] - 18:8
from.. [1] - 63:19
front [7] - 25:5, 26:22, 27:4, 33:11, 33:20, 34:10, 34:22
full [5] - 4:7, 5:20, 5:24, 13:23
full-time [2] - 5:20, 13:23
funded [1] - 52:24
funds [5] - 52:9, 52:25, 53:3, 53:17, 69:5
furthest [1] - 9:15

G

gap [1] - 33:25
gaps [2] - 7:16, 7:20
gate [4] - 34:10, 34:20, 45:12, 45:13
generally [4] - 11:2, 11:14, 13:17, 16:18
Geneva [1] - 49:16
gestures [1] - 4:19
gift [2] - 57:23, 57:25
girl [1] - 28:16
girlfriend [2] - 5:11, 19:12
given [3] - 48:21, 55:5, 55:8
grade [2] - 9:7, 9:8
graduated [1] - 10:17
grassy [1] - 57:4
Greece [1] - 54:3
ground [10] - 28:2, 28:4, 30:3, 30:5, 30:23, 30:24, 43:4, 45:5, 46:2, 46:8
guardian [1] - 1:3
guess [3] - 6:6, 33:12, 38:12
guide [1] - 19:3
gun [18] - 28:23, 28:24, 28:25, 29:7, 29:13, 29:20, 30:4, 30:8, 30:10, 30:14, 30:16, 31:17, 31:20, 31:21, 32:11, 42:19, 44:2, 59:13
gunpoint [1] - 31:12
guys [3] - 40:20, 53:14, 64:2

H

Hall [2] - 1:13, 2:13
hand [2] - 4:19, 70:15
hands [3] - 39:20, 39:24, 42:25
happy [1] - 53:19
headed [2] - 25:2, 25:4
heads [1] - 51:12
Health [5] - 61:9, 61:10, 61:13, 61:20, 61:24
health [3] - 52:14, 60:4, 60:13
heard [3] - 27:25, 31:8
Hearing [1] - 1:9
held [4] - 29:13, 41:22, 42:8
help [11] - 21:18, 36:13, 36:14, 41:18, 41:21, 48:5, 52:10, 63:22, 63:24, 64:2, 64:6
helped [1] - 35:13
helping [2] - 35:21, 36:6
Henrietta [4] - 6:7, 40:17, 41:9, 41:14
hereby [1] - 70:5
herein [1] - 3:9
herself [2] - 37:6, 37:7
high [6] - 9:17, 9:18, 10:11, 10:12, 10:14, 10:17
higher [1] - 30:6
Hilton [5] - 6:13, 6:15, 9:20, 9:21, 54:6
holding [4] - 31:12, 41:17, 42:9, 43:12
holster [3] - 31:20, 32:8, 32:12
home [7] - 13:8, 13:13, 16:20, 16:21, 19:22, 53:22, 54:8
hospital [24] - 37:11, 38:10, 40:16, 41:6, 41:9, 41:14, 42:13, 48:6, 48:9, 49:24, 50:13, 50:19, 50:22, 51:15, 51:23, 52:19, 52:23, 52:24, 53:12, 53:14, 53:16, 53:21, 69:5
Hospital [1] - 38:4
hospital 's [1] - 53:6
hot [1] - 15:2
hour [1] - 13:21
hours [4] - 13:16, 48:17, 48:18, 50:21
house [31] - 6:22, 8:17, 14:22, 16:16, 18:20, 25:6, 25:8, 25:13, 25:18, 27:18, 29:4, 32:22, 32:23, 32:24, 33:3, 33:13, 33:15, 34:10, 34:16, 34:24, 35:6, 35:22, 43:7, 43:8, 55:6, 55:8, 64:23, 65:2, 65:24
houses [5] - 33:22, 34:4, 35:18, 43:7, 43:13

I

ID'ed [1] - 68:3
identification [1] - 3:7
identified [1] - 10:24
immediately [4] - 22:7, 24:21, 28:19, 56:15
Immediately [1] - 28:20
Inc [1] - 1:22
incident [24] - 3:15, 4:3, 11:23, 12:21, 19:18, 20:11, 20:16, 20:20, 21:19, 21:21, 22:7, 44:21, 54:15, 54:21, 54:25, 55:13, 56:5, 56:11, 56:14, 59:21, 60:6, 60:15, 62:4, 65:13
incidents [1] - 51:4
individually [1] - 1:2
informed [1] - 38:9
injuries [7] - 58:16, 59:15, 61:2, 62:3, 62:4, 62:7, 62:8
injury [1] - 59:11
inside [4] - 19:22, 37:5, 47:12, 47:13
instead [1] - 4:19

4:4, 7:22, 11:24, 12:21, 13:11, 14:2, 14:8, 14:9, 14:11, 14:18, 14:21, 15:14, 15:20, 15:23, 19:18, 27:12, 27:16, 39:18, 54:17, 54:21, 56:5
**OF** [3] - 1:6, 70:3, 70:4
**offer** [1] - 17:9
**office** [7] - 47:5, 47:8, 47:11, 48:13, 48:16, 54:9, 60:3
**Officer** [5] - 39:13, 39:16, 46:8, 46:13, 46:17
**officer** [48] - 12:7, 12:9, 12:12, 14:21, 20:11, 20:16, 22:24, 24:8, 24:12, 26:2, 26:5, 26:9, 26:15, 26:21, 27:5, 27:23, 28:3, 28:13, 28:15, 31:12, 31:16, 31:17, 31:20, 37:18, 38:14, 38:15, 39:8, 39:13, 39:14, 39:23, 40:5, 43:19, 43:21, 43:24, 43:25, 44:3, 44:5, 44:17, 44:19, 44:20, 45:3, 45:6, 45:10, 45:14, 45:22, 51:2, 55:3, 63:17
**officer's** [2] - 35:9, 35:18
**officers** [21] - 26:7, 26:10, 26:11, 38:15, 38:19, 39:7, 39:11, 39:12, 41:17, 42:4, 42:8, 42:11, 42:14, 42:15, 42:17, 43:11, 44:10, 44:14, 45:16, 45:20, 63:6
**often** [2] - 5:17, 46:15
**old** [4] - 8:21, 17:12, 57:21, 57:22
**older** [1] - 49:12
**one** [11] - 5:7, 16:8, 26:9, 34:8, 34:9, 38:9, 38:17, 39:7, 43:19, 50:25, 51:7
**open** [3] - 23:13, 38:10, 62:21
**opened** [2] - 45:11, 45:12
**opening** [1] - 23:22
**operation** [1] - 40:10
**optimistic** [1] - 49:25
**option** [1] - 52:2
**or..** [3] - 5:25, 20:7, 56:15
**order** [1] - 54:24
**orders** [1] - 65:17
**outside** [19] - 20:15, 22:8, 22:21, 22:23, 23:3, 23:6, 23:11, 23:16, 23:21, 23:22, 23:25, 24:2, 24:5, 24:6, 24:13, 24:17, 24:19, 29:4, 37:2
**own** [4] - 6:22, 6:24, 18:21, 49:21
**owned** [2] - 7:3, 8:9
**owner** [1] - 19:16

## P

**p.m** [3] - 12:23, 13:9, 66:7
**Page** [4] - 67:3, 68:11, 69:3, 69:12
**page** [2] - 11:5, 11:12
**pages** [2] - 55:12, 70:7
**paid** [4] - 7:4, 7:7, 19:4, 52:20
**paperwork** [4] - 50:12, 54:25, 55:4, 55:8
**paragraph** [6] - 58:10, 58:11, 58:18, 62:13, 63:3, 63:4
**Parcel** [1] - 9:24
**parents** [2] - 8:12, 8:14
**parents'** [1] - 8:17
**part** [2] - 13:23, 13:24
**part-time** [2] - 13:23, 13:24
**partial** [2] - 55:5, 55:11
**parties** [1] - 70:12
**passageway** [1] - 33:14
**past** [1] - 5:2
**patting** [1] - 39:25
**pause** [8] - 11:7, 11:11, 34:13, 40:22, 46:21, 58:5, 58:9, 58:25
**pavers** [1] - 43:4
**pay** [4] - 17:15, 50:11, 52:7, 52:12
**Pediatrics** [1] - 61:21
**pediatrics** [1] - 61:25
**pedigree** [1] - 4:2
**people** [3] - 42:7, 48:8, 48:10
**performance** [1] - 10:21
**period** [3] - 37:14, 44:15, 65:25
**permission** [1] - 64:12
**person** [9] - 10:20, 17:24, 27:9, 38:12, 46:3, 46:5, 50:6, 51:11, 54:20
**personal** [1] - 70:8
**perspective** [1] - 25:21
**pertaining** [1] - 54:25
**phone** [1] - 55:25
**photograph** [1] - 57:7
**photographs** [3] - 56:13, 56:24, 57:4
**physical** [2] - 62:4, 62:8
**physician** [2] - 61:3, 61:17
**pick** [1] - 32:2
**place** [3] - 11:15, 11:24, 35:25
**pleading** [1] - 63:22
**pocket** [1] - 17:22
**point** [4] - 26:17, 28:25, 29:11, 53:13
**pointed** [8] - 28:21, 28:22, 28:23, 28:24, 29:7, 29:10, 30:9, 32:11
**pointing** [3] - 30:4, 30:11, 59:12
**Police** [6] - 50:24, 51:4, 54:19, 54:20, 55:16, 56:4
**police** [19] - 12:9, 12:12, 14:21, 20:11, 20:16, 22:24, 24:8, 24:12, 26:7, 26:10, 26:11, 26:15, 28:13, 28:15, 31:16, 35:9, 39:23, 42:4, 55:3
**porch** [2] - 24:24, 65:2
**positive** [1] - 41:8
**pre** [5] - 15:6, 15:8, 15:9, 19:20
**pre-dinner** [2] - 15:8, 19:20
**pre-shopping** [3] - 15:6, 15:9, 19:20
**preloader** [1] - 10:6
**presence** [6] - 23:8, 26:3, 26:5, 26:15, 57:2, 62:11
**Presented** [1] - 68:15
**presently** [1] - 6:6
**pressure** [2] - 65:2, 65:5
**pretty** [3] - 4:4, 17:19, 17:20
**prevent** [1] - 43:2
**prevented** [1] - 26:18
**previous** [2] - 6:11, 51:4
**PREVIOUSLY** [1] - 68:10
**Previously** [1] - 68:15
**primary** [2] - 61:3, 61:17
**problems** [1] - 52:14
**proceeding** [10] - 11:7, 11:11, 34:13, 40:23, 40:24, 46:21, 58:5, 58:9, 58:25, 70:10
**proceedings** [1] - 3:3
**processed** [1] - 41:24
**produced** [1] - 70:7
**professional** [3] - 59:16, 60:25, 61:15
**program** [2] - 19:4, 19:5
**property** [7] - 3:16, 4:4, 7:11, 7:14, 33:20, 57:6, 62:20
**provide** [1] - 53:19
**Public** [3] - 54:22, 55:7, 70:24
**public** [1] - 55:9
**puppy** [1] - 17:10
**purchase** [1] - 17:3
**purebred** [3] - 18:13, 18:14, 18:15
**purpose** [1] - 63:8
**put** [6] - 18:24, 31:20, 32:8, 32:11, 43:22, 47:10

## Q

**questioned** [2] - 43:23, 43:24
**questioning** [1] - 44:8
**Questions** [1] - 69:16
**questions** [3] - 3:15, 3:25, 66:4
**quick** [1] - 4:5

## R

**raise** [1] - 29:20
**raised** [1] - 29:10
**raising** [1] - 19:6
**Ralph** [3] - 53:25, 54:2, 54:14
**ran** [1] - 35:17
**rate** [1] - 60:23
**rays** [1] - 50:16
**reaction** [1] - 26:16
**read** [6] - 11:6, 58:20, 59:10, 62:14, 63:5
**reading** [1] - 59:3
**real** [1] - 44:9
**realize** [1] - 24:11
**really** [4] - 21:3, 34:6, 65:4
**rear** [1] - 47:22
**received** [2] - 55:10, 55:12
**recessed** [1] - 40:23
**recognize** [1] - 32:6
**reconvened** [1] - 40:24
**record** [7] - 4:7, 10:25, 16:2, 16:3, 16:4, 40:8, 70:9
**recounting** [1] - 27:2
**referring** [7] - 28:13, 33:3, 33:9, 37:3, 51:8, 51:10, 61:24
**reflection** [1] - 44:22
**regarding** [6] - 3:15, 4:2, 27:19, 56:5, 60:25, 62:4
**Regents** [1] - 9:17
**Regional** [6] - 60:4, 60:13, 61:9, 61:10, 61:13, 61:20
**relationship** [3] - 5:8, 26:20, 37:16
**relative** [1] - 70:12
**remains** [3] - 52:3, 52:5, 52:7
**remember** [6] - 12:3, 12:5, 38:3, 44:4, 44:7, 54:10
**remove** [1] - 65:6
**removed** [1] - 65:8
**rental** [1] - 33:7
**repeat** [2] - 3:22, 3:23
**rephrase** [3] - 3:23, 10:9, 23:19

TIME [1] - 66:7
tiny [1] - 15:2
title [2] - 10:5, 38:13
titled [1] - 3:3
Titled [1] - 1:9
today [2] - 3:15, 54:18
Todd [1] - 10:23
tony [2] - 21:13, 21:15
Tony [2] - 21:18, 21:21
took [11] - 11:24, 14:16, 36:2, 37:10, 40:15, 41:13, 42:13, 51:16, 57:4, 57:7, 57:9
tool [2] - 43:22, 45:4
touch [3] - 39:18, 39:23, 40:5
toward [1] - 25:4
towards [10] - 25:2, 25:9, 25:18, 25:19, 26:17, 29:21, 31:2, 31:3, 32:22, 33:11
trained [6] - 19:3, 19:9, 29:17, 30:11, 36:15, 38:22
training [2] - 18:25
transcription [1] - 70:8
traumatic [2] - 36:24, 57:8
treading [2] - 40:12, 40:13
treading -water - busy [1] - 40:13
tried [10] - 14:13, 14:15, 26:2, 26:14, 26:16, 26:17, 26:18, 31:9, 65:2
true [1] - 70:9
trunk [2] - 47:19, 47:22
try [4] - 3:23, 26:4, 36:8, 40:9
trying [7] - 11:14, 26:25, 31:3, 34:14, 35:8, 40:2
TUESDAY [1] - 3:2
twice [1] - 46:19
two [13] - 9:11, 32:15, 32:16, 33:8, 33:22, 34:7, 35:18, 42:15, 43:7, 46:20, 46:25, 55:12, 60:19
type [4] - 18:11, 18:18, 18:25

U

unable [3] - 14:12, 42:20, 65:5
unaware [1] - 53:4
under [3] - 63:4, 65:17, 70:8
unexpected [2] - 24:7, 24:10
uniform [1] - 24:15
uniformed [1] - 22:24
unit [1] - 45:2
United [1] - 9:24
unpaid [1] - 19:5
up [29] - 4:18, 21:3, 24:7, 29:11, 29:13, 29:16, 29:20, 30:8, 32:2, 34:9, 40:3, 40:9, 40:20, 41:7, 41:19, 41:20, 41:25, 43:17, 43:21, 44:6, 44:18, 45:11, 50:9, 51:12, 53:18, 53:22, 57:8, 63:11
updates [1] - 48:21
UPS [3] - 9:25, 10:18, 10:20

V

vehicle [2] - 47:12, 47:13
verbal [1] - 4:19
verbally [1] - 26:6
vet [13] - 35:13, 36:2, 37:11, 37:20, 40:15, 48:4, 48:5, 48:9, 48:23, 51:14, 52:15
vet's [5] - 47:7, 47:11, 48:13, 48:15, 54:9
veterinarian [2] - 37:25, 49:24
veterinarian 's [1] - 47:5
veterinary [2] - 53:11, 69:5
vets [1] - 50:23
vicinity [1] - 26:11
video [3] - 26:24, 35:10, 36:4
violated [1] - 62:18
visit [2] - 16:13, 16:18
visited [1] - 16:15
visual [1] - 35:5

W

waiting [3] - 38:18, 38:21, 42:12
waiver [1] - 50:10
walk [1] - 24:2
walked [2] - 23:24, 24:5
wall [3] - 20:8, 20:9, 25:12
warehouse [1] - 10:2
was .. [1] - 63:23
wash [1] - 65:2
washer [1] - 65:5
water [1] - 40:13
weapon [10] - 26:17, 28:21, 28:22, 29:3, 32:2, 32:8, 32:12, 46:18, 46:24, 62:21
weapons [2] - 64:20, 64:21
week [9] - 5:24, 12:18, 14:13, 14:14, 14:16, 14:17, 15:24, 65:16
weekdays [1] - 14:5
weekend [5] - 15:14, 15:16, 16:5, 16:6, 16:17
weekends [3] - 5:24, 6:3, 16:8
weeks [1] - 17:14
west [1] - 25:7
whatsoever [1] - 52:23
whole [2] - 18:20, 57:7
widthwise [1] - 25:16
window [2] - 37:15, 37:16
Wintish [1] - 70:23
WINTISH [2] - 1:21, 70:5
wish [1] - 26:18
witness [3] - 3:9, 31:11
WITNESS [4] - 36:19, 40:11, 53:9, 70:15
witnessed [2] - 27:22, 46:17
woman [4] - 5:14, 6:5, 21:23, 22:3
wondering [1] - 62:7
woodworth [1] - 60:2
works [1] - 38:2
worried [1] - 31:5
worry [1] - 46:15
wounds [4] - 32:18, 32:20, 41:18, 42:25
wrap [1] - 40:9
writing [1] - 53:18
written [1] - 11:13
wrote [1] - 44:9

X

x-rays [1] - 50:16

Y

yard [28] - 22:14, 24:7, 25:3, 25:5, 25:16, 26:2, 26:8, 28:10, 32:21, 33:11, 33:23, 34:11, 34:17, 34:21, 34:22, 35:19, 38:16, 39:11, 42:17, 44:3, 44:6, 44:22, 45:17, 57:7, 64:24
yards [3] - 27:3, 27:4, 35:2
years [2] - 9:11, 10:4
yell [3] - 30:18, 30:20, 30:22
yelp [1] - 28:2
yelped [1] - 27:25
YORK [1] - 70:3
York [8] - 1:14, 1:24, 2:7, 2:15, 4:17, 70:16, 70:24
younger [2] - 49:12, 49:14
youngest [1] - 57:18
yourself [3] - 19:7, 58:20, 58:23