```
 1                    A P P E A R A N C E S

 2    Appearing on Behalf of Plaintiffs:

 3    Elliot D. Shields, Esq.
          Roth & Roth LLP
 4        192 Lexington Avenue, Suite 802
          New York, New York 10016
 5        eshields@rothandrothlaw.com

 6
      Appearing on Behalf of Defendants:
 7
      Peachie L. Jones, Esq.
 8        City of Rochester Department of Law
          City Hall
 9        30 Church Street, Room 400A
          Rochester, New York 14614
10        peachie.jones@cityofrochester.gov

11
      Also Present:
12
      Ben Parrow, Videographer
13        Studio 80 ROC
          277 North Goodman Street, Apartment 407
14        Rochester, New York  14607

15
                          *      *      *
16

17

18

19

20

21

22

23

24

25
```



1                S T I P U L A T I O N S

2    FRIDAY, JULY 15, 2022;

3              (Proceedings in the above-titled matter

4              commencing at 9:46 a.m.)

5                      *       *       *

6              IT IS HEREBY STIPULATED by and between the

7    attorneys for the respective parties that this

8    deposition may be taken by the Plaintiff at this time

9    pursuant to notice;

10             IT IS FURTHER STIPULATED, that all

11   objections except as to the form of the questions and

12   responsiveness of the answers, be reserved until the

13   time of the trial;

14             IT IS FURTHER STIPULATED, that pursuant to

15   Federal Rules of Civil Procedure 30(e)(1) the witness

16   requests to review the transcript and make any

17   corrections to same before any Notary Public;

18             IT IS FURTHER STIPULATED, that if the

19   original deposition has not been duly signed by the

20   witness and returned to the attorney taking the

21   deposition by the time of trial or any hearing in this

22   cause, a certified transcript of the deposition may be

23   used as though it were the original;

24             IT IS FURTHER STIPULATED, that the

25   attorneys for the parties are individually responsible



```
 1               P R O C E E D I N G S
 2   for their certified transcript charge, including any
 3   expedite or other related production charges;
 4               AND IT IS FURTHER STIPULATED, that the
 5   Notary Public, KIMBERLY A. BONSIGNORE, may administer
 6   the oath to the witness.
 7                     *      *      *
 8               THE VIDEOGRAPHER:  I'm going on the
 9   record.
10               This is the case of Charles Dempsey
11   against the City of Rochester et al., Case No.
12   19-cv-6780.  Today's date is July 15, 2022.  The time
13   is 9:46 a.m.
14               My name is Ben Parrow with Studio 80 ROC
15   at 277 North Goodman Street, Apartment 407, Rochester,
16   New York 14607.  I am the videographer.
17               MR. SHIELDS:  And for the plaintiff, my
18   name is Elliot Shields of Roth & Roth, LLP.  The
19   address is 192 Lexington Avenue, Suite 802, New York,
20   New York 10016.
21               MS. JONES:  For the defendants, I'm
22   Peachie Jones with the City of Rochester Law
23   Department, 300 Church Street, Rochester, New York
24   14614.  And my client here is...
25               OFFICER ALGARIN:  Officer Javier Algarin.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                 MR. SHIELDS:  And I believe we're ready to
 3      swear the witness in.
 4                 THE COURT REPORTER:  And the court
 5      reporter is Kim Bonsignore with Alliance Court
 6      Reporting.
 7      OFFICER JAVIER ALGARIN,
 8              called herein as a witness, first being sworn,
 9              testified as follows:
10      EXAMINATION BY MR. SHIELDS:
11      Q.  Good morning, Officer Algarin.
12      A.  Good morning.
13      Q.  Am I saying your name right?
14      A.  Yes.
15      Q.  My name is Elliot Shields.  I represent
16      the father and daughter whose dog was shot and killed
17      in front of them, and I'm going to ask you some
18      questions today.
19                 First I'm just going to lay out some
20      ground rules for the deposition.  Will you tell me if
21      you don't understand my question?
22      A.  I will.
23      Q.  And will you tell me if my question is
24      confusing?
25      A.  I will.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  And will you tell me if I've assumed an
 3    incorrect fact in a question?
 4         A.  That question right there is confusing.
 5    What are you -- can you explain that?
 6         Q.  Sure.  If I assume a fact and you say,
 7    well, you're assuming a fact and maybe that fact isn't
 8    true.
 9         A.  Uh-huh.
10         Q.  Can you tell me that?  And you can say,
11    "You're assuming a fact, and so I find your question
12    confusing."
13         A.  I can.
14         Q.  And will you tell me if you don't know the
15    answer to one of my questions?
16         A.  I can.
17         Q.  And will you tell me if you need -- will
18    you remind me -- I'm sorry.  Will you need to be
19    reminded to follow these rules?
20         A.  No.
21         Q.  Okay.  And if there's anything I ask that
22    you don't understand, please say so and I'll gladly
23    rephrase the question.  Okay?
24         A.  Will do.
25         Q.  Otherwise, if you answer the question,
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     we're going to assume that you understood it.
 3              Do you understand everything I've said so
 4     far?
 5         A.  So far, yes.
 6         Q.  And you agree to these terms?
 7         A.  I do.
 8         Q.  Can you tell me everything you did to
 9     prepare for today's deposition?
10         A.  Meeting with my representation, reviewing
11     statements and documents, reports regarding the
12     matter, body-worn camera regarding the matter.
13         Q.  Okay.  And you said you met with your
14     representation.  Are you referring to Ms. Jones?
15         A.  I am.
16         Q.  And did you meet with any other attorneys
17     from the City of Rochester?
18         A.  Yes.  Attorney Patrick Beath.
19         Q.  And how many times did you meet with
20     Ms. Jones?
21         A.  This is only the second time.
22         Q.  And how many times did you meet with
23     Mr. Beath?
24         A.  Only twice.
25         Q.  And when were those meetings?
```



1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS

2          A.  I do not remember.

3          Q.  One of those meetings was today?

4          A.  One of those meetings would be today.

5          Q.  And the other meeting would have been

6     before today?

7          A.  It would be before today.

8          Q.  A week before today or more than that?

9          A.  My meeting with Ms. Jones was

10    approximately a few weeks.  As for Mr. Patrick, a year

11    or two.

12          Q.  And you said that you reviewed statements.

13    Can you tell me what statements you reviewed?

14          MS. JONES:  Objection.

15          A.  The --

16          MS. JONES:  Don't get into the information

17    that we went over.

18          MR. SHIELDS:  I didn't ask him any

19    substance of the conversation he had with his

20    attorneys.  He said that he reviewed documents and

21    statements and body-worn camera video.

22          MS. JONES:  Go ahead.

23          A.  The report made by Sergeant Rudolph.  The

24    affidavit.

25          Q.  And what affidavit are you referring to?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  My affidavit.
 3              MR. SHIELDS:  And, Ms. Jones, I don't
 4    believe that we have an affidavit from Officer
 5    Algarin.  Do you know if you ever produced that in
 6    discovery?
 7              MS. JONES:  It was submitted as part of
 8    the motion for summary judgment.
 9         Q.  Okay.  So the affidavit that you prepared
10    a while ago as part of this case?
11         A.  Correct.
12         Q.  Okay.  I'm sorry.  I was confused about
13    that.
14              So you said the report prepared by
15    Sergeant Rudolph?
16         A.  Correct.
17         Q.  Your affidavit submitted with the summary
18    judgment motion, and you said body-worn camera video;
19    right?
20         A.  Correct.
21         Q.  What body-worn camera video did you
22    review?
23         A.  My own body-worn camera video.
24         Q.  Did you review any other body-worn camera
25    video?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   No.
 3         Q.   Did you do anything else to prepare for
 4    today's deposition?
 5         A.   No.
 6         Q.   You didn't review any other documents?
 7         A.   Not that I remember.
 8         Q.   Okay.  And you didn't watch any other
 9    video?
10         A.   No.
11         Q.   All right.  And the date of this incident
12    was October 19, 2018; correct?
13         A.   Correct.
14         Q.   And on the day of the incident, you were
15    doing a vice operation; is that right?
16         A.   Was responding to a 911 call.
17         Q.   Okay.  And do you remember what that 911
18    call was about?
19         A.   About vice activity.
20         Q.   Okay.  So you were responding to a 911
21    call about vice activity?
22         A.   Correct.
23         Q.   And what in general does "vice activity"
24    mean?
25         A.   It could mean a certain -- a plethora of
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2     things.  It could mean drug sales.  It could mean
3     prostitution.  It could mean gambling sorts.  It could
4     mean just illicit activity happening within an area.
5            Q.  At the time of the incident, were you
6     responding to a call about drugs or something else?
7            A.  It was responding for a call about drugs.
8            Q.  Okay.  And on the day of the incident, you
9     made a plan for how to apprehend the suspects -- the
10    suspected drug dealers with Officers DiSabatino,
11    Gorman, and Horowitz; right?
12           A.  Correct.
13           Q.  And the plan was that you and Officer
14    DiSabatino would drive up to the front of 61
15    Kosciusko, and you expected the suspects to run south
16    through the backyards to Sobieski Street; correct?
17           A.  Correct.
18           Q.  And as part of the plan, Gorman and
19    Horowitz were set up on Sobieski Street, waiting to
20    catch the suspects as they fled; right?
21           A.  Correct.
22           Q.  So the plan was to make the suspects run
23    through the backyards of the residential properties on
24    Kosciusko Street and Sobieski Street; right?
25                MS. JONES:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  No.  There was no plan to force them to do
 3    anything.  The plan was to drive and address the
 4    situation.  When we arrived there, it was their choice
 5    to run through the yards.
 6         Q.  Okay.  The plan was that you expected,
 7    from prior instances, that they would run through the
 8    yards; correct?
 9              MS. JONES:  Objection.
10         A.  Correct.
11         Q.  And you devised that plan because the
12    suspected drug dealers on Kosciusko Street had
13    previously escaped by running through the backyards;
14    is that right?
15              MS. JONES:  Objection.
16         A.  Correct.
17         Q.  And the day before this incident, in
18    fact -- well, let me withdraw that question.
19              In his deposition, Officer Gorman
20    testified that on the day prior to this incident,
21    which would have been October 18, 2019 [sic], he had
22    been part of an operation where officers drove up to
23    the suspected drug dealers on Kosciusko Street and
24    they ran through the yards towards Sobieski Street.
25              Were you with Officer Gorman during that?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  Do not remember.
 3         Q.  So you might have been with Officer Gorman
 4    during that incident?
 5              MS. JONES:  Objection.
 6         A.  Do not remember.
 7         Q.  Okay.  Do you remember if you were working
 8    on August 18, 2019 [sic]?
 9         A.  Do not remember.
10         Q.  At the time of this incident, what was
11    your assignment?
12         A.  I was assigned to Clinton Third Platoon,
13    which is afternoon hours.
14         Q.  Okay.  And so do you know if Officer
15    Gorman was also assigned to Clinton Third Platoon?
16         A.  At the time of the incident, yes.
17         Q.  Yes.  Okay.
18              And did you have a partner at the time of
19    the incident?
20         A.  No.
21         Q.  Okay.  Were you in your field training at
22    the time of the incident?
23         A.  No.
24         Q.  Okay.  You had finished your field
25    training at the time of the incident?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2       A.  Correct.
 3       Q.  So you would drive your own car at the
 4  time of the incident, or would you be with another
 5  officer, a two-officer car?
 6            MS. JONES:  Objection.
 7       A.  I would be in the car by myself.
 8       Q.  Okay.  When did you and the other officers
 9  devise the plan on October 19, 2018?
10       A.  Just moments before arriving.
11       Q.  So after you received the 911 call?
12       A.  Correct.
13       Q.  Had you previously responded to calls of
14  drugs being dealt on Kosciusko Street?
15       A.  Yes.
16       Q.  And when was the last time that you
17  remember responding to a call about drug activity on
18  Kosciusko Street prior to October 19, 2018?
19       A.  I do not remember specifically.  It could
20  have been that same day, earlier the same day, or just
21  days before.
22       Q.  Okay.  Could it have been the day before?
23       A.  Very well possibly, if I was working.
24       Q.  Okay.  And when you responded previously
25  to drug activity on Kosciusko Street, had you
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     responded with Officers Gorman, DiSabatino, and/or
 3     Horowitz?
 4          A.  Do not remember.
 5          Q.  Would it be common to respond with other
 6     officers if you got a call about drug activity?
 7          A.  Yes.
 8          Q.  Okay.  So you may have responded with one
 9     or more of those same officers that you responded with
10     on October 19, 2018?
11              MS. JONES:  Objection.
12          A.  May have.
13          Q.  Did you often work with those same
14     officers?
15          A.  Yes, because they worked my platoon and my
16     same hours.
17          Q.  Okay.  On the date of the incident, when
18     you drove up to Kosciusko Street, you were in your own
19     car; is that right?
20          A.  Correct.
21          Q.  And Officer DiSabatino also drove up on
22     Kosciusko Street; correct?
23              MS. JONES:  Objection.
24          A.  Correct.
25          Q.  And he was in his own car as well;
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2     correct?
3                   MS. JONES:  Objection.
4             A.  Correct.
5             Q.  Do you remember whose car arrived first;
6     you or DiSabatino?
7             A.  I do not remember.
8             Q.  Okay.  Do you remember if you were
9     following DiSabatino or if he was following you?
10            A.  I do not remember.
11            Q.  Okay.  And did you talk -- how did you
12    talk with the other officers to devise the plan prior
13    to responding to the vice activity call?
14            A.  I do not remember.
15            Q.  Was it on the radio or something else?
16            A.  It may have been in person.
17                  MS. JONES:  Objection.
18            A.  It may have been on the radio.  Do not
19    remember.
20            Q.  Ordinarily, when you would speak with
21    other officers before responding to a call, would that
22    either be in person or the radio or something else?
23            A.  It could be either radio, phone, in
24    person.
25            Q.  When you say "phone," do you have a
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2      department-issued cell phone?
 3              A.   No.
 4              Q.   Okay.  So if you were to coordinate with
 5      other officers on the telephone, that would be your
 6      personal telephone?
 7              A.   Correct.
 8              Q.   And how often do you communicate with
 9      other officers on your personal telephone during work
10      hours?
11              A.   Several times a day.
12              Q.   Okay.  Would that be via text message or
13      phone call or something else?
14              A.   It could be both.
15              Q.   Okay.  Do you ever use any apps to
16      communicate, or would it just be text message and
17      phone call?
18              A.   Email.
19              Q.   And when you email with other officers,
20      would that be through a City of Rochester-issued email
21      address?
22              A.   Correct.
23              Q.   Would you ever use a personal email
24      address to communicate with other officers?
25              A.   No.
```



```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2         Q.  On the day of the incident, do you recall
3    emailing with other officers?
4         A.  I do not remember.
5         Q.  Okay.  Either before or after the
6    incident, do you remember sending any emails about
7    this incident?
8         A.  I do not remember.
9         Q.  So you may have sent emails about this
10   incident, but you don't remember?
11            MS. JONES:  Objection.
12        A.  I do not remember.
13            MR. SHIELDS:  Okay.  We just call for the
14   production of any emails that he did send related to
15   this incident, as well as any other written
16   communications, including text messages.  And we'll
17   follow up in writing about that.
18            MS. JONES:  Please do.
19         (Document request - emails, written
20         communications, text messages related to
21         incident)
22        Q.  When did you finish your field training?
23        A.  In, I believe, July of 2018.
24        Q.  So you had recently finished your field
25   training at the time of this incident.  Is that fair
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    to say?
 3              A.  A few months prior to, yes.
 4              Q.  Had you responded to vice activity on
 5    Kosciusko Street during your field training?
 6              A.  No.
 7              Q.  Had you responded to vice activity in
 8    other areas of the city during your field training?
 9              A.  Yes.
10              Q.  Were you assigned to a different area of
11    the city during your field training?
12              A.  I was.
13              Q.  Okay.  Where were you assigned in the city
14    during your field training?
15              A.  Lake section.
16              Q.  And during vice-activity responses during
17    your field training, did you ever have occasions where
18    you would chase suspects?
19              A.  Yes.
20              Q.  And did you ever have occasions during
21    your field training where you would chase suspects
22    through yards on residential properties?
23              A.  Yes.
24              Q.  And how many times would you say had that
25    happened?
```



```
 1                OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2           A.  I do not remember specifically.  More than
 3      twice during field training.
 4           Q.  And more than twice during field training,
 5      but less than ten or more than ten?
 6                MS. JONES:  Objection.
 7           A.  Do not remember.
 8           Q.  Somewhere between two and ten, maybe?
 9                MS. JONES:  Objection.
10           A.  More than two.  I cannot specifically put
11      in a range for you.
12           Q.  Okay.  So somewhere between two and ten is
13      fair to say?
14                MS. JONES:  Objection.
15           A.  I cannot specifically put in a range for
16      you.
17           Q.  So you said more than two.  So at least
18      three?
19                MS. JONES:  Objection.
20           A.  More than two.
21           Q.  More than four?
22                MS. JONES:  Objection.
23           A.  More than two.
24           Q.  Okay.  Somewhere -- more --
25                MS. JONES:  Elliot --
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   Less than 20?
 3              MS. JONES:  Elliot, objection.
 4              MR. SHIELDS:  You can go ahead and object.
 5    Are you directing him not to answer?  He said more
 6    than two.
 7              MS. JONES:  Yeah, how many times he's got
 8    to say "more than two"?  Let's move on.
 9              MR. SHIELDS:  There's a lot of numbers
10    that are bigger than two.
11              MS. JONES:  Yeah, but he said that he
12    doesn't -- like he can't specify more than that.  It's
13    just more than two.
14         Q.   Okay.  And less than 20?
15              MS. JONES:  Objection.
16         A.   More than two.
17         Q.   Okay.  So we'll go with something more
18    than 2 and less than 20.  Sounds like that's fair?
19              MS. JONES:  Objection.  More than two.
20              Elliot, that's a mischaracterization of
21    his testimony.
22              MR. SHIELDS:  Please stop.  Please stop
23    putting your speaking objections on the record.  You
24    can say "I object to the form of the question," and
25    that's the proper objection.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  Can you give me any more specific answer
 3    than "more than two"?
 4              MS. JONES:  Objection.
 5         A.  More than two.
 6         Q.  Okay.  And "more than two" would mean at
 7    least three; correct?
 8              MS. JONES:  Objection.
 9         A.  Just more than two.
10         Q.  Do you remember two specific instances
11    where you chased suspects through residential
12    properties during field training?
13         A.  I do.
14         Q.  Okay.  Can you describe those instances
15    for me?
16         A.  Yes.  One was a robbery suspect that had
17    just stolen a phone that I just gave chase to on foot.
18    The other one was a suspect, armed, home invasion
19    robbery that I gave chase on foot to.
20         Q.  And do you recall those instance -- those
21    two instances during your field training from your
22    review of documents in preparation of this deposition?
23         A.  No.
24         Q.  Okay.  You have an independent
25    recollection of those instances?
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2            A.   Correct.
 3            Q.   And during that time, you would have been
 4   with your field training officer; correct?
 5            A.   Correct.
 6            Q.   And who was your field training officer?
 7            A.   At which point in time?
 8            Q.   During the first instant where you chased
 9   the robbery suspect.
10            A.   That would have been, I believe, my field
11   training officer Chris Morales.
12            Q.   Okay.  And who was your field training
13   officer during the second instant that you recall?
14            A.   Kevin Smith.
15            Q.   On the date of the incident, when you
16   drove up to the front of 61 Kosciusko Street, the
17   suspects ran; correct?
18            A.   Correct.
19            Q.   And they ran through the backyard of 61
20   Kosciusko Street; right?
21            MS. JONES:  Objection.
22            A.   Down the driveway of 61 Kosciusko Street,
23   correct.
24            Q.   Okay.  And then they ran -- and then they
25   jumped a fence in the back of that yard; is that
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    right?
 3            MS. JONES:  Objection.
 4       A.  Yes.
 5       Q.  Okay.  And did you see them jump the
 6    fence?
 7       A.  No.
 8       Q.  And you didn't see them jump the fence
 9    because you didn't chase them; is that right?
10            MS. JONES:  Objection.
11       A.  No.  I gave chase when I arrived at the
12    backyard.  I peered over the fence, which I saw
13    somebody that was running from 61 Kosciusko, running
14    behind the fence going westbound.
15       Q.  So when you got out of your car, you ran?
16       A.  Correct.
17       Q.  And you ran into the backyard of 61
18    Kosciusko Street?
19            MS. JONES:  Objection.
20       A.  Down the driveway of 61 Kosciusko Street.
21       Q.  Okay.  And you did not immediately jump
22    the fence; is that right?
23            MS. JONES:  Objection.
24       A.  Immediately?  Can you define
25    "immediately"?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS

2          Q.   When you got to the back of 61 Kosciusko

3    Street, the first thing you said was that you peered

4    over the fence; is that right?

5          A.   Yes.

6          Q.   After you peered over the fence, did you

7    then remain in the backyard of 61 Kosciusko Street for

8    a period of time?

9          A.   No.

10         Q.   After you peered over the fence in the

11   backyard of Kosciusko Street, you then jumped into the

12   backyard of 57 Kosciusko Street?

13         A.   Correct.

14         Q.   Okay.  And then when you were in the back

15   of 57 Kosciusko Street, you could see that both of the

16   suspects had been detained; correct?

17              MS. JONES:  Objection.

18         A.   Correct.

19         Q.   And after you jumped into the backyard of

20   57 Kosciusko Street, you searched the backyard of 57

21   Kosciusko Street; correct?

22              MS. JONES:  Objection.

23         A.   Correct.

24         Q.   And you were looking for a gun; correct?

25              MS. JONES:  Objection.



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  Looking for tossed contraband.
 3         Q.  And when you say "contraband," that would
 4    include a gun or drugs or some other illegal thing;
 5    correct?
 6              MS. JONES:  Objection.
 7         A.  Correct.
 8         Q.  And at the time, you said you were
 9    looking -- so can you tell me specifically what you
10    were looking for at the time?
11         A.  Any sort of contraband.
12         Q.  What did you suspect that these people may
13    have discarded as a result of them running from you?
14         A.  I wouldn't know.
15         Q.  But you had responded for a call of drug
16    activity; correct?
17         A.  Correct.
18         Q.  So it's fair to say that you may have been
19    looking for drugs; right?
20              MS. JONES:  Objection.
21         A.  Any illegal contraband.
22         Q.  And at the time that you were in the
23    backyard of 57 Kosciusko Street after you had jumped
24    the fence from 61 Kosciusko Street, you weren't
25    running, right, you were just walking around the yard?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3         A.   Can you repeat the question?
 4         Q.   Yeah, it was a bad question.
 5              At the time, when you first jumped from
 6    the fence in the backyard of 61 Kosciusko Street to
 7    the backyard of 57 Kosciusko Street, you weren't
 8    chasing anyone; correct?
 9                   MS. JONES:  Objection.
10         A.   Only until I confirmed that both suspects
11    were in custody.
12         Q.   I've asked you this, but just to confirm,
13    after you jumped the fence into 57 Kosciusko Street,
14    you had confirmed that both suspects were in custody;
15    correct?
16         A.   Only after.
17         Q.   After you jumped the fence?
18         A.   Correct.
19         Q.   So after you jumped the fence, you walked
20    around the backyard of 57 Kosciusko Street and you
21    looked for contraband; correct?
22                   MS. JONES:  Objection.
23         A.   Only after confirming that they were in
24    custody did I search some sort of flight that the
25    suspects had for any contraband that they may have
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     tossed.
 3              Q.   In the backyard of 57 Kosciusko Street?
 4              A.   Correct.
 5              Q.   And that flight had concluded by the time
 6     that you jumped into the backyard of 57 Kosciusko
 7     Street from the backyard of 61 Kosciusko Street;
 8     correct?
 9              MS. JONES:  Objection.
10              A.   Their flight?  The suspects' flight?
11              Q.   Correct.
12              A.   As soon as I confirmed it, I'm not sure as
13     to what point, but I arrived at 57, then realized that
14     they were in custody.
15              Q.   Okay.  And you looked around, you searched
16     the backyard of 57 Kosciusko Street, and you did not
17     find any contraband; correct?
18              MS. JONES:  Objection.
19              A.   I searched what was a possible flight path
20     for the suspects.  In only the brief time I was able
21     to, I was unable to find any contraband and could not
22     complete my search.
23              Q.   And why could you not complete your
24     search?
25              A.   Because that is when Charles Dempsey and
```



1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2    his dog came to the backyard.
3          Q.  Okay.  So I'm not talking about that time.
4          A.  Uh-huh.
5          Q.  Okay?  We'll ask about that in a little
6    bit.
7               The first time that you jumped the fence
8    from 61 Kosciusko Street into the backyard of 57
9    Kosciusko Street --
10         A.  Uh-huh.
11         Q.  -- that's the first time you entered the
12   backyard of 57 Kosciusko Street; correct?
13         A.  Correct.
14         Q.  And at that time, you searched around the
15   backyard for a little bit; correct?
16         A.  In their flight path, correct.
17         Q.  And then you went to the back fence and
18   you spoke with Officer Horowitz, who was in the yard
19   on Sobieski Street; correct?
20         A.  Correct.
21         Q.  And you asked him where did he throw a
22   gun; correct?
23              MS. JONES:  Objection.
24         A.  I asked him about a gun, correct.
25         Q.  And what did he say in response to you?



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   That he did not have a gun.
 3         Q.   Now, was that Officer Horowitz or was that
 4    the suspect that he had stopped?
 5         A.   The suspect.
 6         Q.   So the suspect told you he didn't have a
 7    gun, and then you looked around the yard for a little
 8    longer?
 9              MS. JONES:  Objection.
10         A.   Nope.  Went straight to Officer Gorman to
11    ensure that he was fine with his suspect that he had
12    in custody.
13         Q.   Okay.  And you were present in the
14    backyard of 57 Kosciusko Street the first time, before
15    you joined Officer Gorman, for approximately a minute
16    and 10 seconds.  Is that fair to say?
17              MS. JONES:  Objection.
18         A.   Can you repeat that?
19         Q.   You were present in the backyard at 57
20    Kosciusko Street before you jumped the fence into the
21    backyard of 49 Kosciusko Street for approximately a
22    minute and 10 seconds; is that correct?
23              MS. JONES:  Objection.
24         A.   The house -- one house west of 57
25    Kosciusko Street, yes.
```



```
 1                OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2          Q.  And one house west of Kosciusko Street,
 3     that's the yard where Officer Gorman had apprehended
 4     the suspect who was wearing a red sweatshirt; correct?
 5          A.   That's where he had the suspect.  As to
 6     what color his sweatshirt is, I can't tell you --
 7     remember.
 8          Q.   But the one yard west is where Officer
 9     Gorman was present with one of the suspects that he
10     had apprehended; correct?
11          A.   Correct.
12          Q.   And you asked Officer Gorman where they
13     had discarded a gun when you were in the backyard of
14     57 Kosciusko Street the first time; correct?
15              MS. JONES:  Objection.
16          A.   I do not remember what our conversation
17     entailed.  It was more -- he directed me to the flight
18     path of where the suspect ran through that yard, 57
19     Kosciusko Street.
20          Q.   I'm sorry.  Did I say "Gorman"?  If I said
21     Gorman, I meant to say Horowitz.  So let me ask you a
22     new question.
23              When you were in the backyard of 57
24     Kosciusko Street and you spoke to Officer Horowitz,
25     you asked him where he threw a gun; correct?
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2       A.   No.  I asked the suspect.
 3       Q.   Okay.  You asked the suspect.
 4            And you assumed that he had a gun because
 5  they ran from you?
 6            MS. JONES:  Objection.
 7       A.   It was more to make sure that they didn't
 8  leave a gun somewhere.
 9       Q.   And he responded that he didn't have a
10  gun; correct?
11       A.   Correct.
12            MR. SHIELDS:  Give me one second.
13            I may have been saying the wrong
14  addresses.
15            Oh, did you pause that?  We weren't off
16  the record.  You can put it back on.
17            THE VIDEOGRAPHER:  No.  It just timed out
18  on me.  It's back on.
19            MR. SHIELDS:  And just for the written
20  record --
21            THE VIDEOGRAPHER:  The camera timed out
22  after 30 minutes of continuous recording.
23            MR. SHIELDS:  Okay.  So are you going to
24  have to kind of --
25            THE VIDEOGRAPHER:  30 minutes, probably.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2              MR. SHIELDS:  -- press the -- maybe you
 3    can set a timer for like 28 minutes.
 4              THE VIDEOGRAPHER:  I can see it right on
 5    there.
 6              MR. SHIELDS:  Okay.
 7              THE VIDEOGRAPHER:  I apologize.
 8              MR. SHIELDS:  Okay.  And just for the
 9    record, all of these prior questions that I was asking
10    about the backyard of 57 Kosciusko Street, what I
11    meant was -- actually, let me pause before I say this.
12    Let me just make sure I have this correct.  I'm sorry.
13              MS. JONES:  Kim, can I ask you a question
14    while he's looking?  Are you certifying to the
15    authenticity of the video recording?
16              MR. SHIELDS:  We don't need a
17    certification for the authenticity of the video
18    recording because we have a written stenographer who
19    is making the official written record of the
20    deposition.  But we can work that out later.
21              MS. JONES:  Thank you, Elliot.
22              Kim, are you certifying to the
23    authenticity of the video recording?
24              You're shaking your head no.  Okay.  I
25    just wanted to ask.  Thank you.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MR. SHIELDS:  Okay.  And so I figured out
 3         the answer to my question.  So all of the prior times
 4         that I was talking about my client's backyard, the
 5         proper address should have been 53 Kosciusko Street,
 6         not 57 Kosciusko Street.
 7                   So just for the record, all of the prior
 8         questions up to this point we should change the
 9         address from 57 Kosciusko Street -- all the times that
10         I said 61 Kosciusko Street, it should be 57 Kosciusko
11         Street.  All the times that I said 57 Kosciusko
12         Street, it should be 53 Kosciusko Street.  So I'm just
13         going to ask some questions to clarify that.
14                   MS. JONES:  Can you say that one more
15         time?  So every time you said 61, it should have been
16         which number?
17                   MR. SHIELDS:  57.
18                   MS. JONES:  57.
19                   And every time you said 57, it should have
20         been 53?
21                   MR. SHIELDS:  Correct.
22         Q.  And I'm just going to ask a couple of
23         questions, Officer Algarin, to clarify that.
24                   So to be clear, on the date of the
25         incident, you said that the suspects ran down the
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    driveway of 61 Kosciusko Street; is that correct?
 3              A.   Correct.
 4              Q.   And then they entered the backyard of 57
 5    Kosciusko Street; is that correct?
 6              MS. JONES:  Objection.
 7              A.   No.   53.   Directly into 53.
 8              Q.   Do you remember if 53 Kosciusko Street
 9    had -- was surrounded by a wooden fence or something
10    else?
11              A.   53 Kosciusko Street only had a wooden
12    fence on the east side of the perimeter.  The rest was
13    chain-link.
14              Q.   So you're saying that the driveway from 61
15    Kosciusko Street had direct access into the backyard
16    of 53 Kosciusko Street?
17              A.   I do not remember.
18              Q.   Now -- so you chased them down the
19    backyard of -- I'm sorry -- down the driveway of 61
20    Kosciusko Street.  That's what you said; right?
21              A.   Yes.
22              Q.   And then they entered a backyard; right?
23              A.   Now I'm getting confused with all these
24    number changes.
25              Q.   The yard that the suspects ran into, that
```



```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2     is the first yard that you entered; correct?
3              A.  Correct.
4              Q.  And then you said that you peered over a
5     wooden fence; correct?
6              A.  Correct, that looks over 53 Kosciusko
7     Street.
8              Q.  So the fence that you looked over looked
9     over into 53 Kosciusko Street; correct?
10             A.  Correct.
11             Q.  And then you jumped over the fence from
12    the yard that I'll represent to you is 57 Kosciusko
13    Street into the yard that was 53 Kosciusko Street?
14             A.  Yes.
15             Q.  Okay.  So it would be fair to say that the
16    suspects ran down a driveway into the backyard of 57
17    Kosciusko Street; correct?
18             A.  Correct.
19             Q.  Okay.  And then you jumped the fence into
20    the backyard of 53 Kosciusko Street; correct?
21             A.  Correct.
22             Q.  And then you searched the yard of 53
23    Kosciusko Street for some period of time; correct?
24             A.  Just the flight path of the suspects that
25    they had taken, 53 Kosciusko Street.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   Okay.  And when you jumped into the
 3    backyard of 53 Kosciusko Street, Officer Gorman had
 4    one suspect detained in the yard directly to the west
 5    of Kosciusko Street; correct?
 6              MS. JONES:  Objection.
 7         A.   Officer Gorman?
 8         Q.   Correct.
 9         A.   Yes.
10         Q.   And Officer Horowitz had the other suspect
11    detained in the yard on Sobieski Street; correct?
12         A.   To the south of 53 Kosciusko Street,
13    correct.
14         Q.   And that yard to the south would have been
15    a yard off of Sobieski Street; correct?
16         A.   Correct.
17         Q.   Okay.  And so you were present in the
18    backyard of 53 Kosciusko Street the first time for
19    approximately one minute.  Is that accurate --
20              MS. JONES:  Objection.
21         Q.   -- to your recollection?
22         A.   Do not remember specifically --
23         Q.   Okay.
24         A.   -- how long.
25         Q.   Long enough to walk around, search the
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    flight path that you believed the suspects ran
 3    through, and have a short conversation with the
 4    suspect that Officer Horowitz had detained; correct?
 5         A.  Correct.
 6         Q.  Did you do anything else while you were in
 7    the backyard of 53 Kosciusko Street the first time?
 8         A.  Walked over to Officer Gorman.
 9         Q.  Okay.  So you walked over to Officer
10    Gorman and you jumped the fence from 53 Kosciusko
11    Street into the yard directly to the west of 53
12    Kosciusko Street; correct?
13         A.  Correct.
14         Q.  And --
15              MS. JONES:  One piece of clarification on
16    these numbers.  You weren't asking him to change the
17    numbers in your prior questioning, we're just going to
18    leave the note in there that 61 should be 57 and 57
19    should be 53?
20              MR. SHIELDS:  Correct.  And that's why I
21    asked the questions over again, basically.
22              MS. JONES:  I just wanted to clarify that
23    the record wasn't changing before.
24         Q.  After you jumped into the backyard of 49
25    Kosciusko Street where Officer Gorman was, what did
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    you do?
 3            A.   Sorry.  Let them go by.
 4                 I spoke with Officer Gorman briefly to see
 5    if the suspect had any contraband on him and as to
 6    what his flight were.  Officer Gorman told me as to
 7    what the flight path was.
 8            Q.   And did you look around in the backyard of
 9    49 Kosciusko Street at all?
10            A.   Just from my walk from the fence to
11    Gorman, to Gorman to the fence.
12            Q.   And the backyard at 49 Kosciusko Street
13    had a big dog cage in it; is that right?
14            A.   Correct.
15            Q.   And what would you have done if a dog had
16    run out at you in the backyard of 49 Kosciusko Street?
17                 MS. JONES:  Objection.
18            A.   It depends on the situation.
19            Q.   You might have shot the dog if it ran at
20    you?
21                 MS. JONES:  Objection.
22            A.   No.  It depends on that dog's demeanor,
23    aggressiveness, flight path, speed, size.
24            Q.   We'll get back to that later.
25                 When you were in the backyard of 49
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    Kosciusko Street, Officer Gorman told you to backtrack
 3    through the flight path in 53 Kosciusko Street;
 4    correct?
 5            MS. JONES:  Objection.
 6            A.   He pointed out a flight path of the
 7    suspect, so that was a good starting point to
 8    backtrack.
 9            Q.   And he told you you should backtrack;
10    correct?
11            MS. JONES:  Objection.
12            A.   Yes.
13            Q.   And then you pulled up a small picnic
14    table, and then you jumped over the fence into the
15    backyard of 53 Kosciusko Street; correct?
16            A.   I used the picnic table to assist myself
17    over the fence, yes.
18            Q.   What was going through your head at the
19    exact moment that you jumped the fence?
20            A.   Do not remember.
21            Q.   Were you thinking about anything at the
22    moment that you jumped the fence?
23            A.   Just searching for contraband.
24            Q.   Did you think about the fact that you had
25    already searched the yard?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   No.
 3         Q.   Did you think about the fact that the
 4    suspects were already detained and in custody?
 5         A.   No.
 6         Q.   Okay.  Did you think about any rules that
 7    you're required to follow?
 8         A.   As to what rules?
 9         Q.   Any rules.
10         A.   Sure.
11         Q.   You thought about rules that you're
12    required to follow?
13              MS. JONES:  Objection.
14         A.   Should always think about rules.
15         Q.   And, Officer Algarin, what are the set of
16    rules that RP officers must follow?  What are they
17    called?
18         A.   General orders.
19         Q.   Among those rules or general orders that
20    you know of, are there any specific rules that deal
21    with entering the curtilage to a property?
22         A.   There is hot pursuit.
23         Q.   Are there any other rules that apply when
24    you enter the curtilage to somebody's property?
25         A.   Outside of that, I do not remember.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  Can we pause for one second?
 3                   I mean, are you in the sun?  Are you okay?
 4    I feel like you're in the sun.  You're not meant to
 5    be, like, in the hot seat literally.
 6                   I just didn't know if you wanted to move
 7    because -- can you still see him like that?
 8                   THE VIDEOGRAPHER:  Okay.  Can I move it
 9    over a little bit, if you don't mind?
10                   MR. SHIELDS:  Yes.
11                   Is the lighting okay?
12                   THE VIDEOGRAPHER:  It was a little rough
13    there for a minute, but it's fine.
14                   There we go.  Okay.  We're good.  Thank
15    you.
16         Q.  Officer Algarin, isn't there a rule for
17    police officers that generally you must have a warrant
18    before you enter someone's property?
19         A.  Based on circumstances, yes.
20         Q.  Is that rule important?
21         A.  Yes.
22         Q.  Why?
23         A.  Because it is a rule.
24         Q.  The rule is important -- the rule is
25    important because it's a rule.  What happens if you
```



```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2     break that rule?
3              A.  There could be consequences.
4              Q.  What could the consequences be?
5              A.  Interdepartmental memos, training memos,
6     write-ups, memorandums, suspensions.
7              Q.  Anything else?
8              A.  Termination.
9              Q.  Are there any other reasons that the rule
10    is important?
11             A.  A good guideline to follow.
12             Q.  And a warrantless entry into somebody's
13    property is presumptively unreasonable; correct?
14                 MS. JONES:  Objection.
15             A.  In this -- are we speaking theoretically
16    in an isolated situation?
17             Q.  Isn't a rule that a warrantless entry into
18    somebody's property is presumptively unreasonable?
19                 MS. JONES:  Objection.
20             A.  Are we speaking of an isolated scenario of
21    somebody entering a premise or property without a
22    warrant?
23             Q.  Can you just answer my question, or you
24    can tell me that you can't answer my question.
25             A.  Then I cannot answer your question.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2           Q.   Okay.  Were you taught during your
3     training that a warrantless entry into somebody's
4     property is presumptively unreasonable?
5           A.   Based on circumstances.
6           Q.   So absent any exceptions that might apply,
7     if none of the exceptions apply, then a warrantless
8     entry into somebody's property is presumptively
9     unreasonable; correct?
10          A.   Correct.
11          Q.   And isn't there another rule that if you
12    don't have a warrant, then generally you must obtain
13    consent from someone to enter the property?
14          A.   With those same circumstances that you've
15    just described?
16          Q.   Correct.
17          A.   Correct.
18          Q.   And why is that rule important?
19          A.   To have consent.  So any evidence that was
20    found within the property is able to be put into court
21    without it getting thrown out.
22          Q.   So it's not excluded for an unlawful
23    entry; correct?
24          A.   Correct.
25          Q.   And are there any other reasons that that



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     rule is important?
 3              A.  It could be for the sake of a property
 4     owner.  It could be for the sake of planning.  It
 5     could be for the sake of obtaining all your -- make
 6     sure ducks are in a row before you take a case to
 7     court.
 8              Q.  And when you said it could be for the sake
 9     of the property owner, can you explain what you meant?
10              A.  Sure.  So to allow them to know what's
11     going on.
12              Q.  So generally, if there's not some other
13     exception that applies, the rule is that you need to
14     get consent from the property owner to let them know
15     what's going on; is that correct?
16              MS. JONES:  Objection.
17              A.  Correct.
18              Q.  And are you familiar with the phrase "That
19     a man's home is his castle"?
20              A.  I am.
21              Q.  And what does that mean to you?
22              A.  Exactly what it sounds like.
23              Q.  Can you elaborate for us, please?
24              A.  That a man's home is his castle, something
25     to defend.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2          Q.  And so someone who is trespassing on your
 3     property, then you're allowed to defend your property.
 4     Is that what you're saying?
 5                MS. JONES:  Objection.
 6          A.  Under the State of New York, no.
 7          Q.  Doesn't it mean that people enjoy the
 8     position of rulers in their own homes and others have
 9     no right to enter without their permission?
10                MS. JONES:  Objection.
11          A.  Ideally.
12          Q.  And what do you mean when you say
13     "ideally"?
14          A.  Ideally, in a perfect world, you wouldn't
15     want anyone on your property that doesn't -- that's
16     not supposed to be there.
17          Q.  And that rule applies because you have a
18     right to privacy on your own property; correct?
19          A.  Correct.
20          Q.  And the next rule is that sometimes a
21     police officer can enter someone's property without a
22     warrant or their consent, but only if there's an
23     emergency, which requires both exigent circumstances
24     and probable cause; correct?
25          A.  Correct.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  And is that rule important?
 3         A.  Yes.
 4         Q.  Why?
 5         A.  So you are allowed exceptions during
 6    either dangerous or times of emergency where evidence
 7    is of value and time is of the essence.
 8         Q.  Why is it important to have probable cause
 9    before you enter a property?
10         A.  So you don't -- I'm sorry.  Say that one
11    more time.
12         Q.  Why is it important that you have probable
13    cause before you enter a property if you don't have a
14    warrant or the homeowner's consent?
15         A.  So you have a reason for being there.
16         Q.  Probable cause to search a property would
17    be something like an informant's tip that there were
18    guns on the property; right?
19              MS. JONES:  Objection.
20         A.  Can you clarify your question?
21         Q.  If an informant told you that someone was
22    secreting guns on their property, would that provide
23    you with probable cause?
24         A.  No.
25         Q.  If there was a gun in plain view on
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    someone's property, would that provide you with
 3    probable cause?
 4         A.   It depends where.
 5         Q.   What would that depend on?
 6         A.   Whether it's in an open area, or if it's
 7    inside a home and you're outside the home, if you're
 8    inside the home and see it inside the home.
 9         Q.   So if it was in plain view inside the home
10    and you could see it through a window, would that
11    provide you with probable cause?
12         A.   To go in there without a warrant?
13         Q.   Without a warrant or without consent.
14         A.   No.
15         Q.   If you were in a neighboring backyard and
16    you could see over the fence and you saw a gun on the
17    ground, would that provide you with probable cause?
18         A.   It depends on the situation, yes.
19         Q.   What would that depend on?
20         A.   Highly populated area, flight through
21    there, hot pursuit.
22         Q.   And it sounds like what you're describing
23    is whether there was also an emergency.  Is that fair
24    to say?
25              MS. JONES:  Objection.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   If there's an emergency, no.
 3         Q.   Because the rule for exigent circumstances
 4    requires both that there's an emergency and there's
 5    probable cause; correct?  You said that earlier.
 6              MS. JONES:  Objection.
 7         A.   That falls into those certain exigent
 8    circumstances.
 9         Q.   Can you explain to me what "exigent
10    circumstances" means to you?
11         A.   Something that would have an exception to
12    the rules and that would not apply to the rule because
13    it's an exception to it.
14         Q.   Exigent circumstances has two components,
15    correct, probable cause and an emergency?
16              MS. JONES:  Objection.
17         A.   I can't answer your question.
18         Q.   Are you saying that you are unaware of the
19    legal requirements that would provide you with exigent
20    circumstances to enter a property?
21         A.   No.
22         Q.   Okay.  Can you please explain what the
23    legal requirements for exigent circumstances are?
24         A.   It depends on the situation.
25         Q.   Okay.  One of the requirements is that you
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     have probable cause; correct?
 3              MS. JONES:  Objection.
 4         A.  Sure.
 5         Q.  By "sure," you mean, yes, you must have
 6     probable cause as part of the exigent circumstances
 7     test; correct?
 8         A.  Yes.
 9         Q.  And you also must have an emergency
10     situation; correct?
11              MS. JONES:  Objection.
12         A.  No.
13         Q.  So part of ex --
14         A.  Can you define your emergency situation?
15         Q.  Sure.  Emergency would generally mean that
16     there was an urgent need to either render aid or take
17     action.
18         A.  Yes.
19         Q.  So, yes, exigent circumstances require
20     both probable cause and an emergency; correct?
21         A.  Yes.
22         Q.  And an emergency could be something like
23     someone's life is in danger; correct?
24         A.  Yes.
25         Q.  Like if you heard someone screaming for
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1           OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    help?
 3           A.  Yes.
 4           Q.  Or if you saw them being attacked?
 5           A.  Yes.
 6           Q.  Those are situations where there would be
 7    an emergency?
 8           A.  Correct.
 9           Q.  So you could reasonably enter someone's
10    property without a warrant or consent if you believe
11    their life was in danger; correct?
12           A.  Yes.
13           Q.  And can we agree if there was no
14    emergency, then a warrantless entry to search for
15    weapons or contraband is not allowed; correct?
16             MS. JONES:  Objection.
17           A.  No.
18           Q.  No, the warrantless entry is not allowed;
19    correct?
20             MS. JONES:  Objection.
21           A.  No, that's not what I meant.  I'm saying
22    "no" to your statement.
23           Q.  So you're saying you're allowed to enter a
24    property to search for contraband or weapons even if
25    there's no emergency?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

52

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2            A.  No, I didn't say for weapons or
 3       contraband.
 4            Q.  Are you allowed to enter someone's
 5       property to search for weapons or contraband if
 6       there's no emergency, if you don't have consent or a
 7       warrant?
 8            A.  No.
 9            Q.  So if you don't have consent or a warrant,
10       there must be an emergency for you to enter someone's
11       property to search for weapons or contraband; correct?
12            MS. JONES:  Objection.
13            A.  I'm really stuck on the drugs-and-weapons
14       thing that you keep putting out there, but no.
15            Q.  Can you explain what you mean by "no"?
16            A.  It all depends on the situation.
17            Q.  And we agree that for exigent
18       circumstances to apply you must have probable cause
19       and an emergency; right?
20            A.  Correct.
21            Q.  So if there's no emergency, then there's
22       no exigent circumstances; correct?
23            MS. JONES:  Objection.
24            A.  I feel like we're going around in circles.
25       Can you say your question one more time?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  We can agree that if there's no emergency,
 3    then a warrantless entry to search for weapons or
 4    contraband is not allowed; correct?
 5         A.  Correct.
 6         Q.  Even if there's probable cause to believe
 7    that there's weapons or contraband on the property, if
 8    there's no emergency, you're not allowed to enter the
 9    property; correct?
10              MS. JONES:  Objection.
11         A.  Correct.
12         Q.  And we can agree if there's no emergency,
13    then the warrantless entry is unlawful even if a
14    felony has been committed; correct?
15              MS. JONES:  Objection.
16         A.  What is that felony?
17         Q.  It doesn't matter what the felony is.  If
18    there's no emergency, you're not allowed --
19         A.  There's an emergency.
20         Q.  -- you're not allowed to enter the
21    property; correct?
22              MS. JONES:  Objection.
23         A.  And your emergency is only that somebody's
24    in danger?
25         Q.  Any emergency.  There's got to be an
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    emergency in order for you to lawfully enter the
 3    property without a warrant or consent; correct?
 4              A.  No.
 5              Q.  So you can enter a property without a
 6    warrant or consent even if there's not an emergency?
 7              A.  To make sure there's no one else in the
 8    home, correct.
 9              Q.  So you're saying in certain circumstances
10    if you need to make sure there's not someone in a
11    house, you can enter a property?
12              A.  If the house is supposed to be empty and
13    we're supposed to hold for a warrant, however, we
14    believe there's somebody still inside the home,
15    clearing the home to make sure that nobody else is in
16    there, not necessarily searching for weapons or
17    contraband, yes.
18              Q.  So under certain circumstances without a
19    warrant or consent, you can still enter a home even if
20    there's not an emergency?
21              A.  Correct.
22              Q.  Are there certain circumstances where you
23    can enter a property without a warrant or consent if
24    you don't have probable cause?
25              A.  Define "property."  What is the property?
```



1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS

2          Q.  A residential property.

3          A.  A house with a fenced-in area?  Are we

4    talking about woods?  Open field?

5          Q.  Someone's home --

6          A.  Okay.

7          Q.  -- and/or the curtilage to their home.

8          A.  Okay.  No.

9          Q.  A mere suspicion that contraband is

10   present on the property does not on its own create an

11   urgency, justifying a warrantless entry onto the

12   property; correct?

13               MS. JONES:  Objection.

14          A.  In that isolated what you just said, yes.

15          Q.  Because suspicion is less than probable

16   cause; correct?

17          A.  Correct.

18          Q.  So the mere possibility that contraband

19   could be removed or destroyed does not create urgency,

20   justifying a warrantless entry onto a property;

21   correct?

22               MS. JONES:  Objection.

23          A.  It depends on the situation and exigent

24   circumstances.

25          Q.  We're talking about exigent circumstances



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    here.  "Urgency" means emergency.  So if there's no
 3    emergency, you can't enter a property; correct?
 4              MS. JONES:  Objection.
 5         A.  I think we just discussed that.
 6         Q.  Okay.  So my question is:  The mere
 7    possibility, the hypothetical possibility --
 8         A.  Uh-huh.
 9         Q.  -- that contraband could be removed or
10    destroyed does not create an emergency; correct?
11         A.  Not in itself, no.
12         Q.  So the mere possibility that contraband
13    can be removed or destroyed does not create an
14    emergency that would justify a warrantless entry onto
15    property; correct?
16              MS. JONES:  Objection.
17         A.  Correct.
18              THE VIDEOGRAPHER:  I'm coming up on that
19    30 minutes.  I'm just going to reset it now.
20              THE WITNESS:  Now is a good time to take a
21    break?
22              MR. SHIELDS:  Sure.
23              So we're off the record.
24         (The proceeding recessed at 10:45 a.m.)
25         (The proceeding reconvened at 10:48 a.m.;
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2            appearances as before noted.)
 3                 MR. SHIELDS:  Okay.  Back on the record.
 4     OFFICER JAVIER ALGARIN, resumes;
 5            CONTINUING EXAMINATION BY MR. SHIELDS:
 6            Q.  And, Officer Algarin, we just took a short
 7     break.  During that break, did you have an opportunity
 8     to speak with your attorney?
 9            A.  No.
10            Q.  Okay.  Are there any answers that you
11     already gave that you want to change after taking the
12     break?
13            A.  No.
14            Q.  Okay.  For exigent circumstances -- for
15     the exigent circumstances exception to apply, you must
16     reasonably believe that contraband is in the process
17     of being destroyed or removed or that the removal or
18     destruction of the contraband is imminent; correct?
19                 MS. JONES:  Objection.
20            A.  Correct.
21            Q.  And would you agree that exigent
22     circumstances justifying an immediate search may not
23     be present if police have a reasonable opportunity to
24     secure the residence to prevent destruction or removal
25     of contraband or evidence while a search warrant is
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    obtained?
 3              A.  Correct.
 4              Q.  And would you also agree that exigent
 5    circumstances justifying an immediate search may not
 6    be present if police have a reasonable opportunity to
 7    seek the owner's consent to enter and search the
 8    property?
 9              MS. JONES:  Objection.
10              A.  Correct.
11              Q.  And when considering exigency, the gravity
12    of the underlying offense is an important factor;
13    right?
14              A.  Say that one more --
15              Q.  When considering exigency, the gravity of
16    the underlying offense is an important factor; right?
17              MS. JONES:  Objection.
18              A.  Correct.
19              Q.  So like if someone's being assaulted,
20    that's a serious offense; right?
21              MS. JONES:  Objection.
22              A.  Correct.
23              Q.  And that would be more serious than, for
24    example, suspicion somebody had discarded marijuana;
25    correct?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3         A.   Both crimes, however one is a little
 4    higher than the other, yes.
 5         Q.   And so when you say "one is a little
 6    higher than the other," you mean preventing someone
 7    from being physically assaulted is a little higher or
 8    a more serious crime than marijuana possession.  Is
 9    that fair to -- is that a fair characterization of
10    your answer?
11         A.   Correct.
12         Q.   And would you agree that the alleged
13    presence of a gun or drugs does not create urgency,
14    justifying a warrantless entry onto property?
15                   MS. JONES:  Objection.
16         A.   One more time.
17         Q.   You would agree that the alleged presence
18    of a gun or drugs does not create urgency, justifying
19    a warrantless entry onto property; correct?
20                   MS. JONES:  Objection.
21         A.   Correct.
22         Q.   And would you agree that the fact that it
23    would take -- would have taken longer to walk to the
24    front door and ask for Mr. Dempsey's consent to enter
25    his yard does not create -- that's a bad question.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2   Let me withdraw that.
 3            Would you agree that the fact that it
 4   would have taken longer to walk to Mr. Dempsey's front
 5   door to ask for his consent to enter his yard, it
 6   would have taken longer to do that than just simply
 7   jumping the yard -- jumping into his yard, that
 8   doesn't in and of itself create an emergency; correct?
 9            MS. JONES:  Objection.
10        A.  Can you say the question one more time?
11        Q.  Yeah, that was a bad question.
12            Can we agree it would take about -- it
13   would have taken about 15 to 20 seconds to walk from
14   the backyard of 49 Kosciusko Street to the front door
15   of Mr. Dempsey's house at 53 Kosciusko Street?
16            MS. JONES:  Objection.
17        A.  Yeah.
18        Q.  And the fact that it would have taken 15
19   to 20 seconds to walk to his front door and ask for
20   his consent does not in and of itself create an
21   emergency; correct?
22            MS. JONES:  Objection.
23        A.  No.
24        Q.  By "no," do you mean correct that does not
25   create an emergency in and of itself?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2        A.  Correct.
 3        Q.  And is it important that police officers
 4   do not enter property unless there is an emergency,
 5   unless you have a warrant or consent?
 6        A.  Or hot pursuit under certain
 7   circumstances, yes.
 8        Q.  Hot pursuit under certain circumstances
 9   are only permitted if there's an emergency; correct?
10             MS. JONES:  Objection.
11        A.  Hot pursuit in an emergency?
12        Q.  Hot pursuit is a subset of the exigent
13   circumstances exception to the warrant requirement;
14   correct?
15        A.  Correct.
16        Q.  Hot pursuit therefore requires that there
17   be probable cause and an emergency; correct?
18             MS. JONES:  Objection.
19        A.  The emergency thing is what I'm getting
20   hung up on.
21        Q.  Hot pursuit in and of itself would be part
22   of the probable cause and emergency analysis; correct?
23        A.  Correct.
24        Q.  So therefore, for hot pursuit to apply,
25   you need probable cause and an emergency; correct?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   Correct.
 3         Q.   And if a police officer entered a property
 4    without a warrant, consent, or exigent circumstances,
 5    that would be wrong; correct?
 6              MS. JONES:  Objection.
 7         A.   Correct.
 8         Q.   That would be conduct that could put the
 9    public in danger?
10              MS. JONES:  Objection.
11         A.   Yeah.
12         Q.   That would be conduct that would be
13    reckless?
14              MS. JONES:  Objection.
15         A.   Yeah.
16         Q.   And assuming that an officer does
17    something they know is wrong, it would be fair to
18    refer to that conduct as willful misconduct; correct?
19              MS. JONES:  Objection.
20         A.   If an officer knowingly did something
21    reckless and broke the rules?
22         Q.   Correct.
23         A.   Correct.
24              MR. SHIELDS:  Okay.  So I want to play the
25    video on the television and ask some questions about
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2      that.  So this should be easy now that we've worked
3      out our tech issues, hopefully.
4                THE COURT REPORTER:  Ms. Jones, I will not
5      be taking down the audio from the video.
6                MS. JONES:  It sounds good.
7                Do you sometimes do that?
8                MR. SHIELDS:  You have to get paid extra
9      for that.
10          Q.  Okay.  Officer Algarin, before we start
11     the video, I have a few questions about what is being
12     displayed on the television screen right now that
13     we're looking at.  Okay?
14          A.  Okay.
15          Q.  My first question is:  What do the numbers
16     on the bottom right side indicate, where it says
17     883_816772?
18          A.  That is the body-worn camera specific ID,
19     the 883, to that specific camera.  The 816772 is my
20     specific employee ID.  Combine the two, you get the
21     camera and the employee.
22          Q.  So the 816772, is that your IDM number or
23     something else?
24          A.  That is my City of Rochester employee
25     number.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  Got it.
 3              And so looking at this screen, you
 4    recognize this as your body-worn camera; correct?
 5         A.  Correct.
 6         Q.  From -- and then the date displayed looks
 7    like it's 10/19/2018; is that correct?
 8         A.  Correct.
 9         Q.  And then next to that, is that military
10    time?
11         A.  Correct.
12         Q.  And military time says 17:07:17; is that
13    correct?
14         A.  Correct.
15              MS. JONES:  Elliot, can you help me out
16    and tell me what file name this is?
17              MR. SHIELDS:  The file number is -- of
18    the -- I will send this to you.
19              And, Kim, just for the record, can we mark
20    this as Plaintiffs' Exhibit A.
21              And I will email this to you, Ms. Jones,
22    after our deposition.
23              MS. JONES:  Sounds good.
24              (The following exhibit was marked for
25              identification:  Plaintiff EXH A.)
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   Okay.  So, Officer Algarin, one more
 3    question before we play the video.  Is this the -- do
 4    you recognize, just from looking at this video before
 5    we begin to play it, as depicting right now the
 6    backyard that you entered after you went up the
 7    driveway of 61 Kosciusko Street?
 8              MS. JONES:  Objection.
 9         A.   Correct.
10         Q.   And so that's what earlier we agreed was
11    the backyard of 57 Kosciusko Street?
12              MS. JONES:  Objection.
13         A.   Correct.
14         Q.   So now I'm just going to play the video,
15    and I just ask that you watch the video closely until
16    I pause.  Okay?
17              And I'm now hitting "Play."
18         (At this time the video was played.)
19              MR. SHIELDS:  So I'm going to pause it.
20    The time on the bottom right-hand corner of the video
21    is 17:08 and 30 seconds, and it looks like it's paused
22    at 1 minute and 12 seconds into the video.
23         Q.   Is that accurate, Officer Algarin?
24         A.   Correct.
25         Q.   And does your -- does watching that first
```



1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS

2    portion of the video refresh your recollection of

3    whether or not you believed one or both suspects had a

4    gun?

5          A.   I'm sorry.  What?

6          Q.   Does watching the video refresh your

7    recollection as to whether or not you believed that

8    one or both of the suspects may have had a gun?

9               MS. JONES:  Objection.

10         A.   Yes.

11         Q.   And what did you believe about whether or

12   not they had a gun?  Is that what you were looking for

13   in the backyard?

14         A.   I was looking for illegal contraband.

15         Q.   Okay.  And that portion of the video

16   showed you walking around the backyard for

17   approximately a minute and 10 seconds looking for

18   contraband before you exited the backyard of 53

19   Kosciusko Street; correct?

20              MS. JONES:  Objection.

21         A.   Following the line to the fence, that

22   could have been a flight path; ensuring that Horowitz

23   was okay with his detainee; questioning to make sure

24   that he was able to say that he did throw a gun, and

25   afterwards, checked on Officer Gorman and his



1           OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2    detainee.
3           Q.   And in that video, the suspect that
4    Officer Horowitz had detained in fact told you he did
5    not have a gun; correct?
6           A.   Correct.
7           Q.   And when you were searching the yard as
8    depicted in that first 1 minute and 12 seconds of the
9    video, you didn't find a gun or any other contraband;
10   correct?
11          A.   In that very brief moment in the yard, no.
12          Q.   And the entire yard was surrounded by a
13   fence; correct?
14          A.   Correct.
15          Q.   And the video depicted what you had
16   testified to earlier, that both of the suspects were
17   detained when you were having the conversation with
18   Officer Horowitz; correct?
19               MS. JONES:  Objection.
20          A.   Say it again.
21          Q.   The video -- the portion of the video that
22   we just watched depicted that both of the suspects had
23   been detained by Officer Horowitz and Officer Gorman
24   at the time that you were leaning on the fence and
25   having the conversation with Officer Gorman and his



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2   suspect about the gun; correct?
 3            MS. JONES:  Objection.
 4        A.  Officer Horowitz about the gun and his
 5   suspect.
 6        Q.  And at that time -- what I'm just getting
 7   at is both of those suspects were detained.  They were
 8   no longer running or fleeing; correct?
 9        A.  Correct.
10        Q.  And Officer Horowitz found marijuana on
11   the suspect that he detained; correct?
12        A.  Correct.
13            MR. SHIELDS:  Okay.  And now I'm going to
14   play the video again.  Okay?  And we are beginning the
15   video at the same spot where we had paused it, 1
16   minute and 12 seconds into the video, which is 17
17   hours, 8 minutes, and 30 seconds on the bottom
18   right-hand corner.
19            (At this time the video was played.)
20            MR. SHIELDS:  And I'm pausing the video
21   now at 2 minutes and 12 seconds into the video, and
22   that is also 17 hours, 9 minutes, and 29 seconds on
23   the bottom right.
24        Q.  Is that accurate, Officer Algarin?
25        A.  Correct.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  And previously, when I had begun playing
 3    the video, it was at 1 minute and 12 seconds into the
 4    video; is that right?
 5         A.  Correct.
 6         Q.  And that depicted you jumping into the
 7    backyard at 49 Kosciusko Street, where Officer Gorman
 8    was; correct?
 9         A.  Correct.
10         Q.  So you were in the backyard of 49
11    Kosciusko Street for approximately one minute;
12    correct?
13         A.  Correct.
14         Q.  And we agreed earlier that it would have
15    taken about 15 to 20 seconds to walk to the front door
16    of Mr. Dempsey's house; correct?
17              MS. JONES:  Objection.
18         A.  Correct.
19         Q.  So in the one minute that you were in the
20    backyard of 49 Kosciusko Street, you could have in a
21    shorter amount of time walked to the front door and
22    knocked on Mr. Dempsey's door and asked for his
23    consent to enter his yard; correct?
24              MS. JONES:  Objection.
25         A.  Correct.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  Does watching the video refresh your
 3    recollection at all about what was going through your
 4    head at the exact moment that you jumped the fence and
 5    entered Mr. Dempsey's yard?
 6         A.  Same as I stated before.
 7         Q.  And you stated before that you weren't
 8    thinking about anything; correct?
 9              MS. JONES:  Objection.
10         A.  Finding contraband.
11         Q.  And --
12         A.  And always thinking about rules.
13         Q.  I'm sorry.  Can you repeat the last thing
14    you just said?
15         A.  When we had the conversation, it was about
16    rules, and we had that whole thing about rules and
17    always thinking about following the rules, and then
18    finding contraband.
19         Q.  At the exact moment that you jumped the
20    fence, are you saying that you were thinking about any
21    specific rule?
22              MS. JONES:  Objection.
23         A.  No.
24         Q.  At the exact moment that you jumped the
25    fence, you were not thinking about any specific rule?
```



```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2         A.  No.
3         Q.  And we agreed before that the first time
4    you were in Mr. Dempsey's yard for approximately a
5    minute and 10 seconds you didn't not find a gun or
6    contraband; correct?
7         A.  Correct.
8         Q.  And from the neighboring yard, 49
9    Kosciusko Street, you could see over the fence into
10   the backyard; correct?
11        A.  Say that one more time.
12        Q.  From the neighboring yard where Officer
13   Gorman was, 49 Kosciusko Street, you could see over
14   the fence into the backyard of 53 Kosciusko Street;
15   correct?
16        A.  Correct.
17             MS. JONES:  One second.  Do you need to
18   move back over since the sun has moved?  I mean, you
19   don't have to.  I'm just -- because I hate being in
20   the sun.  Sorry.  If that's better.  Do what you want.
21             MR. SHIELDS:  Is that better light for
22   you, Ben?
23             THE VIDEOGRAPHER:  Yes.  Give me one
24   second.
25             MS. JONES:  And I'm keeping him on his
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    toes.
 3              THE VIDEOGRAPHER:  I'm good there.  Thank
 4    you.
 5         Q.  And prior to jumping the fence from 49
 6    Kosciusko Street into the yard at 53 Kosciusko Street,
 7    you did not observe a gun or any contraband on the
 8    ground by looking over the fence; correct?
 9         A.  Correct.
10         Q.  And prior to entering the yard from 49
11    Kosciusko Street into 53 Kosciusko Street, you did not
12    ask the suspect if he discarded any contraband in that
13    yard; correct?
14              MS. JONES:  Objection.
15         A.  Correct.
16         Q.  And you never saw the suspect discard any
17    contraband on the property; correct?
18              MS. JONES:  Objection.
19         A.  Correct.
20         Q.  And Gorman didn't tell you that he had
21    seen the suspect discard any contraband in the yard at
22    53 Kosciusko Street; correct?
23              MS. JONES:  Objection.
24         A.  Correct.
25         Q.  Gorman simply told you to backtrack
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     through the yard, and then you immediately jumped the
 3     fence; correct?
 4              MS. JONES:  Objection.
 5         A.  Correct.
 6         Q.  And you had no facts to support a
 7     reasonable belief that the suspect had discarded a gun
 8     in that yard; correct?
 9              MS. JONES:  Objection.
10         A.  Looking for contraband, not specifically a
11     gun.
12         Q.  Listen to my question and answer my
13     question, please.  You had no facts to support a
14     reasonable belief that the suspect had discarded a gun
15     in the yard; correct?
16              MS. JONES:  Objection.
17         A.  Specifically a gun, no.
18         Q.  And you had no facts to support a
19     reasonable belief that the suspect had discarded any
20     drugs in the yard; correct?
21              MS. JONES:  Objection.
22         A.  Other than that Officer Horowitz's
23     detainee had drugs on him.
24         Q.  So the answer is, no, you had no specific
25     facts to support a reasonable belief that the suspect
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     had discarded guns -- or drugs in that yard; correct?
 3                MS. JONES:  Objection.
 4            A.  Correct.
 5            Q.  And do you accept responsibility for
 6     entering Mr. Dempsey's backyard without a warrant?
 7                MS. JONES:  Objection.
 8            A.  Correct.
 9            Q.  So, yes, you do accept responsibility for
10     entering Mr. Dempsey's yard without a warrant?
11                MS. JONES:  Objection.
12            A.  Correct.
13            Q.  And do you accept responsibility for
14     entering Mr. Dempsey's backyard without his
15     permission?
16            A.  Correct.
17            Q.  And earlier we agreed that you could have
18     walked to his front door, and it would have only taken
19     15 to 20 seconds, and you could have asked his
20     permission to enter his yard; correct?
21                MS. JONES:  Objection.
22            A.  Correct.
23            Q.  And earlier you agreed that that's
24     important so that you could let him know what was
25     going on in his backyard; correct?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3              A.  That was the theoretical setting, not
 4    necessarily pertaining to Mr. Dempsey.
 5              Q.  Here it would have been important to go
 6    knock on his front door to tell him what was going on
 7    in his backyard; correct?
 8              A.  Correct.
 9              Q.  And would you agree that if there's one
10    more -- more than one choice, it's always best to make
11    the safest choice?
12                   MS. JONES:  Objection.
13              A.  No.
14              Q.  Okay.  When are you allowed to make an
15    unsafe choice?
16              A.  When I have to save someone's life.
17              Q.  Okay.  Other than instances where you have
18    to save someone's life, would you agree that if
19    there's more than one choice, it's always best to make
20    the safest choice?
21                   MS. JONES:  Objection.
22              A.  Correct.
23              Q.  Earlier you said that you made a plan with
24    Officers DiSabatino, Gorman, and Horowitz; right?
25              A.  Correct.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   And that plan was that you believed the
 3    suspects would run through the backyards of Kosciusko
 4    Street, into the yards of Sobieski Street?
 5         A.   Correct.
 6         Q.   And have you devised similar plans in the
 7    past before this incident?
 8         A.   I don't remember.
 9         Q.   So you might have, but you don't remember?
10         A.   I do not remember.
11         Q.   And is that a common police tactic?
12         A.   Which part?
13         Q.   Is it a common police tactic to make a
14    plan with other officers to detain suspects?
15         A.   Yes.
16         Q.   And is it a common plan with other -- I'm
17    sorry.  Withdrawn.
18              Is it a common tactic to make a plan with
19    other officers where you expect suspects to run and to
20    station officers in a location to detain them?
21         A.   Yes.
22         Q.   Is it common to chase suspects through
23    people's yards?
24         A.   Yes.
25         Q.   How often during a typical week would you
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    say you chase suspects through people's yards?
 3              A.   Possibly once a week.
 4              Q.   And you said possibly.  So sometimes more?
 5              A.   Yes.
 6              Q.   And when is the last time that you chased
 7    a suspect through someone's yard?
 8              A.   Saturday night.
 9              Q.   Tell me about that incident.
10              MS. JONES:  Objection.
11              A.   Individuals were in Greece, the Town of
12    Greece.  They're armed with a handgun.  They
13    approached an elderly couple with this gun.  They
14    pistol-whipped them, assaulted them.  A neighbor
15    attempted to intervene.  Those individuals then
16    assaulted him.
17                   After the assault, those same individuals
18    went to the elderly couple's home.  Within that home,
19    they did take their personal belongings.  One of them
20    car keys.  And then after taking the car keys, they
21    proceeded to take the car, which is a white Buick
22    Encore.
23                   Later on that night, myself and my partner
24    found that Encore.  The Encore came to a stop.  One of
25    the occupants proceeded to flee from that vehicle
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    which had led officers to several backyards.
 3              Q.  So you chased them through those
 4    backyards?
 5              MS. JONES:  Objection.
 6              A.  Chased the one through those backyards,
 7    correct.
 8              Q.  And you detained and arrested that person?
 9              A.  No.
10              Q.  They were able to get away?
11              A.  Yes.
12              Q.  Did you have to jump any fences when you
13    chased them through those yards?
14              A.  Yes.
15              Q.  Did you see any dogs when you went through
16    those backyards?
17              A.  No.
18              Q.  Have you previously encountered dogs in
19    other situations when you went through people's
20    backyards?
21              A.  Yes.
22              Q.  Or front yards?
23              A.  Yes.
24              THE VIDEOGRAPHER:  I'm going to refresh
25    this.  Okay?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                 MR. SHIELDS:  Yes.
 3                 THE VIDEOGRAPHER:  Okay.
 4                 MR. SHIELDS:  So now we're good for 30
 5    minutes?
 6                 THE VIDEOGRAPHER:  Yeah, we're good.  I've
 7    got it timed on here.
 8         Q.  On the date of the incident, as part of
 9    the plan that you made, did you consider what you
10    might do if you encountered a dog when you were
11    present in any of the yards?
12         A.  No.
13         Q.  And you previously stated that, as you've
14    gone through people's yards before, you have
15    encountered dogs; correct?
16         A.  Correct.
17         Q.  Lots of people in the city of Rochester
18    have dogs; correct?
19                 MS. JONES:  Objection.
20         A.  There's a large amount of dogs in the city
21    of Rochester, yes.
22         Q.  And can you estimate the percentage of
23    properties that you would say, in your experience as a
24    police officer, have dogs?
25                 MS. JONES:  Objection.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  I don't know for certain.  I'd like to say
 3    approximately 60, 65 percent.
 4         Q.  And we agreed earlier that the backyard of
 5    49 Kosciusko Street had a big dog cage; right?
 6         A.  Correct.
 7         Q.  And so that would indicate that a dog
 8    resided at 49 Kosciusko Street; right?
 9              MS. JONES:  Objection.
10         A.  A possibility of there being a dog at 49
11    Kosciusko Street.
12         Q.  And, obviously, there was a dog that
13    resided at 53 Kosciusko Street; right?
14         A.  Correct.
15         Q.  So it's fair to say that if you're in
16    someone's yard, because in your experience 60 to 65
17    percent of the households in Rochester have dogs,
18    you're more likely than not to be in someone's yard
19    that has a dog; correct?
20              MS. JONES:  Objection.
21         A.  Correct.
22         Q.  So that means that it's likely that you'll
23    encounter a dog if you're in someone's yard; correct?
24              MS. JONES:  Objection.
25         A.  No.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  Okay.  It's likely that if you enter a
 3    yard that a dog might live there; correct?
 4              MS. JONES:  Objection.
 5         A.  Correct.
 6         Q.  So it's possible that you would encounter
 7    a dog on that property; correct?
 8              MS. JONES:  Objection.
 9         A.  It's possible.
10         Q.  So on this day, you knew that it was
11    possible that you might encounter a dog; correct?
12              MS. JONES:  Objection.
13         A.  Correct.
14         Q.  And when a dog sees a stranger, often the
15    dog runs up to that person; correct?
16              MS. JONES:  Objection.
17         A.  No.  It can.
18         Q.  Some dogs run up to strangers that they
19    don't know on their property; correct?
20         A.  Correct.
21         Q.  And that's not necessarily indicative of a
22    dog attacking; correct?
23              MS. JONES:  Objection.
24         A.  Not always.
25         Q.  How many times before this incident had
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     you encountered a dog during your duties as a police
 3     officer?
 4          A.   Several times.
 5          Q.   Had you ever previously shot a dog?
 6          A.   No.
 7          Q.   Had you ever previously -- withdrawn.
 8               Have you ever been attacked by a dog other
 9     than -- other than this incident, and not saying that
10     you were attacked in this incident, just at any other
11     time have you been attacked by a dog either as a
12     police officer or as a civilian?
13               MS. JONES:  Objection.
14          A.   I'm trying to think.
15               Yes, when I was younger, my dog.
16          Q.   I'm sorry.  I didn't hear everything you
17     said.  You said when you were younger, you were
18     attacked by a dog?
19          A.   Yeah, my dog.
20          Q.   You were attacked by your dog when you
21     were younger?
22          A.   Yeah.
23          Q.   And were you injured?
24          A.   No.  Seriously injured, no.
25          Q.   And what happened during that attack?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2          A.   He bit me.
 3          Q.   But you were okay?
 4          A.   Yes.
 5          Q.   And how old were you?
 6          A.   I don't know.  Maybe 5.
 7          Q.   And what did you do to the dog after it
 8   bit you?
 9          A.   Me, nothing.
10          Q.   Did your parents or anybody else
11   discipline the dog for biting you?
12          A.   I do not know.
13          Q.   Did you continue to live with that dog
14   after that incident?
15          A.   No.
16          Q.   What happened after that incident?
17          A.   That, I don't know.  It's a question till
18   this day.
19          Q.   Was it your family dog?
20          A.   Yes.
21          Q.   So is it fair to say that your family got
22   rid of that dog after that incident?
23               MS. JONES:  Objection.
24          A.   That's what I'm assuming happened.
25          Q.   All right.  So earlier you said that you
```



```
 1                OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    didn't make any plan for what you would do if you
 3    encountered a dog on that day; correct?
 4           A.   Correct.
 5           Q.   And you earlier testified that you had
 6    recently finished your academy training; correct?
 7                MS. JONES:  Objection.
 8           A.   My field training training.
 9           Q.   You had recently finished your training;
10    correct?
11           A.   Field training.
12                MS. JONES:  Objection.
13           Q.   And immediately before field training is
14    your academy training; right?
15           A.   Correct, in March.
16           Q.   So you finished your academy training in
17    March, and then you did your field training from March
18    till -- did you say July?
19           A.   Yes.
20           Q.   So you recently just had gotten about 13
21    months of training with the RPD.  Is that fair to say?
22                MS. JONES:  Objection.
23           A.   No.
24           Q.   How long is your academy training?
25           A.   Six months.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  Okay.  And then field training is four
 3    months?
 4         A.  Correct.
 5         Q.  So ten months of training?
 6         A.  Correct.
 7         Q.  And then after that ten months of
 8    training, you've been an officer between July and
 9    October; correct?
10         A.  Correct.
11         Q.  And at the academy, did they train you to
12    make a plan for how to safely interact with a dog when
13    you entered a residential property?
14         A.  There was a class, interaction with dogs.
15         Q.  How long was that class?
16         A.  I don't remember.  Possibly half a day.
17         Q.  Okay.  Tell me everything you remember
18    about that class.
19         A.  It was through the Humane Society coming
20    into the classroom, basically, to state what the --
21    what their purpose is, where they're located, how to
22    get in contact with them, what they deal with, and
23    their experiences, what they have dealt with, and
24    their dog interactions of what they do and tactics
25    they might use, what -- where it could be they use a
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    baton or they use some other instrument.
 3              Q.  So you were trained to potentially use a
 4    baton or some other instrument in part of that
 5    training.  Is that what you're saying?
 6              A.  Correct.
 7              Q.  And do you remember how long that training
 8    lasted on that day?
 9              A.  Half a day.  So approximately three, four
10    hours.
11              Q.  Okay.  And did you -- did they teach you
12    that you could use OC spray or pepper spray with the
13    dog?
14              A.  No.
15              Q.  Okay.  So that wasn't part of that class?
16              A.  Not that I remember.
17              Q.  Okay.  And did you get any handouts when
18    you took that class?
19              A.  I don't remember.
20              Q.  Do you have any documents in your
21    possession, either at RPD or at home, relating to that
22    class?
23              A.  No.
24              Q.  At the academy, were you trained that you
25    could shoot a dog if it ran at you when you were on a
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2      residential property?
 3              MS. JONES:  Objection.
 4         A.  We were trained to protect ourselves from
 5      imminent threat.
 6         Q.  Okay.  And were you taught that if a dog
 7      is running at you without anything else that that
 8      constitutes an imminent threat?
 9         A.  No.
10         Q.  Okay.  What is generally the definition of
11      an "imminent threat"?
12         A.  A threat they believe is going to
13      seriously injure and/or kill you.
14         Q.  Okay.  Are you aware of any officer ever
15      sustaining serious injuries or death as a result of a
16      dog attack?
17              MS. JONES:  Objection.
18         A.  Officer?  No.
19         Q.  Were you trained at the academy or during
20      field training that any officer had ever been -- any
21      RPD officer had ever sustained serious injuries or
22      died as a result of a dog attack?
23         A.  Not that I'm aware of.
24         Q.  Okay.  So you were never trained that a
25      dog running at you posed an imminent threat?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  Say that again.
 3         Q.  You were never trained that a dog running
 4   at you in and of itself constitutes an imminent
 5   threat?
 6              MS. JONES:  Objection.
 7         A.  No.
 8         Q.  As part of your training, were you told
 9   that you were allowed to shoot dogs?
10         A.  Under circumstances, yes.
11         Q.  Those circumstances would be if they posed
12   an imminent threat?
13         A.  Correct.
14         Q.  But you were also told that there's never
15   been a circumstance in the history of the RPD where a
16   dog had seriously injured or killed an officer;
17   correct?
18         A.  Incorrect.
19              MS. JONES:  Objection.
20         A.  That's not what I said.
21         Q.  Okay.
22         A.  I said none that I was aware of.
23         Q.  Okay.  So you don't remember at all, as
24   part of your training, ever learning that a dog had
25   seriously injured or killed an officer; correct?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3         A.   Correct, not that I'm aware of.  It wasn't
 4    specifically stated that no one has ever been injured
 5    by a dog in RPD.
 6         Q.   Were you trained that a dog could pose an
 7    imminent threat?
 8         A.   Yes.
 9         Q.   Okay.  And under those circumstances, you
10    were trained to shoot and kill the dog?
11         A.   If necessary.
12         Q.   Okay.  And sometimes it might not be
13    necessary?
14         A.   Correct.
15         Q.   Okay.  And sometimes you could use a baton
16    or pepper spray instead?
17         A.   A baton.  Never said pepper spray.
18         Q.   Okay.  So just a baton.
19              Were you trained that you could maybe kick
20    the dog?
21         A.   Yeah.
22         Q.   No?
23         A.   I said, "Yeah."
24         Q.   Oh, you said yes.  So you were trained
25    that you could use a baton or you could kick the dog?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  (The witness indicated nonverbally.)
 3         Q.  And was that part of your Human Society
 4    training or something else?
 5         A.  I don't remember.
 6         Q.  Was that at the academy or something else?
 7         A.  Academy.
 8         Q.  And aside from the Humane Society
 9    training, do you remember any other training about
10    dealing with dogs during your police duties?
11         A.  I'm sorry.  Say it one more time.
12         Q.  Other than the Humane Society training,
13    when you were at the police academy, was there any
14    additional training about dog interactions?
15         A.  Yes, aggressive dog, to be able to fire
16    upon an aggressive dog if need be.
17         Q.  Was that part of your firearms training?
18         A.  Correct.
19         Q.  Okay.  So you've got Humane Society
20    training dealing with dogs and you've got firearms
21    training relating to dogs.  Is that accurate?
22         A.  Correct.
23         Q.  Anything else at the academy?
24         A.  Not that I remember.
25         Q.  Okay.  Any training after the academy
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2    before this incident specifically relating to
3    interactions with dogs?
4          A.  Not that I remember.
5          Q.  So before this incident, the only training
6    that you had gotten about interacting with dogs was
7    the Humane Society training and the firearms training.
8    Is that fair to say?
9          MS. JONES:  Objection to form.
10         A.  That I remember, yes.
11         Q.  And in the Humane Society training, did
12   they tell you that in certain circumstances you're
13   allowed to shoot a dog?
14         A.  I do not remember.
15         Q.  Tell me anything else you remember about
16   that Humane Society training.
17         A.  I've stated it.
18         Q.  So you've told me everything that you
19   remember about the Humane Society training?
20         A.  That I remember from six years ago, five
21   years ago, correct.
22         Q.  Okay.  And since that time, five or six
23   years ago at the academy, have you gotten any other
24   training about safely interacting with dogs during
25   your police duties?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   No.
 3         Q.   So in the past six years, you've gotten no
 4    training about interacting with dogs?
 5         A.   Correct.
 6         Q.   And as part of your training, would it be
 7    accurate to say that you were never told that you
 8    aren't allowed to shoot a dog?
 9         A.   I'm sorry?
10         Q.   As part of your training, were you ever
11    told that you are not allowed to shoot a dog?
12         A.   No.
13         Q.   And as part of your training, were you
14    ever trained on the use of force continuum applied to
15    dogs?
16         A.   Use of force continuum applied to dogs?
17         Q.   Correct.
18         A.   No.
19         Q.   And at the academy, were you provided any
20    training about how to avoid shooting a dog?
21         A.   I do not remember.
22         Q.   So you don't remember any specific
23    training about situations that you might encounter a
24    dog and how to make sure you don't shoot the dog?
25         A.   Well, not every encounter is a --
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  I'm sorry?
 3         A.  Not every encounter is a shoot situation.
 4         Q.  Some encounters might be a shoot
 5    situation; right?
 6         A.  Correct.
 7         Q.  Some encounters might be on the line --
 8              MS. JONES:  Objection.
 9         Q.  -- correct?
10         A.  That's a hard question to answer.
11         Q.  As a police officer, you have to make
12    quick decisions under stressful circumstances.  That's
13    fair to say?
14         A.  Yes.
15         Q.  And some of those quick decisions and
16    stressful circumstances could involve whether or not
17    you have to shoot a dog; correct?
18              MS. JONES:  Objection.
19         A.  Yes.
20         Q.  As part of your training, did you ever
21    have any training about a quick decision you might
22    have to make under stressful circumstances involving a
23    dog specifically related to avoiding shooting a dog?
24         A.  Not that I remember.
25         Q.  Okay.  So that might be something like --
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     let's say, at the academy, was there simulation
 3     training?
 4              A.  Yes.
 5              Q.  At the academy, was there any simulation
 6     training involving dogs?
 7              A.  Yes.
 8              Q.  Tell me about that simulation training
 9     involving dogs.
10              A.  It's simply a decoy of sorts that traveled
11     left to right with a simulation firearm trying to hit
12     a moving target.
13              Q.  And when you say "a decoy" --
14              A.  Or just an object to shoot at the --
15     that's supposed to represent an aggressive dog that
16     could be coming to do harm to you.
17              Q.  Okay.  So the object of that training was
18     about shooting accuracy.  Is that fair to say?
19              MS. JONES:  Objection.
20              A.  Correct.
21              Q.  And just so we have it clear for the
22     record without the objection, the object of that
23     training was about shooting accuracy; correct?
24              MS. JONES:  Objection.
25              A.  Correct.
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2       Q.  And so the object of that training was not
 3   about avoiding shooting a dog; correct?
 4            MS. JONES:  Objection.
 5       A.  Correct.
 6       Q.  The object of that training was not other
 7   less lethal options that you could consider to avoid
 8   shooting the dog; correct?
 9            MS. JONES:  Objection.
10       A.  Correct.
11            MS. JONES:  Can you give me one second to
12   step outside with my client?
13            MR. SHIELDS:  Sure.  I have to use the
14   bathroom, so...
15            MS. JONES:  Can we go off the record?
16            MR. SHIELDS:  Off the record.
17        (The proceeding recessed at 11:36 a.m.)
18        (The proceeding reconvened at 11:44 a.m.;
19         appearances as before noted.)
20            MR. SHIELDS:  We're back on the record.
21   OFFICER JAVIER ALGARIN, resumes;
22            CONTINUING EXAMINATION BY MR. SHIELDS:
23       Q.  And, Officer Algarin, we just took another
24   short break.  The same question as before.  Did you
25   have an opportunity to speak with your attorney during
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS

2     the break?

3              A.  Yes.

4              Q.  And are there any questions, after

5     speaking to your attorney, that you would like to

6     change any answers to?

7              A.  No.

8              Q.  Okay.

9              MS. JONES:  Before we move any further,

10    can we put the statements that go on the record after

11    the breaks because we're video recording it?

12             MR. SHIELDS:  And the statement that we're

13    going to put on the record is that we were off the

14    record for a certain amount of time and now we're back

15    on the record?

16             MS. JONES:  It's the date, time, place of

17    the deposition, videographer's name, deponent's name,

18    the time that we're starting.

19             MR. SHIELDS:  And we did that at the

20    beginning of the recording.

21             MS. JONES:  Yeah, but aren't we supposed

22    to do that after every break?

23             MR. SHIELDS:  I don't believe so.

24             THE COURT REPORTER:  Can we go off for a

25    second?



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MR. SHIELDS: Yes.
 3                   MS. JONES:  Sure.
 4              (There was a discussion off the record.)
 5                   MR. SHIELDS:  So let's go back on the
 6      record.
 7                   Okay.  So now we are back on the record.
 8      The time is 11:46 a.m., and we have been on the record
 9      for a total of 1 hour and 48 minutes up to this point.
10         Q.  Okay.  And, Officer Algarin, just for the
11      record, the same questions from before.  You had said
12      that during our break you had an opportunity to speak
13      with your attorney but you don't have any answers that
14      you want to change; correct?
15         A.  Correct.
16         Q.  And at the academy, were you provided any
17      other training about how to safely interact with dogs
18      encountered during your police work?
19         A.  Outside of what we've discussed, I don't
20      remember.
21         Q.  So my question was were you provided any
22      other training other than what you remembered about
23      how to safely interact with dogs at the academy.  So
24      the answer is "no"?
25         A.  I don't remember.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MR. SHIELDS:  Okay.  So what I'm going to
 3      do is play the remainder of the video in one second.
 4                   And the time on the video -- into the
 5      video is 2 minutes and 12 seconds, and the bottom
 6      right, it's -- military time is 17:09 and 29 seconds.
 7              Q.  And previously we had paused right at the
 8      moment where you were jumping the fence from 49
 9      Kosciusko Street into the backyard of 53 Kosciusko
10      Street.  Is that correct, Officer Algarin?
11              A.  Correct.
12                   MR. SHIELDS:  And we're hitting "Play"
13      now.
14                   I thought I was.
15              (At this time the video is played.)
16              Q.  Officer Algarin, you have a dog named
17      Hudson; right?
18                   MS. JONES:  Objection.
19              A.  I do have a dog now in my personal life.
20              Q.  You own a dog in your personal life, and
21      the dog's name is Hudson; right?
22                   THE WITNESS:  Is this something we have to
23      talk about?
24                   MS. JONES:  Yeah, what's the relevance of
25      this?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   Objection.
 3                   MR. SHIELDS:  Are you directing your
 4     officer not to answer?
 5                   MS. JONES:  Why are we talking about his
 6     personal life?
 7          Q.   Okay.  You can answer the question,
 8     please, Officer Algarin.
 9                   MS. JONES:  Can you repeat the question
10     for me?
11          Q.   You have a dog named Hudson -- you own a
12     dog named Hudson; correct?
13                   MS. JONES:  Yeah, I'm objecting.
14          Q.   Okay.  And you can answer.
15          A.   I'm not going to answer.
16          Q.   You have to answer the question.  You own
17     a dog in your personal capacity; correct?
18                   THE WITNESS:  Is this something I have to
19     answer?
20                   MS. JONES:  Give me one second.  Can we
21     circle back to this?
22                   MR. SHIELDS:  No, we can't.
23                   MS. JONES:  Okay.  Then just give us a
24     second.
25                   MR. SHIELDS:  Are you directing your
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    officer not to answer?
 3              MS. JONES:  I'm just going to confer
 4    with --
 5              MR. SHIELDS:  Okay.  No, that's not okay.
 6         Q.  Can you please answer my question?
 7              MS. JONES:  Can we take a break?
 8              MR. SHIELDS:  You want to go off the
 9    record?
10              Okay.  The time is currently -- can you do
11    it, Ben?
12              THE VIDEOGRAPHER:  Yep.
13              We're going off the record.  The time is
14    11:50.
15         (The proceeding recessed at 11:50 a.m.)
16         (The proceeding reconvened at 11:54 a.m.;
17         appearances as before noted.)
18              THE VIDEOGRAPHER:  We're going back on the
19    record.  The time is now 11:54 a.m.
20              MS. JONES:  I appreciate -- sorry.  One
21    more thing.  I appreciate you giving the time, but I
22    am still objecting to the appropriateness of these
23    videos because there's still more information we're
24    supposed to put on the record here.
25              I don't feel like it's my responsibility
```



```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2     to tell you all of that again, but just so that we
3     know, we're not complying with 30(b)(5)(b).
4              We can continue.
5              MR. SHIELDS:  Okay.  So why don't you
6     explain what you think 35(b), that rule requires us to
7     do every time.  Do you want us all to state our names
8     right now?
9              MS. JONES:  No.  The videographer just has
10    to say his name, his business address, the date, time,
11    and place of the deposition, and the deponent's name.
12             MR. SHIELDS:  At the beginning of the
13    deposition.
14             MS. JONES:  At the beginning of every time
15    we come back on the record.
16             MR. SHIELDS:  Okay.  Ben, can you please
17    state all of those things?
18             THE VIDEOGRAPHER:  Yep.
19             MS. JONES:  Your name and business, date,
20    time, place of the deposition, deponent's name.
21             THE VIDEOGRAPHER:  My name is Ben Parrow.
22    I represent Studio 80 ROC.  Today's date is July 15,
23    2022.  Business address:  277 North Goodman Street,
24    Apartment 437, Rochester, New York 14607.
25             I'm here at the deposition of Charles M.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2   Dempsey against the City of Rochester et al., Case No.
 3   19-cv-6780.
 4              MR. SHIELDS:  And did you say the address?
 5              THE VIDEOGRAPHER:  Yeah.  My business
 6   address, yes.
 7              MR. SHIELDS:  And the place of the
 8   deposition?
 9              THE VIDEOGRAPHER:  I did not say that.
10              MR. SHIELDS:  16 West Main Street --
11              THE VIDEOGRAPHER:  Oh, 16 West Main
12   Street, Rochester, New York.
13         Q.  And, Officer Algarin, we just took a short
14   break.  Did you have time to talk with your attorney
15   during that break?
16         A.  I did.
17         Q.  And is there any answers to any questions
18   that you would like to change?
19         A.  No.
20         Q.  Okay.  So I'm going to play the video
21   again for you.  Okay?  I ask that you look at the
22   screen and watch the video closely.  Okay?
23              MR. SHIELDS:  For the record, I'm
24   beginning the video from the same spot that I had
25   previously started it, which was 2 minutes and 12
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2   seconds into the video, and military time of 17 hours,
 3   9 minutes, and 29 seconds.
 4         Q.  Is that accurate, Officer Algarin?
 5         A.  Yes.
 6         (At this time the video is played.)
 7         Q.  Officer Algarin, do you own a dog?
 8         A.  I do.
 9         Q.  Is that dog's name Hudson?
10         A.  It is.
11         Q.  How would you feel if a police officer
12   shot and killed Hudson right in front of you in your
13   yard?
14              MS. JONES:  Objection.
15         A.  I would be upset.
16         Q.  And you explained in the "Why I wear the
17   badge" video that you rescued Hudson on a winter day
18   underneath a storage unit; is that right?
19         A.  That's correct.
20         Q.  And when did you rescue Hudson?
21         A.  The end of November 2018.
22         Q.  So approximately a month after this
23   incident happened; is that correct?
24         A.  Correct.
25         Q.  And you love your dog Hudson.  Is that
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    fair to say?
 3                MS. JONES:  Objection.
 4         A.  Yes.
 5         Q.  And in the video you explain that Hudson
 6    is one of your best friends; is that correct?
 7         A.  Yes.
 8         Q.  And you love Hudson like a member of your
 9    family.  Is that fair to say?
10                MS. JONES:  Objection.
11         A.  Yes.
12         Q.  You consider him to be a member of your
13    family?
14         A.  I consider him to be a pet.  My dog.
15         Q.  You consider him to be more than just a
16    piece of property?
17         A.  Yes.
18         Q.  And tell me all of the things that you
19    love about Hudson.
20                MS. JONES:  Objection.
21         A.  I'm sorry.  What?
22         Q.  Tell me all of the things that you love
23    about Hudson.
24         A.  He's a good boy.
25         Q.  Do you like playing with him?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2       A.   I do.
 3       Q.   Do you take him on walks?
 4       A.   I do.
 5            MS. JONES:  Objection.
 6       Q.   Play fetch with him?
 7            MS. JONES:  Objection.
 8            Why are we talking about his personal
 9  life, Elliot?
10       Q.   You can answer the question.
11            MS. JONES:  Why are we talking about his
12  personal life?
13            MR. SHIELDS:  Would you stop making
14  speaking objections on the record.
15            MS. JONES:  Okay.
16       Q.   Officer Algarin, can you please answer the
17  question?
18       A.   What was your question?
19       Q.   My question was tell me all of the things
20  that you like to do with your dog Hudson?
21            MS. JONES:  Objection.
22       A.   That wasn't the last thing you said.
23       Q.   Okay.  Well, that's my -- I'll withdraw my
24  prior question, and my new question is, tell me all of
25  the things that you like to do with your dog Hudson.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2              MS. JONES:  Yeah, I'm instructing him not
 3     to answer.  We don't need to talk about his personal
 4     life.
 5              MR. SHIELDS:  Okay.  You're directing the
 6     witness not to answer the question.
 7              MS. JONES:  Yeah, we can move along.
 8         Q.  And previously you said that you love
 9     Hudson like he's a member of your family; correct?
10         A.  He's my dog, yes.
11         Q.  And you love Hudson, your dog; right?
12         A.  Yes.
13         Q.  And do you think Mr. Dempsey felt the same
14     way about Tesla?
15         A.  I don't know.
16         Q.  From watching the video, do you think that
17     Mr. Dempsey loved his dog, Tesla?
18         A.  I don't know.
19         Q.  Is Mr. Dempsey upset in the video?
20         A.  Yes.
21         Q.  Did he say, "Why did you do that?"
22         A.  Yes.
23         Q.  Did you say, "You would have been fine?"
24         A.  Yes.
25         Q.  And you said that you had one dog when you
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    were a young child.  Did you have any other dogs other
 3    than the dog you talked about earlier when you were a
 4    kid?
 5              A.  Yes.
 6              Q.  How many dogs have you owned in your
 7    lifetime?
 8              A.  More than seven.
 9              Q.  So you're familiar with dogs.  Is that
10    fair to say?
11              A.  Yes.
12              Q.  Were they all the same breed of dog or
13    different breeds of dogs?
14              A.  Different.
15              Q.  So throughout your lifetime, you've had a
16    lot of interactions with different kinds of dogs that
17    you have owned.  Is that fair to say?
18              A.  Correct.
19              Q.  And to the extent that you remember, what
20    different breeds of dogs have you owned in your
21    lifetime?
22              A.  A Rottweiler, a Chihuahua, a
23    Bichon-Chihuahua mix, a Chihuahua mutt, a Pomeranian,
24    a Miniature Poodle, a Pit Bull, a French Brittany, a
25    Beagle.  And that's all I can remember.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   And those, in my count, were nine
 3    different types of dogs.  Does that sound right to
 4    you?
 5         A.   If that's what you counted.
 6         Q.   And what kind of dog is Hudson?
 7         A.   He's a Pit Bull.
 8         Q.   And do you have any other dogs, or just
 9    Hudson right now?
10         A.   I have two other dogs.
11         Q.   So you own three dogs right now?
12         A.   Correct.
13         Q.   And what are the breeds of those two other
14    dogs?
15         A.   A French Brittany and a Beagle.
16         Q.   And if someone shot and killed either one
17    of those other dogs, do you think you would be
18    similarly upset to how Mr. Dempsey was in this video?
19         A.   I would be upset, yes.
20         Q.   And if they -- if it was a police officer
21    that had entered your yard and shot one of your dogs
22    in front of you, do you think you would be similarly
23    upset to how Mr. Dempsey was in this video?
24         A.   I would be upset, yes.
25         Q.   Do you think you would react similarly as
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    to how Mr. Dempsey reacted in this video if a police
 3    officer shot and killed your dog in front of you?
 4              MS. JONES:  Objection.
 5         A.  I don't know.
 6         Q.  So you're not sure how you would react in
 7    the moment.  Is that fair to say what your answer was?
 8         A.  Sure.
 9         Q.  And do you think that Mr. Dempsey's
10    daughter loved her dog?
11         A.  I don't know.
12         Q.  When you were a child and you owned dogs,
13    did you love those dogs?
14         A.  Yes.
15         Q.  And if someone shot and killed your dog in
16    front of you when you were a child, would you have
17    been upset?
18         A.  Yes.
19         Q.  Do you think this case is frivolous?
20              MS. JONES:  Objection.
21         A.  Define the word, please.
22         Q.  Define the word "frivolous"?
23         A.  Yes.
24         Q.  Meritless.  Do you think this case is
25    meritless?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  In what way?
 3         Q.  Do you think this case is meritless?  Do
 4    you think it lacks any legal merit?
 5         A.  Your case or our case?
 6         Q.  Do you think that Mr. Dempsey and his
 7    daughter's allegations against you are frivolous?
 8         A.  Yes.
 9         Q.  Why?
10         A.  Because there was an aggressive dog that
11    was coming to attack me.
12         Q.  You felt like you were being attacked --
13         A.  Yes.
14         Q.  -- in the moment?
15              Can you point to anything that Mr. Dempsey
16    did wrong?
17         A.  What do you mean?
18         Q.  Can you point to anything that Mr. Dempsey
19    did wrong in this situation?
20         A.  Did wrong?
21         Q.  Is Mr. Dempsey at fault in any way for
22    what happened?
23         A.  No.
24         Q.  Do you take personal responsibility for
25    shooting and killing Tesla?
```



ALLIANCE
COURT REPORTING, INC.

Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3         A.   One more time.
 4         Q.   Do you take personal responsibility for
 5    shooting and killing Tesla?
 6         A.   I pulled the trigger, so yes.
 7         Q.   Do you think the city should have provided
 8    you with better training so you could have avoided
 9    shooting and killing Tesla?
10                   MS. JONES:  Objection.
11         A.   I don't know.
12         Q.   Why did this incident happen?
13         A.   Bad circumstances.
14         Q.   And can you describe in detail what you
15    mean by "bad circumstances"?
16         A.   I was in a bad place at a bad time.  Tesla
17    was let out in a bad place at a bad time.
18         Q.   You were in a bad place and bad time is
19    the first thing you said; correct?
20         A.   Yes.
21         Q.   And what do you mean by that?
22         A.   I was in a place where Tesla was going to
23    reach me.
24         Q.   And you didn't have to be in that place at
25    that time; correct?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3         A.  I was in that place at that time.
 4         Q.  And that was your choice to be in that
 5    place at that time; correct?
 6                   MS. JONES:  Objection.
 7         A.  Yes.
 8         Q.  And you could have chosen to instead, as
 9    we have discussed earlier, walked to the front door
10    and asked for Mr. Dempsey's consent to enter his yard;
11    correct?
12         A.  Yes.
13         Q.  And you said earlier that it would be
14    important to knock on his door and tell him what was
15    going on in his backyard; correct?
16                   MS. JONES:  Objection.
17         A.  No.
18         Q.  Okay.  Do you think it might have been
19    important to knock on his front door and tell him what
20    was going on in his backyard prior to entering his
21    backyard?
22         A.  Yes.
23         Q.  And why would that have been important?
24         A.  To let him know what's going on.
25         Q.  For his safety?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   Yeah.
 3         Q.   For the safety of his daughter?
 4         A.   Yes.
 5         Q.   For the safety of his dog?
 6         A.   Yes.
 7         Q.   Because it can be dangerous if a police
 8    officer who is armed with a gun enters your yard and
 9    gets scared and fires his weapon; correct?
10              MS. JONES:  Objection.
11         A.   Say that one more time.
12         Q.   It can be dangerous when a police
13    officer's armed with a gun, is on someone's property,
14    because if they get scared, they might fire their gun;
15    correct?
16              MS. JONES:  Objection.
17         A.   No.
18         Q.   Can you explain why you say "no"?
19         A.   "Officer scared, might fire his weapon"
20    portion of it.
21         Q.   Were you scared when -- in this situation?
22         A.   I was definitely worried that the dog was
23    going to bite me, attack me.
24         Q.   Did you -- were you in fear that you might
25    suffer a serious injury or death?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2          A.   Yes.
 3          Q.   Okay.  Do you think that fear was
 4     reasonable?
 5          A.   Yes.
 6          Q.   Okay.  Why do you think that fear was
 7     reasonable?
 8          A.   Because I had a large dog coming at me at
 9     a high rate of speed, barking aggressively, not
10     stopping.
11          Q.   And everything that happened was
12     consistent with your training; correct?
13               MS. JONES:  Objection.
14          A.   Correct.
15          Q.   The entry into the yard was consistent
16     with your training?
17          A.   Backtracking, yes.
18          Q.   You were trained to backtrack?
19          A.   Yes.
20          Q.   When were you trained to backtrack?
21          A.   I don't remember.
22          Q.   Were you trained to backtrack during the
23     academy?
24          A.   I don't remember.
25          Q.   Were you trained to backtrack during your
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     field training?
 3              MS. JONES:  Objection.
 4         Q.  Were you -- I'm sorry.  I missed your
 5     answer because of the objection that I didn't
 6     understand.  Were you trained to backtrack during your
 7     field training?
 8              MS. JONES:  Objection.
 9         A.  Yes.
10         Q.  Had you previously entered yards during
11     your field training to backtrack under similar
12     circumstances?
13         A.  Yes.
14         Q.  Okay.  And those "similar circumstances,"
15     by what I mean is after a foot chase where suspects
16     were detained, you had then gone back into a different
17     property and searched it to backtrack.  Is that
18     accurate?
19         A.  I don't remember --
20         Q.  Okay.
21         A.  -- those specifics.
22         Q.  Okay.  Can you explain generally what
23     "backtracking" means?
24         A.  Taking the flight path of a suspect to see
25     if he had discarded any contraband.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2            Q.  And is it common to backtrack?
 3            A.  Yes.
 4            Q.  Is it common to backtrack through
 5      residential properties?
 6            A.  Yes.
 7            Q.  Is it common to backtrack through
 8      residential properties without seeking the property
 9      owner's consent?
10            A.  Yes.
11            Q.  And is it common to backtrack through
12      backyards where you have to jump fence?
13            A.  Yes.
14            Q.  And how often, in your duties as a police
15      officer, on a weekly basis would you say that you
16      backtrack through residential properties with fences?
17            A.  As many times as somebody runs on foot,
18      which was, I believe I said, once a week.
19            Q.  So on average, would you say it's about
20      once a week?
21            A.  Yes.
22            Q.  Since you've started your field
23      training -- about once a week from when you started
24      field training to today.  Would that be accurate?
25                 MS. JONES:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   I don't know exactly.  Once a week.
 3         Q.   Approximately?
 4         A.   Approximately.
 5         Q.   We're just asking for your estimate.  You
 6    said approximately once a week.  Is that accurate?
 7         A.   From my FTO days to now?
 8         Q.   Yes.
 9         A.   If you want to do ratios and numbers and
10    fractions, you could say once every three weeks.
11         Q.   So I guess what I was really thinking
12    of was -- your assignments have changed since you were
13    an FTO.  Is that fair to say?  You were assigned to
14    the Lake section when you were an FTO; is that right?
15         A.   Are you saying from FTO to now?
16         Q.   Correct.
17         A.   Since I completed FTO?
18         Q.   Yes.
19         A.   Then yes.
20         Q.   When you were an FTO, you were in the Lake
21    section?
22         A.   Correct.
23         Q.   And now you're in the Central; is that
24    right?
25         A.   Nope.  I'm in Lake section now.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  You're in Lake section now?
 3         A.  Correct.
 4         Q.  At the time of the incident, where were
 5    you?
 6         A.  Clinton section.
 7         Q.  Clinton.
 8              You went to Lake section FTO --
 9         A.  Uh-huh.
10         Q.  -- Clinton at the time of the incident,
11    and now you're back to Lake?
12         A.  Correct.
13         Q.  Were you ever in any other sections?
14         A.  No.
15         Q.  Okay.  In the Clinton section, would you
16    backtrack through properties more or less frequently
17    than you do as you're assigned to the Lake section?
18         A.  The same.
19         Q.  So it's the same, but -- they're different
20    parts of the cities, but basic same police tactics?
21         A.  Yes.
22         Q.  And you were never disciplined in
23    connection with this incident; correct?
24         A.  No.
25         Q.  And I think earlier you said that Sergeant
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    Rudolph had reviewed the incident; is that right?
 3              A.  Correct.
 4              Q.  And was he your direct supervisor at the
 5    time?
 6              A.  He was.
 7              Q.  Okay.  And did he ever tell you that you
 8    did anything wrong?
 9              A.  No.
10              Q.  And did he ever tell you that you violated
11    any RPD rules?
12              A.  No.
13              Q.  And so he determined that all of your
14    actions were consistent with RPD's policies and your
15    training?
16              MS. JONES:  Objection.
17              A.  Correct.
18              Q.  And do you know if Lieutenant Person was
19    notified?  Am I saying the name right?
20              A.  Yes.  According to Sergeant Rudolph's
21    document, the report, he was notified.
22              Q.  And let me just back up for a second.
23              Did you ever speak with Sergeant Rudolph
24    about this incident?
25              A.  At what point?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2       Q.  At any time.
 3       A.  Yes.
 4       Q.  When did you speak with Sergeant Rudolph
 5   about this incident?
 6       A.  Immediately after the incident.
 7       Q.  At the scene?
 8       A.  Correct.
 9       Q.  Anytime after that?
10       A.  I do not remember.  Don't believe so.
11       Q.  Did you ever review the body-worn camera
12   of this incident with Sergeant Rudolph?
13       A.  With Sergeant Rudolph?  I don't remember.
14       Q.  Did you ever speak with Sergeant Rudolph
15   about the body-worn camera recording of this incident?
16       A.  Not that I remember.
17       Q.  And you're aware from his report that he
18   reviewed the body-worn camera video of this incident?
19       A.  Correct.
20       Q.  Did he ever talk to you after he reviewed
21   the body-worn camera video of the incident?
22       A.  Regarding what occurred?
23       Q.  Correct.
24       A.  No, not that I remember.
25       Q.  And did you ever speak with Lieutenant
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    Person about the incident?
 3              A.   No.
 4              Q.   And who is Lieutenant Person?  Like what's
 5    his role in the RPD?
 6              A.   Currently or back then?
 7              Q.   Back then.
 8              A.   He was a lieutenant.  I do not remember
 9    where he was placed at the time, what section.  At
10    that point in time, he was staff duty officer, so he
11    was going to be, let's say, the highest-ranking person
12    working at the time.
13              Q.   So the highest-ranking person working --
14              A.   On the clock.
15              Q.   -- at the time of the incident?
16              A.   Correct, on the clock.
17              Q.   So that's why he would have been notified?
18              A.   Correct.
19              Q.   And is it required that he's notified when
20    a firearm is discharged?
21              A.   That's more of a sergeant's general
22    orders.  I believe so, but I can't -- don't quote me
23    on that.
24              Q.   Did you ever talk to Lieutenant Person
25    about the incident?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2          A.  No.
 3          Q.  And according to the report, Lieutenant
 4     Torday from PSS was notified; correct?
 5          A.  Lieutenant Torday, yes.
 6          Q.  And did you speak with Lieutenant Torday
 7     about this incident?
 8          A.  No.
 9          Q.  Did you ever speak with anybody from PSS
10     about this incident?
11          A.  No.
12          Q.  And do you know why PSS would have been
13     notified about the incident?
14          A.  Specifically, no.  I can only assume it
15     was for the discharge of a firearm.
16          Q.  But you don't know in general if there's a
17     rule that requires every time a firearm is discharged
18     that PSS be notified?
19          A.  Do I know for a fact that that exists?
20     No.
21          Q.  But no one from PSS ever contacted you
22     about this incident; correct?
23              MS. JONES:  Objection.
24          A.  Correct.
25          Q.  If PSS is notified, would it be common for
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    them to -- in general, if PSS is notified about any
 3    incident, would you have been -- is it common that
 4    they would follow up with the involved officers, if
 5    you know?
 6              A.  I don't know.
 7              Q.  Have you ever spoken with PSS about any
 8    incident that you were involved with, aside from this
 9    incident?
10              A.  Yes.
11              Q.  And were those -- how many times?
12              A.  Twice.
13              Q.  Were you ever disciplined as a result of
14    either of those incidents?
15              A.  No.
16              Q.  In general, were those a use of force
17    incident, either one of them?
18              A.  Are we speaking directly about me, I was
19    the involved officer, about the PSS complaint, or if I
20    was just someone that PSS spoke to about an incident?
21              Q.  The two incidents that you mentioned
22    earlier --
23              A.  Uh-huh.
24              Q.  -- were they complaints about actions that
25    you took, or were you a witness?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2              A.  I was a witness for one and the subject of
 3      one.
 4              Q.  Okay.  And the incident that you were a
 5      subject in, can you tell me about that incident?
 6              A.  That was my use of force of when an
 7      individual in a stolen vehicle attempted to run myself
 8      and my partner over.  At that point in time, I
 9      discharged my firearm into the vehicle.
10              Q.  Okay.  And when was that incident?
11              A.  February 28th of 2021.
12              Q.  And PSS reviewed the incident and
13      determined that your actions were justified.  Is that
14      fair to say?
15              A.  Correct.
16              Q.  Other than the February 28, 2021, incident
17      and the incident in Charles Dempsey's backyard on
18      October 19, 2018, have you ever discharged your
19      firearm while you were on duty as a police officer?
20              A.  Yes.
21              Q.  When was that other incident?
22              A.  May 25th of 2022.
23              Q.  And tell me about that incident.
24              THE WITNESS:  I think we're in the realm
25      of open cases.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                MS. JONES:  Yeah, I was just about to say,
 3     I'm not sure that investigation has been finished.
 4                THE WITNESS:  That's very fresh.  That's
 5     not...
 6                MR. SHIELDS:  Let's go off the record for
 7     a second.
 8                The time is -- do you want to do the time?
 9                THE VIDEOGRAPHER:  Yep.
10                Going off the record.  The time is 12:21.
11            (The proceeding recessed at 12:21 p.m.)
12            (Pages 126 through 128, inclusive, have been
13            deemed "Confidential.")
14                            *      *      *
15
16
17
18
19
20
21
22
23
24
25
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     OFFICER JAVIER ALGARIN, resumes:
 3              CONTINUING EXAMINATION BY MR. SHIELDS
 4         Q.  Going back to the incident that gives rise
 5     to this lawsuit where you shot Charles Dempsey --
 6     Dempsey's dog on October 19, 2018.  Before we
 7     discussed that your supervisors in PSS, they reviewed
 8     the incident and the body-worn camera video, and they
 9     determined that everything that happened was in
10     accordance with RPD's policies and procedures.  Is
11     that fair to say?
12         A.  As far as I know, yes.
13         Q.  Okay.  Have you ever shot a dog before?
14         A.  No.
15         Q.  Have you ever used force against a dog
16     other than shooting?
17         A.  No.
18         Q.  Excuse me.
19              And your father is an RPD officer; is that
20     right?
21              MS. JONES:  Objection.
22         A.  Yes.
23         Q.  Did your father ever shoot a dog if you
24     know?
25              MS. JONES:  Objection.
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2           A.  I don't know.
 3           Q.  Do you know of any other RPD officers who
 4      have shot dogs?
 5           A.  No.
 6           Q.  Do you know that other RPD officers have
 7      in fact shot dogs?
 8           A.  Yes.
 9           Q.  But you just don't remember anyone
10      specifically by name?
11           A.  Correct.
12           Q.  Do you know if any other RPD officers have
13      shot more than one dog in their time as a police
14      officer?
15           A.  I don't know.
16           Q.  Do you know whether any RPD officer has
17      ever been disciplined for shooting a dog?
18           A.  I don't know.
19           Q.  When are you allowed to point your gun at
20      someone?
21           A.  When you believe there's a threat.
22           Q.  In this incident, did you believe that
23      Charles Dempsey was a threat to you?
24           A.  As he charged, there was a potential
25      threat, yes.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  During this incident, Charles Dempsey
 3    charged at you?
 4         A.  Yes.
 5         Q.  And you felt threatened by that?
 6         A.  Yes.
 7         Q.  Other than pointing your gun at him, did
 8    you point any other weapons at him?
 9         A.  After I put my gun away, I brought up my
10    pepper spray.
11         Q.  And you could have simply pulled out your
12    pepper spray from the beginning instead of your gun;
13    correct?
14         A.  My gun was out.
15         Q.  When you jumped the fence, your gun was
16    out?
17         A.  No.
18         Q.  So at the moment that you jumped the fence
19    from 49 Kosciusko Street into the backyard of 53
20    Kosciusko Street, you didn't have any weapons out;
21    correct?
22         A.  Correct.
23         Q.  And so it was your choice to pull out your
24    gun instead of your --
25         A.  Can we clarify for one second?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  I understand what you meant, so I was just
 3    switching to a different question.
 4         A.  But for the record, can we clarify it?
 5              MS. JONES:  Yes.
 6         Q.  I think the record gets -- sure.  So at
 7    the point when you pointed your gun at Mr. Dempsey,
 8    the gun was already out; correct?
 9         A.  Correct.
10         Q.  Because you had pulled it out when you
11    shot and killed Tesla; correct?
12         A.  Correct.
13         Q.  At the moment that you jumped the fence
14    from 49 Kosciusko Street into the backyard of 53
15    Kosciusko Street, you did not have any weapons in your
16    hands at that moment; correct?
17         A.  Correct.
18         Q.  You only pulled out your firearm after you
19    saw Tesla; correct?
20              MS. JONES:  Objection.
21         A.  After I saw Tesla charging, yes.
22         Q.  And when you saw Tesla, you could have
23    instead pulled out your OC spray; correct?
24              MS. JONES:  Objection.
25         A.  I could have.
```



ALLIANCE
COURT REPORTING, INC.

Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2         Q.  Did you also have a taser on you at the
3    time?
4         A.  No.
5         Q.  Okay.  Did you also have a baton on you at
6    the time?
7         A.  Yes.
8         Q.  Did you have any other weapons on you at
9    the time?
10        A.  No.
11        Q.  So other options, in terms of weapons,
12   were only OC spray or a baton; correct?
13        A.  Correct.
14        Q.  Did you ever play baseball?
15             MS. JONES:  Objection.
16             Maybe you can help us with where this is
17   going.  It seems very far afield.
18             MR. SHIELDS:  I think Officer Algarin
19   probably understands my question.
20             MS. JONES:  Do you?
21        Q.  Did you ever play baseball, Officer
22   Algarin?
23             MS. JONES:  In his life?
24        Q.  Okay.  Yes.  In your life, did you ever
25   play on a baseball team?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  What's the relevance?
 3                   MR. SHIELDS:  Okay.  Just let me ask the
 4      question, and then you'll get the relevance, okay,
 5      instead of interrupting my deposition.
 6                   MS. JONES:  I think we're struggling
 7      with --
 8                   MR. SHIELDS:  I think you're struggling,
 9      and I think that you're speaking on the record, and
10      you need to let me ask my questions, unless you're
11      directing him not to answer.
12                   MS. JONES:  So we're struggling with
13      relevance here; right?
14                   MR. SHIELDS:  Okay.  It's very relevant.
15                   MS. JONES:  You're talking about things in
16      his personal life.  So if you can help us understand
17      how baseball is relevant, then I think --
18                   MR. SHIELDS:  Why don't you let me ask two
19      questions, and you'll get the relevance very quickly.
20                   MS. JONES:  Great.  Ask them both at the
21      same time.
22                   MR. SHIELDS:  No.  I'm going to ask one
23      question at a time so it's not a compound question.
24           Q.  Please tell me, Officer Algarin, in your
25      life did you ever play baseball on a team?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2                   MS. JONES:  Objection.
3         Q.   You can answer.
4                   MS. JONES:  On a team?
5                   Sure.  Go ahead and answer.
6         A.   Yes.
7         Q.   Okay.  And baseball requires you to swing
8    a bat at a fast-moving ball; correct?
9                   MS. JONES:  Objection.
10        A.   Correct.
11        Q.   Were you good at baseball?
12        A.   I was okay.
13        Q.   Did you play in high school?
14                  MS. JONES:  Objection.
15        A.   Yes.
16                  MS. JONES:  I think we're --
17        Q.   What was your batting average?
18                  MS. JONES:  Okay.  We're not answering
19   this.  Sorry.
20                  I'm instructing you not to answer.
21        Q.   And so you have to have some hand-eye
22   coordination to swing a bat and hit a ball; correct?
23                  MS. JONES:  Are you talking in general?
24        A.   What was your question?
25        Q.   You have to have pretty good hand-eye
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2     coordination in order to be able to swing the baseball
3     bat to hit the fast-moving baseball; correct?
4              MS. JONES:  Objection.
5         A.   Correct.
6         Q.   That's the same hand-eye coordination that
7     you might need to swing a baton and hit a dog;
8     correct?
9              MS. JONES:  Objection.
10        A.   Correct.
11        Q.   Does a baseball travel faster than a dog
12    running?
13             MS. JONES:  Objection.
14        A.   I don't --
15        Q.   When you played baseball and you were
16    hitting, would the pitcher throw the ball faster than
17    Tesla was running at you?
18             MS. JONES:  Objection.
19        A.   No.
20        Q.   Were you a young child when you played
21    baseball?
22             MS. JONES:  You don't have to answer that.
23             Objection.
24             You don't have to answer that.
25        Q.   How old were you when you played baseball?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3                   Don't answer that.
 4                   Elliot, really?
 5                   MR. SHIELDS:  He gave an answer.  He said
 6       that the pitchers wouldn't throw the ball faster than
 7       Tesla was running.  At most, Tesla was running --
 8              Q.  Can you estimate for me, Officer Algarin,
 9       how fast Tesla was running at you?
10                   MS. JONES:  That's relevant.
11              A.  I'm sorry.  We'll have to go back to your
12       question -- that question about Tesla and the
13       baseball.  Can you please say that question one more
14       time?  I may not have understood it.
15              Q.  So my question now is:  How fast would you
16       estimate Tesla was running at you?
17              A.  Speed-wise?
18              Q.  Correct, if you can estimate in miles per
19       hour.
20              A.  I do not -- do not know.
21              Q.  In miles per hour, would you estimate that
22       Tesla was running more slowly than a baseball gets
23       pitched?
24              A.  Say that one more time.
25              Q.  Let me withdraw that question.  It was a
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    bad question.
 3                   When you played baseball, how fast would
 4    the pitchers pitch when you were batting?
 5                   MS. JONES:  Objection.
 6              A.   70, 80 miles per hour.
 7              Q.   And you would sometimes be able to hit a
 8    baseball that was traveling at you at 70 to 80 miles
 9    per hour.  Is that fair to say?
10              A.   Correct.
11              Q.   And do you think in this circumstance you
12    would have been able to hit Tesla with your baton as
13    she ran at you?
14              A.   No.
15              Q.   And why do you think you wouldn't have
16    been able to hit Tesla with your baton, if you can hit
17    a baseball that's traveling 70, 80 miles an hour at
18    you?
19              A.   Because the bat and baseball is in my hand
20    and ready to go, to swing, where the baton was not.
21              Q.   And the gun was not in your hand either
22    when Tesla began to run at you; correct?
23              A.   The gun was more accessible.
24              Q.   Where is the baton on your person?  Where
25    do you keep it or where did you keep it on that day?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  My left hip.
 3         Q.  Okay.  And does it take longer to take
 4    your baton out than your firearm?
 5         A.  Yes.
 6         Q.  Okay.  And why?
 7         A.  With the baton, not only do I have to
 8    reach across body to my left hip, I have to bring it
 9    out.  Not only bring it out, make sure it comes out
10    straight, because it gets snagged sometimes.  It is
11    collapsible.  So after you bring it out, it is only
12    about 10 inches close to a foot.  You have to whip it
13    so it can spring out to full length and then afterward
14    be able to get into a position to use it.
15         Q.  So you have an expandable baton?
16         A.  Correct.
17         Q.  And that takes a good amount of time,
18    because you pull it out and expand it before you can
19    use it?
20         A.  More time than I had.
21         Q.  And could you have kicked Tesla?
22         A.  Could I have?
23         Q.  Yes.
24         A.  I could have.
25         Q.  Do you work out?
```



1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS

2          A.   Sometimes.

3          Q.   As part of your police training, are you

4    required to pass a physical fitness test?

5          A.   Yes.

6          Q.   And as part of your police duties, you've

7    testified that sometimes you have to chase suspects;

8    correct?

9          A.   Yes.

10         Q.   Sometimes you have to jump fences?

11         A.   Yes.

12         Q.   Sometimes you have to take large males

13   into custody that weigh more than you?

14         A.   Yes.

15         Q.   And sometimes you have to physically

16   restrain agitated large men.  Is that fair to say?

17         A.   Yes.

18         Q.   It's the nature of police duties when you

19   make an arrest.  Sometimes you have to use force

20   against people that you're taking into custody.  Is

21   that fair to say?

22              MS. JONES:  Objection.

23         A.   Sometimes.

24         Q.   And so would it be fair to say that

25   sometimes you take large men into custody that could



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    also potentially cause you physical injuries; right?
 3              MS. JONES:  Objection.
 4         A.   Yes.
 5         Q.   And you do that without shooting them;
 6    right?
 7              MS. JONES:  Objection.
 8         A.   Are we talking armed people, unarmed
 9    people?  We have to be a little more specific.
10         Q.   Sure.  Let's say unarmed people.
11         A.   Uh-huh.  It also depends on the
12    officer-to-subject factors.
13         Q.   Let's say there's an unarmed man that's
14    larger than you running at you and he's unarmed.
15         A.   Okay.
16         Q.   Would you be justified in shooting that
17    person?
18         A.   Again, officer-to-subject circumstances.
19         Q.   What other factors would you need to know
20    to know if you could shoot an unarmed person that was
21    running at you?
22         A.   Size.  Relevance to my size.  Larger --
23    that's very broad -- how much larger.  Is he athletic?
24    Is he muscular?  Is he huge?  Does he look like he
25    could bench press 500 pounds?  Does he look like he
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     can overpower me if he gets to me and my gun?  Does it
 3     look like, if I wrestle him, will he overpower me and
 4     take my gun?  Does he have any martial arts skills?
 5     Does he have any fighting skills?  Does his skills
 6     exceed my own?  Will he be able to wrestle me until
 7     the point I cannot reach my gun?  Is he going to put
 8     me in a choke hold?  Those kind of subject factors.
 9              Q.  And so those are all specific factors
10     where your life could potentially be in danger;
11     correct?
12              A.  Those are factors to consider when using
13     use of force.
14              Q.  Considering the deadly -- the use of
15     deadly force; correct?
16              A.  Correct.
17              Q.  And in this circumstance, was Tesla larger
18     than you?
19              A.  No.
20              Q.  And could Tesla have taken your gun
21     potentially?
22              A.  No.
23              Q.  Could Tesla have been a threat to your
24     life?
25              A.  Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2          Q.  Have you ever heard that in the entire
 3    history of policing in the United States that no
 4    officer has ever been killed during an attack by a
 5    dog?
 6          A.  I don't know about officers.  I know of
 7    people who have been killed or seriously injured by
 8    dogs.
 9          Q.  So you've never specifically heard that no
10    police officer in the history of the United States has
11    ever been killed during police duties by a dog?
12              MS. JONES:  Objection.
13          A.  Not that I know of.
14          Q.  That's not something that you learned in
15    your training?
16          A.  No.
17          Q.  And police officers generally have more
18    training on interacting with people in dangerous
19    situations than normal civilians; correct?
20              MS. JONES:  Objection.
21          A.  Yes.
22          Q.  That's the nature of police work?  Yes?
23          A.  Was that a question?
24          Q.  Yes.
25          A.  Is it the nature of police work?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  The nature of police work is that
 3    sometimes you have to interact with the public and
 4    sometimes those people are agitated?
 5         A.  Yes.
 6         Q.  How could you have done things differently
 7    to avoid shooting and killing Tesla?
 8              MS. JONES:  Objection.
 9         A.  I could have knocked on the door.
10         Q.  And you had the time -- you had the time
11    that you could have done that; right?
12         A.  Yes.
13         Q.  Because there was no emergency in his
14    backyard that required you to jump the fence?
15              MS. JONES:  Objection.
16         A.  I had time.
17         Q.  So the answer is, yes, there was no
18    emergency, so you had time to walk to his front
19    door --
20              MS. JONES:  Objection.
21         Q.  -- and ask for his permission to enter his
22    yard; correct?
23              MS. JONES:  Objection.
24         A.  Yes.
25         Q.  What else could you have done?
```



```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2                   MS. JONES:  Objection.
3         A.   That's it.
4         Q.   Could you have announced "Police entering
5    your property" or something similar prior to jumping
6    his fence to warn him that you were entering his yard?
7                   MS. JONES:  Objection.
8         A.   Could I have yelled and just yelled that
9    I'm entering your yard?
10        Q.   Yes.
11        A.   In a backyard full of houses?
12        Q.   Correct.
13        A.   Sure.
14        Q.   Or providing some other sort of warning
15   before entering his property?
16        A.   Sure.
17        Q.   And could you have used pepper spray on
18   Tesla?
19        A.   I don't believe it's effective.
20        Q.   Why do you believe that pepper spray is
21   not effective on dogs?
22        A.   Because I don't believe OC will be
23   effective on dogs.
24        Q.   Is OC effective on people?
25        A.   Yes, sometimes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2          Q.   Have you ever been trained that OC is not
3   effective on dogs?
4          A.   No.
5          Q.   So no one has ever told you that OC spray
6   is ineffective on dogs?
7          A.   No.
8          Q.   So that's just your personal belief?
9          A.   Yes.
10         Q.   Have you ever tried to use OC -- withdraw
11  that.
12              Have you ever tried to use OC spray on a
13  dog?
14         A.   No.
15         Q.   And maybe we covered this before, could
16  you have tried to kick Tesla?
17         A.   Could I have tried?
18         Q.   Yes.
19         A.   Yes and no.  I could have tried to kick
20  Tesla, but that kick could have just given Tesla my
21  leg to bite me.
22         Q.   Have you ever been bitten by a dog before
23  while you were working as a police officer?
24         A.   No.
25         Q.   Were you ever trained any time about using



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    any sort of less lethal force against dogs?
 3              A.   Baton.
 4              Q.   Other than the baton?
 5              A.   And the OC spray, I believe, from what I
 6    can remember.
 7              Q.   So you were trained on using OC spray?
 8              A.   I don't necessarily remember specifically.
 9              Q.   You might have been trained on OC spray,
10    but you don't remember?
11              A.   Exactly.
12              Q.   Okay.  And do you know why you would have
13    been trained to use OC spray against a dog?
14              A.   It may have been effective for some dogs,
15    like it is for some people.
16              Q.   So you would have been trained -- you
17    wouldn't be trained on something that's not effective;
18    right?
19              A.   OC spray is sometimes not effective.
20              Q.   Against people?
21              A.   Yes.
22              Q.   But you don't remember anything about the
23    training for when it may or may not be effective
24    against a dog.  Is that fair to say?
25              A.   Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  So, basically, you have a vague
 3    recollection of maybe being told that OC spray could
 4    work in some circumstances against a dog?
 5              MS. JONES:  Objection.
 6         A.  Yes.
 7         Q.  And that was at the academy, you said?
 8         A.  Yes.
 9         Q.  And would you agree that if there's more
10    than one choice that you can make, it's always best to
11    make the safest choice?
12              MS. JONES:  Objection.
13         A.  Again, it depends on the situation.  I
14    don't know.
15         Q.  If you could turn back time and do it all
16    over again, would you do anything different in this
17    incident?
18              MS. JONES:  Objection.
19         A.  I definitely don't wish I had to shoot
20    anything.
21         Q.  Okay.  I appreciate that, but that wasn't
22    my question.  My question was if you could turn back
23    time and do it all over again, would you do anything
24    different?
25              MS. JONES:  Objection.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  Yeah, I would go to Charles Dempsey and
 3    let him know that I'm in his backyard.
 4         Q.  You would go and you would seek his
 5    consent prior to entering his backyard.  Is that what
 6    you mean?
 7         A.  Yes.
 8         Q.  You would have walked to his front door
 9    and knocked on his front door?
10              MS. JONES:  Objection.
11         A.  Yes.
12         Q.  And you would have done that because there
13    was no emergency requiring you to jump his fence
14    immediately into his yard instead of going to his door
15    and knocking and asking for his consent.
16              MS. JONES:  Objection.
17         Q.  Is that fair?
18              MS. JONES:  Objection.
19         A.  Yes.
20         Q.  After this incident, did you draft an
21    incident report?
22         A.  No.
23         Q.  After this incident, did you make any
24    written notes about the incident?
25         A.  I don't remember.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2          Q.  If you made written notes about the
3     incident, would they have been handwritten notes?
4               MS. JONES:  Objection.
5          A.  I don't remember.
6          Q.  At the time of the incident, if you were
7     to make notes, would it have been handwritten or on
8     some electronic device?
9               MS. JONES:  Objection.
10         A.  It depends on the notes.
11         Q.  If you're making notes as an officer -- do
12    you carry around, like, a spiral notepad with you?
13         A.  Yes.
14         Q.  Do you take notes in that spiral notepad?
15         A.  Yes.
16         Q.  Do you -- are there any rules about taking
17    notes in your spiral notepad?
18         A.  No.
19         Q.  You're not required to put certain things
20    in your notes every day?
21         A.  No.
22         Q.  There's no rule from RPD requiring you to
23    write certain things down in your notepad?
24         A.  No.
25         Q.  How about any other -- are there any --



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    does the RPD issue you, like, an iPhone?
 3              A.  No.
 4              Q.  Does the RPD issue you any other
 5    electronic device?
 6              A.  Issue to us personally?  No.  There's
 7    computers that we use at the office.
 8              Q.  Okay.  Do you ever write notes on your
 9    computer at the office?
10              A.  Sometimes.
11              Q.  Do you have a personal computer assigned
12    to you at the office, or is that, like, in a common
13    area?
14              A.  Common area.
15              Q.  Do you have, like, a personal portal or
16    something that you log in to?
17              A.  Yes.
18              Q.  Okay.  And would you save your notes there
19    if you had made them?
20              MS. JONES:  Objection.
21              A.  Yes.
22              Q.  So if you were to make electronic notes,
23    would it have been on the computer in your portal?
24              A.  Yes.
25              Q.  Okay.  And what do you do with any
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2      handwritten notes that you make?  Where are they
 3      saved?
 4              A.  In a spiral notebook.
 5              Q.  After the spiral notebook gets all filled
 6      up, where do you put it?
 7              A.  If I haven't lost it, it's in the filing
 8      cabinet.
 9              Q.  Is there any requirement that you save
10      your spiral notes after they're all filled up?
11              A.  No.
12              Q.  Did you complete a firearm discharge
13      report as a result of this incident?
14              A.  I don't remember.
15              Q.  Pursuant to the RPD's rules, are you
16      required to create any sort of writing after you
17      discharge your firearm?
18              A.  With a dog, I do not know.  I believe
19      sergeants take the report, which is why Sergeant
20      Rudolph made his, but that's more of a supervisor
21      role.
22              Q.  So it sounds like you don't know
23      specifically if you are personally required to create
24      a report after you discharge your firearm at a dog.
25      Is that fair to say?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  Correct.
 3         Q.  And in this incident, did you not create
 4    any reports, any official RPD reports?
 5         A.  Not that I remember.
 6         Q.  Okay.  Did you ever email anyone about
 7    anything that happened during this incident --
 8         A.  No.
 9         Q.  -- other than your attorney?
10         A.  No.
11         Q.  Did you ever email anyone in the RPD about
12    the incident?
13         A.  No.
14         Q.  Did you ever communicate in writing in any
15    way about this incident?
16         A.  No.
17              THE VIDEOGRAPHER:  I have to refresh this
18    here.
19              Okay.  We're good.
20         Q.  Did you ever send any text messages about
21    the incident?
22         A.  No.
23         Q.  Tell me everybody that you spoke with
24    about the incident after the incident.
25         A.  Simply people at the incident location.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  So that would be Sergeant Rudolph; right?
 3         A.  Officer Horowitz.
 4         Q.  Okay.  Horowitz.
 5             Gorman?
 6         A.  Sergeant -- sorry.  Gorman, DiSabatino.
 7         Q.  Anyone else?
 8         A.  Not from what I can remember.
 9         Q.  Did you ever speak with anybody at the
10  Locust Club?
11         A.  No, other than receiving this lawsuit.
12         Q.  So when you got the lawsuit, you contacted
13  the Locust Club?
14         A.  Yes.
15         Q.  Are you required to do that?
16         A.  To notify them?
17         Q.  Yes.
18         A.  Yes.
19         Q.  Have you spoken with anybody, other than
20  your attorneys, about the lawsuit?
21         A.  No.
22         Q.  Have you spoken with Officer Gorman?
23         A.  No.
24         Q.  Have you spoken with any of your
25  supervisors?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  No.
 3         Q.  Have you spoken with any of your friends?
 4         A.  No.
 5         Q.  Have you spoken with, like, your
 6    significant other?
 7         A.  No.
 8         Q.  I'm going to put up an exhibit on the
 9    screen.  I'll just ask you some questions.
10              And for the record, it's going to be
11    Exhibit B, and it's going to be your PDS file that was
12    produced in discovery, a few quick questions.
13         A.  PDS?
14              (The following exhibit was marked for
15              identification:  Plaintiff EXH B.)
16         Q.  Okay.  One second.
17              After this, I will email you, Peachie, and
18    Kim copies of Exhibit B.
19              Okay.  So I don't know why this is doing
20    it like that, but -- okay.
21              So -- here.  I don't like how this is
22    displaying.  It's hard to see.  Hold on a second.
23    It's my computer.
24              That's a little better.
25              And, Officer Algarin, does the document
```



1               OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2      that we're looking at on the television screen appear
3      to be your PDS file if you know?
4               A.   It is a police form evaluation.
5               Q.   Okay.  So this first page, is it dated
6      October 1, 2018?  Is that what that looks like?
7               A.   Yes.
8               Q.   All right.  So I'm just going to ask you a
9      few questions about the documents in your PDS file.
10              So first -- so let me go back up for a
11     second.
12              This says that the -- do you know what --
13     the date of the evaluation period, can you tell from
14     looking at this first page what your evaluation period
15     was?
16              A.   September 1st through September 30th.
17              Q.   And that is of 2018?
18              A.   Correct.
19              Q.   And can you tell me why the evaluation
20     period was only one month?
21              A.   This is after a complete field training
22     and while I'm on probationary period.  So during the
23     probationary period, the probationary officer
24     undergoes an evaluation by their supervisor or a
25     supervisor monthly to assure that they are on track



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                 OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2      and improve in areas where they need to improve.
3                 Q.  Okay.  So the probationary period follows
4      the field training period?
5                 A.  Correct.
6                 Q.  And how long is that probationary period?
7                 A.  From the completion of FTO to 18 months of
8      being hired by RPD.
9                 Q.  Okay.
10                A.  So whenever the individual can complete
11     the field training.
12                Q.  Got it.  Okay.
13                    I have a question about page 2.  I'm going
14     to highlight this portion right here (indicating) and
15     ask you questions.
16                    So the area of improvement that it says is
17     that you do good preliminary investigations on
18     occasion, however you make careless mistakes in those
19     investigations.
20                    Did you speak with your officer about that
21     criticism?  Or your sergeant.
22                A.  We spoke about it.  What that pertained
23     to, I don't remember.
24                Q.  Did you speak about ways to be more
25     careful during investigations?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2          A.  Refreshing my recollection through this
 3    document, we discussed slowing down and
 4    double-checking my work.
 5          Q.  Okay.  And is that something you could
 6    have done in this situation with Tesla, slowing down
 7    and thinking before you jumped into the yard?
 8          A.  Yes.
 9          Q.  All right.  I'm going to fast-forward to
10    page 6 of this 36-page document.
11              Okay.  So my question here is:  This is a
12    career development worksheet dated January 22, 2021;
13    correct?
14          A.  Correct.
15          Q.  And I'm going to go down here under this
16    typed portion, which says "The supervisor offered the
17    following guidance and assistance toward reaching your
18    goals."
19              My first question is:  What are 60s?  It
20    says, "Start studying 60s."  What is that?
21          A.  The 6 looks like Gs.  GOs.
22          Q.  GOs.  Okay.  "Start studying GOs."  Got
23    it.
24              Do you know why it says, "Start studying
25    GOs, training bulletins, and roll calls"?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   Absolutely.
 3              Can you scroll up just a little bit --
 4         Q.   Sure.
 5         A.   -- just to that top part?
 6              So that top part discusses any sort of
 7    avenue I would like to take within the department.
 8    There we can see fourth platoon, tactical unit, and
 9    sergeant.  To become a sergeant, of course, you would
10    take tests, which is heavily based on the GO.  So to
11    prepare yourself for that sergeant's exam, studying
12    the GOs is a great way to do so.
13         Q.   Prior to taking that test to become a
14    sergeant, do you have to get tested on the general
15    orders, training bulletins, or roll calls?
16         A.   The academy had some questions GO-wise pop
17    up on exam.
18         Q.   Was it a comprehensive test about the
19    general orders or -- can you tell me about that test
20    at the academy?
21         A.   I don't remember specifics, no.
22         Q.   Now, the academy, that training involves
23    officers from other departments, not just the RPD;
24    correct?
25         A.   I'm sorry.  Can you say that one more
```



1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2    time?
3         Q.   When you went to the academy --
4         A.   Uh-huh.
5         Q.   -- that's not just RPD officers that went
6    to the academy with you; correct?
7         A.   Correct.
8         Q.   It's officers from other local police
9    departments; correct?
10        A.   Correct.
11        Q.   And those other local police departments
12   would have different sets of rules and general orders.
13   Is that fair to say?
14        A.   Correct.
15        Q.   So at the academy, you're not studying
16   RPD-specific general orders.  Is that fair to say?
17             MS. JONES:  Objection.
18        A.   Sometimes you will.  There's trainings
19   that are RPD-specific, especially in the -- I can't
20   remember what it's called.  It's a two-week period at
21   the academy where it's RPD-specific.  Every agency
22   goes through the specific respective department and
23   they will train on more agency-specific.
24        Q.   So following the academy, before your
25   field training, you have two weeks of RPD-specific



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    training.  Is that fair to say?
 3              A.  Correct.
 4              Q.  And during that two-week RPD-specific
 5    training, do you have to study the general orders,
 6    training bulletins, or roll calls?
 7              A.  I don't remember.
 8              Q.  At any point, before the October 19, 2018,
 9    incident, did you have to study the general orders,
10    training bulletins, and roll calls?
11              A.  The field training officers will assign
12    homework of some sort to read up on certain GOs or
13    certain bulletins that will come out.  And then roll
14    calls are usually done in roll call, that's where the
15    training --
16              Q.  How long does a roll call usually take?
17              A.  It's allotted 15 minutes.
18              Q.  So at most -- and you speak about multiple
19    things in roll calls?
20              A.  Correct.
21              Q.  And sometimes there will be, like, a
22    refresher about a certain topic that had come up in
23    maybe a training bulletin or a general order?
24              A.  Correct.
25              Q.  Okay.  That's not like a full-blown, like,
```



1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2     in-service training day; right?
3          A.   No.
4          Q.   Okay.  And when that says "roll call,"
5     that's not talking -- well, how would you study a roll
6     call?  Can you explain what that means?
7          A.   You have copies of the -- it's a
8     PowerPoint.  So a PowerPoint is presented in roll
9     call, which has all the updated information or any
10    changes to the GO, because there's a lot of changes in
11    the RPD.  So those roll calls are available in a
12    PowerPoint, which you could review.
13         Q.   So when that says "roll call," that's
14    referring to a document, like a PowerPoint?
15         A.   That's what I am interpreting it as, yes.
16         Q.   Okay.  And so that's dated January 20,
17    2021.  Before January 20, 2021, had you ever started
18    to study the general orders, training bulletins, and
19    roll calls?
20         A.   Before?
21         Q.   Yes.
22         A.   Yes, in my field training.
23         Q.   Okay.  All right.  Because it's just
24    confusing to me, I guess.  It says start studying them
25    in this document.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  It's just to make sure that if I were to
 3    follow up with a sergeant exam that I -- so if I had
 4    not been studying, to start studying because that's
 5    something you're going to need to know on the test.
 6         Q.  Got it.  Okay.
 7              I am going to page 17 now.
 8              All right.  So page 17 is the second page
 9    of a two-page document that looks like it is a
10    performance evaluation form dated February 26, 2019.
11    Is that right, Officer Algarin?
12         A.  Actually, I'm not sure why there's two
13    dates.
14         Q.  Okay.  So there's two dates here:  one is
15    February 26, 2019, and one is March 11, 2019?
16         A.  Correct.
17         Q.  Okay.  And the evaluation period is
18    February 1, 2019, to February 28, 2019?
19         A.  Correct.
20         Q.  And that's because you're still on your
21    probationary period that it's a monthly evaluation?
22         A.  At that time, correct.
23         Q.  Okay.  And let's see.  So my question here
24    is -- so in this portion, it says, "I spoke to Officer
25    Algarin about completing assignments on time,
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    especially when he is instructed to do so by a
 3    higher-ranking officer.  Officer Algarin received a
 4    verbal warning about not following through with an
 5    order and was told that if his performance does not
 6    improve with his follow-ups, he may be faced with
 7    greater discipline in the future."
 8              Did I read that correctly?
 9         A.   Yes.
10         Q.   Okay.  So my question really is -- it says
11    that you may face greater discipline in the future.
12    To me, that indicates that you were disciplined in
13    this instance.  Is that a fair interpretation?
14         A.   Given a verbal warning.
15         Q.   Okay.  So a verbal warning is considered
16    discipline?
17         A.   It can be, but it's more of a warning than
18    an actual discipline on paperwork.
19         Q.   Okay.  So that is where my confusion was,
20    whether or not there was anything else other than the
21    verbal warning that happened here.
22         A.   No.
23         Q.   So when he's saying "greater discipline,"
24    all he's talking about is the verbal warning here;
25    correct?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  Correct, that can turn into something
 3    else.
 4         Q.  Have you ever been formally disciplined in
 5    your time as an RPD officer for any incident?
 6              MS. JONES:  Objection.
 7         A.  Formally disciplined in what way?
 8         Q.  Yeah, I don't know.  That's why I was
 9    confused about the wording here about greater
10    discipline.  I guess, have you ever been disciplined
11    in writing?
12              MS. JONES:  Objection.
13         A.  That's tough to answer based on
14    discipline, but I have received memos, training memos.
15         Q.  Okay.  And what kind of training memos
16    have you received?
17         A.  One for -- when an incident -- where a
18    domestic incident report was required, and my partner
19    failed to complete that form.  But it was -- it was
20    expected of both of us to ensure that it was done.
21              So it was a training memo to ensure that
22    it is done, regardless if you were the one expected to
23    write it, but to ensure that it was done because it
24    was supposed to be done.
25         Q.  Got it.
```



```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2                    And that's something that would have been
3       laid out in, like, the general orders who has to write
4       the report?
5              A.  It was more of a review on the general
6       order of when a domestic incident report is to be
7       written.
8              Q.  Got it.  Okay.
9                    I am going to page 20 now.
10                   All right.  So, Officer Algarin, is this a
11      career development worksheet dated January 21, 2019?
12             A.  (The witness indicated nonverbally.)
13             Q.  Yes?
14             A.  Yes.
15             Q.  Okay.  And so my question is:  Do you see
16      where it says "Would like to attend any schools given
17      by RPD"?
18             A.  Yes.
19             Q.  What kind of schools are put on by the
20      RPD?
21             A.  There's vice schools, there's taser
22      school, there's FTO school.  There is -- you can be --
23      instructor school, firearm school, defensive tactic
24      school, physical training school.  There is the
25      Warrant Act school, pepper school, from what I can
```



1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2     remember.
3          Q.  And are the schools something that
4     everyone is required to attend, like a training, or
5     something different?
6          A.  No, voluntary.  Based on department needs,
7     they'll send people who like to attend those schools
8     to, you know, attend -- gain certification --
9     certification -- sorry -- that you attended and
10    completed that school.
11         Q.  So if you attend and complete a school,
12    you'll get a certificate usually?
13         A.  Correct.
14         Q.  And so it's not like some kind of
15    department-wide required training?
16         A.  No.
17         Q.  What kinds of annual department-wide
18    required trainings are there?
19         A.  There are the firearms that meet
20    qualification yearly to make sure you're up to date
21    with your aim, and there is usually some sort of
22    in-service that they will put together.  But I don't
23    necessarily know if that's something done yearly or if
24    something that -- if there's a concern or something
25    is -- for example, we just had an in-service about



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     suicidal awareness because the suicide rates within --
 3     with this career.
 4              So it was more of a wellness in-service,
 5     where you can go for help if you need it.  There's
 6     some signs to look for, speak with your family.  It
 7     could be to find comfort in something.
 8              And that's what that in-service is about.
 9     It's not necessarily something they do yearly, but
10     it's something that there was an issue.  They
11     addressed it in-service so people can be aware of
12     these options if they were feeling that way.
13          Q.  Does RPD offer, like, mental health
14     services?
15          A.  They do.
16          Q.  Did you seek out any mental health
17     services after you shot and killed Tesla?
18          A.  No.
19          Q.  Did you speak with any therapist or any
20     doctor about any feelings you had after you shot and
21     killed Tesla?
22              MS. JONES:  Objection.
23          A.  No.
24          Q.  Have you ever sought mental health
25     services in any incident that was traumatic that
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2    happened when you were a police officer?
3              MS. JONES:  Objection.
4              How is this relevant?
5              MR. SHIELDS:  If you would like to know,
6    I'm trying to compare whether he thought this incident
7    was traumatic compared to any other incidents that
8    he's been involved in.
9         A.   When involved in a critical incident like
10   the two shootings, when I feared for either my life,
11   the life of my partner, and the sergeant, those type
12   of incidents require that you speak to the Officer
13   Assistance Program or the Employee Assistance Program
14   that's provided by the city.  They are required to
15   speak to you.
16             So they speak about the events.  Speak
17   about -- just make sure that you're okay.  It's very
18   brief to make sure that you are of sound mind and
19   you're okay.
20        Q.   So it sounds like -- let me just make sure
21   I understand your answer.  If there's an
22   officer-involved shooting of a person, you're required
23   to speak with the Officer Assistance Program, but if
24   there's an officer-involved shooting involving a dog,
25   then you're not required to speak with someone from
```



```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2    the Officer Assistance Program.  Is that accurate?
3         A.  Correct.
4         Q.  Okay.  I'm going to jump to page 26 now.
5              Okay.  So let's go to page 25.
6              And this is the performance evaluation
7    form, and it looks like it's dated November 29, 2018.
8    Is that correct, Officer Algarin?
9         A.  Correct.
10        Q.  Okay.  And the evaluation period says it
11   was November 1, 2018, until November 30, 2018;
12   correct?
13        A.  Correct.
14        Q.  And, again, you're still on your monthly
15   evaluation, probation evaluation; right?
16        A.  Yes.
17        Q.  So now going to page 26, this -- let me
18   see here.  One second.
19        A.  I'm sorry.  Did you ask me a question?
20        Q.  No, I didn't.  I'm sorry.  I misread my
21   notes, which is why I was pausing.
22              Okay.  So my question about this one is
23   just that did you have an opportunity to read this
24   page?
25        A.  Skimmed it, briefly.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  And, in general, it says that you were
 3    making good gun and drug arrests; right?
 4         A.  Correct.
 5         Q.  And that was the focus of your police work
 6    at the time in November 2018.  Is that fair to say?
 7              MS. JONES:  Objection.
 8         A.  No.
 9         Q.  No.  Okay.
10         A.  No.  It was just a part of what a daily
11    routine would be parallel to calls for service.
12         Q.  Okay.  And -- okay.  And as part of your
13    daily calls for service, they involve making gun and
14    drug arrests; right?  Is that fair to say?
15              MS. JONES:  Objection.
16         A.  Yes.  I deal with the bad guys to get the
17    guns off the street, and drugs.
18         Q.  Is that something that was a priority at
19    the time for your section?
20         A.  No.  No.
21         Q.  You weren't, like, specifically assigned
22    to any kind of, like, vice squad at the time?
23         A.  No.
24         Q.  All right.  I am going to jump down to
25    page 27 and 28.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   So 27, this is an evaluation form dated
 3      October 29, 2018; correct?
 4              A.  October 29, 2018, correct.
 5              Q.  And the evaluation period is October 1,
 6      2018, to October 31, 2018; correct?
 7              A.  Correct.
 8              Q.  All right.  Page 28, can you just read the
 9      highlighted portion?
10              A.  Do you want me to read the highlighted
11      portion?
12              Q.  Sure.
13              A.  "Javier had to dispatch an aggressive dog.
14      After reviewing the incident on body camera, it was
15      clear that Javier was calm and appropriately addressed
16      the dog, and later, the dog's owner."
17              Q.  Okay.  And this form was completed by --
18      do you know who completed the form at the bottom, or
19      do you need to see the top page?
20              A.  Yeah.  Can I see the top page, please?
21                   That would be Sergeant Rudolph.
22              Q.  Okay.  And he was your direct supervisor
23      at the time; is that right?
24              A.  Yes.
25              Q.  Okay.  So it was Sergeant Rudolph who
```



```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2    wrote this evaluation and made the evaluation that it
3    was clear that you acted appropriately; correct?
4              MS. JONES:  Objection.
5         A.  Can you say that one more time, sir?
6         Q.  So this written form was completed by
7    Sergeant Rudolph; correct?
8         A.  Correct.
9         Q.  And in this form, he expresses the opinion
10   that you appropriately address the dog; correct?
11        A.  Correct.
12        Q.  And then also the dog's owner; correct?
13        A.  Correct.
14        Q.  Did you ever speak with Sergeant Rudolph
15   about the entry into the yard before you shot Tesla?
16        A.  I don't remember.
17        Q.  Okay.  Do you remember speaking with
18   Sergeant Rudolph about the shooting of Tesla?
19        A.  Other than just factual stuff.
20        Q.  Okay.  So his opinion was based on his
21   review of the body-worn camera and his brief
22   discussion with you about the factual stuff.  Is that
23   fair to say?
24        A.  Correct.
25        Q.  Okay.  He never asked you, like, what was
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    going through your head at the time that this incident
 3    happened?
 4         A.   No.
 5         Q.   And he never talked to you about the
 6    events that led up to the incident?
 7         A.   No.
 8         Q.   He never asked you, for example, did you
 9    ever consider going to the front door and requesting
10    permission to enter the backyard?
11              MS. JONES:  Objection.
12         A.   No.
13         Q.   And I may have asked this a little bit
14    before, but prior to this incident, had you ever done
15    any training where a dog actually ran at you under
16    similar circumstances?
17         A.   Like specifically at me?
18         Q.   Yeah.  Like, for example, some departments
19    do training where you put on padded gear and a dog is
20    released, a real dog --
21         A.   Uh-huh.
22         Q.   -- to run at you.  Did you ever do any
23    training like that in your time with the RPD?
24         A.   No.
25         Q.   You never did any training like that at
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     the academy?
 3              A.   No.
 4              Q.   Prior to this incident, had you ever done
 5     a training simulator about dog interactions, other
 6     than the dog-shooting simulator that you spoke about
 7     earlier?
 8              A.   Not that I remember.
 9              Q.   Prior to this incident, had you ever taken
10     a class specifically about dog behaviors?
11              MS. JONES:  Objection.
12              A.   I don't remember.
13              Q.   Okay.  So you might have, but if you did,
14     you don't remember anything about that class?
15              MS. JONES:  Objection.
16              A.   I don't remember.
17              Q.   Okay.  So would it be fair to say that
18     since you don't remember if you did take the class you
19     don't remember what was taught at that class?
20              MS. JONES:  Objection.
21              A.   I don't remember as of right now, correct.
22              Q.   Okay.  And do you think it would be
23     helpful for the RPD to get a training simulator that
24     had dog interaction scenarios so that you could train
25     and avoid situations like what happened when you shot
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    and killed Tesla?
 3              MS. JONES:  Objection.
 4         A.   I think more training is always good
 5    regardless of the situation, yes.
 6         Q.   The more training the better; right?
 7              MS. JONES:  Objection.
 8         A.   Yes.
 9         Q.   Especially when it comes to situations
10    where you have to make quick decisions on your feet,
11    under stressful circumstances; right?
12              MS. JONES:  Objection.
13         A.   Yes.
14              MR. SHIELDS:  Okay.  I want to just take a
15    quick break if that's okay.
16              MS. JONES:  I was going to joke and say
17    "objection."
18              How long?
19              MR. SHIELDS:  Five minutes.
20              MS. JONES:  Yeah, that's fine.
21              Off the record.
22              MR. SHIELDS:  So we're going off the
23    record at --
24              THE VIDEOGRAPHER:  1:27 p.m.
25              (The proceeding recessed at 1:27 p.m.)
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2              (The proceeding reconvened at 1:40 p.m.;
 3              appearances as before noted.)
 4              THE VIDEOGRAPHER:  Going back on the
 5     record for the case Charles Dempsey against the City
 6     of Rochester et al., Case No. 19-cv-6780.  Today's
 7     date is July 15, 2022.  The time is 1:40 p.m.
 8              My name is Ben Parrow with Studio 80 ROC,
 9     at the business address:  277 North Goodman Street,
10     Apartment 407, Rochester, New York.  And we are at 16
11     West Main Street, Rochester, New York.
12     OFFICER JAVIER ALGARIN, resumes;
13              CONTINUING EXAMINATION BY MR. SHIELDS:
14        Q.  Okay.  And, Officer Algarin, we just took
15     a little break.  During the break, did you talk to
16     your attorney at all?
17        A.  Yes.
18        Q.  Any answers to any questions that you want
19     to change?
20        A.  No.
21        Q.  Okay.  I just had a couple of questions
22     about the video and the incident.
23              You said earlier that you put in an
24     affidavit in opposition to a motion earlier in this
25     case; correct?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   There was an affidavit.  As to
 3    specifically what it was for, I don't remember.
 4         Q.   Okay.  And did you draft that affidavit?
 5         A.   What do you mean?
 6         Q.   Did you write the affidavit?
 7         A.   With my own hand?  No.
 8         Q.   Did you review the affidavit for -- in
 9    preparation for your testimony today?
10         A.   Yes.
11         Q.   Okay.  And one of the things that you said
12    in the affidavit is that Mr. Dempsey was never in the
13    line of fire when you fired your weapon; is that
14    correct?
15         A.   When my firearm was discharged, correct.
16              (The following exhibit was marked for
17              identification:  Plaintiff EXH C.)
18         Q.   I just want to look at some still-shots
19    from the video that were put in plaintiffs' motion as
20    part of what you had put in the affidavit form.
21              Okay.  So this will be Plaintiffs' Exhibit
22    C, and this was Exhibit 8 --
23              MS. JONES:  8.
24         Q.   -- in plaintiffs' opposition to
25    defendants' motion to dismiss, or in the alternative,
```



```
 1             OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    motion for summary judgment, and it's part of
 3    plaintiffs' motion for summary judgment.
 4             And, Officer Algarin, does this look like
 5    it's a screenshot from your body-worn camera on the
 6    day of the incident?  Can you tell from the numbers in
 7    the bottom right?
 8             A.  Yes.
 9             Q.  And in this screenshot, can you see the
10    firearm in your hand?
11             A.  Yes.
12             Q.  And in the background, can you see
13    Mr. Dempsey on the porch?
14             A.  Yes.
15             Q.  And would it be fair to say that
16    Mr. Dempsey is in the general direction behind where
17    you're pointing your gun?
18             A.  No.
19             Q.  Okay.  Would it be fair to -- and your
20    answer is "no" because you're pointing the gun down.
21    Is that why you said "no"?
22             A.  Correct.
23             Q.  Okay.  Sometimes a bullet can ricochet off
24    the ground.  Is that fair to say?
25             A.  Depending on the material.
```



```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2         Q.  And what are the types of things that a
3    bullet could ricochet off of?
4         A.  Metal, ceramic, walls of sorts.
5         Q.  Hard things?  Rocks?  Cement?
6         A.  Maybe.
7         Q.  Do you know if any of those hard things,
8    like metal or rocks or cement, were present in
9    Mr. Dempsey's backyard?
10        A.  Not in that area that I saw or remember.
11             (The following exhibit was marked for
12             identification:  Plaintiff EXH D.)
13        Q.  Okay.  And I'm just going to go to the
14   next screenshot, which should be Exhibit 9 from -- I
15   guess this is just -- let me just ask you.  Does this
16   also appear to be a screenshot from your body-worn
17   camera video based on the numbers in the bottom
18   right-hand corner of the screen?
19        A.  Correct.
20        Q.  And the screenshot, it looks like it's
21   from 2 minutes and 23 seconds into your body-worn
22   camera video.  Is that fair to say?
23        A.  Correct.
24        Q.  Okay.  And just for the record -- going
25   back to Exhibit 8 -- or Exhibit C, which was Exhibit 8
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    to the motion, that would have been a screenshot from
 3    2 minutes and 19 seconds in the video; is that
 4    correct?
 5              A.  Correct.
 6              Q.  Okay.  So going back to Exhibit 9 from the
 7    motion, which for the deposition will be Exhibit D, in
 8    general, does that just depict a close-up of you
 9    holding your firearm with two hands?
10              A.  Correct.
11              Q.  But you can't really see anything directly
12    behind that?
13              A.  Correct.
14              (The following exhibit was marked for
15              identification:  Plaintiff EXH E.)
16              Q.  Okay.  The next one will be Exhibit 10
17    from the motion, plaintiffs' motion for summary
18    judgment in opposition to defendants' motion to
19    dismiss, or in the alternative, for summary judgment.
20              And, Officer Algarin, does this again
21    appear to be, based on the numbers in the bottom
22    right-hand corner of the screen, a screenshot from
23    your body-worn camera from the day?
24              A.  Yes.
25              Q.  And this screenshot is from 2 minutes and
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    24 seconds into the video; is that correct?
 3            A.  Yes.
 4            Q.  And does this appear to be you pointing
 5    your firearm at Mr. Dempsey?
 6            MS. JONES:  Objection.
 7            A.  I have no idea from the screenshot.
 8            Q.  You can't tell based on this screenshot?
 9            A.  Correct.
10            (The following exhibit was marked for
11            identification:  Plaintiff EXH F.)
12            Q.  Okay.  So we're going to go to Exhibit 11
13    from plaintiffs' motion for summary judgment in
14    opposition to defendants' motion to dismiss, or in the
15    alternative, motion for summary judgment.
16                And, Officer Algarin, again based on the
17    numbers in the bottom right-hand corner of the
18    exhibit, which will be for this deposition Exhibit E,
19    does -- do those numbers indicate that that is your
20    body-worn camera video from the date of this incident?
21            A.  Yes.
22            Q.  And it's paused at 2 minutes and 24
23    seconds into the video --
24            MS. JONES:  Are we entering Exhibit 10
25    from your motion, because I feel like 10 should be E
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
1
2    and this should be F?
3             MR. SHIELDS:  If you had those down as E
4    and F, that might be correct.  I think I might have
5    lost track of the numbers.
6             MS. JONES:  Okay.
7             MR. SHIELDS:  So we can go -- that sounds
8    like -- so Exhibit 10 should have been E and Exhibit
9    11 from the motion should have been Exhibit F, and I
10   will email those afterwards.  So we did -- the video
11   is A, the PDF file is B, C, D, E, F, correct.  Okay.
12   So that's right.
13            8 should be C, Exhibit 9 should be D,
14   Exhibit 10 should be E, Exhibit 11 should be F.
15            Okay.  So this is now Exhibit 11, which
16   will be marked in this deposition as Exhibit F.
17       Q.  And, Officer Algarin, is this your
18   body-worn camera from the day of the incident paused
19   at 2 minutes and 24 seconds into the video?
20       A.  Yes.
21       Q.  Okay.  And does this appear to be you
22   pointing your firearm at Mr. Dempsey?
23       A.  Yes.
24       Q.  Okay.  And you said earlier that you
25   pointed your firearm at Mr. Dempsey because he was



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     charging at you; correct?
 3              MS. JONES:  Objection.
 4          A.  Yes, he was charging at me, and my gaze
 5     turned to him.  Where my eyes go, the gun follows.
 6          Q.  Okay.  From this still-shot, can you tell
 7     if Mr. Dempsey was charging at you?
 8          A.  With his motion of his leg?  Yes.
 9          Q.  Let's just see -- watch the video for a
10     second and see if that's what we see in the video.
11              Okay.  So I'm pulling up the video, which
12     had previously been marked as Exhibit A, and we are
13     going to 2 minutes and 19 seconds into the video, and
14     I'm going to hit "Play."
15              (At this time the video was played.)
16          Q.  Okay.  Did he look like he was charging at
17     you in a manner that he wanted to harm you?
18          A.  Yes.
19          Q.  Okay.  You didn't think that he was just
20     saying "What are you doing to my dog?"
21          A.  No.
22          Q.  All right.  But this all could have been
23     avoided, like we talked about earlier, if you had gone
24     to his front door and simply asked his permission to
25     enter his yard; right?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   Yes.
 3         Q.   Okay.  And if you could take it all back
 4    and do it over again, that's the choice you would
 5    make?
 6              MS. JONES:  Objection.
 7         A.   Yes.
 8              MR. SHIELDS:  Thank you.  I have no
 9    further questions.
10              MS. JONES:  That means it's my turn.
11              No, I don't have any questions.
12              MR. SHIELDS:  Okay.  Thank you.
13              And, Ben?
14              THE VIDEOGRAPHER:  All right.  We are
15    going off the record.  The time is 1:52 p.m. and this
16    concludes the deposition for the case Charles -- of
17    Officer Javier Algarin against Charles Dempsey.
18              MR. SHIELDS:  In the case of Charles
19    Dempsey against the City of Rochester et al.
20              THE VIDEOGRAPHER:  Sorry.  Should I start
21    over from the beginning?
22              Okay.  This concludes the deposition for
23    the case of Javier Algarin against Charles -- Javier
24    Algarin and the City of Rochester --
25              MR. SHIELDS:  This concludes the
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                    P R O C E E D I N G S
 2      deposition of police officer Javier Algarin in the
 3      case of Charles Dempsey against the City of Rochester.
 4                    THE VIDEOGRAPHER:  Sorry.  This concludes
 5      the deposition of Officer Javier Algarin in the case
 6      of Charles Dempsey against the City of Rochester et
 7      al.
 8                         (TIME:  1:53 p.m.)
 9                         *       *       *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1
 2                        W I T N E S S
 3    Name                          Examination by        Page
 4    ------------------------------------------------------------
 5     Officer  Javier Algarin      Mr. Shields          5-125
 6       "       "                   Confidential       126-128
 7       "       "                   Mr. Shields        129-185
 8                          *        *        *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1

 2                          E X H I B I T S

 3    Plaintiff        Description              Marked ID'ed

 4    -----------------------------------------------------------

 5    EXH A    Video from body-worn camera       64      64

 6    EXH B    Officer Algarin's PDS file        155     155

 7    EXH C    Screenshot                        178     178

 8    EXH D    Screenshot                        180     180

 9    EXH E    Screenshot                        181     181

10    EXH F    Screenshot                        182     182

11

12                      (Electronic Exhibits)

13                      *       *       *

14

15

16

17              EXHIBITS PREVIOUSLY MARKED

18    Exhibit          Description                      Page

19    -----------------------------------------------------------

20    EXH

21         (No Previously Marked Exhibits Presented)

22                      *       *       *

23

24

25
```



```
 1
 2              D O C U M E N T   R E Q U E S T S
 3    Request                                        Page
 4    -------------------------------------------------------------
 5      Emails, written communications, text
        messages related to incident (By Mr. Elliot)  18
 6
 7                         *       *       *
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1

 2      D I R E C T I O N S   N O T   T O   A N S W E R

 3    Question                                             Page

 4    ----------------------------------------------------------------

 5    Okay.  Well, that's my -- I'll withdraw my
      prior question, and my new question is, tell
 6    me all of the things that you like to do
      with your dog Hudson.                                 105
 7
      What was your batting average?                        135
 8
      Were you a young child when you played
 9    baseball?                                             136

10    How old were you when you played baseball?            136

11
                         *       *       *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1
 2                    A C K N O W L E D G M E N T
 3                    I, Officer Javier Algarin, declare, swear
 4     and aver that I have read my testimony contained
 5     herein and that my answers are true and correct, with
 6     any exceptions noted on the errata sheet, under
 7     penalty of perjury.
 8                    _____
 9                    Officer Javier Algarin
10
11
12                    I certify that this transcript was signed
13     in my presence by Officer Javier Algarin on the _____
14     day of _____, 2022.
15
16                    IN WITNESS WHEREOF, I have hereunto set my
17     hand and affixed my seal of office of _____, New
18     York on this _____day of _____, 2022.
19
20                    _____
21                    Notary Public
22
23                    _____
24                    My Commission Expires:
25
```



1

2                    E R R A T A   S H E E T

3              Witness: Officer Javier Algarin
               Deposition Date:  July 15, 2022
4       Pg #   Line #     Change              Clarification

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1

 2                     C E R T I F I C A T I O N
     STATE OF NEW YORK:
 3   COUNTY OF MONROE:

 4               I, KIMBERLY A. BONSIGNORE, do hereby

 5   certify that the foregoing testimony was duly sworn

 6   to; that I reported in machine shorthand the foregoing

 7   pages of the above-styled cause, and that they were

 8   produced by computer-aided transcription (CAT) under

 9   my personal supervision and constitute a true and

10   accurate record of the testimony in this proceeding;

11               I further certify that the witness

12   requests to review the transcript;

13               I further certify that I am not an

14   attorney or counsel of any parties, nor a relative or

15   employee of any attorney or counsel connected with the

16   action, nor financially interested in the action;

17               WITNESS my hand in the City of Rochester,

18   County of Monroe, State of New York.

19

20
     KIMBERLY A. BONSIGNORE
24   Freelance Court Reporter and
     Notary Public No. 01B06032396
25   in and for Monroe County, New York
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920