1

2                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
3  - - - - - - - - - - - - - - - - - - - - - - - - - -
   CHARLES DEMPSEY, individually, and L.D. by her
4  father and natural guardian, CHARLES DEMPSEY,

5           Plaintiffs,

6                            Index No. 19-cv-6780 (EAW)
   v.
7
   THE CITY OF ROCHESTER, a municipal entity, JAVIER
8  ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER
   RESPONSIBLE FOR TRAINING JAVIER ALGARIN,
9
            Defendants.
10 - - - - - - - - - - - - - - - - - - - - - - - - - -

11
   Remote Deposition Upon Oral Examination of:
12
                    Officer Jason Horowitz
13

14

15
   Date:            February 8, 2023
16

17
   Time:            10:00 a.m.
18

19

20

21 Reported By:   Jayme C. Wintish

22                Alliance Court Reporting, Inc.

23                109 South Union Street, Suite 400

24                Rochester, New York 14607

25



```
 1
 2                      A P P E A R A N C E S
 3   Appearing Remotely on Behalf of Plaintiffs:
 4   Elliot D. Shields, Esq.
 5       Roth & Roth LLP
 6       192 Lexington Avenue, Suite 802
 7       New York, New York  10016
 8       eshields@rothandrothlaw.com
 9
10   Appearing Remotely on Behalf of Defendants:
11   Peachie L. Jones, Esq.
12       City of Rochester Law Department
13       City Hall, Room 400A
14       30 Church Street
15       Rochester , New York  14614
16       peachie.jones@cityofrochester.gov
17                        *      *      *
18
19
20
21
22
23
24
25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                    S T I P U L A T I O N S
 2    WEDNESDAY, FEBRUARY 8, 2023;
 3                (Proceedings in the above-titled matter
 4                commencing at 10:04 a.m.)
 5                          *       *       *
 6                IT IS HEREBY STIPULATED by and between the
 7    attorneys for the respective parties that this
 8    deposition may be taken by the Plaintiff at this time
 9    pursuant to subpoena;
10                IT IS FURTHER STIPULATED, that all
11    objections except as to the form of the questions and
12    responsiveness of the answers, be reserved until the
13    time of the trial;
14                IT IS FURTHER STIPULATED, that pursuant to
15    Federal Rules of Civil Procedure 30(e)(1) the witness
16    requests to review the transcript and make any
17    corrections to same before any Notary Public;
18                IT IS FURTHER STIPULATED, that if the
19    original deposition has not been duly signed by the
20    witness and returned to the attorney taking the
21    deposition by the time of trial or any hearing in this
22    cause, a certified transcript of the deposition may be
23    used as though it were the original;
24                IT IS FURTHER STIPULATED, that the
25    attorneys for the parties are individually responsible
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    for their certified transcript charge, including any
 3    expedite or other related production charges;
 4              AND IT IS FURTHER STIPULATED, that the
 5    Notary Public, JAYME C. WINTISH, may administer the
 6    oath to the witness.
 7                        *     *     *
 8              THE COURT REPORTER:  Will counsel please
 9    stipulate to me remotely swearing in the witness
10    located in New York State; that counsel will not
11    object to the admissibility of the transcript based on
12    proceeding in this way; and that the witness has
13    verified that he is, in fact, Officer Jason Horowitz.
14              MS. JONES:  Yes.
15              MR. SHIELDS:  Yes.
16    OFFICER JASON HOROWITZ,
17         called herein as a witness, first being sworn,
18         testified as follows:
19         EXAMINATION BY MR SHIELDS:
20         Q.  Good morning, Officer Horowitz.  My name
21    is Elliot Shields.  I represent the plaintiffs in this
22    lawsuit, and I'm going to be asking you some questions
23    today.
24              First, I'm just going to go over the
25    ground rules for the deposition.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2                   Will you tell me if you don't understand
 3      any of my questions?
 4              A.   Yes.
 5              Q.   Okay.  And can you please tell me if you
 6      find any of my questions confusing?
 7              A.   Yes.
 8              Q.   And if I assume a fact that's incorrect,
 9      will you tell me that as well?
10              A.   Yes.
11              Q.   Okay.  And will you tell me if you don't
12      understand or you don't know the answer to any of my
13      questions?
14              A.   Yes.
15              Q.   Okay.  And will you need me to remind you
16      of any of those rules?
17              A.   No.
18              Q.   And if there's anything I ask you that you
19      don't understand, please say so, and I'll gladly
20      rephrase my question for you.  Okay?
21              A.   Okay.
22              Q.   And -- because otherwise, if you answer
23      the question, we're going to assume that you
24      understood it.
25                   Do you understand everything I've said so
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2     far?
3              A.   Yes.
4              Q.   Okay.  And -- is that a YETI I see?  We're
5     twins.
6              A.   Hey.  Yeah.  You got the 46-ouncer?
7              Q.   Mine is a little smaller.
8              And can you tell me what's your
9     understanding of why you're being deposed today?
10             A.   I was a witness to an incident that
11    occurred.
12             Q.   Okay.  So you understand that you're not a
13    defendant in this case; right?
14             A.   Correct.
15             Q.   And you understand that it's been more
16    than three years since the incident that you were the
17    witness to, so there's no possibility that we could
18    add you as a defendant in the case; right?
19             A.   I do now, yes.
20             Q.   Okay.  Can you tell me everything that you
21    did to prepare for today's deposition?
22             A.   I met with Ms. Jones yesterday.
23             Q.   Okay.  Did you meet with any other city
24    attorneys?
25             A.   Not recently.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.  Okay.  So previously you met with Patrick
 3    Beath?
 4         A.  I believe so.  That was a few years ago.
 5         Q.  Okay.  Was that when he like wrote up the
 6    affidavit that you signed in the case?
 7         A.  Yes.
 8         Q.  Okay.  And how long was your meeting
 9    yesterday?
10         A.  It was about an hour or so.
11         Q.  Okay.  And did you review any documents to
12    prepare for the deposition?
13         A.  Yes.
14         Q.  Tell me everything that you reviewed.
15         A.  My affidavit and my report.
16         Q.  Okay.  When you say your report, what do
17    you mean?
18         A.  The report related to this incident.  It
19    was an arrest report.
20         Q.  Okay.  So the arrest report for the
21    individual that you stopped and arrested in the vacant
22    lot on 54 Sobieski Street?
23         A.  Yes.
24         Q.  Did you review anything else?
25         A.  No.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.  Did you review your body-worn camera?
 3         A.  Yes.  I reviewed the camera footage.
 4         Q.  Okay.  Did you review just your footage or
 5    anyone else's?
 6         A.  Just mine.
 7         Q.  Okay.  So not Algarin's?
 8         A.  No.
 9         Q.  Is that how you say it, Officer?
10         A.  There's a couple different pronunciations,
11    Algarin is -- I'm sure he accepts that.
12         Q.  Did you review any like training and
13    policy documents?
14         A.  No.
15         Q.  And everything that you reviewed, did it
16    refresh your recollection of the incident?
17         A.  Yes.
18         Q.  Okay.  Did you do anything else to prepare
19    for the deposition today?
20         A.  No.
21         Q.  Did you talk to any of the officers, like
22    Officer Algarin?
23         A.  No.
24         Q.  Okay.  I'm just going to ask you some
25    background questions.  I'll start with your
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JASON HOROWITZ - BY MR. SHIELDS

2    educational background.

3                Can you tell me where you graduated from

4    high school?

5           A.   Hilton.

6           Q.   Okay.  And what year?

7           A.   2006.

8           Q.   All right.  And did you do any college

9    after that?

10          A.   Yes.

11          Q.   And where was that?

12          A.   One semester at Monroe Community College

13   and the rest of my undergrad at SUNY Brockport.

14          Q.   Okay.  And what was your major, if you had

15   one?

16          A.   Criminal justice and sociology.

17          Q.   All right.  And did you get a degree in

18   criminal justice and sociology?

19          A.   Yes.

20          Q.   Okay.  Did you work at all when you were

21   in college?

22          A.   Yes.

23          Q.   And where did you work?

24          A.   I worked at the Monroe County Jail as an

25   unsworn employee.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.   What were your job duties?
 3         A.   Just dealing with inmates, take care of
 4   certain supplies, deliveries, checking them in at
 5   visitations, inmate kitchen.  That's where the inmates
 6   make the food and prepare it.
 7         Q.   Okay.  So when you were in college and
 8   working at MCC, during that time period, did you get
 9   any police-related training?
10         A.   No.
11         Q.   Okay.  When you went to college, you --
12   did you intend on becoming a police officer?
13         A.   Yes.
14         Q.   And can you give me an overview of your
15   work history with the Rochester Police Department?
16         A.   Okay.  I was hired in March of 2016.
17   After completing the academy I was on field training
18   in Clinton section, first platoon.  After I completed
19   my field training, I was assigned to Lake section,
20   third platoon.  So the evening shift.
21              And from there I -- after I did my
22   probationary period, I then transferred back to
23   Clinton section.  And then I bounced between Clinton
24   section and Goodman section.  And ultimately, I'm now
25   back in Clinton section for the past year.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JASON HOROWITZ - BY MR. SHIELDS

2          Q.  And let me just back up.

3               When did you graduate from SUNY Brockport?

4          A.  In the fall of 2010.

5          Q.  What did you do between the fall of 2010

6     and when you began working for the RPD?

7          A.  I worked for the University of Rochester

8     Public Safety.

9          Q.  Okay.  So you were like one of the campus

10    security guards?

11         A.  Yes.  And at the hospital, at Strong

12    Memorial Hospital.  They're all under the same URMC

13    umbrella.

14         Q.  Got it.

15              Were you -- did you have to go to like the

16    academy before that?

17         A.  No.  It was all in-house training.

18         Q.  Okay.

19         A.  I believe it was in 2014 I did attend the

20    peace officer academy, which was a very short academy.

21    It was like about a two-month academy at the Public

22    Safety Training Facility in Rochester.

23         Q.  All right.  That's the same facility where

24    the academy takes place?

25         A.  Yes.



1          OFFICER JASON HOROWITZ - BY MR. SHIELDS

2          Q.   Okay.  So before that you didn't have any

3    training when you worked as a security guard for U of

4    R?

5          A.   Correct.

6          Q.   Okay.  Just in-house training, you mean?

7          A.   Yes.

8          Q.   And when did you start working as a

9    security guard at U of R?

10         A.   In 2000 -- it was March 2011.

11         Q.   Okay.  And how long was that peace officer

12   training in 2014?

13         A.   So they did half of your work week was at

14   the academy and half was working at the U of R.  So it

15   took a little longer than two months.  But all

16   together it was about two months.

17         Q.   And how come you started that in 2014?

18         A.   It was kind of a promotion or like an

19   upgrade from security guard to peace officer.

20         Q.   Got it.

21              Before you went to that training, could

22   you carry a gun?

23         A.   No.

24         Q.   After the training could you carry a gun?

25         A.   No.



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.   Okay.  So U of R security doesn't -- at
 3    the time at least that you worked there -- carry
 4    firearms?
 5         A.   Correct.
 6         Q.   Okay.  So you didn't have any firearms
 7    training until the academy.
 8              Is that fair to say?
 9         A.   Yes.
10         Q.   Okay.  How long is the probationary
11    period?
12         A.   Six months after completion of the academy
13    for Rochester Police Department.
14         Q.   Okay.  And when did you complete the
15    academy?
16         A.   It was around mid-September of 2016.
17         Q.   Okay.  So at the time of this incident in
18    October 2018 your probationary period was done?
19         A.   Yes.
20         Q.   Okay.  And so you were Clinton third.
21              Is that what you said?
22         A.   Yes.  3 p.m. to 11 p.m.
23         Q.   Okay.  Have you ever shot a dog in your
24    duties as a police officer?
25         A.   No.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2          Q.  Other than this incident have you ever
3     witnessed another police officer shoot a dog?
4              MS. JONES:  Objection.
5          A.  No.
6          Q.  Have you ever been questioned under oath
7     before?
8          A.  Yes.
9          Q.  Was that in the context of just criminal
10    cases or a civil case like this as well?
11         A.  Yes.  Criminal and civil.
12         Q.  Okay.  What was the context of the other
13    civil cases?
14         A.  I was a witness as well to a motor vehicle
15    accident involving a police vehicle.
16         Q.  Okay.  And can you estimate how many times
17    you've testified under oath before?
18         A.  Over a hundred times.
19         Q.  Because basically it's part of your job as
20    a police officer?  Come to court and testify about
21    things that happened?
22         A.  Yes.
23         Q.  Did you receive any training at the
24    academy or afterwards about testifying?
25         A.  We spent a day.  It was kind of like a
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2    field trip at the Hall of Justice where we met with an
3    ADA and they kind of put us through some scenarios.
4         Q.   Okay.  And was that during the academy?
5         A.   Yes.
6         Q.   Since the academy have you gotten any
7    training about testifying?
8         A.   No.
9         Q.   Okay.  I'm going to switch gears and ask
10   you questions about the incident.
11              Do you remember the date of the incident?
12        A.   Not off the top of my head.
13        Q.   If I said it was October 19th, 2018, does
14   that sound right to you?
15        A.   Yes.
16        Q.   Okay.  Can you just tell me everything you
17   remember about the incident?
18        A.   I remember responding to a vice call.
19   Essentially a vice call could be drug activity,
20   prostitution, drinking, people with handguns.
21        Q.   Okay.  So you responded.
22              Then what happened next?
23        A.   When we were responding, the officers that
24   were on the job, we all communicated together.
25        Q.   And how did you communicate?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2        A.  I believe we messaged -- either messaged
 3  each other through -- we contacted each other either
 4  through radio or phone calls.
 5        Q.  Okay.  So it was a conversation?
 6        A.  Yes.
 7        Q.  Okay.  And what did you talk about?
 8        A.  Well, we discussed the fact that we've
 9  been picking up on the people -- the individuals in
10  question, the type of behavior that they'll display
11  when we pull down the street, which was they would
12  flee or retreat into the backyard and hop over a few
13  fences to the next street south of that location.  So
14  we came up with a plan to split up:  Two officers go
15  down Kosciusko, two officers go down Sobieski.
16        Q.  Okay.  So you devised a plan.
17            Is that what you said?
18        A.  Yes.
19        Q.  With the other officers?
20        A.  Yes.
21        Q.  Now, who are the other officers?
22        A.  Officer Gorman, Officer DiSabatino, and
23  Officer Algarin.
24        Q.  Okay.  And so what was the plan you guys
25  had devised?
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.   Officer Gorman and I, we would wait on
 3    Sobieski Street, which is one block south of Kosciusko
 4    Street.  And Officer DiSabatino and Officer Algarin
 5    would go down Kosciusko Street, essentially showing
 6    their presence, which would cause -- what we would
 7    have believed and what ultimately happened -- the
 8    suspects to retreat into the backyard and try to make
 9    it to the next street south of Kosciusko, which is
10    Sobieski Street.
11         Q.   So the plan was basically Algarin and
12    DiSabatino pull up on Kosciusko, and you expected,
13    based on prior experience, the suspects to run south
14    to Sobieski Street where you would apprehend them with
15    Gorman?
16         A.   Yes.
17         Q.   And that's ultimately what happened?
18         A.   Yes.
19         Q.   All right.  Officer Gorman testified that
20    he had been working the day prior, and basically that
21    is what happened on the day prior.  They had run south
22    from Kosciusko through the yards to Sobieski Street.
23              Were you working that prior day with
24    Officer Gorman?
25         A.   I don't know if I was working with him on
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2     that certain case.
 3              Q.  So you don't recall if you were working
 4     the prior day?
 5              A.  Correct.
 6              Q.  Okay.  Prior to this incident, had you
 7     witnessed these same suspects or others on Kosciusko
 8     Street run through the backyards to Sobieski Street?
 9              A.  Yes.
10              Q.  And when did you guys come up with a plan
11     on this day?
12              A.  The job came in shortly after roll call.
13     And when we saw the job waiting for an officer to take
14     it, we discussed it.
15              Q.  Can you describe what you mean when you
16     say "the job came in"?
17              A.  So when somebody calls 911, they speak to
18     an operator and the operator takes down the caller's
19     information -- whether they want to give it or not.
20     Sometimes it's a refused caller.  Sometimes they leave
21     their name and number.  But they give a general
22     description and a location of where the service call
23     would be.  And from there the operator puts the card
24     together and puts it in a hopper, which waits for an
25     officer to call dispatch for the job.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.   Okay.  So a 911 call comes in.  You said
 3    it gets put "in a hopper."  Now, the hopper, that's
 4    like a -- I don't know -- a list -- a waiting list or
 5    something?
 6         A.   Yes.
 7         Q.   Okay.  So it's in the waiting list.  You
 8    call dispatch.  You say, "I'll respond to this call"?
 9         A.   Yes.
10         Q.   Okay.  And so that's what happened on this
11    day.
12              And how did it come about that the four of
13    you all responded to this one call?
14         A.   We just all called dispatch and added
15    ourselves.  So typically for -- it's a priority job,
16    which means two officers have to go to it.  And we all
17    work together.  We all know what type of job call that
18    it was, so we all decided to go together.
19         Q.   Okay.  So this was a priority job --
20         A.   Yes.
21         Q.   -- because it was a vice call?
22         A.   Yes.
23         Q.   And when you say this call was a vice
24    call, do you remember if it was a call about drugs or
25    something else?
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2              MS. JONES:  Objection.
 3              But go ahead.
 4         A.   I don't remember.
 5         Q.   Okay.  And when you say it was a vice
 6  call, do you remember that from looking at your
 7  paperwork previously in preparation for the
 8  deposition?
 9         A.   Yes.  Yes.  It was a vice call.  I don't
10  remember the description of the call or the -- the
11  complaint.
12         Q.   And this was your section that you'd
13  worked for some period of time before the incident;
14  right?
15         A.   Yes.
16         Q.   How long had you worked in the Clinton
17  section before the incident?
18         A.   I transferred from Lake section to Clinton
19  in, I think, January -- yes -- January 2018.  So
20  approximately nine months prior to the incident.
21         Q.   Okay.  And had you responded to this, I
22  guess, specific block of Kosciusko Street and Sobieski
23  Street more than once prior to this incident?
24         A.   Yes.
25         Q.   Can you estimate how many times?
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2              A.  We would respond to that location -- a
 3   call would come in, I would say, twice a shift for the
 4   males selling drugs, among other things.  Sometimes
 5   they had other details about the job.  It all depends
 6   on the caller.  But that's been a main trouble of that
 7   street, that certain location.  So I would say I
 8   probably responded to that location over 50 times.
 9              Q.  Prior to this incident?
10              A.  Yes.
11              Q.  In the nine or ten months prior to this
12   incident?
13              A.  Yes.
14              Q.  Okay.  And had you ever interacted with
15   these specific individuals who were arrested on the
16   date of the incident, previously?
17              A.  I've never -- prior to this incident, I
18   was never able to ID the individuals.  So no, I'm not
19   positive that I dealt with specifically them.
20              Q.  In the 50 or so times that you responded
21   to this location previously, on how many prior
22   occasions had they run through the yards on Kosciusko
23   Street?
24              A.  I would say about half of the times that
25   I've responded they've fled south of the location.
```



```
1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2    Sometimes -- not always, but sometimes they would have
3    access to the house at 61 Kosciusko.  And they would
4    retreat into the house.
5              Q.  Okay.  What would you do when they went
6    inside the house?
7              A.  At that point we can't do anything,
8    especially if they lock the door.
9              Q.  Okay.  You never went and got like a
10   search warrant or an arrest warrant?
11             A.  No.
12             Q.  Okay.  So basically you would give up and
13   leave at that point?
14             A.  Yes.
15             Q.  Okay.  And it was always the same house,
16   61 Kosciusko?
17             A.  It would be in the general area, give or
18   take a few addresses.  But 61, generally, would always
19   come in as the location.
20             Q.  And was that the residence directly next
21   door to where Officer Algarin shot my client's dog?
22             MR. JONES:  Objection.
23             Q.  If you know.
24             A.  I do not know.  There may be a house or
25   two in between.  I can't say for sure.
```



1          OFFICER JASON HOROWITZ - BY MR. SHIELDS

2          Q.  And when you say they would run south, do

3    you mean they would run through driveways and

4    backyards from Kosciusko Street to the direction of

5    Sobieski Street?

6          A.  So the vacant lot that they would retreat

7    to, and that would be their course of travel, there's

8    a privacy fence, a 6-foot stockade fence.  Then there

9    is also a couple of chain-link fences on the border of

10   these properties that they would ultimately have to

11   defeat in order to get to the vacant lot.

12         Q.  Had you ever previously stationed on

13   Sobieski Street to watch them run from Kosciusko

14   Street?

15         A.  Prior to this incident, no.

16         Q.  Okay.  How did you guys come up with this

17   new plan on this day?

18              MS. JONES:  Objection.

19              But go ahead.

20         A.  Based on our experience, we knew where

21   their flight of path would be.  So we made a decision

22   to set up that way, and we were able to apprehend both

23   suspects.

24         Q.  So after several months of prior

25   experiences, you said, "Hey, let's try this," and it



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           OFFICER JASON HOROWITZ - BY MR. SHIELDS

2    worked?

3           A.  Yes.

4           Q.  Okay.  I want to just go over your body

5    camera video with you.  So I'm going to put that up

6    and play it for you.

7           (The following exhibit was marked for

8           identification:  Number EXH 1.)

9           MR. SHIELDS:  And Jayme, that will be

10   Exhibit 1.  But obviously, I don't think we can

11   include that in our PDF record.

12          Q.  Sorry.  I thought I had it up.  Let me

13   just pull it up.

14          And it looks to me -- I didn't ask you at

15   the beginning of the deposition -- at Alliance right

16   now, when you're looking at me, is that on a

17   television screen?

18          A.  Yes.

19          Q.  Okay.  Give me one second.  And I'm going

20   to display the exhibit and ask you -- make sure that

21   you can see it.

22          Okay.  Officer Horowitz, do you see what

23   looks like the beginning of your body-worn camera

24   recording?

25          A.  Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2       Q.  Okay.  And on the bottom right corner here
 3   where it says "00938_jh2559," is that an identifier
 4   that identifies this as your body-worn camera
 5   recording?
 6       A.  Yes.  The "00938" is the actual body
 7   camera.  And then the underscore.  And then it's my
 8   initials and IBM.
 9       Q.  Okay.  Great.  And it looks like it's
10   starting at 2018, 10/19.  So October 19th, 2018, at 17
11   hours, 6 minutes, and 36 seconds?
12       A.  Yes.
13       Q.  And it's 5:06 in non-military time?
14       A.  Yes.
15       Q.  Okay.  All right.  I'm just going to play
16   it.  And then I'll stop it and ask you some questions.
17   Okay?
18       A.  Yes.
19       Q.  All right.  We'll hit play from the
20   beginning.
21                 (Video was played.)
22       Q.  And when we first hit play, it's silent
23   because that's the prerecording; is that right?
24       A.  Yes.
25                 MR. SHIELDS:  All right.  And right here
```



```
1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2    at -- I'm going to pause it 15 seconds into the video,
3    which is 17 hours, 6 minutes, and 50 seconds.
4         Q.  So this shows you parking.
5              And can you just say for the record where
6    you parked your car here?
7         A.  I parked my car on Sobieski Street.
8         Q.  Okay.  And kind of in the top right
9    portion of the screen, there's a blue car parked in a
10   dirt-looking driveway; is that right?
11        A.  Yes.
12        Q.  Is that the -- is that next to the vacant
13   lot at 54 Sobieski Street?
14             MS. JONES:  Objection.
15             But go ahead.
16        A.  So that is considered the vacant lot.
17   That house's driveway is to the right, essentially,
18   east of the white house.  So that's actually an
19   illegally parked vehicle in a vacant lot.
20        Q.  Okay.  So that car right there is in the
21   vacant lot at 54 Sobieski Street?
22        A.  Yes.
23        Q.  Okay.  So I'm going to hit play again at
24   17 hours, 6 minutes, and 50 seconds.  And then I'll
25   pause again and ask you some questions.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2                       (Video was played.)
 3              MR. SHIELDS:  Okay.  So I'm pausing it at
 4    24 seconds into the video, 17 hours, 7 minutes, and
 5    zero seconds.
 6         Q.  It looks like you just started to run; is
 7    that right?
 8         A.  Yes.
 9         Q.  Okay.  And why did you just start to run
10    right there?
11         A.  I can go only on the assumption that there
12    was somebody entering the vacant lot at the north part
13    of the property.
14         Q.  Okay.  Do you have an independent
15    recollection of the incident and why you began to run?
16         A.  Yes.  It was -- we were told over radio by
17    the other officers that they were running southbound
18    toward Sobieski Street.  And I heard the individuals
19    on the fence line.
20         Q.  Okay.  Do you remember if you began to run
21    before you actually visually saw the individuals?
22         A.  Yes.  I ran before I actually physically
23    saw the individuals.  Yes.
24         Q.  Okay.  All right.  I'm going to hit play
25    again at 17 hours, 7 minutes, and zero seconds.  And
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    then I'll pause again and ask you some more questions.
 3                    (Video was played.)
 4         Q.   Okay.  So the sound came on a couple
 5    seconds right before I paused at 17 hours, 7 minutes,
 6    and 9 seconds; is that right?
 7         A.   Yes.
 8         Q.   Okay.  It's because the prerecord is 30
 9    seconds long; is that right?
10         A.   Yes.
11         Q.   And where we're paused right now, can you
12    tell me where you're located?
13         A.   We're in the vacant lot at 54 Sobieski.
14         Q.   Okay.  In the middle or somewhere else in
15    the vacant lot?
16         A.   We're in the middle of the vacant lot.
17         Q.   Okay.  And can you just describe for the
18    record what's displayed at this portion where we're
19    paused?
20         A.   Yes.  The -- half of the north end of the
21    property is a stockade fence, 6-foot tall.  To the
22    east of the property, again, 54 Sobieski, is another
23    stockade fence, 6-feet tall.  And it looks like on the
24    north -- west side of the property it is chain-link
25    fence.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.   Okay.  And just for the record, when you
 3    say "north," that's, I guess, if you're looking
 4    straight back towards Kosciusko Street?
 5         A.   Yes.
 6         Q.   And then if you're looking to the right,
 7    that's the east?
 8         A.   Yes.
 9         Q.   Okay.  And the west would be on the left
10    side?
11         A.   Yes.
12         Q.   Okay.  Where did the individual jump the
13    fence?
14         A.   He jumped the fence -- so if you look at
15    the stockade fence on the north side there, right in
16    front of us, there's a tree right in the middle.
17              Do you see the tree?
18         Q.   The tall tree that has like a V that comes
19    up?
20         A.   Yes.  Yes.
21         Q.   Okay.
22         A.   So he hopped that fence -- just east, or
23    just right of that tree is where he hopped the fence.
24         Q.   Okay.  And do you know if that's -- if
25    that -- beyond that fence to the north, do you know
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2     what the property address is?
 3          A.   I do not.
 4          Q.   Okay.  Do you know if it was 61 or
 5     something else?
 6              MS. JONES:  Objection.
 7              But go ahead.
 8          A.   The -- sorry.  The doctor was calling me.
 9              The house...
10          Q.   We can take a short break if you need.
11          A.   The tall, white house is --
12              I missed the call.  We can continue.
13              So the tall, white house there on the
14     right-hand side, that's kind of in between the -- or
15     stationed beyond -- but in between the stockade fence,
16     there is 61 Kosciusko.
17          Q.   Okay.  So are you saying that there's --
18     61 Kosciusko Street is kind of covered by trees in
19     this picture?
20          A.   Partially covered.  It's the tall one on
21     the right-hand side of the screen.
22          Q.   Oh, okay.  The tall one is 61?
23          A.   Yes.  Beyond the fence.
24          Q.   Okay.  So do you know if where he jumped
25     the yard was part of the backyard to 61, that tall
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   house, or the house that would be directly to its left
 3   in the, you know, image that we're looking at?
 4         A.  It's partially in the house to the left of
 5   61 is where he would have to jump.
 6         Q.  Okay.  And then to -- in our view, looking
 7   at the screen, to the left of that, there's a
 8   chain-link fence; right?
 9         A.  Yes.
10         Q.  And do you know if that chain-link fence
11   is to 54 Kosciusko Street?
12         A.  I do not know.
13         Q.  I'm sorry.  What I meant to say was 53
14   Kosciusko Street.
15         A.  I can't assume.  I don't remember the
16   numerical.
17         Q.  Sure.  Was that the yard where the dog was
18   shot?
19         A.  I don't know.
20         Q.  Okay.  All right.  So let's keep playing
21   it, and then I'll pause again.  So we're hitting play
22   at 17 hours, 7 minutes, and 9 seconds.
23                   (Video was played.)
24              MR. SHIELDS:  All right.  I'm pausing it
25   at 17 minutes, 7 -- or 17 hours, 7 minutes, and 13
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    seconds.
 3         Q.  When you said, "Gorman's got him" -- did
 4    you hear yourself say that?
 5         A.  Yes.
 6         Q.  Were you talking about the second
 7    individual that had fled through the yards?
 8         A.  Yes.
 9         Q.  Did you see that second individual flee
10    through the yards?
11         A.  I was looking down at the individual that
12    was with me.  I don't remember if I saw him, but I do
13    remember seeing Officer Gorman with him -- the other
14    suspect.
15         Q.  Okay.  And that was in one of the other
16    yards?
17         A.  Yes.
18         Q.  Okay.  Do you remember which yard?
19         A.  I don't.
20         Q.  Okay.  It was not the same yard as where
21    the dog was shot, if you remember?
22         A.  I don't remember.
23              MS. JONES:  Objection.
24              MR. SHIELDS:  Okay.  I'm going to hit play
25    again at 17 hours, 7 minutes, and 13 seconds.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2                       (Video was played.)
 3         Q.  All right.  Did you hear what you just
 4    said there?
 5         A.  I do not remember what I said.
 6         Q.  Okay.
 7              MR. SHIELDS:  I paused it at 17 hours, 7
 8    minutes, and 43 seconds.  I'm just going to back up a
 9    little bit.  Let's go to 17 hours, 7 minutes, and 37
10    seconds.  I'm going to hit play.
11                       (Video was played.)
12              MR. SHIELDS:  Okay.  I think I just missed
13    it.  So I'm going to back up a little further.  Okay.
14    17 hours, 7 minutes, and 34 seconds is where I rewound
15    to.  And I'm going to hit play again.
16                       (Video was played.)
17         Q.  Did you hear yourself that time?
18         A.  Yes.
19         Q.  Okay.  What did you say?
20         A.  "Is there another too?"
21         Q.  Okay.  Do you know what you were talking
22    about?
23         A.  No.
24         Q.  Okay.
25              MR. SHIELDS:  All right.  So I had paused
```



```
 1                OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    at 17 minutes -- 17 hours, 7 minutes, and 39 seconds.
 3    And I'm going to hit play again now.
 4                       (Video was played.)
 5                MR. SHIELDS:  Okay.  So I'm pausing at 17
 6    hours, 8 minutes, and 15 seconds.
 7           Q.   Can you just generally describe your
 8    interaction and what happened since the last time that
 9    we had paused?
10           A.   I was searching the suspect that I had
11    there and asking him typical questions we would have
12    for the suspect while we're searching.
13           Q.   Okay.  And did you find anything?
14           A.   Not on his person.  But in the area in
15    which he was running I did find that black bag.
16           Q.   Okay.  So he dropped that black bag?
17           A.   Yes.  When he hopped the fence, I could
18    see him discard it as he ran up towards me.
19           Q.   Okay.  And as we're paused right here, do
20    you see another officer in the, I guess, kind of north
21    part of the picture -- to your north in the middle of
22    the screen?
23           A.   Yes.
24           Q.   And do you know who that is?
25           A.   Officer Algarin.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2       Q.   Okay.  And he's standing on the other side
 3  of that chain-link fence; is that fair to say?
 4       A.   Yes.
 5       Q.   So that was the backyard in one of the
 6  houses on Kosciusko Street?
 7       A.   Yes.
 8       Q.   Okay.  And are you talking to him, or
 9  what's going on?
10       A.   Not yet.
11       Q.   Okay.  Okay.  I'm going to hit play again.
12            MR. SHIELDS:  We're at 17 hours, 8
13  minutes, and 15 seconds.
14                 (Video was played.)
15            MR. SHIELDS:  Okay.  So I'm going to pause
16  again at 17 hours, 8 minutes, and 30 seconds.
17       Q.   You guys were talking about whether the
18  suspect that you had stopped had a gun; is that right?
19            MS. JONES:  Objection.
20            But go ahead.
21       A.   Yes.
22       Q.   Did you suspect that he had a gun?
23       A.   Yes.
24       Q.   And why did you suspect that he might have
25  a gun?
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.   Because it's a known area for the
 3    individuals that are selling drugs to carry firearms.
 4         Q.   Okay.  Did you see him with a gun?
 5         A.   I did not.
 6         Q.   Okay.  Did you guys recover a gun?
 7         A.   No.
 8         Q.   Okay.  Would it be a typical question that
 9    you'd ask a suspect that you'd stop in that area?
10         A.   Yes.
11         Q.   Especially after a foot chase where you'd
12    seen them discard something from their person?
13         A.   Yes.
14         Q.   And Officer Algarin was also asking about
15    the gun?
16         A.   Yes.
17         Q.   And to your knowledge, Officer Algarin
18    never found a gun either?
19              MS. JONES:  Objection.
20              But go ahead.
21         A.   There was not a gun recovered by any of
22    the officers in that accident.
23         Q.   Okay.  And where we're paused right now,
24    do you know what Officer Algarin is doing?
25         A.   Based on my camera footage, it shows him
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   walking away, north.
 3          Q.  Oh, north.  Okay.  I'm sorry.  I wasn't
 4   sure if you were done.  Okay.  All right.  I'm going
 5   to hit play again.
 6              MR. SHIELDS:  We're paused at 17 hours, 8
 7   minutes, and 30 seconds.
 8          Q.  Then I'll pause again and ask you more
 9   questions.
10                      (Video was played.)
11              MR. SHIELDS:  I'm just going to pause at
12   17 hours, 8 minutes, and 43 seconds.
13          Q.  He took out his ID; right?
14          A.  Yes.
15          Q.  And you said his name was Stevie Smith; is
16   that right?
17              MS. JONES:  Objection.
18              But go ahead.
19          A.  Yes.
20          Q.  Okay.  Did you ever know Stevie Smith or
21   had you stopped him prior to this incident?
22              MS. JONES:  Objection.
23              But go ahead.
24          A.  No.
25              MR. SHIELDS:  Okay.  So it's paused at 17
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    hours, 8 minutes, and 43 seconds.  I'm going to hit
 3    play again.
 4                    (Video was played.)
 5         Q.  Okay.  For the record, you just said, "He
 6    hopped the fence right where you are"; is that -- is
 7    that right?
 8         A.  Yes.
 9         Q.  Okay.  Who are you talking to?
10         A.  I don't know.
11         Q.  Okay.  Would it be fair to say that you
12    were talking to an officer in the yard behind the tall
13    stockade fence?
14         A.  Yes.
15         Q.  Okay.  Do you know if that would have been
16    DiSabatino or someone else?
17              MS. JONES:  Objection.
18              But go ahead.
19         A.  It could have been Officer DiSabatino or
20    it could have been Officer Algarin.
21         Q.  Okay.  But previously we saw Algarin
22    behind the chain-link fence; is that right?
23         A.  Yes.
24         Q.  Okay.  Did you see Officer Algarin jump
25    back over the stockade fence?
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.  No.
 3         Q.  But it was only Algarin and DiSabatino who
 4    had responded to Kosciusko Street in the first place;
 5    right?
 6              MS. JONES:  Objection.
 7              But go ahead.
 8         A.  Yes.
 9         Q.  And at this point, no additional officers
10    had arrived at the scene?
11              MS. JONES:  Objection.  Go ahead.
12         A.  Other than Officer Gorman and myself, no.
13         Q.  Okay.  Additional officers didn't arrive
14    at the scene until after the dog was shot?
15         A.  I believe so.
16         Q.  Okay.
17              MR. SHIELDS:  All right.  So we're paused
18    at 17 hours, 8 minutes, and 47 seconds.  I'm going to
19    hit play again.
20                   (Video was played.)
21         Q.  Okay.  As you're looking through that
22    black bag --
23              MR. SHIELDS:  And for the record, we
24    paused at 17 hours, 9 minutes, and 37 seconds.
25         Q.  And Officer Horowitz, as we -- right
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2     before we paused you're looking through a black
 3     plastic bag; is that right?
 4          A.   Yes.
 5          Q.   And did you say, "What's that, weed?" or
 6     you said something like that?
 7          A.   Yes.
 8               MS. JONES:   Objection.
 9               Go ahead.
10          A.   Yes.
11          Q.   All right.   So you located marijuana in
12     the bag?
13          A.   Yes.
14          Q.   Anything else?
15          A.   It was packaged to sell.
16          Q.   Okay.   So just some marijuana that was
17     packaged to sell?
18          A.   Yes.
19          Q.   Okay.   But no weapons?
20          A.   No weapons.
21          Q.   Okay.   And no other drugs?
22          A.   No other drugs.
23          Q.   Okay.
24               MR. SHIELDS:   So we're at 17 hours, 9
25     minutes, and 37 seconds.   And I'm going to hit play
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   again.  Okay?
 3                    (Video was played.)
 4              MR. SHIELDS:  Okay.  And now I paused at
 5   17 hours, 9 minutes, and 43 seconds.
 6         Q.  Can you just describe what you saw and
 7   heard between when we had previously paused and when I
 8   just paused it again?
 9         A.  I couldn't hear on this clip of my body
10   camera, but I do remember that it was gunshots.
11         Q.  Do you remember how many gunshots?
12         A.  Two.
13         Q.  Do you know who shot those two gunshots?
14         A.  At this point, I did not.
15         Q.  Okay.  As we sit here today, do you?
16         A.  Yes.
17         Q.  And who was that?
18         A.  Officer Algarin.
19         Q.  Okay.  After this incident did you ever
20   talk with Officer Algarin about the incident?
21         A.  Yes.
22         Q.  And when did that conversation happen?
23         A.  Moments after the incident.
24         Q.  Okay.  Is that captured in your body
25   camera?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.   No.
 3         Q.   Okay.  What did you guys talk about?
 4         A.   What happened.
 5         Q.   And what did he tell you happened?
 6         A.   From what I could remember -- because we
 7    haven't spoken about this incident since the day that
 8    it happened.  But he had told me that he was in the
 9    yard searching for evidence when he heard a door open
10    up at the rear of the location.  I don't remember
11    which location it was, but he heard a door open up.
12    And he turned around and he saw a dog running his way.
13         Q.   Okay.  Did he tell you anything else?
14         A.   That the dog appeared to be aggressive.
15         Q.   And did you see the dog at all?
16         A.   I did not.
17         Q.   Did you see the dog at all after it was
18    shot?
19         A.   Yes.
20         Q.   Okay.  And was the dog still alive when
21    you saw it?
22         A.   Yes.
23         Q.   And do you know if it eventually died?
24         A.   Yes.  It did die.
25         Q.   Did you talk with anybody else about the
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

 1          OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    incident after the incident?
 3          A.   No.
 4          Q.   Okay.  You never spoke with Sergeant
 5    Rudolph?
 6          A.   I spoke to him later that day about it.
 7    But after the day of the incident, we haven't spoken
 8    about it.
 9          Q.   Okay.  Did you speak with any other
10    supervisors in the department?
11          A.   No.
12          Q.   Did you ever speak with anybody from PSS?
13          A.   No.
14          MR. SHIELDS:  And for the record, PSS is
15    the Professional Standards Section.
16          Q.   Did you ever speak with anybody from the
17    Professional Development Section or PDS?
18          A.   No.
19          Q.   Are the only people within the department
20    that you spoke about the incident with -- did that
21    occur only on the day of the incident?
22          MS. JONES:  Objection.
23          But go ahead.
24          MR. SHIELDS:  That was a bad question.
25    Let me withdraw that.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.   After the day of the incident, did you
 3    speak with any officers or supervisors in the
 4    department about the incident?
 5         A.   No.
 6         Q.   Okay.  And is the only person you ever
 7    spoke with about the incident after the incident
 8    Sergeant Rudolph?
 9              MS. JONES:  Objection.
10              Go ahead.
11         A.   No.
12         Q.   Okay.  Who else did you talk to?
13         A.   Is his name Patrick?  The attorney for the
14    City Law Department.
15         Q.   Okay.  I meant just -- I'm sorry.  Bad
16    question.
17              Within the RPD?  Any other employees in
18    the RPD?  Did you speak with anybody just who works
19    for the RPD?
20         A.   No.
21         Q.   Okay.
22              MR. SHIELDS:  I'm going to hit play again.
23    We're paused at 17 hours, 9 minutes, and 43 seconds.
24                   (Video was played.)
25              MR. SHIELDS:  Okay.  So I'm just pausing
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   it at 17 hours, 10 minutes, and 1 second.
 3        Q.   The body camera is pointed at the ground
 4   here.
 5              Do you have an independent recollection of
 6   what you were able to see at -- between the prior time
 7   that we had paused and where we're paused now at 17
 8   hours, 10 minutes, and 1 second?
 9        A.   No.
10        Q.   Okay.  But you can hear -- what did you
11   hear?
12        A.   I heard a dog barking and crying, it
13   sounds like.
14        Q.   And people screaming?
15              MS. JONES:  Elliot, I don't think all the
16   audio comes through when you're playing the video.
17   It's almost like there's a few-second delay while Zoom
18   figures out where the sound is coming from.  And then
19   the audio comes in on the video.
20              MR. SHIELDS:  Got it.  Okay.
21        Q.   You said you heard a dog kind of crying
22   and barking?
23        A.   Not in this video.  In the video that I
24   reviewed yesterday with Ms. Jones, it was better
25   quality and I could hear the gunshots.  And I can hear
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2      the dog barking and crying.
 3              Q.   Okay.
 4              MR. SHIELDS:   All right.   I'm just going
 5      to hit play again at 17 hours, 10 minutes, and 1
 6      second.
 7                     (Video was played.)
 8              MR. SHIELDS:   Okay.   So we played through
 9      the end of the video, which looks like it stopped at
10      17 hours, 12 minutes, and 25 seconds.
11              Q.   At the end of the video, you were handing
12      Officer Gorman your body camera; is that right?
13              A.   I was about to.   I don't remember if he
14      actually used my camera or not.
15              Q.   Okay.   So basically the body cameras can
16      be used as -- both to video record and take
17      photographs?
18              A.   Yes.
19              Q.   So if you did give it to him, it was for
20      the purpose of taking photographs of, I guess, the
21      incident location?
22              A.   Yes.
23              Q.   And as we're standing here, it looks like
24      you're standing at the fence at the south side of the
25      property where the dog shooting happened; is that
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

        OFFICER JASON HOROWITZ - BY MR. SHIELDS
1
2    right?
3         A.   Now, I don't want to assume, but it
4    appears to be on the camera.
5         Q.   Okay.  And did you hear Officer Gorman say
6    that he had to jump the fence to get into that yard?
7         A.   I didn't hear him say that.  Oh.  I think
8    I was talking about how he was going to get his
9    individual that was detained back to his vehicle on
10   Sobieski, if he needed to -- if he had a clear passage
11   back to Sobieski or we needed to organize some other
12   transportation.
13        Q.   Okay.  And that individual that he had
14   detained is not in the yard that we're sort of looking
15   at in this paused picture at the end of your video;
16   right?
17        A.   I can't tell.
18        Q.   Okay.  Do you remember if he was in the
19   yard that would be depicted to the left side of your
20   video?
21        A.   I don't.
22        Q.   Okay.  And as we're looking at this fence
23   at the end of the video here, can you estimate how
24   tall that fence is?
25        A.   It looks like there's some sort of



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    addition to the fence.  I would say it's about 4 1/2,
 3    5 feet.
 4         Q.  Okay.  So when you say "4 1/2, 5 feet," is
 5    that to the bar that would be the normal -- I don't
 6    know if you would call it the normal top of the fence,
 7    or would that be with the additional wiring on top of
 8    that bar?
 9         A.  With additional wiring.
10         Q.  Okay.  And where on your body do you wear
11    your body camera?
12         A.  Center chest.
13         Q.  Do you know how -- how -- I don't know --
14    how many feet high off the ground your body camera is?
15         A.  I would say about 4 1/2 feet.
16         Q.  Okay.  So is it about equal with that bar
17    there, from this angle?
18         A.  I would say it's a little above the bar.
19         Q.  Okay.  And then the additional wiring goes
20    up about -- I don't know -- can you estimate how much
21    further?
22         A.  Another 6 inches.
23         Q.  Okay.  Probably about between 4 1/2 and 5
24    feet, you're saying, for the total fencing at the
25    south side of the yard?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2            A.  Yes.
 3            Q.  Okay.  I'm going to pull down the body
 4   camera for now.  Okay.  What I'm going to do is, I'm
 5   going to put up your affidavit.
 6            (The following exhibit was marked for
 7            identification:  Number EXH 2.)
 8            MR. SHIELDS:  So that will be Exhibit 2,
 9   for the record.
10            Q.  I'm just going to ask you a few questions
11   about that.
12            A.  Okay.
13            Q.  Let's see.  Okay.  And Officer Gorman, do
14   you see on your screen what's been marked as Exhibit 2
15   for this deposition, Affidavit of Jason Horowitz?
16            I'm sorry.  I think I just called you
17   "Officer Gorman."
18            A.  You did.  That's all right.
19            I do see it, yes.
20            Q.  Okay.  So I'm just going to scroll down to
21   the numbered paragraphs on the first page.  And let me
22   know when you're done reading that, and I'll scroll
23   down to the next page.
24            A.  I'm done.
25            Q.  All right.
```



1    OFFICER JASON HOROWITZ - BY MR. SHIELDS

2        A.  Yes.

3        Q.  All right.  And I'm going to -- oh.  I'm

4    sorry.  That was not the bottom of the page.

5        A.  Okay.

6        (There was a pause in the proceeding.)

7        A.  Okay.

8        Q.  All right.  I'm just going to ask you a

9    few questions about the affidavit.

10        Let's start from the last paragraph here.

11   Paragraph 20 says (as read):  At no point did I

12   inspect the integrity of the fencing at the backyard

13   of 53 Kosciusko Street, and I cannot say whether there

14   were any holes or gaps in the fence.

15        A.  Correct.

16        Q.  Why did you write that?

17        A.  Well, it wasn't a priority at the time or

18   it wasn't a task that I was assigned to check the

19   integrity of the fence.

20        Q.  Okay.  Why did you include that in this

21   affidavit?

22        A.  Why did I include that last portion?

23        Q.  Correct.  Why did you include Paragraph 20

24   in this affidavit?

25        A.  To have a proper description of the fence



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    line -- or to mention that I didn't have a proper
 3    description of the fence line separating the yards in
 4    Kosciusko and the yards at Sobieski.
 5          Q.  Okay.  Why was that important to include
 6    in this affidavit?
 7          A.  Because at that -- during that incident,
 8    that wasn't something that I -- that wasn't a task
 9    that I did.
10          Q.  Is that a task that someone else did?
11          A.  I'm not aware of anyone else that checked
12    out the fence.
13          Q.  What's the fence have anything to do with
14    the incident?
15          A.  It would probably have something to do
16    with my ability of seeing the incident.
17          Q.  All right.  So if there were holes or gaps
18    in the fence, maybe you could have seen the incident
19    better?
20          A.  Among other things.
21          Q.  Okay.  Any other reasons that you included
22    this last paragraph, 20?
23          A.  I didn't have a full view between me and
24    the incident location, so there wouldn't be -- I can't
25    say whether I'd be able to see it if I had complete
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   focus on the incident scene.
 3         Q.  Okay.  And from this last paragraph where
 4   it says "at the backyard of 53 Kosciusko Street," does
 5   that refresh your recollection as to whether the yard
 6   that we were looking at the fence at the end of your
 7   body camera video, if that was 53 Kosciusko Street?
 8         A.  I do not know.
 9         Q.  Okay.  Okay.  Back up to the upper
10   portion.  All right.
11              Here in Paragraph 6 you say that you had
12   discussed with Algarin, DiSabatino, and Gorman and
13   made a plan.
14              My question was going to be how you guys
15   discussed that, but you testified earlier that that
16   was by radio; is that right?
17         A.  Radio and by phone.
18         Q.  Okay.  So like you guys would call each
19   other on your personal cell phones?
20         A.  Yes.
21         Q.  Do you have the personal cell phone number
22   for like all RPD officers or just the people that you
23   work with a lot?
24         A.  Just the people I work with.
25         Q.  Okay.  And why would you call someone on
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   the phone as opposed to talking to them over the
 3   radio?
 4            A.  We don't like to tie up radio time because
 5   they're -- we only have two channels for the entire
 6   city -- primary channels.  The east side has channel
 7   one; the west side has channel two.  And if we're
 8   talking over the radio at length and comprising a plan
 9   to arrive at the scene, we don't want to be tying up
10   radio air.  There may be other officers dealing with
11   other incidents.  And if we were tying up the radio
12   air, if they were going through some sort of emergency
13   and they can't broadcast it over the radio, then that
14   could be an officer safety issue.  So we tend to
15   either talk to each other over the phone or we meet up
16   at a location nearby the incident location that we
17   were going to.
18            Q.  Okay.  But on this -- for this incident,
19   you remember that it was either the radio or the
20   phone.  You didn't meet up in person?
21            A.  I don't remember.
22            Q.  Okay.  Okay.  How often would you say you
23   call other officers on your personal cell phone?
24            A.  If we're not already together -- say
25   myself and another officer were going to an
```



```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2      incident --
 3            Q.   Uh-huh.
 4            A.   -- if we're coming from another incident
 5      that we were already together, we would discuss before
 6      we leave for that incident whether we have history of
 7      going to that location, if we know any individuals
 8      that live at that location that may pose a threat to
 9      our safety.  Just prior knowledge, we would discuss
10      that.
11                 If we're coming from different locations,
12      we would typically call each other.  Let them know,
13      "Hey, listen.  I'm coming from this side of the city.
14      It's going to take me two minutes to get there" or,
15      you know, "I'm right up the block.  I'm going to be
16      there in like 10, 15 seconds."  And we would discuss
17      how long it would take us to get there.  And we
18      discuss if we'd been there before or if we're familiar
19      with the area.
20            Q.   So like if you would get the job in the
21      hopper and respond to it, would you also know if
22      another officer responded to that job in the hopper?
23            A.   Yeah.  So over primary, the radio, say --
24      you know, I call the radio, "Hey, please give me this
25      job."  The dispatcher would accept it, "10-4, sir."
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           OFFICER JASON HOROWITZ - BY MR. SHIELDS
2      Any car that would be available to back them.  And
3      then over primary the other vehicle would -- or the
4      other officer would call out with his radio identifier
5      and say, "Yes," so and so, "I'll back them."
6           Q.   Okay.  Would that also like pop up on your
7      computer display in your car, who was also responding?
8           A.   So the old -- so this was during kind of
9      like a transition period.  That day we had the old --
10     they're called MDTs.  I don't know what the acronym
11     is, but it's the old computer dispatch system.  And
12     the way it reads, every job card, it almost looks like
13     "The Matrix," you know, the movie, with all the
14     numbers and letters.  It's -- it would show this unit
15     backing you.  It would have just a quick -- a small
16     response talking about who is assigned to the job,
17     essentially responding to the job with you.  And
18     now -- now, these days, it's -- technology and
19     everything, you can see a lot more.  But that's
20     obviously in the future from this incident.
21          Q.   Got it.  So you'd know from the radio and
22     the job card, basically, who was going to respond.
23     And then if you needed to, you would pick up your
24     personal phone and call them?
25          A.   It's common practice to take my phone out



1           OFFICER JASON HOROWITZ - BY MR. SHIELDS

2    and call them, especially if we're not together.  If

3    we're at different locations, we would call.

4           Q.  Okay.  Is there any like RPD policy about

5    using your personal cell phones?

6           A.  There is no policy, but it's encouraged.

7           Q.  Okay.  It's encouraged.  Do you get any

8    kind of like payment from the City or the RPD to cover

9    costs associated with using your personal cell phone

10   for job-related duties?

11          A.  We don't.  We don't.  But that's

12   definitely something we can fight for; right?

13          Q.  I know a couple good lawyers.

14               Okay.  So let's see.  So on Paragraph 6

15   you guys say that the 911 call came in for 61

16   Kosciusko Street, right, as you testified to earlier?

17          A.  Yes.

18          Q.  Okay.  It was the tall house that you

19   described in the body camera?

20          A.  Yes.

21          Q.  Okay.  7 just says that you and Gorman

22   went to Sobieski Street, and DiSabatino and Algarin

23   went to Kosciusko; right?

24          A.  Yes.

25          Q.  All right.  And so in Paragraph 9, you



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    say, "Hearing this, I made my way to a vacant lot on
 3    54 Sobieski Street, which borders the backyards of 49,
 4    53, and 57 Kosciusko Street."
 5            And then in 10, you say (as read):  I
 6    observed a black male climb over the tall, wooden
 7    stockade fence surrounding the backyard at 57
 8    Kosciusko Street and jump into the vacant lot at 54
 9    Sobieski Street.
10            So does that refresh your recollection
11    about some of the property addresses that we were
12    talking about that were displayed in the body camera
13    footage earlier?
14            A.  Yes.
15            Q.  Okay.  57 Kosciusko Street, that was the
16    property that we saw that had the tall, wooden fence;
17    is that right?
18            MS. JONES:  Objection.
19            But go ahead.
20            A.  It was half and half.  Half the yard was a
21    stockade fence and the other half was a chain-link,
22    which was in my body camera.
23            Q.  Okay.  Is it possible that the property
24    that you just described -- let me just pause and
25    withdraw that question.
```



```
1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2              The fence that the guy jumped was 57
3    Kosciusko Street; right?
4              MS. JONES:  Objection.
5              But go ahead.
6         A.   It was kind of like an intersecting part
7    of the property with 61, 57, and 54.  And it was at
8    the southwest, the back left portion of the property
9    at 61 and 57.  That intersection right there, I
10   believe, is where he defeated the fence and jumped
11   over.
12        Q.   Okay.  And then 53 Kosciusko Street, would
13   it be accurate to say, in the angle we looked at from
14   your body camera, would have been located to the left
15   of 57 Kosciusko Street?
16        A.   Yes.
17        Q.   Okay.  And then 49 Kosciusko Street would
18   have been to the left of 53 Kosciusko Street?
19        A.   Yes.
20        Q.   Okay.  And do you know if 53 Kosciusko
21   Street was the location where the dog was shot?
22        A.   I don't know.
23        Q.   All right.  Well, I'm just going to tell
24   you for the purpose to make this go faster that 53 is
25   where the dog was shot.  Okay?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.  Okay.
 3         Q.  So the guy jumped the fence from 57.
 4              So that would have been to the right of
 5    the property where the dog was shot; right?
 6         A.  My individual was the one, yes, that
 7    jumped over the fence at 57.
 8         Q.  Okay.  Okay.  So then in Paragraph 13, it
 9    says that there was a second guy in a red sweatshirt.
10    He fled west through the backyards behind the
11    Kosciusko Street properties and was stopped by Gorman
12    in the backyard of 49 Kosciusko Street; right?
13         A.  Yes.
14         Q.  So that would have been to the left of the
15    property where the dog was shot; right?
16         A.  Yes.
17         Q.  Okay.  Okay.  And so here in Paragraph 15,
18    it says Officer Algarin was in the backyard of 53
19    Kosciusko Street.  And he called from the chain-link
20    fence separating 53 and -- 53 Kosciusko Street from 54
21    Sobieski Street asking whether the guy had a gun, and
22    he denied it.
23              We saw that in the body camera video;
24    right?
25         A.  Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1          OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2          Q.  And then in Paragraph 17 it basically says
 3   that about half of the time when you do a foot
 4   pursuit, the perpetrator discards contraband?
 5          A.  Yes.
 6          Q.  Okay.  Is that still true today?  Has
 7   anything changed in your experience?
 8               MS. JONES:  Objection.
 9               But go ahead.
10          A.  I would say yes.  It is still true to the
11   day that about 50 percent of the time, if not more,
12   people that are fleeing discard property, contraband,
13   other assortment of things.
14          Q.  Okay.  And then in Paragraph 18, it says
15   "The police usually backtrack over the course of
16   flight to make sure that no contraband was discarded"?
17          A.  Correct.
18          Q.  Okay.  And is that like the policy of the
19   RPD to backtrack?
20               MS. JONES:  Objection.
21               But go ahead.
22          A.  That's typically common sense that goes
23   along with police work, that if you lose sight of an
24   individual, that you check the area that you lost
25   sight of them.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.  So it would be your practice to backtrack?
 3              MS. JONES:  Objection.
 4              But go ahead.
 5         A.  Yes.
 6         Q.  Okay.  And did you receive any training
 7    about backtracking?
 8         A.  During the academy we would go over
 9    different scenarios, talking about in the flight of
10    path for an individual that's fleeing from the police,
11    if you happen to find contraband, whether it was drugs
12    or guns, and say it's in the backyard of someone's
13    house, you would have to confirm that that contraband
14    doesn't belong to the property owner.  And when we get
15    that confirmation that the property owner has no idea,
16    no recollection of that stuff being back there, it's
17    something that we would be able to charge the suspect
18    with, especially if it was the flight of path that he
19    was taking.
20         Q.  Okay.  And how would you normally get that
21    confirmation from the property owner?
22         A.  We would knock on the door, somehow
23    communicate with them.
24         Q.  Okay.  And when would you normally knock
25    on the door?
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.  We would knock on the door after the
 3    evidence has been secured.
 4         Q.  Okay.  So first you would secure the
 5    evidence, and then you would talk to the property
 6    owner?
 7         A.  Correct.
 8         Q.  Okay.  And why would you do it in that
 9    order?
10         A.  Because if we leave the evidence behind,
11    for lack of better words, it could grow feet and walk
12    away.  Somebody may come by and take it.  Just the
13    preservation of the evidence.  We would typically have
14    to have a technician come down if it was a handgun.
15    And from there they would be able to lift prints and
16    do their procedures for the handgun.  If it's just
17    narcotics, we'd be able to collect it right away.
18         Q.  Okay.  Did you get any training on that?
19         A.  Training on collecting evidence?
20         Q.  Training on entering someone's yard while
21    backtracking to look for evidence?
22         A.  No.  We did not get training.
23         Q.  Okay.  No training at the academy?
24              MS. JONES:  Objection.
25              But go ahead.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.  Up until this incident we did not get
 3    training on backtracking a person's flight path.
 4         Q.  After this incident did you get training
 5    on backtracking a person's flight path?
 6         A.  We got training on -- what's the word I'm
 7    thinking of?  I believe it's "curtilage."  I believe
 8    it's areas of property that's not part of the house.
 9              THE WITNESS:  I don't want to sound silly,
10    but I think it's "curtilage"?
11              MS. JONES:  I can't answer for you.
12         Q.  Curtilage.
13         A.  I was right.  I was right.
14         Q.  When did you receive training on entering
15    the curtilage of a property?
16         A.  I don't remember, but it was either 2019
17    or 2020.  I don't remember though.
18         Q.  Tell me everything you remember about the
19    training.
20         A.  It had to do with searching somebody's
21    yard.  It's -- it -- I believe the policy that they --
22    or training covered that we treat the yard as a
23    building or a house.  So that kind of encompasses all
24    of it.  So same rules apply to searching a house as it
25    does the yard.  And that's the training that we got
```



```
1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2    later after the incident.
3         Q.  Was that a required training for everyone
4    in the department?
5         A.  That was roll call training.  There wasn't
6    any type of record of who received it.  It was an
7    overall PowerPoint presentation during our roll call.
8    Roll call is when all the officers meet at the
9    beginning of shift.  And we go over post assignments
10   and any updated news in our section and our
11   department.
12        Q.  Okay.  So just so I am getting this right,
13   2019 or '20, you don't remember when it was, but
14   around that period?
15        A.  Yes.
16             MS. JONES:  Objection.
17        Q.  And that occurred in a roll call, which is
18   the beginning of your shift; is that right?
19        A.  Yes.
20        Q.  And how long would this training have
21   lasted?
22        A.  Training to go through the whole
23   PowerPoint during roll call was around five minutes
24   long, presentation.
25        Q.  Okay.  So it was a PowerPoint that was
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   presented for about five minutes long?
 3         A.   Yes.
 4         Q.   Okay.  And who would have done that
 5   presentation for you?
 6         A.   The supervisor conducting roll call.
 7         Q.   Okay.  Do you remember who conducted your
 8   roll call and presented this PowerPoint to you?
 9         A.   I do not remember.
10         Q.   Is it like the same supervisor at the
11   beginning of every shift for you?
12         A.   No.  So every section has several
13   sergeants, supervisors, and they rotate who does roll
14   call.
15         Q.   Okay.  What else do you remember about
16   this roll call training about entering the curtilage
17   to a property?
18         A.   I don't remember any additional facts from
19   the roll call.
20         Q.   Okay.  Do you know if the roll call was
21   implemented in response to this incident?
22         A.   I don't know that.
23         Q.   Okay.  But it happened after this
24   incident?
25              MR. JONES:  Objection.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2              Go ahead.
 3       A.   Yes.
 4       Q.   And prior to this incident you've never
 5  gotten training about entering the curtilage to a
 6  property?
 7              MR. JONES:  Objection.
 8              Go ahead.
 9       A.   No.
10       Q.   And you said basically your takeaway was
11  that the same rules apply for entering the curtilage
12  to a property as if you were entering a home.
13              Is that accurate?
14              MS. JONES:  Objection.
15              Go ahead.
16       A.   Yes.
17       Q.   Okay.  And so what -- what are those
18  factors that you have to consider before entering the
19  curtilage to a property?
20       A.   Hot pursuit.  If it was involved, then
21  chasing a suspect to go through their yard -- yard, it
22  doesn't count.  That is something that you can do.
23       Q.   I'm sorry.  I was a little confused by
24  your answer.
25              So a hot pursuit is a reason you can enter
```



1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2     someone's yard; correct?
3              A.   Yes.
4              Q.   And what is a "hot pursuit"?
5              A.   Hot pursuit is when you basically have
6     probable cause to detain somebody, and while doing so,
7     they take off from you; they run.  And you can chase
8     them on foot until you catch them.
9              Q.   Okay.  Then after you catch them, the hot
10    pursuit is concluded?
11             A.   Yes.  Unless you lose them.
12             Q.   Unless you lose them.
13                  So after you catch them, the hot pursuit
14    is concluded, and you no longer have the hot pursuit
15    exception to the warrant requirement to enter the
16    curtilage to a property; correct?
17                  MS. JONES:  Objection.
18                  But go ahead.
19             A.   Correct.
20             Q.   Okay.  And what other exceptions to the
21    warrant requirement are there to enter the curtilage
22    to a property?
23             A.   If you obtain a search warrant.
24             Q.   Okay.  The search warrant is the general
25    rule under the 4th Amendment; right?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JASON HOROWITZ - BY MR. SHIELDS
2               MS. JONES:  Objection.
3               But go ahead.
4          A.  Yes.
5          Q.  So without a search warrant, what other
6    circumstances could you enter someone's property?
7          A.  In the scenario of life or death, an
8    individual is injured.
9          Q.  Okay.  So that would sort of fall into
10   sort of like hot pursuit; right?  You're going to stop
11   an imminent physical bodily danger to somebody?
12         A.  Yes.
13         Q.  Okay.  Any other reasons that you can
14   enter someone's property?
15         A.  Not that I can remember.  I know there are
16   several reasons, but I don't remember off the top of
17   my head.
18         Q.  Okay.  If you get their consent, you can
19   enter their property?
20         A.  Yes.
21         Q.  Okay.  And so in -- in this instance, do
22   you know if Officer Algarin got the property owner's
23   consent before he entered the property?
24         A.  I do not know.
25         Q.  But the hot pursuit had concluded at the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    time that he entered the property?
 3              MS. JONES:  Objection.
 4              But go ahead.
 5         A.  I do not know.
 6         Q.  You had detained the suspect in 54
 7    Sobieski Street?
 8         A.  Yes.
 9         Q.  And Officer Gorman had detained the other
10    suspect in the red sweatshirt in the backyard of 49
11    Kosciusko Street?
12         A.  Yes.
13         Q.  Okay.  So the hot pursuit had concluded?
14              MS. JONES:  Objection.
15              But go ahead.
16         A.  Again, I don't -- I don't know where
17    Officer Algarin and Officer Gorman were.  I don't
18    remember if Officer Algarin made it to 49 Kosciusko
19    Street.  That's not something that I remember.
20         Q.  Okay.  If we assume that Officer Algarin
21    had joined Officer Gorman in the backyard of 49
22    Kosciusko Street after the individual in the red
23    sweatshirt had been handcuffed, then the hot pursuit
24    would have concluded before Officer Algarin jumped the
25    fence and went back into the backyard of 53 Kosciusko
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    Street?
 3              MS. JONES:  Objection.
 4              But go ahead.
 5         A.  So I'm confused.  You're saying if he made
 6    it to 49 where the arrest took place.  But then you
 7    said it would have stopped at 53.  I don't understand
 8    that.
 9         Q.  Yeah.  So that was a bad question.  I'll
10    withdraw it.
11              So if there were no officers in the
12    backyard of 53 Kosciusko Street -- that's a bad
13    question, so let me withdraw that.
14              You testified earlier that the hot pursuit
15    concludes when the suspects are detained; correct?
16         A.  Yes.
17         Q.  Okay.  And so then you would need a
18    different exception to the warrant requirement, such
19    as consent to enter the curtilage to the property;
20    correct?
21              MR. JONES:  Objection.
22              But go ahead.
23         A.  A lot of times when someone is taken --
24    detained or taken in custody, you just check the
25    grabbable, reachable area.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.   Okay.  And if -- in your roll call
 3    training, were you taught that the curtilage to an
 4    area -- I'm sorry -- the curtilage to a property is
 5    the grabbable, reachable area?
 6         A.   No.  The curtilage is the property line --
 7    it ends at the property line.
 8         Q.   Okay.  So if it's separated by a fence,
 9    that wouldn't be a grabbable, reachable area; right?
10         A.   I guess it depends.
11         Q.   Okay.  After you received the roll call
12    training in 2019 or 2020, have you chased suspects
13    through residential properties?
14         A.   Yes.
15         Q.   Okay.  How often does that occur?
16         A.   Personally?  Not very often.  I would say
17    once a week.
18         Q.   Okay.  Do other officers do it more than
19    you?
20         A.   Yes.
21         Q.   Okay.  Any reason why?
22         A.   Some officers take more jobs.  Depends on
23    the type of job that they're responding to.  If it's a
24    call for a man with a warrant, and he runs, that would
25    be one occasion.  Or if they observe something over
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1               OFFICER JASON HOROWITZ - BY MR. SHIELDS
2    camera footage, that could be one.  And when they go
3    to -- approach an individual and he takes off.
4    Anytime where probable cause exists and -- during an
5    investigation -- say it's a domestic and the boyfriend
6    says, "Yeah.  She just slashed my tires.  I saw her do
7    it and now she's running in the backyard."  That's
8    another occasion.  There is other officers that don't
9    get in any foot chases.
10               Q.  For different reasons?
11               A.  Yes.
12               Q.  Some officers aren't as fit as you and
13   can't chase people down?
14               MS. JONES:  Objection.
15               A.  I wouldn't say I'm -- I wouldn't say I'm
16   fit, but there's some officers that prefer to just --
17   to take reports versus going to active scenes and
18   investigations and conduct proactive work.
19               Q.  When is the last time that you chased
20   somebody through curtilage to a property?
21               A.  I would say it was last week.
22               Q.  Okay.  Tell me about that incident?
23               A.  Not to get into too many details, but I
24   believe it was somebody that was going through a
25   mental health crisis.  And they tried leaving out the
```



1           OFFICER JASON HOROWITZ - BY MR. SHIELDS
2    back door, and I chased them through the backyard and
3    stopped their flight.
4           Q.   In their own backyard?
5           A.   Yes.
6           Q.   Okay.  When is the last time that you
7    chased somebody through multiple different yards?
8           A.   Multiple different yards?  I would say
9    this past fall.  It was a call for a man with a gun.
10   And as I drove up on the individual, he ran into the
11   immediate backyard holding on to something in his coat
12   pocket.  And when he went into the backyard he started
13   to run behind a shed, and I saw him throw something.
14   This movement (indicating) and then an object leave
15   his hand.  And it landed in the next property over.
16   We were unable to locate him.  But when I went back
17   there to check and see if there was -- because the
18   call was for a gun -- to make sure that there was no
19   guns or anything that he discarded, and there was, in
20   fact, a gun that the individual discarded.
21          Q.   So you chased him through one property,
22   and he threw the gun into the neighboring property?
23          A.   Yes.  Directly behind the property that he
24   ran to.  He threw it over a fence, a stockade fence.
25          Q.   Okay.  And how did you get into that other



1           OFFICER JASON HOROWITZ - BY MR. SHIELDS
2   property?
3           A.   I kind of like peered over the fence, and
4   I saw what appeared to be a handgun in the center of
5   the property.
6           Q.   Before you entered that property, did you
7   go to the property owner's front door and knock and
8   ask permission to enter the property?
9           MS. JONES:  Objection.
10           But go ahead.
11       A.   I did not.
12       Q.   Okay.  Did you just jump the fence and
13   enter the property?
14       A.   Correct.
15       Q.   Okay.  And did you ever talk with the
16   homeowner of that property at all?
17       A.   Yes.
18       Q.   And when was that?
19       A.   That was after confirming that it was a
20   handgun and put it over dispatch that it was
21   recovered, and I need another unit so that we can make
22   contact with the resident.
23       Q.   Okay.  And that was after the roll call
24   training that you got about entering the curtilage to
25   a property?



1           OFFICER JASON HOROWITZ - BY MR. SHIELDS

2           A.  Yes.

3           Q.  Was the entry into that property

4    consistent with what you learned in that roll call

5    training?

6           A.  Yes.  Especially after seeing that it was

7    a handgun.

8           Q.  Okay.  So the hot pursuit had concluded,

9    right, because you didn't have the guy; he wasn't

10   there anymore?

11          A.  Correct.

12              MS. JONES:  Objection.

13          Q.  And you didn't get consent before entering

14   the property; right?

15          A.  Correct.

16          Q.  So what other exception to the warrant

17   requirement permitted you to enter the property?

18          A.  It could pose a threat to anybody that

19   enters that backyard if they were to pick it up, if a

20   small child were to go and pick it up.  I would say

21   just overall safety.  It posed a dangerous threat to

22   anybody that may go back there, to myself, to other

23   people.

24          Q.  Okay.  So your understanding based on your

25   training is that you're allowed to enter someone's



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    property if you believe that there's a gun or other
 3    contraband on the property that has been discarded
 4    that could pose a threat to someone?
 5              A.  After you have confirmation that it was a
 6    gun.
 7              Q.  And how do you get confirmation that it
 8    was a gun?
 9              A.  Well, seeing it, it would appear to be a
10    firearm.
11              Q.  Okay.  And when you say "seeing it," you
12    mean when you peered over the fence and you think that
13    you saw a gun on the property?
14              A.  Yeah.  It appeared to be a handgun.
15              Q.  Okay.  So you were never taught that you
16    peer over the fence and see a gun -- and the suspect
17    who discarded the gun has either been apprehended or
18    fled -- you were never told that you have to go and
19    get consent before entering the person's yard?
20              A.  At that point, we didn't have, first of
21    all, confirmation that it is a handgun, and we don't
22    know if the suspect may have backtracked and be in
23    that yard.  So as far as the training is, there is a
24    potential threat to myself or a third party in that
25    backyard, and that's something that needs to be
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2      secured.
 3              Q.   Let's say that you had apprehended the
 4      person who discarded the gun in a different yard.
 5                   Would you then be allowed to enter the
 6      backyard to secure the gun?
 7                   MS. JONES:  Objection.
 8                   But go ahead.
 9              A.   As being evidence in the crime, yes.
10              Q.   Okay.  So you would -- you wouldn't first
11      have to go get confirmation or consent of the
12      homeowner?
13                   MS. JONES:  Objection.
14                   Go ahead.
15              A.   Not at that point, no.
16              Q.   Okay.  So that's the policy, as you
17      understand it from your training, of the RPD that you
18      can just enter the yard at that point after the hot
19      pursuit was concluded?
20                   MS. JONES:  Objection.
21                   But go ahead.
22              A.   All right.  Can you rephrase the question?
23              Q.   Your understanding of the RPD's policy and
24      your personal practice would be to enter the curtilage
25      to a property under the circumstances that we just
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2     discussed, where the person, the suspect, had fled,
 3     been apprehended, and discarded the gun in the
 4     neighboring property?
 5              MS. JONES:  Objection.
 6              But go ahead.
 7         A.   Yes.
 8         Q.   Okay.  Have you received any other
 9     training other than the 2019 and 2020 training about
10     entering the curtilage to a property?
11         A.   No.
12         Q.   When you received that training -- my
13     understanding is that sometimes RPD will basically
14     email you an electronic copy of a training bulletin or
15     a policy, and you have to click a box saying -- you
16     know, affirming that you've read it and you consent to
17     that training bulletin or policy and to abide by it.
18              Is that -- is that accurate?  Is that how
19     RPD does it sometimes?
20         A.   Recently, yes.  I want to say they started
21     doing that about -- maybe around 2020 they started
22     doing that where they would -- it's called Laserfiche.
23     I think it's called Laserfiche.
24         Q.   Okay.
25         A.   It's just like a -- like a robot email
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   sent out and -- it's either 2000 or 2021 they started
 3   doing it.  But yes.  There is -- it's now in that
 4   fashion that it's on the officer to click on the link
 5   and accept.
 6        Q.   Okay.  For the 2019 or '20 training was
 7   there any Laserfiche acceptance that you had to click
 8   associated with that training?
 9        A.   Not that I remember.
10        Q.   Did you get any kind of handouts or
11   documents at all associated with that training?
12        A.   No.
13        Q.   If you wanted to access that PowerPoint to
14   refresh your recollection about the training, would
15   you have the ability to do that?
16        A.   Yes.
17        Q.   And how would you do that?
18        A.   It's an inner department website.  It's
19   called RPD web.  And they have all the policies,
20   procedures, roll call presentation -- not
21   presentation -- roll call trainings, and that's kept
22   in a normal fashion on that website.
23        Q.   Okay.  How often do you go to that website
24   to review policies and training?
25        A.   It depends on -- if I'm handling a certain
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

            OFFICER JASON HOROWITZ - BY MR. SHIELDS
1
2    case, and I have time to look at the policy or
3    procedure or the roll call to get a better idea of --
4    or to refresh my memory.
5          Q.  Do you have to like be at a computer to do
6    that?
7          A.  Yes.  You can't access it through your
8    phone, not to my knowledge.  You can be inside your
9    vehicle.  You can be at the office.
10         Q.  So if you're in your vehicle and you get a
11   call.  You say, "I'm going to respond to a call," and
12   then you have a question about RPD policy, you can
13   look that policy up on the computer in your vehicle?
14         A.  Depends on the scenario.  If it's a hot
15   call, no.  You don't have time for it.  But if you
16   have time to pull over, open up the website, and click
17   on the policy, you can do that from the vehicle, yes.
18         Q.  Okay.  Okay.  Can you tell me all the
19   training that you've received regarding interactions
20   with dogs?
21         A.  We receive training in the academy about
22   dog behaviors and animal control and what duties and
23   responsibilities they have.
24         Q.  Okay.  Tell me everything you remember
25   about the training.



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.  I remember talking about dogs' behaviors
 3    and different ways that you can escape from a dog
 4    or...
 5         Q.  Okay.  Like what?
 6         A.  Running away from them.  I know they
 7    covered what animal control can do as far as -- if the
 8    dog is contained, and it's safe, we can have an animal
 9    control officer come out to retrieve the dog.
10              Typically, bite reports.  If the dog has
11    bitten somebody, animal control has to come out and do
12    the report for that.  That's not handled by police
13    officers.
14              And then, you know, obviously, they taught
15    us about aggressive dogs.  They can be playful at one
16    moment and be aggressive the next moment.  Just things
17    that you always have to be aware of, dog behaviors
18    and -- you know, they can be sporadic and...
19         Q.  Okay.  Do you remember anything else about
20    dog behavior from the academy?
21         A.  No.
22         Q.  Do you remember who provided that training
23    or taught that course at the academy?
24         A.  Somebody from Rochester Animal Services --
25    I'm sorry.  The animal control unit, which is based
```



          1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
          2    out of Rochester Animal Services.  One of the officers
          3    came out to teach the class -- or employees.  I don't
          4    remember who specifically though.
          5         Q.  Okay.  You said someone from animal
          6    control?
          7         A.  Yes.
          8         Q.  And how did that course about animal
          9    behavior get taught?  By which I mean, did they show
         10    videos?  Was it a PowerPoint?  Something else?
         11         A.  It was both.  It was both.  They came out.
         12    They did their PowerPoint presentation.  They showed a
         13    couple of videos of different scenarios with dogs.
         14              You don't mind if I take a quick break to
         15    use the bathroom?
         16         Q.  No.  That's fine.
         17              MR. SHIELDS:  Let's do five, ten minutes?
         18    What do you guys need?
         19              MS. JONES:  That's fine.
         20              MR. SHIELDS:  All right.  Let's come back
         21    at 12:10.  It's 12 o'clock right now.
         22              MS. JONES:  Sounds good.
         23         (The proceeding recessed at 12:01 p.m.)
         24         (The proceeding reconvened at 12:15 p.m.;
         25              appearances as before noted.)



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    OFFICER JASON HOROWITZ, resumes;
 3              CONTINUING EXAMINATION BY MR. SHIELDS:
 4         Q.  Officer Gorman -- I'm sorry I keep calling
 5    you "Officer Gorman."  Officer Horowitz.  I apologize.
 6              So we're back.  We just took a little
 7    15-minute break.
 8              Did you have a chance to talk with your
 9    attorney during the break?
10              MS. JONES:  Uh-huh.
11         A.  Yes.
12         Q.  And are there any answers to any questions
13    that you gave earlier that you want to change after
14    speaking with your attorney?
15         A.  No.  It was unrelated.
16         Q.  Okay.  I want to go back to ask you a
17    couple additional questions about the curtilage
18    training that you received.  I'm going to put up an
19    exhibit.  It's Training Bulletin L-65-19.
20              (The following exhibit was marked for
21              identification:  Number EXH 3.)
22              MR. SHIELDS:  That will be Exhibit 3, I
23    believe.
24         Q.  Okay.  Officer Horowitz, can you see on
25    your screen the Rochester Police Department Training
```



1          OFFICER JASON HOROWITZ - BY MR. SHIELDS

2     Bulletin TB Number L-65-19?

3          A.   Yes.

4          Q.   Okay.  And it says the issue date was

5     5/30/2019?

6          A.   Yes.

7          Q.   And subject is "Warrantless searches on

8     curtilage"?

9          A.   Yes.

10          Q.   Have you ever seen this document before?

11          A.   Not this specific one.  The one that we

12     reviewed was a PowerPoint presentation.

13          Q.   Okay.  I'm just going to ask you to read

14     through this first page.  And then I'll scroll to the

15     second page.

16          MR. SHIELDS:  And for the record, this is

17     Bates Number City of Rochester 1200 to 1201.

18          Q.   I'm just going to ask you some questions

19     about the document.  Okay?

20          A.   All right.

21          Q.   Is it big enough for you to see?

22          A.   Yeah.  Yeah.  I should be good.

23          (There was a pause in the proceeding.)

24          A.   All right.  Next page, please.

25          Q.   Okay.  And -- okay.  There's just a little



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   more at the bottom that's not displayed on the screen.
 3              So just let me know when you're done.
 4         A.  Okay.
 5         (There was a pause in the proceeding.)
 6         A.  You can scroll down.  Okay.
 7         Q.  Okay.  So my question is, is this
 8   document, Training Bulletin L-65-19, consistent with
 9   the PowerPoint training that you got about searching a
10   curtilage?
11         A.  Yes.
12         Q.  Okay.  In the PowerPoint training that you
13   received, do you remember if you discussed the case
14   Collins versus Virginia?
15         A.  Yes.
16         Q.  Okay.  You remember like talking about the
17   facts of that case in the training?
18         A.  I don't remember.
19         Q.  Okay.  You just remember the name of that
20   United States Supreme Court case after reading this
21   training bulletin?
22         A.  Yes.
23         Q.  Okay.  Is there anything else about this
24   training bulletin that refreshes your recollection
25   about the training -- the roll call training that you
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1               OFFICER JASON HOROWITZ - BY MR. SHIELDS

2     received about searching a curtilage?

3               A.   Yes.

4               Q.   Okay.   What else?

5               A.   It mentions law enforcement officers can't

6     physically enter the curtilage to gather evidence.

7               Q.   Okay.   So that's something that you were

8     also taught at the roll call training?

9               A.   Yes.

10              Q.   That in order to physically enter a

11    property to gather evidence, you need to have a

12    qualified exception to the warrant rule?

13              A.   Yes.

14              Q.   Okay.   And it says -- see the appendix

15    here on the second page, "Exceptions to the search

16    warrant requirement," and it lists two things:   The

17    automobile exception and the open fields exception;

18    right?

19              A.   Yes.

20              Q.   Do you remember in the roll call training

21    if you were taught about any other exemptions -- I'm

22    sorry -- exceptions?

23              A.   No.   I don't remember.

24              Q.   Okay.   All right.   Give me one second

25    here.   So I want to do -- so that was Exhibit 3;



```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   right.  I'm just making sure that I mark this so that
 3   I can send them after.
 4            (The following exhibit was marked for
 5            identification:  Number EXH 4.)
 6            MR. SHIELDS:  I want to put up one other
 7   document, which will be marked as Exhibit 4.  And that
 8   is Training Bulletin Number L-15-97, Warrantless
 9   entries with or without exigent circumstances.  And
10   for the record, that's marked City of Rochester -- or
11   Bates Number City of Rochester 1169 to 1170.
12            Q.  All right.  Let me put that up on the
13   screen and ask you some questions, Officer Horowitz.
14            Okay.  And can you see that document on
15   your screen, Officer Horowitz?
16            A.  Yes.
17            Q.  Have you seen this document before?
18            A.  No.  Not to my recollection.
19            Q.  Okay.  Other than the 2019 or '20 roll
20   call training that we discussed earlier, have you ever
21   received any other trainings with the RPD about
22   warrantless entries to a property?
23            A.  Not that I remember.
24            Q.  Okay.  Let me give you the opportunity to
25   just read through the first page.  It's a two-page
```



1                 OFFICER JASON HOROWITZ - BY MR. SHIELDS

2       document.  And then let me know, and I'll scroll down

3       to the second page.  Okay?

4                 A.  Okay.

5                 (There was a pause in the proceeding.)

6                 A.  Okay.

7                 Q.  Scroll down to page 2 here.  And I think

8       this is -- I have everything we can see on screen.  So

9       just let me know when you're done.

10                (There was a pause in the proceeding.)

11                A.  Okay.

12                Q.  Okay.  So my first question is, have you

13      ever gotten any training from the RPD about what

14      constitutes exigent circumstances?

15                A.  Yes.

16                Q.  Okay.  And tell me what training you

17      received about that?

18                A.  It goes back to our academy.

19                Q.  Okay.  And here in this training bulletin,

20      L-15-97, it says (as read):  Probable cause must exist

21      for warrantless entries leading one to believe:  1, a

22      crime, a misdemeanor or felony, has been or is being

23      committed, and that if immediate action is not taken,

24      the crime will be completed or you have reasonable

25      suspicion that you or others will suffer physical



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   injury or death, or you have reason to believe that
 3   evidence of the crime, misdemeanor or felony, will be
 4   destroyed or otherwise lost.
 5              That portion of the training bulletin, is
 6   that what you were referring -- you were referring to
 7   that?  You learned that at the academy?
 8        A.   Not into those specifics.  More along the
 9   lines of if it's a traffic violation or if it's
10   littering.  Those are things that you typically
11   wouldn't take it to this level by violating this.
12        Q.   And then right after that paragraph that
13   we read I highlighted this sentence that says "Assume
14   you cannot use this exception in other than extremely
15   unusual circumstances."  All right.  Then it gives a
16   couple examples.
17              In the case that we had discussed earlier
18   with the gun being discarded onto a property, after
19   reviewing this training bulletin, what warrant
20   exception would permit you to enter that property?
21        A.   The example that I gave earlier.
22        Q.   Okay.  So did you have probable cause to
23   believe that a crime was being committed on that
24   property?
25        A.   Yes.
```



1          OFFICER JASON HOROWITZ - BY MR. SHIELDS

2          Q.   Okay.  And what's that crime?

3          A.   Possession of a handgun.

4          Q.   Okay.  Who possessed the handgun?

5          A.   The individual that was running away from

6     me.

7          Q.   Okay.  But the gun was on the property and

8     the individual wasn't; right?

9          A.   Correct.

10          Q.   Okay.  So can someone possess a gun if

11    they discarded it into a different property?

12          A.   If it was confirmed that they were

13    possessing it at the time that I saw the evidence

14    enter that yard.

15          Q.   Okay.  So -- so even though the person

16    wasn't physically there themselves, you're allowed to

17    enter the property because of the -- the gun was used

18    in the commission of a crime?

19          A.   Yes.

20          Q.   Okay.  Okay.  But you would have to

21    confirm that the gun was on that property before

22    entering?

23          A.   That -- I mean, it all depends.

24          Q.   Okay.  So let's say you weren't sure if

25    you saw him discard the gun, and you looked over the



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

OFFICER JASON HOROWITZ - BY MR. SHIELDS

1                  OFFICER JASON HOROWITZ - BY MR. SHIELDS

2     fence, and you didn't see anything.

3                  Would you be allowed to enter that

4     property?

5                  MS. JONES:  Objection.

6                  Go ahead.

7          A.   I guess -- let me just ask you this

8     question that -- so if I saw him throw something, but

9     I didn't see anything in the yard, is that what we're

10    talking about?

11         Q.   Sure.  Let's go with that example.

12         A.   So I see him throw an object into the

13    yard.  I look over the fence, and I can't see

14    anything.  I would say that it could be interpreted

15    that I need to investigate further and enter that yard

16    to preserve any evidence that was put in there on

17    reason to believe that it was a handgun or narcotics.

18         Q.   Okay.  And what if you didn't actually see

19    him throw something, but you had a suspicion that he

20    might have --

21                MS. JONES:  Objection.

22         Q.   -- and you also did not actually see

23    anything when you looked over the fence?

24                MS. JONES:  Objection.

25                But go ahead.



1           OFFICER JASON HOROWITZ - BY MR. SHIELDS

2           A.  No.

3           Q.  Then you would not have probable cause to

4    enter the property?

5               MS. JONES:  Objection.

6               But go ahead.

7           A.  Correct.

8           Q.  Okay.  Okay.  Let me take that one down.

9               Okay.  So let's go back to talking about

10   dogs.  I'm sorry.  Can you just remind me -- I had

11   asked you -- if you can just tell me -- well, let me

12   withdraw that.

13              I think I had asked you to tell me

14   everything about the training you've received related

15   to interactions with dogs, and you started telling me

16   about your academy training; is that right?

17          A.  Yes.

18          Q.  Okay.  Can you just tell me about your

19   academy training again?

20          A.  Yeah.  They came in, and they had a

21   PowerPoint presentation.  They had videos that they

22   showed us about behaviors that dogs will display and

23   how they -- their behaviors can change.  I don't

24   remember who taught the course, but I do know that it

25   was an animal control officer from the Rochester



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1            OFFICER JASON HOROWITZ - BY MR. SHIELDS

2    Animal Services.

3            Q.   Okay.  How long was that training?

4            A.   I believe it was a four-hour block time

5    frame.

6            Q.   Did you learn anything about dog behavior?

7            A.   Yes.

8            Q.   Okay.  Tell me what you remember about dog

9    behavior.

10           A.   That dogs can change from being friendly

11   to being aggressive.  They could appear to be

12   friendly, but then they could change drastically.

13           Q.   Okay.  Do you remember how to identify,

14   based on that training, whether a dog is being

15   aggressive?

16           A.   Like showing their teeth, hair sticks up,

17   barking, charging.

18           Q.   And those were things that were discussed

19   in the PowerPoint?

20           A.   For lack of words, yes.

21           Q.   Okay.  Have you reviewed that PowerPoint

22   since the academy?

23           A.   No.

24           Q.   Did they tell you that you could shoot a

25   dog if it was acting aggressively?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.   I guess it depends.  If they're just
 3    acting aggressively from a distance, in a closed room,
 4    confined area, no one else near it, no.  But if
 5    yourself or a third party was in close proximity to
 6    the dog, and the dog was loose, then, yes, they taught
 7    us in that class.  And they also taught us in
 8    firearms.
 9         Q.   They taught you that you could shoot a dog
10    if you or someone else was close to the dog and it was
11    acting aggressively?
12         A.   And there was a risk of physical harm.
13         Q.   Okay.  And what did they teach you about
14    identifying whether there was a risk of physical harm?
15         A.   I guess I don't understand the question.
16         Q.   So if you're afraid of the dog, and you
17    think subjectively, in your head, that there's a risk
18    of physical harm, you're permitted to shoot the dog?
19         A.   Correct.
20         Q.   Are there any objective factors that they
21    taught you to look out for to determine whether a dog
22    that you perceive as potentially being a threat of
23    physical harm poses an actual threat of physical harm?
24         A.   I guess that all depends if the dog is
25    chained up or confined in a room or an area.  But if
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    the dog is acting aggressively, then no.
 3         Q.   Okay.  So I guess, you know, for example,
 4    let's say a dog is standing 10 feet away from you, not
 5    chained, but barking and standing in an aggressive
 6    stance, could you shoot the dog under those
 7    circumstances?
 8              MS. JONES:  Objection.
 9              Go ahead.
10         A.   No.
11         Q.   Let's say a dog is 30 pounds and it's
12    running at you and barking, can you shoot the dog
13    under those circumstances?
14              MS. JONES:  Objection.
15         A.   Yes.
16         Q.   And can you explain your reasoning for why
17    you'd be permitted to shoot a 30-pound dog if it was
18    barking and running at you?
19         A.   If the dog was running at me, and it was
20    barking and charging at me, then I'm at risk or my
21    partner or a third party is at risk of that dog biting
22    you.  You don't know if the dog has any conditions
23    like rabies or anything of that nature.  It doesn't
24    matter how big the dog is -- how big or small the dog
25    is.  If it's running at you -- it's charging at you,
```



1          OFFICER JASON HOROWITZ - BY MR. SHIELDS

2    and it does end up causing bodily harm, bite marks,

3    and all that, you can contract whatever that dog has.

4    And at that point, you could be hospitalized for those

5    reasons, for your injuries or anything that you

6    contracted.

7          Q.   Okay.  So you said it doesn't matter how

8    big the dog is?

9          A.   No.

10              MS. JONES:  I object to that last

11   question.

12         Q.   Were you trained that it doesn't matter

13   how big the dog is?

14              MS. JONES:  Objection.

15              Go ahead.

16         A.   It was never specified.

17         Q.   Okay.  So they didn't teach you that that

18   might be one of the objective factors to consider when

19   you're determining whether it's reasonable to believe

20   that you or a third party might be at risk of physical

21   danger?

22         A.   Not to my knowledge that there is a weight

23   range.

24         Q.   Okay.  What about breeds?  Were different

25   breeds discussed?



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.  Of course, we spoke about, you know, pit
 3    bull isn't a breed and stuff like that.  We talked
 4    about -- we discussed -- it wasn't on the PowerPoint,
 5    but we discussed how different breeds are typically
 6    more aggressive.  Stuff like that.  Or people perceive
 7    pit bulls to be aggressive, but not always is the
 8    case.  They talk about the power of the bite or the
 9    jaw, the pounds per square inch, is no greater for a
10    pit bull than to a golden retriever.
11         Q.  Okay.  So misconceptions about pit bulls,
12    it sounds like, you talked about a lot?
13              MS. JONES:  Objection.
14         A.  Yeah.  I'm a pit bull fan.
15         Q.  Do you own any dogs?
16         A.  I do.
17         Q.  One dog or more than one?
18         A.  Two.
19         Q.  What kinds of dogs do you own?
20         A.  I own a pit bull and a
21    retriever-rottweiler mix.
22         Q.  A couple big, scary dogs?
23         A.  To the untrained eye.
24              MS. JONES:  For the record, I wanted to
25    note that he was doing air quotation marks when he
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2     said "pit bull."
 3          Q.  Is it like a pit mix?  Is that why you put
 4     air quotes?
 5          A.  Well, pit bull isn't an actual breed.  So
 6     I guess -- a terrier, I guess, they call them,
 7     terriers.
 8          Q.  Yeah.  Okay.  When you walk in your front
 9     door when you get home at the end of the day, do they
10     run up to you?
11              MS. JONES:  Objection.
12          (There was a discussion off the record.)
13              MS. JONES:  I asked him if he felt
14     comfortable answering this.
15          A.  They don't.
16          Q.  Okay.  If a stranger comes to your house,
17     do they bark?
18          A.  Yes.
19          Q.  And do they -- if you're out in public
20     and -- I don't know -- one of your friends comes,
21     would they run up and greet that person?
22          A.  So we typically don't walk our dogs in the
23     neighborhood.  We'll go to a park, or we'll just -- I
24     have a fenced-in backyard.
25          Q.  Let's say your friend's over -- you know,
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
2    one of your friends comes in your fenced-in backyard.
3               Would your dog greet your friend?
4         A.   Yes.
5               MS. JONES:  Objection.
6         Q.   They'd run over to them?
7               MS. JONES:  Objection.
8               But go ahead.
9         A.   Yes.
10        Q.   Have any of your friends ever told you
11   that they were scared of your dogs?
12        A.   Yes.
13        Q.   And what did you do about that?
14        A.   It was more comments, a jokingly manner
15   because they are larger dogs.  And I'd like to say
16   that they're curious.  So when they do run up to them,
17   it's to sniff them.  It's typically more of a friendly
18   manner.  They run up to them, but they run up to them
19   to smell them.
20        Q.   That's what dogs do; right?
21              MS. JONES:  Objection.
22              Go ahead.
23        A.   Yup.
24        Q.   Typical dog behavior is to approach
25   somebody and greet them, smell them because they're



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           OFFICER JASON HOROWITZ - BY MR. SHIELDS

2    curious?

3           MS. JONES:  Objection.

4           But go ahead.

5      A.  Yes.

6      Q.  Is that something that you learned in your

7    academy training?

8      A.  No.

9           MS. JONES:  Objection.

10     Q.  I'm sorry.  I didn't hear your answer

11   because there was an objection at the same time.

12     A.  No.  We -- we're not trained that.  That's

13   personal experience.

14     Q.  Were you ever trained in the academy that

15   if you enter somebody's property, a dog might run up

16   to you?

17     A.  Yes.

18     Q.  And how were you trained to handle that

19   situation?

20     A.  To retreat out of the house and have the

21   homeowner secure the dog.

22     Q.  And if you didn't have time to retreat out

23   of the house before the dog approached you, what were

24   you trained to do?

25     A.  I guess it depends.



```
 1          OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2          Q.   Okay.  Can you tell me what it would
 3    depend on?
 4          A.   The manner in which the dog is approaching
 5    you.
 6          Q.   Okay.  And what were you trained to do if
 7    you were afraid for your physical safety?
 8          A.   Attempt to escape.  Or if that wasn't an
 9    option and we were in fear for our life, was to shoot
10    the dog.
11          Q.   Okay.  If you were in fear for your life?
12          A.   Yes.
13          Q.   Okay.  What if you weren't in fear for
14    your life, but you were afraid?
15          MS. JONES:  Objection.
16          But go ahead.
17          A.   I would consider them both the same.  I
18    misspoke.  In fear for your life and in fear of
19    physical bodily harm, I would say, you are warranted
20    to shoot the dog.
21          Q.   "Warranted."
22          Is that what you said?
23          A.   Yeah.
24          Q.   Okay.  Were you trained about any ways in
25    a situation like that, that you could avoid shooting
```



1                OFFICER JASON HOROWITZ - BY MR. SHIELDS

2    the dog?

3                A.   Other than escaping?

4                Q.   Correct.

5                A.   No.  Not trained in the academy, no.

6                Q.   Okay.  So in the academy you weren't

7    trained, for example, that you could use pepper spray

8    on a dog?

9                A.   We were shown -- from what I could

10   remember, we were shown that -- I don't remember what

11   the outcome of the video was.  Yeah.  I don't

12   remember.  I don't recall what the outcome of that

13   video was.  I do remember they did show us something

14   along those lines.

15               Q.   And when you say "something along those

16   lines," you mean using pepper spray on an aggressive

17   dog?

18               A.   I believe it was the dog's response.  But

19   I remember that there was a video about a dog being

20   pepper sprayed, but not whether it was effective or

21   not.  I don't remember the outcome or the -- the

22   lesson learned, I guess.

23               Q.   Were you taught about using any other form

24   of less lethal force against an aggressive dog?

25               A.   Not in the academy.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JASON HOROWITZ - BY MR. SHIELDS

2          Q.  Okay.  After the academy what training

3     have you received about interactions with dogs?

4          A.  Just recently, this past December of 2022,

5     I received the TASER 7 training.  It's a new TASER.

6     And that if you're able to deploy the probes from the

7     TASER and successfully connect both probes into the

8     dog, it would be effective to incapacitate the dog --

9          Q.  Okay.

10         A.  -- in a less lethal way.

11         Q.  Can you tell me more about that training?

12         A.  It's not recommended, but it is plausible

13    given the scenario of you having enough time, you are

14    in a safe position to do so, and you're able to have a

15    good target.  As far as when you turn -- or activate

16    the TASER 7, it has two lights that display at your

17    target.  If you're able to have a good deployment and

18    both probes enter the target, then that would

19    incapacitate the dog.

20         Q.  Okay.  Other than the TASER training,

21    since the academy, have you received any other

22    training about interactions with dogs?

23         A.  No.

24         Q.  Okay.  So after this incident in this

25    lawsuit you didn't receive any additional training



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           OFFICER JASON HOROWITZ - BY MR. SHIELDS

2      about interactions with dogs?

3           A.  No.

4           Q.  Can you tell me, generally, all the

5      training that you've received on any topics since you

6      graduated from the academy?

7                MS. JONES:  Objection.

8                But go ahead.

9           A.  Any topic?  I've received training for --

10     to become a field training officer.  I've received

11     training to be a defensive tactics instructor.  I've

12     received training to be a TASER operator.  I've

13     received training to be a breath test operator, BTO.

14     I received training to be a CIT member, Crisis

15     Intervention Team.  I received training for that.

16     That's all that I can remember right now.

17          Q.  You also receive annual firearms training?

18          A.  Recertification, yes.

19          Q.  Recertification is required; right?

20          A.  Yes.

21          Q.  As part of the recertification, is there

22     like a training component?

23          A.  Most of the time it's to go and qualify

24     with your handgun at the range.

25          Q.  Is there any other required annual



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   training?
 3              MS. JONES:  Objection.
 4              But go ahead.
 5         A.   There is, I guess, an educational
 6   in-service that you would have to take.
 7         Q.   Okay.  Can you explain that?
 8         A.   Just to cover any recent hot topics, I
 9   guess.  The most recent one was active shooter drills,
10   searching the buildings for active shooters.  That was
11   the most recent one.  I think that was last -- I want
12   to say it was this past fall.
13         Q.   Okay.
14         A.   The fall of 2022.
15         Q.   So when you say that there's a required
16   "educational in-service" training, what does that
17   mean?  For example, that there's like a four-hour
18   requirement or an eight-hour requirement or something
19   like that per year on some topic?
20         A.   Yes.  Most times, like general topics.
21   But they will have eight-hour blocks of it where
22   you're taken off the road, and you attend this
23   training for the eight hours, and you go over the
24   topics that are provided by the instructors.  Like I
25   said, the most recent one was the active shooter
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    drills and searching -- they call it "dynamic
 3    searches" -- building searches.
 4         Q.  Okay.  Since you've been an officer, those
 5    educational in-service trainings have never included
 6    anything about interactions with dogs?
 7         A.  No.
 8         Q.  Since you've been an RPD officer, have any
 9    of those educational in-service trainings ever had
10    anything to do with the search of a curtilage?
11         A.  No.
12         Q.  What voluntary trainings have you done?
13         A.  Well, all the ones that I mentioned
14    earlier were voluntary.
15         Q.  Okay.
16         A.  TASER operator, DT instructor, field
17    training officer.  That's all voluntarily.  It wasn't
18    mandated for me to go there.
19         Q.  Got it.
20              So like defensive tactics training isn't
21    something that's required?  That's voluntary?
22         A.  I was trained to be an instructor for
23    defensive tactics.  So when a police academy goes
24    through, I'll be assisting with the recruits being
25    trained in defensive tactics.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.   Is defensive tactics training include
 3    anything about interactions with dogs?
 4         A.   No.
 5         Q.   Okay.  Just people?
 6         A.   Yes.
 7         Q.   Have you ever done any trainings that were
 8    put out by private organizations?
 9         A.   No.
10              MS. JONES:  Objection.
11         Q.   Do you know if you ever received any of
12    the training from the Humane Society about
13    interactions with dogs?
14         A.   In the academy they came out, but it
15    wasn't about interactions with dogs.  It was about
16    living conditions of dogs and when to report them.
17    Some people have dog fighting obstacles or setups in
18    their backyard.  That would be something that you
19    would report to the Humane Society or -- like I said,
20    bad living conditions, dogs left out for an extended
21    period of time during cold weather, or no food or
22    water during, you know, warm weather days.
23         Q.   Okay.  I'm just going to put up an
24    exhibit, if I can find it, and just ask you a couple
25    questions.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2                  Hold on.  I opened the PowerPoint, but I
 3      think for the purposes of making this an exhibit, it
 4      would be easier to open the PDF version.  Sorry.
 5              (There was a pause in the proceeding.)
 6              (The following exhibit was marked for
 7              identification:  Number EXH 5.)
 8                  MR. SHIELDS:  So this will be Exhibit 5.
 9      And this is a PDF entitled -- let me put it up so we
10      can see it -- Roll Call Training, December 2019, LE
11      Dog Bite Prevention, Humane Society of Greater
12      Rochester.
13              Q.  So just looking at that cover page,
14      Officer Horowitz, do you recall whether or not you
15      received this roll call training?
16              A.  I don't recall.
17              Q.  Okay.  Do you remember ever receiving any
18      training from the Humane Society after you graduated
19      from the academy?
20              A.  No.
21              Q.  Okay.  And does this cover page of this
22      document look familiar to you?
23              A.  No.
24                  MR. SHIELDS:  Okay.  And for the record,
25      this is Bates Number COR 001244 on the first page.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    And the last page is COR 1267.
 3              Q.  Let me just -- you know what I'm going to
 4    do?  I'm just going to scroll through the -- from the
 5    beginning with you and just ask you if it refreshes
 6    your recollection at all.  Okay?
 7              So page 2 here entitled "Officers will
 8    encounter a dog in at least one out of three
 9    residences," is that something that you were taught
10    ever, either at the academy or afterwards?
11              A.  I'm not familiar with this PowerPoint.  I
12    don't recall ever seeing it.
13              Q.  Okay.  All right.  So I'll just save us
14    some time.  Just in your -- aside from the PowerPoint,
15    were you ever -- in any of your training were you ever
16    told that you will encounter a dog in at least one out
17    of three residences?
18              A.  I don't remember that statistic.
19              Q.  In your experience as a police officer,
20    how many residences on average do you think have dogs
21    in the City of Rochester?
22              MS. JONES:  Objection.
23              Go ahead.
24              A.  I would say that's a fair statistic.  Like
25    I said, I've never heard of that before, but I would
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1               OFFICER JASON HOROWITZ - BY MR. SHIELDS
2    agree with that statistic that one out of three
3    residents has a dog.
4          Q.   At least one out of three?
5          A.   Yes.
6          Q.   Some other officers have testified that it
7    might be more than one out of three.
8               Would you agree with that?
9               MS. JONES:  Objection.
10              But go ahead.
11         A.   Yeah.  I could agree with that.  I guess
12   it all depends on, you know, the calls of the day.
13         Q.   In the Clinton section, do you think it's
14   at least one out of three residences?
15         A.   At least one out of three, yes.
16         Q.   Okay.  I'm going to fast forward.
17              Have you ever seen this page of the
18   document marked COR 1250, which is entitled "Dog
19   Postures" --
20              MS. JONES:  Objection.
21         Q.   -- either in this document or in any other
22   document provided by the RPD?
23         A.   No.
24         Q.   At the academy did you review any
25   documents regarding dog postures, either this document



1    OFFICER JASON HOROWITZ - BY MR. SHIELDS

2 or something similar to it?

3    A. Not that I can remember.

4    Q. Did you ever get any training about

5 signals of increasing discomfort or stress or tension

6 or any warning signs?

7    A. Not that I can remember.

8    Q. Did you ever get any training about how to

9 recognize if a dog is fearful or aggressive such as

10 what's displayed in this page which is Bates Number

11 COR 1253?

12    MS. JONES:  Objection.

13    But go ahead.

14    A. Not that I can remember.

15    Q. How about -- have you ever received any

16 training about how to identify whether a dog is in an

17 offensive, aggressive posture such as what's displayed

18 in this page, which is Bates Number COR1255?

19    MS. JONES:  Objection.

20    But go ahead.

21    A. I don't remember any pictures.  More of

22 just the physical cues.  Just bulletins, not actual

23 pictures.

24    Q. Okay.  And that's from the academy?

25    A. Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.  When you say a "bulletin," you mean like a
 3    training bulletin?
 4         A.  No.  It was like -- you've got the title
 5    of the topic and then you've got bulletins.
 6              What's another word for them?
 7         Q.  You mean bullet points?
 8         A.  Bullet points.  Yes.  We'll use that.
 9         Q.  Okay.  Were you ever trained at the
10    academy or afterwards about recognizing signs that a
11    dog might be present or live at a property such as
12    what's displayed in the document, Bates Number COR
13    1261?
14              MS. JONES:  Objection.
15              But go ahead.
16         A.  No.
17         Q.  Were you ever provided any training such
18    as what's described here on COR 1262 to announce your
19    arrival by basically making noise, jiggling the fence,
20    whistling, shaking keys, or inquiring about dogs
21    before entering, and asking for dogs to be secured?
22         A.  No.
23         Q.  Were you ever told anything or trained on
24    talking to the dog such as what's described here on
25    page Bates Number COR 1263?
```



1           OFFICER JASON HOROWITZ - BY MR. SHIELDS

2                MS. JONES:  Objection.

3                But go ahead.

4           A.  No.

5           Q.  Which would continue onto 1264 about

6    talking to the dog.

7                Were you ever trained anything about

8    what's displayed here on page COR 1264 about various

9    different bite prevention tools?

10               MS. JONES:  Objection.

11               But go ahead.

12          A.  No.

13          Q.  And then earlier we discussed using, in

14   some circumstances, pepper spray or OC spray and you

15   described your training about the TASER 7.

16               Other than that, did you receive any

17   training about using any other, I guess, chemical or

18   electronic repellents?

19          A.  No.

20          Q.  Were you ever given any training about

21   using the force continuum as it applies to a dog?

22               MS. JONES:  Objection.

23               But go ahead.

24          A.  No.

25          Q.  Okay.  When is the last time that you



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1              OFFICER JASON HOROWITZ - BY MR. SHIELDS

2    responded to a residence where there was a dog?

3         A.   Two nights ago.

4         Q.   Can you just describe what happened in

5    that instance?

6         A.   An officer and I were going to a residence

7    to deliver an order of protection.  And we went to the

8    side door of the residence to knock on the door.  And

9    as we were approaching, the door opened up and a dog

10   popped its head out and was barking at us.  And I was

11   able to retreat behind a car and draw my firearm.

12        Q.   Did you discharge your firearm?

13        A.   I did not.  Luckily, the resident had it

14   on a leash.  And they were just -- just by

15   coincidence, was taking the dog for a walk and opened

16   up the door at the same time that we were walking up

17   the driveway.

18        Q.   So basically, the resident had no idea

19   that you guys were arriving and was exiting their door

20   at the same time?

21             MS. JONES:  Objection.

22             But go ahead.

23        A.   Correct.

24        Q.   And is that, I guess, a common interaction

25   when you arrive at someone's residence, that there



```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2  would be a dog, maybe not exiting the door, but that
 3  would approach the door and bark?
 4        A.   Yes.
 5        Q.   How many times a week does that happen?
 6        A.   Out of a four-day work wheel, I would say
 7  it probably happens -- we're talking about a dog
 8  contained inside barking at me?
 9        Q.   Sure.  Let's go with that.  Yeah.
10        A.   Okay.  I would say depends on the call
11  volume of the day.  But on average, probably two a
12  day.  So on a four-day work wheel, that would be eight
13  times.
14        Q.   And then how many different types of
15  interactions with dogs, other than they're inside
16  barking at you, would you have on a typical work
17  wheel?
18        A.   Like I actually physically made contact
19  with the dog?
20        Q.   Sure.  Any other type of interaction.
21  Like the dog actually runs up to you or something
22  else?
23        A.   All right.  I would say probably two times
24  a week I'll be in a residence and, you know, the owner
25  has a dog in there in the other room or in the current
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    room that I'm in.  And they tell me, "The dog is
 3    friendly.  He's not going to bite you."  And, you
 4    know, I'm able to pet the dog -- pet the pet.
 5         Q.  So basically, every day you have some sort
 6    of interaction with the dog, and you make physical
 7    contact with the dog multiple times a week, on
 8    average?
 9              MS. JONES:  Objection.
10              But go ahead.
11         A.  Yes.
12         Q.  If you knew that there was free training
13    available to you that could make you a better officer,
14    would you take that training?
15              MS. JONES:  Objection.
16              But go ahead.
17         A.  If my schedule allows it.
18         Q.  And when you say if your "schedule allows
19    it," does that mean like if it was during work hours,
20    and you were permitted to do the training instead of
21    like being on the road patrol or something?
22              MS. JONES:  Objection.
23              But go ahead.
24         A.  Either.  That would be ideal.  But given
25    my family life, I don't have time for that kind of
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    stuff.
 3              Q.  So let's say you approached your
 4    supervisor and said, "Hey, there's this training I
 5    would like to take.  It's free.  Can I set aside a
 6    four-hour block next Tuesday to take the training."
 7                   Is that something you'd be permitted to
 8    do?
 9                   MS. JONES:  Objection.
10                   But go ahead.
11              A.  Depending on staffing levels.  A lot of
12    times, being understaffed, they're not allowed to
13    grant us that time.  But given if we're fully staffed,
14    they would allow it, yes.
15              Q.  Okay.  So like without all those
16    contingencies, family life, staffing levels, just in
17    general, if there was free training available, and you
18    wanted to take it, it could make you a better officer,
19    and you had the opportunity to take it, would you do
20    that?
21              A.  Yes.
22                   MS. JONES:  Objection.
23              Q.  If that free training included how to more
24    safely interact with dogs, would you take that?
25                   MS. JONES:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2              Go ahead.
 3         A.   Given the same scenario, no contingencies,
 4    nothing like that, yes.
 5         Q.   Okay.  And are you aware that the United
 6    States Department of Justice offers a five one-hour
 7    video training courses about -- I'm sorry.  Let me
 8    withdraw that.
 9              Are you aware the Department of Justice of
10    the United States offers free training courses about
11    how to safely interact with dogs?
12         A.   I'm not aware.
13         Q.   If I told you that the City of Buffalo
14    implemented a requirement that all of its officers
15    take this training, and then the number of dogs that
16    were shot by Buffalo police officers dramatically
17    dropped after that training was provided to all of its
18    officers, does that sound like a training that you'd
19    be interested in taking?
20              MS. JONES:  Objection.
21              But go ahead.
22         A.   If staffing allows.  Like you said, if
23    there was no contingencies.  In a perfect world, yes.
24         Q.   You'd agree that more training -- the more
25    training, the better?
```



```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2                 MS. JONES:  Objection.
 3                 But go ahead.
 4       A.  Yes.
 5       Q.  Do you think that the Rochester Police
 6  Department offers enough opportunities for its
 7  officers to take trainings that they're interested in?
 8       A.  I believe -- I guess I don't understand
 9  the question.
10       Q.  Sure.
11                 Do you think that you could get more
12  training from the Rochester Police Department?
13       A.  Yes.
14       Q.  Do you think that they should provide more
15  training?
16                 MS. JONES:  Objection.
17                 But go ahead.
18       A.  Yes.
19       Q.  Are there any topics, specifically,
20  including interactions with dogs that you think they
21  should provide more or better training on?
22                 MS. JONES:  Objection.
23                 But go ahead.
24       A.  Are we talking about like -- is that a
25  broad question, like any topic?
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.  Let's break it down because that was a
 3    complicated question.
 4              Let's start with do you think that the
 5    Rochester Police Department should provide more
 6    training on how to safely interact with dogs?
 7              MS. JONES:  Objection.
 8              But go ahead.
 9         A.  Yes.
10         Q.  And now to the broad question.
11              Are there any other specific topics, based
12    on your experience and your training with the
13    Rochester Police Department, that you think the
14    Rochester Police Department should provide additional
15    training on?
16              MS. JONES:  Objection.
17         A.  Yes.
18         Q.  Can you tell us what those specific topics
19    would be?
20         A.  Yes.  I am a firm believer that officers
21    should be doing DWI investigations on -- by
22    themselves, and they shouldn't request for a traffic
23    unit to assist.  So I think an eight-hour block -- not
24    even an eight-hour block.  It could be a two-hour or
25    four-hour refresher on standardized field sobriety
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    tests training and how to demonstrate and explain to
 3    people.  And also covering the paperwork involved.
 4         Q.  On the subject of paperwork, do you have
 5    any idea why in an incident like when a dog is shot,
 6    it's the supervisor that fills out the incident report
 7    and not the officer who shot the dog?
 8              MS. JONES:  Objection.
 9              But go ahead.
10         A.  I don't know why.
11         Q.  With this incident, other than the arrest
12    report, did you have to fill out any other paperwork
13    related to Officer Algarin entering the property and
14    shooting the dog?
15              MS. JONES:  Objection.
16              But go ahead.
17         A.  The affidavit that I -- that we have on
18    file.
19         Q.  Okay.
20              (There was a pause in the proceeding.)
21              MR. SHIELDS:  I'm just going over some
22    loose ends.  Give me one second.
23         Q.  Have you ever -- let me withdraw that.
24              Does the RPD ever use video -- body camera
25    video from an incident as part of any training?
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2          A.  Not that I've been a part of, or I'm aware
 3   of.
 4          Q.  Have you ever reviewed body camera
 5   recordings of an incident, for example, with a
 6   supervisor to discuss what could have been done
 7   differently?
 8          A.  From my -- like for any of my jobs that I
 9   respond to?
10          Q.  Yes.
11          A.  We're talking about my own body camera;
12   right?
13          Q.  Well, your body camera or anyone else's.
14   Sure.
15          A.  A supervisor has never played body camera
16   from another person for me, personally.
17          Q.  Okay.  How about your own body camera?
18          A.  We've gone over it, yes, for certain like
19   citizen complaints or something like that, of that
20   nature.  We would go over that.
21          Q.  Okay.  So if a citizen makes a complaint
22   that you used, for example, excessive force, that
23   would be a situation where you'd sit down with your
24   supervisor and review the body camera?
25              MS. JONES:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.  Yes.
 3         Q.  Other than when a citizen makes a
 4  complaint, are there any other instances where you'd
 5  review a body camera recording to determine, you know,
 6  whether things could have been done differently?
 7         A.  With a supervisor?
 8         Q.  With a supervisor.
 9         A.  No, I have not.
10         Q.  Okay.  So basically, it's a tool to
11  determine whether or not you acted in accordance with
12  RPD policy and training with a supervisor?
13         A.  Yes.
14         Q.  Okay.  Do you review your body-worn camera
15  recordings on your own under various circumstances?
16         A.  Yes.
17         Q.  Okay.  Generally, when do you look at your
18  body camera footage?
19         A.  At the end of the night when I'm -- it's
20  called "tagging."  It's when you're assigning the
21  report number and the location and the type of service
22  we provided.  Other times I would review it for like
23  an arrest, for a DWI arrest.  I review it so I can
24  refresh my recollection about the tests that I gave
25  the individual.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JASON HOROWITZ - BY MR. SHIELDS
2          Q.  So it sounds like tagging and then
3    refreshing your recollection for report writing?
4          A.  Yes.
5          Q.  Okay.  And can you just describe what the
6    tagging process entails?
7          A.  Yes.  So the body camera detaches from
8    like -- basically, like a clip or something on your
9    uniform and you -- it's called "docking."  You
10   basically put it into kind of like a charger, and the
11   charger is connected to the computer.  And you open up
12   the program and all your videos pop up.  And you can
13   only select the videos and then select another button.
14   With those videos already selected, you select the
15   Case tab, and that's where you're able to upload
16   that -- type in the information.
17         Q.  Okay.  So you highlight -- let's say you
18   took 20 videos in a day.  The first five relate to a
19   specific CR number.  You highlight them, and you tag
20   them to be associated with that CR number?
21         A.  Yes.
22         Q.  Okay.  And then do you know what happens
23   after you tag them to be associated with that CR
24   number?
25         A.  When I'm done tagging at the end of the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JASON HOROWITZ - BY MR. SHIELDS

2    day, I take the body-worn camera, and I put it on

3    another essential charger that extracts the

4    information from the camera and all the data.  And it

5    goes right into a database.  And then from there it's

6    uploaded into -- it's called "C3 Sentinel," and that's

7    where you can further review your body camera on that

8    program itself.  That's the database that the program

9    has.

10          Q.  So that's what you do at the end of every

11   day?  You upload your videos.  You tag them to

12   associate them with a specific incident number.  And

13   then you put it on the other charger, which uploads it

14   to C3 Sentinel?

15          A.  Yes.

16          Q.  Okay.  If there's like videos that aren't

17   associated with a specific incident number, maybe you

18   turned it on and then nothing happened, do those

19   videos get deleted, or do those videos get saved too?

20          A.  They get saved.

21          Q.  Okay.  How do you tag those?

22          A.  So you would tag them under "Recorded with

23   error."  Say you accidentally bumped into the button

24   and it turns on, and you turn it off right away, you

25   tag it as "Recorded in error."  And when you upload it



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   into the database, someone on the other end reviews
 3   that footage to confirm that it was a recorded error.
 4         Q.  Okay.  Does someone always review every
 5   body camera that you upload?
 6              MS. JONES:  Objection.
 7         A.  Just the ones that are recorded in error.
 8   And I guess -- I mean, if a supervisor wants to just
 9   open up different videos, I guess they can do that.
10   But that's -- I don't know that.  I'm just an officer.
11         Q.  Yeah.  Yeah.  I mean, I guess I was saying
12   like -- you said specifically if it's recorded in
13   error, they review it before deleting it to make sure
14   that that's tagged correctly.
15              Is that why they do that, to your
16   understanding?
17              MS. JONES:  Objection.
18         A.  I don't know if they delete it.  I know --
19   like I said the recorded in errors do get reviewed,
20   every single one of them.  And when they can confirm
21   that it's not involved in any incident, it goes like
22   in a storage for X amount of days, I believe.  And
23   then it gets deleted.
24         Q.  Okay.  If you're involved in an incident
25   where a firearm is discharged or force is used, are
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2     you required to review your body-worn camera?
 3              A.  I don't think you're required to review
 4     it, no.
 5              Q.  Okay.  Have you ever seen body camera
 6     video used by the department to train officers about
 7     how the officers could have acted differently under
 8     the circumstances?
 9              MS. JONES:  Objection.
10              But go ahead.
11              A.  I've never seen it under those
12     circumstances.  The only time we would review it was
13     for -- I guess, you would say to be commended.  So if
14     they were to show like great work that an officer did,
15     they would show it and say, "Look how this officer
16     responded.  They rendered aid to somebody that was
17     just stabbed or shot" or whatever the case.  And it
18     would kind of be like a morale booster, help with
19     other officers like how to ideally respond.
20              Q.  Okay.  So it sounds like you're saying --
21     so it sounds like you're saying that the department
22     will use body-worn cameras to show examples of things
23     that officers did right, and that they want other
24     officers to do similarly.
25              Is that what you're saying?
```


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.  Not the department.  It would be more of
 3    on a smaller -- like in roll call.
 4         Q.  Okay.  So it would be maybe your
 5    supervisor that's overseeing roll call will say,
 6    "Yesterday this thing happened and Officer Horowitz
 7    did a great job."  And then he'd display that to
 8    everyone at roll call?
 9         A.  That happened a few times, yes.
10         Q.  Okay.  And the opposite is not true,
11    though?  You've never had a supervisor, at a roll call
12    or otherwise, say, you know, "Officer Horowitz" -- or
13    any other officer -- "didn't do something correctly in
14    this interaction with a citizen" or whatever and
15    display the body camera so that everyone can learn
16    from it?
17         A.  No.
18         Q.  Okay.  Have you ever done any
19    simulation-based training at all in your time with
20    RPD?
21         A.  We did reality-based training.
22         Q.  Is that at the Public Safety Training
23    Facility?
24         A.  Yes.
25         Q.  Okay.  And what sorts of scenarios did you
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   use a simulator for?
 3              MS. JONES:  Objection.
 4              But go ahead.
 5        A.  So it's not a simulator.  It's
 6   reality-based, which means there is role players.  And
 7   they would take place in small rooms, large rooms,
 8   rooms that have furniture in it.  And the scenario
 9   would be -- you know, it would be different scenarios
10   that require you to use less lethal or lethal or
11   whatever the case, whatever the topic that they're
12   trying to train.
13        Q.  And have you ever done any of those topics
14   related to interactions with a dog?
15        A.  No.
16        Q.  Have you ever done any of those topics
17   related to entering into the curtilage of a property?
18        A.  No.
19        Q.  Do you think it would be helpful for the
20   RPD to get a simulator that would include different
21   scenarios where you would interact with a dog?
22              MS. JONES:  Objection.
23              But go ahead.
24        A.  That would sound good, yes.
25        Q.  The more training, the better?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JASON HOROWITZ - BY MR. SHIELDS
2               MS. JONES:  Objection.
3          A.  Yes.  The more training, the better.
4          Q.  Is there anything that we haven't talked
5     about regarding this incident that you want to tell me
6     about?
7          A.  No.
8          Q.  Is there anything else that you think
9     would be helpful about knowing?  Anything about
10    interactions with dogs in your time as an RPD officer
11    that we haven't talked about?
12         A.  No.
13         Q.  Anything about any training that you
14    received on entering the curtilage to a property that
15    you didn't mention earlier that you want to add before
16    we end?
17         A.  No.
18              MR. SHIELDS:  All right.  Well, I think I
19    am all set with my questions for today.  I appreciate
20    your time, Officer Horowitz.  And I apologize.  For
21    some reason I keep calling you Officer Gorman even
22    though you don't really look anything alike.
23              THE WITNESS:  Thank you.
24              (TIME:  1:36 p.m.)
25                   *     *     *



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1
 2                    W I T N E S S
 3   Name              Examination by              Page
 4   --------------------------------------------------------------
 5   Officer Jason Horowitz    Mr. Shields         4-130
 6
 7                        *       *       *
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1
 2                          E X H I B I T S
 3     Exhibit           Description                Marked ID'ed
 4     ----------------------------------------------------------------
 5     EXH 1    Body camera video                     24      24
 6     EXH 2    Affidavit of Jason Horowitz,
              signed and dated June 9, 2020, 3
 7            pages                                  49      49
 8     EXH 3    Rochester Police Department
              Training Bulletin Number L-65-19,
 9            Subject: Warrantless searches on
              curtilage, dated May 30, 2019,
10            Bates-stamped COR 001200 and COR
              001201, 2 pages                        83      83
11
       EXH 4    Rochester Police Department
12            Training Bulletin Number L-15-97,
              Subject: Warrantless entries
13            with/without exigent
              circumstances, dated January 1997,
14            Bates-stamped COR 001169 and COR
              001170, 2 pages                        87      87
15
       EXH 5    Humane Society of Greater
16            Rochester Roll Call Training: L/E
              Dog Bite Prevention, December
17            2019, Bates-stamped COR 001244
              through COR 001267, 24 pages          108     108
18
                          (Digital Exhibits)
19                           *      *      *
20
21
22
23
24
25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1

 2                      EXHIBITS  PREVIOUSLY  MARKED

 3    Exhibit            Description                    Page

 4    ------------------------------------------------------------

 5    EXH

 6          (No

 7

 8

 9

10

11    Request

12    ------------------------------------------------------------

13

14

15

16

17

18

19    Question

20    ------------------------------------------------------------

21

22

23

24

25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1
 2                    A C K N O W L E D G M E N T
 3               I, Officer Jason Horowitz, declare, swear
 4  and aver that I have read my testimony contained
 5  herein and that my answers are true and correct, with
 6  any exceptions noted on the errata sheet, under
 7  penalty of perjury.
 8               _____
 9               Officer Jason Horowitz
10
11
12           I certify that this transcript was signed
13  in my presence by Officer Jason Horowitz on the _____
14  day of _____, 2023.
15
16           IN WITNESS WHEREOF, I have hereunto set my
17  hand and affixed my seal of office of _____
18  on this _____day of _____, 2023.
19
20               _____
21               Notary Public
22
23               _____
24               My Commission Expires:
25
```



1

2           E R R A T A   S H E E T

3           Witness: Officer Jason Horowitz
            Deposition Date:  February 8, 2023
4    Pg #   Line #    Change              Clarification

5    _____  _____   _____       _____
     |    | |     |   |           |       |              |
6    |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
7    |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
8    |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
9    |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
10   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
11   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
12   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
13   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
14   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
15   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
16   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
17   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
18   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
19   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
20   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
21   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
22   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
23   |____| |_____|   |_____|       |_____|
     |    | |     |   |           |       |              |
24   |____| |_____|   |_____|       |_____|

25



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1

 2                    C E R T I F I C A T I O N
     STATE OF NEW YORK:
 3   COUNTY OF MONROE:

 4               I, JAYME C. WINTISH, do hereby certify

 5   that the foregoing testimony was duly sworn to; that I

 6   reported in machine shorthand the foregoing pages of

 7   the above-styled cause, and that they were produced by

 8   computer-aided transcription (CAT) under my personal

 9   supervision and constitute a true and accurate record

10   of the testimony in this proceeding;

11               I further certify that the witness

12   requests to review the transcript;

13               I further certify that I am not an

14   attorney or counsel of any parties, nor a relative or

15   employee of any attorney or counsel connected with the

16   action, nor financially interested in the action;

17               WITNESS my hand in the City of Rochester,

18   County of Monroe, State of New York.

19

20

23   ----------------------------------
     JAYME C. WINTISH
24   Freelance Court Reporter and
     Notary Public No. 01WI6361272
25   in and for Monroe County, New York
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920