1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
CHARLES DEMPSEY, individually, and
L.D., by her Father and Natural
Guardian, Charles Dempsey,

                       Plaintiffs,

    -against-
THE CITY OF ROCHESTER, a Municipal
entity, et al.,


                 Defendants.


- - - - - - - - - - - - - - - - - x


                 Video Conference
                 June 3, 2022
                 9:45 a.m.


    EXAMINATION BEFORE TRIAL of P.O. ADAM
GORMAN, a Defendant in the above-entitled action,
taken by the Plaintiff, held at the above
time and place, pursuant to Court Order,
taken before Robyn Lehrmann, a Notary Public
in and for the State of New York.



2

1
2   A P P E A R A N C E S :
3
4   ROTH & ROTH, LLP
            Attorneys for Plaintiffs
5           192 Lexington Avenue, Suite 802
            New York, New York 10016
6
    BY:   ELLIOT SHIELDS, ESQ.
7
8   LINDA KINGSLEY, CORPORATION COUNSEL
            Attorney for CITY OF ROCHESTER
9           30 Church Street
            Rochester, New York 14614
10
    BY:   PEACHIE JONES, ESQ.
11
12
13
14
15
16
17
18              S T I P U L A T I O N S
19
20      IT IS HEREBY STIPULATED AND AGREED by
21  and among counsel for the respective parties
22  hereto, that the sealing and certification of
23  the within deposition shall be and the same
24  are hereby waived;
25      IT IS FURTHER STIPULATED AND AGREED

3

1

2  that all objections, except to the form of

3  the question, shall be reserved to the time

4  of the trial;

5       IT IS FURTHER STIPULATED AND AGREED

6  that the within deposition may be signed

7  before any Notary Public with the same force

8  and effect as if signed and sworn to before

9  the Court.

10                  * * * * * * * * * * * * *

11

12            THE REPORTER:  The attorneys

13            participating in the deposition

14            acknowledge that I am not

15            physically present in the

16            deposition room and that I will

17            be reporting this deposition

18            remotely.

19                 They further acknowledge

20            that in lieu of an oath

21            administered in person, I will

22            administer the oath remotely.

23                 The parties and their

24            counsel consent to this

25            arrangement and waive any

4

1

2      objections to this manner of

3      reporting.  Please indicate your

4      agreement by stating your name

5      and your agreement on the

6      record.

7           MR. SHIELDS:  Elliot

8      Shields, I agree.

9           MS. JONES:  Peachie Jones

10     for the City, I also agree. I

11     will request a copy of the

12     transcript.

13          MR. SHIELDS:  Peachie, can

14     you get in the video view so we

15     can see you during the

16     deposition?

17          MS. JONES:  You want me in

18     the video?

19          MR. SHIELDS:  Yes.

20          Off the record.

21          (A discussion was held off

22     the record.)

23          * * * * * * * * * * * *

24

25

```
 1                    P.O. Adam Gorman
 2    P.O.  A D A M   G O R M A N,
 3              Having been first duly sworn by a Notary
 4              Public of  the State of New York, was
 5              examined and testified as follows:
 6                   THE COURT REPORTER: Please
 7              state your name for the record.
 8                   THE WITNESS:  P.O. Adam
 9              Gorman.
10                   THE COURT REPORTER:  Please
11              state your precinct address for
12              the record.
13                   THE WITNESS:  185 Exchange
14              Boulevard, Rochester, New York
15              14614.
16    EXAMINATION BY
17    MR. SHIELDS:
18         Q    Good morning, Officer Gorman.
19         A    Good morning.
20         Q    My name is Elliot Shields.  I
21    represent a father and daughter whose dog was
22    shot and killed and I am going to ask you
23    some questions today.
24                   If there is anything that I ask
25    you that you don't understand, please say so
```

6

```
 1                P.O. Adam Gorman
 2   and I will gladly rephrase it for you.  Okay?
 3        A      Sounds good.
 4        Q      Otherwise, if you answer the
 5   question, I will assume that you understood
 6   it.
 7               Do you understand everything
 8   that I've said so far?
 9        A      Yes.
10        Q      You agree to those terms?
11        A      Yes, sir.
12        Q      This is a virtual deposition.
13   We're not in-person together.
14               Can you just tell me where you
15   are doing the deposition from?
16        A      I am doing it at City Hall,
17   which is located at 30 Church Street,
18   Rochester, New York.
19        Q      Ms. Jones is in the room with
20   you?
21        A      Yes, sir.
22        Q      Is there anyone else in the room
23   with you?
24        A      No, sir.
25        Q      Do you have any papers or
```

```
 1                    P.O. Adam Gorman
 2    anything in the room with you to help you
 3    review to help you answer questions today?
 4         A      No.
 5         Q      Do you understand that
 6    everything that you say and I say is going to
 7    be transcribed into a little book for us to
 8    use at trial in this case?
 9         A      Yes, I do.
10         Q      Have you ever been questioned
11    under oath before?
12         A      Yes, I have.
13         Q      How many times would you
14    estimate?
15         A      A couple hundred.
16         Q      Were those all in the context of
17    criminal cases testifying in hearings and at
18    trial?
19         A      Yes. .
20         Q      Have you ever been deposed or
21    given testimony in a civil case like this
22    one?
23         A      I have not.
24         Q      You gave your business address,
25    right?
```

```
 1                    P.O. Adam Gorman
 2              MR. SHIELDS:  And, Peachie,
 3              since he gave the business
 4              address, not his home address,
 5              does the City agree to produce
 6              Officer Gorman at the time of
 7              trial?
 8              MS. JONES:  Yes.
 9        Q     Officer, I will try to tell you
10   in advance where I am going with the
11   questions so that you can have a little heads
12   up.
13              First, I'm going to ask you just
14   some background questions.  Okay?  So I will
15   start with your educational background.
16              Starting with high school, can
17   you tell me where you went to high school and
18   what year you graduated?
19        A     Greece Athena High School.
20              (Reporter clarification.)
21              THE WITNESS:  Greece,
22              G-R-E-E-C-E, and then Athena,
23              like the god.
24        Q     What year did you graduate?
25        A     2011.
```

9

|     |     |                                         |
| --- | --- | --------------------------------------- |
| 1   |     | P.O. Adam Gorman                        |
| 2   | Q   | What is your highest level of           |
| 3   | education? |                                  |
| 4   | A   | Currently in college.                   |
| 5   | Q   | I'm sorry.  Corinthian?                  |
| 6   | A   | Currently in college.                   |
| 7   | Q   | You are currently in college?           |
| 8   | A   | Yes.                                    |
| 9   | Q   | Where are you currently in              |
| 10  | college? |                                    |
| 11  | A   | Monroe Community College.               |
| 12  | Q   | What is your course of study or         |
| 13  | your major or whatever? |                |
| 14  | A   | Business administration.                |
| 15  | Q   | When did you start classes              |
| 16  | there? |                                      |
| 17  | A   | A year ago, a year and a half           |
| 18  | ago. |                                        |
| 19  | Q   | Are you taking any classes              |
| 20  | related to police work? |                |
| 21  | A   | I am not.                               |
| 22  | Q   | Can you just give me an overview        |
| 23  | of your job experience since you graduated |           |
| 24  | from high school? |                       |
| 25  | A   | As far as having to do with my          |

                    P.O. Adam Gorman
1
2    job I held or just a general overview?

3         Q      Yes, just a general overview.

4    Like, you know, this was my first job.  I was

5    in this field for "X" amount of time and then

6    I became a police officer.

7         A      After I graduated high school, I

8    worked in a pizza shop for just a couple of

9    months.  After that I enlisted in the United

10   States Army.  Served active duty for about

11   three and a half years and the rest of my

12   eight-year contract on reserve status.  And

13   shortly after that I became a police officer.

14        Q      Thank you for the overview.  I

15   will ask you a few other questions.

16               Prior to joining the RPD, had

17   you done any police-related work in any other

18   job?

19        A      No.

20        Q      Did you have any particular

21   training about doing police work?

22        A      No.

23        Q      You said that you were three and

24   a half years active duty and then on reserve

25   after that?

1                    P.O. Adam Gorman

2        A        Correct.

3        Q        Are you still on reserve with

4   the U.S. Army?

5        A        I am not.

6        Q        When did that end?

7        A        In 2019.

8        Q        You said it was an eight-year

9   contract?

10       A        Correct.

11       Q        Your hire date with RPD was

12   September of 2016; is that correct?

13       A        That is correct.

14       Q        After you were hired you went to

15   the police academy?

16       A        Yes.

17       Q        How long was that?

18       A        The academy lasted six months.

19       Q        Where did you go physically for

20   your training in the police academy?

21       A        To the -- to the public safety

22   training facility.  It is located at 1190

23   Scottsville Road, also in Rochester.

24       Q        Was that full-time, 40 hours a

25   week?

```
1                    P.O. Adam Gorman
2          A        Yes, it was.
3          Q        Was it just RPD officers or was
4     it members from other police departments as
5     well?
6          A        A combination of different
7     agencies.
8          Q        So it wasn't just specific for
9     RPD, correct?
10         A        No, it was not.
11         Q        So you're taught more generally
12    the laws applicable throughout the State of
13    New York for all police officers?
14         A        Correct.
15         Q        You were taught things like
16    police practices and procedures applicable
17    throughout New York State?
18         A        Correct.
19         Q        You were taught good and
20    accepted police practices and procedures for
21    things like the laws of arrest?
22         A        Yes.
23         Q        You were taught basically the
24    professional standards of care for a police
25    officer, right?
```

```
 1                    P.O. Adam Gorman
 2        A        Correct.
 3        Q        How to be a professional police
 4   officer?
 5        A        That is correct.
 6        Q        You were taught about being, for
 7   example, diligent when you do an
 8   investigation or a search?
 9        A        Yes.
10        Q        You were taught basically the
11   elements of various different crimes?
12        A        That is correct.
13        Q        You were taught about probable
14   cause?
15        A        Yes, sir.
16        Q        You were taught about the use of
17   force matrix or is that something specific
18   for the RPD?
19        A        No.  That is generalized for New
20   York State.
21        Q        So you were taught that at the
22   academy as well?
23        A        That is correct.
24        Q        Were you taught about
25   testifying?
```

14

```
1                    P.O. Adam Gorman
2         A       I am sorry.  Say that again.
3         Q       Were you taught about how to
4    testify in court?
5         A       Not that I recall.
6         Q       Is there anything else generally
7    from the academy that you learned that we
8    didn't review?
9         A       Nothing comes to mind.
10        Q       After the academy ended, did you
11   have to take a test?
12        A       After it ended?
13        Q       I guess, to complete the
14   academy, did you have to take a test?
15        A       A written test.
16        Q       A written test?
17        A       We took a couple during the
18   academy throughout.
19        Q       So you obviously passed all of
20   those tests?
21        A       Yes, sir.
22        Q       And then after the academy, what
23   happened next?
24        A       After the academy, we attended
25   two weeks of post-academy, which is RPD
```

<pre>
 1                    P.O. Adam Gorman
 2    specific, and then from there we got four
 3    months of field training.
 4          Q       Can you tell me about those two
 5    weeks of post-academy training?
 6          A       Very vaguely, it's specific
 7    policies, procedures where paperwork -- how
 8    we file paperwork at RPD versus other
 9    agencies.  I believe we went over DWIs during
10    that portion.  That's about it.
11          Q       Did you learn, like, the RPD's
12    general orders and other policies?
13          A       Not during that portion, I don't
14    believe.
15          Q       Were you ever given, like, a
16    handout of all of the City of Rochester's
17    police department's policies, like, general
18    orders and training bulletins?
19          A       No.  They're all found online.
20          Q       At some point, like, during that
21    two-week period, were told that you had to be
22    familiar with all of those policies and that
23    you were accountable if you violated them?
24          A       I don't recall if we were told
25    that.
</pre>

                          P.O. Adam Gorman

1

2          Q       So after the academy, two weeks

3     of training, and then you said four months of

4     fields training; is that right?

5          A       That is correct.

6          Q       And who were your field training

7     officers?  Well, let me back up.  Let me

8     withdraw that question.

9                  During field training there is

10    four phases of field training; is that right?

11         A       Correct.

12         Q       Do you have the same field

13    training officer or different field training

14    officers throughout that time?

15         A       You have different field

16    training officers throughout.

17         Q       Can you tell me who your field

18    training officers were?

19         A       My first one was Officer Scott

20    Calkins.

21                      (Reporter clarification.)

22                      THE WITNESS:  Calkins,

23                      C-A-L-K-I-N-S.

24         Q       And the second?

25         A       Officer Denny Wright.  I don't

1                    P.O. Adam Gorman

2    remember who the other one was.  I don't.

3         Q     So you named two.

4               Do you finish with your primary

5    FTO, the one that you started with?  Is that

6    how that works?

7         A     Yes.  You return back to your

8    first phase.

9         Q     So for the fourth phase it would

10   have been Scott Calkins again?

11        A     Correct.

12        Q     Do you remember when you ended

13   your field training?

14        A     I don't.  I generally --

15   generally August of 2017, give or take.

16        Q     Basically, throughout field

17   training, it's a hands-on, learn on the job

18   experience, correct?

19        A     Yes.

20        Q     Throughout the four phases

21   you're given more independence and

22   responsibility; is that right?

23        A     That's correct.

24        Q     And do you have tests that you

25   have to take to complete each phase of field

1                    P.O. Adam Gorman

2    training?

3         A       No written exams.

4         Q       So would it just be your FTO

5    evaluating you and your performance?

6         A       Correct.

7         Q       And after you complete your

8    field training, is there a probationary

9    period?

10        A       Yes.

11        Q       And do you know how long that

12   lasts?

13        A       The probation period lasts, in

14   total, from date of hire, 18 months.

15        Q       When you say date of hire, do

16   you mean when you begin the police academy?

17        A       Yes.  The first day of the

18   academy.

19        Q       So the academy is six months and

20   then field training is four months.  That

21   would be 10 months.  So then it's an

22   additional eight months after your field

23   training ends; is that right?

24        A       That would be an additional --

25   sounds right.  Sounds about right.  My math

1                    P.O. Adam Gorman

2     is not too good.

3          Q      18 months total though, right?

4          A      Yes.  Correct.

5          Q      I just want to backtrack for a

6     second.

7                  Can you tell me everything that

8     you did to prepare for today's deposition?

9          A      I reviewed the incident with

10    corporation counsel.

11         Q      Don't tell me any of the

12    substance of your conversation, but when you

13    say corporation counsel, do you mean

14    Ms. Jones?

15         A      Yes, that's correct.

16         Q      Did you speak with anyone else

17    about the incident?

18         A      Another gentleman.  I don't know

19    who it was.

20         Q      Mr. Beath?

21         A      Could be.  I couldn't tell you.

22         Q      Another attorney for the City?

23         A      Correct.

24                (Reporter clarification.)

25                MR. SHIELDS:  Correct.

1                    P.O. Adam Gorman

2                    B-E-A-T-H.

3          Q       How many times did you speak

4    with the attorneys?

5          A       I don't know the specific

6    number.   Twice.

7          Q       Were those two times that you

8    spoke with the attorneys the only time that

9    you spoke with them about the case --

10         A       Yes.

11         Q       -- to prepare for today's

12   deposition?

13         A       Yes.

14         Q       How long did each meeting last?

15         A       I don't remember the first one,

16   the length of it.   The second one, maybe a

17   couple of hours.

18         Q       Did you speak with anybody other

19   than your attorneys about today's deposition?

20         A       I have not.

21         Q       Or the previously scheduled

22   deposition that we had to reschedule?

23         A       No, I have not.

24         Q       Have you spoken with anyone in

25   the police department about the case since

1                      P.O. Adam Gorman

2          the lawsuit was filed?

3          A        No.

4          Q        Have you spoken with Algarin

5          about the case at all?

6          A        Not since the day or the couple

7          of days preceding the incident.

8          Q        Do you mean the couple of days

9          after the incident or before the incident?

10         A        After the incident.

11         Q        And when you spoke with Algarin

12         about the incident, what did you guys talk

13         about?

14         A        Exactly what happened.

15         Q        Can you elaborate at all?  Do

16         you remember any details?

17         A        No.  That was years ago.

18         Q        In preparation for today, did

19         you review any other paperwork?

20         A        I reviewed an incident report.

21         Q        Anything else?

22         A        No.

23         Q        Did you look at any pictures?

24         A        No, not pictures.

25         Q        Did you watch any videos?

22

```
 1                    P.O. Adam Gorman
 2         A        I did.
 3         Q        What videos did you watch?
 4         A        My body-worn camera and Officer
 5    Algarin's body-worn camera.
 6         Q        When you do your field training,
 7    are you assigned to a section?
 8         A        Yes, you are.
 9         Q        What section were you assigned
10    to?
11         A        Clinton section.
12                  (Reporter clarification.)
13                  THE WITNESS:  Yes, ma'am.
14                  That's spelled C-L-I-N-T-O-N.
15         Q        And after you finished your
16    field training, did you continue with the
17    Clinton section?
18         A        Yes.
19         Q        Are you still assigned to the
20    Clinton section?
21         A        That I am.
22         Q        So throughout your entire career
23    with RPD you've been assigned to the Clinton
24    section?
25         A        Correct.
```

P.O. Adam Gorman

1

2       Q       Can you tell us generally, what

3  is that section like?  How would you describe

4  it?

5       A       Violent.

6       Q       What else?

7       A       I don't know how else to

8  describe it.  Small.

9       Q       What are the geographic

10  boundaries of the Clinton section?

11       A       Generally speaking, it goes from

12  the most northern end of East Ridge Road, a

13  couple of streets north of that.  The

14  majority of it ends at East Bridge Road where

15  Irioqort starts south to the interloop, east

16  toward North Goodman Street, and westward to

17  the Genesee River.

18                    (Reporter Clarification.)

19       Q       So thank you for that

20  description.

21                    So you said it was violent.

22                    Geographically small compared to

23  other sections I guess is what you mean when

24  you say small; is that right?

25       A       Yes.

24

1                    P.O. Adam Gorman

2        Q        When you say violent, you mean a

3   lot of violent crime?

4        A        That is correct.

5        Q        Is there other types of crime in

6   that section as well?

7        A        Yes.

8        Q        What other types of crime are

9   predominant in the Clinton section?

10       A        Anywhere from family issues to

11  public disorderly crimes.

12       Q        What types of crimes are public

13  disorderly crimes?

14       A        Could be anything from selling

15  drugs to making unreasonable noise.

16       Q        Demographically, how would the

17  Clinton section break down generally?

18       A        I want to clarify.  You are

19  talking about the race?

20       Q        Demographics, correct.

21       A        I couldn't give you a specific

22  number, but the majority are either black or

23  Hispanic.

24       Q        So a majority minority

25  neighborhood?

25

```
 1                     P.O. Adam Gorman
 2          A       Correct.
 3          Q       Let's go back to the training a
 4    little bit.  Since you finished your field
 5    training, what other training have you done
 6    with the RPD?
 7          A       Just that.
 8                  Additional schools you're
 9    saying?
10          Q       Yes.  Like, is there any
11    mandatory training required by the RPD, I
12    don't know, on an annual basis or something?
13          A       Yes.  We have annual
14    in-services.
15          Q       And what topics are required at
16    annual in-services?
17          A       I couldn't tell you what is
18    required.
19          Q       So 2017 is when you finished
20    your field training.
21                  Is there any training that
22    you've received every year since 2017?
23          A       Yes.
24          Q       What would that be?
25          A       One, we would qualify annually
```

```
 1                    P.O. Adam Gorman
 2    with our firearms.
 3         Q       Other than firearms, is there
 4    any annual training that you have done every
 5    year since 2017?
 6         A       There is no specific topic that
 7    comes to mind.
 8         Q       So as far as you know, it is
 9    just firearms training that is required every
10    year?
11                    MS. JONES:  I am going to
12                    object to that.  You can answer.
13         A       It's the only thing that I can
14    recall.  I wouldn't say required.  I am sure
15    there is a laundry list.
16         Q       Since finishing your field
17    training, what in-service trainings have you
18    done other than firearms training?
19         A       We have done defensive tactics,
20    things like updates on policies and
21    procedures, mental health, things of that
22    nature.
23         Q       Do you remember any specific
24    training on updates for policies and
25    procedures that you have done?
```

1                    P.O. Adam Gorman

2        A        None comes to mind.

3        Q        And the only specific thing that

4    you said was mental health.

5                 Can you elaborate on that a

6    little bit?

7        A        I only say that because that's

8    probably -- I think that's our -- that is our

9    most -- my most recent in-service training.

10       Q        And how long does an in-service

11   training last?  Like, do you take a day off

12   and go to a training?

13       A        Typically they are eight-hour

14   in-services.

15       Q        And let's just say in the last

16   year, how many eight-hour in-service

17   trainings have you done?

18       A        I have done -- July or June --

19   two, I believe.

20       Q        That includes the mental health

21   training that you just said and another one?

22       A        Correct.

23       Q        Does that help you remember the

24   topic of the other training that you did?

25       A        It does not.

28

P.O. Adam Gorman

1

2    Q      Well, I don't want you to guess.

3           Could it have been a defensive

4    tactics training?

5                MS. JONES:   Objection.

6    A      It was not, no.

7    Q      Other than in-service training

8    with the RPD, have you attended any trainings

9    hosted by private entities?

10   A      No.

11   Q      Just to be clear, when I say

12   private entities, I mean either private

13   companies -- so I'll just take it one by one.

14          Have you ever gone to a training

15   held by a private company?

16   A      I have not.

17   Q      How about any trainings hosted

18   by the Locust Club?

19   A      No.

20   Q      And I guess there was an

21   assumption based into that question.

22          Are you a member of the Locust

23   Club?

24   A      Yes, I am.

25   Q      And when you go to trainings,

P.O. Adam Gorman

 1

 2     generally you get a training certificate; is

 3     that right?

 4          A      Yes.

 5          Q      And when you get those training

 6     certificates, they're put into your personnel

 7     file; is that right?

 8          A      Yes, they are.

 9          Q      So your personnel file should

10     contain all of the training certificates that

11     you have done?

12          A      It should.

13          Q      So I want to review your

14     personnel file that was produced in discovery

15     in this case.

16                 MR. SHIELDS:  So, Robyn,

17                 we'll mark that as Exhibit A.

18                 And, for the record, this is

19                 documents Bates number City of

20                 Rochester 999 to 1132.

21                 (Witness's personnel file

22                 marked as Plaintiff's Exhibit A

23                 for identification, as of this

24                 date.)

25          Q      So I'm going to start at the

```
1                    P.O. Adam Gorman
2      back and move up because the back, 1132, is
3      where the certificate starts.  So I am going
4      to share my screen and just go over some of
5      these documents with you.  Okay?
6            A      Okay.
7            Q      So, first, I'm going to share my
8      screen and I'm going to ask if you can see
9      what I put up here.
10                  And, Officer, can you see this
11     bottom document here?  It says, "Certificate
12     of Completion"?
13           A      Yes, I can.
14           Q      Great.
15                  Is that the only thing that you
16     see or do you see the rest of my computer
17     too?
18           A      I only see that right now.  You
19     would have to scroll.
20           Q      Great.  So police bicyclist,
21     that basically means you are one of the guys
22     that can ride around the city on a bike?
23           A      That it is.
24           Q      Is that a primary assignment or
25     is that something that you do at special
```

```
 1                   P.O. Adam Gorman
 2    events or something else?
 3         A       Usually a special detail of some
 4    sort.
 5         Q       This next one, page 1131, it
 6    says that you successfully completed the
 7    basic course for police officers or
 8    equivalent on 9/1/2017.
 9                 My question about this one is,
10    this is just your police academy training
11    certificate, correct?
12         A       I honestly don't know if it's
13    just for the six months of the academy or --
14    the date doesn't really match up -- or if
15    that is everything.  It looks like it is more
16    like everything.
17         Q       So that would be after the field
18    training ended?
19         A       I would assume so based on the
20    date.
21         Q       And this is a certificate from
22    the State Division of Criminal Justice
23    Services; is that correct?
24         A       Correct.
25         Q       And do you know if the DCJS is
```

1                    P.O. Adam Gorman

2      what sets basically the standards for

3      training for all police officers in New York

4      State?

5           A      They do.

6           Q      And the next one is another DCJS

7      certificate regarding opioid overdose and

8      that's dated February 1, 2017.

9                  Do you remember that training?

10          A      Yes, I do.

11          Q      Was that part of the academy or

12     something else?

13          A      We went over -- I don't know if

14     this certification is from the academy, but I

15     do recall going over it when receiving

16     medical training in the academy.

17          Q      So you received some medical

18     training in the academy also?

19          A      Correct.

20          Q      The next one is a FEMA training

21     from January 18th, 2017.

22                 Do you remember that training?

23          A      Vaguely.

24          Q      Can you tell me generally what

25     that training involved?

33

                         P.O. Adam Gorman

1

2        A        Scene management.

3        Q        Was it something special like

4    some kind of, like, crisis scenes as opposed

5    to, I don't know, a regular stop and arrest

6    on the street?

7        A        Not that I recall.  I honestly

8    don't know.

9        Q        This looks like this next one is

10    the same certificate maybe.  Let's compare

11    them.

12                 Does it look like a duplicate to

13    you?

14        A        Scroll down again.

15                 No.  They are slightly

16    different.

17        Q        So they are both issued on

18    January 18th, though, right?

19        A        Correct.

20        Q        And what is the difference that

21    you see?  That part?

22        A        Yes.  That has the "B" and the

23    first one you showed has the letter "A," as

24    in Adam.

25        Q        And do you know the significance

34

```
 1                  P.O. Adam Gorman
 2    of the difference in the two certificates?
 3         A     I don't.
 4         Q     And above that we've got a DCJS
 5    certificate for another one for opioid
 6    overdose and it looks like that's maybe
 7    duplicate of the prior since it's the same
 8    date.
 9                Does that look right to you?
10         A     It looks about right.
11         Q     I believe those are all the
12    certificates at this times that were
13    contained in the file that the City produced.
14                Are there additional trainings
15    that you received other than what you
16    reviewed in terms of these training
17    certificates?
18         A     Yes, there are.
19         Q     To your knowledge, should those
20    other trainings have had certificates that
21    should have been in your file?
22         A     I couldn't say.  I don't know.
23                MR. SHIELDS:  To the extent
24                that there are additional
25                training certificates, we'd call
```

1                    P.O.  Adam  Gorman

2                    for  production  of  those

3                    certificates  of  those,  please,

4                    Ms.  Jones.   And  we'll  follow  up

5                    in  writing  about  that.

6                         MS.  JONES:   Yes.   I  thought

7                    he  said  he  didn't  know  if  there

8                    were  certificates.

9                         MR.  SHIELDS:   I  believe  that

10                   is  what  he  said.   That  is  why

11                   the  production  called  for  to  the

12                   extent  that  there  is  anything

13                   else.

14        Q      I  will  go  over  some  of  your

15   evaluation  again  from  bottom  to  top.

16                   So  this  one  is  for  the  period

17   November  2017,  to  November  1st  to  the  30th.

18                   So  my  first  question  is,  this  is

19   only  a  one-month  period.   Is  that  because  you

20   were  on  probation  still?

21        A      This  looks  like  a  --  oh,  okay.

22   Yes.   This  is  a  monthly  probation,  yes.   When

23   you're  on  probation,  they  do  monthly

24   evaluations.

25        Q      So  my  question  is  about  the

36

1                     P.O. Adam Gorman

2     highlighted parts.  So my first question is

3     the supervisor -- and if we go down here, can

4     you tell me, do you know whose signature that

5     is there at the bottom?

6          A      I have no idea whose signature

7     that is.

8          Q      Do you know who your rater would

9     have been during this period?

10         A      Well, based on the signature at

11    the top of the page it would have been

12    Sergeant Nicholas Iceler.

13         Q      Got it.  That should have been

14    the same person that signed down here.  And

15    he says here in this highlighted sentence, "I

16    would like to see Officer Gorman be a little

17    more proactive during normal patrol

18    functions."  Right?

19         A      Yes.

20         Q      And can you tell me, generally,

21    what does proactive mean?

22         A      Proactive means to actively

23    deter crime before getting a 911 call.

24         Q      So can you give me some examples

25    of how you would do that?

37

```
 1                    P.O. Adam Gorman
 2        A        So proactive could be something
 3   as simple as a traffic stop or we clear
 4   people from corners if needed or necessary or
 5   deal with drug issues in the area.
 6        Q        So how would you clear people
 7   from a corner?  What would you do?
 8        A        Assuming I had a legal reason to
 9   do so, I would step out of my patrol car and
10   tell them to leave.
11        Q        If there is just a bunch of
12   people hanging out on the corner, would you
13   have a legal reason to disburse them?
14        A        The act of hanging out on a
15   public corner is not in itself illegal.
16        Q        So what circumstances might, you
17   know, give you the authority to clear people
18   from a corner?
19        A        For starters, if they are
20   disrupting the flow of pedestrian traffic.
21        Q        Okay.  And how do you make that
22   determination?
23                    MS. JONES:  Objection.
24        A        If they are blocking passing
25   traffic, if I can see other people on the
```

38

1                        P.O. Adam Gorman

2      sidewalk that are having difficulty getting

3      around said group.

4           Q       If they can walk around them on

5      the sidewalk, is that enough?

6                        MS. JONES:   Objection.

7           A       Are you saying is it enough to

8      step out on them if they can still walk

9      around.

10          Q       Correct.

11          A       I think that is a very vague

12     statement and there are too many factors.

13          Q       So can you tell me, have you had

14     to do that before?

15          A       Yes, I have.

16                       MS. JONES:   Objection.

17          Q       Can you give me a specific

18     example of the time that you have done that

19     because you felt that it was legal?

20                       MS. JONES:   Objection.

21          A       Something specific to you're

22     saying a public sidewalk?

23          Q       Correct.

24          A       On a proactive stop or a 911

25     call?

39

```
 1                    P.O. Adam Gorman
 2          Q         Proactive stop.
 3          A         Frequently we deal with a
 4   corner.  I wouldn't say a corner, but Boston
 5   Street.  There is a high volume drug area
 6   where there are numerous parties and on
 7   multiple occasions myself and different
 8   officers have had to go there and clear
 9   people from the street and from the
10   sidewalks.
11          Q         So it is a high-crime area and
12   there are a lot of people on the sidewalk so
13   you can disburse them for that reason?
14                    MS. JONES:  Objection.
15          A         For being on the sidewalk, as I
16   said before, no, I cannot.
17          Q         For being on a sidewalk in a
18   high-drug area?
19                    MS. JONES:  Objection.
20          A         Being on the sidewalk in a
21   high-volume drug area is not in itself a
22   crime.
23          Q         So in instances where you have
24   gone to Boston Street, which you described as
25   a high-drug area, and had to clear people off
```

P.O. Adam Gorman

1                      P.O. Adam Gorman
2      the street, what are the other factors in
3      those circumstances that gave you the legal
4      authority to clear those people off the
5      street?
6                      MS. JONES:  Objection.
7                      Elliot?
8                     (Technical difficulties.)
9                      MR. SHIELDS:  Peachie, can
10                     you stop talking in my
11                     deposition?
12                     MS. JONES:  We are far
13                     afield of what we're talking
14                     about in this case.
15                     MR. SHIELDS:  I am talking
16                     exactly what I want to talk
17                     about and I will ask him any
18                     questions that I want.  So I am
19                     asking him about his personnel
20                     file that was produced in
21                     discovery.  I am asking him
22                     about Rochester Police
23                     Department policies.
24                     So you know what?  We can
25                     call the Judge if you're going

41

```
 1              P.O. Adam Gorman

 2         to keep interrupting my

 3         deposition that we started a

 4         half hour late because of your

 5         technical deposition.  So I

 6         would appreciate it if you would

 7         stop talking.

 8              MS. JONES:  This is

 9         completely irrelevant.  This has

10         nothing to do with --

11              MR. SHIELDS:  That is not a

12         valid reason for you to object

13         to my deposition question.  So I

14         am going to ask you again,

15         please, stop interrupting my

16         deposition.

17              MS. JONES:  We can continue,

18         you know.

19              MR. SHIELDS:  Thank you.

20              Robyn, can you please read

21         back the last question?

22              (The requested portion of

23         the record was read back by the

24         reporter.)

25              MS. JONES:  Objection.
```

42

```
 1                    P.O. Adam Gorman
 2         A        Making unreasonable noise,
 3    blocking vehicular traffic.
 4         Q        And when you say vehicular
 5    traffic, do you mean pedestrian traffic?
 6         A        No.  She said street.
 7         Q        Well, when you went to Boston
 8    Street to clear people from the corner, were
 9    they in the street or on the sidewalk?
10                        MS. JONES:  Objection.
11         A        If you are talking about a
12    specific time of the many, they had been all
13    over this street and sidewalk.
14         Q        And some of those times you had
15    to clear people, have there ever been
16    instances where you arrived to clear them
17    that people have run away from you?
18         A        Yes.
19         Q        When people have run away from
20    you, have you pursued them on foot?
21         A        Not any specific call that I
22    would remember.
23         Q        So you show up.  And to clear
24    the sidewalk, what do you do?  Do you get out
25    of your car?
```

43

```
 1                    P.O. Adam Gorman
 2                    MS. JONES:   Objection.
 3          A       It depends.
 4          Q       You approach and you ask them to
 5   move along?
 6                    MS. JONES:   Objection.
 7          A       Yes.
 8          Q       Sometimes people run away from
 9   you when you ask them to move along?
10          A       Yes.   That does happen.
11          Q       Sometimes you pursue them on
12   foot when they run away from you?
13          A       If I have a reason to do so.
14          Q       What would give you a reason to
15   chase them after you had them to clear the
16   corner?
17                    MS. JONES:   Objection.
18          A       If I was placing them under
19   arrest or detaining them.
20          Q       So you would have to have
21   probable cause to believe that they had
22   committed a crime or were committing a crime,
23   correct?
24          A       Correct.
25          Q       That would have to be more than
```

44

```
 1                P.O. Adam Gorman

 2     just the fact that they were on a corner in a

 3     high crime area, correct?

 4                     MS. JONES:  Objection.

 5          A     As I stated before, being on the

 6     corner is not a crime.

 7          Q     Have you ever issued someone

 8     that you chased from a corner, either on

 9     Boston Street or somewhere else, a ticket or

10     arrested them simply for blocking pedestrian

11     traffic?

12                     MS. JONES:  Objection.

13          A     I can't tell you.  I'm not sure.

14     I most likely have, but --

15          Q     Let's go through a few more of

16     these.

17                     So this report is dated January

18     1st, or I guess the evaluation period is

19     January 1st, 2018, to January 31st, 2018, and

20     it is Bates number City of Rochester 1116 to

21     1117.

22                     This one also has the evaluator

23     who is, again, Nicholas Iceler, right?

24          A     That is correct.

25          Q     He, again, says he would like to
```

45

```
 1                    P.O. Adam Gorman
 2    see you step up your proactive efforts during
 3    your down time when assigned to a beat,
 4    right?
 5          A      That is what it says.
 6          Q      So my question is, is it fair to
 7    say that your supervisors encourage you to be
 8    proactive during your assignments?
 9                    MS. JONES:   Objection.
10          A      I can't speak for my
11    supervisors.
12          Q      So there are a few of your
13    evaluations that said that they would like
14    you to be more proactive, correct?
15          A      Correct.
16          Q      Do you know how they measure the
17    RPD, that is, how the RPD measures your level
18    of being proactive or not?
19          A      I don't know if or how they do
20    it.
21          Q      When you do these evaluations,
22    do you have a discussion with Sergeant Iceler
23    or whoever else has completed the evaluation?
24          A      That I do.
25          Q      Did he explain to you what he
```

```
 1                    P.O. Adam Gorman
 2    meant in terms of wanting you to be more
 3    proactive?
 4         A       Sorry.  I feel a sneeze coming.
 5    It held back.
 6                  If there was a discussion, I
 7    couldn't tell you the specifics of it.
 8         Q       I guess he says down below where
 9    he talks about the discussions, he says, "I
10    spoke with Officer Gorman about addressing
11    quality of life concerns and writing traffic
12    tickets.  The community is thankful for our
13    efforts and this is an excellent way to
14    develop contacts within the community."
15                  Did I read that right?
16         A       Yes, you did.
17         Q       And does that refresh your
18    recollection of any conversations that you
19    had with Sergeant Iceler on this date or any
20    other date?
21         A       Not of any specific
22    conversations, no.
23         Q       In general, can you just tell me
24    who Sergeant Iceler is?  Is he like your
25    supervisor?
```

```
 1                    P.O. Adam Gorman

 2          A       He was my immediate supervisor

 3   when I worked Clinton third platoon.

 4          Q       And, I'm sorry, so at that time

 5   you worked Clinton third.

 6                  What do you work now?

 7          A       I work Clinton first platoon.

 8          Q       What is the difference between

 9   third and first?  The time of day that you

10   work?

11          A       Correct.

12          Q       What time of day was third

13   platoon?

14          A       That is scheduled from 1500

15   hours to 2315 hours.

16          Q       And for those of us that weren't

17   in the Army, 1500 would be 3:00 o'clock; is

18   that right?

19          A       Yes.

20          Q       3:00 p.m. to, I'm sorry, what

21   was the end time?

22          A       11:15 p.m.

23          Q       And is 11:15, that extra 15

24   minutes, is that like a break period?

25          A       No.  The 15 minutes covers
```

1                    P.O. Adam Gorman

2    overlap.

3         Q       There is a 15-minute overlap

4    between when there is a shift change?

5         A       Correct.

6         Q       What is the first platoon?

7         A       The first platoon is from

8    11:00 p.m. until 7:00 a.m.

9         Q       When did you switch from first

10   platoon to third platoon or was there

11   something in between?

12        A       Nothing in between.  2019, I

13   believe.

14        Q       Did you have any say in that

15   switch or was that decision made for you?

16        A       No.  I had a choice.

17        Q       You wanted to work overnights

18   instead?

19        A       Correct.

20        Q       Can you explain why you wanted

21   to work overnights?

22        A       Less traffic.

23        Q       But they want you to make more

24   traffic stops and write more traffic tickets?

25        A       There is less, but there is

1                    P.O. Adam Gorman

2    still traffic.

3         Q      More drunk drivers I would

4    assume?

5         A      Typically.

6         Q      So back to the discussion.

7                He said in this evaluation,

8    Sergeant Iceler, "Addressing quality of life

9    concerns."  So we talked about that a little

10   bit before where you said examples would be

11   traffic stops, clearing people from corners,

12   and dealing with drug issues, right?

13        A      Yes.

14        Q      So if you are trying to deal

15   with drug issues, for example, how would you

16   do that during I guess what he is describing

17   as your downtime when you are assigned to a

18   beat?

19        A      Well, if I am not taking calls

20   for service, then I get -- I'm sorry.  I have

21   a sneeze coming.  I can either address the

22   known drug areas or I can drive around any

23   neighborhood and actively seek out suspicious

24   activity.

25        Q      So when you say actively seek

50

1                    P.O. Adam Gorman
2    out, can you describe that, what you mean?
3         A       Well, I would drive my car
4    around the block and look around.
5         Q       If you saw something that you
6    felt was suspicious, what would you do?
7         A       Well, if I have time, I would
8    inquire with said person about their behavior
9    and/or activities.
10        Q       To do that, you would drive up,
11   park your car, and approach them?
12        A       Yes.
13        Q       Sometimes when you do that,
14   would the person run from you?
15        A       It has happened, yes.
16        Q       In those circumstances where you
17   see something that you think is suspicious,
18   you want to speak with the person, you get
19   out of your car and they run, have you ever
20   chased them on foot in those circumstances?
21        A       Not based solely on suspicion.
22        Q       In circumstances where you have
23   had more than just suspicion, you chased them
24   on foot?
25        A       I have.

1                    P.O. Adam Gorman

2        Q        And what would those additional

3    things, other than just suspicion, have been?

4        A        A variety of factors to include

5    911 calls, my knowledge of the area or

6    specific area, or specific body movements

7    and/or motions being made by said person.

8        Q        When you say body movements or

9    motions, do you mean it would indicate that

10   they might be selling drugs?

11       A        That is one of the things that

12   we look for.  Yes.

13       Q        And you described earlier the

14   entire Clinton section as a high-drug crime

15   area, correct?

16       A        I'm sorry.  Say that again.

17       Q        Earlier you described the

18   Clinton section as a high-drug crime area,

19   correct?

20                    MS. JONES:  Objection.

21       A        No, I did not.

22       Q        You just described it as, I

23   guess, violent?

24       A        Yes, violent.

25       Q        Would you also describe it as a

52

1                    P.O. Adam Gorman

2     high-drug crime area?

3          A       Some blocks, not all.

4          Q       And so if you are on a high-drug

5     crime block, you see someone that you think

6     is suspicious and you pull up and you get out

7     of your car and they run, is that enough for

8     you to pursue them on foot?

9                       MS. JONES:   Objection.

10         A       No, it is not.

11         Q       What else would you need to

12    pursue them on foot?

13         A       Well, in my opinion, I would

14    need to see definitive movements such as a

15    drug sale, or a transaction I should say.  Or

16    we could have something if we have a 911

17    caller calling in specific people and

18    describing those people and their activities.

19         Q       So if you have a description of

20    a specific person someone says is selling

21    drugs, you pull up, they run, then you can

22    chase them?

23         A       Their act of running is a factor

24    in us chasing somebody.  It does play a

25    factor.

53

```
 1                    P.O. Adam Gorman
 2          Q       In your evaluation, Sergeant
 3    Iceler says, "The community is thankful for
 4    our efforts and this is an excellent way to
 5    develop contacts within the community."
 6    Right?
 7          A       Yes.  That is what he said.
 8          Q       Do you feel like the community
 9    appreciates you and/or the police, generally,
10    in the Clinton section?
11                    MS. JONES:  Objection.
12          A       Do I feel like they appreciate
13    me?  I never took a survey, so I couldn't
14    tell you.
15          Q       Do you feel appreciated when you
16    are on foot in the Clinton section by the
17    community?
18                    MS. JONES:  Objection.
19          A       Sometimes, sometimes not.  It is
20    very hit or miss.  I have had people approach
21    me and say we are glad you are here, thank
22    you for your presence.  And I have had people
23    tell me to get out of here.
24          Q       So sometimes when you stop
25    people to talk to them they like it and
```

54

```
 1                    P.O. Adam Gorman
 2    sometimes they don't?
 3         A      If I am just -- it depends what
 4    I am talking to them about.
 5         Q      And do you think the community
 6    is generally thankful to you and/or the RPD
 7    for their efforts as Sergeant Iceler says --
 8                    MS. JONES:  Objection.
 9         Q      -- when you do proactive
10    policing?
11                    MS. JONES:  Objection.
12         A      I would assume so.
13         Q      Have people told you that after
14    you make a stop or something?
15         A      You can say that.
16         Q      How about after you stop
17    someone?  Have you ever had a situation where
18    you stopped someone, put them in handcuffs,
19    searched them, not found anything and
20    released them?  Have you had that situation?
21         A      Yes.
22         Q      Did any of those individuals
23    ever tell you they appreciated that?
24         A      I have had people tell me they
25    appreciate us being out there and they
```

55

                    P.O. Adam Gorman

1                    P.O. Adam Gorman

2    understand.

3         Q     Yes.   Those people would be the

4    people that you stopped or like other people

5    such as, I don't know, business owners?

6         A     Both.

7         Q     So you have had somebody that

8    you have stopped, searched, and released tell

9    you that they appreciated that?

10        A     Yes, actually.

11        Q     That they appreciated being

12   released or that they appreciated the whole

13   interaction?

14        A     They appreciated that -- from my

15   understanding of what they expressed to me,

16   that they appreciate us doing a diligent job

17   and serving the community.

18        Q     And in the Clinton section, are

19   the majority of the people that you stop and

20   search black?

21                    MS. JONES:   Objection

22        A     I think that is a fair

23   assumption.

24        Q     Is it a fair assumption because

25   of the demographics of the Clinton section?

```
 1                    P.O. Adam Gorman

 2        A       Yes.

 3        Q       And from your personnel

 4   experience?

 5        A       Yes.   That is correct.

 6        Q       And based on these evaluations

 7   where Sergeant Iceler said that he wants to

 8   see you do more proactive efforts during your

 9   downtime, in response to that, these

10   evaluations, did you try to engage in more

11   proactive policing as opposed to, I guess,

12   responding to 911 calls?

13        A       I honestly couldn't tell you a

14   specific answer as to how I reacted to that

15   individual evaluation.

16        Q       But that there were a few

17   evaluations that said that, right?

18                So, in general, are those

19   evaluations an accurate representation of

20   what your sergeants want you to do, that

21   being more proactive policing?

22        A       I think so.

23        Q       That is something that is

24   encouraged, not only for you, but other

25   officers, at least in the Clinton section, to
```

1                    P.O. Adam Gorman

2    do proactive policing?

3                    MS. JONES:  Objection

4    A       Yes.  Yes, it is.

5    Q       Have you gotten any specific

6    training doing proactive policing?

7                    MS. JONES:  Objection.

8    A       Yes.

9    Q       Would that be in-service

10   training or something else?

11   A       Well, we learn it in the academy

12   and FTO.

13                   (Reporter clarification.)

14                   THE WITNESS:  Field

15                   training.

16   Q       So aside from the academy, have

17   you gotten any, like, course work training --

18   I guess what I am calling in-service

19   training, and maybe that is inaccurate, like,

20   where you attend a class about doing

21   proactive policing?

22                   MS. JONES:  Objection.

23   A       I don't recall a specific

24   in-service.  I have never been to a course if

25   that is what you are asking, an additional

                        P.O. Adam Gorman

1

2      course for it, outside of the training, but I

3      don't recall any in-service talking about --

4           Q      And what type of things when

5      you're in FTO were you taught about proactive

6      policing?

7                        MS. JONES:   Objection.

8           A      One of the major things that

9      specifically when it comes to field training

10     you learn the area.  You know what spots are

11     high crime.  You know what spots are -- what

12     behavior is normal at certain corner stores,

13     what isn't.

14          Q      So you learn the area.  You

15     learn what spots are high-crime areas within

16     the area.

17                        And do you learn things like the

18     legal requirements to, for example, chase

19     someone if you are suspicious about their

20     activity?

21          A      During field training, that is

22     one of the things that you -- I don't want to

23     say learn because you've already learned it

24     at that point -- you reiterate.

25          Q      And when you say you have

59

                        P.O. Adam Gorman

1                       P.O. Adam Gorman
2       already learned it at that point, you meant
3       in the academy?
4              A       Yes.  Correct.
5              Q       So you learn the legal
6       requirements in the academy and then you
7       apply that during your field training with
8       your FTO?
9              A       That is correct.
10             Q       And then if there a problem your
11      FTO can critique you on the job.  Say, oh,
12      hey, you know, we forgot to think about X, Y,
13      and Z, or, hey, you did a great job?
14             A       That is correct.
15             Q       Let's see.  So I just want to go
16      over a few more things in your file.  So this
17      one is dated February of 2018.  And, again,
18      it is Sergeant Iceler, and the date for the
19      evaluation period.  So the date of the
20      document is February 24th, 2018.  Evaluation
21      period, 2/1 to 2/24.
22                     And so since that was still a
23      one-month evaluation, does that mean that you
24      were still on probation at that point?
25             A       I believe so.

60

                    P.O. Adam Gorman

1
2        Q        So Sergeant Iceler goes over
3    your military background and says that you
4    can be very assertive, which can be confused
5    as aggressive.  And then he says, "I brought
6    this to his attention and told Officer Gorman
7    to be mindful of the words he chooses and the
8    body language he displays."
9                 Do you remember this evaluation
10   with Sergeant Iceler?
11       A        I don't.
12       Q        Then he says he spoke with you
13   about your level of assertiveness, though it
14   is powerful and at times positive skill that
15   needs to be harnessed.  Oftentimes we're
16   dealing with community members at their worst
17   because of the circumstances.  And if
18   officer's safety allows we should always be
19   trying to deescalate a situation, not
20   escalate."
21                 And does that refresh your
22   recollection, Officer Gorman, at all about
23   the particular evaluation?
24       A        It does not.
25       Q        I want to scroll up to this

61

1                        P.O. Adam Gorman

2      report.

3                        Now, this is dated January 16th,

4      2020, and the rater's name is Augustine

5      Gonzalez; is that right?

6             A       Yes.

7             Q       That is a different rater

8      because you are now, at this point, in the

9      first platoon?

10            A       No.  I am still on the third.

11            Q       January of 2019, until December

12     of 2019, looks like the evaluation period.

13            A       Yes.

14            Q       So you were on the third

15     throughout all of 2019, still then?

16            A       It looks like it.

17            Q       I wasn't sure if maybe it was

18     the third because that is where you started

19     that year and maybe you switched in the

20     middle.  Or you don't remember?

21            A       No.  Probably until 2020.

22            Q       So just a few questions here.

23                    So it says for knowledge of

24     department policies and procedures for

25     officer safety generally and relations with

62

1                       P.O. Adam Gorman

2       citizens you got a three out of seven, but

3       higher marks in everything else; is that

4       right?

5              A       That is correct.

6              Q       And after this evaluation, did

7       you discuss that with Officer Gonzalez?

8              A       Sergeant Gonzales, yes.

9              Q       Do you know generally why that

10      was that you received lower marks on those

11      things?

12             A       No, I do not.

13             Q       If we go down here, it says, in

14      area of performance which supervisor would

15      like to see improvement, he says.  "In some

16      instances Officer Gorman is having a

17      difficult time in following the RPD's use of

18      force matrix.  On at least two occasions

19      Officer Gorman has used a higher level of

20      force than necessary.  The force wasn't

21      excessive, but it was inappropriate."

22                     And do you know what he is

23      talking in that sentence, those couple of

24      sentences?

25             A       I don't know what instance he is

```
 1                    P.O. Adam Gorman
 2   talking about.
 3        Q      You do or you don't?
 4        A      I do not.
 5        Q      And then he goes on to say,
 6   "Officer Gorman has been baited on several
 7   occasions in back and forth chatter that made
 8   him look unprofessional."
 9               Does that refresh your
10   recollection at all?
11        A      It does not.
12        Q      Then it says that you got
13   training on deescalation techniques in
14   September of 2019, by Sergeant McPherson,
15   Sergeant Gonzalez, and the DT staff at the
16   academy.
17               Do you remember that training?
18        A      That, I do.
19        Q      Is that training something that
20   you would get a certificate for or not?
21        A      No, it is not.
22        Q      So why wouldn't you get a
23   certificate for that training?
24        A      Because it's an additional --
25   it's just considered additional training.
```

64

1                    P.O. Adam Gorman

2       It's not a course.

3            Q       Additional training, what does

4       additional training mean?

5            A       It means you train more on

6       whatever specific topic they feel you should

7       improve on.

8            Q       So if you need improvement, they

9       may assign you to get additional training; is

10      that right?

11           A       Correct.

12           Q       So here they felt like you

13      needed additional training on use of force

14      matrix because you used, in their opinion,

15      inappropriate levels of force?

16           A       That is what they said.  Yes.

17           Q       Hold on a second.

18                   So also in praising you they

19      say, "I have observed Officer Gorman conduct

20      many pat down and searches and he is very

21      thorough.  I have also observed him research

22      a suspect if he felt he didn't do a good

23      enough job."

24                   So he is praising you for that?

25           A       Yes.

```
 1                    P.O. Adam Gorman
 2        Q        Is it important to be thorough
 3   and make sure if the bad guy has drugs or a
 4   weapon that you find it, right?
 5        A        Yes.  Correct.
 6                  MS. JONES:  Objection.
 7        Q        Skip up again a little bit here.
 8                  MS. JONES:  Elliot, can you
 9                  zoom any on this and make it a
10                  tad bigger, the font a little
11                  bigger?
12                  MR. SHIELDS:  Let me see if
13                  I can do that.
14                    Does that make it bigger?
15                  MS. JONES:  Yes.
16                  THE WITNESS:  Yes, it does.
17                  MS. JONES:  Thank you.
18        Q        So I went up to the first page
19   here, Bates number City of Rochester 999.
20                    So this is one of the additional
21   training reports that we just spoke about; is
22   that right?
23        A        Yes, it is.
24        Q        It is dated September 5, 2019,
25   right?
```

                        P.O. Adam Gorman

1

2          A      Yes.

3          Q      So it says this is Sergeant

4     McPherson.  And who is Sergeant McPherson?

5     What is his role?

6          A      He is retired now.  His role

7     was -- I don't know his specific title, but

8     he was involved in training at the police

9     academy.

10         Q      At the academy?

11         A      Yes.  Correct.

12         Q      So when you went to the academy,

13    he was one of the trainers?

14         A      Correct.

15         Q      Then he did these additional

16    trainings also with you after you, you know,

17    finished the academy?

18         A      Correct.

19         Q      So it said, "Clinton section,

20    third platoon command contacted me several

21    weeks ago and asked if I can provide some

22    additional training to Officer Adam Gorman

23    relating to professional communication and

24    deescalation techniques."  Right?

25         A      Right.

67

```
1                    P.O. Adam Gorman

2        Q       And do you remember doing this

3    training?

4        A       Not this specific one.

5        Q       Do you remember the additional

6    trainings that you did in general?

7        A       Yes, in general.

8        Q       So would it be fair to say that

9    it's like a step before being disciplined or

10   is it like part of the RPD's disciplinary

11   process?

12       A       I do not think this is part of

13   their disciplinary -- I never say it right --

14   disciplinary process at all.  I think this is

15   just something that they throw in there.

16       Q       So let's go down.  Narrative

17   continued.  So Sergeant McPherson explained

18   how and why he became involved in the

19   training.  You talked about the goals and

20   benefits of deescalation and communication

21   techniques.

22               Do you remember doing that with

23   Sergeant McPherson?

24       A       Vaguely.

25       Q       And it says, "We discussed
```

1                   P.O. Adam Gorman
2    recognizing our own shortcomings, making some
3    adjustments to help control the perceptions
4    from the persons he comes into contact with."
5                   Do you remember discussing that?
6         A       The whole discussion is very
7    vague in my memory.
8         Q       Do you remember discussing your
9    own shortcomings with him, what that might
10   have been that you were talking about?
11        A       A little bit.
12        Q       Can you tell us about that
13   conversation?
14        A       In sum and substance, it was
15   along the lines of talking to people with
16   more sympathy.
17        Q       And did you agree with Sergeant
18   McPherson?
19        A       I don't recall.
20        Q       As we sit here today, do you
21   agree with that assessment?
22        A       I think it is based on
23   perspective.
24        Q       Do you have a different
25   perspective today than you had at the time of

                         P.O. Adam Gorman
1
2   this additional training in 2019?
3         A      Not necessarily.
4         Q      You have more experience, right?
5         A      Correct.
6         Q      After you had this additional
7   training, do you think you changed the way
8   you communicated with people in the
9   community?
10        A      I don't this training is a --
11  was a deciding factor to me.
12        Q      Do you think the training was
13  helpful?
14        A      Yes.  I think it was good to get
15  another officer's perspective.
16        Q      I will scroll down.  I have a
17  few more questions.
18                   MS. JONES:  Just for the
19                   record, we were talking about
20                   CR999 and CR1000, I believe.
21                   Yes.  I wanted to be able to
22                   find it.  Thank you.
23                   MR. SHIELDS:  You're
24                   welcome.
25        Q      It says you talked about officer

70

```
 1                    P.O. Adam Gorman
 2    wellness and taking care of ourselves
 3    physically and mentally, especially when it
 4    comes to fatigue, and getting the right
 5    amount of sleep.  And then it says that you
 6    went over a stress management Power Point
 7    presentation.
 8                    Did Sergeant McPherson feel like
 9    you were overly fatigued and stressed.  Is
10    that part of that?
11                    MS. JONES:  Objection.
12         Q      If you recall?
13                    MS. JONES:  Objection.
14         A      I don't remember what that
15    specific -- those couple of sentences were in
16    regards to.
17         Q      I guess I was curious if that
18    was something specific or if maybe this is
19    something generally that is taught to other
20    people as well during additional trainings.
21                    MS. JONES:  Objection.
22         A      I don't know.
23         Q      You don't know?
24         A      I can't tell you.
25         Q      I will skip ahead, but, just
```

P.O. Adam Gorman

1  generally, the next few pages, the next 40

2  pages or so are handouts.

3  Are these handouts that were

4  given to you at this training, if you

5  remember?

6  MS. JONES:  Objection.

7  A     They would have been, but I

8  don't specifically recall being handed this

9  piece of paper.

10  Q     If you have a training like this

11  and there are handouts, do they give them to

12  you to take home?

13  A     Yes, they do.

14  Q     Do you take them home or do you

15  have a locker at the police department where

16  you keep them or what do you do with them?

17  A     I would normally keep them with

18  me at home.

19  Q     Is there any kind of requirement

20  that you hold onto them or can you toss them

21  when you go home if you want?

22  A     I can toss them if I wanted.

23  Q     On the subject of papers, in

24  your time as a police officer with the

```
 1                    P.O. Adam Gorman
 2    Rochester Police Department, are you required
 3    to carry around like a little notebook to
 4    write notes in when you are on duty?
 5         A      I don't know if it is a
 6    requirement by the department, but I don't
 7    know what every single officer does.
 8         Q      Are those little notebooks
 9    provided to you by the department?
10         A      Yes, they are.
11         Q      Do you have yours with you right
12    now?
13         A      I have one with me, yes.
14         Q      Can you do me a favor and show
15    me what it looks like?
16         A      (The witness complied.)
17         Q      It is basically something that
18    somebody can buy from a store?
19         A      Yes, very generic.
20         Q      It doesn't say anything like
21    Rochester Police Department on it or
22    anything?
23         A      It does not.
24         Q      And it fits in your front pocket
25    it looks like.
```

```
1                    P.O. Adam Gorman
2         A       Yes.
3         Q       Is it your front pocket?
4         A       Yes, it does, right there
5    (indicating).
6         Q       Thank you.
7                 I'm going to go back to sharing
8    my screen there.
9                     MS. JONES:  I guess I know
10                    this is video recorded, but do
11                    you want to mark for the record
12                    that Officer Gorman lifted the
13                    camera up so we could see his
14                    breast pocket and he indicated
15                    that the notebook was in his
16                    pocket?
17                    MR. SHIELDS:  You know, I
18                    was thinking about asking
19                    questions about that.  I don't
20                    think we need to mark it as an
21                    Exhibit.
22                    MS. JONES:  Not as an
23                    exhibit.  Just indicating what
24                    Officer Gorman did because this
25                    is a --
```

1                    P.O. Adam Gorman
2               MR. SHIELDS:  Oh, okay.
3          Yes.  That is a good idea.
4               MS. JONES:  I also want to
5          note for the record that earlier
6          you were scrolling COR1001 down
7          to some number.
8               MR. SHIELDS:  It was 1039 is
9          where I believe the handouts
10          from that first additional
11          training concluded.
12               MS. JONES:  Thank you.
13     Q     And, Officer Gorman, here at the
14  bottom here it says, "NYS Division of
15  Criminal Justice Services, Office of Public
16  Safety, copy right."
17               So does that indicate that the
18  handouts that you received at that additional
19  training or at least this one in particular
20  was put together by DCJS?
21     A     I would make that assumption
22  based on that bottom line.
23     Q     Thank you.
24               So now I am going to ask a few
25  more questions about some of these additional

1                     P.O. Adam Gorman

2    training reports.  This one is dated March

3    10th, 2020, and it says that it relates to, I

4    believe, the two use of force incidents that

5    we discussed on your evaluation from 2019,

6    that were 10 days apart.

7                     And looking just generally at

8    this page, does this refresh your

9    recollection about those incidents?

10          A       Give me one second.  Can I read

11   it?

12          Q       Sure.

13          A       I don't recall it.

14          Q       You don't.

15                  You see the part, "We made him

16   aware of additional scrutiny when using force

17   on a rear-handcuffed subject, especially when

18   the force results in an injury and how

19   quickly and easily all force and

20   training-related documents get FOILed."

21          A       I do see that part.

22          Q       Generally, is that a concern of

23   the police department that the documents

24   related to force incidents might become

25   public?

76

<pre>
 1                    P.O. Adam Gorman
 2              MS. JONES:  Objection.
 3       A     I can't speak on behalf of the
 4  Rochester Police Department, but I am sure
 5  they are aware.
 6       Q     And, FOIL, you understand that
 7  means the Freedom of Information Law?
 8       A     Yes, I do.
 9       Q     Let's go down.  I think it talks
10  about the incidents more specifically in the
11  next few pages.
12              MS. JONES:  For the record,
13              we were talking about document
14              Bates-stamped COR1040.
15              MR. SHIELDS:  Thank you.
16       Q     Now, I am going down to 1041.
17  You read that page and let me know when you
18  finish reading it.
19       A     I will.
20              MS. JONES:  Can you scroll
21              up and show me the COR
22              Bates-stamp?
23              MR. SHIELDS:  1041.
24              MS. JONES:  1041.  Thank
25              you.
</pre>

77

```
 1                    P.O. Adam Gorman
 2         Q       My first question is, this
 3   document discusses how he review body-worn
 4   camera footage with you, correct?
 5         A       Yes.
 6         Q       How often do you review your
 7   body-worn camera footage after an incident?
 8   Is it something that is done in every use of
 9   force incident or something else?
10                    MS. JONES:   Objection.
11         A       It is not required by the
12   department.   If you are talking -- are you
13   talking about me personally?
14         Q       Let's take that step-by-step.
15                    So are there times that you are
16   required to review your body-worn camera
17   footage of an incident?
18         A       If a supervisor tells me to.
19         Q       So there is no written rule that
20   says every time, I don't know, for example,
21   that you have to write a subject resistance
22   report you are required to review your
23   body-worn camera footage?
24         A       Not that I know of.
25         Q       So you said the only time that
```

1                          P.O. Adam Gorman

2     you know of is if your supervisor tells you

3     to review your body-worn camera footage. .

4                          That's the only time that you

5     know of that you are required to do that?

6          A      I believe so.

7          Q      If you wanted to review your

8     body-worn camera footage of an incident, is

9     that available and accessible to you to do

10    that?

11         A      If it is mine -- I'm sorry.  If

12    it is my body-worn camera, then, yes, I can.

13         Q      When you say your body-worn

14    camera, do you have a specific device that is

15    assigned to you?

16         A      Yes, I do.

17         Q      So you're always able to view

18    your own body worn-camera footage?

19         A      Yes.

20         Q      When you do that, is that like

21    on a specific computer in the police

22    department or something?

23         A      Yes.  The only place I know of

24    is from the computers at the police

25    department.

```
                        P.O. Adam Gorman
1
2          Q        Is there a special room or like
3      a library or something?  How do you do that?
4          A        No.  It is all done on a -- what
5      is the term -- virtual desktop.
6          Q        So it is like in the cloud?
7          A        Essentially, yes.
8          Q        Can you access that cloud like
9      if you are at home and you dial in or do you
10     have to be physically present at PSB?
11         A        I believe you need to have --
12     there is a program that you have to log into
13     and I don't think it is a program that you
14     can just download on the internet.
15         Q        What is that program called?
16         A        C3 Sentinal.
17         Q        I am sure we can look that up.
18                  This incident that you are
19     discussing with it looks like Sergeant
20     Michael Azzolina, did you review that
21     body-worn camera footage prior to meeting
22     with the sergeant?
23         A        I have no idea.
24         Q        What is your practice in terms
25     of reviewing your own body-worn camera
```

1                      P.O. Adam Gorman

2    footage of an incident?

3         A      Typically, I will review it

4    prior to completing a use of force report.

5         Q      If you have an incident that

6    doesn't involve a use of force, would you

7    ever review your body-worn camera?

8         A      I would.

9         Q      And under what circumstances?

10        A      When I don't remember what

11   the -- the exact details.

12        Q      So they are helpful to refresh

13   your recollection when you are writing

14   reports?

15        A      That they are.

16        Q      As part of your preparation for

17   today, you said that you reviewed your

18   body-worn camera of this incident, right?

19        A      I did.

20        Q      Did you do that in the way that

21   you described previously logging into

22   Sentinal or something else?

23        A      In reference to being with

24   corporation counsel or by himself?

25        Q      Well, I don't want you to go

```
 1                    P.O. Adam Gorman
 2      into any discussions or anything that you had
 3      with corporation counsel.  You can say, I log
 4      in and I watched it on my own or you can say
 5      I watched it with corporation counsel.
 6            A     I did both.
 7            Q     You did both.
 8                  Here, it says sergeant has
 9      watched the body-worn camera with you, that
10      the suspect baited you.  He called you the
11      F-word and boy.  You responded back, "Boy,
12      boy boy, you had your chance."  You walked
13      him to the car.  It continued to be
14      confrontational.  And then you told him to
15      get into the car.  And when he didn't, two
16      seconds later you deployed OC spray, right?
17            A     Correct.
18            Q     Can you tell me what the
19      departmental policies are in terms of using
20      OC spray?
21                  MS. JONES:  Objection.
22            A     It is considered a use of force
23      level two, so it can be used for
24      noncompliance.
25            Q     Is that one of the reasons it
```

82

1                    P.O. Adam Gorman

2    can be used to gain compliance?

3         A      Correct.

4         Q      So that is why you used it in

5    this situation?

6                    MS. JONES:  Objection.

7         A      That is correct.

8         Q      But your supervisor disagreed

9    with that decision in that situation?

10                   MS. JONES:  Objection.

11        A      It would appear so.

12        Q      And after this additional

13   training report, did you change your use of

14   OC spray in any way in general?

15                   MS. JONES:  Objection.

16        A      Not to my knowledge.

17        Q      So would you say this additional

18   training was helpful to you?

19                   MS. JONES:  Objection.

20        A      I would say it was a valid point

21   to bring up.

22        Q      You learned from it?

23                   MS. JONES:  Objection.

24        A      Yes.

25        Q      You think in general it is

1                    P.O. Adam Gorman

2    helpful to be able to review videos of

3    incidents to learn from them?

4         A      Yes.

5         Q      Is part of any of the ongoing

6    training that you have done, aside from the

7    additional training reports, have you

8    reviewed body-worn camera footage of

9    incidents to learn from them?

10        A      You will have to say it one more

11   time.

12        Q      Other than these additional

13   training reports that we were reviewing in

14   your time with Rochester Police Department,

15   have you reviewed body-worn camera footage to

16   analyze an incident to learn from it?

17        A      I have watched body-worn camera

18   footage from different officers around the

19   country.

20        Q      Throughout the country?

21        A      Yes.

22        Q      When you say that, do you mean

23   that would include RPD officers or are you

24   saying like when you are in a training they

25   don't use RPD specific body-worn camera

84

```
 1                    P.O. Adam Gorman
 2    footage?
 3         A      I am just, like, watching the
 4    show cops.  I watch when they play body-worn
 5    camera footage and it is good training.
 6         Q      So that would be something that
 7    you do on your own, correct?
 8         A      Correct.
 9         Q      As part of any RPD training,
10    in-service training, or something else, does
11    the RPD show body-worn camera footage of
12    incidents to review them generally with the
13    department about what an officer did right or
14    wrong?
15         A      They have.
16         Q      Can you give me an example?
17         A      I remember this one.  It was a
18    southern trooper, like Alabama, pulled a
19    gentleman out of a car during a traffic stop.
20    I guess that is standard procedure for them
21    down there.  He punched her once in the face.
22    She gets knocked out cold.  And he attempted
23    to use the weapon and drives off.  Just kind
24    of uses that as training as to why we don't
25    let the people out of the car.  Some states
```

                          P.O. Adam Gorman

1

2   prefer that.  New York State, we train to

3   keep then inside of the vehicle.

4           Q       Thank you.

5                   Other than body-worn camera from

6   other locations around the country, does the

7   RPD ever use body-worn camera footage from an

8   RPD officer similar to what you just

9   described from the southern officer?

10          A       I don't think so.

11          Q       Not that you remember?

12          A       Not that I remember.

13          Q       The training that you just

14  described with the southern trooper, was that

15  in-service training or something else?

16          A       I think it was during the

17  academy.

18          Q       Just my last question about this

19  one.  I am not going to promise my last

20  question, but is it a common occurrence that

21  when you are arresting somebody they try to

22  bait you like this person calling you the

23  F-word and boy?

24          A       All the time.

25                  MS. JONES:  Objection.

P.O. Adam Gorman

1

2     Q     So that is why you think you

3  received this additional training about

4  trying to keep your cool and deescalate

5  situations?

6               MS. JONES:  Objection.

7     A     Most likely.

8     Q     Can you tell me what the RPD 's

9  policy is generally about deescalation?

10              MS. JONES:  Objection.

11    A     They want us to escalate only as

12  necessary and continue to deescalate at all

13  possible times.

14     Q     Do you know if that is in

15  writing somewhere?

16    A     I don't.  I am paraphrasing.

17    Q     Thank you.

18          So it looks like generally what

19  Sergeant Azzolina was trying to emphasize

20  here is just thinking about the totality of

21  the circumstances of every situation.

22          Is that fair to say?

23             MS. JONES:  Objection.

24     Q     If we look at the continued

25  narrative on page 1042.

87

P.O. Adam Gorman

1

2     A     I agree.

3     Q     And generally that applies not

4  just in a use of force situation, but, you

5  know, making stops or arrests, you have to

6  always be aware of the totality of the

7  circumstances.

8           Is that fair to say?

9     A     Correct.

10    Q     I will skip forward a little

11  bit, but my questions are, before I skip to

12  the next additional training report, these

13  next few pages are handouts.  These are

14  handouts that were given to you after this

15  additional training report, do you think?

16    A     It looks like it.

17    Q     It looks like there were two

18  handouts.

19           The use of force matrix, is this

20  the curerent use of force matrix, if you

21  know, for the RPD?

22    A     To my knowledge.

23    Q     The next handout on page 1044,

24  the force factor slash evidence --

25           MS. JONES:  For the record,

88

```
 1                    P.O. Adam Gorman
 2                 the use of force matrix is on
 3                 1043.
 4                    MR. SHIELDS:  Correct.
 5        Q      So then the next additional
 6   training report is dated --
 7                    MS. JONES:  If we're going
 8                 into the additional training
 9                 report, do you mind if we take a
10                 little break?
11                    MR. SHIELDS:  Can we do it
12                 after this one?  I mean, now is
13                 fine.  I don't care.  Whatever
14                 you want.  I mean, I was
15                 thinking I would be done with
16                 the PDS file shortly, but --
17                    MS. JONES:  It looks like
18                 there are multiple --
19                    MR. SHIELDS:  Now is good.
20                 Do you want to take a
21                 five-minute now and do you want
22                 to take a long lunch break or
23                 what do you want to do?
24                    (A discussion was held off
25                 the record.)
```

89

```
 1                    P.O. Adam Gorman
 2                    (TIME NOTED:  11:31 a.m.)
 3                    (A brief recess was taken.)
 4          Q     Let me ask you, Officer Gorman,
 5   do you feel comfortable proceeding with your
 6   deposition?
 7          A     Yes.
 8          Q     I just don't want there to be
 9   any issues in the future.  If you say, hey,
10   look, I was up for a long period of time and
11   I was too tired to answer questions.  So as
12   long as that is not the case, do you feel
13   like we're good to go?
14          A     Let's keep on trucking along.
15                    MS. JONES:  At some point I
16                    might need to stop and eat
17                    lunch.
18                    MR. SHIELDS:  Definitely.
19                    MR. SHIELDS:  We'll approach
20                    a natural breaking point.  And I
21                    don't plan on going until 5:00
22                    p.m., so, you know.
23                    (A discussion was held off
24                    the record.)
25          Q     I am going to go back and ask a
```

90

                    P.O. Adam Gorman

1
2    few more questions about your PDS file, not
3    the entire rest of it, but I will go ahead to
4    page -- let me see here.  I might as well ask
5    about that one too.
6                    This is page 1045 of the City's
7    production, again, Exhibit A.
8                    This is another additional
9    training report dated 12/4/19, correct?
10        A        Correct.
11                    MS. JONES:  Can you zoom in
12                    more?  It was a little larger
13                    last time and that was ideal.
14        Q        So can you read this and tell me
15    when you are done reading this page, Officer?
16        A        Yes, I will.
17        Q        Just in general the incident
18    that this additional training report is about
19    involved a handcuffed suspect that was
20    refusing to enter the vehicle and you
21    delivered three knee strikes to the back of
22    his thigh; is that right?
23                    MS. JONES:  Objection.
24        A        Correct.
25        Q        And so, in general, these two

                            P.O. Adam Gorman

1

2    additional training reports involved

3    handcuffed suspects that you had used force

4    against, right?

5                      MS. JONES:  Objection.

6    A       Correct.

7    Q       And so they gave you these

8    additional trainings and asked you to

9    familiarize yourself with more appropriate

10   techniques in general.

11                     Is that fair to say?

12                     MS. JONES:  Objection.

13   A       Correct.

14   Q       This is a separate additional

15   training report on page 1046.  It is dated

16   October 30th, 2018.

17                     And, let's see, does it says who

18   the sergeant was that did this with you?

19   Sergeant Jason Rudolph.

20                     Who is Sergeant Jason Rudolph?

21   A       He was a Clinton third boss for

22   a short period of time.

23   Q       So sometimes these additional

24   trainings would be done by the section

25   supervisors?

1              P.O. Adam Gorman

2      A      Correct.

3      Q      Can you read this one and let me

4  know when you are done reading it?

5      A      Will do.  Okay.

6      Q      So, in general, this one

7  involved an arrest for an OGA that your

8  supervisor later determined you lacked

9  probable cause to file those charges; is that

10  fair?

11              MS. JONES:  Objection.

12      A      Correct.

13      Q      So it says, as we discussed a

14  little bit earlier, there was a situation

15  where you arrived at a scene, spoke with

16  someone, and they ran from you, and you

17  pursued them; is that right?

18      A      You failed to mention there was

19  a 911 call describing that, but, yes.

20      Q      Here there was a 911 call.

21              Earlier we were discussing

22  situations where there was no 911 call,

23  right?

24      A      Correct.

25      Q      So it says here there had been a

```
1                     P.O. Adam Gorman
2     description.  You pulled up.  You observed
3     the male described by the caller standing
4     with someone else.  Upon arrival you told
5     them to take their hands out of their pockets
6     at which point the male, who was not
7     described in the original call, took off
8     running; is that correct?
9                     MS. JONES:  Objection.
10         A      That's correct.
11         Q      So you chased that guy, took him
12    into custody, searched him.  He didn't have
13    anything, but you arrested him for OG anyway,
14    right?
15                    MS. JONES:  Objection.
16         A      Correct.
17         Q      Can you tell me, in general,
18    during this initial training, what did you do
19    with Sergeant Rudolph to review this
20    particular incident?
21                    MS. JONES:  Objection.
22         A      I don't recall.
23         Q      You had a conversation?
24         A      I would imagine so.
25                    MS. JONES:  Objection.
```

1                  P.O. Adam Gorman

2          Q       Did you watch the body-worn

3    camera with him?

4                       MS. JONES:  Objection.

5                       MR. SHIELDS:  Peachie, like,

6                  you can just say ongoing

7                  objection, but, you know, first

8                  of all, the questions are not

9                  objectionable.

10                      Second of all, if you say

11                 ongoing objection to this line

12                 of questioning, you know, you

13                 don't interrupt the deposition.

14                 It goes a lot quicker.

15                      MS. JONES:  Well, I don't

16                 have to object to every

17                 question.  I feel like it should

18                 be noted which question I

19                 specifically object to.

20                      MR. SHIELDS:  I asked him,

21                 did you review the body-worn

22                 camera footage with Sergeant

23                 Rudolph?

24                      MS. JONES:  About this

25                 particular incident?

95

```
 1                    P.O. Adam Gorman
 2                    MR. SHIELDS:  Correct.
 3                    MS. JONES:  Yes.  I have no
 4          objection to that.
 5      A       I don't recall if I watched it
 6  with him.
 7      Q       Let's put it on the next page
 8  and see.
 9                  Can you read this page, which is
10  CR 1047, and tell me when you are done
11  reading that page?
12      A       Okay.
13      Q       One of the things that Sergeant
14  Rudolph says that he discussed with you was
15  how taking your time can help in situations
16  like that; is that correct?
17      A       Yes.  He does describe that.
18      Q       Do you agree with that?
19      A       Generally speaking, yes.
20      Q       Sometimes you may have
21  disagreements with sergeants who are not in
22  the field on a day-to-day basis and what they
23  tell you to do when you're in a situation.
24                  Have you ever had that
25  situation?
```

96

1                          P.O. Adam Gorman

2                          MS. JONES:   Objection.

3          A          I have.

4          Q          But here you agree with him?

5          A          I do not, but --

6          Q          So you think that in this

7    situation taking a little extra time it

8    wouldn't have really made a difference?

9          A          I don't think there was a lot of

10   time to be had.

11         Q          When you do these additional

12   trainings, are they all done in one place or

13   you said that, for example, was with the

14   Clinton section.  So my question is where

15   these additional trainings would happen.

16         A          Typically at the Clinton section

17   office.

18         Q          They are like a classroom

19   training?

20         A          Conference room.

21         Q          I guess my question is, do you

22   ever do any type of scenario-based training

23   during these additional trainings?

24         A          We have.

25         Q          When you do scenario-based

```
 1                    P.O. Adam Gorman
 2      training, is it like officers interacting and
 3      role play?
 4           A       Yes.
 5           Q       Does the RPD have any simulators
 6      that you do for training purposes?
 7           A       They do.
 8           Q       What types of simulation-based
 9      training does the RPD provide?
10           A       I don't know the name of it.
11      It's actually a screen that has a prerecorded
12      video, I suppose you would say, and you sit
13      there and you talk to the screen.  It is not
14      interactive.  It is not AI by any means, but
15      you talk to it as if it is a real person and
16      you address it as the scenario plays out
17      whether or not that becomes violent, whether
18      the person cooperates, or whether you need to
19      go hands-on, use deadly physical force.  It
20      has multiple situations.
21           Q       Just so I understand, it is
22      basically just a screen and you talk to it,
23      but you said it is not interactive, right?
24           A       Correct.
25           Q       So I am assuming that -- I don't
```

```
 1                    P.O. Adam Gorman
 2    want to assume anything.  I am trying to
 3    understand here.
 4                    So if you make one choice, let's
 5    say, if it is a yes-or-no question, if you
 6    say "yes," would there be a sergeant or
 7    somebody that would click a button and make
 8    the simulation?
 9         A       I'm not trained in it, but my --
10    from my understanding, that is how it is.  It
11    can be altered based on the person
12    controlling the program.
13         Q       But it requires, as far as you
14    understand, an additional person to put in a
15    prompt based on how you react to the video?
16         A       Correct.
17         Q       Have you used the
18    simulation-based training for anything?
19         A       Yes.
20         Q       What types of things have you
21    done simulation-based training for?
22         A       Just overall training.  I don't
23    exactly remember when.
24         Q       I guess my question is, for a
25    use of force incident, have you used
```

99

                    P.O. Adam Gorman

1    simulation-based training?

3         A    We have used it for use of force

4    training, yes.

5         Q    Like, I guess my question is,

6    what topics have you used the simulator for

7    for training purposes?

8         A    Deescalation is one of them.

9         Q    Anything else that you remember?

10        A    Deadly physical force.  We use

11   them as shoot scenarios.

12        Q    If you are doing a use of force,

13   a deadly use of physical force situation for

14   a shoot situation with a simulator and you

15   have to decide whether or not to shoot, but

16   it is not interactive, do you yell out like,

17   shoot it, before you are going to shoot?  How

18   does that work?

19        A    So it is not -- I should

20   clarified.  It is not voice interactive, but

21   the side arm, the pistol that we are given,

22   it is -- it has a laser so it can shoot at

23   the screen and I think it registers if you

24   hit the target and then the computer will

25   automatically prompt it to whatever the next

1                    P.O. Adam Gorman

2    screen would be, so someone falling down

3    after being shot, hypothetically.

4          Q       So it is like a low-attack video

5    game sort of?

6          A       Like Duck Hunter, yes.

7          Q       You said deescalation, deadly

8    physical force.

9                  Anything else that you remember

10   training on the simulator for?

11         A       Not in particular.

12         Q       Specifically, you have never

13   done any training involving use of force with

14   a dog, have you?

15         A       No.

16         Q       So no assimilation training for

17   a dog?

18         A       Not that I remember.

19         Q       Other than deadly physical

20   force, and I'm sorry if I already asked this,

21   deescalation, any other topics that you

22   remember using the simulation for?

23                 MS. JONES:   Objection.

24         A       No, I don't think so.

25         Q       Is the simulator used as part of

```
 1                  P.O. Adam Gorman
 2     these additional trainings or something else
 3     or both?
 4          A      It can be used as initial or
 5     additional training.
 6          Q      You said initial; is that right?
 7          A      Yes.  Such as training during
 8     academy.
 9          Q      So you did simulation training
10     in the academy?
11          A      Yes.
12          Q      How about in-service training?
13          A      I think we have.  I think we
14     have done it for in-service training.
15          Q      How about, have you done any
16     mental health-based scenarios dealing with a
17     person dealing with mental health issues?
18          A      Yes.
19          Q      On the simulator?
20          A      Yes.
21          Q      I will scroll down here.
22                 On page 1048, type of training,
23     it says five, in parentheses, prism scenarios
24     in three simulation exercises.
25                 So my first question is, is
```

```
 1                    P.O. Adam Gorman
 2   prism the simulation or something else?  Do
 3   you know what that is?
 4        A      That is the program.
 5        Q      Okay.
 6        A      The simulation.
 7        Q      So prism is what is projected up
 8   or the name of the company?
 9        A      I am speculating.  I would say
10   to me it is the program.
11        Q      They say prism.  Here in the
12   highlighted part, it says this first part of
13   the training was in the prism room.
14               Does that mean there is a room
15   where that simulator is where you go to do
16   that training?
17        A      Yes.
18        Q      Where is that?  Is that at PST
19   or somewhere else?
20        A      No.  It's at PSTF, 11
21   Scottsville Road.
22        Q      PSTF, the training center?
23        A      Correct.
24        Q      That is not just for the RTP?
25   That is for other departments as well?
```

                        P.O. Adam Gorman

1

2          A       I have no idea.

3          Q       But the training center, is that

4    the training center where you did your

5    academy training also, correct?

6          A       Correct.

7          Q       That training center is used by

8    more than just the Rochester Police

9    Department, correct?

10         A       Correct.

11         Q       Then it said the second part of

12   the training was in the DT Lab 2020.

13                 What is the DT Lab?

14         A       Defensive tactics.

15         Q       Is that also at the training

16   center?

17         A       Yes, it is.

18         Q       What is the DT Lab, just a room?

19         A       Just a room with pads in it.

20         Q       So a padded room?

21         A       Correct.

22         Q       So in that padded room, is that

23   where you would do role-playing scenarios?

24         A       Yes.

25         Q       Do you think that the

1                    P.O. Adam Gorman

2    simulation-based training is effective?

3          A      I think so.

4          Q      You think it would be good to

5    have more of it?

6                    MS. JONES:  Objection.

7          A      I would love to see more of it.

8          Q      You would love to see more of

9    it?

10         A      Yep.

11         Q      Can you explain that a little?

12         A      It is good training.  It is --

13   the program is outdated, but it is -- with

14   the amount of scenarios that it offers with

15   limited personnel that it takes to run it, I

16   think it is very useful training that can

17   open your eyes to multiple scenarios,

18   including low-light scenario or fast-paced

19   work, slow paced, anything.  All it takes is

20   one man to operate.

21         Q      It sounds like the concept is

22   great and you would like a newer program that

23   works better and has more different types of

24   a scenarios; is that fair?

25                    MS. JONES:  Objection.

```
1                   P.O. Adam Gorman
2          A       I think that is a fair
3    statement.
4          Q       Like an upgraded program would
5    be good?
6          A       I would say so.
7          Q       Have they had the same program
8    since you began working at the RPD?
9          A       I could not tell you.
10         Q       When is the last time that you
11   used the prism simulator?
12         A       I think it was this training.
13         Q       Back in 2019?
14         A       Yes.
15         Q       Is that the same prism
16   simulation that you used during the academy?
17         A       From what I recall, yes.
18         Q       So from at least 2016 to '19,
19   it's the same program as far as you know?
20         A       Yes.
21         Q       You like the program for one of
22   the reasons being that it's similar to a
23   real-world scenario without the risks.
24                 Is that a fair statement?
25                 MS. JONES:  Objection.
```

                          P.O. Adam Gorman

1

2       A       Yes.

3       Q       And it is easy to use and

4    doesn't require a lot of manpower?

5       A       Yes.

6       Q       Sounds like a lot of great

7    reasons.  I'm sorry to beat a dead horse.

8                In total, how many times do you

9    think you have used the prism simulation

10   training?

11      A       Twice.

12      Q       Just is that twice in addition

13   to your academy training or twice after the

14   academy?

15      A       Twice total completely.

16      Q       The academy and then afterwards?

17      A       Right.

18      Q       The academy and then during this

19   additional training?

20      A       Correct.

21      Q       You thought it was effective I

22   would assume then during the additional

23   training?

24      A       Yes.

25      Q       Do you have any idea of what

```
 1                    P.O. Adam Gorman
 2    other officers think about the simulation
 3    training?
 4                    MS. JONES:   Objection.
 5        A       I don't, actually.
 6        Q       Do you play video games?
 7                    MS. JONES:   Objection.
 8        A       Not usually.
 9        Q       Not usually.
10                    Do you play Call of Duty every
11    once in a while or anything like that?
12        A       Not in probably the past five
13    years.
14        Q       Okay.  You don't have, like, a
15    twitch?
16                    MS. JONES:   Objection.
17        A       I have no idea what a twitch is.
18        Q       Do you have any kind of, like,
19    online game handle where you play video games
20    online with other people?
21                    MS. JONES:   Objection.
22        A       I am probably the youngest
23    person in this room, but what is a handle?
24        A       It is, you know, like an online
25    user name.  Like, sometimes people have a
```

1                      P.O. Adam Gorman

2    Twitter account with a different name than

3    their, you know, personal government given

4    name.

5          A      Oh, like -- okay.  No.  I -- no.

6          Q      On the subject of social media,

7    do you use social media at all?

8          A      No.

9          Q      Do you have a Facebook account?

10                MS. JONES:  Objection.

11         A      I do not.

12         Q      Do you know what the

13   department's policies are, if any, about

14   using social media?

15                MS. JONES:  Objection.

16         A      From my understanding, you just

17   cannot represent the police on social media

18   in any manner unless authorized to do so.

19         Q      So you are allowed to have your

20   own account if you want?

21         A      Correct.

22         Q      You choose not to have at least

23   a Facebook account, right?

24         A      Correct.

25         Q      Do you maintain any other

```
 1                P.O. Adam Gorman
 2   accounts or media platforms?
 3        A     No.
 4        Q     No Twitter?
 5              MS. JONES:  Objection.
 6        A     No.
 7        Q     No Instagram?
 8              MS. JONES:  Objection.
 9        A     No.
10              MR. SHIELDS:  And just for
11              the record, he nodded his head
12              "no" to both of those questions,
13              but for the record, if you can
14              answer verbally so that she can
15              write it down.
16        A     No.  I do not have any social
17   media.
18        Q     So the purposes of all of these
19   trainings and these additional trainings is
20   to make sure that you understand and comply
21   with the Rochester Police Department's policy
22   and procedures, right?
23        A     Correct.
24        Q     And the laws for the state of
25   New York?
```

110

                         P.O. Adam Gorman

1

2        A        Correct.

3        Q        I may have asked this earlier.

4                 After you were hired by the RPD,

5    is there any requirement that you sit down

6    and familiarize yourself with the specific

7    policies and procedures of the Rochester

8    Police Department?

9        A        Yes.

10       Q        How do they ensure that you have

11   done that?  Is there any testing or anything

12   like that?

13       A        There is no specific written

14   examination.

15       Q        Would that be more on-the-job

16   training then?

17       A        Yes.

18                MS. JONES:  Since you are

19                done with Exhibit A, can you

20                make sure you send me a copy of

21                that exhibit?

22                MR. SHIELDS:  I will send

23                you copies of all of the

24                exhibits from today as well as

25                the court reporter.

111

```
 1                    P.O. Adam Gorman
 2                    Do you want them before I
 3           send them to the court reporter
 4           and she sends them back to us
 5           marked?
 6                    MS. JONES:  Yes.  That would
 7           be helpful.
 8                    MR. SHIELDS:  Sure.  No
 9           problem.
10                    (Warrant List Entries
11           Training Bulletin L1597 marked
12           as Plaintiff's Exhibit B for
13           identification, as of this
14           date.)
15      Q       Now, I want to go through some
16   of those policies with you that the City
17   produced in discovery.  So the next one is
18   going to be Exhibit B.  It is Warrant List
19   Entries Training Bulletin L1597, so let me
20   put it up and I will give you Bates numbers.
21   So Bates number 1169 to 1170.
22                    My first question for you,
23   Officer Gorman, is this a document that you
24   have seen before?
25      A       It looks familiar.
```

1                    P.O. Adam Gorman

2          Q      Do you remember, can you tell

3    me, generally, the legal requirements for

4    entering a property without a warrant?

5          A      Two circumstances; a hot

6    pursuant or exigent circumstances.

7          Q      How is hot pursuant and exigent

8    circumstances, how are they different?

9          A      Hot pursuit is I am actively

10   pursuing somebody that has committed a crime

11   or I had reason to detain or arrest that

12   person.  So that would be I am, for example,

13   a couple of feet away running after them and

14   following their trail, their path.

15                Exigent circumstances, the

16   difference would be there is no -- I do not

17   believe -- or I'm sorry.  I do not know for

18   sure there is a crime being comitted, but I

19   do believe that someone is in danger, so I

20   must actively enter the premises to present

21   that.

22         Q      So hot pursuit, that would end

23   at some point, right?

24         A      After the pursuit is concluded,

25   generally.

1                     P.O. Adam Gorman

2          Q       Can you explain what you mean by

3     generally?

4          A       After the suspect has been

5     caught, there are still tasks that need to be

6     completed immediately after a pursuant to

7     include securing evidence.  Those -- it is

8     pertinent and time sensitive to do so to make

9     sure there is a solid chain of custody for

10    any potential evidence that is being

11    collected.

12         Q       Evidence or potential evidence,

13    right?

14         A       Correct.

15         Q       Sometimes there is no evidence.

16         A       Sometimes.

17         Q       Let's review this document,

18    Exhibit B.

19                 So this describes a Supreme

20    Court case from 1984, Welsh v. Wisconsin,

21    where it says the Supreme Court disallowed a

22    warrantless entry in order to make an arrest

23    for a non-jailable traffic offense classified

24    as a civil offense.  It says, "It is clear

25    under the Welsh case that once the violation

P.O. Adam Gorman

1
2    is abated there is no justification for entry
3    into the house unless you have a warrant or
4    consent."
5              Did I read that right?
6         A    I believe so, but I am going to
7    stop you there.
8              Can someone explain to me
9    abated?
10        Q    Yes.  Abated means once the
11   violation is abated.  So it is not ongoing
12   anymore.  So here they are talking about a
13   non-jailable traffic offense, so they are
14   saying that it is no longer occurring.
15        A    Okay.
16        Q    So after reading that
17   definition, do you still agree with your
18   prior description of hot pursuit and what has
19   to be completed immediately afterwards?
20        A    Yes, I do.
21        Q    If completing your search would
22   require entry into someone else's property,
23   does the Welsh case require that you either
24   have a warrant or consent?
25        A    It is open for interpretation.

```
1                    P.O. Adam Gorman
2         Q       How is it open for
3    interpretation?
4         A       Where you enter on the property.
5         Q       Okay.  What types of factors
6    would you be looking for?
7         A       I would be looking for public
8    access.  I would be looking for the amount of
9    resources that we have to secure the area.  I
10   would also be looking for the reasonable area
11   to be looking at.  Am I looking a kilometer
12   down the road, you know, in someone's farm
13   field or am I looking five feet away?
14        Q       If you are five feet away, maybe
15   you would be able to see whatever you are
16   looking for?
17        A       Possibly.
18        Q       This document goes on to
19   describe a couple of circumstances that would
20   not allow you to enter onto the property
21   without a warrant and consent, right?
22                A person who loiters in a public
23   area and then runs into the residence or
24   someone who violates an open container law
25   observes the police and then takes refuge in
```

P.O. Adam Gorman

1

2    their home, so you couldn't go into their

3    property in those circumstances, right?

4          A      Based on this court case,

5    correct.

6          Q      When the Supreme Court issues an

7    opinion about a policing issue, you have to

8    comply with the case law, right?

9          A      Correct.

10         Q      That is what they teach you in

11   the academy?

12         A      That's correct.

13         Q      It goes on to say that,

14   "Additionally, according to General Order

15   415, if the minor violation continues, such

16   as loud music from inside the home, the

17   exigent circumstances exception would not be

18   applicable because it is a minor offense."

19   Correct?

20         A      Correct.

21         Q      Can you tell me on what types of

22   offenses does the RPD consider a minor

23   offense?

24         A      I don't know specifically as to

25   what the department would consider minor.  I

P.O. Adam Gorman

1

2  think that all depends on who is looking at

3  the offense.  Loitering is a minor defense by

4  definition, but it is a major nuisance to

5  people that have to live in a neighborhood

6  every day day-in and day-out.

7       Q       It is something that, for

8  example, your supervisors, according to your

9  PDFs file, say, hey, look, these quality of

10  life issues are a big deal for the people in

11  the community, right?

12       A       Correct.

13       Q       Even though under some

14  circumstances they might be considered a

15  minor offense, right?

16       A       Correct.

17       Q       So it looks like there are three

18  examples here, at least, right?  Loitering,

19  open container law.  And what is this third

20  one, loud music?  Those would all be minor

21  offenses, right?

22       A       In a general sense, yes.

23       Q       Those would all be things that

24  you could just issue a ticket for, right, and

25  let the person go?

```
1                    P.O. Adam Gorman

2        A       Yes.

3        Q       So ticketable offenses might be

4   something that you can define as a minor

5   offense as opposed to something that you

6   would be required to take the person into

7   custody?

8        A       I disagree.

9        Q       There are ticketable offenses

10  that are not minor offences?

11       A       Yes.

12       Q       Can you give me some examples?

13       A       Well, for example, DWI, I

14  consider that a pretty serious offense.

15       Q       You can give someone a ticket

16  for a DWI and let them drive away?

17       A       Not drive away, but they are not

18  going to jail.  It is not jailable.

19       Q       Other than driving offenses, do

20  you have any other examples?

21       A       Yes.  Bail reform.  I mean, this

22  isn't exactly relevant to our current

23  situation, but we give nearly everybody

24  tickets now.

25       Q       So now there are offenses for
```

```
1                    P.O. Adam Gorman
2    which you have to give tickets instead of
3    arresting the individual and bringing them to
4    PSD?
5         A       Correct.
6         Q       So you have to issue them a
7    ticket at the scene instead of taking them in
8    your car downtown?
9         A       If possible, yes.
10        Q       And can you give me an example
11   of something that previously you would have
12   arrested someone for but now you give them a
13   ticket?
14                 MS. JONES:   Objection.
15        A       We can go with nondomestic,
16   assault third.
17        Q       How about things from before
18   bail reform?
19                 MS. JONES:   Objection.
20        Q       Ticketable offenses that were
21   non-minor?
22                 MS. JONES:   Objection.
23        A       Not off the top of my head.
24        Q       If we go down here and look, it
25   goes on to explain some factors identified by
```

1                    P.O. Adam Gorman

2     different lower courts and mentioned by the

3     Supreme Court about what might constitute

4     exigent circumstances for a warrantless

5     entry, right?

6           A      Yes.

7           Q      Seriousness of the offense.  So

8     the more serious the crime, right, that plays

9     into exigent circumstances?  If you think the

10    person is armed, right?  Strong probable

11    cause the suspect committed to the crime and

12    is on the premises, likelihood of escape,

13    entry can be made peacably, and the time

14    between the occurrence and the entry, right?

15          A      Yes.

16          Q      That goes on to explain further

17    in General Order 415 that if a violation or

18    other minor offense has occurred and the sole

19    purpose for the warrantless entry is to make

20    an arrest or serve an appearance ticket, the

21    exigent circumstances exception would not be

22    applicable, right?

23          A      I am just reading it over.  Yes.

24          Q      Then it goes down to explain

25    there must be probable cause for a

                    P.O. Adam Gorman
1
2    warrantless entry leading you to believe
3    that, one, a crime, a misdemeanor or a
4    felony, has been or is being committed and,
5    two, that if immediate action is not taken
6    the crime will be completed, or you have
7    reasonable suspicion that you or others will
8    suffer physical injury or death, or you will
9    have reason to believe that evidence of the
10   crime will be destroyed or otherwise lost,
11   right?
12          A       Correct.
13          Q       That requires two things, right?
14   One, probable cause to believe that a crime
15   has been or is being committed and, two,
16   right, if you don't do something immediately,
17   for example, evidence might be destroyed,
18   right?
19          A       Correct.
20          Q       Then it goes on to specify that
21   you should assume that you can't use this
22   exemption in other than extremely unusual
23   circumstances, right?
24                  MS. JONES:   Objection.
25          A       Yep.

1                     P.O. Adam Gorman

2          Q        Such as entering a home in the

3     pursuit of an armed fleeing felon, right?

4          A        Correct.

5          Q        Or when you are legally at a

6     premises investigating a minor matter and you

7     hear what you appear to be sounds,

8     conversations, or the like leading you to

9     conclude that a serious physical injury crime

10    is occurring or about to occur, in those

11    circumstances you may enter the premises and

12    terminate said crime, right?

13         A        Correct.

14         Q        After reading that, you remember

15    the incident that happened on October 19th,

16    2022?  I'm sorry.  October 19th, 2018.

17         A        Yes, I do.

18         Q        The subject of this lawsuit.

19                  So how does the entry into

20    Mr. Dempsey's yard fall within the legality

21    outlined in Exhibit B here, warrantless

22    entries with or without exigent

23    circumstances?

24         A        I believe we needed to secure

25    the evidence or potential evidence in the

1                   P.O. Adam Gorman

2     backyard of Mr. Dempsey's residence.

3          Q       That being the case, how does

4     that fit within -- so that would be one

5     factor, right, of these two?  You had to have

6     probable cause, so that's the second factor,

7     right?  That if immediate action is not taken

8     the evidence might have been destroyed?

9          A       Correct.

10         Q       So what led you to think that if

11    immediate action wasn't taken that the

12    evidence might be destroyed?

13         A       Well, for starters, no officer

14    was near it, near any potential evidence, had

15    not located it.  It is also outside, so

16    weather-induced.  And, obviously, it is

17    outside, which means animals are at easy

18    access to said evidence or potential evidence

19    and could, for lack of a better term,  scurry

20    away with it.  It is a possibility

21    nonetheless.

22         Q       So you had probable cause you

23    think to believe that something needed to be

24    done immediately?

25         A       Yes.

```
                         P.O. Adam Gorman
 1
 2          Q        Did you have probable cause to
 3   believe that a crime was being committed on
 4   that property?
 5          A        Yes.
 6          Q        So just potentially having maybe
 7   some contraband on someone's property
 8   constitutes a crime?
 9                   MS. JONES:   Objection.
10          A        I was assisting another officer
11   in-taking some people who were running from
12   custody.  Was there reasonable belief for
13   those people committing a crime was not
14   witnessed by myself, so I cannot say.  I was
15   assisting for the crime.
16          Q        I'm sorry.  But that didn't
17   answer the question.
18                   MR. SHIELDS:   Move to strike
19                   that answer as nonresponsive.
20          Q        So my question is just if you
21   think that there might be contraband located
22   on someone's property, is that alone probable
23   cause to believe that a crime is being
24   committed on that property?
25          A        If I think that there is or do I
```

```
1                    P.O. Adam Gorman
2    know?
3         Q      I am talking about the
4    circumstances of this case.
5                 So you did not know that there
6    was contraband on the property because, in
7    fact, there was no contraband, correct?
8         A      No.  There was no contraband,
9    correct.
10        Q      Did it magically disappear at
11   some point between when officers were able to
12   search the property and when Algarin jumped
13   the fence?
14                    MS. JONES:  Objection.
15        A      I don't think it took
16   precedence.
17        Q      You don't think that the
18   potential contraband took precedence.  You
19   were searching for other things on the
20   property instead?
21        A      I was more concerned about a
22   wounded dog and a distressed person.
23        Q      Two distressed people?
24        A      I suppose so.
25        Q      So just going back to the
```

1                    P.O. Adam Gorman

2      specific question, though, in the

3      circumstances of this case where you thought

4      that there might be, but you did not know

5      whether there was, in fact, any contraband on

6      the property, just the suspicion that there

7      might be, is that enough to give you probable

8      cause to believe that a crime is being

9      committed on that property?

10          A      The suspicion alone, the answer

11     would be "no", but I also believe that that

12     was in the direct path of the subject.

13          Q      So this says here on this

14     training bulletin that you have to have

15     probable cause to believe that a crime, a

16     misdemeanor or a felony, has been or is being

17     committed on the property, right?

18          A      Correct.

19          Q      So how does your belief that

20     that might have been the path that the person

21     you detained, how does that fit within the

22     parameters of this training bulletin?

23          A      Because the possession of drugs

24     obviously can vary, even in small amounts can

25     change a violation to a misdemeanor or a

P.O. Adam Gorman

1
2      felony, and that evidence had crossed over,
3      in my belief, Mr. Dempsey's backyard.
4           Q     So if evidence crossed over
5      someone's property, then you have probable
6      cause to believe that you can enter the
7      property?
8           A     That it was -- if it is in the
9      direct path, yes, of their pursuit and it is
10     immediately thereafter, yes, I do.
11          Q     So that gives you probable cause
12     to believe that a crime has been or is being
13     comitted?
14          A     Yes.
15          Q     That if immediate action isn't
16     taken that evidence might be destroyed?
17          A     Correct.
18          Q     Did you ever try to figure out
19     how long it would have taken to walk to the
20     front door of Mr. Dempsey's house to ask his
21     consent to enter his property?
22          A     I did not.
23          Q     If you had to estimate how long
24     it takes to walk from someone's backyard to
25     their front door, how long do you think that

```
1                    P.O. Adam Gorman
2    would take?
3                    MS. JONES:   Objection.
4         A     Maybe a minute.
5         Q     If I told you that Officer
6    Sobieski's body-worn camera shows that it is
7    about 15 seconds, does that sound
8    unreasonable?
9         A     It does not.
10        Q     If it takes between 15 seconds
11   and one minute, is that an unreasonably long
12   amount of time?
13                   MS. JONES:   Objection.
14        A     It can be.  It may not be.  It
15   is circumstantial.
16        Q     In this instance, in this
17   incident, multiple officers arrived in the
18   area where the incident occurred before my
19   client's dog was shot, right?
20        A     Yes.
21        Q     So you could have radioed to
22   someone that was out front to knock on the
23   door and ask for a consent to enter my
24   client's backyard?
25        A     Could have, yes.
```

                    P.O. Adam Gorman

1

2        Q        Did you consider that option

3   before you asked Officer Algarin to

4   backtrack?

5        A        I did not.

6        Q        If you had to do it over again,

7   would you maybe have considered that option?

8                    MS. JONES:   Objection.

9        A        Given hindsight is 20/20, yes, I

10   would have.

11       Q        Seeing as how you're a defendant

12   in a lawsuit alleging there was an unlawful

13   entry, you know, do you think that it would

14   have been better to avoid having those

15   allegations and to have requested a consent

16   if it would have only taken 15 seconds or

17   maybe a minute to go and knock on the front

18   door?

19       A        I honestly don't understand a

20   word of that question.

21       Q        That was a bad question.  I will

22   ask you a different question.

23                    Generally, if you are wrong and

24   there was not a legal reason because of hot

25   pursuit or exigent circumstances and you

1                    P.O. Adam Gorman

2     didn't have a warrant, then you would have

3     needed a person's consent to lawfully enter

4     their yard, right?

5          A     Right.

6          Q     So to cover all of your basis

7     and ensure that the entry wasn't unlawful,

8     you could have simply asked for my client's

9     consent, right?

10         A     Correct.

11                   (Training Bulletin L3499

12                   marked as Plaintiff's Exhibit C

13                   for identification, as of this

14                   date.)

15                   MR. SHIELDS:  I'm going to

16                   move own to the next exhibit,

17                   which is going to be Exhibit C,

18                   and that is Training Bulletin

19                   L3499, and those are Bates

20                   numbered.  I will tell you in

21                   one second.  1171 to 1173.

22         Q     Officer Gorman, can you see what

23    I have put up on the screen, this Training

24    Bulletin L3400, consent to searches and

25    family court Orders?

                          P.O. Adam Gorman

1
2        A       Yes.

3        Q       Have you seen this document

4   before?

5        A       This one doesn't look familiar.

6   Does not look familiar.

7        Q       But this looks like an official

8   document for the Rochester Police Department?

9        A       It does.

10       Q       It says here at the top a search

11  is a long recognized exception for the search

12  warrant requirement.  Here, the courts have

13  permitted the search and seizure when it is

14  the result of a valid consent, right?  I'm

15  sorry.  I asked you and then I scrolled away

16  from that part.

17       A       Yes.  That is what it says.

18       Q       So my question is really going

19  to be about the next document, but before I

20  put this one down, it looks like this lays

21  out a few requirements.  It says several

22  rules must be applied before a consent search

23  is deemed valid, right?

24       A       Yes.

25       Q       If you read the second factor,

1                    P.O. Adam Gorman

2    can you read that paragraph and tell me when

3    you are done.

4            A      Okay.

5            Q      Basically it says, hey, look you

6    have to have reasonable suspicion before you

7    request consent to search, right?

8            A      Yes.

9            Q      It is kind of like maybe a

10   slightly lower standard than for exigent

11   circumstances.  Exigent circumstances said

12   you have to have probable cause to believe

13   that there is a crime occurring or about to

14   occur, but for consent all you need is

15   reasonable suspicion, right?

16           A      Yes.

17           Q      According to these two Rochester

18   Police Department training bulletins?

19           A      Sounds correct.

20           Q      So when you don't have probable

21   cause, but you have more than a hunch, you

22   are required to get consent before you do a

23   search, right?

24           A      Correct.

25                  MR. SHIELDS:  I will move on

1                   P.O. Adam Gorman

2                   to what what will be marked

3                   Plaintiff's D.  This is the

4                   document entitled Warrantless

5                   Searches of Curtilage.  And it

6                   is document Bates number COR1200

7                   to 1201.

8                       (Warrantless Searches of

9                   Curtilage marked as Plaintiff's

10                  Exhibit D for identification, as

11                  of this date.)

12        Q      Officer Gorman, is this a

13    document that you are familiar with or that

14    you have seen before?

15                   MS. JONES:  Can you scroll

16                  down?

17                   MR. SHIELDS:  Do you want

18                  the Bates number?

19                   MS. JONES:  I just want to

20                  give him a chance to see more

21                  than just the top of it.

22        Q      Based on the top of it, is this

23    a document that you think you are familiar

24    with?  Do you want a chance to look at the

25    whole page?

134

1                    P.O. Adam Gorman

2        A       I would like to skim through it.

3        Q       So let me put it here.  And let

4    me know when you need me to scroll down more,

5        A       Okay.

6        Q       I don't think I am going to ask

7    you questions about this page.

8                So, in general, do you

9    understand what the concept of curtilage

10   means?

11       A       Yes.

12       Q       And what does that mean to you?

13       A       The immediate area surrounding a

14   home.

15       Q       Such as someone's backyard?

16       A       Yes.

17       A       So this training bulletin

18   describes the Supreme Court case from May

19   29th, 2018, right?

20       A       Yes, it does.

21       Q       That is about May to June, June

22   to July, July to August, August to September,

23   about five months prior to the incident.

24               In our case, it happened on

25   October 19th, 2018; is that right?

                    P.O. Adam Gorman

1

2        A        Yes.

3        Q        So you would have had to comply

4    with the Supreme Court case at that point?

5        A        That's correct.

6        Q        Do you know if the Rochester

7    Police Department did any in-service training

8    or informed you guys about this Supreme Court

9    case at all before the incident?

10       A        Not that I recall.

11       Q        So, basically, this says that

12   you can't go onto someone's property to get

13   something that you believe might be on the

14   property unlawfully, correct?

15       A        Yes.

16       Q        Instead you have to have one or

17   the other exceptions that must apply, right?

18       A        That is what it looks like, yes.

19       Q        Such as consent.  That would

20   have been one of them?

21       A        Correct.

22       Q        Let me back up.

23                In your understanding, hot

24   pursuit and exigent circumstances are

25   different exceptions or are they the same

1                    P.O. Adam Gorman

2    exceptions?  I was confused by your answer.

3        A       They are different.

4        Q       They are different?

5        A       Yes.

6        Q       Is that like a category of

7    exigent circumstance?

8        A       It would be -- I suppose it

9    could be considered a subcategory, but, yes,

10   I am looking at it from two different lenses.

11   Hot pursuit is an active chase of a direct

12   path or an immediate area of that said path.

13   And exigent circumstances I think in the eye

14   is more of a domestic case where you walk up,

15   no one is answering the door, and you hear

16   screaming coming from inside bloody murder.

17   And to me that is the exigent circumstance to

18   enter that house.

19       Q       Exigent basically means

20   emergency?

21       A       Correct.

22       Q       So hot pursuit would be a

23   subcategory of an emergency?

24       A       Yes.

25       Q       So if there is no emergency, you

```
 1                    P.O. Adam Gorman
 2    basically can't do the search.
 3                    MS. JONES:   Objection.
 4          A      That is a fair generalization,
 5    yes.
 6                       (General Order 415 marked as
 7                       Plaintiff's Exhibit E for
 8                       identification, as of this
 9                       date.)
10                    MS. SHIELDS:   The first one
11                       is General Order 415.   That will
12                       be Plaintiff's Exhibit E, Bates
13                       numbers are City of Rochester
14                       823 to City of Rochester 872.
15          Q      Officer Gorman, can you see what
16    I marked as Exhibit E on your screen?
17          A      I can.
18          Q      Search warrant seizures by
19    dynamic entries, search warrant, arrest
20    warrant, without warrant, General Order 415.
21          A      Yes.
22          Q      And is this a document that you
23    are familiar with?
24          A      Yes.
25          Q      Let me see.  A couple of
```

138

1                    P.O. Adam Gorman

2    questions.  I'm going to zoom ahead.  Let's

3    see.  First, it defines probable cause on

4    page 823.

5                    Can you just read that

6    definition?  And I'm going to ask you a

7    couple of questions.

8           A       Which one?

9           Q       Probable cause right here.

10          A       Okay.

11          Q       Then I'm going to scroll to the

12   next page and it gives the definition on

13   COR324 of reasonable suspicion.

14                   Can you just read that one?

15          A       Okay.

16          Q       Can you just kind of give me

17   your general understanding of the difference

18   between reasonable suspicion and probable

19   cause in the context of conducting a search?

20          A       Reasonable suspicion is as a --

21   I don't want to say the word reasonable -- as

22   a normal person where an average officer, I

23   should say, with knowledge of the area would

24   believe that there is some sort of crime

25   going on based on the activities at hand.

1          P.O. Adam Gorman

2               Probably cause specifically is

3   believing that there is evidence of a crime

4   or -- let's see.  I am drawing a blank on the

5   word.  I will go with evidence of a crime has

6   happened or so I believe and that has

7   occurred in a specific area.  So probable

8   cause to stop the vehicle as I know a crime

9   has occurred or violation, whatever the case

10  may be, and reasonable suspicion is that

11  vehicle coming off of a known drug area after

12  having a very short interaction, that is

13  consistent with drug sales.

14               Definitions aren't my thing.  I

15  guess examples I am better off with.

16       Q     Is it fair to say that probable

17  cause is a more stringent legal requirement

18  than reasonable suspicion?

19       A     Yes.  It needs more specifics to

20  it.

21       Q     When we say more specifics, more

22  facts to support the belief that a crime is

23  committed or the evidence of a crime exists

24  in the location?

25       A     Yes.  You definitely need more

```
 1                    P.O. Adam Gorman
 2    to get to that level.
 3         A       So, basically, it is more
 4    specific facts to support that legal
 5    conclusion, right.
 6         A       I wouldn't say facts.  I would
 7    say -- I would say reasonable suspicion if
 8    you have --
 9                 (Reporter Clarification.)
10         A       I don't think facts are the sole
11    factor for probable cause.  Circumstances and
12    your reasonable suspicion are major portions
13    of it and I just don't want that to be
14    overlooked in this case.
15         Q       The totality of the
16    circumstances, right?
17         A       Correct.
18         Q       Got it.
19                 This just says it's the policy
20    of the department, under 3D, not to conduct a
21    warrantless search unless it meets the legal
22    criteria for the exception to the warrant
23    rule, right?
24         A       Correct.
25         Q       Prior to the incident in this
```

```
                      P.O. Adam Gorman
 1
 2    case, had you received any specific training
 3    from the Rochester Police Department about
 4    exigent circumstances, consent, and other
 5    exceptions to the warrant rule?
 6         A    I'm sorry.  I'm am out of cough
 7    drops.  Yes.
 8         Q    Was that field training or
 9    something else?
10         A    Academy and field training.
11         Q    The academy isn't a specific RPD
12    training, right?  I guess that is what I
13    meant.  I am sorry for asking the unclear
14    question.
15              RPD would have been just field
16    training?
17         A    That and post-academy.
18         Q    Procedures during and following
19    warrantless searches, City of Rochester, 843
20    is the page.  So under "A" it says, following
21    any search, members will document their
22    actions.  This is especially important
23    because the reasonableness of the search and
24    seizure cannot be based on what was found as
25    a result of the search.  Instead it is
```

1                    P.O. Adam Gorman

2    measured by the facts and circumstances known

3    to the member prior to the search and

4    seizure, right?

5                    So I am going to stop there.  So

6    my first question is, after this incident,

7    did you complete any paperwork?

8         A       I don't think so.

9         Q       When this says, "Following any

10   search members will document their actions,"

11   is there like a specific form that that is

12   referring to?

13        A       No.  There is no specific

14   search, I guess you would say.

15        Q       So do you know what this General

16   Order is referring to when it says document?

17   Is there a general rule about documenting

18   things like searches in a specific form?

19        A       It would be documented under --

20   in the narrative portion of your either

21   incident report or IA report.

22        Q       So, basically, this says that if

23   you do a search you have to do an IA report

24   or an incident report?

25        A       That is what I am gathering from

1                         P.O. Adam Gorman

2     it, yes.

3          Q      You conducted a search in this

4     case, right?

5          A      Yes, I did.

6          Q      But you didn't complete any

7     forms?

8          A      No, I did not.

9          Q      So, technically, that would be a

10    violation of General Order 415, right?

11         A      That it would be.

12         Q      It says, "This is especially

13    important because the reasonableness must be

14    measured by the facts that you knew prior to

15    the search and not after."  Right?

16         A      That's correct.

17         Q      We already discussed what you

18    knew prior to searching the individual that

19    you stopped that he had run.

20         A      Correct.

21         Q      After you searched him, you

22    didn't find anything on him, right?

23         A      I did not find any illegal

24    objects on his person, no.

25         Q      No contraband on his person or

1                    P.O. Adam Gorman

2    anywhere else, right?

3         A        Correct.

4         Q        He was eventually released

5    without being given a ticket or charged with

6    a crime?

7         A        That is correct.

8         Q        I will have more questions about

9    that later, but I'm going to move on for now.

10                 Appendix one, exceptions to the

11   search warrant requirement.

12                 Have you read this General Order

13   all the way through before?

14        A        I would say, yes, I have.  I

15   have read a lot of them, but I can't narrow

16   it down to one specific day.

17        Q        What are the general

18   circumstances when you read general orders?

19   Like, why would you just sit down and read

20   one?

21        A        I am board.

22        Q        At work, like you have downtime?

23        A        Slow day, winter days, so open

24   up the books and go at it.

25        Q        Like, when you worked in the

1                    P.O. Adam Gorman

2    pizza shop, did they ever tell you time to

3    lean is time to clean?

4         A      I have actually heard that

5    before, yes.

6         Q      So it is like that for police

7    officers?

8         A      Yes.  Technically, if you are

9    not actively doing police work you are only

10   allowed to read police material during work

11   hours.

12        Q      Got it.

13               Police would be general orders

14   or policies.

15               What else would that be?

16        A      Anything related to the job,

17   case law, if I am researching case law,

18   things of that nature.

19        Q      Let's go through this exception

20   for the search warrant requirements.  We have

21   the arrest warrant.  We're not worried about

22   that here.

23               The frisk exception, so when you

24   did the search of the individual that you

25   handcuffed, was that the frisk exception or

1                    P.O. Adam Gorman

2    something else?

3          A      It was not.

4          Q      We'll just move on from that.

5                    Search incident to arrest

6    exception, is that what that was because you

7    had put handcuffs on him?

8          A      I wouldn't necessarily say

9    arrest at that point.

10         Q      Was he free to leave?

11         A      No, he was not.  It was a search

12   incident to detain is a better word.

13         Q      Let's see if there is an

14   exception to that.  Automobile exception, no.

15   Consent, he didn't consent, right?  Plain

16   view, you didn't see anything on him.  Open

17   fields, no.  Inventory, no.  Exigent

18   circumstances, no.  I don't see an exception

19   for search incident for being detained.

20                    Must have been search incident

21   to arrest; is that fair?

22         A      That is the most fitting one,

23   yes.

24         Q      Consent to search, we went over

25   that one already in the other document.  I

1                    P.O. Adam Gorman

2     just have a general question.

3                    What is the interaction between

4     the training bulletins and the general

5     orders?  Like, which one, if they conflict,

6     would supercede and control?

7          A      The most up-to-date one, the

8     most recent.

9          Q      That makes sense.

10                   So the training bulletin might

11    be issued in between when general orders are

12    issued?

13         A      Training orders may be issued

14    typically as the training orders come out.

15    The bulletins are exactly what the word is,

16    bulletin.  They are just to update people as

17    time goes on.

18         Q      Let's see.  So plain view

19    exception here, we're talking about my

20    client's yard.  That doesn't apply, right,

21    because he jumped on the fence before he was

22    on the premises, right?  He was on the

23    neighboring premises, right?  So that doesn't

24    apply, correct?

25         A      I can't attest to that.

1                    P.O. Adam Gorman

2        Q        You want to read that and then

3    let me know if you thought it applied in this

4    circumstance?

5        A        Are you referring to -- I don't

6    understand what you're referring to.

7        Q        I'm sorry.  I'm referring to

8    when Algarin jumped the fence and entered my

9    client's property.  The plain view exception

10   didn't apply to that, correct?

11       A        No.  I agree with your

12   statement.

13       Q        Thank you.

14                 Open fields, that doesn't apply.

15   Let's see.  I don't have any questions about

16   that.  It does talk about curtilage.

17       Q        Can you just read that one for

18   me, "J."  Let me know when you need me to

19   scroll.

20       A        Okay.

21       Q        The one thing this emphasizes

22   that, it says the more serious the crime the

23   more likely courts are to recognize the

24   situation as a true emergency justifying the

25   search based on exigent circumstances, right?

```
 1                   P.O. Adam Gorman
 2        A        Correct.
 3        Q        And, in your experience, is that
 4   generally when you would apply the exigent
 5   circumstances exception to entering a
 6   property?
 7        A        Yes.
 8        Q        For example, earlier you gave an
 9   example of knocking at a door but no one
10   answering but hearing what sounded like an
11   assault occurring inside, right?
12        A        Correct.
13        Q        That would be a violent crime,
14   an assault, something that needed to be
15   prevented from continuing immediately.
16   Someone could be seriously physically
17   injured, right?
18        A        That's correct.
19        Q        As opposed to a suspected
20   potential drug crime, right?  That would be a
21   less serious crime?
22                   MS. JONES:  Objection.
23        A        Could be.
24        Q        So a potential possession of
25   marijuana might be as serious as a physical
```

1                    P.O. Adam Gorman

2     assault.  Is that what you are saying?

3          A      Based on the penal law, simple

4     marijuana, no.  But a large amount of

5     Fentanyl, yes, it is more serious under the

6     penal law.

7          Q      Did you suspect that the person

8     that you were facing on October 19th, 2018,

9     possessed Fentanyl or marijuana or something

10    else?

11         A      I believe they possessed drugs.

12         Q      Are all drugs the same?

13         A      They are not.

14         Q      There is not a nationwide

15    epidemic of marijuana overdosing right now?

16         A      There is not.

17         Q      But there is a nationwide,

18    specifically in Monroe County, of Fentanyl

19    overdoses?

20         A      Yes, there is.

21         Q      So, at the time, you know, if

22    you suspected this person had Fentanyl, that

23    might have been a more serious drug crime

24    than suspicion of marijuana, correct?

25         A      That is correct.

1                     P.O. Adam Gorman

2         Q       Did you suspect that this person

3    that you were chasing might have had Fentanyl

4    on them?

5         A       Like I said before, I suspected

6    that they had illicit drugs on them, most

7    commonly which is marijuana.

8         Q       So you more likely than not

9    believed they might have had marijuana and

10   not Fentanyl?

11                    MS. JONES:  Objection.

12        A       I believe that was a more common

13   outcome, yes.

14        Q       Did you ever arrest that

15   specific individual before for marijuana

16   possession?

17        A       Not to my knowledge, no.

18                    MR. SHIELDS:  I am done with

19                    that exhibit.  Maybe it is a

20                    good time to grab a quick bite.

21                    (A discussion was held off

22                    the record.)

23                    (A lunch recess was taken.)

24                    (General Order 340 marked as

25                    Plaintiff's Exhibit F for

1              P.O. Adam Gorman

2              identification, as of this

3              date.)

4              MR. SHIELDS:  I will do

5              General Order 340, so that will

6              be Exhibit F.

7        Q      Can you see that on your screen,

8    Officer Gorman?

9        A      Yes, I can.

10       Q      General Order No. 340, and the

11   title is Use of Deadly Physical Force.  I

12   didn't write down the page numbers.  I will

13   do a search here.

14             In general, Officer Gorman, you

15   are familiar with this General Order?

16       A      Yes.

17       Q      So we are on City of Rochester

18   page 118, and under Subsection D here, "If a

19   firearm discharge is directed at an animal,

20   one, the member supervisor will submit an

21   incident report."

22             Do you know if that happened in

23   this case?

24       A      It did.

25       Q      So who was the supervisor?

```
 1                   P.O. Adam Gorman
 2                   MR. SHIELDS:  I will pull up
 3             that report later.
 4      A      Yes.  I don't recall offhand.
 5      Q      I know there was an incident
 6 report.  I wasn't sure if it was done by the
 7 supervisor.  It was completed by Jason
 8 Rudolph.
 9             He would have been the
10 supervisor?
11      A      Yes.
12      Q      I didn't know who that was until
13 earlier when we went over your file.
14             It's saying number section
15 platoon, commanding officer.
16             Do you know who that was at the
17 time of the incident?
18      A      I don't.
19      Q      What is the section platoon
20 commanding officer?  What does that mean?
21      A      It would be -- it's referring to
22 a lieutenant.
23      Q      So section would be Clinton,
24 right?
25      A      Correct.
```

154

```
 1                    P.O. Adam Gorman
 2        Q        Platoon, is that like the third?
 3        A        Third shift.
 4        Q        So it is the shift commander
 5   basically for the section for that time?
 6        A        Correct.
 7        Q        That person is supposed to go to
 8   the scene, direct the investigation, and
 9   notify PSS?
10        A        Yes.  Correct.
11        Q        PSS decides if they need to
12   respond to the scene or notify anyone else?
13        A        What was that?
14        Q        Under three, it says, "The
15   commanding officer PSS will make a
16   determination based on the circumstances of
17   the situation as to whether to respond to the
18   scene and/or make further notifications."
19        A        Correct.
20        Q        "Document any nonresponse to the
21   scene by PSS and make it part of the incident
22   file."
23                 Do you know what that would mean
24   if it says document any nonresponse?  That
25   means like some sort of report, right?
```

```
                       P.O. Adam Gorman
 1
 2         A        I would imagine so, yes.
 3         Q        Have you ever seen a report like
 4    that, a document of a nonresponse?
 5         A        From PSS, no, I have not.
 6                   MR. SHIELDS:   And,
 7                   Ms. Jones, just to the extent
 8                   that this General Order seems to
 9                   have required documentation of
10                   PSS not responding to the scene,
11                   I don't believe we have gotten
12                   any documentation of that sort
13                   that has been produced, so we
14                   call for production of that
15                   documentation now.  And I will
16                   follow up in writing about that.
17                   And that is on COR119.
18         Q        So it also requires an evidence
19    tech to come to the scene.  That happened
20    here, right?  Do you remember?
21         A        I don't remember.
22         Q        It says the incident report is
23    supposed to be forwarded through the normal
24    distribution process a copy of which will be
25    forwarded to PSS, right?
```

1                    P.O. Adam Gorman

2         A        Correct.

3         Q        Now, do you know what that

4    means, the incident report is forwarded to

5    the normal distribution process?  Do you know

6    what the normal distribution process is?

7         A        Yes.

8         Q        Can you tell me what that would

9    be?

10        A        It is when you submit a report

11   it is submitted through the computer and it

12   goes up to the next level, next level of

13   command, and that person has to approve it.

14   So when I submit a report, it goes to the

15   sergeant and the sergeant has to approve it.

16   And from there it goes to what we call a

17   section coordinator who then also reviews it.

18   And then from there it goes to another person

19   who would use it.  And then it gets merged

20   into the system.

21        Q        After the section coordinator,

22   you are not sure who reviews it after that?

23        A        I'm not sure, no.

24        Q        So it looks like one, two, three

25   levels of review before it is done.

1                    P.O. Adam Gorman

2        A        Correct.

3        Q        And then it says tell them to

4    contact the law department to file a claim if

5    they want any reimbursement, right?  So that

6    is why we're here, right?

7                 Let me just see.  On this page

8    here, COR109, is this highlighted section

9    consistent with your training from the

10   academy and/or any other training that you

11   received with the Rochester Police

12   Department?

13       A        Yes, it is.

14       Q        Did you receive any training

15   about interacting with dogs other than using

16   firearms?

17       A        Yes.

18       Q        Can you describe that training

19   for me?

20       A        Animal control came in and spoke

21   of it and I don't recall what else.

22       Q        When was that?

23       A        During the academy.

24       Q        So animal control came and said

25   something, but you don't remember what it

1                    P.O. Adam Gorman

2    was?

3         A       Not specifically, no.

4         Q       Do you remember what that was

5    about?  Was it about interacting with dogs or

6    interacting with animals generally?

7         A       Animals, generally.

8         Q       Other than that animal control

9    training during the academy, have you

10   received any other training about

11   interactions with dogs?

12        A       Not that I recall.

13        Q       I know I asked you before about

14   the prism and whether you had ever done any

15   dog training on the prism program, right, and

16   you said "no"?

17        A       Not that I recall.

18        Q       Do you happen to know whether or

19   not the prism system simulator has any dog

20   interaction simulations?

21        A       I have no idea.

22        Q       Would you like to have a dog

23   simulator?  Would that be helpful?

24        A       More training can never hurt.

25                    MS. JONES:  Objection.

1                    P.O. Adam Gorman

2        Q       Great.  I agree.

3                Have you ever received any

4    in-service training on interactions with

5    dogs?

6        A       Not that I remember.

7        Q       Am I missing any kind of, like,

8    terminology used by the police department in

9    terms of training that you received on the

10   job?

11               There is in-service training.

12   There would be the specific training that we

13   went over earlier in response to specific

14   incidents, right?

15               Is there any other kind of

16   training, roll call training?

17       A       There is roll call training.  I

18   wouldn't consider it training.  It is just

19   more brief discussions, but not involving

20   dogs that I can recall.

21       Q       Remind me of your date of hire

22   again.  2016, right, September?

23       A       September 2016, correct.

24       Q       The last question I think on

25   that, September of 2016, until present, the

                    P.O. Adam Gorman

1

2   only training that you have gotten about dogs

3   is animal control training at the police

4   academy, but you don't really remember the

5   specifics of that, right?

6         A      Correct.

7         Q      Have you ever received any kind

8   of handout or PowerPoints about interactions

9   with dogs?

10        A      No.

11        Q      As part of your work since you

12  have been working for the Rochester Police

13  Department you have been with the Clinton

14  section the whole time, right?

15        A      Yes.

16        Q      You are a patrol officer, right?

17        A      Yes.

18        Q      So you are either driving or

19  walking on the streets in the Clinton

20  section.  Is that fair to say?

21        A      Yes.

22        Q      How frequently would you say

23  that you come in contact with dogs during

24  your patrol services?

25        A      On a seven-day week, at least a

1                    P.O. Adam Gorman

2    few times.

3         Q      It would vary week to week,

4    right?

5         A      Correct.

6         Q      Some weeks it might be every day

7    or multiple times a day and some weeks it

8    might be less?

9         A      Yes.

10        Q      In terms of the homes in the

11   Clinton section, based on your training and

12   experience working in the Clinton section

13   since 2016, '17, what would your estimate be

14   of the percentage of homes that have dogs in

15   the Clinton section?

16        A      I couldn't make a fair

17   assumption or a fair estimation.

18        Q      About half, more than half, less

19   than half?

20                    MS. JONES:  Objection.

21        A      I really don't -- I can't say

22   for sure.

23        Q      When you do interact with dogs,

24   is there a predominant breed that you

25   interact with?

                    P.O. Adam Gorman

1

2        A       Yes.

3        Q       What would that be?

4        A       Typically pit bulls.

5        Q       You said typically.  Is it most

6    of the dogs that people have in the Clinton

7    section are pit bulls?

8        A       From my interactions, yes.

9        Q       From your interactions, are pit

10   bulldogs that are more aggressive than other

11   breeds of dog?

12       A       No.

13       Q       Is there a different breed that

14   might be generally more aggressive or is it

15   just dog to dog in your experience?

16       A       I believe it is 100 percent on

17   the owner.

18       Q       So what you are saying is the

19   aggressiveness of a dog is based on if the

20   owner trains it is be aggressive?

21       A       I wouldn't say trains it to be

22   aggressive.  More so lack of training.

23       Q       Or if they neglect the dog,

24   maybe the dog is angry or something?

25       A       That could be one possibility,

1                    P.O. Adam Gorman

2     yes.

3          Q        Have you ever been injured by a

4     dog in the line of duty?

5          A        No.

6          Q        Have you ever shot a dog?

7                    MS. JONES:   Objection.

8          A        No.

9          Q        Have you ever avoided shooting a

10    dog by using some other technique like using

11    a baton?

12                   MS. JONES:   Objection.

13         A        No.

14         Q        Have you ever had to, I don't

15    know, run from a dog that you perceived to be

16    attacking you?

17                   MS. JONES:   Objection.

18         A        I have kept my distance from

19    dogs at work.

20         Q        Basic common sense, you know,

21    the dog could be aggressive and try to attack

22    you for those reasons?

23         A        Correct.

24         Q        But you were never specifically

25    trained, hey, keep your distance from a dog?

1                    P.O. Adam Gorman

2          A        Not that I can recall.  Not

3    specifically.

4          A        How about before entering onto a

5    property?  Were you trained to look for signs

6    that there might be a dog that resides there?

7          A        Yes.

8          Q        What did that training consist

9    of?

10         A        Typical situational awareness,

11   posted signs, dog chains, things of that

12   nature.

13         Q        So you were trained to look for

14   those things before entering a property

15   because that might indicate that there would

16   be a dog there?

17         A        Correct.

18         Q        You are trained to look for

19   those things.

20                  Was there a reason that you were

21   trained to look out for dogs that might be on

22   the property?

23         A        To avoid getting bit by a dog.

24         Q        So, to date, you have

25   successfully avoided getting bit by a dog,

```
 1                    P.O. Adam Gorman
 2    right?
 3         A       That's correct.
 4         Q       Are there other things that they
 5    trained you to do before entering a property
 6    if you believe a dog might be located on the
 7    property?
 8         A       One thing I picked up, I don't
 9    know if it is specific to RPD training I
10    guess you would say, but it is kind of -- if
11    there is a fence around the property, just
12    rattle it, try to draw the potential of any
13    potential dogs that are lurking around.
14         Q       Is that a thing that you do
15    generally before you enter a fenced-in
16    property?
17         A       Yes.
18         Q       When is the last time that you
19    did that?
20         A       Earlier this week.
21         Q       Can you describe to me when you
22    did that what the situation was?
23         Q       Responding to a 911 call, the
24    front yard was fenced in, including portions
25    of the driveway.  I just rattled the cage,
```

1                       P.O. Adam Gorman

2     the chain-link fence.  I didn't get any

3     response and I proceeded to open it and walk

4     to the front door.

5          Q      So you rattle the fence.

6                 How long do you wait before to

7     see if there is a dog that appears?

8          A      Five, ten seconds.

9          Q      In this instance, earlier this

10    week, there was no dog that appeared?

11         A      No.

12         Q      If a dog had appeared, what

13    would you have done?

14                If a dog runs up to the fence

15    and you are outside of the fence and you need

16    to respond to a call, what do you do?

17                     MS. JONES:  Objection.

18         A      Not walk into the fenced-in

19    area.

20         Q      Would you, like, try to contact

21    the 911 caller or something before going into

22    the fence-in area to secure the dog?

23         A      If it is an option, then, yes,

24    we can try to do a call back, have the

25    dispatch call whoever called 911 within and

1                       P.O. Adam Gorman

2      see if they can secure the dog or have them

3      call it and come out to us.

4            Q      It might depend on the dog, like

5      if it is a Chihuahua versus like a vicious

6      pit bull?

7                       MS. JONES:   Objection.

8            A      It is taken into consideration

9      based on the strength of a dog.  But, in my

10     experience, Chihuahuas have -- the little

11     dogs have always been the yappiest and I

12     guess you can call it aggressive of bleeds

13     when it comes to size.

14           Q      They have to make up for their

15     size?

16           A      That's what it would appear to

17     be.

18           Q      I want to pull up your body

19     camera and ask you some questions about that.

20     This will be Exhibit G?

21                       (Officer Gorman's body-worn

22                       video camera from incident

23                       marked as Plaintiff's Exhibit G

24                       for identification, as of this

25                       date.)

1              P.O. Adam Gorman

2              MS. JONES:  I think we

3              uploaded them with the same file

4              number as we do.  So if I can

5              see the file name and the first

6              few digits to see if I have the

7              right one identified.

8              MR. SHIELDS:  No problem.  I

9              will share the screen which

10             should have that at the top

11             here, so I just have to move my

12             cursor.

13             Do you see that at the top?

14             MS. JONES:  Thank you.

15    Q      So, Officer Gorman, before I

16 start to play it, do you know right here what

17 property this is that we're looking at?

18    A      It is a house on Sobieski

19 Street.

20    Q      That is the street behind

21 Kosciusko Street, right?

22    A      Just south of Kosciusko, yes.

23    Q      And before this incident you

24 were familiar with this area?

25    A      Yes, sir.

1                    P.O. Adam Gorman

2          Q       Was it a high-drug area, as you

3    described before, one of the parts of the

4    Clinton section?

5          A       Yes, it is.

6          Q       I will play it for a little bit

7    and then I will stop it and ask you some

8    questions.  Okay?

9          A       Works for me.

10         Q       Before I hit play, actually,

11   this view that we're seeing right now, right,

12   this is the first frame of the video.  How

13   does that start?  Do you have to hit a button

14   on your camera to begin recording?  Is that

15   how that works?

16         A       Yes.

17         Q       Then if I am right, it does not

18   start to record audio for 30 seconds or

19   something; is that right?

20         A       The body cam, if the system is

21   on, it will prerecord visual recording for 30

22   seconds prior to activation.  If the whole

23   system is off and I just activate it, it will

24   begin recording video and audio immediately.

25         Q       So basically you can walk around

170

1                    P.O. Adam Gorman

2   with it with basically, like, the camera on

3   and if you hit the button it will start

4   recording and it will have that 30 seconds

5   from before you hit record, but not audio?

6        A       Correct.  I am going to use

7   color coding because there is a light

8   indicator that's on the camera.  If it is

9   green, it is -- and if it is green status and

10  you hit record it will capture the previous

11  30 seconds of visual.

12       Q       Got it.

13               And then at that point you would

14  see a green light on the camera itself?

15       A       Correct.

16       Q       Is that when you are walking

17  around normally your body camera is working?

18       A       Yes.

19       Q       In green?

20       A       Yes.

21       Q       Now, I will hit play and pause

22  it at some point and ask you some questions.

23               My first question is, it sounded

24  like there was only about five seconds of

25  there not being any audio.  Is that normal?

1                     P.O. Adam Gorman

2          A       It is not abnormal.  All it

3    indicates to me is that the camera wasn't in

4    green status.

5          Q       So you just ran.

6                  Do you know what the property

7    address was that you just ran through?

8          A       I do not.

9          Q       Do you know why you were on

10   Sobieski Street at that point?

11         A       Yes.

12         Q       Why was that?

13         A       With the anticipation that the

14   suspected drug dealers were going to run

15   south through the yards towards Sobieski

16   Street as they have done in the past.

17         Q       So you guys had a plan basically

18   on this day?

19         A       Correct.

20         Q       So that was your, like, I don't

21   know, station, or whatever, and the other

22   officers went to the front and Kosciusko

23   Street?

24         A       Correct.

25         Q       The plan was to have the suspect

1                    P.O. Adam Gorman

2    run through the backyard and Kosciusko Street

3    as you anticipated that is what they would do

4    and as they came through the yard your plan

5    was to go and apprehend them?

6           A       Correct.

7           Q       So that is what we thought with

8    you running through this yard here and

9    apprehending this guy right here, right?

10          A       Correct.

11          Q       We hit pause, for the record, at

12   1707 and 13 seconds.  There is activity 15

13   seconds into the video.  And I will hit play

14   again.  So I am just going to pause there.

15   So you said you did it yesterday too.

16                  Did you guys do a similar thing

17   the day before?

18          A       Similar, yes.  We were familiar

19   with these individuals at the time selling on

20   that corner, correct.  Yes.

21          Q       What happened on the day before?

22                  MS. JONES:  Objection.

23          A       From my recollection, on our

24   arrival they had ran south to Sobieski Street

25   through the same yards.

```
                        P.O. Adam Gorman
 1
 2          Q       So that is how you guys devised
 3   a plan on this day?
 4          A       Correct.
 5          Q       Do you know what the officers on
 6   Kosciusko Street did?
 7          A       I do not.
 8          Q       On the previous day, had you
 9   arrived on Kosciusko Street and witnessed
10   them running?
11          A       Yes.
12          Q       So on the previous day, what
13   happened?  Did you drive your car and then
14   park and they ran or something else?
15                  MS. JONES:  Objection.
16          A       I vaguely remember just pulling
17   up and upon police arrival it was immediate
18   flight.
19          Q       Did you chase them through the
20   yards on the previous day as well?
21                  MS. JONES:  Objection.
22          A       I don't recall.
23          Q       So you might have, but you don't
24   recall?
25          A       Correct.
```

174

P.O. Adam Gorman

1

2      Q      But they weren't apprehended on

3   the previous day, right?

4                   MS. JONES:   Objection.

5      A      I believe that's correct.

6      Q      Do you remember if on the

7   previous day it was a response to a 911 call

8   or if it was, what do we call it, proactive

9   policing when you stopped them?

10     A      I cannot tell you.

11     Q      So you don't recall?

12     A      Correct.

13     Q      I will hit play again here.  We

14  paused at 58 seconds into the video, which is

15  170757 on the bottom right.  I am going to

16  pause there.

17                  So when we first paused, it was

18  about 15 seconds into the video, right?

19     A      Correct.

20     Q      Then that is how long it took

21  you to go from the front on Sobieski to the

22  fence before you apprehended him, right?

23     A      Correct.

24     Q      Now, we are two minutes into the

25  video.  Does that look right to you?

<pre>
                         P.O. Adam Gorman
 1
 2         A      Yes.
 3         Q      Right before I paused, did you
 4    hear yourself ask Officer Algarin to
 5    backtrack?
 6         A      Yes.
 7         Q      So if it took you about 15
 8    seconds to get from Sobieski Street to the
 9    back of that fence, would it be fair to say
10    that it probably would take a similar amount
11    of time to get from the backyard to the front
12    of the house on Kosciusko Street?
13                     MS. JONES:   Objection.
14         A      Similar time frame, yes.
15         Q      So for at least a minute and 45
16    seconds, right, we know that the individual
17    that you apprehended was present in this
18    backyard, correct?
19         A      Correct.
20         Q      So for at least a minute and 45
21    seconds, there would have been any potential
22    contraband located in the backyard at the
23    house next door that was owned by my client,
24    correct?
25         A      Correct.
</pre>

1                           P.O. Adam Gorman

2          Q        So that is a longer amount of

3     time than it would have taken to just walk to

4     the front door, right, maybe knock, ask for

5     permission or consent to enter the backyard?

6          A        At the time I was searching him

7     was a longer time than it would have taken to

8     walk to the front door, yes.

9          Q        Before you asked Officer Algarin

10    to backtrack, do you know how many officers

11    had responded to the scene at that point?

12         A        Just the initial ones that were

13    there.

14         Q        Would that have been a couple of

15    more officers?  There was one other officer

16    with you on Sobieski Street and one other

17    officer with Algarin?

18         A        Yes.

19         Q        So there were two other

20    officers, right?

21         A        Correct.

22         Q        At that point, there could have

23    been another officer to watch over the

24    backyard and any potential contraband while

25    another officer asked for consent to enter

1                    P.O. Adam Gorman

2    the backyard?

3         A       No.

4         Q       Why not?

5         A       Because you don't put one

6    officer with two suspects.

7         Q       How many suspects were there?

8         A       There were two.

9         Q       There were two suspects and

10   there were four officers?

11        A       Total, yes.

12        Q       So there could have been one

13   officer with one suspect, a second officer

14   with a second suspect, a third officer

15   looking at the yard, and a fourth officer

16   knocking on the door?

17        A       Yes.

18        Q       That is something that could

19   have reasonably been done, correct?

20                    MS. JONES:   Objection.

21        A       Could have after a few moments

22   of orchestrating it, yes.

23        Q       Before you asked Algarin to

24   backtrack, as far as you were aware, there

25   were no other suspects that were in the area,

```
 1                    P.O. Adam Gorman
 2    correct, just the two people that had been
 3    apprehended?
 4          A      Not to my knowledge.
 5          Q      So in that time Algarin or
 6    another officer could have taken 15, 20
 7    seconds to walk to the front door and ask for
 8    consent, right?
 9          A      Correct.
10          Q      I will keep playing here for a
11    second.  We are paused at exactly two minutes
12    into the video, or 170858 on the bottom
13    right.  I am going to pause right here.
14                 In this yard you see this big
15    cage and a doghouse, right?
16          A      Correct.
17          Q      What would you have done if the
18    dog had just suddenly run out of that
19    doghouse at you?
20                 MS. JONES:  Objection.
21          A      Depends on the manner of the
22    dog.
23          Q      If it had ran right at you and
24    barked, what would you have done?
25                 MS. JONES:  Objection.
```

P.O. Adam Gorman

2      A    I think that is too hypothetical
3 and very vague.

4      Q    It would help if maybe you had
5 some prior simulation-based training to help
6 you deal with an incident like that, right?

7      A    No.  I mean, yes, but, no.

8      Q    The more exposure and training
9 that you have to specific types of threats,
10 the better you are able to deal with them in
11 real time, right?

12      A    Yes.

13      Q    So if you had more training
14 about interacting with potentially aggressive
15 dogs running at you, maybe you could make a
16 better decision in the moment, right?

17      A    Potentially.

18      Q    Because we agreed earlier that
19 the more training the better, right?

20      A    It doesn't hurt.

21      Q    In this instance, there was no
22 dog in this yard, right?

23      A    Correct.

24      Q    Before you jumped the fence and
25 entered this yard, is that something that you

```
1                    P.O. Adam Gorman
2    noticed, the doghouse?
3         A      Not particularly, no.
4         Q      You didn't really think about
5    that before you came into this yard?
6         A      No.
7         Q      I will hit play.  We're at two
8    minutes and three seconds into the video, or
9    170903.  Let me ask you about that statement
10   that you just made.
11                Do you know who his cousins are?
12                MS. JONES:  Objection.
13        A      Not by name.
14        Q      Were you familiar with that guy
15   that you had stopped?
16        A      Yes.  I've seen him in the area
17   before.
18        Q      Did you know his name?
19        A      Not offhand, no.
20        Q      Do you know who his cousins
21   were?
22                MS. JONES:  Objection.
23        A      Again, all the personnel hanging
24   out in that area that day were all familiar
25   faces and known to stand there and sell
```

Enright Court Reporting    (631) 589-7788

```
 1                    P.O. Adam Gorman
 2    drugs.
 3         Q      Do you know what his cousins
 4    look like?
 5         A      Not anymore.
 6         Q      Do you know why you said to him
 7    whether it is you or your cousins?
 8         A      Just to talk.
 9         Q      Do you think his cousins were
10    other, I don't know, black men?
11                    MS. JONES:  Objection.
12         A      Do I think or do I know?
13         Q      Sure.  Do you know?  I mean, I
14    asked you if you knew who his cousins were.
15         A      Yes.  I know that people I seen
16    on that day were male blacks.
17         Q      Do you know if the other guy
18    that was stopped was his cousin?
19         A      The term I'd identify for
20    everyone here, the term "cousin" is very
21    commonly used as pal, friend, buddy,
22    acquaintance in the City of Rochester.  It
23    does not have to be direct familial
24    relationship to be a cousin or aunt or uncle.
25         Q      Did you ever review this
```

1                    P.O. Adam Gorman

2      recording with your supervisor or anybody

3      else?

4           A     Not that I remember.

5           Q     Can you see how somebody might

6      perceive your statement, "Whether it is you

7      or your cousins out here dealing," that is

8      pretty racist?

9           A     No, not at all.

10          Q     So you don't see any reason why

11     somebody might think that what you said to

12     him could be perceived as racist by him or

13     somebody else?

14                    MS. JONES:  Objection.

15          A     Not in the slightest.

16          Q     Have you ever had any

17     conversations with supervisors or anybody

18     else about, I don't know, communicating with

19     members of the community in a way to ensure

20     that they don't perceive things that you say

21     as being racist?

22                    MS. JONES:  Objection.

23          A     Not particularly, no.

24          Q     Because some of the prior

25     training reports that we have gone over

                    P.O. Adam Gorman

1       emphasize community relations and

2

3       communicating effectively, correct?

4              A       That's correct, yes.

5              Q       None of those prior training

6       reports or things that your supervisors had

7       spoken with you about regarding communicating

8       with people in the community effectively

9       involved any statements made by you that

10      could be perceived as potentially racist?

11             A       No.

12             Q       This is one of the things that

13      your supervisors were emphasizing is trying

14      to improve community relations, right?

15             A       Correct.

16             Q       So you want to, you know, maybe

17      use an interaction like this to have a

18      positive outcome, right.  And, for example,

19      encourage the person that you stopped to make

20      different choices?

21                     MS. JONES:  Objection.

22             A       Are you implying that I did not?

23             Q       What I am saying is that what

24      your supervisors and your different training

25      reports were emphasizing was trying to

1                    P.O. Adam Gorman

2    improve community relations through

3    communications with individuals that you

4    interact with on a daily basis, right?

5          A      Yes.   That is fair ultimate

6    wish.

7          Q      Do you agree with their ultimate

8    wish?

9                    MS. JONES:   Objection.

10         A      Yes.

11         Q      One of your goals of patrolling

12   is having positive interactions with people

13   in the community to improve relations between

14   the police and people in the community?

15         A      Most definitely.

16         Q      Do you think your interaction

17   with this man here went towards achieving

18   that goal of improving relations between the

19   police and the community?

20         A      Yes, actually, I do.

21         Q      Can you kind of explain how you

22   think that that individual left this

23   interaction feeling better about the police?

24                    MS. JONES:   Objection.

25         A      Well, what I am inferring from

1                    P.O. Adam Gorman

2    your question is that I am acting in a racist

3    manner towards these individuals, which is

4    not the case.  And using common terms that is

5    used within the City of Rochester makes them

6    feel like I am more personable to them.  In

7    addition to that, this man, whether he has

8    had bad experiences with the police or not,

9    his interaction went relatively smooth.  He

10   got detained and then he got let go.  That is

11   a pretty positive interaction to not have to

12   come out facing criminal charges.

13        Q     What criminal charges would you

14   have brought against him?

15        A     I don't know.  It depends on

16   what the officers on Kosciusko had seen.

17        Q     So based on your observations

18   and the fact that no contraband was

19   recovered, just based on your knowledge,

20   there was not probable cause to charge him

21   with a crime, correct?

22                    MS. JONES:  Objection.

23        A     No.  There was not probable

24   cause to charge him with a crime.  There was

25   reason to stop him and detain him.  But, no,

1                    P.O. Adam Gorman

2     not at this exact moment in the

3     investigation.

4          Q        That is my question, yes.  You

5     let him go because after pat searching him,

6     not finding any contraband, there was not

7     evidence to support probable cause to believe

8     that he had committed a crime, correct?

9          A        No, there was.  He was

10    trespassing.  I have reason to believe he was

11    trespassing on multiple different properties

12    by cutting through them.

13         Q        You could have charged him with

14    trespass?

15         A        No, not without the owner's

16    consent or the owner's will, but that would

17    have been further investigative action that I

18    would have taken.

19         Q        You could have talked to my

20    client, Chuck Dempsey, and asked him if he

21    wanted him to be charged with trespassing,

22    but you didn't.

23         A        We hadn't gotten to that point.

24         Q        You didn't ask the owner of this

25    house where you detained him if he wanted him

187

```
 1                    P.O. Adam Gorman
 2    to be arrested for trespass?
 3                    MS. JONES:  Objection.
 4        A      I would have if we had been able
 5    to get to that point, yes.
 6        Q      As a part of your training by
 7    the RPD, have you ever done any implicit bias
 8    training?
 9        A      Yes, we have.
10                    MS. JONES:  Objection.
11        Q      Sorry.  I couldn't hear over the
12    objection.
13                    Is that, yes, you have?
14        A      Yes.
15        Q      Can you describe that training
16    for me?
17                    MS. JONES:  Objection.
18        A      The idea of the training is to
19    say that based on your upbringing, nature,
20    nurture, argument that you have some
21    conscious thoughts that can manifest into
22    actions based on different race, religion,
23    creed, or any other characterization, the
24    idea of the training is to make you aware
25    that those subconscious thoughts are there or
```

```
 1                    P.O. Adam Gorman
 2   can be there.
 3        Q      And do they teach you about how
 4   those subconscious thoughts can manifest in
 5   ways that you might say something that you
 6   don't think could be perceived as racist,
 7   might be perceived by other people as
 8   potentially being racist, right?
 9                    MS. JONES:  Objection.
10                    Elliot, there are not these
11                    type of allegations in the
12                    lawsuit.
13                    MR. SHIELDS:  I am asking
14                    him about what he said to this
15                    particular person on this
16                    particular day and so it is a
17                    valid line of questioning.
18                    MS. JONES:  But it's not
19                    about the claims that was
20                    actually brought against Officer
21                    Gorman.
22                    MR. SHIELDS:  And deposition
23                    questions are not limited in
24                    that way.  So I am going to have
25                    to ask you to stop making
```

1                P.O. Adam Gorman

2                speaking objections on the

3                record.  You have stated your

4                objection.  He can answer the

5                question.

6        A        The term cousin, if you --

7   Elliot, if you would like, you can define it

8   for me.  The term cousin is in no way, shape,

9   or form racist.  And if that's the term that

10  you are referring to, perception, sure, can

11  be -- as the saying goes, perception is

12  everything, but I can perceive anything I

13  want.  It doesn't make it true.

14       Q        When did you receive implicit

15  bias training with the Rochester Police

16  Department?

17                MS. JONES:  Objection.

18       A        Prior to this date, I would say

19  the academy.

20       Q        Have you also received implicit

21  bias training after this date?

22                MS. JONES:  Objection.

23       A        Yes.  Yes.

24       Q        Was that like an in-service

25  training or something else?

190

```
 1                  P.O. Adam Gorman
 2                  MS. JONES:  Objection.
 3       A      I am quite sure it was
 4  in-service training.
 5       Q      So it would be like a day-long
 6  training?
 7                  MS. JONES:  Objection.
 8       A      A portion thereafter, yes.
 9       Q      When you do, like, an in-service
10  training, is that a day that you would
11  otherwise be working on patrol that instead
12  you take off and go to a training?
13       A      Yes.  Typically an eight-hour
14  in-service is counted as your work day or
15  your work hours and you are compensated, for
16  example, not going to work the night before.
17       Q      You don't remember the date you
18  might have done that in-service training?
19       A      No clue.
20                  MS. JONES:  Objection.
21       Q      I am going to continue playing
22  the video.  So we hit pause at two minutes
23  and 15 seconds into the video, or 170915.
24                  Just in that interaction right
25  there, can you tell me what you meant when
```

1                      P.O. Adam Gorman

2    you were saying to him that day, you know, "I

3    am not new.  We have to stop it."

4                      MS. JONES:  Is this still

5                 playing?

6                      MR. SHIELDS:  No.  I paused

7                 it.

8                      MR. JONES:  We are lagging.

9                 I think we are a little behind

10                you.

11                     MR. SHIELDS:  I'm sorry.

12        Q      Do you want me to repeat the

13   question?

14        A      No.  No.  When I expressed not

15   only do I understand the activities going on

16   out here, I am talking with him and trying to

17   avoid beating around the bush about the drug

18   activity that is going on.

19        Q      When you were talking about

20   that, do you mean specifically on Kosciusko

21   Street?

22        A      Correct.

23        Q      So for two days in a row on

24   Kosciusko Street you and other officers

25   basically drove the cars up and then this

```
 1                  P.O. Adam Gorman
 2     individual and other people ran from the
 3     police when you pulled up.
 4                  Is that fair to say?
 5          A      Correct.
 6          Q      The fact that that happened two
 7     days in a row, does that go under the
 8     totality of the circumstances evaluation of
 9     whether you had suspicion to stop him or
10     suspicion or probable cause to conduct a
11     search?
12          A      That it does.
13          Q      I will keep playing now.
14                  In the moment when he was
15     screaming about his daughter, what were you
16     thinking?
17          A      I didn't hear daughter.  I heard
18     dog.
19          Q      I am going to rewind a little
20     bit.
21                  Did you hear him say "my
22     daughter"?
23          A      I did.
24          Q      Were you aware that his daughter
25     was watching the entire incident from right
```

1                    P.O. Adam Gorman

2    inside the back door there?

3         A      No, I was not.

4         Q      Did you ever come to learn that

5    after the incident?

6         A      I did.

7         Q      I just want to rewind a little

8    bit and ask you a couple of other questions.

9    We are rewinding to 259 in the video, or

10   170958 seconds.  He asked you to leave his

11   property, but did you ever do that?  Did you

12   ever leave his property?

13        A      No.

14        Q      And why not?

15        A      It was an active scene at this

16   point.

17        Q      By active scene you mean because

18   Officer Algarin had shot Tesler two times?

19        A      Correct.

20               I am assuming by Tesler you mean

21   the dog.

22        Q      His pet dog, Tesler, yes.

23               So is that like a police

24   department policy, once a firearm is

25   discharged, that makes it like an active

P.O. Adam Gorman

1
2     crime scene?

3          A      Yes.

4          Q      So you have to stay there to

5     investigate the crime that another officer

6     had committed?

7                       MS. JONES:   Objection.

8          A      I would not call it a crime, no.

9     I will investigate the incident to determine

10    if a crime was committed.

11         Q      That is generally what happens

12    any time a firearm is discharged?

13         A      Yes.   Whether an officer or a

14    third-party civilian, whatever the case is,

15    yes.

16         Q      So legally you are saying even

17    though he asked you to leave his property you

18    didn't have the authority to leave his

19    property, you had to stay there?

20         A      Correct.

21         Q      Interesting.

22                And do you know if that is

23    written anywhere in the Rochester Police

24    Department policy?

25         A      To secure a crime scene, yes.

```
                          P.O. Adam Gorman
```

1                          P.O. Adam Gorman

2          Q        But you just said that it was

3     just an incident, not a crime scene.

4          A        A crime scene in my contact as I

5     am using it now as a general term.  Incident

6     location, I suppose we'll use that in the

7     future.

8          Q        So an incident location, legally

9     you are saying if you guys had just gone to a

10    neighboring yard or the front yard, that

11    would have been a violation of the police

12    department policies?

13                       MS. JONES:  Objection.

14         A        I don't understand the question.

15         Q        So he asked you to leave his

16    property, right?  And you are saying, well,

17    we couldn't do that because it was an active

18    incident scene and we needed to secure the

19    incident scene, right?

20         A        Correct.

21         Q        And you are saying that you

22    couldn't leave and it is an active incident

23    scene and that is pursuant to Rochester

24    Police Department policies that you have to

25    secure the incident scene?

P.O. Adam Gorman

2  A  Yes.

3  Q  And so those policies should be

4 written somewhere, correct?

5  A  Yes.

6  Q  Do you know where those policies

7 are written?

8  A  Not offhand.

9  Q  From what you said earlier, you

10 said securing a crime scene, would that be

11 the type of policy that we would be looking

12 for, something about securing a crime scene?

13  A  It might give rise to that, yes.

14  Q  If I were going to go look and

15 read up on some policies to try to confirm

16 that, would that be where you would check?

17    MS. JONES:  Objection.

18  A  I would look under scene

19 management.

20  Q  So scene management requires you

21 to disregard his request that you leave his

22 property and stay there to basically secure

23 the evidence.

24    Is that fair to say?

25  A  Yes.

```
 1                   P.O. Adam Gorman

 2        Q        The evidence would be the shell

 3   casings?

 4        A        Shell casings, obviously check

 5   for anyone who may have been accidentally hit

 6   by a ricochet, things of that nature.

 7        Q        People being hit by a ricochet,

 8   that is always a concern if a firearm is

 9   discharged, right?

10        A        It's a possibility.

11        Q        Always a possibility, right?  So

12   that would be maybe particularly a

13   possibility, a high risk if you are going to

14   fire your department-issued pistol at a fast

15   moving dog.

16                 Is that fair to say?

17                 MS. JONES:  Objection.

18        A        I would say a high possibility.

19   It depends on the backdrop.

20        Q        Shooting a fast moving object is

21   more difficult than shooting a stationary

22   object, right?

23        A        Correct.

24        Q        So shooting at a dog running at

25   you full speed is more dangerous than, I
```

198

1                        P.O. Adam Gorman

2       don't know, shooting at a target 50 feet

3       away, right?

4                        MS. JONES:   Objection.

5            A       No.   I disagree with that

6       statement.   I am not sure how familiar you

7       are with firearms, if you have ever shot a

8       firearm before, but 50 feet is a significant

9       distance to discharge a firearm at,

10      specifically a handgun.   Shooting something

11      within a couple feet, even at a moving

12      target, depending on the shooter, it could be

13      classified as easier.

14           Q       Are there other factor that come

15      in play in terms of the risks of discharging

16      a firearm such as being in a residential

17      neighborhood?

18           A       Yes.   That is a general concern.

19           Q       That could raise the risk of a

20      ricochet and potentially hitting somebody?

21           A       I would say so.

22           Q       Are you aware of any incidents

23      where somebody, a person that was shot by a

24      Rochester police officer, was attempting to

25      shoot a dog?   Have you ever heard of that

199

1                    P.O. Adam Gorman

2    situation happening?

3         A       No.

4         Q       But, again, you haven't received

5    any specific training by the Rochester Police

6    Department about whether or not a specific

7    circumstance justified shooting at a dog,

8    right?

9                    MS. JONES:  Objection.

10        A       Not to my memory, but I can

11   speculate that they would have discussed

12   justify shooting of dogs.  I can't remember a

13   specific person telling me a specific story.

14        Q       Do you think any training that

15   might be developed to avoid situations like

16   this should include discussion of the

17   potential risk of a person being shot and hit

18   by either a ricochet or the officer

19   misfiring?

20                    MS. JONES:  Objection.

21        A       I don't think that that concept

22   is specific to shooting of dogs or any other

23   animals.  I think that is general firearm

24   safety and knowledge.

25        Q       I think I'm mostly done with

1                    P.O. Adam Gorman

2     this video, but let me look at my notes one

3     second.

4                    In the video, you can see a

5     bunch of tattoos on your arms.

6                    Can you show us your tattoos and

7     tell us what they mean?

8                    MS. JONES:  Objection.

9          Q     You can go ahead and do it.

10         A     Is that a direct order or

11    something?  I think that is a very weird

12    question.

13         Q     I asked about your tattoos.

14                   MS. JONES:  I find that very

15                   strange.

16                   MR. SHIELDS:  Are you

17                   directing him not to answer?

18                   MS. JONES:  Give me one

19                   second to recover from my

20                   laughter.

21                   (A discussion was held off

22                   the record.)

23                   (The requested portion of

24                   the record was read back by the

25                   reporter.)

```
 1               P.O. Adam Gorman
 2               MS. JONES:  Objection.  This
 3          is not a physical examination so
 4          I will permit him to describe
 5          his tattoos, but that is it.
 6               MR. SHIELDS:  No.  Thank
 7          you.
 8     Q    Can you please hold up your arms
 9  and show us your tattoos also?
10               MS. JONES:  No.
11               MR. SHIELDS:  Well, then I
12          am happy to call Judge Payson
13          whose number I have right here.
14               Do you want me to call the
15          Judge?
16               MS. JONES:  This is not a
17          physical examination.  This is
18          an oral examination, so he can
19          describe things, but we're not
20          inspecting his --
21               MR. SHIELDS:  Would you like
22          me to conference you in with the
23          Judge or do you want me to hold
24          the phone up to the computer.
25               MS. JONES:  Whatever is
```

202

1                P.O. Adam Gorman

2       easiest.

3            Do you want me to go back to

4       my office and I can put it on

5       the landline?

6            MR. SHIELDS:  No.  It is not

7       for you to waste time.  I mean,

8       you can see most of his tattoos

9       in the video, you know, but I

10      don't know if those are all his

11      tattoos.  So, yes, it is pretty

12      easy.  He has held up his arms a

13      couple of times.  I'll show you

14      my tattoo, if you want to see

15      it.  So I don't have anything to

16      hide.

17           MS. JONES:  He doesn't have

18      anything to hide.

19           If you already saw this in

20      the video, why do you need him

21      to hold his arms up right now?

22           MR. SHIELDS:  Listen to me.

23           Like, we're just going to

24      call the Judge, right?

25           MS. JONES:  I think we

```
 1              P.O. Adam Gorman
 2         should.
 3              MR. SHIELDS:  I'm going to
 4         try to hold the phone up to the
 5         computer and hopefully we can
 6         all hear, but we will see.
 7              (A discussion was held off
 8         the record.)
 9              (The following is a
10         telephone discussion with Judge
11         Payson's law clerk.)
12              MS. JONES:  So we are
13         currently on the record?
14              MR. SHIELDS:  Yes.
15              Ms. Cornetta, we are all set
16         and on the record.
17              MS. CORNETTA:  So I am not
18         sure what the call is for, but
19         if you could let me know what
20         the dispute is.
21              MR. SHIELDS:  Yes.  This is
22         Elliot Shields, Ms. Cornetta.
23         It is pretty simple.  We're
24         almost completed with the
25         deposition of Police Officer
```

204

```
1                  P.O. Adam Gorman
2        Adam Gorman.  There was a
3        body-worn camera as part of the
4        incident.  I had asked Officer
5        Gorman some questions about the
6        body-worn camera videos and some
7        statements that he had made to a
8        young black man who was stopped
9        as part of the incident.  On the
10       body-worn camera you can see on
11       his arms he has numerous
12       tattoos.
13               We are doing our deposition
14       virtually by Zoom.  I asked
15       Officer Gorman if he could show
16       us the tattoos on his arms and
17       describe what they mean and
18       counsel for the City objected
19       and then conferred and then
20       stated that they would permit
21       Officer Gorman to describe the
22       tattoos, but not to show them.
23       And the objection from the City
24       was that it is not a physical
25       examination.  It's, instead, a
```

1          P.O. Adam Gorman

2          deposition, so they are not

3          going to allow him to show the

4          tattoos.

5              MS. JONES:  That is correct.

6          This is Peachie Jones from the

7          City of Rochester.  I think what

8          is important here is that a lot

9          of the questions that

10         Mr. Shields was asking Officer

11         Gorman about the black man he

12         detained were really about

13         racism and if Officer Gorman was

14         having positive community

15         relations in offending members

16         of the African-American

17         community.  We think that these

18         is in that line of questioning,

19         just intending to harass and

20         annoy my client.

21             Again, we are perfectly

22         happy -- not perfectly happy --

23         willingly to permit Officer

24         Gorman, even after stating our

25         objection to describe his

1          P.O. Adam Gorman
2          tattoos, but we're not
3          interested in a physical
4          examination.  Some of his
5          tattoos are visible, but not all
6          of them.  And it would be serve
7          Mr. Shield's purposes, not
8          forgetting the fact that this is
9          completely irrelevant to the
10         claims that are brought in this
11         case.  It serves Mr. Shields's
12         purposes to describe them and
13         have them in the written record.
14              I will add that there are no
15         claims of unlawful
16         discrimination on the basis of
17         race in the lawsuit.  This is
18         about a dog shooting.  And so we
19         are also very far afield from
20         what is relevant or even
21         designed to introduce relevant
22         information to this case.  I
23         just don't know why we need a
24         physical examination of Officer
25         Gorman at this time.

1              P.O. Adam Gorman

2              MS. CORNETTA:  A couple of

3        questions.

4              MR. SHIELDS:  Yes.

5              MS. CORNETTA:  I apologize.

6        (Reporter clarification.)

7              MR. SHIELDS:  I'm sorry,

8        Ms. Cornetta.  I'm going to try

9        to make you a little louder for

10       the court reporter.  I'm not

11       sure where my microphone is, but

12       I am going to try to hold it to

13       where I think it is near.

14             I'm sorry.  Can we try it

15       again?

16             MS. CORNETTA:  I am going to

17       start again.  I have a couple of

18       questions.  First, I apologize

19       that I don't have the case file

20       in front of me.

21             So is Officer Gorman one of

22       the defendants?

23             MR. SHIELDS:  Correct.  He

24       is the named defendant.

25             MS. CORNETTA:  The named

1              P.O. Adam Gorman

2         defendant.

3              Just so I know, what are the

4         claims in this case?

5              MR. SHIELDS:  We have an

6         unlawful entry claim, a trespass

7         claim, unlawful seizure of my

8         client's dog, and an unlawful

9         seizure of my client when the

10        other officer pointed his gun at

11        my client after having basically

12        jumped the fence into his yard

13        at the same time that the dog

14        was released.

15             In short, what happened was

16        the officers were doing an

17        operation, a vice operation.

18        Some officers on one street,

19        Kosciusko Street, drove their

20        cars up, a couple of young black

21        men ran through a couple of

22        backyards.  Officer Gorman was

23        on the adjacent street, Sobieski

24        Street.  He stopped one of the

25        young black men in the yard, the

1                P.O. Adam Gorman

2        backyard neighboring my client's

3        back yard.  And then another

4        officer, Officer Algarin, the

5        other named defendant, came in

6        that yard and Officer Gorman

7        asked him to backtrack through

8        my client's yard, so he jumped

9        the fence.  And then basically

10       at the exact same time

11       coincidentally, horribly, my

12       client had let his dog out of

13       the back door and the dog ran up

14       to Officer Algarin who shot and

15       killed the dog right in front of

16       my client.

17            MS. CORNETTA:  I understand

18       what the case is about.  And I

19       want to make sure I am clear.

20       The dispute right now from what

21       I am hearing is about whether or

22       not Officer Gorman should be

23       required during the deposition

24       to display his arm tattoos.

25            MR. SHIELDS:  Correct.

210

P.O. Adam Gorman

1

2      MS. CORNETTA:  It is not any
3      particular question right now?
4      MS. JONES:  No, I believe it
5      was.
6      MR. SHIELDS:  The open
7      question I believe I asked him,
8      "Can you please show me your
9      tattoos that we can see in the
10     video on your arms and describe
11     their meaning?"
12     MS. CORNETTA:  And,
13     Ms. Jones, you object both to
14     him showing the tattoos although
15     you would be willing to permit
16     him to describe the arm tattoo,
17     but you object to him answering
18     the questions as to the meaning
19     of the tattoos; is that correct?
20     MS. JONES:  That is correct.
21     I mean, I didn't object to the
22     question, but we are willing to
23     let Officer Gorman describe the
24     tattoos.
25     I will add I didn't remember

1            P.O. Adam Gorman

2         Mr. Shields had limited it to

3         only the tattoos that were shown

4         in the video, but we also are

5         more comfortable to limiting it

6         to only those that are seen in

7         the video.

8           MS. CORNETTA:  Mr. Shields,

9         is that correct that is it your

10        position that you are only

11        talking about the arm tattoos

12        that are visible in the

13        body-worn camera?

14          MR. SHIELDS:  I hadn't

15        really been able to ask any

16        questions.  So that was the

17        first question.  If he told me,

18        hey, I have more tattoos, I was

19        going to ask him about those

20        tattoos as well.

21          MS. CORNETTA:  Ms. Jones, go

22        ahead.

23          MS. JONES:  There is

24        absolutely no relevance of

25        Officer Gorman's tattoos to a

1          P.O. Adam Gorman

2          claim about a different officer

3          shooting a dog.  I mean, other

4          than the fact that Mr. Shields

5          has mentioned that a black young

6          man was detained right before

7          the dog shooting, there is no --

8          like, we are just so far afield

9          of what this case is actually

10         about.  Mr. Shields has not

11         described or identified how

12         Mr. Gorman's tattoos leads to

13         any relevant information about

14         any of the claims in this case.

15         This is really just lengthening

16         a deposition and harassing my

17         client.  Like, we're willing to

18         describe the tattoos, but even

19         that we think is irrelevant and

20         unnecessary.

21             MS. CORNETTA:  I understand

22         what your position is.  So I

23         just want to make sure I am

24         clear as to what the disputes

25         are and also to avoid a further

```
 1                P.O. Adam Gorman
 2           phone call.
 3              What I am hearing the
 4           disputes are, one, displaying
 5           the arm tattoo during the
 6           deposition.  Ms. Jones, your
 7           position is because it is not a
 8           physical examination and he
 9           should not be required to do
10           that.
11              Two, there is a dispute
12           about whether or not -- it is my
13           understanding that the defendant
14           is going to describe the tattoos
15           that can be seen in the video,
16           but you would object to him
17           being required to answer the
18           question as to what the meaning
19           of those tattoos are.
20              And, three, to the extent
21           there are tattoos in the
22           body-worn camera, Mr. Shields,
23           your position is you would like
24           to ask about those.
25              And, Ms. Jones, your
```

214

```
 1              P.O. Adam Gorman
 2         position is that it is not
 3         relevant and that he shouldn't
 4         be permitted to ask questions
 5         about tattoos that are not
 6         visible on the body-worn camera.
 7              Do I have both sides'
 8         positions, correct?
 9              Mr. Shields?
10              MR. SHIELDS:  Yes, from what
11         you said.
12              MS. CORNETTA:  Ms. Jones?
13              MS. JONES:  Yes.  That's
14         correct.  Thank you.
15              MS. CORNETTA:  So this is
16         what we do.  I mean, I will say,
17         you know, generally, I
18         understand, Ms. Jones, that your
19         objection as to questions about
20         the tattoos are a relevance
21         objection and your position that
22         it goes into the territory of
23         just being harassing that there
24         is no relevance.  Even,
25         generally, in federal
```

P.O. Adam Gorman

1          depositions, objections as to

2          relevance aren't really a basis

3          to instruct a witness not to

4          answer.

5          With respect to the question

6          of displaying the tattoos, you

7          know, I have never really had

8          that before.  Obviosly, I am a

9          law clerk and I can't really

10         make any determinations for you,

11         but what I can do is I can see

12         if I can get Judge Payson and

13         see if she has any further

14         insight.  She has a very full

15         calendar today, so I don't know

16         that I can get her.  And I

17         understand you are nearing the

18         end of the deposition; is that

19         correct?

20             MR. SHIELDS:  Correct.

21             MS. CORNETTA:  What I would

22         suggest is let me put you on

23         hold and I will see if I can get

24         Judge Payson to if she can give

1           P.O. Adam Gorman

2           me any insight into this issue.

3           You are free while I have you on

4           hold if you want to try to

5           continue the deposition, that is

6           fine with me and I will come

7           back on when I have some further

8           information for you.  If you

9           want to sit and wait that is

10          fine as well.  I don't think it

11          will be terribly long to

12          determine whether or not I can

13          get her.

14              So why don't I put you on

15          hold and you guys do what you

16          think is the most sufficient use

17          of your time and I will get back

18          on as soon as I have more

19          information.

20              MR. SHIELDS:  Great.  Thank

21          you so much.  We'll be waiting.

22              MS. CORNETTA:  I will get

23          back.

24              MS. JONES:  Are we going to

25          continue?

```
 1                 P.O. Adam Gorman
 2                 MR. SHIELDS:  Yes.  Let's
 3            keep going, so we can,
 4            hopefully, finish this up after
 5            they get back.
 6       Q        Officer Gorman, in this
 7  situation, right, that we watched in the
 8  body-worn camera video where Officer Algarin
 9  jumped the fence in my client's yard, you
10  guys obviously didn't have a warrant, right?
11       A        Correct.
12       Q        The exception for the other
13  warrants would have had to apply what we
14  covered earlier, right?
15       A        Correct.
16       Q        Why didn't you just ask Officer
17  Algarin to walk to the front door to ask for
18  permission and knock on the door?  Did you
19  ever think about that?
20       A        At the time, it did not cross my
21  mind.
22       Q        So earlier you had described
23  that on a prior day you had run a similar
24  operations where these same individuals had
25  run from you on Koskusco Street.
```

```
 1                   P.O. Adam Gorman
 2        A       Correct.
 3        Q       How frequent is that type of
 4   situation where people run from you into
 5   residential yards?
 6        A       In the City of Rochester, if
 7   someone runs, they are cutting through a
 8   residential yard.
 9        Q       So when someone runs and you
10   chase them, you are often also going through
11   a residential yard, right?
12        A       Correct.
13        Q       That is like a typical
14   situation?
15        A       Yes.
16        Q       This happens on a frequent
17   basis?
18        A       In terms of foot chases, yes.
19        Q       So if you say it's frequent in
20   terms of foot cases, that means more than
21   half of foot cases ends up going through
22   someone's residential yard?
23        A       Yes.
24        Q       How often would you say that
25   happens during a normal week?
```

```
1                   P.O. Adam Gorman
2         A       I couldn't even fathom to give
3    you a number.  There are too many platoons
4    and sections in the City.  I couldn't give
5    you a realistic number at all.
6         Q       I am sorry.  I mean, in your
7    experience, how often do you end up having to
8    do a foot chase through some residential
9    yards?
10        A       Me, personally, once every
11   couple of weeks.
12        Q       On average?
13        A       Yes.
14        Q       Would that be since you switched
15   to the first platoon or throughout your time
16   both on the third and the first?
17        A       If you did it altogether, I
18   would say once every couple of weeks.
19        Q       Is that something that would
20   have happened more frequently when you were
21   on the third platoon than when you were on
22   the first?
23        A       Yes.
24        Q       Have you previously encountered
25   dogs on peoples' property during foot chases?
```

P.O. Adam Gorman

1

2          A        No, I don't think so, not during
3     the foot chase.

4          Q        How often during those foot
5     chances did you end up backtracking and going
6     through the route that you chase the person
7     to look for any discarded contraband?

8          A        On my personal foot chases are
9     you asking?

10         Q        Yes.  I am just asking about
11    your experience, you know, what you have
12    done.

13         A        I would say the majority of the
14    time.

15         Q        Would it be fair to say that a
16    majority of the time some of those times at
17    least would require you to jump over a fence
18    similar to what happened in this instance?

19         A        Yes.

20         Q        In any of those other instances,
21    have you ever gone to the property owner's
22    front door and asked for consent to enter
23    their property?

24         A        Prior to this date, not that
25    comes to mind.

221

                    P.O. Adam Gorman

1

2        Q       After this date of incident,

3   have you ever done that, gone to the front

4   door and asked for someone's consent to enter

5   their property?

6        A       Yeah.

7        Q       Why did you do that after this

8   incident?

9        A       Typically, when looking for

10  discarded contraband, those items can be

11  obviously tossed relatively easily to a

12  significant distance, so multiple yards over.

13  And within the City limits, many people have

14  fences and some of those fences are either

15  impassible without damage to the fence,

16  injury to the officer, or just the height.

17  So there have been occasions where I go knock

18  on the door, ask them, hey, can you open up

19  the gate.  Or I hear a dog in the backyard

20  and I will say, hey, can you bring your

21  animals inside?  We're looking for something.

22       Q       So when you think there might be

23  a dog in the yard because there are

24  indications that in an instance after this

25  dog shooting where you have gone and knocked

```
 1                    P.O. Adam Gorman
 2    on someone's door to ask for them to put the
 3    dog away and allow you to search the
 4    property?
 5          A       Are you asking because of this
 6    instance?
 7          Q       That wasn't the wording of my
 8    question, but let's break that into two
 9    different questions.
10                  So after this incident in
11    instances where you think there is a dog on
12    the property you have sought the owner's
13    consent, or the lessee, or whatever, prior to
14    entering the yard, correct?
15          A       Correct.
16          Q       And part of the reason is
17    because, if there is a dog, that can be
18    dangerous for the officers, right?
19          A       Correct.
20          Q       After this incident, in general,
21    did you change anything that you would do
22    prior to entering a residential yard to
23    search for property that may have been
24    discarded while you are backtracking?
25          A       It is a more conscious thought.
```

```
 1                    P.O. Adam Gorman
 2          Q      So you learned from your
 3   experiences, right?
 4          A      Correct.
 5          Q      Do you think about it every time
 6   you enter someone's yard or just when you
 7   think there might be a dog that could
 8   potentially run out?
 9          A      Primarily, if there is a fence,
10   that is usually an indicator, kind of, I
11   guess, a trigger, I guess you would say just
12   to --
13          Q      So now when you see a yard that
14   is surrounded by a fence you think, oh, hey,
15   you know, this is an indication that there
16   may be a dog that lives at this property?
17          A      Yes.
18          Q      And so if there any training
19   changes implemented by the City as a result
20   of these incidents, it should include
21   training that, hey, look, a fence is an
22   indication that there might be a dog that
23   lives at this property, right?
24          A      Yes, I guess.
25          Q      Based on your experience, have
```

```
1                      P.O. Adam Gorman
2    you ever been involved in any other instances
3    where a dog has been shot?
4         A     Yes.
5         Q     Only one other instant or more
6    than one?
7         A     Just one.
8         Q     Oh, you know what?  I am going
9    to put that report up and just ask you a
10   couple of questions about it.  So this will
11   be Exhibit H.
12                    MS. CORNETTA:  Counsel?
13                    MS. SHIELDS:  Oh, hold on.
14               The Court is back.
15                    Hello, we're all here.
16                    MS. CORNETTA:  Sorry for the
17               delay.  I was able to speak with
18               Judge Payson.
19                    Are we still on the record?
20                    THE COURT REPORTER:  Yes.
21                    MS. CORNETTA:  So,
22               Mr. Shields, I'm not sure that I
23               have a clear idea, and maybe I
24               didn't ask you this, but could
25               you just articulate for me what
```

1          P.O. Adam Gorman

2      you believe the relevance is of

3      the tattoos, either the ones

4      that are visible on the

5      body-worn camera or any other

6      tattooing and what the relevance

7      of their meanings are to the

8      claims in the case?

9          MR. SHIELDS:  Well, I don't

10     know.  That is why I need to ask

11     him questions about the tattoos.

12     We can see them visible on his

13     arms in the body-worn camera,

14     you know.

15          As far as any potential

16     meaning, you know, the claims in

17     the case and one of the lines of

18     questioning in today's

19     deposition was about the

20     demographics of the

21     neighborhood.  Officer Gorman

22     testified that he is assigned to

23     the Clinton section, that it is

24     predominantly a black

25     neighborhood, that most of the

1              P.O. Adam Gorman

2       individuals he has interactions

3       with are young black men.  There

4       was an interaction with the

5       individual that he had stopped

6       in the neighboring yard here

7       where he had asked him --

8       basically he said to him,

9       whether it is you or your

10      cousins, someone is dealing

11      drugs out here and we have got

12      to stop it.

13          So that is the context of

14      asking about the arm tattoos

15      that we can see in the video

16      and, you know, any other tattoos

17      he might have, you know.  We

18      asked about implicit bias

19      training provided by the

20      Rochester Police Department and,

21      you know, how perhaps some

22      statements Officer Gorman may

23      have made may not seem to him to

24      have any kind of racist

25      connotation, but could be

```
 1                P.O. Adam Gorman
 2           perceived differently by members
 3           of the community.
 4                So, you know, that is why I
 5           am interested in looking at his
 6           tattoos because, you know, I
 7           don't know what they look like
 8           unless he shows me.  And I would
 9           like to ask him questions about
10           them because I don't know if
11           during his patrol members of the
12           community might see tattoos and
13           say, hey, what does that mean,
14           you know, and have questions
15           about it.  You know, I want to
16           know what they look like and I
17           want to know what they mean.
18                And I don't think relevance
19           is necessarily an appropriate
20           objection on the City's part,
21           you know, because a deposition
22           is, generally, in my experience,
23           meant to allow me to explore
24           these areas that I am not sure
25           about.  And I have gotten
```

1                    P.O. Adam Gorman

2          objections from the City in the

3          past that say, hey, look, you

4          know, this would be a more

5          appropriate question for you to

6          ask at deposition, and so that

7          is what I am doing instead of

8          serving an interrogatory about

9          the tattoos beforehand.

10            MS. CORNETTA:  Mr. Shields,

11         just one follow-up question.

12            MR. SHIELDS:  Yes.

13            MS. CORNETTA:  You mentioned

14         that part of the relevance to

15         your question about the tattoos

16         are what, you know, people

17         within the neighborhood that

18         might interact with Officer

19         Gorman walking on patrol, what

20         they might see and what they

21         might, you know, presumably

22         interpret those tattoos to mean.

23            Is it your intention to ask

24         about tattoos that will be

25         visible during his normal patrol

1          P.O. Adam Gorman

2          duties?

3             MR. SHIELDS:  I mean, I'm

4          not going to ask to see them,

5          you know, if it is on his back.

6          I am not going to ask him to

7          take his shirt off.  But if he

8          showed me his tattoos, I was

9          going to say, okay, do you have

10         any others, what are they, where

11         are they, you know.  I actually

12         hadn't thought that all through

13         at the time I asked about the

14         tattoos as we were watching the

15         video.  And I said, hey, I see

16         these tattoos on your arm.  Can

17         you show me and describe them?

18         That is a long way of saying I

19         plan on just asking, but not

20         asking to see them.

21            MS. CORNETTA:  Counsel, can

22         you hold on for one more minute?

23            MR. SHIELDS:  Yes.  Thank

24         you.

25            MS. JONES:  Are we going to

230

1           P.O. Adam Gorman

2       continue while we are waiting?

3           MR. SHIELDS:  Yes.  I guess

4       she said one more minute, but

5       who knows how long it will

6       really take, right.

7           (Incident Report Number

8       2018-0009117 marked as

9       Plaintiff's Exhibit H for

10      identification, as of this

11      date.)

12          This is Exhibit H.  This is

13      Rochester Police Department

14      incident report RC number

15      2018 --

16          MS. CORNETTA:  Counsel, I am

17      back.

18          MR. SHIELDS:  Okay.  Hello.

19          MS. CORNETTA:  Are we still

20      on the record?

21          MR. SHIELDS:  Yes.

22          MS. CORNETTA:  Great.

23          So as I had indicated to

24      you, I was able to speak to

25      Judge Payson, and, you know, one

```
 1              P.O. Adam Gorman
 2         of the things that she did want
 3         to know a little bit more about
 4         was from Mr. Shields to
 5         articulate the relevance that he
 6         thought to the tattoos.
 7              Judge Payson's strong
 8         instincts was that she didn't
 9         see any relevance of the tattoos
10         other than they were in the
11         body-worn camera.  The
12         defendant's position was that
13         they were willing to permit him
14         to describe the tattoos that
15         were depicted in the video.  She
16         thinks it would be fine to show
17         the witness the body-worn camera
18         and the tattoos and ask him if
19         those are the tattoos that are,
20         indeed, on his arm.
21              Judge Payson understands
22         that typically issues of
23         relevance are a basis to not
24         answer during a deposition, but
25         she does think she really can't
```

```
1                    P.O. Adam Gorman
2               see any particular relevance to
3               the tattoos or what the officer,
4               you know -- they might obviously
5               have personal meaning to the
6               officer and have nothing to do
7               with what someone else might
8               view them as and she just
9               doesn't see the relevance of
10              them and she doesn't think that
11              the officer should be required
12              to do anything more than what
13              the defense indicated, which is
14              to describe the tattoos on his
15              arm that are depicted in the
16              video.
17                  MR. SHIELDS:  Okay.
18                  MS. CORNETTA:  So if there
19              is anything else that I can help
20              you with, give the Court a call
21              back.
22                  MR. SHIELDS:  Thank you.
23              Appreciate your time.
24                  MS. CORNETTA:  Thank you.
25          (Telephonic conversation concluded.)
```

233

1                    P.O. Adam Gorman

2           Q        So let's just go back to this

3     other incident.  So it is incident report

4     2018-0009117, right?

5           A        Yes.

6           Q        So that was a report dated April

7     22nd, 2018, right?

8           A        Correct.

9           Q        So that is before our date of

10    incident, right?

11          A        Yes.

12          Q        And do you remember this

13    incident?  Can you just kind of tell us what

14    happened?

15          A        Yes, I do.  Myself and Officer

16    Whitmore -- correct me if I am wrong or I

17    have to review the report -- we responded to

18    a call for dogs fighting.  Upon our arrival,

19    we observed I want to say it is two dogs.

20    Again, I have to review the report.  Two dogs

21    attacking a third dog in an open backyard or

22    partially enclosed backyard I guess you would

23    say.  The panels were partially enclosing the

24    backyard.  Access from the street was no

25    gate, no attempt at a fence.  And, if I am

234

```
1                     P.O. Adam Gorman
2      not mistaken, they were actually in the
3      neighbor's yard.  The two loose dogs were in
4      the neighbors yard attacking the neighbor's
5      dog as we approached.
6           Q       And then what happened?
7      Eventually Officer Whitmore ended up shooting
8      one of the dogs?
9           A       Correct.  Ultimately the dogs
10     approached us.  We waited.  We waited.  They
11     were just kind of standoffish, but still had
12     aggressive mannerisms, the growling and such,
13     but they were within a 5 to 10-foot distance
14     from us constantly.  And after a few minutes,
15     one of the dogs lunged towards Officer
16     Whitmore and Officer Whitmore shot the dog.
17          Q       My question was going to be, how
18     come you didn't shoot the dog and is that
19     because it didn't lunge at you, it lunged at
20     Officer Whitmore?
21          A       My focus was -- because there
22     were two dogs, my focus was on the second dog
23     while Officer Whitmore was trained on the dog
24     that he ended up ultimately shooting.
25          Q       So you guys were both kind of
```

```
 1                    P.O. Adam Gorman
 2    taking one dog each?
 3         A      Yes.  Eventually, yes.
 4         Q      Throughout this whole period,
 5    did you guys have your pistols out?
 6         A      Yes.
 7         Q      So if one of the dogs had come
 8    at either you or Officer Whitmore, your
 9    intention would have been to shoot the dog?
10    That was your plan, I guess, since you had
11    your pistols out?
12         A      Yes.
13         Q      Did you ever consider or do you
14    know if Officer Whitmore ever considered any
15    other type of force, like using OC spray or a
16    baton instead of shooting the dog?
17         A      I can't speak for Officer
18    Whitmore's thought process on that.  I can't
19    actually say I considered it at the time due
20    to the amount of time that elapsed during
21    this incident.  It wasn't as fast-paced I
22    should say as things that we're discussing
23    today.
24         Q      When you said that you did think
25    about that, were you referring to either a
```

```
 1                    P.O. Adam Gorman
 2    baton or OC spray or both or something else?
 3         A      Primarily the baton.
 4         Q      At the time you had your pistol
 5    out, though, right, did you also have your
 6    baton in your hand or would you have
 7    potentially reached for it?
 8         A      I don't remember.
 9         Q      So at the time you and Officer
10    Whitmore had your guns in your hand, right?
11         A      Correct.
12         Q      That would have been, I guess,
13    the primary method of using force against the
14    dog or the first option since that it was out
15    and ready to go?
16         A      Yes.
17         Q      Let me see.  I will scroll down.
18    I don't think I have any other questions on
19    that.
20                     MS. JONES:  Did we get the
21                COR numbers on that?
22                     MR. SHIELDS:  I think that
23                is all I have on that.  Thank
24                you.
25         Q      I think you said earlier, right,
```

237

```
 1              P.O. Adam Gorman
 2  you never either shot a dog or hit a dog with
 3  a baton or used OC spray against a dog.
 4      A      Correct.
 5      Q      I will pull up the Arrest Report
 6  from this incident.  I just have a couple of
 7  questions on that.
 8              MR. SHIELDS:  This will be
 9              Exhibit I, arrest report.
10              (Arrest Report marked as
11              Plaintiff's Exhibit I for
12              identification, as of this
13              date.)
14      Q      Officer Gorman, can you see what
15  I marked as Exhibit I, the Arrest Report?
16      A      Yes.
17      Q      It's 54 Sobieski Street, right?
18      A      Yes.
19      Q      Narcotic offenses, 10/19/18?
20      A      Correct.
21      Q      If you go down to the narrative
22  section, this is filled out by Officer
23  Horowitz.  And Officer Horowitz says, "On the
24  above date and time I was responding per ther
25  report of drug activity at 61 Kosciusko
```

```
 1                    P.O. Adam Gorman
 2      Street.  I was at 54 Sobieski Street with
 3      Officer Gorman and Officer -- how do say his
 4      name?
 5           A       DeSabatino.
 6           Q       DeSabatino.   That makes more
 7      sense.
 8                   And Officer Algarin drove up to
 9      61 Kosciusko Street.   Two black males later
10      identified as," redacted, "fled on foot.
11      Stopped towards Sobiesky Street.   "A" Hopped
12      the fence, fled on foot in the vacant lot and
13      dropped a black bag and walked towards me.   I
14      ordered "A" to stop and get down on the
15      ground.  He cooperated.  I placed handcuffs
16      on "A", searched, and brought him to my
17      vehicle.  I located black bag "A" dropped,
18      which contained seven plastic bags containing
19      a light green-leaf substance.   Officer Gorman
20      detained PK.  Called for a check with city
21      records.  Negative 1029 check."
22                   I am stopping right there.
23                   My first question is, what is a
24      1029 check?
25           A       1029 check is just a warrants
```

1                          P.O. Adam Gorman

2    check.

3          Q       Just checking if they had any

4    open warrants?

5          A       Correct.

6          Q       Back here it says "PK" and "A"

7    were released.

8                  So that means, both of them were

9    just released from the scene, right?

10         A       I don't know if the man arrested

11   was released and issued an appearance ticket

12   on scene or at his office.

13         Q       The guy you stopped was released

14   from the scene?

15         A       Correct.

16         Q       You know, when I first read

17   this, I didn't know about the day before.  So

18   at the beginning of the incident report where

19   he is talking about, you know, how Officer

20   Horowitz said he had responded with you to

21   Sobieski Street, that was all planned in

22   advance, right?

23         A       Yes.

24         Q       Had you done that before, kind

25   of like camped out on Sobiesky Street and

1                    P.O. Adam Gorman

2     expected people to run through the yards?

3          A      I don't think so.

4          Q      You guys devised it that day

5     based on what had happened the prior day?

6          A      Yes.  Based on once we received

7     the 911 call, that is how we were going to

8     respond to the 911 call.

9          Q      So basically you made a plan to

10    flush them out through the yards and stop

11    them hopefully in one of those backyards?

12         A      No.  Just cut them off mid run.

13         Q      Yeah.

14                Now, before you did that, did

15    you do any investigation into any of those

16    homes or yards to see whether any of them had

17    dogs?

18         A      No.  By the time we -- I pulled

19    up on Sobieski, the -- I mean, we were

20    already running.  That is why.

21         Q      Remember when you only saw the

22    five seconds?

23         A      Yes.  Because I just had

24    activated it and it only stayed in the green

25    status as we discussed earlier for about five

1                          P.O. Adam Gorman

2       seconds.

3              Q       So basically before the camera

4       turned on, you had just arrived at the scene

5       in your car?

6              A       Yes.

7              Q       So it wasn't like you had hours

8       to devise this plan.  You had the 911 call,

9       responded, and at the same time you pulled up

10      on Sobieski Street, Officer Alagrin and

11      DeSabatino arrived on Kosciusko Street?

12             A       Correct.

13             Q       And those are streets that you

14      are familiar with; is that right?  You were

15      there the prior day?

16             A       Yes.

17             Q       I just want to go over the

18      incident report with you.  This will be

19      Exhibit J.

20                           (Incident report marked as

21                           Plaintiff's Exhibit J for

22                           identification, as of this

23                           date.)

24             Q       Can you see that on your screen,

25      Officer Gorman?

```
1                    P.O. Adam Gorman

2        A       Yes, I can.

3        Q       So I asked you one question

4   earlier.

5                Jason Rudolph was the

6   supervisor, correct?

7        A       Correct.

8        Q       He showed up later?

9        A       Yes.

10       Q       I guess my question is, we have

11  reports written by the supervisor and a

12  different officer.

13               Is that typical in a situation

14  like this that, you know, you wouldn't write

15  a report after you had conducted a search?

16       A       If nothing of relevance was

17  found, then, yes.

18       Q       So even though General Order 415

19  said you are supposed to write a report, no

20  one ever gave you a hard time, none of your

21  supervisors, if you don't do that?

22       A       No.

23       Q       Have you ever been told by any

24  of your supervisors that you are supposed to

25  write a report pursuant to General Order 415
```

1                    P.O. Adam Gorman

2    when you haven't?

3         A       Not to my knowledge, no.

4         Q       After the dog shoot, did you

5    speak to any witnesses at the scene?

6         A       I don't think so.  I don't

7    recall.

8         Q       You didn't take any witness

9    statements or supporting deposition from

10   anyone?

11        A       No.  No.  I don't recall, but I

12   am pretty sure I did not.

13        Q       Before prior to preparing for

14   the deposition, had you ever watched your

15   body-worn camera video from this incident?

16        A       Yes.

17        Q       When was that?

18        A       Whenever my last visit was with

19   corporation counsel.

20        Q       Aside from preparing for

21   anything having to do with this lawsuit, did

22   you watch the body-worn camera video of the

23   incident?

24        A       Possibly immediately after the

25   incident just to review it all, but I

```
1                    P.O. Adam Gorman
2    couldn't say for sure.
3         Q       There wasn't like an incident
4    report that was completed with supervisors
5    and all the officers at the scene and
6    anything like that?
7         A       Such as what is called an
8    after-action report?
9         Q       Sure.  I guess that would be it,
10   if that is what you guys call it, right?
11        A       Yes, after-action report.  After
12   any, I guess, critical incident, we would
13   review, go over things, but, no, that was not
14   done.
15        Q       Have you had other incidents
16   where you have done after-action reports?
17        A       Yes.
18        Q       It sounds like you were just
19   describing when that happens you review the
20   body-worn camera footage and basically assess
21   what happened at that incident.
22                Is that what the purpose of
23   doing an after-action report would be?
24                MS. JONES:  Objection.
25        A       The body-worn camera is used as
```

1                    P.O. Adam Gorman

2    a tool in reviewing, not specifically the dog

3    shooting or any incident like that, but any

4    critical incident just to review tactics,

5    safety procedures, or just what we could have

6    done better.

7            Q      So to learn from the incident

8    and, you know, make sure that things in the

9    future are done as safe as possible, right?

10           A      Correct.

11           Q      Officer's safety is the number

12   one priority, right?

13           A      Correct.

14           Q      And one takeaway here in terms

15   of officer's safety could be, when you have

16   time, and it could have only taken maybe 15

17   seconds to go knock on the front door, that

18   would have been a safer option than Officer

19   Algarin jumping the fence into my client's

20   backyard?

21           A      Correct.  I agree with that.

22           Q      Have you ever reviewed the legal

23   filings, any of the legal filings in this

24   case?

25           A      Are you referring to the lawsuit

                         P.O. Adam Gorman
1

2   itself?

3        Q       Correct.   Like the complaint.

4        A       I want to say "yes," but not

5   recently.

6        Q       Maybe when the case was first

7   filed and served on you?

8        A       Yes.

9        Q       Did you receive a physical copy

10  of the document that was delivered by

11  exchange?

12       A       Yes.   Yes.

13       Q       And then what is the process

14  after?   Then you reach out to the City and

15  ask for representation?   Is that how that

16  goes?

17       A       What I did was I notified the

18  union.   And I don't think I reached out to

19  the City myself.

20       Q       Maybe the union did that for

21  you?

22       A       Possibly, yes.   I believe that

23  is what they do.

24       Q       Have you ever spoken with any

25  union representatives about the allegations

```
 1                    P.O. Adam Gorman
 2      in the lawsuit or the incident?
 3           A      Not that I remember.
 4           Q      Other than --
 5           A      Other than notified.
 6           Q      I just want to go back to the
 7      tattoos.
 8                    Can you describe the tattoos on
 9      your forearms that are displayed in the
10      body-worn camera footage?
11                    MS. JONES:  Which tattoos
12                    are in the body-worn camera?
13                    I thought we were going to
14                    pull up the video and identify.
15                    MR. SHIELDS:  I think she
16                    said he can describe the ones on
17                    the forearms that are visible.
18                    MS. JONES:  What is visible?
19                    MR. SHIELDS:  You want to
20                    watch the whole video right now
21                    and when he describes what is on
22                    his arms?
23                    MS. JONES:  As long as you
24                    are fine with him making, I
25                    guess, the determination of what
```

1                    P.O. Adam Gorman

2                    is visible.  I mean, like, we

3                    haven't been looking for tattoos

4                    in the video.  We don't have to

5                    watch the whole thing, but I

6                    assume that you know what you

7                    want identified.

8                      MR. SHIELDS:  Well, I am

9                    just asking questions right now

10                   first and then maybe we'll watch

11                   the video.

12          Q        I want to know, if you can tell

13    me, how many tattoos do you have below your

14    elbows on your right arm and your left arm?

15                      MS. JONES:  Hold on.

16                      Do you know which tattoos

17                   are in the video?

18          A        There is only one that would

19    have been.

20                      MS. JONES:  There is just

21                   one tattoo, so we can just

22                   describe that one.

23          A        There would have only been one

24    visible.

25          Q        How many do you have total on

```
 1                    P.O. Adam Gorman
 2   your forearm?
 3                    MS. JONES:  That wasn't a
 4                    question that she permitted.
 5                    MR. SHIELDS:  I am asking it
 6                    now.
 7                    MS. JONES:  Do you want to
 8                    call her back?  We already
 9                    talked about this.  We're
10                    describing the tattoos that are
11                    visible in the body-worn camera
12                    and it is one and that is what
13                    we're going to do.
14          Q     How many tattoos do you have on
15   your forearms?
16                    MS. JONES:  Don't answer
17                    that.
18                    MR. SHIELDS:  I am not
19                    asking him to describe it.  I am
20                    asking how many he has.  We can
21                    go back to the video.  Maybe he
22                    only has one and that is the end
23                    of it.
24                    MS. JONES:  I thought he
25                    said only one would be visible.
```

250

1                         P.O. Adam Gorman

2                   MR. SHIELDS:  That wasn't my

3            question.

4       Q      How many tattoos do you have on

5    your forearms?

6                   MS. JONES:  That wasn't

7            allowed.

8                   MR. SHIELDS:  Are you

9            directing him not to answer?

10                  MS. JONES:  We just called

11           the Judge.

12                  MR. SHIELDS:  We will mark

13           that for a ruling.

14                  That is not my recollection

15           of the Judge's ruling.

16                  MS. JONES:  Hold on.  Let me

17           go back to my notes.

18                  There is no particular

19           relevancy.  He is not required

20           to show.  He just needs the

21           tattoos that are depicted in the

22           body-worn camera.  You can show

23           the body-worn camera and he can

24           confirm that these are his

25           tattoos and he can describe

1                    P.O. Adam Gorman

2                    them.  We can pull up the video

3                    if you would like so you can

4                    confirm those are his tattoos.

5          Q      What is this tattoo right here

6    on your left arm above your watch?

7          A      Yes.  Yes.  That is me.  That is

8    just the guy in front of me.  That is me.

9    That tattoo is -- that portion you can see

10   there are of dog tags.

11         Q      And do the dog tags have any

12   writing on them?

13         A      They do.

14         Q      And what is the writing?

15         A      The one in this freeze frame, I

16   guess you would say, the furthest one to the

17   left says OEF Roman Numeral 13.

18         Q      What is OEF Roman Numeral 13?

19         A      Yes.  That's the one furthest to

20   the left.

21         Q      What does that mean?

22         A      Operation Enduring Freedom.

23         Q      Is is that from Iraq?

24         A      Afghanistan.

25         Q      And 13 is the significant of a

```
1                    P.O. Adam Gorman
2    year or something like that?
3         A        The year I deployed.
4         Q        I'm sorry.  The other one?
5         A        The other one depicts two last
6    names of two of my squad members that were
7    killed in Afghanistan.
8         Q        Thank you.
9                  I remembered, I thought, a
10   larger tattoo on your forearm.
11                 Is that depicted in the
12   body-worn camera video?
13                      MS. JONES:  We only saw one
14                 in the body-worn camera footage.
15                      MR. SHIELDS:  I am just
16                 asking him a simple question so
17                 we don't have to watch the whole
18                 video all over again.  I am
19                 trying to make this easier.
20        A        What you are, I am assuming,
21   recalling is if you go back and when I
22   conducted a search of his ankles, when I bent
23   over to frisk his ankles, you can see the
24   full depiction of the tattoo on my left arm.
25        Q        Is that a different tattoo than
```

1                    P.O. Adam Gorman

2    the dog tags that we already described?

3        A       No.  It is all in one.  It is

4    just the bigger picture of it.  The dog tags

5    that are in the tattoo, the dog tags are

6    being carried by an eagle's head.

7        Q       And the eagle's head, I am

8    assuming, is similar to -- it's significance

9    would be the eagle's symbol of America?

10                   MS. JONES:  Objection.  I

11                   think we described the tattoos.

12                   We can move along.

13       Q       He was about to answer the

14   question.  I am literally about to finish.

15                   MS. JONES:  For the record,

16                   you need to mark this section

17                   describing the tattoos as

18                   confidential.

19                   MR. SHIELDS:  You can make a

20                   motion for protective order for

21                   that.

22                   MS. JONES:  Really?

23                   MR. SHIELDS:  Yes.

24                   Pursuant to our protective

25                   order, you can file the

1             P.O. Adam Gorman

2        procedures in the case about

3        that.

4            And I have no further

5        questions.

6            MS. JONES:  I guess it is on

7        the record that I am asking that

8        it be marked as confidential.

9            MR. SHIELDS:  And I am

10       asking you to file the

11       procedures in the

12       confidentiality order that was

13       ordered by Judge Payson.

14           (Continued on next page to

15       include jurat.)

16

17

18

19

20

21

22

23

24

25

255

1

2                    MS. JONES:  And you don't

3              have any more questions?

4                    MR. SHIELDS:  I am all set.

5                    MS. JONES:  Excellent.

6              Thank you.

7                    MR. SHIELDS:  Thank you.

8                    (TIME NOTED: 4:12 p.m.)

9

10                              _____

                               P.O. ADAM GORMAN

11

12   Subscribed and sworn to

13   before me this_____ day

14   of_____, 2022.

15

     _____

16        NOTARY PUBLIC

17

18

19

20

21

22

23

24

25

256

```
 1
 2                    INDEX TO TESTIMONY
 3
 4   WITNESS                 EXAMINATION BY        PAGE
 5   P.O. Adam Gorman    Mr. Shields              6
 6
 7
                     INDEX TO EXHIBITS
 8
     PLAINTIFF'S
 9   EXHIBITS                DESCRIPTION          PAGE
10   A   Personnel file                          29
     B   Warrant List Training Bulletin L1597    111
11   C   Training Bulletin L3499                 130
     D   Warrantless Searches of Curtilage       133
12   E   General Order 415                       137
     F   General Order 340                       151
13   G   Body-worn camera of incident            167
     H   Incident Report No. 2018-0009117        230
14   I   Arrest report                           237
     J   Incident report                         241
15
16            TO BE PRODUCED/INSERTED
17   DESCRIPTION                                 PAGE
18   Additional Certificates not produced        34
     Documentation concerning COR119            155
19
20
             QUESTIONS MARKED FOR A RULING
21
     QUESTIONING ATTORNEY               PAGE/LINE
22
     How many tattoos do you have on your  250/4-5
23   forearms?
24
25
```

Enright Court Reporting   (631) 589-7788

```
 1
 2                      C E R T I F I C A T E
 3
 4          I, ROBYN LEHRMANN, a Shorthand Reporter
 5     and Notary Public of the State of New York,
 6     do hereby certify:
 7
 8          That, P.O. ADAM GORMAN, the witness
 9     whose examination is hereinbefore set forth,
10     was duly sworn, and that such examination is
11     a true record of the testimony given by such
12     witness.
13
14          I further certify that I am not related
15     to any of the parties to this action by blood
16     or marriage; and that I am no way interested
17     in the outcome of this matter.
18
19
20
21                                     June 2  2022
22

       ROBYN LEHRMANN                      DATE
23
24
25
```

**A**

.m 1:13 48:8 89:2
abated 114:2,9,10
  114:11
able 69:21 78:17
  83:2 115:15
  125:11 179:10
  187:4 211:15
  224:17 230:24
abnormal 171:2
above-entitled 1:16
absolutely 211:24
academy 11:15,18
  11:20 13:22 14:7
  14:10,14,18,22,24
  16:2 18:16,18,19
  31:10,13 32:11,14
  32:16,18 57:11,16
  59:3,6 63:16 66:9
  66:10,12,17 85:17
  101:8,10 103:5
  105:16 106:13,14
  106:16,18 116:11
  141:10,11 157:10
  157:23 158:9
  160:4 189:19
accepted 12:20
access 79:8 115:8
  123:18 233:24
accessible 78:9
accidentally 197:5
account 108:2,9,20
  108:23
accountable 15:23
accounts 109:2
accurate 56:19
achieving 184:17
acknowledge 3:14
  3:19
acquaintance
  181:22
act 37:14 52:23
acting 185:2
action 1:16 121:5
  123:7,11 127:15
  186:17 257:15
.ctions 141:22
  142:10 187:22

activate 169:23
activated 240:24
activation 169:22
active 10:10,24
  136:11 193:15,17
  193:25 195:17,22
actively 36:22
  49:23,25 112:9,20
  145:9
activities 50:9
  52:18 138:25
  191:15
activity 49:24 58:20
  172:12 191:18
  237:25
Adam 1:15 5:1,8
  6:1 7:1 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1,24
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1,22
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1
  79:1 80:1 81:1
  82:1 83:1 84:1
  85:1 86:1 87:1
  88:1 89:1 90:1
  91:1 92:1 93:1
  94:1 95:1 96:1
  97:1 98:1 99:1
  100:1 101:1 102:1

103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
204:2 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1

246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:10 256:5
257:8
add 206:14 210:25
addition 106:12
  185:7
additional 18:22,24
  25:8 34:14,24
  51:2 57:25 63:24
  63:25 64:3,4,9,13
  65:20 66:15,22
  67:5 69:2,6 70:20
  74:10,18,25 75:16
  82:12,17 83:7,12
  86:3 87:12,15
  88:5,8 90:8,18
  91:2,8,14,23
  96:11,15,23 98:14
  101:2,5 106:19,22
  109:19 256:18
Additionally
  116:14
address 5:11 7:24
  8:4,4 49:21 97:16
  171:7
addressing 46:10
  49:8
adjacent 208:23
adjustments 68:3
administer 3:22
administered 3:21
administration
  9:14
advance 8:10
  239:22
Afghanistan
  251:24 252:7
afield 40:13 206:19
  212:8
African-American
  205:16
after-action 244:8
  244:11,16,23
against- 1:7
agencies 12:7 15:9
aggressive 60:5

162:10,14,20,22
163:21 167:12
179:14 234:12
aggressiveness
  162:19
ago 9:17,18 21:17
  66:21
agree 4:8,10 6:10
  8:5 68:17,21 87:2
  95:18 96:4 114:17
  148:11 159:2
  184:7 245:21
agreed 2:20,25 3:5
  179:18
agreement 4:4,5
ahead 70:25 90:3
  138:2 200:9
  211:22
AI 97:14
al 1:8
Alabama 84:18
Alagrin 241:10
Algarin 21:4,11
  125:12 129:3
  148:8 175:4 176:9
  176:17 177:23
  178:5 193:18
  209:4,14 217:8,17
  238:8 245:19
Algarin's 22:5
allegations 129:15
  188:11 246:25
alleging 129:12
allow 115:20 205:3
  222:3 227:23
allowed 108:19
  145:10 250:7
allows 60:18
altered 98:11
altogether 219:17
America 253:9
amount 10:5 70:5
  104:14 115:8
  128:12 150:4
  175:10 176:2
  235:20
amounts 126:24
analyze 83:16

and/or 50:9 51:7
  53:9 54:6 154:18
  157:10
angry 162:24
animal 152:19
  157:20,24 158:8
  160:3
animals 123:17
  158:6,7 199:23
  221:21
ankles 252:22,23
annoy 205:20
annual 25:12,13,16
  26:4
annually 25:25
answer 6:4 7:3
  26:12 56:14 89:11
  109:14 124:17,19
  126:10 136:2
  189:4 200:17
  213:17 215:5
  231:24 249:16
  250:9 253:13
answering 136:15
  149:10 210:17
anticipated 172:3
anticipation 171:13
anybody 20:18
  182:2,17
anymore 114:12
  181:5
anyway 93:13
apart 75:6
apologize 207:5,18
appear 82:11 122:7
  167:16
appearance 120:20
  239:11
appeared 166:10
  166:12
appears 166:7
Appendix 144:10
applicable 12:12,16
  116:18 120:22
applied 131:22
  148:3
pplies 87:3
apply 59:7 135:17

147:20,24 148:10
  148:14 149:4
  217:13
appreciate 41:6
  53:12 54:25 55:16
  232:23
appreciated 53:15
  54:23 55:9,11,12
  55:14
appreciates 53:9
apprehend 172:5
apprehended 174:2
  174:22 175:17
  178:3
apprehending
  172:9
approach 43:4
  50:11 53:20 89:19
approached 234:5
  234:10
appropriate 91:9
  227:19 228:5
approve 156:13,15
April 233:6
area 37:5 39:5,11
  39:18,21,25 44:3
  51:5,6,15,18 52:2
  58:10,14,16 62:14
  115:9,10,23
  128:18 134:13
  136:12 138:23
  139:7,11 166:19
  166:22 168:24
  169:2 177:25
  180:16,24
areas 49:22 58:15
  227:24
argument 187:20
arm 99:21 209:24
  210:16 211:11
  213:5 226:14
  229:16 231:20
  232:15 248:14,14
  251:6 252:24
armed 120:10
  122:3
arms 200:5 201:8
  202:12,21 204:11

204:16 210:10
  225:13 247:22
Army 10:10 11:4
  47:17
arrangement 3:25
arrest 12:21 33:5
  43:19 92:7 112:11
  113:22 120:20
  137:19 145:21
  146:5,9,21 151:14
  237:5,9,10,15
  256:14
arrested 44:10
  93:13 119:12
  187:2 239:10
arresting 85:21
  119:3
arrests 87:5
arrival 93:4 172:24
  173:17 233:18
arrived 42:16 92:15
  128:17 173:9
  241:4,11
articulate 224:25
  231:5
aside 57:16 83:6
  243:20
asked 66:21 91:8
  94:20 100:20
  110:3 129:3 130:8
  131:15 158:13
  176:9,25 177:23
  181:14 186:20
  193:10 194:17
  195:15 200:13
  204:4,14 209:7
  210:7 220:22
  221:4 226:7,18
  229:13 242:3
asking 40:19,21
  57:25 73:18
  141:13 188:13
  205:10 220:9,10
  222:5 226:14
  229:19,20 248:9
  249:5,19,20
  252:16 254:7,10
assault 119:16

149:11,14 150:2
assertive 60:4
assertiveness 60:13
assess 244:20
assessment 68:21
assign 64:9
assigned 22:7,9,19
  22:23 45:3 49:17
  78:15 225:22
assignment 30:24
assignments 45:8
assimilation 100:16
assisting 124:10,15
assume 6:5 31:19
  49:4 54:12 98:2
  106:22 121:21
  248:6
assuming 37:8
  97:25 193:20
  252:20 253:8
assumption 28:21
  55:23,24 74:21
  161:17
Athena 8:19,22
attack 163:21
attacking 163:16
  233:21 234:4
attempt 233:25
attempted 84:22
attempting 198:24
attend 57:20
attended 14:24
  28:8
attention 60:6
attest 147:25
attorney 2:8 19:22
  256:21
attorneys 2:4 3:12
  20:4,8,19
audio 169:18,24
  170:5,25
August 17:15
  134:22,22
Augustine 61:4
aunt 181:24
authority 37:17
  40:4 194:18
authorized 108:18

automatically
  99:25
Automobile 146:14
available 78:9
Avenue 2:5
average 138:22
  219:12
avoid 129:14
  164:23 191:17
  199:15 212:25
avoided 163:9
  164:25
aware 75:16 76:5
  87:6 177:24
  187:24 192:24
  198:22
awareness 164:10
Azzolina 79:20
  86:19

**B**
B 33:22 111:12,18
  113:18 122:21
  256:10
B-E-A-T-H 20:2
back 16:7 17:7 25:3
  30:2,3 41:21,23
  46:5 49:6 63:7
  73:7 81:11 89:25
  90:21 105:13
  111:4 125:25
  135:22 166:24
  175:9 193:2
  200:24 202:3
  209:3,13 216:7,17
  216:23 217:5
  224:14 229:5
  230:17 232:21
  233:2 239:6 247:6
  249:8,21 250:17
  252:21
backdrop 197:19
background 8:14
  8:15 60:3
backtrack 19:5
  129:4 175:5
  176:10 177:24
  209:7

**backtracking** 220:5
222:24
**backyard** 123:2
127:3,24 128:24
134:15 172:2
175:11,18,22
176:5,24 177:2
209:2 221:19
233:21,22,24
245:20
**backyards** 208:22
240:11
**bad** 65:3 129:21
185:8
**bag** 238:13,17
**bags** 238:18
**bail** 118:21 119:18
**bait** 85:22
**baited** 63:6 81:10
**barked** 178:24
**based** 28:21 31:19
36:10 50:21 56:6
68:22 74:22 98:11
98:15 116:4
133:22 138:25
141:24 148:25
150:3 154:16
161:11 162:19
167:9 185:17,19
187:19,22 223:25
240:5,6
**basic** 31:7 163:20
**basically** 12:23
13:10 17:16 30:21
32:2 72:17 97:22
132:5 135:11
136:19 137:2
140:3 142:22
154:5 169:25
170:2 171:17
191:25 196:22
208:11 209:9
226:8 240:9 241:3
244:20
**basis** 25:12 95:22
130:6 184:4
206:16 215:3
218:17 231:23

**Bates** 29:19 44:20
65:19 111:20,21
130:19 133:6,18
137:12
**Bates-stamp** 76:22
**Bates-stamped**
76:14
**baton** 163:11
235:16 236:2,3,6
237:3
**beat** 45:3 49:18
106:7
**Beath** 19:20
**beating** 191:17
**began** 105:8
**beginning** 239:18
**behalf** 76:3
**behavior** 50:8
58:12
**belief** 124:12
126:19 127:3
139:22
**believe** 15:9,14
27:19 34:11 35:9
43:21 48:13 59:25
69:20 74:9 75:4
78:6 79:11 112:17
112:19 114:6
121:2,9,14 122:24
123:23 124:3,23
126:8,11,15 127:6
127:12 132:12
135:13 138:24
139:6 150:11
151:12 155:11
162:16 165:6
174:5 186:7,10
210:4,7 225:2
246:22
**believed** 151:9
**believing** 139:3
**benefits** 67:20
**bent** 252:22
**better** 104:23
123:19 129:14
139:15 146:12
179:10,16,19
184:23 245:6

**bias** 187:7 189:15
189:21 226:18
**bicyclist** 30:20
**big** 117:10 178:14
**bigger** 65:10,11,14
253:4
**bike** 30:22
**bit** 25:4 27:6 49:10
65:7 68:11 87:11
92:14 164:23,25
169:6 192:20
193:8 231:3
**bite** 151:20
**black** 24:22 55:20
181:10 204:8
205:11 208:20,25
212:5 225:24
226:3 238:9,13,17
**blacks** 181:16
**blank** 139:4
**bleeds** 167:12
**block** 50:4 52:5
**blocking** 37:24
42:3 44:10
**blocks** 52:3
**blood** 257:15
**bloody** 136:16
**board** 144:21
**body** 51:6,8 60:8
78:18 167:18
169:20 170:17
**body-worn** 22:4,5
77:3,7,16,23 78:3
78:8,12,13 79:21
79:25 80:7,18
81:9 83:8,15,17
83:25 84:4,11
85:5,7 94:2,21
128:6 167:21
204:3,6,10 211:13
213:22 214:6
217:8 225:5,13
231:11,17 243:15
243:22 244:20,25
247:10,12 249:11
250:22,23 252:12
252:14 256:13
**book** 7:7

**books** 144:24
**boss** 91:21
**Boston** 39:4,24
42:7 44:9
**bottom** 30:11 35:15
36:5 74:14,22
174:15 178:12
**Boulevard** 5:14
**boundaries** 23:10
**boy** 81:11,11,12,12
85:23
**break** 24:17 47:24
88:10,22 222:8
**breaking** 89:20
**breast** 73:14
**breed** 161:24
162:13
**breeds** 162:11
**Bridge** 23:14
**brief** 89:3 159:19
**bring** 82:21 221:20
**bringing** 119:3
**brought** 60:5
185:14 188:20
206:10 238:16
**buddy** 181:21
**bull** 167:6
**bulldogs** 162:10
**bulletin** 111:11,19
126:14,22 130:11
130:18,24 134:17
147:10,16 256:10
256:11
**bulletins** 15:18
132:18 147:4,15
**bulls** 162:4,7
**bunch** 37:11 200:5
**bush** 191:17
**business** 7:24 8:3
9:14 55:5
**button** 98:7 169:13
170:3
**buy** 72:18

———————————
**C**
———————————
**C** 2:2 130:12,17
256:11 257:2,2
**C-A-L-K-I-N-S**

16:23
**C-L-I-N-T-O-N**
22:14
**C3** 79:16
**cage** 165:25 178:15
**calendar** 215:16
**Calkins** 16:20,22
17:10
**call** 34:25 36:23
38:25 40:25 42:21
92:19,20,22 93:7
107:10 155:14
156:16 159:16,17
165:23 166:16,24
166:25 167:3,12
174:7,8 194:8
201:12,14 202:24
203:18 213:2
232:20 233:18
240:7,8 241:8
244:10 249:8
**called** 35:11 79:15
81:10 166:25
238:20 244:7
250:10
**caller** 52:17 93:3
166:21
**calling** 52:17 57:18
85:22
**calls** 49:19 51:5
56:12
**cam** 169:20
**camera** 22:4,5
73:13 77:4,7,16
77:23 78:3,8,12
78:14 79:21,25
80:7,18 81:9 83:8
83:15,17,25 84:5
84:11 85:5,7 94:3
94:22 128:6
167:19,22 169:14
170:2,8,14,17
171:3 204:3,6,10
211:13 213:22
214:6 217:8 225:5
225:13 231:11,17
241:3 243:15,22
244:20,25 247:10

247:12 249:11
250:22,23 252:12
252:14 256:13
**camped** 239:25
**capture** 170:10
**car** 37:9 42:25 50:3
50:11,19 52:7
81:13,15 84:19,25
119:8 173:13
241:5
**care** 12:24 70:2
88:13
**career** 22:22
**carried** 253:6
**carry** 72:3
**cars** 191:25 208:20
**case** 7:8,21 20:9,25
21:5 29:15 40:14
89:12 113:20,25
114:23 116:4,8
123:3 125:4 126:3
134:18,24 135:4,9
136:14 139:9
140:14 141:2
143:4 145:17,17
152:23 185:4
194:14 206:11,22
207:19 208:4
209:18 212:9,14
225:8,17 245:24
246:6 254:2
**cases** 7:17 218:20
218:21
**casings** 197:3,4
**category** 136:6
**caught** 113:5
**cause** 13:14 43:21
92:9 120:11,25
121:14 123:6,22
124:2,23 126:8,15
127:6,11 132:12
132:21 138:3,9,19
139:2,8,17 140:11
185:20,24 186:7
192:10
**center** 102:22 103:3
103:4,7,16
**certain** 58:12

**certificate** 29:2
30:3,11 31:11,21
32:7 33:10 34:5
63:20,23
**certificates** 29:6,10
34:2,12,17,20,25
35:3,8 256:18
**certification** 2:22
32:14
**certify** 257:6,14
**chain** 113:9
**chain-link** 166:2
**chains** 164:11
**chance** 81:12
133:20,24
**chances** 220:5
**change** 48:4 82:13
126:25 222:21
**changed** 69:7
**changes** 223:19
**characterization**
187:23
**charge** 185:20,24
**charged** 144:5
186:13,21
**charges** 92:9
185:12,13
**Charles** 1:4,5
**chase** 43:15 52:22
58:18 136:11
173:19 218:10
219:8 220:3,6
**chased** 44:8 50:20
50:23 93:11
**chases** 218:18
219:25 220:8
**chasing** 52:24
151:3
**chatter** 63:7
**check** 196:16 197:4
238:20,21,24,25
239:2
**checking** 239:3
**Chihuahua** 167:5
**Chihuahuas** 167:10
**choice** 48:16 98:4
**choices** 183:20
**choose** 108:22

**chooses** 60:7
**Chuck** 186:20
**Church** 2:9 6:17
**circumstance** 136:7
136:17 148:4
199:7
**circumstances**
37:16 40:3 50:16
50:20,22 60:17
80:9 86:21 87:7
112:5,6,8,15
115:19 116:3,17
117:14 120:4,9,21
121:23 122:11,23
125:4 126:3
129:25 132:11,11
135:24 136:13
140:11,16 141:4
142:2 144:18
146:18 148:25
149:5 154:16
192:8
**circumstantial**
128:15
**citizens** 62:2
**city** 1:8 2:8 4:10
6:16 8:5 15:16
19:22 29:19 30:22
34:13 44:20 65:19
111:16 137:13,4
141:19 152:17
181:22 185:5
204:18,23 205:7
218:6 219:4
221:13 223:19
228:2 238:20
246:14,19
**City's** 90:6 227:20
**civil** 7:21 113:24
**civilian** 194:14
**claim** 157:4 208:6,7
212:2
**claims** 188:19
206:10,15 208:4
212:14 225:8,16
**clarification** 8:20
16:21 19:24 22:12
23:18 57:13 140:9

207:6
**clarified** 99:20
**clarify** 24:18
**class** 57:20
**classes** 9:15,19
**classified** 113:23
198:13
**classroom** 96:18
**clean** 145:3
**clear** 28:11 37:3,6
37:17 39:8,25
40:4 42:8,15,16
42:23 43:15
113:24 209:19
212:24 224:23
**clearing** 49:11
**clerk** 203:11 215:10
**click** 98:7
**client** 175:23
186:20 205:20
208:9,11 209:12
209:16 212:17
**client's** 128:19,24
130:8 147:20
148:9 208:8 209:2
209:8 217:9
245:19
**Clinton** 22:11,17
22:20,23 23:10
24:9,17 47:3,5,7
51:14,18 53:10,16
55:18,25 56:25
66:19 91:21 96:14
96:16 153:23
160:13,19 161:11
161:12,15 162:6
169:4 225:23
**cloud** 79:6,8
**Club** 28:18,23
**clue** 190:19
**coding** 170:7
**coincidentally**
209:11
**cold** 84:22
**collected** 113:11
**college** 9:4,6,7,10
9:11
**color** 170:7

**combination** 12:6
**come** 147:14
155:19 160:23
167:3 185:12
193:4 198:14
216:6 234:18
235:7
**comes** 14:9 26:7
27:2 58:9 68:4
70:4 167:13
220:25
**comfortable** 89:5
211:5
**coming** 46:4 49:21
136:16 139:11
**comitted** 112:18
127:13
**command** 66:20
156:13
**commander** 154:4
**commanding**
153:15,20 154:15
**committed** 43:22
112:10 120:11
121:4,15 124:3,24
126:9,17 139:23
186:8 194:6,10
**committing** 43:22
124:13
**common** 85:20
151:12 163:20
185:4
**commonly** 151:7
181:21
**communicated**
69:8
**communicating**
182:18 183:3,7
**communication**
66:23 67:20
**communications**
184:3
**community** 9:11
46:12,14 53:3,5,8
53:17 54:5 55:17
60:16 69:9 117:11
182:19 183:2,8,14
184:2,13,14,19

205:14,17 227:3
227:12
companies 28:13
company 28:15
102:8
compare 33:10
compared 23:22
compensated
190:15
complaint 246:3
complete 14:13
17:25 18:7 142:7
143:6
completed 31:6
45:23 113:6
114:19 121:6
153:7 203:24
244:4
completely 41:9
106:15 206:9
completing 80:4
114:21
Completion 30:12
compliance 82:2
complied 72:16
comply 109:20
116:8 135:3
computer 30:16
78:21 99:24
156:11 201:24
203:5
computers 78:24
concept 104:21
134:9 199:21
concern 75:22
197:8 198:18
concerned 125:21
concerning 256:18
concerns 46:11
49:9
conclude 122:9
concluded 74:11
112:24 232:25
conclusion 140:5
conduct 64:19
140:20 192:10
conducted 143:3
242:15 252:22

conducting 138:19
conference 1:12
96:20 201:22
conferred 204:19
confidential 253:18
254:8
confidentiality
254:12
confirm 196:15
250:24 251:4
conflict 147:5
confrontational
81:14
confused 60:4
136:2
connotation 226:25
conscious 187:21
222:25
consent 3:24 114:4
114:24 115:21
127:21 128:23
129:15 130:3,9,24
131:14,22 132:7
132:14,22 135:19
141:4 146:15,15
146:24 176:5,25
178:8 186:16
220:22 221:4
222:13
consider 116:22,25
118:14 129:2
159:18 235:13
consideration
167:8
considered 63:25
81:22 117:14
129:7 136:9
235:14,19
consist 164:8
consistent 139:13
157:9
constantly 234:14
constitute 120:3
constitutes 124:8
contact 68:4 157:4
160:23 166:20
195:4
contacted 66:20

contacts 46:14 53:5
contain 29:10
contained 34:13
238:18
container 115:24
117:19
containing 238:18
context 7:16 138:19
226:13
continue 22:16
41:17 86:12
190:21 216:5,25
230:2
continued 67:17
81:13 86:24
254:14
continues 116:15
continuing 149:15
contraband 124:7
124:21 125:6,7,8
125:18 126:5
143:25 175:22
176:24 185:18
186:6 220:7
221:10
contract 10:12 11:9
control 68:3 147:6
157:20,24 158:8
160:3
controlling 98:12
conversation 19:12
68:13 93:23
232:25
conversations
46:18,22 122:8
182:17
cool 86:4
cooperated 238:15
cooperates 97:18
coordinator 156:17
156:21
copies 110:23
cops 84:4
copy 4:11 74:16
110:20 155:24
246:9
COR 76:21 236:21
COR1001 74:6

COR1040 76:14
COR109 157:8
COR119 155:17
256:18
COR1200 133:6
COR324 138:13
Corinthian 9:5
corner 37:7,12,15
37:18 39:4,4 42:8
43:16 44:2,6,8
58:12 172:20
corners 37:4 49:11
Cornetta 203:15,17
203:22 207:2,5,8
207:16,25 209:17
210:2,12 211:8,21
212:21 214:12,15
215:22 216:22
224:12,16,21
228:10,13 229:21
230:16,19,22
232:18,24
corporation 2:8
19:10,13 80:24
81:3,5 243:19
correct 11:2,10,12
11:13 12:9,14,18
13:2,5,12,23 16:5
16:11 17:11,18,23
18:6 19:4,15,23
19:25 22:25 24:4
24:20 25:2 27:22
31:11,23,24 32:19
33:19 38:10,23
43:23,24 44:3,24
45:14,15 47:11
48:5,19 51:15,19
56:5 59:4,9,14
62:5 64:11 65:5
66:11,14,18 69:5
77:4 81:17 82:3,7
84:7,8 87:9 88:4
90:9,10,24 91:6
91:13 92:2,12,24
93:8,10,16 95:2
95:16 97:24 98:16
102:23 103:5,6,9
103:10,21 106:20

108:21,24 109:23
110:2 113:14
116:5,9,12,19,20
117:12,16 119:5
121:12,19 122:4
122:13 123:9
125:7,9 126:18
127:17 130:10
132:19,24 135:5
135:14,21 136:21
140:17,24 143:16
143:20 144:3,7
147:24 148:10
149:2,12,18
150:24,25 153:25
154:6,10,19 156:2
157:2 159:23
160:6 161:5
163:23 164:17
165:3 170:6,15
171:19,24 172:6
172:10,20 173:4
173:25 174:5,12
174:19,23 175:18
175:19,24,25
176:21 177:19
178:2,9,16 179:23
183:3,4,15 185:21
186:8 191:22
192:5 193:19
194:20 195:20
196:4 197:23
205:5 207:23
209:25 210:19,20
211:9 214:8,14
215:20,21 217:11
217:15 218:2,12
222:14,15,19
223:4 233:8,16
234:9 236:11
237:4,20 239:5,15
241:12 242:6,7
245:10,13,21
246:3
cough 141:6
counsel 2:8,21 3:24
19:10,13 80:24
81:3,5 204:18

224:12 229:21
230:16 243:19
**counted** 190:14
**country** 83:19,20
85:6
**County** 150:18
**couple** 7:15 10:8
14:17 20:17 21:6
21:8 23:13 62:23
70:15 112:13
115:19 137:25
138:7 176:14
193:8 198:11
202:13 207:2,17
208:20,21 219:11
219:18 224:10
237:6
**course** 9:12 31:7
57:17,24 58:2
64:2
**court** 1:2,18 3:9 5:6
5:10 14:4 110:25
111:3 113:20,21
116:4,6 120:3
130:25 134:18
135:4,8 207:10
224:14,20 232:20
**courts** 120:2 131:12
148:23
**cousin** 181:18,20
181:24 189:6,8
**cousins** 180:11,20
181:3,7,9,14
182:7 226:10
**cover** 130:6
**covered** 217:14
**covers** 47:25
**CR** 95:10
**CR1000** 69:20
**CR999** 69:20
**creed** 187:23
**crime** 24:3,5,8
36:23 39:22 43:22
43:22 44:3,6
51:14,18 52:2,5
58:11 112:10,18
120:8,11 121:3,6
121:10,14 122:9

122:12 124:3,8,13
124:15,23 126:8
126:15 127:12
132:13 138:24
139:3,5,8,22,23
144:6 148:22
149:13,20,21
150:23 185:21,24
186:8 194:2,5,8
194:10,25 195:3,4
196:10,12
**crimes** 13:11 24:11
24:12,13
**criminal** 7:17 31:22
74:15 185:12,13
**crisis** 33:4
**criteria** 140:22
**critical** 244:12
245:4
**critique** 59:11
**cross** 217:20
**crossed** 127:2,4
**curerent** 87:20
**curious** 70:17
**current** 118:22
**currently** 9:4,6,7,9
203:13
**cursor** 168:12
**curtilage** 133:5,9
134:9 148:16
256:11
**custody** 93:12
113:9 118:7
124:12
**cut** 240:12
**cutting** 186:12
218:7

**D**
**D** 5:2 133:3,10
152:18 256:11
**daily** 184:4
**damage** 221:15
**danger** 112:19
**dangerous** 197:25
222:18
**date** 11:11 18:14,15
29:24 31:14,20

34:8 46:19,20
59:18,19 111:14
130:14 133:11
137:9 152:3
159:21 164:24
167:25 189:18,21
190:17 220:24
221:2 230:11
233:9 237:13,24
241:23 257:22
**dated** 32:8 44:17
59:17 61:3 65:24
75:2 88:6 90:9
91:15 233:6
**daughter** 5:21
192:15,17,22,24
**day** 18:17 21:6
27:11 47:9,12
117:6 144:16,23
161:6,7 171:18
172:17,21 173:3,8
173:12,20 174:3,7
180:24 181:16
188:16 190:10,14
191:2 217:23
239:17 240:4,5
241:15 255:13
**day-in** 117:6
**day-long** 190:5
**day-out** 117:6
**day-to-day** 95:22
**days** 21:7,8 75:6
144:23 191:23
192:7
**DCJS** 31:25 32:6
34:4 74:20
**dead** 106:7
**deadly** 97:19 99:10
99:13 100:7,19
152:11
**deal** 37:5 39:3
49:14 117:10
179:6,10
**dealers** 171:14
**dealing** 49:12 60:16
101:16,17 182:7
226:10
**death** 121:8

**December** 61:11
**decide** 99:15
**decides** 154:11
**deciding** 69:11
**decision** 48:15 82:9
179:16
**deemed** 131:23
**deescalate** 60:19
86:4,12
**deescalation** 63:13
66:24 67:20 86:9
99:8 100:7,21
**defendant** 1:16
129:11 207:24
208:2 209:5
213:13
**defendant's** 231:12
**defendants** 1:9
207:22
**defense** 117:3
232:13
**defensive** 26:19
28:3 103:14
**define** 118:4 189:7
**defines** 138:3
**definitely** 89:18
139:25 184:15
**definition** 114:17
117:4 138:6,12
**Definitions** 139:14
**definitive** 52:14
**delay** 224:17
**delivered** 90:21
246:10
**Demographically**
24:16
**demographics**
24:20 55:25
225:20
**Dempsey** 1:4,5
186:20
**Dempsey's** 122:20
123:2 127:3,20
**Denny** 16:25
**department** 20:25
40:23 61:24 71:16
72:2,6,9,21 75:23
76:4 77:12 78:22

78:25 83:14 84:13
103:9 110:8
116:25 131:8
132:18 135:7
140:20 141:3
157:4,12 159:8
160:13 189:16
193:24 194:24
195:12,24 199:6
226:20 230:13
**department's** 15:17
108:13 109:21
**department-issued**
197:14
**departmental**
81:19
**departments** 12:4
102:25
**depend** 167:4
**depending** 198:12
**depends** 43:3 54:3
117:2 178:21
185:15 197:19
**depicted** 231:15
232:15 250:21
252:11
**depiction** 252:24
**depicts** 252:5
**deployed** 81:16
252:3
**deposed** 7:20
**deposition** 2:23 3:6
3:13,16,17 4:16
6:12,15 19:8
20:12,19,22 40:11
41:3,5,13,16 89:6
94:13 188:22
203:25 204:13
205:2 209:23
212:16 213:6
215:19 216:5
225:19 227:21
228:6 231:24
243:9,14
**depositions** 215:2
**DeSabatino** 238:5,6
241:11
**describe** 23:3,8

50:2 51:25 95:17
115:19 157:18
165:21 187:15
201:4,19 204:17
204:21 205:25
206:12 210:10,16
210:23 212:18
213:14 229:17
231:14 232:14
247:8,16 248:22
249:19 250:25
described 39:24
51:13,17,22 80:21
85:9,14 93:3,7
169:3 212:11
217:22 253:2,11
describes 113:19
134:18 247:21
describing 49:16
52:18 92:19
244:19 249:10
253:17
description 23:20
52:19 93:2 114:18
256:9,17
designed 206:21
desktop 79:5
destroyed 121:10
121:17 123:8,12
127:16
detail 31:3
details 21:16 80:11
detain 112:11
146:12 185:25
detained 126:21
146:19 185:10
186:25 205:12
212:6 238:20
detaining 43:19
deter 36:23
determination
37:22 154:16
247:25
determinations
215:11
determine 194:9
216:12
determined 92:8

develop 46:14 53:5
developed 199:15
device 78:14
devise 241:8
devised 173:2 240:4
dial 79:9
difference 33:20
34:2 47:8 96:8
112:16 138:17
different 12:6
13:11 16:13,15
33:16 39:7 61:7
68:24 83:18
104:23 108:2
112:8 120:2
129:22 135:25
136:3,4,10 162:13
183:20,24 186:11
187:22 212:2
222:9 242:12
252:25
differently 227:2
difficult 62:17
197:21
difficulties 40:8
difficulty 38:2
digits 168:6
diligent 13:7 55:16
direct 126:12 127:9
136:11 154:8
181:23 200:10
directed 152:19
directing 200:17
250:9
disagree 118:8
198:5
disagreed 82:8
disagreements
95:21
disallowed 113:21
disappear 125:10
disburse 37:13
39:13
discarded 220:7
221:10 222:24
discharge 152:19
198:9
discharged 193:25

194:12 197:9
discharging 198:15
disciplinary 67:10
67:13,14
disciplined 67:9
discovery 29:14
40:21 111:17
discrimination
206:16
discuss 62:7
discussed 67:25
75:5 92:13 95:14
143:17 199:11
240:25
discusses 77:3
discussing 68:5,8
79:19 92:21
235:22
discussion 4:21
45:22 46:6 49:6
68:6 88:24 89:23
151:21 199:16
200:21 203:7,10
discussions 46:9
81:2 159:19
disorderly 24:11,13
dispatch 166:25
display 209:24
displayed 247:9
displaying 213:4
215:7
displays 60:8
dispute 203:20
209:20 213:11
disputes 212:24
213:4
disregard 196:21
disrupting 37:20
distance 163:18,25
198:9 221:12
234:13
distressed 125:22
125:23
distribution 155:24
156:5,6
DISTRICT 1:2,2
Division 31:22
74:14

document 30:11
59:20 76:13 77:3
111:23 113:17
115:18 131:3,8,19
133:4,6,13,23
137:22 141:21
142:10,16 146:25
154:20,24 155:4
246:10
documentation
155:9,12,15
256:18
documented
142:19
documenting
142:17
documents 29:19
30:5 75:20,23
dog 5:21 100:14,17
125:22 128:19
158:15,19,22
162:11,15,15,19
162:23,24 163:4,6
163:10,15,21,25
164:6,11,16,23,25
165:6 166:7,10,12
166:14,22 167:2,4
167:9 178:18,22
179:22 192:18
193:21,22 197:15
197:24 198:25
199:7 206:18
208:8,13 209:12
209:13,15 212:3,7
221:19,23,25
222:3,11,17 223:7
223:16,22 224:3
233:21 234:5,16
234:18,22,23
235:2,9,16 236:14
237:2,2,3 243:4
245:2 251:10,11
253:2,4,5
doghouse 178:15
178:19 180:2
dogs 157:15 158:5
158:11 159:5,20
160:2,9,23 161:14

161:23 162:6
163:19 164:21
165:13 167:11
179:15 199:12,22
219:25 233:18,19
233:20 234:3,8,9
234:15,22 235:7
240:17
doing 6:15,16 10:21
55:16 57:6,20
67:2,22 99:12
145:9 204:13
208:16 228:7
244:23
domestic 136:14
door 127:20,25
128:23 129:18
136:15 149:9
166:4 175:23
176:4,8 177:16
178:7 193:2
209:13 217:17,18
220:22 221:4,18
222:2 245:17
download 79:14
downtime 49:17
56:9 144:22
downtown 119:8
draw 165:12
drawing 139:4
drive 49:22 50:3,10
118:16,17 173:13
drivers 49:3
drives 84:23
driveway 165:25
driving 118:19
160:18
dropped 238:13,17
drops 141:7
drove 191:25
208:19 238:8
drug 37:5 39:5,21
49:12,15,22 52:15
139:11,13 149:20
150:23 171:14
191:17 237:25
drugs 24:15 51:10
52:21 65:3 126:23

150:11,12 151:6
181:2 226:11
**drunk** 49:3
**DT** 63:15 103:12,13
103:18
**Duck** 100:6
**due** 235:19
**duly** 5:3 257:10
**duplicate** 33:12
34:7
**duties** 229:2
**duty** 10:10,24 72:4
107:10 163:4
**DWI** 118:13,16
**DWIs** 15:9
**dynamic** 137:19

**E**

**E** 2:2,2 137:7,12,16
256:12 257:2,2
**eagle's** 253:6,7,9
**earlier** 51:13,17
74:5 92:14,21
110:3 149:8
153:13 159:13
165:20 166:9
179:18 196:9
217:14,22 236:25
240:25 242:4
**easier** 198:13
252:19
**easiest** 202:2
**easily** 75:19 221:11
**east** 23:12,14,15
**easy** 106:3 123:17
202:12
**eat** 89:16
**education** 9:3
**educational** 8:15
**effect** 3:8
**effective** 104:2
106:21
**effectively** 183:3,8
**efforts** 45:2 46:13
53:4 54:7 56:8
**eight** 18:22
ight-hour 27:13
27:16 190:13

**eight-year** 10:12
11:8
**either** 24:22 28:12
44:8 49:21 114:23
142:20 160:18
199:18 221:14
225:3 235:8,25
237:2
**elaborate** 21:15
27:5
**elapsed** 235:20
**elbows** 248:14
**elements** 13:11
**Elliot** 2:6 4:7 5:20
40:7 65:18 188:10
189:7 203:22
**else's** 114:22
**emergency** 136:20
136:23,25 148:24
**emphasize** 86:19
183:2
**emphasizes** 148:21
**emphasizing**
183:13,25
**enclosed** 233:22
**enclosing** 233:23
**encountered**
219:24
**encourage** 45:7
183:19
**encouraged** 56:24
**ended** 14:10,12
17:12 31:18 234:7
234:24
**ends** 18:23 23:14
218:21
**Enduring** 251:22
**engage** 56:10
**enlisted** 10:9
**ensure** 110:10
130:7 182:19
**enter** 90:20 112:20
115:4,20 122:11
127:6,21 128:23
130:3 136:18
165:15 176:5,25
220:22 221:4
223:6

**entered** 148:8
179:25
**entering** 112:4
122:2 149:5 164:4
164:14 165:5
222:14,22
**entire** 22:22 51:14
90:3 192:25
**entities** 28:9,12
**entitled** 133:4
**entity** 1:8
**entries** 111:10,19
122:22 137:19
**entry** 113:22 114:2
114:22 120:5,13
120:14,19 121:2
122:19 129:13
130:7 208:6
**epidemic** 150:15
**equivalent** 31:8
**escalate** 60:20
86:11
**escape** 120:12
**especially** 70:3
75:17 141:22
143:12
**ESQ** 2:6,10
**Essentially** 79:7
**estimate** 7:14
127:23 161:13
**estimation** 161:17
**et** 1:8
**evaluating** 18:5
**evaluation** 35:15
44:18 45:23 49:7
53:2 56:15 59:19
59:20,23 60:9,23
61:12 62:6 75:5
192:8
**evaluations** 35:24
45:13,21 56:6,10
56:17,19
**evaluator** 44:22
**events** 31:2
**eventually** 144:4
234:7 235:3
**everybody** 118:23
**evidence** 87:24

113:7,10,12,12,15
121:9,17 122:25
122:25 123:8,12
123:14,18,18
127:2,4,16 139:3
139:5,23 155:18
186:7 196:23
197:2
**exact** 80:11 186:2
209:10
**exactly** 21:14 40:16
98:23 118:22
147:15 178:11
**examination** 1:15
5:16 110:14 201:3
201:17,18 204:25
206:4,24 213:8
256:4 257:9,10
**examined** 5:5
**example** 13:7 38:18
49:15 58:18 77:20
84:16 96:13
112:12 117:8
118:13 119:10
121:17 149:8,9
183:18 190:16
**examples** 36:24
49:10 117:18
118:12,20 139:15
**exams** 18:3
**excellent** 46:13
53:4 255:5
**exception** 116:17
120:21 131:11
140:22 145:19,23
145:25 146:6,14
146:14,18 147:19
148:9 149:5
217:12
**exceptions** 135:17
135:25 136:2
141:5 144:10
**excessive** 62:21
**exchange** 5:13
246:11
**exemption** 121:22
**exercises** 101:24
**exhibit** 29:17,22

73:21,23 90:7
110:19,21 111:12
111:18 113:18
122:21 130:12,16
130:17 133:10
137:7,12,16
151:19,25 152:6
167:20,23 224:11
230:9,12 237:9,11
237:15 241:19,21
**exhibits** 110:24
256:7,9
**exigent** 112:6,7,15
116:17 120:4,9,21
122:22 129:25
132:10,11 135:24
136:7,13,17,19
141:4 146:17
148:25 149:4
**exists** 139:23
**expected** 240:2
**experience** 9:23
17:18 56:4 69:4
149:3 161:12
162:15 167:10
219:7 220:11
223:25 227:22
**experiences** 185:8
223:3
**explain** 45:25 48:20
104:11 113:2
114:8 119:25
120:16,24 184:21
**explained** 67:17
**explore** 227:23
**exposure** 179:8
**expressed** 55:15
191:14
**extent** 34:23 35:12
155:7 213:20
**extra** 47:23 96:7
**extremely** 121:22
**eye** 136:13
**eyes** 104:17

**F**

**F** 151:25 152:6
256:12 257:2

F-word 81:11 85:23
face 84:21
Facebook 108:9,23
faces 180:25
facility 11:22
facing 150:8 185:12
fact 44:2 125:7
    126:5 185:18
    192:6 206:8 212:4
factor 52:23,25
    69:11 87:24 123:5
    123:6 131:25
    140:11 198:14
factors 38:12 40:2
    51:4 115:5 119:25
facts 139:22 140:4
    140:6,10 142:2
    143:14
failed 92:18
fair 45:6 55:22,24
    67:8 86:22 87:8
    91:11 92:10
    104:24 105:2,24
    137:4 139:16
    146:21 160:20
    161:16,17 175:9
    184:5 192:4
    196:24 197:16
    220:15
fall 122:20
falling 100:2
familial 181:23
familiar 15:22
    111:25 131:5,6
    133:13,23 137:23
    152:15 168:24
    172:18 180:14,24
    198:6 241:14
familiarize 91:9
    110:6
family 24:10
    130:25
far 6:8 9:25 26:8
    40:12 98:13
    105:19 177:24
    206:19 212:8
    225:15
farm 115:12

fast 197:14,20
fast-paced 104:18
    235:21
father 1:4 5:21
fathom 219:2
fatigue 70:4
fatigued 70:9
favor 72:14
February 32:8
    59:17,20
federal 214:25
feel 46:4 53:8,12,15
    64:6 70:8 89:5,12
    94:17 185:6
feeling 184:23
feet 112:13 115:13
    115:14 198:2,8,11
felon 122:3
felony 121:4 126:16
    127:2
felt 38:19 50:6
    64:12,22
FEMA 32:20
fence 125:13
    147:21 148:8
    165:11 166:2,5,14
    166:15 174:22
    175:9 179:24
    208:12 209:9
    217:9 220:17
    221:15 223:9,14
    223:21 233:25
    238:12 245:19
fence-in 166:22
fenced 165:24
fenced-in 165:15
    166:18
fences 221:14,14
Fentanyl 150:5,9
    150:18,22 151:3
    151:10
field 10:5 15:3 16:6
    16:9,10,12,13,15
    16:17 17:13,16,25
    18:8,20,22 22:6
    22:16 25:4,20
    26:16 31:17 57:14
    58:9,21 59:7

95:22 115:13
    141:8,10,15
fields 16:4 146:17
    148:14
fighting 233:18
figure 127:18
file 15:8 29:7,9,14
    29:21 34:13,21
    40:20 59:16 88:16
    90:2 92:9 117:9
    153:13 154:22
    157:4 168:3,5
    207:19 253:25
    254:10 256:10
filed 21:2 246:7
filings 245:23,23
filled 237:22
find 65:4 69:22
    143:22,23 200:14
finding 186:6
fine 88:13 216:6,10
    231:16 247:24
finish 17:4 76:18
    217:4 253:14
finished 22:15 25:4
    25:19 66:17
finishing 26:16
fire 197:14
firearm 152:19
    193:24 194:12
    197:8 198:8,9,16
    199:23
firearms 26:2,3,9
    26:18 157:16
    198:7
first 5:3 8:13 10:4
    16:19 17:8 18:17
    20:15 30:7 33:23
    35:18 36:2 47:7,9
    48:6,7,9 61:9
    65:18 74:10 77:2
    94:7 101:25
    102:12 111:22
    137:10 138:3
    142:6 168:5
    169:12 170:23
    174:17 207:18
    211:17 219:15,16

219:22 236:14
    238:23 239:16
    246:6 248:10
fit 123:4 126:21
fits 72:24
fitting 146:22
five 101:23 107:12
    115:13,14 134:23
    166:8 170:24
    240:22,25
five-minute 88:21
fled 238:10,12
fleeing 122:3
flight 173:18
flow 37:20
flush 240:10
focus 234:21,22
FOIL 76:6
FOILed 75:20
follow 35:4 155:16
follow-up 228:11
following 62:17
    112:14 141:18,20
    142:9 203:9
follows 5:5
font 65:10
foot 42:20 43:12
    50:20,24 52:8,12
    53:16 218:18,20
    218:21 219:8,25
    220:3,4,8 238:10
    238:12
footage 77:4,7,17
    77:23 78:3,8,18
    79:21 80:2 83:8
    83:15,18 84:2,5
    84:11 85:7 94:22
    244:20 247:10
    252:14
force 3:7 13:17
    62:18,20,20 64:13
    64:15 75:4,16,18
    75:19,24 77:9
    80:4,6 81:22 87:4
    87:19,20,24 88:2
    91:3 97:19 98:25
    99:3,10,12,13
    100:8,13,20

152:11 235:15
    236:13
forearm 249:2
    252:10
forearms 247:9,17
    249:15 250:5
    256:23
forgetting 206:8
forgot 59:12
form 3:2 142:11,18
    189:9
forms 143:7
forth 63:7 257:9
forward 87:10
forwarded 155:23
    155:25 156:4
found 15:19 54:19
    141:24 242:17
four 15:2 16:3,10
    17:20 18:20
    177:10
fourth 17:9 177:15
frame 169:12
    175:14 251:15
free 146:10 216:3
Freedom 76:7
    251:22
freeze 251:15
frequent 218:3,16
    218:19
frequently 39:3
    160:22 219:20
friend 181:21
frisk 145:23,25
    252:23
front 72:24 73:3
    127:20,25 128:22
    129:17 165:24
    166:4 171:22
    174:21 175:11
    176:4,8 178:7
    195:10 207:20
    209:15 217:17
    220:22 221:3
    245:17 251:8
FTO 17:5 18:4
    57:12 58:5 59:8
    59:11

**full** 197:25 215:15
  252:24
**full-time** 11:24
**functions** 36:18
**further** 2:25 3:5,19
  120:16 154:18
  186:17 212:25
  215:14 216:7
  254:4 257:14
**furthest** 251:16,19
**future** 89:9 195:7
  245:9

---

**G**

**G** 5:2 167:20,23
  256:13
**G-R-E-E-C-E** 8:22
**gain** 82:2
**game** 100:5 107:19
**games** 107:6,19
**gate** 221:19 233:25
**gathering** 142:25
**general** 10:2,3
  15:12,17 46:23
  56:18 67:6,7
  82:14,25 90:17,25
  91:10 92:6 93:17
  116:14 117:22
  120:17 134:8
  137:6,11,20
  138:17 142:15,17
  143:10 144:12,17
  144:18 145:13
  147:2,4,11 151:24
  152:5,10,14,15
  155:8 195:5
  198:18 199:23
  222:20 242:18,25
  256:12,12
**generalization**
  137:4
**generalized** 13:19
**generally** 12:11
  14:6 17:14,15
  23:2,11 24:17
  29:2 32:24 36:20
  53:9 54:6 61:25
  62:9 70:19 71:2

75:7,22 84:12
  86:9,18 87:3
  95:19 112:3,25
  113:3 129:23
  149:4 158:6,7
  162:14 165:15
  194:11 214:17,25
  227:22
**generic** 72:19
**Genesee** 23:17
**gentleman** 19:18
  84:19
**geographic** 23:9
**Geographically**
  23:22
**getting** 36:23 38:2
  70:4 164:23,25
**give** 9:22 17:15
  24:21 36:24 37:17
  38:17 43:14 71:12
  75:10 84:16
  111:20 118:12,15
  118:23 119:2,10
  119:12 126:7
  133:20 138:16
  196:13 200:18
  215:25 219:2,4
  232:20
**given** 7:21 15:15
  17:21 71:5 87:14
  99:21 108:3 129:9
  144:5 257:11
**gives** 127:11 138:12
**glad** 53:21
**gladly** 6:2
**go** 11:19 25:3 27:12
  28:25 30:4 35:14
  36:3 39:8 44:15
  59:15 62:13 67:16
  71:22 73:7 76:9
  80:25 89:13,25
  90:3 97:19 102:15
  111:15 116:2
  117:25 119:15,24
  129:17 135:12
  139:5 144:24
  145:19 154:7
  172:5 174:21

185:10 186:5
  190:12 192:7
  196:14 200:9
  202:3 211:21
  221:17 233:2
  236:15 237:21
  241:17 244:13
  245:17 247:6
  249:21 250:17
  252:21
**goal** 184:18
**goals** 67:19 184:11
**god** 8:23
**goes** 23:11 60:2
  63:5 94:14 115:18
  116:13 119:25
  120:16,24 121:20
  147:17 156:12,14
  156:16,18 189:11
  214:22 246:16
**going** 5:22 7:6 8:10
  8:13 26:11 29:25
  30:3,7,8 32:15
  40:25 41:14 73:7
  74:24 76:16 85:19
  88:7 89:21,25
  99:17 111:18
  114:6 118:18
  125:25 130:15,17
  131:18 134:6
  138:2,6,11,25
  142:5 144:9
  166:21 170:6
  171:14 172:14
  174:15 178:13
  188:24 190:16,21
  191:15,18 192:19
  196:14 197:13
  202:23 203:3
  205:3 207:8,12,16
  211:19 213:14
  216:24 217:3
  218:10,21 220:5
  224:8 229:4,6,9
  229:25 234:17
  240:7 247:13
  249:13
**Gonzales** 62:8

**Gonzalez** 61:5 62:7
  63:15
**good** 5:18,19 6:3
  12:19 19:2 64:22
  69:14 74:3 84:5
  88:19 89:13 104:4
  104:12 105:5
  151:20
**Goodman** 23:16
**Gorman** 1:16 5:1,9
  5:18 6:1 7:1 8:1,6
  9:1 10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1,16
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1,10 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1,6
  60:22 61:1 62:1
  62:16,19 63:1,6
  64:1,19 65:1 66:1
  66:22 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1,12,24
  74:1,13 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1,4 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1 100:1
  101:1 102:1 103:1
  104:1 105:1 106:1
  107:1 108:1 109:1
  110:1 111:1,23
  112:1 113:1 114:1

115:1 116:1 117:1
  118:1 119:1 120:1
  121:1 122:1 123:1
  124:1 125:1 126:1
  127:1 128:1 129:1
  130:1,22 131:1
  132:1 133:1,12
  134:1 135:1 136:1
  137:1,15 138:1
  139:1 140:1 141:1
  142:1 143:1 144:1
  145:1 146:1 147:1
  148:1 149:1 150:1
  151:1 152:1,8,14
  153:1 154:1 155:1
  156:1 157:1 158:1
  159:1 160:1 161:1
  162:1 163:1 164:1
  165:1 166:1 167:1
  168:1,15 169:1
  170:1 171:1 172:1
  173:1 174:1 175:1
  176:1 177:1 178:1
  179:1 180:1 181:1
  182:1 183:1 184:1
  185:1 186:1 187:1
  188:1,21 189:1
  190:1 191:1 192:1
  193:1 194:1 195:1
  196:1 197:1 198:1
  199:1 200:1 201:1
  202:1 203:1 204:1
  204:2,5,15,21
  205:1,11,13,24
  206:1,25 207:1,21
  208:1,22 209:1,6
  209:22 210:1,23
  211:1 212:1 213:1
  214:1 215:1 216:1
  217:1,6 218:1
  219:1 220:1 221:1
  222:1 223:1 224:1
  225:1,21 226:1,22
  227:1 228:1,19
  229:1 230:1 231:1
  232:1 233:1 234:1
  235:1 236:1 237:1
  237:14 238:1,3,19

239:1 240:1 241:1
241:25 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:10 256:5
257:8
Gorman's 167:21
211:25 212:12
gotten 57:5,17
155:11 160:2
186:23 227:25
government 108:3
grab 151:20
graduate 8:24
graduated 8:18
9:23 10:7
great 30:14,20
59:13 104:22
106:6 159:2
216:20 230:22
Greece 8:19,21
green 170:9,9,14,19
171:4 240:24
green-leaf 238:19
ground 238:15
group 38:3
growling 234:12
Guardian 1:5
guess 14:13 23:23
28:2,20 44:18
46:8 49:16 51:23
56:11 57:18 70:17
73:9 84:20 96:21
98:24 99:5 139:15
141:12 142:14
165:10 167:12
223:11,11,24
230:3 233:22
235:10 236:12
242:10 244:9,12
247:25 251:16
254:6
gun 208:10
guns 236:10
uy 65:3 93:11
172:9 180:14

181:17 239:13
251:8
guys 21:12 30:21
135:8 171:17
172:16 173:2
195:9 216:15
217:10 234:25
235:5 240:4
244:10

**H**

H 224:11 230:9,12
256:13
half 9:17 10:11,24
41:4 161:18,18,19
218:21
Hall 6:16
hand 138:25 236:6
236:10
handcuffed 90:19
91:3 145:25
handcuffs 54:18
146:7 238:15
handed 71:9
handgun 198:10
handle 107:19,23
handout 15:16
87:23 160:8
handouts 71:3,4,12
74:9,18 87:13,14
87:18
hands 93:5
hands-on 17:17
97:19
hanging 37:12,14
180:23
happen 43:10
96:15 158:18
happened 14:23
21:14 50:15
122:15 134:24
139:6 152:22
155:19 172:21
173:13 192:6
208:15 219:20
220:18 233:14
234:6 240:5
244:21

happening 199:2
happens 194:11
218:16,25 244:19
happy 201:12
205:22,22
harass 205:19
harassing 212:16
214:23
hard 242:20
harnessed 60:15
head 109:11 119:23
253:6,7
heads 8:11
health 26:21 27:4
27:20 101:17
health-based
101:16
hear 122:7 136:15
175:4 187:11
192:17,21 203:6
221:19
heard 145:4 192:17
198:25
hearing 149:10
209:21 213:3
hearings 7:17
height 221:16
held 1:17 4:21 10:2
28:15 46:5 88:24
89:23 151:21
200:21 202:12
203:7
Hello 224:15
230:18
help 7:2,3 27:23
68:3 95:15 179:4
179:5 232:19
helpful 69:13 80:12
82:18 83:2 111:7
158:23
hereinbefore 257:9
hereto 2:22
hey 59:12,13 89:9
117:9 132:5
163:25 211:18
221:18,20 223:14
223:21 227:13
228:3 229:15

hide 202:16,18
high 8:16,17,19
9:24 10:7 39:5
44:3 58:11 197:13
197:18
high-crime 39:11
58:15
high-drug 39:18,25
51:14,18 52:2,4
169:2
high-volume 39:21
higher 62:3,19
highest 9:2
highlighted 36:2,15
102:12 157:8
hindsight 129:9
hire 11:11 18:14,15
159:21
hired 11:14 110:4
Hispanic 24:23
hit 53:20 99:24
169:10,13 170:3,5
170:10,21 172:11
172:13 174:13
180:7 190:22
197:5,7 199:17
237:2
hitting 198:20
hold 64:17 71:21
201:8,23 202:21
203:4 207:12
215:24 216:4,15
224:13 229:22
248:15 250:16
home 8:4 71:13,15
71:19,22 79:9
116:2,16 122:2
134:14
homes 161:10,14
240:16
honestly 31:12 33:7
56:13 129:19
hopefully 203:5
217:4 240:11
Hopped 238:11
Horowitz 237:23
237:23 239:20
horribly 209:11

horse 106:7
hosted 28:9,17
hot 112:5,7,9,22
114:18 129:24
135:23 136:11,22
hour 41:4
hours 11:24 20:17
47:15,15 145:11
190:15 241:7
house 114:3 127:20
136:18 168:18
175:12,23 186:25
hunch 132:21
hundred 7:15
Hunter 100:6
hurt 158:24 179:20
hypothetical 179:2
hypothetically
100:3

**I**

IA 142:21,23
Iceler 36:12 44:23
45:22 46:19,24
49:8 53:3 54:7
56:7 59:18 60:2
60:10
idea 36:6 74:3
79:23 103:2
106:25 107:17
158:21 187:18,24
224:23
ideal 90:13
identification 29:23
111:13 130:13
133:10 137:8
152:2 167:24
230:10 237:12
241:22
identified 119:25
168:7 212:11
238:10 248:7
identify 181:19
247:14
illegal 37:15 143:23
illicit 151:6
imagine 93:24
155:2

**immediate** 47:2
  121:5 123:7,11
  127:15 134:13
  136:12 173:17
**immediately** 113:6
  114:19 121:16
  123:24 127:10
  149:15 169:24
  243:24
**impassible** 221:15
**implemented**
  223:19
**implicit** 187:7
  189:14,20 226:18
**implying** 183:22
**important** 65:2
  141:22 143:13
  205:8
**improve** 64:7
  183:14 184:2,13
**improvement** 62:15
  64:8
**improving** 184:18
**in-person** 6:13
**in-service** 26:17
  27:9,10,16 28:7
  57:9,18,24 58:3
  84:10 85:15
  101:12,14 135:7
  159:4,11 189:24
  190:4,9,14,18
**in-services** 25:14
  25:16 27:14
**in-taking** 124:11
**inaccurate** 57:19
**inappropriate**
  62:21 64:15
**incident** 19:9,17
  21:7,9,9,10,12,20
  77:7,9,17 78:8
  79:18 80:2,5,18
  83:16 90:17 93:20
  94:25 98:25
  122:15 128:17,18
  134:23 135:9
  140:25 142:6,21
  142:24 146:5,12
  146:19,20 152:21

153:5,17 154:21
  155:22 156:4
  167:22 168:23
  179:6 192:25
  193:5 194:9 195:3
  195:5,8,18,19,22
  195:25 204:4,9
  221:2,8 222:10,20
  230:7,14 233:3,3
  233:10,13 235:21
  237:6 239:18
  241:18,20 243:15
  243:23,25 244:3
  244:12,21 245:3,4
  245:7 247:2
  256:13,13,14
**incidents** 75:4,9,24
  76:10 83:3,9
  84:12 159:14
  198:22 223:20
  244:15
**include** 51:4 83:23
  113:7 199:16
  223:20 254:15
**includes** 27:20
**including** 104:18
  165:24
**independence**
  17:21
**INDEX** 256:2,7
**indicate** 4:3 51:9
  74:17 164:15
**indicated** 73:14
  230:23 232:13
**indicates** 171:3
**indicating** 73:5,23
**indication** 223:15
  223:22
**indications** 221:24
**indicator** 170:8
  223:10
**individual** 56:15
  119:3 143:18
  145:24 151:15
  175:16 184:22
  192:2 226:5
**individually** 1:4
**individuals** 54:22

172:19 184:3
  185:3 217:24
  226:2
**inferring** 184:25
**information** 76:7
  206:22 212:13
  216:8,19
**informed** 135:8
**initial** 93:18 101:4
  101:6 176:12
**injured** 149:17
  163:3
**injury** 75:18 121:8
  122:9 221:16
**inquire** 50:8
**inside** 85:3 116:16
  136:16 149:11
  193:2 221:21
**insight** 215:15
  216:2
**inspecting** 201:20
**Instagram** 109:7
**instance** 62:25
  128:16 166:9
  179:21 220:18
  221:24 222:6
**instances** 39:23
  42:16 62:16
  220:20 222:11
  224:2
**instant** 224:5
**instincts** 231:8
**instruct** 215:4
**intending** 205:19
**intention** 228:23
  235:9
**interact** 161:23,25
  184:4 228:18
**interacting** 97:2
  157:15 158:5,6
  179:14
**interaction** 55:13
  139:12 147:3
  158:20 183:17
  184:16,23 185:9
  185:11 190:24
  226:4
**interactions** 158:11

159:4 160:8 162:8
  162:9 184:12
  226:2
**interactive** 97:14
  97:23 99:16,20
**interested** 206:3
  227:5 257:16
**Interesting** 194:21
**interloop** 23:15
**interloop2** 23:15
**internet** 79:14
**interpret** 228:22
**interpretation**
  114:25 115:3
**interrogatory**
  228:8
**interrupt** 94:13
**interrupting** 41:2
  41:15
**introduce** 206:21
**Inventory** 146:17
**investigate** 194:5,9
**investigating** 122:6
**investigation** 13:8
  154:8 186:3
  240:15
**investigative**
  186:17
**involve** 80:6
**involved** 32:25 66:8
  67:18 90:19 91:2
  92:7 183:9 224:2
**involving** 100:13
  159:19
**Iraq** 251:23
**Irioqort** 23:15
**irrelevant** 41:9
  206:9 212:19
**issue** 116:7 117:24
  119:6 216:2
**issued** 33:17 44:7
  147:11,12,13
  239:11
**issues** 24:10 37:5
  49:12,15 89:9
  101:17 116:6
  117:10 231:22
**items** 221:10

**J**

**J** 148:18 241:19,21
  256:14
**jail** 118:18
**jailable** 118:18
**January** 32:21
  33:18 44:17,19,19
  61:3,11
**Jason** 91:19,20
  153:7 242:5
**job** 9:23 10:2,4,18
  17:17 55:16 59:11
  59:13 64:23
  145:16 159:10
**joining** 10:16
**Jones** 2:10 4:9,9,17
  6:19 8:8 19:14
  26:11 28:5 35:4,6
  37:23 38:6,16,20
  39:14,19 40:6,12
  41:8,17,25 42:10
  43:2,6,17 44:4,12
  45:9 51:20 52:9
  53:11,18 54:8,11
  55:21 57:3,7,22
  58:7 65:6,8,15,17
  69:18 70:11,13,21
  71:7 73:9,22 74:4
  74:12 76:2,12,20
  76:24 77:10 81:21
  82:6,10,15,19,23
  85:25 86:6,10,23
  87:25 88:7,17
  89:15 90:11,23
  91:5,12 92:11
  93:9,15,21,25
  94:4,15,24 95:3
  96:2 100:23 104:6
  104:25 105:25
  107:4,7,16,21
  108:10,15 109:5,8
  110:18 111:6
  119:14,19,22
  121:24 124:9
  125:14 128:3,13
  129:8 133:15,19
  137:3 149:22
  151:11 155:7

158:25 161:20
163:7,12,17
166:17 167:7
168:2,14 172:22
173:15,21 174:4
175:13 177:20
178:20,25 180:12
180:22 181:11
182:14,22 183:21
184:9,24 185:22
187:3,10,17 188:9
188:18 189:17,22
190:2,7,20 191:4
191:8 194:7
195:13 196:17
197:17 198:4
199:9,20 200:8,14
200:18 201:2,10
201:16,25 202:17
202:25 203:12
205:5,6 210:4,13
210:20 211:21,23
213:6,25 214:12
214:13,18 216:24
229:25 236:20
244:24 247:11,18
247:23 248:15,20
249:3,7,16,24
250:6,10,16
252:13 253:10,15
253:22 254:6
255:2,5
**Judge** 40:25 201:12
201:15,23 202:24
203:10 215:13,25
224:18 230:25
231:7,21 250:11
254:13
**Judge's** 250:15
**July** 27:18 134:22
134:22
**jump** 220:17
**jumped** 125:12
147:21 148:8
179:24 208:12
209:8 217:9
**jumping** 245:19
**June** 1:12 27:18

134:21,21 257:21
**jurat** 254:15
**Justice** 31:22 74:15
**justification** 114:2
**justified** 199:7
**justify** 199:12
**justifying** 148:24

—————
**K**
—————
**keep** 41:2 71:17,18
85:3 86:4 89:14
163:25 178:10
192:13 217:3
**kept** 163:18
**killed** 5:22 209:15
252:7
**kilometer** 115:11
**kind** 33:4 71:20
84:23 107:18
132:9 138:16
159:7,15 160:7
165:10 184:21
223:10 226:24
233:13 234:11,25
239:24
**KINGSLEY** 2:8
**knee** 90:21
**knew** 143:14,18
181:14
**knock** 128:22
129:17 176:4
217:18 221:17
245:17
**knocked** 84:22
221:25
**knocking** 149:9
177:16
**know** 10:4 18:11
19:18 20:5 23:7
25:12 26:8 31:12
31:25 32:13 33:5
33:8,25 34:22
35:7 36:4,8 37:17
40:24 41:18 45:16
45:19 55:5 58:10
58:11 59:12 62:9
62:22,25 66:7,16
70:22,23 72:5,7

73:9,17 76:17
77:20,24 78:2,5
78:23 86:14 87:5
87:21 89:22 92:4
94:7,12 97:10
102:3 105:19
107:24 108:3,12
112:17 115:12
116:24 125:2,5
126:4 129:13
134:4 135:6 139:8
142:15 148:3,18
150:21 152:22
153:5,12,16
154:23 156:3,5
158:13,18 163:15
163:20 165:9
168:16 171:6,9,21
173:5 175:16
176:10 180:11,18
180:20 181:3,6,10
181:12,13,15,17
182:18 183:16
185:15 191:2
194:22 196:6
198:2 202:9,10
203:19 206:23
208:3 214:17
215:8,16 220:11
223:15 224:8
225:10,14,16
226:16,17,21
227:4,6,7,10,14
227:15,16,17,21
228:4,16,21 229:5
229:11 230:25
231:3 232:4
235:14 239:10,16
239:17,19 242:14
245:8 248:6,12,16
**knowledge** 34:19
51:5 61:23 82:16
87:22 138:23
151:17 178:4
185:19 199:24
243:3
**known** 49:22
139:11 142:2

180:25
**knows** 230:5
**Kosciusko** 168:21
168:22 171:22
172:2 173:6,9
175:12 185:16
191:20,24 208:19
237:25 238:9
241:11
**Koskusco** 217:25

—————
**L**
—————
**L** 2:18
**L.D** 1:4
**L1597** 111:11,19
256:10
**L3400** 130:24
**L3499** 130:11,19
256:11
**Lab** 103:12,13,18
**lack** 123:19 162:22
**lacked** 92:8
**lagging** 191:8
**landline** 202:5
**language** 60:8
**large** 150:4
**larger** 90:12 252:10
**laser** 99:22
**lasted** 11:18
**lasts** 18:12,13
**late** 41:4
**laughter** 200:20
**laundry** 26:15
**law** 76:7 115:24
116:8 117:19
145:17,17 150:3,6
157:4 203:11
215:10
**lawfully** 130:3
**laws** 12:12,21
109:24
**lawsuit** 21:2 122:18
129:12 188:12
206:17 243:21
245:25 247:2
**lays** 131:20
**leading** 121:2 122:8
**leads** 212:12

**lean** 145:3
**learn** 15:11 17:17
57:11 58:10,14,15
58:17,23 59:5
83:3,9,16 193:4
245:7
**learned** 14:7 58:23
59:2 82:22 223:2
**leave** 37:10 146:10
193:10,12 194:17
194:18 195:15,22
196:21
**led** 123:10
**left** 184:22 248:14
251:6,17,20
252:24
**legal** 37:8,13 38:19
40:3 58:18 59:5
112:3 129:24
139:17 140:4,21
245:22,23
**legality** 122:20
**legally** 122:5
194:16 195:8
**Lehrmann** 1:19
257:4,22
**length** 20:16
**lengthening** 212:15
**lenses** 136:10
**lessee** 222:13
**let's** 25:3 27:15
33:10 44:15 59:15
67:16 76:9 77:14
89:14 91:17 95:7
98:4 113:17 138:2
139:4 145:19
146:13 147:18
148:15 217:2
222:8 233:2
**letter** 33:23
**level** 9:2 45:17
60:13 62:19 81:23
140:2 156:12,12
**levels** 64:15 156:25
**Lexington** 2:5
**library** 79:3
**lieu** 3:20
**lieutenant** 153:22

life 46:11 49:8
  117:10
lifted 73:12
light 170:7,14
  238:19
likelihood 120:12
limited 104:15
  188:23 211:2
limiting 211:5
limits 221:13
LINDA 2:8
line 74:22 94:11
  163:4 188:17
  205:18
lines 68:15 225:17
list 26:15 111:10,18
  256:10
Listen 202:22
literally 253:14
little 7:7 8:11 25:4
  27:6 36:16 49:9
  65:7,10 68:11
  72:3,8 87:10
  88:10 90:12 92:14
  96:7 104:11
  167:10 169:6
  191:9 192:19
  193:7 207:9 231:3
live 117:5
lives 223:16,23
LLP 2:4
located 6:17 11:22
  123:15 124:21
  165:6 175:22
  238:17
location 139:24
  195:6,8
locations 85:6
locker 71:16
Locust 28:18,22
log 79:12 81:3
logging 80:21
Loitering 117:3,18
loiters 115:22
long 11:17 18:11
  20:14 27:10 88:22
  89:10,12 127:19
  127:23,25 128:11

131:11 166:6
  174:20 216:11
  229:18 230:5
  247:23
longer 114:14
  176:2,7
look 21:23 33:12
  34:9 50:4 51:12
  63:8 79:17 86:24
  89:10 117:9
  119:24 131:5,6
  132:5 133:24
  164:5,13,18,21
  174:25 181:4
  196:14,18 200:2
  220:7 223:21
  227:7,16 228:3
looking 75:7 115:6
  115:7,8,10,11,11
  115:13,16 117:2
  136:10 168:17
  177:15 196:11
  221:9,21 227:5
  248:3
looks 31:15 33:9
  34:6,10 35:21
  61:12,16 72:15,25
  79:19 86:18 87:16
  87:17 88:17
  111:25 117:17
  131:7,20 135:18
  156:24
loose 234:3
lost 121:10
lot 24:3 39:12 94:14
  96:9 106:4,6
  144:15 205:8
  238:12
loud 116:16 117:20
louder 207:9
love 104:7,8
low-attack 100:4
low-light 104:18
lower 62:10 120:2
  132:10
lunch 88:22 89:17
  151:23
lunge 234:19

lunged 234:15,19
lurking 165:13

———————

**M**

M 5:2,2
ma'am 22:13
magically 125:10
maintain 108:25
major 9:13 58:8
  117:4 140:12
majority 23:14
  24:22,24 55:19
  220:13,16
making 24:15 42:2
  68:2 87:5 188:25
  247:24
male 93:3,6 181:16
males 238:9
man 104:20 184:17
  185:7 204:8
  205:11 212:6
  239:10
management 33:2
  70:6 196:19,20
mandatory 25:11
manifest 187:21
  188:4
manner 4:2 108:18
  178:21 185:3
mannerisms 234:12
manpower 106:4
March 75:2
marijuana 149:25
  150:4,9,15,24
  151:7,9,15
mark 29:17 73:11
  73:20 250:12
  253:16
marked 29:22
  111:5,11 130:12
  133:2,9 137:6,16
  151:24 167:23
  230:8 237:10,15
  241:20 254:8
  256:20
marks 62:3,10
marriage 257:16
match 31:14

material 145:10
math 18:25
matrix 13:17 62:18
  64:14 87:19,20
  88:2
matter 122:6
  257:17
McPherson 63:14
  66:4,4 67:17,23
  68:18 70:8
mean 18:16 19:13
  21:8 23:23 24:2
  28:12 36:21 42:5
  50:2 51:9 59:23
  64:4 83:22 88:12
  88:14 102:14
  113:2 118:21
  134:12 153:20
  154:23 179:7
  181:13 191:20
  193:17,20 200:7
  202:7 204:17
  210:21 212:3
  214:16 219:6
  227:13,17 228:22
  229:3 240:19
  248:2 251:21
meaning 210:11,18
  213:18 225:16
  232:5
meanings 225:7
means 30:21 36:22
  64:5 76:7 97:14
  114:10 123:17
  134:10 136:19
  154:25 156:4
  218:20 239:8
meant 46:2 59:2
  141:13 190:25
  227:23
measure 45:16
measured 142:2
  143:14
measures 45:17
media 108:6,7,14
  108:17 109:2,17
medical 32:16,17
meeting 20:14

79:21
meets 140:21
member 28:22
  142:3 152:20
members 12:4
  60:16 141:21
  142:10 182:19
  205:15 227:2,11
  252:6
memory 68:7
  199:10
men 181:10 208:21
  208:25 226:3
mental 26:21 27:4
  27:20 101:16,17
mentally 70:3
mention 92:18
mentioned 120:2
  212:5 228:13
merged 156:19
method 236:13
Michael 79:20
microphone 207:11
mid 240:12
middle 61:20
military 60:3
mind 14:9 26:7
  27:2 88:9 217:21
  220:25
mindful 60:7
mine 78:11
minor 116:15,18,22
  116:25 117:3,15
  117:20 118:4,10
  120:18 122:6
minority 24:24
minute 128:4,11
  129:17 175:15,20
  229:22 230:4
minutes 47:24,25
  174:24 178:11
  180:8 190:22
  234:14
misdemeanor
  121:3 126:16,25
misfiring 199:19
missing 159:7
mistaken 234:2

moment 179:16
186:2 192:14
moments 177:21
Monroe 9:11
150:18
monthly 35:22,23
months 10:9 11:18
15:3 16:3 18:14
18:19,20,21,22
19:3 31:13 134:23
morning 5:18,19
motion 253:20
motions 51:7,9
move 30:2 43:5,9
124:18 130:16
132:25 144:9
146:4 168:11
253:12
movements 51:6,8
52:14
moving 197:15,20
198:11
multiple 39:7 88:18
97:20 104:17
128:17 161:7
186:11 221:12
Municipal 1:8
murder 136:16
music 116:16
117:20

**N**
N 2:2,18 5:2
name 4:4 5:7,20
61:4 97:10 102:8
107:25 108:2,4
168:5 180:13,18
238:4
named 17:3 207:24
207:25 209:5
names 252:6
Narcotic 237:19
narrative 67:16
86:25 142:20
237:21
narrow 144:15
nationwide 150:14
150:17

natural 1:4 89:20
nature 26:22
145:18 164:12
187:19 197:6
near 123:14,14
207:13
nearing 215:18
nearly 118:23
necessarily 69:3
146:8 227:19
necessary 37:4
62:20 86:12
need 52:11,14 64:8
73:20 79:11 89:16
97:18 113:5
132:14 134:4
139:25 148:18
154:11 166:15
202:20 206:23
225:10 253:16
needed 37:4 64:13
122:24 123:23
130:3 149:14
195:18
needs 60:15 139:19
250:20
Negative 238:21
neglect 162:23
neighbor's 234:3,4
neighborhood
24:25 49:23 117:5
198:17 225:21,25
228:17
neighboring 147:23
195:10 209:2
226:6
neighbors 234:4
never 53:13 57:24
67:13 100:12
158:24 163:24
215:8 237:2
new 1:2,20 2:5,5,9
5:4,14 6:18 12:13
12:17 13:19 32:3
85:2 109:25 191:3
257:5
newer 104:22
Nicholas 36:12

44:23
night 190:16
nodded 109:11
noise 24:15 42:2
non-jailable 113:23
114:13
non-minor 119:21
noncompliance
81:24
nondomestic
119:15
nonresponse
154:20,24 155:4
nonresponsive
124:19
normal 36:17 58:12
138:22 155:23
156:5,6 170:25
218:25 228:25
normally 71:18
170:17
north 23:13,16
northern 23:12
Notary 1:19 3:7 5:3
255:16 257:5
note 74:5
notebook 72:3
73:15
notebooks 72:8
noted 89:2 94:18
255:8
notes 72:4 200:2
250:17
noticed 180:2
notifications
154:18
notified 246:17
247:5
notify 154:9,12
November 35:17,17
nuisance 117:4
number 20:6 24:22
29:19 44:20 65:19
74:7 111:21 133:6
133:18 153:14
168:4 201:13
219:3,5 230:7,14
245:11

numbered 130:20
numbers 111:20
137:13 152:12
236:21
Numeral 251:17,18
numerous 39:6
204:11
nurture 187:20
NYS 74:14

**O**
O 2:18 5:2
o'clock 47:17
oath 3:20,22 7:11
object 26:12 41:12
94:16,19 197:20
197:22 210:13,17
210:21 213:16
objected 204:18
objection 28:5
37:23 38:6,16,20
39:14,19 40:6
41:25 42:10 43:2
43:6,17 44:4,12
45:9 51:20 52:9
53:11,18 54:8,11
55:21 57:3,7,22
58:7 65:6 70:11
70:13,21 71:7
76:2 77:10 81:21
82:6,10,15,19,23
85:25 86:6,10,23
90:23 91:5,12
92:11 93:9,15,21
93:25 94:4,7,11
95:4 96:2 100:23
104:6,25 105:25
107:4,7,16,21
108:10,15 109:5,8
119:14,19,22
121:24 124:9
125:14 128:3,13
129:8 137:3
149:22 151:11
158:25 161:20
163:7,12,17
166:17 167:7
172:22 173:15,21

174:4 175:13
177:20 178:20,25
180:12,22 181:11
182:14,22 183:21
184:9,24 185:22
187:3,10,12,17
188:9 189:4,17,22
190:2,7,20 194:7
195:13 196:17
197:17 198:4
199:9,20 200:8
201:2 204:23
205:25 214:19,21
227:20 244:24
253:10
objectionable 94:9
objections 3:2 4:2
189:2 215:2 228:2
objects 143:24
observations
185:17
observed 64:19,21
93:2 233:19
observes 115:25
Obviosly 215:9
obviously 14:19
123:16 126:24
197:4 217:10
221:11 232:4
OC 81:16,20 82:14
235:15 236:2
237:3
occasions 39:7
62:18 63:7 221:17
occur 122:10
132:14
occurred 120:18
128:18 139:7,9
occurrence 85:20
120:14
occurring 114:14
122:10 132:13
149:11
October 91:16
122:15,16 134:25
150:8
OEF 251:17,18
offences 118:10

**offending** 205:15
**offense** 113:23,24
   114:13 116:18,23
   117:3,15 118:5,14
   120:7,18
**offenses** 116:22
   117:21 118:3,9,19
   118:25 119:20
   237:19
**offers** 104:14
**offhand** 153:4
   180:19 196:8
**office** 74:15 96:17
   202:4 239:12
**officer** 5:18 8:6,9
   10:6,13 12:25
   13:4 16:13,19,25
   22:4 30:10 36:16
   46:10 60:6,22
   61:25 62:7,16,19
   63:6 64:19 66:22
   69:25 71:25 72:7
   73:12,24 74:13
   84:13 85:8,9 89:4
   90:15 111:23
   123:13 124:10
   128:5 129:3
   130:22 133:12
   137:15 138:22
   152:8,14 153:15
   153:20 154:15
   160:16 167:21
   168:15 175:4
   176:9,15,17,23,25
   177:6,13,13,14,15
   178:6 188:20
   193:18 194:5,13
   198:24 199:18
   203:25 204:4,15
   204:21 205:10,13
   205:23 206:24
   207:21 208:10,22
   209:4,4,6,14,22
   210:23 211:25
   212:2 217:6,8,16
   221:16 225:21
   226:22 228:18
   232:3,6,11 233:15

234:7,15,16,20,23
   235:8,14,17 236:9
   237:14,22,23
   238:3,3,8,19
   239:19 241:10,25
   242:12 245:18
**officer's** 60:18
   69:15 245:11,15
**officers** 12:3,13
   16:7,14,16,18
   31:7 32:3 39:8
   56:25 83:18,23
   97:2 107:2 125:11
   128:17 145:7
   171:22 173:5
   176:10,15,20
   177:10 185:16
   191:24 208:16,18
   222:18 244:5
**official** 131:7
**Oftentimes** 60:15
**OG** 93:13
**OGA** 92:7
**oh** 35:21 59:11 74:2
   108:5 223:14
   224:8,13
**okay** 6:2 8:14 30:5
   30:6 35:21 37:21
   74:2 92:5 95:12
   102:5 107:14
   108:5 114:15
   115:5 132:4 134:5
   138:10,15 148:20
   169:8 229:9
   230:18 232:17
**on-the-job** 110:15
**once** 84:21 107:11
   113:25 114:10
   193:24 219:10,18
   240:6
**one-month** 35:19
   59:23
**ones** 176:12 225:3
   247:16
**ongoing** 83:5 94:6
   94:11 114:11
**online** 15:19 107:19
   107:20,24

**open** 104:17 114:25
   115:2,24 117:19
   144:23 146:16
   148:14 166:3
   210:6 221:18
   233:21 239:4
**operate** 104:20
**operation** 208:17
   208:17 251:22
**operations** 217:24
**opinion** 52:13
   64:14 116:7
**opioid** 32:7 34:5
**opposed** 33:4 56:11
   118:5 149:19
**option** 129:2,7
   166:23 236:14
   245:18
**oral** 201:18
**orchestrating**
   177:22
**order** 1:18 113:22
   116:14 120:17
   137:6,11,20
   142:16 143:10
   144:12 151:24
   152:5,10,15 155:8
   200:10 242:18,25
   253:20,25 254:12
   256:12,12
**ordered** 238:14
   254:13
**orders** 15:12,18
   130:25 144:18
   145:13 147:5,11
   147:13,14
**original** 93:7
**outcome** 151:13
   183:18 257:17
**outdated** 104:13
**outlined** 122:21
**outside** 58:2 123:15
   123:17 166:15
**overall** 98:22
**overdose** 32:7 34:6
**overdoses** 150:19
**overdosing** 150:15
**overlap** 48:2,3

**overlooked** 140:14
**overly** 70:9
**overnights** 48:17
   48:21
**overview** 9:22 10:2
   10:3,14
**owned** 175:23
**owner** 162:17,20
   186:24
**owner's** 186:15,16
   220:21 222:12
**owners** 55:5

**P**

**P** 2:2,2,18
**p.m** 47:20,22 48:8
   89:22 255:8
**P.O** 1:15 5:1,2,8 6:1
   7:1 8:1 9:1 10:1
   11:1 12:1 13:1
   14:1 15:1 16:1
   17:1 18:1 19:1
   20:1 21:1 22:1
   23:1 24:1 25:1
   26:1 27:1 28:1
   29:1 30:1 31:1
   32:1 33:1 34:1
   35:1 36:1 37:1
   38:1 39:1 40:1
   41:1 42:1 43:1
   44:1 45:1 46:1
   47:1 48:1 49:1
   50:1 51:1 52:1
   53:1 54:1 55:1
   56:1 57:1 58:1
   59:1 60:1 61:1
   62:1 63:1 64:1
   65:1 66:1 67:1
   68:1 69:1 70:1
   71:1 72:1 73:1
   74:1 75:1 76:1
   77:1 78:1 79:1
   80:1 81:1 82:1
   83:1 84:1 85:1
   86:1 87:1 88:1
   89:1 90:1 91:1
   92:1 93:1 94:1
   95:1 96:1 97:1

98:1 99:1 100:1
   101:1 102:1 103:1
   104:1 105:1 106:1
   107:1 108:1 109:1
   110:1 111:1 112:1
   113:1 114:1 115:1
   116:1 117:1 118:1
   119:1 120:1 121:1
   122:1 123:1 124:1
   125:1 126:1 127:1
   128:1 129:1 130:1
   131:1 132:1 133:1
   134:1 135:1 136:1
   137:1 138:1 139:1
   140:1 141:1 142:1
   143:1 144:1 145:1
   146:1 147:1 148:1
   149:1 150:1 151:1
   152:1 153:1 154:1
   155:1 156:1 157:1
   158:1 159:1 160:1
   161:1 162:1 163:1
   164:1 165:1 166:1
   167:1 168:1 169:1
   170:1 171:1 172:1
   173:1 174:1 175:1
   176:1 177:1 178:1
   179:1 180:1 181:1
   182:1 183:1 184:1
   185:1 186:1 187:1
   188:1 189:1 190:1
   191:1 192:1 193:1
   194:1 195:1 196:1
   197:1 198:1 199:1
   200:1 201:1 202:1
   203:1 204:1 205:1
   206:1 207:1 208:1
   209:1 210:1 211:1
   212:1 213:1 214:1
   215:1 216:1 217:1
   218:1 219:1 220:1
   221:1 222:1 223:1
   224:1 225:1 226:1
   227:1 228:1 229:1
   230:1 231:1 232:1
   233:1 234:1 235:1
   236:1 237:1 238:1
   239:1 240:1 241:1

242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:10
256:5 257:8
**paced** 104:19
**padded** 103:20,22
**pads** 103:19
**page** 31:5 36:11
65:18 75:8 76:17
86:25 87:23 90:4
90:6,15 91:15
95:7,9,11 101:22
133:25 134:7
138:4,12 141:20
152:12,18 157:7
254:14 256:4,9,17
**PAGE/LINE**
256:21
**pages** 71:2,3 76:11
87:13
**pal** 181:21
**panels** 233:23
**paper** 71:10
**papers** 6:25 71:24
**paperwork** 15:7,8
21:19 142:7
**paragraph** 132:2
**parameters** 126:22
**paraphrasing**
86:16
**parentheses** 101:23
**park** 50:11 173:14
**part** 32:11 33:21
67:10,12 70:10
75:15,21 80:16
83:5 84:9 100:25
102:12,12 103:11
131:16 154:21
160:11 187:6
204:3,9 222:16
227:20 228:14
**partially** 233:22,23
**participating** 3:13
**particular** 10:20
60:23 74:19 93:20
94:25 100:11

188:15,16 210:3
232:2 250:18
**particularly** 180:3
182:23 197:12
**parties** 2:21 3:23
39:6 257:15
**parts** 36:2 169:3
**passed** 14:19
**passing** 37:24
**pat** 64:20 186:5
**path** 112:14 126:12
126:20 127:9
136:12,12
**patrol** 36:17 37:9
160:16,24 190:11
227:11 228:19,25
**patrolling** 184:11
**pause** 170:21
172:11,14 174:16
178:13 190:22
**paused** 174:14,17
175:3 178:11
191:6
**Payson** 201:12
215:13,25 224:18
230:25 231:21
254:13
**Payson's** 203:11
231:7
**PDFs** 117:9
**PDS** 88:16 90:2
**peacably** 120:13
**Peachie** 2:10 4:9,13
8:2 40:9 94:5
205:6
**pedestrian** 37:20
42:5 44:10
**penal** 150:3,6
**people** 37:4,6,12,17
37:25 39:9,12,25
40:4 42:8,15,17
42:19 43:8 49:11
52:17,18 53:20,22
53:25 54:13,24
55:3,4,4,19 68:15
69:8 70:20 84:25
107:20,25 117:5
117:10 124:11,13

125:23 147:16
162:6 178:2
181:15 183:8
184:12,14 188:7
192:2 197:7 218:4
221:13 228:16
240:2
**peoples'** 219:25
**perceive** 182:6,20
189:12
**perceived** 163:15
182:12 183:10
188:6,7 227:2
**percent** 162:16
**percentage** 161:14
**perception** 189:10
189:11
**perceptions** 68:3
**perfectly** 205:21,22
**performance** 18:5
62:14
**period** 15:21 18:9
18:13 35:16,19
36:9 44:18 47:24
59:19,21 61:12
89:10 91:22 235:4
**permission** 176:5
217:18
**permit** 201:4
204:20 205:23
210:15 231:13
**permitted** 131:13
214:4 249:4
**person** 3:21 36:14
50:8,14,18 51:7
52:20 85:22 97:15
97:18 98:11,14
101:17 107:23
112:12 115:22
117:25 118:6
120:10 125:22
126:20 138:22
143:24,25 150:7
150:22 151:2
154:7 156:13,18
183:19 188:15
198:23 199:13,17
220:6

**person's** 130:3
**personable** 185:6
**personal** 108:3
220:8 232:5
**personally** 77:13
219:10
**personnel** 29:6,9,14
29:21 40:19 56:3
104:15 180:23
256:10
**persons** 68:4
**perspective** 68:23
68:25 69:15
**pertinent** 113:8
**pet** 193:22
**phase** 17:8,9,25
**phases** 16:10 17:20
**phone** 201:24 203:4
213:2
**physical** 97:19
99:10,13 100:8,19
121:8 122:9
149:25 152:11
201:3,17 204:24
206:3,24 213:8
246:9
**physically** 3:15
11:19 70:3 79:10
149:16
**picked** 165:8
**picture** 253:4
**pictures** 21:23,24
**piece** 71:10
**pistol** 99:21 197:14
236:4
**pistols** 235:5,11
**pit** 162:4,7,9 167:6
**pizza** 10:8 145:2
**PK** 238:20 239:6
**place** 1:18 78:23
96:12
**placed** 238:15
**placing** 43:18
**plain** 146:15
147:18 148:9
**Plaintiff** 1:17
**Plaintiff's** 29:22
111:12 130:12

133:3,9 137:7,12
151:25 167:23
230:9 237:11
241:21 256:8
**Plaintiffs** 1:6 2:4
**plan** 89:21 171:17
171:25 172:4
173:3 229:19
235:10 240:9
241:8
**planned** 239:21
**plastic** 238:18
**platforms** 109:2
**platoon** 47:3,7,13
48:6,7,10,10 61:9
66:20 153:15,19
154:2 219:15,21
**platoons** 219:3
**play** 52:24 84:4
97:3 107:6,10,19
168:16 169:6,10
170:21 172:13
174:13 180:7
198:15
**playing** 178:10
190:21 191:5
192:13
**plays** 97:16 120:8
**please** 4:3 5:6,10,25
35:3 41:15,20
201:8 210:8
**pocket** 72:24 73:3
73:14,16
**pockets** 93:5
**point** 15:20 58:24
59:2,24 61:8 70:6
82:20 89:15,20
93:6 112:23
125:11 135:4
146:9 170:13,22
171:10 176:11,22
186:23 187:5
193:16
**pointed** 208:10
**police** 9:20 10:6,13
10:21 11:15,20
12:4,13,16,20,24
13:3 15:17 18:16

20:25 30:20 31:7
31:10 32:3 40:22
53:9 66:8 71:16
71:25 72:2,21
75:23 76:4 78:21
78:24 83:14 103:8
108:17 109:21
110:8 115:25
131:8 132:18
135:7 141:3 145:6
145:9,10,13
157:11 159:8
160:3,12 173:17
184:14,19,23
185:8 189:15
192:3 193:23
194:23 195:11,24
198:24 199:5
203:25 226:20
230:13
**police-related**
10:17
**policies** 15:7,12,17
15:22 26:20,24
40:23 61:24 81:19
108:13 110:7
111:16 145:14
195:12,24 196:3,6
196:15
**policing** 54:10
56:11,21 57:2,6
57:21 58:6 116:7
174:9
**policy** 86:9 109:21
140:19 193:24
194:24 196:11
**portion** 15:10,13
41:22 142:20
190:8 200:23
251:9
**portions** 140:12
165:24
**position** 211:10
212:22 213:7,23
214:2,21 231:12
**positions** 214:8
ositive 60:14
183:18 184:12

**185:11 205:14**
**possessed** 150:9,11
**possession** 126:23
149:24 151:16
**possibility** 123:20
162:25 197:10,11
197:13,18
**possible** 86:13
119:9 245:9
**Possibly** 115:17
243:24 246:22
**post-academy**
14:25 15:5 141:17
**posted** 164:11
**potential** 113:10,12
122:25 123:14,18
125:18 149:20,24
165:12,13 175:21
176:24 199:17
225:15
**potentially** 124:6
179:14,17 183:10
188:8 198:20
223:8 236:7
**Power** 70:6
**powerful** 60:14
**PowerPoints** 160:8
**practice** 79:24
**practices** 12:16,20
**praising** 64:18,24
**precedence** 125:16
125:18
**preceding** 21:7
**precinct** 5:11
**predominant** 24:9
161:24
**predominantly**
225:24
**prefer** 85:2
**premises** 112:20
120:12 122:6,11
147:22,23
**preparation** 21:18
80:16
**prepare** 19:8 20:11
**preparing** 243:13
243:20
**prerecord** 169:21

**prerecorded** 97:11
**presence** 53:22
**present** 3:15 79:10
112:20 159:25
175:17
**presentation** 70:7
**presumably** 228:21
**pretty** 118:14 182:8
185:11 202:11
203:23 243:12
**prevented** 149:15
**previous** 170:10
173:8,12,20 174:3
174:7
**previously** 20:21
80:21 119:11
219:24
**Primarily** 223:9
236:3
**primary** 17:4 30:24
236:13
**prior** 10:16 34:7
79:21 80:4 114:18
134:23 140:25
142:3 143:14,18
169:22 179:5
182:24 183:5
189:18 217:23
220:24 222:13,22
240:5 241:15
243:13
**priority** 245:12
**prism** 101:23 102:2
102:7,11,13
105:11,15 106:9
158:14,15,19
**private** 28:9,12,12
28:15
**proactive** 36:17,21
36:22 37:2 38:24
39:2 45:2,8,14,18
46:3 54:9 56:8,11
56:21 57:2,6,21
58:5 174:8
**probable** 13:13
43:21 92:9 120:10
120:25 121:14
123:6,22 124:2,22

**126:7,15 127:5,11**
132:12,20 138:3,9
138:18 139:7,16
140:11 185:20,23
186:7 192:10
**probably** 27:8
61:21 107:12,22
139:2 175:10
**probation** 18:13
35:20,22,23 59:24
**probationary** 18:8
**problem** 59:10
111:9 168:8
**procedure** 84:20
**procedures** 12:16
12:20 15:7 26:21
26:25 61:24
109:22 110:7
141:18 245:5
254:2,11
**proceeded** 166:3
**proceeding** 89:5
**process** 67:11,14
155:24 156:5,6
235:18 246:13
**produce** 8:5
**produced** 29:14
34:13 40:20
111:17 155:13
256:18
**PRODUCED/IN...**
256:16
**production** 35:2,11
90:7 155:14
**professional** 12:24
13:3 66:23
**program** 79:12,13
79:15 98:12 102:4
102:10 104:13,22
105:4,7,19,21
158:15
**projected** 102:7
**promise** 85:19
**prompt** 98:15
99:25
**properties** 186:11
**property** 112:4
114:22 115:4,20

**116:3 124:4,7,22**
124:24 125:6,12
125:20 126:6,9,17
127:5,7,21 135:12
135:14 148:9
149:6 164:5,14,22
165:5,7,11,16
168:17 171:6
193:11,12 194:17
194:19 195:16
196:22 219:25
220:21,23 221:5
222:4,12,23
223:16,23
**protective** 253:20
253:24
**provide** 66:21 97:9
**provided** 72:9
226:19
**PSB** 79:10
**PSD** 119:4
**PSS** 154:9,11,15,21
155:5,10,25
**PST** 102:18
**PSTF** 102:20,22
**public** 1:19 3:7 5:4
11:21 24:11,12
37:15 38:22 74:15
75:25 115:7,22
255:16 257:5
**pull** 52:6,21 153:2
167:18 237:5
247:14 251:2
**pulled** 84:18 93:2
192:3 240:18
241:9
**pulling** 173:16
**punched** 84:21
**purpose** 120:19
244:22
**purposes** 97:6 99:7
109:18 206:7,12
**pursuant** 1:18
112:6,7 113:6
195:23 242:25
253:24
**pursue** 43:11 52:8
52:12

pursued 42:20
  92:17
pursuing 112:10
pursuit 112:9,22,24
  114:18 122:3
  127:9 129:25
  135:24 136:11,22
put 29:6 30:9 54:18
  74:20 95:7 98:14
  111:20 130:23
  131:20 134:3
  146:7 177:5 202:4
  215:23 216:14
  222:2 224:9

**Q**

qualify 25:25
quality 46:11 49:8
  117:9
question 3:3 6:5
  16:8 28:21 31:9
  35:18,25 36:2
  41:13,21 45:6
  77:2 85:18,20
  94:17,18 96:14,21
  98:5,24 99:5
  101:25 111:22
  124:17,20 126:2
  129:20,21,22
  131:18 141:14
  142:6 147:2
  159:24 170:23
  185:2 186:4 189:5
  191:13 195:14
  200:12 210:3,7,22
  211:17 213:18
  215:6 222:8 228:5
  228:11,15 234:17
  238:23 242:3,10
  249:4 250:3
  252:16 253:14
questioned 7:10
questioning 94:12
  188:17 205:18
  225:18 256:21
questions 5:23 7:3
  8:11,14 10:15
  40:18 61:22 69:17

73:19 74:25 87:11
  89:11 90:2 94:8
  109:12 134:7
  138:2,7 144:8
  148:15 167:19
  169:8 170:22
  188:23 193:8
  204:5 205:9 207:3
  207:18 210:18
  211:16 214:4,19
  222:9 224:10
  225:11 227:9,14
  236:18 237:7
  248:9 254:5 255:3
  256:20
quick 151:20
quicker 94:14
quickly 75:19
quite 190:3

**R**

R 2:2 5:2 257:2
race 24:19 187:22
  206:17
racism 205:13
racist 182:8,12,21
  183:10 185:2
  188:6,8 189:9
  226:24
radioed 128:21
raise 198:19
ran 92:16 171:5,7
  172:24 173:14
  178:23 192:2
  208:21 209:13
rater 36:8 61:7
rater's 61:4
rattle 165:12 166:5
rattled 165:25
RC 230:14
reach 246:14
reached 236:7
  246:18
react 98:15
reacted 56:14
read 41:20,23
  46:15 75:10 76:17
  90:14 92:3 95:9

114:5 131:25
  132:2 138:5,14
  144:12,15,18,19
  145:10 148:2,17
  196:15 200:24
  239:16
reading 76:18
  90:15 92:4 95:11
  114:16 120:23
  122:14
ready 236:15
real 97:15 179:11
real-world 105:23
realistic 219:5
really 31:14 96:8
  131:18 160:4
  161:21 180:4
  205:12 211:15
  212:15 215:3,8,10
  230:6 231:25
  253:22
rear-handcuffed
  75:17
reason 37:8,13
  39:13 41:12 43:13
  43:14 112:11
  121:9 129:24
  164:20 182:10
  185:25 186:10
  222:16
reasonable 115:10
  121:7 124:12
  132:6,15 138:13
  138:18,20,21
  139:10,18 140:7
  140:12
reasonableness
  141:23 143:13
reasonably 177:19
reasons 81:25
  105:22 106:7
  163:22
recall 14:5 15:24
  26:14 32:15 33:7
  57:23 58:3 68:19
  70:12 71:9 75:13
  93:22 95:5 105:17
  135:10 153:4

157:21 158:12,17
  159:20 164:2
  173:22,24 174:11
  243:7,11
recalling 252:21
receive 157:14
  189:14 246:9
received 25:22
  32:17 34:15 62:10
  74:18 86:3 141:2
  157:11 158:10
  159:3,9 160:7
  189:20 199:4
  240:6
receiving 32:15
recess 89:3 151:23
recognize 148:23
recognized 131:11
recognizing 68:2
recollection 46:18
  60:22 63:10 75:9
  80:13 172:23
  250:14
record 4:6,20,22
  5:7,12 29:18
  41:23 69:19 73:11
  74:5 76:12 87:25
  88:25 89:24
  109:11,13 151:22
  169:18 170:5,10
  172:11 189:3
  200:22,24 203:8
  203:13,16 206:13
  224:19 230:20
  253:15 254:7
  257:11
recorded 73:10
recording 169:14
  169:21,24 170:4
  182:2
records 238:21
recover 200:19
recovered 185:19
redacted 238:10
reference 80:23
referring 142:12,16
  148:5,6,7 153:21
  189:10 235:25

245:25
reform 118:21
  119:18
refresh 46:17 60:21
  63:9 75:8 80:12
refuge 115:25
refusing 90:20
regarding 32:7
  183:7
regards 70:16
registers 99:23
regular 33:5
reimbursement
  157:5
reiterate 58:24
related 9:20 75:24
  145:16 257:14
relates 75:3
relating 66:23
relations 61:25
  183:2,14 184:2,13
  184:18 205:15
relationship 181:24
relatively 185:9
  221:11
released 54:20 55:8
  55:12 144:4
  208:14 239:7,9,11
  239:13
relevance 211:24
  214:20,24 215:3
  225:2,6 227:18
  228:14 231:5,9,23
  232:2,9 242:16
relevancy 250:19
relevant 118:22
  206:20,21 212:13
  214:3
religion 187:22
remember 17:2,12
  20:15 21:16 26:23
  27:23 32:9,22
  42:22 60:9 61:20
  63:17 67:2,5,22
  68:5,8 70:14 71:6
  80:10 84:17 85:11
  85:12 98:23 99:9
  100:9,18,22 112:2

122:14 155:20,21
157:25 158:4
159:6 160:4
173:16 174:6
182:4 190:17
199:12 210:25
233:12 236:8
240:21 247:3
**remembered** 252:9
**Remind** 159:21
**remotely** 3:18,22
**repeat** 191:12
**rephrase** 6:2
**report** 21:20 44:17
61:2 77:22 80:4
82:13 87:12,15
88:6,9 90:9,18
91:15 142:21,21
142:23,24 152:21
153:3,6 154:25
155:3,22 156:4,10
156:14 224:9
230:7,14 233:3,6
233:17,20 237:5,9
237:10,15,25
239:18 241:18,20
242:15,19,25
244:4,8,11,23
256:13,14,14
**reporter** 3:12 5:6
5:10 8:20 16:21
19:24 22:12 23:18
41:24 57:13
110:25 111:3
140:9 200:25
207:6,10 224:20
257:4
**reporting** 3:17 4:3
**reports** 65:21 75:2
80:14 83:7,13
91:2 182:25 183:6
183:25 242:11
244:16
**represent** 5:21
108:17
**representation**
56:19 246:15
**representatives**

246:25
**request** 4:11 132:7
196:21
**requested** 41:22
129:15 200:23
**require** 106:4
114:22,23 220:17
**required** 25:11,15
25:18 26:9,14
72:2 77:11,16,22
78:5 118:6 132:22
155:9 209:23
213:9,17 232:11
250:19
**requirement** 71:20
72:6 110:5 131:12
139:17 144:11
**requirements** 58:18
59:6 112:3 131:21
145:20
**requires** 98:13
121:13 155:18
196:20
**reschedule** 20:22
**research** 64:21
**researching** 145:17
**reserve** 10:12,24
11:3
**reserved** 3:3
**residence** 115:23
123:2
**residential** 198:16
218:5,8,11,22
219:8 222:22
**resides** 164:6
**resistance** 77:21
**resources** 115:9
**respect** 215:6
**respective** 2:21
**respond** 154:12,17
166:16 240:8
**responded** 81:11
176:11 233:17
239:20 241:9
**responding** 56:12
155:10 165:23
237:24
**response** 56:9

159:13 166:3
174:7
**responsibility**
17:22
**rest** 10:11 30:16
90:3
**result** 131:14
141:25 223:19
**results** 75:18
**retired** 66:6
**return** 17:7
**review** 7:3 14:8
21:19 29:13 77:3
77:6,16,22 78:3,7
79:20 80:3,7 83:2
84:12 93:19 94:21
113:17 156:25
181:25 233:17,20
243:25 244:13,19
245:4
**reviewed** 19:9
21:20 34:16 80:17
83:8,15 245:22
**reviewing** 79:25
83:13 245:2
**reviews** 156:17,22
**rewind** 192:19
193:7
**rewinding** 193:9
**ricochet** 197:6,7
198:20 199:18
**ride** 30:22
**Ridge** 23:12
**right** 7:25 12:25
16:4,10 17:22
18:23,25,25 19:3
23:24 29:3,7
30:18 33:18 34:9
34:10 36:18 44:23
45:4 46:15 47:18
49:12 53:6 56:17
61:5 62:4 64:10
65:4,22,25 66:24
66:25 67:13 69:4
70:4 72:11 73:4
74:16 80:18 81:16
84:13 90:22 91:4
92:17,23 93:14

97:23 101:6
106:17 108:23
109:22 112:23
113:13 114:5
115:21 116:3,8
117:11,15,18,21
117:24 120:5,8,10
120:14,22 121:11
121:13,16,18,23
122:3,12 123:5,7
126:17 128:19
130:4,5,9 131:14
131:23 132:7,15
132:23 134:19,25
135:17 138:9
140:5,16,23
141:12 142:4
143:4,10,15,22
144:2 146:15
147:20,22,23
148:25 149:11,17
149:20 150:15
153:24 154:25
155:20,25 157:5,6
158:15 159:14,22
160:5,14,16 161:4
165:2 168:7,16,21
169:11,11,17,19
172:9,9 174:3,15
174:18,22,25
175:3,16 176:4,20
178:8,13,13,15,23
179:6,11,16,19,22
183:14,18 184:4
188:8 190:24
192:25 195:16,19
197:9,11,22 198:3
199:8 201:13
202:21,24 209:15
209:20 210:3
212:6 217:7,10,14
218:11 222:18
223:3,23 230:6
233:4,7,10 236:5
236:10,25 237:17
238:22 239:9,22
241:14 244:10
245:9,12 247:20

248:9,14 251:5
**rise** 196:13
**risk** 197:13 198:19
199:17
**risks** 105:23 198:15
**River** 23:17
**road** 11:23 23:12
23:14 102:21
115:12
**Robyn** 1:19 29:16
41:20 257:4,22
**Rochester** 1:8 2:8,9
5:14 6:18 11:23
29:20 40:22 44:20
65:19 72:2,21
76:4 83:14 103:8
109:21 110:7
131:8 132:17
135:6 137:13,14
141:3,19 152:17
157:11 160:12
181:22 185:5
189:15 194:23
195:23 198:24
199:5 205:7 218:6
226:20 230:13
**Rochester's** 15:16
**role** 66:5,6 97:3
**role-playing** 103:23
**roll** 159:16,17
**Roman** 251:17,18
**room** 3:16 6:19,22
7:2 79:2 96:20
102:13,14 103:18
103:19,20,22
107:23
**ROTH** 2:4,4
**route** 220:6
**row** 191:23 192:7
**RPD** 10:16 11:11
12:3,9 13:18
14:25 15:8 22:23
25:6,11 28:8
45:17,17 54:6
83:23,25 84:9,11
85:7,8 86:8 87:21
97:5,9 105:8
110:4 116:22

141:11,15 165:9
187:7
**RPD's** 15:11 62:17
67:10
**RTP** 102:24
**Rudolph** 91:19,20
93:19 94:23 95:14
153:8 242:5
**rule** 77:19 140:23
141:5 142:17
**rules** 131:22
**ruling** 250:13,15
256:20
**run** 42:17,19 43:8
43:12 50:14,19
52:7,21 104:15
143:19 163:15
171:14 172:2
178:18 217:23,25
218:4 223:8 240:2
240:12
**running** 52:23 93:8
112:13 124:11
172:8 173:10
179:15 197:24
240:20
**runs** 115:23 166:14
218:7,9

———————

**S**

**s** 2:2,18,18 86:8
**safe** 245:9
**safer** 245:18
**safety** 11:21 60:18
61:25 74:16
199:24 245:5,11
245:15
**sale** 52:15
**sales** 139:13
**saw** 50:5 202:19
240:21 252:13
**saying** 25:9 38:7,22
83:24 114:14
150:2 153:14
162:18 183:23
189:11 191:2
194:16 195:9,16
195:21 229:18

**says** 30:11 31:6
36:15 44:25 45:5
46:8,9 52:20 53:3
54:7 60:3,5,12
61:23 62:13,15
63:12 66:3 67:25
69:25 70:5 74:14
75:3 77:20 81:8
91:17 92:13,25
95:14 101:23
102:12 113:21,24
126:13 131:10,17
131:21 132:5
135:11 140:19
141:20 142:9,16
142:22 143:12
148:22 154:14,24
155:22 157:3
237:23 239:6
251:17
**scenario** 97:16
104:18 105:23
**scenario-based**
96:22,25
**scenarios** 99:11
101:16,23 103:23
104:14,17,24
**scene** 33:2 92:15
119:7 154:8,12,18
154:21 155:10,19
176:11 193:15,17
194:2,25 195:3,4
195:18,19,23,25
196:10,12,18,20
239:9,12,14 241:4
243:5 244:5
**scenes** 33:4
**scheduled** 20:21
47:14
**school** 8:16,17,19
9:24 10:7
**schools** 25:8
**Scott** 16:19 17:10
**Scottsville** 11:23
102:21
**screaming** 136:16
192:15
**screen** 30:4,8 73:8

97:11,13,22 99:23
100:2 130:23
137:16 152:7
168:9 241:24
**scroll** 30:19 33:14
60:25 69:16 76:20
101:21 133:15
134:4 138:11
148:19 236:17
**scrolled** 131:15
**scrolling** 74:6
**scrutiny** 75:16
**scurry** 123:19
**sealing** 2:22
**search** 13:8 55:20
114:21 125:12
131:10,11,13,22
132:7,23 137:2,18
137:19 138:19
140:21 141:21,23
141:25 142:3,10
142:14,23 143:3
143:15 144:11
145:20,24 146:5
146:11,19,20,24
148:25 152:13
192:11 222:3,23
242:15 252:22
**searched** 54:19
55:8 93:12 143:21
238:16
**searches** 64:20
130:24 133:5,8
141:19 142:18
256:11
**searching** 125:19
143:18 176:6
186:5
**second** 16:24 19:6
20:16 64:17 75:10
94:10 103:11
123:6 130:21
131:25 177:13,14
178:11 200:3,19
234:22
**seconds** 81:16
128:7,10 129:16
166:8 169:18,22

170:4,11,24
172:12,13 174:14
174:18 175:8,16
175:21 178:7
180:8 190:23
193:10 240:22
241:2 245:17
**section** 22:7,9,11,17
22:20,24 23:3,10
24:6,9,17 51:14
51:18 53:10,16
55:18,25 56:25
66:19 91:24 96:14
96:16 153:14,19
153:23 154:5
156:17,21 157:8
160:14,20 161:11
161:12,15 162:7
169:4 225:23
237:22 253:16
**sections** 23:23
219:4
**secure** 115:9
122:24 166:22
167:2 194:25
195:18,25 196:22
**securing** 113:7
196:10,12
**see** 4:15 30:8,10,16
30:16,18 33:21
36:16 37:25 45:2
50:17 52:5,14
56:8 59:15 62:15
65:12 73:13 75:15
75:21 90:4 91:17
95:8 104:7,8
115:15 130:22
133:20 137:15,25
138:3 139:4
146:13,16,18
147:18 148:15
152:7 157:7 166:7
167:2 168:5,6,13
170:14 178:14
182:5,10 200:4
202:8,14 203:6
204:10 210:9
215:12,14,24

223:13 225:12
226:15 227:12
228:20 229:4,15
229:20 231:9
232:2,9 236:17
237:14 240:16
241:24 251:9
252:23
**seeing** 129:11
169:11
**seek** 49:23,25
**seen** 111:24 131:3
133:14 155:3
180:16 181:15
185:16 211:6
213:15
**seizure** 131:13
141:24 142:4
208:7,9
**seizures** 137:18
**sell** 180:25
**selling** 24:14 51:10
52:20 172:19
**send** 110:20,22
111:3
**sends** 111:4
**sense** 117:22 147:9
163:20 238:7
**sensitive** 113:8
**sentence** 36:15
62:23
**sentences** 62:24
70:15
**Sentinal** 79:16
80:22
**separate** 91:14
**September** 11:12
63:14 65:24
134:22 159:22,23
159:25
**sergeant** 36:12
45:22 46:19,24
49:8 53:2 54:7
56:7 59:18 60:2
60:10 62:8 63:14
63:15 66:3,4
67:17,23 68:17
70:8 79:19,22

81:8 86:19 91:18
91:19,20 93:19
94:22 95:13 98:6
156:15,15
sergeants 56:20
95:21
serious 118:14
120:8 122:9
148:22 149:21,25
150:5,23
seriously 149:16
Seriousness 120:7
serve 120:20 206:6
served 10:10 246:7
serves 206:11
service 49:20
services 31:23
74:15 160:24
serving 55:17 228:8
set 203:15 255:4
257:9
sets 32:2
seven 62:2 238:18
seven-day 160:25
shape 189:8
share 30:4,7 168:9
sharing 73:7
shell 197:2,4
Shield's 206:7
Shields 2:6 4:7,8,13
4:19 5:17,20 8:2
19:25 29:16 34:23
35:9 40:9,15
41:11,19 65:12
69:23 73:17 74:2
74:8 76:15,23
88:4,11,19 89:18
89:19 94:5,20
95:2 109:10
110:22 111:8
124:18 130:15
132:25 133:17
137:10 151:18
152:4 153:2 155:6
168:8 188:13,22
191:6,11 200:16
201:6,11,21 202:6
202:22 203:3,14

203:21,22 205:10
207:4,7,23 208:5
209:25 210:6
211:2,8,14 212:4
212:10 213:22
214:9,10 215:21
216:20 217:2
224:13,22 225:9
228:10,12 229:3
229:23 230:3,18
230:21 231:4
232:17,22 236:22
237:8 247:15,19
248:8 249:5,18
250:2,8,12 252:15
253:19,23 254:9
255:4,7 256:5
Shields's 206:11
shift 48:4 154:3,4
shirt 229:7
shoot 99:11,14,15
99:17,17,22
198:25 234:18
235:9 243:4
shooter 198:12
shooting 163:9
197:20,21,24
198:2,10 199:7,12
199:22 206:18
212:3,7 221:25
234:7,24 235:16
245:3
shop 10:8 145:2
short 91:22 139:12
208:15
shortcomings 68:2
68:9
Shorthand 257:4
shortly 10:13 88:16
shot 5:22 100:3
128:19 163:6
193:18 198:7,23
199:17 209:14
224:3 234:16
237:2
show 42:23 72:14
76:21 84:4,11
200:6 201:9

202:13 204:15,22
205:3 210:8
229:17 231:16
250:20,22
showed 33:23
229:8 242:8
showing 210:14
shown 211:3
shows 128:6 227:8
side 99:21
sides' 214:7
sidewalk 38:2,5,22
39:12,15,17,20
42:9,13,24
sidewalks 39:10
signature 36:4,6,10
signed 3:6,8 36:14
significance 33:25
253:8
significant 198:8
221:12 251:25
signs 164:5,11
similar 85:8 105:22
172:16,18 175:10
175:14 217:23
220:18 253:8
simple 37:3 150:3
203:23 252:16
simply 44:10 130:8
simulation 99:8
100:22 101:9,24
102:2,6 105:16
106:9 107:2
simulation-based
97:8 98:18,21
99:2 104:2 179:5
simulations 158:20
simulator 99:6,14
100:10,25 101:19
102:15 105:11
158:19,23
simulators 97:5
single 72:7
sir 6:11,21,24 13:15
14:21 168:25
sit 68:20 97:12
110:5 144:19
216:9

situation 54:17,20
60:19 82:5,9
86:21 87:4 92:14
95:23,25 96:7
99:13,14 118:23
148:24 154:17
165:22 199:2
217:7 218:4,14
242:13
situational 164:10
situations 86:5
92:22 95:15 97:20
199:15
six 11:18 18:19
31:13
size 167:13,15
skill 60:14
skim 134:2
skip 65:7 70:25
87:10,11
slash 87:24
sleep 70:5
slightest 182:15
slightly 33:15
132:10
slow 104:19 144:23
small 23:8,22,24
126:24
smooth 185:9
sneeze 46:4 49:21
Sobieski 168:18
171:10,15 172:24
174:21 175:8
176:16 208:23
237:17 238:2
239:21 240:19
241:10
Sobieski's 128:6
Sobiesky 238:11
239:25
social 108:6,7,14,17
109:16
sole 120:18 140:10
solely 50:21
solid 113:9
somebody 52:24
55:7 72:18 85:21
98:7 112:10 182:5

182:11,13 198:20
198:23
someone's 115:12
124:7,22 127:5,24
134:15 135:12
218:22 221:4
222:2 223:6
soon 216:18
sorry 9:5 14:2 46:4
47:4,20 49:20
51:16 78:11
100:20 106:7
112:17 122:16
124:16 131:15
141:6,13 148:7
187:11 191:11
207:7,14 219:6
224:16 252:4
sort 31:4 100:5
138:24 154:25
155:12
sought 222:12
sound 128:7
sounded 149:10
170:23
sounds 6:3 18:25
18:25 104:21
106:6 122:7
132:19 244:18
south 23:15 168:22
171:15 172:24
southern 84:18
85:9,14
speak 19:16 20:3
20:18 45:10 50:18
76:3 224:17
230:24 235:17
243:5
speaking 23:11
95:19 189:2
special 30:25 31:3
33:3 79:2
specific 12:8 13:17
15:2,6 20:5 24:21
26:6,23 27:3
38:17,21 42:12,21
46:21 51:6,6
52:17,20 56:14

57:5,23 64:6 66:7
  67:4 70:15,18
  78:14,21 83:25
  110:6,13 126:2
  139:7 140:4 141:2
  141:11 142:11,13
  142:18 144:16
  151:15 159:12,13
  165:9 179:9 199:5
  199:6,13,13,22
specifically 58:9
  71:9 76:10 94:19
  100:12 116:24
  139:2 150:18
  158:3 163:24
  164:3 191:20
  198:10 245:2
specifics 46:7
  139:19,21 160:5
specify 121:20
speculate 199:11
speculating 102:9
speed 197:25
spelled 22:14
spoke 20:8,9 21:11
  46:10 60:12 65:21
  92:15 157:20
spoken 20:24 21:4
  183:7 246:24
spots 58:10,11,15
spray 81:16,20
  82:14 235:15
  236:2 237:3
squad 252:6
staff 63:15
stand 180:25
standard 84:20
  132:10
standards 12:24
  32:2
standing 93:3
standoffish 234:11
start 8:15 9:15
  29:25 168:16
  169:13,18 170:3
  207:17
tarted 17:5 41:3
  61:18

starters 37:19
  123:13
Starting 8:16
starts 23:15 30:3
state 1:20 5:4,7,11
  12:12,17 13:20
  31:22 32:4 85:2
  109:24 257:5
stated 44:5 189:3
  204:20
statement 38:12
  105:3,24 148:12
  180:9 182:6 198:6
statements 183:9
  204:7 226:22
  243:9
states 1:2 10:10
  84:25
stating 4:4 205:24
station 171:21
stationary 197:21
status 10:12 170:9
  171:4 240:25
stay 194:4,19
  196:22
stayed 240:24
step 37:9 38:8 45:2
  67:9
step-by-step 77:14
STIPULATED
  2:20,25 3:5
stop 33:5 37:3
  38:24 39:2 40:10
  41:7,15 53:24
  54:14,16 55:19
  84:19 89:16 114:7
  139:8 142:5 169:7
  185:25 188:25
  191:3 192:9
  226:12 238:14
  240:10
stopped 54:18 55:4
  55:8 143:19 174:9
  180:15 181:18
  183:19 204:8
  208:24 226:5
  238:11 239:13
stopping 238:22

stops 48:24 49:11
  87:5
store 72:18
stores 58:12
story 199:13
strange 200:15
street 2:9 6:17
  23:16 33:6 39:5,9
  39:24 40:2,5 42:6
  42:8,9,13 44:9
  168:19,20,21
  171:10,16,23
  172:2,24 173:6,9
  175:8,12 176:16
  191:21,24 208:18
  208:19,23,24
  217:25 233:24
  237:17 238:2,2,9
  238:11 239:21,25
  241:10,11
streets 23:13
  160:19 241:13
strength 167:9
stress 70:6
stressed 70:9
strike 124:18
strikes 90:21
stringent 139:17
strong 120:10
  231:7
study 9:12
subcategory 136:9
  136:23
subconscious
  187:25 188:4
subject 71:24 75:17
  77:21 108:6
  122:18 126:12
submit 152:20
  156:10,14
submitted 156:11
Subscribed 255:12
Subsection 152:18
substance 19:12
  68:14 238:19
successfully 31:6
  164:25
suddenly 178:18

suffer 121:8
sufficient 216:16
suggest 215:23
Suite 2:5
sum 68:14
supercede 147:6
supervisor 36:3
  46:25 47:2 62:14
  77:18 78:2 82:8
  92:8 152:20,25
  153:7,10 182:2
  242:6,11
supervisors 45:7,11
  91:25 117:8
  182:17 183:6,13
  183:24 242:21,24
  244:4
support 139:22
  140:4 186:7
supporting 243:9
suppose 97:12
  125:24 136:8
  195:6
supposed 154:7
  155:23 242:19,24
Supreme 113:19,21
  116:6 120:3
  134:18 135:4,8
sure 26:14 44:13
  61:17 65:3 75:12
  76:4 79:17 109:20
  110:20 111:8
  112:18 113:9
  153:6 156:22,23
  161:22 181:13
  189:10 190:3
  198:6 203:18
  207:11 209:19
  212:23 224:22
  227:24 243:12
  244:2,9 245:8
surrounded 223:14
surrounding
  134:13
survey 53:13
suspect 64:22 81:10
  90:19 113:4
  120:11 150:7

151:2 171:25
  177:13,14
suspected 149:19
  150:22 151:5
  171:14
suspects 91:3 177:6
  177:7,9,25
suspicion 50:21,23
  51:3 121:7 126:6
  126:10 132:6,15
  138:13,18,20
  139:10,18 140:7
  140:12 150:24
  192:9,10
suspicious 49:23
  50:6,17 52:6
  58:19
switch 48:9,15
switched 61:19
  219:14
sworn 3:8 5:3
  255:12 257:10
symbol 253:9
sympathy 68:16
system 156:20
  158:19 169:20,23

T

T 2:18,18 257:2,2
tactics 26:19 28:4
  103:14 245:4
tad 65:10
tags 251:10,11
  253:2,4,5
take 14:11,14 17:15
  17:25 27:11 28:13
  71:13,15 77:14
  88:9,20,22 93:5
  118:6 128:2
  175:10 190:12
  229:7 230:6 243:8
takeaway 245:14
taken 1:17,19 89:3
  121:5 123:7,11
  127:16,19 129:16
  151:23 167:8
  176:3,7 178:6
  186:18 245:16

takes 104:15,19
115:25 127:24
128:10
talk 21:12 40:16
53:25 97:13,15,22
148:16 181:8
talked 49:9 67:19
69:25 186:19
249:9
talking 24:19 40:10
40:13,15 41:7
42:11 54:4 58:3
62:23 63:2 68:10
68:15 69:19 76:13
77:12,13 114:12
125:3 147:19
191:16,19 211:11
239:19
talks 46:9 76:9
target 99:24 198:2
198:12
tasks 113:5
tattoo 202:14
210:16 213:5
248:21 251:5,9
252:10,24,25
253:5
tattooing 225:6
tattoos 200:5,6,13
201:5,9 202:8,11
204:12,16,22
205:4 206:2,5
209:24 210:9,14
210:19,24 211:3
211:11,18,20,25
212:12,18 213:14
213:19,21 214:5
214:20 215:7
225:3,11 226:14
226:16 227:6,12
228:9,15,22,24
229:8,14,16 231:6
231:9,14,18,19
232:3,14 247:7,8
247:11 248:3,13
248:16 249:10,14
250:4,21,25 251:4
253:11,17 256:22

taught 12:11,15,19
12:23 13:6,10,13
13:16,21,24 14:3
58:5 70:19
teach 116:10 188:3
tech 155:19
technical 40:8 41:5
technically 143:9
145:8
technique 163:10
techniques 63:13
66:24 67:21 91:10
telephone 203:10
Telephonic 232:25
tell 6:14 8:9,17 15:4
16:17 19:7,11,21
23:2 25:17 32:24
36:4,20 37:10
38:13 44:13 46:7
46:23 53:14,23
54:23,24 55:8
56:13 68:12 70:24
81:18 86:8 90:14
93:17 95:10,23
105:9 112:2
116:21 130:20
132:2 145:2 156:8
157:3 174:10
190:25 200:7
233:13 248:12
telling 199:13
tells 77:18 78:2
ten 166:8
term 79:5 123:19
181:19,20 189:6,8
189:9 195:5
terminate 122:12
terminology 159:8
terms 6:10 34:16
46:2 79:24 81:19
159:9 161:10
185:4 198:15
218:18,20 245:14
terribly 216:11
territory 214:22
Tesler 193:18,20,22
test 14:11,14,15,16
testified 5:5 225:22

testify 14:4
testifying 7:17
13:25
testimony 7:21
256:2 257:11
testing 110:11
tests 14:20 17:24
thank 10:14 23:19
41:19 53:21 65:17
69:22 73:6 74:12
74:23 76:15,24
85:4 86:17 148:13
168:14 201:6
214:14 216:20
229:23 232:22,24
236:23 252:8
255:6,7
thankful 46:12
53:3 54:6
ther 237:24
thigh 90:22
thing 26:13 27:3
30:15 139:14
148:21 165:8,14
172:16 248:5
things 12:15,21
26:20,21 51:3,11
58:4,8,17,22
59:16 62:11 95:13
98:20 117:23
119:17 121:13
125:19 142:18
145:18 164:11,14
164:19 165:4
182:20 183:6,12
197:6 201:19
231:2 235:22
244:13 245:8
think 27:8 38:11
50:17 52:5 54:5
55:22 56:22 59:12
67:12,14 68:22
69:7,12,14 73:20
76:9 79:13 82:25
85:10,16 86:2
87:15 96:6,9
99:23 100:24
101:13,13 103:25

104:3,4,16 105:2
105:12 106:9
107:2 117:2 120:9
123:10,23 124:21
124:25 125:15,17
127:25 129:13
133:23 134:6
136:13 140:10
142:8 159:24
168:2 179:2 180:4
181:9,12 182:11
184:16,22 188:6
191:9 199:14,21
199:23,25 200:11
202:25 205:7,17
207:13 212:19
216:10,16 217:19
220:2 221:22
222:11 223:5,7,14
227:18 231:25
232:10 235:24
236:18,22,25
240:3 243:6
246:18 247:15
253:11
thinking 73:18
86:20 88:15
192:16
thinks 231:16
third 47:3,5,9,12
48:10 61:10,14,18
66:20 91:21
117:19 119:16
154:2,3 177:14
219:16,21 233:21
third-party 194:14
thorough 64:21
65:2
thought 35:6
106:21 126:3
148:3 172:7
222:25 229:12
231:6 235:18
247:13 249:24
252:9
thoughts 187:21,25
188:4
threats 179:9

three 10:11,23 62:2
90:21 101:24
117:17 154:14
156:24 180:8
213:20
throw 67:15
ticket 44:9 117:24
118:15 119:7,13
120:20 144:5
239:11
ticketable 118:3,9
119:20
tickets 46:12 48:24
118:24 119:2
time 1:18 3:3 8:6
10:5 16:14 20:8
38:18 42:12 45:3
47:4,9,12,21 50:7
62:17 68:25 71:25
77:20,25 78:4
83:11,14 85:24
89:2,10 90:13
91:22 95:15 96:7
96:10 105:10
113:8 120:13
128:12 145:2,3
147:17 150:21
151:20 153:17
154:5 160:14
165:18 172:19
175:11,14 176:3,6
176:7 178:5
179:11 194:12
202:7 206:25
208:13 209:10
216:17 217:20
219:15 220:14,16
223:5 229:13
232:23 235:19,20
236:4,9 237:24
240:18 241:9
242:20 245:16
255:8
times 7:13 20:3,7
34:12 42:14 60:14
77:15 86:13 106:8
161:2,7 193:18
202:13 220:16

tired 89:11
title 66:7 152:11
today 5:23 7:3
  21:18 68:20,25
  80:17 110:24
  215:16 235:23
today's 19:8 20:11
  20:19 225:18
told 15:21,24 54:13
  60:6 81:14 93:4
  128:5 211:17
  242:23
tool 245:2
top 35:15 36:11
  119:23 131:10
  133:21,22 168:10
  168:13
topic 26:6 27:24
  64:6
topics 25:15 99:6
  100:21
toss 71:21,23
tossed 221:11
total 18:14 19:3
  106:8,15 177:11
  248:25
totality 86:20 87:6
  140:15 192:8
traffic 37:3,20,25
  42:3,5,5 44:11
  46:11 48:22,24,24
  49:2,11 84:19
  113:23 114:13
trail 112:14
train 64:5 85:2
trained 98:9 163:25
  164:5,13,18,21
  165:5 234:23
trainers 66:13
training 10:21
  11:20,22 15:3,5
  15:18 16:3,4,6,9
  16:10,13,13,16,18
  17:13,17 18:2,8
  18:20,23 22:6,16
  25:3,5,5,11,20,21
  26:4,9,17,18,24
  27:9,11,12,21,24

28:4,7,14 29:2,5
29:10 31:10,18
32:3,9,16,18,20
32:22,25 34:16,25
57:6,10,15,17,19
58:2,9,21 59:7
63:13,17,19,23,25
64:3,4,9,13 65:21
66:8,22 67:3,19
69:2,7,10,12 71:5
71:11 74:11,19
75:2 82:13,18
83:6,7,13,24 84:5
84:9,10,24 85:13
85:15 86:3 87:12
87:15 88:6,8 90:9
90:18 91:2,15
93:18 96:19,22
97:2,6,9 98:18,21
98:22 99:2,4,7
100:10,13,16
101:5,7,9,12,14
101:22 102:13,16
102:22 103:3,4,5
103:7,12,15 104:2
104:12,16 105:12
106:10,13,19,23
107:3 110:16
111:11,19 126:14
126:22 130:11,18
130:23 132:18
134:17 135:7
141:2,8,10,12,16
147:4,10,13,14
157:9,10,14,18
158:9,10,15,24
159:4,9,11,12,16
159:16,17,18
160:2,3 161:11
162:22 164:8
165:9 179:5,8,13
179:19 182:25
183:5,24 187:6,8
187:15,18,24
189:15,21,25
190:4,6,10,12,18
199:5,14 223:18
223:21 226:19

256:10,11
training-related
  75:20
trainings 26:17
  27:17 28:8,17,25
  34:14,20 66:16
  67:6 70:20 91:8
  91:24 96:12,15,23
  101:2 109:19,19
trains 162:20,21
transaction 52:15
transcribed 7:7
transcript 4:12
trespass 186:14
  187:2 208:6
trespassing 186:10
  186:11,21
trial 1:15 3:4 7:8,18
  8:7
trigger 223:11
trooper 84:18
  85:14
trucking 89:14
true 148:24 189:13
  257:11
try 8:9 56:10 85:21
  127:18 163:21
  165:12 166:20,24
  196:15 203:4
  207:8,12,14 216:4
trying 49:14 60:19
  86:4,19 98:2
  183:13,25 191:16
  252:19
turned 241:4
twice 20:6 106:11
  106:12,13,15
twitch 107:15,17
Twitter 108:2
  109:4
two 14:25 15:4 16:2
  17:3 20:7 27:19
  34:2 62:18 75:4
  81:15,23 87:17
  90:25 112:5 121:5
  121:13,15 123:5
  125:23 132:17
  136:10 156:24

174:24 176:19
177:6,8,9 178:2
178:11 180:7
190:22 191:23
192:6 193:18
213:11 222:8
233:19,20 234:3
234:22 238:9
252:5,6
two-week 15:21
type 58:4 96:22
  101:22 188:11
  196:11 218:3
  235:15
types 24:5,8,12
  97:8 98:20 104:23
  115:5 116:21
  179:9
typical 164:10
  218:13 242:13
typically 27:13 49:5
  80:3 96:16 147:14
  162:4,5 190:13
  221:9 231:22

_____
U
U 2:18
U.S 11:4
ultimate 184:5,7
ultimately 234:9,24
uncle 181:24
unclear 141:13
understand 5:25
  6:7 7:5 55:2 76:6
  97:21 98:3,14
  109:20 129:19
  134:9 148:6
  191:15 195:14
  209:17 212:21
  214:18 215:18
understanding
  55:15 98:10
  108:16 135:23
  138:17 213:13
understands
  231:21
understood 6:5
union 246:18,20,25

United 1:2 10:9
unlawful 129:12
  130:7 206:15
  208:6,7,8
unlawfully 135:14
unnecessary
  212:20
unprofessional
  63:8
unreasonable
  24:15 42:2 128:8
unreasonably
  128:11
unusual 121:22
up-to-date 147:7
upbringing 187:19
update 147:16
updates 26:20,24
upgraded 105:4
uploaded 168:3
use 7:8 13:16 62:17
  64:13 75:4 77:8
  80:4,6 81:22
  82:13 83:25 84:23
  85:7 87:4,19,20
  88:2 97:19 98:25
  99:3,10,12,13
  100:13 106:3
  108:7 121:21
  152:11 156:19
  170:6 183:17
  195:6 216:16
useful 104:16
user 107:25
uses 84:24
usually 31:3 107:8
  107:9 223:10

_____
V
v 113:20
vacant 238:12
vague 38:11 68:7
  179:3
vaguely 15:6 32:23
  67:24 173:16
valid 41:12 82:20
  131:14,23 188:17
variety 51:4

**various** 13:11
ary 126:24 161:3
**vehicle** 85:3 90:20
  139:8,11 238:17
**vehicular** 42:3,4
**verbally** 109:14
**versus** 15:8 167:5
**vice** 208:17
**vicious** 167:5
**video** 1:12 4:14,18
  73:10 97:12 98:15
  100:4 107:6,19
  167:22 169:12,24
  172:13 174:14,18
  174:25 178:12
  180:8 190:22,23
  193:9 200:2,4
  202:9,20 210:10
  211:4,7 213:15
  217:8 226:15
  229:15 231:15
  232:16 243:15,22
  247:14,20 248:4
  248:11,17 249:21
  251:2 252:12,18
**videos** 21:25 22:3
  83:2 204:6
**view** 4:14 78:17
  146:16 147:18
  148:9 169:11
  232:8
**violated** 15:23
**violates** 115:24
**violation** 113:25
  114:11 116:15
  120:17 126:25
  139:9 143:10
  195:11
**violent** 23:5,21 24:2
  24:3 51:23,24
  97:17 149:13
**virtual** 6:12 79:5
**virtually** 204:14
**visible** 206:5
  211:12 214:6
  225:4,12 228:25
  247:17,18 248:2
  248:24 249:11,25

**visit** 243:18
**visual** 169:21
  170:11
**voice** 99:20
**volume** 39:5

---
**W**
**wait** 166:6 216:9
**waited** 234:10,10
**waiting** 216:21
  230:2
**waive** 3:25
**waived** 2:24
**walk** 38:4,8 127:19
  127:24 136:14
  166:3,18 169:25
  176:3,8 178:7
  217:17
**walked** 81:12
  238:13
**walking** 160:19
  170:16 228:19
**want** 4:17 19:5
  24:18 28:2 29:13
  40:16,18 48:23
  50:18 56:20 58:22
  59:15 60:25 71:22
  73:11 74:4 80:25
  86:11 88:14,20,21
  88:23 89:8 98:2
  108:20 111:2,15
  133:17,19,24
  138:21 140:13
  148:2 157:5
  167:18 183:16
  189:13 191:12
  193:7 201:14,23
  202:3,14 209:19
  212:23 216:4,9
  227:15,17 231:2
  233:19 241:17
  246:4 247:6,19
  248:7,12 249:7
**wanted** 48:17,20
  69:21 71:23 78:7
  186:21,25
**wanting** 46:2
**wants** 56:7

**warrant** 111:10,18
  112:4 114:3,24
  115:21 130:2
  131:12 137:18,19
  137:20,20 140:22
  141:5 144:11
  145:20,21 217:10
  256:10
**warrantless** 113:22
  120:4,19 121:2
  122:21 133:4,8
  140:21 141:19
  256:11
**warrants** 217:13
  238:25 239:4
**wasn't** 12:8 61:17
  62:20 123:11
  130:7 153:6 171:3
  222:7 235:21
  241:7 244:3 249:3
  250:2,6
**waste** 202:7
**watch** 21:25 22:3
  84:4 94:2 176:23
  243:22 247:20
  248:5,10 251:6
  252:17
**watched** 81:4,5,9
  83:17 95:5 217:7
  243:14
**watching** 84:3
  192:25 229:14
**way** 46:13 53:4
  69:7 80:20 82:14
  144:13 182:19
  188:24 189:8
  229:18 257:16
**ways** 188:5
**we'll** 29:17 35:4
  89:19 146:4 195:6
  216:21 248:10
**we're** 6:13 40:13
  60:15 88:7 89:13
  145:21 147:19
  157:6 168:17
  169:11 180:7
  201:19 202:23
  203:23 206:2

212:17 221:21
  224:15 235:22
  249:9,13
**we've** 34:4
**weapon** 65:4 84:23
**weather-induced**
  123:16
**week** 11:25 160:25
  161:3,3 165:20
  166:10 218:25
**weeks** 14:25 15:5
  16:2 66:21 161:6
  161:7 219:11,18
**weird** 200:11
**welcome** 69:24
**wellness** 70:2
**Welsh** 113:20,25
  114:23
**went** 8:17 11:14
  15:9 32:13 42:7
  65:18 66:12 70:6
  146:24 153:13
  159:13 171:22
  184:17 185:9
**weren't** 47:16
  174:2
**WESTERN** 1:2
**westward** 23:16
**Whitmore** 233:16
  234:7,16,16,20,23
  235:8,14 236:10
**Whitmore's** 235:18
**willing** 210:15,22
  212:17 231:13
**willingly** 205:23
**winter** 144:23
**Wisconsin** 113:20
**wish** 184:6,8
**withdraw** 16:8
**witness** 5:8,13 8:21
  16:22 22:13 57:14
  65:16 72:16 215:4
  231:17 243:8
  256:4 257:8,12
**Witness's** 29:21
**witnessed** 124:14
  173:9
**witnesses** 243:5

**word** 129:20
  138:21 139:5
  146:12 147:15
**wording** 222:7
**words** 60:7
**work** 9:20 10:17,21
  47:6,7,10 48:17
  48:21 57:17 99:18
  104:19 144:22
  145:9,10 160:11
  163:19 190:14,15
  190:16
**worked** 10:8 47:3,5
  144:25
**working** 105:8
  160:12 161:12
  170:17 190:11
**works** 17:6 104:23
  169:9,15
**worn-camera** 78:18
**worried** 145:21
**worst** 60:16
**wouldn't** 26:14
  39:4 63:22 96:8
  140:6 146:8
  159:18 162:21
  242:14
**wounded** 125:22
**Wright** 16:25
**write** 48:24 72:4
  77:21 109:15
  152:12 242:14,19
  242:25
**writing** 35:5 46:11
  80:13 86:15
  155:16 251:12,14
**written** 14:15,16
  18:3 77:19 110:13
  194:23 196:4,7
  206:13 242:11
**wrong** 84:14
  129:23 233:16

---
**X**
**x** 1:3,10 10:5 59:12

---
**Y**
**Y** 59:12

**yappiest** 167:11
**yard** 122:20 130:4
  147:20 165:24
  172:4,8 177:15
  178:14 179:22,25
  180:5 195:10,10
  208:12,25 209:3,6
  209:8 217:9 218:8
  218:11,22 221:23
  222:14,22 223:6
  223:13 226:6
  234:3,4
**yards** 171:15
  172:25 173:20
  218:5 219:9
  221:12 240:2,10
  240:16
**Yeah** 221:6 240:13
**year** 8:18,24 9:17
  9:17 25:22 26:5
  26:10 27:16 61:19
  252:2,3
**years** 10:11,24
  21:17 107:13
**yell** 99:16
**Yep** 104:10 121:25
**yes-or-no** 98:5
**yesterday** 172:15
**York** 1:2,20 2:5,5,9
  5:4,14 6:18 12:13
  12:17 13:20 32:3
  85:2 109:25 257:5
**young** 204:8 208:20
  208:25 212:5
  226:3
**youngest** 107:22

---
**Z**
---

**Z** 59:13
**zoom** 65:9 90:11
  138:2 204:14

---
**0**
---

---
**1**
---

**1** 32:8
**10** 18:21 75:6
**10-foot** 234:13

**10/19/18** 237:19
**100** 162:16
**10016** 2:5
**1029** 238:21,24,25
**1039** 74:8
**1041** 76:16,23,24
**1042** 86:25
**1043** 88:3
**1044** 87:23
**1045** 90:6
**1046** 91:15
**1047** 95:10
**1048** 101:22
**10th** 75:3
**11** 102:20
**11:00** 48:8
**11:15** 47:22,23
**11:31** 89:2
**111** 256:10
**1116** 44:20
**1117** 44:21
**1131** 31:5
**1132** 29:20 30:2
**1169** 111:21
**1170** 111:21
**1171** 130:21
**1173** 130:21
**118** 152:18
**1190** 11:22
**12/4/19** 90:9
**1201** 133:7
**13** 172:12 251:17
  251:18,25
**130** 256:11
**133** 256:11
**137** 256:12
**14614** 2:9 5:15
**15** 47:23,25 128:7
  128:10 129:16
  172:12 174:18
  175:7 178:6
  190:23 245:16
**15-minute** 48:3
**1500** 47:14,17
**151** 256:12
**155** 256:18
**167** 256:11
**16th** 61:3

**17** 161:13
**1707** 172:12
**170757** 174:15
**170858** 178:12
**170903** 180:9
**170915** 190:23
**170958** 193:10
**18** 18:14 19:3
**185** 5:13
**18th** 32:21 33:18
**19** 105:18
**192** 2:5
**1984** 113:20
**19th** 122:15,16
  134:25 150:8
**1st** 35:17 44:18,19

---
**2**
---

**2/1** 59:21
**2/24** 59:21
**20** 178:6
**20/20** 129:9
**2011** 8:25
**2016** 11:12 105:18
  159:22,23,25
  161:13
**2017** 17:15 25:19
  25:22 26:5 32:8
  32:21 35:17
**2018** 44:19,19
  59:17,20 91:16
  122:16 134:19,25
  150:8 230:15
  233:7
**2018-0009117**
  230:8 233:4
  256:13
**2019** 11:7 48:12
  61:11,12,15 63:14
  65:24 69:2 75:5
  105:13
**2020** 61:4,21 75:3
  103:12
**2022** 1:12 122:16
  255:14 257:21
**21** 257:21
**22nd** 233:7
**230** 256:13

**2315** 47:15
**237** 256:14
**241** 256:14
**24th** 59:20
**250/4-5** 256:22
**259** 193:9
**29** 256:10
**29th** 134:19

---
**3**
---

**3** 1:12
**3:00** 47:17,20
**30** 2:9 6:17 169:18
  169:21 170:4,11
**30th** 35:17 91:16
**31st** 44:19
**34** 256:18
**340** 151:24 152:5
  152:10 256:12
**3D** 140:20

---
**4**
---

**4:12** 255:8
**40** 11:24 71:2
**415** 116:15 120:17
  137:6,11,20
  143:10 242:18,25
  256:12
**45** 175:15,20

---
**5**
---

**5** 65:24 234:13
**5:00** 89:21
**50** 198:2,8
**54** 237:17 238:2
**58** 174:14

---
**6**
---

**6** 256:5
**61** 237:25 238:9

---
**7**
---

**7:00** 48:8

---
**8**
---

**802** 2:5
**823** 137:14 138:4
**843** 141:19
**872** 137:14

---
**9**
---

**9/1/2017** 31:8
**9:45** 1:13
**911** 36:23 38:24
  51:5 52:16 56:12
  92:19,20,22
  165:23 166:21,25
  174:7 240:7,8
  241:8
**999** 29:20 65:19