```
 1

 2                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 3      - - - - - - - - - - - - - - - - - - - - - - - - -
        CHARLES DEMPSEY, individually, and
 4      L.D., by her father and natural guardian,
        CHARLES DEMPSEY,
 5
                    Plaintiffs,
 6
                                  Case No. 19:cv:6780
 7      v.

 8      THE CITY OF ROCHESTER, a municipal entity,
        JAVIER ALGARIN, ADAM GORMAN, "JOHN DOE" RPD
 9      OFFICER RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

10                  Defendants.
        - - - - - - - - - - - - - - - - - - - - - - - - -
11

12      Deposition Upon Oral Examination of:

13                    Charles R. Dempsey III

14
        Location:       City of Rochester Law Department
15                      City Hall, Room 400A
                        30 Church Street
16                      Rochester, New York 14614

17

18      Date:           October 3, 2023

19

20      Time:           9:30 a.m.

21

22      Reported By:    SANDRA C. HEWLETT, RPR

23                      Alliance Court Reporting, Inc.

24                      109 South Union Street, Suite 400

25                      Rochester, New York 14607
```



```
 1
 2                     A P P E A R A N C E S
 3    Appearing on Behalf of Plaintiffs:
 4    Elliot D. Shields, Esq.
 5         Roth & Roth, LLP
 6         192 Lexington Avenue, Suite 802
 7         New York, New York  10016
 8         eshields@rothandrothlaw.com
 9
10    Appearing on Behalf of Defendants:
11    Peachie L. Jones, Esq.
12         City of Rochester Law Department
13         City Hall, Room 400A
14         30 Church Street
15         Rochester, New York  14614
16          peachie.jones@cityofrochester.gov
17
18                      *       *       *
19
20
21
22
23
24
25
```



1              S T I P U L A T I O N S

2    TUESDAY, OCTOBER 3, 2023;

3              (Proceedings in the above-titled matter

4              commencing at 9:43 a.m.)

5                        *      *      *

6              IT IS HEREBY STIPULATED by and between the

7    attorneys for the respective parties that this

8    deposition may be taken by the Defendants at this time

9    pursuant to notice;

10             IT IS FURTHER STIPULATED, that all

11   objections except as to the form of the questions and

12   responsiveness of the answers, be reserved until the

13   time of the trial;

14             IT IS FURTHER STIPULATED, that pursuant to

15   Federal Rules of Civil Procedure 30(e)(1) the witness

16   requests to review the transcript and make any

17   corrections to same before any Notary Public;

18             IT IS FURTHER STIPULATED, that if the

19   original deposition has not been duly signed by the

20   witness and returned to the attorney taking the

21   deposition by the time of trial or any hearing in this

22   cause, a certified transcript of the deposition may be

23   used as though it were the original;

24             IT IS FURTHER STIPULATED, that the

25   attorneys for the parties are individually responsible



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2   for their certified transcript charge, including any
 3   expedite or other related production charges in
 4   accordance with Rochester Rules;
 5              AND IT IS FURTHER STIPULATED, that the
 6   Notary Public, SANDRA C. HEWLETT, RPR, may administer
 7   the oath to the witness.
 8                   *      *      *
 9   CHARLES R. DEMPSEY III,
10          called herein as a witness, first being sworn,
11          testified as follows:
12          EXAMINATION BY MS. JONES:
13          Q.  Good morning.
14          A.  Good morning.
15          Q.  My name is Peachie Jones.  I'm an attorney
16   for the City of Rochester, as you know.  I thank you
17   for being here today so I can take your deposition.
18              So you were here yesterday for your
19   daughter's deposition, so you know the same ground
20   rules, but I will still go over them.  So you can ask
21   me any questions if you have them.
22              We have you placed under oath which means
23   you have to tell the truth, the whole truth.  Like I
24   said yesterday, you're not offending anybody.  Please
25   be honest so that we can have a good record for the
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    case.
 3              Wait to provide an answer.  Wait to
 4    provide your answer after I finish my question so the
 5    stenographer can hear everything that I have said and
 6    that you have said.
 7              Because you are obligated to tell the
 8    truth, make sure you hear my question and understand
 9    it.  If either of those are not true, will you please
10    tell me that you haven't heard or didn't understand my
11    question?
12         A.   Yes.
13         Q.   Of course, Elliott might object.  That's a
14    verbal bookmark, so to speak.  You still have to
15    answer unless he instructs you not to.
16              And then pronouns.  We'll try and avoid
17    those as much as possible so it is clear who the "he,"
18    "she" and "we" is -- yeah.  "He," "she" and "we."  I
19    think that's it.
20              Did I miss anything from yesterday or do
21    you have any questions?
22         A.   I don't have any questions.
23         Q.   All right.  Do you have any condition
24    whether mental, medical or physical that would impair
25    your ability to hear the questions I'm going to ask
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    you today?
 3              A.  No.
 4              Q.  Do you have any conditions, whether
 5    mental, medical or physical, that would impair your
 6    ability to understand the questions I'm going to ask
 7    you today?
 8              A.  No.
 9              Q.  Do you have any condition, whether mental,
10    medical or physical that would impair your ability to
11    respond to my questions today?
12              A.  No.
13              Q.  Have you consumed any alcohol in the last
14    24 hours?
15              A.  No.
16              Q.  Have you consumed any drug in the last 24
17    hours?
18              A.  No.
19              Q.  Have you consumed any medications in the
20    last 24 hours?
21              A.  No.
22              Q.  When did you learn that you were going to
23    undergo a deposition today?
24              MR. SHIELDS:  Objection.
25              A.  I understood that this was part of the
```



1              CHARLES R. DEMPSEY III - BY MS. JONES

2    process that I started four years ago -- five years

3    ago now.  I mean it's part of the Court process

4    between the petition and a trial, I believe.

5            Q.  What did you do to prepare for the

6    deposition today?

7            A.  I met my attorney.

8            Q.  Did you meet with anyone else to prepare

9    for today?

10           A.  No.

11           Q.  Did you talk with anyone other than your

12   attorney to prepare for the deposition today?

13           A.  No.

14           Q.  Did you review any documents in

15   preparation for your deposition today?

16           A.  Yes.

17           Q.  What documents did you look at?

18           A.  I looked at the -- I don't recall the name

19   of the document, but the transcript from the previous

20   deposition of my mother.

21           Q.  Is that Grandma Sherry?

22           A.  That's correct.

23           Q.  Did you review any other documents to

24   prepare for today?

25           A.  I had reviewed the previous hearing that I



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2     had taken.  50-h.  Something like that.
3              Q.  Did you review any other documents?
4              A.  No.
5              Q.  Did you review any video in preparation
6     for the deposition today?
7              A.  Yes.
8              Q.  What video did you review?
9              A.  Officer Algarin's body-cam footage.
10             Q.  How many times did you watch it?
11             A.  When it --
12                 MR. SHIELDS:  Objection.
13             A.  How many times did I watch it when?
14             Q.  When you were preparing for this
15    deposition.
16                 MR. SHIELDS:  Objection.
17             A.  Recently I watched it once.
18             Q.  Did you watch any other videos in
19    preparation for the deposition today?
20             A.  No.
21             Q.  Did you speak with anyone else other than
22    your attorney in preparation for this deposition?
23             A.  No.
24             Q.  Have you spoken with anyone other than
25    your attorney about the lawsuit that you're being
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    deposed for today?
 3              A.  Yes.
 4              Q.  Who have you spoken to about the lawsuit?
 5              A.  My daughter, LD Dempsey.  My mother,
 6    Sherry Dempsey.  My father, Charles Dempsey.  I have
 7    spoken to -- I mean immediate family.
 8              Q.  Who falls into the category of "immediate
 9    family" other than your daughter, mother and father,
10    that have you spoken to about the lawsuit?
11              A.  I have spoken to my brother.  I mean
12    the -- the people that I live with.  My girlfriend.
13              Q.  Do you live with anyone else besides your
14    girlfriend?
15              A.  My daughter.
16              Q.  Are there anyone else in the category of
17    people that you live with?
18              A.  No.  No.
19              Q.  How many brothers do you have?
20              A.  Two.
21              Q.  Which brother did you speak to about the
22    lawsuit?
23              A.  Benjamin.
24              Q.  Is his last name Dempsey?
25              A.  That's correct.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            CHARLES R. DEMPSEY III - BY MS. JONES
 2            Q.   Did you have -- have you spoken with
 3   anyone else other than your daughter, mother, dad,
 4   Brother Benjamin and girlfriend about the lawsuit?
 5            A.   In the last five years?
 6            Q.   Yes.
 7            A.   Yes.
 8            Q.   Who else have you spoken to about the
 9   lawsuit?
10            A.   I can't remember every time that it might
11   have come up, but I do recall speaking about it at
12   work to people who were inquiring as to what I was
13   doing about what happened to me.
14            Q.   Who at work did you talk to about the
15   lawsuit?
16            A.   Guys like Tom and Lee.
17            Q.   Do you know Tom's last name?
18            A.   Not off the top of my head.
19            Q.   Do you know Lee's last name?
20            A.   Johnson.
21            Q.   Do Lee and Tom -- scratch that.
22                 Are Lee and Tom your current co-workers?
23            A.   Lee is retired.  Tom works a different
24   shift.
25            Q.   Did Lee retire from the place of
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    employment that you currently have?
 3              A.   Yes.
 4              Q.   Where do you work?
 5              A.   United Parcel Service.
 6              Q.   What's your position there?
 7              A.   Pre-loader.
 8              Q.   What does a pre-loader do?
 9              A.   Picks stuff up and puts it down.
10              Q.   Are you moving things from one location to
11    another?
12              A.   For example, if somebody was to order
13    something from Home Depot, it would come off the UPS
14    truck and go through the warehouse and then my job is
15    to take it and load it on the appropriate delivery
16    vehicle and space.
17              Q.   Was Lee also a pre-loader?
18              A.   He was a yard guy, which meant he drove
19    the -- that -- the Mack truck.  He moved the trailers.
20              Q.   Did Lee work the same shift you did?
21              A.   Yes.
22              Q.   What shift was that?
23              A.   Pre-load shift.
24              Q.   What hours were your shift?
25              A.   From midnight until 9 a.m.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  What shift did Tom work?
 3         A.  Tom was a part-time employee.  He worked
 4    from midnight to 3:45 a.m.
 5         Q.  How many times did you speak with Lee or
 6    Tom about -- how many times did you speak with Tom
 7    about the lawsuit?
 8         A.  I don't recall.
 9         Q.  Can you give me an estimate?
10         A.  I can recall one specific incident, but
11    there may have been more.
12         Q.  I'm sorry.
13              Was that Tom or Lee?
14         A.  You asked about Tom.
15         Q.  Thank you.
16              How many times did you speak with Lee
17    about the lawsuit?
18         A.  I don't recall a number.  More than once.
19         Q.  What's your full name?
20         A.  Charles Richard Dempsey III.
21         Q.  Does your dad go by "Junior"?  Charles
22    Dempsey, Jr.?
23         A.  He is.
24         Q.  Did you speak with anyone else about the
25    lawsuit besides Tom, Lee and your family members and
```



```
 1                    CHARLES R. DEMPSEY III - BY MS. JONES
 2     girlfriend that you mentioned?
 3             A.  I -- I don't recall.
 4             Q.  Do you go by "Charles"?
 5             A.  I prefer to go by "Chuck."
 6             Q.  Where were you born?
 7             A.  Genesee Hospital on Alexander Street in
 8     Rochester.
 9             Q.  Where do you currently live?
10             A.  In -- on Simpson Road.
11             Q.  Where is that?
12             A.  Rochester.
13             Q.  How long have you lived on Simpson Road in
14     Rochester?
15             A.  Past few years.
16             Q.  Did you move to Simpson Road after
17     Kosciusko Street?
18             A.  Yes.
19             Q.  Do you know when you moved out of the
20     Kosciusko Street house?
21             A.  That end of 2020.
22             Q.  Did you rent or own the Kosciusko Street
23     house?
24                  MR. SHIELDS:  Objection.
25             A.  Both.  I bought the home from the guy I
```



```
 1                 CHARLES R. DEMPSEY III - BY MS. JONES
 2     was renting it from.
 3             Q.  Did you have a mortgage?
 4             A.  For a period.
 5             Q.  At the time of the incident with the dog,
 6     you had a mortgage?  You were no longer renting?
 7                 MR. SHIELDS:  Objection.
 8             A.  I was no longer renting.
 9             Q.  Had you already paid off your mortgage at
10     that time?
11             A.  I believe so.
12             Q.  Were you renting or buying the Simpson
13     Road address?
14             A.  Buying.
15             Q.  Are you married?
16             A.  No.
17             Q.  Have you ever been married?
18             A.  No.
19             Q.  Do you currently have a girlfriend?
20             A.  Yes.
21             Q.  What's her name?
22             A.  Ashley.
23             Q.  What's her last name?
24             A.  Reichert.
25             Q.  Can you spell that for us?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.   R-E-I-C-H-E-R-T.
 3         Q.   How do you spell Ashley?
 4         A.   A-S-H-L-E-Y.
 5         Q.   Did you graduate high school?
 6         A.   Yes.
 7         Q.   Where did you graduate from?
 8         A.   Hilton.
 9         Q.   Did you pursue additional education after
10    high school?
11         A.   Yes.
12         Q.   Did you earn any additional degrees?
13         A.   No.
14         Q.   Where did you take classes after high
15    school?
16         A.   Monroe Community College.
17         Q.   Do you have any employment licenses or
18    certifications?
19         A.   On -- I'm confused as to what that
20    includes.
21         Q.   Do you have any special licenses that you
22    used for your employment?
23         A.   Like I had a DOT license.
24              Is that something that would be included?
25         Q.   Uh-huh.
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2                  Do you still have a DOT license?
 3         A.   It may have expired.
 4         Q.   Was it a license or a certification?
 5         A.   A certification.
 6              Again, I was confused what that includes.
 7         Q.   What was the certification for?
 8         A.   DOT is for driving.  For driving the UPS
 9    trucks.
10         Q.   Okay.  When did that lapse?
11         A.   I don't know when it had expired.
12         Q.   Did you have a commercial driver's
13    license?
14         A.   A CDL, no.
15         Q.   Do you have any children?
16         A.   Yes.
17         Q.   How many?
18         A.   One.
19         Q.   How long have you been a pre-loader at
20    UPS?
21         A.   Since June of 2006.
22         Q.   And when is your current shift?
23         A.   From midnight to 9 a.m.
24         Q.   Have you ever worked a shorter shift than
25    midnight to 9 a.m.?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1            CHARLES R. DEMPSEY III - BY MS. JONES
 2            A.   Yes.
 3            Q.   How long have you worked midnight to
 4   9 a.m. most recently?
 5            A.   The last nearly two years.
 6            Q.   What hours did you work before midnight to
 7   9 a.m.?
 8            A.   9 a.m. to 9 p.m.
 9            Q.   How long did you work 9 a.m. to 9 p.m.?
10            A.   From 2020 until -- or I believe I started
11   doing that at the very end of 2019 until I switched to
12   the current shift.
13            Q.   What were your hours in 2019 before you
14   went to 9 a.m. to 9 p.m.?
15            A.   12:00 a.m. to like 3:30, 3:45 a.m.
16            Q.   How long did you work from 12:00 a.m. to
17   3:45 a.m.?
18            A.   Several years going back to about 2009 or
19   2010.  I don't recall.
20            Q.   Did you have an additional source of
21   employment or -- excuse me.
22                 Did you have any additional sources of
23   income when you were working from 12 a.m. to 3
24   something a.m.?
25            A.   Did I have another job during that time?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  Correct.
 3         A.  No.
 4         Q.  Did you have another source of income
 5    during that time?
 6         A.  No.
 7         Q.  Were you with Ashley from any point in
 8    2009 to 2019?
 9         A.  Yes.
10         Q.  Was she working during that time period?
11         A.  Yes.
12         Q.  Why did you choose to work part-time from
13    2009 to 2019 approximately?
14              MR. SHIELDS:  Objection.
15         A.  As a teamster, my position is granted
16    through seniority.  I had to earn seniority to get a
17    full-time position.
18         Q.  Are you saying you didn't have seniority
19    until 2019 approximately?
20         A.  No.
21         Q.  When did you first gain seniority in the
22    Teamsters?
23         A.  I joined the Teamsters in 2006.
24         Q.  When did you first become eligible to work
25    full-time?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  In 2006.
 3         Q.  So why did -- so were you eligible to work
 4    full-time in 2009?
 5         A.  Was I eligible to work full-time in 2009?
 6    Is that your question?
 7         Q.  Yes.
 8         A.  Yes.
 9              MR. SHIELDS:  Objection.
10         Q.  Why did you choose to have only part-time
11    hours in 2009 to 2019?
12              MR. SHIELDS:  Objection.
13         A.  Because there -- there was not a seniority
14    for me to get a set position as a full-time employee.
15              To explain?
16         Q.  Yes, please.
17         A.  I would -- I would have then become a
18    floater, so instead of delivering one neighborhood, I
19    would deliver the neighborhood of the guy who called
20    in sick that day.
21         Q.  So you were waiting for a specific
22    position?
23         A.  As well as I was taking care of my
24    daughter as she was growing up at that time, so I
25    would not have been able to do that if I had taken the
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    full-time role at work.
 3              Q.  Were there any other reasons that you
 4    chose to have shorter hours from 2009 to 2019?
 5              MR. SHIELDS:  Objection.
 6              A.  I learned how to live on it.  I was there
 7    for my daughter.  I was able to get her to all of her
 8    appointments and her schools.  It felt convenient.
 9              Q.  How much did you earn at UPS as a
10    pre-loader?
11              MR. SHIELDS:  Objection.
12              A.  Teamsters get contract wages each year.
13              Q.  How much were you earning in 2018 at the
14    time of the incident?
15              A.  I don't recall the specific wage, but it
16    was approximately -- just shy of $20 an hour.
17              Q.  Have you had any raises or increases to
18    your hourly wage since the time of the incident?
19              A.  Yes.
20              Q.  How much are you making now per hour?
21              A.  Just over $30 an hour.
22              Q.  Did you have health insurance at the time
23    of the incident in 2018?
24              A.  The incident?
25              Q.  Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  Did I have -- yes.
 3         Q.  Is that through your employment?
 4         A.  Yes.
 5         Q.  How long had you lived on Kosciusko Street
 6    as of September 2018?
 7         A.  11 years and some months.
 8         Q.  Did you like living in that area?
 9              MR. SHIELDS:  Objection.
10         A.  Yes.
11         Q.  Why?
12              MR. SHIELDS:  Objection.
13         A.  I was born in the City of Rochester.  I
14    find that it is convenient to be close to the things
15    that I use and go to.  It's a tighter community than
16    the neighborhood my parents were living at.  The
17    flowers that grew in the backyard came all summer.
18         Q.  Are you referring to your backyard?
19         A.  My backyard on Kosciusko Street, that's
20    correct.
21         Q.  Anything else that you liked about your
22    neighborhood at Kosciusko Street?
23         A.  Less than a mile from my job.  I could
24    take a poop on my lunch break.
25         Q.  Will you describe your backyard at
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     Kosciusko Street?
 3              MR. SHIELDS:  Objection.
 4         A.   From -- the south side -- from the south
 5     side is a fence that is -- it's a metal fence that is
 6     kind of a wire kind of fence, I guess you would say.
 7     Link.
 8              And there is a flowering tree to the east
 9     corner of it.
10         Q.   You know, I'm sorry.  I don't do very well
11     with north, south, east and west.  If you're standing
12     on your back porch, like on --
13         A.   I would be looking south.
14         Q.   Okay.  Thanks.
15         A.   So the east would be to my left.
16         Q.   Okay.  Go ahead.
17              Where was the flowering tree?
18         A.   Honestly, I believe it's a bush.  But --
19     so the back left corner standing from the porch would
20     have a bush.  There -- fence goes along the property
21     line from east to west.  And the west side is another
22     tree that grows at an angle over the corner of that --
23     over the corner of the fence there where it meets the
24     chain-link fence of my neighbor's house, of which
25     there's a black chestnut tree a few feet from that
```



```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2    corner.  It's very old.
3              Following that fence line, there is a
4    flowering -- there is two flowering bush -- bushes.  I
5    think a -- purple and white flowers.  Along the fence
6    line continuing is -- you know, there are other
7    flowers.  Tulips come up and stuff like this.
8              There is a walkway, an old walkway that --
9    like sidewalk bricks kind of, like concrete.  Along
10   the fence there.  And there is another -- there is a
11   cherry tree continuing north.  Along my neighbor's
12   chain-link fence there is a cherry tree.  And then
13   past the cherry tree is another bush that makes these
14   white flowers in like late July, August.  I don't know
15   the name of that either.  But I always appreciated
16   that.  And that's right along the back of my house of
17   which -- like right where the bush is, is -- is a door
18   to which -- which enters the basement of my home.
19             And then just, you know, a few feet from
20   there that begins my back porch.  The porch continues
21   until the -- the other side of my house where -- at
22   that point, at the other side of the porch is a stairs
23   that you come down and -- in an eastward direction.
24             And then the yard encases the land between
25   my next neighbor's house, which is then, you know,
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1              CHARLES R. DEMPSEY III - BY MS. JONES
2      continuing from -- if I was to be on the porch facing
3      south.  We're now referring to my left and that would
4      be my neighbor's house which is larger than my house
5      as far as depth.  So at my back porch, my neighbor's
6      house continues.
7              Um, there is a space in between the two
8      homes that's fenced in.  So that would -- that would
9      include that in the yard.
10             And along that space is a sidewalk.  And
11     there's a -- a fence at the front of that.  And then
12     it's my neighbor's house.  And then my neighbor has a
13     wooden fence, like a taller-than-me wooden fence that
14     covers his -- entire property line between mine and
15     his home going all of the way back to the -- the metal
16     fence that was -- that I started talking about with
17     the bush.
18         Q.   Uh-huh.
19         A.   And inside of the center of the yard was a
20     tree that has since collapsed.  My friend told me not
21     to let that ivy grow up the tree.  "It's not good for
22     it."
23             I was like, "Hey, it looks cool."
24             Sure enough.  Ivy is not, you know, good
25     for a tree's health and that tree fell.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  When did that tree fall down?
 3         A.  It was Halloween.  I don't remember which
 4    year exactly.  But I remember it being Halloween
 5    because it was scary.
 6         Q.  Was it standing at the time of the
 7    incident with Tesla?
 8         A.  I don't recall.
 9         Q.  Was there anything else in your yard
10    besides a tree?
11         A.  Yeah.
12         Q.  What else was in your yard?
13         A.  Are we referring to at the time of the
14    incident or are we referring to like over the years?
15    I spent a long time in that yard.
16         Q.  Sure.  We can talk about at the time of
17    the incident.
18              Was there anything inside your yard?
19              MR. SHIELDS:  Objection.
20         A.  There would have been -- obviously there
21    would have been the -- all of the stuff that we played
22    with the dog.  She would scatter toys and favorite
23    sticks.  There was a nice chunk from the cherry tree.
24    She would find that in a foot of snow.
25              There was a stone circle of which I would
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2   have fires in it.  Up to that point I never -- I never
 3   invited somebody to come back there again after that
 4   incident.
 5              The -- there was -- it would have had a
 6   grill.
 7         Q.  Where was the grill?
 8         A.  I usually kept the grill against the
 9   porch.  Sometimes I would stash it on the porch for
10   winter, but I would usually have it like on the --
11   north side of the porch -- or south side of the porch.
12         Q.  Can you think of anything else that would
13   have been in your yard at the time of the incident
14   with Tesla?
15              MR. SHIELDS:  Objection.
16         A.  It's difficult because I recently reviewed
17   that video and it's -- you got me trying to picture it
18   and I can't get over parts that I can't get over.
19              Can I just say I don't recall all of the
20   details of my yard?
21         Q.  Sure.
22              Can you tell me how wide your porch --
23   your back porch is or was?
24              MR. SHIELDS:  Objection.
25         Q.  Can you tell me how wide the porch of
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    Kosciusko Street is?
 3              MR. SHIELDS:  Objection.
 4         A.   Do you mean by depth or by -- I mean --
 5         Q.   Both.
 6         A.   Both.  So I would -- the porch extends 5
 7    or 6 feet from the back of the house and goes length
 8    of the house from -- as I described before -- past the
 9    basement door, so it goes from that length to the --
10    the end of the house where the stairs are.  I would
11    assume that was approximately 17 feet and that's just
12    a guess.
13         Q.   Do you know how many stairs there were
14    going from the top of the porch down to the ground --
15         A.   I think four steps.
16         Q.   -- at Kosciusko Street?
17         A.   Sorry for interrupting you.
18         Q.   Okay.  What pets did you have in 2018, if
19    any?
20         A.   Tesla, who you should be aware of.  And I
21    had a cat named Kit.
22         Q.   And we were referring to the cat yesterday
23    as KitKat, but is the name Kit?
24         A.   KitKat is her whole name.
25         Q.   Okay.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2              A.  I refer to her as Kit.  We're buds.
 3              Q.  And Kit, KitKat, you -- know what -- you
 4     okay.  I'm referring to the cat.
 5              Any other pets besides Tesla and KitKat?
 6              A.  Not that lived in the home.
 7              Q.  Did you -- okay.  Well, what other pets
 8     did you have?
 9              MR. SHIELDS:  Objection.
10              A.  I sort of looked out for a neighborhood
11     cat.  Looked just like my cat inside.  Called "Out
12     Cat."
13              Q.  Did KitKat know about Out Cat?
14              A.  Yeah.  She got a hold of her once.  Not
15     too happy about sharing food.  Or my affection.  I
16     don't know how cats think, but...
17              Q.  Any other pets you had?
18              A.  No.
19              Q.  When did -- so who did Tesla belong to?
20              A.  Tesla was a family pet.  I mean she had
21     her own heart.
22              Q.  I'm sorry.
23              She had her own what?
24              A.  Her own heart.
25              Q.  When did y'all get Tesla?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  I believe 2016.
 3         Q.  Did y'all get Tesla for Christmas?  Or was
 4    that Savannah?
 5              MR. SHIELDS:  Objection.
 6         A.  I remember it being warm and grassy when I
 7    brought Tesla to LD for the first time.  Which does
 8    not describe Christmas if I'm remembering right.
 9         Q.  Who took care of Tesla?
10         A.  What do you mean by "took care"?
11         Q.  What's your understanding of the word
12    "care," or to take care?
13              MR. SHIELDS:  Objection.
14         A.  To aid in food, shelter and hygiene.
15         Q.  There you go.
16              Who participated in taking care of Tesla?
17              MR. SHIELDS:  Objection.
18         A.  Everyone in the home.
19         Q.  Was Tesla licensed or registered in the
20    city?
21         A.  Yes.
22         Q.  Under whose name was Tesla licensed?
23         A.  My name.
24         Q.  Did Tesla have her shots?
25         A.  Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          CHARLES R. DEMPSEY III - BY MS. JONES

2          Q.  What veterinarian did you take Tesla to?

3          A.  Multiple veterinarians.

4          Q.  Did you use one vet more than others?

5          A.  We often got recurring shots through the

6    Petco program at Petco.

7          Q.  Do you remember the names of any other

8    veterinarians you used for Tesla?

9          A.  Animal Hospital that's on Bay Street.  I

10   believe it's called The Bay Street Animal Clinic or --

11   I got to be close.  Something like that.

12         Q.  And any other vets that you remember?

13         A.  Not that I recall.

14         Q.  Who would take Tesla to the veterinarian?

15         A.  Myself.

16         Q.  Anyone else?

17         A.  Ashley would sometimes take her to get her

18   shots.

19         Q.  What kind of exercise did Tesla get?

20         A.  As I mentioned before, she loved sticks.

21   A lot of fetch.  A lot of running.  We would walk.

22   Play -- I don't know if you call it "exercise," but,

23   you know, Tom and Jerry with the cat and dog kind of

24   relationship.  Activity.  We would take Tesla for

25   walks.  Hikes even.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.   Who would take Tesla for walks?
 3         A.   Myself.
 4         Q.   Would your daughter go with you when you
 5    took Tesla for walks?
 6         A.   Yes.
 7         Q.   More often than not?
 8         A.   Yeah.
 9         Q.   So I feel like yesterday your daughter
10    said she didn't go on walks very often with Tesla.
11              MR. SHIELDS:  Objection.  She said --
12         Q.   Do you have a different understanding?
13         A.   In reference to walks locally in my
14    neighborhood.
15         Q.   Okay.  Would you go on walks with Tesla
16    other places?
17         A.   Yes.
18         Q.   Where would y'all walk with Tesla?
19         A.   Well, we would walk when we -- at State
20    parks.  Take her for walks along the riverway that I'm
21    looking at a picture of now.  We would walk her -- the
22    City made a dog park that she was registered to.  And
23    we would take her to the dog park.  And then we would
24    walk along that park which is off of Culver Road here
25    in Rochester near the Water Authority.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2              We would walk along the Maplewood Park
 3    area where the bridge is across the Genesee River.  We
 4    would walk several -- I mean places all over New York
 5    State.  Stony Brook.  Letchworth.
 6         Q.  So on a given week, would you take one of
 7    these longer walks outside of the neighborhood with
 8    Tesla?
 9         A.  I wouldn't say 52 times a year a given
10    week, but on average of multiple times a month, yeah.
11         Q.  How many times did you walk around the
12    neighborhood with Tesla?
13         A.  I would walk around the neighborhood with
14    Tesla more often when she was a puppy because it just
15    was -- you know, it just was a little easier.
16         Q.  So in 2018, who fed Tesla?
17         A.  Everyone in my house.
18         Q.  Did y'all have a schedule for determining
19    who fed Tesla?
20         A.  Not a schedule.  We would just feed her in
21    the morning and feed her in the afternoon.  Or
22    evening.  Or the evening.  However you want to phrase,
23    you know, dinnertime.
24         Q.  Sure.
25              So when I said "schedule," I meant maybe
```



1          CHARLES R. DEMPSEY III - BY MS. JONES
2    like an assignment chart.  So dad does Mondays, Ashley
3    does Tuesdays, your daughter does Wednesdays.  That
4    type of thing.
5               Did you have some sort of set schedule for
6    who was responsible for feeding Tesla on any given
7    day?
8               MR. SHIELDS:  Objection.
9          A.  Not a schedule.  Often Ashley would feed
10   her more frequently in the morning just because of
11   routine.  But sometimes I would feed her in the
12   morning.  Sometimes LD would feed her in the morning.
13        Q.  Did Tesla indicate when she was hungry or
14   would y'all just feed her because it was dinnertime?
15             MR. SHIELDS:  Objection.
16        A.  I never wanted that dog to feel hungry.  I
17   would always provide food.  But if -- if Tesla wanted
18   attention from somebody in the house, she would have
19   no problem being close to us, licking us, cuddling us.
20   She would lay down on top of you.
21        Q.  So did Tesla engage in any specific
22   activity when she was hungry or thirsty?
23             MR. SHIELDS:  Objection.
24        A.  If she was thirsty, she would pant.
25        Q.  Can you think of anything specific she



1                CHARLES R. DEMPSEY III - BY MS. JONES
2    would do if she were hungry?
3                A.  I can remember one time she kicked the
4    bowl at us.  We had a metal bowl.  I remember it being
5    empty and her kicking it.  I thought well maybe we
6    should give her that dinner.
7                Q.  What about when she needed to use the
8    bathroom?  Did she indicate that in any way?
9                A.  She would -- when a dog like needs to
10   poop, it would often sniff the ground.
11               Q.  Did Tesla sniff the ground when she needed
12   to poop?
13               A.  Sometimes.  I would notice that behavior.
14   "Oh, maybe you need to go out."
15               Q.  Was there any specific behavior when Tesla
16   needed to pee?
17               A.  She might have -- no.  I can't recall
18   specifically if she had a pee behavior.  Standing at
19   the door maybe.
20               Q.  Did y'all have some sort of schedule for
21   letting Tesla out to use the bathroom?
22               A.  We had a routine.  Just, you know, daily
23   life routine as we all have.  But it was never a
24   schedule to make sure she gets out like that.
25               Q.  What was the routine for letting Tesla out



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    to use the bathroom?
 3              A.  Well, I would let Tesla outside whenever I
 4    wanted to.  And so -- to let her use the bathroom, you
 5    know, I would -- you know -- when we would come home
 6    from the grocery store.  You know, we would be
 7    cooking.  When -- you know, it's just -- she's been
 8    inside.  It's been raining.  Maybe we should let her
 9    out.  Just -- just seems like a regular day-to-day
10    activity.
11              Q.  Was there anything that she would do to
12    indicate she wanted to go outside and play?
13              A.  To go outside and play?
14              Q.  Uh-huh.
15              A.  She would bring toys to you.  She would
16    hand them right to you.
17              Q.  Did she do that when she, Tesla, wanted to
18    play inside?
19              A.  She always wanted to be a part of what
20    anybody was doing.  She was a huge part of our lives.
21              Q.  I guess I'm wondering, did Tesla
22    communicate that?  Was there anything specific she
23    would do when she wanted to play outside versus
24    inside?
25              A.  I think that that would have been my call
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    in any given situation if we were going to be inside
 3    or outside, so I don't know if I ever categorized a
 4    difference.
 5              Q.  Did you train Tesla to respond to
 6    commands?
 7              A.  Yes.
 8              Q.  What commands did Tesla respond to?
 9              A.  First one she learned was "Sit."  It was
10    instinctful for her.  She would lay.  She would roll
11    over and show her belly.  You could never get her to
12    completely roll over.  She was just comfortable
13    getting a treat after her belly was out.
14                   When we were walking on a leash, I had,
15    you know -- we had to -- the "Heel" command to calm
16    down and wait at this intersection before we crossed
17    the road.
18              Q.  You would say "Heel"?
19              A.  That's correct.
20                   She would -- she knew when it was food.
21    When we said "Food," she would go sit down and wait.
22              Q.  Sorry.
23                   When you said "Food," she would go and
24    wait by the bowl?
25              A.  Well, she would understand that -- dogs
```



```
 1                 CHARLES R. DEMPSEY III - BY MS. JONES
 2      learn with your habits.  So when we would verbalize
 3      "I'm going to feed you," she would try and get ahead
 4      of the curve and be prepared.
 5                 Just like if we said we're going for a
 6      walk, she would wag her tail and get prepared.  "Let's
 7      head out the door.  What are we waiting for?"
 8           Q.   Any other commands?
 9           A.   I kind of thought for a while that I had
10      her trained to close the door on command.  But that
11      just sort of wasn't -- she was so heavy, when she
12      jumped up and would push on it, it was enough to close
13      the door.
14           Q.   What would you say to get her to close the
15      door?
16           A.   "Who is it?"
17           Q.   And any other commands that Tesla would
18      respond to?
19           A.   "Give me kisses."  "Who's your pup-pups?"
20      Which is like cuddling-type commands.  She would just
21      come right up, curl right up to you.  She would roll
22      and get her face as close as she could to mine and
23      then cover my glasses in dog drool, spit.  She was
24      just licking my whole face.
25           Q.   Would Tesla obey your commands if you said
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     them just once?
 3              A.  Some of them more than others.
 4              Q.  So did that depend on the command or
 5     situation?
 6              A.  The situation.
 7              Q.  Were there any -- so which commands would
 8     you be more likely to have to repeat for her to
 9     respond as you wanted?
10              A.  "Calm down."  You know, "Be quiet."
11              Like I said, I thought I had her -- I
12     thought I had her trained to go to the door and close
13     it, but that was just sort of me thinking that that
14     worked out because it worked out when it did.  I would
15     like to believe that she would do it.
16              Q.  So you didn't mention "Calm Down" in the
17     list earlier, but that's another command that she
18     would --
19              A.  Kind of like I had referred to "Heel."
20     "Heel" is the word I would say on a walk.  I wouldn't
21     say "Heel" and she would stop on a dime.  I would --
22     "Heel" was just sort of meaning -- I'm saying
23     "Heel" because I'm not moving.  You're on a leash and
24     we're working together here.  So I was trying -- I
25     mean -- I'm not Cesar Millan.
```



```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2           Q.  Is "Calm Down" a command that she would
 3      respond to?
 4           A.  No.  The words "Calm Down," no.
 5           Q.  There is another command that you would
 6      often have to repeat for her to respond to you as you
 7      wanted?
 8           A.  I don't remember having to like try to
 9      repeat over and over again anything.
10           Q.  So walks were not quite on a weekly basis.
11                So was fetch a more frequent form of
12      exercise for Tesla?
13           A.  Tesla loved fetch.  And I would play fetch
14      with her until she stopped bringing it back, which
15      sometimes would last near an hour.  Just throw the
16      stick.  She would go find that thing.  If we were on
17      the side of a mountain, she would find just the stick
18      I had just thrown and bring it right back to me.  It
19      was instinctive of her.  She -- she, you know -- she
20      was very happy during that time.
21           Q.  Did you typically play fetch in your
22      backyard with Tesla?
23           A.  Yes.
24           Q.  Or did you -- did you play fetch in other
25      places with Tesla?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  Yes.
 3         Q.  On a given week what was the more common
 4    location for playing fetch with Tesla?
 5         A.  The backyard of my house on Kosciusko
 6    Street.
 7         Q.  How -- how many times a week would you
 8    play fetch with Tesla?  Back in 2018.
 9         A.  I would say over two dozen.
10         Q.  Two dozen times each week?
11         A.  Yeah.  I mean a game of fetch can last a
12    few minutes and we would play multiple times a day.
13         Q.  And when I say "you," I'm referring
14    specifically to you playing two dozen times with
15    Tesla?
16         A.  That's correct.
17         Q.  Okay.  What about Ashley?  How often would
18    she play fetch with Tesla?
19         A.  Ashley prefers to play fetch with tennis
20    balls over sticks.  I -- I prefer sticks.  But we
21    would play -- when we would go to parks -- I don't
22    know if you ever seen one of those little chuck-it,
23    mini lacrosse sticks.  We have one of those.  We would
24    go to the park at the end of -- it's near Durand
25    Beach.  There's an open field area that nobody is ever
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2      there.  We would go -- she would often -- your
 3      question was how often?
 4              Q.  Yes.
 5              A.  It would -- situationally.  When we were
 6      out in a place where she could throw.  She would throw
 7      a ball in the backyard occasionally when she was back
 8      there.
 9              Q.  How often would your daughter play fetch
10      with Tesla?
11              A.  When she was playing with her.  It was --
12      I mean this was her favorite thing to do.
13              Q.  It was Tesla's favorite thing to do or
14      your daughter's?
15              A.  I always considered fetch was Tesla's
16      favorite thing to do.
17              Q.  Did your daughter play fetch with Tesla as
18      often as you did?
19              A.  I would say no.  Because I played fetch
20      with her a lot.
21              Q.  Did Tesla use the bathroom in any specific
22      place in the house or yard?
23              A.  I'm not -- around the yard.  Just sort
24      of -- she didn't have like a premium section of the
25      yard where she preferred.  But she did -- she did like
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2   to run into it kind of.
 3           Q.  I don't understand what that means.
 4               What do you mean by "run into it"?
 5           A.  So before a dog takes a poop, sometimes
 6   they run.  And so she would run and then just stop,
 7   spin halfway around and start pooping just straight
 8   from the run.  That's how I describe it as running
 9   into it.  I don't know if it helps with her stomach
10   or -- it just was how she behaved.
11           Q.  Did Tesla also quote/unquote "run into it"
12   when she needed to pee?
13           A.  No.  She would squat to pee.  So no.
14           Q.  Yeah.  So I understand "running into it"
15   to be the behavior immediately preceding her pooping.
16               So would she also run and then immediately
17   stop and then pee?
18               MR. SHIELDS:  Objection.
19           A.  For example, if I was to be opening the
20   door because it had been raining all day, in the time
21   to get her out to go use the bathroom, she would walk
22   out there, find a good spot and just pee.
23               Situationally, if there was a squirrel in
24   the yard, that would be more important than taking the
25   pee.
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2                   Which was -- another thing she loved to do
 3    for exercise is clear the yard of squirrels and birds
 4    which love the backyard because of the nuts and the
 5    cherries and the flowers.
 6         Q.   Sorry.  I forgot what you said.
 7                   There was no specific place in the yard
 8    she would use the bathroom?
 9         A.   I mean she wouldn't poop on the porch.
10    She would use the grass.
11         Q.   Yeah.  I just didn't know if she would go
12    for the tree or the fire pit or the barbecue or
13    anything, the fence.
14         A.   Poop kind of just happens where it
15    happens.  But like I said, when she would poop, she
16    would often go farther back into the yard as opposed
17    to pooping right next to the house.
18         Q.   Where did Tesla sleep inside the house?
19         A.   Bed.
20         Q.   Whose bed?
21         A.   She would sleep in LD's bed.  She would
22    sleep in my bed.  She would -- I mean she is a dog.
23    She would sleep during the day.  She would sleep on
24    the couch.  On the floor.  Especially the summertime.
25                   But in the evening time, she would sleep
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    in bed with LD, Ashley or myself.
 3              Q.  Did you -- have you ever referred to Tesla
 4    as your "best friend"?
 5              A.  Yeah.
 6              Q.  Why did you consider Tesla your best
 7    friend?
 8              MR. SHIELDS:  Objection.
 9              A.  During the time that I had Tesla, I worked
10    a part-time job and I would come home and she would be
11    there.  My girlfriend and my daughter would go to
12    school and work.  You know.  But they would -- I would
13    be alone.  I would be with Tesla.
14              And, you know, my heart, my eye contact,
15    my energy would be reciprocated by her daily and --
16    like when I wanted a hug, that was always there for
17    me.
18              And like I said, we played fetch a lot.
19    I -- I played -- I spent a lot of time with her and a
20    lot of eye contact.  And...
21              MR. SHIELDS:  Probably a good time for a
22    break.  I need to use the bathroom after he is done
23    with his answer.
24              A.  I considered her my best friend because
25    maybe I didn't have anybody outside of my family that
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    was in my life that would sit close to being more of a
 3    friend of mine than she was.
 4              MR. SHIELDS:  I really do need to pee.
 5         A.  Can we pause to use the bathroom?
 6         Q.  Yes.  Give me one second.
 7              MR. SHIELDS:  He is not in the middle of a
 8    question, so we're taking a break.  We are off the
 9    record.  I'm going to pause my timer.
10              MS. JONES:  Okay.  We're still on the
11    record.
12              MR. SHIELDS:  No, we're not.  We're going
13    off the record.  It's not in the middle of a question.
14    I need to pee.  We're going to take a break.
15              MS. JONES:  Elliott, sit down.  I'm in the
16    middle of a line of questioning.
17              MR. SHIELDS:  You're not in the middle of
18    a question.
19              He is allowed to take a break at any time
20    other than in the middle of a question.  So we're
21    taking a break.
22         Q.  How often did you cuddle with Tesla?
23              MR. SHIELDS:  Stop it.  I'm walking out of
24    the room.  We're going off the record.
25         A.  Every single day.
```



```
 1                   CHARLES R. DEMPSEY III - BY MS. JONES
 2                       THE WITNESS:  I would like to use the
 3       bathroom.
 4                       MS. JONES:  You need to use the bathroom?
 5                       THE WITNESS:  Yes.
 6                       MS. JONES:  Okay.  Can you come back in
 7       five minutes?
 8                       THE WITNESS:  Less.
 9                       MS. JONES:  Okay.
10              (The proceedings recessed at 10:45 a.m.)
11              (The proceedings reconvened at 10:52 a.m.;
12              appearances as before noted.)
13       CHARLES R. DEMPSEY III, resumes;
14              CONTINUING EXAMINATION BY MS. JONES:
15              Q.  Did Tesla go with your daughter when she
16       spent time at her -- at her mother's?  Meaning did
17       Tesla go with your daughter when your daughter spent
18       time at your daughter's mother's house?
19              A.  No.
20              Q.  Why not?
21                  MR. SHIELDS:  Objection.
22              A.  LD's mother had cats and just -- we -- we
23       never really established like a -- never created a
24       routine for that.
25              Q.  Who named Tesla?
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  It was a -- like a family.  Tesla was my
 3   inspiration from Nikola Tesla, a scientist that has a
 4   statue in Niagara Falls that I remember as a child.
 5   So that was the inspiration for the name.
 6         Q.  Did you have -- oh, yes.  You did.
 7              So who cared for KitKat, the cat?
 8         A.  The family.  The household.  Cats are
 9   easier than dogs.  They kind of clean themselves, poop
10   in a box.  If you ask where she used the bathroom, it
11   was in a box.
12         Q.  Who bathed Tesla?
13         A.  I have bathed Tesla.  Ashley more
14   frequently would be the bather.
15         Q.  Why is that?
16         A.  I think she enjoyed it.
17         Q.  Ashley enjoyed giving Tesla the baths?
18         A.  She would sing a "Rub a Dub Dub, Fun in
19   the Tub."
20         Q.  Did Tesla like getting a bath?
21         A.  Tesla loved water.
22         Q.  Did Tesla ever bark or growl at you?
23         A.  Dogs don't speak in any mannerism other
24   than barking verbally.  I mean that's what dogs do.
25         Q.  So Tesla --
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  So yes.
 3         Q.  -- did sometimes bark at you?
 4              MR. SHIELDS:  Objection.
 5         A.  Yes.
 6         Q.  Did Tesla ever growl at you?
 7         A.  By "growl," are you inferring in a
 8    threatening manner or just to make a growling noise?
 9    Because the answer is yes.
10         Q.  To both the threatening version and just
11    to make a noise?
12         A.  When we would play tug with a rope, she
13    would get into a growl with that.  But to threaten me,
14    no.
15         Q.  Did Tesla ever growl at you if you weren't
16    giving her attention?
17         A.  No.
18         Q.  Would she bark at you if you weren't
19    giving her attention?
20         A.  If I was ignoring her trying to hand me a
21    toy long enough, she would bark to gain the attention.
22         Q.  Did Tesla ever bark when she wanted to go
23    to the bathroom?
24         A.  No.
25         Q.  Did Tesla ever bark if she was "running
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2    into it," as you said?  Running into the -- stopping
 3    and pooping.
 4            A.   No.  She did not bark in preparation for
 5    pooping.
 6            Q.   Did she growl in preparation for pooping?
 7            A.   No.
 8            Q.   Did Tesla have a bed inside the house
 9    other than the people's beds and the couch?
10            A.   We had a -- a mat or like a padded dog
11    bed, I guess, that was a -- that was the purpose of
12    the purchase, but it wasn't -- she only laid on it to
13    look at us.
14            Q.   Okay.  Let's go to the day of the
15    incident.
16                 What were you wearing that day?
17            A.   Glasses, socks, underpants, pants, belt,
18    shirt and jacket.
19            Q.   Did you have on a watch?
20            A.   No.
21            Q.   Did you have your phone on you?
22            A.   Yes.
23            Q.   Did you have your phone on you when you
24    were outside interacting with the officers?
25            A.   Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  Did you have a brace on your hand on the
 3    day of the incident?
 4         A.  A brace, like a medical brace?  Is that
 5    what you mean?
 6         Q.  Yes.
 7         A.  No.
 8         Q.  What had you been doing earlier that day?
 9              MR. SHIELDS:  Objection.
10         A.  Are you referring to like that morning?
11    Did I shampoo and wash my hair?  Or are you referring
12    to like in the moments before?
13         Q.  In the few hours before the incident.
14         A.  It was -- my daughter's birthday was that
15    weekend and I was preparing to take her out and she
16    wanted to go to this haunted house that was -- it was
17    Halloween time in October.  It is kind of the thing to
18    do.  And I was, you know, just doing my household
19    routine sort of during the day.  And I keep just
20    drawing on.  I will just tell you.
21              I remember after LD had come home, I
22    was -- I had just started to prepare food before I had
23    gone outside and the officer shot my dog.  And you're
24    asking more about what I was doing before then.  And
25    I -- I just keep going back to that, to the stove.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    Just a routine day.
 3          Q.  So what were you doing immediately
 4    before -- so how did Tesla get outside?
 5          A.  From the back door?
 6          Q.  Yes.
 7              How did the back door open?  Who opened
 8    the back door?
 9          A.  I opened the back door.
10          Q.  Why did you open the back door?
11          A.  To exit.
12          Q.  Were you -- are you saying that you were
13    leaving the back door?
14          A.  Yes.
15          Q.  Why were you going outside?
16          A.  Because I was intending on having a
17    cigarette.
18          Q.  Did you know that Tesla was around you?
19          A.  Yes.
20          Q.  Was Tesla in front or behind you?  Or I
21    guess alongside you?
22              MR. SHIELDS:  Objection.
23          Q.  So I guess where in -- where was Tesla in
24    relation to you?
25              MR. SHIELDS:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1              CHARLES R. DEMPSEY III - BY MS. JONES

2         A.  At what point?

3         Q.  When you first opened the door.

4         A.  In order for me to open the door, I would

5   have been in front of her.  And then when I opened the

6   screen door -- which was her habit of then clearing

7   the yard of squirrels and birds -- she had passed me

8   at that point.

9         Q.  Was it your understanding that Tesla was

10  going outside to clear the yard of birds and

11  squirrels?

12        A.  That's correct.  Until --

13        Q.  Did you see anyone in the backyard when

14  you opened the -- I will take a step back.

15             Did you see anyone in the backyard before

16  you opened the screen door?

17        A.  No.

18        Q.  Had the main door to the house, the

19  non-screen door -- had it been shut before you opened

20  the screen door?

21        A.  To exit?

22        Q.  Yes.

23        A.  Yes.  I had to open it before I had...

24        Q.  You had to open both doors to get outside?

25        A.  That's correct.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2          Q.  When did you first see the officer in your
 3   backyard?
 4          A.  After I myself had stepped down from the
 5   house level to the porch level.
 6          Q.  Where was Tesla when you first saw the
 7   officer?
 8          A.  The bottom of the stairs, around the
 9   corner of the porch.  At which point I tried to tell
10   the officer that it was fine.  And that she would be
11   okay.
12          Q.  So what did you do or say after you saw
13   the officer?
14          A.  I shouted that she -- "She's fine.  It
15   will be okay."
16          Q.  You said all of those words?
17          A.  Yeah.  I don't recall the precise word
18   that I said, but I do recall saying "She's fine"
19   because that's what I would say to everyone and I
20   followed it up with a statement like "It's okay."
21                That officer was too quick to just grab
22   his gun and fire it.  I didn't -- there wasn't any
23   time for any communication.  I'm sorry for raising my
24   tone.
25          Q.  Where did Tesla go after you opened the
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2   door?  Well, she went down the stairs.
 3                Where did she go -- after Tesla went down
 4   the stairs?
 5                MR. SHIELDS:  Objection.
 6        A.   Into the yard.
 7        Q.   Did Tesla head towards any specific part
 8   of the yard?
 9        A.   Towards the center of the yard.
10        Q.   From your perspective, did Tesla run
11   towards the officer?
12        A.   When you exit the porch down the stairs,
13   there's a wall, which is my neighbor's house and you
14   only have the option of going into the center of the
15   yard or back where you came.  So the officer, being in
16   the center of the yard, was in the direction that she
17   went.
18        Q.   When you say "center of the yard," are you
19   meaning center east to west as opposed to north/south?
20        A.   Yes.
21        Q.   Were you normally outside when Tesla would
22   chase squirrels and birds?
23                MR. SHIELDS:  Objection.
24        A.   Are you asking if I was normally outside
25   when I let Tesla outside?  That was her routine.  I
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     would be outside with her if I was outside to play
 3     fetch or to have a cigarette.  Then yes.  Was I
 4     outside every time she went outside?  No.
 5         Q.  Have you been outside on multiple
 6     occasions with Tesla when she is clearing the yard of
 7     squirrels and birds?
 8         A.  Yes.
 9         Q.  Can you describe her behavior when she
10     clears the yards of squirrels and birds, just
11     generally speaking?
12              MR. SHIELDS:  Objection.
13         A.  She sort of runs in the direction of the
14     squirrel, which was usually in the direction of the
15     tree, and then do a half circle around the tree and
16     realize that she had once again been duped by
17     squirrels.
18         Q.  So when you were describing your backyard
19     earlier, you named a lot of trees.
20              So -- any particular tree that she would
21     run in the direction of?
22         A.  The one in my memory reference -- I'm
23     referring to is the chestnut tree, which is the
24     largest in the yard.
25         Q.  I thought you said the chestnut tree was
```



1            CHARLES R. DEMPSEY III - BY MS. JONES

2    along one of the fences.

3            A.   It was along the fence.  I mean it is.

4    Fence was built after the tree.

5            Q.   Do you know if that chestnut tree is

6    depicted in the body-worn camera video?

7            A.   I'm sure at some point.

8            Q.   Was the chestnut tree the one that had ivy

9    on it?

10           A.   No.

11           Q.   Was the chestnut tree close to your house?

12           A.   Could you rephrase that?

13           Q.   Is this the chestnut tree (indicating)?

14           A.   No.  That is a cherry tree.  Also useful

15   for the squirrels for escape.

16           Q.   Is that the chestnut tree?

17           A.   On the left side of that video, that is

18   correct.  It's an old one.

19           Q.   Okay.  So for the record, I pulled up the

20   body-worn camera video Officer Algarin marked COR 053

21   and I had paused it at 3 minutes and 43 seconds into

22   the video.

23               And -- do you want to describe in this

24   screenshot where the chestnut tree is?

25           A.   Describe it -- where it is in the video



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    screen?
 3              Q.   In screen.
 4              A.   The left.
 5              Q.   Okay.  On the left-hand side you see the
 6    tree and that's the chestnut tree?
 7              A.   Yes.
 8              Q.   Okay.
 9              A.   I'm not an arborist, but I think those are
10    chestnuts.
11              Q.   Did you see the officer shoot Tesla?
12              A.   Yes.
13              Q.   What did you do after the officer shot
14    Tesla?
15              MR. SHIELDS:  Objection.
16              A.   I tried to put the -- myself in between
17    his gun and my dog.  I tried to -- I tried to figure
18    out what was going on.  I tried to like diffuse the
19    situation.  I didn't know what I did was -- I left my
20    porch and proceeded across my yard.
21              Q.   Were you still on your porch when the
22    officer shot the dog?
23              A.   I believe I had not exited the porch at
24    that point.
25              Q.   Did Tesla -- from your perspective, did
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    Tesla run off the porch any quicker than she normally
 3    would?
 4         A.   No.
 5         Q.   Did you hear the officer say anything --
 6         A.   No.
 7         Q.   -- when you were at your back door or on
 8    the porch?
 9         A.   No.
10         Q.   Did you hear Tesla bark or growl when she
11    was running down the porch and into the yard?
12         A.   Not until he shot her.  She whimpered and
13    it's a noise that lives rent free in my head.
14         Q.   So what did you do after leaving the --
15    what did you do after leaving the porch and trying
16    to -- I think you said -- I don't remember what you
17    said.
18              What did you do after you left the porch
19    into the yard?
20              MR. SHIELDS:  Objection.
21         A.   I -- I started to ask the officer
22    questions or -- you know, like -- I started to shout.
23    I -- I walked out into my yard and he was holding his
24    gun now at me with my back to the house.  And I didn't
25    know why he was even there.  And like at that point it
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2      had only been seconds and I hadn't even really like --
 3      I didn't even know he was a cop at first.  And, you
 4      know -- I saw the uniform.  I put it all together in
 5      seconds, but like -- I was being held at gunpoint
 6      after that point.  After I had come off the porch and
 7      come down, I was being held at gunpoint.
 8              Q.  And then what happened?
 9              A.  I stopped walking because the officer
10      showed the intent to fire.  And -- another officer had
11      come from another yard, I would assume.  I don't know
12      where that guy came from.  He just sort of showed up.
13              I remember I told that guy to like -- I
14      said, "Get that guy.  Get the officer.  Stop him.
15      He's like shooting at" -- "at my family."
16              I think I said something along the lines
17      of "Get your boss" or something.  "Call the Sarge."
18              He -- he -- he holstered his gun and
19      pulled out some other weapon that he pointed at me for
20      a period of time until that officer had told him to
21      stop.  I didn't know what that was.
22              And then I remember when -- when I finally
23      had felt like that guy was no longer pointing a weapon
24      at me, that I -- that I need to go and like figure out
25      what had happened with -- like -- I needed to go and
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    help my dog.
 3              Q.  So you mentioned two officers.
 4                  There's -- do you know either of their
 5    names?
 6              A.  I'm aware that Officer Algarin's body
 7    camera footage is -- he is the officer who -- I'm
 8    aware of his name.
 9              Q.  Okay.  So is Officer Algarin the one that
10    held you at gunpoint, you said?
11              A.  Yes.
12              Q.  Is he the one that also pulled out the
13    different weapon that you just mentioned?
14              A.  That's correct.
15              Q.  Are you -- or at the time of this
16    incident, were you familiar with guns?
17                  MR. SHIELDS:  Objection.
18              A.  Could you rephrase that?
19              Q.  Did you own a gun at the time of this
20    incident?
21              A.  No.
22              Q.  Have you ever shot a gun as of the time of
23    this incident?
24              A.  No.  I -- that's a very vague thing
25    because I played Call of Duty up to that point.  I
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2    can't play Call of Duty anymore because gun violence
3    makes me shaky and I don't like it.  But I have never
4    owned a gun, as far as a firearm goes.
5         Q.  Yes.  I was referring to real life.
6         A.  I have -- I -- mean -- to answer your
7    question.
8         Q.  Some people go to firing ranges or things
9    like that.
10             So have you ever been to a firing range or
11   shot a gun in any other type of context?
12             MR. SHIELDS:  Objection.
13        A.  My dad had taught me how to shoot a pistol
14   when I was coming of age.
15        Q.  When was that?
16        A.  I was a teenage boy.  I don't recall the
17   age.
18        Q.  Did you shoot that pistol with your dad on
19   multiple occasions?
20        A.  No.  Just one lesson.
21        Q.  So prior to this -- the day of this
22   incident, had you held a gun since your dad taught you
23   how to shoot a pistol?
24        A.  I never owned a gun.
25        Q.  Is that "no"?
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.   I -- nobody gave me a gun to hold.
 3         Q.   Okay.
 4         A.   So like I said, I would say no.
 5         Q.   Did you ever consider buying a firearm
 6    prior to the day of this incident?
 7         A.   No.
 8         Q.   The other type of weapon that you
 9    mentioned Officer Algarin having, can you describe it
10    at all?
11         A.   Black.  He pulled it from his belt, so it
12    was police-issued.  And he pointed it at me and it --
13    with -- with -- I believe he was only using one arm.
14    I -- I can't recall if he had to use both hands.
15         Q.   When you reviewed the body-worn camera of
16    Officer Algarin in preparation for this deposition,
17    did you watch the entire video?
18         A.   No.
19         Q.   What portions did you watch?
20              MR. SHIELDS:  Objection.
21         A.   Beginning.
22         Q.   Would you describe what was depicted in
23    the portion of the video that you reviewed in
24    preparation for the deposition today?
25         A.   The officer jumping the fence, walking
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2   around my backyard, jumping out of my yard, jumping
 3   back into my yard and then opening fire on Tesla.  And
 4   we had -- we hadn't reviewed beyond that point.
 5         Q.  So to be clear, you didn't review when the
 6   officer pointed the guns or weapons at you?
 7              MR. SHIELDS:  Objection.
 8         A.  That's correct.
 9         Q.  Did an officer point a weapon or firearm
10   at you at any other time during this entire incident
11   with Tesla?
12              MR. SHIELDS:  Objection.
13         A.  It's -- it's a long time.  I don't know
14   how long I was -- I was in the dirt.  But I had felt
15   that they were holding me there.  And at one point I
16   had asked -- I looked up and watched a cop with his
17   hand on his gun and asked him, "Why" -- "Why are you
18   doing that and not helping me?"
19         Q.  Did you say anything else besides "Why are
20   you doing that?"
21         A.  I don't --
22              MR. SHIELDS:  Objection.
23         A.  -- think those are the words I used.
24         Q.  Sure.
25              I guess I'm wondering did you indicate in
```



```
 1               CHARLES R. DEMPSEY III - BY MS. JONES
 2    some sort of way "Why are you pointing your gun at
 3    me?" or "Why are you holding your gun?" or something
 4    like that?
 5               MR. SHIELDS:  Objection.
 6          A.   I remember I was scared to move because I
 7    was surrounded by officers and I felt like if I had
 8    released my dog, another dog -- I thought -- I could
 9    still save Tesla.  I was afraid that -- I mean they --
10    they surrounded me and just -- they wouldn't -- they
11    didn't help.  They -- they cleaned up -- they went and
12    picked -- sorry.  I'm straying from your question.
13               I don't recall the -- what words that I
14    said at the time.
15          Q.   Do you remember specifically any officer
16    pointing a weapon at you other than Officer Algarin
17    and what you just mentioned?
18               MR. SHIELDS:  Objection.
19          A.   During that incident?
20          Q.   Yes.  The whole time that the officers
21    were at your property that day.
22               MR. SHIELDS:  Objection.
23          A.   Again, I felt like they were -- I don't
24    recall an unholstered weapon in my line of sight, but
25    I do recall weapons that were in -- with hands on.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1               CHARLES R. DEMPSEY III - BY MS. JONES
 2        Q.  You said that you felt like they were
 3   holding you there.
 4             Can you explain what the officers did that
 5   make you feel like they were holding you there?
 6        A.  They surrounded me with their hands on
 7   their guns and told me not to go.  And like -- just
 8   started using my yard so that they could collect their
 9   shells.  Like -- just started going in and out of my
10   yard.  To just like clean up.  When somebody fires a
11   gun and police show up to the scene, they take
12   pictures of the shells on the ground before they pick
13   them up.  These guys just pushed through and cleaned
14   up their scene and wiped their hands clean of it while
15   I was laying in the dirt, bleeding out, asking for
16   help.
17        Q.  I'm sorry.
18             Are you saying that officers didn't take
19   pictures of the shells this time?
20        A.  I -- I'm aware of that.  At that point in
21   time I'm lying down in the dirt.
22        Q.  So I feel like you're making some sort of
23   a complaint or expressing displeasure and I'm not sure
24   what about the situation you're displeased with.
25             MR. SHIELDS:  Objection.
```



1          CHARLES R. DEMPSEY III - BY MS. JONES

2          A.   Could you re-ask your previous question

3    that led me to say that?

4          Q.   I don't remember what it was.

5               MR. SHIELDS:  Objection.  It's not a

6    question.

7          A.   I don't remember what you were asking me.

8          Q.   You said -- or yesterday your daughter

9    testified that she thought officers were pointing

10   their gun at you while she was looking at you out of

11   the living room window.

12              Did any officers point their guns at you

13   while you would have been viewable by her through the

14   living room window?

15         A.   From the living room window she would have

16   had an overhead perspective of the multiple officers

17   that were standing around me.

18         Q.   From --

19         A.   And you're asking did they have guns out

20   in my direction at that point in time?

21         Q.   Yes.

22              Do you remember any officers pointing

23   their weapons at you?

24         A.   At that point in time, no.

25         Q.   When you say you were "surrounded," can



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1              CHARLES R. DEMPSEY III - BY MS. JONES

2    you describe that a little more?

3              MR. SHIELDS:  Objection.

4         A.  At the point that I got to Tesla, that was

5    in between mine and my neighbor's houses.  So the only

6    way to go would be north/south as far as traveling.

7    And to the north of me was my fence, which the

8    officers had blockaded.

9              And to the south of me was not only the

10   officer who had just opened fire on my dog, but other

11   officers.  And they stood over me and offered me no

12   assistance.  And traveled freely past me.

13        Q.  What do you mean by blockaded me?

14        A.  I mean that I could only travel north and

15   south and they stood to my north and to my south.

16        Q.  Did you ask them to move so you could

17   leave?

18        A.  I was screaming for help.  How was

19   standing over somebody with your hand on your weapon

20   helping somebody?  It's not.

21        Q.  What type of help were you looking for

22   from the officers?

23              MR. SHIELDS:  Objection.

24        A.  Officers are trained -- if -- for -- for

25   medical response for each other.  So their vehicles



```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2    have to have some sort of emergency kit in them.
 3    That's my assumption.  Those officers could have gone
 4    to one of their many vehicles on the scene and
 5    provided me with some sort of bandage or something
 6    that I could help tie off the open wounds.  That's
 7    what I was -- that's -- in reflection that's what I
 8    was hoping they would provide me with.
 9          Q.  Do you remember asking specifically for
10    that?
11          A.  Yeah.
12          Q.  What did they say in response?
13          A.  Sometime later I was given a used towel
14    from Animal Control.
15          Q.  Do you remember any of the officers
16    verbally responding to your request?
17          A.  I remember an officer saying "Animal
18    Control is on their way."
19          Q.  Do you remember anything else -- or what
20    else did the officers say to you when you were in the
21    location to the side of the living room window?
22              MR. SHIELDS:  Objection.
23          A.  There were many officers.  There was a lot
24    said.  I don't recall words.
25          Q.  When you were -- when Officer Algarin
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1               CHARLES R. DEMPSEY III - BY MS. JONES
 2     pointed the firearm or weapons at you in the yard like
 3     you said before, did you feel like you couldn't leave?
 4          A.   When he flexed with his pistol pointed at
 5     me, I felt like he was ready to shoot me.  For a while
 6     I had like nightmares of taking a bullet to my --
 7     right here (indicating) above my heart.  It's -- yes.
 8     I felt like I was not allowed to operate freely in
 9     life at that point.
10          Q.   What else were you feeling at the moment?
11          A.   What other feelings was I experiencing?
12     At the moment after -- just after he had shot my dog
13     and -- I was very concerned about my daughter.  I was
14     worried about the dog.  I was -- I was still confused
15     as to why he was even in the yard.  I was genuinely,
16     you know, scared that he was willing to shoot me.  I
17     mean -- scared.
18          Q.   Okay.  I'm going to -- I will pull up the
19     video and we're going to walk through it and I'm going
20     to ask you a few questions.
21               MR. SHIELDS:  Want a cigarette before
22     that?
23               THE WITNESS:  No.  It's fine.
24          (There was a discussion off the record.)
25          Q.   Okay.  So I have Officer Algarin's
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    body-worn camera up.  Can you see that?  Is there
 3    glare?
 4         A.   That's better.
 5         Q.   Okay.  So I have Officer Algarin's
 6    body-worn camera up.  The same one that we were
 7    looking at earlier, COR 53.
 8              Right now it's 2 minutes and 14 seconds
 9    into the video.  I'm going to -- actually -- yep.  Is
10    it -- yes, it is 2 seconds -- 2 minutes and 14
11    seconds.
12              So I will push play and then I will
13    probably push pause and ask you questions about what
14    you saw and heard and did and we'll go from there.
15              It's at 50 right now -- the volume -- but
16    tell me if it needs to be louder.
17              MR. SHIELDS:  For the record, I think the
18    time stamp is 17 hours, 9 minutes and 32 seconds.
19              MS. JONES:  Great.
20            (The video was played.)
21         Q.   Okay.  Maybe that should be louder.
22         A.   I can hear it fine.
23         Q.   Oh, okay.
24              Because I have trouble hearing you in this
25    video.
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2                   And earlier you said that you said
 3     something?
 4              A.  I did.
 5              Q.  Okay.  I was hoping that you could at
 6     least, I guess, point it out to me.
 7                   Did you hear yourself in that few-second
 8     clip?  Let me see how many seconds it was.  That
 9     4-second clip?
10              A.  You can play it again and --
11                   MR. SHIELDS:  Objection.
12              Q.  Did you hear yourself in that 4-second
13     clip?
14                   MR. SHIELDS:  Objection.
15              A.  Yes.
16              Q.  Oh, you did.
17                   Then I will go back and -- we're back at
18     2:14 and I'm going to push play again.
19              (The video was played.)
20              A.  So in between his "Whoa"s is a moment that
21     you can hear my voice.
22              Q.  Okay.
23              A.  And I heard that.
24              Q.  Because you can hear your voice.
25              A.  In between these "Whoa"s.
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2              Can I understand what I'm saying on this
 3   video?  Is that what you're going to ask me?
 4         Q.  Yes.
 5         A.  No.
 6         Q.  And the "his" that you're referring to
 7   with the "Whoa"s, are you talking about the officer's
 8   "Whoa"s?
 9         A.  Yes.
10         Q.  Do you hear anything else in that video?
11   Excuse me.
12              Did you hear anything else in that 4- or
13   5-second clip?
14         A.  Cry my dog made I told you -- that I
15   talked about earlier.
16         Q.  Did you hear your dog barking or growling
17   in that clip?
18         A.  I don't recall.
19         Q.  I will play it one more time and then I'm
20   going to ask you if you hear your dog saying -- not
21   saying -- barking or growling.  All right.
22              We're back to 2:13 in the video.  17:09:31
23   is the time stamp on the -- well, actually let me play
24   it fast.
25              Okay.  So -- so we're at 2 minutes and 14
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    seconds.  The time stamp on the video is 17:09:32.
 3              All right.  Here we go.  We'll listen for
 4    the dog.
 5         (The video was played.)
 6         Q.  So did you hear the dog bark or growl in
 7    that 5-second clip?
 8         A.  Yes.
 9         Q.  Why -- why was Tesla barking or growling?
10              MR. SHIELDS:  Objection.
11         A.  Probably because she didn't speak English.
12              Would that have been a preferable way to
13    approach an officer, for a dog to speak English?
14         Q.  So I thought that you understood Tesla to
15    just be going out into the yard to look for birds and
16    squirrels?
17              MR. SHIELDS:  Objection.
18         A.  What do you mean by that?  That was where
19    we lived.
20         Q.  Did -- did you think that Tesla was
21    running towards the officer?
22              MR. SHIELDS:  Objection.
23         A.  At this point in the video?
24         Q.  Well, no.  During the 5-second clip that I
25    just played.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2          A.   Did I think that she was approaching the
 3     officer?
 4          Q.   Yes.
 5               Did you think --
 6          A.   Yes.  Yes.  That would make a lot of sense
 7     to approach a stranger in the yard.
 8          Q.   Did you -- do you -- do you interpret
 9     Tesla's action as being aggressive?
10               MR. SHIELDS:  Objection.
11          A.   No.  Inquisitive.
12          Q.   So you would characterize Tesla's barking
13     as inquisitive?
14               MR. SHIELDS:  Objection.
15          A.   Sounded like a "Who are you to me?"
16               She was a big dog.  If she wanted to make
17     intimidating noises, she would have made them in an
18     intimidating, louder manner.
19          Q.   Did you hear Tesla growl in that 5-second
20     clip?
21          A.   She -- "ur-ur-ur-ur."  Yes.  She made the
22     same noise as the squirrels.  She was "ur-ur-ur-ur."
23     I mean I don't speak dog, but there is bark, there is
24     "ur-ur-ur-ur."  There is "roar roar roar roar."  You
25     know.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  So I'm going to keep playing and then I
 3    will pause it when I have some questions for you.
 4              So we're at 2:19.
 5              Can you still see this okay?
 6         A.  Yeah.
 7         Q.  Okay.  Great.  I will push play.
 8         (The video was played.)
 9         Q.  So I want you to identify when the officer
10    points his gun at you.
11              MR. SHIELDS:  Objection.
12         Q.  I will try to pause it as quickly
13    thereafter after you say it.
14         A.  Where is he pointing his gun now at this
15    point in the video?
16         Q.  Oh, I'm sorry.  You don't get to ask me
17    questions.
18              But -- so I'm going to push play and you
19    can tell me where the officer points the gun at you.
20         (The video was played.)
21         A.  There.
22         Q.  Okay.  So just there?
23         A.  Um, he's already still -- I mean he is
24    actively pointing his gun at me now.
25         Q.  He is?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  Yes.
 3              (The video was played.)
 4         Q.  Where?
 5         A.  His body camera is on his chest.  His gun
 6    is held up in his line of sight.
 7         Q.  Okay.  So you're saying that even though
 8    we don't see the gun on the body-worn camera, the gun
 9    was up?
10         A.  Yeah.
11         Q.  Okay.  So I'm going to go back to 2:17 in
12    the video and I'm going to play it a little slower.
13    We're going to go to half-time.  And that really
14    messes up the sound.  I will actually take the sound
15    off.  Sound off.  Okay.
16              So I'm going to play this again.  We're at
17    2:17.  And I'll try to be a little faster and pause it
18    where he's pointing the gun at you.
19              (The video was played.)
20         Q.  Can you tell me when he is pointing the
21    gun at you?
22         A.  Right there.  He is lifting his gun and
23    aiming it at me.
24         Q.  So I thought you were farther over.
25              Are you already over?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          CHARLES R. DEMPSEY III - BY MS. JONES

2               MR. SHIELDS:  Objection.

3          A.  At this point -- at this point I'm already

4     underneath his arm.  My entire person is underneath

5     his right arm.

6          Q.  Okay.  And you felt like the gun was being

7     pointed at you right now?

8               MR. SHIELDS:  Objection.

9          A.  Yes.  He had raised the gun from pointing

10    downwards towards my dog at that point towards me.

11         Q.  Okay.

12         A.  Who had just came down from the porch, the

13    same way the dog had just come that he had just shot.

14         Q.  So we're 2 minutes and 22 seconds into the

15    video and then what happens?

16         (The video was played.)

17         Q.  When does he pull out the other weapon?

18    Did I miss that already?

19               MR. SHIELDS:  Objection.

20         A.  Again, I can only see the chest in this

21    video.  I don't see the outside of the body.

22         Q.  Oh.  So where was --

23         A.  The frame of his body.

24         Q.  Where was the other weapon that he pulled

25    at you?



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.   From his -- from his belt.
 3         Q.   He -- so he pulled the second weapon from
 4    his belt?
 5              MR. SHIELDS:  Objection.
 6         A.   Yes.  Yes.  That is where I thought he got
 7    it from.
 8         Q.   Did he point it at you, the second weapon?
 9         A.   Yes.
10         Q.   I guess I -- I just don't see it in the
11    video.  So I will go back to 2:15 -- no.  We'll go to
12    2:20.  If you can just tell me where he pulls out the
13    second weapon, that would be helpful.  So we have the
14    first one.  I'm just looking for the second.
15              I will push play and I will push pause
16    whenever you tell me to push pause.
17              (The video was played.)
18         A.   He -- he already has it at this point.
19         Q.   So in -- in which hand is it?
20              MR. SHIELDS:  Objection.
21         A.   It's not on the screen.
22         Q.   It's not on the screen.
23              So is it in his right hand?
24              MR. SHIELDS:  Objection.
25         A.   He had -- it makes sense it would be in
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            CHARLES R. DEMPSEY III - BY MS. JONES
 2    his right hand --
 3            Q.   So --
 4            A.   -- but I'm not seeing it on your screen.
 5            Q.   Sure.
 6                 So I paused the video at 2 minutes and 29
 7    seconds.
 8                 So in this frame, can you describe what
 9    you see in this frame?
10            A.   In terms of -- I see a fence.  I see
11    rocks.  I see myself.  I see the officer's thumb.
12            Q.   So that thumb that you're --
13            A.   Is that what -- that's what I'm assuming
14    it is -- his hand?
15            Q.   So that would be his left hand?  Is that
16    right?
17            A.   Yeah.
18            Q.   So is there a weapon in the left hand?
19            A.   I see his thumb.
20            Q.   So is that a "yes" or a "no"?
21                 MR. SHIELDS:  Objection.
22            A.   I don't see the weapon in that frame, no.
23            Q.   So you're saying that the weapon then
24    would have been in his right hand that we can't see
25    right now?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2          A.   Yeah.
 3          Q.   Okay.  Do you know when in this
 4     interaction with Officer Algarin he pulled out the
 5     second weapon?
 6          A.   After he holstered his pistol, he -- in
 7     the same motion -- pulled out the other weapon.
 8          Q.   What did the other weapon look like?
 9          A.   And it was black.  It was small.  It -- it
10     was like -- it wasn't much larger than his hand.
11          Q.   Do you know what a taser looks like?
12          A.   The -- like yellow taser guns that RPD
13     uses?  Is that -- or -- there are many tasers.
14          Q.   Did the weapon that Officer Algarin pulled
15     out -- was that a taser?
16          A.   I don't know.
17          Q.   I'm sorry.
18               Did you answer?
19          A.   I said, "I don't know."
20          Q.   Okay.  Okay.  So I'm going to play this
21     again.  We're going to go back to about 2:19.  I want
22     to talk about the audio now.  So I'm going to play the
23     sound and I'm also going to play it at regular speed.
24     Because slow speed is just hard to understand.
25               Okay.  So I'm going to play about 5 or 7
```



```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2     seconds and then I'm going to ask you what you say and
3     do and then -- we'll probably play it again and we can
4     talk about what the officer is saying and doing unless
5     you can get all of that information from playing it
6     once.  We'll talk about what you're doing and saying
7     first.
8              MR. SHIELDS:  Objection.
9        Q.  So I'm pushing play from 2 minutes and 20
10    seconds into the video.
11              Can you still see that okay?
12       A.  The screen, yes.
13       Q.  Okay.  Here we go.
14              (The video was played.)
15       Q.  Okay.  So I paused it at 2:27 and 7
16    seconds.
17              Can you describe to me what you were doing
18    in those 7 seconds?
19       A.  I was walking to that point of the yard --
20       Q.  Okay.
21       A.  -- physically.
22              I pointed with my arm in the direction
23    of -- I pointed with my right arm.  And I was speaking
24    towards the officer.
25       Q.  What were you saying?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2              A.  My comments were inaudible.  Perhaps with
 3    more...
 4              Q.  Okay.  Did you hear or do you know what
 5    the officer was saying and doing based on that clip?
 6    Or do you need me to play the 7 seconds again?
 7              A.  That was when he was retreating and he
 8    switched from one -- that was -- he was walking
 9    backwards on his feet.  He said -- I heard "Get back."
10              Q.  And what else, if anything, was he doing
11    in those 7 seconds?
12              A.  I can only see the camera from his chest.
13    All I can tell is he was heading in a -- he wasn't
14    standing still.
15              Q.  Sure.
16                  I'm going to play those seconds one more
17    time and if you want to pick out any other details of
18    what you did or the officer did, let's do that.  I
19    will even turn the sound up a little more to see if
20    you can hear what you're saying.
21                  MR. SHIELDS:  Objection.
22              Q.  And we'll start at 2 -- 2:19.  Okay.  I'm
23    pushing play.
24                  (The video was played.)
25              Q.  Okay.  Were you able to hear what you were
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2   saying at that time around?
 3         A.  Sounded like I cried the word "No."  And
 4   that -- I mean pieced together with my memory, I
 5   recall telling him to get off my property.
 6         Q.  Okay.  And how many times did the officer
 7   say "Get back"?
 8              MR. SHIELDS:  Objection.
 9         A.  During that period of time there?
10         Q.  Yes.
11         A.  Sounded like he repeated himself.
12         Q.  Okay.  I'm going to play it a little
13   longer now.  And we'll do the same questions.  What
14   you were doing and saying and then what the officer is
15   doing and saying.  So I'm going to start at 2:25.  It
16   overlaps a little bit with what we watched before and
17   then goes for another 7 to 10 seconds.  All right.  So
18   this should be at 2:25.  And I'm going to push play.
19              (The video was played.)
20         Q.  Okay.  So I stopped that at 2 minutes and
21   40 seconds.  A little longer than 10.
22              Can you tell me what you were doing in
23   that 15-ish-second clip?
24         A.  Trying to understand what just happened.
25   And again, I was confused as to if that guy -- who he
```



                      CHARLES R. DEMPSEY III - BY MS. JONES

 1

 2    was and why he was there.  And why did he do that?  I

 3    asked multiple times just in that period of time

 4    "Why?"  "Why?"

 5           Q.  Do you say "Why?" in that clip?

 6               MR. SHIELDS:  Objection.

 7           A.  "What is the matter with you?  Why would

 8    you do that?"

 9           Q.  And are you walking towards or away from

10    the officers in those 15 seconds?

11               MR. SHIELDS:  Objection.

12           A.  During that time we were walking in the

13    same direction it appears.

14           Q.  Which direction is that?  Which direction

15    is that?

16           A.  I was walking out into the yard.  So I did

17    get closer to the officer.  Towards.

18           Q.  Okay.  Do you have any comments on what

19    the officer was doing or saying in those 15 seconds?

20           A.  At no point did he tell me he was an

21    officer or why he was there or why it was okay to

22    shoot my dog.

23           Q.  What did the officer say?

24           A.  He threatened me.

25           Q.  What did he say that was threatening to



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2   you?
 3         A.  He pointed his smoking pistol at me and
 4   told me to get back.
 5         Q.  So which part of -- so -- that was two
 6   things.
 7              So we talked earlier about him pointing
 8   the firearm at you.  What did he -- scratch that.
 9              We talked about the pointing of the
10   firearm.
11              But you're also saying he said "Get back"
12   at you?
13         A.  Did we not get that from the second time
14   we reviewed the video and you asked me what the
15   officer was saying?
16         Q.  Your phrasing that in the form of a
17   question.  But I think that was rhetorical.
18              Are you saying that you understood or
19   heard the officer to say "Get back" at you from this
20   clip?
21              MR. SHIELDS:  Objection.
22         A.  Yes.
23         Q.  Great.
24              Am I understanding you correctly that you
25   interpret the term "get back" to be threatening?
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  With a hot gun barrel in -- yes.  That --
 3    that man was shooting his gun.  He's a threat to
 4    everything in his line of sight.
 5         Q.  So earlier you said that he had out his
 6    firearm and then he holstered it and then pulled out a
 7    different weapon?
 8         A.  Yes.
 9         Q.  So -- I don't want to put words in your
10    mouth.
11              So which parts of that were threatening
12    when in combination with the words "Get back"?
13              MR. SHIELDS:  Objection.
14         A.  He had said the words "Get back" before he
15    had holstered his weapon and swapped for the
16    alternative or -- again, I don't remember -- I don't
17    know what he had switched to.  He put that in his hand
18    and pointed it in my direction just as he was before.
19         Q.  So can you describe what about that you
20    found threatening?
21         A.  After he freely like opened fire in my
22    yard, he then is now like intimidating me to do his
23    will.  Without reason.
24         Q.  So are you saying that the words "Get
25    back" alone were the intimidating part?
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.   No.  It was a hot pistol barrel that
 3    scared me.
 4         Q.   Sure.  But at some point the firearm was
 5    holstered.
 6              So what actions subsequent to the
 7    holstering of the gun did you find intimidating or
 8    threatening?
 9         A.   At the end of the video which you were
10    just showing there my arm was pointing and my words
11    were directed towards another officer that I had
12    assumed would now help protect me from this man in my
13    yard.
14         Q.   So you were intimidated or threatened by
15    the fact that the other officer didn't help you?
16              MR. SHIELDS:  Objection.
17         A.   I was intimidated by the fact that that
18    man, Officer Algarin, was comfortable with shooting a
19    firearm on my property for no purpose other than his
20    own will.  Like -- at that point in time, like --
21    active shooter drills became like a thing in school
22    where kids are now getting -- when somebody is firing,
23    it's best -- to pardon the phrase -- but duck and
24    cover.  You know, lock the door.  Protect yourself.
25    Because like nothing is safe.
```



| | |
|---|---|
| 1 | CHARLES R. DEMPSEY III - BY MS. JONES |
| 2 | Q.  So would you have felt threatened or |
| 3 | intimidated no matter what Algarin did after shooting |
| 4 | your dog? |
| 5 | A.  By that man in my yard who had just shot |
| 6 | my dog, yes.  I was afraid he would be willing to do |
| 7 | anything. |
| 8 | Q.  Why didn't you immediately retreat if you |
| 9 | felt threatened or intimidated? |
| 10 | A.  Adrenaline.  I was -- he didn't hear -- |
| 11 | you know, he wasn't hearing my words. |
| 12 | Q.  Why did you believe he wasn't hearing your |
| 13 | words? |
| 14 | A.  Because I told him that she would be fine |
| 15 | and it would be okay.  He proceeded to open fire and |
| 16 | then I told him to leave and he proceeded to stand his |
| 17 | ground. |
| 18 | Q.  What do you mean by "stand his ground"? |
| 19 | MR. SHIELDS:  Objection. |
| 20 | A.  I mean that if you were to continue that |
| 21 | video, he would continue to be standing on my |
| 22 | property.  Despite my request for him to leave. |
| 23 | Q.  So by stand your ground, you meant he |
| 24 | stayed in your yard? |
| 25 | A.  As if it was his own. |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                CHARLES R. DEMPSEY III - BY MS. JONES
2          Q.  Let's see what we got.  Great.
3                So I'm going to start it back at 2:25
4     again and I'll play it for a little longer.  I was
5     hoping you could describe what's going through your
6     mind at this point.  We have a few of those things on
7     record, but if there is anything else you want to add
8     about what you're thinking here, that would be
9     helpful.  So 2:25 and I will turn the laptop and push
10    play.
11              (The video was played.)
12         Q.  Can you describe what was going through
13    your mind during those 23 seconds?  I stopped the
14    video at 2:58.
15         A.  Another -- an officer had entered from the
16    rear of this footage.  I was relieved that he was
17    there because I was less intimidated -- I was less
18    concerned about the threat of that man, Algarin.  And
19    I was -- I was verbalizing how they didn't belong
20    there.
21              I -- you know, I'm still confused as to
22    why that happened.  Hence why I asked him, "Why did
23    you do that?"
24              And my head at that point in time, that
25    was -- that was so -- so long ago at this point now
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     that -- I can't -- I can't remember every thought that
 3     crossed my mind.  That was one of the worst things
 4     I've ever been through in my life and those moments --
 5     they say sometimes that time -- time flows differently
 6     based on your energy of a situation and this -- I said
 7     my adrenaline was high at that point in time.
 8              Q.  So you said they didn't --
 9              A.  And I tried to -- that was my best "grr"
10     voice.  It is all squeaky and soft and that's probably
11     why they didn't listen to me because they didn't care.
12              Q.  So you said they didn't belong there.
13              Were you expecting the second officer to
14     leave, as well?
15              A.  When I asked him to get off my property in
16     the video?  Is that what you're referring to?  Did I
17     expect that both officers would leave -- would then
18     leave the property?
19              Q.  Yes.
20              A.  Yes.
21              Q.  So earlier you said you were relieved at
22     seeing the second officer.
23              If you were relieved at seeing the second
24     officer, why did you want him off the property?
25              MR. SHIELDS:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  I wanted him to take the guy, Algarin -- I
 3    wanted him to take him with him.  I didn't know what
 4    his purpose was.  "His," being Algarin.
 5         Q.  Did the officers ever tell you to stay
 6    put?
 7         A.  Algarin told me to "Get down."
 8              Isn't that equivalent to stay put.
 9         Q.  He said to "Get down"?
10         A.  I believe so.
11              "Get back," "Get down," "Get back."  I
12    thought I heard that earlier, but I could be mistaken.
13    I'm very high on adrenaline at the moment.  It's
14    upsetting.
15         Q.  I thought it was just "Get back," but I
16    can -- so you interpret the words "Get down" as "Stay
17    put" -- do you interpret "Get back" as "Stay put," as
18    well?
19              MR. SHIELDS:  Objection.
20         A.  Yes.  It's not an invitation.
21         Q.  Why did you eventually decide to move
22    backwards away from the officers?
23              MR. SHIELDS:  Objection.
24         A.  Towards the end of that video?
25         Q.  Correct.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2              Why did you choose to move backwards
3    towards the end of that clip?
4         A.  Because my fear of Algarin being a threat
5    had passed with the arrival of the second person and I
6    had to -- they -- they brought -- you can hear them
7    say "Go get your dog.  Go get your dog" to me.  And I
8    had to go get my dog.
9              Like I didn't know where she was at that
10   point.  I didn't know what was happening.
11        Q.  And why didn't you go get your dog sooner?
12        A.  I was in fear of what Algarin was willing
13   and going to do.  I didn't know why he was in my yard.
14   It's not unheard of for people who do bad things to do
15   more bad things.  And that's my theory.
16        Q.  Have you been in a situation where someone
17   that did something bad to you did more bad things to
18   you?
19             MR. SHIELDS:  Objection.
20        A.  It's a very vague question.  Have I been
21   eliminated in dodgeball twice by the same guy?  Had I
22   been bullied by the same person?  You know, like --
23   are you referring to -- I don't understand the depth
24   of your question or the -- or incidence of it.
25        Q.  Anything.  So I'm wondering what is the
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2   basis of your life experience that causes you to
 3   believe that people can do additional bad things to
 4   you.
 5              MR. SHIELDS:  Objection.
 6         A.   Untrustworthy people are untrustworthy.
 7   It's just something that you learn the hard way, I
 8   guess, I would say.
 9         Q.   Do you have any specific examples of
10   untrustworthy people that have taught this hard
11   lesson?
12              MR. SHIELDS:  Objection.
13         A.   I had a neighbor I loaned some money for
14   and made the mistake of doing it twice and I never got
15   any of it back.
16              Is that an example of a repetitive act of
17   mistrust?
18         Q.   How much did you loan to that neighbor?
19         A.   I don't recall.
20         Q.   When did you loan the money to the
21   neighbor?
22              MR. SHIELDS:  Objection.
23         A.   I don't recall.
24         Q.   Any other examples of bad things happening
25   multiple times with the same person?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2              MR. SHIELDS:  Objection.
 3        A.  I remember when I was in high school and
 4   there was the Columbine shooters and those kids just
 5   kept killing until they killed themselves.  That was
 6   traumatic for me as a kid in school to think about
 7   that.
 8        Q.  What did you do after this part in the
 9   clip when you walked away to go find your dog?
10        A.  After the point of which you had stopped
11   the video before, what was the next thing I did that
12   was upsetting?
13        Q.  Yes.
14        A.  I went to the dog.  I think I -- I think I
15   tried to call for help.  I didn't know who to call
16   for.  I think it was just dial, dial.  And then I got
17   to the dog.
18              And I saw she was -- I saw that there was
19   blood dripping and I tried to use my -- my clothes to
20   try to -- and -- I tried to shield her.  I laid over
21   her.  Because at that point, the other officers in the
22   area started responding to the shots fired and started
23   to...
24        Q.  Did you say you dialed?  You called people
25   on your phone?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2         A.  I -- I thought I called for help.  I
3    thought I -- yeah.
4         Q.  Who did you call?
5         A.  My girlfriend.
6         Q.  Did she pick up?
7         A.  I don't know.  I didn't speak.  I -- I
8    think she did.
9         Q.  Did you call anyone else for help?
10        A.  No.  Because I had been at that -- I
11   had -- I hung up on -- I had put my phone in my pocket
12   and I was using my body and both of my hands to
13   address wounds on Tesla that were inflicted by the
14   bullets.
15        Q.  You said that you were shielding Tesla.
16             What do you mean by that?
17        A.  I was genuinely concerned that the
18   officers would just finish the gig.  I didn't know how
19   Tesla would react after having just been shot.  And if
20   they thought that her just exiting the house was -- I
21   was -- I was laying in the dirt over her bleeding body
22   while the people who were responsible for the
23   situation at hand passed by freely in my yard as if it
24   had now become theirs.  And I was shielding her from
25   what I posed as a threat of them inflicting their
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    will.
 3              Q.  Earlier you, I think, said you asked the
 4    officers for help at some point; is that correct?
 5              A.  That is.
 6              Q.  Do you remember who you spoke to while you
 7    were shielding Tesla, as you said?
 8              MR. SHIELDS:  Objection.
 9              A.  Like directly?  I --
10              Q.  Uh-huh.
11              A.  I remember just shouting at the air.  I
12    remember at one point when I could -- no, I don't
13    remember the -- the name of a human that was around me
14    that I was speaking to.
15              Q.  What did the officers say to you while you
16    were holding Tesla in that corner of the yard?
17              A.  I remember them telling me that Animal
18    Control was coming.  I -- I -- I asked that -- I asked
19    the cops to help with LD because I couldn't -- I
20    couldn't hold -- I couldn't stop her from bleeding and
21    I couldn't like tell LD...
22              MR. SHIELDS:  Just for the record, my
23    client is crying.
24              A.  Look, I asked -- I saw an officer whose
25    name I'm not aware of -- who I was facially familiar
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    with -- in the back of my yard while I'm laying in the
 3    dirt and the front part of my yard with the dog and I
 4    could hear LD pounding.  I could hear a pounding
 5    coming from my house.  I knew it had to be LD.
 6              And I asked -- I asked -- I asked
 7    somebody, "Can you please" -- "Can you please tell her
 8    it would be okay?"
 9              And I asked them for help.  I couldn't be
10    there for them both.
11         Q.  Just to clarify what you just said, you
12    asked one of the cops to go take care of your daughter
13    and tell her it would be okay.
14              Was there an additional type of help that
15    you asked for?
16              MR. SHIELDS:  Objection.
17         A.  I wanted -- I wanted first aid.
18         Q.  Any other specific types of help that you
19    asked for?
20         A.  Yeah.  About an hour or so -- I don't know
21    how long that I was into it I had been aware that
22    Animal Control was not going to assist me and that I
23    would be responsible for getting this situation
24    cleaned up on my own and I had -- I was -- I now had
25    to figure out how to get my dog to someone that could
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    help her.
 3              And I couldn't -- I couldn't let go -- if
 4    I -- I couldn't let go of the bullet wounds without
 5    the blood just coming.  And I knew it was -- that she
 6    couldn't -- I could hear the blood in her lungs.  I
 7    could hear the blood in the lungs.
 8              I asked for help so that -- when Animal
 9    Control was there, I asked for help so that I could
10    get my keys and the officer helped me get my -- he
11    helped me get her in the truck.
12         Q.  Did the officers say anything in response
13    to your request for assistance?
14              MR. SHIELDS:  Objection.
15         A.  He -- they told me that Animal Control
16    would come.
17         Q.  Did they go and talk to your daughter?
18         A.  I couldn't witness that, but I understood
19    that they had gone inside the house.
20         Q.  Did the officers encourage you to take
21    your dog to the vet?
22              MR. SHIELDS:  Objection.
23         A.  The Animal Hospital?
24         Q.  Did the cops tell you to take the -- take
25    Tesla to a veterinarian?  A hospital?  Some type of
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2   medical care -- veterinary care?  Excuse me.
 3              A.  Yes.
 4              Q.  When did they tell you to take Tesla to
 5   get some veterinary care?
 6              A.  After Animal Control had arrived.  Or --
 7   while I was laying there in the dirt.
 8              Q.  Do you know how much time passed between
 9   when Tesla was shot and when you took her to the
10   Animal Hospital or veterinarian?
11              A.  I have no idea.
12              Q.  Earlier you said about an hour or so into
13   it.
14              Do you --
15              A.  Maybe when I had said that, I just -- it
16   felt like a long time.
17              Q.  Why didn't you go to the veterinarian or
18   Animal Hospital sooner?
19              MR. SHIELDS:  Objection.
20              A.  For one, I was trying to administer, you
21   know, like -- I was trying to stop active bleeding of
22   a loved one while I was surrounded by officers that
23   had me blocked on both of my exits to where I was at.
24   And was frozen in the moment.
25              Q.  Any other reasons why you didn't take
```



1          CHARLES R. DEMPSEY III - BY MS. JONES

2    Tesla to the veterinarian sooner?

3          MR. SHIELDS:  Objection.

4          A.  Honestly, there was a part of me that

5    really thought Animal Control would show up and be

6    able to help me.

7          Q.  And what did you believe that Animal

8    Control was going to assist you with?

9          A.  First aid kit the officers were refusing

10   to help me with.  And perhaps a ride to the Animal

11   Hospital.

12         Q.  Did you ask for those things from Animal

13   Control when they arrived?

14         A.  Yeah.

15         Q.  What did Animal Control say?

16         A.  "We'll give you a dirty blanket."

17              That's not what she said verbatim.  It is

18   just...

19         Q.  Did the Animal Control Officer communicate

20   anything else?

21         A.  I don't recall that -- the exact

22   conversation I had with the Animal Control Officer.  I

23   believe that they told me which Animal Hospital to go

24   to, I think.  Somebody told me which Animal Hospital

25   to go to.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  Which Animal Control hospital were you
 3    told to take Tesla to?
 4         A.  The one that is -- well, was -- it
 5    recently closed.  But it was near -- is on East
 6    Henrietta Road.
 7         Q.  Were there any other reasons that you
 8    didn't take Tesla to the vet sooner?  You were trying
 9    to stop bleeding.  Thought Animal Control would help.
10    You felt frozen for a little bit.
11              MR. SHIELDS:  Objection.
12         A.  I was surrounded by the officers that were
13    collected en masse around me and was just like a -- I
14    was -- I didn't feel safe to just get up and grab my
15    dog and go grab my keys and leave.  I didn't -- I
16    didn't -- I didn't feel comfortable with that for some
17    time.
18         Q.  Prior to this incident with Tesla, have
19    you had any negative interactions with the police?
20              MR. SHIELDS:  Objection.
21         A.  Throughout my life?
22         Q.  Yes.  At any point in your life.
23         A.  Could you describe the depth of
24    "negative"?  Because unfavorable -- is that what you
25    mean?  Or more like just...
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2         Q.  Why don't you give me an example of a
3    negative interaction and then I'll ask some follow-up
4    questions.
5              MR. SHIELDS:  Objection.
6         Q.  Have you had any negative interactions
7    with police in your lifetime?
8              MR. SHIELDS:  Objection.
9         A.  I don't recall.
10        Q.  Have you had any interactions with police
11   in your lifetime that contributed to the fear or
12   discomfort that you felt on the day of the incident
13   with Tesla?
14        A.  No.
15        Q.  So your feelings and interpretations of
16   the officers' conduct were based on their conduct that
17   day during that incident?
18        A.  In that moment, correct.  Yes.
19        Q.  What -- do you know the name of the
20   veterinarian that provided care to Tesla when you
21   arrived at the Animal Hospital?
22        A.  I do not.
23        Q.  Do you have records of Tesla's veterinary
24   care that she received at that Animal Hospital?
25              MR. SHIELDS:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2         A.  I don't believe.
3              By "records," you mean like receipts and
4    paperwork from the hospital?
5         Q.  Yes.
6         A.  Tesla was cremated and they were kind
7    enough to making like a paw print -- I don't know if
8    you're aware what that is, but they take a paw print
9    and press it into like a clay.  And I have -- I know
10   that there is papers with those prints, but I don't
11   know if they're actual medical records or just
12   associated with that.  But I know that there is
13   paperwork that I have there.
14        Q.  Do you have any receipts about the cost of
15   the cremation?
16        A.  No.
17        Q.  How much did the veterinary care that
18   Tesla received at the Animal Hospital cost?
19        A.  I don't recall.
20        Q.  Do you have any sort of estimate?
21        A.  No.
22        Q.  You can't tell me whether it was 500 or
23   5,000?
24        A.  No.
25        Q.  Are you seeking to be reimbursed for the
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           CHARLES R. DEMPSEY III - BY MS. JONES
2    veterinary care that Tesla received on that day?
3           A.  The people at the veterinary hospital were
4    so touched by the traumatic -- of the situation that
5    they had granted me a -- a -- they had given me like a
6    grant that they had or some sort of -- they had a --
7    they used money that was donated.
8           Q.  So did you pay any out-of-pocket costs for
9    the veterinary care provided to Tesla on the day of
10   the incident?
11          A.  To the Animal Hospital?
12          Q.  Correct.
13          A.  No.
14          Q.  Did you pay for the cremation of Tesla?
15          A.  No.
16          Q.  Did you talk to anyone at the Animal
17   Hospital about Tesla's veterinary care that day?
18          A.  Yes.
19          Q.  Who did you talk to?
20          A.  The staff.  I don't know any names.
21          Q.  Do you know the position of the staff
22   members?
23          A.  There is front desk and there is behind
24   the door.  That is about as close as I could get.
25          Q.  What did -- what was the name of the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    individual that was at the front desk that you spoke
 3    to?
 4              A.  I do not recall.
 5              Q.  What did the person at the front desk tell
 6    you?
 7              A.  She was sorry.  She was just at work.
 8              Q.  How many people did you talk to that were
 9    quote/unquote "behind the door"?
10              A.  Two, maybe three.
11              Q.  Could you distinguish between
12    veterinarians versus vet techs versus assistants of
13    those two to three people?
14              A.  No.  I mean I don't know.  I'm sure they
15    each had their own job roles, but I don't recall who
16    was who and what was what.
17              Q.  What did those people tell you about
18    Tesla -- Tesla's condition?
19              A.  She had multiple wounds and that there was
20    still a bullet inside of her.  They told me that to
21    remove it would be an extensive surgery and that she
22    had lost significant blood and that -- that they --
23    there was a period where I was alone and they came
24    back and they said that if we were to proceed, that
25    you -- you would be on the hook for the bills that
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2   would exceed $15,000.  And at that time that was more
 3   money than I had ever had.  It -- so that was an
 4   impossible figure.
 5              And I asked him if there was like any, you
 6   know -- if there was another way or -- or like -- that
 7   person told me that -- I asked them, "So you're
 8   telling me that she's going to die from this?"
 9              And that person told me, "Yes."
10              And so then -- so then they included to
11   put her down, that they would -- it would be best to
12   have her go down than to suffer this blood loss.
13        Q.   I'm sorry.
14              Did you say that there would be more blood
15   loss through the surgery?
16        A.   Yeah.  When -- when you do surgery on an
17   animal or person, you cut them open.  There is lost
18   blood.  That's not what I said, but I would agree.
19        Q.   I'm sorry.  I was trying to understand
20   your last statement where you said they said it was
21   better to put her down than to suffer a blood loss.
22        A.   The bullet had traveled into her organs.
23   There were internal wounds that were bleeding that
24   couldn't be addressed with gauze that I was
25   requesting.  And it required an expensive surgery and
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           CHARLES R. DEMPSEY III - BY MS. JONES

2    that was a low-percentage chance already.  I remember

3    asking, "What are the chances?"

4           Q.  Chances of surviving?

5           A.  Of survival.  They told me it was low and

6    if she did come through, she would never walk -- she

7    would never be the same.

8           Q.  Did the employees at the Animal Hospital

9    tell you anything else about the location of the

10   bullet?

11          A.  There was multiple bullets.  They did --

12   when they x-rayed, they told me there was one inside

13   of her still, I believe.  From what I recall.

14          Q.  Yes.  So sorry I was unclear.

15          I was asking if there was additional

16   communication about the bullet that was still inside

17   of Tesla.

18          A.  I -- I feel like that was part of the

19   previous conversation that I just was referring to in

20   the last question.

21          Q.  Okay.  So there is no additional details?

22          A.  That was such a blur.  I just remember

23   crying in the parking lot.

24          Q.  Did the employees at the Animal Hospital

25   talk to you about the blood loss from Tesla?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          CHARLES R. DEMPSEY III - BY MS. JONES

2          A.   Yes.

3          Q.   What did they say other than she lost a

4     lot of blood?

5          A.   The reason why she lost blood was gunshot

6     wounds.

7          Q.   They said that?

8          A.   Yeah.

9          Q.   Did they say anything else about the blood

10    loss?

11         A.   I don't recall.  I remember them saying

12    that at first they were worried it was worse and then

13    they were -- it -- I -- I don't know the specifics

14    about the blood loss conversation.

15         Q.   Would the surgery have had a higher chance

16    of success if she hadn't lost as much blood?

17         A.   I'm not a veterinarian.

18         Q.   Did they --

19         A.   I would assume.

20         Q.   Did they mention anything specifically

21    about whether the chance of success of the surgery was

22    related to her prior blood loss?

23         A.   I do remember that that was part of the

24    risk of the surgery, was the blood loss.  I remember

25    that being -- I mean you are asking me about a



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     conversation that I had in the room four years ago
 3     that I blocked out of my memory.  So I don't -- I
 4     don't recall.
 5          Q.  Yeah.  That's fine.  I just need to know
 6     what you do remember.  So that's why I'm asking that.
 7              Have you ever -- you said you're not a
 8     veterinarian, but have you taken any veterinary
 9     classes?
10              MR. SHIELDS:  Objection.
11          A.  No.  I mean I don't know what veterinary
12     classes is titled.  Everyone has to take English 101.
13          Q.  When you were at MCC, did you take
14     something like a vet tech class?
15          A.  No.  That is why I answered "No."
16          Q.  Have you taken a first aid class?
17          A.  I have had first aid training for -- I
18     have never taken a class.
19          Q.  When was the first aid training?
20          A.  Well, we learned first aid in the Boy
21     Scouts.  You know.  And the Elementary School that I
22     went to, you know, they had a -- they had this
23     traveling health professor that would come to the
24     classrooms and gave us a basic first aid lesson.  When
25     I was in middle school we learned CPR, first aid.
```



```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2              You know, you get trained to ask
3     permission before you help somebody at the scene.
4     Stuff like that.  I just -- but those are instances
5     that I can recall.
6         Q.  When you were -- I think you described it
7     as shielding Tesla.
8              When you were laying with her in that
9     portion of the yard, do you remember how many wounds
10    there were on Tesla?
11        A.  She had blood coming from her face by her
12    ear.  And she had -- I remember that there were two
13    wounds on her chest.  And then there was another
14    that -- I want to say I was trying to hold three
15    different spots on her body.
16        Q.  Was blood oozing out -- I think that's the
17    word you used -- from all three of those spots?
18        A.  There was blood coming in all those spots.
19    Earlier when I used the term "ooze," it was a
20    reference to at one point I had released and there was
21    an ooze, like -- like the pressure had built up from
22    me stopping the blood from coming out and when I
23    released there -- I used the word "ooze" sort of.
24        Q.  Like a gush?
25        A.  Like a gush.
```



1          CHARLES R. DEMPSEY III - BY MS. JONES

2          Q.  Was blood coming out prior to you applying

3   pressure to the wounds?

4          A.  Yes.  She left a trail of blood.

5          Q.  Earlier you said that you could hear blood

6   in her lungs.

7               How do you know that that is what you were

8   hearing?

9          A.  I spent a lot of time cuddling with the

10  dog, laying my head on her body.  Laying her -- her

11  laying her head on my body.  I had heard her breathe

12  in the past.  I knew what it sounds like.  I was

13  comfortable with the sound.  I could fall asleep to

14  it.

15              And laying in the dirt, with my body, I

16  could hear the "hawk."  I could hear the -- I could

17  hear the difference.  I could hear the "hawk."  I

18  can't verbalize a word for that.  I could hear the

19  (sound representation).

20          Q.  A raspiness or is it called a glottal?

21              MR. SHIELDS:  Gurgling?

22          Q.  Yes.

23              Like a gurgle?

24          A.  It -- it was different.  It -- it sounded

25  like water in a place where it shouldn't be.  Or



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                    CHARLES R. DEMPSEY III - BY MS. JONES
2       fluid.
3                    Q.   Did you stay at -- scratch that.
4                         How long were you at the Animal Hospital?
5                    A.   Until it was pretty dark out.  I don't
6       know the time.  It was October, so it gets dark around
7       7.  I was probably -- I was there for some time.  Even
8       after they had -- I didn't know what to do afterwards.
9       My daughter had been taken to her grandmother's house
10      so I knew she was safe.  I didn't want to go home.  I
11      didn't know where to go.
12                   Q.   Where did you sleep that night?
13                   A.   I slept at a friend's house.
14                   Q.   How many -- well, when did you next sleep
15      back at Kosciusko Street?
16                   A.   Probably near November.  It had to be
17      almost November at that point.  I would say a long
18      week, maybe eight or nine days from that point.
19      Maybe.
20                   Q.   Did you miss any work because of the
21      incident?
22                   A.   I did.
23                   Q.   How many shifts did you miss?
24                   A.   I missed the rest of that week.
25                   Q.   And --
```



```
 1                   CHARLES R. DEMPSEY III - BY MS. JONES
 2              A.  Well, it was -- it was Friday and then --
 3      I remember I called in and then called again.  I don't
 4      recall how many days specifically I had called into
 5      work.  But -- again, this is like four years ago.
 6              Q.  Did you use paid leave for those absences?
 7              A.  I don't recall.  If I had the sick time,
 8      I'm sure they gave it to me, but I don't recall.
 9              Q.  Are you seeking to be compensated for your
10      missed work because of the incident?
11                   MR. SHIELDS:  Objection.
12              A.  You're asking if I'm asking to be paid for
13      my hourly wage that I missed?  Is that what you're
14      saying?
15              Q.  Or -- yeah.  Yeah.
16                   Are you seeking to be compensated for
17      that?  If so, I need to figure out how much that is.
18                   So -- so are you seeking to be compensated
19      for the work you missed at -- or having to use your
20      paid leave for that time period?
21                   MR. SHIELDS:  Objection.
22              A.  I never returned to work the same.  From
23      that.
24              Q.  Is that a "yes," "no" or "I need to think
25      about it"?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  Yes.
 3         Q.  You work for the same employer as you did
 4    in 2018?
 5         A.  Yes.
 6         Q.  Do you know who at work you would contact
 7    to get a copy of your attendance and/or pay records
 8    for that time period?
 9         A.  Human Resources with the United Parcel
10    Service.
11         Q.  Is there a particular person in Human
12    Resources you would contact?
13         A.  Not whose name I know off the top of my
14    head.
15              MS. JONES:  Okay.  It's 12:45.  We can
16    stop for lunch since we're well past noon.
17              Off the record.
18         (There was a discussion off the record.)
19         (The proceedings recessed at 12:45 p.m.)
20         (The proceedings reconvened at 1:48 p.m.;
21         appearances as before noted.)
22    CHARLES R. DEMPSEY III, resumes;
23              CONTINUING EXAMINATION BY MS. JONES:
24         Q.  Did you have a chance to talk to your
25    attorney over break?
```



```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2         A.   Yes.
3         Q.   Did you want to add anything to your
4    answers that we had before lunch or since we started
5    this morning?
6         A.   No.
7         Q.   So your attorney just emailed me some
8    documents.
9              Do you recognize these?  Do you recognize
10   these documents?
11        A.   The header appears to be from the
12   veterinary hospital.
13        Q.   Have you seen these documents before?
14        A.   That looks like a -- it looks familiar.
15        Q.   Okay.
16             MR. SHIELDS:  For the record, I forwarded
17   an email from the veterinary emergency hospital of
18   records that we just got from the veterinary emergency
19   hospital during the lunch break.
20        Q.   Did you request these records from the
21   veterinary hospital?
22        A.   Yes.
23        Q.   When did you request these records from
24   the veterinary hospital?
25        A.   We just got them.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  Is there -- when did you request these
 3    records from the veterinary hospital?
 4         A.  We just made a phone call to request them.
 5         Q.  Like earlier today?
 6         A.  Yes.
 7         Q.  Is this location still open?
 8         A.  Um, I believe they're in the process of
 9    changing that.
10         Q.  So I thought earlier you said that the
11    veterinary hospital you took Tesla to is now closed?
12         A.  In the news it was mentioned that the
13    emergency services for veterinary care there was
14    shutting down and that was the last option for people
15    in the City of Rochester area.  That's why it was
16    newsworthy.
17         Q.  When did you read that in the news?
18         A.  That was a few -- that was a few weeks
19    ago.  Maybe about a month or more.
20         Q.  So you saw it was shutting down?
21         A.  Yeah.  I didn't like go into depth, but I
22    recall --
23         Q.  Did you know -- or do you know if the
24    location is -- scratch that.
25              Is this the location of the veterinary
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    hospital that you took Tesla to?
 3              MR. SHIELDS:  Objection.
 4         A.   "This" in reference to?
 5         Q.   The --
 6         A.   I can't see what you're --
 7         Q.   Sure.  I have the same records up I had a
 8    minute ago.
 9              Is this the name of the hospital that you
10    took Tesla to on the date of the incident?
11         A.   Yeah.  I believe so.
12         Q.   Okay.  Okay.  I will show you a body-worn
13    camera video.  So this is a video of -- well, we have
14    his name as Lindauer, L-I-N-D-A-U-E-R.
15              I'm going to show you this video because
16    it depicts again that part of -- where you were
17    holding Tesla in the corner of your yard.  And I would
18    like you to identify -- if it is in this video -- the
19    point where you felt -- I forget the words you used --
20    like surrounded -- not barricaded.
21              Do you know what I'm referring to?  I
22    forget the word you actually used.
23         A.   I understand what you're referring to.
24              MR. SHIELDS:  Objection.
25         Q.   So what word do you want to use for that
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    time where you felt enclosed, kept?
 3              A.   That my liberties were impeded on --
 4              Q.   Yes.
 5              A.   -- to freely roam on my property?
 6              Q.   Yes.
 7                   You felt like you couldn't leave; is that
 8    fair?
 9              A.   I would assume the entirety of the video
10    before you play it, but --
11              Q.   Okay.  So -- so I will play it and we'll
12    see where we get to.
13                   (The video was played.)
14              Q.   Okay.  So this is the officer's body-worn
15    camera.
16                   Again, I have turned up the sound a little
17    bit.  This is a video ending in 00:15.  I've skipped
18    it ahead to 17 seconds in the video.  Right now the
19    time stamp in the lower right-hand corner is 17:31:41.
20    I'm just going to play it for a bit.  And if there is
21    ever a point in this body-worn camera video where you
22    felt like your liberties were -- as you say -- you
23    weren't at liberty to leave, let me know.
24                   (The video was played.)
25              A.   May I?
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  I'll pause it.
 3         A.  I can't see.
 4         Q.  Oh, sorry.
 5         A.  Thank you.
 6              (The video was played.)
 7         Q.  So he did take a few steps towards you
 8    though.  He's walking.
 9              (The video was played.)
10         Q.  Okay.  So I paused it at -- at 57 seconds
11    into the video.  17:14:22 is the time stamp.
12              So he has gotten a little closer to you.
13    Are you feeling like you're not at liberty to leave at
14    this point?
15              MR. SHIELDS:  Objection.
16         A.  That's correct.  There is an officer
17    standing over looking at me -- right there in the
18    video -- in the top left corner of the fence who's
19    looking down on me.
20         Q.  So it is not maybe this officer that's
21    making you feel --
22         A.  You're asking me about my feelings.
23              And that officer is approaching me into a
24    corner.  So he is cornering me.
25         Q.  So this officer at this point in time,
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    given his location and the combination of the officer
 3    looking over the fence, that's what's making you feel
 4    like you cannot leave?
 5            A.  At that point in time, I'm trying to find
 6    help.
 7            Q.  No.  I -- I just want to -- so I feel like
 8    you're not answering my questions clearly.  I'm trying
 9    to make sure I'm understanding you correctly.
10            So am I understanding you correctly when I
11    say this officer in this position right here at
12    17:14:22, in combination with the officer looking over
13    the fence, makes you feel like you are not free to
14    leave?
15            MR. SHIELDS:  Objection.
16            A.  Yeah.
17            Q.  So I will push play.
18            (The video was played.)
19            Q.  Okay.  So I don't -- I paused it at
20    1:39:17:15 because he starts blocking his body-worn
21    camera with his arm.  I'm going to scoot forward.
22            Okay.  So I scooted the video forward to 2
23    minutes into the video at 17:15:24.  And I'm going to
24    push play again because we can actually see again.
25            (The video was played.)
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  CHARLES R. DEMPSEY III - BY MS. JONES
 2           Q.  So I paused it at 9 seconds later.
 3               Can you describe what is going on right
 4      now in the video?
 5           A.  Yes.  There is three, four officers that
 6      had me surrounded while I'm laying on the ground with
 7      my dog.
 8           Q.  Okay.  Can you tell me where the officers
 9      are?
10           A.  Yeah.
11               There's an officer on my porch.  You can
12      see that the officer just before had moved across the
13      gaps in the fence line.
14           Q.  Okay.
15           A.  There is the officer recording this video.
16      And there is that officer there (indicating).
17           Q.  So the officer recording, the officer
18      taking a picture of you and you're talking about
19      officers behind the fence, as well?
20           A.  Yes.
21           Q.  So did know the officers were behind the
22      fence in the moment when you were --
23           A.  Yes.  I was aware of the officers looking
24      down on me from over the fence.
25           Q.  It's their presence looking at you in
```



```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2      combination with these two officers --
 3                A.   I'm surrounded.
 4                Q.   Hold on.
 5                A.   I didn't mean to interrupt.
 6                Q.   So I just need to be clear.
 7                     So you're saying you feel surrounded
 8      because of the officer that's taking the body-worn
 9      camera video and this officer taking a picture of you
10      and the officers that are behind the fence walking
11      around?
12                MR. SHIELDS:  Objection.
13                A.   I feel surrounded because every 45 degrees
14      from where I'm at there is no exit point but through
15      officers or a wall of a home.  There -- there -- I'm
16      in a corner.
17                Q.   Okay.  All right.  I'm going to push play.
18                (The video was played.)
19                Q.   So I pushed play again and it played for a
20      second and I pushed pause.  So now --
21                A.   The time stamp is --
22                Q.   Yeah, sure.
23                     So now we're at 2:34 into the video and
24      the time stamp on the BWC is 17:15:58.
25                     So would you like to describe what's in
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    the screen now?
 3              MR. SHIELDS:  Objection.
 4         A.   I see -- I see the body camera.  The
 5    person wearing the body camera was putting on gloves.
 6         Q.   Yes.
 7         A.   Which -- I see another officer who has
 8    entered through my fence, which was locked.  By that
 9    lock right there.  They had unlocked that lock to get
10    into the fence.
11         Q.   Okay.
12         A.   And I see myself in the corner.
13         Q.   So you are still feeling like you cannot
14    leave at this point in time?
15         A.   Yeah.
16         Q.   Okay.  Tell me again why you feel like you
17    cannot leave at this point.
18         A.   Because there is no --
19              MR. SHIELDS:  Objection.
20         A.   -- physical place for me to go.  I'm
21    surrounded by guys who have already established that
22    they feel comfortable opening fire on -- like --
23    I'm -- I'm not comfortable even now looking at this.
24         Q.   So you didn't feel like you could get up
25    and walk past this officer whose body-worn camera
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2     video we're watching?
3          A.   No.
4          Q.   And that was because why exactly?
5               MR. SHIELDS:  Objection.
6          A.   Because I was afraid that they were going
7     to continue to fire at my dog if I was to release her.
8     I was afraid that she would bleed out if I was to let
9     go of her wounds.
10         Q.   So I feel like those are two separate
11    things.
12         A.   But I was dealing --
13              MR. SHIELDS:  Objection.
14         A.   -- with both of them at the time.
15         Q.   Sure.  That is fair.
16              But I guess my question is what were the
17    officers doing that made you feel like you could not
18    move?
19         A.   Surrounded --
20              MR. SHIELDS:  Objection.
21         A.   Surrounding me, hovering over me.  I'm
22    surrounded by officers.  Officers just continue to
23    appear at that fence.  There -- I have seen at least
24    four officers already in the seconds that you have
25    shown me a video.
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2              MR. SHIELDS:  Objection.
 3         Q.   So is there anything else besides their
 4    presence that makes you feel intimidated or that you
 5    cannot leave?
 6              MR. SHIELDS:  Objection.  You have asked
 7    the same question about five times which is about --
 8         A.   The physicality of it?
 9              MR. SHIELDS:  You have asked the question
10    about five times, which is where the Courts draw the
11    line for questions being harassing and so I'm going to
12    ask you to move on or I'm going to make an instruction
13    for him to stop answering this question.
14         Q.   Is there anything about this officer that
15    is standing right in front of you that just came
16    through the fence, besides his mere presence, that
17    looks intimidating or that communicates to you --
18              MR. SHIELDS:  Objection.
19         Q.   -- that you should not -- that you cannot
20    move -- I got to get the whole question out.
21              Is there anything about this officer that
22    is standing right in front of you next to the gate,
23    other than his presence, that indicates to you that
24    you cannot leave?
25              MR. SHIELDS:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2           A.  The fact that he is obstructing my path of
 3      leaving.
 4           Q.  Okay.  Let me fast-forward a bit.
 5                In the video we just saw, do you know how
 6      far the officer was standing in front of you, the one
 7      with the body camera footage -- or video on him?
 8           A.  During the sequence you showed me, he
 9      continued to approach me.  He was closer the longer
10      the video ran.
11           Q.  Sure.
12                So what was the closest he got to you?
13           A.  Feet?
14           Q.  Yes.
15           A.  Feet away.  I -- I -- feet.  I -- I -- I
16      mean if you want me to look at it and make an
17      estimated guess, that's the best I could do.
18           Q.  Okay.  This is that same video.  This is
19      towards -- well, I have put it to 2 minutes into the
20      video.  We can play and see if he gets any closer to
21      you.
22                Same video with -- how do you pronounce
23      his name -- Lindauer that ends in 15.  We're at 2
24      minutes and 1 second into the video.  The time stamp
25      is 17:15:25.  And we're going to push play.
```



1           CHARLES R. DEMPSEY III - BY MS. JONES

2           (The video was played.)

3      Q.  So I just played it for a few seconds so

4  you could look at it again and get an idea how far

5  away from you he was.

6           Can you estimate how far he was from you?

7           MR. SHIELDS:  Objection.

8      A.  Based on the fact that my feet aren't even

9  included in the frame, would mean that I'm somewhat

10 around distance from his chest -- the distance from

11 him to me is going to be, I would think, between his

12 chest and the ground.

13     Q.  The -- okay.  So an average officer might

14 be 6 feet tall, so less than 6 feet?

15          MR. SHIELDS:  Objection.

16     A.  Yeah, I mean -- I would say what --

17          MR. SHIELDS:  Objection.  Objection.  I

18 don't think the average officer is 6 feet tall.

19     A.  Feet, I had -- I mean.

20     Q.  I like dealing in round numbers.  We'll

21 just go with 6 feet.

22          So it is definitely less than 6 feet

23 because you're saying a body-worn camera would be

24 somewhere along his chest height?

25          MR. SHIELDS:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.   That's where I -- it should -- that's
 3    where they normally carry it.  I don't recall if the
 4    guy has his camera in his hand like the other officer,
 5    but we saw him put on gloves in the video, so I would
 6    assume not.
 7         Q.   I just want to -- so are you -- so you're
 8    saying less than 6 feet is a fair approximation?
 9              MR. SHIELDS:  Objection.
10         A.   That's kind of what I'm approximating
11    based on looking at the video here.
12         Q.   Okay.  Do you remember in that situation
13    there being other times when you felt more or less
14    able to leave?
15         A.   Yes.
16         Q.   Okay.  What about those other situations?
17              MR. SHIELDS:  Objection.
18         Q.   So what specifically do you remember about
19    feeling less able to leave?
20              MR. SHIELDS:  Objection.
21         A.   Officers continued to come and go past me
22    and blocked the exit to my yard.  That -- continuing
23    beyond that point in the video we just watched.  There
24    was an officer that stood over me.
25         Q.   Yeah.  I think you're talking about this
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    video, so I will pull it up.
 3              I pulled up --
 4              MR. SHIELDS:  Objection.
 5         Q.  -- Adam Broadsky?
 6              MR. SHIELDS:  Objection.  I don't think he
 7    is talking about a video personally.
 8         Q.  I pulled up Officer Broadsky's body-worn
 9    camera, the one that ends in 003.  I will play this
10    for you.  It's from his perspective.  But you can tell
11    me if this rings a bell.
12              I will start playing it from the
13    beginning.  And right now we're about 10, 12 seconds
14    in.  Time stamp is 17:32:33.
15         (The video was played.)
16         Q.  Does this video depict what you were
17    referring to about an officer standing over you?
18         A.  That appears to be a video of him standing
19    right above me.
20         (The video was played.)
21         Q.  Do you remember having a conversation with
22    the officer when he was standing over you?
23         A.  I don't recall the -- the details of the
24    verbal -- I don't remember words that --
25         Q.  Do you remember having a conversation with
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    the officer when he was standing close to you?
 3              A.  I -- I don't -- I just -- there was a lot.
 4    I remember speaking.  I remember them speaking to me.
 5              Q.  Do you remember speaking to this officer
 6    who was close to you?
 7              MR. SHIELDS:  Objection.
 8              A.  In this moment, not particularly.  I'm
 9    not...
10              Q.  Okay.  Let's see.  So would -- the officer
11    that was close to you, was it his physical presence or
12    something else that he did that made you feel like you
13    could not leave?
14              MR. SHIELDS:  Objection.
15              A.  Yes.
16              Q.  Okay.  What else did he do besides being
17    present that made you feel like you could not leave?
18              MR. SHIELDS:  Objection.
19              A.  He stood over me cornered.  Every time I
20    looked up at him, I had to see past his -- his
21    weapons, his belt.  Which included his gun, which at
22    many points he had his hand on his waist.  So I felt
23    like he was there to -- I don't know what.  Guard.  I
24    don't know what word to use.  I felt like he was
25    posted to make sure that I didn't leave.
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  Did you ever communicate that to the
 3    officer?
 4              MR. SHIELDS:  Objection.
 5         A.  I -- again, I don't recall the words of
 6    what happened there.
 7         Q.  So you don't remember one way or another
 8    if you told him his presence was intimidating or not?
 9              MR. SHIELDS:  Objection.
10         A.  I feel like I did.
11         Q.  Do you remember what you said?
12         A.  No.
13         Q.  Okay.  Okay.  We are going to fast-forward
14    a little bit.  Okay.  So we're still on Adam
15    Broadsky's body-worn camera that ends in 003.  I'm
16    going to move ahead in the video to a minute 16 and
17    I'll play it for a little bit.
18              And tell me which of the other officers
19    that come into the screen are responsible for making
20    you feel like you cannot leave.
21              MR. SHIELDS:  Objection.
22              (The video was played.)
23         Q.  Oh, I don't know if I said time stamp.
24              MR. SHIELDS:  Can you stop hitting the
25    court reporter's computer?  I'm afraid it's going to
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    fall off the table.
 3              MS. JONES:  My apologies.
 4         Q.  So it was 1:18 into the video at 17:33:34
 5    on the time stamp.
 6         A.  Can you please move it?
 7         Q.  Yep.  Yep.  I'm pushing play.
 8         (The video was played.)
 9         Q.  Is this the officer that just came in that
10    you felt like was standing over you?
11              MR. SHIELDS:  Objection.
12         Q.  Do you know?
13         A.  The officer just that entered?
14         Q.  Yes.
15         A.  The --
16         Q.  I'll play it --
17         A.  The guy with the mustache I'm looking at.
18         Q.  So now he is kind of out of the screen.
19              Is it the officer now speaking or the one
20    with the mustache?
21              MR. SHIELDS:  Objection.
22         A.  I feel like the position of where the man
23    with the mustache is -- is how I recall --
24         Q.  Okay.
25         A.  -- the position that I was.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2              (The video was played.)
 3          Q.  Okay.  Because I realize this guy
 4     eventually leaves.
 5              (The video was played.)
 6          Q.  Is it this guy?
 7              MR. SHIELDS:  Objection.
 8          A.  The guy that's guarding my door?
 9          Q.  That's not how I would describe it, but
10     this guy with the mustache.
11              MR. SHIELDS:  Objection.
12          A.  The guy that is completely holding my gate
13     in his hand?  In control of my gate?
14          Q.  Sure.
15          A.  And who comes and goes out of my yard?
16          Q.  Sure.
17              MR. SHIELDS:  Objection.
18          A.  Is that man intimidating me and making me
19     feel like I can't come and go?  Yes.
20          Q.  So just for the record, I stopped it at
21     2:46 into the video at -- 17:35:02 is the time stamp.
22              So more on this, is it this, what he is
23     doing right now, or something else that made this guy
24     particularly intimidating?
25              MR. SHIELDS:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2          A.  I'm -- are you asking about in this second
 3    of this moment of -- in that moment?  Or are you
 4    asking about the situation as a whole?
 5          Q.  Well, I was asking particularly about
 6    these few seconds.  I can rewind them a little bit.
 7    You said we were talking about when he was holding the
 8    door.
 9          A.  Which he --
10          Q.  So I thought we were talking about him
11    holding the door.
12              So was it him holding a door that is
13    intimidating or was there something else?
14              MR. SHIELDS:  Objection.
15          A.  There is one, two, three, four, five, six
16    guns in that clip right there.  I just watched a
17    pistol smoke.  I am at that point afraid of guns.  He
18    has one just above my head.  If he was to trip over,
19    he could potentially have struck me with it because he
20    is that close to me.
21          Q.  So I feel like you're saying --
22          A.  So I'm fearful of his weapon.  Which I
23    feel like that's what you're trying to ask me.
24          Q.  Um, yeah.  But I feel like you're saying
25    it's multiple things.  It's not just this guy standing
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                    CHARLES R. DEMPSEY III - BY MS. JONES
 2      here in front of you holding the door with a gun on
 3      his hip.
 4                    It's the other officers outside that also
 5      have guns that in totality indicate to you that you
 6      are not free to leave?
 7                    MR. SHIELDS:  Objection.
 8            A.   Yeah.
 9            Q.   Okay.  I just want to make sure I
10      understand you correctly.
11            A.   Great.
12                    Look at it.  What would my options have
13      been?  There was no -- what -- what would you do here?
14            Q.   Do you know why or how you were able to
15      gather the courage and ultimately leave with your dog?
16                    MR. SHIELDS:  Objection.
17            A.   My brother had taken my daughter from the
18      scene and when Animal Control arrived and I realized
19      that it wasn't the dog ambulance that I thought it
20      would be -- does that answer your question?
21            Q.   I'm still a little unclear.
22                    What about the realization that Animal
23      Control wasn't going to take your dog enabled you to
24      then take the dog yourself?
25                    MR. SHIELDS:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  Are you asking what made me decide to get
 3    out of the dirt?  Or are you asking what -- I --
 4    what -- when you say the courage to leave, what --
 5              MR. SHIELDS:  For the record --
 6         A.  I'm confused.
 7         Q.  Did the officer -- did the officer leave,
 8    the one that was standing at the gate?
 9              MR. SHIELDS:  Objection.
10         A.  Those officers were there until I had
11    left.
12         Q.  So if --
13              MR. SHIELDS:  For the record, you're not
14    showing him video anymore when you're asking him
15    questions about the video.
16              MS. JONES:  I'm not asking questions about
17    the video.
18              MR. SHIELDS:  Sure you are.
19         Q.  I'm asking you what -- what do you
20    remember about how or why you were finally able to
21    leave if you're saying that the officers were blocking
22    your ability to exit?
23              MR. SHIELDS:  Objection.
24         A.  When Animal Control arrived and told me
25    that I would have to be responsible to take the dog
```



1              CHARLES R. DEMPSEY III - BY MS. JONES

2    myself, I trusted that Animal Control would be able to

3    keep my dog safe from the officers opening fire on her

4    again.

5              Q.  Did the Animal Control Officer have a

6    weapon?

7                   MR. SHIELDS:  Objection.

8              A.  I don't know.

9              Q.  What -- what did the Animal Control

10   Officer do to indicate to you that the officer could

11   keep your dog safe from the police officers?

12                  MR. SHIELDS:  Objection.

13             A.  I -- I just had this blind faith in it.

14             Q.  Do you remember the officer leaving from

15   behind the gate or from where he was holding the gate

16   to provide a path for you to leave?

17             A.  The mustached officer?

18             Q.  Correct.

19             A.  Um, no.  I do not recall -- I -- I do not

20   recall.

21             Q.  So do you remember one way or another if

22   he --

23             A.  He had to because physically I could not

24   have left if he didn't move.

25             Q.  Do you remember which officer helped you



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    carry Tesla into the car?
 3              A.  I remember he had nice hair.  By "nice,"
 4    I -- just -- full, I guess.  Dark hair.  I remember he
 5    had dark hair.
 6              Q.  In -- well generally speaking, how would
 7    you say this incident with Tesla has affected you?
 8              MR. SHIELDS:  Objection.
 9              A.  For one, I'm sitting here shaking.  Five
10    years later.
11              MR. SHIELDS:  For the record, my clients'
12    hands are shaking.
13              Q.  So you're saying that the incident causes
14    you to shake?
15              MR. SHIELDS:  Objection.
16              A.  The incident follows me every day of my
17    life.
18              Q.  I'm sorry.
19              Was that a "yes" or "no" about the
20    incident causes you to shake?
21              A.  Yes.
22              Q.  Because, you know, some people are just
23    nervous about depositions.
24              MR. SHIELDS:  Objection.
25              Q.  So the incident causes you to shake.
```



```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2                    How else does the incident affect you?
 3           A.   It made my home uncomfortable to be -- it
 4      made me socially secluded.  It felt real loss, like
 5      heartbreaking loss for months.
 6                    Every time that I see a Black Lab, whether
 7      it be in a photograph or in person, every time I -- I
 8      have a dog now and sometimes -- I love -- I love the
 9      dog that I have now.  I do.  She loves me.  But
10      sometimes I look at her and I remember that she's not
11      the dog that I had.  You ever look at somebody that is
12      close to you and feel like they're your second pick?
13                    I can't -- I can't enjoy things that I
14      used to enjoy.  I made reference earlier to I used to
15      play video games, shooters.  I can't -- I don't enjoy
16      it -- my first-person shooter games anymore because of
17      having seen body camera footage.  It's -- I mean it's
18      an obvious relation to first-person shooting.  I
19      can't -- I haven't -- and that used to be my hobby.
20                    I don't even have like -- I can't -- I
21      don't -- I can't sit here all day and tell you about
22      how every single day I'm reminded of this.  About how
23      my relationship with my daughter never -- how I wasn't
24      there for her and how I proceeded to not be there for
25      her while she was traumatized from this because I was
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
1               CHARLES R. DEMPSEY III - BY MS. JONES
2    too traumatized.
3               I thought that I had faith in -- that --
4    that therapy would help ease -- ease pain.  I --
5    tried -- I drive by the Clinton police station every
6    day on my way to work, every single page, and I'm
7    worried that some officer that knows about that might
8    want to come out and pick on me.
9               I'm ashamed of all of the people that got
10   to see that body-camera footage.  That -- that heard
11   me and saw me at the weakest.
12              I can't -- I can't even like -- I'm not
13   forming sentences because it -- when she -- when --
14   when I stepped out into the yard and began to interact
15   with Officer Algarin, Tesla bled out on my porch and I
16   was unable to get the blood out.  I was able to get
17   the blood off the floors in my house from off of my
18   body, but I was never able to get the blood off of
19   that porch.  I have it covered and -- and every time I
20   look at the cover, I'm reminded of why it's there.
21          Q.  I thought you no longer lived at the --
22          A.  I own the home.
23          Q.  Do you still live at the Kosciusko
24   Street --
25          A.  No.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2                   MR. SHIELDS:  Objection.
 3         Q.   How often do you go to the Kosciusko
 4    Street residence?
 5         A.   At least once a month.  Every couple
 6    weeks.
 7         Q.   Do you rent out that location?
 8         A.   Currently.
 9         Q.   So you're going there to take care of your
10    tenants at that location?
11         A.   Yes.
12         Q.   Have you considered a property management
13    company?
14                   MR. SHIELDS:  Objection.
15         A.   I don't have an LLC.  Is that the same?  I
16    don't know.  I would say no.
17         Q.   Meaning have you considered having someone
18    else manage the property for you and take care of
19    those kind of things?
20         A.   I don't understand how those things
21    operate, so no.
22         Q.   No one has ever suggested you could
23    have -- pay someone else to handle the property for
24    you?
25                   MR. SHIELDS:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  No.
 3         Q.  You said that the incident made you
 4    socially secluded.
 5              What do you mean by that?
 6         A.  I -- for example, at my job, when we start
 7    our shift, we have a safety meeting with the entirety
 8    of the staff and it's in a group, a collective group.
 9    And up to that point in my career, I would be part of
10    that group and interact with the meeting and answer
11    questions.
12              And ever since then and for the last
13    several years, I am afraid to be in the middle of that
14    group because I feel like everybody knows what
15    happened and I was -- didn't want to address it.  And
16    it -- it went from just hiding from the -- just hiding
17    to just like -- it became the habit.  And I -- I
18    don't -- I stopped going out.  I stopped answering
19    people that reached out to me.
20         Q.  Are you still not participating in the
21    safety group at work?
22         A.  Yeah.  I still stand behind the truck
23    while it's happening.
24         Q.  Have you talked with any of the employees
25    at work to gain information about how they feel about
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     the situation?
 3              MR. SHIELDS:  Objection.
 4         A.  I don't understand your question totally.
 5         Q.  Have you ever talked to anybody and said
 6     "Hey, do you still think about this incident?  What do
 7     other people think about?  Are people talking about
 8     it?"
 9              Like why -- that kind of thing.
10              MR. SHIELDS:  Objection.
11         A.  I have had co-workers approach me and ask
12     me just that, "Hey, you know, what's going on with
13     that?  You doing all right?  What's happening?"
14              I have had other workers approach me.
15         Q.  Was that Tom or Lee that you mentioned
16     earlier that approached you?
17         A.  Lee Johnson in reference.
18         Q.  It sounds like he was asking if you were
19     doing all right.
20              Did you not interpret the inquiry, his
21     catching up with you in a friendly manner?
22              MR. SHIELDS:  Objection.
23         A.  He was asking me if I had made a -- if
24     there was any resolution, if anybody had been held
25     responsible.
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2        Q.  Have you spoken with anyone else about
 3   whether or not they have feelings about the incident?
 4        A.  Over the course of the last five years?
 5        Q.  Uh-huh.  But specifically at work.
 6             MR. SHIELDS:  Objection.
 7        A.  Have I asked other employees about that?
 8   Their opinion on me?
 9        Q.  I'll move on.  I'll move on.
10             Can you give me other examples about how
11   you're socially secluded after the incident?
12        A.  Up to that point, I was very neighborly.
13   I would help my neighbors with their yard, clean
14   gutters.  I would help this senior lady across the
15   street, just -- even moving groceries.
16             After that point, I never -- I never
17   strayed down the street just to say "Hi" to my
18   neighbors.  I like -- I liked -- what I liked about
19   living there was the community that -- you know, I
20   knew my neighbors.  I stopped talking to them.
21        Q.  Why did you stop talking to the neighbors?
22        A.  I became just -- I became afraid just to
23   approach any -- any conversation.  I was depressed.
24   I -- I -- I couldn't -- I didn't have the courage to
25   go and face people and put a face on.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  So how long after the incident did you
 3    feel unable to engage in conversation and interact
 4    with your neighbors?
 5         A.  I still feel differently.
 6         Q.  You still feel differently or you still
 7    feel this way you have been describing?
 8         A.  I still feel differently than I did before
 9    the incident.  And I still have those feelings like
10    now.  I don't -- I have new neighbors.  I haven't even
11    introduced myself to them.  That's not who I was
12    before.
13         Q.  What did you mean when you said that you
14    were ashamed of all of the people that -- or ashamed
15    because of all of the people who saw the body-worn
16    camera footage?
17              MR. SHIELDS:  Objection.
18         A.  The body-cam-worn footage was posted to
19    YouTube, which was posted by the Associated Press,
20    which was picked up by The Sun, which was picked up by
21    over a dozen different media outlets.  In each of
22    these feeds and shares, networks just spread to the
23    number of people and places where people had seen me
24    in my worst moment.
25         Q.  Which body-worn camera video was posted to
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    YouTube?
 3              MR. SHIELDS:  Objection.
 4         A.   The first one you showed me.
 5         Q.   Officer Algarin's?
 6         A.   Yes.
 7         Q.   Did you think you did anything wrong in
 8    that video?
 9              MR. SHIELDS:  Objection.
10         A.   Define "wrong."
11         Q.   I mean that's up to you and your own
12    world.
13              Do you think you did anything wrong in
14    that video?
15              MR. SHIELDS:  Objection.
16         A.   I did the best I could.
17         Q.   Then can you help me understand if you
18    feel like you did the best you could, why you feel
19    embarrassed by the video?
20              MR. SHIELDS:  Objection.
21         A.   I tried to demand for him to leave my yard
22    and he just stood there.  Made me feel so
23    insignificant.
24              The way -- the way my voice crackled and
25    the way I collapsed.  I fell to my knees.  How I --
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHARLES R. DEMPSEY III - BY MS. JONES

1
2       how it "feeled" is evident.  I was unable to provide
3       support for both my dog and my daughter.  It hurts me
4       that I wasn't there.  And that's why when you asked me
5       if I did something wrong, I couldn't be in both places
6       at the same time.
7              Q.  Did you watch the video that was posted to
8       YouTube in its entirety?
9                    MR. SHIELDS:  Objection.
10             A.  Yes.
11             Q.  What did you mean by you felt like you
12      couldn't be there for your daughter when she was also
13      going through this traumatic incident?  At what point
14      were you not there for your daughter?
15                   MR. SHIELDS:  Objection.
16             A.  The entirety of the incident.
17             Q.  So are we talking about the day of the
18      incident or the weeks, months, years later or
19      afterwards when she is processing it?
20             A.  I felt that we were in reference to the
21      day of the incident.  But that hurts me because I
22      was -- I wasn't in a proper headspace to -- just lost
23      for so long.  I thought I was over this.
24             Q.  So when you say you weren't there for your
25      daughter, you're not just talking about the day of



```
 1                  CHARLES R. DEMPSEY III - BY MS. JONES
 2      because you were addressing Tesla, but also in the
 3      weeks or months after?
 4           A.   No.   I'm saying that -- that I was not
 5      emotionally strong.   That she is in a house screaming
 6      and banging and I couldn't -- I couldn't -- I
 7      couldn't -- I'm so grateful that my brother arrived
 8      and was able to take her from the scene because I
 9      don't know how I would have -- or what I would have
10      been able to do.
11           Q.   Did you consider leaving Tesla and going
12      inside and consoling your daughter briefly?
13                MR. SHIELDS:   Objection.
14           A.   No.   I was in fear of the officers who
15      were in my yard.
16           Q.   Prior to September -- prior to this
17      incident with Elsa -- Elsa -- Tesla -- excuse me --
18      had you ever been screened for mental illness?
19           A.   No.   Screened?   I don't understand what
20      that means.   But I would say no since I never -- don't
21      recall anything along that.
22           Q.   Prior to this incident, have you ever had
23      a medical professional recommend that you engage in
24      therapy?
25           A.   No.
```



```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2           Q.  Prior to this incident have you ever had a
 3      family member suggest that maybe you have mental
 4      health concerns or issues?
 5           A.  No.
 6           Q.  Had your daughter's mother ever suggested
 7      to you that she thought you had some mental health
 8      concerns?
 9           A.  I -- I don't know what you mean.  Had she
10      said like "You're crazy" before?
11           Q.  Yes.
12           A.  Yes.
13           Q.  Had she ever said anything else that might
14      implicate you might have some mental health issues?
15                MR. SHIELDS:  Objection.
16           A.  She, for some reason, claims I had -- was
17      a narc -- what is the word she used?  Narcoleptic?
18      That I -- I would like fall asleep in my soup.  Is
19      that right, narcoleptic?
20                MR. SHIELDS:  Narcolepsy.
21           Q.  I know what you're referring to.
22                Prior to this incident, did you ever
23      believe that you had some mental health issues or
24      concerns?
25           A.  No.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1                  CHARLES R. DEMPSEY III - BY MS. JONES
 2            Q.  Has anyone in your family ever been
 3       diagnosed with any sort of mental illness?
 4                  MR. SHIELDS:  Objection.
 5            A.  No.
 6            Q.  Has anyone in your family thought they
 7       might have some mental health concerns?
 8                  MR. SHIELDS:  Objection.
 9            A.  Mental health is a very vague topic.
10            Q.  So when I say "mental health," what are
11       you thinking about?
12                  MR. SHIELDS:  Objection.
13            A.  Again, I -- I believe it to be a very
14       vague -- like spectrum of -- non-physical ailment, I
15       suppose.  I guess if you wanted me to say.
16            Q.  So yes, it is definitely or usually not
17       physical.  Any sort of ailment or illness that
18       originates in the mind or emotion.  So that can be
19       anything like depression, anxiety, PTSD, bipolar
20       disorder, schizophrenia, anorexia.  Some people put
21       eating disorders as mental illnesses.  Anything that
22       would fall into a category like that.
23                  So with that said, are you aware of anyone
24       in your family having any sort of mental health
25       concern prior to this incident?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1            CHARLES R. DEMPSEY III - BY MS. JONES

2                MR. SHIELDS:  Objection.

3        A.   No.

4        Q.   And with that definition in mind, have you

5   ever had any mental health concerns in your lifetime

6   prior to this incident?

7                MR. SHIELDS:  Objection.

8        A.   No.

9        Q.   In some of your medical records it says

10  you dealt with depression at a young age.

11               Do you remember that?

12               MR. SHIELDS:  Objection.

13       A.   Dealing with depression at a young age?

14       Q.   Yes.

15       A.   I do not remember that.

16       Q.   I'm going to show you what is

17  Bates-stamped.  We talked about this with your

18  daughter.  That all of these pages have numbers in the

19  bottom right-hand corner called Bates-stamps.  I will

20  refer to them by this little number.

21       A.   This one is DEMPSEY 2602 and this

22  paragraph, the second sentence, um, it talks about you

23  having depression.  I will give this to you.  Go ahead

24  and read the whole paragraph if you would like and

25  tell me if this jogs your memory at all.



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2              MR. SHIELDS:  Are these included in the
 3    email you sent me yesterday?
 4              MS. JONES:  I do not know.
 5         A.  What was your question again?
 6         Q.  So do you remember reporting to Rochester
 7    Regional you had experienced or -- or dealt with
 8    depression at a young age?
 9         A.  Which -- who am I speaking to on this?
10    Oh, down here.  To Desiree in September of 2021?  I
11    don't recall our session discussion at that time.
12         Q.  You don't remember reporting or sharing
13    with this clinician that you had previously
14    experienced depression?
15              MR. SHIELDS:  Objection.
16         A.  I don't recall.
17         Q.  Sorry.  I'm just -- I'm trying to be clear
18    about what "I don't recall" means.  So you don't
19    remember saying that one way or another?  Or you don't
20    remember --
21         A.  I don't understand what I would have told
22    her that would have given her that interpretation.
23         Q.  Okay.  Because as far as your memory goes,
24    you have never dealt with depression prior to this
25    incident?
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2                   MR. SHIELDS:  Objection.
 3         A.  I don't -- again, I'm stuck trying to
 4    recall what I would have said to her that made her --
 5         Q.  Sure.  I will give you the prior page
 6    DEMPSEY 6201.  Up here in this paragraph it gives a
 7    little more detail.  This person says "Client reports
 8    he started experiencing depressive and anxiety
 9    symptoms in his late 20s.  But that sometimes it's
10    increased."
11              Do you remember any depression in your
12    late 20s?
13              MR. SHIELDS:  Can you please read the rest
14    of the sentence?
15              MS. JONES:  Sure.
16         Q.  "But is somewhat of a poor historian."
17              So do you remember stating that you
18    experienced depression in your late 20s?
19              MR. SHIELDS:  Objection.  I don't think
20    that that is exactly what that says.
21         A.  I -- I -- I don't recall.  Is this -- when
22    was this from?
23         Q.  Sure.
24         A.  Is this also --
25         Q.  At the top they have the dates of the
```



```
1                CHARLES R. DEMPSEY III - BY MS. JONES
2    visits.  So this date would have been August 31st of
3    2021.  You can flip it over if you would like.  It has
4    the -- the page before and then it just goes into --
5                MR. SHIELDS:  Objection.
6           A.  At this point, I had been talking to
7    somebody for a while and I was really trying to
8    like -- I guess I had a blind faith that therapy would
9    just open up this door for me and I would see like a
10   brighter -- I don't recall being depressed in my late
11   20s.
12          Q.  Do you remember having anxiety in your
13   late 20s?
14               MR. SHIELDS:  Objection.
15          Q.  Or do you remember experiencing anxiety in
16   your late 20s?
17               MR. SHIELDS:  Objection.
18          A.  I was a single father living in the City
19   of Rochester, you know.  Anxiety was -- you worry
20   about things every day.
21          Q.  What is your understanding of the term
22   "anxiety" then?
23          A.  I consider "anxiety" just an uncomfortable
24   prediction of the future.
25          Q.  Okay.  So at some point anxiety rises to
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            CHARLES R. DEMPSEY III - BY MS. JONES
 2    an unhealthy level and then I think you become
 3    diagnosed with anxiety.  So when it's more frequent
 4    than, you know, maybe once a month and you're
 5    experiencing it on a daily basis or a weekly basis and
 6    you have panic attacks, then it becomes like a
 7    clinical formulation of anxiety.  So I think it's not
 8    just I'm worried, but I'm experiencing anxiety on a
 9    more regular, frequent basis.
10            MR. SHIELDS:  Objection.
11        Q.  So do -- would you say that your feelings
12    of worry ever crossed into anxiety from a clinician's
13    standpoint?
14            MR. SHIELDS:  Objection.
15        A.  Is this before the incident in 2019?
16        Q.  Yes.
17        A.  No.
18            MR. SHIELDS:  I actually have to go to the
19    bathroom.
20        A.  I mean it's about -- about that -- my
21    system runs in that time.
22            MR. SHIELDS:  Hold on.  I have been
23    waiting for a minute.
24            MS. JONES:  Do you need to use the
25    bathroom?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 CHARLES R. DEMPSEY III - BY MS. JONES
 2                    MR. SHIELDS:  I do.
 3                    THE WITNESS:  I could use the bathroom.
 4                    MS. JONES:  Do you need to use the
 5    bathroom?
 6                    MR. SHIELDS:  I need to use the bathroom.
 7    I don't think anybody will be comfortable if I --
 8                    THE WITNESS:  That's a private inquiry.
 9                    MS. JONES:  Is that a "yes" or a "no"?
10                    MR. SHIELDS:  Let's go off the record.
11    I'm walking out.
12                    THE WITNESS:  I need to use the bathroom.
13                    MR. SHIELDS:  We're taking a break.  I'll
14    be right back.
15                    MS. JONES:  We can go off the record.  The
16    witness will use the restroom.
17             (The proceedings recessed at 2:54 p.m.)
18             (The proceedings reconvened at 3:11 p.m.;
19             appearances as before noted.)
20    CHARLES R. DEMPSEY III, resumes;
21             CONTINUING EXAMINATION BY MS. JONES:
22         Q.  So I understood that -- I understand that
23    you sought therapy after the incident with Tesla.
24                    MR. SHIELDS:  Objection.
25         Q.  Did you seek therapy after the incident
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     with Tesla?
 3              A.  Yes.
 4              Q.  Why did you decide to seek therapy after
 5     the incident with Tesla?
 6              A.  I believe it would help.
 7              Q.  Did someone suggest that you -- you seek
 8     therapy?
 9              A.  I don't recall.
10              Q.  Have you received therapy before?
11              A.  No.
12              Q.  What was the purpose of -- what was your
13     purpose in seeking therapy?
14              MR. SHIELDS:  Objection.
15              A.  I was hoping that therapy would help me
16     cope with loss and re-establish my -- help me feel
17     more like I did before.
18              Q.  When did you start therapy after the
19     incident with Tesla?
20              A.  It took me a little while.  Finding a
21     doctor is more difficult than I thought it would be
22     and I ended up going into a -- walk-in hours.  I don't
23     remember the name.  Must have been -- must have been a
24     couple weeks after the incident.
25              Q.  Did you -- so after that walk-in clinic,
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     did you start seeing a clinician and start receiving
 3     therapy on a regular basis?
 4              A.   Yes.
 5              Q.   In February of 2 -- did you consider the
 6     therapy to be helpful?
 7                   MR. SHIELDS:  Objection.
 8              A.   Somewhat.
 9              Q.   Can you explain how it was somewhat
10     helpful?
11              A.   The first therapist I was working with had
12     shared with me some of the things she learned about
13     coping and I applied those into my daily life.
14                   It was -- it was useful to use those
15     strategies when I was having like a -- like a stress
16     ball moment that I was experiencing at the time.
17              Q.   Okay.  Do you remember what any of those
18     strategies were?
19              A.   There was the 3-2-1 Strategy.  There was
20     the grounding techniques.  There was breathing
21     strategies.
22              Q.   What is the grounding technique?
23              A.   Sort of just mentally grounding yourself
24     to the -- to the earth, to the moment, just being more
25     conscientious of your present place as opposed to
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    being stuck in a negative headspace.  Which is
 3    upsetting.
 4         Q.   What does 3-2-1 mean?
 5         A.   Three, things you can see; two, things you
 6    can hear; and one, things you can smell.
 7         Q.   What about re-framing negative thoughts?
 8    What does that mean?
 9         A.   Like -- by changing what I'm thinking
10    about to my surroundings as opposed to flashbacks.  By
11    actively thinking of a distraction.
12         Q.   Was that -- was re-framing your negative
13    thoughts a helpful recommendation from the therapist?
14         A.   It -- it was a technique that I tried to
15    use.
16         Q.   Did you ever go on medication to address
17    your mental health after the incident with Tesla?
18         A.   Yes.
19         Q.   When did you first -- what was your first
20    prescription for mental health?
21         A.   It -- it was generic Prozac.  I don't
22    recall what the medical generic Prozac term is.
23         Q.   That's fine.
24              Do you remember when you first started
25    taking the generic Prozac?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          CHARLES R. DEMPSEY III - BY MS. JONES

2          A.  Right when it was prescribed to me.  What

3     month it was or day, I do not recall.

4          Q.  Do you remember who prescribed the generic

5     Prozac to you?

6          A.  The Dr. B.

7          Q.  Can you spell that?

8          A.  His name is long.  I just always referred

9     to him as "Dr. B."

10         Q.  At what clinic do you see Dr. B?

11         A.  He was a member of the Rochester Regional

12    Health Group and I would see him at his office on

13    Carter Street.

14         Q.  Did you find the generic Prozac helpful?

15         A.  I did not.

16         Q.  Why was it not helpful to you?

17         A.  It destabilized my mood on a day-to-day

18    basis.  When it left my system, it left me more upset

19    than I would have been if I was taking it.

20         Q.  What do you mean "when it left" your

21    system?

22              MR. SHIELDS:  Objection.

23         A.  When -- I don't know if you have ever like

24    taken time-controlled medication, but when you take

25    it, you take it and then it enters into your body and



```
 1                    CHARLES R. DEMPSEY III - BY MS. JONES
 2      then it dissolves in your stomach and esophagus and
 3      enters your system.  It sort of times out eventually
 4      and just sort of fades out.
 5                    For example, when someone drinks alcohol,
 6      they become intoxicated and then eventually, they're
 7      not.
 8           Q.  Did you find that the generic Prozac faded
 9      out, as you said, before it was time for you to take
10      another pill?
11           A.  Yes.
12           Q.  Did you tell your doctor about how it was
13      affecting you when it left your system?
14           A.  Yes.
15           Q.  When did you tell your doctor that?
16           A.  At my -- at my next appointment.
17           Q.  Did you notice any positive effects from
18      the generic Prozac?
19           A.  It left me a little more dead-headed
20      during the day, which was better than being
21      distraught.
22           Q.  What do you mean by "dead-headed"?
23           A.  Um, loopy.  Checked out.
24           Q.  Do you remember how long you took the
25      Prozac before telling your doctor about how it was
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    affecting you when it left your system?
 3         A.  I took it as was prescribed.
 4         Q.  Do you remember how many weeks you took it
 5    as prescribed?
 6         A.  I do not recall.
 7         Q.  Okay.  So I found this record.  It's in --
 8    marked as DEMPSEY 66.  This is one of the first times
 9    I see that you have the generic Prozac, which is
10    Fluoxetine, 15 milligrams.  So this is March 7th of
11    2019.  I actually wanted to ask you a question about
12    something that you said on the back.
13              Okay.  You said -- well, here in the
14    session notes it indicates to me that the Fluoxetine
15    has helped you with no longer shaking and that
16    flashbacks are happening less often.
17              Do you remember if the Prozac was helping
18    with your shaking?
19              MR. SHIELDS:  Objection.
20         A.  It was leaving me more, as I said, loopy
21    and -- which would -- you know, I then spent less time
22    in flashbacks and having negative -- I was constantly
23    recalling what had happened.  I was still living
24    there, so I was seeing the scene.  Reliving it.  And
25    being checked out led into less, you know, reaction.
```



```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  Okay.  That makes sense.
 3              Here in this narrative you also report to
 4    the clinician that you're still having trouble getting
 5    out of the house.  I don't read upside down very well.
 6              "Client endures that he is continuing to
 7    have trouble getting out of the house."
 8              Do you remember specifically what that
 9    looked like on a day-to-day basis?
10         A.  Yes.
11         Q.  Can you tell me what you meant by it was
12    hard getting out of the house?
13         A.  I was afraid to open the door.
14         Q.  Anything else?
15         A.  I -- when -- when I had to leave the
16    house, I would just -- I would just flutter out -- I
17    would float.  I would pace.  I would go to the fridge
18    for no reason.  I would -- I would pat my pockets 11
19    times.  I just generally -- that is why I would never
20    go and talk to my friends.  I was just afraid to go
21    anywhere.
22              And as far as like -- opening the door
23    itself was -- it was not something that I -- I recall
24    that being difficult for me for a while.
25         Q.  Were you experiencing any other symptoms
```



1               CHARLES R. DEMPSEY III - BY MS. JONES

2    that made it difficult for you to leave the house

3    around this time in March 2019?

4          A.   Symptoms that made it leave -- difficult

5    to leave the house as in like -- physical reactions

6    towards the action?

7          Q.   Anything.

8          A.   I remember being very stressed about it.

9    I remember getting in trouble with work because I

10   wasn't -- was showing up like late and -- and it was

11   just -- it wasn't that I wasn't ready to go.  It was

12   just I wasn't going.  I was making it to work, but I

13   wasn't making it before the clock started.

14         Q.   How late were you showing up to work

15   around this time?

16         A.   Frequently.

17         Q.   What -- what time would you arrive at

18   work?

19         A.   A few minutes after I was supposed to be

20   there.  But, you know -- but with a corporation, you

21   know, not -- not early is late.

22         Q.   Sure.

23              Are we talking like five minutes late or

24   30?

25         A.   Like five.



1              CHARLES R. DEMPSEY III - BY MS. JONES

2         Q.   And I want to ask you a question about one

3    that I did not print out, so I will show you this

4    screen.  This is DEMPSEY page 71.  This is the session

5    narrative from April 9th, 2019.  I will turn this

6    screen around.  It's talking about you watching a

7    body-worn camera video.

8              Do you remember which body-worn camera

9    video you were watching?

10        A.   Yes.

11        Q.   Which one was that?

12        A.   The one mentioned earlier when it was

13   posted to YouTube and shared on to news media outlets

14   from Officer Algarin.

15        Q.   Did you watch the video while it was

16   posted publicly?  Or did you have prior access through

17   some other means?

18             MR. SHIELDS:  Objection.

19        A.   I watched it from a public post.  When I

20   had requested -- when I made a FOIL request from the

21   City, they had denied me.

22        Q.   Later on in this paragraph it says that

23   you were -- you noticed watching the video affected

24   your mood or emotions.  Let me see what word she used.

25             Oh.  "His symptoms."  "Client agreed his



1          CHARLES R. DEMPSEY III - BY MS. JONES

2    symptoms increasing due to watching the video."

3               Do you remember how watching the video

4    affected you?

5          A.  I went right back into a -- multiple-day

6    flashbacks and -- and the -- started shaking and

7    the -- the -- that shame feeling I was referring to

8    where I didn't -- just afraid of people and -- I

9    always thought that every cop that I saw was -- knew

10   about that and they held it against me.  For some

11   reason, I -- you know, despite them just being people

12   doing their jobs, I -- I was -- I always felt like

13   they were looking at me like "Hey, you're that poor

14   boy."

15         Q.  Were these the feelings that you

16   experienced in general, or after watching the video

17   again?

18         A.  After watching the video, I -- I couldn't

19   get over the feeling that if I had continued to

20   approach that officer, that he would have opened fire

21   on me.  That -- that -- that that would have put my

22   daughter at risk.  That -- like --

23         Q.  So watching the video --

24         A.  Some people --

25         Q.  -- made those feelings worse?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  CHARLES R. DEMPSEY III - BY MS. JONES
 2                  MR. SHIELDS:  Objection.
 3                  Can you not interrupt his answer?
 4             Q.   I'm trying to understand what you're
 5       saying.
 6                  Did watching the video like reinforce
 7       those feelings or brought them back up to the surface?
 8                  MR. SHIELDS:  I will just object and ask
 9       you don't interrupt him when he is answering, please.
10             A.   Watching the video was worse than ripping
11       off a scab.  Because it was like reopening the wound
12       and then with the ability to pause and rewind and go
13       through it and look at the minutia and think about,
14       you know, the unlimited possibilities if this had gone
15       that way or that had gone that way and what could I
16       have done.  Why did this even deserve to happen?
17             Q.   How many times did you re-watch the video
18       after it became public?
19             A.   Too many.
20             Q.   Can you give me some sort of context for
21       "too many"?  Are we talking 2 or are we talking 500?
22             A.   In between there.
23             Q.   All right.
24             A.   But, you know, as -- many.  More than two.
25             Q.   So after noticing that it increased your
```



 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    symptoms and talking about it with your therapist, did
 3    you watch the BWC again prior to today and yesterday?
 4              MR. SHIELDS:  Objection.
 5         A.   We have reviewed the first few seconds of
 6    it.  I have seen the first few seconds of it.
 7         Q.   Prior to today and yesterday?
 8              MR. SHIELDS:  Objection.
 9         A.   Yes.
10         Q.   When did you watch it again after talking
11    about it with your therapist in April of 2019?
12         A.   Um, earlier I had talked about preparing
13    for Elliott and I had reviewed a video.
14         Q.   Yes.
15         A.   It was the first few seconds of that
16    video.
17         Q.   I thought you prepared with your attorney
18    yesterday, but I guess that wasn't yesterday.
19              So aside from today's deposition and when
20    you prepared with your attorney, did you watch the
21    video at any other occasion after talking with your
22    therapist about it in April of 2019?
23              MR. SHIELDS:  Objection.
24         A.   I may have.  I -- it -- I mean it became a
25    realization that it was not helping me, too, and I cut



```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2    it, you know, off of my -- I cut it -- you know, I
3    avoided it entirely in order to protect my own
4    stability.
5              Q.  So I'm a little unclear on your answer.
6    You say you may have watched it, but you avoided it
7    completely.
8                   Do you know which one?
9                   MR. SHIELDS:  Objection.
10             A.  What I'm saying is you're asking me after
11   I had had the session with my therapist, had I gone
12   back and seen it again?  And what I'm saying is I -- I
13   don't recall chronologically if I had or hadn't, but
14   eventually I had just cut myself off from the social
15   media, the internet, like...
16             Q.  Why did you choose to share the -- why did
17   you choose to share a video that -- excuse me.
18                  Why did you choose to share an article
19   about the dog-shooting incident on your social media?
20                  MR. SHIELDS:  Objection.
21             A.  I thought that it would help explain
22   myself to -- to some people that were unable to see
23   it.
24             Q.  Did you have specific people in mind?
25             A.  Not any one specific person in mind.
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.   Okay.  I'm going to show you another page.
 3    This one is DEMPSEY 75.  And this one has notes from a
 4    session in April 24th, 2019.  So I just wanted to ask
 5    you a question about this.  Here it says that "Client
 6    endures easing off his new medication for a week."
 7              Do you remember no longer taking the
 8    Prozac in April of 2019?
 9         A.   I remember stopping taking it.  I don't
10    remember the details of the date.
11         Q.   Why did you stop taking the Prozac?
12              MR. SHIELDS:  Objection.
13         A.   I didn't like how it made me feel.  I
14    didn't like it.
15         Q.   How did you stop taking the Prozac?
16              MR. SHIELDS:  Objection.
17         A.   By not taking it.
18         Q.   Did you just cut cold turkey?  Did you
19    talk with your doctor?  Did you tell him you were
20    going to stop taking it?  Did you wean yourself off?
21    Or did you do anything else besides just stop taking
22    it?
23              MR. SHIELDS:  Objection.
24         A.   I started at first to take it less
25    frequently and then not at all.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2         Q.  Did you talk to your doctor prior to
3    decreasing the frequency of your dosage?
4         A.  I spoke to my doctor at my doctor
5    appointments.
6         Q.  Was that before or after you stopped
7    taking Prozac?
8         A.  Both.
9         Q.  Did you tell your doctor you were going to
10   stop taking the Prozac?
11        A.  I told my doctor that I didn't like how it
12   was making me feel.
13        Q.  Did you tell your doctor you were going to
14   stop taking the Prozac?
15             MR. SHIELDS:  Objection.
16        A.  I don't recall that conversation with my
17   doctor, but...
18        Q.  Did you ask for a different medication
19   from your doctor?
20        A.  I don't recall asking, but I do recall
21   being prescribed to a different medication.
22        Q.  Did your doctor tell you that it might
23   take a while for Prozac to work effectively in your
24   system?
25             MR. SHIELDS:  Objection.
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  He may have.
 3         Q.  Do you remember if he did one way or
 4    another?
 5         A.  This was so long ago, I don't remember the
 6    conversation.  It sounds like something that a medical
 7    person should, you know, tell somebody.
 8         Q.  Sure.  I guess I'm wondering if that was
 9    part of your decision-making.  You said, "Hey, I'm
10    going to give this two weeks" -- if that is the amount
11    of time it generally takes to see if it will work --
12    "and then after two weeks, if this isn't working, I'm
13    quitting"?
14              Or it was just "I don't like how this
15    feels.  I'm going to stop"?
16         A.  Yes.  He did explain that it's not going
17    to be a one-day, one pill, you're better, happy-pill
18    solution.
19         Q.  There is a word in one of your session
20    notes that I would like you to explain.  So this is on
21    DEMPSEY 79.  Progress notes from May 8th of 2019.  I
22    will zoom in for you.  It says here that you are
23    experiencing "hypervigilance."
24              Can you explain what "hypervigilance" was
25    and how it was manifesting in your life?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2                   MR. SHIELDS:  Objection.
 3         A.   It's a big word.  I'm trying to define it
 4    for myself.  Hypervigilance.  "Vigilance" being --
 5    like alertness?  "Hyper" being a lot of it?
 6         Q.   "Hyper" is definitely a lot of it.
 7                   "Vigilance," sure.  Alertness.  Um,
 8    careful.
 9         A.   I remember I was super paranoid after the
10    video was released of some sort of retribu --
11    harassment or retribution from the Rochester Police
12    Department.
13         Q.   From --
14         A.   I was nervous when I would see a police
15    car just drive down the road or an officer, you know,
16    in passing.  Perhaps that's what it is referring to.
17         Q.   For what did you think the police officers
18    were going to engage in retribution?
19                   MR. SHIELDS:  Objection.
20         A.   I had initiated this case.
21         Q.   When did you file the actual lawsuit?
22                   MR. SHIELDS:  Objection.
23         A.   I don't recall the date.  It's been many
24    years up to this point.
25         Q.   Also in this notes -- sorry.  It talks
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    about journaling.
 3              Do you remember the clinician suggesting
 4    you engage in journaling?
 5         A.  Yes.  I remember that being one of her
 6    suggestions.
 7         Q.  Here it says that you reported that you
 8    hadn't been journaling much, in this session note from
 9    May 8, 2019.
10              Can you explain why you might not have
11    been journaling as much?
12         A.  I didn't find the journaling that
13    effective.
14         Q.  Did you find her other techniques or
15    suggestions to be more effective for you?
16         A.  Like I said, the grounding techniques were
17    helpful.  My answer should be "yes"?
18         Q.  Yes.
19              After you stopped taking your medication
20    in April of 2019, do you remember resuming taking the
21    generic Prozac?
22         A.  I remember going to the doctor and telling
23    him about how it wasn't like -- that I wasn't happy
24    with it.  And I remember him increasing the
25    prescription.  I don't know if that period was in
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    between those visits.  Or after.
 3              Q.  This is a very good question.  So in the
 4    progress notes for April 24th, 2019, if I scroll down,
 5    your Fluoxetine, which is the generic Prozac, is at
 6    20 milligrams.  Then earlier in the month it was only
 7    at 10.
 8              So I'm assuming then at some point in
 9    April is when it was increased from 10 to 20.
10    Milligrams is here on April 9th, 2019.
11              Does that ring a bell?  Do you think you
12    would have gone to the doctor in April of 2019?
13              MR. SHIELDS:  Objection.
14         A.  That would explain the difference.
15         Q.  Did you start taking the Prozac again
16    after the dose was increased?
17         A.  Yes, I did.
18         Q.  So then on -- so then on May 28th, 2019,
19    in this session note on page -- let me look at it --
20    DEMPSEY 83, it talked about being back off your
21    medication.
22              Do you remember stopping taking the
23    medication again in May?
24              MR. SHIELDS:  Objection.
25         A.  I don't recall specifically, but I know I
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    did eventually.
 3              Q.  So just to get the timeline, you remember
 4    starting medication at the 10 milligrams.  Talking to
 5    your doctor and him increasing it to 20.  And then
 6    stopping the -- no.
 7              Did you stop it before or after it
 8    increased to 20?
 9              Did you stop taking it at 10 milligrams
10    and again at the 20 milligrams?
11              MR. SHIELDS:  Objection.
12              A.  I don't recall.
13              Q.  But do you remember stopping taking the
14    Prozac after your doctor increased the dosage?
15              A.  I mean I did eventually.  I don't remember
16    doing it, but I did.
17              Q.  Why did you eventually decide to stop
18    taking it?
19              MR. SHIELDS:  Objection.
20              A.  I felt it didn't have what I hoped were
21    the intended effects on me.
22              Q.  Okay.  Here the clinician recommends you
23    going to a men's trauma group.
24              Do you remember trying that out as the
25    practitioner suggested?
```



1              CHARLES R. DEMPSEY III - BY MS. JONES

2         A.  The group that I had tried to join, it

3   didn't end up lining up.

4         Q.  What do you mean by it didn't line up?

5         A.  There wasn't room for me in the place I

6   went to.  And...

7         Q.  Can you explain what working extra hard at

8   your job meant?

9         A.  Picking stuff up, putting it down real

10  fast.  I probably was talking about just trying to

11  take pride in actually what I was doing.

12              What year was this?

13        Q.  This is in May of 2019.

14              Were you compensating for being late?  Or

15  were you --

16        A.  I think I was just putting excess energy

17  towards it.  I was using -- I felt good while I was

18  working because I was distracted to any negative

19  thoughts.  I had less flashbacks at work than I did at

20  home.

21        Q.  Do you know if your medication was ever

22  changed from the Prozac?

23              MR. SHIELDS:  Objection.

24        A.  We tried something else.  I -- I would say

25  yes.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

| | |
|---|---|
| 1 | CHARLES R. DEMPSEY III - BY MS. JONES |
| 2 | Q.  Do you know what the name of that |
| 3 | medication is? |
| 4 | A.  I'm going to say no because the first |
| 5 | thing that comes to mind is Alexa and that's an Amazon |
| 6 | product and not a medication. |
| 7 | Q.  Sure. |
| 8 | So I will show you again on my computer |
| 9 | what's been Bates-stamped as DEMPSEY 1363.  So this is |
| 10 | another one of the progress notes from Ms. Woodworth. |
| 11 | This one is from June 18th of 2019.  It lists your |
| 12 | medications as citalopram, C-I-T-A-L-O-P-R-A-M.  And |
| 13 | then its brand name is Celexa, C-E-L-E-X-A, which is |
| 14 | really close to Alexa.  So do you remember or -- |
| 15 | scratch that. |
| 16 | Did you find the Celexa to be effective? |
| 17 | MR. SHIELDS:  Objection. |
| 18 | A.  Not entirely. |
| 19 | Q.  Okay.  How did the Celexa help you? |
| 20 | MR. SHIELDS:  Objection. |
| 21 | A.  Almost with like a placebo effect.  To the |
| 22 | extent of I was taking this in order to feel better so |
| 23 | that it would make me feel better in my mind. |
| 24 | Q.  Did it alleviate any of your symptoms? |
| 25 | A.  I can't recall feeling relief this -- from |



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     it.
 3              Q.  Did you have any negative symptoms or
 4     effects from the Celexa?
 5              A.  It also -- it destabilized my mood as the
 6     Prozac did.
 7              Q.  What did that look like on a day-to-day
 8     basis?
 9              A.  I would be upset for just nothing.
10     Just -- just -- I didn't wake up in a good mood.
11              Q.  In the session notes for this same day,
12     June 18, 2019, Ms. Woodworth states that your primary
13     care physician wanted you to see a psychiatrist.
14              Do you -- I don't read upside-down very
15     well.  There it is.
16              Do you remember or did your primary care
17     physician recommend that you see a psychiatrist?
18              A.  That's what I thought I was doing with
19     Melissa at that time.
20              Q.  So is your answer yes, your -- primary
21     care physician recommended --
22              A.  I don't recall him directly making a
23     recommendation to see a psychiatrist.
24              Q.  Okay.
25              A.  But it doesn't surprise me if he had
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 CHARLES R. DEMPSEY III - BY MS. JONES
 2      considering as he was prescribing me psychiatric
 3      drugs.
 4            Q.  Did you see another medical professional
 5      in addition to Melissa based on a recommendation of
 6      your primary care provider?
 7            A.  Like did I find another doctor?  No.
 8            Q.  And is the primary care provider we're
 9      talking about the Dr. B that you referred to earlier?
10            A.  Yes.
11            Q.  Why didn't you see another medical
12      professional?
13            A.  I thought that I was already seeking that
14      mental health assistance.  I didn't understand that
15      there was -- I don't understand the difference.
16            Q.  Did you find your sessions with Melissa to
17      be helpful at this point in time?
18            A.  Yes.
19            Q.  These session notes also mention a
20      physical altercation with your significant other.
21                 Do you remember a physical altercation in
22      June of 2019?
23            A.  I don't remember June of 2019 as far as a
24      chronological thing.
25            Q.  Okay.  I'm going to show you this page
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    from the session notes on July 19th, 2019.  This one
 3    is on page DEMPSEY 1357.  So this mentions that you
 4    haven't seen your daughter in a month.
 5              Can you tell me about that situation and
 6    why you hadn't seen your daughter in a month as of
 7    June -- excuse me -- July 2019?
 8              MR. SHIELDS:  Objection.
 9         A.   My daughter was living with her mother.
10         Q.   Did you give permission for your daughter
11    to live with her mother at this point in time?
12         A.   To whom?
13              MR. SHIELDS:  Objection.
14         Q.   To either your daughter or her mother.
15              MR. SHIELDS:  Objection.
16         A.   I don't recall doing so.
17         Q.   Why didn't you go and collect your
18    daughter from her mother's house?
19              MR. SHIELDS:  Objection.
20         A.   I believe I tried to and she did not want
21    to come back to my house.
22         Q.   "She," being your daughter?
23         A.   Yes.
24         Q.   Your daughter lived with her mother in
25    2020 from around March to September; is that right?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2              MR. SHIELDS:  Objection.
 3        A.  Yes.
 4        Q.  How long did your daughter live with her
 5   mother this time around in summer of 2019?
 6        A.  I don't -- I don't recall specifically.
 7        Q.  Was it more than a month?
 8        A.  Yeah.
 9        Q.  Was it more than three months?
10        A.  I don't recall.
11        Q.  So as for DEMPSEY 1356, it indicates that
12   you're still prescribed Celexa 10 milligrams.  But in
13   the session notes on 1357, it says that you're not
14   taking those medications right now.
15              How did you stop taking the Celexa?  July
16   of 2019.
17        A.  I had finished the bottle I had and I
18   wanted to move on in my life from that.
19        Q.  I'm sorry.
20              Did you say you wanted to move on from
21   that?
22        A.  Yeah.  That's what I said.
23        Q.  Meaning you wanted to try a new medication
24   or just no longer take the Celexa or something else
25   all together?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           CHARLES R. DEMPSEY III - BY MS. JONES
2               MR. SHIELDS:  Objection.
3           A.  I wanted to experience life without the
4   Celexa again.
5           Q.  Did you feel worse on the Celexa than you
6   did without it?
7           A.  Situationally.  Yes.  I mean --
8   situationally, no.
9           Q.  You said here you don't want to take a
10  daily medication.
11              Why didn't you want to take a daily
12  medication?
13          A.  There was a book that I read in high
14  school where everyone in the community had to take a
15  daily shot and there was a boy who was called "The
16  Giver" and he learned to not take that shot and then
17  he was then able to see color.  And that left an
18  impression on me.
19          Q.  Did you believe that you could experience
20  life more vibrantly because -- if you were not taking
21  a medication?
22          A.  I did believe that the medication was
23  taking the vibrancy from life.  If that's -- if
24  "vibrancy" is a word.
25          Q.  Is that why you were hesitant to permit



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1            CHARLES R. DEMPSEY III - BY MS. JONES

2    your daughter to receive medication for her mental

3    health concerns?

4         A.   Not entirely.

5         Q.   Okay.  Why didn't you want your daughter

6    to take medication for her mental health?

7         A.   Eventually I was convinced that she should

8    take medication for mental health and I requested it,

9    she received it.  But my initial opinion on the mental

10   health medication was -- for one, it would not work.

11   Didn't work for me.

12            And for two, LD was at such a vulnerable

13   place in her life, I was afraid of creating habitual

14   drug use.

15        Q.   Did you consider that she could stop

16   taking the medication just as you had stopped taking

17   your medication?

18        A.   With regards to LD as a minor, I was very

19   concerned as to the red flag warnings on all of the

20   medications about how it negatively affected minors

21   drastically when they came on and off the medication.

22        Q.   Where did you hear about these warnings?

23            MR. SHIELDS:  Objection.

24        A.   They -- they come with the prescription

25   when you get it at the pharmacy.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

1          CHARLES R. DEMPSEY III - BY MS. JONES

2          Q.  Are you saying that you read the warning

3   labels for the prescriptions you were prescribed?

4              MR. SHIELDS:  Objection.

5          A.  I -- I did.  I don't know if you're

6   inferring that -- like that was what I was doing in

7   reference to LD's medication.  LD's medication I

8   researched online and the red flag warnings were the

9   first link.

10         Q.  So before -- scratch that.

11             So when the doctors wanted to prescribe a

12  specific medication to your daughter, you would

13  research that medication online and find out how it

14  affected minors and then this would contribute to your

15  decision whether or not to permit to have the

16  medication or not?

17             MR. SHIELDS:  Objection.

18         A.  No.  That's not quite how it played out.

19         Q.  Okay.  So can you explain how that played

20  out?

21         A.  It played out over a series of several

22  meetings.  And first time that I really had a doctor

23  tell me that LD should be on medication, she was

24  hospitalized.  That was the first guy that really sat

25  me down and was like "Hey, this is what I think is



1             CHARLES R. DEMPSEY III - BY MS. JONES

2    best for your daughter."

3             And at that point, I had told him about my

4    opinion of the habitual happy pill becoming, you know,

5    problematic with the development of a kid.  And, you

6    know, my personal experience.  And, you know, that was

7    when -- it was after that that then I researched his

8    suggestions and saw that it was -- that there was

9    dangers for underdeveloped minds to take that

10   medication.  So I mean it wasn't like I Googled --

11   searched the pill right after he told me what he was

12   planning on prescribing.  It was research in

13   preparation for him telling me that this is what he

14   would prescribe.

15        Q.  So what led you to eventually give

16   permission to have a prescription medication?

17        A.  The grounding techniques and methods and

18   therapy sessions hadn't -- hadn't done enough.  I

19   was -- I was concerned that not enough was being done.

20        Q.  Had your daughter asked you prior to her

21   hospitalization to receive a medication for her mental

22   health?

23        A.  Not that I recall.

24        Q.  Why did you bring this lawsuit against the

25   City?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  The man was wrong for what he did.
 3         Q.  Any other reasons?
 4         A.  The City is responsible for arming him,
 5    training him, setting him loose.
 6              Q.  Any other reasons that you brought this
 7    lawsuit?
 8         A.  I would not wish this upon my worst of
 9    enemies.  This loss in -- I had a family member taken
10    from me.  I don't -- I have no ill will against
11    anyone.  And I wouldn't want -- I'm -- I'm born in
12    Rochester.  I'm proud of Rochester.  And I wouldn't
13    want an outsider to look at Rochester as a place where
14    it wasn't safe to have a family pet in your own yard.
15    I don't think that.
16              That's how the City of Rochester should
17    reflect itself, in the community.  And I feel like
18    they should do -- I felt like the City -- City needed
19    to do more to protect its own community.
20         Q.  So you were hoping the lawsuit would have
21    some sort of preventative or curative effect?
22         A.  I'm hoping -- I hope that this lawsuit
23    will deter this from happening again.
24         Q.  Any other reasons that you brought this
25    lawsuit against the City?
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2           A.  This situation, those few seconds and
 3    moments in the videos that you were showing me hangs
 4    with me and my family every day.  As I said, every day
 5    when I drive to work and I go past the parking lot
 6    that I sat at and cried at -- I just cried in my car
 7    with no idea what I would be able to do to ever have
 8    this officer own up to his actions.
 9              I drive by there every single day and I
10    think about like how back then -- I don't have this
11    thought every day, but I do think about how -- like
12    back then in that moment I was so desperate to like --
13    I wanted -- I wanted him to know he was wrong.  I
14    didn't think anybody was telling him that.  I was
15    hurt.
16           Q.  Were you censured or disciplined at work
17    because of how you were affected by the incident with
18    Tesla?
19           A.  I had obtained, you know, disciplinary
20    letters about my attendance.
21           Q.  Is there a route that you could take to
22    work that -- that would not pass by the Clinton police
23    office?
24           A.  Indirect.  An indirect route to work.
25           Q.  Is there a way that you could drive to
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    work to avoid driving by that specific parking lot you
 3    mentioned?
 4          A.  Again, that would -- you're referring to
 5    the same location.
 6          Q.  Oh.  Is that the same location?  Thank
 7    you.
 8              Have you considered getting a different
 9    job?
10              MR. SHIELDS:  Objection.
11          A.  I've had my job since I was 19 years old.
12    I'm currently in my late 30s and I intend to retire
13    there.
14          Q.  Have you ever considered getting a
15    different job?
16              MR. SHIELDS:  Objection.
17          A.  There was that Onlyfans bubble, but I
18    didn't think it was for me.
19              MR. SHIELDS:  For the record, this was
20    obviously a joke.
21          A.  I'm sorry.  It -- I'm -- yes.  For the
22    record, I was obviously joking.  It is a defensive
23    means.
24          Q.  Have you had any co-pays or medicine or
25    doctors visits that you attribute to the Tesla
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 CHARLES R. DEMPSEY III - BY MS. JONES
 2     incident?
 3                 A.  Yes.
 4                 Q.  What co-pays are those?
 5                 A.  For every appointment, the co-pay is $10.
 6     Co-pay for the medications was different.  It was -- I
 7     have a good -- I have Teamsters insurance so my
 8     co-pays were lower than some other people's.  Never
 9     more than, you know, 5 to $12 for a prescription.
10                 Q.  Was it the same co-pay for doctors visits
11     as for the therapy sessions?
12                 A.  Yes.
13                 Q.  Were you buying the medications even when
14     you weren't taking Prozac pills or the Celexa?
15                 A.  I'm confused.
16                 Q.  Did you ever get the pills from the
17     pharmacy and pay the $5 co-pay and not take the pills?
18                 A.  No.  There was the last bottle of Prozac
19     that I didn't finish, but I discarded that.
20                 Q.  How much out-of-pocket costs did you have
21     for your daughter's hospitalization at Strong?
22                 A.  I mean there was paying for -- there was
23     the $100 co-pay for the emergency, the initial
24     emergency.  There was the parking.  There was -- I had
25     to provide her meals when she was first there at
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    Strong because she didn't -- I thought that would help
 3    her feel more comfortable than the hospital food.
 4    There was...
 5              Q.  Did you have any out-of-pocket costs for
 6    the duration of her hospitalization at Strong other
 7    than parking when you visited her?
 8              A.  To the hospital -- like did they charge me
 9    out-of-pocket co-pays?  Is that what you're asking?
10              Q.  Yes.
11              A.  Um, I think -- I feel like I recall just
12    $100 -- one co-pay payment from that incident -- from
13    that one incident.
14              Q.  Okay.  Was it $100 a day for each day she
15    was in --
16              A.  It was $100 each emergency visit.
17              Q.  Okay.  Was there a co-pay when she was
18    hospitalized inside Strong for those two to three
19    months?
20              A.  No.
21              Q.  Was there any cost when she was
22    hospitalized in Western New York CPC?
23              A.  I mean there was -- that was during the
24    COVID lockdown and I wasn't allowed to visit her for a
25    period of time.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            CHARLES R. DEMPSEY III - BY MS. JONES
 2            Q.  Did you have any co-pays for her
 3   hospitalization there?
 4            A.  I don't -- I don't recall.
 5            Q.  Would you be able to reconstruct that
 6   through bills or insurance payments?
 7            A.  I'm sure if I went in and asked them for
 8   the records, that perhaps it would demonstrate that.
 9   But I -- I believe that -- no.
10            Q.  How did the -- how did Tesla's death
11   affect your daughter?
12            MR. SHIELDS:  Objection.
13            A.  Psychologically?  I mean --
14            Q.  Sure.
15            How did Tesla's death affect your daughter
16   in the two to three weeks after the incident?
17            A.  She refused to go back to that house at
18   first.  Just refused.  She -- she didn't want to be
19   home.  She -- our relationship was never the same
20   again.  You know, we were making -- we were cooking.
21   I said my memory just before that was standing at the
22   stove.
23            Over these years, we don't stand over the
24   stove together and -- it's not something -- she -- she
25   became kind of like I was referring to, like
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2   socially -- like she just didn't want to talk to
 3   people.  She didn't want to like -- she became very
 4   cut off, from my perspective.
 5         Q.  How did the -- how did Tesla's death
 6   affect your daughter in the months after the incident?
 7         A.  There was a period of a few months later
 8   where some of her comments were -- were increasingly
 9   just -- just concerning.  She was -- she --
10         Q.  Concerning how?
11         A.  For example, if like -- I'm just creating
12   an example.  If we were watching TV and a police
13   officer was approaching somebody's house, she would
14   say something along the lines, "Well, they better lock
15   that dog up."
16         Q.  Did those comments ever stop?
17         A.  I mean she would say things that were less
18   drastic in relation to the case, less frequently over
19   time, yeah.
20         Q.  And why do you attribute the change in
21   y'alls' relationship to Tesla's death?
22         A.  Up to that point, we were able to
23   communicate with each other a lot better about how we
24   felt.  And during that time -- like during our
25   grieving process we both hid like -- hid that emotion
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          CHARLES R. DEMPSEY III - BY MS. JONES
2    from each other.  We were both pretending to be strong
3    when we weren't.  And it never -- it never came back
4    around.  It never -- she never became comfortable
5    talking to me about her body and her emotions or --
6    like -- it never came back.  That -- that tightness
7    that we had as a family just wasn't -- wasn't the
8    same.  We got -- we got Savannah.  We had another dog
9    in the home, but, you know, like I said earlier, it's
10   almost like a consolation.  Yeah, you know, it's good
11   to have a dog here to deal with the burden, with a big
12   black heart.
13        Q.  You said "we" hid the emotion.
14            How do you know she was hiding her
15   emotions and it wasn't just you?  Did you talk to her
16   about that or --
17        A.  Because there was a lack therefore of.
18   And it's perfectly natural for everyone to have
19   emotion.  And the lack of sharing signified to me that
20   there was a lack of communication.
21        Q.  Did you ever notice any changes to your
22   daughter's mood or personality in the months after the
23   incident with Tesla?
24        A.  Yes.
25            MR. SHIELDS:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2          Q.   What changes did you see?
 3               MR. SHIELDS:  Objection.
 4          A.   She -- she had developed this anger
 5     towards police in specific.  But it then projected
 6     onto teachers.  Or anyone else that was -- you know,
 7     teachers and other school staff that were in a
 8     position to give her commands and she resented them.
 9     I -- I -- I can't speak on somebody else's -- but that
10     was a change.  She was some -- she cared less about
11     her bedroom.  She -- her like developing even.
12          Q.   Do you believe your daughter's
13     hospitalization in Strong in 2020 was linked to
14     Tesla's death?
15          A.   I do.  She was traumatized.
16          Q.   So can you help me understand why those
17     two things are linked even though they're separated in
18     time by two years?
19               MR. SHIELDS:  Objection.
20          A.   When that happened, that hurt.  It hurt
21     me.  It hurt her.  And it continued to hurt.  Hurt
22     carried for weeks to months, to years.  I sought help.
23          Q.   How do you know that she was carrying hurt
24     for years if she wasn't communicating with you?
25          A.   It wasn't several years.  It wasn't until
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          CHARLES R. DEMPSEY III - BY MS. JONES
2     several years had passed until we had actually had an
3     honest discussion about what had happened and she told
4     me about how she tried to keep within her struggles.
5          Q.  When did she tell you that?
6          A.  I can't give you a date, but I would say a
7     few years ago.  A few, like two.  Maybe two years ago.
8     Maybe one.  Or two.
9          Q.  Did anything else contribute to your
10    daughter's hospitalization -- hospitalization in
11    Strong Hospital?
12          MR. SHIELDS:  Objection.
13          A.  She had told her therapist she had
14    suicidal intentions.
15          Q.  Do you think your daughter's suicidality
16    was caused by or related to Tesla's death?
17          A.  I think it was a factor in it.  Yes.  We
18    both kind of felt helpless and useless.
19          Q.  Did you experience suicidal ideation --
20    never mind.
21          What other factors contributed to your
22    daughter's suicidality?
23          MR. SHIELDS:  Objection.
24          A.  You would have to ask her.
25          Q.  Your daughter mentioned that she has



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           CHARLES R. DEMPSEY III - BY MS. JONES
2    sensitivity to loud noises.
3               Is there anything similar to that in your
4    life, like new things that have come about since
5    Tesla's death that negatively affect your life?
6               MR. SHIELDS:  Objection.
7       A.  For example, at -- in -- and in relation
8    to the loud noises, at my job, if somebody was to say
9    drop a pallet on the concrete floor, that loud noise
10   triggers me and I start to shake like I was earlier
11   when we were watching the videos.  It's -- sometimes
12   when I'm having like -- sometimes -- sometimes it gets
13   so tense, in the depths of -- I play through that
14   so -- so often.  It -- it's -- I thought it would be
15   easier.
16              Could you please re-ask me the question?
17      Q.  Are you currently experiencing any new
18   things in your life that you believe are caused by
19   Tesla's death that negatively impact you?  For
20   example, sensitivity to loud noises that you did not
21   have before.
22      A.  There --
23              MR. SHIELDS:  Objection.
24      A.  I do shake when I'm scared.  I didn't do
25   that before.  That -- that happened post that.  It is



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2    a totally new thing.  Something I'm talking to my
3    therapist about.  And, you know, something the doctor
4    was trying to address with the medication he gave me.
5    And it didn't go away.  You know, it became less
6    triggered, but it never went away.
7              I'm -- I have -- like I said, I have
8    stress around the presence of the Rochester Police
9    Department.  I have this weird blanket thought that
10   everyone has seen that video and that everyone has
11   some sort of judgment on me.  And while -- I
12   haven't -- I haven't gone back to like really wanting
13   to be around people.  It hasn't come back to me.  I
14   was -- when I was in high school, I was the class
15   clown.  I would bounce around and knew everybody in
16   town, you know?
17             And I moved to Kosciusko Street.  I was
18   friendly with the neighbors.  I helped the elderly.
19   And ever since then, I just sort of -- punching a
20   clock and take the trash out.  Happy that I did that
21   much.
22        Q.  Have any of your personal relationships
23   been impacted by the changes you've experienced since
24   Tesla's death?
25             MR. SHIELDS:  Objection.
```



```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2         A.   Yeah.   When -- when you stop talking to
3    people, they stop reaching out to you.   So I have lost
4    friendships that I had.
5         Q.   You said your hobby used to be playing
6    first-person shooter games.
7              Did you do that in a group or a club or
8    with some regularity before Tesla's death?
9         A.   Yeah.   I had an -- online friends that I
10   would group with.
11        Q.   How often would you do that with your
12   online friends?
13        A.   I would play the game like, you know, five
14   times a week.   You know.   Maybe more than once a day.
15   And sort of group together with your friends where
16   you're all playing at the same time.   So when those
17   things lined up.
18              As far as like a number per month, I
19   really couldn't guess because it would be different
20   from month to month.
21        Q.   Is there anything else that you haven't
22   mentioned already that you used to do that you no
23   longer can do because of Tesla's death?
24        A.   Yeah.
25        Q.   What is that?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                   CHARLES R. DEMPSEY III - BY MS. JONES
 2           A.  Enjoy my property on Kosciusko Street.
 3           Q.  Anything else?
 4           A.  Yeah.
 5           Q.  What else?
 6           A.  Enjoy the company of a Labrador.  My uncle
 7    has two Labradors and I couldn't even spend time -- I
 8    went to visit him and I had to leave.  It was just --
 9    it -- it re -- it -- it upset -- it just upsets me.
10    It is not like I'm mad at that dog or mad at him.  I'm
11    just -- it just makes me feel sad.
12           Q.  Has your therapy been helpful in lessening
13    the impact of those triggers that bring back the
14    sadness?
15                   MR. SHIELDS:  Objection.
16           A.  Those grounding techniques are what I go
17    to while I'm having like a -- like a stress-ball
18    feeling -- when I'm upset, I remember to breathe.
19                   When I'm really upset, I remember to put
20    myself more in the moment.  I -- I try to use those
21    techniques to help me.
22                   MS. JONES:  Okay.  I need to take five
23    minutes and go get a different binder of information.
24    So we'll go off the record and I'll be back by 4:40,
25    which is actually 6 minutes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2                   THE WITNESS:  Take a few minutes to hit
 3      your office.  I will hit the head.
 4              (The proceedings recessed at 4:34 p.m.)
 5              (The proceedings reconvened at 4:41 p.m.;
 6              appearances as before noted.)
 7      CHARLES R. DEMPSEY III, resumes;
 8              CONTINUING EXAMINATION BY MS. JONES:
 9              Q.  So I wanted to ask you some questions
10      about your session notes in July of 2019.  It's on
11      DEMPSEY 1354.
12              So up at the top in this paragraph, it
13      talks about you're still struggling with certain
14      symptoms of fatigue and lack of appetite.  And --
15      Anhedonia, A-N-H-E-D-O-N-I-A -- if I'm pronouncing
16      that correctly.
17              And on the second line you talk about
18      you're unsure what the cause of those symptoms are.
19              Do you -- do you remember discussing this
20      with this clinician?
21              A.  I don't recall.
22              Q.  Okay.  Do you remember what interpersonal
23      stressors with your daughter being with her mother was
24      referring to?
25              A.  I believe this is right after LD began to
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    stay with her mother and I was stressed because of the
 3    fact that LD had stayed with me and that was a change.
 4    I didn't like change.  I still don't like change.
 5              MR. SHIELDS:  Louder.
 6              THE WITNESS:  Sorry.
 7         Q.  Later on you said you don't have structure
 8    in your life because your daughter was no longer
 9    there.
10              Can you explain what type of structure was
11    missing when your daughter was gone?
12         A.  So there is the habit that, you know,
13    forms when you get your kids off to school and they
14    come home from school and then there is the
15    after-school, you know, care.  And those things being
16    gone left me free to my thoughts.
17         Q.  This was in July, though.
18              Did your daughter attend summer school?
19              MR. SHIELDS:  Objection.
20         A.  I don't -- this is July 2019 where she
21    was -- no.  She did not attend summer school.
22         Q.  So what other type of structure did having
23    your daughter around provide other than just like --
24         A.  I'm sorry for interrupting.
25         Q.  Go ahead.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           CHARLES R. DEMPSEY III - BY MS. JONES

2           A.  It's -- I mean -- the same concept of just

3      having to be there, to provide, to focus your energy

4      to make sure that, you know, meals are provided.

5      There's not poop on anything.  Parental care involves

6      attention and time.

7           Q.  How did the lack of structure lead to you

8      feeling overwhelmed?

9           A.  At this point I was still having a lot of

10     like -- struggle with being in my home.

11          Q.  Okay.  Did you find or did you try to find

12     structure in other ways?

13          A.  There was a point I tried to take on

14     exercising.

15          Q.  How long did you have the habit of

16     exercising?

17          A.  It didn't last long.  As I said, it was a

18     point.  It wasn't a period.

19          Q.  Were there other ways you tried to find

20     structure in your life when your daughter wasn't at

21     your home?

22          A.  I tried to pick up an internet education.

23     Which means I just read a bunch of stuff online.

24          Q.  Do you still struggle with fatigue, lack

25     of appetite and anhedonia?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1               CHARLES R. DEMPSEY III - BY MS. JONES

2          A.   I don't know what anhedonia is.

3          Q.   Generally like a lack of or inability to

4     feel joy and happiness and take delight in things.

5          A.   To be honest, occasionally I do feel

6     anhedonia.

7          Q.   How often would you say you feel that way?

8          A.   Really, the more -- more people, the

9     louder it is, the more I feel withdrawn from enjoying

10    the situation.  I think it's natural to feel fatigue

11    from time to time.

12         Q.   Okay.  I have some questions about a

13    different one.  This one is from August 22nd of 2019.

14    And I just have some questions on some of the things

15    you said there.  This one is Bates-stamped as 1348.

16              So toward the bottom, fourth line up, it

17    says "Client discussed moving to a new location."

18              Were you considering moving around this

19    time in August of 2019?

20         A.   Yes.

21         Q.   When did you end up moving?

22         A.   Any thought you -- during -- during the

23    COVID stretch.  That was -- that was the end of 2020.

24         Q.   So -- so why did it take so long for you

25    to find a new place to live?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1              CHARLES R. DEMPSEY III - BY MS. JONES

2                  MR. SHIELDS:  Objection.

3          A.  Because the housing market is not

4    beneficial to people who don't have -- it was very

5    difficult to purchase a home without a large down

6    payment and part-time job.

7          Q.  So were you putting offers on houses and

8    just getting beat out or you couldn't find one you

9    could afford?  How was that working more specifically?

10                 MR. SHIELDS:  Objection.

11         A.  Any houses that I did put an offer on, I

12   was beat out on.  And I had difficulty finding a place

13   that wasn't already sold by the time I inquired about

14   it.

15         Q.  Did you consider increasing your hours at

16   work in order to become eligible to buy additional

17   properties?

18         A.  Yes.

19         Q.  Did you increase your hours at work?

20         A.  Yes.

21         Q.  When did you do that?

22         A.  At the end of 2019.

23         Q.  In this note it talks about your

24   medication ran out and you just didn't go back for

25   more.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2              Is that referring to what we discussed
 3    earlier when you said you just finished the bottle and
 4    then stopped?
 5         A.  I believe.
 6         Q.  Okay.  I'm going to hand you this one
 7    which is 1545.  Excuse me.  DEMPSEY 1345, or the
 8    session notes from September 13th of 2019.  This
 9    session note indicates a new job at work.
10              Is this when you moved to daytime hours?
11              MR. SHIELDS:  Objection.
12         A.  This was just before I did.
13         Q.  So was there a gap between when you
14    accepted the job and when you started working the
15    daytime hours?
16         A.  So I worked for the same company.  And I
17    had taken a change from a part-time position to a
18    full-time driver's position.  And I had to be trained
19    to -- for the driving position.
20         Q.  How long was the training period for the
21    driving position?
22         A.  It was a week long.
23         Q.  This session narrative notes mentions your
24    daughter coming back to stay with you.
25              Do you remember this being a positive
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     time, having your daughter back in your care?
 3              MR. SHIELDS:  Objection.
 4          A.  Yes.
 5          Q.  Do you -- did you notice any positive
 6     changes in your daughter around this time?
 7          A.  Positive changes from?
 8          Q.  From before she went to live with her
 9     mother.
10              MR. SHIELDS:  Objection.
11          A.  No.
12          Q.  Do you -- do you remember if you were
13     still experiencing flashbacks around this time period
14     in September 2019?
15          A.  Sure I was.
16          Q.  Why do you say you're sure you were?
17          A.  I continue to have flashbacks to this day.
18          Q.  How often do you experience flashbacks
19     now?
20          A.  More infrequently than before, but -- like
21     I said, this whole thing comes up every single day.
22     I -- I go back to my home there on Kosciusko Street
23     and that's never without experiencing flashbacks.  And
24     like I said, sometimes it hits me on my commute to
25     work.
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  Are there other things that will cause you
 3    to have flashbacks besides going to Kosciusko or
 4    driving past the Clinton office?
 5         A.  Discussing it.  "It" being the incident.
 6    Um, Labradors just in general.  Police officers, just
 7    in general.
 8         Q.  Have you talked with the therapist about
 9    finding ways to minimize or eliminate your reaction to
10    these type of triggers?
11         A.  That's when I was given those grounding
12    techniques that we discussed earlier.
13         Q.  So grounding techniques lessen the impact,
14    but they don't necessarily eliminate a certain object
15    or thing that triggers a certain emotional response?
16         A.  Yes.
17         Q.  Have you found a way to eliminate a
18    specific thing or object from triggering certain
19    emotions or memories?
20         A.  I've stopped playing video games entirely,
21    so I'm no longer upset by that.
22         Q.  Do you remember -- scratch that.
23              So you -- the clinician continues to list
24    the Celexa as a medication you're prescribed
25    throughout October of -- I want to say and November.
```



1          CHARLES R. DEMPSEY III - BY MS. JONES

2               Did you ever resume taking the Celexa

3     after you stopped taking it in -- whenever that was in

4     2019?

5          A.   No.

6          Q.   No?

7          A.   No.

8          Q.   Did you start taking a different

9     medication instead of the Celexa or Prozac?

10         A.   No.

11         Q.   Has a medical professional suggested that

12    maybe you should consider taking a medication to

13    address your symptoms?

14         A.   No.

15         Q.   Have you seen your primary care provider

16    since you last stopped taking the Celexa?

17         A.   No.  With the exception of when I caught

18    COVID.  I didn't see Dr. B.  It was another doctor.

19         Q.   Why haven't you seen your primary care

20    provider since you stopped being -- taking the Celexa?

21              MR. SHIELDS:  Objection.

22         A.   Because I -- I didn't request another

23    appointment with him.

24         Q.   Did your symptoms dissipate or end

25    altogether?



```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2         A.  Over time, but frequencies and the
3    intensities have dulled, but never like go away.
4         Q.  Do you still -- do you currently
5    experience depressive symptoms that you attribute to
6    Tesla's death?
7         A.  Yeah.  There are certain times throughout
8    the year that --
9         Q.  Go ahead.
10        A.  -- that -- that lead me to shoe in.  This
11   coming, you know -- it's the anniversary this month.
12   The coming of fall is just a reminder that it's
13   coming.  And...
14        Q.  What do you do in response to those
15   depressive symptoms?
16        A.  Drink coffee and go to work the next day.
17   It's just...
18        Q.  So do you consider those depression
19   symptoms to be debilitating at all?
20        A.  You don't enjoy life and you just feel
21   blah.  Yes.
22        Q.  Have any of the techniques that you
23   mentioned earlier, the 3-2-1, the breathing, the
24   grounding -- do those address depression symptoms for
25   you?
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.   Those help me from getting too deep
 3    into -- if -- if I sit on it for so long like I have
 4    been today -- you know, today is going to affect me
 5    for the next several days.  You know.  It's -- they
 6    help momentarily.  They help prevent the situation
 7    from feeling worse or they're distracting.
 8         Q.   Have you adjusted to the fact that you
 9    will continue to experience depressive symptoms in the
10    future?
11              MR. SHIELDS:  Objection.
12         A.   Honestly, I hope that one day I would grow
13    wise enough to -- to be more accepting of -- of it.  I
14    hoped -- I hope not.  I hope that -- to have those
15    golden years.
16         Q.   Are you currently seeing a therapist?
17         A.   No.
18         Q.   Are there any other tools or techniques
19    that you're currently utilizing besides the breathing,
20    3-2-1 and grounding we discussed earlier that you use
21    to address your negative symptoms right now, including
22    flashback and tremors and depressive symptoms?  I
23    guess you mentioned drinking coffee and going to work.
24              But are there any others?
25         A.   To be honest and not to say something
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    upsetting, but masturbation.
 3         Q.   Okay.  How often do you do that to address
 4    your symptoms?
 5              MR. SHIELDS:  Objection.
 6         A.   It just helps me cut out and go to sleep.
 7    And -- I don't know.  A few times a month.
 8         Q.   Anything else?
 9         A.   Sometimes I -- I spend time out in nature.
10    And try to -- try to really focus on one thing out,
11    you know, in the wild.  Just like a single bee
12    crawling on a flower.  You know, an ant crawling
13    across the ground.
14         Q.   That sounds similar to the grounding you
15    mentioned earlier.  Like focusing on the here and now.
16         A.   I --
17              MR. SHIELDS:  Objection.  If that is a
18    question.
19         A.   I agree.
20         Q.   I know earlier you said that you didn't
21    find journaling particularly effective, but have you
22    since then tried to use journaling to address some of
23    your negative symptoms associated with Tesla's death?
24         A.   Shortly, no.
25         Q.   Do you know the frequency with which you
```



```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2    were triggered by certain things to recall these
 3    memories about Tesla's death, in late 2019?
 4                MR. SHIELDS:  Objection.
 5           A.  By "late," are you referring to like
 6    December?  Or are you referring to like October to
 7    December?
 8           Q.  October to December.
 9           A.  So at the end of 2019, I began becoming a
10    driver for UPS and every single day I would have to
11    approach a stranger's property and announce myself.
12    And every single day I would be on properties that may
13    or may not have dogs or that do have dogs.  And every
14    single day I would get, you know, that internal
15    reminder that -- that it happened.  Every single day.
16           Q.  Memory triggers are just coming up in
17    October and early November session notes a lot.  And I
18    didn't understand why the same thing just kept coming
19    up.  So that makes a lot of sense that you changed
20    your job and were now driving for UPS.
21                Is that -- is that one of the reasons that
22    you switched back to the night shift?
23                MR. SHIELDS:  Objection.
24           A.  I didn't think about it at the time, but
25    in reflection, it made sense.
```



```
1            CHARLES R. DEMPSEY III - BY MS. JONES
2            Q.  Well, at the time, do you know why or --
3   at the time what were your main reasons for going back
4   to the night shift?
5            A.  Not having to work in the rain.  Being
6   available for LD.  Being a driver for UPS keeps you on
7   the road for the majority of doctor hours and LD had
8   recurring doctor appointments.
9            Q.  When you went to the night shift, did you
10  go back to the pre-loading, the -- moving packages to
11  the correct truck?
12           A.  Yes.  That's the night shift.
13           Q.  In November 2019, you mentioned to the
14  practitioner you were excessively spending money.
15               Do you attribute that to Tesla's death?
16           A.  It's hard to say.  Because I was spending
17  money because it made me feel very small happy and I
18  felt very big sad because of Tesla's death.
19           Q.  Do you still excessively spend money as a
20  way to make yourself feel better?
21           A.  Sometimes I spend more on food than I
22  should because it makes me feel good.
23           Q.  Do you know who released the body-worn
24  camera footage to the public?
25               MR. SHIELDS:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.   The Democrat & Chronicle.
 3         Q.   It wasn't your attorney?
 4              MR. SHIELDS:  Objection.
 5         A.   I was aware of the Democrat & Chronicle
 6    who had contacted me that they wanted the story about
 7    the case.
 8         Q.   So that was a "no," you don't think your
 9    attorney released it to the public?
10              MR. SHIELDS:  Objection.  Especially to
11    the extent it might concern any privileged
12    communications.  And he already answered the question.
13         A.   I was aware of the video through the
14    Democrat & Chronicle.  They were -- that's where I got
15    it from.  They're the ones that did it.  I don't know
16    anything beyond that.
17         Q.   Have you ever been suicidal or had
18    suicidal thoughts?
19         A.   I've had suicidal thoughts throughout my
20    36 years of living.  It's...
21         Q.   Do you connect any of those suicidal
22    thoughts to Tesla's thoughts?
23         A.   Some of them.  Absolutely.
24         Q.   Why did you have suicidal thoughts that
25    you feel were caused by Tesla's death?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           CHARLES R. DEMPSEY III - BY MS. JONES

2               MR. SHIELDS:  Objection.

3       A.  It made me feel helpless and useless.  And

4   I felt like I should have taken a bullet to defend my

5   dog's honor.  I felt she deserved that and I didn't

6   give her that.

7       Q.  How often were you having suicidal

8   ideations in the end of 2019?

9       A.  I don't recall.

10      Q.  In December 2019 and January of 2020, you

11  have been discussing interpersonal difficulties and

12  your daughter a lot per the session notes.

13          Did these interpersonal difficulties with

14  your partner and daughter and parenting overtake the

15  effect on your life that Tesla's death was having?

16              MR. SHIELDS:  Objection.

17      Q.  Like did those interpersonal difficulties

18  kind of have a -- yeah -- larger effect on your life

19  than Tesla's death at this point in time?

20              MR. SHIELDS:  Objection.

21      A.  I don't understand quite what you mean.

22      Q.  Sure.

23          So in the beginning you're talking with

24  the clinician a lot about triggers and negative

25  memories from Tesla and flashbacks.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2                   And then it starts to shift to
 3    interpersonal stressors and your daughter and your
 4    girlfriend and parenting and -- "my daughter."
 5                   So did you ever reach a point in time when
 6    the main stress or cause of any negativity or mental
 7    health concerns was these interpersonal difficulties
 8    as opposed to Tesla's death, which is what originally
 9    led you to seek therapy?
10              MR. SHIELDS:  Objection.
11         A.  The therapist appointment was generally
12    only 40 to 50 minutes.  I see her once a week.  And
13    you know, it -- oftentimes it was initiated with what
14    was on my mind.  What was my day-to-day like.
15                   My dog wasn't getting shot and killed
16    every single day.  And so, you know, you start
17    conversation that way and, you know -- just like we
18    have been here for hours.  You don't have hours in
19    therapy.  You got 40 minutes.  So it didn't come back
20    to the dog, but the dog remains in the -- the flash --
21    the stress and the unnecessary like outside reminders
22    of it.  Like those remained.
23         Q.  Did you guide or determine the topics that
24    you spoke about with your therapist?
25              MR. SHIELDS:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 CHARLES R. DEMPSEY III - BY MS. JONES
 2            A.  My therapist was more of a listener than
 3      a...
 4            Q.  So did you determine what you talked about
 5      with your therapist?
 6            A.  I felt like I did most of the discussion.
 7      Dictate whatever I was about.
 8            Q.  Why did you stop seeking therapy in
 9      mid-2020?
10            MR. SHIELDS:  Objection.
11            A.  Wasn't that during the COVID -- when they
12      had the masks and -- during mid-2020, I was working as
13      a driver for UPS, so my work hours overshadowed
14      Business Office hours.  And I was -- I had lost touch
15      with the therapist and time just continued to pass.
16                 It wasn't that I felt that I didn't need
17      therapy.  It was just I wasn't taking the time to have
18      it.  Going to therapy upset me because going to
19      therapy itself was a reminder why I needed to go to
20      therapy in the first place.
21                 You know, I was born at the hospital which
22      is in the same -- which is attached to the building I
23      was going to therapy for.  I felt like that was a
24      place that I was -- was comfortable for me at first.
25      And now, you know, after years of attending there,
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                    CHARLES R. DEMPSEY III - BY MS. JONES
 2      it's the opposite.  It's -- as I referred to earlier,
 3      it's like a scab.  It -- you know, it just -- it's
 4      part of the wound.
 5              Q.  Did your girlfriend encourage you to
 6      prioritize therapy and go back to the therapist?
 7                    MR. SHIELDS:  Objection.
 8              A.  At that time?
 9              Q.  Yes.
10              A.  I don't recall.
11              Q.  So in March of 2020, on this -- on these
12      notes from the therapist, it lists medications for
13      you.  Zofran.  The --Ondansetron,
14      O-N-D-A-N-S-E-T-R-O-N.  Yeah.  Zofran.
15                    Do you remember taking Zofran in March of
16      2020?
17              A.  Do you mind if I go into it --
18              Q.  Sure.
19              A.  -- instead of just answering your
20      question?  These documents you have been showing me
21      from Rochester Regional Health --
22              Q.  Yes.
23              A.  -- are generated by computers.
24              Q.  Okay.
25              A.  And basically there's like -- all of these
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     things are -- are already there and the person who
 3     fills out the form goes through empty spaces on the
 4     form and enters in whatever information they want to
 5     enter in.
 6              Q.  Okay.
 7              A.  And if this medication is -- was once
 8     prescribed to me and not being -- has not been
 9     unprescribed by a doctor or a doctor has not gone into
10     the MyCare portal and removed it, it will continue to
11     show on the MyCare portal even to this day.
12              But this medication was given to me for
13     nausea which I was experiencing with -- what now in
14     the future looking back, I believe I had the COVID-19
15     virus at that point in time.
16              MR. SHIELDS:  Just for the record, that
17     was Bates number DEMPSEY 1306.
18              Q.  So yes, you took Zofran?  Just maybe not
19     at this time in March of 2020?
20              A.  I believe that's when I was prescribed
21     Zofran.
22              Q.  Okay.
23              A.  For having nausea and diarrhea.  And
24     fever.  And what turned out to be a cold.
25              Q.  I will take that back.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2                  Did you resume going to therapy after
 3     stopping in mid-to late 2020?
 4          A.   I did try therapy again.
 5          Q.   Do you remember when that was?
 6          A.   I don't recall the date.
 7          Q.   Can you give an estimate?
 8          A.   Somewhere during the next year.
 9          Q.   Did you see the same therapist?
10          A.   No.
11          Q.   Do you remember -- well, why did you go
12     back to therapy again?
13          A.   I was still experiencing the shakes, the
14     flashbacks, the stress balls.  I -- I thought that
15     therapy would -- I mean I thought -- I thought maybe
16     it was something I should do.
17          Q.   Did those symptoms increase which then led
18     to you returning to therapy or had they just not
19     ended?
20          A.   That stuff hadn't gone away.  I was --
21          Q.   Did something happen to increase those
22     symptoms around the time that you decided to return to
23     therapy in August of 2021?
24               MR. SHIELDS:  Objection.
25          A.   I don't want to say "increased."  I don't
```



1              CHARLES R. DEMPSEY III - BY MS. JONES

2    want to use that word.

3          Q.  Was there any change in your symptoms that

4    motivated you to return to therapy in August of 2021?

5          A.  I just wasn't happy.  I was feeling

6    depressed.

7          Q.  I'm going to hand you what's marked as --

8    or identified as DEMPSEY 2600.  I want to talk about

9    some of the symptoms that you mentioned here.

10             So this is in August of 2021.  In the

11   current -- current symptoms, duration history and

12   impairment, you describe feeling like a zombie.  I

13   don't think we have talked about that before.

14             What do you mean by "feeling like a

15   zombie"?

16             MR. SHIELDS:  Objection.

17         A.  So a zombie is, you know, a mythological

18   creature that operates without -- I don't know -- I'm

19   sorry if I -- if I can restart.

20         Q.  Go ahead.

21         A.  I just felt like I was just going with the

22   flow in life and not making my own freewill living

23   choice.  Just sort of as I referred to earlier,

24   deadhead.

25         Q.  The therapist noted that you said, quote,



1           CHARLES R. DEMPSEY III - BY MS. JONES

2    "My symptoms are getting bad again."

3               Do you remember a time prior to August of

4    2021 where your symptoms had improved so they weren't

5    as severe or frequent?

6           A.  I remember during the COVID shutdowns for

7    the schools and the stores, that I was super busy at

8    work.  And that really became a dominating part of my

9    life.

10              And again, when I was less occupied with

11   work, I became more lost in thoughts.  Which were

12   often kind of messed up.  I don't want to sit here and

13   say everything in my life goes back to that moment,

14   but so many times in my mind that's where it goes --

15   that's where I go.

16          Q.  Why didn't you command Tesla to stop when

17   she was running out the door and down the porch and

18   into the yard?

19          A.  Because during those few seconds, I had

20   told the officer that she was fine and she would be

21   okay.  I had spent that time using my English to speak

22   to a human.

23          Q.  You said you're no longer seeking therapy

24   right now?

25          A.  I'm no longer visiting therapists.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  So after -- how long did you continue to
 3    be in therapy after resuming in August of 2021?
 4         A.  Desiree became pregnant and that was kind
 5    of, you know -- grown in her belly over the weeks and
 6    months and then it was like, "Well, you know, you're
 7    looking pretty big."  As far as like "When is the baby
 8    due?"  Finally, the question came out and she -- you
 9    know, she -- she stopped working.  I stopped making
10    appointments with her and again, you know, as I stated
11    earlier before, time -- it's time now that needs to
12    pass.
13         Q.  When did you stop having sessions with
14    Desiree?
15         A.  I don't recall the last date.  Um, I don't
16    know the last time I had a session with her.
17         Q.  Have you considered seeing a new
18    therapist?
19         A.  I have considered it.
20         Q.  Have you called to see if Desiree came
21    back to work after her maternity leave?
22         A.  I called once to try to make an
23    appointment to come up with somebody other than
24    Desiree, but the call -- I never finished the call.
25         Q.  Why didn't you finish the call?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          CHARLES R. DEMPSEY III - BY MS. JONES
2          A.  I don't recall the instance, but there was
3   something happening immediately to my surroundings
4   that had to take my attention.
5          Q.  Did you lose your job in March of '22?
6          A.  Did I lose my job?
7          Q.  Yes.
8          A.  I still work for the same company that I
9   did.  I was disciplined.
10         Q.  Were you temporarily laid off for
11  anything?
12         A.  You're talking March of last year?
13         Q.  That is correct.
14         A.  I missed time about two years ago for a
15  knee injury, but I don't know if that time is the time
16  you're referring to.
17         Q.  Now -- no.  I thought there was a time
18  where you lost your job at UPS and then were rehired.
19             Is that --
20             MR. SHIELDS:  Objection.
21         Q.  -- not true?
22         A.  Again, I was never rehired.
23         Q.  You mentioned you were disciplined at
24  work?
25         A.  Yes.  As a teamster, there is a -- there



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1            CHARLES R. DEMPSEY III - BY MS. JONES
2    is a -- there is a written out in -- you know, way of
3    passive discipline.  You know, it starts with a
4    warning.  With a letter.  A suspension.  A
5    multiple-day suspension.
6               I had gone through that process.
7         Q.  Was this discipline related to Tesla's
8    death?
9         A.  I was still struggling to leave my home.
10        Q.  So what discipline did you receive through
11   that written process?
12        A.  A lot of write-ups.
13        Q.  Earlier you mentioned attendance issues.
14              Were there any other reasons you were
15   disciplined at UPS?
16        A.  That is what I was disciplined for.  Not
17   getting to the clock.
18        Q.  So what levels of discipline did you
19   receive?
20        A.  The highest is an Article 7 discharge,
21   which is a working discharge.  Which means that they
22   had sent me a certified letter that said they had the
23   right to -- or reason to discharge me from their
24   employment.  Of which I was continuing to do.
25              So I received a letter that said they had



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    reason to fire me but was not fired.
 3              Does that make sense?
 4         Q.  Yes.
 5              Had you previously been suspended prior to
 6    receiving that Article 7 letter?
 7         A.  Yes.  That's a part of the process that's
 8    in the Teamsters contract.
 9         Q.  How many days were you suspended from work
10    for attendance issues?
11         A.  There was a one-day suspension, a
12    three-day suspension and a five-day suspension.  I
13    worked through all of them.  They did not actually
14    suspend me.  It's a paperwork process.
15         Q.  So did they tell you you were suspended or
16    have it in abeyance or something?  How did they
17    suspend you but not actually suspend you?
18         A.  They told me I was suspended and then told
19    me to get back to work and to show up the next day.
20    This is Corporate America for you.
21         Q.  Were you paid for the day you were working
22    when you were technically suspended?
23         A.  That's correct.
24         Q.  When did the one-day suspension occur?
25         A.  There -- there never was like an
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    assigned -- like "You're going to be suspended this
 3    day."
 4              It was "You're being served with a one-day
 5    suspension letter.  This is official.  Here is your
 6    Union Rep."  You know.  "Here is the office."
 7    Everything is --
 8         Q.  When were you served that one-day
 9    suspension letter?
10         A.  I -- I can't recall a date.
11         Q.  Can you tell me what year?
12         A.  I guess that would be '20 -- we're talking
13    '20 -- I hadn't been served that more than once.
14         Q.  Do you feel like your job is currently in
15    jeopardy?
16              MR. SHIELDS:  Objection.
17         A.  As we stand now?
18         Q.  Yes.  Like today.
19         A.  I am currently still on an Article 7
20    discharge and my company has reason to fire me if --
21         Q.  Can they retract an Article 7 discharge
22    letter?
23         A.  The way it is in the contract, they -- a
24    letter like that will time out in -- and your answer
25    should have just been yes.  The Union can dispute it
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    and such.
 3              Q.  But the letter can also time out after a
 4    certain period of time?
 5              A.  That's correct.
 6              Q.  What is that length of time?
 7              A.  On the last contract, from what -- I
 8    believe it to be nine months.
 9              THE WITNESS:  Would it be appropriate for
10    me to have another cigarette break soon?  Not saying
11    right now, but -- so you could expect that.
12              MS. JONES:  Yeah.  Give me a few more
13    seconds.
14              Q.  Did you know prior to yesterday's
15    deposition Uncle Mark mistreated LD in the way she
16    described?
17              MR. SHIELDS:  Objection.
18              A.  I had taken LD to the Civil Service
19    building and requested action be taken against Mark
20    and was told by the Judge -- whose name I can't
21    recall -- that there -- that he didn't feel a crime
22    had been committed and that I should take up my issues
23    with Family Court.
24              Q.  Did you address Mark's mistreatment of
25    your daughter with Felicia, your daughter's mother?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  Yes.
 3         Q.  How many -- well, would you agree with the
 4    Western New York CPC's description of LD's homelife as
 5    "chaotic"?
 6              MR. SHIELDS:  Objection.
 7         A.  No.
 8         Q.  Why not?
 9         A.  I don't consider my home to be chaotic.
10         Q.  What about the time your daughter was
11    living with her mother?
12         A.  I wasn't there.  I can't speak to that.
13         Q.  Did your daughter tell you about what
14    Uncle Mark did to her?
15              MR. SHIELDS:  Objection.
16         A.  You asked me that.  I answered you.
17         Q.  If you took action on what your daughter
18    told you about Uncle Mark, why didn't you not believe
19    other things that she reported about her mother's
20    home?
21         A.  I'm sorry?
22         Q.  Well, it seems like you believed your
23    daughter when she told you about Uncle Mark's
24    mistreatment of her.
25              Did you not believe what your daughter
```



1            CHARLES R. DEMPSEY III - BY MS. JONES

2   said about other things she experienced at her

3   mother's house?

4          MR. SHIELDS:  Objection.

5      A.  I -- I -- I believe my daughter.  I don't

6   know what you're trying to -- I -- I don't know what

7   two pins you're putting together.

8      Q.  Do you think your daughter is currently

9   affected by Tesla's death?

10      A.  Yes.

11      Q.  How so?

12      A.  She's still triggered and traumatized by

13   police, Black Labs.  She -- she wants nothing to do

14   with my house on Kosciusko Street.

15         She don't even really want to live with me

16   anymore, but she's -- she doesn't want to be there

17   over on Kosciusko Street because she doesn't want to

18   have those flashbacks and memories.

19         So I'm assuming that she also deals with

20   the stress, you know, of worrying about that in your

21   own head.  We talk about it.  You know, she doesn't --

22   her places and things we did with the dog that remind

23   her of the dog and make her feel sad.

24      Q.  Is there anything else that you would like

25   to tell me about the incident or Tesla's death or how



1              CHARLES R. DEMPSEY III - BY MS. JONES
2      it's affected you that you haven't shared with me
3      already?
4              A.  Again, I thought that you were trying to
5      wrap this up, but if you would like, I could tell you
6      about how when I drive my car and I look up in the
7      driver's rearview mirror, sometimes I see the ghost of
8      that dog looking back at me in the mirror.  Because
9      that was the last time I made real, good, solid eye
10     contact with Tesla, was in my driver's mirror -- the
11     rearview mirror while she was in the back of the car
12     driving to the Animal Hospital.  And I think -- she is
13     not there now, but sometimes when I look up, I
14     remember her looking back.
15             Q.  Do you have the same car that you drove
16     Tesla --
17             A.  I still own that vehicle.
18             Q.  Do you consider getting a different car?
19             A.  I have.
20             Q.  Do you see Tesla in the rearview mirror
21     when you're driving any car?
22             A.  I didn't see her in the rearview mirror of
23     the UPS truck when I was driving it.  Right after the
24     loss, I would feel like the shadow presence of my dog
25     next to me.  The therapist told me that that was



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1                    CHARLES R. DEMPSEY III - BY MS. JONES
2      common for people dealing with the loss of pets.
3                    And -- it's just for no reason out of the
4      blue.  It's just like poof, "Here I'm not."  And it's
5      just like this unfriendly reminder.
6                    I took time off of work so I could speak
7      to you today.  It's time that I could have taken to
8      enjoy this great State of New York, you know?
9              Q.  Are you working the day shift right now?
10             A.  No.  But we started here at 9 a.m. at
11     which time I -- I'm at work.
12             Q.  Anything else you would like to share?
13             A.  Yes.
14             Q.  Go ahead.
15             A.  There is more.
16                   When -- when we got KitKat, the cat, in my
17     home -- when she was just a kitten and we brought her
18     home, the big deal was how is Tesla going to react to
19     this?  And it was adorable.  Watching the little
20     kitten play with the big, old, black dog, white cat.
21     They were good friends.
22                   They eventually became really close with
23     each other over the years and they would sleep
24     together.  Cat would lick her face.  She would just
25     lay on her back with her mouth open and just like let



1          CHARLES R. DEMPSEY III - BY MS. JONES
2     the cat crawl across her.
3          And I -- I referred to earlier with, you
4     know, Savannah, the dog I have now.  Like her
5     relationship with Savannah is not like it was like
6     with Tesla.  And when I'm like with the cat and I'm
7     sad and like the cat sometimes knows that and -- you
8     know, animals have that sort of heart vibe instinct I
9     would guess I would describe it as -- you know,
10    sometimes -- sometimes when I'm with the cat, I just
11    remember that the cat remembers Tesla.
12         And it's you know -- you know, you quoted
13    me earlier saying Tesla was my best friend.  I -- I
14    have another dog, but it -- but that cat has been
15    through -- through it with me now.  It's -- I have a
16    deeper bond with my cat than I do with my dog.  I
17    don't know if that makes me a cat person or not.
18         There's -- there's so many like from --
19    day-to-day reminders that upset me.  There is so many
20    like places that I won't go to avoid having those
21    negative emotional feeds.
22         For example, the -- the Rochester City Dog
23    Park that I referred to earlier on Cobbs Hill.  I stay
24    away from that area.  I don't even like driving by it
25    on the 490.  Because it's in my -- my daughter feels



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2   the same way.  We have talked about it on the highway.
 3              Like, "Oh, yeah.  I remember" -- just you
 4   remember -- and then sad, sad, sad.  Just kind --
 5         Q.   You don't take Savannah to the dog park?
 6         A.   Not to that doing park, no.
 7         Q.   Anything else you would like to share
 8   about how Tesla's death has affected you or your
 9   family?
10         A.   I stopped inviting people to my home after
11   that.
12         Q.   You mentioned that you didn't have people
13   at the fire pit anymore.
14         A.   Yeah.  Which, you know -- I stopped
15   engaging with people who were close to me at that
16   time, just entirely.  And -- you know, because of
17   that, those relationships drift on and, you know,
18   apart.  And I don't have those relationships that I
19   had before anymore.
20              I really prided myself in helping my
21   elderly neighbors back then.  And I just -- I watched
22   them die over the years and -- and I could have spent
23   more time helping them with their last years if I
24   hadn't been so secluded in my -- just...
25              I have a really hard time getting rid of
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    things from back then.  With example, my car.
 3              Q.   Hmm.
 4              A.   I have gotten a new vehicle, as you asked.
 5    Yes, I have fewer flashbacks of the dog in the mirror
 6    in that vehicle.
 7              Q.   In the new vehicle?
 8              A.   In the new vehicle.  But I can't bring
 9    myself to get rid of the old vehicle because it's one
10    of the last pieces of Tesla I have left.
11              I'm still afraid to go into the yard
12    without inspecting it.  I -- I'm afraid to step
13    outside of my house without making sure that there is
14    not somebody out there that might kill me.  That's not
15    a comfortable feeling to have.  It's not.
16              I don't even -- I found myself afterwards
17    that I would -- I -- I found myself drawn deeply to
18    like -- for example, like a Facebook friend that
19    shared a picture of them with their dog.  I -- I found
20    myself so happy for them that they had that in their
21    life.  And I -- I get emotional sometimes when I
22    don't -- I don't get to -- when I'm left alone in
23    these thoughts of, you know, I should have taken that
24    bullet and, you know, what could -- how could I
25    have -- could I have carried her into the home away
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    from them?  Could -- could I -- what could I have done
 3    differently?
 4              Did I have to have that cigarette?  I
 5    smoke cigarettes.  I smoke a lot of cigarettes in a
 6    year.  Every time I light a cigarette -- not every
 7    single time I light a cigarette, but frequently, while
 8    I'm smoking a cigarette, I think about should I have
 9    had that cigarette?
10              You know, I was cooking little -- you
11    know, you ever have a cocktail wiener or, you know,
12    like a smoked sausage, small smoked sausage?  We were
13    cooking those.  I have not purchased those.  I avoid
14    that entire section in the Wegmans grocery with the
15    baloney and the ham.  That -- I avoid that entire
16    section of the grocery store.
17              Sometimes I stare at it.  When I end up
18    there, I just stare at it.  Why?
19              I -- I have been affected by loss of Tesla
20    every single day and I can continue to name these
21    things throughout the evening if that is what you
22    would like.  But it exceeds what I have said.
23              MS. JONES:  I don't have any more
24    questions.
25              MR. SHIELDS:  I just have a few.
```



1          CHARLES R. DEMPSEY III - BY MR. SHIELDS

2          EXAMINATION BY MR. SHIELDS:

3          Q.  Before the officer entered your yard, did

4    you give him permission to enter your yard?

5          A.  No.

6          Q.  If the officer had walked to your front

7    door, knocked and explained the situation that they

8    wanted to enter your yard to search in your yard,

9    would you have given the officer permission?

10          A.  If he had knocked on my door and garnered

11    my attention and asked for permission to enter, would

12    I have told him yes?

13          Q.  Yes.

14          A.  Yes.

15          Q.  Before the officer entered your yard, did

16    he make any kind of announcement or warn you that he

17    was going to enter your yard before he entered your

18    yard?

19          A.  No.  I was unaware of his presence.

20          Q.  Earlier, Ms. Jones showed you the

21    body-camera video and the moment when the officer had

22    pointed his gun at you and then he put it down by his

23    side.

24              In the video, you weren't able to actually

25    see the officer holster his gun; correct?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2                 MS. JONES:  Objection.
 3        A.  Correct.
 4        Q.  So just by watching the video, there is no
 5   way to tell when the officer actually holstered his
 6   gun; correct?
 7                 MS. JONES:  Objection.
 8        A.  Yes.
 9        Q.  From your memory of the incident, do you
10   remember exactly when the officer holstered his gun?
11        A.  By "exactly," do you mean like
12   order-of-event exactly?
13        Q.  Like --
14        A.  Sorry.
15        Q.  So in the video what you see is the
16   officer pointing his gun at you and then putting it
17   down by his side.
18            Could the officer have held the gun at his
19   side for some portion of time before he re-holstered
20   it?
21                 MS. JONES:  Objection.
22        A.  Time was moving very slowly at that point.
23   He could have.
24        Q.  Okay.  Sounds like you don't remember
25   exactly when he holstered the gun, if it was
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2    immediately after he put it down by his side, if he
 3    held it there for a while before holstering his gun or
 4    not?
 5              MS. JONES:  Objection.
 6         A.   Right.  I can't recall.
 7         Q.   Okay.  Ms. Jones asked you a series of
 8    questions about why you didn't bring Tesla to the
 9    Animal Hospital sooner.
10              One of those reasons was because the
11    officers told you that Animal Control was coming to
12    your home, correct?
13              MS. JONES:  Objection.
14         A.   Yes.
15         Q.   And was another reason because you didn't
16    feel you were free to leave when you were surrounded
17    by the officers?
18              MS. JONES:  Objection.
19         A.   Yes.
20         Q.   And Ms. Jones asked you why you didn't go
21    inside to see LD.
22              Was -- would LD have seen your shirt
23    covered in blood if you had gone inside at that point?
24              MS. JONES:  Objection.
25         A.   Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
2         Q.  Is another reason that you didn't leave
3    Tesla to go inside and see LD because you were afraid
4    that Tesla would bleed out and die?
5              MS. JONES:  Objection.
6         A.  I was afraid of blood coming out of her
7    and causing her death, yes.
8         Q.  Did you stop taking the Prozac because the
9    side effects were worse than the benefits or something
10   else?
11        A.  Yes.  I -- I -- I felt like it was more of
12   a negative than a positive.
13        Q.  Was that the same with the Celexa?
14        A.  Yeah.  I mean I -- I stopped the Celexa
15   because I ran out of Celexa and I was hoping that I
16   could go on without it.
17        Q.  Your deposition was previously scheduled
18   about a year ago, correct?
19        A.  Yes.
20        Q.  Did you watch the -- the video at that
21   time in preparation for the previously scheduled
22   deposition?
23        A.  I believe I did.
24        Q.  How did that make you feel?
25        A.  Angry, confused, upset.  I -- I felt
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2    like -- in this moment right now I'm reflecting on the
 3    video and I feel anger.
 4              Reflecting on it made me feel really sad
 5    about myself.
 6         Q.  When you say it makes you feel sad about
 7    yourself, is one of the reasons because of how
 8    emotional you are in the video?
 9              MS. JONES:  Objection.
10         A.  Yeah.  I was -- it made me feel like I
11    wasn't who my ego thinks I was.  Not the man I thought
12    I was, I guess.  You know, I gave -- I gave my best
13    "Hey" voice and they treated me like some kid.
14         Q.  Were you raised to view a man's role as
15    being strong and stoic and not expressing emotion?
16              MS. JONES:  Objection.
17         A.  My father was a marine and he raised me.
18    I was born a few years after he, you know, had left
19    the Marines.  So he had used I lot of what he learned
20    in the Marines to raise me on.  And being strong,
21    protective.  That just was -- that was an example that
22    I had.
23         Q.  In June 2019, there was a custody order
24    granting you and Felicia, your daughter's mother,
25    joint custody; correct?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3         A.  Yes.
 4         Q.  So it's not like you had to give Felicia
 5    permission to see LD, correct?
 6                   MS. JONES:  Objection.
 7         A.  Yes.
 8         Q.  Earlier one of the things that you said in
 9    response to one of Ms. Jones' questions about your
10    daughter was that it wasn't until several years had
11    passed that you had an honest discussion about what
12    happened with LD and that she told you that she tried
13    to -- I think the words you used were "keep within her
14    struggles."
15              So my question is do you mean that she
16    held in her emotions about the incident?
17                   MS. JONES:  Objection.
18         A.  We withdrew the detail -- we held back the
19    details of the moment and the after moment and how we
20    felt.  I mean yeah.  She held in her emotions.  She
21    held in -- we didn't talk about what we felt because
22    we both felt broken-hearted.  It was hard to share
23    that without coming right to the surface and I'm
24    choked up now referring to it.  I mean -- staring in
25    the eyes of my daughter and feeling the same way.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2    It's even harder.
 3         Q.  And another thing that was said in
 4    response to Ms. Jones' questions is that you --
 5    something like you felt bad about not being able to
 6    help LD process her feelings about the incident
 7    because you were dealing with your own feelings about
 8    the incident.
 9              Is that accurate?
10         A.  Yes.
11         Q.  And do you think that is something that
12    affected your relationship with LD?
13         A.  I do.  I do.
14         Q.  And Ms. Jones had asked you why you had
15    gone to see your primary care physician for a period
16    of time, I believe, between maybe after you were
17    prescribed the Celexa to present or something like
18    that.
19              Is the reason you didn't go see your PCP
20    in that time period because you simply weren't sick?
21    You didn't have a reason to go see your PCP?
22              MS. JONES:  Objection.
23         A.  Yeah.  I said before that I had gone in
24    because I had a really bad cold and I didn't go spend
25    time with my PCP because -- when I was a kid, you
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          CHARLES R. DEMPSEY III - BY MR. SHIELDS
2    called a doctor when you break an arm.  I did that
3    only once.
4          Q.  So you wouldn't just like go regularly and
5    have check-ins with your doctor if you weren't sick or
6    if you didn't have an injury?
7          A.  Yes.  Yes, I would not.
8          Q.  When you became a driver with UPS, did you
9    get training on interacting with dogs?
10          A.  I did.
11          Q.  When you were a driver with UPS, did you
12    have any weapons or anything else that you would carry
13    to help protect you if you had to interact with a dog
14    on someone's property?
15          A.  The UPS uniform includes nothing but, you
16    know, shirt, pants, socks if you're wearing shorts,
17    coat and the -- the UPS diad, which is like -- the new
18    ones are nicer and lighter than the old ones, but --
19    the UPS diad is about --
20          MS. JONES:  Like the handheld thing?
21    Handheld thing?
22          A.  Yeah.  That you would sign for an
23    electronic thing.  You would -- that was the only
24    thing that would -- that you would have other than a
25    package that you're carrying.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2         Q.  How long was the training about
 3    interactions with dogs?
 4         A.  They -- I had my week-long training down
 5    in Worcester, Massachusetts and -- at a place they
 6    call Browntown, which is Integrad, where they train a
 7    lot of UPS employees and they had addressed it
 8    multiple days.  But there was a certain point where it
 9    was an open discussion that -- that had gone on for a
10    significant portion of an hour.  I'm not saying an
11    hour, but -- but I remember us -- I mean I remember it
12    bouncing around for a little bit of time.
13         Q.  In training about how to interact with
14    dogs, that's because necessarily that happens when you
15    are delivering packages onto somebody's property?
16         A.  Yeah.  That's correct.  I mean they even
17    had a fake dog in their little -- they have like a
18    fake town that you go out and you deliver to and you
19    drive the truck like 12 feet down the street and park
20    and get out and go and deliver packages.  They had one
21    house they kept just specifically for there to be a
22    dog behind the door.  While you weren't paying
23    attention, somebody would go behind that door and try
24    to jump you and catch you off guard.  If you weren't
25    paying attention -- if you weren't doing what they had
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
2     trained you to do, they would catch you off guard.
3              Q.  And did they train you on how to avoid
4     being attacked by dogs when you're delivering
5     packages?
6              A.  Yes.
7              MS. JONES:  Objection.
8              A.  Yes.  That was the intention of training
9     us with dogs, because they didn't want their employees
10    to be injured on the job.
11             Q.  So there was about a one-hour on one day
12    and then multiple other days when there was training
13    about interactions with dogs?
14             MS. JONES:  Objection.
15             A.  Yes.  There was also like online, um,
16    training that we did.  Outside of the classroom.  We
17    did computer training and -- and there was also a
18    section in one of the training programs that
19    addressed, you know, how to interact in identifying a
20    home with a dog.  Or a yard with a dog.
21             Q.  So you were taught when you were
22    approaching any home that you were delivering a
23    package to to be cognizant and to look for signs of
24    whether or not there was a dog that resided at the
25    property?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
2         A.  Yes.
3         Q.  And what types of precautions were you
4    thought to take if you saw signs or thought that there
5    might be a dog that resided at the property?
6         A.  Just walking through it, step by step.
7    You know, they would say -- beep the horn before you
8    get out of the seat to make a noise.  Announce
9    yourself.  As you're approaching the yard, to observe
10   the yard for telltale signs that there -- being a dog
11   there.  And look for like a dog house or a sign that
12   said "Beware of Dog" or a beaten trail along a fence
13   line.  Or toys in the yard.  Or a bowl.  Or -- there
14   are many things that could signal there's a dog in the
15   yard like there being a dog in the yard.
16              And they taught us to announce ourselves
17   as we approach.  Again, making a noise as we are
18   approaching is another way to -- of aware -- not only
19   inform the customer, but also the dog that you're
20   around.
21              If we were to cross a fence in order to
22   reach the home, that we -- shake the fence, tap on the
23   fence, kick the fence.  Make some more noise along the
24   fence line so again if there is a dog there, they're
25   aware and if -- if we were to ever feel unsafe about
```



```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2    the situation because there was a dog, you know, they
 3    taught us to write an info notice and not deliver a
 4    package.  That -- you know, try again the next day.
 5         Q.  Were you taught how to deal with if the
 6    dog actually ran at you or attacked you?
 7         A.  Yes.  That was part of the open
 8    discussion.  And, you know, it was -- the -- the guy
 9    who was, you know, discussing to us what to do.  He
10    was like if a dog -- if you end up -- find yourself in
11    a situation after taking all of the steps to see and
12    prevent it and now here you're in the moment, what you
13    should do is try and find something to separate you
14    from the dog if you can't get immediately back over
15    the fence -- the barrier, the fence.  Use the package.
16    Or use the diad to just put something in between you
17    and the dog.
18         Q.  Create space between you and the dog, some
19    kind of physical barrier?
20         A.  Right.  And to retreat.  Call for the
21    owner.
22              I ended up in a situation like that one
23    day where I was in somebody's -- I was on somebody's
24    porch, knocking on their door and, you know, I knew
25    they had a dog.  And I actually had pet this dog
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          CHARLES R. DEMPSEY III - BY MR. SHIELDS
2    before, but he scared me.  He came coming around the
3    corner and, you know, it -- my reaction was to do what
4    I was just saying.  I created space.  I set that
5    package down right in between me and him and I
6    proceeded to exit immediately.  And called out for the
7    owner as I was doing so.  They had to come to the
8    door.  By the time, I was already outside the fence
9    but before I got back to my truck and the dog was
10   paying attention to the box and the owners.  I -- I
11   don't know why I just flashed on that.  That dog got
12   me, though.  I was -- it -- that set in my memory.
13   But I never would have done anything to hurt him.  You
14   know, I just retreated.
15          Q.  Was going through the dog training with
16   UPS triggering for you?
17          A.  It -- it was because I had like developed
18   such a -- I had felt like I was such a dog person at
19   that time.  And for him to say that, you know, you
20   would prefer me to -- you know, hit a dog with a
21   package -- or, you know -- to just -- it was
22   triggering for me.  I remember feeling shaky and like
23   palm-sweaty during the group discussion.
24          I remember even speaking up to make
25   suggestions about, you know, alerting dogs that --



```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2    or -- just like figuring out if there is a dog there.
 3    You know, other ways to make noise other than honking
 4    the horn and verbally tapping the diad or something.
 5         Q.  During group discussion did you share
 6    about the incident with Tesla?
 7         A.  No.  I didn't want to put that on those
 8    people.  Anybody I ever talked to about Tesla is
 9    immediately -- changes their demeanor to being sad and
10    upset and like -- they like pity me.  Like -- like
11    they're -- they say that they're sorry to me like they
12    did something.  "I'm sorry."
13              I don't even know if I answered the
14    question.
15              MR. SHIELDS:  I will just note for the
16    record that Mr. Dempsey is crying.
17         Q.  Is one of the reasons that you don't bring
18    up the situation with people, that when you do, they
19    apologize to you because you become emotional like you
20    have throughout the deposition today?
21              MS. JONES:  Objection.
22         A.  Yes.
23         Q.  Prior to the incident, on October 19th,
24    2018, had you ever seen police officers in your
25    backyard before?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2         A.  I had seen police officers from my
 3    backyard.  But not like in my backyard.  So I -- I --
 4    if you're asking if I had seen officers like on my
 5    property in my backyard prior to that, no.
 6         Q.  Prior to the incident on October 19th,
 7    2018, had you ever seen anyone in the neighborhood,
 8    any -- any neighbors or people you didn't know walking
 9    or running through your backyard?
10         A.  No.  No.  It felt like the neighborhood
11    respected me more than that.
12         Q.  And your backyard was completely enclosed
13    by a fence, correct?
14              MS. JONES:  Objection.
15         A.  Yes.  It actually was four different
16    fences.
17         Q.  And --
18         A.  And there was -- I mean my neighbor's
19    house was longer than my house, so, you know, a lot of
20    the yard is barricaded by the house next door.  Which
21    affects then -- extends to the end of the property.  I
22    described it.
23         Q.  And fences that the officer -- Officer
24    Algarin jumped over to get into your yard, that --
25    that's a chain-link fence when he entered the yard
```



```
 1            CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2    right before he shot Tesla?
 3                 MS. JONES:  Objection.
 4            A.  Yes.
 5            Q.  Is that like a regular height chain-link
 6    fence?
 7            A.  Yes.
 8            Q.  And so the officers could peer over that
 9    fence into your yard from your neighbor's yard?
10            A.  Easily.
11            Q.  And on the body-camera video, not the
12    portion that Ms. Jones showed you, but the portion you
13    had seen previously, the officer jumps over your fence
14    and walks around your yard for about a minute before
15    he first exits your yard; correct?
16                 MS. JONES:  Objection.
17            A.  Yes.
18            Q.  So he had already been in your yard for
19    about a minute before he re-entered it, correct?
20                 MS. JONES:  Objection.
21            A.  Yes.
22            Q.  And yesterday, Ms. Jones asked your
23    daughter if she had found a gun or drugs in your
24    backyard, what she would have done with them.
25                 At the time of the incident your daughter
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2    was ten years old; is that right?
 3              MS. JONES:  Objection.
 4         A.  At the time of the incident, my daughter
 5    was two days from being ten years old -- or I'm sorry.
 6    I misspoke.
 7              My daughter was ten years old.  She was
 8    two days from being 11.
 9         Q.  At any time had you previously ever found
10    guns or drugs or anything like that in your backyard?
11         A.  No.  I mean weeds, but they grow.
12    Dandelions.  That's what I meant by "weeds."  I'm
13    sorry.  I'm tired.
14         Q.  By "weeds," you meant like regular garden
15    weeds and not like marijuana?
16         A.  Yes.  Dandelions.  Cabbage patches,
17    whatever you want to call them.  Bird -- again, I'm
18    deflecting.
19         Q.  And how long would you estimate it takes
20    to walk from the back of your house to your front
21    door, if you were to go around the side of your house
22    and walk up on your front porch?
23         A.  Seconds.  I mean -- if it took more than a
24    minute, you know -- I would still define that in
25    seconds.  But not long.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2            Q.  So having watched Officer Algarin's
 3    body-camera video and knowing the location he was at
 4    in your neighbor's yard, can you estimate how long it
 5    would have taken him to walk from your neighbor's
 6    backyard up to your front door?
 7            A.  Just picture the walk in your head that he
 8    would have had to take.  I feel like in less than two
 9    minutes he would have already had my attention at the
10    door.
11            Q.  So you're saying less than two minutes to
12    get from the back of your neighbor's yard where he was
13    detaining the guy in the red shirt up to your front
14    door?
15            MS. JONES:  Objection.
16            A.  Yes.
17            Q.  Did you ever watch the body-camera video
18    of an officer walking from the front of your yard to
19    the back of your neighbor's yard?
20            A.  I don't -- I don't recall -- from the
21    front of my yard to the back of the neighbor's yard?
22            Q.  Yeah.  One of the subsequent officers that
23    arrived -- there is a video of him walking around the
24    side of your house and entering the backyard of your
25    neighbor's yard where the guy in the red shirt was
```



```
 1             CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2    detained and that took about ten seconds to get from
 3    your front yard to your neighbor's backyard.
 4             A.  I believe it.
 5             MS. JONES:  Objection.
 6             Q.  So do you think it -- Algarin could have
 7    gotten to your front door and, you know -- somewhere
 8    between 10 and 30 seconds?
 9             MS. JONES:  Objection.
10             A.  If that was his objective -- if that is
11    where he was headed, yeah.
12             Q.  And if he had taken that 10 to 30 seconds
13    to go to your front door and knock and ask your
14    permission to enter and search your backyard, you
15    would have given him permission?
16             A.  Yes.
17             Q.  When Algarin was pointing the gun at you,
18    were you afraid that if he shot -- he would shoot you?
19             A.  I -- when he pointed the gun at me, I was
20    afraid he intended to shoot me.
21             Q.  When he pointed the gun at you, were you
22    afraid that he could possibly shoot your daughter?
23             MS. JONES:  Objection.
24             A.  Yes.  I had just come from my front door
25    and my daughter was in behind that door.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2         Q.  When you watched --
 3         A.  I said "front."  I'm sorry.  It was the
 4    back door of the house.
 5         Q.  You said that you watched the body-camera
 6    video of Officer Algarin many times in the past,
 7    correct?
 8         A.  Yes.
 9              MS. JONES:  Objection.
10         A.  Yes.
11         Q.  Do you remember seeing in the body-camera
12    video from Officer Algarin at any point where the back
13    door moves or closes?
14         A.  Yes.
15         Q.  Do you know how or why the back door moved
16    or closed?
17         A.  LD came to the door and saw -- saw me
18    being detained and my dog, Tesla, was at the door at
19    that point.  She saw her bleeding out.  And she closed
20    the door to, I believe, avoid the confrontation that I
21    was at that moment having with the officer.  She told
22    me that she was scared.
23         Q.  All right.
24         A.  She was afraid.
25              MR. SHIELDS:  All right.  According to my
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1              CHARLES R. DEMPSEY III - BY MS. JONES

2     clock, that is seven hours so I think our questioning

3     time is done.  So I don't have any more questions for

4     you.

5              THE WITNESS:  Do you have follow-up to the

6     follow-up?

7              MR. SHIELDS:  We're at seven hours.

8              MS. JONES:  The seven hours don't include

9     your time.

10             MR. SHIELDS:  Yes, they do.  It is total

11    time.

12             MS. JONES:  Is that right?  I don't think

13    that is right.

14             MR. SHIELDS:  It's right.

15             THE WITNESS:  I don't know.

16             MR. SHIELDS:  But you know what?  In the

17    spirit of cooperativeness, if you have follow-up

18    questions, I'm not going to object to you asking them.

19             RE-EXAMINATION BY MS. JONES:

20        Q.  Did you watch the body-worn camera with

21    your attorney in preparation for your previously

22    scheduled deposition?

23        A.  Are you referring to the one a year ago?

24        Q.  Yes.

25        A.  Yes.



```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2         Q.  Did you ever go to the doctor when you
3    were just in pain or felt like something was wrong but
4    couldn't identify a particular injury or sickness?
5         A.  I -- that's how I had my knee diagnosis
6    done.
7              MS. JONES:  Okay.  That's all I have.
8                   (TIME:  6:30 p.m.)
9                    *     *     *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1

2                          W I T N E S S

3    Name                        Examination by          Page

4    -----------------------------------------------------------

5    Charles  R.  Dempsey III     Ms.  Jones              4-238

6         "            "           Mr.  Shields         238-258

7         "            "           Ms.  Jones           258-259

8                              *      *       *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
1

2                    E X H I B I T S

3    Exhibit         Description           Marked ID'ed

4    ------------------------------------------------------------

5                 (No Exhibits Marked)

6                   *      *      *

7              EXHIBITS PREVIOUSLY MARKED

8    Exhibit         Description               Page

9    ------------------------------------------------------------

10       (No Previously Marked Exhibits Presented)

11                  *      *      *

12

13        D O C U M E N T   R E Q U E S T S

14   Request                              Page

15   ------------------------------------------------------------

16              (No Documents Requested)

17                  *      *      *

18

19      C E R T I F I E D   Q U E S T I O N S

20   Question                             Page

21   ------------------------------------------------------------

22              (No Certified Questions)

23                  *      *      *

24

25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1

2                A C K N O W L E D G M E N T

3            I, Charles R. Dempsey III, declare, swear

4    and aver that I have read my testimony contained

5    herein and that my answers are true and correct, with

6    any exceptions noted on the errata sheet, under

7    penalty of perjury.

8                    _____

9                    Charles R. Dempsey III

10

11

12           I certify that this transcript was signed

13   in my presence by Charles R. Dempsey III on the _____

14   day of _____, 2023.

15

16           IN WITNESS WHEREOF, I have hereunto set my

17   hand and affixed my seal of office of _____ on

18   this _____ day of _____, 2023.

19

20                    _____

21                    Notary Public

22

23                    _____

24                    My Commission Expires:

25



```
 1

 2                E R R A T A   S H E E T

 3            Witness: Charles R. Dempsey III
             Deposition Date:  October 3, 2023
 4      Pg #   Line #     Change            Clarification

 5      |_____|_____|_____|_____|

 6      |_____|_____|_____|_____|

 7      |_____|_____|_____|_____|

 8      |_____|_____|_____|_____|

 9      |_____|_____|_____|_____|

10      |_____|_____|_____|_____|

11      |_____|_____|_____|_____|

12      |_____|_____|_____|_____|

13      |_____|_____|_____|_____|

14      |_____|_____|_____|_____|

15      |_____|_____|_____|_____|

16      |_____|_____|_____|_____|

17      |_____|_____|_____|_____|

18      |_____|_____|_____|_____|

19      |_____|_____|_____|_____|

20      |_____|_____|_____|_____|

21      |_____|_____|_____|_____|

22      |_____|_____|_____|_____|

23      |_____|_____|_____|_____|

24      |_____|_____|_____|_____|

25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1

2                  C E R T I F I C A T I O N
    STATE OF NEW YORK:
3   COUNTY OF MONROE:

4                  I, SANDRA C. HEWLETT, RPR, do hereby

5   certify that the foregoing testimony was duly sworn

6   to; that I reported in machine shorthand the foregoing

7   pages of the above-styled cause, and that they were

8   produced by computer-aided transcription (CAT) under

9   my personal supervision and constitute a true and

10  accurate record of the testimony in this proceeding;

11                 I further certify that the witness

12  requests to review the transcript;

13                 I further certify that I am not an

14  attorney or counsel of any parties, nor a relative or

15  employee of any attorney or counsel connected with the

16  action, nor financially interested in the action;

17                 WITNESS my hand in the City of Rochester,

18  County of Monroe, State of New York.

19

20

21

    SANDRA C. HEWLETT, RPR

24  Freelance Court Reporter and

    Notary Public No. 01HE5057286

25  in and for Monroe County, New York
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920