UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

-------------------------------------------------->

CHARLES DEMPSEY, individually, and L.D. by her

father and natural guardian, CHARLES DEMPSEY,


                    Plaintiffs,

                                        Docket No.

            - against -                 20-CV-6780

                                        (EAW)(MWP)

THE CITY OF ROCHESTER, a municipal entity, JAVIER

ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER

RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

                    Defendants.

--------------------------------------------------X



                    Zoom Conference

                    Long Island, New York


                    August 22, 2023

                    9:10 a.m.


            VIDEOTAPED DEPOSITION of LIEUTENANT

MICHAEL CUILLA, Witness, taken by Plaintiff,

pursuant to Federal Rules of Civil Procedure, and

Notice, held at the above-noted time and place,

before Emma Badger-DeRienzis, a Stenotype Reporter

and Notary Public within and for the State of New

York.

```
(1)
(2)     A P P E A R A N C E S:
(3)
(4)         ROTH & ROTH LLP
                 Attorneys for Plaintiffs
(5)              192 Lexington Avenue, Suite 802
                 New York, New York 10016
(6)
            BY:  ELLIOT DOLBY SHIELDS, ESQ.
(7)
(8)
            MUNICIPAL ATTORNEY
(9)         CITY OF ROCHESTER LAW DEPARTMENT
                 Attorneys for Defendants
(10)             30 Church Street, Rcom 400A
                 Rochester, New York 14614
(11)
            BY:  PEACHIE JONES, ESQ.
(12)
(13)
        ALSO PRESENT:
(14)
            KEVIN GONZALEZ - Videographer
(15)        NELLIE KLUZ - Videographer intern
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

(1)

(2)          F E D E R A L    S T I P U L A T I O N S

(3)

(4)          IT IS HEREBY STIPULATED AND AGREED by and

(5)   between (among) counsel for the respective parties

(6)   herein, that filing and sealing being the same are

(7)   hereby waived.

(8)          IT IS FURTHER STIPULATED AND AGREED that all

(9)   objections, except as to the form of the question,

(10)  shall be reserved to the time of trial.

(11)         IT IS FURTHER STIPULATED AND AGREED that the

(12)  within deposition may be sworn to and signed before

(13)  any officer authorized to administer an oath, with

(14)  the same force and effect as if signed and sworn to

(15)  before the Court.

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)                    VIDEO STIPULATIONS

(3)

(4)

(5)          IT IS HEREBY STIPULATED AND AGREED by and

(6)    between counsel for all parties present that

(7)    Pursuant to CPLR Section 3113(d) this deposition is

(8)    being conduced by Videoconference, that the Court

(9)    Reporter, all counsel, and the witness are all in

(10)   separate remote locations and participating via

(11)   Videoconference, (LegalView/Zoom/WebEx) meeting

(12)   under the control of Lexitas Court Reporting

(13)   Service, that the officer administrating the oath to

(14)   the witness need witness shall be sworn in remotely

(15)   by the Court Reporter after confirming the witness's

(16)   identity, that this Videoconference will not be

(17)   recorded in any manner, and that any recording

(18)   without the express written consent of all parties

(19)   shall be considered unauthorized, in violation of

(20)   law, and shall not be used for any purpose in this

(21)   litigation or otherwise.

(22)          IT IS FURTHER STIPULATED that exhibits may

(23)   be marked by the attorney presenting the exhibit to

(24)   the witness, and that a copy of any exhibit

(25)   presented to a witness shall be e-mailed to or

(1)

(2)    otherwise in possession of all counsel prior to any

(3)    questioning of a witness regarding the exhibit in

(4)    question.   All Parties shall bear their own costs in

(5)    the conduct of this deposition by Videoconference.

(6)        (Both attorneys acknowledged and agreed.)

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)              Lieutenant Michael Cuilla

(2)    to a residential property.  Was he mistaken?

(3)         **A    Yes.**

(4)         Q    When did Officer Jason Horowitz receive

(5)    training about the legal requirements to enter the

(6)    curtilage to a residential property?

(7)              **MS. JONES:  Jason Horowitz is not a**

(8)              **named defendant so we didn't specifically**

(9)              **look up the training offered to Jason**

(10)             **Horowitz.  We only focused on the named**

(11)             **defendants.  So if you're going to ask him**

(12)             **about the named defendants, he can speak**

(13)             **to that.**

(14)        Q    When did Officer Javier Algarin receive

(15)    any training about the legal requirements to enter

(16)    the curtilage to a residential property?

(17)        **A    In late 2017 and early 2018 when he**

(18)    **attended the police academy.**

(19)        Q    What did they teach him specifically?

(20)        **A    The rights to privacy for a person under**

(21)    **the Fourth Amendment, what is and is not in a legal**

(22)    **search and seizure as well as exceptions to the**

(23)    **search warrant, the requirements of a search warrant**

(24)    **including what is and is not personal property and**

(25)    **curtilage.**

[Page 61]
August 22, 2023

Lieutenant Michael Cuilla

(1)

(2)    Q   Did you review those documents that he was

(3)    provided in the police academy in preparation for

(4)    your deposition today?

(5)    A   No.

(6)    Q   So how do you know sitting here today that

(7)    those are the things that he received in his

(8)    training at the police academy?

(9)    **A**   **In consultation with Lieutenant Michael**

(10)   **Cuilla, who has attended the police academy and**

(11)   **taught at the police academy for several years as**

(12)   **well as currently overseeing the police academy for**

(13)   **the Rochester Police Department.  That is why I, as**

(14)   **the City, am aware of the topics covered in the**

(15)   **Fourth Amendment search and seizure portion of the**

(16)   **academy.**

(17)   Q   Do you teach the Fourth Amendment search

(18)   and seizure portion of the academy?

(19)   **A**   **No.  I am the City of Rochester.**

(20)          **MR. SHIELDS:  Peachie, you got to be**

(21)          **kidding me.  Like, this is ridiculous.**

(22)          **You obviously produced somebody who has a**

(23)          **specific knowledge background to testify**

(24)          **on behalf of the City.  I have to ask him**

(25)          **background questions.  We could have just**

(1)          Lieutenant Michael Cuilla

(2)     skipped over a whole bunch of silly

(3)     questions if you just let me figure out

(4)     from the beginning that he's the person

(5)     who teaches at the police academy.  Are

(6)     you going to let me ask these background

(7)     questions?

(8)          MS. JONES:  He's a witness on behalf

(9)     of the City so --

(10)         MR. SHIELDS:  I don't think you have

(11)    any idea how a 30(b)(6) deposition works

(12)    because, you know what, you produced

(13)    somebody who has all of the relevant

(14)    knowledge and background to testify on

(15)    behalf of the City.  You designate someone

(16)    and then you fully prepare them.  You

(17)    fully prepare them by picking somebody

(18)    that has the relevant knowledge and/or

(19)    giving them the information, so it's both

(20)    things.  If he has relevant information

(21)    because he's the person who trains people,

(22)    then I need to be able to ask him about

(23)    that.

(24)         MS. JONES:  You can ask the City of

(25)    Rochester about Lieutenant Cuilla's

(1)              **Lieutenant Michael Cuilla**

(2)         **training and oversight of the police**

(3)         **academy.  Our witness should know that.**

(4)      Q    What training is provided at the police

(5)  academy regarding search and seizure and entry

(6)  onto -- let me withdraw that.

(7)         At the police academy, what specific

(8)  training is provided to recruits about the legal

(9)  requirements to enter the curtilage to somebody's

(10) property?

(11)              **MS. JONES:  Objection.**

(12)      **A    That is laid out by the DCJS and provided**

(13) **by Monroe Community College in a course entitled**

(14) **"Fourth Amendment Search and Seizure."**

(15)      Q    How long is that course?

(16)      **A    I don't recall the specific hours off the**

(17) **top of my head.**

(18)      Q    Is it a one-hour course?

(19)              **MS. JONES·  Objection.**

(20)      **A    No, it is a longer course.**

(21)      Q    Is it a two-hour course?

(22)              **MS. JONES:  Objection.**

(23)      **A    Generally courses will range from, at**

(24) **minimum, four hours to, for most topics, 40 hours.**

(25) **So I can't recall specifically where this particular**

Lieutenant Michael Cuilla

(1)

(2) course follows in that spectrum.  I will say that

(3) these issues are touched upon throughout the

(4) training, whether that's a training on arrest

(5) procedures or training on evidentiary rules or how

(6) to gather evidence.  These topics are built upon and

(7) layered upon one another.  So for the most part,

(8) training generally is done in a fashion where many

(9) topics are covered within one specific training that

(10) may touch on many of these topics again and again

(11) and again, and it may not be labeled as such.  It

(12) would be difficult, again, without searching through

(13) each of the training documents word by word to find

(14) all of the times that these things may be mentioned.

(15)     Q     After recruits graduate from the academy,

(16) once they become members of the RPD, what does the

(17) RPD do to ensure that they understand the definition

(18) of curtilage?

(19)          MS. JONES:  Objection.

(20)     A     In the course of general operations, the

(21) Rochester Police Department will monitor their

(22) officers through the use of supervisors.  Those

(23) supervisors are called upon to monitor their

(24) officers' activity, as well as the reports they

(25) generate and then they are to verbally counsel them

[Page 65]
August 22, 2023

(1)                    Lieutenant Michael Cuilla

(2)    when required as well as document deficiencies and

(3)    remediate deficiencies.  Those officers also are

(4)    subject to an annual -- allow me to correct that.

(5)    They are first subject to monthly probationary

(6)    evaluations and then to annual evaluations -- I

(7)    apologize.  Let me correct that as well.  Prior to

(8)    that, they are subject to field training.  In field

(9)    training, they are subject to daily evaluations by

(10)   the field training officer.  Each of those daily

(11)   observation reports are generated and may or may not

(12)   mention the specific topic that you are referring

(13)   to.  That is a 16-week, which is now a 10- to

(14)   16-week program that officers go through upon

(15)   graduation from the academy where all topics

(16)   regarding being a police officer including the

(17)   definition of Fourth Amendment and curtilage are

(18)   covered and may or may not be documented in any of

(19)   the DORs created by every officer that has been

(20)   hired by the Rochester Police Department since 2013.

(21)        Q    But you haven't reviewed any documents

(22)   created by the Rochester Police Department since

(23)   2013 that specifically dealt with the training or

(24)   oversight of any specific officers regarding the

(25)   definition of curtilage, true?

(1)                    Lieutenant Michael Cuilla

(2)              **MS. JONES:   Objection.**

(3)        **A     To do that, I would need to look through**

(4)   **every DOR for every officer --**

(5)        Q     Sorry, I have to cut you off.

(6)        **A     It's okay.**

(7)        Q     It's a yes or no question.  The answer is

(8)   no, correct?

(9)        **A     The answer is no.**

(10)       Q     I want to move on to the next topic.  So

(11)  I'm just going to put up Exhibit 1 one more time.

(12)             Okay, Lieutenant, I'm going to move on to

(13)  topics 1-B and C.  So all rules, regulations,

(14)  methods, policies, procedures and practices in

(15)  effect or customarily followed between January 1,

(16)  2013 and present regarding, B, foot pursuits of

(17)  suspects who flee from officers; and C, backtracking

(18)  through the curtilage of residential properties

(19)  after a foot chase has concluded.  Can you tell me

(20)  everything that you did to prepare to testify about

(21)  topics 1-B and 1-C?

(22)       **A     I reviewed training bulletins regarding**

(23)  **New York v. De Bour, as well as training that occurs**

(24)  **in the academy as well as general orders.**

(25)       Q     What general orders did you review?

Lieutenant Michael Cuilla

(1)

(2) **A** **The general order regarding searches as**

(3) **well as general orders regarding arrest.**

(4) Q And so the searches is Exhibit 3 that we

(5) had looked at previously?

(6) **A** **Yes.**

(7) THE WITNESS: Counsel, I apologize,

(8) you don't mind while I take drinks, do

(9) you? I don't need to be...

(10) MR. SHIELDS: Not at all.

(11) THE WITNESS: Thank you.

(12) Q When an officer chases somebody on foot,

(13) that's also known as a hot pursuit, true?

(14) **A** **Yes.**

(15) Q Sometimes a hot pursuit could provide

(16) justification for an officer to chase somebody

(17) through the curtilage to a residential property,

(18) correct?

(19) **A** **Yes.** **Legally, that's under the definition**

(20) **of exigent circumstances, but it has been**

(21) **specifically outlined in the policy.**

(22) Q According to General Order 415, an officer

(23) must have probable cause to believe that a crime is

(24) being committed and then immediate action must be

(25) taken, correct?

(1)                   Lieutenant Michael Cuilla

(2)      **A     Correct.**

(3)      Q    What circumstances may be considered

(4)  exigent such that police can run through the

(5)  curtilage without a warrant or consent?

(6)      **A     As outlined by you, hot pursuit would be**

(7)  **one of those.   There are other exigent**

(8)  **circumstances, some that are put forward in the**

(9)  **general orders, and some that are dictated by**

(10) **New York State case law.**

(11)     Q    I scrolled down on Exhibit 3 to page 30,

(12) which is the exigent circumstances exception.  If we

(13) look at this part where it says "Probable cause must

(14) exist leading one to believe, one, a crime

(15) (misdemeanor or felony) has been or is being

(16) committed; and two, that if immediate action is not

(17) taken, the crime will be completed or you will have

(18) reasonable suspicion that you or others will suffer

(19) physical injury or death or you have reason to

(20) believe the evidence of the crime will be destroyed

(21) or otherwise lost" and then it says "If a minor

(22) offense is occurred and the sole purpose of the

(23) warrantless entry is to make an arrest or serve an

(24) appearance ticket for that offense, the exigent

(25) circumstances exception would not be applicable."

(1)            Lieutenant Michael Cuilla

(2)            I guess when I had asked my prior

(3)    question, what I was trying to reference was number

(4)    two here and ask if there were any other types of

(5)    circumstances other than what's listed in this

(6)    paragraph that would be considered an exigency that

(7)    would justify a warrantless entry?

(8)        A    Yes.

(9)        Q    What else might justify a warrantless

(10)   entry?

(11)       **A    There is an exception for a medical**

(12)   **emergency if there were, for example, a small child**

(13)   **in medical duress, an officer would be allowed to**

(14)   **enter into a premises to save that child's life or**

(15)   **any person's life.  That is not dictated, I believe,**

(16)   **here in this general order, but it is part of**

(17)   **New York State case law.**

(18)       Q    In addition to that exigency outlined in

(19)   the second paragraph, as articulated in paragraph 1,

(20)   you also have to have probable cause to believe that

(21)   a crime is being or has been committed on that

(22)   property, correct?

(23)       **A    Again, this is one of the several**

(24)   **circumstances in which exigency applies that has**

(25)   **been defined here in the general order.  There are**

Lieutenant Michael Cuilla

(1)

(2) other circumstances for exigency that may not be

(3) defined in the general order that are covered under

(4) case law, which we are also under.

(5)      Q    And then down here, it says, "Assume you

(6) cannot use this exception in other than extremely

(7) unusual circumstances," correct?

(8)      A    Yes.

(9)      Q    Is that the practice of the RPD to only

(10) enter the curtilage to a property in extremely

(11) unusual circumstances?

(12)           MS. JONES:  Objection.

(13)      A    In what is characterized as the general

(14) order as extremely unusual, yes.

(15)      Q    One entering a home or curtilage in

(16) pursuit of a fleeing felon, correct?

(17)      A    Yes, an armed fleeing felon.

(18)      Q    You would have to have probable cause to

(19) believe that that fleeing felon is armed, correct?

(20)           MS. JONES:  Objection.

(21)      A    The first paragraph or section seems to be

(22) separate than the second, which is referencing a

(23) second set of circumstances.

(24)      Q    As the City of Rochester here testifying

(25) today, Lieutenant, is it your understanding that you

(1)                    Lieutenant Michael Cuilla

(2)    have to have probable cause to believe that the

(3)    fleeing felon, in fact. is armed in order to enter

(4)    the curtilage to their property during a hot

(5)    pursuit?

(6)          A     Reading the general order right here, and

(7)    this is my understanding, that you would need

(8)    probable cause for a crime, misdemeanor or felony is

(9)    being committed.  You would also need probable cause

(10)   that if the immediate action is not taken -- I will

(11)   not read the full paragraph but it is two, and then

(12)   secondarily and mapped under the probable cause

(13)   section, "Assume you cannot use this exception in

(14)   other than extremely unusual circumstances, for

(15)   example," and then listing some of the extremely

(16)   unusual circumstances, two examples given, one is

(17)   "entering a home in pursuit of an armed fleeing

(18)   felon," doesn't reference probable cause and it's

(19)   not my understanding that you would need probable

(20)   cause if you were in pursuit of an armed fleeing

(21)   felon.  Reasonable suspicion under New York State

(22)   law would suffice.

(23)         Q     I want to put up what we'll mark as

(24)   Exhibit 4, which is a training bulletin entitled

(25)   "Warrantless Entries With or Without Exigent

(1)                Lieutenant Michael Cuilla

(2)     Circumstances," and that number is L-1597 and it

(3)     said it was issued in January 1997.

(4)             So, Lieutenant, my first question is, is

(5)     this a document that you reviewed in preparation for

(6)     today's deposition?

(7)             **MS. JONES:  Sorry, Elliot, can you**

(8)             **zoom in again?**

(9)         **A    I do not recall.**

(10)        Q    My next question is, when there's a

(11)    training bulletin that was issued decades ago, like

(12)    in 1997 as this one appears to have been, does the

(13)    department hold additional trainings or updated

(14)    trainings about these older training bulletins?

(15)        **A    Trainings are updated when the training**

(16)    **bulletin occurs.  The training bulletins are given**

(17)    **out and conducted in roll call trainings.  If you're**

(18)    **asking if this training is referenced in any roll**

(19)    **call trainings or any conversations or verbal**

(20)    **counseling or any of that, I am unaware that that is**

(21)    **the case, but it may be.**

(22)        Q    I guess my question is, like, would the

(23)    RPD hold an updated roll call training on this topic

(24)    and issue, this training bulletin, to its officers?

(25)        **A    When this training bulletin is issued, the**

(1)              **Lieutenant Michael Cuilla**

(2)   **RPD would train the officers in this new**

(3)   **information.**

(4)       Q    When is the last time that this training

(5)   bulletin that we marked as Exhibit 4 was provided to

(6)   its officers?

(7)       A    **This training bulletin is provided to its**

(8)   **officers on a continuous basis on the Rochester**

(9)   **Police Department web.**

(10)      Q    If an officer from the department wanted

(11)  to look at this training bulletin, they would

(12)  affirmatively have to go and search for it on the

(13)  RPD web themselves?

(14)      A    **Their sergeant may direct them to do so --**

(15)  **I apologize.  Any supervisor may direct them to do**

(16)  **so.**

(17)      Q    So when is the last time that the RPD held

(18)  either a roll call training or some other training

(19)  where this specific training bulletin was provided

(20)  to all of the officers who attended the training?

(21)      A    **On a department-wide basis, when was the**

(22)  **last time that this was provided?  The only time**

(23)  **that I would know it would have been provided was**

(24)  **when it was issued and then henceforth, it would be**

(25)  **provided on an individual basis for officers that**

(1)                 Lieutenant Michael Cuilla

(2)     needed it as a reminder for -- through remedial

(3)     training.

(4)         Q    Do you know if Officer Algarin ever got

(5)     this training?

(6)         A    This particular bulletin would be covered

(7)     in the academy training that he receives on the

(8)     Fourth Amendment search and seizure laws.  All

(9)     relevant case law is covered.  Now, when I say that,

(10)    I don't mean that they go through every relevant

(11)    case law that has ever existed, but they do cover

(12)    what is current for Fourth Amendment search and

(13)    seizure.  And if it were updated, it would come out

(14)    in a training bulletin that would be disseminated to

(15)    the department.

(16)             MR. SHIELDS:  I'm going to move to

(17)             strike that portion of the answer as

(18)             nonresponsive to my question.

(19)        Q    So just answer -- just listen to my

(20)    specific question --

(21)        A    Yes, sir.

(22)        Q    -- because it'll help us get out of here

(23)    more quickly.

(24)             So the specific question was, when was the

(25)    last time that this training bulletin, if ever, was

(1)                Lieutenant Michael Cuilla

(2)  provided to Officer Javier Algarin?

(3)            MS. JONES:  Objection, asked and

(4)        answered.

(5)      A    It was provided to him on a near constant

(6)  basis on the RPD web, which he has full access to.

(7)      Q    So there was never any specific training

(8)  where Officer Javier Algarin was provided this

(9)  specific document by one of his supervisors where

(10) this document was sat down and discussed with Javier

(11) Algarin about warrantless entries with or without

(12) exigent circumstances, this document; is that true?

(13)           MS. JONES:  Objection.

(14)     A    No training that I'm aware of.

(15)     Q    Did Officer Adam Gorman ever get this

(16) specific training bulletin as part of any training

(17) that he attended after he graduated from the academy

(18) with the Rochester Police Department?

(19)     A    Not that I am aware of.

(20)     Q    We discussed earlier that hot pursuit is

(21) one of the reasons an officer may be permitted to

(22) enter the curtilage to a residential property,

(23) correct?

(24)     A    Yes.

(25)     Q    We agreed that hot pursuit falls under the

(1)          Lieutenant Michael Cuilla

(2)   emergency exceptions to the warrant requirement,

(3)   correct?

(4)        **A    Exigency, yes.**

(5)        Q    And the hot pursuit ends after the

(6)   officers catch or apprehend the person that they

(7)   were chasing, true?

(8)              **MS. JONES:  Objection.**

(9)        **A    Hot pursuit ends once the person is**

(10)  **caught, yes.**

(11)       Q    After the person is caught, the hot

(12)  pursuit is concluded, true?

(13)       **A    Yes.  The hot pursuit can also be ended if**

(14)  **the person is lost.  It doesn't go on forever if we**

(15)  **lose sight of him.**

(16)       Q    After the hot pursuit is concluded,

(17)  there's no longer exigent circumstances that would

(18)  permit entry into the curtilage of a residential

(19)  property that the police chase somebody across,

(20)  correct?

(21)              **MS. JONES:  Objection.**

(22)       **A    No.**

(23)       Q    Why would exigent circumstances still

(24)  apply after the hot pursuit has concluded?

(25)       **A    If the suspect were to discard something**

Lieutenant Michael Cuilla

(1)

(2) that could be deemed a danger to the public, the

(3) officers would have a duty to retrieve it prior to

(4) it causing harm to a member of the public and that

(5) would create an exigency.

(6)     Q    So if the suspect did not discard

(7) anything, there would not be an exigency to enter

(8) the curtilage to that property, correct?

(9)         MS. JONES:  Objection.

(10)    A    If the officer can articulate and

(11) reasonably suspect that the suspect may have

(12) discarded something that was a danger to the public,

(13) then there would be exigency until the officer was

(14) certain that that particular danger was not

(15) discarded.

(16)    Q    If the officer did not see the suspect

(17) discard anything on that property, then the officer

(18) would not have a reasonable basis to articulate any

(19) specific facts that would support probable cause to

(20) believe that something was discarded on that

(21) property, correct?

(22)    A    No.

(23)    Q    What's the police department's policy

(24) about being able to backtrack through residential

(25) properties that a felon, a fleeing person was chased

(1)                    Lieutenant Michael Cuilla

(2)    through?

(3)         A    If an officer can articulate that there is

(4)    reason to believe that the suspect may have

(5)    discarded something that is a danger to the public,

(6)    then the officer has a duty to retrieve that weapon,

(7)    specifically referring to a gun.  Your question

(8)    previously was would he have had to have -- I'm

(9)    sorry -- he or she have had to have seen a gun be

(10)   discarded, if the officers caught up with the

(11)   individual -- and I'm only giving an example here

(12)   for clarification purposes -- an individual had an

(13)   empty holster, that would be a reasonable suspicion

(14)   that that person may have been carrying a firearm

(15)   during the chase, then the officer would have a duty

(16)   to check to make sure that that firearm was not left

(17)   on someone's property.

(18)        Q    Let's take your example and say the

(19)   officer caught up with the person.  The officer did

(20)   not see anything discarded and the person did not

(21)   have a holster on their body.  Under those

(22)   circumstances, would an officer have a reason to

(23)   backtrack through a fenced-in curtilage to someone's

(24)   property to check for any hypothetically potentially

(25)   discarded weapon?

(1)                    Lieutenant Michael Cuilla

(2)              MS. JONES:  Objection.

(3)         A    So there's a lot of other circumstances

(4)    that I would need to know to answer that question

(5)    correctly.  In addition would be the officer's

(6)    knowledge of the individual, the individual's

(7)    history of carrying weapons, what the individual was

(8)    doing prior to having fled.  If the call was for

(9)    shots being fired and this person matched the

(10)   description and is found with no gun, oftentimes,

(11)   suspects do not have holsters in the city of

(12)   Rochester.  They keep their firearms in their

(13)   pockets of their pants.  So that would be another

(14)   articulable reason.  The number of articulable

(15)   reasons is substantial as to why an officer may

(16)   believe reasonably that a person was armed with a

(17)   firearm and may have left it in the backyard.  In

(18)   addition, a knife or other dangerous instrument,

(19)   syringes are all things that create a danger to the

(20)   public.  If the officer believes that this person

(21)   has discarded something that could be dangerous to

(22)   the public, they have a duty to retrieve it as

(23)   opposed to it being retrieved by, let's say, a small

(24)   child or an unsuspecting homeowner.

(25)        Q    Let's say the hot pursuit concluded, the

(1)                 Lieutenant Michael Cuilla

(2)    officers did not see any guns or other contraband

(3)    potentially discarded.  The person stops -- was

(4)    being chased because they were suspected of selling

(5)    marijuana and they don't have anything on their

(6)    person after they're stopped.  Does the officer,

(7)    first, before entering the curtilage to the

(8)    property, have a duty to seek the consent of the

(9)    homeowner before entering their property?

(10)              **MS. JONES:  Objection.**

(11)       **A     Again, not knowing the knowledge of the**

(12)    **officer, the knowledge of the suspect, what I can**

(13)    **say is that the officer would have exigent belief**

(14)    **that a dangerous instrument, syringe, knife, gun**

(15)    **were left, were discarded during the chase, the**

(16)    **officer would have a duty to obtain that property**

(17)    **and would have the right to do so under exigency.**

(18)       Q    If the officer can see over the fence and

(19)    can't see anything on the ground, right, and the

(20)    officer has time to walk to the front door of the

(21)    person's property, knock on the front door and ask

(22)    their consent to enter their property, under those

(23)    circumstances, there would not be an immediate need

(24)    to enter the property prior to seeking their

(25)    consent, true?

Lieutenant Michael Cuilla

(1)

(2)        MS. JONES:  Objection.

(3)        A    Again, I agree again there may be some

(4)  factors that would allow the officer to enter the

(5)  property without consent and certainly legally under

(6)  exigency.  I don't know enough about the property to

(7)  say if the officer left it for long enough, that

(8)  someone couldn't get to the discarded contraband in

(9)  that time.  I do not know about who is or is not

(10) outside, the time of day, whether or not this a cut

(11) that people use that perhaps don't utilize the

(12) property, you know, along a path, you know, maybe

(13) children jump the fence pretty often.  I don't know

(14) enough about the neighborhood to say that this is a

(15) well traveled area or a backyard that people have a

(16) lot of access to or if there's some difficultly in

(17) getting to the front of the home that the officer

(18) would be better served by immediately trying to

(19) locate the contraband prior to it being picked up by

(20) an uninvolved third party.

(21)        Q    If the officer has the time and the

(22) opportunity to seek the homeowner's consent prior to

(23) entering their property, they're required to first

(24) ask the homeowner for consent to enter their

(25) property, true?

(1)                    Lieutenant Michael Cuilla

(2)           MS. JONES:  Objection.

(3)      A    If the officer believes that there is no

(4) immediate danger, then they would need consent or an

(5) exigent circumstance to enter that property.

(6)      Q    When you say if the officer believes,

(7) that's not the correct standard, right?  The correct

(8) standard is under the totality of the circumstances

(9) if the officer has objective facts to believe?

(10)      A    If they reasonably --

(11)           MS. JONES:  Objection.

(12)      Q    It's objective standard, not a subjective

(13) standard, correct?

(14)           MS. JONES:  Objection.

(15)      A    They reasonably suspect, it's what a

(16) reasonable officer would do.

(17)      Q    Considering the totality of the

(18) circumstances, correct?

(19)      A    Yes, correct.

(20)      Q    If there is no emergency and the officers

(21) don't have consent, then the warrantless entry is

(22) not allowed, correct?

(23)           MS. JONES:  Objection.

(24)      A    Without exigent circumstances, consent or

(25) a warrant, there are very few other search

(1)           **Lieutenant Michael Cuilla**

(2)   **exceptions and certainly none that I think can apply**

(3)   **here.**

(4)        Q    Even if there's probable cause to believe

(5)   that there's incriminating evidence on the property,

(6)   if there is not an emergency and there is not

(7)   consent, without a warrant, they're not allowed to

(8)   enter onto the property, true?

(9)              MS. JONES:   Objection.

(10)       **A    Again, as I previously stated, it depends**

(11)   **on the nature of the evidence and whether or not**

(12)   **that poses a danger to the public or the homeowner.**

(13)       Q    And so that would be the officer's

(14)   reasonable belief based on the totality of the

(15)   circumstances that there's potentially some sort of

(16)   evidence that may have been discarded on the

(17)   property, correct?

(18)       **A    It would not suffice for it to be**

(19)   **evidence.   It would need to be dangerous for the**

(20)   **public for them to have the exigency exception.**

(21)       Q    Any time that a police officer can

(22)   articulate facts that they believe a gun may have

(23)   been discarded on a property during a hot pursuit,

(24)   is it the RPD's policy that they have exigent

(25)   circumstances to immediately enter the property

(1)                    Lieutenant Michael Cuilla

(2)    prior to seeking the homeowner's consent to search

(3)    for any potentially discarded gun?

(4)         A    It is our policy and practice to

(5)    immediately secure any firearms that have been

(6)    discarded during a pursuit or during a struggle or

(7)    simply discarded by a suspect.

(8)              MR. SHIELDS:   That's not my question.

(9)         I'm going to move to strike that as

(10)        non-responsive.

(11)        Q    My question is, you don't know that

(12)   there's a gun that was discarded, okay?  We're going

(13)   to start with that premise.  Any time that an RPD

(14)   officer engages in a hot pursuit, traverses across a

(15)   property, then detains a suspect, doesn't see a gun

(16)   was discarded, but can say that they think there

(17)   might have been a gun that was discarded on a

(18)   property, is it the RPD's policy -- without having

(19)   any articulable facts supporting a reasonable

(20)   suspicion that a gun, in fact, was discarded other

(21)   than the fact that there was a hot pursuit across

(22)   the property, is it the RPD's policy that under

(23)   those circumstances, the exigent circumstances

(24)   exception applies and they're allowed to backtrack

(25)   through the property to search for any potentially

[Page 85]
August 22, 2023

(1)                Lieutenant Michael Cuilla

(2)   discarded gun?

(3)                   MS. JONES:   Objection.

(4)        A    They would need to have at least some

(5)   reasonable suspicion based on articulable facts.

(6)        Q    In order to have reasonable suspicion

(7)   based on articulable facts, there have to be more

(8)   than simply the fact that there was a hot pursuit

(9)   that the person ran from them when they attempted to

(10)  apprehend them, true?

(11)       A    That is true.

(12)                  MS. REPORTER:   Elliot, when it's a

(13)  good time to take a quick bathroom break,

(14)  please.

(15)                  MR. SHIELDS:   Sure.  Do you want to

(16)  take -- now is a good time.

(17)                  MS. REPORTER:   Great, thank you.

(18)                  MR. SHIELDS:   Sure.

(19)                  THE VIDEOGRAPHER:   Off the record,

(20)  Counsel?

(21)                  MR. SHIELDS:   Yes.

(22)                  THE VIDEOGRAPHER:   Going off the

(23)  record.  The time is 10:56 a.m.  Please

(24)  standby while I stop recording.

(25)                  (A brief recess was taken from

[Page 86]
August 22, 2023

(1)            Lieutenant Michael Cuilla

(2)        10:54 a.m. to 11:05 a.m.)

(3)            THE VIDEOGRAPHER:  The time is now

(4)     11:07 a.m.  We are back on the record.

(5)     Q    Lieutenant -- it's lieutenant, right?

(6)     A    Yes.

(7)     Q    We just had an opportunity to take a break

(8)    for about 10 minutes.  During that break, did you

(9)    have an opportunity to speak with your attorney?

(10)    A    Yes.

(11)    Q    Did you speak about your testimony?

(12)    A    Somewhat, yes.

(13)    Q    Tell me everything you spoke about.

(14)            MS. JONES:  Sorry, I'm directing him

(15)    not to answer that.

(16)            MR. SHIELDS:  What's the basis of you

(17)    directing him not to answer that?

(18)            MS. JONES:  That was covered by

(19)    attorney/client privilege.

(20)            MR. SHIELDS:  And our position is

(21)    that you're not permitted to speak with

(22)    your deponent in the middle of the

(23)    deposition about the subject of his

(24)    testimony and that by doing so, you waived

(25)    the attorney/client privilege and anything

Lieutenant Michael Cuilla

(1)

(2)     you discuss is not protected.  I'm not

(3)     going to waste our time calling the court

(4)     right now about that so we'll preserve

(5)     that objection to bring up in the future.

(6)        Q     Let me ask you this, Lieutenant, after

(7)     having the opportunity to speak with your attorney,

(8)     are there any questions that you gave answers to

(9)     that you'd either like to clarify or change your

(10)    answer to?

(11)       A     I'd like to clarify that the training

(12)    that's given on these particular topics -- I know

(13)    I've listed that we do several inservice trainings.

(14)    To be more specific, we currently do two full-day

(15)    in-services and four two-hour off the road

(16)    in-services as well as 12 roll call trainings.  And

(17)    any training given that touches on arrests or

(18)    searches would touch on the topics that you listed.

(19)    So it is most likely that this training is given two

(20)    to three times per year to be more specific about

(21)    these particular topics.

(22)       Q     Did you review any of those trainings in

(23)    preparation for your testimony today?

(24)       A     No.

(25)       Q     Did you review any materials that might

(1)                 Lieutenant Michael Cuilla

(2)    have been used as those trainings in preparation for

(3)    your testimony today?

(4)          A    No.

(5)                MR. SHIELDS:  Just to the extent that

(6)           they haven't been provided, we call for

(7)           production of any of those materials given

(8)           to officers at any of the trainings that

(9)           Lieutenant Chula just referenced and I'll

(10)          follow up in writing.

(11)         A    I'd like to further clarify that many of

(12)   the requests made for training from the Professional

(13)   Development Section or from lieutenants is conducted

(14)   via e-mail as well.  So a lot of communications

(15)   throughout the department is either done through

(16)   face-to-face contact or e-mail.  A formal request

(17)   via additional training form or interdepartmental

(18)   correspondence is not required in order to get

(19)   assistance for an officer that may need remedial

(20)   training.  They can simply reach out to the section

(21)   commander of the Professional Development Section

(22)   directly and ask for some advice on the types of

(23)   remedial training that might be needed.

(24)                THE VIDEOGRAPHER:  Counsel, this is

(25)           the videographer.  I apologize for the

(1)           Lieutenant Michael Cuilla

(2)     interruption just briefly.

(3)           Lieutenant Cuilla, it looks like when

(4)     you speak, the camera is shaking a lot.

(5)     Maybe someone there is moving the desk,

(6)     but the video recording is very shaky at

(7)     the moment when you speak.

(8)           MS. JONES:  I'm sorry, that's

(9)     probably me.  I'll try to be more still.

(10)          THE VIDEOGRAPHER:  Thank you so much,

(11)    Counsel.  I apologize.

(12)          MS. JONES:  I'll also add that we, as

(13)    the city, are still expecting the

(14)    videographer to add other information

(15)    pursuant to Federal Rules 30 once when we

(16)    come from break in between these segments

(17)    and --

(18)          MR. SHIELDS:  Okay.  We hired the

(19)    videographer, we checked with the

(20)    videographer.  We went over the federal

(21)    rules with the videographer.  The

(22)    videographer is compliant with the federal

(23)    rules, just as he always complies with

(24)    federal rules in his practice for his

(25)    entire career and he's never put on any

[Page 90]
August 22, 2023

(1)           Lieutenant Michael Cuilla

(2)      statements that the City is requesting

(3)      because they're not required by Federal

(4)      Rules Civil Procedure 30 so...

(5)          MS. JONES:  I just wanted to finish

(6)      and say that the City objects to the

(7)      propriety of these video recording since

(8)      you're not going to comply with Federal

(9)      Rules 30.  Thank you.

(10)     Q    Lieutenant, you said that there were, I

(11) believe you said two full-day inservices and then

(12) can you just remind me, you said four other some

(13) sort of training, then 12 some other training?

(14)     A    Four two-hour off the road inservices.  I

(15) say off the road because the officers aren't taken

(16) away from their shift to sit in two hours of

(17) training.  And then the roll call trainings are --

(18) they are monthly roll call training and that's in

(19) addition to any training bulletins that come out or

(20) updates to the general orders that are also

(21) administered in roll calls.

(22)     Q    Are you aware of any training bulletins

(23) that have come out since 2019 that specifically

(24) discussed curtilage to a person's property?

(25)     A    I am not.

(1)             **Lieutenant Michael Cuilla**

(2)        Q    Are you aware of any of these two full-day

(3)   inservice for off the road trainings or 12 roll call

(4)   trainings that have specifically discussed curtilage

(5)   to an individual's property?

(6)        **A    Insofar as the officers know that**

(7)   **curtilage is part of a person's property, property**

(8)   **is discussed.   The word curtilage may or may not be**

(9)   **discussed.**

(10)        Q    As we sit here today, you're not sure if

(11)   the word curtilage or entry onto the curtilage to

(12)   somebody's property is a topic specifically

(13)   discussed in any of those trainings, true?

(14)            **MS. JONES:   Objection.**

(15)        **A    Again, the officers are taught in the**

(16)   **academy that curtilage is part of someone's property**

(17)   **and it may henceforth be referred to as property, as**

(18)   **officers are aware that curtilage is part of the**

(19)   **property.**

(20)        Q    I've taken about 20 depositions between

(21)   these cases and almost every officer has testified

(22)   that they believe, based on their training and

(23)   experience, that there's a difference in the legal

(24)   requirements for entering the curtilage to

(25)   somebody's property versus entering their home

(1)                    Lieutenant Michael Cuilla

(2)    itself.  Those officers are confused about the legal

(3)    requirements if that was their testimony, true?

(4)              MS. JONES:  Objection.

(5)         A    I can't testify as to their state of mind,

(6)    but what you have stated is they are incorrect.

(7)         Q    They would be incorrect about that,

(8)    correct?

(9)              MS. JONES:  Objection.

(10)        Q    After any of the testimony provided by any

(11)   of these officers in these cases about their

(12)   incorrect understanding about the legal requirements

(13)   to enter the curtilage to somebody's property, did

(14)   they receive any additional training after their

(15)   depositions in these civil cases?

(16)        A    As this civil case is ongoing, I am

(17)   unaware of what will occur at the end of this civil

(18)   case once we had debriefed from this, but during the

(19)   civil case, no, we have not discussed each other's

(20)   testimony.

(21)        Q    As far as my question, my question is, if

(22)   an officer were to testify about an incorrect legal

(23)   understanding during a deposition of civil case, the

(24)   Professional Development Section of the RPD would

(25)   not be made aware of that fact that they were

(1)                    Lieutenant Michael Cuilla

(2)    incorrect about their legal understanding?

(3)                    MS. JONES:  Objection.

(4)        A    PDS would need to be notified either by

(5)    the city attorney or at the end of the civil case

(6)    whatever the findings were.  The city attorney could

(7)    then advise the police department and we would then

(8)    remediate any issues that occurred.

(9)        Q    So you'd have to be notified first.  And

(10)   as far as you're aware, you weren't notified after

(11)   any of these depositions, correct?

(12)                   MS. JONES:  Objection.

(13)       A    As this is an ongoing civil case, I'm not

(14)   entirely sure I could be notified but, no, I was not

(15)   notified at this time.  I, the City of Rochester,

(16)   we.

(17)       Q    No one from PDS was notified, correct?

(18)                   MS. JONES:  Objection.

(19)       A    That's correct.

(20)       Q    Does the RPD teach its officers that the

(21)   mere possibility that there's contraband on a

(22)   property that could be removed or destroyed does not

(23)   create an emergency under the exigent circumstances

(24)   exception that would justify entry onto the

(25)   property?

(1)                   Lieutenant Michael Cuilla

(2)        **A    Yes, that is correct.**

(3)        Q    That's what General Order 415 says,

(4)    correct?

(5)        **A    Yes.**

(6)        Q    And if officers have a reasonable

(7)    opportunity to obtain the homeowner's consent prior

(8)    to entering the curtilage to their property, then

(9)    there's no emergency that would justify a

(10)   warrantless entry onto the property, correct?

(11)       **A    That is not correct.**

(12)       Q    How is that not correct?

(13)       **A    Your question was, if the officers had**

(14)   **time to obtain a homeowner's consent, there is no**

(15)   **emergency that would cause them to have exigency to**

(16)   **enter the property?**

(17)       Q    My question was, if officers have a

(18)   reasonable opportunity to obtain the homeowner's

(19)   consent prior to entering the curtilage to their

(20)   property, then there's not an emergency that would

(21)   justify the warrantless entry onto their property

(22)   without the homeowner's consent, true?

(23)       **A    That's correct.**

(24)       Q    If officers don't have a warrant and

(25)   there's no emergency, then they're not permitted to

Lieutenant Michael Cuilla

(1)

(2)  enter the property unless they have consent from the

(3)  homeowner, correct?

(4)      **A     I apologize, Counsel.  You used the word**

(5)  **emergency to refer to exigent circumstances?**

(6)      Q    Well, emergency is part of the exigent

(7)  circumstances -- let me withdraw that.

(8)          Yes, for the purposes of your question.

(9)      **A     Then, yes, barring any exigent**

(10) **circumstances, they would need consent or a warrant**

(11) **or another exception to the search warrant that I'm**

(12) **unaware of at this time.**

(13)     Q    And I just wanted to put back up

(14) Exhibit 3, General Order 415, and ask just a couple

(15) more questions about that.  So if we're looking at

(16) the exigent circumstances exception again, there is

(17) this highlighted portion right here, and it says,

(18) "Simply because the evidence may be lost or

(19) destroyed does not in itself justify a search under

(20) the exigent circumstances."  That's the policy of

(21) the RPD, correct?

(22)     **A    Correct.**

(23)     Q    Let me just take that down for now.  Now,

(24) does the RPD teach its officers that the flight of a

(25) misdemeanor suspect alone does not necessarily

[Page 96]
August 22, 2023

(1)                Lieutenant Michael Cuilla

(2)    justify the warrantless entry into a home or its

(3)    curtilage?

(4)        A    Yes.

(5)        Q    Prior to 2019, did the RPD provide any

(6)    training to its officers about backtracking a

(7)    person's flight path through the curtilage to

(8)    residential property?

(9)        A    **That training would be covered under the**

(10)   **Fourth Amendment training searches and seizures.**

(11)       Q    Is there any specific training about,

(12)   quote, unquote, backtracking?

(13)       A    **I can't recall if that particular word is**

(14)   **used in the training that discusses what is and is**

(15)   **not an illegal search or warrantless search**

(16)   **procedure.**

(17)       Q    Is backtracking a common practice in the

(18)   RPD?

(19)       A    **Yes.**

(20)       Q    And it's RPD's policy and practice to

(21)   backtrack through the curtilage to residential

(22)   properties after a hot pursuit has concluded, true?

(23)                **MS. JONES:   Objection.**

(24)       A    **If they have reasonable suspicion that**

(25)   **something was discarded that could be a danger to**

Lieutenant Michael Cuilla

(1)
(2) the public.
(3)       Q    We had just gone over the definition in --
(4) well, hold on.  Let me put it back up.  So General
(5) Order 415 as we just had looked at, right, it says,
(6) "Simply because the evidence may be lost or
(7) destroyed does not in itself justify a search under
(8) exigent circumstances," right?  So where in the
(9) general orders does it say that officers are
(10) permitted to enter a property if they believe that
(11) there might be something that could endanger the
(12) public?
(13)      A    That's part of New York state case law.
(14) The general orders do not articulate every policy
(15) that the Rochester Police Department is adherent to.
(16) That starts with the U.S. Constitution as
(17) interpreted by the U.S. Supreme Court, New York
(18) State Constitution as interpreted by the New York
(19) State Court as well as all relevant New York State
(20) laws.  Those are all, for the most part, not
(21) articulated in the general orders.
(22)      Q    What specific case law permits an officer
(23) to enter the curtilage to somebody's property if
(24) officers believe that there might be a dangerous
(25) object that was discarded on the property?

(1)            Lieutenant Michael Cuilla

(2)      A    I would probably have to look that up.

(3)      Q    Is that something that's taught at the

(4) academy, specific case law?

(5)      A    For the most part, we don't teach the

(6) officers the names of all specific case laws.  There

(7) are a few that stick out, but for the most part, we

(8) just teach what the case laws dictate to the police

(9) department.

(10)      Q    Are officers specifically told that if

(11) they believe some dangerous object was discarded

(12) onto a residential property during a hot pursuit

(13) that they're required to backtrack to collect that

(14) potentially dangerous thing that was discard?

(15)      A    Officers are specifically trained to

(16) retrieve any dangerous objects that might fall into

(17) the hands of the unsuspected public whether that's

(18) during a hot pursuit or during an altercation or

(19) simply discarded by a suspect while standing on a

(20) street corner.  The officers are trained not to just

(21) leave a gun or knife or syringes there on the street

(22) corner for anyone to find.

(23)      Q    We're talking about a backyard and the

(24) officers do not, in fact, know that there was a gun

(25) or syringe or a knife that was discarded and they

(1)            Lieutenant Michael Cuilla

(2)    have the time and opportunity to obtain a warrant

(3)    before entering the property.  Are they required to

(4)    obtain a warrant before entering the property?

(5)        A    But first, I just want to make sure we're

(6)    clear that they didn't have to, in fact, know that

(7)    something has been discarded.  It is reasonable

(8)    suspicion, not knowledge.  Number two, they're not

(9)    required to obtain a warrant if they have consent;

(10)   they are not required to obtain consent if they have

(11)   exigency.  So as long as an exception of the search

(12)   warrant applies, they can use that exception to the

(13)   search warrant.

(14)       Q    So simply because the evidence may be lost

(15)   or destroyed, right, so simply because somebody

(16)   might come along and find the gun that they have

(17)   reasonable suspicion may have been discarded, that

(18)   alone doesn't provide exigency to enter the yard to

(19)   search for the potentially discarded gun according

(20)   to General Order 415, true?

(21)            MS. JONES:  Objection.

(22)       A    It's not that the gun will be lost.  It

(23)   will harm the public.  So that would be -- it's a

(24)   different exception to the search warrant under RPD

(25)   dictated by New York State case law.

Lieutenant Michael Cuilla

(2)    Q    You're saying that there is this whole

(3) other exception to the search warrant requirement

(4) that isn't articulated specifically in the RPD's

(5) written general orders, true?

(6)    **A    I am saying, yes, that there are**

(7) **exceptions to the search warrant that are not**

(8) **articulated in the RPD general orders, specifically**

(9) **those to public safety as well as medical**

(10) **emergencies by the public, which is also not**

(11) **dictated in the general orders but is part of New**

(12) **York State case law.**

(13)    Q    Officer Horowitz testified that prior to

(14) the Dempsey incident, the RPD hadn't provided any

(15) training about backtracking along the flight path

(16) after the conclusion of a hot pursuit.  Was he

(17) mistaken about that?

(18)         **MS. JONES:   Objection.**

(19)    **A    Backtracking is a term used to indicate**

(20) **searching, so the training is under searching.  What**

(21) **word that Officer Horowitz used, it may or may not**

(22) **be specifically in the training, but a backtrack**

(23) **would be a search and the search training has been**

(24) **articulated previously.**

(25)    Q    So, yes, Officer Horowitz was mistaken is

(1)                    Lieutenant Michael Cuilla

(2)     the City's position because specific training about

(3)     searches was provided; is that your testimony?

(4)              MS. JONES:  Objection.

(5)         A    That is correct, although he was correct

(6)     in the fact that the word backtracking may not have

(7)     been covered in the training specifically as there

(8)     are many, many words used for searches that may not

(9)     be covered in the training.

(10)        Q    Officer Algarin testified that every time

(11)    a suspect is chased through a fenced-in backyard to

(12)    a residential property, officers backtrack through

(13)    the property to check for potentially discarded

(14)    contraband or weapons.  Is that consistent with RPD

(15)    policy?

(16)        A    There would have to be articulable reason

(17)    to conduct that backtracking or search.

(18)        Q    My question is specifically was --

(19)    assuming that that is what Officer Algarin testified

(20)    to, his testimony would not be consistent with RPD

(21)    policy, true?

(22)             MS. JONES:  Objection.

(23)        A    It might be difficult for Officer Algarin

(24)    to split that particular hair.  Maybe having other

(25)    circumstances in his mind as to officer's knowledge,

Lieutenant Michael Cuilla

(1)

(2) what caused the flight, the area that it's in, that

(3) would count for a reasonable suspicion.  I can't

(4) testify to his exact knowledge when it comes to what

(5) he was referring to.  So I would like not to say

(6) that he's incorrect.  He could be correct under

(7) particular circumstances.

(8)     Q    It would be a violation of the RPD's

(9) policy to backtrack through the property to check

(10) for potentially discarded contrabands or weapons

(11) unless an officer can articulate reasonable

(12) suspicion to believe that a potentially dangerous

(13) weapon or something that could endanger the public

(14) was discarded by the person, correct?

(15)     A    That is correct.

(16)     Q    It would be a violation of RPD policy to

(17) not make that determination and instead to simply

(18) backtrack every time that a suspect is chased

(19) through the fenced-in backyard to residential

(20) property, correct?

(21)          MS. JONES:  Objection.

(22)     A    That is correct.

(23)     Q    And Officer Algarin was never disciplined

(24) as a result of entering Mr. Dempsey's backyard to

(25) backtrack, correct?

Lieutenant Michael Cuilla

(1)

(2)     **A     That's correct.**

(3)     Q     And Officer Algarin was never required to

(4) undergo any retraining on backtracking after this

(5) incident, correct?

(6)     **A     That is correct.**

(7)     Q     And Officer Algarin's backtracking through

(8) Mr. Dempsey's backyard at 53 Kosciusko Street, that

(9) was consistent with RPD practice, true?

(10)     **A     That is correct.**

(11)     Q     And Algarin backtracking through

(12) Mr. Dempsey's backyard at 53 Kosciusko Street, that

(13) was consistent with -- or that was inconsistent with

(14) General Order 415, correct?

(15)     **MS. JONES:  Objection.**

(16)     **A     I do not know that to be true based on the**

(17) **circumstances.  A supervisor on the scene may have**

(18) **-- a supervisor on the scene believed that it was**

(19) **consistent with our policies, training and New York**

(20) **State law.**

(21)     Q     Where did Officer Algarin ever justify the

(22) backtrack by articulating a reasonable suspicion

(23) that the suspect had discarded something on the

(24) property that created an exigency?

(25)     **A     I would have to refresh my recollection of**

Lieutenant Michael Culla

(1)

(2) his report, as well as I do not know what he did or

(3) did not articulate to a supervisor or any court

(4) testimony after that.

(5)     Q     Did you review any of those documents

(6) prior to coming here to testify today?

(7)     A     Yes.  In addition to the nearly five hours

(8) of meeting with counsel, I reviewed all of the

(9) documents over the course of many, many, many, many

(10) hours.  That's my need for caffeine today.

(11)     Q     As we sit here today, you don't remember

(12) exactly what his justification was, but you remember

(13) that Sergeant Rudolph, his supervisor, determined

(14) that his actions were consistent with RPD policy?

(15)     A     Yes.

(16)     Q     I want to move on to the next topic on the

(17) 30(b)(6) Notice.  I'm just going to put that up so

(18) we can review it together.  So we're at 1-D.  So

(19) "All rules regulations, methods, policies,

(20) procedures and practices in effect or customarily

(21) followed between January 1, 2013 and present

(22) regarding:  The training, supervision and discipline

(23) of officers who enter residential properties

(24) unlawfully."  So we've covered this a little bit

(25) already, but some additional questions.  Other than

[Page 105]
August 22, 2023

(1)              Lieutenant Michael Cuilla

(2)    what we've discussed already, what training do

(3)    officers receive to ensure that they don't

(4)    unlawfully enter the curtilage to a residential

(5)    property?

(6)         A    So as I previously stated, all the types

(7)    of trainings that officers receive that are

(8)    multi-faceted, these are very broad topics that

(9)    we're referring to that touch upon these particular

(10)   trainings.  Any training that's going to be related

(11)   to the Fourth Amendment searches is going to touch

(12)   upon these topics.  The officers make the link to

(13)   curtilage and property after they've had that

(14)   defined for them in the academy.  So whether or not

(15)   we reiterate the definition of what is or is not

(16)   property, we do touch upon the training regarding

(17)   searches and unlawful searches and gathering of

(18)   evidence.  One of the many sources of this

(19)   information would be the court system, you know, as

(20)   officers continuously gather evidence and use those

(21)   evidences in court cases.  Judges make

(22)   determinations, those determinations are then

(23)   reported back to the Rochester Police Department and

(24)   that too informs our training as to what the

(25)   officers need.  So if, for example, we started

(1)                    Lieutenant Michael Cuilla

(2)   seeing a rash of evidence being kicked back or

(3)   suppressed in court, then that would be dictated

(4)   from the district attorney's office to Rochester

(5)   Police Department.   Then Rochester Police Department

(6)   would then remediate in training.

(7)        Q     Like an across-the-board training?

(8)        A     That is correct, if it appeared to be an

(9)   across-the-board problem.

(10)       Q     Other than getting that information from

(11)   the district attorney's office, what does the RPD do

(12)   to look at issues like unlawful entry onto the

(13)   curtilage of people's properties to determine an

(14)   across-the-board retraining is necessary?

(15)                  MS. JONES:   Objection.

(16)       A     So in addition to -- so how we determine

(17)   training would be the documentation, if we get

(18)   additional training reports all indicating the same

(19)   issue, a bunch of interdepartmental correspondences

(20)   all indicating the same issue.   We get reports from

(21)   the sections via e-mail or simple phone calls

(22)   regarding training that they had to give the

(23)   officers or requesting some advice about particular

(24)   trainings.   If it seems as it's getting to be a

(25)   larger issue, then we would do a departmental

(1)                 Lieutenant Michael Cuilla

(2)     training.

(3)         Q    So basically, it would need to be

(4)     documented and put up the chain?

(5)         MS. JONES:  Objection.

(6)         A    There are times where it's not documented

(7)     or put up the chain.  For example, we just did a

(8)     training on crime scene management that was kicked

(9)     out to the entire department.  That was at the

(10)    request of one section, which is the Major Crimes

(11)    Unit, that saw that there was an issue

(12)    department-wide.  I do not know that they documented

(13)    that.  What they did was they reached out to the

(14)    Professional Development Section and said, "We

(15)    recognize that there's a problem, can you please

(16)    kick this training out," and we did.  We, as the

(17)    City of Rochester, not as the Professional

(18)    Development Section as I do represent the City.

(19)        Q    So if, for example, supervisors in one

(20)    section saw an ongoing problem, realized that their

(21)    officers were repeatedly entering the curtilage to a

(22)    property unlawfully, they could reach out to the

(23)    Professional Development Section and request a

(24)    department-wide training on that issue?

(25)        A    Yes.

Lieutenant Michael Cuilla

Q    Has that ever been done specifically with regard to the unlawful entry on the curtilage to residential property?

A    Not that I'm aware of.

Q    Has that ever been done with respect to the legal requirements for backtracking to collect evidence?

A    The difficulty is that it has been done in cases of De Bour or, you know, what is reasonable suspicion, what is probable cause and that may touch upon backtracking and searches and the Fourth Amendment.  But for that specific purpose, not that I can recall.

Q    What were the trainings that you just referenced with respect to De Bour?

A    We've done several roll call trainings as updates and just refreshers as to what De Bour is.

Q    What the legal requirements would be to engage in a foot chase in the first place if somebody were to run away from an officer, for example?

MS. JONES:  Objection.

A    That is correct.  De Bour articulates when we can or cannot chase a suspect.

Lieutenant Michael Cuilla

(1)

(2)    Q    What you were discussing previously, how

(3)  that would intersect with the requirements and the

(4)  training that might be covered to enter the

(5)  curtilage to residential property, if you chase

(6)  somebody, that would begin with an assessment under

(7)  De Bour whether or not you had the legal

(8)  requirements met to engage in a foot chase in the

(9)  first place?

(10)    A    **That is correct.**

(11)    Q    Taking a step back, for example, with

(12)  General Order 415, how does the RPD develop these

(13)  general orders, where they come from?

(14)    **A    We have a research and evaluation section.**

(15)  **That section is in contact with the city law**

(16)  **department.  They are in contact with the county**

(17)  **ADA.  They are in contact with the New York State**

(18)  **DCJS.  They are in contact with law enforcement**

(19)  **agencies in our area and outside of our area and**

(20)  **develop these general orders reviewed by the**

(21)  **relevant parties and then they are disseminated to**

(22)  **the department.**

(23)    Q    Do you know -- give me one second.  Do you

(24)  know if the RPD or the City subscribes to any policy

(25)  risk management services such as Lexipol?

Lieutenant Michael Cuilla

(1)

(2)     MS. JONES:  Elliot, I don't see --

(3)  which topics are you asking questions

(4)  under?  I don't think there's an order --

(5)     MR. SHIELDS:  The general training

(6)  and policies about everything there since

(7)  2013 to present.

(8)     MS. JONES:  Counsel, we interpreted

(9)  this topic as what policies we had

(10)  enforced, not how we created policies

(11)  generally.  I think this is little off

(12)  topic.

(13)     MR. SHIELDS:  Well, General Order 415

(14)  that we're looking at was created

(15)  January 20, 2018.  So, you know, where did

(16)  this come from and its contents, I think

(17)  are certainly relevant to the testimony

(18)  today.

(19)     MS. JONES:  No.  It says -- no.

(20)     MR. SHIELDS:  All regulations,

(21)  methods, policies, a general order is a

(22)  policy, procedures and practices in effect

(23)  or customarily followed.

(24)     MS. JONES:  I disagree with that.

(25)     MR. SHIELDS:  Put the objection on

(1)          Lieutenant Michael Cuilla

(2)    the record and let him answer if he knows

(3)    the answer.

(4)          MS. JONES:  No.  It's not that

(5)    (inaudible) --

(6)          MR. SHIELDS:  You're wasting

(7)    everyone's time by making speaking

(8)    objections on the record.  I'm going to

(9)    ask you to stop and just state your

(10)   objection and let him answer whether or

(11)   not he knows.

(12)         MS. JONES:  So, I'm directing him not

(13)   to answer because this is outside of the

(14)   scope of this deposition and the judge --

(15)         MR. SHIELDS:  It is not outside of

(16)   the scope of the deposition, Counsel.

(17)         MS. JONES:  (Inaudible.)

(18)         MS. REPORTER:  Ms. Jones, you're

(19)   cutting in an out.

(20)         MS. JONES:  I'm sorry.  Since you did

(21)   not notify the City that you wanted to

(22)   speak about the creation of these

(23)   policies, I'm directing him not to answer,

(24)   but we're happy to speak to the substance

(25)   of what our policies are in addition to

(1)          Lieutenant Michael Cuilla

(2)    our methods.

(3)          MR. SHIELDS:  I don't see how you can

(4)    reasonably say that this isn't covered

(5)    under the matters of the deposition, but

(6)    you know what, I can tell that you're just

(7)    trying to waste my time so I'm going to

(8)    move on for now and we can raise this in a

(9)    motion later.

(10)         MS. JONES:  Just for the record,

(11)   we're not trying to waste your time.

(12)   We're trying to follow the judge's

(13)   recommendations and guidance on --

(14)         MR. SHIELDS:  You're objecting to

(15)   something that's specifically articulated

(16)   in number one to testify about "all rules,

(17)   regulations, methods, policies, procedures

(18)   and practices in effect or customarily

(19)   followed between January 1, 2013 and

(20)   present."  Where did this policy come from

(21)   that we've been talking about for two

(22)   hours, I think is 100 percent relevant to

(23)   his testimony today.

(24)         MS. JONES:  I understand that and we

(25)   just disagree.

**Lieutenant Michael Cuilla**

(1)

(2)     Q     Lieutenant Cuilla, you testified that

(3) these policies will be drafted by the research and

(4) evaluation section, correct?

(5)          **MS. JONES:  Elliot --**

(6)     Q     You can't -- first of all, you can't look

(7) at your attorney and wait for her to say something

(8) before you answer.  You got to let her jump in and

(9) object and you can't wait for -- looking to her for

(10) some kind of clue about whether you should answer my

(11) question, okay?  So let's just get that clear for

(12) the deposition, all right?

(13)          **MS. JONES:  Elliot, it's important**

(14)          **for the stenographer that people aren't**

(15)          **talking at the same time and so I think**

(16)          **when he sees I'm about to speak, he gives**

(17)          **me pause so I can jump in.  I think that's**

(18)          **perfectly fine.  So I'm objecting to this**

(19)          **additional line of questioning because the**

(20)          **creation and background and reasons that**

(21)          **we're creating this policy was not noticed**

(22)          **in the 30(b)(6).  So can we please move**

(23)          **forward?**

(24)          **MR. SHIELDS:  No.**

(25)     Q     Who approved the training that you just

Lieutenant Michael Cuilla

(1)

(2) testified?  After it's developed by the research and

(3) evaluation sectic.., does that training, before it's

(4) implemented into a general order, have to be

(5) approved by, for example, the chief of police?

(6)      **A    It's signed off on by the chief of police**

(7) **or their designee.**

(8)      Q    How about training bulletins, does the

(9) chief of police also sign off on training bulletins?

(10)      **A    Or they designate.**

(11)      Q    My question about that is -- and I'm not

(12) trying to trick you, so I'm going to put up the

(13) training bulletin that we marked as Exhibit 4, is

(14) just on that training bulletin.  I don't see there

(15) -- so if we compare Exhibit 4 with Exhibit 3, so I

(16) see what you're saying on Exhibit 3, the chief's

(17) signature.  At the time, it was Michael Ciminelli,

(18) correct?

(19)      **A    Correct.**

(20)      Q    And then if we compare that with

(21) Exhibit 4, I just don't see any signature on that

(22) document.

(23)      **A    The training bulletin as previously, it**

(24) **helps articulate the policy.  It does not in itself**

(25) **become a general order.**

Lieutenant Michael Cuilla

(1)

(2)      Q      Who would develop these training

(3)  bulletins?

(4)           MS. JONES:  Elliot, I'm sorry,

(5)  again I --

(6)           MR. SHIELDS:  We're calling the

(7)  court, we're calling the court.  I'm going

(8)  to go off the record.

(9)           MS. JONES:  You're going to have to

(10)  because if you want him to speak as to how

(11)  --

(12)           MR. SHIELDS:  I'm calling the court.

(13)  This is ridiculous.

(14)           MS. JONES:  You need me --

(15)           MR. SHIELDS:  Stop talking.  And I'm

(16)  going to go off the record and preserve my

(17)  time and we're going to call the court.

(18)           MS. JONES:  Okay, thank you.  Are we

(19)  off the record?  Do we need the

(20)  videographer to say something?

(21)           MR. SHIELDS:  Yes.

(22)           THE VIDEOGRAPHER:  Standby everyone.

(23)  The time is 11:46 a.m.  We are off the

(24)  record.

(25)           (Discussion held off the record.)

Lieutenant Michael Cuilla

(1)

(2)       THE VIDEOGRAPHER:  The time is

(3)  12:40 p.m.  We are now back on the record.

(4)       MR. SHIELDS:  Thank you.  Before we

(5)  get back into questions about the

(6)  testimony, I think Ms. Jones and I will

(7)  just put on quick statement about the

(8)  conference that we had with

(9)  Judge Peterson.  First, Judge Peterson

(10)  informed us that Judge Payson was

(11)  unavailable.  Judge Peterson held a

(12)  conference, which was recorded.  There

(13)  were two issues discussed.  The first

(14)  issue was whether or not Lieutenant Cuilla

(15)  was required to answer questions regarding

(16)  the training bulletin that I had asked him

(17)  about and the developments and how it

(18)  was -- how it came to be into existence,

(19)  who wrote it and where it came from.

(20)  Judge Peterson agreed with Ms. Jones that

(21)  Lieutenant Cuilla did not have to answer

(22)  those questions.

(23)       The second issue that was raised was

(24)  conferences during breaks between

(25)  Ms. Jones and Lieutenant Cuilla and

(1)          Lieutenant Michael Cuilla

(2)   whether -- whether the city attorney was

(3)   permitted to discuss the substance of the

(4)   testimony with the deponent and

(5)   Judge Peterson said that no substance of

(6)   the deponent's testimony could not be

(7)   discussed during any breaks and if we took

(8)   a break and came back, that the

(9)   plaintiff's attorney would be permitted to

(10)  question the deponent regarding the

(11)  substance of those conversations.

(12)       So, Ms. Jones, I'll obviously let

(13)  you --

(14)       MS. JONES:  Yes.  Judge Peterson

(15)  prohibited coaching.  He said it was

(16)  perfectly fine for me to give feedback on

(17)  how he's testifying, right, speak up,

(18)  answer questions directly, examples that

(19)  he offered, but just that I'm not supposed

(20)  to coach the witness in his testimony.  So

(21)  I agreed to not coach.

(22)       MR. SHIELDS:  And just so we're all

(23)  on the same page, Judge Peterson said that

(24)  coaching constituted discussions about the

(25)  substance of the testimony that had been

(1)          Lieutenant Michael Cuilla

(2)     provided already or that would be

(3)     provided, but that, of course, she's

(4)     allowed to instruct the deponent, hey, you

(5)     can speak up a little louder or things of

(6)     that nature that don't have to do with the

(7)     substance of the testimony.

(8)          MS. JONES:  That's not what I wrote

(9)     down about his definition of coaching, but

(10)    we can talk about that later.

(11)         MR. SHIELDS:  The substance -- we

(12)    agree that you can't talk about the

(13)    substance of the testimony.

(14)         MS. JONES:  We don't agree about

(15)    that.  Now, we agree that I'm not allowed

(16)    to sway the content of his testimony, but

(17)    not that I can't talk about the substance.

(18)         MR. SHIELDS:  Okay.  I believe that

(19)    what I heard Judge Peterson say was that

(20)    you're not permitted to talk about the

(21)    substance of the testimony that had been

(22)    given, so that is what my understanding

(23)    was.

(24)         MS. JONES:  Understood.

(25)    Q    So, Lieutenant, we're back on the record.

Lieutenant Michael Cuilla

(1)

(2) We just had a break for a while.  Did you have an

(3) opportunity to speak with your attorney during the

(4) break?

(5)      **A**   **Yes, I had an opportunity, but didn't**

(6) **really speak with the attorney.**

(7)      Q   You didn't discuss the testimony that has

(8) been given so far?

(9)         **MS. JONES:   Objection.**

(10)      **A**   **No, I did not.   Other than the length of**

(11) **time, you know, exhaustion, I ate a snack.**

(12)      Q   Lieutenant, we're still talking about 1-D

(13) now from the Notice of Deposition and so that

(14) included the training supervision and discipline of

(15) officers who enter residential properties

(16) unlawfully.  We discussed training a little bit.

(17) I'm going to move on to supervision.  My question

(18) is, has the department ever found that an officer

(19) unlawfully entered the curtilage to a residential

(20) property?

(21)      **A**   **Ever in the history of the Rochester**

(22) **Police Department?**

(23)      Q   Well, we can limit it to what the Notice

(24) of Deposition said, which is between January 1, 2013

(25) and present.  Has the Rochester Police Department

[Page 120]
August 22, 2023

Lieutenant Michael Cuilla

(1)
(2)     ever found that an officer unlawfully entered the
(3)     curtilage to a residential property?
(4)          A     From the specific name of defendants?
(5)               MS. JONES:  Elliot, I don't -- yeah,
(6)          I think we just disagree on the scope, but
(7)          we're talking about rules, methods,
(8)          policies and procedures in effect about
(9)          the training and discipline of officers.
(10)         Like, that's about the substance of how we
(11)         supervise and discipline, not whether or
(12)         not we've ever found an officer to do
(13)         that, to have unlawfully entered
(14)         residential property.  I think we just
(15)         understand these differently.
(16)         Q     The training, supervision and discipline
(17)    of officers who enter residential properties
(18)    unlawfully, so in your preparation for your
(19)    deposition today, did you ever find an instance
(20)    where the Rochester Police Department has imposed
(21)    discipline on an officer because they entered a
(22)    residential property including the curtilage to a
(23)    residential unlawfully?
(24)              MS. JONES:  I'm going to object to
(25)         that and instruct him not to answer

Lexitas Court Reporting
800-678-0166

(1)          Lieutenant Michael Cuilla

(2)     because this is outside of the scope.

(3)     We're talking about --

(4)          MR. SHIELDS:  I just literally read

(5)     what the Notice of Deposition says.

(6)          MS. JONES:  (Inaudible.)

(7)          MS. REPORTER:  I can't hear,

(8)     Ms. Jones.

(9)          MS. JONES:  You read the subtopics of

(10)    the deposition.  You didn't read the

(11)    title, like, all of these subtopics go

(12)    under the rules, regulations, procedures

(13)    and practices in effect, like, the

(14)    substance of those policies, not whether

(15)    or not we discipline any officer pursuant

(16)    to these topics.

(17)         MR. SHIELDS:  It says, "the training,

(18)    supervision and discipline of officers who

(19)    enter residential properties unlawfully."

(20)    How are you going to talk about any of

(21)    that unless you know if somebody was found

(22)    to have entered a residential property

(23)    unlawfully?

(24)         MS. JONES:  This is part of

(25)    number one.  Each of these subtopics has

Lieutenant Michael Crilla

(1)

(2) to be read in conjunction with what's at

(3) the top, right?  All rules, regulations,

(4) policies, procedures and practices in

(5) effect regarding the training, supervision

(6) and discipline of officers who enter

(7) residential property.  Like, you're asking

(8) about our policies, the substance of those

(9) procedures regarding these things, not if

(10) any officer has been found in violation of

(11) them.

(12)     Q     Lieutenant, what was the procedure that

(13) was followed if and when any officers was ever found

(14) to have unlawfully entered a residential property

(15) unlawfully between January 1, 2013, and present?

(16)          MS. JONES:  Objection.

(17)     A     If an officer was found to have entered an

(18) property unlawfully, that would be documented by

(19) their supervisor, which would then be submitted up

(20) the chain of command.  Depending on the seriousness

(21) of the incident, the chief would make the ultimate

(22) distinction whether or not discipline or training

(23) would be justified.

(24)     Q     Has any officer between January 1, 2013,

(25) and present ever been found to have entered the

(1)              Lieutenant Michael Cuilla

(2)    curtilage to a residential property unlawfully?

(3)              MS. JONES: Objection. I'm directing

(4)    you not to answer. That's outside of the

(5)    scope.

(6)              MR. SHIELDS: Alright, we gotta call

(7)    the court back so let's go back off the

(8)    record.

(9)              MS. JONES: I'm objecting until we

(10)   break. This is ridiculous. Why are you

(11)   continuing to ask questions outside of the

(12)   scope? We talked about --

(13)              MR. SHIELDS: Stop, stop talking and

(14)   wasting our time.

(15)              (Both attorneys speaking at the same

(16)   time and reporter asking for

(17)   clarification.)

(18)              MR. SHIELDS: Let's go off the record

(19)   because we're going to call the court

(20)   back.

(21)              THE VIDEOGRAPHER: Going off the

(22)   record. The time is 12:49 p.m.

(23)              (A brief recess was taken from

(24)   12:49 p.m. to 1:09 p.m.)

(25)              THE VIDEOGRAPHER: The time is now

(1)          Lieutenant Michael Cuilla

(2)     1:09 p.m.  We are back on the record.

(3)          MR. SHIELDS:  Thank you.  We just had

(4)     another conference with Judge Peterson

(5)     about the scope of the Notice Section 1,

(6)     Subsection D.  And in short, after

(7)     discussing that topic with Judge Peterson,

(8)     his ruling was that the plaintiff is

(9)     permitted to ask, in practice, how has

(10)    this been applied.  So in practice, how

(11)    has the training, supervision, discipline

(12)    of officers who enter residential

(13)    properties unlawfully, how has that been

(14)    applied by the Rochester Police

(15)    Department.  Is that an accurate

(16)    recitation, Ms. Jones?

(17)         MS. JONES:  Yes, that's my

(18)    understanding.

(19)    Q    So, Lieutenant, in practice, how has the

(20)    department disciplined officers who enter

(21)    residential properties unlawfully?

(22)    A    Based on the severity of the violation of

(23)    the policy, the sergeant who's supervising the

(24)    officer would have several options, one of which is

(25)    the verbal counseling, going up through additional

Lieutenant Michael Cuilla

(1)

(2)     training through an interdepartmental correspondence

(3)     generated and submitted up the chain to request

(4)     either additional training through Professional

(5)     Development Section or for discipline.

(6)          Q    So the question wasn't hypothetical.  The

(7)     question was, in practice, how has the department

(8)     disciplined officers who enter residential

(9)     properties unlawfully?  Can you tell me how it has

(10)    actually happened?

(11)              MS. JONES:  Objection.

(12)         A    Sergeants have verbally counselled their

(13)    officers.  Sergeants have submitted documentation

(14)    for review up the chain of command or to the

(15)    Professional Development Section for additional

(16)    training.  And ultimately, the chief's office has

(17)    made the designation whether or not discipline was

(18)    required or additional training was required.

(19)              MS. SHIELDS:  So I'm going to move to

(20)              strike the nonresponsive portion of that

(21)              answer.

(22)         Q    And can you say any specific examples of

(23)    an instance where, in practice, the department has

(24)    disciplined an officer who has been found to enter

(25)    residential property unlawfully?

Lieutenant Michael Cuilla

(1)

(2) MS. JONES: Objection. I think this

(3) goes back to the same, I guess, dispute

(4) that we talked about the scope over the

(5) deposition. You're not permitted to ask

(6) us about specific examples unless it's one

(7) of the named defendants, which we're happy

(8) to do so because you have done that with

(9) your history, but he is -- the witness has

(10) testified what happens in practice and

(11) that's what Judge Peterson stated.

(12) MR. SHIELDS: He said that I can ask

(13) him in practice how has the department

(14) disciplined officers who enter residential

(15) properties unlawfully. So I'm asking how

(16) has the department disciplined an officer

(17) who has been found to enter a residential

(18) property unlawfully?

(19) MS. JONES: Yes. He already said

(20) that.

(21) MR. SHIELDS: He didn't -- he didn't

(22) give any specific examples of any

(23) discipline has ever been imposed. He gave

(24) a hypothetical answer. He said, "We

(25) follow our policy," which is exactly what

(1)          Lieutenant Michael Cuilla

(2)     Judge Peterson said you're not supposed to

(3)     do.  You're supposed to talk about the

(4)     practice, which is separate from the

(5)     policy.

(6)          MS. JONES:  I think you're not

(7)     listening to his answers.  So maybe you

(8)     should ask the question again and he can

(9)     answer it again.

(10)         MR. SHIELDS:  I think I listened to

(11)    his answer and I moved to strike the

(12)    answer for being nonresponsive to my

(13)    question.

(14)    Q     So, Lieutenant Cuilla, my question is, in

(15)    practice, how has the department disciplined

(16)    officers who have been found to have entered a

(17)    residential property unlawfully?

(18)    A     So in practice, the department finds, in

(19)    this scenario that you're laying out for me, that an

(20)    officer has entered into a property unlawfully and

(21)    then the supervisor has found or desires for that

(22)    officer to receive some discipline and submits up

(23)    the chain of command an IDC to the chief's office.

(24)    And you're asking how, in practice, the chief's

(25)    office can discipline the officer?

Lieutenant Michael Cuilla

(1)

(2)    Q    I'm asking, in practice, what has

(3)  happened?

(4)    A    **As far as discipline regarding this exact**

(5)  **topic?**

(6)    Q    So for example -- let's just back it up.

(7)  In practice, has a supervisor ever written an IDC

(8)  and submitted up to the chain of command because he

(9)  found that an officer entered a residential -- the

(10) curtilage to a residential property unlawfully?

(11)           MS. JONES:  I think that's a

(12)           different question than how the City, in

(13)           practice, does its discipline.

(14)    A    Counsel, if you're asking the specific --

(15)  about the time a specific person was disciplined and

(16)  what their discipline was --

(17)           MS. JONES:  Then we're objecting to

(18)           that.

(19)    A    -- it's obviously a different question.

(20)  If you would like to know how, in practice, if

(21)  someone were to do this, what could happen and what

(22)  would happen in practice as opposed to what would

(23)  happen strictly within the policy, I'm happy to

(24)  testify.

(25)           MR. SHIELDS:  Look, I'm calling for

Lieutenant Michael Cuilla

(1)
(2) production of all interdepartmental

(3) communications regarding any instance

(4) where an individual was found to have

(5) unlawfully entered the curtilage to a

(6) residential property.

(7)     MS. JONES:  Please follow up in

(8) writing.  And for the record, I don't

(9) understand how that request connects to

(10) this line of questioning.

(11)     MR. SHIELDS:  That's great.  I don't

(12) care what you understand or not.  You're

(13) directing your witness not to answer

(14) specific questions about specific

(15) instances where somebody was found to have

(16) been disciplined for entering a

(17) residential property unlawfully, in

(18) practice.  So if you're not going to let

(19) him answer these in-practice questions,

(20) then I need documentation to show what the

(21) City's practice is.  That's the answer to

(22) your question.

(23)     MS. JONES:  Lieutenant Cuilla just

(24) said that he's happy to testify on what

(25) would happen in practice if an individual

Lieutenant Michael Cuilla

(1)

(2) were found to have entered a residential

(3) property unlawfully.

(4)         MR. SHIELDS:  And I'm calling for

(5) production of any documentation about what

(6) the lieutenant is testifying about.

(7)     Q    So, Lieutenant, first, you said one could

(8) be training memorandum, correct?

(9)         MS. JONES:  Objection.

(10)     A    Correct.  There can be verbal counseling,

(11) additional training and then submitting of an IDC up

(12) the chain of command and then that IDC would be

(13) reviewed by the chief's office and he would then

(14) either assign that investigation to DSS or make a

(15) different determination.  He has several options, he

(16) or she.  In this case, it's he.

(17)         MR. SHIELDS:  So we're calling for

(18) production of all documentation regarding

(19) any verbal counseling, any additional

(20) training or any IDCs that were issued as a

(21) result of any findings or allegations

(22) regarding an officer unlawfully entering

(23) the curtilage to a residential property.

(24)         MS. JONES:  Please follow up in

(25) writing.

### Lieutenant Michael Cuilla

(1)

(2)     Q    Now, Lieutenant Cuilla, after an instance

(3) where officers backtracked through someone's

(4) fenced-in yard, are supervisors instructed to review

(5) the incident to ensure that the officer did not

(6) violate General Order 415?

(7)     **A**    **Yes.**

(8)     Q    Where is that instruction to the

(9) supervisors or the sergeants laid out or documented

(10) in the RPD's policies?

(11)     **A**    **It's a general instruction for supervisors**

(12) **to observe and maintain their officers' performance**

(13) **as well as their abilities to operate as a police**

(14) **officer. So it's part of a more general broad**

(15) **instruction towards the sergeants to make sure that**

(16) **the officers are not violating policies.**

(17)     Q    Where is that general instruction to

(18) supervisors documented in the RPD's policy?

(19)     **A**    **The instruction to supervisors that they**

(20) **have to observe and -- that would be under our**

(21) **general order, I'm sure, to -- again, it's a very**

(22) **general topic, but to supervise an officer, I guess**

(23) **that would be in the chain of command and directing**

(24) **if the word supervise is defined in the general**

(25) **orders, I don't believe it is. I don't think**

Lieutenant Michael Cuilla

(1)

(2) there's a definition section.  However, there is a

(3) supervisor school training, which is a one-week

(4) course given to all sergeants.  It's required by

(5) DCJS.  It covers many of these topics.  Also, our

(6) sergeants are subject to field training for

(7) sergeants where these topics are touched on again by

(8) their field training sergeant.

(9)     Q    In any of those things, the general order,

(10) the supervisor training school, sergeant field

(11) training, is there any specific written policy that

(12) says after an incident, you're required to review

(13) the officer's actions to ensure that they complied

(14) with the RPD's general orders?

(15)     A    Again, you know, I would have to say that

(16) that's the definition of supervision.  Just the

(17) general common knowledge or definition of how to

(18) supervise a person.  I am not sure that we define it

(19) so specifically, but I am unsure as to how someone

(20) would supervise without observing the officer's

(21) behavior and remediating it.  So under the duties of

(22) our sergeants, there is probably some listing of

(23) supervision.  I'd have to have my recollection

(24) refreshed, but that is my answer to that.

(25)     Q    So as we sit here today, you're unsure

[Page 133]
August 22, 2023

Lieutenant Michael Cuilla

(1)

(2) what specific general order or other policy document

(3) specifies exactly the method by which supervisors

(4) must review the actions of their subordinates to

(5) ensure that they complied with the RPD's general

(6) orders and other written policies, true?

(7)         MS. JONES:  Objection.

(8)     A    That is true if such a document exists.

(9)     Q    So such a document may not exist, true?

(10)        MS. JONES:  Objection.

(11)    A    Yes.  How to supervise may just be done

(12) through training and best practices.  I'm sure it is

(13) articulated that an officer reports to a sergeant

(14) and what a sergeant's duties are in the general

(15) orders.  That, I am certain of.  Whether or not that

(16) specifies what the word supervise means or observe

(17) or how to observe or how to supervise, I am unaware

(18) whether it goes into that specificity.  It's more of

(19) a general concept of supervising, observing,

(20) evaluating.  And those other subtopics may be

(21) considered to be just parts of the larger comments.

(22)    Q    Has a supervisor ever found any of the

(23) named defendants violated General Order 415 when

(24) they backtracked through someone's fenced-in

(25) backyard?

Lieutenant Michael Cuilla

(1)
(2)    A    Not to my knowledge.  I have to have my
(3)  recollection refreshed perhaps.  I don't believe so.
(4)         MS. JONES:  So, Elliot, I think
(5)  that's outside of his scope.
(6)         MR. SHIELDS:  It's named defendants
(7)  covered in the topics that we agreed to so
(8)  I'm not asking about Mitchell Leach.  I'm
(9)  asking about Javier Algarin, Adam Gorman,
(10)  the officers that are defendants that have
(11)  those claims and defenses asserted in
(12)  these cases.
(13)    Q    So to your knowledge, Lieutenant, has --
(14)         MS. JONES:  (Inaudible.)
(15)         MS. REPORTER:  Hold on a second,
(16)  you're cutting out.
(17)         MS. JONES:  We agreed to speak to the
(18)  discipline (inaudible).  So any other
(19)  discipline or corrective action, the
(20)  witness was not prepared to speak to
(21)  today.
(22)         MR. SHIELDS:  That's something that
(23)  we disagree about because it's says the
(24)  discipline so -- but anyways...
(25)         MS. JONES:  What?  Which topic are

Lieutenant Michael Cuilla

(1)          you talking about?  Are you still on 1-D?

(2)          Are you talking about 1-D or 3?  Because

(3)          now we're talking about --

(4)               MR. SHIELDS:  I don't want to have

(5)          conversations with you on the record,

(6)          okay?  You're wasting my time.

(7)     Q    Now, Lieutenant Cuilla, within the --

(8)               MS. JONES:  For the record --

(9)               (Both attorneys speaking at the same

(10)         time.)

(11)              MS. JONES:  For the record, I just

(12)         wanted to understand your position so we

(13)         can attempt to resolve it.

(14)    Q    Lieutenant, the only person within the

(15)    department that has the authority to impose

(16)    discipline is the chief, correct?

(17)    A    That is correct.

(18)    Q    And if there's any lesser amount of

(19)    remedial action that needs to be taken, that could

(20)    be done at the supervisory level, correct?

(21)    A    That is correct.

(22)    Q    Other than that remedial action being

(23)    addressed at the supervisory level by the sergeant,

(24)    could there be any other remedial actions taken that

(25)

Lieutenant Michael Cuilla

(1)

(2) were not initiated by the sergeant if it's less than

(3) formal discipline imposed by the chief?

(4)     A    If PDS becomes aware of a widespread

(5) problem, they may require all of the officers to do

(6) what is ultimately remedial training as a refresher,

(7) but I wouldn't consider that discipline in any way,

(8) shape or form but just a refresher training.

(9)     Q    And in order for PDS to take those

(10) actions, we spoke earlier, usually, that's either

(11) the result of one of two things, either

(12) documentation being submitted to PDS and then

(13) recognizing a pattern or a specific request from a

(14) supervisor?

(15)     A    Yes.  That specific request does not need

(16) to come specifically from a supervisor.  It can come

(17) from the head of a unit that's noticing a trend,

(18) like the technician's unit, if they noticed that

(19) officers were, I mean, for example, touching places

(20) where fingerprints might be, they might ask us to do

(21) a refresher training on surfaces that are usually

(22) fingerprintable.  The DA's office can also reach out

(23) to the department and request additional training.

(24) If the DA's office has found in court cases, certain

(25) types of evidence is being suppressed due to the way

Lieutenant Michael Cuilla

(1)

(2) we are doing our searches, the DA's office could

(3) reach out to the Rochester Police Department and let

(4) them know that this is happening and we would

(5) conduct training.

(6)      Q    What specific training did Officer Javier

(7) Algarin receive regarding the prohibition against

(8) entering a residential property unlawfully?

(9)      A    Other than the training that he received

(10) in the academy, the training that he received in

(11) field training, that's the 16 weeks after the

(12) academy where they're assigned a field training

(13) officer and cover a range of topics, he may have

(14) received -- I can't speak to whether he received

(15) training on a verbal counseling level from his

(16) supervisor, but as far as formal training requested

(17) from the Professional Development Section, I'm

(18) unaware of any training.

(19)      Q    Did you do anything to reach out to

(20) Officer Algarin or any of his supervisors to find

(21) out whether he had received any additional training

(22) other than what he received at the academy?

(23)      A    In response to this deposition?

(24)      Q    In preparation for this deposition, did

(25) you prepare to answer the question about what

Lieutenant Michael Cuilla

(1)

(2) training Officer Algarin had received about whether

(3) he'd ever been -- you know, ever received any verbal

(4) counseling or whether he had received any other

(5) remedial training of any kind about entering into

(6) residential properties unlawfully?

(7)     **A    I did not reach out to his former or**

(8) **current supervisors regarding any verbal counseling.**

(9)     Q    Did you reach out to Officer Algarin about

(10) that topic?

(11)    **A    No.   I did not reach out to any of the**

(12) **named defendants to discuss their previous training.**

(13)    Q    Did you reach out to any of the named

(14) defendants' supervisors to ask them about any

(15) training or disciplinary issues or remedial issues

(16) about any of the topics for today's deposition?

(17)    **A    No, I did not.**

(18)    Q    I want to put up the Notice of Deposition

(19) again, which has been marked as Exhibit 1 for this

(20) deposition.   So, Lieutenant, I want to move on to

(21) topics 1-E, F and G.   So "All rules, regulations,

(22) methods, policies, procedures and practices in

(23) effect or customarily followed between January 1,

(24) 2013 and present regarding:   Encounters with dogs on

(25) residential properties, use of deadly force against

Lieutenant Michael Cuilla

(1)

(2) dogs and using less lethal force against dogs." I'm

(3) going to take that down for now.

(4)      My first question is, Lieutenant, can you

(5) tell me everything that you did or everything that

(6) was done to prepare you to testify about those three

(7) topics at today's deposition?

(8)           MS. JONES:  Objection.

(9)      A     I reviewed the training that was done in

(10) 2014 and 2019 regarding dogs, aggressive dogs, and I

(11) also reviewed a training bulletin that had the same

(12) diagram as the training in 2014.  I also reviewed

(13) our Taser training regarding Axon's claims of using

(14) the Taser on dogs.

(15)      Q     In the training, RPD officers are taught

(16) that they'll inevitably encounter dogs on

(17) residential properties, true?

(18)           MS. JONES:  Objection.

(19)      A     Yes.  We let officers know that they will

(20) encounter dogs.

(21)      Q     Are these trainings that you listed

(22) earlier, the 2014 and 2019 aggressive dog trainings,

(23) the training bulletin that you said that you

(24) reviewed and then the Taser training, is that the

(25) complete universe of training materials provided by

(1)              Lieutenant Michael Cuilla

(2)    the RPD to its officers between 2013 and present

(3)    about encounters with dogs on residential

(4)    properties?

(5)         A    That's the universe of training solely

(6)    devoted to the encounters of dogs, but like much

(7)    about training, it is touched on in other topics.

(8)         Q    What other topics is that training about

(9)    encounters with dogs touched on?

(10)        A    Defensive tactics, firearms.

(11)        Q    What is discussed in defensive tactics

(12)   about encounters with dogs?

(13)        A    Well, when encountering a suspect, if

(14)   there are dogs at the scene, it may change the way

(15)   that the officer encounters that suspect, that

(16)   suspect needs to be arrested, are there other

(17)   serviced that can be called, what type of use of

(18)   force may be necessary to take someone into custody

(19)   quicker, if they are struggling with an individual

(20)   and a dog jumps into the fight.  That's as far as I

(21)   can think of in defensive tactics.  Insofar as the

(22)   dog will modify the totality of circumstances when

(23)   taking someone into custody or when dealing with a

(24)   noncomplying subject.

(25)        Q    Do you know if there's any specific DT