UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

----------------------------------------x

CHARLES DEMPSEY, individually, and L.D. by her

father and natural guardian, CHARLES DEMPSEY,

                         Plaintiff(s),

                         Index No. 19-CV-6780(EAW)

             -against-

THE CITY OF ROCHESTER, a municipal entity, JAVIER

ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER

RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

                         Defendant(s).

----------------------------------------x


                         June 9, 2023

                         11:08 a.m.


             VIDEO CONFERENCED EXAMINATION BEFORE

TRIAL of Defendant by SERGEANT JASON RUDOLPH,

pursuant to Order, before Laura B. Lowenthal, a

Notary Public within and for the State of New

York.

```
(1)
(2)      A P P E A R A N C E S:
(3)
         ROTH & ROTH, LLP
(4)      Attorneys for Plaintiff(s)
            192 Lexington Avenue, Suite 802
(5)         New York, New York 10016-6823
(6)      BY: ELLIOT DOLBY-SHIELDS, ESQ.
            E-mail:  eshields@rothandrothlaw.com
(7)
(8)      CITY OF ROCHESTER LAW DEPARTMENT
         Attorneys for Defendant(s)
(9)         30 Church Street
            Rochester, New York 14614
(10)
         BY: PEACHIE L. JONES, ESQ.
(11)        E-mail:  peachie.jones@cityofrochester.gov
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

(1)

(2)                    S T I P U L A T I O N S:

(3)                    IT IS STIPULATED AND AGREED by and

(4)       between the attorneys for the respective parties

(5)       herein, and in compliance with Rule 221 of the

(6)       Uniform Rules for the Trial Courts:

(7)       THAT the parties recognize the provision of Rule

(8)       3115 subdivisions (b), (c) and/or (d).  All

(9)       objections made at a deposition shall be noted by

(10)      the officer before whom the deposition is taken,

(11)      and the answer shall be given and the deposition

(12)      shall proceed subject to the objections and to

(13)      the right of a person to apply for appropriate

(14)      relief pursuant to Article 31 of the C.P.L.R.;

(15)                    THAT every objection raised during a

(16)      deposition shall be stated succinctly and framed

(17)      so as not to suggest an answer to the deponent

(18)      and, at the request of the questioning attorney,

(19)      shall include a clear statement as to any defect

(20)      in form or other basis of error or irregularity.

(21)      Except to the extent permitted by CPLR Rule 3115

(22)      or by this rule, during the court of the

(23)      examination persons in attendance shall not make

(24)      statements or comments that interfere with the

(25)      questioning.

(1)

(2)          THAT a deponent shall answer all

(3)   questions at a deposition, except (i) to preserve

(4)   a privilege or right of confidentiality, (ii) to

(5)   enforce a limitation set forth in an order of a

(6)   court, or (iii) when the question is plainly

(7)   improper and would, if answered, cause

(8)   significant prejudice to any person.  An attorney

(9)   shall not direct a deponent not to answer except

(10)  as provided in CPLR Rule 3115 or this

(11)  subdivision.  Any refusal to answer or direction

(12)  not to answer shall be accompanied by a succinct

(13)  and clear statement on the basis therefore.  If

(14)  the deponent does not answer a question, the

(15)  examining party shall have the right to complete

(16)  the remainder of the deposition.

(17)          THAT an attorney shall not interrupt

(18)  the deposition for the purpose of communicating

(19)  with the deponent unless all parties consent or

(20)  the determining whether the question should not

(21)  be answered on the grounds set forth in Section

(22)  221.2 of these rules, and, in such event, the

(23)  reason for the communication shall be stated for

(24)  the record succinctly and clearly.

(25)

(1)

(2)          THAT the failure to object to any

(3)   question or to move to strike any testimony at

(4)   this examination shall not be a bar or waiver to

(5)   make such objection or motion at the time of the

(6)   trial of this action, and is hereby reserved; and

(7)   THAT this examination may be signed and sworn to

(8)   by the witness examined herein, before any Notary

(9)   Public, but the failure to do so or to return the

(10)  original of the examination to the attorney on

(11)  whose behalf the examination is taken, shall not

(12)  be deemed a waiver of the rights provided by Rule

(13)  3116 and 3117 of the C.P.L.R., and shall be

(14)  controlled thereby; and

(15)          THAT the certification and filing of

(16)  the original of this examination are hereby

(17)  waived; and THAT the questioning attorney shall

(18)  provide counsel for the witness examined herein

(19)  with a copy of this examination at no charge.

(20)                    *  *  *

(21)

(22)

(23)

(24)

(25)

(1)

(2)                VIDEOCONFERENCE STIPULATION

(3)

(4)            IT IS HEREBY STIPULATED AND AGREED by

(5)    and between counsel for all parties present that

(6)    pursuant to the CPLR section 3113(d) this

(7)    deposition is to be conducted by video

(8)    conference, that the court reporter, all counsel,

(9)    and the witness are all in separate remote

(10)   locations and participating via videoconference

(11)   (LegalView/Zoom) meeting under the control of

(12)   Lexitas Court Reporting Service, that the officer

(13)   administering the oath to the witness need not be

(14)   in the place of the deposition and the witness

(15)   shall be sworn in remotely by the court reporter

(16)   after confirming the witnesses identity, that

(17)   this videoconference will not be recorded in any

(18)   manner and that any recording without the express

(19)   written consent of all parties shall be

(20)   considered unauthorized, in violation of law, and

(21)   shall not be used for any purpose in this

(22)   litigation or otherwise.

(23)            IT IS FURTHER STIPULATED that exhibits

(24)   may be marked by the attorney presenting the

(25)   exhibit to the witness, and that a copy of any

(1)

(2)    exhibit presented to a witness shall be e-mailed

(3)    to or otherwise in possession of all counsel

(4)    prior to any questioning of a witness regarding

(5)    the exhibit in question. All parties shall bear

(6)    their own costs in the conduct of this deposition

(7)    by videoconference, notwithstanding the

(8)    obligation by CPLR to supply a copy of the

(9)    transcript to the deposed party by the taking

(10)   party in civil litigation matters.

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)  S E R G E A N T   J A S O N   R U D O L P H,

(3)      called as a witness, having been first duly

(4)      sworn by a Notary Public, was examined and

(5)      testified as follows:

(6)  EXAMINATION BY

(7)  MR. DOLBY-SHIELDS:

(8)      Q    Can you please state your full name

(9)  for the record?

(10)      **A    Jason Rudolph.**

(11)      Q    Can you please state your current work

(12)  address for the record?

(13)      **A    I work at 185 Exchange Boulevard,**

(14)  **Rochester, New York  14614.**

(15)          **MS. JONES:  My name is Peachie Jones.**

(16)          **I am an attorney for the City of**

(17)          **Rochester.  I represent Jason Rudolph**

(18)          **and I am affirming that the witness**

(19)          **today is Jason Rudolph.**

(20)      Q    Good morning, Sergeant.

(21)      **A    Good morning.**

(22)      Q    My name is Elliot Shields.  I

(23)  represent the father and daughter whose dog was

(24)  shot and killed in front of them in their yard.

(25)          I am going to ask you some questions

(1)              Sergeant J. Rudolph

(2)     today.

(3)        A     **Okay.**

(4)        Q     First question is have you ever had

(5)     your deposition taken before in a civil case like

(6)     this?

(7)        A     **I have not.**

(8)        Q     First I will just go over some ground

(9)     rules for the deposition.

(10)            First, will you tell me if you don't

(11)    understand my question?

(12)       A     **I understand your question.**

(13)       Q     But as we go forward can you tell me

(14)    if I ask you a question that you don't

(15)    understand?

(16)       A     **I will.**

(17)       Q     Will you tell me if you find my

(18)    question confusing?

(19)       A     **I will.**

(20)       Q     Will you tell me if I have assumed an

(21)    incorrect fact in a question?

(22)       A     **I will.**

(23)       Q     Will you tell me if you don't know the

(24)    answer to my question?

(25)       A     **I will.**

**Sergeant J. Rudolph**

(1)

(2)    Q     Will you need me to remind you to

(3)   follow the rules?

(4)    **A     No.**

(5)    Q     If there is anything that I ask you

(6)   that you don't understand please say so and I

(7)   will gladly rephrase the question for you; okay?

(8)    **A     Sounds good.**

(9)    Q     Otherwise if you answer the question

(10)  we will assume that you understood it.

(11)         Do you understand everything I have

(12)  said so far?

(13)   **A     Yes.**

(14)   Q     You agree to those terms?

(15)   **A     Yes.**

(16)   Q     You understand that everything that we

(17)  say today is being written down in a little book

(18)  for use at trial in this case?

(19)   **A     I do.**

(20)   Q     First I will ask you questions about

(21)  what you did to prepare for today's deposition.

(22)         Generally can you just tell me

(23)  everything that you did to prepare to come and

(24)  give testimony today?

(25)   **A     I reviewed my Incident Report that I**

(1)                    **Sergeant J. Rudolph**
(2)    **completed on the day of the incident as well as**
(3)    **other prior trainings that we have had within the**
(4)    **department in general orders.**
(5)         Q    So you reviewed your Incident Report
(6)    for the incident at issue in this lawsuit the
(7)    Charles Dempsey case?
(8)         **A    I don't know who the -- if it is**
(9)    **Dempsey that lives over there on Kosciusko Street**
(10)   **then yes.**
(11)        Q    You said that you also reviewed prior
(12)   trainings.
(13)             Can you tell me all of the prior
(14)   trainings or policies that you reviewed?
(15)        **A    Just use of force general order and**
(16)   **training bulletins regarding animals.**
(17)        Q    Do you remember the numbers on those
(18)   training bulletins?
(19)        **A    Not off the top of my head.**
(20)        Q    Did you review any other documents or
(21)   was that it?
(22)        **A    That is it.**
(23)        Q    Did you review any body-worn cameras?
(24)        **A    I did.**
(25)        Q    Which body-worn cameras did you

(1)                   Sergeant J. Rudolph

(2)    review?

(3)         **A       I reviewed Officer Javier Algarin's**

(4)    **body camera on the day of the incident.**

(5)         Q       Only Algarin or anybody else?

(6)         **MS. JONES:    Objection.**

(7)         **A       Only Algarin.**

(8)         Q       Sergeant, just as we go forward if

(9)    your attorney objects you can still go ahead and

(10)   answer the question unless she specifically

(11)   directs you not to answer the question.

(12)        **A       Understood.**

(13)        Q       Did you meet with Miss Jones to

(14)   prepare for the deposition?

(15)        **A       I did.**

(16)        Q       Don't tell anything that you talked

(17)   about with her but how long was that meeting?

(18)        **A       Approximately an hour, hour and a**

(19)   **half.**

(20)        Q       When was that meeting?

(21)        **A       Two days ago, Wednesday.**

(22)        Q       Did you ever meet with any other

(23)   attorneys from the City in regards to this case?

(24)        **MS. JONES:    Objection. Go ahead.**

(25)        **A       No.**

(1)                    **Sergeant J. Rudolph**

(2)        Q      Did you ever speak with anyone else in

(3)    the Police Department in preparation for this

(4)    deposition?

(5)        **A      No.**

(6)        Q      That would include the defendants in

(7)    this case or anyone else?

(8)            **MS. JONES:   Objection. Go ahead.**

(9)        **A      Correct.**

(10)        Q      I want to ask you some background

(11)    questions. We will start with your educational

(12)    background.

(13)            When did you graduate from high

(14)    school?

(15)        **A      2004.**

(16)        Q      Where from?

(17)        **A      East Rochester High School.**

(18)        Q      What did you do after high school?

(19)        **A      Two years of college at Monroe**

(20)    **Community College where I received an associates**

(21)    **degree in criminal justice.**

(22)        Q      What did you do after you graduated

(23)    from MCC with a BA in criminal justice?

(24)            **MS. JONES:   Objection.  Go ahead.**

(25)        **A      I was hired by the Monroe County**

(1)               **Sergeant J. Rudolph**

(2)   **Sheriff's Office in my last semester at Monroe**

(3)   **Community College.**

(4)        Q     So what was the month and year that

(5)   you were hired by the Monroe County Sheriff's

(6)   Office?

(7)        **A      November 2006.**

(8)        Q     In November of 2006 did you go to the

(9)   police academy?

(10)       **A      I did.**

(11)       Q     Was that six months at the public

(12)  safety training facility?

(13)       **A      It was longer because we were only**

(14)  **allowed to go 24 hours a week but it is the same**

(15)  **New York State DCJS police certification as if**

(16)  **you went for six months.**

(17)       Q     So it was like the part-time program

(18)  instead of the full-time program?

(19)       **A      Correct.**

(20)       Q     After you graduated from the police

(21)  academy did you then begin working for the Monroe

(22)  County Sheriff's Office?

(23)       **A      I did.**

(24)       Q     What was your role?

(25)       **A      Deputy sheriff, worked in the parks**

(1)                    **Sergeant J. Rudolph**

(2)    **and in the airport.**

(3)         Q      What was your start date for that

(4)    role?

(5)         **A      September 2007.**

(6)         Q      How long were you a deputy sheriff

(7)    working in the parks and airport for the Monroe

(8)    County Sheriff's Office?

(9)         **A      Approximately two years.**

(10)         Q      What did you do after those two years?

(11)         **A      I was hired in August of 2008 by the**

(12)    **Rochester Police Department.**

(13)         Q      August 2008 did you have to go back to

(14)    the police academy or no?

(15)         **A      No.**

(16)         Q      When you transferred or were hired by

(17)    the Rochester Police Department did you have to

(18)    get any training whatsoever when you initially

(19)    started working for the RPD?

(20)         **A      Yes.**

(21)         Q      What did that consist of?

(22)         **A      Approximately three months of off the**

(23)    **road training specific to Rochester Police**

(24)    **Department policies and procedures, firearms and**

(25)    **defense tactics, things of that nature.**

(1)                    **Sergeant J. Rudolph**

(2)       Q      Is that different from field training

(3)    because it was off the road you said?

(4)       **A      That is different from field training,**

(5)    **yes, that preceded field training and then once**

(6)    **those three months were done I then entered the**

(7)    **Field Training Officer Program for Rochester**

(8)    **Police Department.**

(9)       Q      Where did that initial three month off

(10)   the road training take place?

(11)      **A      At the Public Safety Training Facility**

(12)   **in Rochester.**

(13)      Q      So that was off the road training but

(14)   it was different from the police academy then?

(15)      **A      Yes, again it was only specific to RPD**

(16)   **policies, procedures and training.**

(17)      Q      Is that a training that only transfers

(18)   like you have to do and not all normal police

(19)   officers that had not already gone through the

(20)   police academy?

(21)      **MS. JONES:   Objection.**

(22)      **A      Correct.  Since I was already a DCJS**

(23)   **certified police officer I only had to do a**

(24)   **course because I was a transfer with the**

(25)   **Rochester Police Department before going out and**

(1)                    **Sergeant J. Rudolph**

(2)   **doing field training.**

(3)        Q      When did you start your field

(4)   training?

(5)        **A      Say November, December of 2008,**

(6)   **somewhere in there.**

(7)        Q      Who were your field training officers?

(8)        **A      Officer Darrell Schultz, Officer Dave**

(9)   **Anne and Officer Dennis Wright.**

(10)       Q      After your field training was

(11)  concluded where were you assigned?

(12)       **A      To Patrol Division East in the patrol**

(13)  **section.**

(14)       Q      What platoon?

(15)       **A      Initially Second Platoon.**

(16)       Q      Can you just take me through your

(17)  first assignment to today the roles that you have

(18)  had with the RPD?

(19)       **A      Yes, after nine months approximately**

(20)  **after field training I was assigned to Patrol**

(21)  **Division East First Platoon which is the**

(22)  **overnight shift, I stayed in that role until the**

(23)  **department reorganized, then I was assigned to**

(24)  **Clinton section First Platoon again the midnight**

(25)  **shift up until I was promoted to sergeant in**

(1)                    **Sergeant J. Rudolph**

(2)    **2016, August of 2016.  I was then transferred as**

(3)    **a sergeant to Clinton section Third Platoon which**

(4)    **is afternoon shift, from there I transferred to**

(5)    **Goodman section Third Platoon.  And in July or**

(6)    **August of 2020 I was transferred to the Special**

(7)    **Operations section as a sergeant and that is**

(8)    **where we are today.**

(9)         Q     Where were you assigned in September

(10)   of 2018?

(11)        **A     Clinton section Third Platoon.**

(12)        Q     When did you go to Clinton section

(13)   Third Platoon, was that right when you were

(14)   promoted to sergeant in August 2016 or something

(15)   else?

(16)        **A     Yes, shortly thereafter. I went**

(17)   **through a, I forget how long it was, maybe four**

(18)   **week to six week, somewhere in that area, I**

(19)   **honestly forget how long it was, but supervisor**

(20)   **training program similar to like a field training**

(21)   **program for officers I did it for supervisors and**

(22)   **then I was transferred to Clinton section Third**

(23)   **Platoon.**

(24)        Q     Supervisor training you said it was

(25)   similar to field training, so was it just out in

(1)              Sergeant J. Rudolph

(2)   the field or was it a mix of classroom in field

(3)   or something else?

(4)        **MS. JONES:   Objection.**

(5)        **A     It was out in the field.**

(6)        Q     So were you like teamed up with a

(7)   senior sergeant, is that how it works?

(8)        **A     Yes, I was.**

(9)        Q     In your time with the RPD have you had

(10)  any other roles that we didn't discuss like

(11)  S.W.A.T. team?

(12)       **A     Yes, I am a member of the S.W.A.T.**

(13)  **team.  I joined the S.W.A.T. team in November of**

(14)  **2011 and I am currently on the S.W.A.T. team now.**

(15)       Q     What are all the roles that you have

(16)  held on the S.W.A.T. team from September 2011

(17)  until today?

(18)       **A     Assistant team leader, team leader,**

(19)  **assistant commander and today as of now in the**

(20)  **last three years I am the commander of the**

(21)  **S.W.A.T. team.**

(22)       Q     As of about 2020, since 2020?

(23)       **A     January 2020, yes.**

(24)       Q     You said first assistant team leader,

(25)  which team?

(1)                    Sergeant J. Rudolph

(2)        **A        On the S.W.A.T. team.**

(3)        Q        So you were the assistant --

(4)        **A        I was an assistant team leader of**

(5)    **small, we have smaller teams within the team, an**

(6)    **assistant team leader of a smaller element on the**

(7)    **team and then I was a team leader of a smaller**

(8)    **element on the team and then I was the team's**

(9)    **assistant commander and now I am the S.W.A.T.**

(10)   **team commander.**

(11)        Q        So you were an assistant team leader

(12)   for the entry team, for the sniper team, for

(13)   which team?

(14)        **A        For the entry team.**

(15)        Q        Then you were the team leader for the

(16)   entry team?

(17)        **A        Yes.**

(18)        Q        And then assistant commander; is that

(19)   what you said?

(20)        **A        Correct.**

(21)        Q        Now you're the commander?

(22)        **A        Correct.**

(23)        Q        When were you promoted to assistant

(24)   commander?

(25)        **A        Early 2019.**

**Sergeant J. Rudolph**

(1)

(2)     Q     Any other roles either with the

(3)   S.W.A.T. team or with the RPD generally that you

(4)   have had that we have not discussed?

(5)     **A     No.**

(6)     Q     So let's talk about the incident,

(7)   first I want to put up your Incident Report so we

(8)   will mark that as Exhibit 1 for this deposition.

(9)                 (Whereupon, Plaintiff's Exhibit 1,

(10)                Incident Report, bates stamped DEMPSEY

(11)                2120-2122, 3 pages, was marked for

(12)                identification.)

(13)    Q     Sergeant, on your screen do you see a

(14)   Incident Report?

(15)    **A     I do, sir.**

(16)    Q     Is this the same Incident Report that

(17)   you reviewed in preparation for the deposition?

(18)    **A     It is.**

(19)    Q     A three page document?

(20)    **A     Yes.**

(21)    Q     It was dated October 19, 2018;

(22)   correct?

(23)    **A     Correct.**

(24)    Q     So let's go down to the narrative

(25)   section here.

(1)                    Sergeant J. Rudolph

(2)             In the beginning basically it says

(3)    that the officers that responded to report VICE

(4)    activity at 62 Kosciusko Street. They were

(5)    familiar with the area. Basically they chased the

(6)    suspects through the backyards and then detained

(7)    them; is that an accurate summary of the

(8)    beginning of the report?

(9)         **A     It is.**

(10)        Q     And then it goes on to say that

(11)   Algarin began to backtrack through the

(12)   Plaintiff's backyard at 53 Kosciusko Street;

(13)   right?

(14)        **A     Yes.**

(15)        Q     In these circumstances was Algarin's

(16)   entry into the Plaintiff's backyard to backtrack

(17)   consistent with RPD practices and policies?

(18)        **MS. JONES:   Objection.**

(19)        **A     Yes.**

(20)        Q     Are RPD officers taught that they're

(21)   permitted to enter into the curtilage of a

(22)   residential home to backtrack after the

(23)   conclusion of a hot pursuit of a fleeing suspect?

(24)        **MS. JONES:   Objection.**

(25)        **A     You have more details to that?  Every**

(1)                    **Sergeant J. Rudolph**

(2)    **situation is different.**

(3)         Q      Sure.

(4)              So in this instance at the time that

(5)    Algarin had gone back, according to your report,

(6)    right, so we are just looking at what your report

(7)    says at this time, at the time that your report

(8)    documents Officer Algarin beginning to backtrack

(9)    both of the suspects had been detained and they

(10)   were in handcuffs; right?

(11)        **A      Correct.**

(12)        Q      Under those circumstances where both

(13)   suspects had been detained and they were

(14)   handcuffed at that point the pursuit had

(15)   concluded; right?

(16)        **A      Correct.**

(17)        Q      So the question is under those

(18)   circumstances is it consistent with RPD's

(19)   policies and practices for Algarin to have

(20)   backtracked into a different property that was

(21)   enclosed by a fence?

(22)             **MS. JONES:    Objection.**

(23)        **A      In this situation as the details are**

(24)   **presented, yes.**

(25)        Q      Algarin testified that he was

(1)                    Sergeant J. Rudolph

(2)    affirmatively trained to backtrack through

(3)    residential properties following the conclusion

(4)    of a hot pursuit, were you also trained to do

(5)    that type of backtracking?

(6)              **MS. JONES:   Objection.**

(7)        **A     Yes, but again under the circumstances**

(8)    **of this which it should be noted that because of**

(9)    **the possibility of weapons in this job for the**

(10)   **VICE activity we would send somebody through a**

(11)   **yard on the flight path to ensure that there is**

(12)   **not a weapon that may have been discarded that**

(13)   **may pose a risk to the public or other people in**

(14)   **that area.**

(15)       Q     So that is the policy of the RPD after

(16)   the conclusion of a chase, of a foot chase, you

(17)   send somebody back along the path of that foot

(18)   chase to look for any possible weapons or drugs

(19)   that may have been discarded even if none of the

(20)   officers actually saw any guns or weapons

(21)   actually be discarded?

(22)             **MS. JONES:   Objection.**

(23)       **A     The policy is not so finite as to**

(24)   **that, it is always situationally depended upon**

(25)   **the facts of the case at that time.**

(1)                    Sergeant J. Rudolph

(2)            **So no, there is not a hard written**

(3)    **rule to go through a backyard every single time**

(4)    **but if there are other things that are presented**

(5)    **here and mentioned of weapons then yes, we would**

(6)    **send somebody down the path, the flight path, of**

(7)    **which the person ran.**

(8)        Q    In here where was the mention of

(9)    weapons?

(10)       **A    Correct.**

(11)       Q    Where was the mention of weapons?

(12)       **A    In this case here?**

(13)            **I am trying to understand what you're**

(14)    **asking, sir.**

(15)       Q    You just told me that in this case the

(16)    reason that they backtracked was because of the

(17)    possibility of weapons; right?

(18)       **A    Correct.**

(19)       Q    Where did that possibility of weapons

(20)    come from?

(21)       **A    From the initial call about drug sales**

(22)    **and the possibility of weapons.**

(23)       Q    So you're saying that the 9-1-1 caller

(24)    said that there was a possibility of weapons?

(25)            **MS. JONES:    Objection.**

(1)                    **Sergeant J. Rudolph**

(2)        **A      I don't have that 9-1-1 transmission**

(3)    **or documentation in front of me.**

(4)        Q      As we sit here today you don't know if

(5)    there was ever any complaint about the

(6)    possibility of weapons?

(7)              **MS. JONES:   Objection.**

(8)        **A      I would have to review the 9-1-1**

(9)    **dispatch for that job.**

(10)       Q      So you just told me that the

(11)   possibility of weapons was the reason that they

(12)   backtracked but you don't know if there was

(13)   actually any complaint that there were weapons;

(14)   right?

(15)             **MS. JONES:   Objection.**

(16)       **A      Based on this set of circumstances if**

(17)   **I put that in there during the time I wrote this**

(18)   **report then at some point during this**

(19)   **investigation that was brought to light.**

(20)       Q      When the officers chased the suspects

(21)   no officer ever saw anyone discard any weapons;

(22)   right?

(23)             **MS. JONES:   Objection.**

(24)       **A      I cannot speak to what the officers**

(25)   **saw during that foot pursuit.**

(1)                    **Sergeant J. Rudolph**

(2)        Q      Before you wrote your Incident Report

(3)    did you speak with the officers?

(4)        **A      Yes.**

(5)        Q      Did any of the officers ever tell you

(6)    that they saw any of the suspects discard any

(7)    weapons?

(8)        **A      I cannot remember the contents of that**

(9)    **conversation in 2018.**

(10)       Q      If they had told you that they had

(11)   seen one of the suspects discard weapons or

(12)   contraband or anything else that would have gone

(13)   in your report; right?

(14)                **MS. JONES:   Objection.**

(15)       **A      That would have been documented in**

(16)   **their report if they saw anything.**

(17)       Q      They didn't write a report in this

(18)   case; right?

(19)       **A      I have not reviewed their**

(20)   **documentation. I do not know.**

(21)       Q      Generally though if they had seen that

(22)   then it would have been documented in writing

(23)   somewhere; right?

(24)                **MS. JONES:   Objection.**

(25)       **A      Again, I can't speak for what the**

(1)                    **Sergeant J. Rudolph**

(2)    **officer would have or would not have put in his**

(3)    **report.**

(4)         Q     If they had told you that they had

(5)    seen a gun or drugs discarded in the plaintiff's

(6)    backyard and that that was the reason that

(7)    Officer Algarin entered the plaintiff's backyard

(8)    that would have been in your report because your

(9)    report is about the entry into the backyard;

(10)   right?

(11)            **MS. JONES:   Objection.**

(12)    **A     My report is not about the entry to**

(13)   **the backyard. It is more so directed toward the**

(14)   **use of firearm on an animal.**

(15)        Q     In the plaintiff's backyard?

(16)            **MS. JONES:   Objection.**

(17)    **A     Yes, the using of firearm against a**

(18)   **dog in this backyard of number 53 Kosciusko.**

(19)        Q     Before Officer Algarin entered the

(20)   yard at 53 Kosciusko he didn't see any guns or

(21)   drugs on the ground; right?

(22)            **MS. JONES:   Objection.**

(23)    **A     I can't speak to what he saw or did**

(24)   **not see.**

(25)        Q     Officer Algarin testified that he

(1)                 Sergeant J. Rudolph

(2)    backtracked through residential properties

(3)    approximately once per week.

(4)             Does that sound right for officers in

(5)    the Clinton section in your experience?

(6)             **MS. JONES:    Objection.**

(7)       **A    I can't speak to those statistics. I**

(8)    **do not know.**

(9)       Q    When you were an officer how often

(10)   would you backtrack through residential

(11)   properties?

(12)            **MS. JONES:    Objection.**

(13)      **A    There is really no way to quantify**

(14)   **that data. It would be a situationally dependent.**

(15)   **There so no number to say that I have done it**

(16)   **this many times for this many weeks or months or**

(17)   **years.**

(18)      Q    Officer Horowitz testified that

(19)   backtracking to look for discarded contraband

(20)   happens in about half of all foot pursuits; does

(21)   that sound right to you?

(22)            **MS. JONES:    Objection.**

(23)      **A    I don't know to what he would be**

(24)   **talking about as far as his experiences but I am**

(25)   **not going to speak on what he basically does or**

(1)                    Sergeant J. Rudolph

(2)  **does not do as far as tracking.**

(3)      Q      You were their direct supervisor at

(4)  the time; correct?

(5)      **A      I was Officer Algarin's direct**

(6)  **supervisor, yes.**

(7)      Q      If he had not backtracked in this case

(8)  or he had refused to do it and you had heard

(9)  about that is that something that you would have

(10) reprimanded him for?

(11)          MS. JONES:   Objection.

(12)     **A      No, I would based on the facts of what**

(13) **was presented to me at the time we would have a**

(14) **discussion about what we would do but in your**

(15) **hypothetical here no, I would not reprimand him.**

(16)     Q      So you said you would have a

(17) discussion.

(18)             What kind of discussion would you

(19) have?

(20)     **A      We would have a discussion again**

(21) **talking about the totality of the circumstances.**

(22)     Q      Why would you talk about the totality

(23) of the circumstances?

(24)     **A      To understand exactly what the call**

(25) **was for, what officers would see at the time and**

(1)                    **Sergeant J. Rudolph**

(2)    **actions that were taken and really just painting**

(3)    **the entire picture of the incident.  That is what**

(4)    **I would discuss with an officer.**

(5)         Q     So if he refused to enter Mr.

(6)    Dempsey's backyard to backtrack and you had this

(7)    conversation about the totality of the

(8)    circumstances that would be to discuss whether or

(9)    not it was appropriate for him to refuse to

(10)   backtrack to check in Mr. Dempsey's backyard; is

(11)   that what you're saying?

(12)        **A     I am absolutely not saying that.**

(13)             **What I am saying is generally speaking**

(14)   **any job like this or any call we go to that**

(15)   **involves this type of activity with foot pursuits**

(16)   **it would be discussions had and decisions would**

(17)   **be made on the totality of the circumstances.**

(18)             **In this case I cannot recall or tell**

(19)   **you about that discussion if it was had or not**

(20)   **with Officer Algarin.**

(21)        Q     Algarin testified that you reviewed

(22)   his actions and determined that they were

(23)   consistent with the RPD policies and training; is

(24)   that right?

(25)             **MS. JONES:    Objection.**

(1)                    **Sergeant J. Rudolph**

(2)        **A       Can you repeat the question.**

(3)        Q       Officer Algarin testified that after

(4)   this incident you reviewed his actions and

(5)   determined that they were consistent with the

(6)   RPD's policies and training; is that right?

(7)        **A       I don't remember having a specific**

(8)   **conversation to that.**

(9)        Q       If you had determined that they were

(10)  inconsistent or in violation of the RPD's

(11)  policies and training that is something that you

(12)  would have discussed with Officer Algarin;

(13)  correct?

(14)       **A       Correct.**

(15)       Q       If you had made that determination

(16)  that something he did violated RPD's policies and

(17)  training would you have also been required to

(18)  notify anyone else like your direct supervisor?

(19)       **A       Yes.**

(20)            **MS. JONES:   Objection.**

(21)       Q       Can you just tell me about that

(22)  process like who would you be required to notify?

(23)       **A       If there was any issue with policies**

(24)  **and procedure I would notify a lieutenant on my**

(25)  **shift who was my boss.**

(1)                    **Sergeant J. Rudolph**

(2)        Q     Would you also be required to notify

(3)    PSS or only the lieutenant?

(4)        **A     It depends, and we can talk about a**

(5)    **bunch of different scenarios, it just depends on**

(6)    **what occurred during any policy or general order**

(7)    **of violation on who would be called passed a**

(8)    **lieutenant.**

(9)        Q     Is that laid out somewhere in a rule

(10)   like certain violations are required to be

(11)   reported to the lieutenant and others for example

(12)   maybe something more serious would be required to

(13)   be reported to someone else?

(14)       **A     Yes.**

(15)       Q     Do you know what general order that

(16)   would be detailing?

(17)       **A     I don't know the number general order**

(18)   **but it is titled Discipline.**

(19)       Q     Can you tell me all of the evidence

(20)   that you reviewed before you wrote your Incident

(21)   Report?

(22)       **A     I responded to the scene and saw the**

(23)   **dog, I saw the area from which Officer Algarin**

(24)   **fired his weapon from and just checked the**

(25)   **general area if you will.**

**Sergeant J. Rudolph**

(1)

(2)      Q      Who did you speak with, before you

(3)   wrote your Incident Report who did you speak

(4)   with?

(5)      **A      I spoke with -- say again, sorry.**

(6)      Q      Before you wrote your Incident Report

(7)   who did you speak with?

(8)      **A      Officer Algarin.**

(9)      Q      Did you speak with any of the other

(10)   officers who were at the scene?

(11)      **A      I cannot recall.**

(12)      Q      Did you speak with any of the

(13)   witnesses at the scene?

(14)      **A      I did speak with the dog owner at the**

(15)   **time that was at the scene.**

(16)      Q      Tell me everything you remember about

(17)   your conversation with Mr. Dempsey?

(18)      **A      Obviously he was at the time as you**

(19)   **can see on the body-worn camera he was very**

(20)   **upset, I remember telling him that he can bring**

(21)   **his dog to the veterinarian if he wants to at any**

(22)   **time, I did tell him that Animal Control was on**

(23)   **the way.  Specifics passed that I can't recall.**

(24)      Q      Did you speak with his daughter at

(25)   all?

(1)                    Sergeant J. Rudolph

(2)        **A      I do not recall speaking to his**

(3)    **daughter.**

(4)        Q      Did you speak with any of the other

(5)    civilian witnesses at the scene?

(6)        **A      I don't recall.**

(7)        Q      You watched body-worn camera recording

(8)    prior to writing your report; correct?

(9)        **A      Yes.**

(10)       Q      Do you remember if you only watched

(11)   Officer Algarin's body-worn camera or if you also

(12)   watched body-worn camera recordings from the

(13)   other officers who were at the scene?

(14)       **A      I know that I watched Officer**

(15)   **Algarin's body-worn camera. I cannot recall if I**

(16)   **viewed others.**

(17)       Q      In the Incident Report you said that

(18)   there were no witnesses; is that right?

(19)       **A      If I can read through this.  Do you**

(20)   **want to direct me to a spot that?**

(21)       Q      I apologize because I had a version

(22)   that I highlighted and that is not what I put up

(23)   here. I apologize.

(24)              "No witnesses".

(25)       **A      Yes, no witnesses.**

(1)                    **Sergeant J. Rudolph**

(2)        Q     In the body-worn camera recording you

(3)   can see that there were the two individuals who

(4)   Officer Gorman and Officer Horowitz had stopped

(5)   in the neighboring yards; correct?

(6)              **MS. JONES:   Note my objection.**

(7)        **A     I don't recall reviewing their**

(8)   **body-worn cameras.**

(9)        Q     But in Algarin's camera you can see at

(10)  least the one individual in the red sweatshirt

(11)  that Officer Gorman had detained in the

(12)  neighboring yard; correct?

(13)             **MS. JONES:    Objection.**

(14)       **A     I have to review the body-worn camera**

(15)  **again to make a definitive answer on that.**

(16)       Q     Assuming that that is true that there

(17)  is the individual that had been detained in the

(18)  neighboring yard he would have been a witness;

(19)  right?

(20)             **MS. JONES:   Note my objection.**

(21)       **A     I don't know if he would have been a**

(22)  **witness or not. If he actually saw the events I**

(23)  **don't know.**

(24)       Q     Why don't we just jump forward to that

(25)  part of the video and just look at that.

(1)                    Sergeant J. Rudolph

(2)        **A       Okay.**

(3)        **MR. SHIELDS:  Exhibit 1 is the**

(4)        **Incident Report. Exhibit 2 will be**

(5)        **Algarin video.**

(6)        **(Whereupon, Plaintiff's Exhibit 2,**

(7)        **video from Algarin's body-worn camera,**

(8)        **5:47 long, was marked for**

(9)        **identification.)**

(10)       Q       Sometimes we have some difficulties

(11)  playing the video. I don't think it really

(12)  matters here but just let me know if I am choppy

(13)  or if you can't hear.

(14)       **A       Okay.**

(15)       Q       For the purposes of the questions I am

(16)  going to ask you about the witness I don't think

(17)  it really matters but I am going to share the

(18)  screen and then why don't you just let me know

(19)  first, do you see on the screen paused at the

(20)  beginning of Officer Algarin's body-worn camera

(21)  video, sergeant?

(22)       **A       Yes.**

(23)       Q       Do you recognize this at the body-worn

(24)  camera from Officer Algarin on the date of the

(25)  incident?

(1)                    Sergeant J. Rudolph

(2)        **A      Unless I see or hear him in there I**

(3)     **don't recognize the identifiers of both the date**

(4)     **and time.  So to say that this is his video I**

(5)     **don't know.**

(6)        Q      He testified at this deposition that

(7)     this is his video so I will go ahead and play it,

(8)     hopefully you can hear him and I will just pause

(9)     it at the point where he is in the neighboring

(10)    yard with the other individual.

(11)       **A      Okay.**

(12)       Q      I will go ahead and hit play.

(13)              The beginning 30 seconds of the

(14)    body-worn camera doesn't have audio; correct?

(15)           **MS. JONES:    Objection.**

(16)       **A      Correct, no audio.**

(17)       Q      Is it playing smoothly for you or is

(18)    it choppy?

(19)       **A      It is choppy.**

(20)       Q      I paused it.

(21)              First question is before I paused it

(22)    were you able to hear any audio in the video?

(23)       **A      I heard some radio transmission, yes.**

(24)       Q      Where I have paused it in the view

(25)    that we have right now at 41 seconds into this

(1)                     Sergeant J. Rudolph

(2)     video are you aware of what property Officer

(3)     Algarin is standing in?

(4)          **A     No.**

(5)          Q     So I will just represent to you that

(6)     it is Charles Dempsey's backyard at 53 Kosciusko

(7)     Street.

(8)               If you know that can you tell which

(9)     property he is looking or at least the body-worn

(10)    camera is depicting on the other side of the

(11)    chain link fence?

(12)         **A     If you are saying that he is in 53**

(13)    **Kosciusko backyard he is looking, I don't know**

(14)    **what direction, but in what appears to be another**

(15)    **fenced yard over.**

(16)         Q     So that is the yard in Sobieski Street

(17)    where the one individual is, where one of the two

(18)    individuals was stopped?

(19)         **A     Yes.**

(20)         Q     I am going to go ahead and hit play

(21)    and then I will pause it when he is with Officer

(22)    Gorman in the backyard of 49 Kosciusko Street.

(23)              So before I do that, now do you see

(24)    two individuals depicted in the video at this

(25)    point where we are paused?

(1)                    Sergeant J. Rudolph

(2)        **A**      **I do.**

(3)        Q      I don't know if you can tell, does it

(4)   look like one is a police officer and one is a

(5)   suspect?

(6)        **A**      **I believe so.**

(7)        Q      I will go ahead and hit play now.

(8)               (Whereby, we played from 41 seconds to

(9)               3:19).

(10)       Q      Back to the question about the

(11)  witnesses, do you think the two men that had been

(12)  detained witnessed that incident?

(13)              **MS. JONES:    Objection.**

(14)       **A**      **I can't speak to if they would be able**

(15)  **to see it or not.**

(16)       Q      Did you ask them if they were able to

(17)  see it or not?

(18)              **MS. JONES:    Objection.**

(19)       **A**      **I do not recall.**

(20)       Q      If they were able to see it but you

(21)  didn't ask them would that have been a violation

(22)  of RPD policy?

(23)              **MS. JONES:    Objection.**

(24)       **A**      **If I did not ask them if they saw it**

(25)  **are you asking if that is a violation of policy,**

(1)                    **Sergeant J. Rudolph**

(2)    **is that the question?**

(3)        Q      You're suppose to --

(4)             So the question is yes, if they did

(5)    witness the incident and you put in your report

(6)    that there were no witnesses would that be a

(7)    violation of policy?

(8)             **MS. JONES:   Objection.**

(9)        **A      No, I don't, again, I can't speak to**

(10)   **if they saw something or not. No, I would not say**

(11)   **that is a violation of policy.**

(12)       Q      When you are investigating an incident

(13)   that has happened you are required to be

(14)   diligent; right?

(15)            **MS. JONES:   Objection.**

(16)       **A      Are you stating a line from the**

(17)   **general order, is that what you're saying?**

(18)       Q      I am asking you is that a requirement

(19)   to be diligent when you investigate an incident

(20)   that has happened?

(21)       **A      Yes.**

(22)       Q      You're suppose to gather all relevant

(23)   facts and evidence; correct?

(24)       **A      Correct.**

(25)            **MS. JONES:   Objection.**

**Sergeant J. Rudolph**

(1)

(2)     Q     So would it have been better if you

(3)   had asked the two suspects that were detained if

(4)   they had witnessed the dog shooting; correct?

(5)          **MS. JONES:   Objection.**

(6)     **A     At that time I don't know where they**

(7)   **were and if they would have been a witness or**

(8)   **not.  So at that point no, I did not ask them if**

(9)   **they witnessed anything.**

(10)     Q     Assuming that the other officers

(11)   body-worn cameras show that they witnessed the

(12)   incident then that would mean that the statement

(13)   in your Incident Report that there were no

(14)   witnesses that that is not accurate; is that

(15)   right?

(16)          **MS. JONES:   Objection.**

(17)     **A     I cannot speak to if they witnessed**

(18)   **anything or not.  Based on our neighborhood check**

(19)   **that is what had me put no witnesses.**

(20)     Q     Assuming that those two individuals

(21)   did witness the dog shooting, if you accept that

(22)   as true then the statement in your Incident

(23)   Report that there were no witnesses that would

(24)   not be accurate; correct?

(25)          **MS. JONES:   Objection.**

(1)                     Sergeant J. Rudolph

(2)        **A      Yes, if they're not putting anything**

(3)    **in there about them those officers about them**

(4)    **being witnesses in their reports, again people I**

(5)    **spoke to or could not speak to are what I put my**

(6)    **report as no witnesses.  If they put in their**

(7)    **documentation that there were witnesses then that**

(8)    **is a different story.**

(9)        Q      So my understanding from the seven dog

(10)   shooting cases that I am litigating and from the

(11)   numerous depositions I have taken is that the

(12)   shooting officer and any other officers at the

(13)   scene are not required to create any

(14)   documentation as a result of an incident like

(15)   this and that the only Incident Report that is

(16)   written is written by the supervisor and so here

(17)   that would be you; is that right?

(18)        **MS. JONES:    Objection.**

(19)        **A      I write a specific report to the dog**

(20)   **shooting portion, yes.  If there is documentation**

(21)   **that they generate based on other investigations**

(22)   **that they were doing that they were involved in**

(23)   **and that person was there then they would be in**

(24)   **that other documentation.**

(25)        Q      That other documentation would have to

(1)                    Sergeant J. Rudolph

(2)    do specifically with the other incident that was

(3)    separate and apart for and had a separate CR

(4)    number that was separate from the dog shooting

(5)    incident; right?

(6)              **MS. JONES:   Objection.**

(7)         **A      It would be something separate, yes.**

(8)         Q      So that other paperwork would not have

(9)    to say anything about the dog shooting incident;

(10)   right?

(11)             **MS. JONES:   Objection.**

(12)        **A      There could be a cross reference of**

(13)   **information sometimes but again it is situation**

(14)   **dependent.**

(15)        Q      The CR number for the dog shooting

(16)   incident is contained in your Incident Report;

(17)   right?

(18)        **A      Yes.**

(19)        Q      Your Incident Report is the official

(20)   report related to the dog shooting incident?

(21)             **MS. JONES:   Objection.**

(22)        **A      It is the primary Incident Report,**

(23)   **yes.**

(24)        Q      If there had not been some separate

(25)   criminal incident with a separate CR number then

(1)              Sergeant J. Rudolph

(2)   Officer Algarin and Officer Gorman would not have

(3)   had to draft any reports related to this incident

(4)   on this day at all; right?

(5)           **MS. JONES:   Objection.**

(6)       **A      If there was nothing from that**

(7)   **investigation then they would not have any other**

(8)   **information or any other reports.**

(9)       Q      So they would not have had any reason

(10)  or duty under the RPD rules and the general

(11)  orders it said document anything about the fact

(12)  either way as to whether the individuals they had

(13)  detained witnessed the incident or not; right?

(14)          **MS. JONES:   Objection.**

(15)      **A      Can you rephrase that.**

(16)      Q      They would have had no duty to

(17)  document in any report whether or not those two

(18)  individuals that they had detained, that is

(19)  Officer Gorman and Officer Horowitz, they would

(20)  have had no duty to document in any report

(21)  anywhere whether or not those individuals

(22)  witnessed the dog shooting; right?

(23)          **MS. JONES:   Objection.**

(24)      **A      If it didn't apply to their case, then**

(25)  **no, they would not have to document the dog**

(1)                    **Sergeant J. Rudolph**

(2)    **shooting aspect.**

(3)         Q      So what I am trying to get at is if

(4)    these guys witnessed the incident it should have

(5)    been in your report; right?

(6)               **MS. JONES:    Objection.**

(7)         **A      It was not brought to my attention**

(8)    **that these two individuals witnessed the shooting**

(9)    **of the dog.**

(10)        Q      People make mistakes, right, so you

(11)    know --

(12)              **MS. JONES:    Objection.**

(13)        **A      I wouldn't call it a mistake. We have**

(14)    **a process by which that there are neighborhood**

(15)    **checks that are done with all these types of**

(16)    **incidents, right.  We have and I delegate**

(17)    **officers to do neighborhood checks, I don't do**

(18)    **every single one of them myself, right, but from**

(19)    **assigning officers to do things if it is not**

(20)    **reported back to me of anybody that it was a**

(21)    **witness then that is what led me to put no**

(22)    **witnesses.**

(23)        Q      Neither Horowitz nor Gorman who were

(24)    the officers with these two individuals reported

(25)    to you that either of the suspects that they had

(1)                     Sergeant J. Rudolph

(2)     detained witnessed the incident; is that fair to

(3)     say?

(4)                 **MS. JONES:   Objection.**

(5)         **A      That is fair to say.**

(6)         Q      Are there any other inaccuracies in

(7)     your report?

(8)                 **MS. JONES:   Objection.**

(9)         **A      Are you implying that I have an**

(10)    **inaccuracy in there, is that what we are**

(11)    **implying?**

(12)        Q      Yes.

(13)        **A      Okay, again, I don't know what is**

(14)    **leading to an inaccuracy in this report.**

(15)        Q      The fact that you said there were no

(16)    witnesses when in fact there were two witnesses

(17)    that were not listed?

(18)        **A      If you are saying that there were**

(19)    **witnesses you're saying that but when I was doing**

(20)    **my preliminary investigation at the scene it was**

(21)    **not brought to my attention that either of these**

(22)    **two individuals were witnesses of this incident.**

(23)        Q      It is your duty as Supervisor to

(24)    ensure that all of the information is gathered

(25)    and put into the report; correct?

(1)                Sergeant J. Rudolph

(2)          **MS. JONES:   Objection.**

(3)      **A      It is.**

(4)      Q      If one of your officers didn't report

(5)  something to you ultimately that falls on you;

(6)  right?

(7)          **MS. JONES:   Objection.**

(8)      **A      If they don't report something to me?**

(9)      Q      Yes.

(10)     **A      Yes.**

(11)     Q      Assuming that they were witnesses and

(12)  your officer didn't tell you about that then that

(13)  made it into your report as no witnesses that

(14)  would make your report that statement at least in

(15)  your report inaccurate; right?

(16)         **MS. JONES:   Objection.**

(17)     **A      If it is not brought to my attention**

(18)  **that anybody is a witness then I would put it in**

(19)  **there that there are no witnesses.**

(20)         **So again, I trust that the officers**

(21)  **that are in the area doing what we call a**

(22)  **neighborhood check are doing it, I don't have to**

(23)  **go and do it again myself.  I understand that a**

(24)  **neighborhood check was done and if there was a**

(25)  **witness there would be witnesses, if there was**

(1)                    **Sergeant J. Rudolph**

(2)   **not there was not.**

(3)        Q      After you drafted your report have you

(4)   learned that there are potentially any other

(5)   inaccuracies in your report?

(6)              **MS. JONES:   Objection.   Elliot, this**

(7)              **has been asked already.**

(8)        Q      You can go ahead and answer the

(9)   question.

(10)       **A      Yes, again, I am going to disagree**

(11)  **with you, sir, that there inaccuracies in my**

(12)  **report. I do not generate reports with**

(13)  **deficiencies and inaccuracies.**

(14)       Q      I am just going to ask you to listen

(15)  to my specific question which was after you

(16)  drafted the report have you learned any other

(17)  information that could lead you to believe that

(18)  there is any other potential inaccuracies in your

(19)  report?

(20)             **MS. JONES:   Objection.**

(21)       **A      No.**

(22)       Q      And your report says that you notified

(23)  Lieutenant Person and Lieutenant Tordai; correct?

(24)       **A      Correct.**

(25)       Q      Who is Lieutenant Person?

(1)                    Sergeant J. Rudolph

(2)       **A      He was the commanding officer for the**

(3)    **City and patrol that day.**

(4)       Q      How did you make that notification?

(5)       **A      I cannot recall if he came to the**

(6)    **scene or not. It is either he came to the scene**

(7)    **or I notified him via telephone.**

(8)       Q      So you mean if you notified him via

(9)    telephone would you have picked up the phone and

(10)   called him and spoken to him verbally?

(11)      **A      Yes.**

(12)      Q      Would you ever notify him by text

(13)   messages or by e-mail?

(14)             **MS. JONES:   Objection.**

(15)      **A      With an incident like this it would be**

(16)   **a phone call, verbal phone call.**

(17)      Q      How about Lieutenant Tordai?

(18)             First, who is Lieutenant Tordai?

(19)      **A      At the time he was the commanding**

(20)   **officer of professional standard section.**

(21)      Q      How did you notify Lieutenant Tordai?

(22)      **A      That was via a verbal phone call.**

(23)      Q      Were those notifications made when you

(24)   were at the scene or something else?

(25)      **A      I can't recall the exact time.  It was**

(1)                    Sergeant J. Rudolph

(2)    **after my arrival at the scene.  From then on I**

(3)    **can't recall what the exact time was for the**

(4)    **notifications but it was obviously the same day.**

(5)         Q     Could it have been after you got back

(6)    to the office or was it when you were still at

(7)    the scene if you remember?

(8)              **MS. JONES:   Objection.**

(9)         **A     I cannot remember.**

(10)        Q     Do you know what they did after you

(11)   notified them?

(12)        **A     Lieutenant Tordai and/or Lieutenant**

(13)   **Person?**

(14)        Q     Correct.

(15)        **A     I do not know what they did after.**

(16)              **MR. SHIELDS:  I want to put up what**

(17)              **will be Exhibit 3 and this is the view**

(18)              **history from the body-worn camera.**

(19)              **(Whereupon, Plaintiff's Exhibit 3,**

(20)              **File History Activity dated range**

(21)              **10/19/18-12/29/22, bates stamped COR**

(22)              **GUR 01655, 1 page, was marked for**

(23)              **identification.)**

(24)              **THE WITNESS:  Mr. Shields, if I could**

(25)              **real quick can I run to the restroom**

(1)                    **Sergeant J. Rudolph**

(2)            **real fast.**

(3)            **(Short break:  12:05 to 12:10)**

(4)       Q      Officer, I will ask you before we get

(5)   back to the questions we had an opportunity to

(6)   take a break, did you have an opportunity to

(7)   speak with your attorney during that break?

(8)       **A      Yes.**

(9)       Q      After speaking with your attorney are

(10)  there any answers to any questions that you gave

(11)  that you would like to clarify or change your

(12)  answer to?

(13)      **A      No.**

(14)      Q      So I wanted to put up the view history

(15)  that will be Exhibit 3 from the body-worn camera

(16)  recording and I just have a few questions about

(17)  the view history.

(18)            Now is this view history are you

(19)  familiar with that document?  Have you ever seen

(20)  this before?

(21)      **A      No.**

(22)      Q      So this was produced by the City in

(23)  discovery in this case and this just shows who

(24)  has viewed or exported or uploaded the body-worn

(25)  cameras recording.

(1)            Sergeant J. Rudolph

(2)        So this the body-worn recording for

(3)    Officer Algarin.

(4)        **A    Okay.**

(5)        Q    So this shows that on the date of the

(6)    incident if the video was uploaded at about 7:33

(7)    p.m. and then at about 7:35 p.m. you viewed the

(8)    video.

(9)        Do you remember viewing the body-worn

(10)   camera video on the night of the incident?

(11)       **A    Yes.**

(12)       Q    Can you tell me where you reviewed the

(13)   body-worn camera video?

(14)       **A    That would be in my office.**

(15)       Q    So you have an office at 185 or

(16)   something?

(17)       **A    No, a separate office at 630 North**

(18)   **Clinton Avenue.**

(19)       Q    When you reviewed the video were you

(20)   alone, were you with Officer Algarin or something

(21)   else?

(22)       **MS. JONES:    Objection.**

(23)       **A    I can't recall if there was anybody**

(24)   **else proximate to my computer at the time.**

(25)       Q    What did you do after you reviewed the

(1)                    Sergeant J. Rudolph

(2)    video?

(3)        **A       After I reviewed the video I then**

(4)    **generated that Incident Report that we talked**

(5)    **about.**

(6)        Q       When you were at the scene did you

(7)    take any notes?

(8)        **A       Not that I recall.**

(9)        Q       If you did take notes would you have

(10)   them still?

(11)       **A       I am not sure if I would or not.**

(12)       Q       What do you do with --

(13)               Withdrawn.

(14)               If you took notes would they have been

(15)   taken in the little notepad that is issued by the

(16)   RPD?

(17)               **MS. JONES:    Objection.**

(18)       **A       Yes.**

(19)       Q       Where do you -- do you carry that

(20)   notepad with you every day?

(21)       **A       Yes, but through the course of my**

(22)   **career I have been through several, several**

(23)   **notepads.**

(24)       Q       I guess my question is right now where

(25)   do you -- do you keep it in a breast pocket or

(1)                    Sergeant J. Rudolph

(2)     something else on your body?

(3)         **A      Yes, I have not had to carry a notepad**

(4)     **in some years now but yes, it would be carried in**

(5)     **my shirt pocket when I was in patrol.**

(6)         Q      When you completed or filled up a

(7)     notepad where would you store it?

(8)         **A      I honestly think I discarded them at**

(9)     **some point. I really don't know where it would be**

(10)    **where they are today.**

(11)        Q      If you know are there any general

(12)    orders or other rules about whether or not you're

(13)    required to preserve and maintain your notepads

(14)    after they're filled up?

(15)        **A      No.**

(16)        Q      No, you don't know or no, there is no

(17)    rule?

(18)        **A      No, I only -- any time we need notes**

(19)    **for a case they would be entered into the**

(20)    **investigation.  Any notes relevant to that case**

(21)    **would be enter into the investigation.  Other**

(22)    **than that, no.**

(23)        Q      But you would be the one determining

(24)    whether or not the information is relevant,

(25)    right, there could be additional information in

(1)                Sergeant J. Rudolph

(2)    your handwritten notes --

(3)            **MS. JONES:   Objection.**

(4)        Q    -- that maybe you don't think is

(5)    relevant?

(6)            **MS. JONES:   Objection.**

(7)        **A     I cannot recall if -- in speaking**

(8)    **again in terms of this case, is that the question**

(9)    **you're asking?**

(10)       Q    I mean I was using this case as a

(11)   hypothetical but there is you can understand that

(12)   there would be circumstances where you might make

(13)   a determination that you think you entered all

(14)   the relevant information into the system and

(15)   somebody else might think that other information

(16)   contained in your handwritten notes is also

(17)   relevant but it didn't make it into the system;

(18)   do you agree with that?

(19)           **MS. JONES:   Objection.**

(20)       **A     Anything needing to be remembered is**

(21)   **what I would jot down into those notes but you**

(22)   **know I can't speak to what I used that day.**

(23)       Q    For example, the NYPD requires that

(24)   certain information be drafted and kept by

(25)   officers in their what they call memo books.

(1)                 Sergeant J. Rudolph

(2)             Does the RPD have similar requirements

(3)     for what information is put in your notepads?

(4)         **A      There is no required information or**

(5)     **direction as to what is written or what is not**

(6)     **written in notepads.**

(7)         Q      For example, the NYPD requires that if

(8)     you speak with a witness you have to document

(9)     that in your notepad.

(10)             The RPD doesn't have a similar

(11)    requirement?

(12)        **A      No.**

(13)        Q      If I ask you to look for your notes

(14)    from the date of this accident is that something

(15)    that you would be able to do?

(16)            **MS. JONES:   Objection.**

(17)        **A      I could check but I don't -- again, I**

(18)    **don't even know if I made notes that day so that**

(19)    **would be tough to try to figure out.**

(20)        Q      If you were to check where would you

(21)    look?

(22)            **MS. JONES:   Objection.**

(23)        **A      I honestly don't know to tell you the**

(24)    **truth.**

(25)        Q      Did you have a practice of storing

(1)                Sergeant J. Rudolph

(2)  them for example in your locker or somewhere

(3)  else?

(4)           **MS. JONES:   Objection.**

(5)       **A      No.**

(6)       Q      So they were not maintained in like

(7)  one specific place?

(8)       **A      No.**

(9)           **MR. SHIELDS:   To the extent that**

(10)          **Officer or Sergeant Rudolph has any**

(11)          **relevant notes we call for the**

(12)          **production and I will followup in**

(13)          **writing.**

(14)      Q      So back to Exhibit 3, the File History

(15)  Activity. I just want to go through it and ask

(16)  you about some of the individuals who viewed the

(17)  video.

(18)          So if we go above your entry next it's

(19)  Officer Algarin again and above him it's Ralph

(20)  Montinarelli; am I saying that right?

(21)      **A      Montinarelli.**

(22)      Q      Who is Ralph Montinarelli?

(23)      **A      He I believe at the time was a**

(24)  **lieutenant.  He is currently retired.**

(25)      Q      Do you know why Lieutenant

(1)                  Sergeant J. Rudolph

(2)  Montinarelli would have watched the video?

(3)             **MS. JONES:    Objection.**

(4)      **A     I do not.**

(5)      Q     Was he a Lieutenant in the Clinton

(6)  section?

(7)      **A     I do not recall his assignment at the**

(8)  **time.**

(9)      Q     Would he have been someone above you

(10) in the chain of command?

(11)     **A     Yes.**

(12)     Q     So can you explain the review process

(13) during an incident like this?

(14)           After you report the incident to,

(15) let's see, it was Lieutenant Person and PSS they

(16) would then someone at their level would then

(17) review the incident?

(18)     **A     At the PSS level, yes.**

(19)     Q     How about in the section level you

(20) said that Lieutenant Person was the lieutenant on

(21) duty that day for what was it?

(22)     **A     For the City.  He is basically in**

(23) **charge of the City that day.**

(24)     Q     Now was Lieutenant Montinarelli and

(25) Lieutenant Person did they have basically the

(1)                    Sergeant J. Rudolph

(2)  same role?

(3)      **A       No, not that day. Lieutenant Person**

(4)  **was again the commanding officer in the City at**

(5)  **the time.**

(6)              **I am unsure of what Lieutenant**

(7)  **Montinarelli's role was that day.**

(8)      Q     It looks like he reviewed the

(9)  body-worn camera three days later on October 22.

(10)             So I don't know if that gives you any

(11)  clue as to why he might have reviewed the

(12)  body-worn camera at that time?

(13)             **MS. JONES:   Objection.**

(14)      **A     I can't speak on his behalf.**

(15)      Q     So all you know is that he was

(16)  Lieutenant, someone who was higher ranking and he

(17)  reviewed the video.  That is all that this can

(18)  tell you?

(19)      **A     Correct.**

(20)      Q     So then above him again is Officer

(21)  Algarin on October 24.

(22)             If we go up a couple October 28 it's

(23)  Matthew Ehlers; do you know who Matthew Ehlers

(24)  is?

(25)      **A     I do not.**

(1)              **Sergeant J. Rudolph**

(2)      Q    It just says that he exported file and

(3)  then above that is Michael Perkowski; am I saying

(4)  that right?

(5)      **A    Yes.**

(6)      Q    Who is Michael Perkowski?

(7)      **A    He was a Lieutenant with the Rochester**

(8)  **Police Department.**

(9)      Q    So he is retired now?

(10)     **A    Yes.**

(11)     Q    Do you know what his role was back in

(12)  December of 2018?

(13)     **A    I do not.**

(14)     Q    It looks like he exported and viewed

(15)  it.  And then Matthew Ehlers again exported the

(16)  file a few times. Officer Algarin and then

(17)  Michael Perkowski again. Michael Perkowski again.

(18)  This is into March 2019.

(19)          Above him is Steven Kennedy, do you

(20)  know who Steven Kennedy is?

(21)     **A    Yes.**

(22)     Q    Who is Steven Kennedy?

(23)     **A    He is a sergeant with the Rochester**

(24)  **Police Department.**

(25)     Q    What is his role in the Rochester

(1)                    Sergeant J. Rudolph

(2)     Police Department other than being a sergeant?

(3)         **A     Currently or during the time of the**

(4)     **incident?**

(5)         Q     Well at the time that he viewed it, it

(6)     was March 2019, so if you know March 2019?

(7)         **A     I don't know where he was assignment**

(8)     **wise in 2019.**

(9)         Q     Do you know where he was assignment

(10)    wise at the time of the incident?

(11)        **A     No.**

(12)        Q     Do you know where he is now?

(13)        **A     Yes.**

(14)        Q     Where is he now?

(15)        **A     He is a sergeant in the major crimes**

(16)    **division.**

(17)        Q     And if we go above that Michael

(18)    Perkowski again, Matthew Ehlers, Javier Algarin

(19)    and then Abigail Minchella, do you know who

(20)    Abigail Minchella is?

(21)        **A     No.**

(22)        Q     Then Matthew Ehlers, Matthew Ehlers

(23)    and then lastly Kevin Flanagan in February of

(24)    2021, do you know who Kevin Flanagan is?

(25)        **A     I do.**

(1)                    **Sergeant J. Rudolph**

(2)        Q      Who is Kevin Flanagan?

(3)        **A      He is a sergeant with the Rochester**

(4)   **Police Department.**

(5)        Q      Do you know his assignment?

(6)        **A      Time of the incident or now?**

(7)        Q      Both.

(8)        **A      Time of the incident I am not sure**

(9)   **where he was. Now he is in Lake section on the**

(10)  **day shift.**

(11)       Q      Any idea where he was in February

(12)  2021?

(13)              **MS. JONES:   Objection.**

(14)       **A      No.**

(15)       Q      Any idea why he might have viewed the

(16)  video in February 2021?

(17)       **A      I do not.**

(18)       Q      Do you know where Officer Algarin is

(19)  currently assigned?

(20)       **A      Today, no.**

(21)       Q      Could it have been that Kevin Flanagan

(22)  viewed the video because maybe he was Officer

(23)  Algarin's supervisor at the time in February of

(24)  2021?

(25)              **MS. JONES:   Objection.**

(1)                    **Sergeant J. Rudolph**

(2)        **A      I don't know.**

(3)        Q      Of any of the individuals that we went

(4)   over do you have any idea why any of them might

(5)   have watched the video?

(6)               **MS. JONES:    Objection.**

(7)        **A      No.**

(8)        Q      Did you ever speak with any of those

(9)   individuals about their review of the video?

(10)       **A      No.**

(11)       Q      Did you ever speak with anyone from

(12)  PSS about the incident?

(13)       **A      Besides the initial phone to**

(14)  **Lieutenant Tordai, no.**

(15)       Q      Did you ever speak with any other

(16)  supervisors or anyone above you in the chain of

(17)  command about the incident?

(18)              **MS. JONES:    Objection.**

(19)       **A      I can't recall.**

(20)       Q      Same questions for just the body-worn

(21)  camera video.  I am assuming that if I asked you

(22)  if you spoke with anyone about the incident if I

(23)  asked you the same questions if you ever spoke

(24)  with anybody from PSS or above you in the chain

(25)  of command about the body-worn camera video I am

(1)                    Sergeant J. Rudolph

(2)    assuming that the answer is the same, no?

(3)              **MS. JONES:   Objection.**

(4)       **A     You're asking me if anybody on this**

(5)    **list if I have spoken to them about viewing the**

(6)    **camera, that is what you're asking?**

(7)       Q     Let me withdraw that really bad

(8)    question.  Let's take it step by step.

(9)              Have you ever spoken with any in PSS

(10)   only about the body-worn camera video?

(11)             **MS. JONES:   Objection.**

(12)      **A     Not to my recollection.**

(13)      Q     Have you ever spoken with any

(14)   supervisors or anyone above you in the chain of

(15)   command about the incident?

(16)      **A     About the incident, I can't recall.**

(17)             **Again, chain of command that day was**

(18)   **Lieutenant Person as the commanding officer for**

(19)   **the City.  So yes, I spoke to him to answer your**

(20)   **question correctly, I spoken to him about the**

(21)   **incident as that was the proper notification.**

(22)      Q     But other than Lieutenant Person you

(23)   don't recall speaking to anybody above you in the

(24)   chain of command about the incident?

(25)             **MS. JONES:   Correct.**

(1)                    **Sergeant J. Rudolph**

(2)        **A      Correct, not that I can recall.**

(3)        Q      Officer Algarin testified that he was

(4)   never disciplined or required to undergo any

(5)   additional training as a result of the incident;

(6)   is that your understanding also?

(7)             **MS. JONES:   Objection.**

(8)        **A      To the best of my recollection I don't**

(9)   **recall him getting any additional training.**

(10)       Q      As his direct supervisor that is

(11)  something that you would have been aware of;

(12)  correct?

(13)            **MS. JONES:   Objection.**

(14)       **A      Yes.**

(15)       Q      So if the incident was reviewed by

(16)  supervisors and PSS and he was never disciplined

(17)  or required to undergo any additional training

(18)  that would mean that the supervisors in PSS

(19)  determined that his actions were lawful and

(20)  appropriate and complied with RPD policies and

(21)  procedures?

(22)            **MS. JONES:   Objection.**

(23)       **A      I don't know the exact routing of how**

(24)  **they handle and what they do with every single**

(25)  **case once they review it.**

(1)                    **Sergeant J. Rudolph**

(2)          **If there is anything that gets**

(3)   **directed back my way to either further look at or**

(4)   **provide additional training to then I would be**

(5)   **notified and in this case I do not recall that.**

(6)        Q    If they had determined, if someone had

(7)   determined that his actions were either unlawful

(8)   or violated RPD's policy that is something that

(9)   you would have been notified of; correct?

(10)          **MS. JONES:    Objection.**

(11)        **A    Not every time. Again, within our**

(12)   **professional standard section there are a couple**

(13)   **of avenues in which they can go down on a case by**

(14)   **case basis as far as what they want to do.**

(15)          **There are a few instances where it**

(16)   **could come my way but there is also instances**

(17)   **where I would not be notified.**

(18)        Q    So if Officer Algarin said that he was

(19)   never notified by PSS and if your testimony is

(20)   that you don't remember ever being notified that

(21)   anyone found his actions to be in violation of

(22)   any policy or rule then that would mean that the

(23)   supervisors that reviewed the incident and PSS

(24)   didn't find that he violated any policies of the

(25)   RPD; is that fair to say?

(1)                    Sergeant J. Rudolph

(2)          **MS. JONES:    Objection.**

(3)      **A      Again, I can't speak to the**

(4)  **conversations or the stuff that PSS produces and**

(5)  **if what ever Officer Algarin told you that is if**

(6)  **he said he heard nothing and you say that then**

(7)  **that is what happened then.**

(8)      Q      Basically I guess just to make sure I

(9)  understand everything, and I will take this down,

(10) if PSS finds an officer violated a policy there

(11) is a notification process; right, he would have

(12) been notified?

(13)         **MS. JONES:    Objection.**

(14)     **A      In most cases I would say yes, he**

(15) **would be notified.**

(16)     Q      Are there exceptions to that?

(17)     **A      Again, not knowing every single avenue**

(18) **because I never worked in PSS, not knowing every**

(19) **single approach they take I can't answer that and**

(20) **say absolutely no.**

(21)     Q      In this instance part of that review

(22) that was done by you --

(23)         Withdrawn.

(24)         Do you know if PSS and/or any other

(25) supervisors reviewed the portion of the incident

(1)                    Sergeant J. Rudolph

(2) where Officer Algarin backtracked through Mr.

(3) Dempsey's backyard?

(4)      **A     I can't speak to the other reviews**

(5) **that would have happened.**

(6)      Q     But that was part of your review?

(7)      **A     My review of the situation, yes, as**

(8) **outlined in the Incident Report.**

(9)      Q     We discussed earlier that RPD policy

(10) and training requires in circumstances like this

(11) that officers backtrack through the backyards

(12) after a suspect has been detained to look for

(13) potentially guns or contraband that has been

(14) discarded?

(15)           **MS. JONES:    Objection.**

(16)      **A     There is not policy that says every**

(17) **single time you backtrack through a backyard. We**

(18) **have to take in totality of the circumstances**

(19) **surrounding the incident.**

(20)      Q     So it would be more like the practice

(21) that the RPD has is when you consider the

(22) totality of the circumstances based on your

(23) experience in the field you backtrack under

(24) certain circumstances to check for any discarded

(25) guns or weapons?

(1)                    Sergeant J. Rudolph

(2)        **A        On a case by case basis.**

(3)        Q        Does RPD policy and training require

(4)    officers to try to get consent of the homeowner

(5)    prior to entering their property?

(6)        **A        Before entering a property there are**

(7)    **exceptions to as far as like a search warrant and**

(8)    **you're getting consent or things of that nature**

(9)    **but in this situation again them backtracking to**

(10)   **ensure there are no weapons in that immediate**

(11)   **path is the reasoning for the backtracking.**

(12)       Q        Does RPD policy otherwise require

(13)   officers to warn the homeowner prior to entering

(14)   their property as part of their backtracking?

(15)       **A        There is nothing that outlines that**

(16)   **specifically.**

(17)       Q        Are there any general orders or other

(18)   written policies that provide guidance to

(19)   officers as to when backtracking through the

(20)   curtilage to a property is permissible?

(21)       **A        We would follow just the general order**

(22)   **and investigations basically falling into the**

(23)   **realm of search warrant requirements and things**

(24)   **of that nature.**

(25)       Q        So the rule is about searches?

(1)                Sergeant J. Rudolph

(2)        **A      Yes, in the general orders, yes,**

(3)    **searches, search warrants that I don't have the**

(4)    **general order off the top of my head but it is**

(5)    **outlined in the investigation section.**

(6)        Q      Are you aware that on the date of the

(7)    incident Algarin, Gorman, Horowitz and DiSabatino

(8)    had made a plan to chase the suspected drug

(9)    dealers through the residential backyards?

(10)       **MS. JONES:      Objection.**

(11)       **A      I don't know of any plan.**

(12)       Q      So basically all of them testified,

(13)   well I didn't take DiSabatino's deposition,

(14)   anyway, every officer that testified talked about

(15)   how they had devised a plan where Officer Algarin

(16)   and Officer DiSabatino drove up on Kosciusko

(17)   Street and Officer Gorman and Horowitz waited

(18)   behind the vacant lot on Sobieski Street because

(19)   of their prior knowledge and interactions with

(20)   people who were suspected drug dealers on the

(21)   street running through the backyards.  And so

(22)   after they got the 9-1-1 call they said alright,

(23)   Algarin and DiSabatino, we are going to come up

(24)   on Kosciusko, Gorman and Horowitz are going to

(25)   wait on Sobieski expecting the suspected drug

(1)                    Sergeant J. Rudolph

(2)    dealers to run through those yards so that they

(3)    can be detained, were you ever made aware that

(4)    they had devised that plan prior to responding to

(5)    the 9-1-1 call?

(6)        A    Not that I can recall.

(7)        Q    Is there any specific RPD general

(8)    order that deals with entering the curtilage to a

(9)    property?

(10)           MS. JONES:   Objection.

(11)       A    Again, that would be as we have

(12)   situations come up, right, and you reflect that

(13)   from what were generally is outlined in that

(14)   search warrants section and searches and that

(15)   section of the GO.

(16)       Q    If a misdemeanor suspect flees into

(17)   the curtilage of private property are officers

(18)   allowed to chase them on to that private

(19)   property?

(20)       A    A misdemeanor suspect you said flees

(21)   into a property?

(22)       Q    Correct.

(23)           MS. JONES:   Objection.

(24)       A    As in the outside or are you talking

(25)   about go into a house?

(1)                    **Sergeant J. Rudolph**

(2)       Q      Why don't you tell me, okay, we will

(3)    take it step by step.

(4)              If they go in a house are you allowed

(5)    to follow them into a house?

(6)              **MS. JONES:   Objection.**

(7)       **A      So again, it is very easy just to ask**

(8)    **this question but again you have to take the**

(9)    **totality of the circumstances in play, so there**

(10)   **has to be more detail than that.**

(11)      Q      If they flee into the backyard of a

(12)   property are you allowed to follow them into the

(13)   backyard of a property?

(14)             **MS. JONES:   Objection.**

(15)      **A      Again, specifics of the case, we have**

(16)   **to know more detail as to why there would be a**

(17)   **pursuit or what the reason would be to pursue.**

(18)   **Can't just paint it with a broad stroke.**

(19)      Q      Have you ever been trained that there

(20)   is a difference legally as to whether you're

(21)   permitted to follow somebody that is suspected of

(22)   only having committed a misdemeanor versus

(23)   someone who is suspected of having committed a

(24)   felony?

(25)      **A      Any difference from misdemeanor or**

(1)                    Sergeant J. Rudolph

(2)    felony on if we can pursue or not, is that what

(3)    you're asking?

(4)        Q     Correct.

(5)        A     If there is probable cause to arrest

(6)    for a crime that is committed, yes, we can take

(7)    lawful action to stop that person.

(8)        Q     So you can enter the property to stop

(9)    the person?

(10)       A     Well again, there has got to be more

(11)   circumstances as to the entering the property.

(12)   What are we saying as far as that?

(13)       Q     What is your understanding, why don't

(14)   you just tell me what different circumstances you

(15)   would consider?

(16)             MS. JONES:    Objection.

(17)       A     So entering a property if there is

(18)   probable cause and they're right there and they

(19)   take a step onto property and you're right there

(20)   to arrest them then you arrest them and place

(21)   them into custody.

(22)       Q     If someone who was suspected of

(23)   committing a misdemeanor runs into a backyard are

(24)   officers permitted to chase them into the

(25)   backyard?

(1)                    Sergeant J. Rudolph

(2)              **MS. JONES:    Objection.**

(3)        **A      If they are in hot pursuit of a**

(4)   **suspect that runs and they have probable cause to**

(5)   **arrest for a crime then they will, yes, they will**

(6)   **chase somebody until they are apprehended.**

(7)        Q      Is there any difference, is there any

(8)   rule that delineate any kind of difference

(9)   legally if that person is suspected of having

(10)  committed a felony?

(11)             **MS. JONES:    Objection.**

(12)       **A      No, a crime, right, the difference is**

(13)  **a violation which is lesser which no and then a**

(14)  **crime would be a misdemeanor or felony.**

(15)       Q      Does the RPD teach you that people

(16)  have a reasonable expectation of privacy in their

(17)  home?

(18)       **A      Yes.**

(19)       Q      Does the RPD teach you that the legal

(20)  requirements for entering the curtilage to a

(21)  property are the same as entry into the home

(22)  itself?

(23)       **A      Under what set of circumstances?**

(24)       Q      All circumstances.

(25)       **A      All circumstances.**

(1)                 **Sergeant J. Rudolph**

(2)                 **If we are in hot pursuit then we**

(3)       **would, yes, we would enter and chase somebody and**

(4)       **enter if you're describing as curtilage.**

(5)            Q     So I guess my question was were you

(6)       ever taught while at the RPD that the Supreme

(7)       Court has held that legally speaking the

(8)       curtilage to a property enjoys the same fourth

(9)       amendment protections as the home itself?

(10)           **A     Are you citing a Supreme Court case?**

(11)      **Are you asking if I have been taught that?**

(12)           Q     I am asking if you have been taught

(13)      that, yes.

(14)           **A     You would to tell me the Supreme Court**

(15)      **case. I don't know.**

(16)           Q     Just in general, assume that, I am not

(17)      trying to trick you here, I am just asking you.

(18)           **A     I know but if you're asking if I have**

(19)      **been taught something out of the Supreme Court,**

(20)      **yes, if I recall the such and such verse such and**

(21)      **such I can tell you if I recall getting that**

(22)      **training but just say a Supreme Court case about**

(23)      **entering property.**

(24)           Q     That is not my question.

(25)                 My question is have you ever been

(1)                    Sergeant J. Rudolph

(2)    taught the legal concept that the legal

(3)    requirements to enter the curtilage to the

(4)    property are the same not any different from the

(5)    legal requirements to enter into a home itself,

(6)    have you ever been taught that?

(7)              **MS. JONES:   Objection.**

(8)       **A     To distinguish the two you are asking**

(9)    **if I have been taught that?**

(10)      Q     Correct.

(11)             **MS. JONES:   Objection.**

(12)      **A     It would be again case by case and**

(13)   **situation dependent upon the fact pattern.   To**

(14)   **again give it a broad stroke to say that this is**

(15)   **this and this is that, it is not, we are giving**

(16)   **the parameters of again exceptions to search**

(17)   **warrants and things of that nature, right, but to**

(18)   **narrow it down to such a specific thing there has**

(19)   **to be more taken into account.**

(20)      Q     So all that I am asking is the

(21)   concept. It is a very simple question.

(22)             Were you ever taught that the legal

(23)   requirements to enter into a home are in distinct

(24)   from the legal requirements to enter onto the

(25)   curtilage to the home?

(1)                    Sergeant J. Rudolph

(2)       **A      Not to my recollection.**

(3)       Q      Does the RPD teach you that if you

(4)  violate someone's reasonable expectation of

(5)  privacy by entering their home or its curtilage

(6)  that that entry would be unlawful?

(7)       **A      If you violate, yes, it is unlawful to**

(8)  **make, yes.**

(9)       Q      It is unlawful to make an entry into

(10)  an area where a person has a reasonable

(11)  expectation of privacy?

(12)            **MS. JONES:   Objection.**

(13)       **A      Yes.**

(14)       Q      If we take a step back, you had

(15)  mentioned the warrant requirement previously,

(16)  right, so the general rule is that for police

(17)  officers to enter someone's property generally

(18)  under the fourth amendment you're required to

(19)  obtain a warrant; correct?

(20)            **MS. JONES:   Objection.**

(21)       **A      In general terms, yes, except with the**

(22)  **exceptions.**

(23)       Q      The courts have said that a

(24)  warrantless entry into someone's property is

(25)  presumptively unreasonable; right?

(1)                    Sergeant J. Rudolph

(2)        **MS. JONES:    Objection.**

(3)        **A      Unless there is an exception to that**

(4)   **which is an exception to a search warrants.**

(5)        Q      One of those exceptions is exigent

(6)   circumstances?

(7)        **A      Correct.**

(8)        Q      What is your understanding of the

(9)   exigent circumstances exception to the warrant

(10)  requirement?

(11)       **A      Anything that could provide, produce a**

(12)  **heightened risk to the public or third party.**

(13)       Q      There has to be an emergency; correct?

(14)       **A      Some type of an emergency.**

(15)       Q      It is more than a heightened risk, it

(16)  is an actual ongoing immediate emergency; right?

(17)       **MS. JONES:    Objection.**

(18)       **A      It could be a play on words but again**

(19)  **something that is, that needs to happen sooner**

(20)  **rather than later; right.**

(21)       Q      Were you ever taught that there is two

(22)  requirements for the rule; one, an emergency and

(23)  two, probable cause?

(24)       **A      Taught that specifically, no.  Just**

(25)  **basically the outline of exigent circumstances in**

(1)                    **Sergeant J. Rudolph**

(2)    **its form.**

(3)        Q      Is that rule important?

(4)              **MS. JONES:   Objection.**

(5)        **A      The rule?  Which rule?**

(6)        Q      Does the rule that you can't enter

(7)    someone's property if you don't have a warrant

(8)    consent for exigent circumstances why is that

(9)    rule important?

(10)             **MS. JONES:   Objection.**

(11)       **A      Why is it important if you don't have**

(12)   **any of those things?**

(13)       Q      Correct.

(14)       **A      Because it would be a warrantless**

(15)   **entry.**

(16)       Q      Why is it important not to make

(17)   warrantless entries?

(18)       **A      Because it is a violation of the**

(19)   **fourth amendment.**

(20)             **MS. JONES:   Objection.**

(21)       Q      It could be unsafe to the police

(22)   officers too; right?

(23)             **MS. JONES:   Objection.**

(24)       **A      Yes.**

(25)       Q      It could be unsafe to the property

(1)                 Sergeant J. Rudolph

(2)    owner; right?

(3)              **MS. JONES:   Objection.**

(4)        **A     Yes.**

(5)        Q     Did you ever learn that hot pursuit is

(6)    a subcategory of exigent circumstances?

(7)        **A     Yes.**

(8)        Q     Can you please explain everything that

(9)    the RPD told you about the legal requirements for

(10)   the hot pursuit exception to apply?

(11)             **MS. JONES:   Objection.**

(12)       **A     So again, hot pursuit, somebody that**

(13)   **has probable cause to arrest and is in foot or in**

(14)   **toe of that person in running through, going**

(15)   **through onto property would be deemed hot pursuit**

(16)   **if it exits the public area, right in its kind of**

(17)   **purest simplest form there.**

(18)       Q     Did the RPD ever teach you the Supreme

(19)   Court has noted that there is no hot pursuit

(20)   unless there is a "continuous pursuit of the

(21)   suspect from the scene of a crime" and it is

(22)   Welsh versus Wisconsin?

(23)             **MS. JONES:   Objection.**

(24)       **A     No, but it is an understanding that if**

(25)   **hot pursuit no longer exists then the pursuit of**

(1)                     **Sergeant J. Rudolph**

(2)     **that individual or suspect is over.**

(3)         Q      So once that pursuit is over then

(4)     you're no longer provided with the lawful basis

(5)     to enter onto private property; correct?

(6)             **MS. JONES:   Objection.**

(7)         **A      If for a reason that that pursuit**

(8)     **caused the potential of risk to other parties**

(9)     **that may be on that property then yes, to still**

(10)    **go on that property we would say is lawful.**

(11)        Q      So after a pursuit has concluded and

(12)    the suspects are detained you're still permitted

(13)    to enter onto some other property; is that what

(14)    you're saying?

(15)            **MS. JONES:   Objection.**

(16)        **A      That is a broad stroke there.**

(17)            **Again, a lot of the circumstances**

(18)    **surrounding the investigation have to be brought**

(19)    **into play and just again to bring it back to what**

(20)    **we are talking about here in this case the**

(21)    **possibility of a weapon being discarded is why we**

(22)    **would backtrack and search that immediately that**

(23)    **immediate flight path.**

(24)        Q      But backtracking would not be

(25)    permitted by the hot pursuit exception, correct,

(1)                 Sergeant J. Rudolph

(2)   because the pursuit was concluded?

(3)           **MS. JONES:   Objection.**

(4)       **A     I would not say hot pursuit at that**

(5)   **point. I would say that that is exigent**

(6)   **circumstance based on a firearm being in the open**

(7)   **during immediately from a pursuit.**

(8)       Q     We talked earlier about how there is

(9)   two requirements, an emergency and probable

(10)  cause.

(11)           So in this circumstance are you saying

(12)  that the officers had probable cause to believe

(13)  that there was a crime being committed in that

(14)  property?

(15)          **MS. JONES:   Objection.**

(16)      **A     I can't speak to that, what those**

(17)  **officers established is probable cause at that**

(18)  **time.**

(19)      Q     They never told you that they could

(20)  see a weapon as they peered over the fence prior

(21)  to entering Mr. Dempsey's backyard; correct?

(22)          **MS. JONES:   Objection.**

(23)      **A     I don't recall a conversation.**

(24)      Q     So there is no reason to believe that

(25)  there were guns or contraband discarded on the

(1)                  Sergeant J. Rudolph

(2)    property other than the fact that they believed

(3)    the suspect had traversed that backyard prior to

(4)    being detained in the neighboring yard; correct?

(5)              **MS. JONES:   Objection.**

(6)       **A     They believed that he went -- he**

(7)    **traversed that yard.**

(8)       Q     That was the only reason that they

(9)    backtracked through that yard; correct?

(10)             **MS. JONES:   Objection.**

(11)      **A     With the information that he could**

(12)   **have possibly been armed at the time.**

(13)      Q     So the belief that he possibly

(14)   discarded something in the yard alone provided a

(15)   lawful basis for them to enter the yard after the

(16)   conclusion of the hot pursuit?

(17)      **A     That immediate flight path for**

(18)   **discarded firearm that could potentially be**

(19)   **dangerous but also you know as an evidentiary**

(20)   **reason as well but more so of the nature of that**

(21)   **firearm being potentially dangerous unknowing who**

(22)   **had access to that backyard.**

(23)      Q     Did the RPD ever teach you that the

(24)   Supreme Court has held that the flight of a

(25)   misdemeanor suspect alone does not justify the

(1)                    Sergeant J. Rudolph

(2)   warrantless entry into a home or its curtilage?

(3)        **A       I don't recall.**

(4)        Q     So no, you never as far as you recall

(5)   you have never received that training from the

(6)   RPD?

(7)        **A       On somebody who has committed a crime**

(8)   **in hot pursuit into a property, is that what**

(9)   **you're asking?**

(10)       Q     What I am asking is if you only

(11)  suspect that they may have committed a

(12)  misdemeanor has the RPD ever told you that you're

(13)  not allowed to pursue them on to a property if

(14)  all that you suspect is that they have committed

(15)  a misdemeanor?

(16)       **A       If there is probable cause to arrest**

(17)  **for a crime then they will pursue.**

(18)            **I have not heard of the case of**

(19)  **wherein if it is a misdemeanor or felony, right,**

(20)  **in which you are delineating here.**

(21)       Q     So the answer is no, the RPD has never

(22)  taught that you the Supreme Court has held that

(23)  the flight of a misdemeanor suspect alone does

(24)  not justify a warrantless entry into a home or

(25)  its curtilage?

(1)                    Sergeant J. Rudolph

(2)        **A       I do not recall that.**

(3)        Q       So no, you have never been taught that

(4)   by the RPD as far as you recall?

(5)            **MS. JONES:    Objection.**

(6)        **A       Again, I do not recall.**

(7)        Q       I am just trying to understand what

(8)   you are mean when you say you don't recall.

(9)            So you don't recall ever having been

(10)  taught that by the RPD?

(11)           **MS. JONES:    Objection.**

(12)       **A       So again, I am not trying to be**

(13)  **evasive with you or not trying to be hesitant to**

(14)  **answer anything.**

(15)           **Over a 15 year career I have attended**

(16)  **several trainings. I can't recall every one**

(17)  **specifically.**

(18)       Q       From your prior answers about you

(19)  saying that if you suspect that a crime has been

(20)  committed it doesn't matter if it is a

(21)  misdemeanor or a felony if the suspect flees onto

(22)  a property you're going to -- it's lawful for the

(23)  RPD officers to pursue them onto the property in

(24)  hot pursuit; correct?

(25)           **MS. JONES:    Objection.**

(1)                    **Sergeant J. Rudolph**

(2)        **A      If there is hot pursuit for officers**

(3)    **that have probable cause to arrest that they will**

(4)    **continue to pursue.**

(5)        Q      And it doesn't matter if it is a

(6)    misdemeanor or if it is a felony that they

(7)    suspect that person of having committed?

(8)        **A      A crime misdemeanor or felony.**

(9)        Q      Did the RPD ever teach you that the

(10)   mere suspicion that contraband is present on the

(11)   property does not on its own create a urgency

(12)   justifying a warrantless entry onto the property?

(13)       **A      I cannot recall.**

(14)       Q      The mere possibility that contraband

(15)   could be removed or destroyed that doesn't create

(16)   urgency justifying a warrantless entry onto a

(17)   property; correct?

(18)           **MS. JONES:   Objection.**

(19)       **A      Can you repeat that again.**

(20)       Q      The mere possibility that there is

(21)   contraband on a property that can be removed or

(22)   destroyed that doesn't create an emergency under

(23)   the exigent circumstances exception that would

(24)   justify entry onto the property; is that correct?

(25)           **MS. JONES:   Objection.**

(1)                 **Sergeant J. Rudolph**

(2)        **A      I agree.**

(3)        Q      For the exigent circumstances

(4)   exception to apply you have to reasonably believe

(5)   that the contraband is in the process of being

(6)   removed or destroyed or that removal or

(7)   destruction of the contraband is imminent, do you

(8)   agree with that?

(9)              **MS. JONES:   Objection.**

(10)       **A      No, that is similar to what you just**

(11)  **asked before, right?  So it does not create**

(12)  **exigency.**

(13)       Q      So what I am talking about is the

(14)  immediacy of the destruction.

(15)              If you see somebody in the vicinity of

(16)  contraband that is on the property and you think

(17)  that they might go and flush the drugs down the

(18)  toilet that would be immediate; right?  That

(19)  would create an immediacy and an emergency; can

(20)  we agree on that?

(21)       **A      If we can see there is destruction of**

(22)  **evidence?**

(23)       Q      If you can see that there is a

(24)  potential for an immediate destruction of

(25)  evidence, yes?

(1)                      Sergeant J. Rudolph

(2)        **A       Yes.**

(3)        Q       That is different from if you just see

(4)   for example drugs sitting on a table in the

(5)   middle of a backyard but nobody around?

(6)        **A       There is a difference, yes, no one**

(7)   **around, yes.**

(8)        Q       In that second scenario there would be

(9)   no emergency; right?

(10)       **MS. JONES:    Objection.**

(11)       **A       Correct, if there is no one back**

(12)  **there.**

(13)       Q       Would you also agree the exigent

(14)  circumstances justifying an immediate search may

(15)  not be present if the officers have a reasonable

(16)  opportunity to seek the homeowner's consent to

(17)  enter and search the property?

(18)       **A       They would have to take into totality**

(19)  **the circumstances of how many officers were there**

(20)  **at the time and that or anybody's access to that**

(21)  **area during that time.**

(22)       Q       So my question is if you just listen

(23)  carefully, if the officers have a reasonable

(24)  opportunity, so assuming that yes, look, there is

(25)  enough officers, that one of them can reasonably

(1)                    Sergeant J. Rudolph

(2)    go up to the front door, knock, ask for consent

(3)    to enter and search the property, under those

(4)    circumstances there would not be an emergency

(5)    that would justify entry to the property absent

(6)    obtaining that consent; do you agree with that?

(7)         **A    I agree.**

(8)         Q    Because if they have time to seek the

(9)    owner's consent there is no emergency; right?

(10)        **MS. JONES:   Objection.**

(11)        **A    Yes.**

(12)        Q    In this circumstance would you agree

(13)   that the fact that it would have taken longer to

(14)   walk to the front door and ask for Mr. Dempsey's

(15)   consent to enter his yard just the fact that that

(16)   would have taken longer that alone doesn't create

(17)   an emergency; right?

(18)        **MS. JONES:   Objection.**

(19)        **A    Again, it is about the timeframe in**

(20)   **which so how many people are in that area, it's**

(21)   **very common that people traverse backyards**

(22)   **private property or not with how many people are**

(23)   **out in the neighborhood at the time and with the**

(24)   **amount of officers back there as well.**

(25)        Q    So my specific question is just that

(1)                    Sergeant J. Rudolph

(2) only, the only question is simply the fact that

(3) it would have taken longer to walk from the

(4) backyard of the neighboring property to Mr.

(5) Dempsey's front door and knock to ask for his

(6) consent that additional 30 seconds or what ever

(7) it would have taken instead of just jumping over

(8) the fence that additional 30 seconds alone does

(9) not create an emergency; would you agree with

(10) that?

(11)        **A     I couldn't tell you. That is a**

(12) **hypothetical because within those 30 seconds I**

(13) **don't know who has access to the backyard, I**

(14) **don't know who could be traversing through there**

(15) **so in that hypothetical I can't specifically tell**

(16) **you that yes, there would be time.**

(17)        Q     The only question is would that

(18) additional amount of time 30 seconds would that

(19) alone justify an emergency?

(20)            **MS. JONES:   Objection.**

(21)        Q     Would that additional 30 seconds

(22) constitute an emergency?

(23)            **MS. JONES:   Objection.**

(24)        **A     I would say that yes, the additional**

(25) **30 seconds with nobody back there would still be**

(1)                    Sergeant J. Rudolph

(2)    a risk to people in the area if we lost sight of

(3)    what was going on in that backyard.

(4)        Q    In this instance Officer Horowitz and

(5)    Officer Gorman were both standing in the two

(6)    neighboring backyards immediately adjacent to Mr.

(7)    Dempsey's backyard, so under those circumstances

(8)    would the additional 30 seconds create an

(9)    emergency?

(10)        MS. JONES:    Objection.

(11)        A    So I can't speak to those officers'

(12)    actions at the time.  As we can see from the

(13)    body-worn camera they were dealing with two

(14)    individuals at the time so them having

(15)    uninterrupted observations into that backyard you

(16)    can't say that they could devote all of that

(17)    attention back there.

(18)                And again, when we talk about what

(19)    that area and that neighborhood again it

(20)    shouldn't be glossed over that people walk

(21)    through backyards and what are called cuts or

(22)    areas in which people walk through between

(23)    streets through neighborhoods is certainly a

(24)    thing in that neighborhood.

(25)        Q    Is there a different rule that

(1)                Sergeant J. Rudolph

(2)    permits --

(3)              Withdrawn.

(4)              Is there any rule that applies to

(5)    police officers that doesn't apply to regular

(6)    citizens regarding entry into those backyards

(7)    that people cut through?

(8)        A    **The laws are the same.**

(9)        Q    So the fourth amendment applies

(10)   similarly to private citizens as it does to

(11)   police officers?

(12)       A    **In this -- in the context of what we**

(13)   **are talking about here and people third parties**

(14)   **entering yards that is typically not considered**

(15)   **by people that traverse other peoples yards in**

(16)   **what we are talking about here.**

(17)       Q    Let's forget about the case for a

(18)   second.

(19)             My question is if an officer knew of a

(20)   cut through through peoples backyards from

(21)   Kosciusko Street to Sobieski Street that

(22)   residents in the neighborhood took but obviously

(23)   they had to jump a fence in someone's backyard is

(24)   a police officer allowed to also take that cut

(25)   through jump over someone's fence to get from

(1)                    Sergeant J. Rudolph

(2)    Kosciusko Street to Sobieski Street?

(3)        **A      No, they would not be taking that path**

(4)    **unless they had reason to.**

(5)        Q      Because they would be prohibited by

(6)    the fourth amendment; correct?

(7)        **MS. JONES:    Objection.**

(8)        **A      Entering somebody else's premises,**

(9)    **yes, they would not have a reason to be on that**

(10)   **premises.**

(11)       Q      So what I want to do is I want to put

(12)   the camera video back up and I have a few more

(13)   questions. That is Exhibit 2. I want to rewind it

(14)   back to the beginning and then I am going to play

(15)   it and ask you some questions.

(16)              Sergeant, on your screen do you see

(17)   the beginning of the body-worn camera video

(18)   again?

(19)       **A      I do.**

(20)       Q      Earlier when we played it after

(21)   hearing some of the voices and whatnot did you

(22)   recognize that video as Officer Algarin's

(23)   body-worn camera video?

(24)       **A      I did.**

(25)       Q      As we are paused here at the beginning

(1)                    Sergeant J. Rudolph

(2)  of the video do you know what property Officer

(3)  Algarin is standing in?

(4)        **A    No.**

(5)        Q    But it is not on Mr. Dempsey's

(6)  backyard; do you agree with that?

(7)        **A    I don't know where he is at that**

(8)  **moment in time.**

(9)        Q    So let's just begin the video and the

(10) first thing that he is going to do is jump this

(11) large fence; do you remember that from watching

(12) it previously?

(13)       **A    Yes.**

(14)       Q    Watching it previously do you know the

(15) yard that he jumps into is Mr. Dempsey's

(16) backyard?

(17)       **A    I am not sure.**

(18)       Q    So I will just represent to you that

(19) it is and I will just ask you to kind of pay

(20) attention to what he does when he is in that

(21) backyard before he then exits the yard; okay?

(22)       **A    Okay.**

(23)       Q    Then I will ask you some questions.

(24)            (Whereby, the video is played.)

(25)       **A    Are you saying this is Mr. Dempsey's**

Sergeant J. Rudolph

(1)                    **Sergeant J. Rudolph**

(2)  **backyard now?**

(3)      Q      Correct.

(4)             Pause at 1 minute and 12 seconds.

(5)             The individual in general what was

(6)  Officer Algarin doing before he is depicted here

(7)  jumping over the fence at 1 minutes and 12

(8)  seconds into the video?

(9)             **MS. JONES:   Objection.  Just for the**

(10)            **record the video is really choppy**

(11)            **especially when I guess the camera is**

(12)            **spanning it looks like it jumped**

(13)            **frames so I am sure Sergeant Rudolph**

(14)            **will answer the best he can but the**

(15)            **video quality is poor.  I guess this**

(16)            **room doesn't have any better Wifi than**

(17)            **the other place we were at yesterday.**

(18)            **MR. SHIELDS:  Is there any chance,**

(19)            **Peachie, that you could get a copy of**

(20)            **the video like you did yesterday?**

(21)            **MS. JONES:   Yes, we moved rooms today**

(22)            **in hopes of being in a better Wifi**

(23)            **place so I am further away.  I prefer**

(24)            **not to.**

(25)            **MR. SHIELDS:  Can you do it even**

(1)            Sergeant J. Rudolph

(2)        though you prefer not to?

(3)        THE WITNESS:  Are you talking to me?

(4)        MR. SHIELDS:  No, I am asking your

(5)        attorney if she wouldn't mind getting

(6)        a better copy of the video so you can

(7)        view it without it being choppy?

(8)        MS. JONES:  No, I would rather just

(9)        continue along.

(10)       MR. SHIELDS:  So I will call the court

(11)       and ask them if they can ask you to

(12)       get a copy of the video because I

(13)       don't think that is very courteous of

(14)       you and I don't understand why you

(15)       can't do me that courtesy.  Maybe you

(16)       would want to reconsider?

(17)       MS. JONES:   No.

(18)       (Whereby, a call was made to Judge

(19)       Payson's chambers.)

(20)       MR. SHIELDS:  Hey, Kim, it is Elliot

(21)       Shields.  How are you today?  I am

(22)       okay.  I am calling because I have got

(23)       a deposition we are in on the Charles

(24)       Dempsey case.

(25)       SECRETARY:  Okay.

(1)                    Sergeant J. Rudolph

(2)          MR. SHIELDS:  And we are having just a

(3)     little dispute that we were hoping

(4)     Judge Payson can help us out with.

(5)          SECRETARY:  One second, this usually

(6)     goes through Christin first so just

(7)     give me one moment.

(8)          MR. SHIELDS:  Hi, this is Elliot

(9)     Shields.

(10)         SECRETARY:  Hi, Elliot.  Do you have

(11)    opposing counsel on the line as well.

(12)         MR. SHIELDS:  Yes, we are here on

(13)    Zoom.  Can you hear Peachie?

(14)         SECRETARY:  I am not sure. Peachie,

(15)    can I hear you?

(16)         MS. JONES:  I can hear you.

(17)         SECRETARY:  Let me transfer you to

(18)    Christin.

(19)         LAW CLERK:  Hi Elliot.  How are you?

(20)         MR. SHIELDS:  Good. We are okay. We

(21)    are just having a little dispute in a

(22)    deposition in the Charles Dempsey case

(23)    that we are hoping you might be able

(24)    to help us out with.

(25)         LAW CLERK:  Okay, and Mr. Shields, is

(1)              Sergeant J. Rudolph

(2)         Miss Jones there?

(3)         MR. SHIELDS:  Can you hear, Peachie?

(4)         MS. JONES:  Yes, sorry we are both

(5)         here.

(6)         LAW CLERK:  Are we on the record?

(7)         COURT REPORTER:  Yes.

(8)         LAW CLERK:  Mr. Shields, you called,

(9)         do you want to go ahead and tell me

(10)        what is going on?

(11)        MR. SHIELDS:  So what is going on is

(12)        we have got a lot of depositions that

(13)        we have been doing over the past while

(14)        and we will have a lot more

(15)        depositions going forward and the

(16)        other day yesterday we had a

(17)        deposition all conducted by Zoom and

(18)        they're in the dog shooting cases

(19)        where there is body-worn camera

(20)        recordings and yesterday Miss Jones

(21)        explained that when I tried to display

(22)        the body-worn camera on the screen on

(23)        their end playing it through Zoom it

(24)        was choppy and didn't look great and

(25)        so I had asked Miss Jones if she

(1)                    Sergeant J. Rudolph

(2)           minded getting a copy of the video to

(3)           display for the officers so that it

(4)           would not be choppy and it would play

(5)           smoothly and yesterday she agreed and

(6)           she went and she did that and it was

(7)           very helpful.

(8)           Today same issue, I was trying to play

(9)           the body-worn camera video and display

(10)          it through the Zoom application and

(11)          again Miss Jones informed me that the

(12)          video was choppy and it was hard to

(13)          ask specific questions about the video

(14)          and I asked her if she would mind

(15)          doing the same thing that she did

(16)          yesterday and getting a copy of the

(17)          video to play for the officer on her

(18)          computer and she said no she is not

(19)          going to do that today.

(20)          LAW CLERK:   Okay, Miss Jones.

(21)          MS. JONES:   Good afternoon.  That is

(22)          correct. This is plaintiff's

(23)          deposition. He has the obligation to

(24)          be prepared and have the materials

(25)          ready to question a witness.  He

(1)              Sergeant J. Rudolph
(2)         didn't provide me the notice that we
(3)         would be doing this every single time
(4)         and if this is going to happen for
(5)         every single one of our twenty
(6)         depositions I am just disinclined to
(7)         do the work for him. He wants to have
(8)         a remote deposition for his
(9)         convenience and it seems like suddenly
(10)        defendants are shouldering the burden
(11)        of his convenience by bringing
(12)        exhibits and what not to facilitate
(13)        his questioning. We offered to have
(14)        these in person so that these
(15)        technology issues are not an issue and
(16)        he has declined to do so and I
(17)        honestly don't feel the -- I don't
(18)        have the obligation or duty to be his
(19)        assistant and facilitate his
(20)        deposition. We have produced our
(21)        witness and he is prepared to be asked
(22)        questions but you know we even tried a
(23)        different room today so that maybe the
(24)        internet would be better but I guess
(25)        City Hall is what it is and videos are

(1)              Sergeant J. Rudolph

(2)        just hard to see. That is my position.

(3)        LAW CLERK:   Just remind me, I know

(4)        the parties have been in these

(5)        depositions are these the Monell

(6)        depositions or are they fact specific

(7)        to the Dempsey matter?

(8)        MR. SHIELDS:  This is the deposition

(9)        of the supervisor who completed the

(10)       Incident Report for this specific

(11)       incident.

(12)       LAW CLERK:   I do recall speaking to

(13)       you both before when you were

(14)       arranging for deposition but I think

(15)       it was in this matter that there was

(16)       some dispute over whether they be in

(17)       person, whether they be remote.   I

(18)       just don't recall maybe you can

(19)       refresh my recollection, is it the

(20)       fact the parties agreement that you

(21)       are doing the remote deposition, were

(22)       they noticed that way, I just don't

(23)       recall what that dispute was.

(24)       MR. SHIELDS:  They were noticed and

(25)       Judge Peterson issued an order saying

(1)              Sergeant J. Rudolph
(2)         that all of the depositions could
(3)         proceed remotely since there is
(4)         overlap of all the dog shooting cases.
(5)         MS. JONES:    Yes, so Judge Peterson
(6)         said that we should accommodate Mr.
(7)         Shields as much as possible and so we
(8)         agreed to hold depositions remotely
(9)         since that is Mr. Shields preference
(10)        and how he has subpoenaed these
(11)        depositions.
(12)        LAW CLERK:    Okay, and was that order
(13)        issued in just one of the cases or was
(14)        it issued in all Judge Peterson's
(15)        cases?
(16)        MS. JONES:    It actually was not
(17)        ordered in any of these dog cases.   It
(18)        was ordered in a separate case in Van
(19)        which then during a conference in one
(20)        of the dog cases he said that he
(21)        expected the parties to abide by that
(22)        decision in the Van matter that he
(23)        expected the City to accommodate Mr.
(24)        Shields' preference to hold these
(25)        remotely.

(1)                Sergeant J. Rudolph

(2)          MR. SHIELDS:  It is not a preference.

(3)     I can do it remotely because I noticed

(4)     it remotely.  And so the only

(5)     discourtesy that is happening here is

(6)     the city's refusal to obtain a copy of

(7)     their own record that they produced in

(8)     not only FOIL but in this litigation

(9)     also, and yesterday Miss Jones

(10)    extended me the courtesy of obtaining

(11)    a copy of the video and in the notice

(12)    itself it said that I was going to

(13)    question Supervisor about his review

(14)    of the incident and his review of the

(15)    incident included his review of the

(16)    body-worn camera video.

(17)    Now what I could have done and what I

(18)    did in the past and what I am happy to

(19)    do right now is e-mail Miss Jones a

(20)    copy of the video, she can just pull

(21)    it up on her computer and display it

(22)    for the officer so she doesn't even

(23)    have to leave the office. That is a

(24)    common practice in depositions to

(25)    e-mail the other party a copy of the

(1)            Sergeant J. Rudolph

(2)            Exhibit. So I really don't understand

(3)            why she is not agreeing to display a

(4)            copy of the video on the computer that

(5)            they have at City Hall.

(6)            LAW CLERK:   Miss Jones, if Mr.

(7)            Shields were to e-mail you a copy of

(8)            the exhibit would that satisfy your

(9)            concerns here or would that not

(10)           satisfy your concerns?

(11)           MS. JONES:   I do have my lap top up.

(12)           I could download the video, sure.

(13)           LAW CLERK:   Great.  And I would just

(14)           suggest since you guy are going to

(15)           have so many depositions together if

(16)           this kind of issue is going to be an

(17)           ongoing issue maybe send a letter and

(18)           so it is not going to interrupt and

(19)           obviously eating up deposition time

(20)           encourage the parties to work together

(21)           as well as trying to get through these

(22)           depositions.  I know you have a quite

(23)           a few of them, Mr. Shields.  If you go

(24)           ahead and send that video to Miss

(25)           Jones agreeing that she will display

(1)             Sergeant J. Rudolph

(2)        it and try to work through it that

(3)        way. And then understanding that this

(4)        may be a reoccurring issue let's try

(5)        to get it resolved; okay?

(6)        MR. SHIELDS:  Thank you so much

(7)        Christin.

(8)        MS. JONES:   I am sorry.  I only heard

(9)        three quarters of that. I heard

(10)       something about send a letter and this

(11)       will happen a few times because we

(12)       have a lot of depositions.

(13)       Could you maybe repeat what you said?

(14)       LAW CLERK:   Sure, I just said it

(15)       sounds like we resolved what we need

(16)       to for today.  Mr. Shields was going

(17)       to send you a copy of the body-worn

(18)       camera and you have agreed to display

(19)       it but because you're going to be

(20)       doing a lot of depositions together

(21)       one, obviously we encourage you to try

(22)       to work through these tech issues

(23)       together but if this is going to be a

(24)       reoccurring issue you should talk

(25)       about it after deposition and if you

(1)                    Sergeant J. Rudolph

(2)              can't resolve it and try to figure out

(3)              a way for you both to get through this

(4)              kind of an issue send a letter to the

(5)              court so that you're not eating up

(6)              deposition time to try to resolve

(7)              these issues.  It sounds like it is

(8)              something that might reoccur.

(9)              MS. JONES:  That was better.  Thank

(10)             you.

(11)             MR. SHIELDS:  Thank you so much,

(12)             Christin.

(13)        A      What would you like me to do, Mr.

(14)   Shields?

(15)        Q      Can you please watch the video from

(16)   the beginning until Officer Algarin jumps in to

(17)   the yard which is right at 1 minute and 12

(18)   seconds into the video.

(19)              (Whereby, the officer played the

(20)              video.)

(21)             MR. SHIELDS:  Thank you for pulling

(22)             that video up, Peachie.  I appreciate

(23)             it.

(24)        Q      So first question, when Algarin

(25)   originally jumps the stockade fence, the tall

(1)                    Sergeant J. Rudolph

(2)    fence in the beginning, at that point the two

(3)    suspects had already been detained in the

(4)    neighboring yards but Horowitz and Gorman;

(5)    correct?

(6)            **MS. JONES:   Objection.**

(7)        **A    It appears to be that way.**

(8)        Q    So the hot pursuit had already

(9)    concluded at the point that he originally entered

(10)   Mr. Dempsey's backyard at that point; correct?

(11)           **MS. JONES:    Objection.**

(12)       **A    Yes.**

(13)       Q    At that point there was no lawful

(14)   basis for him to enter the yard in the first

(15)   place; correct?

(16)           **MS. JONES:   Objection.**

(17)       **A    Whose yard?**

(18)       Q    Mr. Dempsey's backyard when he jumped

(19)   the tall stockade fence in the beginning of the

(20)   video?

(21)       **A    I again believe that him entering that**

(22)   **backyard at that point with the possible firearm**

(23)   **in the backyard and the amount of officers they**

(24)   **had there at the time, dealing with other**

(25)   **individuals and no other officers out there in**

(1)                    **Sergeant J. Rudolph**

(2)     **the totality of the circumstances of the call**

(3)     **they were at I would say for them to traverse**

(4)     **through that backyard at that point was okay.**

(5)         Q     So what was the lawful basis that

(6)     permitted him to enter the backyard at that

(7)     point?

(8)         **A     I would say he is checking that area**

(9)     **based on exigent circumstance that being a**

(10)    **possible danger to the people that could be in**

(11)    **the area of discarded firearm.**

(12)        Q     So he had probable cause to believe

(13)    that there potentially could be a discarded

(14)    firearm in the yard?

(15)        **A     I believe if yes, they believed that**

(16)    **there was at that point discarded firearm in the**

(17)    **backyard.   That is what would want to have them**

(18)    **go through that backyard.**

(19)        Q     Your basis for believing that Algarin

(20)    believed that there is discarded firearm was that

(21)    his question to the suspect that Officer Horowitz

(22)    had detained asking him where the gun was?

(23)        **A     Rephrase that please.**

(24)        Q     What is the basis for your belief that

(25)    he was looking for a gun?

(1)                    Sergeant J. Rudolph

(2)      **A      Based on the call that they got and**

(3)   **the overall reason for them being there that day.**

(4)      Q      Which was a call for VICE activity;

(5)   right?

(6)            **MS. JONES:   Objection.**

(7)      **A      The VICE activity job, yes.**

(8)      Q      VICE activity means drugs; is that

(9)   right?

(10)           **MS. JONES:   Objection.**

(11)     **A      It could mean drugs or guns.**

(12)     Q      In the video you heard Officer Algarin

(13)  ask the suspect where he had discarded a gun?

(14)     **A      I heard him ask, yes.**

(15)     Q      So we talked about the probable cause.

(16)            Now what was the emergency that

(17)  required them to enter the yard at that point?

(18)     **A      So with the officer the other two**

(19)  **officers that he was with they were dealing with**

(20)  **two individuals with their attention toward those**

(21)  **two individuals and again based on their training**

(22)  **and experience which they can speak to and the**

(23)  **understanding of what generally happens in the**

(24)  **area of those VICE activity calls and the ability**

(25)  **for people to traverse through backyards would be**

(1)                    **Sergeant J. Rudolph**

(2)    **some of the factors for them to enter that**

(3)    **backyard.**

(4)         Q     Now Officer Algarin could have just

(5)    walked around to the front instead of jumping the

(6)    stockade fence and told Mr. Dempsey some guys

(7)    just ran through your yard, we think they might

(8)    have discarded a gun, do you mind if I enter to

(9)    search, he could have done that; right?

(10)        **A     That is based on Officer Algarin what**

(11)   **he perceived to be the biggest issue at the time.**

(12)   **I can't speak on his behalf.**

(13)        Q     Sure.

(14)              So what I am asking is it would have

(15)   been physically possible for him to instead of

(16)   jumping the fence to have walked to Mr. Dempsey's

(17)   front door and ask permission or consent to enter

(18)   his yard; right?

(19)              **MS. JONES:    Objection.**

(20)        **A     That is a way that he could have done**

(21)   **that.**

(22)        Q     If he didn't have any other exception

(23)   that applied if he is wrong and he didn't have

(24)   any exigent circumstances that permitted him to

(25)   enter the yard legally he would have had to

(1)             Sergeant J. Rudolph

(2)   either get Mr. Dempsey's consent or a warrant to

(3)   enter his yard; correct?

(4)           **MS. JONES:   Objection.**

(5)       **A     Yes.**

(6)       Q     Are you aware of a lawsuit called Erin

(7)   Gursslin against the City of Rochester which

(8)   S.W.A.T. snipers Josh Kelly and Jeremy Nellist

(9)   entered her backyard and shot and killed her dog?

(10)       **A     I am aware of a case of that nature,**

(11)   **yes.**

(12)       Q     In that case your predecessor Aaron

(13)   Springer testified that at the time of the

(14)   incident which was in September of 2018 he

(15)   believed it was lawful for the snipers to walk

(16)   through her yard to get to their final operating

(17)   position but now after going through the lawsuit

(18)   he understands that officers are not just allowed

(19)   to walk through people's backyards; do you agree

(20)   with that?

(21)           **MS. JONES:   Objection.**

(22)       **A     In that -- I really don't want to go**

(23)   **down the rabbit hole of another case. Can we**

(24)   **explain the relevance to that?  Honestly I am not**

(25)   **trying to be hesitant to answer.  Again, you have**

(1)                    **Sergeant J. Rudolph**

(2)    **to understand that is a different set of**

(3)    **circumstances in that nature as well.  It is not**

(4)    **the Officer Algarin case.  It was different**

(5)    **things that happened during that incident than**

(6)    **this.**

(7)        Q     So what I am asking you to do if you

(8)    can is listen to the specific question that I am

(9)    asking, try to forget every other question that

(10)   has been asked, just listen to the words that

(11)   come out of my mouth and answer this specific

(12)   question that I ask because I am not asking you

(13)   to apply what happened in that case to this case

(14)   or anything.

(15)          The question is that Springer

(16)   testified that at the time in September of 2018

(17)   he believed it was lawful for the snipers to just

(18)   walk through one yard to get to another yard but

(19)   now after going through the lawsuit he

(20)   understands that officers are not permitted to

(21)   walk through one property to get to another

(22)   property.

(23)          So my question is do you agree that

(24)   walking through one property to get to another

(25)   property is unlawful without any warrant or

(1)                    Sergeant J. Rudolph

(2)     exception to the warrant requirement that

(3)     applies?

(4)              **MS. JONES:   Objection.**

(5)         **A      Again, there could be a lot of**

(6)     **circumstances in that, not to be difficult Mr.**

(7)     **Shields, but if I walk onto somebody's property**

(8)     **others -- someone's corner of their property to**

(9)     **get to a front door of another property without**

(10)    **squarely turning corners on the sidewalks I think**

(11)    **we are talking somewhat of the same thing here,**

(12)    **right?**

(13)              **Again, in the context of a sniper**

(14)    **deployment you know that is a different whole set**

(15)    **of different questions.  I am not trying to be**

(16)    **difficult but if I am to go and knock on**

(17)    **somebody's door during a neighborhood check or**

(18)    **something like that I am entering their property**

(19)    **to establish communication at which point I am**

(20)    **okay to do that, right.  So again there has got**

(21)    **to be fact patterns with this.**

(22)         Q     So are you permitted to enter into a

(23)    portion of the property where a person has a

(24)    reasonable expectation of privacy?

(25)              **MS. JONES:   Objection.**

(1)                    **Sergeant J. Rudolph**

(2)        **A      I would say no, if they have a**

(3)   **reasonable expectation of privacy based on a ways**

(4)   **in which properties are setup which everyone is**

(5)   **different but again every layout of a property is**

(6)   **going to be different as well.**

(7)        Q      If Springer testified that he learned

(8)   as part of that case that without a warrant

(9)   consent or exigent circumstances he can't just

(10)  walk through someone's backyard even if you are

(11)  not searching that yard and that the RPD never

(12)  taught him that that was unlawful, is that

(13)  consistent with the training that you received

(14)  also?

(15)       **A      Of Aaron Springer's statement you're**

(16)  **saying?**

(17)       Q      Correct.

(18)       **MS. JONES:   Objection.**

(19)       **A      Again, I can't recall the exact**

(20)  **training and the way individuals retain things**

(21)  **during some training is different than others so**

(22)  **I can't recall training in that matter.**

(23)       Q      It is important for you as the

(24)  Supervisor to understand the policies and

(25)  procedures of the RPD so that you can review the

(1)                 Sergeant J. Rudolph

(2)   action of your subordinates; right?

(3)       **A     Yes.**

(4)           **MS. JONES:   Objection.**

(5)       Q     So if one of your subordinate

(6)   trespassed in the backyard of someone's property

(7)   and that person complained about it what would

(8)   you do under those circumstances?

(9)       **A     I would investigate the situation.**

(10)      Q     In order to properly investigate you

(11)  would have to understand the RPD policies and the

(12)  laws that applies has been decided by the courts;

(13)  right?

(14)      **A     Yes, if you're talking case law and**

(15)  **policies and procedures, yes, you have an**

(16)  **understanding of that.**

(17)      Q     So do you still have the video up on

(18)  your screen?

(19)      **A     I do.**

(20)      Q     So can you just play it.

(21)          (Whereby, the video was played.)

(22)      Q     Just for the record, can you -- that

(23)  went through the shooting and a little bit after

(24)  the shooting?

(25)      **A     Yes.**

(1)                    **Sergeant J. Rudolph**

(2)         Q     Can you give me the time that the

(3)    video was paused at?

(4)         **A     2:44.**

(5)         Q     Did you ever ask Algarin what was

(6)    going through his head at the exact moment that

(7)    he jumped the fence and entered Mr. Dempsey's

(8)    yard for the second time?

(9)         **A     To the exact conversation I can't**

(10)   **recall.**

(11)        Q     The first time that Algarin was in Mr.

(12)   Dempsey's backyard for about a minute he didn't

(13)   find a gun or any contraband during that first

(14)   time he was in the yard; correct?

(15)             **MS. JONES:     Objection.**

(16)        **A     I don't know if he was looking at that**

(17)   **time.**

(18)        Q     Can you describe what he was doing the

(19)   first time that he was in the yard?

(20)        **A     It appears he came over the fence,**

(21)   **identified an officer with another individual in**

(22)   **the lot on to the other side and was asking**

(23)   **questions and then went over to assist the other**

(24)   **officer in the other lot.**

(25)        Q     Did you recognize the second officer

(1)                    Sergeant J. Rudolph

(2)    in the other lot as Officer Gorman?

(3)         **A**       **Yes.**

(4)         Q       From the neighboring yard where he was

(5)    with Officer Gorman his body camera shows that he

(6)    can see over the fence into Mr. Dempsey's yard;

(7)    correct?

(8)              **MS. JONES:   Objection.**

(9)         **A**       **Yes, yes, that is reasonable.**

(10)        Q       There is no indication that prior to

(11)   jumping the fence he saw a gun or contraband on

(12)   the ground in Mr. Dempsey's yard; correct?

(13)             **MS. JONES:   Objection.**

(14)        **A**       **Nothing that he said verbally to**

(15)   **indicate.**

(16)        Q       Did you ever ask him as part of your

(17)   review of the incident whether he observed a gun

(18)   or any contraband on the ground in Mr. Dempsey's

(19)   yard prior to jumping the fence and entering the

(20)   yard the second time?

(21)        **A**       **I can't recall a conversation.**

(22)        Q       If he had told you that as part of the

(23)   conversations that something you would have

(24)   documented in your Incident Report?

(25)             **MS. JONES:   Objection.**

(1)                    **Sergeant J. Rudolph**

(2)        **A        Depending on the context I can't tell**

(3)    **you definitively yes or no if I would have put it**

(4)    **or not.**

(5)        Q    Do you remember in your review of the

(6)    incident if in fact at any point after the

(7)    incident when additional officers showed up if a

(8)    gun or contraband were ever located in Mr.

(9)    Dempsey's backyard?

(10)       **A        Nothing was found.**

(11)       Q    In your review of the camera video

(12)   just now did you hear Officer Gorman tell Algarin

(13)   to backtrack through the yard?

(14)       **A        I can't recall if Officer Algarin**

(15)   **asked or if Officer Gorman told him to.   I**

(16)   **couldn't recall that.**

(17)       Q    There is a conversation between the

(18)   two of them; do you recall that?

(19)       **A        Yes, I looked that there was a**

(20)   **conversation or sounded like there was a**

(21)   **conversation.**

(22)       Q    After they had that conversation is

(23)   when Officer Algarin asked where he jumped the

(24)   fence and then he went to the picnic table and

(25)   jumped over the fence?

(1)                    Sergeant J. Rudolph

(2)          **MS. JONES:   Objection.**

(3)     **A      Looks like after the conversation,**

(4) **yes, he did traverse the fence.**

(5)     Q      Earlier we discussed how Officer

(6) Algarin, DiSabatino, Gorman and Horowitz had this

(7) plan to force the suspects to run through the

(8) backyard; right?

(9)          **MS. JONES:   Objection.**

(10)    **A      That we discussed, yes.**

(11)    Q      Is that a common practice in the RPD?

(12)         **MS. JONES:   Objection.**

(13)    **A      It is a case by case basis but yes,**

(14) **sometimes while responding to jobs of any nature**

(15) **officers come up with some type of plan.**

(16)    Q      To purposefully chase suspects through

(17) residential properties?

(18)         **MS. JONES:   Objection.**

(19)    **A      I would not say that is an accurate**

(20) **description.**

(21)    Q      To force suspects to go through the

(22) backyards of residential properties?

(23)    **A      No, Mr. Shields, I am talking**

(24) **generally that, and I don't know what their**

(25) **conversation was about this job and what they**

(1)                    **Sergeant J. Rudolph**

(2)    **planned or did not plan, but when officers meet**

(3)    **or plan something in the beginning they generally**

(4)    **just talk about how they're going to get there**

(5)    **and generalize what would happen.  But again to**

(6)    **this case I don't know if they did or did not do**

(7)    **that.**

(8)        Q    So my question is I represented to you

(9)    earlier is that every officer who has testified

(10)   in this case said their plan was DiSabatino and

(11)   Algarin drive up to the suspects on Kosciusko

(12)   Street, they expected them to run through the

(13)   yards into the backyards on Sobieski Street where

(14)   Gorman and Horowitz would be waiting to detain

(15)   them expecting that that is their flight path

(16)   through the backyards.

(17)            So the question is are plans like that

(18)   common practice in the RPD?

(19)            **MS. JONES:    Objection.**

(20)       **A    The specific way in which they roll it**

(21)   **out, no.  Sometimes there is no plan, sometimes**

(22)   **there is a plan and/or there could be other**

(23)   **variations of a plan.  It is really based off of**

(24)   **what those officers with that level of training**

(25)   **and experience if they do make a plan they come**

(1)                  **Sergeant J. Rudolph**

(2)  **up with a plan in their way.**

(3)       Q       Does the RPD train its officers that

(4)  when they make a plan like that that they need to

(5)  consider what to do if they encounter a dog when

(6)  they are present on someone's property?

(7)            **MS. JONES:   Objection.**

(8)       **A       Yes, when ever and how everything is**

(9)  **outlined in the general orders and training**

(10) **bulletins and in-service training that is what**

(11) **guides us and obviously the New York State penal**

(12) **law and just law in general.**

(13)      Q       So aside from everything that you just

(14) referenced does the RPD say hey look, if you're

(15) planning to go onto a residential property you

(16) need to be prepared for encountering a dog and

(17) what to do if you encounter a dog when you're on

(18) someone's property?

(19)           **MS. JONES:   Objection.**

(20)      **A       No, there is not policy that just says**

(21) **when on someone's property.  It will tell you**

(22) **guidelines of how to deal with an aggressive dog**

(23) **should it present any type of danger to the**

(24) **officer or to the public.**

(25)      Q       Any time that you enter onto

(1)                 Sergeant J. Rudolph

(2)    somebody's property there is a possibility that

(3)    you might encounter a dog; right?

(4)             **MS. JONES:    Objection.**

(5)        **A      There is always a possibility you can**

(6)    **encounter a dog anywhere.**

(7)        Q      But especially on somebody's property

(8)    a lot people own dogs; right?

(9)             **MS. JONES:    Objection.**

(10)       **A      People own dogs, yes.**

(11)       Q      Most of the officers that have

(12)   testified have said between a third and 60% of

(13)   people in the City of Rochester own dogs; does

(14)   that sound accurate that range to you?

(15)            **MS. JONES:    Objection.**

(16)       **A      I don't know if that is accurate.**

(17)       Q      In your experience would you say the

(18)   majority of people in the City of Rochester own

(19)   dogs?

(20)            **MS. JONES:    Objection.**

(21)       **A      I have never quantified that data.  I**

(22)   **have come across a lot of dogs in my experience,**

(23)   **to say half, less, more, yes, people have dogs,**

(24)   **sometimes you come across them, sometimes you**

(25)   **don't.**

(1)                    **Sergeant J. Rudolph**

(2)        Q      When a dog sees a stranger often they

(3)   run up to that person; right?

(4)             **MS. JONES:    Objection.**

(5)        **A      I am not an expert on behaviors of**

(6)   **dogs.**

(7)        Q      Have you ever received any training

(8)   about behaviors of dogs?

(9)        **A      I have.**

(10)       Q      In that training did you learn that

(11)  often times especially if you're on that dog's

(12)  property it will run up to you and approach you?

(13)       **A      The dogs take interest in people, yes,**

(14)  **but some dogs no.  I have certainly in my**

(15)  **experience gone onto properties during other jobs**

(16)  **wherein there is a dog and there is no interest.**

(17)       Q      In your training were you taught what

(18)  to do if a dog runs up to you?

(19)       **A      Yes, the training outlines various**

(20)  **things, if the dog is aggressive, if it is**

(21)  **submissive, if it is posturing in a certain way**

(22)  **and if it runs towards you, yes, there is**

(23)  **training on that and there has been.**

(24)       Q      What does the training tell you to do

(25)  or permit you to do if a dog runs up to you when

(1)                 Sergeant J. Rudolph

(2)    you're on its property?

(3)              **MS. JONES:   Objection.**

(4)         **A    The training isn't just subjected to**

(5)    **property. It is just any dog encounters anywhere.**

(6)              **But when a dog runs up to you anywhere**

(7)    **based on that officer's perception of it if it is**

(8)    **aggressive or not you can use tools that you have**

(9)    **on your belt, you can use a firearm if you feel**

(10)   **that that dog is going to injure you or a third**

(11)   **person, to stop that.**

(12)        Q    So it is a subjective standard that

(13)   applies when you're responding to a dog that is

(14)   approaching you?

(15)             **MS. JONES:    Objection.**

(16)        **A    Again, it is based on the officer's**

(17)   **perception of that dog and also take into account**

(18)   **the environmental factors that are going on**

(19)   **around him, people in the area, if there is**

(20)   **someone there or not to take the dog, there is a**

(21)   **lot of things that come into play as a dog comes**

(22)   **running up at you.**

(23)        Q    So my question is is the standard when

(24)   you're reviewing whether or not the use of force

(25)   against a dog was reasonable is that a subjective

(1)              Sergeant J. Rudolph

(2)    standard for what the officer believed at the

(3)    time if the officer believed that the dog was

(4)    attacking them or is it an objective standard

(5)    where you have to consider all of the facts and

(6)    the totality of the circumstances?

(7)         **MS. JONES:   Objection.**

(8)         **A     When I review the video and take a**

(9)    **look based on what the discussion is with the**

(10)   **officer and then looking at the video yes, I take**

(11)   **all of that into account as to if shooting the**

(12)   **dog is a last resort was warranted.**

(13)        Q     Let me ask you this.

(14)              If an officer told you that there is a

(15)   dog shooting incident and the officer said look,

(16)   I know the dog wasn't going to hurt me and I

(17)   wasn't scared that it was attacking but it was

(18)   running at me so I shot it any ways, what would

(19)   you do in that circumstance?

(20)        **MS. JONES:   Objection.**

(21)        **A     Are you saying that they just shot the**

(22)   **dog because they shot the dog basically?**

(23)        Q     Let's say, let me give you some more

(24)   facts.

(25)              Let's say in this case you

(1)              Sergeant J. Rudolph

(2)    investigated and Officer Algarin told you look

(3)    yes, that black lab was running at me full speed

(4)    but I wasn't scared, I knew he wouldn't hurt me,

(5)    he probably was just going to lick my face but I

(6)    shot him any ways, would that change your

(7)    determination of whether his actions were

(8)    reasonable under the circumstances?

(9)         **A     Yes.**

(10)        Q     Because he wasn't actually afraid;

(11)   right?

(12)             **MS. JONES:    Objection.**

(13)        **A     If he tells me he was not afraid of**

(14)   **the dog and the dog was not a threat to him or**

(15)   **any other party in the area and that he shot it**

(16)   **anyway yes, that would create an issue.**

(17)        Q     Is the RPD training to officers that

(18)   when a dog approaches them while they are on a

(19)   residential property that the officer is allowed

(20)   to shoot the dog?

(21)             **MS. JONES:    Objection.**

(22)        **A     Again, it doesn't pigeonhole**

(23)   **residential properties.**

(24)             **Again, when encountering a dog and if**

(25)   **it is again acting aggressive poses a danger to**

(1)                    **Sergeant J. Rudolph**

(2)    **that officer or a third party then they are**

(3)    **allowed to shoot a dog.**

(4)        Q    When you say if it poses a threat to

(5)    that officer and third party just going back to

(6)    the objective versus subjective standard, like is

(7)    that something that you have to review

(8)    objectively or can you just take the officer's

(9)    subjective belief and accept what they say?

(10)        **MS. JONES:   Objection.**

(11)        **A    Take in again the totality of the**

(12)    **circumstances.**

(13)            **In this case the officer made the**

(14)    **observation.  If that dog is coming at that**

(15)    **officer in an aggressive manner and that officer**

(16)    **feels that way the officer can discharge a**

(17)    **firearm.  And then I take that, look at a body**

(18)    **camera footage, right, and see what is on there**

(19)    **and then draw up that Incident Report and then if**

(20)    **I feel that anything is out of line then it would**

(21)    **be addressed.**

(22)            **(Short break:  1:57 to 2:07)**

(23)        Q    Sergeant, same question as last time,

(24)    after taking our break did you have an

(25)    opportunity during the break to speak with your

(1)                     Sergeant J. Rudolph

(2)    attorney?

(3)         **A**     **I did.**

(4)         Q     After speaking with your attorney and

(5)    taking a break do you have any questions that you

(6)    would like to either clarify or change your

(7)    answers to?

(8)         **A**     **No.**

(9)         Q     Just to be clear, as parts of your

(10)   training you were told that under certain

(11)   circumstances you're allowed to shoot a dog;

(12)   right?

(13)              **MS. JONES:   Objection.**

(14)        **A**     **Yes.**

(15)        Q     As part of your training you were

(16)   never told that you are not allowed to shoot a

(17)   dog; right?

(18)              **MS. JONES:   Objection.**

(19)        **A**     **Correct.**

(20)        Q     Did you receive the 2014 in-service

(21)   training about bite prevention for law

(22)   enforcement officers?

(23)        **A**     **Yes.**

(24)        Q     Is that power point one of the things

(25)   that you reviewed in preparation for today's

(1)                    Sergeant J. Rudolph

(2)    deposition?

(3)        **A       I briefly looked at it, yes.**

(4)        Q       Do you remember attending that

(5)    training?

(6)        **A       To be honest, Mr. Shields, the**

(7)    **in-services all blend together.  To say I**

(8)    **remember that exact training I can't say yes or**

(9)    **no. 2014 was a good amount of time ago.**

(10)       Q       Since that training in 2014 have you

(11)   received any additional training about how to

(12)   interact with dogs that you might encounter

(13)   during law enforcement activities?

(14)       **A       Yes, I know that that power point**

(15)   **which is recognizable was also given during a**

(16)   **rollcall as a rollcall training and that we did**

(17)   **have a training bulletin out about dogs as well.**

(18)       Q       Aside from those things have you ever

(19)   received any training in your time with the RPD

(20)   about interacting with dogs?

(21)       **A       Yes, through S.W.A.T. training.**

(22)       Q       So additional training that is

(23)   specific for the S.W.A.T. team?

(24)       **MS. JONES:   Objection.**

(25)       **A       Yes, another separate training, yes,**

(1)                    **Sergeant J. Rudolph**

(2)    **from general law RPD training, yes.**

(3)        Q       So training that only S.W.A.T. members

(4)    would have received but not the remainder of RPD

(5)    members who are not members of the S.W.A.T. team?

(6)        **A       Yes.**

(7)        Q       Have you ever shot a dog?

(8)        **A       I have.**

(9)        Q       Have you shot one dog or more than one

(10)   dog?

(11)       **A       One dog.**

(12)       Q       When was that?

(13)       **A       A very long time ago.  It was during**

(14)   **the time I was an officer on the overnight**

(15)   **midnight shift. I can't really give you a year.**

(16)   **It's kind of tough.**

(17)       Q       Before 2010?

(18)       **A       I would say that is reasonable. Yes,**

(19)   **maybe around then I would say.**

(20)       Q       Let me ask you before 2013?

(21)       **MS. JONES:    Objection.**

(22)       **A       Yes, I would say that is accurate.**

(23)       Q       I am only asking that date because I

(24)   have got Incident Reports going back to the end

(25)   of 2013.  So I don't believe that I have an

(1)                    Sergeant J. Rudolph

(2)     Incident Report for you having shot a dog so that

(3)     is why I am asking that.

(4)          A     Okay. If you don't have it then it was

(5)     probably, I think it was when I was way younger

(6)     on the job.

(7)          Q     Can you tell me everything you

(8)     remember about the incident where you shot a dog?

(9)          A     Yes, so working the midnight shift, I

(10)    got sent to a location for a young female that

(11)    had just been bitten on the back.  During that

(12)    investigation she identified a residence from

(13)    which that dog came from.  At that point the dog

(14)    was in the backyard of that property which at

(15)    least did not have a fence line in the front of

(16)    the property. Knowing the dog is in the backyard

(17)    but unknowing where because it was dark I did

(18)    remove and take with me my patrol shotgun.  While

(19)    it stood on the sidewalk while another officer

(20)    went to the front porch and tried to establish

(21)    communication with the homeowner while that was

(22)    happening and the officer was knocking at the

(23)    door the dog began continuously barking and it

(24)    started running directly at me at which point I

(25)    discharged a shotgun and ultimately killed the

(1)                    Sergeant J. Rudolph

(2)     dog.

(3)          Q     How many shots did you fire?

(4)          A     Two shots.

(5)          Q     What kind of dog was it?

(6)          A     It was a Bull Mastiff I believe.

(7)          Q     What happened after you shot the dog?

(8)          A     We called Animal Services and reported

(9)     it to my supervisor and then don't recall maybe

(10)    much else from that.

(11)              Obviously we got the girl the medical

(12)    attention that she needed as well.

(13)         Q     Did you ever consider calling Animal

(14)    Services before you arrived at the scene?

(15)         A     I do not recall.  Animal Services also

(16)    does not work the night shift. They have to be --

(17)    they're on a call back basis overnight.

(18)         Q     So you had to call them and then they

(19)    came after the incident?

(20)         A     Correct.

(21)         Q     What does the call back basis mean,

(22)    like it takes longer?

(23)         A     That means there are no Animal

(24)    Services employees working during the night time

(25)    hours.

(1)                    **Sergeant J. Rudolph**

(2)       Q      So for them to come out you have to

(3)    call and somebody has to wake up out of bed and

(4)    come?

(5)       **A      Come from home, yes.**

(6)       Q      Is there any rule about contacting

(7)    Animal Services first when you respond to an

(8)    incident where the call is about an aggressive or

(9)    a loose dog?

(10)      **A      During the hours in which they are**

(11)   **staffed I believe typically that they are**

(12)   **automatically advised of the job. It just depends**

(13)   **on the severity of which or depends on the**

(14)   **details of the job.**

(15)           **If there is just a loose stray dog**

(16)   **that may just go to Animal Services. If the dog**

(17)   **has bitten someone or acting aggressively in the**

(18)   **neighborhood they will during the staffed hours**

(19)   **of Animal Services they may send us and Animal**

(20)   **Services to them.**

(21)      Q      After you shot the dog did you have to

(22)   talk to your supervisor about the incident?

(23)      **A      I don't recall the conversation but**

(24)   **yes, as it is protocol.**

(25)      Q      Did you speak with anyone from PSS

(1)                Sergeant J. Rudolph

(2)    about the incident?

(3)        **A      I do not recall. More than likely no.**

(4)        Q      Did you speak with anybody else in the

(5)    department who was investigating the

(6)    circumstances of the incident?

(7)        **A      Not that I recall.**

(8)        Q      So the only supervisor that you would

(9)    have spoken with was your direct sergeant at the

(10)   time?

(11)       **MS. JONES:    Objection.**

(12)       **A      Correct.**

(13)       Q      At the time did you write the Incident

(14)   Report or did your sergeant write the Incident

(15)   Report?

(16)       **MS. JONES:    Objection.**

(17)       **A      It would have been my sergeant.   Again**

(18)   **I don't know what supervisor responded. Some**

(19)   **nights there are instances where a sergeant is**

(20)   **not working and that means a Lieutenant would**

(21)   **come to the scene but I can't recall that night**

(22)   **exactly who it was.**

(23)       Q      I ask that question because my

(24)   understanding is that at some point in time the

(25)   rule changed about who writes the Incident Report

(1)                    Sergeant J. Rudolph

(2)    after a dog is shot.

(3)            My understanding is that a number of

(4)    years ago it was the officer and then that

(5)    changed to be the supervisor.  I don't know if

(6)    you remember that change or not?

(7)            **MS. JONES:   Objection.**

(8)        **A     I don't remember that change. I know**

(9)    **that when I got promoted in 2016 to sergeant that**

(10)   **from then on it was a supervisor's duty to write**

(11)   **the Incident Report.**

(12)       Q     Is that something that is unique for

(13)   dog shootings or are there other types of

(14)   incidents where it is the supervisor's duty to

(15)   write the Incident Report?

(16)           **MS. JONES:   Objection.**

(17)       **A     Majority of the time there are the**

(18)   **officers that write reports.  I am trying to**

(19)   **think in my head of instances where only**

(20)   **supervisors writes reports.**

(21)           **Vehicle pursuits I believe a**

(22)   **supervisor will write a report. I can't really**

(23)   **think of anything else off the top of my head.**

(24)       Q     Did you ever receive training about

(25)   application of the use of force continuum against

(1)                 Sergeant J. Rudolph

(2)  dogs?

(3)      **A       The use of force continuum against**

(4)  **dogs?**

(5)      Q     Yes.

(6)      **A       The use of force continuum in dealing**

(7)  **with a person but as far as dogs there is we**

(8)  **don't really have a use of force continuum for**

(9)  **that.**

(10)     Q      Were you ever taught that OC spray can

(11) be effective against an attacking dog?

(12)     **A       Yes, amongst other tools batons,**

(13) **sticks, brooms, what ever you can have available**

(14) **that is longer in nature, yes, that is a way.**

(15)     Q      Were you ever taught that the primary

(16) reason that a dog will attack is because of the

(17) actions of the police officer?

(18)         **MS. JONES:    Objection.**

(19)     **A       Yes, or just any person in general.**

(20) **They are animals so to understand exactly when or**

(21) **what type of situation creates them to get angry**

(22) **I don't know.**

(23)     Q      For example, last week we took the

(24) deposition of Reno DiDomenico who put on the 2014

(25) training and what he testified to is that one of

(1)              Sergeant J. Rudolph
(2)    the primary factors as to whether a dog will act
(3)    aggressively towards the officer is the officer's
(4)    own actions.
(5)              Do you remember that from the 2014
(6)    in-service training?
(7)         **MS. JONES:   Objection.**
(8)    **A     Yes, specifically how it was, yes, I**
(9)    **mean a way that you interact with dogs could**
(10)   **potentially either make it feel like it is**
(11)   **cornered or something like that, yes, we have**
(12)   **generally knowing and having dogs, owned dogs,**
(13)   **that could be a thing.**
(14)   Q    Do you remember if at the academy you
(15)   were ever taught any technique to avoid shooting
(16)   a dog?
(17)   **A     Other than -- the academy is a long**
(18)   **way to think back.**
(19)        **Other than kind of what we described**
(20)   **in some of those training materials again long**
(21)   **objects, sticks, batons, firearm.**
(22)   Q    Other than that one dog that you shot
(23)   have you ever had any other incident where you
(24)   used any less lethal force against a dog?
(25)   **A     The only thing that I have ever done**

(1)                    Sergeant J. Rudolph

(2)    **before is I have used a catch pull on a dog**

(3)    **before. It was in a closet, right, that was**

(4)    **contained to a closet to move the dog.**

(5)         Q     That would have been during a S.W.A.T.

(6)    incident?

(7)         **A     Yes.**

(8)         Q     Because only the S.W.A.T. team has

(9)    catch pulls; is that correct?

(10)            **MS. JONES:   Objection.**

(11)        **A     Animal Services has catch pulls as**

(12)   **well.**

(13)        Q     The only RPD officers that have catch

(14)   pulls are on the S.W.A.T. team?

(15)        **A     I don't know if some officers do carry**

(16)   **some in their cars.  It's not a standard issued**

(17)   **item but I don't know if they work in conjunction**

(18)   **sometimes with Animal Service to do that as well.**

(19)        Q     If you wanted to carry a catch pull

(20)   around in your car is that something that you can

(21)   request?

(22)            **MS. JONES:   Objection.**

(23)        **A     I am not sure.**

(24)        Q     Have you ever been told that the

(25)   statistic that no RPD officer has ever been

(1)                Sergeant J. Rudolph

(2)    seriously injured by a dog?

(3)        **A     Have I been told of that statistic,**

(4)    **no.**

(5)        Q     Have you ever been told the statistic

(6)    that in the entire history of the United States

(7)    no officer has been killed as a result of being

(8)    bitten by a dog since 1932 and that was as a

(9)    result of getting rabies?

(10)       **A     Never.**

(11)       Q     Do you know any other RPD officers

(12)   that have shot dogs?

(13)       **A     Yes.**

(14)       Q     Who is that?

(15)       **A     There is a lot of different instances,**

(16)   **right. Can you be more specific to what you're**

(17)   **looking for?**

(18)       Q     Just list off names of officers that

(19)   you know shot a dog.

(20)       **A     Steven Mitchell, John Laureano, Jeremy**

(21)   **Nellist, Ryan Romig.   That is all that is really**

(22)   **coming to me.**

(23)       Q     Steven Mitchell what do you know about

(24)   him shooting a dog?

(25)       **A     Again, very very long time ago when I**

(1)                    **Sergeant J. Rudolph**

(2)     **worked midnights with him. Date, where, that was**

(3)     **very again early on in my career when he was my**

(4)     **beat partner.**

(5)          Q    So you guys were partners early in

(6)     your career?

(7)          **A    Yes.**

(8)          Q    It happened when you were partners

(9)     with him?

(10)              **MS. JONES:    Objection.**

(11)         **A    Yes.**

(12)         Q    Do you remember any specifics about

(13)    that incident?

(14)         **A    Yes, we were at some type of**

(15)    **disturbance knocking on the door, door was open,**

(16)    **not ajar, open at that point just from the**

(17)    **outside knocking on the door, dog came running**

(18)    **out of the house, we retreated down the porch,**

(19)    **Steve went to the left, I went to the right, the**

(20)    **dog followed Steve and Steve shot the dog one**

(21)    **time.  It actually impacted the middle of the**

(22)    **forehead and then the dog ran off and it just**

(23)    **kind of stayed in the corner till Animal Control**

(24)    **came but it did not die.**

(25)         Q    Do you know in your experience working

(1)                    Sergeant J. Rudolph
(2)    with Officer Mitchell if he has an anger problem?
(3)              **MS. JONES:   Objection. Don't answer**
(4)              **that.**
(5)        Q    Did you ever witness Officer Mitchell
(6)    use excessive force?
(7)              **MS. JONES:   Objection. Elliot, I**
(8)              **think we are outside the scope of the**
(9)              **subpoena now.**
(10)             **MR. SHIELDS:   I can ask any question I**
(11)             **want. It is just like the 30(b)(6).**
(12)             **MS. JONES:   No, the subpoena you**
(13)             **issued to Sergeant Rudolph said all**
(14)             **issues in the complaint concerning**
(15)             **Officer Javier Algarin shooting and**
(16)             **killing the plaintiff's dog in their**
(17)             **backyard.**
(18)             **MR. SHIELDS:   Which goes to the Monell**
(19)             **claims and Monell claims involve other**
(20)             **officers that have shot dogs and other**
(21)             **officers that have shot dogs might**
(22)             **have a history of using an excessive**
(23)             **force also so it is a fair question.**
(24)             **MS. JONES:   No, I disagree.**
(25)        Q    I will ask you again, can you please

(1)                 Sergeant J. Rudolph

(2)   tell me if you're aware of any other incidents

(3)   where Officer Steven Mitchell may have used

(4)   excessive force?

(5)                 **MS. JONES:   Objection.  He is not**

(6)                 **answering that.**

(7)                 **MR. SHIELDS:   We can mark that one**

(8)                 **for a ruling.**

(9)        Q     So you have mentioned Laureano,

(10)  Nellist and Romig.

(11)                I have a few questions.  First is

(12)  those incidents with Romig and Laureano those are

(13)  incidents that happened as part of the S.W.A.T.

(14)  team?

(15)       **A     Yes.**

(16)       Q     So one of them was an incident in 2020

(17)  where Laureano shot a dog in a S.W.A.T. operation

(18)  that you were involved in?

(19)       **A     Yes.**

(20)       Q     So I don't want you to think I am

(21)  tricking you so I will put up the Incident Report

(22)  for that.  That will be Exhibit 4.

(23)                (Whereupon, Plaintiff's Exhibit 4,

(24)                Incident Report dated 7/8/20, bates

(25)                stamped DEMPSEY 2293-2295, 3 pages,

(1)          Sergeant J. Rudolph

(2)          was marked for identification.)

(3)          **MS. JONES:   Before you speak of the**

(4)          **allegations regarding the S.W.A.T.**

(5)          **incident is being distinct from these,**

(6)          **are you lumping them altogether?**

(7)          **MR. SHIELDS:  I don't know what you**

(8)          **are talking about.  They shot a dog.**

(9)          **I am asking about a dog shooting**

(10)         **incident.  He witnessed a dog that was**

(11)         **shot so I will ask questions about it.**

(12)     **A     Elliot, I did not witness a dog being**

(13)  **shot.**

(14)         **Your question is have you ever been**

(15)  **involved in any incident where the dog was shot,**

(16)  **not, you didn't say witnessed.**

(17)     Q     Thank you.  So I will ask you some

(18)  questions about this Incident Report and I will

(19)  be happy for you to clarify that.

(20)         **MS. JONES:  Can you give me one**

(21)         **second.**

(22)         **MR. SHIELDS:  No.**

(23)     Q     On your screen, Sergeant, do you see

(24)  the Incident Report CR# 2020-00151628?

(25)     **A     Yes. Hold on one second, Elliot.**

(1)                    **Sergeant J. Rudolph**

(2)        Q       Is there a problem with the connection

(3)    here?

(4)                  **MR. SHIELDS:  Let's just put on the**

(5)                  **record here that Miss Jones is texting**

(6)                  **someone to ask for instructions about**

(7)                  **how to handle this situation that she**

(8)                  **is unprepared to give me an answer to.**

(9)        Q       So Sergeant, do you see on your screen

(10)   that Incident Report from 30 Dejonge Street?

(11)                She has not instructed you not to

(12)   answer the question so you can answer the

(13)   question?

(14)                **MS. JONES:  Yes, I am instructing him**

(15)                **not to answer. I just want a second**

(16)                **because I think these are different**

(17)                **that the S.W.A.T. incidents are**

(18)                **distinct from the incident outside of**

(19)                **S.W.A.T., that is the whole reason we**

(20)                **are having a different 30(b)(6) for a**

(21)                **S.W.A.T. incident.  So I don't see why**

(22)                **we are conflating them.**

(23)                **MR. SHIELDS:  The topics overlap with**

(24)                **the incidents that we are discussing**

(25)                **about the training that was received**

(1)                    Sergeant J. Rudolph

(2)              so that is not true.  I am not going

(3)              to re ask all the dog shooting

(4)              training at the 30(b)(6) and Gursslin

(5)              versus 30(b)(6) that was noticed in

(6)              Dempsey.

(7)              MS. JONES:  Why don't you let me go

(8)              get the Complaint real fast. That

(9)              would make me feel better.

(10)             (Discussion off the record.)

(11)             MR. SHIELDS:   Ms. Jones took a break

(12)             at 2:33 p.m. to 2:36.

(13)             This Incident Report will be Exhibit 4

(14)             from the incident at 30 Dejonge

(15)             Street.

(16)      Q     Sergeant, do you see that Incident

(17)  Report on your screen?

(18)      A     Yes.

(19)      Q     So that was from July 7, 2020; is that

(20)  right?

(21)      A     Yes.

(22)      Q     In general can you just tell me

(23)  everything you remember about that incident?

(24)             MS. JONES:   Objection.

(25)      A     We were serving a search warrant at 30

(1)                    **Sergeant J. Rudolph**

(2)    **Dejonge Street for S.W.A.T..**

(3)         Q       During that search warrant service

(4)    this is the incident where Jonathan Laureano shot

(5)    a dog?

(6)         **A       Yes.**

(7)         Q       And what was your role during that

(8)    search warrant execution?

(9)         **A       I was the commanding officer for the**

(10)   **S.W.A.T. team.**

(11)        Q       What were the circumstances under

(12)   which Officer Laureano shot the dog?

(13)        **A       During the execution of the search**

(14)   **warrant the dog presented toward Officer Laureano**

(15)   **in an aggressive manner at which time he**

(16)   **discharged his firearm at the dog.**

(17)        Q       Was that inside the house, outside of

(18)   the house or something else?

(19)        **A       Outside of the house.**

(20)        Q       Where outside the house, in the yard

(21)   or something else?

(22)        **A       I believe it was the front driveway of**

(23)   **30 Dejonge Street.**

(24)        Q       I am not trying to make you guess so

(25)   let's go down to the narrative section here.

(1)                Sergeant J. Rudolph

(2)       **A     Scroll down a little bit more to the**

(3)   **bottom there if you can please. Okay.**

(4)       Q     It looks like the team approached --

(5)             Strike.

(6)             When you were the commanding officer

(7)   during this incident were you on the ground with

(8)   the rest of the S.W.A.T. team or were you like in

(9)   a car at a different location or something?

(10)            **MS. JONES:   Objection. Elliot, he is**

(11)            **not going to talk about S.W.A.T.**

(12)            **MR. SHIELDS:   I want to ask him what**

(13)            **he witnessed as part of this incident**

(14)            **and so I need to know if he was on the**

(15)            **ground and witnessed the shooting or**

(16)            **if he didn't.**

(17)            **MS. JONES:   So I was trying to be**

(18)            **helpful in letting us go ahead and**

(19)            **proceed with questioning but this is**

(20)            **outside the scope of this subpoena you**

(21)            **issued.   It was issued in Dempsey just**

(22)            **asking about the issues in the Dempsey**

(23)            **case about Officer Algarin shooting**

(24)            **the dog. I think we are outside the**

(25)            **scope of this subpoena.**

(1)            Sergeant J. Rudolph

(2)        MR. SHIELDS:  Thank you for your

(3)        explanation. I am happy to call Judge

(4)        Payson again.  I think it is a waste

(5)        of time. Why don't you let me ask my

(6)        questions and you can object and that

(7)        would be my suggestion for the most

(8)        sufficient way to resolve our dispute.

(9)        If you object and you're right then

(10)       obviously it can't be used.  Otherwise

(11)       we can call Judge Payson again and ask

(12)       for a ruling.  What would you like to

(13)       do?

(14)       MS. JONES:  I am sorry.  We took you

(15)       at your word that the subpoena was all

(16)       we would be talking about today.

(17)       MR. SHIELDS:  So I believe that the

(18)       subpoena obviously encompasses all of

(19)       the subjects within the Complaint

(20)       which include all of the Monell claims

(21)       which overlap and you are the one who

(22)       wanted to mush all the cases together

(23)       so you know what, like it obviously

(24)       overlaps all of the Monell claims, all

(25)       of the issues in this case.  So if you

(1)              Sergeant J. Rudolph

(2)         would like to reconsider and just

(3)         state your objections on the record so

(4)         that we can more efficiently get

(5)         through the deposition that would be

(6)         my suggestion otherwise we can call

(7)         Judge Payson again.

(8)         MS. JONES:   I am just going to be

(9)         instructing him not to answer this

(10)        line of questioning because it is

(11)        beyond the scope of the subpoena.  So

(12)        we can ask the questions but I am

(13)        not --

(14)        MR. SHIELDS:  You are going to

(15)        instruct him not to answer so we will

(16)        just call Judge Payson.

(17)        MS. JONES:   Yes, okay.

(18)        MR. SHIELDS:  Hi Christin.  Elliot

(19)        Shields again.

(20)        LAW CLERK:  Hi, Mr. Shields, how are

(21)        you?

(22)        MR. SHIELDS:  I am okay.  How are you?

(23)        LAW CLERK:  Good.

(24)        MR. SHIELDS:  So we are still in the

(25)        deposition and we just had another

(1)              Sergeant J. Rudolph

(2)         dispute that we were hoping you might

(3)         be able to help us with.

(4)         LAW CLERK:  Okay.

(5)         MR. SHIELDS:  So I was asking the

(6)         Sergeant, so he is the sergeant who

(7)         wrote the Incident Report in the

(8)         Dempsey matter and I asked him about

(9)         other incidents where he knows of

(10)        officers that have also shot dogs and

(11)        he identified several officers that he

(12)        is aware of who have shot dogs and he

(13)        answered questions about one or two

(14)        other incidents and then I began to

(15)        ask him about another incident where

(16)        he witnessed -- well actually I was

(17)        not able to get to my questions about

(18)        exactly what he witnessed or not

(19)        because Miss Jones instructed the

(20)        Sergeant not to answer the question

(21)        the reason being that Sergeant Rudolph

(22)        who we are questioning he is also now

(23)        the commander of the RPD S.W.A.T. team

(24)        and so this specific dog shooting

(25)        incident happened in the context of a

(1)                  Sergeant J. Rudolph

(2)         S.W.A.T. incident and so Miss Jones

(3)         for some reason let him answer

(4)         questions about other officers that

(5)         had shot dogs outside of S.W.A.T.

(6)         stuff but won't let him answer any

(7)         questions about this specific incident

(8)         because it happened in the context of

(9)         a S.W.A.T. operation and my suggestion

(10)        for how to handle this situation was

(11)        that she just place her objection on

(12)        the record and then going forward if I

(13)        am ruled against later obviously we

(14)        wouldn't be able to use any of his

(15)        testimony but she said no, I am going

(16)        to instruct him not to answer any

(17)        questions and I believe the basis was

(18)        that she didn't think it was within

(19)        the scope of the subpoena that we had

(20)        issued for him which said that we

(21)        would ask him about any issues in the

(22)        Complaint where Charles Dempsey was

(23)        shot and the Complaint obviously

(24)        includes allegations of numerous other

(25)        instances where officers had shot dogs

(1)                Sergeant J. Rudolph

(2)          and the Monell claims. So her basis

(3)          for instructing him not to answer was

(4)          that she thought it was outside the

(5)          scope of the subpoena and I disagree

(6)          with that because we can ask him about

(7)          all the issues in the cases is what

(8)          our position is.

(9)          LAW CLERK:  Okay, Miss Jones, why

(10)         don't you go ahead.

(11)         MS. JONES:   Sorry, I had to unmute

(12)         myself, sure.

(13)         So in these seven dog cases six of

(14)         them concern or involve patrol

(15)         officers and one of the cases Gursslin

(16)         was a dog shooting in the context of a

(17)         S.W.A.T. operation, the Gursslin case

(18)         is in front of Judge Peterson for

(19)         discovery and so he has been handling

(20)         a lot of the S.W.A.T. specific

(21)         concerns that the City has had

(22)         relative to discovery and disclosure

(23)         of S.W.A.T. information.

(24)         So I will also note while we have been

(25)         sharing some Monell discovery amongst

(1)                    Sergeant J. Rudolph

(2)             these cases there is a separate

(3)             30(b)(6) notice for -- 30(b)(6)

(4)             deposition for S.W.A.T. related

(5)             information relative to dogs and a

(6)             30(b)(6) for all the other ones that

(7)             are more like patrol.

(8)             So Mr. Shields issued a subpoena to

(9)             Sergeant Rudolph in the Dempsey case

(10)            that stated "all issues in the

(11)            Complaint concerning Officer Javier

(12)            Algarin shooting and killing the

(13)            plaintiff's dog in their backyard".

(14)            So when we read that we took it at

(15)            their word.  There are no allegations

(16)            of S.W.A.T. in the Dempsey Complaint

(17)            and none of the incidents that Mr.

(18)            Shields wants to ask about involve

(19)            Officer Algarin shooting or killing

(20)            the plaintiff's dog. These Monell

(21)            issues have been treated separate by

(22)            the parties up until this date.  I did

(23)            ask Mr. Shields if he planned to I

(24)            guess combine the 30(b)(6) if he

(25)            viewed them as the same but my

(1)           Sergeant J. Rudolph

(2)       understanding is that because we have

(3)       these separate 30(b)(6) that S.W.A.T.

(4)       is being treated differently by the

(5)       parties and either way that there are

(6)       no S.W.A.T. allegations, no S.W.A.T.

(7)       involvement with Officer Algarin and

(8)       in the incident that led to the

(9)       Dempsey case.

(10)      So again, we just prepared for the

(11)      scope of the subpoena as it was issued

(12)      to us and we preferred or requested

(13)      that Mr. Shields stick to that.  He

(14)      has agreed to issue another subpoena

(15)      to talk about S.W.A.T. related

(16)      incidents to Sergeant Rudolph but as

(17)      of this date he have not gotten that.

(18)      MR. SHIELDS:  Cristin, my dispute with

(19)      what Ms. Jones just said is one,

(20)      yesterday we took the deposition of

(21)      Sergeant Corey Clark and Sergeant

(22)      Clark was prepared to discuss every

(23)      incident where he in preparation for

(24)      this deposition he had reviewed every

(25)      Incident Report where he was the

(1)                    Sergeant J. Rudolph

(2)        sergeant listed in the Incident

(3)        Report. So Miss Jones knew that I was

(4)        he going to ask questions about any

(5)        Incident Report where he was listed as

(6)        the sergeant. So that is the first

(7)        thing.

(8)        Second of all, as she read in my

(9)        subpoena it listed everything in the

(10)       Complaint about Officer Algarin

(11)       shooting the dog. Well everything in

(12)       the Complaint includes the Monell

(13)       claims and the Monell claims include

(14)       the allegations that an officer shot a

(15)       dog because they were not properly

(16)       trained and after they shot the dog

(17)       they were not disciplined.

(18)       So I should be able to ask those

(19)       questions. Now I am not going to go

(20)       into specific S.W.A.T. operations.

(21)       These Incident Reports were not

(22)       produced in Gursslin. They were

(23)       produced in Dempsey. So you know what,

(24)       it is fair game for me to question

(25)       this officer about these Incident

(1)                Sergeant J. Rudolph

(2)          Reports.

(3)          LAW CLERK:   Just a couple of

(4)          questions.   I think I understand but

(5)          ambiguous and I will let you guys add

(6)          anything you want to add.

(7)          One, the incident at issue is Sergeant

(8)          Rudolph the sergeant that signed off

(9)          on the Incident Report?

(10)         MR. SHIELDS:   There is going to be a

(11)         total of three incident reports that I

(12)         wanted to ask him about that happened

(13)         in S.W.A.T. operations.

(14)         In this incident he was the commanding

(15)         officer for the S.W.A.T. team and I

(16)         have not been able to ask him

(17)         questions about what was done

(18)         afterwards but I plan to ask him if

(19)         he -- what he did to review the

(20)         actions of Officer Jonathan Laureano

(21)         in terms of shooting the dog. At this

(22)         point Miss Jones blocked my question

(23)         when I wanted to figure out if he was

(24)         an eyewitness on the ground or for

(25)         example because he was the commander

(1)                   Sergeant J. Rudolph

(2)          if he was at a different location and

(3)          not on the ground with the rest of the

(4)          S.W.A.T. team. I don't know the

(5)          answer.

(6)          LAW CLERK:   Hold on a second.

(7)          I understand a little bit of what you

(8)          want to get into.

(9)          From what I just heard, Mr. Shields,

(10)         is the specific incident that caused

(11)         the phone call is a spot incident yet

(12)         you explained to me some of the

(13)         questions you wanted to ask Sergeant

(14)         Rudolph.

(15)         What wasn't clear to me is on the

(16)         Incident Report is Sergeant Rudolph

(17)         the officer that signed off on it?

(18)         MR. SHIELDS:  So the answer is no, he

(19)         is not the reporting officer.

(20)         However, when you say signed off like

(21)         his signature is not at the bottom but

(22)         he was the commanding officer at the

(23)         scene so.

(24)         LAW CLERK:   Okay. I understood.

(25)         My other question, any of the three

(1)              Sergeant J. Rudolph

(2)         spot incidents are any of them

(3)         specifically referred to even vaguely

(4)         within the Dempsey Complaint?

(5)         MR. SHIELDS:  That is a good question.

(6)         Well, vaguely, yes.

(7)         LAW CLERK:   In some kind of general

(8)         Monell claim but we don't refer to the

(9)         specific incident on such and such a

(10)        date or the specific shooting; is that

(11)        correct?

(12)        MR. SHIELDS:  So without reviewing

(13)        every other incident that we listed in

(14)        the Complaint I can tell you that

(15)        Dempsey was the first one and we

(16)        didn't have any discovery prior to

(17)        filing it and we specifically

(18)        referenced, I don't know, something

(19)        like eight other cases by name and

(20)        then we generally referenced many

(21)        other incidents where RPD officers

(22)        shot dogs and they did that because

(23)        they were not properly trained and

(24)        because they were not disciplined in

(25)        these prior incident so that is the

(1)              Sergeant J. Rudolph

(2)         gist.

(3)         MS. JONES:  Can I --

(4)         LAW CLERK:   Miss Jones, let me just

(5)         get through my questions and then if

(6)         you have something to add or Mr.

(7)         Shields has something to add we can do

(8)         that at the end.  I just have some

(9)         questions that I anticipate Judge

(10)        Payson is going to want answered too.

(11)        Mr. Shields, and I do have a couple of

(12)        questions for you Ms. Jones.

(13)        Mr. Shields, during the deposition

(14)        of -- I am sorry, was it Deputy Clark

(15)        yesterday?

(16)        MR. SHIELDS:  Sergeant.

(17)        LAW CLERK:   Sergeant Clark yesterday,

(18)        the incident that you asked him about

(19)        the different incident reports were

(20)        any of those answered?

(21)        MR. SHIELDS:  No, because Sergeant

(22)        Clark is not a member of the S.W.A.T.

(23)        team.

(24)        LAW CLERK:   And then Miss Jones,

(25)        could you just explain to me what kind

(1)              Sergeant J. Rudolph
(2)         of different discovery is used are
(3)         arising due to the fact that some of
(4)         these are S.W.A.T. incidents?
(5)         MS. JONES:   The City has utilized
(6)         confidentiality and redaction much
(7)         more heavily when it comes to use
(8)         S.W.A.T. incidents due to our concern
(9)         obviously about S.W.A.T. operations
(10)        and making sure we are not
(11)        compromising future operations
(12)        involving high risk search warrants
(13)        and all of that. So we have had
(14)        several conferences with Judge
(15)        Peterson trying to work through the
(16)        confidentiality and sensitivity of
(17)        S.W.A.T. issues.
(18)        To supplement something I think that
(19)        Mr. Shields said, my computer just
(20)        died, but I don't think that any
(21)        S.W.A.T. incidents are specifically
(22)        noticed or identified in the Dempsey
(23)        Complaint which is why we didn't
(24)        believe that he wanted to ask about
(25)        S.W.A.T. incidents that involved the

(1)                    Sergeant J. Rudolph

(2)           shooting of dogs.

(3)           LAW CLERK:   Miss Jones, just another

(4)           question for you.

(5)           Within your discussions with Judge

(6)           Peterson I understand that you're

(7)           taking confidentiality or redaction

(8)           more seriously in the S.W.A.T. cases.

(9)           Does that mean there is certain

(10)          information that have not been turned

(11)          over to plaintiff at all or does that

(12)          just mean it is stamped confidential

(13)          or under a protective order?

(14)          MS. JONES:   I guess both. So we have

(15)          produced S.W.A.T. documents and then

(16)          redacted information out of those

(17)          S.W.A.T. documents that have nothing

(18)          to do with the dog shooting itself so

(19)          that he could see the information

(20)          relative to planning and whatnot

(21)          relative to dogs while maintaining the

(22)          confidentiality of other things

(23)          outside of the scope of the dog

(24)          shooting. So he doesn't need to know

(25)          how we enter the building or that kind

(1)               Sergeant J. Rudolph

(2)          of stuff. But yes, it is

(3)          confidentiality in that what we have

(4)          disclosed is marked as confidential

(5)          pursuant to a protective order but

(6)          then there are also things within our

(7)          documents that have just been redacted

(8)          completely and it is not visible to

(9)          the plaintiffs.

(10)         LAW CLERK:   I want to, Miss Jones,

(11)         make sure I understand what your

(12)         objection is so I can articulate it

(13)         for Judge Payson.

(14)         With respect to the confidentiality

(15)         issue are you concerned that Mr.

(16)         Shields is going to ask Sergeant

(17)         Rudolph questions and he is going to

(18)         reveal information that you otherwise

(19)         are not revealing in the litigation

(20)         due to those kinds of security

(21)         concerns or is your objection simply

(22)         on the fact that it is without the

(23)         scope of the subpoena and he did not

(24)         necessarily prepare to answer it or is

(25)         it both?

(1)             Sergeant J. Rudolph

(2)     MS. JONES:  It is both. We didn't

(3)     think that we were going to be going

(4)     into S.W.A.T. operations or S.W.A.T.

(5)     issues today because Gursslin is

(6)     different than Dempsey and there

(7)     aren't any S.W.A.T. incidents in the

(8)     Dempsey complaint and because of that

(9)     we have not really worked through here

(10)    are the things we disclosed, here are

(11)    the things we didn't, here are the

(12)    things we have concerns about

(13)    confidentiality wise and all of that.

(14)    LAW CLERK:   Ms. Jones, do you think

(15)    that -- I understand that we are going

(16)    to have to deal with the scope of the

(17)    subpoena.

(18)    In terms of the confidentiality do you

(19)    think that is something you can work

(20)    with throughout the course of the

(21)    deposition that if asked something

(22)    that beers on this you could object,

(23)    do you think that is going to reveal

(24)    sensitive or confidential S.W.A.T.

(25)    information or is there a way perhaps

(1)                    Sergeant J. Rudolph

(2)          to mark the deposition transcript

(3)          confidential or do you think that is

(4)          not feasible?

(5)          MS. JONES:  Right, so I started with

(6)          one of those questions that I thought

(7)          was just purely as to S.W.A.T. and had

(8)          nothing to do with the dog shooting so

(9)          I instructed Sergeant Rudolph not to

(10)         answer that and that is what led to

(11)         the call to you, the court, so maybe

(12)         there is certain things that we just

(13)         still have concerns they should not be

(14)         out there.

(15)         We could mark the deposition as

(16)         confidential, we have done that in the

(17)         transcripts for depositions that were

(18)         subpoenaed in the Gursslin case that

(19)         concerns all the S.W.A.T. incidents so

(20)         we could do that here.  That of course

(21)         only addresses one of our concerns

(22)         regarding the confidentiality S.W.A.T.

(23)         operations and not the other that it

(24)         is just simply outside the scope of

(25)         the subpoena.

(1)                 Sergeant J. Rudolph

(2)         LAW CLERK:   Mr. Shields, did you have

(3)         something?

(4)         MR. SHIELDS:   I just had an

(5)         opportunity to pull up the second

(6)         Amended Complaint and a few things I

(7)         wanted to know.

(8)         In the Monell claim paragraphs 140 and

(9)         144 both reference other incidents

(10)        where officers shot dogs during the

(11)        execution of search warrants. All of

(12)        these S.W.A.T. incidents involve

(13)        officers who are executing search

(14)        warrants.

(15)        Then in paragraph 145 it says between

(16)        2013 and 2018 they released 40 other

(17)        incidents where RPD officers

(18)        discharged their firearms at dogs in

(19)        various scenarios in the line of duty.

(20)        And then if you skip forward a couple,

(21)        so later in that paragraph it says "at

(22)        least ten of those incidents involve

(23)        officers who entered a property to

(24)        execute a warrant who apparently

(25)        lacked any plan for how to safely deal

(1)                    Sergeant J. Rudolph

(2)            with any dog they encountered during

(3)            the execution of that warrant".

(4)            So when we served the subpoena our

(5)            intent was to ask about any of the

(6)            issues contained in the complaint

(7)            which I think clearly encompass the

(8)            Monell claim and dogs that were shot

(9)            that he was aware of during the

(10)           execution of a search warrant because

(11)           that is a big part of the claim, that

(12)           is a dangerous thing and that is when

(13)           at lot of dogs are shot when officers

(14)           enter into a property. Here that is

(15)           what happened in Dempsey, the officers

(16)           entered onto his property, another

(17)           common time that officers enter

(18)           peoples properties without a plan for

(19)           how to properly and lawfully and

(20)           safely interact with any dog they

(21)           might encounter is during the

(22)           execution of a search warrants so.

(23)           MS. JONES:   S.W.A.T. don't execute

(24)           warrants.  They only execute high risk

(25)           search warrants.  So our regular

(1)              Sergeant J. Rudolph
(2)         patrol officers execute regular
(3)         warrants so again we thought this was
(4)         just about regular patrol officers and
(5)         not high risk search warrants that are
(6)         executed by S.W.A.T..  We have in
(7)         other depositions have talked about
(8)         certain criteria have to be met for
(9)         high risk search warrants that involve
(10)        the S.W.A.T. team because they're so
(11)        much more dangerous and so much more
(12)        you need a lot more planning and
(13)        execution than a, I don't want to say
(14)        regular search warrant, but that they
(15)        are a different level and a different
(16)        character than what our traditional
(17)        patrol, I don't want to say regular,
(18)        but other patrol officers issue as
(19)        warrants.  Given the number of times
(20)        that we talked about high risk search
(21)        warrants with Mr. Shields and the City
(22)        I again took his words as what they
(23)        meant.  There is a difference between
(24)        a warrant and high risk search
(25)        warrant.

(1)            Sergeant J. Rudolph
(2)       MR. SHIELDS:  Christin, just one thing
(3)       I want to point out.  At least a
(4)       couple of these incidents involve dogs
(5)       that were shot either in the driveway
(6)       to a property or outside in the
(7)       backyard of a property and I don't
(8)       plan on asking S.W.A.T. specific
(9)       questions about that I would ask for
(10)      example Miss Jones referenced the
(11)      30(b)(6) deposition in Gursslin being
(12)      different from the 30(b)(6) deposition
(13)      in Dempsey.
(14)      Just on that point we also don't plan
(15)      on asking overlapping questions.  I am
(16)      not going to do all the questions that
(17)      I do in Dempsey again in the 30(b)(6)
(18)      deposition in Gursslin. I will ask the
(19)      non S.W.A.T. training policy questions
(20)      about when an officer is allowed to
(21)      shoot a dog.
(22)      Now yes, those policies everyone in
(23)      Gursslin testified they still have to
(24)      follow as members of the S.W.A.T. team
(25)      all of the rules that apply and more

(1)              Sergeant J. Rudolph

(2)         generally to the rest of the RPD. So

(3)         that is why I think these questions

(4)         are appropriate.  They're going to be

(5)         limited, they're not going to be

(6)         S.W.A.T. specific but they are about

(7)         incidents where he was either present

(8)         at or witnessed or has knowledge of

(9)         these officers having shot a dog and

(10)        where he was the commanding officer of

(11)        the S.W.A.T. team so it is relevant to

(12)        Monell claim what he did to review the

(13)        incident and if he imposed any

(14)        discipline or required them to get any

(15)        remedial training those are

(16)        appropriate questions I think.

(17)        LAW CLERK:   The three answers that

(18)        are added to were each of those, I

(19)        understand they were S.W.A.T.

(20)        incidents.  Did each of those involve

(21)        a high risk search warrant, Miss

(22)        Jones?

(23)        MR. SHIELDS:  It is her defense

(24)        that --

(25)        MS. JONES:   If it involved S.W.A.T.

(1)              Sergeant J. Rudolph
(2)         it would be a high risk search
(3)         warrant.  That is all they do.
(4)         LAW CLERK:  And then just remind me
(5)         again, I apologize, Dempsey was that a
(6)         search warrant case or was it an
(7)         entering on the property and the
(8)         pursuit of somebody, something like
(9)         that.
(10)        MS. JONES:  That was with a regular
(11)        patrol officer.
(12)        MR. SHIELDS:  A regular patrol
(13)        officer, yes.
(14)        LAW CLERK:  Was it a search warrant
(15)        or did he enter the property for a
(16)        different reason?
(17)        MR. SHIELDS:  He entered the property
(18)        for a different reason.
(19)        LAW CLERK:  Was he in pursuit of a
(20)        suspect or something?
(21)        MS. JONES:  That is correct.
(22)        LAW CLERK:  Understood. I will go see
(23)        if I can get Judge Payson.  Before I
(24)        do because I know I interrupted people
(25)        a couple of times is there in anything

(1)                    Sergeant J. Rudolph

(2)              else that I need to hear?

(3)              MR. SHIELDS:  I don't think so from my

(4)              end.  Thank you, Christin.

(5)              MS. JONES:   I am good.  Thank you.

(6)              LAW CLERK:  I will put you on hold.  I

(7)              will see if I can get Judge Payson and

(8)              I will come back and let you know

(9)              either way if I do or if I don't,

(10)             okay.

(11)             MS. JONES:  Thank you.

(12)             (Whereby, we were waiting for a

(13)             response.)

(14)             (Time Noted:  3:05 to 3:08)

(15)             (Whereby, we continued asking

(16)             questions while waiting for a response

(17)             from the Judge.)

(18)      Q    Sergeant Rudolph, do you know if any

(19) RPD officer has ever been disciplined for

(20) shooting a dog?

(21)      A    I do not.

(22)      Q    Do you know if any RPD officer has

(23) ever been required to undergo additional training

(24) as a result of having shot a dog?

(25)      A    I do not.

**Sergeant J. Rudolph**

(1)

(2)     Q      How could the officers have done

(3)   things differently in the Dempsey case to avoid

(4)   having shot Tesla the dog?

(5)          **MS. JONES:   Objection.**

(6)     **A      Again, I am not going to speak to what**

(7)   **their -- what their decision is based on their**

(8)   **training experience on what they did, right.**

(9)          **I did not see anything there that**

(10)  **would make me have to do followup training or**

(11)  **discipline for that matter if that is what we are**

(12)  **getting at.**

(13)    Q      It is not what we are getting at.

(14)         The question was what could the

(15)  officers have done differently to avoid having

(16)  shot and killed Tesla the dog?

(17)         **MS. JONES:   Objection.**

(18)    **A      I don't really want to speak on their**

(19)  **behalf, right, of what they could have done. I am**

(20)  **not them and you know I am not in the realm of**

(21)  **their training and experience.  I have mine and**

(22)  **they have theirs.**

(23)         **MR. SHIELDS:  I will move to strike**

(24)         **those portions that are unresponsive.**

(25)    Q      The question is what could these

(1)                 Sergeant J. Rudolph

(2)    officers have done differently to avoid having

(3)    shot and killed Tesla the dog?

(4)         **MS. JONES:   Objection.**

(5)       **A      Hold on to a dog. I don't know. They**

(6)    **could have seen if anything was indicative of a**

(7)    **dog. Whistling.**

(8)       Q      So they could have warned the property

(9)    owner or any dogs that might be present on the

(10)   property prior to entering the property; is that

(11)   what you're saying?

(12)        **MS. JONES:   Objection.**

(13)      **A      Based on the totality of what they saw**

(14)   **at that time the decision that they make is what**

(15)   **they do, right. I am not there at the time to**

(16)   **make that decision for them.**

(17)        **MR. SHIELDS:  Move to strike those**

(18)            **portions that are unresponsive.**

(19)      Q      The question is really simple.

(20)           What other things could they have done

(21)   to avoid the situation where they were put where

(22)   Officer Algarin was put where he shot and killed

(23)   Tesla?

(24)      **A      Is there a specific answer you're**

(25)   **looking for, sir?  I don't know what you're**

(1)                    **Sergeant J. Rudolph**

(2)    **trying to get at here.**

(3)         Q    Just how they could have handled the

(4)    situation differently.

(5)              Previously you mentioned they could

(6)    have called out, they could have whistled.  Those

(7)    are two things that you mentioned that possibly

(8)    could have helped to avoid shoot the dog, right?

(9)              Could you think of anything else?

(10)         **MS. JONES:    Objection.**

(11)      **A    Again, based on the fact pattern there**

(12)    **and what the officers perceived to be the**

(13)    **priorities in that situation I support what they**

(14)    **did with backtracking through that backyard.**

(15)              **MR. SHIELDS:  So I understand that you**

(16)              **support what they did.  Again I will**

(17)              **move to strike those portions that are**

(18)              **unresponsive.**

(19)         Q    The question is just could they have

(20)    done anything else?  For example, could they have

(21)    instead of jump the fence could they have walked

(22)    to the front door, knocked and asked for

(23)    permission to enter and told Mr. Dempsey why they

(24)    wanted permission to enter his backyard?

(25)      **A    Could that be a way, they could have.**

```
(1)                    Sergeant J. Rudolph
(2)        Q     That is one way they could have
(3)   avoided shooting and killing Tesla; right?
(4)              Could you think of any other ways they
(5)   could have handled the situation differently to
(6)   avoid shooting and killing Tesla?
(7)              MS. JONES:   Objection.
(8)        A     You talked about notifying the owner.
(9)              I don't see what else you would you
(10)  are looking for here on that.
(11)       Q     They could have secured the premises
(12)  and obtained a search warrant?
(13)             MS. JONES:   Objection.
(14)       Q     Is that a possibility?
(15)       A     That could be a possibility.
(16)       Q     Instead of pulling out his gun Officer
(17)  Algarin could have pulled out his pepper spray;
(18)  that is a possibility?
(19)             MS. JONES:   Objection.
(20)       A     I am not going to speak to what he
(21)  perceived through his eyes based on his training
(22)  and experience.
(23)       Q     The question is he could have, right,
(24)  he could have done that and he didn't; right?
(25)             MS. JONES:   Objection.
```

(1)                    **Sergeant J. Rudolph**

(2)        Q    You understand the difference between

(3)   could and should, I am not asking you he should

(4)   have done this, he was wrong for not, I am just

(5)   saying he could have, that is a hypothetical

(6)   possibility of a different way to handle the

(7)   situation; right?

(8)            **MS. JONES:   Objection.**

(9)        **A    Yes, he could have taken out pepper**

(10)  **spray, yes.**

(11)       Q    And he could have taken out his baton

(12)  instead?

(13)       **A    It could be a way.**

(14)       Q    He could have tried to speak in a more

(15)  calm manner to Tesla like good dog, good dog

(16)  instead of saying whoa, whoa, whoa?

(17)           **MS. JONES:   Objection.**

(18)       **A    Sure.**

(19)       Q    Do you remember ever receiving any

(20)  specific training about any of those less lethal

(21)  force options as they apply to dogs?

(22)       **A    Yes, the power point that we have seen**

(23)  **in the roll call training, yes, in the in-service**

(24)  **the one that you refer to as Reno, the Animal**

(25)  **Services one.**

(1)                Sergeant J. Rudolph
(2)        LAW CLERK:   I apologize for the wait.
(3)        I was able to speak to Judge Payson so
(4)        if the parties are ready I can give
(5)        you what her guidance is.
(6)        MR. SHIELDS:  We are ready.  Thank
(7)        you, Christin.
(8)        LAW CLERK:  I will try to speak slow
(9)        enough so everyone can hear me.
(10)       So Judge Payson's instinct was that --
(11)       her understanding was to the extent
(12)       that this sergeant had been involved
(13)       in the other dog shootings and he has
(14)       been allowed to be asked about other
(15)       dog shootings and the concern about
(16)       the S.W.A.T. --
(17)       I am not sure if we have a bad
(18)       connection.
(19)       MR. SHIELDS:   I moved my phone a
(20)       little bit.
(21)       LAW CLERK:   Judge Payson was respect
(22)       to the scope issue or the relevancy
(23)       issue her instinct was that this
(24)       sergeant had already been asked about
(25)       other dog shootings in which he was

(1)                Sergeant J. Rudolph

(2)         the -- signed the Incident Report and

(3)         that he didn't really see a

(4)         distinction in terms of S.W.A.T. when

(5)         it came to scope or relevancy and her

(6)         suggestion would be that Mr. Shields

(7)         be permitted to ask about those

(8)         incidents and that Miss Jones be able

(9)         to assert her objection and that to

(10)        the extent Ms. Jones you want to

(11)        pursue any issues with that testimony

(12)        because its taken over your objection

(13)        that could be agreed later but you

(14)        could proceed with the deposition.

(15)        With respect to the confidentiality

(16)        issues for the sensitivity of the

(17)        S.W.A.T. operations it seems to me

(18)        based on our conversation what I

(19)        conveyed to Judge Payson was the

(20)        parties had discussed that there may

(21)        be a way to continue the deposition on

(22)        either if there is a particular

(23)        question asked that might lead to the

(24)        witness to want to answer but some of

(25)        the information the parties can each

(1)                 Sergeant J. Rudolph

(2)          agree to treat that portion of the

(3)          transcript pursuant to the protective

(4)          order and agree on confidentiality I

(5)          think the parties need to make clear

(6)          for the record what can be done with

(7)          that deposition testimony.  I don't, I

(8)          am not familiar with your particular

(9)          protective order in this case but to

(10)         make sure the parties are in agreement

(11)         it cannot be shared with anyone or

(12)         however you want to make that kind of

(13)         agreement but Judge Payson I told

(14)         Judge Payson it seems to me that the

(15)         parties thought they could work

(16)         through those issues.

(17)         MR. SHIELDS:  Thank you, Christin,

(18)         yes, I agree and Miss Jones I see

(19)         shaking her head.  I think that is

(20)         something that the confidentiality is

(21)         not a problem to work through.

(22)         LAW CLERK:  Is there anything else

(23)         that you need from me?

(24)         MR. SHIELDS:  Not from the plaintiff.

(25)         MS. JONES:  Nothing from defendants.

```
(1)                  Sergeant J. Rudolph
(2)         LAW CLERK:   Good luck.  Hopefully you
(3)         will be able to complete the
(4)         deposition.
(5)         MR. SHIELDS:  Thank you so much,
(6)         Christin.
(7)         MS. JONES:  Thank you.
(8)     Q    We were talking about the Incident
(9)  Report from 30 Dejonge Street so I will put that
(10) back.  That was going to be marked as Exhibit 4.
(11) That is actually not what is on the screen right
(12) now but this one should be.  30 Dejonge Street.
(13)         Sergeant, my first question I think is
(14) did you witness Officer Laureano shoot the dog
(15) here or no?
(16)    A    No.
(17)    Q    Where were you at the time the dog was
(18) shot?
(19)         MS. JONES:   I would like to mark his
(20)         answer as confidential.
(21)         MR. SHIELDS:  We can talk about -- we
(22)         can have all of the S.W.A.T. stuff be
(23)         marked as confidential.  That is fine
(24)         with me.  So starting now until we say
(25)         we are done with this S.W.A.T. stuff.
```

(1)                    **Sergeant J. Rudolph**

(2)          **MS. JONES:    Okay, great.**

(3)     **A      I was approximately two houses down in**

(4)  **another vehicle.**

(5)       Q      How were you made aware that the dog

(6)  was shot?

(7)     **A      By radio transmission.**

(8)       Q      How did you go about reviewing this

(9)  incident and what happened where the dog was

(10) shot?

(11)    **A      Sergeant Brandon Ince did the review**

(12) **of this incident.  He was at the time the**

(13) **assistant commander on the team who I put in**

(14) **charge of this aspect of the operation.**

(15)      Q      After the incident was there an

(16) Accident Report that you signed off on?

(17)         **MS. JONES:    Objection.**

(18)    **A      There was.**

(19)      Q      So ultimately you had to do some sort

(20) of review of what happened; is that fair to say?

(21)         **MS. JONES:    Objection.**

(22)    **A      The review specifically pertaining to**

(23) **the dog being shot?**

(24)      Q      Correct.

(25)         **MS. JONES:    Objection.**

(1)                    **Sergeant J. Rudolph**

(2)        **A       Sergeant Ince did the review of the**

(3)    **dog being shot.**

(4)        Q     Did Sergeant Ince have any concerns

(5)    about the incident where the dog was shot?

(6)        **A       Nothing that he reported to me.**

(7)        Q     From reading the Incident Report it

(8)    seems like what happened was they entered the

(9)    front yard knowing that there was a dog standing

(10)   right there in the driveway; is that your

(11)   understanding of the incident?

(12)       **A       My understanding is yes, once they**

(13)   **made entry onto the property of 30 Dejonge Street**

(14)   **that a dog was observed.**

(15)               **MS. JONES:   Just for the record,**

(16)               **Sergeant Rudolph is reading the**

(17)               **Incident Report before giving his last**

(18)               **answer.**

(19)       Q     So I guess my question is they knew

(20)   there was a dog.  Prior to entering the gate it

(21)   seems like they didn't make any plan for how to

(22)   safely interact with that dog; is that something

(23)   that you ever discussed with Sergeant Ince, is he

(24)   a sergeant, am I saying that right?

(25)       **A       He is.**

(1)                    **Sergeant J. Rudolph**

(2)               **MS. JONES:   Objection.**

(3)     **A      You're saying that there was never a**

(4)  **plan for the dog before they continued on the**

(5)  **property, is that the question?**

(6)     Q      Yes, it seems they approached the

(7)  property, saw the dog, entered anyway and then

(8)  the dog approached them and they shot the dog.

(9)            It seems that happened potentially

(10) because there was no plan for how to safely

(11) interact with that dog after they entered onto

(12) the property.

(13)           Is that a concern that Sergeant Ince

(14) ever expressed to you?

(15)              **MS. JONES:   Objection.**

(16)    **A      That is not a concern. The dog in a**

(17) **situation of a high risk search warrant is not a**

(18) **deciding factor on whether the team continues to**

(19) **execute the search warrant because of the high**

(20) **risk factors that are occurring that brought us**

(21) **to execute a high risk search warrant.**

(22)    Q      Do you know if in this instance the

(23) team had a catch pull?

(24)    **A      There is always.**

(25)              **MS. JONES:   Objection.**

(1)                    **Sergeant J. Rudolph**

(2)      **A      There is always a catch pull on our**

(3)  **vehicles.**

(4)      Q      Do you know if anyone on the team who

(5)  approached the property had a catch pull with

(6)  them?

(7)      **A      I do not recall.**

(8)      Q      As a result of this incident I am

(9)  assuming because earlier you said you were

(10)  unaware of any officer ever undergoing any

(11)  discipline or retraining that after this incident

(12)  Officer Laureano was not subjected to any

(13)  discipline or required to undergo any new

(14)  training; is that fair?

(15)              **MS. JONES:   Objection.**

(16)      **A      Not that I am aware of.**

(17)      Q      If an officer violates RPD rules or

(18)  policies during a S.W.A.T. operation you would be

(19)  the one who would recommend any kind of

(20)  discipline or requirement to undergo any

(21)  retraining as the commanding officer; is that

(22)  fair?

(23)              **MS. JONES:   Objection.**

(24)      **A      That is fair that this aspect of it**

(25)  **there could also be any other training or**

(1)                    **Sergeant J. Rudolph**
(2)    **discipline also initiated maybe without my**
(3)    **knowing from PSS if it is warranted but again**
(4)    **that is their review process which not too**
(5)    **familiar with.**
(6)        Q      Here it says that Commander Favor from
(7)    PSS was notified and then in parentheses it says
(8)    (Sergeant Gallagher), what does that mean?
(9)        **A      Commander Favor was notified because**
(10)   **he was -- he is my superior, he is my boss that I**
(11)   **report to as the S.W.A.T. commander. Sergeant**
(12)   **Gallagher at the time worked in PSS.**
(13)       Q      Do you know who made that
(14)   notification?
(15)       **A      I do not recall if it was myself or**
(16)   **Sergeant Ince. I don't want to make an**
(17)   **assumption.  I don't know.  One of us did.**
(18)       Q      Again would that have been by
(19)   telephone?
(20)       **A      Yes, that would be by telephone.**
(21)       Q      I want to put up another Incident
(22)   Report.  So this one is from August 29, 2021, 14
(23)   Forbes Street and this was incident where Officer
(24)   Romig and Laureano both shot at a dog; do you
(25)   remember this incident?

(1)                    Sergeant J. Rudolph

(2)        **A      Yes.**

(3)                **(Whereupon, Plaintiff's Exhibit 5,**

(4)                **Incident Report dated 8/29/21, bates**

(5)                **stamped DEMPSEY 2350-2352, 3 pages,**

(6)                **was marked for identification.)**

(7)        Q      I will go down to the narrative

(8)    section.

(9)                And so this was the reporting officer

(10)   was Kevin Flanagan and then it says it was

(11)   reviewed by you?

(12)       **A      Yes.**

(13)       Q      Is Kevin Flanagan another officer on

(14)   the S.W.A.T. team?

(15)       **A      At that time he was the Assistant**

(16)   **Commander of the S.W.A.T. team.  He took over for**

(17)   **Sergeant Ince.**

(18)       Q      In this instance it looks like

(19)   Sergeant Romig fired a less lethal round and

(20)   Laureano fired a regular round; is that right?

(21)               **MS. JONES:   Objection.**

(22)       **A      Yes, I am refreshing my recollection**

(23)   **here with this report.**

(24)               **Yes, so Sergeant Romig fired a 40**

(25)   **millimeter less lethal baton round, yes, Officer**

(1)                    **Sergeant J. Rudolph**

(2)     **Laureano fired a bullet round, yes.**

(3)          Q      Again, did you witness this incident

(4)     or were you not on the scene?

(5)          **A      I was again in my vehicle a few houses**

(6)     **down.  Did not witness it.**

(7)          Q      After this incident did you conduct

(8)     any review of what happened?

(9)          **A      Sergeant Kevin Flanagan I put in**

(10)    **charge of reviewing the incident at the scene.**

(11)         Q      Did Flanagan express any concerns to

(12)    you after this insurance incident?

(13)         **A      He did not.**

(14)         Q      Do you remember prior to execution of

(15)    the warrant if there had been any surveillance

(16)    done that revealed the possibility of a dog being

(17)    present at the location?

(18)              **MS. JONES:  Objection.**

(19)         **A      I cannot recall.**

(20)         Q      Is that a requirement for members of

(21)    the S.W.A.T. team to conduct pre execution

(22)    surveillance to determine whether or not there is

(23)    a dog at the target location?

(24)         **A      It is not a requirement but we**

(25)    **typically do work through all information about a**

(1)                    **Sergeant J. Rudolph**

(2)    **location.**

(3)         Q      Does that mean that you try to get as

(4)    much information as possible but it is not a

(5)    specific requirement to figure out whether or not

(6)    there is a dog there?

(7)              **MS. JONES:    Objection.**

(8)         **A      We do as much fact finding as we can**

(9)    **prior to an operation.**

(10)        Q      Again, after this incident were either

(11)   Sergeant Romig or Officer Laureano subjected to

(12)   any sort of discipline or retraining?

(13)             **MS. JONES:    Objection.**

(14)        **A      No.**

(15)        Q      And then we will put up Exhibit 6, an

(16)   incident from 1076 North Clinton Avenue from

(17)   December 8, 2020.

(18)             (Whereupon, Plaintiff's Exhibit 6,

(19)             Incident Report dated 12/8/20, bates

(20)             stamped DEMPSEY 2316-2318, 3 pages,

(21)             was marked for identification.)

(22)        Q      Just based on the date and the

(23)   location do you have a recollection of the

(24)   incident?

(25)        **A      I do.**

(1)                    **Sergeant J. Rudolph**

(2)        Q     What do you remember about this one?

(3)        **A     It was a high risk search warrant at**

(4)   **that location.**

(5)        Q     During that execution it was Officer

(6)   Romig at that time that shot a dog?

(7)             **MS. JONES:   Objection.**

(8)        **A     Correct.**

(9)        Q     Did you witness this incident or were

(10)  you again not inside of the location when the

(11)  shooting happened?

(12)            **MS. JONES:   Objection.**

(13)       **A     I was not inside the location at the**

(14)  **time.**

(15)       Q     Did you have any role in reviewing the

(16)  dog shooting after the incident?

(17)            **MS. JONES:   Objection.**

(18)       **A     Sergeant Brandon Ince was in charge of**

(19)  **reviewing that incident.**

(20)       Q     Did Sergeant Ince ever raise any

(21)  concerns with you about the fact that the dog had

(22)  been shot during the execution of the search

(23)  warrant?

(24)       **A     No.**

(25)       Q     Since you have been the commander of

(1)                 Sergeant J. Rudolph

(2)     the S.W.A.T. team have you ever had any incident

(3)     where a dog has been shot that has raised any

(4)     concerns for you?

(5)         **A    No.**

(6)         Q    Have you ever considered implementing

(7)     any additional training for the S.W.A.T. team to

(8)     help them avoid shooting dogs during the

(9)     execution of search warrants?

(10)            **MS. JONES:   Objection. This is even**

(11)            **further outside the scope, Elliot. I**

(12)            **thought we were just talking about the**

(13)            **dog shootings themselves.**

(14)            **MR. SHIELDS:  How to avoid a dog**

(15)            **shooting is about a dog shooting;**

(16)            **right?**

(17)            **MS. JONES:   No, no, it is not.**

(18)            **MR. SHIELDS:  The court said you can**

(19)            **make your objection and then we can**

(20)            **handle it later. I don't think we need**

(21)            **to waste everyone's time arguing our**

(22)            **dispute on the record.**

(23)        **A    The question again, Mr. Shields.**

(24)        Q    Your role as S.W.A.T. team commander

(25)     have you considered implementing any additional

```
(1)                Sergeant J. Rudolph
(2)    measures like additional training to help reduce
(3)    the number of dogs that are shot during the
(4)    execution of high risk search warrants?
(5)              MS. JONES:   Objection.
(6)       A     Yes, it is not that I have considered.
(7)    It is that we do train additional ways to deal
(8)    with dogs on the S.W.A.T. team.
(9)       Q     By that you mean the S.W.A.T. team
(10)   already has additional training separate and
(11)   apart from all the rest of the RPD officers
(12)   undergo?
(13)             MS. JONES:   Objection.
(14)      A     Yes.
(15)      Q     Other than what the S.W.A.T. team
(16)   already undergoes have you ever considered any
(17)   new or additional training on top of that?
(18)      A     No, other than enhancing more training
(19)   that is already done as training just adding to
(20)   it and continuing to train.
(21)      Q     Have you considered implementing
(22)   body-worn cameras for the S.W.A.T. team?
(23)             MS. JONES:   Objection. Objection.
(24)             Elliot, this is very far off the
(25)             scope.
```

(1)                     Sergeant J. Rudolph

(2)              MR. SHIELDS:  This is directly related

(3)         to the review of these incidents

(4)         because there is not body-worn camera

(5)         recordings right now. We can view the

(6)         video of what happened in Dempsey but

(7)         we don't know what happened in these

(8)         other cases.

(9)         A       There is a process by which we are

(10)   looking to implement cameras.  As it currently

(11)   stands we do not have body-worn cameras for

(12)   S.W.A.T..

(13)        Q       Have you ever spoken with Sergeant or

(14)   Lieutenant Negrelli from the City of Buffalo who

(15)   is their S.W.A.T. commander about their body-worn

(16)   camera program that they have for their S.W.A.T.

(17)   officers?

(18)        A       No.

(19)        Q       In your time with the RPD have you

(20)   ever received or seen any of the videos that have

(21)   been published by the United States Department of

(22)   Justice which are published on the internet for

(23)   free for anyone to access about how to safely

(24)   interact with dogs during law enforcement

(25)   activities?

(1)                  Sergeant J. Rudolph

(2)      **A      Can't recall anything from a federal**

(3)  **standpoint.**

(4)      Q      Have you ever used a simulator that

(5)  incorporates scenarios involving "shoot, don't

(6)  shoot" scenarios for dogs?

(7)          **MS. JONES:   Objection.**

(8)      **A       Nothing that I recall.**

(9)      Q      Do you think it would be helpful for

(10)  the Rochester Police Department to purchase

(11)  virtual reality simulator that included numerous

(12)  different topics including "shoot, don't shoot"

(13)  scenarios involving dogs?

(14)          **MS. JONES:   Objection.**

(15)      **A      One dimensional programs you're**

(16)  **talking about displaying a video on a screen?**

(17)      Q      I am talking about state-of-the-art,

(18)  top of the line, best of the best, virtual

(19)  reality simulators that involve many different

(20)  topics that police officers face on a daily basis

(21)  including numerous different scenarios where

(22)  officers have to interact with dogs, do you think

(23)  that additional training tool can be helpful for

(24)  the Rochester Police Department?

(25)          **MS. JONES:   Objection.**

(1)                    Sergeant J. Rudolph

(2)      A      We have simulators.  Again, I don't

(3)   know how you're going to replicate a one

(4)   dimensional highly specific piece of equipment

(5)   that is going to do what an animal does, right,

(6)   an animal is it is unpredictable.

(7)      Q      You guys have a prism simulator;

(8)   right?

(9)      A      Yes, that is what I am referring to.

(10)     Q      It is maybe like ten years old or

(11)  more?

(12)            MS. JONES:   Objection.

(13)     A      Yes, maybe.  Not sure how long its

(14)  been there.

(15)     Q      You would agree that technology has

(16)  advanced exponentially since RPD first obtained

(17)  that prism simulator which is at the public

(18)  safety training facility; correct?

(19)            MS. JONES:   Objection.

(20)     A      Yes, there is -- technology is always

(21)  changing.

(22)     Q      So you can imagine that perhaps a

(23)  newer simulator with updated technology could

(24)  have new training that might be helpful to

(25)  officers; correct?

(1)                    Sergeant J. Rudolph

(2)        **A      To be honest, are you looking for my**

(3)     **opinion, Mr. Shields, is that what you want?**

(4)        Q      Yes, the more training the better;

(5)     right?

(6)              **MS. JONES:   Objection.**

(7)        **A      Agree with more training. Video**

(8)     **training is only going to get you so far. One**

(9)     **dimensional pictures on walls is only going to do**

(10)    **so much.  Until you have robots or what ever or**

(11)    **in the future.**

(12)       Q      Or even better, like a training that

(13)    involved real live dogs, that could be helpful?

(14)             **MS. JONES:   Objection.**

(15)       **A      I don't know about that. I am not an**

(16)    **expert on dog behaviors and how that would really**

(17)    **rollout.**

(18)       Q      So do you think that it could be

(19)    helpful for the RPD to have additional training

(20)    about dog behaviors?

(21)             **MS. JONES:   Objection.**

(22)       **A      We do have training about dogs. You**

(23)    **can look up training bulletins and roll call**

(24)    **presentations at any time on our department --**

(25)    **not our website but our own internal department**

(1)                    **Sergeant J. Rudolph**

(2)    **training website and things of that nature.**

(3)                    **And then again like it is and you saw**

(4)    **it is included periodically into in-service**

(5)    **training and roll call trainings and things of**

(6)    **that nature.**

(7)         Q    Aside from preparation for this

(8)    deposition when is the last time that you looked

(9)    up on your internal server any trainings or

(10)   policies having to do with interactions with

(11)   dogs?

(12)                   **MS. JONES:   Objection.**

(13)        **A    I couldn't tell you.**

(14)                   **Policies, the policies and the general**

(15)   **orders with dog the training that is posted on**

(16)   **there is the training.   Until there is a new cut**

(17)   **of training the training is what the training is**

(18)   **in so many words.**

(19)        Q    Are you aware if since this incident

(20)   in October 2018 there have been any updates or

(21)   changes to the RPD policies regarding

(22)   interactions with dogs?

(23)        **A    Not that I am aware of.**

(24)        Q    Since this incident in October of 2018

(25)   are you aware of any updates or changes to RPD

(1)            Sergeant J. Rudolph

(2)    policies with respect to the legal requirements

(3)    to enter the curtilage to a residential property?

(4)        **A    No policy changes that I can think of.**

(5)        Q    Any updates in training?

(6)        **A    Specific to?**

(7)        Q    Specific to let's take it step by

(8)    step.

(9)            So since this incident in 2018 are

(10)   you -- October of 2018 are you aware of any new

(11)   training for how officers interact with dogs?

(12)       **A    From the department I believe we may**

(13)   **have had a roll call training in there I believe.**

(14)       Q    That is not a new training.  That is

(15)   just kind of a reiteration of the prior 2014

(16)   training?

(17)       **MS. JONES:   Objection.**

(18)       **A    Yes, nothing newer.**

(19)       Q    Same question, similar question, since

(20)   October of 2018 has there been any new or

(21)   additional training about the lawful requirement

(22)   to enter the curtilage to a residential property?

(23)       **A    Not that I am aware of off the top of**

(24)   **my head.**

(25)       **MR. SHIELDS:  Thank you, Sergeant.  I**

(1)                    **Sergeant J. Rudolph**
(2)          **believe those are all of the questions**
(3)          **that I have for you today. I don't**
(4)          **know if your attorney might have some**
(5)          **followup questions for you.**
(6)          **MS. JONES:   No further questions by**
(7)          **the defendant.**
(8)             **(Time noted: 3:46 p.m.)**
(9)

(10)               _____
(11)                  JASON RUDOLPH
(12)

(13)   Subscribed and sworn to before me
(14)   this      day of            , 2023.
(15)

(16)   _____
(17)               NOTARY PUBLIC
(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

```
(1)                    Sergeant J. Rudolph
(2)     --------------- EXHIBIT INDEX-----------------
(3)     WITNESS           EXAMINATION BY   PAGE
(4)     JASON RUDOLPH   MR. SHIELDS         8
(5)
(6)     ----------------- EXHIBITS------------------
(7)     PLAINTIFF'S      PAGE
(8)     Exhibit 1,        21   Incident Report, bates
(9)                            stamped DEMPSEY 2120-2122,
(10)                           3 pages
(11)    Exhibit 2,        37   Video from Algarin's
(12)                           body-worn camera, 5:47 long
(13)    Exhibit 3,        51   File History Activity dated
(14)                           range 10/19/18-12/29/22,
(15)                           bates stamped COR GUR 01655,
(16)                           1 page
(17)    Exhibit 4,       143   Incident Report dated
(18)                           7/8/20, bates stamped
(19)                           DEMPSEY 2293-2295, 3 pages
(20)    Exhibit 5,       187   Incident Report dated
(21)                           8/29/21, bates stamped
(22)                           DEMPSEY 2350-2352, 3 pages
(23)    Exhibit 6,       189   Incident Report dated
(24)                           12/8/20, bates stamped
(25)                           DEMPSEY 2316-2318, 3 pages
```

(1)                        Sergeant  J.  Rudolph

(2)

(3)        "INFORMATION/DOCUMENTATION  REQUEST  INDEX"

(4)

(5)     -------------- DOCUMENT  REQUEST  --------------

(6)     PAGE         58   Notes  from  the  date  of  this

(7)                       accident

(8)

(9)     --------- INFORMATION  TO  BE  FURNISHED  --------

(10)                     -NONE-

(11)

(12)    ----------------- RULINGS  --------------------

(13)    PAGE         LINE

(14)    143          7

(15)                                  oOo

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)                    Sergeant J. Rudolph

(2)                       CERTIFICATION

(3)     STATE OF NEW YORK   )

                                )  ss.:

(4)     COUNTY OF NEW YORK )

(5)

(6)                I, LAURA B. LOWENTHAL, a Notary

(7)     Public within and for the State of New York, do

(8)     hereby certify:

(9)                That JASON RUDOLPH the

(10)    witness(es) whose deposition(s) is(are)

(11)    hereinbefore set forth, was(were) duly sworn by

(12)    me and that such deposition(s) is(are) a true and

(13)    accurate record of the testimony given by such

(14)    witness(es).

(15)                I further certify that I am not

(16)    related to any of the parties to the action by

(17)    blood or marriage; and that I am in no way

(18)    interested in the outcome of this matter.

(19)                IN WITNESS WHEREOF, I have

(20)    hereunto set my hand this 9th day of June, 2023.

(21)

(22)                _Laura B. Lowenthal_

(23)                   LAURA B. LOWENTHAL

(24)

(25)

(1)   ERRATA SHEET FOR: SERGEANT JASON RUDOLPH

         SERGEANT JASON RUDOLPH, being duly sworn, deposes and

(2)    says: I have reviewed the transcript of my

         proceeding taken on 06/09/2023. The following

(3)    changes are necessary to correct my testimony.

(4)   _____

(5)    PAGE LINE    CHANGE              REASON

(6)    ----|----|--------------------|--------------

(7)    ----|----|--------------------|--------------

(8)    ----|----|--------------------|--------------

(9)    ----|----|--------------------|--------------

(10)   ----|----|--------------------|--------------

(11)   ----|----|--------------------|--------------

(12)   ----|----|--------------------|--------------

(13)   ----|----|--------------------|--------------

(14)   ----|----|--------------------|--------------

(15)   ----|----|--------------------|--------------

(16)   ----|----|--------------------|--------------

(17)   ----|----|--------------------|--------------

(18)   ----|----|--------------------|--------------

(19)   ----|----|--------------------|--------------

(20)   ----|----|--------------------|--------------

(21)   ----|----|--------------------|--------------

(22)   ----|----|--------------------|--------------

(23)        Witness Signature:_____

         Subscribed and sworn to, before me

(24)   this ___ day of _____, 20 ___.

         _____      _____

(25)   (NOTARY PUBLIC)            MY COMMISSION EXPIRES

June 9, 2023

[Page 204]

**A**

**a.m (1)**
1:16
**Aaron (2)**
112:12 115:15
**abide (1)**
103:21
**Abigail (2)**
62:19,20
**ability (1)**
110:24
**able (14)**
38:22 40:14,16
40:20 57:15
98:23 151:3
151:17
152:14
156:18
157:16 178:3
179:8 181:3
**absent (1)**
90:5
**absolutely (2)**
31:12 68:20
**academy (7)**
14:9,21 15:14
16:14,20
138:14,17
**accept (2)**
42:21 128:9
**access (4)**
84:22 89:20
91:13 193:23
**accident (3)**
57:14 182:16
201:7
**accommodat...**
103:6,23
**accompanied...**
4:12
**account (3)**
77:19 125:17
126:11
**accurate (8)**

22:7 42:14,24
120:19
123:14,16
131:22
202:13
**act (1)**
138:2
**acting (2)**
127:25 134:17
**action (4)**
5:6 74:7 116:2
202:16
**actions (11)**
31:2,22 32:4
66:19 67:7,21
92:12 127:7
137:17 138:4
157:20
**activities (2)**
130:13 193:25
**activity (10)**
22:4 24:10
31:15 51:20
58:15 110:4,7
110:8,24
200:13
**actual (1)**
79:16
**ADAM (1)**
1:11
**add (4)**
157:5,6 160:6
160:7
**added (1)**
170:18
**adding (1)**
192:19
**additional (24)**
55:25 66:5,9
66:17 67:4
91:6,8,18,21
91:24 92:8
119:7 130:11
130:22

172:23 191:7
191:25 192:2
192:7,10,17
194:23
196:19
198:21
**address (1)**
8:12
**addressed (1)**
128:21
**addresses (1)**
165:21
**adjacent (1)**
92:6
**administerin...**
6:13
**advanced (1)**
195:16
**advised (1)**
134:12
**affirmatively...**
24:2
**affirming (1)**
8:18
**afraid (2)**
127:10,13
**afternoon (2)**
18:4 100:21
**against- (1)**
1:9
**aggressive (7)**
122:22 124:20
125:8 127:25
128:15 134:8
147:15
**aggressively ...**
134:17 138:3
**ago (5)**
12:21 130:9
131:13 136:4
140:25
**agree (18)**
10:14 56:18
88:2,8,20

89:13 90:6,7
90:12 91:9
95:6 112:19
113:23 180:2
180:4,18
195:15 196:7
**agreed (7)**
3:3 6:4 100:5
103:8 106:18
155:14
179:13
**agreeing (2)**
105:3,25
**agreement (3)**
102:20 180:10
180:13
**ahead (13)**
12:9,24 13:8
13:24 38:7,12
39:20 40:7
49:8 99:9
105:24
148:18
153:10
**airport (2)**
15:2,7
**ajar (1)**
141:16
**Algarin (61)**
1:11,12 12:5,7
22:11 23:5,8
23:19,25 28:7
28:19,25
31:20,21 32:3
32:12 33:23
34:8 37:5,24
39:3 45:2
53:3,20 58:19
60:21 61:16
62:18 63:18
66:3 67:18
68:5 69:2
71:7,15,23
95:3 96:6

107:16,24
109:19
110:12 111:4
111:10 113:4
117:5,11
119:12,14,23
120:6 121:11
127:2 142:15
148:23
154:12,19
155:7 156:10
174:22
176:17
**Algarin's (11)**
12:3 22:15
30:5 35:11,15
36:9 37:7,20
63:23 94:22
200:11
**allegations (5)**
144:4 152:24
154:15 155:6
156:14
**allowed (13)**
14:14 72:18
73:4,12 85:13
93:24 112:18
127:19 128:3
129:11,16
169:20
178:14
**alright (1)**
71:22
**altogether (1)**
144:6
**ambiguous (1)**
157:5
**Amended (1)**
166:6
**amendment ...**
76:9 78:18
80:19 93:9
94:6
**amount (4)**

90:24 91:18
108:23 130:9
**and/or (4)**
3:8 51:12
68:24 121:22
**anger (1)**
142:2
**angry (1)**
137:21
**animal (16)**
28:14 34:22
133:8,13,15
133:23 134:7
134:16,19,19
139:11,18
141:23
177:24 195:5
195:6
**animals (2)**
11:16 137:20
**Anne (1)**
17:9
**answer (42)**
3:11,17 4:2,9
4:11,12,14
9:24 10:9
12:10,11
36:15 49:8
52:12 65:2,19
68:19 85:21
86:14 96:14
112:25
113:11 142:3
145:8,12,12
145:15 150:9
150:15
151:20 152:3
152:6,16
153:3 158:5
158:18
163:24
165:10
174:24
179:24

181:20
183:18
**answered (5)**
4:7,21 151:13
160:10,20
**answering (1)**
143:6
**answers (4)**
52:10 86:18
129:7 170:17
**anticipate (1)**
160:9
**anybody (8)**
12:5 46:20
48:18 53:23
64:24 65:4,23
135:4
**anybody's (1)**
89:20
**anyway (3)**
71:14 127:16
184:7
**apart (2)**
44:3 192:11
**apologize (4)**
35:21,23 171:5
178:2
**apparently (1)**
166:24
**appears (3)**
39:14 108:7
117:20
**application (2)**
100:10 136:25
**applied (1)**
111:23
**applies (5)**
93:4,9 114:3
116:12
125:13
**apply (8)**
3:13 45:24
81:10 88:4
93:5 113:13

169:25
177:21
**appreciate (1)**
107:22
**apprehended...**
75:6
**approach (2)**
68:19 124:12
**approached ...**
148:4 184:6,8
185:5
**approaches (1)**
127:18
**approaching...**
125:14
**appropriate ...**
3:13 31:9
66:20 170:4
170:16
**approximate...**
12:18 15:9,22
17:19 29:3
182:3
**area (17)**
18:18 22:5
24:14 33:23
33:25 48:21
78:10 81:16
89:21 90:20
92:2,19 109:8
109:11
110:24
125:19
127:15
**areas (1)**
92:22
**arguing (1)**
191:21
**arising (1)**
161:3
**armed (1)**
84:12
**arranging (1)**
102:14

**arrest (7)**
74:5,20,20
75:5 81:13
85:16 87:3
**arrival (1)**
51:2
**arrived (1)**
133:14
**Article (1)**
3:14
**articulate (1)**
163:12
**aside (3)**
122:13 130:18
197:7
**asked (18)**
42:3 49:7
64:21,23
88:11 99:25
100:14
101:21
113:10
119:15,23
151:8 160:18
164:21
175:22
178:14,24
179:23
**asking (31)**
25:14 40:25
41:18 56:9
65:4,6 74:3
76:11,12,17
76:18 77:8,20
85:9,10 97:4
109:22
111:14 113:7
113:9,12
117:22
131:23 132:3
144:9 148:22
151:5 169:8
169:15
172:15 177:3

**aspect (3)**
46:2 182:14
185:24
**assert (1)**
179:9
**assigned (5)**
17:11,20,23
18:9 63:19
**assigning (1)**
46:19
**assignment (5)**
17:17 59:7
62:7,9 63:5
**assist (1)**
117:23
**assistant (13)**
19:18,19,24
20:3,4,6,9,11
20:18,23
101:19
182:13
187:15
**associates (1)**
13:20
**assume (2)**
10:10 76:16
**assumed (1)**
9:20
**assuming (8)**
36:16 42:10,20
48:11 64:21
65:2 89:24
185:9
**assumption (1)**
186:17
**attack (1)**
137:16
**attacking (3)**
126:4,17
137:11
**attendance (1)**
3:23
**attended (1)**
86:15

attending (1)
130:4
attention (7)
46:7 47:21
48:17 92:17
95:20 110:20
133:12
attorney (14)
3:18 4:8,17
5:10,17 6:24
8:16 12:9
52:7,9 97:5
129:2,4 199:4
attorneys (4)
2:4,8 3:4 12:23
audio (3)
38:14,16,22
August (6)
15:11,13 18:2
18:6,14
186:22
automaticall...
134:12
available (1)
137:13
avenue (4)
2:4 53:18
68:17 189:16
avenues (1)
67:13
avoid (9)
138:15 173:3
173:15 174:2
174:21 175:8
176:6 191:8
191:14
avoided (1)
176:3
aware (16)
39:2 66:11
71:6 72:3
112:6,10
143:2 151:12
167:9 182:5

185:16
197:19,23,25
198:10,23

————————
**B**
————————
b (4)
1:20 3:8 202:6
202:23
BA (1)
13:23
back (26)
15:13 23:5
24:17 40:10
46:20 51:5
52:5 58:14
61:11 67:3
78:14 82:19
89:11 90:24
91:25 92:17
94:12,14
128:5 131:24
132:11
133:17,21
138:18 172:8
181:10
background ...
13:10,12
backtrack (13)
22:11,16,22
23:8 24:2
29:10 31:6,10
69:11,17,23
82:22 119:13
backtracked ...
23:20 25:16
26:12 29:2
30:7 69:2
84:9
backtrackin...
24:5 29:19
70:9,11,14,19
82:24 175:14
backyard (56)
22:12,16 25:3

28:6,7,9,13
28:15,18 31:6
31:10 39:6,13
39:22 69:3,17
73:11,13
74:23,25
83:21 84:3,22
89:5 91:4,13
92:3,7,15
93:23 95:6,16
95:21 96:2
108:10,18,22
108:23 109:4
109:6,17,18
111:3 112:9
115:10 116:6
117:12 119:9
120:8 132:14
132:16
142:17
154:13 169:7
175:14,24
backyards (14)
22:6 69:11
71:9,21 90:21
92:6,21 93:6
93:20 110:25
112:19
120:22
121:13,16
bad (2)
65:7 178:17
bar (1)
5:4
barking (1)
132:23
based (21)
26:16 30:12
42:18 43:21
69:22 83:6
109:9 110:2
110:21
111:10 115:3
121:23 125:7

125:16 126:9
173:7 174:13
175:11
176:21
179:18
189:22
basically (10)
22:2,5 29:25
59:22,25 68:8
70:22 71:12
79:25 126:22
basis (16)
3:20 4:13
67:14 70:2
82:4 84:15
108:14 109:5
109:19,24
120:13
133:17,21
152:17 153:2
194:20
bates (10)
21:10 51:21
143:24 187:4
189:19 200:8
200:15,18,21
200:24
baton (2)
177:11 187:25
batons (2)
137:12 138:21
bear (1)
7:5
beat (1)
141:4
bed (1)
134:3
beers (1)
164:22
began (3)
22:11 132:23
151:14
beginning (12)
22:2,8 23:8

37:20 38:13
94:14,17,25
107:16 108:2
108:19 121:3
behalf (4)
5:11 60:14
111:12
173:19
behaviors (4)
124:5,8 196:16
196:20
belief (3)
84:13 109:24
128:9
believe (20)
40:6 49:17
58:23 83:12
83:24 88:4
108:21
109:12,15
131:25 133:6
134:11
136:21
147:22
149:17
152:17
161:24
198:12,13
199:2
believed (8)
84:2,6 109:15
109:20
112:15
113:17 126:2
126:3
believing (1)
109:19
belt (1)
125:9
best (4)
66:8 96:14
194:18,18
better (9)
42:2 96:16,22

97:6 101:24
107:9 146:9
196:4,12
**beyond (1)**
150:11
**big (1)**
167:11
**biggest (1)**
111:11
**bit (4)**
116:23 148:2
158:7 178:20
**bite (1)**
129:21
**bitten (3)**
132:11 134:17
140:8
**black (1)**
127:3
**blend (1)**
130:7
**blocked (1)**
157:22
**blood (1)**
202:17
**body (4)**
12:4 55:2
118:5 128:17
**body-worn (...**
11:23,25 34:19
35:7,11,12,15
36:2,8,14
37:7,20,23
38:14 39:9
42:11 51:18
52:15,24 53:2
53:9,13 60:9
60:12 64:20
64:25 65:10
92:13 94:17
94:23 99:19
99:22 100:9
104:16
106:17

192:22 193:4
193:11,15
200:12
**book (1)**
10:17
**books (1)**
56:25
**boss (2)**
32:25 186:10
**bottom (2)**
148:3 158:21
**Boulevard (1)**
8:13
**Brandon (2)**
182:11 190:18
**break (8)**
52:3,6,7
128:22,24,25
129:5 146:11
**breast (1)**
54:25
**briefly (1)**
130:3
**bring (2)**
34:20 82:19
**bringing (1)**
101:11
**broad (3)**
73:18 77:14
82:16
**brooms (1)**
137:13
**brought (6)**
26:19 46:7
47:21 48:17
82:18 184:20
**Buffalo (1)**
193:14
**building (1)**
162:25
**Bull (1)**
133:6
**bullet (1)**
188:2

**bulletin (1)**
130:17
**bulletins (4)**
11:16,18
122:10
196:23
**bunch (1)**
33:5
**burden (1)**
101:10

———————
**C**
**c (2)**
2:2 3:8
**C.P.L.R (2)**
3:14 5:13
**call (32)**
25:21 30:24
31:14 46:13
48:21 50:16
50:16,22
56:25 58:11
71:22 72:5
97:10,18
109:2 110:2,4
133:17,18,21
134:3,8 149:3
149:11 150:6
150:16
158:11
165:11
177:23
196:23 197:5
198:13
**called (8)**
8:3 33:7 50:10
92:21 99:8
112:6 133:8
175:6
**caller (1)**
25:23
**calling (2)**
97:22 133:13
**calls (1)**

110:24
**calm (1)**
177:15
**camera (40)**
12:4 34:19
35:7,11,12,15
36:2,9,14
37:7,20,24
38:14 39:10
51:18 52:15
53:10,13 60:9
60:12 64:21
64:25 65:6,10
92:13 94:12
94:17,23
96:11 99:19
99:22 100:9
104:16
106:18 118:5
119:11
128:18 193:4
193:16
200:12
**cameras (8)**
11:23,25 36:8
42:11 52:25
192:22
193:10,11
**car (2)**
139:20 148:9
**career (4)**
54:22 86:15
141:3,6
**carefully (1)**
89:23
**carried (1)**
55:4
**carry (4)**
54:19 55:3
139:15,19
**cars (1)**
139:16
**case (58)**
9:5 10:18 11:7

12:23 13:7
24:25 25:12
25:15 27:18
30:7 31:18
45:24 52:23
55:19,20 56:8
56:10 66:25
67:5,13,14
70:2,2 73:15
76:10,15,22
77:12,12
82:20 85:18
93:17 97:24
98:22 103:18
112:10,12,23
113:4,13,13
115:8 116:14
120:13,13
121:6,10
126:25
128:13
148:23
149:25
153:17 154:9
155:9 165:18
171:6 173:3
180:9
**cases (16)**
43:10 68:14
99:18 103:4
103:13,15,17
103:20
149:22 153:7
153:13,15
154:2 159:19
162:8 193:8
**catch (8)**
139:2,9,11,13
139:19
184:23 185:2
185:5
**cause (13)**
4:7 74:5,18
75:4 79:23

June 9, 2023

[Page 208]

81:13 83:10
83:12,17
85:16 87:3
109:12
110:15
**caused (2)**
82:8 158:10
**certain (8)**
33:10 56:24
69:24 124:21
129:10 162:9
165:12 168:8
**certainly (2)**
92:23 124:14
**certification ...**
5:15 14:15
202:2
**certified (1)**
16:23
**certify (2)**
202:8,15
**chain (7)**
39:11 59:10
64:16,24
65:14,17,24
**chambers (1)**
97:19
**chance (1)**
96:18
**change (6)**
52:11 127:6
129:6 136:6,8
203:5
**changed (2)**
135:25 136:5
**changes (4)**
197:21,25
198:4 203:3
**changing (1)**
195:21
**character (1)**
168:16
**charge (5)**
5:19 59:23

182:14
188:10
190:18
**Charles (7)**
1:5,6 11:7 39:6
97:23 98:22
152:22
**chase (9)**
24:16,16,18
71:8 72:18
74:24 75:6
76:3 120:16
**chased (2)**
22:5 26:20
**check (8)**
31:10 42:18
48:22,24
57:17,20
69:24 114:17
**checked (1)**
33:24
**checking (1)**
109:8
**checks (2)**
46:15,17
**choppy (8)**
37:12 38:18,19
96:10 97:7
99:24 100:4
100:12
**Christin (10)**
98:6,18 106:7
107:12
150:18 169:2
172:4 178:7
180:17 181:6
**Church (1)**
2:9
**circumstanc...**
83:6,11 90:12
109:9 126:19
**circumstanc...**
22:15 23:12,18
24:7 26:16

30:21,23 31:8
31:17 56:12
69:10,18,22
69:24 73:9
74:11,14
75:23,24,25
79:6,9,25
80:8 81:6
82:17 87:23
88:3 89:14,19
90:4 92:7
109:2 111:24
113:3 114:6
115:9 116:8
126:6 127:8
128:12
129:11 135:6
147:11
**citing (1)**
76:10
**citizens (2)**
93:6,10
**City (20)**
1:10 2:8 8:16
12:23 50:3
52:22 59:22
59:23 60:4
65:19 101:25
103:23 105:5
112:7 123:13
123:18
153:21 161:5
168:21
193:14
**city's (1)**
104:6
**civil (2)**
7:10 9:5
**civilian (1)**
35:5
**claim (5)**
159:8 166:8
167:8,11
170:12

**claims (7)**
142:19,19
149:20,24
153:2 156:13
156:13
**clarify (3)**
52:11 129:6
144:19
**Clark (5)**
155:21,22
160:14,17,22
**classroom (1)**
19:2
**clear (5)**
3:19 4:13
129:9 158:15
180:5
**clearly (2)**
4:24 167:7
**CLERK (37)**
98:19,25 99:6
99:8 100:20
102:3,12
103:12 105:6
105:13
106:14
150:20,23
151:4 153:9
157:3 158:6
158:24 159:7
160:4,17,24
162:3 163:10
164:14 166:2
170:17 171:4
171:14,19,22
172:6 178:2,8
178:21
180:22 181:2
**Clinton (9)**
17:24 18:3,11
18:12,22 29:5
53:18 59:5
189:16
**closet (2)**

139:3,4
**clue (1)**
60:11
**college (3)**
13:19,20 14:3
**combine (1)**
154:24
**come (16)**
10:23 25:20
67:16 71:23
72:12 113:11
120:15
121:25
123:22,24
125:21 134:2
134:4,5
135:21 172:8
**comes (2)**
125:21 161:7
**coming (2)**
128:14 140:22
**command (6)**
59:10 64:17,25
65:15,17,24
**commander ...**
19:19,20 20:9
20:10,18,21
20:24 151:23
157:25
182:13 186:6
186:9,11
187:16
190:25
191:24
193:15
**commanding...**
50:2,19 60:4
65:18 147:9
148:6 157:14
158:22
170:10
185:21
**comments (1)**
3:24

COMMISSI...
203:25
committed (...
73:22,23 74:6
75:10 83:13
85:7,11,14
86:20 87:7
committing (1)
74:23
common (5)
90:21 104:24
120:11
121:18
167:17
communicati...
4:18
communicati...
4:23 114:19
132:21
Community ...
13:20 14:3
complained (1)
116:7
complaint (17)
26:5,13 142:14
146:8 149:19
152:22,23
154:11,16
156:10,12
159:4,14
161:23 164:8
166:6 167:6
complete (2)
4:15 181:3
completed (3)
11:2 55:6
102:9
completely (1)
163:8
compliance (1)
3:5
complied (1)
66:20
compromisin...

161:11
computer (5)
53:24 100:18
104:21 105:4
161:19
concept (2)
77:2,21
concern (5)
153:14 161:8
178:15
184:13,16
concerned (1)
163:15
concerning (2)
142:14 154:11
concerns (12)
105:9,10
153:21
163:21
164:12
165:13,19,21
183:4 188:11
190:21 191:4
concluded (5)
17:11 23:15
82:11 83:2
108:9
conclusion (4)
22:23 24:3,16
84:16
conduct (3)
7:6 188:7,21
conducted (2)
6:7 99:17
conference (2)
6:8 103:19
CONFEREN...
1:18
conferences (...
161:14
confidential ...
162:12 163:4
164:24 165:3
165:16

181:20,23
confidentiali...
4:4 161:6,16
162:7,22
163:3,14
164:13,18
165:22
179:15 180:4
180:20
confirming (1)
6:16
conflating (1)
145:22
confusing (1)
9:18
conjunction ...
139:17
connection (2)
145:2 178:18
consent (14)
4:19 6:19 70:4
70:8 80:8
89:16 90:2,6
90:9,15 91:6
111:17 112:2
115:9
consider (5)
69:21 74:15
122:5 126:5
133:13
considered (7)
6:20 93:14
191:6,25
192:6,16,21
consist (1)
15:21
consistent (5)
22:17 23:18
31:23 32:5
115:13
constitute (1)
91:22
contacting (1)
134:6

contained (4)
44:16 56:16
139:4 167:6
contents (1)
27:8
context (6)
93:12 114:13
119:2 151:25
152:8 153:16
continue (3)
87:4 97:9
179:21
continued (2)
172:15 184:4
continues (1)
184:18
continuing (1)
192:20
continuous (1)
81:20
continuously...
132:23
continuum (4)
136:25 137:3,6
137:8
contraband (...
27:12 29:19
69:13 83:25
87:10,14,21
88:5,7,16
117:13
118:11,18
119:8
control (3)
6:11 34:22
141:23
controlled (1)
5:14
convenience ...
101:9,11
conversation...
27:9 31:7 32:8
34:17 83:23
117:9 118:21

119:17,20,21
119:22 120:3
120:25
134:23
179:18
conversation...
68:4 118:23
conveyed (1)
179:19
copy (15)
5:19 6:25 7:8
96:19 97:6,12
100:2,16
104:6,11,20
104:25 105:4
105:7 106:17
COR (2)
51:21 200:15
Corey (1)
155:21
corner (2)
114:8 141:23
cornered (1)
138:11
corners (1)
114:10
correct (70)
13:9 14:19
16:22 20:20
20:22 21:22
21:23 23:11
23:16 25:10
25:18 30:4
32:13,14 35:8
36:5,12 38:14
38:16 41:23
41:24 42:4,24
47:25 49:23
49:24 51:14
60:19 65:25
66:2,12 67:9
72:22 74:4
77:10 78:19
79:7,13 80:13

82:5,25 83:21
84:4,9 86:24
87:17,24
89:11 94:6
96:3 100:22
108:5,10,15
112:3 115:17
117:14 118:7
118:12
129:19
133:20
135:12 139:9
159:11
171:21
182:24 190:8
195:18,25
203:3
**correctly (1)**
65:20
**costs (1)**
7:6
**counsel (5)**
5:18 6:5,8 7:3
98:11
**County (5)**
13:25 14:5,22
15:8 202:4
**couple (7)**
60:22 67:12
157:3 160:11
166:20 169:4
171:25
**course (4)**
16:24 54:21
164:20
165:20
**court (19)**
1:2 3:22 4:6
6:8,12,15
76:7,10,14,19
76:22 81:19
84:24 85:22
97:10 99:7
107:5 165:11

191:18
**courteous (1)**
97:13
**courtesy (2)**
97:15 104:10
**courts (3)**
3:6 78:23
116:12
**CPLR (4)**
3:21 4:10 6:6
7:8
**CR (4)**
44:3,15,25
144:24
**create (10)**
43:13 87:11,15
87:22 88:11
88:19 90:16
91:9 92:8
127:16
**creates (1)**
137:21
**crime (10)**
74:6 75:5,12
75:14 81:21
83:13 85:7,17
86:19 87:8
**crimes (1)**
62:15
**criminal (3)**
13:21,23 44:25
**Cristin (1)**
155:18
**criteria (1)**
168:8
**cross (1)**
44:12
**current (1)**
8:11
**currently (5)**
19:14 58:24
62:3 63:19
193:10
**curtilage (14)**

22:21 70:20
72:8,17 75:20
76:4,8 77:3
77:25 78:5
85:2,25 198:3
198:22
**custody (1)**
74:21
**cut (4)**
93:7,20,24
197:16
**cuts (1)**
92:21

_____

**D**

**d (2)**
3:8 8:2
**daily (1)**
194:20
**danger (3)**
109:10 122:23
127:25
**dangerous (4)**
84:19,21
167:12
168:11
**dark (1)**
132:17
**Darrell (1)**
17:8
**data (2)**
29:14 123:21
**date (13)**
15:3 37:24
38:3 53:5
57:14 71:6
131:23 141:2
154:22
155:17
159:10
189:22 201:6
**dated (9)**
21:21 51:20
143:24 187:4

189:19
200:13,17,20
200:23
**daughter (3)**
8:23 34:24
35:3
**Dave (1)**
17:8
**day (19)**
11:2 12:4 45:4
50:3 51:4
54:20 56:22
57:18 59:21
59:23 60:3,7
63:10 65:17
99:16 110:3
199:14
202:20
203:24
**days (2)**
12:21 60:9
**DCJS (2)**
14:15 16:22
**deal (4)**
122:22 164:16
166:25 192:7
**dealers (3)**
71:9,20 72:2
**dealing (4)**
92:13 108:24
110:19 137:6
**deals (1)**
72:8
**December (3)**
17:5 61:12
189:17
**decided (1)**
116:12
**deciding (1)**
184:18
**decision (4)**
103:22 173:7
174:14,16
**decisions (1)**

31:16
**declined (1)**
101:16
**deemed (2)**
5:12 81:15
**defect (1)**
3:19
**defendant (2)**
1:19 199:7
**Defendant(s)...**
1:13 2:8
**defendants (3)**
13:6 101:10
180:25
**defense (2)**
15:25 170:23
**deficiencies (1)**
49:13
**definitive (1)**
36:15
**definitively (1)**
119:3
**degree (1)**
13:21
**Dejonge (7)**
145:10 146:14
147:2,23
181:9,12
183:13
**delegate (1)**
46:16
**delineate (1)**
75:8
**delineating (1)**
85:20
**Dempsey (38)**
1:5,6 11:7,9
21:10 34:17
97:24 98:22
102:7 111:6
143:25 146:6
148:21,22
151:8 152:22
154:9,16

155:9 156:23
159:4,15
161:22 164:6
164:8 167:15
169:13,17
171:5 173:3
175:23 187:5
189:20 193:6
200:9,19,22
200:25
**Dempsey's (...**
31:6,10 39:6
69:3 83:21
90:14 91:5
92:7 95:5,15
95:25 108:10
108:18
111:16 112:2
117:7,12
118:6,12,18
119:9
**Dennis (1)**
17:9
**department (...**
2:8 11:4 13:3
15:12,17,24
16:8,25 17:23
61:8,24 62:2
63:4 135:5
193:21
194:10,24
196:24,25
198:12
**depended (1)**
24:24
**dependent (3)**
29:14 44:14
77:13
**Depending (1)**
119:2
**depends (4)**
33:4,5 134:12
134:13
**depicted (2)**

39:24 96:6
**depicting (1)**
39:10
**deployment (...**
114:14
**deponent (5)**
3:17 4:2,9,14
4:19
**deposed (1)**
7:9
**deposes (1)**
203:1
**deposition (50)**
3:9,10,11,16
4:3,16,18 6:7
6:14 7:6 9:5,9
10:21 12:14
13:4 21:8,17
38:6 71:13
97:23 98:22
99:17 100:23
101:8,20
102:8,14,21
105:19
106:25 107:6
130:2 137:24
150:5,25
154:4 155:20
155:24
160:13
164:21 165:2
165:15
169:11,12,18
179:14,21
180:7 181:4
197:8
**deposition(s)...**
202:10,12
**depositions (...**
43:11 99:12,15
101:6 102:5,6
103:2,8,11
104:24
105:15,22

106:12,20
165:17 168:7
**deputy (3)**
14:25 15:6
160:14
**describe (1)**
117:18
**described (1)**
138:19
**describing (1)**
76:4
**description (1)**
120:20
**destroyed (3)**
87:15,22 88:6
**destruction (4)**
88:7,14,21,24
**detail (2)**
73:10,16
**detailing (1)**
33:16
**details (3)**
22:25 23:23
134:14
**detain (1)**
121:14
**detained (16)**
22:6 23:9,13
36:11,17
40:12 42:3
45:13,18 47:2
69:12 72:3
82:12 84:4
108:3 109:22
**determinatio...**
32:15 56:13
127:7
**determine (1)**
188:22
**determined (6)**
31:22 32:5,9
66:19 67:6,7
**determining ...**
4:20 55:23

**devised (2)**
71:15 72:4
**devote (1)**
92:16
**DiDomenico ...**
137:24
**die (1)**
141:24
**died (1)**
161:20
**difference (8)**
73:20,25 75:7
75:8,12 89:6
168:23 177:2
**different (36)**
16:2,4,14 23:2
23:20 33:5
43:8 74:14
77:4 89:3
92:25 101:23
113:2,4
114:14,15
115:5,6,21
140:15
145:16,20
148:9 158:2
160:19 161:2
164:6 168:15
168:15
169:12
171:16,18
177:6 194:12
194:19,21
**differently (6)**
155:4 173:3,15
174:2 175:4
176:5
**difficult (2)**
114:6,16
**difficulties (1)**
37:10
**diligent (2)**
41:14,19
**dimensional ...**

194:15 195:4
196:9
**direct (7)**
4:9 30:3,5
32:18 35:20
66:10 135:9
**directed (2)**
28:13 67:3
**direction (3)**
4:11 39:14
57:5
**directly (2)**
132:24 193:2
**directs (1)**
12:11
**DiSabatino (5)**
71:7,16,23
120:6 121:10
**DiSabatino's...**
71:13
**disagree (3)**
49:10 142:24
153:5
**discard (3)**
26:21 27:6,11
**discarded (18)**
24:12,19,21
28:5 29:19
55:8 69:14,24
82:21 83:25
84:14,18
109:11,13,16
109:20
110:13 111:8
**discharge (1)**
128:16
**discharged (3)**
132:25 147:16
166:18
**discipline (8)**
33:18 170:14
173:11
185:11,13,20
186:2 189:12

disciplined (5)
66:4,16 156:17
   159:24
   172:19
disclosed (2)
163:4 164:10
disclosure (1)
153:22
discourtesy (1)
104:5
discovery (6)
52:23 153:19
   153:22,25
   159:16 161:2
discuss (4)
19:10 31:4,8
   155:22
discussed (7)
21:4 32:12
   69:9 120:5,10
   179:20
   183:23
discussing (1)
145:24
discussion (7)
30:14,17,18,20
   31:19 126:9
   146:10
discussions (2)
31:16 162:5
disinclined (1)
101:6
dispatch (1)
26:9
display (7)
99:21 100:3,9
   104:21 105:3
   105:25
   106:18
displaying (1)
194:16
dispute (8)
98:3,21 102:16
   102:23 149:8

151:2 155:18
   191:22
distinct (3)
77:23 144:5
   145:18
distinction (1)
179:4
distinguish (1)
77:8
DISTRICT (2)
1:2,3
disturbance ...
141:15
division (3)
17:12,21 62:16
document (8)
21:19 45:11,17
   45:20,25
   52:19 57:8
   201:5
documentati...
26:3 27:20
   43:7,14,20,24
   43:25
documented ...
27:15,22
   118:24
documents (5)
11:20 23:8
   162:15,17
   163:7
DOE (1)
1:11
dog (163)
8:23 28:18
   33:23 34:14
   34:21 42:4,21
   43:9,19 44:4
   44:9,15,20
   45:22,25 46:9
   99:18 103:4
   103:17,20
   112:9 122:5
   122:16,17,22

123:3,6 124:2
124:16,18,20
124:25 125:5
125:6,10,13
125:17,20,21
125:25 126:3
126:12,15,16
126:22,22
127:14,14,18
127:20,24
128:3,14
129:11,17
131:7,9,10,11
132:2,8,13,13
132:16,23
133:2,5,7
134:9,15,16
134:21 136:2
136:13
137:11,16
138:2,16,22
138:24 139:2
139:4 140:2,8
140:19,24
141:17,20,20
141:22
142:16
143:17 144:8
144:9,10,12
144:15 146:3
147:5,12,14
147:16
148:24
151:24
153:13,16
154:13,20
156:11,15,16
157:21
162:18,23
165:8 167:2
167:20
169:21 170:9
172:20,24
173:4,16

174:3,5,7
175:8 177:15
177:15
178:13,15,25
181:14,17
182:5,9,23
183:3,5,9,14
183:20,22
184:4,7,8,8
184:11,16
186:24
188:16,23
189:6 190:6
190:16,21
191:3,13,14
191:15
196:16,20
197:15
dog's (1)
124:11
dogs (49)
123:8,10,13,19
123:22,23
124:6,8,13,14
130:12,17,20
137:2,4,7
138:9,12,12
140:12
142:20,21
151:10,12
152:5,25
154:5 159:22
162:2,21
166:10,18
167:8,13
169:4 174:9
177:21 191:8
192:3,8
193:24 194:6
194:13,22
196:13,22
197:11,22
198:11
doing (12)

17:2 43:22
   47:19 48:21
   48:22 96:6
   99:13 100:15
   101:3 102:21
   106:20
   117:18
DOLBY-SHI...
2:6 8:7
door (11)
90:2,14 91:5
   111:17 114:9
   114:17
   132:23
   141:15,15,17
   175:22
download (1)
105:12
draft (1)
45:3
drafted (3)
49:3,16 56:24
draw (1)
128:19
drive (1)
121:11
driveway (3)
147:22 169:5
   183:10
drove (1)
71:16
drug (4)
25:21 71:8,20
   71:25
drugs (7)
24:18 28:5,21
   88:17 89:4
   110:8,11
due (3)
161:3,8 163:20
duly (3)
8:3 202:11
   203:1
duty (9)

45:10,16,20
47:23 59:21
101:18
136:10,14
166:19

**E**

**E (4)**
2:2,2 8:2,2
**e-mail (6)**
2:6,11 50:13
104:19,25
105:7
**e-mailed (1)**
7:2
**earlier (6)**
69:9 83:8
94:20 120:5
121:9 185:9
**early (3)**
20:25 141:3,5
**East (3)**
13:17 17:12,21
**easy (1)**
73:7
**eating (2)**
105:19 107:5
**educational (1)**
13:11
**effective (1)**
137:11
**efficiently (1)**
150:4
**Ehlers (6)**
60:23,23 61:15
62:18,22,22
**eight (1)**
159:19
**either (16)**
21:2 45:12
46:25 47:21
50:6 67:3,7
112:2 129:6
138:10 155:5

169:5 170:7
172:9 179:22
189:10
**element (2)**
20:6,8
**Elliot (14)**
2:6 8:22 49:6
97:20 98:8,10
98:19 142:7
144:12,25
148:10
150:18
191:11
192:24
**else's (1)**
94:8
**emergency (...**
79:13,14,16,22
83:9 87:22
88:19 89:9
90:4,9,17
91:9,19,22
92:9 110:16
**employees (1)**
133:24
**enclosed (1)**
23:21
**encompass (1)**
167:7
**encompasses...**
149:18
**encounter (6)**
122:5,17 123:3
123:6 130:12
167:21
**encountered ...**
167:2
**encountering...**
122:16 127:24
**encounters (1)**
125:5
**encourage (2)**
105:20 106:21
**enforce (1)**

4:5
**enforcement ...**
129:22 130:13
193:24
**enhancing (1)**
192:18
**enjoys (1)**
76:8
**ensure (3)**
24:11 47:24
70:10
**enter (36)**
22:21 31:5
55:21 74:8
76:3,4 77:3,5
77:23,24
78:17 80:6
82:5,13 84:15
89:17 90:3,15
108:14 109:6
110:17 111:2
111:8,17,25
112:3 114:22
122:25
162:25
167:14,17
171:15
175:23,24
198:3,22
**entered (14)**
16:6 28:7,19
55:19 56:13
108:9 112:9
117:7 166:23
167:16
171:17 183:8
184:7,11
**entering (18)**
70:5,6,13 72:8
74:11,17
75:20 76:23
78:5 83:21
93:14 94:8
108:21

114:18
118:19 171:7
174:10
183:20
**entire (2)**
31:3 140:6
**entity (1)**
1:10
**entries (1)**
80:17
**entry (20)**
20:12,14,16
22:16 28:9,12
58:18 75:21
78:6,9,24
80:15 85:2,24
87:12,16,24
90:5 93:6
183:13
**environment...**
125:18
**equipment (1)**
195:4
**Erin (1)**
112:6
**ERRATA (1)**
203:1
**error (1)**
3:20
**eshields@rot...**
2:6
**especially (3)**
96:11 123:7
124:11
**ESQ (2)**
2:6,10
**establish (2)**
114:19 132:20
**established (1)**
83:17
**evasive (1)**
86:13
**event (1)**
4:22

**events (1)**
36:22
**everyone's (1)**
191:21
**evidence (4)**
33:19 41:23
88:22,25
**evidentiary (1)**
84:19
**exact (7)**
50:25 51:3
66:23 115:19
117:6,9 130:8
**exactly (4)**
30:24 135:22
137:20
151:18
**examination ...**
1:18 3:23 5:4,7
5:10,11,16,19
8:6 200:3
**examined (3)**
5:8,18 8:4
**examining (1)**
4:15
**example (9)**
33:11 56:23
57:7 58:2
89:4 137:23
157:25
169:10
175:20
**exception (9)**
79:3,4,9 81:10
82:25 87:23
88:4 111:22
114:2
**exceptions (5)**
68:16 70:7
77:16 78:22
79:5
**excessive (3)**
142:6,22 143:4
**Exchange (1)**

8:13
**execute (6)**
166:24 167:23
167:24 168:2
184:19,21
**executed (1)**
168:6
**executing (1)**
166:13
**execution (13)**
147:8,13
166:11 167:3
167:10,22
168:13
188:14,21
190:5,22
191:9 192:4
**exhibit (29)**
6:25 7:2,5 21:8
21:9 37:3,4,6
51:17,19
52:15 58:14
94:13 105:2,8
143:22,23
146:13
181:10 187:3
189:15,18
200:2,8,11,13
200:17,20,23
**exhibits (2)**
6:23 101:12
**EXHIBITS--...**
200:6
**exigency (1)**
88:12
**exigent (12)**
79:5,9,25 80:8
81:6 83:5
87:23 88:3
89:13 109:9
111:24 115:9
**exists (1)**
81:25
**exits (2)**

81:16 95:21
**expectation (5)**
75:16 78:4,11
114:24 115:3
**expected (3)**
103:21,23
121:12
**expecting (2)**
71:25 121:15
**experience (...**
29:5 69:23
110:22
121:25
123:17,22
124:15
141:25 173:8
173:21
176:22
**experiences (1)**
29:24
**expert (2)**
124:5 196:16
**EXPIRES (1)**
203:25
**explain (4)**
59:12 81:8
112:24
160:25
**explained (2)**
99:21 158:12
**explanation (...**
149:3
**exponentiall...**
195:16
**exported (4)**
52:24 61:2,14
61:15
**express (2)**
6:18 188:11
**expressed (1)**
184:14
**extended (1)**
104:10
**extent (4)**

3:21 58:9
178:11
179:10
**eyes (1)**
176:21
**eyewitness (1)**
157:24

------

**F**

**face (2)**
127:5 194:20
**facilitate (2)**
101:12,19
**facility (3)**
14:12 16:11
195:18
**fact (18)**
9:21 45:11
47:15,16
77:13 84:2
90:13,15 91:2
102:6,20
114:21 119:6
161:3 163:22
175:11 189:8
190:21
**factor (1)**
184:18
**factors (4)**
111:2 125:18
138:2 184:20
**facts (5)**
24:25 30:12
41:23 126:5
126:24
**failure (2)**
5:2,9
**fair (9)**
47:2,5 67:25
142:23
156:24
182:20
185:14,22,24
**falling (1)**

70:22
**falls (1)**
48:5
**familiar (4)**
22:5 52:19
180:8 186:5
**far (11)**
10:12 29:24
30:2 67:14
70:7 74:12
85:4 86:4
137:7 192:24
196:8
**fast (2)**
52:2 146:8
**father (2)**
1:6 8:23
**Favor (2)**
186:6,9
**feasible (1)**
165:4
**February (4)**
62:23 63:11,16
63:23
**federal (1)**
194:2
**feel (5)**
101:17 125:9
128:20
138:10 146:9
**feels (1)**
128:16
**felony (8)**
73:24 74:2
75:10,14
85:19 86:21
87:6,8
**female (1)**
132:10
**fence (23)**
23:21 39:11
83:20 91:8
93:23,25
95:11 96:7

107:25 108:2
108:19 111:6
111:16 117:7
117:20 118:6
118:11,19
119:24,25
120:4 132:15
175:21
**fenced (1)**
39:15
**field (15)**
16:2,4,5,7 17:2
17:3,7,10,20
18:20,25 19:2
19:2,5 69:23
**figure (4)**
57:19 107:2
157:23 189:5
**file (5)**
51:20 58:14
61:2,16
200:13
**filing (2)**
5:15 159:17
**filled (2)**
55:6,14
**final (1)**
112:16
**find (3)**
9:17 67:24
117:13
**finding (1)**
189:8
**finds (1)**
68:10
**fine (1)**
181:23
**finite (1)**
24:23
**fire (1)**
133:3
**firearm (14)**
28:14,17 83:6
84:18,21

84:18,21
108:22
109:11,14,16
109:20 125:9
128:17
138:21
147:16
**firearms (2)**
15:24 166:18
**fired (5)**
33:24 187:19
187:20,24
188:2
**first (26)**
8:3 9:4,8,10
10:20 17:17
17:21,24
19:24 21:7
37:19 38:21
50:18 95:10
98:6 107:24
108:14
117:11,13,19
134:7 143:11
156:6 159:15
181:13
195:16
**Flanagan (8)**
62:23,24 63:2
63:21 187:10
187:13 188:9
188:11
**flee (1)**
73:11
**fleeing (1)**
22:23
**flees (3)**
72:16,20 86:21
**flight (7)**
24:11 25:6
82:23 84:17
84:24 85:23
121:15
**flush (1)**

88:17
**FOIL (1)**
104:8
**follow (6)**
10:3 70:21
73:5,12,21
169:24
**followed (1)**
141:20
**following (2)**
24:3 203:2
**follows (1)**
8:5
**followup (3)**
58:12 173:10
199:5
**foot (6)**
24:16,17 26:25
29:20 31:15
81:13
**footage (1)**
128:18
**Forbes (1)**
186:23
**force (13)**
11:15 120:7,21
125:24
136:25 137:3
137:6,8
138:24 142:6
142:23 143:4
177:21
**forehead (1)**
141:22
**forget (4)**
18:17,19 93:17
113:9
**form (3)**
3:20 80:2
81:17
**forth (3)**
4:5,21 202:11
**forward (6)**
9:13 12:8

36:24 99:15
152:12
166:20
**found (2)**
67:21 119:10
**four (1)**
18:17
**fourth (5)**
76:8 78:18
80:19 93:9
94:6
**framed (1)**
3:16
**frames (1)**
96:13
**free (1)**
193:23
**front (14)**
8:24 26:3 90:2
90:14 91:5
111:5,17
114:9 132:15
132:20
147:22
153:18
175:22 183:9
**full (2)**
8:8 127:3
**full-time (1)**
14:18
**FURNISHE...**
201:9
**further (6)**
6:23 67:3
96:23 191:11
199:6 202:15
**future (2)**
161:11 196:11

———— G ————
**G (1)**
8:2
**Gallagher (2)**
186:8,12

**game (1)**
156:24
**gate (1)**
183:20
**gather (1)**
41:22
**gathered (1)**
47:24
**general (25)**
11:4,15 33:6
33:15,17,25
41:17 45:10
55:11 70:17
70:21 71:2,4
72:7 76:16
78:16,21 96:5
122:9,12
131:2 137:19
146:22 159:7
197:14
**generalize (1)**
121:5
**generally (12)**
10:22 21:3
27:21 31:13
72:13 78:17
110:23
120:24 121:3
138:12
159:20 170:2
**generate (2)**
43:21 49:12
**generated (1)**
54:4
**getting (9)**
66:9 70:8
76:21 97:5
100:2,16
140:9 173:12
173:13
**girl (1)**
133:11
**gist (1)**
160:2

**give (9)**
10:24 77:14
98:7 117:2
126:23
131:15
144:20 145:8
178:4
**given (4)**
3:11 130:15
168:19
202:13
**gives (1)**
60:10
**giving (2)**
77:15 183:17
**gladly (1)**
10:7
**glossed (1)**
92:20
**go (47)**
9:8,13 12:8,9
12:24 13:8,24
14:8,14 15:13
18:12 21:24
25:3 31:14
38:7,12 39:20
40:7 48:23
49:8 58:15,18
60:22 62:17
67:13 72:15
72:25 73:4
82:10 88:17
90:2 99:9
105:23
109:18
112:22
114:16
120:21
122:15
134:16 146:7
147:25
148:18
153:10
156:19

June 9, 2023

[Page 216]

171:22 182:8
187:7
**goes (3)**
22:10 98:6
142:18
**going (64)**
8:25 16:25
29:25 37:16
37:17 39:20
49:10,14
71:23,24
81:14 86:22
92:3 94:14
95:10 99:10
99:11,15
100:19 101:4
104:12
105:14,16,18
106:16,19,23
112:17
113:19 115:6
117:6 121:4
125:10,18
126:16 127:5
128:5 131:24
146:2 148:11
150:8,14
152:12,15
156:4,19
157:10
160:10
163:16,17
164:3,3,15,23
169:16 170:4
170:5 173:6
176:20
181:10 195:3
195:5 196:8,9
**good (12)**
8:20,21 10:8
98:20 100:21
130:9 150:23
159:5 172:5
177:15,15

181:2
**Goodman (1)**
18:5
**Gorman (18)**
1:11 36:4,11
39:22 45:2,19
46:23 71:7,17
71:24 92:5
108:4 118:2,5
119:12,15
120:6 121:14
**gotten (1)**
155:17
**graduate (1)**
13:13
**graduated (2)**
13:22 14:20
**great (3)**
99:24 105:13
182:2
**ground (8)**
9:8 28:21
118:12,18
148:7,15
157:24 158:3
**grounds (1)**
4:21
**guardian (1)**
1:6
**guess (10)**
54:24 68:8
76:5 96:11,15
101:24
147:24
154:24
162:14
183:19
**guidance (2)**
70:18 178:5
**guidelines (1)**
122:22
**guides (1)**
122:11
**gun (10)**

28:5 109:22,25
110:13 111:8
117:13
118:11,17
119:8 176:16
**guns (6)**
24:20 28:20
69:13,25
83:25 110:11
**GUR (2)**
51:22 200:15
**Gursslin (10)**
112:7 146:4
153:15,17
156:22 164:5
165:18
169:11,18,23
**guy (1)**
105:14
**guys (5)**
46:4 111:6
141:5 157:5
195:7

____

**H**
**H (1)**
8:2
**half (3)**
12:19 29:20
123:23
**Hall (2)**
101:25 105:5
**hand (1)**
202:20
**handcuffed (1)**
23:14
**handcuffs (1)**
23:10
**handle (5)**
66:24 145:7
152:10 177:6
191:20
**handled (2)**
175:3 176:5

**handling (1)**
153:19
**handwritten ...**
56:2,16
**happen (4)**
79:19 101:4
106:11 121:5
**happened (21)**
41:13,20 68:7
69:5 113:5,13
133:7 141:8
143:13
151:25 152:8
157:12
167:15 182:9
182:20 183:8
184:9 188:8
190:11 193:6
193:7
**happening (2)**
104:5 132:22
**happens (2)**
29:20 110:23
**happy (3)**
104:18 144:19
149:3
**hard (3)**
25:2 100:12
102:2
**head (7)**
11:19 71:4
117:6 136:19
136:23
180:19
198:24
**hear (11)**
37:13 38:2,8
38:22 98:13
98:15,16 99:3
119:12 172:2
178:9
**heard (9)**
30:8 38:23
68:6 85:18

106:8,9
110:12,14
158:9
**hearing (1)**
94:21
**heavily (1)**
161:7
**heightened (2)**
79:12,15
**held (4)**
19:16 76:7
84:24 85:22
**help (5)**
98:4,24 151:3
191:8 192:2
**helped (1)**
175:8
**helpful (7)**
100:7 148:18
194:9,23
195:24
196:13,19
**hereinbefore...**
202:11
**hereunto (1)**
202:20
**hesitant (2)**
86:13 112:25
**hey (2)**
97:20 122:14
**Hi (5)**
98:8,10,19
150:18,20
**high (16)**
13:13,17,18
161:12
167:24 168:5
170:21 171:2
184:17,19,21
190:3 192:4
**higher (1)**
60:16
**highlighted (1)**

35:22
**highly (1)**
195:4
**hired (4)**
13:25 14:5
15:11,16
**history (9)**
51:18,20 52:14
52:17,18
58:14 140:6
142:22
200:13
**hit (3)**
38:12 39:20
40:7
**hold (6)**
103:8,24
144:25 158:6
172:6 174:5
**hole (1)**
112:23
**home (11)**
22:22 75:17,21
76:9 77:5,23
77:25 78:5
85:2,24 134:5
**homeowner (...**
70:4,13 132:21
**homeowner'...**
89:16
**honest (2)**
130:6 196:2
**honestly (5)**
18:19 55:8
57:23 101:17
112:24
**hopefully (2)**
38:8 181:2
**hopes (1)**
96:22
**hoping (3)**
98:3,23 151:2
**Horowitz (12)**
29:18 36:4

45:19 46:23
71:7,17,24
92:4 108:4
109:21 120:6
121:14
**hot (17)**
22:23 24:4
75:3 76:2
81:5,10,12,15
81:19,25
82:25 83:4
84:16 85:8
86:24 87:2
108:8
**hour (2)**
12:18,18
**hours (4)**
14:14 133:25
134:10,18
**house (8)**
72:25 73:4,5
141:18
147:17,18,19
147:20
**houses (2)**
182:3 188:5
**hurt (2)**
126:16 127:4
**hypothetical ...**
30:15 56:11
91:12,15
177:5

——————
**I**
**idea (3)**
63:11,15 64:4
**identificatio...**
21:12 37:9
51:23 144:2
187:6 189:21
**identified (4)**
117:21 132:12
151:11
161:22

**identifiers (1)**
38:3
**identity (1)**
6:16
**ii (1)**
4:4
**iii (1)**
4:6
**imagine (1)**
195:22
**immediacy (2)**
88:14,19
**immediate (7)**
70:10 79:16
82:23 84:17
88:18,24
89:14
**immediately ...**
82:22 83:7
92:6
**imminent (1)**
88:7
**impacted (1)**
141:21
**implement (1)**
193:10
**implementin...**
191:6,25
192:21
**implying (2)**
47:9,11
**important (5)**
80:3,9,11,16
115:23
**imposed (1)**
170:13
**improper (1)**
4:7
**in-service (5)**
122:10 129:20
138:6 177:23
197:4
**in-services (1)**
130:7

**inaccuracies ...**
47:6 49:5,11
49:13,18
**inaccuracy (2)**
47:10,14
**inaccurate (1)**
48:15
**Ince (9)**
182:11 183:2,4
183:23
184:13
186:16
187:17
190:18,20
**incident (172)**
10:25 11:2,5,6
12:4 21:6,7
21:10,14,16
27:2 31:3
32:4 33:20
34:3,6 35:17
37:4,25 40:12
41:5,12,19
42:12,13,22
43:14,15 44:2
44:5,9,16,16
44:19,20,22
44:25 45:3,13
46:4 47:2,22
50:15 53:6,10
54:4 59:13,14
59:17 62:4,10
63:6,8 64:12
64:17,22
65:15,16,21
65:24 66:5,15
67:23 68:25
69:8,19 71:7
102:10,11
104:14,15
112:14 113:5
118:17,24
119:6,7
126:15

128:19
131:24 132:2
132:8 133:19
134:8,22
135:2,6,13,14
135:25
136:11,15
138:23 139:6
141:13
143:16,21,24
144:5,10,15
144:18,24
145:10,18,21
146:13,14,16
146:23 147:4
148:7,13
151:7,15,25
152:2,7 155:8
155:23,25
156:2,5,21,25
157:7,9,11,14
158:10,11,16
159:9,13,25
160:18,19
170:13 179:2
181:8 182:9
182:12,15
183:5,7,11,17
185:8,11
186:21,23,25
187:4 188:3,7
188:10,12
189:10,16,19
189:24 190:9
190:16,19
191:2 197:19
197:24 198:9
200:8,17,20
200:23
**incidents (28)**
46:16 136:14
143:2,12,13
145:17,24
151:9,14

154:17
155:16 159:2
159:21 161:4
161:8,21,25
164:7 165:19
166:9,12,17
166:22 169:4
170:7,20
179:8 193:3
**include (4)**
3:19 13:6
149:20
156:13
**included (3)**
104:15 194:11
197:4
**includes (2)**
152:24 156:12
**including (2)**
194:12,21
**inconsistent ...**
32:10
**incorporates...**
194:5
**incorrect (1)**
9:21
**Index (2)**
1:8 201:3
**INDEX-------...**
200:2
**indicate (1)**
118:15
**indication (1)**
118:10
**indicative (1)**
174:6
**individual (7)**
36:10,17 38:10
39:17 82:2
96:5 117:21
**individually ...**
1:5
**individuals (...**
36:3 39:18,24

42:20 45:12
45:18,21 46:8
46:24 47:22
58:16 64:3,9
92:14 108:25
110:20,21
115:20
**information ...**
44:13 45:8
47:24 49:17
55:24,25
56:14,15,24
57:3,4 84:11
153:23 154:5
162:10,16,19
163:18
164:25
179:25
188:25 189:4
201:9
**INFORMAT...**
201:3
**informed (1)**
100:11
**initial (3)**
16:9 25:21
64:13
**initially (2)**
15:18 17:15
**initiated (1)**
186:2
**injure (1)**
125:10
**injured (1)**
140:2
**inside (3)**
147:17 190:10
190:13
**instance (5)**
23:4 68:21
92:4 184:22
187:18
**instances (6)**
67:15,16

135:19
136:19
140:15
152:25
**instinct (2)**
178:10,23
**instruct (2)**
150:15 152:16
**instructed (3)**
145:11 151:19
165:9
**instructing (3)**
145:14 150:9
153:3
**instructions ...**
145:6
**insurance (1)**
188:12
**intent (1)**
167:5
**interact (8)**
130:12 138:9
167:20
183:22
184:11
193:24
194:22
198:11
**interacting (1)**
130:20
**interactions ...**
71:19 197:10
197:22
**interest (2)**
124:13,16
**interested (1)**
202:18
**interfere (1)**
3:24
**internal (2)**
196:25 197:9
**internet (2)**
101:24 193:22
**interrupt (2)**

4:17 105:18
**interrupted (1)**
171:24
**investigate (3)**
41:19 116:9,10
**investigated ...**
127:2
**investigating...**
41:12 135:5
**investigation...**
26:19 45:7
47:20 55:20
55:21 71:5
82:18 132:12
**investigation...**
43:21 70:22
**involve (9)**
142:19 153:14
154:18
166:12,22
168:9 169:4
170:20
194:19
**involved (7)**
43:22 143:18
144:15
161:25
170:25
178:12
196:13
**involvement ...**
155:7
**involves (1)**
31:15
**involving (3)**
161:12 194:5
194:13
**irregularity (...**
3:20
**is(are) (2)**
202:10,12
**issue (17)**
11:6 32:23
100:8 101:15

105:16,17
106:4,24
107:4 111:11
127:16
155:14 157:7
163:15
168:18
178:22,23
**issued (11)**
54:15 102:25
103:13,14
139:16
142:13
148:21,21
152:20 154:8
155:11
**issues (16)**
101:15 106:22
107:7 142:14
148:22
149:25
152:21 153:7
154:10,21
161:17 164:5
167:6 179:11
179:16
180:16
**item (1)**
139:17

_____

**J**

**J (195)**
8:2 9:1 10:1
11:1 12:1
13:1 14:1
15:1 16:1
17:1 18:1
19:1 20:1
21:1 22:1
23:1 24:1
25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1

June 9, 2023

[Page 219]

33:1 34:1
35:1 36:1
37:1 38:1
39:1 40:1
41:1 42:1
43:1 44:1
45:1 46:1
47:1 48:1
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
59:1 60:1
61:1 62:1
63:1 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1 76:1
77:1 78:1
79:1 80:1
81:1 82:1
83:1 84:1
85:1 86:1
87:1 88:1
89:1 90:1
91:1 92:1
93:1 94:1
95:1 96:1
97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1

121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1
193:1 194:1
195:1 196:1
197:1 198:1
199:1 200:1
201:1 202:1
**January (1)**
19:23
**Jason (9)**

1:19 8:10,17
8:19 199:11
200:4 202:9
203:1,1
**Javier (6)**
1:10,12 12:3
62:18 142:15
154:11
**Jeremy (2)**
112:8 140:20
**job (8)**
24:9 26:9
31:14 110:7
120:25 132:6
134:12,14
**jobs (2)**
120:14 124:15
**John (2)**
1:11 140:20
**joined (1)**
19:13
**Jonathan (2)**
147:4 157:20
**Jones (288)**
2:10 8:15,15
12:6,13,24
13:8,24 16:21
19:4 22:18,24
23:22 24:6,22
25:25 26:7,15
26:23 27:14
27:24 28:11
28:16,22 29:6
29:12,22
30:11 31:25
32:20 36:6,13
36:20 38:15
40:13,18,23
41:8,15,25
42:5,16,25
43:18 44:6,11
44:21 45:5,14
45:23 46:6,12
47:4,8 48:2,7

48:16 49:6,20
50:14 51:8
53:22 54:17
56:3,6,19
57:16,22 58:4
59:3 60:13
63:13,25 64:6
64:18 65:3,11
65:25 66:7,13
66:22 67:10
68:2,13 69:15
71:10 72:10
72:23 73:6,14
74:16 75:2,11
77:7,11 78:12
78:20 79:2,17
80:4,10,20,23
81:3,11,23
82:6,15 83:3
83:15,22 84:5
84:10 86:5,11
86:25 87:18
87:25 88:9
89:10 90:10
90:18 91:20
91:23 92:10
94:7 96:9,21
97:8,17 98:16
99:2,4,20,25
100:11,20,21
103:5,16
104:9,19
105:6,11,25
106:8 107:9
108:6,11,16
110:6,10
111:19 112:4
112:21 114:4
114:25
115:18 116:4
117:15 118:8
118:13,25
120:2,9,12,18
121:19 122:7

122:19 123:4
123:9,15,20
124:4 125:3
125:15 126:7
126:20
127:12,21
128:10
129:13,18
130:24
131:21
135:11,16
136:7,16
137:18 138:7
139:10,22
141:10 142:3
142:7,12,24
143:5 144:3
144:20 145:5
145:14 146:7
146:11,24
148:10,17
149:14 150:8
150:17
151:19 152:2
153:9,11
155:19 156:3
157:22 160:3
160:4,12,24
161:5 162:3
162:14
163:10 164:2
164:14 165:5
167:23
169:10
170:22,25
171:10,21
172:5,11
173:5,17
174:4,12
175:10 176:7
176:13,19,25
177:8,17
179:8,10
180:18,25

181:7,19
182:2,17,21
182:25
183:15 184:2
184:15,25
185:15,23
187:21
188:18 189:7
189:13 190:7
190:12,17
191:10,17
192:5,13,23
194:7,14,25
195:12,19
196:6,14,21
197:12
198:17 199:6
**Josh (1)**
112:8
**jot (1)**
56:21
**Judge (23)**
97:18 98:4
102:25 103:5
103:14 149:3
149:11 150:7
150:16
153:18 160:9
161:14 162:5
163:13
171:23 172:7
172:17 178:3
178:10,21
179:19
180:13,14
**July (2)**
18:5 146:19
**jump (5)**
36:24 93:23,25
95:10 175:21
**jumped (5)**
96:12 108:18
117:7 119:23
119:25

**jumping (6)**
91:7 96:7
111:5,16
118:11,19
**jumps (3)**
95:15 107:16
107:25
**June (2)**
1:16 202:20
**justice (3)**
13:21,23
193:22
**justify (5)**
84:25 85:24
87:24 90:5
91:19
**justifying (3)**
87:12,16 89:14

**K**

**keep (1)**
54:25
**Kelly (1)**
112:8
**Kennedy (3)**
61:19,20,22
**kept (1)**
56:24
**Kevin (7)**
62:23,24 63:2
63:21 187:10
187:13 188:9
**killed (7)**
8:24 112:9
132:25 140:7
173:16 174:3
174:22
**killing (5)**
142:16 154:12
154:19 176:3
176:6
**Kim (1)**
97:20
**kind (16)**

30:18 75:8
81:16 95:19
105:16 107:4
131:16 133:5
138:19
141:23 159:7
160:25
162:25
180:12
185:19
198:15
**kinds (1)**
163:20
**knew (4)**
93:19 127:4
156:3 183:19
**knock (3)**
90:2 91:5
114:16
**knocked (1)**
175:22
**knocking (3)**
132:22 141:15
141:17
**know (99)**
9:23 11:8 26:4
26:12 27:20
29:8,23 33:15
33:17 35:14
36:21,23
37:12,18 38:5
39:8,13 40:3
42:6 46:11
47:13 51:10
51:15 55:9,11
55:16 56:22
57:18,23
58:25 60:10
60:15,23
61:11,20 62:6
62:7,9,12,19
62:24 63:5,18
64:2 66:23
68:24 71:11

73:16 76:15
76:18 84:19
91:13,14 95:2
95:7,14
101:22 102:3
105:22
114:14
117:16
120:24 121:6
123:16
126:16
130:14
135:18 136:5
136:8 137:22
139:15,17
140:11,19,23
141:25 144:7
148:14
149:23
156:23 158:4
159:18
162:24 166:7
171:24 172:8
172:18,22
173:20 174:5
174:25
184:22 185:4
186:13,17
193:7 195:3
196:15 199:4
**knowing (6)**
68:17,18
132:16
138:12 183:9
186:3
**knowledge (2)**
71:19 170:8
**knows (1)**
151:9
**Kosciusko (13)**
11:9 22:4,12
28:18,20 39:6
39:13,22
71:16,24

93:21 94:2
121:11

**L**

**L (3)**
2:10 3:2 8:2
**L.D (1)**
1:5
**lab (1)**
127:3
**lacked (1)**
166:25
**laid (1)**
33:9
**Lake (1)**
63:9
**lap (1)**
105:11
**large (1)**
95:11
**lastly (1)**
62:23
**Laura (3)**
1:20 202:6,23
**Laureano (14)**
140:20 143:9
143:12,17
147:4,12,14
157:20
181:14
185:12
186:24
187:20 188:2
189:11
**law (46)**
2:8 6:20 98:19
98:25 99:6,8
100:20 102:3
102:12
103:12 105:6
105:13
106:14
116:14
122:12,12

129:21
130:13 131:2
150:20,23
151:4 153:9
157:3 158:6
158:24 159:7
160:4,17,24
162:3 163:10
164:14 166:2
170:17 171:4
171:14,19,22
172:6 178:2,8
178:21
180:22 181:2
193:24
**lawful (11)**
66:19 74:7
82:4,10 84:15
86:22 108:13
109:5 112:15
113:17
198:21
**lawfully (1)**
167:19
**laws (2)**
93:8 116:12
**lawsuit (4)**
11:6 112:6,17
113:19
**layout (1)**
115:5
**lead (2)**
49:17 179:23
**leader (8)**
19:18,18,24
20:4,6,7,11
20:15
**leading (1)**
47:14
**learn (2)**
81:5 124:10
**learned (3)**
49:4,16 115:7
**leave (1)**

104:23
**led (3)**
46:21 155:8
165:10
**left (1)**
141:19
**legal (8)**
75:19 77:2,2,5
77:22,24 81:9
198:2
**legally (4)**
73:20 75:9
76:7 111:25
**LegalView/Z...**
6:11
**lesser (1)**
75:13
**let's (12)**
21:6,24 59:15
65:8 93:17
95:9 106:4
126:23,25
145:4 147:25
198:7
**lethal (4)**
138:24 177:20
187:19,25
**letter (3)**
105:17 106:10
107:4
**letting (1)**
148:18
**level (5)**
59:16,18,19
121:24
168:15
**Lexington (1)**
2:4
**Lexitas (1)**
6:12
**lick (1)**
127:5
**lieutenant (29)**
32:24 33:3,8

33:11 49:23
49:23,25
50:17,18,21
51:12,12
58:24,25 59:5
59:15,20,20
59:24,25 60:3
60:6,16 61:7
64:14 65:18
65:22 135:20
193:14
**light (1)**
26:19
**limitation (1)**
4:5
**limited (1)**
170:5
**line (9)**
41:16 98:11
128:20
132:15
150:10
166:19
194:18
201:13 203:5
**link (1)**
39:11
**list (2)**
65:5 140:18
**listed (5)**
47:17 156:2,5
156:9 159:13
**listen (4)**
49:14 89:22
113:8,10
**litigating (1)**
43:10
**litigation (4)**
6:22 7:10
104:8 163:19
**little (8)**
10:17 54:15
98:3,21
116:23 148:2

158:7 178:20
**live (1)**
196:13
**lives (1)**
11:9
**LLP (1)**
2:3
**located (1)**
119:8
**location (10)**
132:10 148:9
158:2 188:17
188:23 189:2
189:23 190:4
190:10,13
**locations (1)**
6:10
**locker (1)**
58:2
**long (11)**
12:17 15:6
18:17,19 37:8
131:13
138:17,20
140:25
195:13
200:12
**longer (8)**
14:13 81:25
82:4 90:13,16
91:3 133:22
137:14
**look (16)**
24:18 29:19
36:25 40:4
57:13,21 67:3
69:12 89:24
99:24 122:14
126:9,15
127:2 128:17
196:23
**looked (3)**
119:19 130:3
197:8

**looking (11)**
23:6 39:9,13
109:25
117:16
126:10
140:17
174:25
176:10
193:10 196:2
**looks (6)**
60:8 61:14
96:12 120:3
148:4 187:18
**loose (2)**
134:9,15
**lost (1)**
92:2
**lot (17)**
71:18 82:17
99:12,14
106:12,20
114:5 117:22
117:24 118:2
123:8,22
125:21
140:15
153:20
167:13
168:12
**Lowenthal (3)**
1:20 202:6,23
**luck (1)**
181:2
**lumping (1)**
144:6

**M**

**maintain (1)**
55:13
**maintained (1)**
58:6
**maintaining ...**
162:21
**major (1)**

62:15
**majority (2)**
123:18 136:17
**making (1)**
161:10
**manner (4)**
6:18 128:15
147:15
177:15
**March (3)**
61:18 62:6,6
**mark (5)**
21:8 143:7
165:2,15
181:19
**marked (10)**
6:24 21:11
37:8 51:22
144:2 163:4
181:10,23
187:6 189:21
**marriage (1)**
202:17
**Mastiff (1)**
133:6
**materials (2)**
100:24 138:20
**matter (9)**
86:20 87:5
102:7,15
103:22
115:22 151:8
173:11
202:18
**matters (3)**
7:10 37:12,17
**Matthew (6)**
60:23,23 61:15
62:18,22,22
**MCC (1)**
13:23
**mean (14)**
42:12 50:8
56:10 66:18

67:22 86:8
110:11
133:21 138:9
162:9,12
186:8 189:3
192:9
**means (3)**
110:8 133:23
135:20
**meant (1)**
168:23
**measures (1)**
192:2
**medical (1)**
133:11
**meet (3)**
12:13,22 121:2
**meeting (3)**
6:11 12:17,20
**member (2)**
19:12 160:22
**members (5)**
131:3,5,5
169:24
188:20
**memo (1)**
56:25
**men (1)**
40:11
**mention (2)**
25:8,11
**mentioned (5)**
25:5 78:15
143:9 175:5,7
**mere (3)**
87:10,14,20
**messages (1)**
50:13
**met (1)**
168:8
**Michael (5)**
61:3,6,17,17
62:17
**middle (2)**

89:5 141:21
**midnight (3)**
17:24 131:15
132:9
**midnights (1)**
141:2
**millimeter (1)**
187:25
**Minchella (2)**
62:19,20
**mind (3)**
97:5 100:14
111:8
**minded (1)**
100:2
**mine (1)**
173:21
**minute (3)**
96:4 107:17
117:12
**minutes (1)**
96:7
**misdemeano...**
72:16,20 73:22
73:25 74:23
75:14 84:25
85:12,15,19
85:23 86:21
87:6,8
**mistake (1)**
46:13
**mistakes (1)**
46:10
**Mitchell (5)**
140:20,23
142:2,5 143:3
**mix (1)**
19:2
**moment (3)**
95:8 98:7
117:6
**Monell (14)**
102:5 142:18
142:19

149:20,24
153:2,25
154:20
156:12,13
159:8 166:8
167:8 170:12
**Monroe (6)**
13:19,25 14:2
14:5,21 15:7
**month (2)**
14:4 16:9
**months (6)**
14:11,16 15:22
16:6 17:19
29:16
**Montinarelli...**
58:20,21,22
59:2,24
**Montinarelli...**
60:7
**morning (2)**
8:20,21
**motion (1)**
5:5
**mouth (1)**
113:11
**move (5)**
5:3 139:4
173:23
174:17
175:17
**moved (2)**
96:21 178:19
**municipal (1)**
1:10
**mush (1)**
149:22

———————
N
———————

**N (4)**
2:2 3:2 8:2,2
**name (4)**
8:8,15,22
159:19

**names (1)**
140:18
**narrative (3)**
21:24 147:25
187:7
**narrow (1)**
77:18
**natural (1)**
1:6
**nature (11)**
15:25 70:8,24
77:17 84:20
112:10 113:3
120:14
137:14 197:2
197:6
**necessarily (1)**
163:24
**necessary (1)**
203:3
**need (13)**
6:13 10:2
55:18 106:15
122:4,16
148:14
162:24
168:12 172:2
180:5,23
191:20
**needed (1)**
133:12
**needing (1)**
56:20
**needs (1)**
79:19
**Negrelli (1)**
193:14
**neighborhoo...**
42:18 46:14,17
48:22,24
90:23 92:19
92:24 93:22
114:17
134:18

134:18
neighborhoo...
92:23
neighboring ...
36:5,12,18
38:9 84:4
91:4 92:6
108:4 118:4
Neither (1)
46:23
Nellist (3)
112:8 140:21
143:10
never (14)
66:4,16 67:19
68:18 83:19
85:4,5,21
86:3 115:11
123:21
129:16
140:10 184:3
new (18)
1:3,21 2:5,5,9
8:14 14:15
122:11
185:13
192:17
195:24
197:16
198:10,14,20
202:3,4,7
newer (2)
195:23 198:18
night (4)
53:10 133:16
133:24
135:21
nights (1)
135:19
nine (1)
17:19
non (1)
169:19
NONE- (1)

201:10
normal (1)
16:18
North (2)
53:17 189:16
Notary (6)
1:21 5:8 8:4
199:17 202:6
203:25
note (3)
36:6,20 153:24
noted (5)
3:9 24:8 81:19
172:14 199:8
notepad (5)
54:15,20 55:3
55:7 57:9
notepads (4)
54:23 55:13
57:3,6
notes (12)
54:7,9,14
55:18,20 56:2
56:16,21
57:13,18
58:11 201:6
notice (3)
101:2 104:11
154:3
noticed (5)
102:22,24
104:3 146:5
161:22
notification (4)
50:4 65:21
68:11 186:14
notifications ...
50:23 51:4
notified (13)
49:22 50:7,8
51:11 67:5,9
67:17,19,20
68:12,15
186:7,9

notify (6)
32:18,22,24
33:2 50:12,21
notifying (1)
176:8
notwithstand...
7:7
November (4)
14:7,8 17:5
19:13
number (9)
28:18 29:15
33:17 44:4,15
44:25 136:3
168:19 192:3
numbers (1)
11:17
numerous (4)
43:11 152:24
194:11,21
NYPD (2)
56:23 57:7

## O

O (3)
3:2 8:2,2
oath (1)
6:13
object (4)
5:2 149:6,9
164:22
objection (224)
3:15 5:5 12:6
12:24 13:8,24
16:21 19:4
22:18,24
23:22 24:6,22
25:25 26:7,15
26:23 27:14
27:24 28:11
28:16,22 29:6
29:12,22
30:11 31:25
32:20 36:6,13

36:20 38:15
40:13,18,23
41:8,15,25
42:5,16,25
43:18 44:6,11
44:21 45:5,14
45:23 46:6,12
47:4,8 48:2,7
48:16 49:6,20
50:14 51:8
53:22 54:17
56:3,6,19
57:16,22 58:4
59:3 60:13
63:13,25 64:6
64:18 65:3,11
66:7,13,22
67:10 68:2,13
69:15 71:10
72:10,23 73:6
73:14 74:16
75:2,11 77:7
77:11 78:12
78:20 79:2,17
80:4,10,20,23
81:3,11,23
82:6,15 83:3
83:15,22 84:5
84:10 86:5,11
86:25 87:18
87:25 88:9
89:10 90:10
90:18 91:20
91:23 92:10
94:7 96:9
108:6,11,16
110:6,10
111:19 112:4
112:21 114:4
114:25
115:18 116:4
117:15 118:8
118:13,25
120:2,9,12,18

121:19 122:7
122:19 123:4
123:9,15,20
124:4 125:3
125:15 126:7
126:20
127:12,21
128:10
129:13,18
130:24
131:21
135:11,16
136:7,16
137:18 138:7
139:10,22
141:10 142:3
142:7 143:5
146:24
148:10
152:11
163:12,21
173:5,17
174:4,12
175:10 176:7
176:13,19,25
177:8,17
179:9,12
182:17,21,25
184:2,15,25
185:15,23
187:21
188:18 189:7
189:13 190:7
190:12,17
191:10,19
192:5,13,23
192:23 194:7
194:14,25
195:12,19
196:6,14,21
197:12
198:17
objections (3)
3:9,12 150:3

June 9, 2023

[Page 224]

objective (2)
126:4 128:6
objectively (1)
128:8
objects (2)
12:9 138:21
obligation (3)
7:8 100:23
101:18
observation (...
128:14
observations...
92:15
observed (2)
118:17 183:14
obtain (2)
78:19 104:6
obtained (2)
176:12 195:16
obtaining (2)
90:6 104:10
obviously (13)
34:18 51:4
93:22 105:19
106:21
122:11
133:11
149:10,18,23
152:13,23
161:9
OC (1)
137:10
occurred (1)
33:6
occurring (1)
184:20
October (8)
21:21 60:9,21
60:22 197:20
197:24
198:10,20
offered (1)
101:13
office (9)

14:2,6,22 15:8
51:6 53:14,15
53:17 104:23
officer (151)
1:11 3:10 6:12
12:3 16:7,23
17:8,8,9 23:8
26:21 28:2,7
28:19,25 29:9
29:18 30:5
31:4,20 32:3
32:12 33:23
34:8 35:11,14
36:4,4,11
37:20,24 39:2
39:21 40:4
43:12 45:2,2
45:19,19
48:12 50:2,20
52:4 53:3,20
58:10,19 60:4
60:20 61:16
63:18,22
65:18 66:3
67:18 68:5,10
69:2 71:14,15
71:16,17 92:4
92:5 93:19,24
94:22 95:2
96:6 100:17
104:22
107:16,19
109:21
110:12,18
111:4,10
113:4 117:21
117:24,25
118:2,5
119:12,14,15
119:23 120:5
121:9 122:24
126:2,3,10,14
126:15 127:2
127:19 128:2

128:5,13,15
128:15,16
131:14
132:19,22
136:4 137:17
138:3 139:25
140:7 142:2,5
142:15 143:3
147:9,12,14
148:6,23
154:11,19
155:7 156:10
156:14,25
157:15,20
158:17,19,22
169:20
170:10
171:11,13
172:19,22
174:22
176:16
181:14
185:10,12,17
185:21
186:23 187:9
187:13,25
189:11 190:5
officer's (4)
125:7,16 128:8
138:3
officers (90)
16:19 17:7
18:21 22:3,20
24:20 26:20
26:24 27:3,5
29:4 30:25
34:10 35:13
42:10 43:3,12
46:17,19,24
48:4,20 56:25
69:11 70:4,13
70:19 72:17
74:24 78:17
80:22 83:12

83:17 86:23
87:2 89:15,19
89:23,25
90:24 93:5,11
100:3 108:23
108:25
110:19
112:18
113:20 119:7
120:15 121:2
121:24 122:3
123:11
127:17
129:22
136:18
139:13,15
140:11,18
142:20,21
151:10,11
152:4,25
153:15
159:21
166:10,13,17
166:23
167:13,15,17
168:2,4,18
170:9 173:2
173:15 174:2
175:12
192:11
193:17
194:20,22
195:25
198:11
officers' (1)
92:11
official (1)
44:19
okay (28)
9:3 10:7 37:2
37:14 38:11
47:13 53:4
73:2 95:21,22
97:22,25

98:20,25
100:20
103:12 106:5
109:4 114:20
132:4 148:3
150:17,22
151:4 153:9
158:24
172:10 182:2
old (1)
195:10
once (5)
16:5 29:3
66:25 82:3
183:12
ones (1)
154:6
ongoing (2)
79:16 105:17
oOo (1)
201:15
open (3)
83:6 141:15,16
operating (1)
112:16
operation (6)
143:17 152:9
153:17
182:14
185:18 189:9
operations (8)
18:7 156:20
157:13 161:9
161:11 164:4
165:23
179:17
opinion (1)
196:3
opportunity ...
52:5,6 89:16
89:24 128:25
166:5
opposing (1)
98:11

**options (1)**
177:21
**order (17)**
1:20 4:5 11:15
33:6,15,17
41:17 70:21
71:4 72:8
102:25
103:12
116:10
162:13 163:5
180:4,9
**ordered (2)**
103:17,18
**orders (7)**
11:4 45:11
55:12 70:17
71:2 122:9
197:15
**original (2)**
5:10,16
**originally (2)**
107:25 108:9
**outcome (1)**
202:18
**outline (1)**
79:25
**outlined (4)**
69:8 71:5
72:13 122:9
**outlines (2)**
70:15 124:19
**outside (15)**
72:24 141:17
142:8 145:18
147:17,19,20
148:20,24
152:5 153:4
162:23
165:24 169:6
191:11
**overall (1)**
110:3
**overlap (3)**

103:4 145:23
149:21
**overlapping ...**
169:15
**overlaps (1)**
149:24
**overnight (3)**
17:22 131:14
133:17
**owned (1)**
138:12
**owner (4)**
34:14 81:2
174:9 176:8
**owner's (1)**
90:9

___

**P**
**P (4)**
2:2,2 3:2 8:2
**p.m (4)**
53:7,7 146:12
199:8
**page (8)**
21:19 51:22
200:3,7,16
201:6,13
203:5
**pages (8)**
21:11 143:25
187:5 189:20
200:10,19,22
200:25
**paint (1)**
73:18
**painting (1)**
31:2
**paperwork (1)**
44:8
**paragraph (2)**
166:15,21
**paragraphs (1)**
166:8
**parameters (1)**

77:16
**parentheses ...**
186:7
**parks (2)**
14:25 15:7
**part (11)**
36:25 68:21
69:6 70:14
115:8 118:16
118:22
129:15
143:13
148:13
167:11
**part-time (1)**
14:17
**participating...**
6:10
**particular (2)**
179:22 180:8
**parties (21)**
3:4,7 4:19 6:5
6:19 7:5 82:8
93:13 102:4
102:20
103:21
105:20
154:22 155:5
178:4 179:20
179:25 180:5
180:10,15
202:16
**partner (1)**
141:4
**partners (2)**
141:5,8
**parts (1)**
129:9
**party (8)**
4:15 7:9,10
79:12 104:25
127:15 128:2
128:5
**passed (2)**

33:7 34:23
**path (9)**
24:11,17 25:6
25:6 70:11
82:23 84:17
94:3 121:15
**patrol (14)**
17:12,12,20
50:3 55:5
132:18
153:14 154:7
168:2,4,17,18
171:11,12
**pattern (2)**
77:13 175:11
**patterns (1)**
114:21
**pause (3)**
38:8 39:21
96:4
**paused (7)**
37:19 38:20,21
38:24 39:25
94:25 117:3
**pay (1)**
95:19
**Payson (14)**
98:4 149:4,11
150:7,16
160:10
163:13
171:23 172:7
178:3,21
179:19
180:13,14
**Payson's (2)**
97:19 178:10
**Peachie (7)**
2:10 8:15
96:19 98:13
98:14 99:3
107:22
**peachie.jone...**
2:11

**peered (1)**
83:20
**penal (1)**
122:11
**people (24)**
24:13 43:4
46:10 71:20
75:15 90:20
90:21,22 92:2
92:20,22 93:7
93:13,15
109:10
110:25 123:8
123:10,13,18
123:23
124:13
125:19
171:24
**people's (1)**
112:19
**peoples (3)**
93:15,20
167:18
**pepper (2)**
176:17 177:9
**perceived (3)**
111:11 175:12
176:21
**perception (2)**
125:7,17
**periodically ...**
197:4
**Perkowski (5)**
61:3,6,17,17
62:18
**permissible (1)**
70:20
**permission (3)**
111:17 175:23
175:24
**permit (1)**
124:25
**permits (1)**
93:2

**permitted (11)**
3:21 22:21
73:21 74:24
82:12,25
109:6 111:24
113:20
114:22 179:7
**person (27)**
3:13 4:8 25:7
43:23 49:23
49:25 51:13
59:15,20,25
60:3 65:18,22
74:7,9 75:9
78:10 81:14
87:7 101:14
102:17
114:23 116:7
124:3 125:11
137:7,19
**persons (1)**
3:23
**pertaining (1)**
182:22
**Peterson (5)**
102:25 103:5
153:18
161:15 162:6
**Peterson's (1)**
103:14
**phone (7)**
50:9,16,16,22
64:13 158:11
178:19
**physically (1)**
111:15
**picked (1)**
50:9
**picnic (1)**
119:24
**picture (1)**
31:3
**pictures (1)**
196:9

**piece (1)**
195:4
**pigeonhole (1)**
127:22
**place (8)**
6:14 16:10
58:7 74:20
96:17,23
108:15
152:11
**plainly (1)**
4:6
**plaintiff (2)**
162:11 180:24
**plaintiff's (16)**
21:9 22:12,16
28:5,7,15
37:6 51:19
100:22
142:16
143:23
154:13,20
187:3 189:18
200:7
**Plaintiff(s) (2)**
1:7 2:4
**plaintiffs (1)**
163:9
**plan (23)**
71:8,11,15
72:4 120:7,15
121:2,3,10,21
121:22,23,25
122:2,4
157:18
166:25
167:18 169:8
169:14
183:21 184:4
184:10
**planned (2)**
121:2 154:23
**planning (3)**
122:15 162:20

168:12
**plans (1)**
121:17
**platoon (9)**
17:14,15,21,24
18:3,5,11,13
18:23
**play (13)**
38:7,12 39:20
40:7 73:9
79:18 82:19
94:14 100:4,8
100:17
116:20
125:21
**played (5)**
40:8 94:20
95:24 107:19
116:21
**playing (3)**
37:11 38:17
99:23
**please (8)**
8:8,11 10:6
81:8 107:15
109:23
142:25 148:3
**pocket (2)**
54:25 55:5
**point (28)**
23:14 26:18
38:9 39:25
42:8 55:9
83:5 108:2,9
108:10,13,22
109:4,7,16
110:17
114:19 119:6
129:24
130:14
132:13,24
135:24
141:16
157:22 169:3

169:14
177:22
**police (28)**
13:3 14:9,15
14:20 15:12
15:14,17,23
16:8,14,18,20
16:23,25 40:4
61:8,24 62:2
63:4 78:16
80:21 93:5,11
93:24 137:17
194:10,20,24
**policies (23)**
11:14 15:24
16:16 22:17
23:19 31:23
32:6,11,16,23
66:20 67:24
70:18 115:24
116:11,15
169:22
185:18
197:10,14,14
197:21 198:2
**policy (17)**
24:15,23 33:6
40:22,25 41:7
41:11 67:8,22
68:10 69:9,16
70:3,12
122:20
169:19 198:4
**poor (1)**
96:15
**porch (2)**
132:20 141:18
**portion (4)**
43:20 68:25
114:23 180:2
**portions (3)**
173:24 174:18
175:17
**pose (1)**

24:13
**poses (2)**
127:25 128:4
**position (3)**
102:2 112:17
153:8
**possession (1)**
7:3
**possibility (17)**
24:9 25:17,19
25:22,24 26:6
26:11 82:21
87:14,20
123:2,5
176:14,15,18
177:6 188:16
**possible (6)**
24:18 103:7
108:22
109:10
111:15 189:4
**possibly (3)**
84:12,13 175:7
**posted (1)**
197:15
**posturing (1)**
124:21
**potential (3)**
49:18 82:8
88:24
**potentially (7)**
49:4 69:13
84:18,21
109:13
138:10 184:9
**power (3)**
129:24 130:14
177:22
**practice (5)**
57:25 69:20
104:24
120:11
121:18
**practices (2)**

22:17 23:19
**pre (1)**
188:21
**preceded (1)**
16:5
**predecessor ...**
112:12
**prefer (2)**
96:23 97:2
**preference (3)**
103:9,24 104:2
**preferred (1)**
155:12
**prejudice (1)**
4:8
**preliminary ...**
47:20
**premises (3)**
94:8,10 176:11
**preparation ...**
13:3 21:17
129:25
155:23 197:7
**prepare (4)**
10:21,23 12:14
163:24
**prepared (5)**
100:24 101:21
122:16
155:10,22
**present (8)**
6:5 87:10
89:15 122:6
122:23 170:7
174:9 188:17
**presentation...**
196:24
**presented (5)**
7:2 23:24 25:4
30:13 147:14
**presenting (1)**
6:24
**preserve (2)**
4:3 55:13

**presumptivel...**
78:25
**prevention (1)**
129:21
**previously (4)**
78:15 95:12,14
175:5
**primary (3)**
44:22 137:15
138:2
**prior (21)**
7:4 11:3,11,13
35:8 70:5,13
71:19 72:4
83:20 84:3
86:18 118:10
118:19
159:16,25
174:10
183:20
188:14 189:9
198:15
**priorities (1)**
175:13
**prism (2)**
195:7,17
**privacy (5)**
75:16 78:5,11
114:24 115:3
**private (5)**
72:17,18 82:5
90:22 93:10
**privilege (1)**
4:4
**probable (12)**
74:5,18 75:4
79:23 81:13
83:9,12,17
85:16 87:3
109:12
110:15
**probably (2)**
127:5 132:5
**problem (3)**

142:2 145:2
180:21
**procedure (1)**
32:24
**procedures (5)**
15:24 16:16
66:21 115:25
116:15
**proceed (4)**
3:12 103:3
148:19
179:14
**proceeding (1)**
203:2
**process (7)**
32:22 46:14
59:12 68:11
88:5 186:4
193:9
**produce (1)**
79:11
**produced (6)**
52:22 101:20
104:7 156:22
156:23
162:15
**produces (1)**
68:4
**production (1)**
58:12
**professional ...**
50:20 67:12
**program (6)**
14:17,18 16:7
18:20,21
193:16
**programs (1)**
194:15
**prohibited (1)**
94:5
**promoted (4)**
17:25 18:14
20:23 136:9
**proper (1)**

65:21
**properly (4)**
116:10 156:15
159:23
167:19
**properties (9)**
24:3 29:2,11
115:4 120:17
120:22
124:15
127:23
167:18
**property (89)**
23:20 39:2,9
70:5,6,14,20
72:9,17,19,21
73:12,13 74:8
74:11,17,19
75:21 76:8,23
77:4 78:17,24
80:7,25 81:15
82:5,9,10,13
83:14 84:2
85:8,13 86:22
86:23 87:11
87:12,17,21
87:24 88:16
89:17 90:3,5
90:22 91:4
95:2 113:21
113:22,24,25
114:7,8,9,18
114:23 115:5
116:6 122:6
122:15,18,21
123:2,7
124:12 125:2
125:5 127:19
132:14,16
166:23
167:14,16
169:6,7 171:7
171:15,17
174:8,10,10

183:13 184:5
184:7,12
185:5 198:3
198:22
**protections (1)**
76:9
**protective (4)**
162:13 163:5
180:3,9
**protocol (1)**
134:24
**provide (5)**
5:18 67:4
70:18 79:11
101:2
**provided (4)**
4:10 5:12 82:4
84:14
**provision (1)**
3:7
**proximate (1)**
53:24
**PSS (18)**
33:3 59:15,18
64:12,24 65:9
66:16,18
67:19,23 68:4
68:10,18,24
134:25 186:3
186:7,12
**public (13)**
1:21 5:9 8:4
14:11 16:11
24:13 79:12
81:16 122:24
195:17
199:17 202:7
203:25
**published (2)**
193:21,22
**pull (7)**
104:20 139:2
139:19 166:5
184:23 185:2

June 9, 2023

[Page 228]

185:5
**pulled (1)**
176:17
**pulling (2)**
107:21 176:16
**pulls (3)**
139:9,11,14
**purchase (1)**
194:10
**purely (1)**
165:7
**purest (1)**
81:17
**purpose (2)**
4:18 6:21
**purposefully...**
120:16
**purposes (1)**
37:15
**pursuant (5)**
1:20 3:14 6:6
163:5 180:3
**pursue (7)**
73:17 74:2
85:13,17
86:23 87:4
179:11
**pursuit (29)**
22:23 23:14
24:4 26:25
73:17 75:3
76:2 81:5,10
81:12,15,19
81:20,25,25
82:3,7,11,25
83:2,4,7
84:16 85:8
86:24 87:2
108:8 171:8
171:19
**pursuits (3)**
29:20 31:15
136:21
**put (27)**

21:7 26:17
28:2 35:22
41:5 42:19
43:5,6 46:21
47:25 48:18
51:16 52:14
57:3 94:11
119:3 137:24
143:21 145:4
172:6 174:21
174:22 181:9
182:13
186:21 188:9
189:15
**putting (1)**
43:2

_____

**Q**

**quality (1)**
96:15
**quantified (1)**
123:21
**quantify (1)**
29:13
**quarters (1)**
106:9
**question (75)**
4:6,14,20 5:3
7:5 9:4,11,12
9:14,18,21,24
10:7,9 12:10
12:11 23:17
32:2 38:21
40:10 41:2,4
49:9,15 54:24
56:8 65:8,20
73:8 76:5,24
76:25 77:21
89:22 90:25
91:2,17 93:19
100:25
104:13
107:24
109:21 113:8

113:9,12,15
113:23 121:8
121:17
125:23
128:23
135:23
142:10,23
144:14
145:12,13
151:20
156:24
157:22
158:25 159:5
162:4 173:14
173:25
174:19
175:19
176:23
179:23
181:13
183:19 184:5
191:23
198:19,19
**questioning (8)**
3:18,25 5:17
7:4 101:13
148:19
150:10
151:22
**questions (48)**
4:3 8:25 10:20
13:11 37:15
52:5,10,16
64:20,23
94:13,15
95:23 100:13
101:22
114:15
117:23 129:5
143:11
144:11,18
149:6 150:12
151:13,17
152:4,7,17

156:4,19
157:4,17
158:13 160:5
160:9,12
163:17 165:6
169:9,15,16
169:19 170:3
170:16
172:16 199:2
199:5,6
**quick (1)**
51:25
**quite (1)**
105:22

_____

**R**

**R (3)**
2:2 8:2,2
**rabbit (1)**
112:23
**rabies (1)**
140:9
**radio (2)**
38:23 182:7
**raise (1)**
190:20
**raised (2)**
3:15 191:3
**Ralph (2)**
58:19,22
**ran (3)**
25:7 111:7
141:22
**range (3)**
51:20 123:14
200:14
**ranking (1)**
60:16
**read (3)**
35:19 154:14
156:8
**reading (2)**
183:7,16
**ready (3)**

100:25 178:4,6
**real (4)**
51:25 52:2
146:8 196:13
**reality (2)**
194:11,19
**really (19)**
29:13 31:2
37:11,17 55:9
65:7 96:10
105:2 112:22
121:23
131:15
136:22 137:8
140:21 164:9
173:18
174:19 179:3
196:16
**realm (2)**
70:23 173:20
**reason (20)**
4:23 25:16
26:11 28:6
45:9 73:17
82:7 83:24
84:8,20 94:4
94:9 110:3
137:16
145:19
151:21 152:3
171:16,18
203:5
**reasonable (...**
75:16 78:4,10
89:15,23
114:24 115:3
118:9 125:25
127:8 131:18
**reasonably (2)**
88:4 89:25
**reasoning (1)**
70:11
**recall (55)**
31:18 34:11,23

35:2,6,15
36:7 40:19
50:5,25 51:3
53:23 54:8
56:7 59:7
64:19 65:16
65:23 66:2,9
67:5 72:6
76:20,21
83:23 85:3,4
86:2,4,6,8,9
86:16 87:13
102:12,18,23
115:19,22
117:10
118:21
119:14,16,18
133:9,15
134:23 135:3
135:7,21
185:7 186:15
188:19 194:2
194:8
**receive (2)**
129:20 136:24
**received (9)**
13:20 85:5
115:13 124:7
130:11,19
131:4 145:25
193:20
**receiving (1)**
177:19
**recognizable...**
130:15
**recognize (5)**
3:7 37:23 38:3
94:22 117:25
**recollection (...**
65:12 66:8
78:2 102:19
187:22
189:23
**recommend ...**

185:19
**reconsider (2)**
97:16 150:2
**record (15)**
4:24 8:9,12
96:10 99:6
104:7 116:22
145:5 146:10
150:3 152:12
180:6 183:15
191:22
202:13
**recorded (1)**
6:17
**recording (6)**
6:18 35:7 36:2
52:16,25 53:2
**recordings (3)**
35:12 99:20
193:5
**red (1)**
36:10
**redacted (2)**
162:16 163:7
**redaction (2)**
161:6 162:7
**reduce (1)**
192:2
**refer (2)**
159:8 177:24
**reference (2)**
44:12 166:9
**referenced (4)**
122:14 159:18
159:20
169:10
**referred (1)**
159:3
**referring (1)**
195:9
**reflect (1)**
72:12
**refresh (1)**
102:19

**refreshing (1)**
187:22
**refusal (2)**
4:11 104:6
**refuse (1)**
31:9
**refused (2)**
30:8 31:5
**regarding (6)**
7:4 11:16 93:6
144:4 165:22
197:21
**regards (1)**
12:23
**regular (9)**
93:5 167:25
168:2,4,14,17
171:10,12
187:20
**reiteration (1)**
198:15
**related (6)**
44:20 45:3
154:4 155:15
193:2 202:16
**relative (4)**
153:22 154:5
162:20,21
**released (1)**
166:16
**relevance (1)**
112:24
**relevancy (2)**
178:22 179:5
**relevant (8)**
41:22 55:20,24
56:5,14,17
58:11 170:11
**relief (1)**
3:14
**remainder (2)**
4:16 131:4
**remedial (1)**
170:15

**remember (25)**
11:17 27:8
32:7 34:16,20
35:10 51:7,9
53:9 67:20
95:11 119:5
130:4,8 132:8
136:6,8 138:5
138:14
141:12
146:23
177:19
186:25
188:14 190:2
**remembered...**
56:20
**remind (3)**
10:2 102:3
171:4
**remote (4)**
6:9 101:8
102:17,21
**remotely (6)**
6:15 103:3,8
103:25 104:3
104:4
**removal (1)**
88:6
**remove (1)**
132:18
**removed (3)**
87:15,21 88:6
**Reno (2)**
137:24 177:24
**reoccur (1)**
107:8
**reoccurring ...**
106:4,24
**reorganized ...**
17:23
**repeat (3)**
32:2 87:19
106:13
**rephrase (3)**

10:7 45:15
109:23
**replicate (1)**
195:3
**report (93)**
10:25 11:5
21:7,10,14,16
22:3,8 23:5,6
23:7 26:18
27:2,13,16,17
28:3,8,9,12
33:21 34:3,6
35:8,17 37:4
41:5 42:13,23
43:6,15,19
44:16,19,20
44:22 45:17
45:20 46:5
47:7,14,25
48:4,8,13,14
48:15 49:3,5
49:12,16,19
49:22 54:4
59:14 69:8
102:10
118:24
128:19 132:2
135:14,15,25
136:11,15,22
143:21,24
144:18,24
145:10
146:13,17
151:7 155:25
156:3,5 157:9
158:16 179:2
181:9 182:16
183:7,17
186:11,22
187:4,23
189:19 200:8
200:17,20,23
**reported (6)**
33:11,13 46:20

46:24 133:8
183:6
**reporter (3)**
6:8,15 99:7
**reporting (3)**
6:12 158:19
187:9
**reports (11)**
43:4 45:3,8
49:12 131:24
136:18,20
156:21 157:2
157:11
160:19
**represent (4)**
8:17,23 39:5
95:18
**represented ...**
121:8
**reprimand (1)**
30:15
**reprimanded...**
30:10
**request (4)**
3:18 139:21
201:3,5
**requested (1)**
155:12
**require (2)**
70:3,12
**required (16)**
32:17,22 33:2
33:10,12
41:13 43:13
55:13 57:4
66:4,17 78:18
110:17
170:14
172:23
185:13
**requirement ...**
41:18 57:11
78:15 79:10
114:2 185:20

188:20,24
189:5 198:21
**requirement...**
57:2 70:23
75:20 77:3,5
77:23,24
79:22 81:9
83:9 198:2
**requires (3)**
56:23 57:7
69:10
**reserved (1)**
5:6
**residence (1)**
132:12
**residential (1...**
22:22 24:3
29:2,10 71:9
120:17,22
122:15
127:19,23
198:3,22
**residents (1)**
93:22
**resolve (3)**
107:2,6 149:8
**resolved (2)**
106:5,15
**resort (1)**
126:12
**respect (4)**
163:14 178:21
179:15 198:2
**respective (1)**
3:4
**respond (1)**
134:7
**responded (3)**
22:3 33:22
135:18
**responding (3)**
72:4 120:14
125:13
**response (2)**

172:13,16
**RESPONSI...**
1:12
**rest (4)**
148:8 158:3
170:2 192:11
**restroom (1)**
51:25
**result (6)**
43:14 66:5
140:7,9
172:24 185:8
**retain (1)**
115:20
**retired (2)**
58:24 61:9
**retraining (3)**
185:11,21
189:12
**retreated (1)**
141:18
**return (1)**
5:9
**reveal (2)**
163:18 164:23
**revealed (1)**
188:16
**revealing (1)**
163:19
**review (30)**
11:20,23 12:2
26:8 36:14
59:12,17 64:9
66:25 68:21
69:6,7 104:13
104:14,15
115:25
118:17 119:5
119:11 126:8
128:7 157:19
170:12
182:11,20,22
183:2 186:4
188:8 193:3

**reviewed (24)**
10:25 11:5,11
11:14 12:3
21:17 27:19
31:21 32:4
33:20 53:12
53:19,25 54:3
60:8,11,17
66:15 67:23
68:25 129:25
155:24
187:11 203:2
**reviewing (7)**
36:7 125:24
159:12 182:8
188:10
190:15,19
**reviews (1)**
69:4
**rewind (1)**
94:13
**right (102)**
3:13 4:4,15
18:13 22:13
23:6,10,15
25:17 26:14
26:22 27:13
27:18,23
28:10,21 29:4
29:21 31:24
32:6 35:18
36:19 38:25
41:14 42:15
43:17 44:5,10
44:17 45:4,13
45:22 46:5,10
46:16,18 48:6
48:15 54:24
55:25 58:20
61:4 68:11
72:12 74:18
74:19 75:12
77:17 78:16
78:25 79:16

79:20 80:22
81:2,16 85:19
88:11,18 89:9
90:9,17
104:19
107:17 110:5
110:9 111:9
111:18
114:12,20
116:2,13
120:8 123:3,8
124:3 127:11
128:18
129:12,17
139:3 140:16
141:19
146:20 149:9
165:5 173:8
173:19
174:15 175:8
176:3,23,24
177:7 181:11
183:10,24
187:20
191:16 193:5
195:5,8 196:5
**rights (1)**
5:12
**risk (18)**
24:13 79:12,15
82:8 92:2
161:12
167:24 168:5
168:9,20,24
170:21 171:2
184:17,20,21
190:3 192:4
**road (4)**
15:23 16:3,10
16:13
**robots (1)**
196:10
**Rochester (21)**
1:10 2:8,9 8:14

| | | | | |
|---|---|---|---|---|
| 8:17 13:17 | 19:9 21:3 | 21:1 22:1 | 109:1 110:1 | 190:1 191:1 |
| 15:12,17,23 | 22:17,20 | 23:1 24:1 | 111:1 112:1 | 192:1 193:1 |
| 16:7,12,25 | 24:15 31:23 | 25:1 26:1 | 113:1 114:1 | 194:1 195:1 |
| 61:7,23,25 | 40:22 45:10 | 27:1 28:1 | 115:1 116:1 | 196:1 197:1 |
| 63:3 112:7 | 54:16 57:2,10 | 29:1 30:1 | 117:1 118:1 | 198:1 199:1 |
| 123:13,18 | 66:20 67:25 | 31:1 32:1 | 119:1 120:1 | 199:11 200:1 |
| 194:10,24 | 69:9,21 70:3 | 33:1 34:1 | 121:1 122:1 | 200:4 201:1 |
| **role (10)** | 70:12 72:7 | 35:1 36:1 | 123:1 124:1 | 202:1,9 203:1 |
| 14:24 15:4 | 75:15,19 76:6 | 37:1 38:1 | 125:1 126:1 | 203:1 |
| 17:22 60:2,7 | 78:3 81:9,18 | 39:1 40:1 | 127:1 128:1 | **rule (23)** |
| 61:11,25 | 84:23 85:6,12 | 41:1 42:1 | 129:1 130:1 | 3:5,7,21,22 |
| 147:7 190:15 | 85:21 86:4,10 | 43:1 44:1 | 131:1 132:1 | 4:10 5:12 |
| 191:24 | 86:23 87:9 | 45:1 46:1 | 133:1 134:1 | 25:3 33:9 |
| **roles (4)** | 115:11,25 | 47:1 48:1 | 135:1 136:1 | 55:17 67:22 |
| 17:17 19:10,15 | 116:11 | 49:1 50:1 | 137:1 138:1 | 70:25 75:8 |
| 21:2 | 120:11 | 51:1 52:1 | 139:1 140:1 | 78:16 79:22 |
| **roll (5)** | 121:18 122:3 | 53:1 54:1 | 141:1 142:1 | 80:3,5,5,6,9 |
| 121:20 177:23 | 122:14 | 55:1 56:1 | 142:13 143:1 | 92:25 93:4 |
| 196:23 197:5 | 127:17 | 57:1 58:1,10 | 144:1 145:1 | 134:6 135:25 |
| 198:13 | 130:19 131:2 | 59:1 60:1 | 146:1 147:1 | **ruled (1)** |
| **rollcall (2)** | 131:4 139:13 | 61:1 62:1 | 148:1 149:1 | 152:13 |
| 130:16,16 | 139:25 | 63:1 64:1 | 150:1 151:1 | **rules (8)** |
| **rollout (1)** | 140:11 | 65:1 66:1 | 151:21 152:1 | 3:6 4:22 9:9 |
| 196:17 | 151:23 | 67:1 68:1 | 153:1 154:1,9 | 10:3 45:10 |
| **Romig (8)** | 159:21 | 69:1 70:1 | 155:1,16 | 55:12 169:25 |
| 140:21 143:10 | 166:17 170:2 | 71:1 72:1 | 156:1 157:1,8 | 185:17 |
| 143:12 | 172:19,22 | 73:1 74:1 | 158:1,14,16 | **ruling (2)** |
| 186:24 | 185:17 | 75:1 76:1 | 159:1 160:1 | 143:8 149:12 |
| 187:19,24 | 192:11 | 77:1 78:1 | 161:1 162:1 | **RULINGS (1)** |
| 189:11 190:6 | 193:19 | 79:1 80:1 | 163:1,17 | 201:12 |
| **room (2)** | 195:16 | 81:1 82:1 | 164:1 165:1,9 | **run (6)** |
| 96:16 101:23 | 196:19 | 83:1 84:1 | 166:1 167:1 | 51:25 72:2 |
| **rooms (1)** | 197:21,25 | 85:1 86:1 | 168:1 169:1 | 120:7 121:12 |
| 96:21 | **RPD's (5)** | 87:1 88:1 | 170:1 171:1 | 124:3,12 |
| **ROTH (2)** | 23:18 32:6,10 | 89:1 90:1 | 172:1,18 | **running (7)** |
| 2:3,3 | 32:16 67:8 | 91:1 92:1 | 173:1 174:1 | 71:21 81:14 |
| **round (4)** | **Rudolph (216)** | 93:1 94:1 | 175:1 176:1 | 125:22 |
| 187:19,20,25 | 1:19 8:10,17 | 95:1 96:1,13 | 177:1 178:1 | 126:18 127:3 |
| 188:2 | 8:19 9:1 10:1 | 97:1 98:1 | 179:1 180:1 | 132:24 |
| **routing (1)** | 11:1 12:1 | 99:1 100:1 | 181:1 182:1 | 141:17 |
| 66:23 | 13:1 14:1 | 101:1 102:1 | 183:1,16 | **runs (6)** |
| **RPD (63)** | 15:1 16:1 | 103:1 104:1 | 184:1 185:1 | 74:23 75:4 |
| 1:11 15:19 | 17:1 18:1 | 105:1 106:1 | 186:1 187:1 | 124:18,22,25 |
| 16:15 17:18 | 19:1 20:1 | 107:1 108:1 | 188:1 189:1 | 125:6 |

**Ryan (1)**
140:21

**S**

**S (5)**
2:2 3:2,2 8:2,2
**S.W.A.T (92)**
19:11,12,13,14
19:16,21 20:2
20:9 21:3
112:8 130:21
130:23 131:3
131:5 139:5,8
139:14
143:13,17
144:4 145:17
145:19,21
147:2,10
148:8,11
151:23 152:2
152:5,9
153:17,20,23
154:4,16
155:3,6,6,15
156:20
157:13,15
158:4 160:22
161:4,8,9,17
161:21,25
162:8,15,17
164:4,4,7,24
165:7,19,22
166:12
167:23 168:6
168:10 169:8
169:19,24
170:6,11,19
170:25
178:16 179:4
179:17
181:22,25
185:18
186:11
187:14,16

188:21 191:2
191:7,24
192:8,9,15,22
193:12,15,16
**safely (5)**
166:25 167:20
183:22
184:10
193:23
**safety (3)**
14:12 16:11
195:18
**sales (1)**
25:21
**satisfy (2)**
105:8,10
**saw (15)**
24:20 26:21,25
27:6,16 28:23
33:22,23
36:22 40:24
41:10 118:11
174:13 184:7
197:3
**saying (23)**
25:23 31:11,12
31:13 39:12
41:17 47:18
47:19 58:20
61:3 74:12
82:14 83:11
86:19 95:25
102:25
115:16
126:21
174:11 177:5
177:16
183:24 184:3
**says (12)**
22:2 23:7
49:22 61:2
69:16 122:20
166:15,21
186:6,7

187:10 203:2
**scared (2)**
126:17 127:4
**scenario (1)**
89:8
**scenarios (6)**
33:5 166:19
194:5,6,13,21
**scene (20)**
33:22 34:10,13
34:15 35:5,13
43:13 47:20
50:6,6,24
51:2,7 54:6
81:21 133:14
135:21
158:23 188:4
188:10
**school (3)**
13:14,17,18
**Schultz (1)**
17:8
**scope (15)**
142:8 148:20
148:25
150:11
152:19 153:5
155:11
162:23
163:23
164:16
165:24
178:22 179:5
191:11
192:25
**screen (11)**
21:13 37:18,19
94:16 99:22
116:18
144:23 145:9
146:17
181:11
194:16
**Scroll (1)**

148:2
**search (38)**
70:7,23 71:3
72:14 77:16
79:4 82:22
89:14,17 90:3
111:9 146:25
147:3,8,13
161:12
166:11,13
167:10,22,25
168:5,9,14,20
168:24
170:21 171:2
171:6,14
176:12
184:17,19,21
190:3,22
191:9 192:4
**searches (3)**
70:25 71:3
72:14
**searching (1)**
115:11
**second (13)**
17:15 89:8
93:18 98:5
117:8,25
118:20
144:21,25
145:15 156:8
158:6 166:5
**seconds (13)**
38:13,25 40:8
91:6,8,12,18
91:21,25 92:8
96:4,8 107:18
**SECRETAR...**
97:25 98:5,10
98:14,17
**section (22)**
4:21 6:6 17:13
17:24 18:3,5
18:7,11,12,22

21:25 29:5
50:20 59:6,19
63:9 67:12
71:5 72:14,15
147:25 187:8
**secured (1)**
176:11
**security (1)**
163:20
**see (35)**
21:13 28:20,24
30:25 34:19
36:3,9 37:19
38:2 39:23
40:15,17,20
59:15 83:20
88:15,21,23
89:3 92:12
94:16 102:2
118:6 128:18
144:23 145:9
145:21
146:16
162:19
171:22 172:7
173:9 176:9
179:3 180:18
**seek (2)**
89:16 90:8
**seen (7)**
27:11,21 28:5
52:19 174:6
177:22
193:20
**sees (1)**
124:2
**semester (1)**
14:2
**send (9)**
24:10,17 25:6
105:17,24
106:10,17
107:4 134:19
**senior (1)**

19:7
**sensitive (1)**
164:24
**sensitivity (2)**
161:16 179:16
**sent (1)**
132:10
**separate (14)**
6:9 44:3,3,4,7
44:24,25
53:17 103:18
130:25 154:2
154:21 155:3
192:10
**September (5)**
15:5 18:9
19:16 112:14
113:16
**sergeant (265)**
1:19 8:20 9:1
10:1 11:1
12:1,8 13:1
14:1 15:1
16:1 17:1,25
18:1,3,7,14
19:1,7 20:1
21:1,13 22:1
23:1 24:1
25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1
33:1 34:1
35:1 36:1
37:1,21 38:1
39:1 40:1
41:1 42:1
43:1 44:1
45:1 46:1
47:1 48:1
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1

57:1 58:1,10
59:1 60:1
61:1,23 62:1
62:2,15 63:1
63:3 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1 76:1
77:1 78:1
79:1 80:1
81:1 82:1
83:1 84:1
85:1 86:1
87:1 88:1
89:1 90:1
91:1 92:1
93:1 94:1,16
95:1 96:1,13
97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
128:23 129:1
130:1 131:1
132:1 133:1
134:1 135:1,9
135:14,17,19
136:1,9 137:1
138:1 139:1

140:1 141:1
142:1,13
143:1 144:1
144:23 145:1
145:9 146:1
146:16 147:1
148:1 149:1
150:1 151:1,6
151:6,20,21
152:1 153:1
154:1,9 155:1
155:16,21,21
156:1,2,6
157:1,7,8
158:1,13,16
159:1 160:1
160:16,17,21
161:1 162:1
163:1,16
164:1 165:1,9
166:1 167:1
168:1 169:1
170:1 171:1
172:1,18
173:1 174:1
175:1 176:1
177:1 178:1
178:12,24
179:1 180:1
181:1,13
182:1,11
183:1,2,4,16
183:23,24
184:1,13
185:1 186:1,8
186:11,16
187:1,17,19
187:24 188:1
188:9 189:1
189:11 190:1
190:18,20
191:1 192:1
193:1,13
194:1 195:1

196:1 197:1
198:1,25
199:1 200:1
201:1 202:1
203:1,1
**serious (1)**
33:12
**seriously (2)**
140:2 162:8
**served (1)**
167:4
**server (1)**
197:9
**service (3)**
6:12 139:18
147:3
**Services (10)**
133:8,14,15,24
134:7,16,19
134:20
139:11
177:25
**serving (1)**
146:25
**set (8)**
4:5,21 26:16
75:23 113:2
114:14
202:11,20
**setup (1)**
115:4
**seven (2)**
43:9 153:13
**severity (1)**
134:13
**shaking (1)**
180:19
**share (1)**
37:17
**shared (1)**
180:11
**sharing (1)**
153:25
**SHEET (1)**

203:1
**sheriff (2)**
14:25 15:6
**Sheriff's (4)**
14:2,5,22 15:8
**Shields (95)**
8:22 37:3
51:16,24 58:9
96:18,25 97:4
97:10,20,21
98:2,8,9,12
98:20,25 99:3
99:8,11 102:8
102:24 103:7
103:9 104:2
105:7,23
106:6,16
107:11,14,21
114:7 120:23
130:6 142:10
142:18 143:7
144:7,22
145:4,23
146:11
148:12 149:2
149:17
150:14,18,19
150:20,22,24
151:5 154:8
154:18,23
155:13,18
157:10 158:9
158:18 159:5
159:12 160:7
160:11,13,16
160:21
161:19
163:16 166:2
166:4 168:21
169:2 170:23
171:12,17
172:3 173:23
174:17
175:15 178:6

178:19 179:6
180:17,24
181:5,21
191:14,18,23
193:2 196:3
198:25 200:4
**Shields' (1)**
103:24
**shift (8)**
17:22,25 18:4
32:25 63:10
131:15 132:9
133:16
**shirt (1)**
55:5
**shoot (11)**
127:20 128:3
129:11,16
169:21 175:8
181:14 194:5
194:6,12,12
**shooting (44)**
42:4,21 43:10
43:12,20 44:4
44:9,15,20
45:22 46:2,8
99:18 103:4
116:23,24
126:11,15
138:15
140:24
142:15 144:9
146:3 148:15
148:23
151:24
153:16
154:12,19
156:11
157:21
159:10 162:2
162:18,24
165:8 172:20
176:3,6
190:11,16

191:8,15,15
**shootings (5)**
136:13 178:13
178:15,25
191:13
**Short (2)**
52:3 128:22
**shortly (1)**
18:16
**shot (57)**
8:24 112:9
126:18,21,22
127:6,15
131:7,9 132:2
132:8 133:7
134:21 136:2
138:22
140:12,19
141:20
142:20,21
143:17 144:8
144:11,13,15
147:4,12
151:10,12
152:5,23,25
156:14,16
159:22
166:10 167:8
167:13 169:5
170:9 172:24
173:4,16
174:3,22
181:18 182:6
182:10,23
183:3,5 184:8
186:24 190:6
190:22 191:3
192:3
**shotgun (2)**
132:18,25
**shots (2)**
133:3,4
**shouldering ...**
101:10

**show (1)**
42:11
**showed (1)**
119:7
**shows (3)**
52:23 53:5
118:5
**side (2)**
39:10 117:22
**sidewalk (1)**
132:19
**sidewalks (1)**
114:10
**sight (1)**
92:2
**signature (2)**
158:21 203:23
**signed (6)**
5:7 157:8
158:17,20
179:2 182:16
**significant (1)**
4:8
**similar (6)**
18:20,25 57:2
57:10 88:10
198:19
**similarly (1)**
93:10
**simple (2)**
77:21 174:19
**simplest (1)**
81:17
**simply (3)**
91:2 163:21
165:24
**simulator (5)**
194:4,11 195:7
195:17,23
**simulators (2)**
194:19 195:2
**single (8)**
25:3 46:18
66:24 68:17

68:19 69:17
101:3,5
**sir (4)**
21:15 25:14
49:11 174:25
**sit (1)**
26:4
**sitting (1)**
89:4
**situation (16)**
23:2,23 44:13
69:7 70:9
77:13 116:9
137:21 145:7
152:10
174:21 175:4
175:13 176:5
177:7 184:17
**situationally ...**
24:24 29:14
**situations (1)**
72:12
**six (4)**
14:11,16 18:18
153:13
**skip (1)**
166:20
**slow (1)**
178:8
**small (1)**
20:5
**smaller (3)**
20:5,6,7
**smoothly (2)**
38:17 100:5
**sniper (2)**
20:12 114:13
**snipers (3)**
112:8,15
113:17
**Sobieski (6)**
39:16 71:18,25
93:21 94:2
121:13

**somebody (13)**
24:10,17 25:6
56:15 73:21
75:6 76:3
81:12 85:7
88:15 94:8
134:3 171:8
**somebody's (4)**
114:7,17 123:2
123:7
**someone's (12)**
78:4,17,24
80:7 93:23,25
114:8 115:10
116:6 122:6
122:18,21
**somewhat (1)**
114:11
**sooner (1)**
79:19
**sorry (6)**
34:5 99:4
106:8 149:14
153:11
160:14
**sort (2)**
182:19 189:12
**sound (3)**
29:4,21 123:14
**sounded (1)**
119:20
**sounds (3)**
10:8 106:15
107:7
**spanning (1)**
96:12
**speak (42)**
13:2 26:24
27:3,25 28:23
29:7,25 34:2
34:3,7,9,12
34:14,24 35:4
40:14 41:9
42:17 43:5

52:7 56:22
57:8 60:14
64:8,11,15
68:3 69:4
83:16 92:11
110:22
111:12
128:25
134:25 135:4
144:3 173:6
173:18
176:20
177:14 178:3
178:8
**speaking (8)**
31:13 35:2
52:9 56:7
65:23 76:7
102:12 129:4
**Special (1)**
18:6
**specific (32)**
15:23 16:15
32:7 43:19
49:15 58:7
72:7 77:18
90:25 100:13
102:6,10
113:8,11
121:20
130:23
140:16
151:24 152:7
153:20
156:20
158:10 159:9
159:10 169:8
170:6 174:24
177:20 189:5
195:4 198:6,7
**specifically (...**
12:10 44:2
70:16 79:24
86:17 91:15

138:8 159:3
159:17
161:21
182:22
**specifics (3)**
34:23 73:15
141:12
**speed (1)**
127:3
**spoke (5)**
34:5 43:5
64:22,23
65:19
**spoken (7)**
50:10 65:5,9
65:13,20
135:9 193:13
**spot (3)**
35:20 158:11
159:2
**spray (3)**
137:10 176:17
177:10
**Springer (3)**
112:13 113:15
115:7
**Springer's (1)**
115:15
**squarely (1)**
114:10
**ss (1)**
202:3
**staffed (2)**
134:11,18
**stamped (11)**
21:10 51:21
143:25
162:12 187:5
189:20 200:9
200:15,18,21
200:24
**standard (8)**
50:20 67:12
125:12,23

126:2,4 128:6
139:16
**standing (4)**
39:3 92:5 95:3
183:9
**standpoint (1)**
194:3
**stands (1)**
193:11
**start (3)**
13:11 15:3
17:3
**started (3)**
15:19 132:24
165:5
**starting (1)**
181:24
**state (8)**
1:21 8:8,11
14:15 122:11
150:3 202:3,7
**state-of-the-...**
194:17
**stated (3)**
3:16 4:23
154:10
**statement (6)**
3:19 4:13
42:12,22
48:14 115:15
**statements (1)**
3:24
**States (3)**
1:2 140:6
193:21
**stating (1)**
41:16
**statistic (3)**
139:25 140:3,5
**statistics (1)**
29:7
**stayed (2)**
17:22 141:23
**step (8)**

65:8,8 73:3,3
74:19 78:14
198:7,8
**Steve (3)**
141:19,20,20
**Steven (6)**
61:19,20,22
140:20,23
143:3
**stick (1)**
155:13
**sticks (2)**
137:13 138:21
**STIPULAT...**
3:3 6:4,23
**STIPULATI...**
6:2
**stockade (3)**
107:25 108:19
111:6
**stood (1)**
132:19
**stop (3)**
74:7,8 125:11
**stopped (2)**
36:4 39:18
**store (1)**
55:7
**storing (1)**
57:25
**story (1)**
43:8
**stranger (1)**
124:2
**stray (1)**
134:15
**street (24)**
2:9 11:9 22:4
22:12 39:7,16
39:22 71:17
71:18,21
93:21,21 94:2
94:2 121:12
121:13

145:10
146:15 147:2
147:23 181:9
181:12
183:13
186:23
**streets (1)**
92:23
**strike (5)**
5:3 148:5
173:23
174:17
175:17
**stroke (3)**
73:18 77:14
82:16
**stuff (5)**
68:4 152:6
163:2 181:22
181:25
**subcategory ...**
81:6
**subdivision (1)**
4:11
**subdivisions ...**
3:8
**subject (1)**
3:12
**subjected (3)**
125:4 185:12
189:11
**subjective (4)**
125:12,25
128:6,9
**subjects (1)**
149:19
**submissive (1)**
124:21
**subordinate ...**
116:5
**subordinates...**
116:2
**subpoena (17)**
142:9,12

148:20,25
149:15,18
150:11
152:19 153:5
154:8 155:11
155:14 156:9
163:23
164:17
165:25 167:4
**subpoenaed ...**
103:10 165:18
**Subscribed (2)**
199:13 203:23
**succinct (1)**
4:12
**succinctly (2)**
3:16 4:24
**suddenly (1)**
101:9
**sufficient (1)**
149:8
**suggest (2)**
3:17 105:14
**suggestion (4)**
149:7 150:6
152:9 179:6
**Suite (1)**
2:4
**summary (1)**
22:7
**superior (1)**
186:10
**supervisor (1...**
18:19,24 30:3
30:6 32:18
43:16 47:23
63:23 66:10
102:9 104:13
115:24 133:9
134:22 135:8
135:18 136:5
136:22
**supervisor's ...**
136:10,14

**supervisors (8)**
18:21 64:16
65:14 66:16
66:18 67:23
68:25 136:20
**supplement (1)**
161:18
**supply (1)**
7:8
**support (2)**
175:13,16
**suppose (2)**
41:3,22
**Supreme (8)**
76:6,10,14,19
76:22 81:18
84:24 85:22
**sure (18)**
23:3 54:11
63:8 68:8
95:17 96:13
98:14 105:12
106:14
111:13
139:23
153:12
161:10
163:11
177:18
178:17
180:10
195:13
**surrounding ...**
69:19 82:18
**surveillance ...**
188:15,22
**suspect (19)**
22:23 40:5
69:12 72:16
72:20 75:4
81:21 82:2
84:3,25 85:11
85:14,23
86:19,21 87:7

109:21
110:13
171:20
**suspected (7)**
71:8,20,25
73:21,23
74:22 75:9
**suspects (14)**
22:6 23:9,13
26:20 27:6,11
42:3 46:25
82:12 108:3
120:7,16,21
121:11
**suspicion (1)**
87:10
**sweatshirt (1)**
36:10
**sworn (7)**
5:7 6:15 8:4
199:13
202:11 203:1
203:23
**system (2)**
56:14,17

———————
**T**
**T (3)**
3:2,2 8:2
**table (2)**
89:4 119:24
**tactics (1)**
15:25
**take (27)**
16:10 17:16
52:6 54:7,9
65:8 68:9,19
69:18 71:13
73:3,8 74:6
74:19 78:14
89:18 93:24
124:13
125:17,20
126:8,10

128:8,11,17
132:18 198:7
**taken (15)**
3:10 5:11 9:5
31:2 43:11
54:15 77:19
90:13,16 91:3
91:7 177:9,11
179:12 203:2
**takes (1)**
133:22
**talk (10)**
21:6 30:22
33:4 92:18
106:24 121:4
134:22
148:11
155:15
181:21
**talked (8)**
12:16 54:4
71:14 83:8
110:15 168:7
168:20 176:8
**talking (17)**
29:24 30:21
72:24 82:20
88:13 93:13
93:16 97:3
114:11
116:14
120:23 144:8
149:16 181:8
191:12
194:16,17
**tall (2)**
107:25 108:19
**target (1)**
188:23
**taught (19)**
22:20 76:6,11
76:12,19 77:2
77:6,9,22
79:21,24

85:22 86:3,10
115:12
124:17
137:10,15
138:15
**teach (6)**
75:15,19 78:3
81:18 84:23
87:9
**team (55)**
19:11,13,13,14
19:16,18,18
19:21,24,25
20:2,4,5,6,7,7
20:8,10,11,12
20:12,13,14
20:15,16 21:3
130:23 131:5
139:8,14
143:14
147:10 148:4
148:8 151:23
157:15 158:4
160:23
168:10
169:24
170:11
182:13
184:18,23
185:4 187:14
187:16
188:21 191:2
191:7,24
192:8,9,15,22
**team's (1)**
20:8
**teamed (1)**
19:6
**teams (1)**
20:5
**tech (1)**
106:22
**technique (1)**
138:15

June 9, 2023

[Page 237]

**technology (4)**
101:15 195:15
195:20,23
**telephone (4)**
50:7,9 186:19
186:20
**tell (36)**
9:10,13,17,20
9:23 10:22
11:13 12:16
27:5 31:18
32:21 33:19
34:16,22 39:8
40:3 48:12
53:12 57:23
60:18 73:2
74:14 76:14
76:21 91:11
91:15 99:9
119:2,12
122:21
124:24 132:7
143:2 146:22
159:14
197:13
**telling (1)**
34:20
**tells (1)**
127:13
**ten (2)**
166:22 195:10
**terms (6)**
10:14 56:8
78:21 157:21
164:18 179:4
**Tesla (7)**
173:4,16 174:3
174:23 176:3
176:6 177:15
**testified (17)**
8:5 23:25
28:25 29:18
31:21 32:3
38:6 66:3

71:12,14
112:13
113:16 115:7
121:9 123:12
137:25
169:23
**testimony (8)**
5:3 10:24
67:19 152:15
179:11 180:7
202:13 203:3
**text (1)**
50:12
**texting (1)**
145:5
**Thank (14)**
106:6 107:9,11
107:21
144:17 149:2
172:4,5,11
178:6 180:17
181:5,7
198:25
**theirs (1)**
173:22
**thing (10)**
77:18 92:24
95:10 100:15
114:11
138:13,25
156:7 167:12
169:2
**things (25)**
15:25 25:4
46:19 70:8,23
77:17 80:12
113:5 115:20
124:20
125:21
129:24
130:18
162:22 163:6
164:10,11,12
165:12 166:6

173:3 174:20
175:7 197:2,5
**think (44)**
37:11,16 40:11
55:8 56:4,13
56:15 88:16
97:13 102:14
111:7 114:10
132:5 136:19
136:23
138:18 142:8
143:20
145:16
148:24 149:4
152:18 157:4
161:18,20
164:3,14,19
164:23 165:3
167:7 170:3
170:16 172:3
175:9 176:4
180:5,19
181:13
191:20 194:9
194:22
196:18 198:4
**third (11)**
18:3,5,11,13
18:22 79:12
93:13 123:12
125:10 128:2
128:5
**thought (5)**
153:4 165:6
168:3 180:15
191:12
**threat (2)**
127:14 128:4
**three (10)**
15:22 16:6,9
19:20 21:19
60:9 106:9
157:11
158:25

170:17
**till (1)**
141:23
**time (89)**
5:5 19:9 23:4,7
23:7 24:25
25:3 26:17
30:4,13,25
34:15,18,22
38:4 42:6
50:19,25 51:3
53:24 55:18
58:23 59:8
60:5,12 62:3
62:5,10 63:6
63:8,23 67:11
69:17 83:18
84:12 89:20
89:21 90:8,23
91:16,18
92:12,14 95:8
101:3 105:19
107:6 108:24
111:11
112:13
113:16 117:2
117:8,11,14
117:17,19
118:20
122:25 126:3
128:23 130:9
130:19
131:13,14
133:24
135:10,13,24
136:17
140:25
141:21
147:15 149:5
167:17
172:14
174:14,15
181:17
182:12

186:12
187:15 190:6
190:14
191:21
193:19
196:24 197:8
199:8
**timeframe (1)**
90:19
**times (6)**
29:16 61:16
106:11
124:11
168:19
171:25
**titled (1)**
33:18
**today (20)**
8:19 9:2 10:17
10:24 17:17
18:8 19:17,19
26:4 55:10
63:20 96:21
97:21 100:8
100:19
101:23
106:16
149:16 164:5
199:3
**today's (2)**
10:21 129:25
**toe (1)**
81:14
**toilet (1)**
88:18
**told (20)**
25:15 26:10
27:10 28:4
68:5 81:9
83:19 85:12
111:6 118:22
119:15
126:14 127:2
129:10,16

June 9, 2023

[Page 238]

139:24 140:3
140:5 175:23
180:13
**tool (1)**
194:23
**tools (2)**
125:8 137:12
**top (7)**
11:19 71:4
105:11
136:23
192:17
194:18
198:23
**topics (3)**
145:23 194:12
194:20
**Tordai (6)**
49:23 50:17,18
50:21 51:12
64:14
**total (1)**
157:11
**totality (12)**
30:21,22 31:7
31:17 69:18
69:22 73:9
89:18 109:2
126:6 128:11
174:13
**tough (2)**
57:19 131:16
**tracking (1)**
30:2
**traditional (1)**
168:16
**train (3)**
122:3 192:7,20
**trained (5)**
24:2,4 73:19
156:16
159:23
**training (113)**
1:12 11:16,18

14:12 15:18
15:23 16:2,4
16:5,7,10,11
16:13,16,17
17:2,4,7,10
17:20 18:20
18:20,24,25
31:23 32:6,11
32:17 66:5,9
66:17 67:4
69:10 70:3
76:22 85:5
110:21
115:13,20,21
115:22
121:24 122:9
122:10 124:7
124:10,17,19
124:23,24
125:4 127:17
129:10,15,21
130:5,8,10,11
130:16,17,19
130:21,22,25
131:2,3
136:24
137:25 138:6
138:20
145:25 146:4
169:19
170:15
172:23 173:8
173:10,21
176:21
177:20,23
185:14,25
191:7 192:2
192:10,17,18
192:19
194:23
195:18,24
196:4,7,8,12
196:19,22,23
197:2,5,15,16

197:17,17,17
198:5,11,13
198:14,16,21
**trainings (6)**
11:3,12,14
86:16 197:5,9
**transcript (4)**
7:9 165:2
180:3 203:2
**transcripts (1)**
165:17
**transfer (2)**
16:24 98:17
**transferred (5)**
15:16 18:2,4,6
18:22
**transfers (1)**
16:17
**transmission...**
26:2 38:23
182:7
**traverse (5)**
90:21 93:15
109:3 110:25
120:4
**traversed (2)**
84:3,7
**traversing (1)**
91:14
**treat (1)**
180:2
**treated (2)**
154:21 155:4
**trespassed (1)**
116:6
**trial (4)**
1:19 3:6 5:6
10:18
**trick (1)**
76:17
**tricking (1)**
143:21
**tried (4)**
99:21 101:22

132:20
177:14
**true (4)**
36:16 42:22
146:2 202:12
**trust (1)**
48:20
**truth (1)**
57:24
**try (10)**
57:19 70:4
106:2,4,21
107:2,6 113:9
178:8 189:3
**trying (15)**
25:13 46:3
76:17 86:7,12
86:13 100:8
105:21
112:25
114:15
136:18
147:24
148:17
161:15 175:2
**turned (1)**
162:10
**turning (1)**
114:10
**twenty (1)**
101:5
**two (30)**
12:21 13:19
15:9,10 36:3
39:17,24
40:11 42:3,20
45:17 46:8,24
47:16,22 77:8
79:21,23 83:9
92:5,13 108:2
110:18,20,21
119:18 133:4
151:13 175:7
182:3

**type (7)**
24:5 31:15
79:14 120:15
122:23
137:21
141:14
**types (2)**
46:15 136:13
**typically (3)**
93:14 134:11
188:25

———————
**U**
———————
**U (2)**
3:2 8:2
**ultimately (3)**
48:5 132:25
182:19
**unauthorize...**
6:20
**unaware (1)**
185:10
**undergo (6)**
66:4,17 172:23
185:13,20
192:12
**undergoes (1)**
192:16
**undergoing (1)**
185:10
**understand (...**
9:11,12,15
10:6,11,16
25:13 30:24
48:23 56:11
68:9 86:7
97:14 105:2
113:2 115:24
116:11
137:20 157:4
158:7 162:6
163:11
164:15
170:19

175:15 177:2
understandi...
43:9 66:6
74:13 79:8
81:24 106:3
110:23
116:16
135:24 136:3
155:2 178:11
183:11,12
understands ...
112:18 113:20
understood (4)
10:10 12:12
158:24
171:22
Uniform (1)
3:6
uninterrupte...
92:15
unique (1)
136:12
United (3)
1:2 140:6
193:21
unknowing (2)
84:21 132:17
unlawful (6)
67:7 78:6,7,9
113:25
115:12
unmute (1)
153:11
unpredictabl...
195:6
unprepared ...
145:8
unreasonabl...
78:25
unresponsive...
173:24 174:18
175:18
unsafe (2)
80:21,25

unsure (1)
60:6
updated (1)
195:23
updates (3)
197:20,25
198:5
uploaded (2)
52:24 53:6
upset (1)
34:20
urgency (2)
87:11,16
use (13)
10:18 11:15
28:14 125:8,9
125:24
136:25 137:3
137:6,8 142:6
152:14 161:7
usually (1)
98:5
utilized (1)
161:5

———————
V
vacant (1)
71:18
vaguely (2)
159:3,6
Van (2)
103:18,22
variations (1)
121:23
various (2)
124:19 166:19
vehicle (3)
136:21 182:4
188:5
vehicles (1)
185:3
verbal (2)
50:16,22
verbally (2)

50:10 118:14
verse (1)
76:20
version (1)
35:21
versus (4)
73:22 81:22
128:6 146:5
veterinarian ...
34:21
VICE (6)
22:3 24:10
110:4,7,8,24
vicinity (1)
88:15
video (69)
1:18 6:7 36:25
37:5,7,11,21
38:4,7,22
39:2,24 53:6
53:8,10,13,19
54:2,3 58:17
59:2 60:17
63:16,22 64:5
64:9,21,25
65:10 94:12
94:17,22,23
95:2,9,24
96:8,10,15,20
97:6,12 100:2
100:9,12,13
100:17
104:11,16,20
105:4,12,24
107:15,18,20
107:22
108:20
110:12
116:17,21
117:3 119:11
126:8,10
193:6 194:16
196:7 200:11
videoconfere...

6:2,10,17 7:7
videos (2)
101:25 193:20
view (7)
38:24 51:17
52:14,17,18
97:7 193:5
viewed (9)
35:16 52:24
53:7 58:16
61:14 62:5
63:15,22
154:25
viewing (2)
53:9 65:5
violate (2)
78:4,7
violated (4)
32:16 67:8,24
68:10
violates (1)
185:17
violation (10)
6:20 32:10
33:7 40:21,25
41:7,11 67:21
75:13 80:18
violations (1)
33:10
virtual (2)
194:11,18
visible (1)
163:8
voices (1)
94:21

———————
W
wait (2)
71:25 178:2
waited (1)
71:17
waiting (3)
121:14 172:12
172:16

waived (1)
5:17
waiver (2)
5:4,12
wake (1)
134:3
walk (10)
90:14 91:3
92:20,22
112:15,19
113:18,21
114:7 115:10
walked (3)
111:5,16
175:21
walking (1)
113:24
walls (1)
196:9
want (31)
13:10 21:7
35:20 51:16
58:15 67:14
94:11,11,13
97:16 99:9
109:17
112:22
142:11
143:20
145:15
148:12 157:6
158:8 160:10
163:10
168:13,17
169:3 173:18
179:10,24
180:12
186:16,21
196:3
wanted (9)
52:14 139:19
149:22
157:12,23
158:13

161:24 166:7
175:24
**wants (3)**
34:21 101:7
154:18
**warn (1)**
70:13
**warned (1)**
174:8
**warrant (31)**
70:7,23 78:15
78:19 79:9
80:7 112:2
113:25 114:2
115:8 146:25
147:3,8,14
166:24 167:3
167:10
168:14,24,25
170:21 171:3
171:6,14
176:12
184:17,19,21
188:15 190:3
190:23
**warranted (2)**
126:12 186:3
**warrantless (...**
78:24 80:14,17
85:2,24 87:12
87:16
**warrants (17)**
71:3 72:14
77:17 79:4
161:12
166:11,14
167:22,24,25
168:3,5,9,19
168:21 191:9
192:4
**was(were) (1)**
202:11
**wasn't (5)**
126:16,17

127:4,10
158:15
**waste (2)**
149:4 191:21
**watch (1)**
107:15
**watched (6)**
35:7,10,12,14
59:2 64:5
**watching (2)**
95:11,14
**way (29)**
29:13 34:23
45:12 67:3,16
102:22 106:3
107:3 108:7
111:20
115:20
121:20 122:2
124:21
128:16 132:5
137:14 138:9
138:18 149:8
155:5 164:25
172:9 175:25
176:2 177:6
177:13
179:21
202:17
**ways (5)**
115:3 126:18
127:6 176:4
192:7
**weapon (4)**
24:12 33:24
82:21 83:20
**weapons (18)**
24:9,18,20
25:5,9,11,17
25:19,22,24
26:6,11,13,21
27:7,11 69:25
70:10
**website (2)**

196:25 197:2
**Wednesday (1)**
12:21
**week (5)**
14:14 18:18,18
29:3 137:23
**weeks (1)**
29:16
**Welsh (1)**
81:22
**went (11)**
14:16 18:16
64:3 84:6
100:6 116:23
117:23
119:24
132:20
141:19,19
**WESTERN (...**
1:3
**whatnot (2)**
94:21 162:20
**whatsoever (1)**
15:18
**WHEREOF ...**
202:19
**whistled (1)**
175:6
**Whistling (1)**
174:7
**whoa (3)**
177:16,16,16
**Wifi (2)**
96:16,22
**Wisconsin (1)**
81:22
**wise (3)**
62:8,10 164:13
**withdraw (1)**
65:7
**Withdrawn (3)**
54:13 68:23
93:3
**witness (34)**

5:8,18 6:9,13
6:14,25 7:2,4
8:3,18 36:18
36:22 37:16
41:5 42:7,21
46:21 48:18
48:25 51:24
57:8 97:3
100:25
101:21 142:5
144:12
179:24
181:14 188:3
188:6 190:9
200:3 202:19
203:23
**witness(es) (2)**
202:10,14
**witnessed (17)**
40:12 42:4,9
42:11,17
45:13,22 46:4
46:8 47:2
144:10,16
148:13,15
151:16,18
170:8
**witnesses (23)**
6:16 34:13
35:5,18,24,25
40:11 41:6
42:14,19,23
43:4,6,7
46:22 47:16
47:16,19,22
48:11,13,19
48:25
**word (2)**
149:15 154:15
**words (4)**
79:18 113:10
168:22
197:18
**work (13)**

8:11,13 101:7
105:20 106:2
106:22
133:16
139:17
161:15
164:19
180:15,21
188:25
**worked (5)**
14:25 68:18
141:2 164:9
186:12
**working (7)**
14:21 15:7,19
132:9 133:24
135:20
141:25
**works (1)**
19:7
**wouldn't (4)**
46:13 97:5
127:4 152:14
**Wright (1)**
17:9
**write (8)**
27:17 43:19
135:13,14
136:10,15,18
136:22
**writes (2)**
135:25 136:20
**writing (3)**
27:22 35:8
58:13
**written (8)**
6:19 10:17
25:2 43:16,16
57:5,6 70:18
**wrong (2)**
111:23 177:4
**wrote (6)**
26:17 27:2
33:20 34:3,6

June 9, 2023

[Page 241]

151:7

---

**X**

**x (2)**
1:4,14

---

**Y**

**yard (40)**
8:24 24:11
28:20 36:12
36:18 38:10
39:15,16 84:4
84:7,9,14,15
90:15 95:15
95:21 107:17
108:14,17
109:14
110:17 111:7
111:18,25
112:3,16
113:18,18
115:11 117:8
117:14,19
118:4,6,12,19
118:20
119:13
147:20 183:9
**yards (6)**
36:5 72:2
93:14,15
108:4 121:13
**year (3)**
14:4 86:15
131:15
**years (8)**
13:19 15:9,10
19:20 29:17
55:4 136:4
195:10
**yesterday (10)**
96:17,20 99:16
99:20 100:5
100:16 104:9
155:20
160:15,17

**York (11)**
1:3,22 2:5,5,9
8:14 14:15
122:11 202:3
202:4,7
**young (1)**
132:10
**younger (1)**
132:5

---

**Z**

**Zoom (4)**
98:13 99:17,23
100:10

---

**0**

**01655 (2)**
51:22 200:15
**06/09/2023 (1)**
203:2

---

**1**

**1 (9)**
21:8,9 37:3
51:22 96:4,7
107:17 200:8
200:16
**1:57 (1)**
128:22
**10/19/18-12/... **
51:21 200:14
**10016-6823 (1)**
2:5
**1076 (1)**
189:16
**11:08 (1)**
1:16
**12 (3)**
96:4,7 107:17
**12/8/20 (2)**
189:19 200:24
**12:05 (1)**
52:3
**12:10 (1)**
52:3

**14 (1)**
186:22
**140 (1)**
166:8
**143 (2)**
200:17 201:14
**144 (1)**
166:9
**145 (1)**
166:15
**14614 (2)**
2:9 8:14
**15 (1)**
86:15
**185 (2)**
8:13 53:15
**187 (1)**
200:20
**189 (1)**
200:23
**19 (1)**
21:21
**19-CV-6780(...**
1:8
**192 (1)**
2:4
**1932 (1)**
140:8

---

**2**

**2 (4)**
37:4,6 94:13
200:11
**2:07 (1)**
128:22
**2:33 (1)**
146:12
**2:36 (1)**
146:12
**2:44 (1)**
117:4
**20 (1)**
203:24
**2004 (1)**

13:15
**2006 (2)**
14:7,8
**2007 (1)**
15:5
**2008 (3)**
15:11,13 17:5
**2010 (1)**
131:17
**2011 (2)**
19:14,16
**2013 (3)**
131:20,25
166:16
**2014 (6)**
129:20 130:9
130:10
137:24 138:5
198:15
**2016 (4)**
18:2,2,14
136:9
**2018 (12)**
18:10 21:21
27:9 61:12
112:14
113:16
166:16
197:20,24
198:9,10,20
**2019 (5)**
20:25 61:18
62:6,6,8
**2020 (7)**
18:6 19:22,22
19:23 143:16
146:19
189:17
**2020-001516...**
144:24
**2021 (5)**
62:24 63:12,16
63:24 186:22
**2023 (3)**

1:16 199:14
202:20
**21 (1)**
200:8
**2120-2122 (2)**
21:11 200:9
**22 (1)**
60:9
**221 (1)**
3:5
**221.2 (1)**
4:22
**2293-2295 (2)**
143:25 200:19
**2316-2318 (2)**
189:20 200:25
**2350-2352 (2)**
187:5 200:22
**24 (2)**
14:14 60:21
**28 (1)**
60:22
**29 (1)**
186:22

---

**3**

**3 (13)**
21:11 51:17,19
52:15 58:14
143:25 187:5
189:20
200:10,13,19
200:22,25
**3:07 (1)**
172:14
**3:08 (1)**
172:14
**3:19 (1)**
40:9
**3:46 (1)**
199:8
**30 (16)**
2:9 38:13 91:6
91:8,12,18,21

---

June 9, 2023

[Page 242]

**91:25 92:8**
145:10
146:14,25
147:23 181:9
181:12
183:13
**30(b)(6) (12)**
142:11 145:20
146:4,5 154:3
154:3,6,24
155:3 169:11
169:12,17
**31 (1)**
3:14
**3113(d) (1)**
6:6
**3115 (3)**
3:8,21 4:10
**3116 (1)**
5:13
**3117 (1)**
5:13
**37 (1)**
200:11

---

**4**

**4 (5)**
143:22,23
146:13
181:10
200:17
**40 (2)**
166:16 187:24
**41 (2)**
38:25 40:8
**49 (1)**
39:22

---

**5**

**5 (2)**
187:3 200:20
**5:47 (2)**
37:8 200:12
**51 (1)**
200:13

**53 (5)**
22:12 28:18,20
39:6,12
**58 (1)**
201:6

---

**6**

**6 (3)**
189:15,18
200:23
**60% (1)**
123:12
**62 (1)**
22:4
**630 (1)**
53:17

---

**7**

**7 (2)**
146:19 201:14
**7/8/20 (2)**
143:24 200:18
**7:33 (1)**
53:6
**7:35 (1)**
53:7

---

**8**

**8 (2)**
189:17 200:4
**8/29/21 (2)**
187:4 200:21
**802 (1)**
2:4

---

**9**

**9 (1)**
1:16
**9-1-1 (5)**
25:23 26:2,8
71:22 72:5
**9th (1)**
202:20