**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

CHARLES DEMPSEY, individually, and
L.D. by her father and natural guardian,
CHARLES DEMPSEY,

                         **19-cv-6780 (EAW)(MWP)**

                      Plaintiffs,

         -against-

THE CITY OF ROCHESTER, a municipal
entity, JAVIER ALGARIN, "JOHN DOE"
RPD OFFICER RESPONSIBLE FOR
TRAINING JAVIER ALGARIN,

                 Defendants.

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

                              Elliot Dolby Shields
                              Roth & Roth, LLP
                              192 Lexington Avenue, Suite 802
                              New York, New York 10016

# **TABLE OF CONTENTS**

Table of Contents ........................................................................................................... i

Table of Authorities ..................................................................................................... iv

PRELIMINARY STATEMENT.................................................................................. 1

STATEMENT OF FACTS ........................................................................................... 1

ARGUMENT................................................................................................................. 1

I. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGEMENT ON THE FOURTH
AMENDMENT UNLAWFUL "ENTRY" OR "SEARCH" CLAIMS…………………………...1

A. Plaintiffs adequately pled their unlawful search claim………………………………..1

B. Officer Algarin's entry into plaintiff's backyard was an unreasonable search………..2

1. The search was not justified by hot pursuit or imminent destruction of
evidence…………………………………………………………………….................2

2. The search was objectively unreasonable under the totality of the
circumstances…………………………………………………………….................3

II. SUMMARY JUDGEMENT MUST BE DENIED ON PLAINTIFFS' SEIZURE OF
PROPERTY CLAIM………………………………………………………………………...3

A. The City's narrow focus on officer safety fails to address the totality of the
Circumstances………………………………………………………………………...3

1. A jury could easily find that Algarin's shooting of Tesla was unreasonable…..4

2. Algarin's claim of fear for safety is subjective, not objective…………………5

B. Gorman directly participated in the seizure……………………………………………5

III. ALGARIN SEIZED MR. DEMPSEY AND L.D…………………………………………...6

IV. GORMAN FAILED TO INTERVENE TO PREVENT ALGARIN'S UNLAWFUL ENTRY
INTO MR. DEPMSEY'S BACK YARD…………………………………………………7

V. ALGARIN IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR THE UNLAWFUL
ENTRY OR SEIZURE CLAIMS…………………………………………………………8

A. Algarin is not entitled to qualified immunity for unlawfully entering Plaintiffs' fenced
in yard………………………………………………………………………………..8

B. Algarin is not entitled to qualified immunity for shooting Tesla and pointing his gun at Mr. Dempsey and L.D…………………………………………………………………………8

IV. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGEMENT ON THE TRESPASS CLAIM AND THE OTHER STATE CLAIMS MUST GO TO THE JURY……………………9

A. Plaintiffs are entitled to summary judgement on their trespass claim…………………9

    1. Defendants' reliance on *United States v. Jones* is misplaced…………………..9

    2. The elements of trespass under New York law………………………………10

    3. Defendants' argument that police officers are immune from trespass is baseless………………………………………………………………………………..10

    4. Plaintiffs are entitled to summary judgment on the trespass claim…………...12

B. Plaintiffs' assault claim must be determined by the jury……………………………..12

    1. Pointing a gun at someone is enough to place them in apprehension of harm………………………………………………………………………..………12

    2. Defendants' argument is legally and factually deficient………………………13

C. Algarin is not entitled to qualified immunity on the state law claims, but even if he was, the city is still liable under *Respondeat Superior*……………………………………..14

VII. DEFENDANTS' MOTION ON THE MUNICIPAL LIABILITY CLAIMS MUST BE DENIED DUE TO NON-COMPLIANCE WITH RULE 56.1…………………………………14

VIII. *MONELL* LIABILITY MAY BE FOUND EVEN IF THE OFFICERS ARE GRANTED IMMUNITY……………………………………………………………………………………...15

IX. THE *MONELL* CLAIM REGARDING DOG SHOOTINGS MUST PROCEED TO THE JURY………………………………………………………………………………………………15

A. The City's "shoot first" policy is unconstitutional…………………………………………15

B. A jury must decide if the City was deliberately indifferent to the RPD shooting pet dogs………………………………………………………………………………………18

    1. Whether the City failed to properly train its officers is a jury question………18

     i.     Dr. Crosby's expert report demonstrates that the need for more or different training was obvious and the City was deliberately indifferent……………………………………………………………...19

2. Whether the City failed to properly supervise and discipline its officers for shooting dogs is a jury question…………………………………………………22

     i. This theory was adequately pled…...……………………………………22

     ii. There is sufficient evidence to go to the jury…………………………22

X. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGEMENT UNDER *MONELL* REGARDING THE CITY'S "BACKTRACKING" POLICY…………………………………..24

CONCLUSION…………………………………………………………………………………..25

# **TABLE OF AUTHORITIES**

**Cases**                                                                      **Pages**

*Adickes v. S.H. Kress & Co.*,
 398 U.S. 144, 167-68 (1970)……………………………………………………16

*Aljoe v. Adams*,
 No. 18-cv-01043, 2020 WL 12188842, at *4 (W.D.N.Y. Nov. 5, 2020)……..…………..5

*Altman v. City of High Point, N.C.,*
 330 F.3d 194, 206 (4th Cir. 2003)…………………………………………………..4

*Amnesty Am. v. Town of W. Hartford*,
 361 F.3d 113, 123 (2d Cir. 2004)……………………………………………………3

*Anderson v. Branen,*
 17 F.3d 552, 557 (2d Cir. 1994)……………………………………………………...7

*Askins v. Doe*,
 727 F.3d 248, 253-54 (2d Cir. 2013), Dkt. 95-1 p. 27 .……………………………….15

*Azurdia v. City of New York*,
 2019 WL 1406647 (E.D.N.Y. 2019)………………………………………………….9

*Barrett v. Orange County Human Rights Comm'n*,
 194 F.3d 341, 350 (2d Cir. 1999)…………………………………………………..15

*Bastein v. Sotto*,
 299 A.D.2d 432, 433 (2 Dept 2002)………………………………………………..12

*Brown v. City of Oneonta*,
 221 F.3d 329, 339 (2d Cir. 2000)……………………………………………………6

*Brown v. Muhlenberg Twp.*,
 269 F.3d 205, 210--11 (3d Cir. 2001)………………………………………………4

*California* v. *Hodari D.*,
 499 U.S. 621 (1991)…………………………………………………………………6

*Carroll v. County of Monroe*,
 712 F.3d 649, 651,652 (2d Cir.2013)……………………………………..…………4

*City of Canton v. Harris*,
 489 U.S. 378, 388, 390 (1989)…………………………………………………....19

iv

*Connick v. Thompson*,
   563 U.S. 51, 61, 63, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)………………..…………19

*Flamer v. City of Yonkers*,
   309 N.Y. 114, 118 (1955)………………………………………………………………...13

*Florida v. Jardines*,
   569 U.S. 1, 7 (2013)……………………………………..…………………....…2, 8, 11

*Gilles v. Repicky*,
   511 F.3d 239, 246 (2d Cir. 2007)…………………………………………………………….6

*Goonewardena v. Spinelli*,
   No. 15CV5239MKBST, 2017 WL 9482109, at *22 (E.D.N.Y. Aug. 14, 2017), *report and recommendation adopted*, No. 15CV5239MKBST, 2017 WL 4280549 (E.D.N.Y. Sept. 26, 2017)…………………………………………………………………………………13

*Harris v. O'Hare*,
   770 F.3d 224, 234, 241 (2d Cir. 2014)…………………………………..………*passim*

*Hill v. Raziano*,
   880 N.Y.S.2d 173, 175 (2 Dept 2009)…………………………………………...12

*Hodge* v. *City of New York*,
   No. 19-CV-2474 (CM), 2019 WL 1455170, at *2 (S.D.N.Y. Apr. 1, 2019)……………...7

*Hunte v. Rushmore Loan Management Services LLC*,
   No. 22-CV-2169, 2023 WL 2504734 (S.D.N.Y. Mar. 14, 2023) ……………………14-15

*Johnson v. City of Shelby, Miss.*,
   135 S. Ct. 346, 347 (2014)…………………………………………………………22

*Jackson v. Mastrangelo*,
   6:17-CV-06448 EAW, 2019 WL 4686456, at *4, 405 F.Supp.3d 488 (W.D.N.Y. Sept. 26, 2019)……………………………………………………………….………………9

Jones v. City of New York,
    2016 WL 1322443 at *8 (S.D.N.Y. 2016)…………………………………………………19

*Kentucky v. King*,
   563 U.S. 452, 459 (2011)………………………………………………………...12

*Kirk v. Louisiana*,
   536 U.S. 635, 638 (2002)…………………………………………………………...12

*Lange v. California*,

594 U.S. 295, 301-02 (2021)……………………………………………………………...2

*Leahy v. Cohen*,
609 F. Supp. 672, 672-73 (S.D.N.Y. 1985)………………………………………...13

*Meli v. City of Burlington,*
585 F. Supp. 3d 615, 643-45 (D. Vt. 2022)………………………………………...16

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) ............................................................................ *passim*

*Oliver v. United States*,
466 U.S. 170, 178 (1984)……………………………………………………………...11

*Pangburn v. Culbertson*,
200 F.3d 65, 71-72 (2d Cir.1999)……………………………………………………..16

*Pembaur v. City of Cincinnati*,
475 U.S. 469, 483-84 (1986)……………………………………………………………16

*Phillips v. Girdich*,
408 F.3d 124, 130 (2d Cir. 2005)…………………………………………………..22

*Reynolds v. United States*,
927 F. Supp. 91 (W.D.N.Y. 1996)…………………………………………...……………10-11

*Ringel v. County of Nassau*,
No. 18-CV-4221, 2021 WL 2117183 (E.D.N.Y. May 25, 2021)………………………...15

*Rodriguez v. City of N.Y.*,
No. 14-CV-8647 (PGG), 2016 WL 5476003, at *4 (S.D.N.Y. Sept. 29, 2016)…………..7

*Roller v. Frankel*,
14 A.D.2d 971, 971, 221 N.Y.S.2d 499, 499 (3d Dep't 1961)…………………………...13

*Segal v. City of New York*,
459 F.3d 207, 219 (2d Cir. 2006)…………………………………………………...15

*Sorlucco v. New York City Police Dep't*,
971 F.2d 864, 870 (2d Cir.1992)……………………………………………………16

*Spencer v. Sullivan County*,
18-cv-365, 2019 WL 4514011, at *7 n.5 (W.D.N.Y. Sept. 19, 2019)…………………….9

*Terebesi v. Torreso*,
764 F.3d 217, 234 (2d Cir. 2014)……………………………………………………….6

*Tobing* v. *City of New York*,
    929 F. Supp. 86, 90 (E.D.N.Y. 1996)……………………………………………………..6

*Triolo v. Nassau Cty.*,
    24 F.4th 98, 110, 112 (2d Cir. 2022)…………………………………………………14

*United States v. Jones*,
    565 U.S. 400, 404-5 (2012)………………………………………………...….…9-10

*Voskerchian v. United States*,
    No. 98-CV-1234, 1999 WL 66709 (W.D.N.Y. Feb. 10, 1999)…………………………11

*Whren* v. *United States*,
    517 U.S. 806, 809–10, (1996)………………………………...…………………...6

*Woodhull v. Town of Riverhead*,
    849 N.Y.S.2d 79, 81 (2 Dept 2007)………………………………………………...10

*Zalaski v. City of Bridgeport Police Dep't*,
    613 F.3d 336, 340 (2d Cir. 2010)………………………………………………8

**Statues and Rules:**

Local Rule
56.1(a)…………………….............................................................................*passim*

## PRELIMINARY STATEMENT

Plaintiffs Charles Dempsey and L.D. oppose Defendants' motion for summary judgment. Separately, Plaintiffs moved for summary judgment on the unlawful entry and trespass claims, as well as on the City's unlawful "backtracking" policy. (ECF 96)

The undisputed evidence and clearly established law support granting Plaintiffs' motion and denying the City's motion. The other claims, including unlawful seizure and assault, involve substantial questions of fact and credibility that can only be determined by a jury. Plaintiffs have also presented substantial evidence of the City's "shoot first" policy and deliberate indifference to officers' unjustifiably shooting pet dogs, precluding summary judgment on the *Monell* claim.

Plaintiffs' motion for partial summary judgment should be granted and Defendants' motion for summary judgment should be denied in its entirety.

## STATEMENT OF FACTS

Plaintiffs respectfully refer the Court to Plaintiff's Rule 56.1 Counter Statement of Undisputed Facts for a more detailed recitation of the evidence that Plaintiffs maintain warrants summary judgment in their favor on the unlawful entry and trespass claims, and the related *Monell* claims; and denial of Defendants motion for summary judgment.

## ARGUMENT

## I. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE FOURTH AMENDMENT UNLAWFUL "ENTRY" OR "SEARCH" CLAIMS

For all of the reasons in Plaintiffs' motion for partial summary judgment (ECF 96), Plaintiffs are entitled to summary judgment on the unlawful "search" or "entry" claims.

### A. Plaintiffs Adequately Pled Their Unlawful Search Claim

The City admitted that under the Fourth Amendment, a "search" occurs simply by an officer entering someone's property. (¶ 94)[1] Regardless, Plaintiffs have sufficiently pled their unlawful "search" claim. (See SAC ¶¶ 39, 156-165). These allegations are sufficient to state a claim for an unlawful "entry" or "search" under the Fourth Amendment. See *Florida v. Jardines*, 569 U.S. 1, 7 (2013) (holding that the curtilage is "part of the home itself" and is protected from warrantless searches, absent consent or exigent circumstances).

### B.  Officer Algarin's Entry Into Plaintiffs' Backyard Was an Unreasonable Search

#### 1.  *The search was not justified by hot pursuit or imminent destruction of evidence*

Algarin's entry was not justified by hot pursuit or the need to prevent the imminent destruction of evidence. When Algarin entered the yard, both suspects had been apprehended and the pursuit had concluded (¶¶ 43-48). The Supreme Court recently reiterated the longstanding principle that the exigent circumstances exception only applies in true emergencies:

> "Whether a 'now or never situation' actually exists—whether an officer has 'no time to secure a warrant'—depends upon facts on the ground... So the issue, we have thought, is most naturally considered by 'look[ing] to the totality of circumstances' confronting the officer as he decides to make a warrantless entry."

*Lange v. California*, 594 U.S. 295, 301-02 (2021)

Here, with both suspects in custody, no such emergency existed. In *Harris v. O'Hare*, the Second Circuit held that officers violated the Fourth Amendment by entering the curtilage without a warrant after a suspect had already been apprehended. 770 F.3d 224, 234 (2d Cir. 2014). The court emphasized that warrantless entry into curtilage is unconstitutional without either probable cause plus exigent circumstances or a warrant.

---

[1] All "¶" citations are to Plaintiffs' Rule 56.1 Counterstatement.

Here, with both suspects in custody, no exigency or imminent risks justified a warrantless entry into the yard. As in *Harris*, there was no ongoing emergency that would excuse the officers' failure to obtain a warrant, nor was there any imminent risk of evidence being destroyed. Algarin had been in Plaintiffs' yard for over a minute without observing any contraband or weapons, further undermining any claim of exigency. (¶¶45-46) Here, like *Harris*, "the police officers lacked a warrant or probable cause plus exigent circumstances to invade Plaintiff's curtilage, and because Defendants cannot offer any other basis on which the officers' intrusion would be lawful... Defendants violated Plaintiffs' Fourth Amendment rights." *Harris*, 770 F.3d at 241.

### 2. *The Search Was Objectively Unreasonable Under the Totality of the Circumstances*

Algarin's entry and search of Plaintiffs' backyard was objectively unreasonable under the totality of the circumstances. The Second Circuit has made clear that granting summary judgment on a Fourth Amendment claim is inappropriate unless no reasonable fact finder could conclude that the officer's conduct was objectively unreasonable. See *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004). Here, Algarin had no probable cause to believe evidence would be found in Plaintiffs' yard. He had time to seek a warrant or consent, as according to his own testimony it would have taken only seconds to walk to the front door. (¶82) Instead, he chose to violate Plaintiffs' Fourth Amendment rights by entering their property without permission.

## II.  SUMMARY JUDGMENT MUST BE DENIED ON PLAINTIFFS' SEIZURE OF PROPERTY CLAIM

### A.  The City's Narrow Focus on Officer Safety Fails to Address the Totality of the Circumstances

The City's argument for summary judgment on the seizure of property claim focuses narrowly on officer safety, disregarding the fact that the totality of the circumstances must be considered when determining the reasonableness of a seizure. Officer safety is not the sole factor,

and cannot, on its own, justify the use of lethal force against a pet dog. The City contends that Algarin perceived Tesla as "a large dog, approaching at a high rate of speed and barking aggressively," which supposedly justified lethal force for self-protection. However, this argument fails for two critical reasons.

1. ***A Jury Could Easily Find that Algarin's Shooting of Tesla Was Unreasonable***

Considering the totality of the circumstances, a reasonable jury could easily find that Officer Algarin's shooting of Tesla was objectively unreasonable. The Second Circuit has held that "the unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013). Courts consider multiple factors in analyzing whether a seizure of a dog is reasonable under the totality of the circumstances, including:

1. Whether the dog's seizure occurred on the owner's property. Brown v. Muhlenberg Twp., 269 F.3d 205, 210--11 (3d Cir. 2001).
2. The breed of the dog. Altman v. City of High Point, N.C., 330 F.3d 194, 206 (4th Cir. 2003).
3. Whether there was time to devise a plan to control of the dog before the seizure. See Carroll v. Cnty of Monroe, 712 F.3d 649, 651 (2d Cir. 2013).
4. Whether non-lethal means were available to control the dog. See Carroll, 712 F.3d at 652.
5. Whether it posed a danger to the officer or the public. See Brown, 269 F.3d at 210--11.

Applying these factors to the present case:

1. Algarin shot Tesla while trespassing on Mr. Dempsey's property, a factor that courts have consistently held weighs in favor of finding a seizure unreasonable.
2. Tesla—a Labrador retriever—was not showing signs of aggression. As noted by expert Jim Crosby, Tesla's behavior was consistent with curiosity rather than aggression (Crosby Report, pp. 18-19). Labradors are not typically associated with aggression or "vicious propensity."
3. Algarin failed to devise a non-lethal plan for dealing with Tesla before entering Plaintiffs' property.
4. Algarin failed to use any non-lethal options when he encountered Tesla. As he admitted in his deposition, he chose not to use his baton or pepper spray, citing concerns about their effectiveness or potential vulnerability. This decision contradicts established case law, which holds that officers must consider non-lethal means, especially when there is time to assess the situation.

4

5. The body-worn camera footage confirms that Tesla did not exhibit behaviors typically associated with an imminent threat as she did not bare her teeth, snarl, or growl.

The failure to use non-lethal means can render the use of force unreasonable. Officer Algarin had both time and opportunity to utilize non-lethal methods but chose not to do so.

Given the disputed facts and the complex factual analysis required, summary judgment on the unlawful seizure claim is inappropriate. *Aljoe v. Adams*, No. 18-cv-01043, 2020 WL 12188842, at *4 (W.D.N.Y. Nov. 5, 2020) ("summary judgment is 'improper when the court merely believes that the opposing party is unlikely to prevail on the merits after trial.'")

Plaintiffs are entitled to have a jury consider all of the relevant factors to make a determination of whether Algain's shooting of Tesla was reasonable under the totality of the circumstances—especially because he was trespassing on Plaintiffs' property when he shot her.

**2.** *Algarin's Claim of Fear for Safety is Subjective, Not Objective*

The City's argument relies heavily on Algarin's subjective belief that he was in danger. However, the legal standard requires an objective assessment of the situation.

The report of Jim Crosby, an expert on dog behavior, provides crucial objective analysis. Crosby concluded that Tesla's behavior did not constitute a real threat of imminent harm. He determined that had Algarin received proper training in dog encounters, he would have recognized that Tesla's actions indicated curiosity, not aggression (Ex 11, Crosby Report, p. 19 opinion 5).

In conclusion, while officer safety is a legitimate consideration, it does not automatically justify the use of lethal force. The objective evidence, supported by expert testimony, overwhelmingly shows that Tesla did not pose an imminent threat. When the totality of the circumstances are considered, it is clear that the shooting was unreasonable.

**B. Gorman Directly Participated in the Seizure**

Contrary to Defendants' arguments, the evidence shows that Gorman directly participated in the violations of Plaintiffs' constitutional rights. The Second Circuit has consistently held that an officer may be liable for another's actions as a "direct participant" in a constitutional violation if he "authorizes, orders, or helps others to do the unlawful acts, even if he ... does not commit the acts personally" *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014). Gorman's instruction to Algarin to "backtrack" through Plaintiffs' yard falls squarely within this standard of liability.

### III.      ALGARIN SEIZED MR. DEMPSEY AND L.D.

Algarin seized Mr. Dempsey when he shot Tesla in Mr. Dempsey's presence and then pointed his gun at him and yelled at him. The Second Circuit has established that factors indicating a seizure include displaying a weapon and issuing commands. *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000). Furthermore, physical force or authority sufficient to restrain liberty can constitute a seizure. *Gilles v. Repicky*, 511 F.3d 239, 246 (2d Cir. 2007).

Algarin's actions of shooting Tesla, pointing his gun at Mr. Dempsey, and yelling commands clearly meet the criteria for a seizure. *California* v. *Hodari D.*, 499 U.S. 621 (1991) (a seizure requires "either physical force ... or, where that is absent, submission to the assertion of authority"); *Whren* v. *United States*, 517 U.S. 806, 809–10, (1996) (The "[t]emporary detention of individuals … by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."); *Tobing* v. *City of New York*, 929 F. Supp. 86, 90 (E.D.N.Y. 1996) (denying summary judgment on plaintiff's Fourth Amendment seizure claim where officers held plaintiffs at gun point for a period of time).

When Algarin intentionally pointed the gun at Mr. Dempsey, he also unintentionally pointed the gun at L.D., who was standing behind Mr. Dempsey just inside the back door. (¶¶ 69-70). Thus, Algarin seized L.D. under a theory of transferred intent. Black's Law Dictionary 1504

("if one person intends to harm a second person but instead unintentionally harms a third, the first person's criminal or tortious intent toward the second applies to the third as well."); *Hodge* v. *City of New York*, No. 19-CV-2474 (CM), 2019 WL 1455170, at *2 (S.D.N.Y. Apr. 1, 2019) ("A prisoner may be able to state an excessive force claim if he is injured by officers who are using force against another inmate."), *citing, Rodriguez* v. *City of N.Y.*, No. 14-CV-8647 (PGG), 2016 WL 5476003, at *4 (S.D.N.Y. Sept. 29, 2016) (adopting magistrate's recommendation to deny motion to dismiss "an Eighth Amendment excessive force claim [that was] based on a transferred intent theory").

## IV.   GORMAN FAILED TO INTERVENE TO PREVENT ALGARIN'S UNLAWFUL ENTRY INTO MR. DEMPSEY'S BACK YARD

Gorman failed to intervene to prevent Algarin's unlawful entry into Mr. Dempsey's backyard, despite having the opportunity and the authority to do so. As the court held in *Anderson v. Branen*, "an officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know... that a citizen has been unjustifiably arrested or any constitutional violation has been committed by a law enforcement official." 17 F.3d 552, 557 (2d Cir. 1994). The critical factor is whether the officer had a "realistic opportunity" to intervene to prevent the harm. *Id*.

Gorman had a realistic opportunity to prevent Algarin's unlawful entry into Mr. Dempsey's yard and the shooting of Tesla. Gorman was present on the scene and actively engaged in directing Algarin's actions. Instead of instructing Algarin to go to the front door of Mr. Dempsey's residence to seek permission to enter the yard, which would have prevented them from letting Tesla out and avoided the entire encounter, Gorman directed Algarin to "backtrack" through the yard. A reasonable jury could find that Gorman failed to intervene to prevent Algarin's unlawful actions, and so the City's motion for summary judgment on this claim should be denied.

V.    **ALGARIN IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR THE UNLAWFUL ENTRY OR SEIZURE CLAIMS**

Qualified immunity does not apply here because (1) Officer Algarin's conduct violated Plaintiffs' clearly established constitutional rights, and (2) his actions were objectively unreasonable in light of clearly established law.

### A. Algarin Is Not Entitled To Qualified Immunity For Unlawfully Entering Plaintiffs' Fenced In Yard.

It was clearly established in October 2018 that a warrantless entry into the curtilage of a home, absent exigent circumstances, violates the Fourth Amendment. See *Florida v. Jardines*, 569 U.S. 1, 7 (2013) (holding that the curtilage is "part of the home itself" and is protected from warrantless searches, absent consent or exigent circumstances); *Harris v. O'Hare*, 770 F.3d 224, 234 (2d Cir. 2014) (finding that warrantless entry into curtilage is unconstitutional without either probable cause plus exigent circumstances or a warrant).

Here, Algarin knew the requirements for entering curtilage without a warrant and acknowledged that exigent circumstances require both probable cause and an emergency, such as an immediate need to render aid or prevent harm (¶88). Algarin admitted there was no emergency when he entered the yard. (¶¶90-91)

Further, Algarin admitted he should have "walked to his front door and knocked on his front door" to obtain Mr. Dempsey's permission to enter his yard because there was no emergency. (¶92) These admissions show he knew his entry was a violation of Mr. Dempsey's constitutional rights. Thus, Algarin's argument for summary judgment based on qualified immunity must be denied. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (where the unlawfulness of the officer's actions is apparent, immunity does not apply).

### B. Algarin is not entitled to qualified immunity for shooting Tesla and pointing his gun at Mr. Dempsey and L.D.

Defendants' argument that the Court must determine, as a matter of law, that Algarin's actions in shooting Tesla and then pointing his gun at Mr. Dempsey and L.D. were "objectively reasonable" is completely meritless. The law was clearly established at the time of the incident that killing a pet without justification violates the Fourth Amendment. See *Azurdia v. City of New York*, 2019 WL 1406647 (E.D.N.Y. 2019) (clearly established that killing a pet without justification violates the Fourth Amendment). For the reasons explained in Points II and III, *supra*, his request for summary judgment based on qualified immunity must be denied. *Jackson v. Mastrangelo*, 6:17-CV-06448 EAW, 2019 WL 4686456, at *4, 405 F.Supp.3d 488 (W.D.N.Y. Sept. 26, 2019) ("[I]n the context of excessive force, the Fourth Amendment reasonableness inquiry tends to converge with the qualified immunity reasonableness inquiry.") (quoting *Spencer v. Sullivan County*, 18-cv-365, 2019 WL 4514011, at *7 n.5 (W.D.N.Y. Sept. 19, 2019)).

## VI. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE TRESPASS CLAIM AND THE OTHER STATE CLAIMS MUST GO TO THE JURY

### A. Plaintiffs Are Entitled To Summary Judgment On Their Trespass Claim.

The Defendants' argument that Algarin did not trespass because a search is not a trespass under *United States v. Jones* is legally flawed and nonsensical. Plaintiffs are entitled to summary judgment on their trespass claim, and Defendants' motion is meritless.

#### 1. *Defendants' reliance on United States v. Jones is misplaced*

Defendants argue that because Algarin was conducting a "search" in Plaintiffs' yard, this precludes a finding of trespass. However, this mischaracterizes the law. In *United States v. Jones*, 565 U.S. 400 (2012), the Supreme Court explicitly held that a physical intrusion onto a person's property for the purpose of gathering information constitutes both a search and a trespass under the Fourth Amendment.

*Jones* reaffirmed that a trespass and a search are not mutually exclusive. The Court ruled that the government's physical occupation of private property to obtain information, such as attaching a GPS device, constitutes both a search and a trespass. See *id.* at 404–05. The City's argument that a search negates a trespass is therefore inaccurate. Officer Algarin's warrantless entry into Plaintiffs' yard, intended to gather evidence, constitutes both a trespass under New York law and a search under the Fourth Amendment.

In conclusion, *Jones* makes clear that a physical trespass with the intent to gather information can be both a trespass and a search. See *id.* Therefore, the City's argument misrepresents the law, and Algarin's entry into the yard was a trespass under New York law.

### 2.  The elements of trespass under New York law

A trespass occurs when someone intentionally enters another's property without permission or justification. Courts have consistently held that entry constitutes trespass even if the individual acts under a mistaken belief that they are allowed to enter. See *Woodhull v. Town of Riverhead*, 849 N.Y.S.2d 79, 81 (2 Dept 2007). There is no requirement that a trespass involve physical damage to the property or a criminal act; the mere unauthorized presence is sufficient.

Algarin entered Plaintiffs' yard without a warrant, consent or exigent circumstances. He was not pursuing a fleeing suspect, nor was there any immediate threat or need for assistance. (¶91) He knew he should have sought permission to enter the property but chose not to do so. (¶92) This willful disregard for Plaintiffs' property rights fulfills the definition of trespass.

### 3.  Defendants' argument that police officers are immune from trespass is baseless

Defendants' reliance on *Reynolds v. United States*, 927 F. Supp. 91 (W.D.N.Y. 1996), to argue law enforcement immunity from trespass claims is misplaced. *Reynolds* involved open

fields, which lack Fourth Amendment protection. *Oliver v. United States*, 466 U.S. 170, 178 (1984). In contrast, this case involves the protected curtilage of a home.

*Voskerchian v. United States*, No. 98-CV-1234, 1999 WL 66709 (W.D.N.Y. Feb. 10, 1999), is directly applicable to this case and demonstrates that Defendants' argument is meritless. In *Voskerchian*, federal agents entered the curtilage of the plaintiff's home without a warrant to investigate potential telemarketing fraud. The court distinguished *Reynolds* and rejected the government's argument that law enforcement officers are immune from trespass when acting within the scope of their duties, holding that entry into the protected curtilage of a home without exigent circumstances or a warrant violated the Fourth Amendment. *Id.* at *3.

The facts in *Voskerchian* closely parallel the present case. Both involve law enforcement officers entering the curtilage of a home without a warrant or exigent circumstances. In *Voskerchian*, as here, the entry was not prompted by an emergency or any immediate threat that would justify bypassing the warrant requirement. The court found that the officers' actions constituted a trespass, and the lack of exigent circumstances made the entry unlawful. *Id.*

Unlike *Reynolds*, which dealt with open fields, *Voskerchian* specifically addresses the constitutional protections afforded to curtilage. This makes *Voskerchian* far more relevant to the current case, where Algarin entered the Dempseys' fenced-in backyard—an area clearly within the curtilage of their home. Notably, Defendants' memorandum ignores the *Voskerchian* case and its rejection of the very argument they advance here.

More recent Supreme Court and Second Circuit decisions have reinforced stringent requirements for warrantless entry into curtilage: *Florida v. Jardines*, 569 U.S. 1, 7 (2013) (holding that the curtilage is "part of the home itself" and is protected from warrantless searches, absent consent or exigent circumstances); *Harris v. O'Hare*, 770 F.3d 224, 234 (2d Cir. 2014) (finding

that warrantless entry into curtilage is unconstitutional without either probable cause plus exigent circumstances or a warrant); *Kentucky v. King*, 563 U.S. 452, 459 (2011) (reaffirming that "searches and seizures inside a home without a warrant are presumptively unreasonable"); *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (stating that law enforcement officers need both probable cause and exigent circumstances to justify a warrantless entry into a home or curtilage).

The legal principles applied in *Voskerchian*, consistent with more recent Supreme Court and Second Circuit decisions, clearly establish that law enforcement officers cannot rely on their official duties to excuse unconstitutional warrantless entries into curtilage.

### 4. *Plaintiffs are entitled to summary judgment on the trespass claim*

For these reasons and the reasons in Plaintiffs' motion for partial summary judgment (ECF 96), the undisputed facts show that Algarin trespassed onto Plaintiffs' property when he entered their backyard without a warrant, consent, or any valid justification. Trespass is a strict liability tort, and New York courts have repeatedly held that the mere unauthorized entry is sufficient to establish a trespass claim. See *Hill v. Raziano*, 880 N.Y.S.2d 173, 175 (2 Dept 2009).

### B. Plaintiffs' Assault Claim Must Be Determined By The Jury.

Defendants argue that Algarin did not assault Plaintiff Charles Dempsey, asserting that no threat of imminent injury existed. Defendants' arguments are meritless.

### 1. *Pointing a gun at someone is enough to place them in apprehension of harm*

Algarin fired his gun, then pointed it at Mr. Dempsey, which is sufficient to establish an assault claim. Firing the gun in close proximity and pointing the gun in Dempsey's direction clearly created a reasonable apprehension of imminent harm.

In New York, the tort of assault is defined as "the intentional placing of another person in fear of imminent harmful or offensive contact." *Bastein v. Sotto*, 299 A.D.2d 432, 433 (2 Dept

2002). New York courts have consistently held that pointing a firearm or weapon at a person is enough to place the person in apprehension of imminent harm. See, e.g., *Flamer v. City of Yonkers*, 309 N.Y. 114, 118 (1955) (holding that whether pointing a gun constituted an assault was a question for the jury); *See Leahy v. Cohen*, 609 F. Supp. 672, 672-73 (S.D.N.Y. 1985) (declining to direct verdict for defendant on assault claim where investigator prevented plaintiff from leaving the room and "placed him in apprehension of immediate harm by pulling back his jacket to reveal a firearm he was carrying"); *see also Roller v. Frankel*, 14 A.D.2d 971, 971, 221 N.Y.S.2d 499, 499 (3d Dep't 1961) (" 'Threatening gestures may constitute an assault unless the parties are so distant from each other that immediate contact is impossible.' "); *Goonewardena v. Spinelli*, No. 15CV5239MKBST, 2017 WL 9482109, at *22 (E.D.N.Y. Aug. 14, 2017), *report and recommendation adopted*, No. 15CV5239MKBST, 2017 WL 4280549 (E.D.N.Y. Sept. 26, 2017) (holding that allegations were sufficient to plead an assault claim where plaintiff alleged that during a confrontation, the officer told plaintiff he was "done with" him and then took out his gun and held it against his stomach).

Here, the BWC clearly shows Algarin pointing the gun at Mr. Dempsey. A jury must determine whether it was reasonable for him to do so under the totality of the circumstances.

### 2. *Defendants' argument is legally and factually deficient*

Defendants claim that Algarin was retreating and demanding that Plaintiff withdraw, arguing that there was no threat of imminent harm. However, prior to any retreat, Algarin fired his weapon in Plaintiff's presence and then pointed the weapon in his direction. The assertion that the officer was retreating does not negate the fact that Dempsey had already been placed in imminent apprehension of harm. Defendants rely on the BWC footage, but the footage shows Algarin pointing the gun at Mr. Dempsey, which alone is sufficient to constitute assault under the law.

13

**C.  Algarin Is Not Entitled To Qualified Immunity On The State Law Claims, But Even If He Was, The City Is Still Liable Under *Respondeat Superior.***

Under New York State law, the standard for qualified immunity differs from the federal standard. New York State law requires both an objective and subjective analysis: (1) whether the officer's conduct was objectively reasonable, and (2) whether the officer was subjectively motivated by malice or an intent to cause harm. *Triolo v. Nassau Cty.*, 24 F.4th 98, 110 (2d Cir. 2022). The dual requirement under state law is harder for officers to show entitlement to immunity.

Here, Algarin is not entitled to qualified immunity on the state law claims. His actions were objectively unreasonable, and his deposition testimony shows that subjectively, he understood his entry into Mr. Dempsey's yard was unreasonable. A jury must determine whether Algarin's decision to shoot Tesla and then point the gun at Mr. Dempsey was reasonable.

Even if Algarin were entitled to qualified immunity under New York State law—which he is not—the City of Rochester is still liable for his actions under the doctrine of *respondeat superior*. *Triolo v. Nassau Cty.*, 24 F.4th at 112 (holding "a municipal employer can be held vicariously liable for its individually immune employee under New York state law").

## VII.  DEFENDANTS' MOTION ON THE MUNICIPAL LIABILITY CLAIMS MUST BE DENIED DUE TO NON-COMPLIANCE WITH RULE 56.1

Defendants' motion for summary judgment on Plaintiff's *Monell* claims should be denied due to non-compliance with Local Rule 56.1 and Fed. R. Civ. P. 56. Local Rule 56.1(a) mandates a "separate, short, and concise statement" of material facts for which there is no genuine issue. Fed. R. Civ. P. 56(c)(1) similarly requires citation to specific parts of the record or a showing that materials cited do not establish a genuine dispute. Courts in this Circuit have consistently denied summary judgment motions when the moving party fails to provide a proper Rule 56.1 statement. *Hunte v. Rushmore Loan Management Services LLC*, No. 22-CV-2169, 2023 WL 2504734

(S.D.N.Y. Mar. 14, 2023) (denying summary judgment due to non-compliant Rule 56.1 statement, noting its necessity to streamline consideration and avoid forcing court to search record for undisputed facts); *Ringel v. County of Nassau*, No. 18-CV-4221, 2021 WL 2117183 (E.D.N.Y. May 25, 2021) (denying summary judgment for deficient 56.1 statement, emphasizing compliance is essential to determining genuine issues of material fact).

Defendants' Rule 56.1 statement does not include any facts regarding the unlawful policy of officers trespassing or "backtracking" through residential properties after the conclusion of a hot pursuit. Similarly, Defendants Rule 56.1 statement only has four paragraphs related to the City's policies and practices regarding shooting dogs (ECF 95-29 ¶¶ 20-23), which is insufficient to demonstrate entitlement to summary judgment on this portion of Plaintiffs' *Monell* claim.

Defendants' failure to include any material facts related to the *Monell* claims warrants denial of their motion, as they have failed to show the absence of a genuine issue for trial.

## VIII.   *MONELL* LIABILITY MAY BE FOUND EVEN IF THE OFFICERS ARE GRANTED IMMUNITY.

Contrary to Defendants' claim, it is well-settled in this Circuit that, even if Algarin and Gorman are granted qualified immunity, municipal liability can still be imposed. *See Askins v. Doe*, 727 F.3d 248, 253-54 (2d Cir. 2013); *see also Barrett v. Orange County Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999). Notably, the only case cited by Defendants for the erroneous proposition that *Monell* liability may not be found in the absence of individual liability is a district court decision from 2006 that predates the Second Circuit's 2013 holding in *Askins v. Doe*. See Dkt. 95-1 p. 27 (citing, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).

## IX.   THE *MONELL* CLAIM REGARDING DOG SHOOTINGS MUST PROCEED TO THE JURY

### A.  The City's "Shoot First" Policy Is Unconstitutional

The City's argument that its policy regarding use of force against dogs is facially constitutional misses the point. Plaintiffs have presented substantial evidence of an unwritten custom or policy of permitting officers to shoot dogs with alarming frequency, without sufficient justification, in situations where non-lethal alternatives are available and effective.

An official policy is one in which "a deliberate choice to follow a course of action is made ... by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986). However, the policy need not be part of an "explicitly adopted rule or regulation." *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir.1992).

The inclusion of "custom" along with "policy" recognizes that the practices of government officials can, "[a]lthough not authorized by written law[,] ... be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)); see generally *Pangburn v. Culbertson*, 200 F.3d 65, 71-72 (2d Cir.1999) (discussing evidence plaintiffs might present to show such an unwritten policy exists).

Importantly, as noted in *Meli v. City of Burlington*, expert testimony is not required to show deficiencies in municipal policies or practices when there is sufficient evidence for a jury to infer the existence of a custom or practice. 585 F. Supp. 3d 615, 643-45 (D. Vt. 2022). Here, the evidence is sufficient without any expert testimony based on the firearm discharge reports (Exhibit 24) the number of shootings between 2004 and 2009 (Exhibit 23) and 2013 to 2021, and the testimony of the numerous RPD officers (see e.g., Exhibits 37-46, 55-56), the testimony of the City of Buffalo's Rule 30(b)(6) witness Peter Nigrelli (Exhibit 54), and the testimony of the City of Rochester's Rule 30(b)(6) witness Michael Cuilla (Exhibit 19).

The statistics paint a disturbing picture. Between 2004 and 2009, RPD officers shot at 87 dogs, killing 35. (¶ 126). Between 2013 and 2018, they killed approximately 50 dogs, averaging nearly one dog per month. (¶ 127). As Dr. Crosby details in his expert report, between 2014 and 2022, RPD officers shot and killed at least 66 pet dogs (Ex 11, Crosby Report, p. 7). This averages to nearly one dog killed per month over an 8-year period.

Yet during this time, no RPD officer was ever disciplined or required to undergo additional training for shooting a dog (¶ 160). This pattern persisted despite clear examples of unreasonable force, like the August 2019 incident where RPD Officer Kenneth Pinckney shot a dog that was not advancing or attacking (¶¶ 181-190). The failure to address such incidents through discipline or retraining reflects a de facto policy of permitting unnecessary shootings.

Moreover, the City's policies instruct officers to use lethal force against dogs even when non-lethal tools like TASERs are available and effective (¶¶ 128, 132-133). This directly contradicts manufacturer guidance and accepted best practices (¶¶ 129-131; Ex 11, Crosby Report, pp. 17-18). Since 2003, TASER has informed all departments that, based on an analysis of 37 incident reports involving animals (mostly dogs), there was a 92% success rate. (Ex 25, TASER Animal Certification). Nevertheless, the City explicitly instructs its TASER-certified officers to ignore this training and to instead shoot dogs. (¶¶ 132-133)

This TASER policy is a clear example of the RPD's "shoot first" policy—or its broader custom or policy that permits and even encourages the use of lethal force against dogs, even when there is no imminent threat and effective non-lethal alternatives are available. By instructing officers to disregard TASER training and manufacturer guidance, the RPD is effectively sanctioning the unnecessary use of deadly force against animals. This policy demonstrates a

systemic disregard for the constitutional protections against unreasonable seizures, as it prioritizes lethal force over readily available and highly effective non-lethal alternatives.

The policy is indicative of a pattern of deliberate indifference to the rights of pet owners and the lives of their animals. The direction to use firearms instead of TASERs is strong evidence of the RPD's de facto policy that treats all dog encounters as situations warranting lethal force. This blanket approach fails to account for the specific circumstances of each encounter and ignores the Fourth Amendment's requirement that seizures be reasonable. The fact that the RPD maintains this policy despite clear evidence of the effectiveness of non-lethal alternatives strongly supports the existence of an unconstitutional custom or policy regarding dog shootings—and a jury should determine whether the evidence demonstrates the existence of said policy.

Dr. Crosby's expert report provides further evidence of the RPD's shoot first policy. Crucially, Dr. Crosby discusses the City's shoot first policy of instructing officers to use lethal force against dogs even when non-lethal tools like TASERs are available and effective. He specifically cites Michael Cuilla's testimony that the RPD directs its Taser-certified officers to ignore TASER training about the use of non-lethal measures and instead to shoot dogs with their firearms (¶138). Dr. Crosby emphatically states that this directive "is a violation of good and accepted best practices" (Ex 11, Crosby Report, p. 17).

B. **A Jury Must Decide If The City Was Deliberately Indifferent To The RPD Shooting Pet Dogs**.

   *1.  Whether the City failed to properly train its officers is a jury question.*

There is substantial evidence to support Plaintiff's claim that the City is liable under a deliberate indifference, failure to train theory of municipal liability. Courts in the Second Circuit have articulated the elements of deliberate indifference for such a claim as follows:

> (1) a policymaker knows to a moral certainty that [his] employees
> will confront a given situation; (2) the plaintiff must show that the
> situation either presents the employee with a difficult choice of the
> sort that training or supervision will make less difficult or that there
> is a history of employees mishandling the situation; and (3) the
> wrong choice by the city employee will frequently cause the
> deprivation of a citizen's constitutional rights.

*Jones v. City of New York*, 2016 WL 1322443 at *8 (S.D.N.Y. 2016).

Deliberate indifference may therefore be found where "city policy makers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). Notice is generally established by alleging a pattern of similar violations; however, "in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference," *id*. at 63, 131 S.Ct. 1350 (internal quotation marks omitted), such as where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 388, 390 (1989).

### i. Dr. Crosby's expert report demonstrates that the need for more or different training was obvious and the City was deliberately indifferent.

The City argues that it provided proper training to its officers through a 2014 in-service session developed by Reno DiDomenico, a former Monroe County Sheriff's Deputy. (¶ 143). However, the expert report of James Crosby, Ph.D., demonstrates that this training was grossly inadequate both in duration and content. According to DiDomenico's own testimony, the training was a brief 1.5 to 2-hour session, which is insufficient to properly educate officers on the complexities of canine behavior and how to handle encounters with dogs without resorting to lethal force. (¶¶ 46-49) The training lacked hands-on or interactive components necessary for officers to

internalize the techniques being taught. Instead, it was only a basic overview that focused on helping officers recognize dog behavior and avoid being bitten, which is inadequate for officers to apply the techniques in real-life situations (¶ 144, 157-159).

Moreover, DiDomenico, who developed and delivered the training, lacks the necessary expertise in dog behavior, a critical component for creating an effective program. (Ex 11 Crosby Report, p. 8). Dr. Crosby emphasizes that DiDomenico is not a certified dog trainer or animal behaviorist, and his background does not equip him to develop a comprehensive training program on this subject. (Id.) The limited involvement of animal behavior expert Robert Lockwood did not extend to the core training provided to the officers. This reliance on inadequately qualified individuals underscores the insufficiency of the training provided by the City.

Dr. Crosby also criticizes the City for not utilizing readily available, comprehensive training resources that could have significantly improved officer preparedness. Specifically, the U.S. Department of Justice's Community Oriented Policing Services (COPS) program offers detailed materials and videos on how to handle dog encounters (Exs. 22-26) yet the City chose not to incorporate these resources into their training program. Crosby notes that these resources are available at no cost and are specifically designed to prevent unnecessary harm to dogs during police encounters (Ex 17, Crosby Report, pp. 18-19).

In addition to the deficiencies in the content and structure of the training, Dr. Crosby reviewed deposition testimonies from approximately 20 RPD officers, revealing a striking lack of recollection regarding the details of the training they received on dog encounters (¶152, Ex 11, Crosby Report p. 9). Many officers could not remember specifics about the non-lethal options supposedly covered in the training. (Id.) For instance, while some officers recalled discussions about using a baton, they could not confirm whether they were trained on the use of OC spray or

other non-lethal methods. (Id.) This lack of retention suggests that the training was not sufficiently impactful or comprehensive to be effective (Ex 11, Crosby Report, p. 22).

The inadequacy of the training is further evidenced by the alarming number of dog shootings by RPD officers. In the five years before this incident, 2013 to 2018, RPD officers shot and killed at least 50 pet dogs. (¶127) This pattern indicates that the training provided was not only insufficient but also failed to instill the necessary skills and knowledge to prevent these tragic incidents. Dr. Crosby compares this with other police departments, such as Buffalo, which, after implementing a proper department-wide training in 2014, saw the number of dogs shot by police drop by 62%, from 26 in 2013 to just 10 in 2017 (Ex 11, Crosby Report, pp. 12-13).

Specifically, in 2014, the Buffalo Police Department provided all of its officers with the free training developed by the U.S. Department of Justice's Community Oriented Policing Services (COPS) program. (¶ 224) This day-long mandatory in-service training included a series of videos specifically designed to educate officers on how to handle encounters with dogs safely and effectively. (¶¶224-225; see also Ex 11, Crosby Report, pp. 12-13; Exs 32-36) The training materials emphasized the importance of understanding canine behavior and applying non-lethal methods to manage situations involving dogs. (Ex 11, Crosby Report, pp. 12-13; Exs 32-36)

Lieutenant Peter Nigrelli of the BPD testified that the training played a critical role in changing how officers approached encounters with dogs. (¶¶224-225). He noted that since the implementation of the training in 2014, the BPD saw a marked decrease in the number of dogs shot by officers, particularly during SWAT operations. He attributed this positive change directly to the comprehensive nature of the COPS training, which provided officers with the necessary tools and knowledge to handle dog encounters more safely (Ex 54 22:1-23:2). This testimony

underscores the effectiveness of the DOJ training and highlights the RPD's failure to adopt similar, readily available, and proven methods to prevent unnecessary shootings of dogs.

**2. Whether the City failed to properly supervise and discipline its officers for shooting dogs a jury question.**

### *i. This theory was adequately pled.*

The theory was clearly adequately pled in the complaint. *See*, *Johnson v. City of Shelby, Miss.,* 135 S. Ct. 346, 347 (2014) (although § 1983 not pled, defendants were advised of the factual basis of the claim, and plaintiffs were "required to do no more"; amendment must be allowed to assert § 1983). If the factual allegations support a valid claim, the court must treat the complaint as raising that claim, even if the plaintiff has not cited the right legal theory. *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005).

### *ii. There is sufficient evidence to go to the jury.*

No RPD officer has ever been disciplined or required to undergo additional training for shooting a dog. (¶ 160). This is despite the long history of troubling dog shootings by RPD officers. The evidence reveals a systemic failure by the RPD to supervise or discipline its officers in incidents involving the shooting of dogs. This lack of accountability has contributed to a culture where officers feel free to use lethal force against dogs without fear of repercussions.

The only person who reviews an incident where an officer fires a gun at a dog is the officer's immediate supervisor. (¶¶ 161-162). The Professional Standards Section (the RPD's internal affairs), does not review incidents where firearms are discharged at dogs. (¶¶ 163).

The RPD has not changed any of its training on canine encounters in response to incidents where officers shot dogs (¶ 164). The City has not made any recommendations for changes in policies or training regarding the use of force against dogs after reviewing BWC of dog shootings

(¶165). The City tracks the number of dogs shot by its officers, but does not conduct any statistical analysis of this data or generate reports on it, unless specifically requested to do so (¶ 166).

Commander Fabian Rivera testified that during his tenure at the RPD, no officers were disciplined or required to undergo retraining after shooting a dog. (¶ 227) He mentioned that although he knew of four or five officers that had shot dogs, none were disciplined, though some were ridiculed for missing their shots. (Id.) Specifically, Chief Rivera referenced an incident involving Officers Mike Johnson and Korey McNees, who were ridiculed for shooting at a small dog and missing, but they did not face any disciplinary actions (¶ 228). Rivera also confirmed that Nellist and Kelly were not disciplined for shooting Erin Gursslin's dog. (¶ 229).

Similarly, Aaron Springer testified that, to his knowledge, no officer within the RPD has ever been disciplined or required to undergo retraining specifically as a result of shooting a dog. (¶ 230) Springer was unaware of any measures taken to reduce the number of dogs shot while he was with the RPD, other than a training bulletin with various "aggressive" dog postures. (¶ 231) Springer does not remember any other trainings from 1996 to 2020 regarding how to safely interact with dogs. (¶ 232) The RPD trains officers that if a dog is running at them and they perceive the dog to be an imminent threat, then they can shoot the dog. (¶ 233) But the RPD does not provide specific training to officers to determine if the dog objectively poses an imminent threat. (¶ 186)

This is particularly concerning, as numerous officers have shot multiple dogs. (¶¶ 167-233) For example, former RPD Sgt. Daniel Zimmerman shot approximately 25 dogs during his time as an officer between 1988 and 2009. (¶167) Zimmerman mentioned that after the last time he shot a dog, there was no retraining or disciplinary action taken against him. Furthermore, he noted that the RPD did not provide any training regarding interactions with dogs during his tenure (Id.).

On August 11, 2019, Officer Kenneth Pinkney shot a dog on Cedarwood Terrace. As detailed by Pinckney at his deposition, he shot the dog while it was standing on the grassy area between the sidewalk and the curb (¶ 183). The dog had previously retreated to its yard but then turned and barked at Pinckney and another officer while in an "assertive, dominant position" (Id.). The dog had not advanced towards the officers or left the curb before Pinckney fired his shotgun (Id.) Pinckney clearly violated RPD policy, as the dog was not advancing or attacking. Yet Pinckney was not disciplined or required to undergo any training after the incident. (¶190)

Dr. Crosby emphasizes that effective supervision and discipline are critical components of maintaining good and accepted police practices. The absence of these elements in the RPD's response to dog shootings indicates a systemic failure of accountability within the department. This failure is particularly egregious given the availability of comprehensive training resources that could have been implemented to prevent such incidents. (Ex 1, Crosby rpt. 21-22).

This lack of supervision and discipline underscores the City's deliberate indifference to the constitutional rights of residents and their pets. The City's inaction in the face of repeated dog shootings demonstrates a clear failure to hold officers accountable, thereby perpetuating a pattern of unconstitutional behavior. This lack of accountability directly contradicts the City's assertion and highlights the need for significant reforms within the RPD to address these systemic issues.

## X.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT UNDER *MONELL* REGARDING THE CITY'S "BACKTRACKING" POLICY

For all the reasons argued in Plaintiffs' motion for partial summary judgment (ECF 96), they are entitled to summary judgment on the City's unlawful "backtracking" policy. In summary, the RPD's policy of allowing officers to "backtrack" through the curtilage of residential properties after a hot pursuit has concluded, based merely on "reasonable suspicion," violates the Fourth Amendment. Lieutenant Michael Cuilla, the City's Rule 30(b)(6) witness, testified that this policy

only requires "reasonable suspicion" rather than the constitutionally mandated probable cause plus exigent circumstances (¶¶ 98-99).

Cuilla claimed that the "backtracking" policy, based on this lower standard of "reasonable suspicion", is justified by some alleged "public safety" execption to the Fourth Amendment's warrant requirement. (¶101). The City apparently made up this alleged exception from *whole cloth*, as it is nowhere in the Supreme Court or Second Circuit jurisprudence.

Cuilla's testimony, binding on the City, establishes that the RPD's official policy permits unconstitutional searches. This unlawful policy directly led to Algarin's violation of Plaintiffs' rights, satisfying the requirements for *Monell* liability.

Multiple officers, including Algarin, Rudolph, Laureano, and Horowitz, testified to inadequate training on constitutional requirements for entering private property. Their testimony confirms that the unconstitutional "backtracking" practice is widespread and ingrained in RPD operations (¶¶ 106-119). Moreover, the City did not have a written policy, and provided no training whatsoever, regarding the constitutional requirements to enter curtilage until a year after this incident, in 2019. (¶¶ 120-125)

The City's claims of lack of identified policymakers or infrequent violations are irrelevant given the evidence of an official policy that directly violates constitutional rights. The testimony of multiple officers contradicts the City's assertion that its training is sufficient.

In conclusion, the undisputed evidence demonstrates that the City maintains an unconstitutional "backtracking" policy that led to the violation of Plaintiffs' rights. This, combined with inadequate training and supervision, establishes the City's liability under *Monell*. Therefore, Plaintiffs are entitled to summary judgment on this portion of their *Monell* claim.

## **CONCLUSION**

For all of the reasons stated herein, Plaintiff respectfully submits the Court should deny the City's motion for summary judgment in its entirety, and grant Plaintiffs' motion for partial summary judgment.

Dated:  September 9, 2024                    Roth & Roth, LLP
        New York, New York

                                            _____~//s//~_____
                                            Elliot Dolby Shields