**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

CHARLES DEMPSEY, individually, and
L.D. by her father and natural guardian,
CHARLES DEMPSEY,

**19-cv-6780 (EAW)(MWP)**

**PLAINTIFF'S**
**COUNTERSTATEMENT OF**
**UNDISPUTED FACTS PURSUANT**
**TO RULE 56.1**

Plaintiffs,

-against-

THE CITY OF ROCHESTER, a municipal
entity, JAVIER ALGARIN, "JOHN DOE"
RPD OFFICER RESPONSIBLE FOR
TRAINING JAVIER ALGARIN,

Defendants.

---

**PLAINTIFF'S LOCAL RULE 56.1  COUNTERSTATEMENT OF UNDISPUTED FACTS**

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Plaintiffs, CHARLES

DEMPSEY, individually, and L.D. by her father and natural guardian, CHARLES DEMPSEY,

submit the below response to Defendants' Statement of Undisputed Facts, and Statement of

further facts that there does not exist any genuine issues to be tried with respect to.

1. **Admit.** Plaintiff owns the home; he lived there with his minor daughter, L.D., his

   girlfriend, and their four year old Black Lab, Tesla. (Exhibit. 1, Mr. Dempsey 50h

   transcript at 6-7; Exhibit 2, Deed).

2. **Admit.**

3. **Admit.** The officers devised a plan to make the suspects run through the back yards.

4. **Admit.** The officers devised this plan in advance to apprehend the suspects when they

   fled through the yards.

5. **Admit.** Horowitz apprehended one suspect in the vacant lot on Sobieski Street and Gorman detained the other suspect in the back yard at 49 Kosciusko Street.

6. **Deny.** The officers had responded to a 911 call about drug sales the day before the incident.

7. **Deny.** Algarin "peered" over the fence prior to jumping over the fence, and was aware that the two individuals had already been detained; thus, this initial entry into Mr. Dempsey's yard was also not justified by the hot pursuit exception to the warrant requirement. (Ex 4, Algarin Dep 25:2-18; 36:4-10)

8. **Admit**.

9. **Admit**. However, add that prior to jumping the fence from Mr. Dempsey's yard at 53 Kosciusko Street to the yard at 49 Kosciusko Street, Algain searched Mr. Dempsey's back yard for approximately one minute, and did not locate any drugs, weapons or contraband. (Ex 4, Algarin Dep 25:19-23, 36:19-25, 67:7-11)

10. **Admit**. While Gorman was searching the detainee, Gorman told the man, "whether its you or your cousins, you're dealing [drugs] out here." (Ex 7, Gorman BWC at 17:09:09–17:09:13).

11. **Admit**. Mr. Dempsey let Tesla out because he was unaware of Algarin's presence in the yard; had he known there was an officer in the yard, he would not have let Tesla out. (Ex 4, Dempsey Dep. 52:4-25, 53:1-3; 238:3-14)

12. **Deny**. This is a subjective question. Tesla was a normal size Black Labrador Retriever, as shown in the BWC. (See Ex. 9, Algarin BWC).

13. **Deny**. Tesla barked, but did not Growl, as she approached Algarin. (See Ex. 9, Algarin BWC at 17:09:33 to 17:09:37).

14. Deny. The BWC depicts Algarin saying "woah, woah, woah" but it does not show Algarin "walking backwards." (See Ex. 9, Algarin BWC at 17:09:33 to 17:09:37).

15. Admit. Algarin fired his gun twice, and never attempted to utilize any less lethal options that were available to him. Alarin then pointed his gun at Mr. Dempsey. (Ex 4, Algarin Dep. 133:5-7; 146:17–147:25)

16. Admit.

17. Admit.

18. Admit. The officers refused to leave Mr. Dempsey's property after being ordered to do so. (Ex 9, Algarin BWC at 17:10:00 – 17:13:05)

19. Admit.

20. Deny. The training did not "teach" the officers how to recognize aggression or "various tactics and tools to use in dog encounters," as none of the officers recalled any of these topics (See, E.g., Ex 4, Algarin Dep, 85:11-91:21, 146:2-9; Ex 5, Horowitz Dep 108:13-113:24; Ex 37, Cala Dep 71:17-94:20; Ex 38, Trenton Dep 128:20-129:3; Ex 39, Leach Dep 42:25-43:6; Ex 40, Alexander Dep 114:16-23, 146:13-24, 149:18-150:5, 152:8-153:15, 157:8-14; Ex 41, Romig Dep 67:9-68:8; Ex 42, Kelly Dep 161:7-21; Ex 43, Nellist Dep 153:13-154:19; Ex 44, Brock Dep 9:13-12:21)

Further Paragraphs Providing Additional Material Facts as to which Plaintiff Contends there Exists Genuine Issues to be Tried.

**A. Facts regarding the incident.**

21. On October 19, 2018, at approximately 5:00 p.m., RPD Officers Javier Algarin, Ryan Disabatino, Jason Horowitz and Officer Adam Gorman responded a report of drug activity at 61 Kosciusko Street. (Exhibit. 3 (arrest report); Ex 4, Algarin Dep. 11:5-7.)

22. After receiving the 911 call, Officers Jason Horowitz, Adam Gorman, Javier Algarin, and Officer DiSabatino devised a plan to intercept the suspects. The officers anticipated that the suspects would attempt to flee south through the backyards of Kosciusko Street properties based on their prior experience responding to similar calls in the area (Exhibit 5, Horowitz Dep. 16:7-18:14; Ex. 6, Gorman Dep. 171:9-172:6; Ex 4, Algarin Dep. 12:6-10)

23. Officer Horowitz and Officer Gorman decided to position themselves on Sobieski Street, one block south of Kosciusko Street, where they expected the suspects to flee. This decision was made because the officers had observed on prior occasions that suspects involved in vice or drug activity on Kosciusko Street would run through backyards and driveways towards Sobieski Street when police arrived (Exhibit 5, Horowitz Dep. 16:7-18:14; Ex. 6, Gorman Dep. 171:9-172:6)

24. Officers Algarin and DiSabatino were assigned to drive up Kosciusko Street, creating a police presence that would prompt the suspects to flee south towards Sobieski Street, where Horowitz and Gorman were waiting to apprehend them (Exhibit 5, Horowitz Dep. 16:7-18:14; Ex. 6, Gorman Dep. 171:9-172:6; Ex 4, Algarin Dep. 12:6-10).

25. The officers based this plan on their prior experience responding to similar calls in the area. Officer Gorman, who had worked in the area the day before, testified that the suspects had fled in a similar manner, running from Kosciusko Street to Sobieski Street (Ex 6, Gorman Dep. 171:9-172:6, 217:22-218:2, 240:4-8).

26. As part of the plan, Algain did not plan for what he might do if he encountered a dog when he was present in any of the back yards, despite knowing there was a possibility he would encounter a dog. (Ex 4, Algarin Dep 78:8-21).

27. The plan was executed as intended. Upon arrival, Gorman and Horowitz went to 54 Sobieski Street, which is a vacant lot. (Ex 5, Horowitz Dep. 17:11-16, 26:12-22).

28. Officers Javier Algarin and Ryan DiSabatino drove up to 61 Kosciusko Street. Upon their arrival, they observed two black males on the property (Ex 4, Algarin Dep. 23:15-18).

29. As Officers Algarin and DiSabatino arrived, the two black males fled south down the driveway and through the backyard of 57 Kosciusko Street, heading towards Sobieski Street. (Ex 4, Algarin Dep. 23:24-24:4; Ex 5, Horowitz Dep 58:12-19, 59:8-16).

30. Officer Adam Gorman detained a man wearing a red sweatshirt in the backyard of 49 Kosciusko Street, Rochester, New York. (Gorman BWC at 17:07:10-40; Ex 5, Horowitz Dep 58:12-19, 59:8-16)

31. The property at 49 Kosciusko Street, Rochester, New York, is located one property west of Mr. Dempsey's home at 53 Kosciusko Street (Ex 4, Algarin Dep 31:2-11, 37:2-9).

32. Officer Gorman proceeded to search the man in the red sweatshirt in the backyard of 49 Kosciusko Street, conducting a pat-down search to ensure the man was not in possession of any weapons or contraband (Ex 7, Gorman BWC at 17:07:40-17:09:30)

33. During the search, Officer Gorman did not locate any drugs, weapons, or contraband on the man (Ex 6, Gorman Dep 143:18-24; Ex 7, Gorman BWC at 17:07:40-17:09:30)

34. Gorman told the man, "whether its you or your cousins, you're dealing [drugs] out here." (Ex 7, Gorman BWC at 17:09:09–17:09:13).

35. Officer Jason Horowitz detained a man wearing a black sweatshirt in the vacant lot located at 54 Sobieski Street. (Ex 5, Horowitz Dep. 59:3-7; Ex 8, Horowitz BWC video at 17:07:01–17:07:15).

5

36. The vacant lot at 54 Sobieski Street is located directly south of Mr. Dempsey's backyard. (Ex 5, Horowitz Dep. 57:20-24).

37. Mr. Dempsey's backyard and the vacant lot at 54 Sobieski Street are separated by a chain-link fence. This fence served as a physical barrier during the incident, as observed in Horowitz's body-worn camera footage (Ex 8, Horowitz BWC video at 17:07:01–17:07:15).

38. Officer Javier Algarin entered the backyard of 57 Kosciusko Street after observing the suspects fleeing south from Kosciusko Street. His entry into the backyard is documented in his body-worn camera footage (Ex 4, Algarin Dep. 25:10-13, 35:25-36:3; Ex 9, Algarin BWC video at 17:07:17).

39. The property at 57 Kosciusko Street, Rochester, New York, is located immediately to the east of Mr. Dempsey's property at 53 Kosciusko Street, on the opposite side from 49 Kosciusko Street (Ex 5, Horowitz Dep. 56:25-57:4; Ex 4, Algarin Dep. 26:5-8, 35:25-36:3).

40. The properties at 53 Kosciusko Street and 49 Kosciusko Street are separated by a chain-link fence (Ex 4, Algarin Dep. 35:11-13; Ex 9, Algarin BWC at 17:08:25).

41. The properties at 57 Kosciusko Street and 53 Kosciusko Street are separated by a tall wooden fence, which is approximately six feet high (Ex 10, Dempsey Dep. 24:10-17).

42. At approximately 17:07:17, Officer Javier Algarin jumped over the six-foot wooden fence from the backyard of 57 Kosciusko Street into Mr. Dempsey's backyard at 53 Kosciusko Street. This action was captured on Algarin's body-worn camera footage (Ex 9, Algarin BWC video at 17:07:17).

43. When Officer Algarin jumped over the six-foot wooden fence from the backyard of 57 Kosciusko Street into Mr. Dempsey's backyard at 53 Kosciusko Street, Officers Horowitz and Gorman had already detained the two suspects. (Algarin BWC video at 17:07:17-17:08:30)

44. After jumping over the six-foot wooden fence into Mr. Dempsey's backyard at 53 Kosciusko Street, Officer Javier Algarin began walking around the yard, assessing the situation. He observed the suspect who had been detained by Officer Horowitz and approached him to inquire about the presence of a gun. This interaction is captured on the body-worn camera footage (Ex 9, Algarin BWC video at 17:07:17-17:08:30; Ex 4, Algarin Dep. 29:7-30:25)

45. Officer Algarin spent approximately one minute in Mr. Dempsey's backyard. During this time, he continued to question the suspect detained by Horowitz about the potential presence of a firearm, and the suspect repeatedly told him that he did not have a gun. (Ex 9, Algarin BWC video at 17:07:17-17:08:30; Ex 4, Algarin Dep. 29:7-30:25)

46. After spending about a minute in Mr. Dempsey's backyard, Officer Algarin jumped over the chain-link fence from 53 Kosciusko Street into the backyard of 49 Kosciusko Street. This action is documented on the body-worn camera footage at approximately 17:08:30 (Ex 9, Algarin BWC video at 17:08:30; Ex 4 Algarin Dep. 38:9-13).

47. Following his entry into the backyard of 49 Kosciusko Street, Officer Algarin spoke with Officer Gorman. Their conversation involved discussing the situation with the suspect and the ongoing search. (Ex 9, Algarin BWC video at 17:08:30; Ex 4, Algarin Dep. 38:24-39:7)

48. During their conversation, Officer Gorman suggested to Officer Algarin, "You want to backtrack," implying that Algarin should retrace the suspects' flight path through the properties. This suggestion can be seen and heard on the body-worn camera footage (Ex 9, Algarin BWC video at 17:08:57–17:08:58; Ex 4, Algarin Dep. 40:9-12; Ex 6, Gorman Dep. 175:3-6).

49. Instead of jumping the chain-link fence to enter Mr. Dempsey's yard at the back of the yard -- which aligned with the suspects' flight path -- Officer Algarin walked towards the front of the house. He then retrieved a small child's picnic table from the yard, positioning it closer to the fence to assist in his jump. This action is clearly documented in the body-worn camera footage (Ex 9, Algarin BWC video at 17:08:30–17:09:15)

50. The body-worn camera footage shows that the fence Officer Algarin approached was a chain-link fence, through which he had a clear and unobstructed view of the other side. Despite this, he did not pause to look over the fence or inspect the area for any potential "dangerous items" or threats, such as a gun, contraband, or anything else (Ex 9, Algarin BWC video at 17:08:30–17:09:15; Ex 4, Algarin Dep. 71:8-16, 72:5-24).

51. Prior to jumping the fence, Algain had no specific facts to support a reasonable belief that the suspect had discarded a gun or drugs in Mr. Dempsey's yard (Ex 4, Algarin Dep. 73:6-74:4).

52. After positioning the picnic table, Officer Algarin jumped over the chain-link fence from 49 Kosciusko Street into Mr. Dempsey's backyard at 53 Kosciusko Street. This action is captured on the body-worn camera footage at approximately 17:09:29 (Ex 9, Algarin BWC video at 17:09:29).

53. Mr. Dempsey's backyard at 53 Kosciusko Street is completely fenced in, with no holes or gaps in the fence (See Ex 9, Algarin BWC).

54. Prior to jumping the fence, Officer Algarin did not announce that he was entering Mr. Dempsey's backyard. (Ex 4, Algarin Dep. 145:4-15).

55. In addition to not announcing his entry, Officer Algarin did not otherwise notify Mr. Dempsey that he was entering his yard. This lack of communication contributed to the unexpected and unauthorized intrusion into Mr. Dempsey's property (Algarin BWC video at 17:09:10 – 17:09:30).

56. At the time of Officer Algarin's entry into Mr. Dempsey's backyard, there was no emergency or immediate threat that required him to enter without a warrant or consent. The suspects had already been detained by other officers, and there was no probable cause to believe that a crime was occurring at Mr. Dempsey's property (Ex 4, Algarin Dep. 72:5-9).

57. The Crosby Report supports this, stating that Algarin's entry into Mr. Dempsey's fully enclosed backyard was without the exigency required to justify such an action and was objectively improper (Ex 11, Crosby Report, p. 18).

58. The entry was objectively unjustified from the standpoint of any reasonable police officer and violated good and accepted police practices (Ex 11, Crosby Report, p. 18)

59. Approximately three to four seconds after Officer Algarin entered Mr. Dempsey's backyard, Mr. Dempsey opened the door on his back porch, and Tesla, the family dog, exited through the door. (Ex 9, Algarin BWC video at 17:09:29-17:09:33).

60. Tesla quickly descended the steps from the back porch into the yard and began to approach Officer Algarin. The dog's approach was direct and purposeful, yet without signs of aggression (Ex 9, Algarin BWC video at 17:09:33–35)

61. Without any attempt to retreat or assess the situation further, Officer Algarin immediately unholstered his firearm and fired two shots at Tesla, striking her. This action occurred within seconds of Tesla entering the backyard, and is visible in the body-worn camera footage (Ex 9, Algarin BWC video at 17:09:33–35; Ex 4, Algarin Dep. 132:6-12).

62. Officer Algarin did not attempt to flee from the yard or distance himself from Tesla before resorting to lethal force. (Ex 9, Algarin BWC video at 17:09:33–35).

63. Officer Algarin also did not attempt to jump back over the fence to exit the yard and avoid confrontation with Tesla. His immediate decision was to use his firearm rather than seeking an alternative means of escape (Ex 9, Algarin BWC video at 17:09:33–35).

64. Prior to firing his weapon, Officer Algarin did not attempt to use any less-lethal methods to subdue Tesla, such as verbal commands, a baton, or pepper spray. The body-worn camera footage and Crosby's expert report highlight this lack of de-escalation efforts before resorting to lethal force (Ex 9, Algarin BWC video at 17:09:33–35; Ex 11, Crosby Report, p. 8).

65. When Officer Algarin shot Tesla, Mr. Dempsey was standing on the back porch, within clear view of the incident. The body-worn camera footage captures Mr. Dempsey's presence and proximity to the line of fire (Ex 9, Algarin BWC video at 17:09:37; Ex 12, BWC Screenshot)

66. At the time of the shooting, Mr. Dempsey was standing in the line of fire, as shown in the body-worn camera footage. This positioning raised significant concerns regarding the

safety and risk to Mr. Dempsey during the incident (Ex 9, Algarin BWC video at 17:09:37; Ex 12, Screenshot)

67. After the shots were fired, Mr. Dempsey descended the stairs into the backyard, approaching the scene where Tesla had been shot. This movement is documented in the body-worn camera footage and corroborated by screenshots taken from the video (Ex 9, Algarin BWC video at 17:09:37–17:09:42; Exs 12 and 13, Screenshots Exs. 9, 10, and 11).

68. After Mr. Dempsey entered the backyard, Officer Algarin pointed his gun at Mr. Dempsey and screamed at him. This intense exchange occurred immediately following the shooting of Tesla, as captured in the body-worn camera footage (Ex 9, Algarin BWC video at 17:09:37–17:09:42; Ex 13, Screenshots; Ex 4, Algarin Dep. 183:21-23).

69. When Mr. Dempsey screamed, L.D. immediately ran to the back door. From her position at the doorway, L.D. had a clear view of the incident. She observed the officer in the backyard, saw her father in distress, she saw Tesla and knew she had been shot, and witnessed Algarin point the gun at her dad (Ex 14, L.D. Dep. 36:13-25; 37:1-7; 206:21-207:25).

70. L.D. observed the officers pointing their guns at her father, Mr. Dempsey, as he attempted to assist Tesla after she was shot. This added to her distress, as she feared for her father's safety while trying to process the fact that her dog had just been shot (Ex 14, L.D. Dep. 207:16-25)

71. While standing in the back doorway, L.D. witnessed Tesla walk up onto the porch after being shot by Officer Algarin. L.D. saw that Tesla was bleeding but, despite her distress, she did not let Tesla into the house. This moment added to the emotional weight of the

incident for L.D., as she saw her beloved pet injured and bleeding, yet felt powerless to help (Ex 14, L.D. Dep. 208:16-210:19)

72. The traumatic nature of these events left L.D. momentarily shocked and unsure of what to do. She remained at the doorway for a short time, processing the scene she had just witnessed (Ex 14, L.D. Dep. 207:13-25; 208:1-10)

73. After witnessing these events, L.D. was visibly shaken and emotionally distressed. She testified that she experienced a panic attack, during which she cried, slammed doors, and felt overwhelmed by the situation. The officers on the scene, including those who had entered the house, attempted to calm her down, but the emotional impact of the event was significant and long-lasting (Ex 14, L.D. Dep. 207:5-210:19)

74. After Officer Algarin shot Tesla, Officer Gorman jumped over the chain-link fence into Mr. Dempsey's property, joining Officer Algarin in the backyard. (Ex 7, Gorman BWC video at 17:09:51).

75. In response to the officers' presence in his yard, Mr. Dempsey ordered Officers Algarin and Gorman to "get out of my yard, get out of my yard! Leave my property!" Mr. Dempsey's commands were clearly captured on both officers' body-worn camera footage (Ex 7, Gorman BWC video at 17:10:06–17:10:12; Ex 9, Algarin BWC video at 17:10:00–17:10:06).

76. Despite Mr. Dempsey's repeated orders, Officers Algarin and Gorman did not leave his property. Their continued presence is recorded in the body-worn camera footage, highlighting their refusal to comply with Mr. Dempsey's demands (Ex 7, Gorman BWC video at 17:10:12; Ex 9, Algarin BWC video at 17:10:06–17:10:12; Gorman Dep. 193:10-13).

77. At no time prior to entering Mr. Dempsey's yard did Officer Algarin request Mr. Dempsey's consent or otherwise notify him that he was going to enter his yard. (Ex 9, Algarin BWC video at 17:07:19–17:09:29; Ex 4, Algarin Dep. 40:18-25).

78. Similarly, Officer Gorman did not request Mr. Dempsey's consent or notify him that either he or Officer Algarin was going to enter his yard before doing so. (Ex 7, Gorman BWC video at 17:05:59–17:09:51; Ex 6, Gorman Dep. 193:10-13).

79. At no time prior to Officers Algarin and Gorman entering Mr. Dempsey's yard did Officer Horowitz request Mr. Dempsey's consent or otherwise notify him that the officers would be entering his property. (Ex 8, Horowitz BWC video at 17:06:36–17:09:40; Ex 5, Horowitz Dep. 69:6-8).

80. Officer DiSabatino also did not request Mr. Dempsey's consent or notify him that either Officer Algarin or Officer Gorman would be entering his yard. (DiSabatino BWC video at 17:06:44–17:09:45).

81. At no time prior to entering Mr. Dempsey's yard did either Officer Algarin or Officer Gorman possess or obtain a warrant permitting entry into Mr. Dempsey's backyard. Officer Algarin confirmed in his deposition that no warrant was obtained or even sought before the entry (Ex 4, Algarin Dep. 74:5-12; Ex 11, Crosby Report, p. 7).

82. It would have taken Officer Algarin approximately 15 seconds to walk from the backyard of 49 Kosciusko Street to the front door of 53 Kosciusko Street to properly notify Mr. Dempsey and seek consent before entering the yard. This brief amount of time underscores the lack of exigency and the failure to follow proper procedure (Ex 16, Lindauer BWC video at 17:12:45–17:13:00; Ex 11, Crosby Report, p. 8).

83. There were no exigent circumstances that justified Officer Algarin's entry into Mr. Dempsey's backyard. The situation did not present any immediate danger, urgency, or probable cause that would have warranted such an entry without a warrant or consent. Officer Algarin confirmed during his deposition that exigent circumstances require both probable cause and an emergency situation, neither of which were present in this case. (Ex 4, Algarin Dep. 50:1-25; 55:6-19; 56:1-25; Ex 11, Crosby Report, p. 7; Ex 9, Algarin BWC, Ex 7, Gorman BWC, Ex 8, Horowitz BWC, and Ex 15, DiSabatino BWC)

84. The non-criminal incident report, CR # 2018-00258730, confirms that there were no exigent circumstances justifying Officer Algarin's entry into Mr. Dempsey's backyard. The report does not document any immediate threat or emergency that would have warranted such an entry without prior consent or a warrant (Ex 17, Non Criminal Incident Report).

85. Officer Adam Brodsky arrived on the scene at approximately 17:13:25. His arrival is captured in his body-worn camera footage, which documents the ongoing situation following the shooting of Tesla (Ex 18, Brodsky BWC video at 17:13:25).

86. During a conversation with Officer Brodsky, Officer Algarin admitted that Mr. Dempsey "did not know I was in the backyard" at the time of the incident. This statement further confirms that Algarin entered the property without notifying Mr. Dempsey or seeking his consent (Ex 18, Brodsky BWC video at 17:15:32).

87. Officer Algarin acknowledged that Mr. Dempsey did not know he was in the backyard when he let Tesla out the backdoor. This admission highlights the lack of communication between the officers and Mr. Dempsey, which ultimately led to the tragic events that unfolded (Ex 18, Brodsky BWC video at 17:15:32).

88. Algarin admitted that he understood the legal requirements for entering a property without a warrant. He acknowledged that exigent circumstances require both probable cause and an emergency, such as an immediate need to render aid or prevent harm (Ex 4, Algarin Dep. 49:22-50:21).

89. Officer Javier Algarin admitted during his deposition that the incident could have been avoided had he taken alternative actions. Specifically, he acknowledged that he could have walked to Mr. Dempsey's front door, knocked, and requested permission to enter the backyard before deciding to jump the fence. He confirmed that it would have taken only 15 to 20 seconds to walk from the backyard of 49 Kosciusko Street to Mr. Dempsey's front door, where he could have informed Mr. Dempsey of the situation (Ex 4, Algarin Dep. 69:14-15; 74:5-19)

90. Algarin agreed that the fact that it would have taken longer to walk to the front door of Mr. Dempsey's home to seek his consent to enter the yard versus just jumping the fence into the yard without permission, in itself, did not create an emergency justifying the warrantless entry (Ex 4, Algarin Dep. 60:4-61:2).

91. Algarin admitted that there was no emergency requiring him to immediately jump the fence into Mr. Dempsey's yard without first seeking consent. (Ex 4, Algarin Dep 144:6-24)

92. In hindsight, he agreed that since there was no emergency, he should have gone to Mr. Dempsey's front door, informed him of the situation, and obtained his consent before entering the yard. (Ex 4, Algarin Dep. 148:15-149:19)

93. The Crosby report supports this admission, noting that a reasonable officer in 2018 would have known that exigent circumstances did not exist to justify entry into Mr. Dempsey's

yard. Crosby emphasizes that Algarin could have radioed another officer or walked to the

front door to request consent. Failure to seek Mr. Dempsey's consent or at least announce

his presence before entering violated good and accepted police practices and professional

standards of care (Ex 11, Crosby Report, p. 18, opinion 3)

94. Eventually, the RPD officers allowed Mr. Dempsey to take Tesla to a veterinary hospital.

Despite the efforts made, Tesla succumbed to the gunshot wounds she sustained when

Officer Algarin shot her. Mr. Dempsey's testimony recounts the emotional toll this event

took on him and his family (Ex 10, Dempsey Dep. 103-117).

**B. Facts regarding the Monell claims.**

**I.   The RPD's official policy permits officers to "backtrack" through the curtilage of a residential property after the conclusion of a hot pursuit based merely on an officer's "suspicion" that a suspect may have discarded something that could be dangerous to the public.**

### A. Official Policy: testimony of the City's Rule 30(b)(6) witness, Michael Cuilla

95. Lieutenant Michael Cuilla, serving as the City's Rule 30(b)(6) witness, testified about the

Rochester Police Department's official policy regarding backtracking through residential

properties. (See generally, Ex 19, Cuilla Dep. 76-103)

96. The City admitted that under the Fourth Amendment, a "search" occurs simply by an

officer entering someone's property. (Ex 19, Ciulla Dep 42:13-43:5)

97. Backtracking is a common practice in the RPD. (Ex 19, Ciulla Dep at 96:17-19)

98.  Cuilla explained it is the RPD's policy and practice to backtrack through the curtilage of

residential properties after a hot pursuit has concluded, based on "reasonable suspicion"

that a suspect may have discarded something dangerous (Ex 19, Ciulla Dep at 96:20-

97:17-25, 98:10-22).

99. Cuilla clarified that RPD policy does not require officers to "know that something has been discarded", but instead can enter the curtilage after the conclusion of a hot pursuit based on "reasonable suspicion" that something may have been discarded on that property. (Ex 19, Ciulla Dep at 99:5-7).

100. Cuilla testified that officers can enter the curtilage following a hot pursuit, without a warrant, consent, or any exigency—and explained that the RPD believes that there is another exception to the warrant requirement that permits an officer to enter the curtilage to a property if the officer can articulate a suspicion that a suspect may have discarded a something on the property that "could harm the public", like gun or syringe. (Ex 19, Ciulla Dep at 99:5-25)

101. Cuilla testified that the RPD's policy is based on the alleged "public safety" exception to the Fourth Amendment's warrant requirement. (Ex 19, Ciulla Dep at 99:22-100:12)

102. Cuilla's testimony established that the RPD's policy allows officers to enter the curtilage to private residential properties, such as backyards, if they believe there is a public safety concern, which could be based merely on speculation rather than concrete evidence to support probable cause. (Ex 19, Ciulla Dep at 76:23-78:7; 99:5-100:12).

103. Cuilla explained that RPD policy permits officers to enter the curtilage to a residential property in the absence of any "emergency" if the officer "reasonably believes" the suspect may have discarded something "dangerous for the public" on the property. (Ex 19, Ciulla Dep at 83:4-20).

104. Cuilla testified that Algarin's actions in jumping the fence from the back yard of 49 Kosciusko Street into the Dempesey's back yard at 53 Kosciusko Street was proper and consistent with the RPD's backtracking policy. (Ex 19, Ciulla Dep 102:23-103:10)

105. Cuilla confirmed that the RPD's policy does not require officers to consider Fourth Amendment constraints when deciding to enter the curtilage of a property during backtracking. (Ex 19, Ciulla Dep at 103:7-10, 102-103:23-25, 2-6).

II. **The RPD's longstanding and widespread practice, and improper training regarding permitting officers to "backtrack" through the curtilage of a residential property after the conclusion of a hot pursuit.**

106. The Rochester Police Department has a longstanding and widespread policy and practice that requires and/or permits officers to backtrack through the curtilage of residential properties after a hot pursuit has concluded. This policy has been confirmed through the testimony of multiple officers. (Ex 19, Cuilla Dep. 96:11-97:9; Ex 20, Rudolph Dep. 22:15-23:24; Ex 5, Horowitz Dep. 60:14-25, 61:2-5; Ex 4, Algarin Dep. 114:11-115:9; Ex 21, Laureano Dep. 93:15-95:22)

107. However, the RPD did not provide training on backtracking through the curtilage to someone's property until after this incident, sometime in 2019 or 2020. (Ex 5, Horowitz Dep 62:20-65:19)

108. The training on the legal requirements to enter curtilage consisted of a Roll Call presentation that lasted approximately five minutes. (Ex 5, Horowitz Dep 64:20-65:2)

109. Lieutenant Michael Cuilla testified that officers are trained to backtrack through yards and other private areas as part of their investigative procedures (Ex 19, Cuilla Dep. 96:17-25, 97:2-9).

110. Sergeant Jason Rudolph also acknowledged that officers are permitted to enter the curtilage of properties following a pursuit without needing additional legal justification (Ex 20, Rudolph Dep. 22:15-23:24).

111.  Officers Jason Horowitz and Javier Algarin further corroborated this practice, stating that it was consistent with their training and experience within the department (Ex 5, Horowitz Dep. 60:14-25, 61:2-5; Ex 4, Algarin Dep. 114:18-25, 115:2-9).

112.  Additionally, Officer Jonathan Laureano provided testimony affirming that RPD officers are not required to request consent to enter the curtilage of residential properties while backtracking, as they believe the "hot pursuit" exception still applies even after the pursuit has concluded (Ex 21, Laureano Dep. 94:12-95:6; 12:26:23-25).

113.  RPD Officer Javier Algarin testified that it was consistent with his training to backtrack through the curtilage of residential properties, even after suspects were apprehended. He indicated that this was a common practice within the RPD, and that he backtracks through the curtilage of residential properties without seeking consent from property owners, just like he did in this case, approximately once per week (Ex 4, Algarin Dep. 114:11-116:21)

114.  Officer Jonathan Laureano testified that RPD officers are going to conduct a "backtrack" regardless" of whether they saw the fleeing suspect discard anything. ((Ex 21, Laureano Dep. 72:5-18). Laureano stated, "I do not believe the Fourth Amendment applies at that point because there's still an ongoing investigation and because hot pursuit applies" (Ex 21, Laureano Dep. 72:5-74:9, 74:10-17).

115.  Officer Jason Horowitz further confirmed that officers routinely conducted backtracking searches without probable cause or exigent circumstances, operating under the assumption that the "hot pursuit" doctrine justified such actions. He testified that this was standard practice and that he backtracks through the curtilage to

residential properties approximately once per week (Ex 5, Horowitz Dep. 60:14-61:-25, 71:11-20).

116.   Sergeant Rudolph, who reviewed and approved Officer Algarin's actions, reinforced that these practices are not only part of RPD's training but also endorsed by supervisory personnel. He testified that the RPD's general policy allowed officers to enter the curtilage of residential properties without the requisite legal justification (Ex 20, Rudolph Dep. 66:3-71:5).

117.   Algarin's testimony shows a clear misunderstanding of the Fourth Amendment; for example, he testified that officers can enter a residential property in the absence of a warrant, consent, or an emergency that would support exigent circumstances. (Ex 4, Algarin Dep. 53:25-54:21).

118.   It has been a normal and longstanding practice of the RPD for officers to jump over fences and traverse across the curtilage of residential properties during backtracking, and not to ask the consent of the property owner. (Ex 6, Gorman Dep. 219:6-220:19).

119.   Prior to the date of the incident on October 19, 2018, it was common practice for RPD officers not to obtain a warrant or consent before entering the curtilage of a property during foot chases. Officer Gorman confirmed that this approach was standard practice, reflecting the department's operational norms (Ex 6, Gorman Dep. 220:20-25).

**B.  Lack of training and policies about entry onto the curtilage of residential properties.**

120.   Prior to the incident in October 2018, the RPD did not provide any training to its officers that a fenced-in backyard to a residential property is considered curtilage to the property, entitled to the same Fourth Amendment protections as the home itself.

(Ex 19, Cuilla Dep. 29:17-25; Ex 20, Rudolph Dep. 70:12-24; Ex 5, Horowitz Dep. 66:4-9).

121. In addition to the absence of training, the RPD did not have a specific written policy concerning warrantless searches on the curtilage of residential properties prior to this incident. Lieutenant Cuilla and Sergeant Rudolph confirmed that no such policy was in place, leaving officers without clear guidance on how to handle these situations in accordance with constitutional requirements (Ex 19, Cuilla Dep. 21:16-23:24; Ex 20, Rudolph Dep. 70:12-24).

122. Following the incident, Officer Algarin was neither disciplined nor required to undergo any additional training for his actions. (Ex 4, Algarin Dep. 118:22-24; Ex 20, Rudolph Dep. 66:3-14).

123. In 2019, only after the incident involving Mr. Dempsey, the RPD issued a written training bulletin specifically addressing warrantless searches on the curtilage of residential properties. (Exhibit 23, 2019 Training Bulletin entitled "Warrantless Searches of Curtilage").

124. Lieutenant Cuilla and Officer Horowitz testified that the bulletin was intended to clarify the requirements for conducting searches on residential curtilage, emphasizing the need for a warrant, consent, or exigent circumstances (Ex 19, Cuilla Dep. 22:25-23:24; Ex 5, Horowitz Dep. 63:4-17).

125. The Crosby report highlights the significant deficiencies in the RPD's training and policies regarding the entry onto the curtilage of residential properties. Crosby notes that the lack of proper training and the absence of a clear policy prior to the incident

directly contributed to the officers' unconstitutional actions. (Ex 11, Crosby Report, p 7)

### III.   The RPD's "shoot first" policy or custom:

126. Between 2004 and 2009, RPD officers shot at 87 dogs, killing 35. *(Ex 23, Democrat and David Andreatta, Shooting dogs on city streets, RPD fired 217 times at 87 often vicious dogs in last 5 years, Democrat & Chronicle (July 14, 2009))*

127. Between 2013 and 2018, RPD officers killed approximately 50 dogs, averaging nearly one dog per month. (Exhibit 24, *Firearm Discharge Reports).*

128. TASERs are an effective non-lethal tool that can be utilized against dogs. *(Ex 25, Taser Animal Certifications;* Ex 26, pages from 2016 TASER Course Guide; Ex 27, PowerPoint of TASER Course Guide 2019, page 149 (with embedded video, provided on thumb drive).

129. In fact, since 2003, TASER International has informed police departments that utilize their product that TASERs are an effective non lethal tool against dogs. *(Ex 25)*

130. The TASER Course guide even includes a video of a real incident where a TASER was effectively used against a dog. (Ex 27, PowerPoint of TASER Course Guide 2019, page 149).

131. In the TASER user course instructor guide, instructors are told to explain what the video shows*: "Officers deployed a single 5-second cycle against the aggressive dog. The dog recovered approximately 10 minutes later and was put back in the residence without further incident.")* (Exhibit 27, PPT TASER user guide, page 149).

132. Yet, the RPD instructs its Taser-certified officers to disregard the training provided by TASER, which states that Tasers can be an effective tool against aggressive dogs (Ex 19, Cuilla dep. 154:20-155:5).

133. The RPD instead directs its officers not to use Tasers on dogs and to shoot them instead, even in situations where a Taser could be effectively deployed (Ex 19, Cuilla dep. 158:9-15).

134. This is despite the fact that RPD officers have effectively used TASERs to subdue aggressive dogs. (Ex 21, Laureano dep 35:3-37:15).

135. TASERs are an effective less-lethal tool for ensuring officer safety when encountering aggressive dogs. (Ex 11, Crosby Report pg. 17)

136. TASER International even designed a model specifically for use on animals (Ex 11, Crosby Report pg. 17)

137. Both the International Association of Chiefs of Police (IACP) and the National Animal Care & Control Association (NACCA) recommend using Tasers against aggressive dogs (Ex 11, Crosby Report pg. 17)

138. Dr. Crosby states that the RPD's policy of instructing officers not to use Tasers on dogs and to shoot them instead "is a violation of good and accepted best practices" (Ex 11, Crosby Report pg. 17)

139. Dr. Crosby testified that he has observed that TASERs are 100 percent effective in deterring an aggressive dog from approaching an officer; and they are widely used by departments around the country, including the Los Angeles Police Department, the New York City Police Department, and the Miami Dade Police Department. (Ex 28, Crosby Dep. 41:5-42:15).

140. RPD policies have not been updated to reflect advances in non-lethal methods for subduing aggressive animals, such as the use of a beanbag gun, and the preference remains to use lethal force as a first resort. (Ex 19, Cuilla Dep. 151:19-152:16).

141. RPD officers are not trained on the use of Catchpoles and the City does not provide Catchpoles to its officers. (Ex 19, Cuilla Dep. 155:6-156:4).

142. Officers are not specifically trained to use OC spray against dogs, instead, they are trained to use firearms when they believe a dog poses a threat. (Ex 19, Cuilla Dep. 150:19-23).

### IV.    Failure to Train on Dog Interactions

143. The primary training the RPD provides to its officers is a 1.5 to 2 hour "awareness course" entitled Dog Bite Prevention for Law Enforcement, developed and presented by Reno DiDomenico. (Ex 29, DiDomenico Dep; Ex 30, Dog Bite Prevention for Law Enforcement presentation).

144. The objectives of the training are to help officers recognize dog behaviors and avoid being bitten by a dog. (Ex. 30 p. 4).

145. The training was provided in 2014 and subsequently was taught at the police academy, was intended as an "awareness course" rather than an in-depth analysis of dog behavior (Ex 30 p. 1; Ex 29, DiDomenico Dep 33:21-34:4, 55:3-24).

146. The emphasis was on providing officers with basic tools and knowledge for handling dog encounters safely, rather than making them experts (Ex 29, DiDomenico Dep 33:21-35:22).

147. Less than half of the training was devoted to avoiding shooting a dog or using non-lethal force. (Ex 29, DiDomenico Dep 54:14-18).

148. Prior to DiDomenico developing his training, The Office of Community Oriented Policing Services (COPS) of the United States Department of Justice ("DOJ") had developed and published a training in 2011 that was freely available to law enforcement agencies, and consisted of a booklet and five videos that provided guidance on handling dog encounters. (Ex 31, COPS Booklet; Ex 32-36, DOJ Videos).

149. The booklet, titled "The Problem of Dog-Related Incidents and Encounters," discussed the importance of understanding dog behavior and offered strategies for de-escalating situations and avoiding the use of lethal force. (Ex 31) The videos provided visual demonstrations of these strategies. (See Exs 32-36).

150. DiDomenico was aware of the COPS training materials and had even reviewed some of the videos, but he chose not to incorporate them into his own training (Ex 29. 172:13-23).

151. DiDomenico teaches officers that when a dog charges them, it could be a "bluff charge" and not an attack; however, DiDomenico does not teach officers how to differentiate between a bluff charge and an actual attack. (Ex 29, DiDomenico Dep 88:15-90:4, 130:18-22, 226:8-227:21).

152. Notably, none of the RPD officers who testified in these seven related cases involving RPD officers shooting dogs could remember specifics about DiDomenico's training—other than the dog body postures. (Ex 5, Horowitz Dep 108:13-113:24; Ex 37, Cala Dep 71:17-94:20; Ex 38, Trenton Dep 128:20-129:3; Ex

39, Leach Dep 42:25-43:6; Ex 40, Alexander Dep 114:16-23, 146:13-24, 149:18-150:5, 152:8-153:15, 157:8-14; Ex 41, Romig Dep 67:9-68:8; Ex 42, Kelly Dep 161:7-21; Ex 43, Nellist Dep 153:13-154:19; Ex 44, Brock Dep 9:13-12:21)

153. Generally, most officers could remember that nonlethal options were discussed, but they could not remember specifics about the nonlethal options that were taught. For example, Algarin, who took the class as part of his police academy training in 2017, remembered that the training discussed using a baton against a dog, but did not remember that the training included a discussion of using OC spray or pepper spray against a dog.  (Ex 4, Algarin Dep 85:17-86:14, 91:15-21) Between his academy training in 2017 and the date of the deposition in July 2022, Algarin testified that he had not received any additional training whatsoever on interactions with dogs. (Ex 4, Algarin Dep 91:22-92:1).

154. Jeremy Nellist testified that he took the DiDomenico training in 2014, but that he did not remember many specifics about the training, just that it discussed how to identify an aggressive dog versus a nonaggressive dog. (Ex 43, Nellist Dep 154:2-19) He testified that he never received any training about how to avoid shooting a dog that was charging at him. (Ex 43, Nellist Dep 145:20-23) He testified that if there is time and space, he was taught he could use OC spray, or could use a baton "as a shield". (Ex 43, Nellist Dep 146:3-10)

155. Dakota Vanbrederode took the DiDomenico training at the police academy in 2017; he remembered some dog body language cues (Ex 45, Vanbrederode Dep 49:23-50:11), but did not remember that DiDomenico taught that pepper spray is effective on dogs (Ex 45, Vanbrederode Dep 63:4-24).

156.   The only training the RPD provides involving a simulation of a dog approaching or charging at officers is in firearms training, where officers are simply trained to shoot the dog. (Ex 37, Cala Dep at 105:11 to 106:24).

157.   Crosby criticizes the RPD for providing inadequate training on interacting with dogs, noting that the only training offered was a one and a half to two-hour "awareness course" that lacked depth and practical application. This training, led by a non-certified trainer, did not effectively teach officers to differentiate between aggressive and non-aggressive dog behaviors or how to utilize non-lethal options effectively (Ex 11, Crosby Report, p. 8).

158.   Crosby points out that the RPD failed to provide scenario-based training or simulation exercises that would help officers make better decisions during dog encounters. He emphasizes that effective training should include practical exercises, such as "shoot/don't shoot" scenarios, to improve officers' ability to assess threats accurately and respond appropriately without resorting to deadly force (Ex 11, Crosby Report, p. 12).

159.   Crosby concludes that the deficiencies in the RPD's training program demonstrate a deliberate indifference to the necessity of preparing officers for safe and humane interactions with dogs. He highlights that proper training on non-lethal measures and de-escalation techniques could have prevented unnecessary shootings, like the incident involving the plaintiff's dog, Tesla (Ex 11, Crosby Report, p. 20 opinion 10).

## V.   **Failure to Supervise or Discipline**

**Rule 30(b)(6) Testimony:**

160.  No RPD officer has ever been disciplined or required to undergo additional training as a result of shooting a dog. (Ex 19, Cuilla Dep 102:23-25, 103:3-6).

161.  Following a dog shooting incident, the officer's immediate supervisor (typically a sergeant) reviews the incident, including any body-worn camera footage and the associated incident report (Ex 19, Cuilla Dep 195:23-196:5).

162.  The only person in the chain of command who is required to review the incident is the officer's immediate supervisor, who assesses whether the officer's actions adhered to departmental policies and training guidelines. (Ex 19, Cuilla Dep 196:3-5).

163.  The Professional Standards Section (PSS) may also choose to review the body-worn camera footage and incident report, although there is no explicit requirement for them to do so in every dog shooting case (Ex 19, Cuilla Dep 196:6-8). The commanding officer of PSS has the discretion to determine whether their involvement is necessary based on the specific circumstances of the incident (Ex 19, Cuilla Dep 212:23-25, 213:2-6). If PSS opts not to respond to the scene, they must document their reasoning, which can be included as an addendum to the incident report or noted by the supervisor in the report itself, if requested by PSS (Ex 19, Cuilla Dep 213:15-214:8).

164.  The RPD has not changed any of its training on canine encounters in response to prior incidents where officers have shot dogs (Ex 19, Cuilla Dep 195:1-5).

165.  The City also has not made any recommendations for changes in its policies or training regarding the use of force against dogs after reviewing BWC of dog shootings (Ex 19, Cuilla Dep 194:22-195:5, 206:18-207:1).

166.    The City does track the number of dogs shot by its officers, but it does not conduct any statistical analysis of this data or generate reports on it, unless specifically requested to do so (Ex 19, Cuilla Dep 200:12-15, 204:7-10, 205:6-9).

**Daniel Zimmerman:**

167.    Sgt. Daniel Zimmerman testified that he shot approximately 25 dogs during his time as an officer with the RPD. He clarified that these shootings occurred primarily during his time in the narcotics division, before 2010. Zimmerman mentioned that after the last time he shot a dog, there was no retraining or disciplinary action taken against him. He also stated that the RPD did not provide any specific training regarding interactions with dogs during police duty (Ex 46, p. 204, lines 12-25; p. 205, lines 1-11).

**Brian Cala:**

168.    On June 10, 2018, RPD officer Brian Cala shot and killed Sampson, a dog owned by Marianne Anniszkiewicz. (See generally, Exhibit 37)

169.    The entire incident was caught on Cala's BWC, (Exhibit 47, Cala BWC), which shows that when Officers Cala and Trenton arrived at Ms. Anniszkiewicz's house, they parked on Belknap Street and immediately approached the front gate to her yard. Despite Trenton's comment about the dog possibly being deaf, and after briefly shaking the gate, both officers entered the yard without contacting Ms. Anniszkiewicz to secure the dog or taking any other precautions. About ten seconds later, Sampson, a dog, trotted from the back of the house toward the officers. At that time, Sampson displayed no signs of aggression—he was not barking, growling, or acting threatening in any way. Despite this, Cala unholstered his gun and pointed it

at Sampson. After Cala yelled at Sampson to "back the fuck up" and the dog barked in response, Cala fired a shot, striking and killing Sampson. (Ex 47, Cala BWC)

170.    Officer Cala testified that he has discharged his firearm in incidents involving dogs a total of five times, including the incident at issue in the Anniszkiewicz case (Ex 37. Cala Dep 116:9-23).

171.    The first two incidents occurred on Mason Street approximately 20 years ago, before 2001. In both incidents, Cala shot and killed pit bulls that charged at him while he was responding to calls for dogs chasing people (Ex 37. Cala Dep 116:25, 117:2-4, 117:9-14, 120:4-11).

172.    The third incident occurred on Elser Terrace before 2004. In that incident, Cala and another officer shot and killed a pit bull that allegedly charged at them while they were attempting to escort a woman from her car to her house (Ex 37. Cala Dep 122:24-123:5, 123:23-124:3).

173.    The fourth incident occurred sometime between 2004 and 2016 at either Campbell Park or Wetmore Park. In that incident, Cala shot a pit bull in the foot after it charged at an animal control officer who had called for police assistance (Ex 37. Cala Dep 126:17-18, 126:20-127:3, 129:5-9).

174.    The fifth incident is the subject of the litigation in Anniszkiewicz v City of Rochester, et al, 20-cv-6629, where he is a defendant, and he shot and killed the plaintiff's dog, Sampson.

175.    In all four prior incidents where Cala shot a dog, the RPD found Cala's actions to be justified (Ex 37. Cala Dep 119:2-4, 121:16-20, 125:14-17, 130:22-25). Cala was not required to testify in any of the investigations, and he does not recall if he wrote any

reports related to the incidents (Ex 37. Cala Dep 119:20-22, 121:21-23, 125:20-22, 125:24, 126:3, 130:7-11).

176. Cala testified that he was not disciplined or required to undergo any additional training following the shooting of Sampson. (Ex 37. Cala Dep 19:25-20:6).

177. Prior to shooting Sampson, Officer Cala had taken the Humane Society training, led by Reno DiDomenico, focused on dog bite prevention for law enforcement (Ex 37. Cala Dep 71:20-22, 73:22-74:1).

178. Although Cala recalled the general topics and some specific slides, he could not remember any specific discussions or instructions from the training (Ex 37. Cala Dep 71:20-22, 73:22-74:1, 75:25, 79:20-22, 80:20-21, 81:15-17, 83:8-9, 84:14-15, 84:24, 85:6, 85:17-19, 87:2-8, 87:22-23, 89:2-8, 90:5-7, 91:9-11, 91:18-20, 92:22-24, 93:10-12, 93:15-17, 93:25).

179. He did, however, remember that the training included pictures of dogs in different postures and discussions about what those postures meant (Ex 37. Cala Dep 83:13-17). He also specifically recalled a slide stating, "Officers will encounter a dog in at least one of three residences" (Ex 37. Cala Dep 74:15-18).

180. The only training Cala remembered involving a simulation of a dog approaching or charging at them was in firearms training, where officers are simply trained to shoot the dog. (Ex 37. Cala Dep at 105:11 to 106:24).

**Kenneth Pinckney:**

181. On August 11, 2019, RPD Officer Kenneth Pinckney responded to Cedarwood Terrace after a 911 call reporting a loose, aggressive Rottweiler in the street (Ex 48, Pinckney Dep 70:24-25, 73:13-16).

182. Pinckney shot the dog, despite the fact it was not attacking or charging at him, after it simply barked at him from approximately 10-15 feet away, which was captured on his BWC video. (Ex 49, Pinckney BWC at 3:18 into the 12:45 long video, or 20:10:00).

183. In the incident on Cedarwood Terrace, Officer Pinckney shot the dog while it was standing on the grassy area between the sidewalk and the curb (Ex 48, Pinckney Dep 102:11-13). The dog had previously retreated to its yard but then turned and barked at Pinckney and another officer while in an "assertive, dominant position" (Ex 48, Pinckney Dep 105:16-20). The dog had not advanced towards the officers or left the curb before Pinckney fired his shotgun (Ex 48, Pinckney Dep 104:21-105:8).

184. Officer Pinckney's training on dog encounters primarily consisted of firearms training at the police academy, which covered recognizing aggressive dog postures and shooting at moving targets (Ex 48, Pinckney Dep 17:24-18:8, 116:7-11).

185. He also received a training bulletin in 2017 that provided guidelines on recognizing dog postures and attempting to contain dogs until Animal Control could arrive (Ex 48, Pinckney Dep 23:19-25:3).

186. Pinckney said the RPD trains officers that if a dog is an imminent threat, they can shoot the dog, but they were not provided any training on identifying whether a dog is presenting an imminent danger or threat. (Ex 48, Pinckney Dep at 60:7-21).

187. Although Pinckney, as an Aerosol Spray Restraint Instructor, was aware that OC spray could be effective against dogs, he stated that there was no specific training on using OC spray on dogs and that it was merely presented as an option (Ex 48,

Pinckney Dep 65:11-15, 65:18-21). He also testified that he had not received

training on using a baton or beanbag rounds against dogs (Ex 48, Pinckney Dep

30:18-22, 112:19-22).

188.   Officer Pinckney stated that the incident was reviewed by Sergeant Osipovitch, who

responded to the scene and completed an incident report (Ex 48, Pinckney Dep

47:17-19). The scene was also processed by a technician, and depositions were

taken from the witness at the scene (Ex 48, Pinckney Dep 48:22-24).

189.   Pinckney himself did not have to write any reports or provide any written record of

the incident (Ex 48, Pinckney Dep 106:14-19). He does not recall if the PSS or the

Professional Development Section (PDS) reviewed the incident (Ex 48, Pinckney

Dep 50:6-12).

190.   He was not disciplined or required to undergo any additional training as a result of

the incident, and no one from the Police Department ever questioned his actions or

the justification for shooting the dog (Ex 48, Pinckney Dep 46:20-47:4, 106:3-4).

## Whitney Celentano

191.    On February 1, 2020, at 17 Webster Crescent in the City of Rochester, Officer

Celentano and her partner, Officer Fry, responded to a call about a loose dog around

6:40 p.m. (Ex 50, Celentano Dep 12:2-7). The dog, named Diesel, initially

approached Officer Fry in a seemingly friendly manner, wagging its tail (Ex 50,

Celentano Dep at 48:3-4). However, when the dog approached Officer Fry and

jumped, he became scared and jumped on top of his police car (Ex 50, Celentano

Dep at 24:19-21).

192. The dog then approached the porch of a home where Celentano was knocking on the door, looking for the owner. (Ex 51, Celentano BWC). The dog stopped on the steps, Celentano pointed her gun at the dog, and when the dog barked, she shot it. (Ex 51, Celentano BWC)

193. Celentano immediately pulled out her gun. (Ex 50, Celentano Dep 28:16-19)

194. Celentano did not consider using her Taser, a baton or pepper spray because the RPD never taught her that those non-lethal options are effective against dogs (Ex 50, Celentano Dep 28:20 to 30:6-12).

195. She stated that the RPD trained her only to use her firearm in situations involving dogs she perceived to be aggressive (Ex 50, Celentano Dep 29:13-25).

196. After the incident, Celentano was not disciplined in any way; instead, she was approached by Officer Brian Bannerman from the firearms unit, who praised her actions as "textbook" and expressed interest in using the body camera footage for training purposes (Ex 50, Celentano Dep 58:19 to 60:6, 63:2-25). However, Celentano was never officially informed whether the footage was actually used for training (Ex 50, Celentano Dep 62, lines 7-10).

**Jonathan Laureano:**

197. Officer Laureano testified about four instances where he discharged his firearm at dogs. (Ex 21, Laureano Dep at 27:16-19).

198. The first incident occurred between 2011 and 2014 on Harris Street when he and his partner encountered two aggressive dogs on a sidewalk during an investigation. He fired one shot between the dogs, scaring them away without causing injury. (Ex 21, Laureano Dep at 27:20-28:8).

199.    The second incident took place on April 1, 2015, at a vacant house where Officer

Laureano responded to a call about an aggressive dog. Upon arrival, the dog

charged at an Animal Control officer attempting to secure it. In response to the

immediate threat, Laureano fired two shots at the dog, intending to stop its advance.

However, the shots missed, and the dog retreated. The dog then attempted to flee

over a fence but was confronted by another officer, Officer Thomas Lisle, who

successfully deployed a Taser to subdue the dog. (Ex 21, Laureano Dep at 35:1-

42:22).

200.    The third incident occurred on July 7, 2020, during the execution of a high-risk

search warrant at 30 DeJonge Street. During the operation, the team encountered a

large dog that was initially secured by its owner in a side room. However, as the

officers continued their search, the dog managed to break free from its restraint and

charged towards Officer Laureano and another officer, showing signs of aggression.

In response to the perceived threat posed by the charging dog, Laureano discharged

his firearm, striking the dog. The dog was killed instantly. This sequence of events

was captured in detail, with Laureano describing the dog's sudden escape, its rapid

approach, and the need to use deadly force to protect himself and his fellow

officers. The situation was assessed and reviewed following standard protocols, and

the decision to fire was deemed necessary. (Ex 21, Laureano Dep at 122:1-142:10).

201.    The fourth incident occurred on August 29, 2021, during another high-risk search

warrant execution at 14 Forbes Street. As officers were clearing the premises, an

unexpected second dog emerged suddenly from under a porch and charged at

Laureano and Sergeant Romig. Both officers perceived a threat as the dog allegedly

exhibited aggressive behavior. In response, Laureano and Romig fired their weapons simultaneously at the charging dog. The gunfire caused the dog to retreat and subsequently become docile. Both officers' actions were later reviewed and found to be in line with department protocols for handling aggressive animals during critical incidents. (Ex 21, Laureano Dep at 149:1-156:10).

202.  Laureano was never disciplined in any way following any of the four instances where he shot at a dog. (Ex 21, Laureano Dep 171:15-19).

203.  Leaureano was never required to undergo any additional training after any of the four instances where he shot at a dog. (Ex 21, Laureano Dep 172:2-6)

**Jeremy Nellist:**

204.  Between 2008 and 2013, Nellist discharged his service weapon at dogs on five occasions. (Ex 43, Nellist Tr. 122:23-124:4, 159:19-21)

205.  The first incident occurred at an apartment complex during a stabbing investigation. Nellist shot a black pit bull when it escaped its cage and charged at Officer Nellist and other officers present in the apartment. (Ex 43, Nellist Tr. 122:23-123:15).

206.  The second incident involved two aggressive dogs that were fighting inside a house. When Nellist was unable to separate the dogs, he shot the more aggressive dog to prevent it from potentially killing the other. (Ex 43, Nellist Tr. 123:16-124:4).

207.  In the third incident, Officer Nellist responded to a call about a loose, aggressive dog that was chasing people in a neighborhood. As Nellist approached, the dog charged at a fellow officer, prompting Nellist to shoot the dog  (Ex 43, Nellist Tr. 159:19-159:21).

208.   The fourth incident took place during a narcotics search. A dog present at the location became aggressive towards the officers, and in response to the immediate threat, Nellist shot the dog. (Ex 43, Nellist Tr. 159:22-160:12).

209.   The fifth incident, where Nellist is a named defendant, along with Sergeant Joshua Kelly, in the case of *Erin Gursslin v. City of Rochester, et al.*, No. 20-cv-6508 (W.D.N.Y.), occurred after the conclusion of a SWAT operation. Officer Jeremy Nellist jumped over a fence and entered the plaintiff Erin Gursslin's backyard without a warrant or permission. While in the backyard, Nellist encountered the plaintiff's dog. As the dog approached him, and despite the fact that Erin Gursslin was standing just a few feet behind her dog, Nellist discharged his firearm, shooting the dog. (Ex 43, Nellist Tr. 106:3-108:8, 116:19-118:13, 160:14-161:6).

210.   In all these cases, Officer Nellist was neither required to undergo any additional training nor disciplined. Each shooting was reviewed and found to be justified, with the incident review process involving only a discussion with the supervisor who completed the incident report (Ex 43, Nellist Tr. 123:8-16, 159:22-160:12)

**Joshua Kelly**

211.   Joshua Kelly described two instances where he shot dogs. The first incident where Kelly is a named defendant, along with Jeremy Nellist, is described in the case of *Erin Gursslin v. City of Rochester, et al.*, No. 20-cv-6508 (W.D.N.Y.). That incident occurred on September 6, 2018. During a SWAT operation at a residential property, Kelly entered the backyard of the property without a warrant, consent, or exigent circumstances. He encountered a dog, Nina, that was inside the yard. As the dog approached Kelly, he discharged his firearm, fatally shooting the dog in front of

its owner, who was standing nearby. (Ex 42, Kelly Tr. 163:25-164:6, 166:10-169:10) .

212. The second incident took place in 2022. Kelly responded to a call reporting shots fired in the area of Kappel Place. Upon arrival, officers encountered uncooperative residents and located handgun casings on the property. While officers were collecting evidence, a resident opened the door, and a dog ran out of the house, directly charging at Kelly. As the dog got within approximately five feet of him, Kelly fired one round, striking the dog. He did not consider using non-lethal means despite carrying them. The review of this incident consisted only of Kelly speaking with his Lieutenant, who filled out the incident report. No further disciplinary action or additional training was mandated following this shooting (Ex 42, Kelly Tr. 169:14-22, 170:11-171:14) .

213. The entirety of the review of the 2022 incident consisted of Kelly speaking with his Lieutenant who filled out the incident report. (Ex 42, Kelly Tr. 170:11-171:14)

**Javier Algarin**

214. Defendant Algarin testified that he does not recall any training specifically focused on avoiding shooting dogs. He mentioned that while there were simulation trainings involving dogs, these were more about shooting accuracy rather than avoiding shooting the dog. (Ex 4, Algarin Tr. 92:19-93:24)

215. Officer Algarin testified that he was not disciplined or required to undergo any retraining following the incident where he shot and killed the plaintiff's dog (Ex 4, Algarin Dep 129:1-5). The incident was reviewed by his supervisor, Sergeant Rudolph, who determined that Algarin's actions were in accordance with RPD's

policies and procedures (Ex 4, Algarin Dep 155:2-9, 160:10-161:3). PSS was notified of the incident but did not contact Algarin or conduct a formal investigation (Ex 4, Algarin Dep 140:3-6, 140:9-11).

216. Algarin testified that he was taught that officers were permitted to shoot a dog if it posed an imminent threat of serious bodily injury or death to the officer, but that he was not taught that a dog running at him constituted an imminent threat, and that he was unaware of any RPD officer ever being seriously injured as a result of a dog attack. (Ex 4, Algarin Dep 86:24-88:7)

217. Notably, other than the Humane Society training at the academy, Algarin testified that the only other training he received about interactions with dogs was in firearms training. (Ex 4, Algarin Dep 90:8-91:4)

**Mitchell Leach**

218. On February 14, 2020, Officer Mitchell Leach and his partner, Alexis Ortiz, responded to 1100 Norton Street in Rochester, New York, following a radio call. The officers were dispatched to assist Child Protective Services (CPS) with the removal of a child from a home deemed unsafe. Upon arrival, CPS workers briefed them on the removal order due to unsafe conditions inside the residence. (Ex 39, Leach Depo. 101:7, 102:2-3; 104:3-5, 104:18-20, 104:23-25).

219. Victoria Preston, the occupant, allowed the CPS workers and RPD officers into her home after securing her dog, Zyria, in a bathroom located in the kitchen. The officers entered through a side door leading directly into the kitchen, which connects to a living room where they spoke with the occupant. (Ex 52, Leach BWC).

220. While speaking with the officers in the living room, which adjoins the kitchen, Plaintiff was holding her one-year-old daughter. An officer's comment about forcibly taking the child escalated the situation, though Plaintiff never threatened CPS workers or officers. She requested a supervisor's presence for further discussion. (Ex 52, Leach BWC).

221. Throughout the interaction, Zyria could be heard scratching and attempting to exit the bathroom. Eventually, Zyria escaped and entered the kitchen while Plaintiff was still speaking with Officers Ortiz and Leach in the adjacent living room. (Ex 52, Leach BWC).

222. As Zyria entered the living room, Officer Leach, who had retreated from the kitchen into the living room, was within arm's length of Plaintiff and her daughter. Despite having access to non-lethal tools like pepper spray and a baton, Officer Leach immediately discharged his firearm six times at Zyria, striking the dog at least once and causing fatal injuries. Zyria succumbed to her injuries in the kitchen. (Ex 52, Leach BWC; Ex 53, incident report).

223. After the incident, Officer Leach was not disciplined or required to undergo additional training. The primary review of the shooting was conducted by Sergeant Osipovitch, who completed the incident report on-site. Several officers, including Sergeant Gonzalez and then-captain Jeff Koehn, reviewed the body camera footage, but there was no formal investigation by the PSS, and Leach had no follow-up discussions with them about the incident. (Ex 39, Leach Dep 47:18-19, 49:3-6; 114:17-21, 115:12-14; 176:11-13; 191:14-192:15; 195:18-196:12).

**Additional testimony regarding the City's unlawful policies and failure to supervise and discipline**:

224.  Lieutenant Peter Nigrelli of the Buffalo Police Department testified as the non-party Rule 30(b)(6) witness for the City of Buffalo regarding their implementation of free DOJ training in 2014, as well as other topics. He explained that this training was mandatory for all officers and was instrumental in changing how officers approached encounters with dogs. (Ex 54, Nigrelli Dep 22:1-23:2).

225.  Nigrelli noted that since the implementation of this training in 2014, the Buffalo Police Department experienced a significant decrease in the number of dogs shot by officers, particularly during SWAT operations. He attributed this reduction directly to the comprehensive nature of the COPS training, which provided officers with essential tools and knowledge to manage dog encounters more safely. (Ex 54, Nigrelli Dep 22:10-23:2).

226.  Nigrelli testified that discharging a firearm in the presence of other people, as Officer Algarin did, would violate Buffalo Police Department policy because of the inherent risk to human life (Ex 54, Nigrelli Dep 34-35)

227.  Commander Fabian Rivera testified that during his tenure at the RPD, no officers were disciplined or required to undergo retraining as a result of shooting a dog. He mentioned that although he knew of four or five officers that had shot dogs, none were disciplined, though some were ridiculed for missing their shots. (Ex 55, Rivera Dep 123:4-12)

228. Specifically, Chief Rivera referenced an incident involving Officers Mike Johnson and Korey McNees, who were ridiculed for firing at a small dog and missing, but they did not face any disciplinary actions (Ex 55, Rivera Dep 124:14-125:10).

229. Rivera also confirmed that there was no record of disciplinary actions taken against officers Nellist and Kelly for shooting Ms. Gursslin's dog. (Ex 55, Rivera Dep 125:17-126:4).

230. Similarly, Aaron Springer testified that, to his knowledge, no officer within the RPD has ever been disciplined or required to undergo retraining specifically as a result of shooting a dog. (Ex 56, Springer Dep 152:17-25; 253:8-254:19)

231. Springer was unaware of any measures taken to reduce the number of dogs shot while he was with the RPD, other than a training bulletin with various "aggressive" dog postures. (Ex 56, Springer Dep 254:20-255:22)

232. Springer does not remember any other specific trainings during his time with the RPD from 1996 to 2020 regarding how to safely interact with dogs. (Ex 56, Springer Dep 256:4-7)

233. The RPD trains officers that if a dog is running at them and they perceive the dog to be an imminent threat, then they can shoot the dog. (Ex 56, Springer Dep 257:17-23)


Dated: New York, New York          Respectfully Submitted,
      September 9, 2024            ROTH & ROTH LLP

By: _____~/s/~_____
    Elliot Dolby Shields, Esq.
    *Counsel for Plaintiff*
    192 Lexington Ave, Suite 802 New York,
    New York 10016

Ph: (212) 425-1020

To:     All parties (via ECF)