1

2                    CONFIDENTIAL SECTION INCLUDED

3

4                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
5        - - - - - - - - - - - - - - - - - - - - - - - - - - -
         CHARLES DEMPSEY, individually, and L.D. by her
6        father and natural guardian, CHARLES DEMPSEY,

7                 Plaintiffs,

8                                  Index No. 19-cv-6780 (EAW)
         v.
9

10       THE CITY OF ROCHESTER, a municipal
         entity, JAVIER ALGARIN, ADAM GORMAN,
11       "JOHN DOE" RPD OFFICER RESPONSIBLE
         FOR TRAINING JAVIER ALGARIN,
12
                  Defendants.
13       - - - - - - - - - - - - - - - - - - - - - - - - - - -

14
         Video-recorded Deposition Upon Oral Examination of:
15
                       Officer Javier Algarin
16

17       Location:        Powers Building
                          16 West Main Street, 7th Floor
18                        Rochester, New York  14614

19
         Date:            July 15, 2022
20

21       Time:            9:00 a.m.

22

23       Reported By:     KIMBERLY A. BONSIGNORE
                          Alliance Court Reporting, Inc.
24                        109 South Union Street, Suite 400
                          Rochester, New York  14607
25



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                    A P P E A R A N C E S

 2    Appearing on Behalf of Plaintiffs:

 3    Elliot D. Shields, Esq.
          Roth & Roth LLP
 4        192 Lexington Avenue, Suite 802
          New York, New York 10016
 5        eshields@rothandrothlaw.com

 6
      Appearing on Behalf of Defendants:
 7
      Peachie L. Jones, Esq.
 8        City of Rochester Department of Law
          City Hall
 9        30 Church Street, Room 400A
          Rochester, New York 14614
10        peachie.jones@cityofrochester.gov

11
      Also Present:
12
      Ben Parrow, Videographer
13        Studio 80 ROC
          277 North Goodman Street, Apartment 407
14        Rochester, New York  14607

15                      *      *      *

16

17

18

19

20

21

22

23

24

25
```



```
1              S T I P U L A T I O N S
2    FRIDAY, JULY 15, 2022;
3              (Proceedings in the above-titled matter
4              commencing at 9:46 a.m.)
5                      *     *     *
6              IT IS HEREBY STIPULATED by and between the
7    attorneys for the respective parties that this
8    deposition may be taken by the Plaintiff at this time
9    pursuant to notice;
10             IT IS FURTHER STIPULATED, that all
11   objections except as to the form of the questions and
12   responsiveness of the answers, be reserved until the
13   time of the trial;
14             IT IS FURTHER STIPULATED, that pursuant to
15   Federal Rules of Civil Procedure 30(e)(1) the witness
16   requests to review the transcript and make any
17   corrections to same before any Notary Public;
18             IT IS FURTHER STIPULATED, that if the
19   original deposition has not been duly signed by the
20   witness and returned to the attorney taking the
21   deposition by the time of trial or any hearing in this
22   cause, a certified transcript of the deposition may be
23   used as though it were the original;
24             IT IS FURTHER STIPULATED, that the
25   attorneys for the parties are individually responsible
```



```
 1                      P R O C E E D I N G S
 2    for their certified transcript charge, including any
 3    expedite or other related production charges;
 4                AND IT IS FURTHER STIPULATED, that the
 5    Notary Public, KIMBERLY A. BONSIGNORE, may administer
 6    the oath to the witness.
 7                         *      *      *
 8                THE VIDEOGRAPHER:   I'm going on the
 9    record.
10                This is the case of Charles Dempsey
11    against the City of Rochester et al., Case No.
12    19-cv-6780.  Today's date is July 15, 2022.  The time
13    is 9:46 a.m.
14                My name is Ben Parrow with Studio 80 ROC
15    at 277 North Goodman Street, Apartment 407, Rochester,
16    New York 14607.  I am the videographer.
17                MR. SHIELDS:   And for the plaintiff, my
18    name is Elliot Shields of Roth & Roth, LLP.  The
19    address is 192 Lexington Avenue, Suite 802, New York,
20    New York 10016.
21                MS. JONES:   For the defendants, I'm
22    Peachie Jones with the City of Rochester Law
23    Department, 300 Church Street, Rochester, New York
24    14614.  And my client here is...
25                OFFICER ALGARIN:   Officer Javier Algarin.
```



                    OFFICER JAVIER ALGARIN - BY MR. SHIELDS

1  right?

2          MS. JONES:  Objection.

3          A.   Yes.

4          Q.   Okay.  And did you see them jump the

5  fence?

6          A.   No.

7          Q.   And you didn't see them jump the fence

8  because you didn't chase them; is that right?

9          MS. JONES:  Objection.

10         A.   No.  I gave chase when I arrived at the

11 backyard.  I peered over the fence, which I saw

12 somebody that was running from 61 Kosciusko, running

13 behind the fence going westbound.

14         Q.   So when you got out of your car, you ran?

15         A.   Correct.

16         Q.   And you ran into the backyard of 61

17 Kosciusko Street?

18         MS. JONES:  Objection.

19         A.   Down the driveway of 61 Kosciusko Street.

20         Q.   Okay.  And you did not immediately jump

21 the fence; is that right?

22         MS. JONES:  Objection.

23         A.   Immediately?  Can you define

24 "immediately"?



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   When you got to the back of 61 Kosciusko
 3    Street, the first thing you said was that you peered
 4    over the fence; is that right?
 5         A.   Yes.
 6         Q.   After you peered over the fence, did you
 7    then remain in the backyard of 61 Kosciusko Street for
 8    a period of time?
 9         A.   No.
10         Q.   After you peered over the fence in the
11    backyard of Kosciusko Street, you then jumped into the
12    backyard of 57 Kosciusko Street?
13         A.   Correct.
14         Q.   Okay.  And then when you were in the back
15    of 57 Kosciusko Street, you could see that both of the
16    suspects had been detained; correct?
17              MS. JONES:  Objection.
18         A.   Correct.
19         Q.   And after you jumped into the backyard of
20    57 Kosciusko Street, you searched the backyard of 57
21    Kosciusko Street; correct?
22              MS. JONES:  Objection.
23         A.   Correct.
24         Q.   And you were looking for a gun; correct?
25              MS. JONES:  Objection.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   Looking for tossed contraband.
 3         Q.   And when you say "contraband," that would
 4   include a gun or drugs or some other illegal thing;
 5   correct?
 6              MS. JONES:  Objection.
 7         A.   Correct.
 8         Q.   And at the time, you said you were
 9   looking -- so can you tell me specifically what you
10   were looking for at the time?
11         A.   Any sort of contraband.
12         Q.   What did you suspect that these people may
13   have discarded as a result of them running from you?
14         A.   I wouldn't know.
15         Q.   But you had responded for a call of drug
16   activity; correct?
17         A.   Correct.
18         Q.   So it's fair to say that you may have been
19   looking for drugs; right?
20              MS. JONES:  Objection.
21         A.   Any illegal contraband.
22         Q.   And at the time that you were in the
23   backyard of 57 Kosciusko Street after you had jumped
24   the fence from 61 Kosciusko Street, you weren't
25   running, right, you were just walking around the yard?
```



```
1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2                   MS. JONES:  Objection.
3         A.  Can you repeat the question?
4         Q.  Yeah, it was a bad question.
5              At the time, when you first jumped from
6    the fence in the backyard of 61 Kosciusko Street to
7    the backyard of 57 Kosciusko Street, you weren't
8    chasing anyone; correct?
9                   MS. JONES:  Objection.
10        A.  Only until I confirmed that both suspects
11   were in custody.
12        Q.  I've asked you this, but just to confirm,
13   after you jumped the fence into 57 Kosciusko Street,
14   you had confirmed that both suspects were in custody;
15   correct?
16        A.  Only after.
17        Q.  After you jumped the fence?
18        A.  Correct.
19        Q.  So after you jumped the fence, you walked
20   around the backyard of 57 Kosciusko Street and you
21   looked for contraband; correct?
22                  MS. JONES:  Objection.
23        A.  Only after confirming that they were in
24   custody did I search some sort of flight that the
25   suspects had for any contraband that they may have
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    tossed.
 3              Q.   In the backyard of 57 Kosciusko Street?
 4              A.   Correct.
 5              Q.   And that flight had concluded by the time
 6    that you jumped into the backyard of 57 Kosciusko
 7    Street from the backyard of 61 Kosciusko Street;
 8    correct?
 9              MS. JONES:  Objection.
10              A.   Their flight?  The suspects' flight?
11              Q.   Correct.
12              A.   As soon as I confirmed it, I'm not sure as
13    to what point, but I arrived at 57, then realized that
14    they were in custody.
15              Q.   Okay.  And you looked around, you searched
16    the backyard of 57 Kosciusko Street, and you did not
17    find any contraband; correct?
18              MS. JONES:  Objection.
19              A.   I searched what was a possible flight path
20    for the suspects.  In only the brief time I was able
21    to, I was unable to find any contraband and could not
22    complete my search.
23              Q.   And why could you not complete your
24    search?
25              A.   Because that is when Charles Dempsey and
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

         OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 1
 2    his dog came to the backyard.
 3         Q.   Okay.  So I'm not talking about that time.
 4         A.   Uh-huh.
 5         Q.   Okay?  We'll ask about that in a little
 6    bit.
 7              The first time that you jumped the fence
 8    from 61 Kosciusko Street into the backyard of 57
 9    Kosciusko Street --
10         A.   Uh-huh.
11         Q.   -- that's the first time you entered the
12    backyard of 57 Kosciusko Street; correct?
13         A.   Correct.
14         Q.   And at that time, you searched around the
15    backyard for a little bit; correct?
16         A.   In their flight path, correct.
17         Q.   And then you went to the back fence and
18    you spoke with Officer Horowitz, who was in the yard
19    on Sobieski Street; correct?
20         A.   Correct.
21         Q.   And you asked him where did he throw a
22    gun; correct?
23              MS. JONES:  Objection.
24         A.   I asked him about a gun, correct.
25         Q.   And what did he say in response to you?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   That he did not have a gun.
 3         Q.   Now, was that Officer Horowitz or was that
 4    the suspect that he had stopped?
 5         A.   The suspect.
 6         Q.   So the suspect told you he didn't have a
 7    gun, and then you looked around the yard for a little
 8    longer?
 9              MS. JONES:  Objection.
10         A.   Nope.  Went straight to Officer Gorman to
11    ensure that he was fine with his suspect that he had
12    in custody.
13         Q.   Okay.  And you were present in the
14    backyard of 57 Kosciusko Street the first time, before
15    you joined Officer Gorman, for approximately a minute
16    and 10 seconds.  Is that fair to say?
17              MS. JONES:  Objection.
18         A.   Can you repeat that?
19         Q.   You were present in the backyard at 57
20    Kosciusko Street before you jumped the fence into the
21    backyard of 49 Kosciusko Street for approximately a
22    minute and 10 seconds; is that correct?
23              MS. JONES:  Objection.
24         A.   The house -- one house west of 57
25    Kosciusko Street, yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  And one house west of Kosciusko Street,
 3    that's the yard where Officer Gorman had apprehended
 4    the suspect who was wearing a red sweatshirt; correct?
 5         A.  That's where he had the suspect.  As to
 6    what color his sweatshirt is, I can't tell you --
 7    remember.
 8         Q.  But the one yard west is where Officer
 9    Gorman was present with one of the suspects that he
10    had apprehended; correct?
11         A.  Correct.
12         Q.  And you asked Officer Gorman where they
13    had discarded a gun when you were in the backyard of
14    57 Kosciusko Street the first time; correct?
15              MS. JONES:  Objection.
16         A.  I do not remember what our conversation
17    entailed.  It was more -- he directed me to the flight
18    path of where the suspect ran through that yard, 57
19    Kosciusko Street.
20         Q.  I'm sorry.  Did I say "Gorman"?  If I said
21    Gorman, I meant to say Horowitz.  So let me ask you a
22    new question.
23              When you were in the backyard of 57
24    Kosciusko Street and you spoke to Officer Horowitz,
25    you asked him where he threw a gun; correct?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   No.  I asked the suspect.
 3         Q.   Okay.  You asked the suspect.
 4              And you assumed that he had a gun because
 5    they ran from you?
 6              MS. JONES:  Objection.
 7         A.   It was more to make sure that they didn't
 8    leave a gun somewhere.
 9         Q.   And he responded that he didn't have a
10    gun; correct?
11         A.   Correct.
12              MR. SHIELDS:  Give me one second.
13              I may have been saying the wrong
14    addresses.
15              Oh, did you pause that?  We weren't off
16    the record.  You can put it back on.
17              THE VIDEOGRAPHER:  No.  It just timed out
18    on me.  It's back on.
19              MR. SHIELDS:  And just for the written
20    record --
21              THE VIDEOGRAPHER:  The camera timed out
22    after 30 minutes of continuous recording.
23              MR. SHIELDS:  Okay.  So are you going to
24    have to kind of --
25              THE VIDEOGRAPHER:  30 minutes, probably.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2              MR. SHIELDS:  -- press the -- maybe you
 3    can set a timer for like 28 minutes.
 4              THE VIDEOGRAPHER:  I can see it right on
 5    there.
 6              MR. SHIELDS:  Okay.
 7              THE VIDEOGRAPHER:  I apologize.
 8              MR. SHIELDS:  Okay.  And just for the
 9    record, all of these prior questions that I was asking
10    about the backyard of 57 Kosciusko Street, what I
11    meant was -- actually, let me pause before I say this.
12    Let me just make sure I have this correct.  I'm sorry.
13              MS. JONES:  Kim, can I ask you a question
14    while he's looking?  Are you certifying to the
15    authenticity of the video recording?
16              MR. SHIELDS:  We don't need a
17    certification for the authenticity of the video
18    recording because we have a written stenographer who
19    is making the official written record of the
20    deposition.  But we can work that out later.
21              MS. JONES:  Thank you, Elliot.
22              Kim, are you certifying to the
23    authenticity of the video recording?
24              You're shaking your head no.  Okay.  I
25    just wanted to ask.  Thank you.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MR. SHIELDS:  Okay.  And so I figured out
 3      the answer to my question.  So all of the prior times
 4      that I was talking about my client's backyard, the
 5      proper address should have been 53 Kosciusko Street,
 6      not 57 Kosciusko Street.
 7                   So just for the record, all of the prior
 8      questions up to this point we should change the
 9      address from 57 Kosciusko Street -- all the times that
10      I said 61 Kosciusko Street, it should be 57 Kosciusko
11      Street.  All the times that I said 57 Kosciusko
12      Street, it should be 53 Kosciusko Street.  So I'm just
13      going to ask some questions to clarify that.
14                   MS. JONES:  Can you say that one more
15      time?  So every time you said 61, it should have been
16      which number?
17                   MR. SHIELDS:  57.
18                   MS. JONES:  57.
19                   And every time you said 57, it should have
20      been 53?
21                   MR. SHIELDS:  Correct.
22          Q.  And I'm just going to ask a couple of
23      questions, Officer Algarin, to clarify that.
24                   So to be clear, on the date of the
25      incident, you said that the suspects ran down the
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     driveway of 61 Kosciusko Street; is that correct?
 3                A.   Correct.
 4                Q.   And then they entered the backyard of 57
 5     Kosciusko Street; is that correct?
 6                MS. JONES:   Objection.
 7                A.   No.   53.   Directly into 53.
 8                Q.   Do you remember if 53 Kosciusko Street
 9     had -- was surrounded by a wooden fence or something
10     else?
11                A.   53 Kosciusko Street only had a wooden
12     fence on the east side of the perimeter.   The rest was
13     chain-link.
14                Q.   So you're saying that the driveway from 61
15     Kosciusko Street had direct access into the backyard
16     of 53 Kosciusko Street?
17                A.   I do not remember.
18                Q.   Now -- so you chased them down the
19     backyard of -- I'm sorry -- down the driveway of 61
20     Kosciusko Street.   That's what you said; right?
21                A.   Yes.
22                Q.   And then they entered a backyard; right?
23                A.   Now I'm getting confused with all these
24     number changes.
25                Q.   The yard that the suspects ran into, that
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     is the first yard that you entered; correct?
 3              A.   Correct.
 4              Q.   And then you said that you peered over a
 5     wooden fence; correct?
 6              A.   Correct, that looks over 53 Kosciusko
 7     Street.
 8              Q.   So the fence that you looked over looked
 9     over into 53 Kosciusko Street; correct?
10              A.   Correct.
11              Q.   And then you jumped over the fence from
12     the yard that I'll represent to you is 57 Kosciusko
13     Street into the yard that was 53 Kosciusko Street?
14              A.   Yes.
15              Q.   Okay.  So it would be fair to say that the
16     suspects ran down a driveway into the backyard of 57
17     Kosciusko Street; correct?
18              A.   Correct.
19              Q.   Okay.  And then you jumped the fence into
20     the backyard of 53 Kosciusko Street; correct?
21              A.   Correct.
22              Q.   And then you searched the yard of 53
23     Kosciusko Street for some period of time; correct?
24              A.   Just the flight path of the suspects that
25     they had taken, 53 Kosciusko Street.
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2       Q.   Okay.  And when you jumped into the
 3   backyard of 53 Kosciusko Street, Officer Gorman had
 4   one suspect detained in the yard directly to the west
 5   of Kosciusko Street; correct?
 6            MS. JONES:  Objection.
 7       A.   Officer Gorman?
 8       Q.   Correct.
 9       A.   Yes.
10       Q.   And Officer Horowitz had the other suspect
11   detained in the yard on Sobieski Street; correct?
12       A.   To the south of 53 Kosciusko Street,
13   correct.
14       Q.   And that yard to the south would have been
15   a yard off of Sobieski Street; correct?
16       A.   Correct.
17       Q.   Okay.  And so you were present in the
18   backyard of 53 Kosciusko Street the first time for
19   approximately one minute.  Is that accurate --
20            MS. JONES:  Objection.
21       Q.   -- to your recollection?
22       A.   Do not remember specifically --
23       Q.   Okay.
24       A.   -- how long.
25       Q.   Long enough to walk around, search the
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    flight path that you believed the suspects ran
 3    through, and have a short conversation with the
 4    suspect that Officer Horowitz had detained; correct?
 5              A.   Correct.
 6              Q.   Did you do anything else while you were in
 7    the backyard of 53 Kosciusko Street the first time?
 8              A.   Walked over to Officer Gorman.
 9              Q.   Okay.  So you walked over to Officer
10    Gorman and you jumped the fence from 53 Kosciusko
11    Street into the yard directly to the west of 53
12    Kosciusko Street; correct?
13              A.   Correct.
14              Q.   And --
15              MS. JONES:  One piece of clarification on
16    these numbers.  You weren't asking him to change the
17    numbers in your prior questioning, we're just going to
18    leave the note in there that 61 should be 57 and 57
19    should be 53?
20              MR. SHIELDS:  Correct.  And that's why I
21    asked the questions over again, basically.
22              MS. JONES:  I just wanted to clarify that
23    the record wasn't changing before.
24              Q.   After you jumped into the backyard of 49
25    Kosciusko Street where Officer Gorman was, what did
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    you do?
 3              A.   Sorry.  Let them go by.
 4                   I spoke with Officer Gorman briefly to see
 5    if the suspect had any contraband on him and as to
 6    what his flight were.  Officer Gorman told me as to
 7    what the flight path was.
 8              Q.   And did you look around in the backyard of
 9    49 Kosciusko Street at all?
10              A.   Just from my walk from the fence to
11    Gorman, to Gorman to the fence.
12              Q.   And the backyard at 49 Kosciusko Street
13    had a big dog cage in it; is that right?
14              A.   Correct.
15              Q.   And what would you have done if a dog had
16    run out at you in the backyard of 49 Kosciusko Street?
17                   MS. JONES:  Objection.
18              A.   It depends on the situation.
19              Q.   You might have shot the dog if it ran at
20    you?
21                   MS. JONES:  Objection.
22              A.   No.  It depends on that dog's demeanor,
23    aggressiveness, flight path, speed, size.
24              Q.   We'll get back to that later.
25                   When you were in the backyard of 49
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2   Kosciusko Street, Officer Gorman told you to backtrack
 3   through the flight path in 53 Kosciusko Street;
 4   correct?
 5            MS. JONES:  Objection.
 6            A.   He pointed out a flight path of the
 7   suspect, so that was a good starting point to
 8   backtrack.
 9            Q.   And he told you you should backtrack;
10   correct?
11            MS. JONES:  Objection.
12            A.   Yes.
13            Q.   And then you pulled up a small picnic
14   table, and then you jumped over the fence into the
15   backyard of 53 Kosciusko Street; correct?
16            A.   I used the picnic table to assist myself
17   over the fence, yes.
18            Q.   What was going through your head at the
19   exact moment that you jumped the fence?
20            A.   Do not remember.
21            Q.   Were you thinking about anything at the
22   moment that you jumped the fence?
23            A.   Just searching for contraband.
24            Q.   Did you think about the fact that you had
25   already searched the yard?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2      have probable cause; correct?
 3                   MS. JONES:  Objection.
 4              A.   Sure.
 5              Q.   By "sure," you mean, yes, you must have
 6      probable cause as part of the exigent circumstances
 7      test; correct?
 8              A.   Yes.
 9              Q.   And you also must have an emergency
10      situation; correct?
11                   MS. JONES:  Objection.
12              A.   No.
13              Q.   So part of ex --
14              A.   Can you define your emergency situation?
15              Q.   Sure.  Emergency would generally mean that
16      there was an urgent need to either render aid or take
17      action.
18              A.   Yes.
19              Q.   So, yes, exigent circumstances require
20      both probable cause and an emergency; correct?
21              A.   Yes.
22              Q.   And an emergency could be something like
23      someone's life is in danger; correct?
24              A.   Yes.
25              Q.   Like if you heard someone screaming for
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2      help?
 3              A.   Yes.
 4              Q.   Or if you saw them being attacked?
 5              A.   Yes.
 6              Q.   Those are situations where there would be
 7      an emergency?
 8              A.   Correct.
 9              Q.   So you could reasonably enter someone's
10      property without a warrant or consent if you believe
11      their life was in danger; correct?
12              A.   Yes.
13              Q.   And can we agree if there was no
14      emergency, then a warrantless entry to search for
15      weapons or contraband is not allowed; correct?
16                   MS. JONES:   Objection.
17              A.   No.
18              Q.   No, the warrantless entry is not allowed;
19      correct?
20                   MS. JONES:   Objection.
21              A.   No, that's not what I meant.   I'm saying
22      "no" to your statement.
23              Q.   So you're saying you're allowed to enter a
24      property to search for contraband or weapons even if
25      there's no emergency?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   No, I didn't say for weapons or
 3   contraband.
 4         Q.   Are you allowed to enter someone's
 5   property to search for weapons or contraband if
 6   there's no emergency, if you don't have consent or a
 7   warrant?
 8         A.   No.
 9         Q.   So if you don't have consent or a warrant,
10   there must be an emergency for you to enter someone's
11   property to search for weapons or contraband; correct?
12              MS. JONES:  Objection.
13         A.   I'm really stuck on the drugs-and-weapons
14   thing that you keep putting out there, but no.
15         Q.   Can you explain what you mean by "no"?
16         A.   It all depends on the situation.
17         Q.   And we agree that for exigent
18   circumstances to apply you must have probable cause
19   and an emergency; right?
20         A.   Correct.
21         Q.   So if there's no emergency, then there's
22   no exigent circumstances; correct?
23              MS. JONES:  Objection.
24         A.   I feel like we're going around in circles.
25   Can you say your question one more time?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  We can agree that if there's no emergency,
 3    then a warrantless entry to search for weapons or
 4    contraband is not allowed; correct?
 5         A.  Correct.
 6         Q.  Even if there's probable cause to believe
 7    that there's weapons or contraband on the property, if
 8    there's no emergency, you're not allowed to enter the
 9    property; correct?
10              MS. JONES:  Objection.
11         A.  Correct.
12         Q.  And we can agree if there's no emergency,
13    then the warrantless entry is unlawful even if a
14    felony has been committed; correct?
15              MS. JONES:  Objection.
16         A.  What is that felony?
17         Q.  It doesn't matter what the felony is.  If
18    there's no emergency, you're not allowed --
19         A.  There's an emergency.
20         Q.  -- you're not allowed to enter the
21    property; correct?
22              MS. JONES:  Objection.
23         A.  And your emergency is only that somebody's
24    in danger?
25         Q.  Any emergency.  There's got to be an
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    emergency in order for you to lawfully enter the
 3    property without a warrant or consent; correct?
 4         A.   No.
 5         Q.   So you can enter a property without a
 6    warrant or consent even if there's not an emergency?
 7         A.   To make sure there's no one else in the
 8    home, correct.
 9         Q.   So you're saying in certain circumstances
10    if you need to make sure there's not someone in a
11    house, you can enter a property?
12         A.   If the house is supposed to be empty and
13    we're supposed to hold for a warrant, however, we
14    believe there's somebody still inside the home,
15    clearing the home to make sure that nobody else is in
16    there, not necessarily searching for weapons or
17    contraband, yes.
18         Q.   So under certain circumstances without a
19    warrant or consent, you can still enter a home even if
20    there's not an emergency?
21         A.   Correct.
22         Q.   Are there certain circumstances where you
23    can enter a property without a warrant or consent if
24    you don't have probable cause?
25         A.   Define "property."  What is the property?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  A residential property.
 3         A.  A house with a fenced-in area?  Are we
 4    talking about woods?  Open field?
 5         Q.  Someone's home --
 6         A.  Okay.
 7         Q.  -- and/or the curtilage to their home.
 8         A.  Okay.  No.
 9         Q.  A mere suspicion that contraband is
10    present on the property does not on its own create an
11    urgency, justifying a warrantless entry onto the
12    property; correct?
13              MS. JONES:  Objection.
14         A.  In that isolated what you just said, yes.
15         Q.  Because suspicion is less than probable
16    cause; correct?
17         A.  Correct.
18         Q.  So the mere possibility that contraband
19    could be removed or destroyed does not create urgency,
20    justifying a warrantless entry onto a property;
21    correct?
22              MS. JONES:  Objection.
23         A.  It depends on the situation and exigent
24    circumstances.
25         Q.  We're talking about exigent circumstances
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    here.  "Urgency" means emergency.  So if there's no
 3    emergency, you can't enter a property; correct?
 4              MS. JONES:  Objection.
 5         A.  I think we just discussed that.
 6         Q.  Okay.  So my question is:  The mere
 7    possibility, the hypothetical possibility --
 8         A.  Uh-huh.
 9         Q.  -- that contraband could be removed or
10    destroyed does not create an emergency; correct?
11         A.  Not in itself, no.
12         Q.  So the mere possibility that contraband
13    can be removed or destroyed does not create an
14    emergency that would justify a warrantless entry onto
15    property; correct?
16              MS. JONES:  Objection.
17         A.  Correct.
18              THE VIDEOGRAPHER:  I'm coming up on that
19    30 minutes.  I'm just going to reset it now.
20              THE WITNESS:  Now is a good time to take a
21    break?
22              MR. SHIELDS:  Sure.
23              So we're off the record.
24         (The proceeding recessed at 10:45 a.m.)
25         (The proceeding reconvened at 10:48 a.m.;
```



OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2   detainee.
3           Q.   And in that video, the suspect that
4   Officer Horowitz had detained in fact told you he did
5   not have a gun; correct?
6           A.   Correct.
7           Q.   And when you were searching the yard as
8   depicted in that first 1 minute and 12 seconds of the
9   video, you didn't find a gun or any other contraband;
10  correct?
11          A.   In that very brief moment in the yard, no.
12          Q.   And the entire yard was surrounded by a
13  fence; correct?
14          A.   Correct.
15          Q.   And the video depicted what you had
16  testified to earlier, that both of the suspects were
17  detained when you were having the conversation with
18  Officer Horowitz; correct?
19               MS. JONES:  Objection.
20          A.   Say it again.
21          Q.   The video -- the portion of the video that
22  we just watched depicted that both of the suspects had
23  been detained by Officer Horowitz and Officer Gorman
24  at the time that you were leaning on the fence and
25  having the conversation with Officer Gorman and his



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    suspect about the gun; correct?
 3              MS. JONES:  Objection.
 4         A.  Officer Horowitz about the gun and his
 5    suspect.
 6         Q.  And at that time -- what I'm just getting
 7    at is both of those suspects were detained.  They were
 8    no longer running or fleeing; correct?
 9         A.  Correct.
10         Q.  And Officer Horowitz found marijuana on
11    the suspect that he detained; correct?
12         A.  Correct.
13              MR. SHIELDS:  Okay.  And now I'm going to
14    play the video again.  Okay?  And we are beginning the
15    video at the same spot where we had paused it, 1
16    minute and 12 seconds into the video, which is 17
17    hours, 8 minutes, and 30 seconds on the bottom
18    right-hand corner.
19              (At this time the video was played.)
20              MR. SHIELDS:  And I'm pausing the video
21    now at 2 minutes and 12 seconds into the video, and
22    that is also 17 hours, 9 minutes, and 29 seconds on
23    the bottom right.
24         Q.  Is that accurate, Officer Algarin?
25         A.  Correct.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  And previously, when I had begun playing
 3    the video, it was at 1 minute and 12 seconds into the
 4    video; is that right?
 5         A.  Correct.
 6         Q.  And that depicted you jumping into the
 7    backyard at 49 Kosciusko Street, where Officer Gorman
 8    was; correct?
 9         A.  Correct.
10         Q.  So you were in the backyard of 49
11    Kosciusko Street for approximately one minute;
12    correct?
13         A.  Correct.
14         Q.  And we agreed earlier that it would have
15    taken about 15 to 20 seconds to walk to the front door
16    of Mr. Dempsey's house; correct?
17              MS. JONES:  Objection.
18         A.  Correct.
19         Q.  So in the one minute that you were in the
20    backyard of 49 Kosciusko Street, you could have in a
21    shorter amount of time walked to the front door and
22    knocked on Mr. Dempsey's door and asked for his
23    consent to enter his yard; correct?
24              MS. JONES:  Objection.
25         A.  Correct.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   Does watching the video refresh your
 3    recollection at all about what was going through your
 4    head at the exact moment that you jumped the fence and
 5    entered Mr. Dempsey's yard?
 6         A.   Same as I stated before.
 7         Q.   And you stated before that you weren't
 8    thinking about anything; correct?
 9              MS. JONES:  Objection.
10         A.   Finding contraband.
11         Q.   And --
12         A.   And always thinking about rules.
13         Q.   I'm sorry.  Can you repeat the last thing
14    you just said?
15         A.   When we had the conversation, it was about
16    rules, and we had that whole thing about rules and
17    always thinking about following the rules, and then
18    finding contraband.
19         Q.   At the exact moment that you jumped the
20    fence, are you saying that you were thinking about any
21    specific rule?
22              MS. JONES:  Objection.
23         A.   No.
24         Q.   At the exact moment that you jumped the
25    fence, you were not thinking about any specific rule?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  No.
 3         Q.  And we agreed before that the first time
 4    you were in Mr. Dempsey's yard for approximately a
 5    minute and 10 seconds you didn't not find a gun or
 6    contraband; correct?
 7         A.  Correct.
 8         Q.  And from the neighboring yard, 49
 9    Kosciusko Street, you could see over the fence into
10    the backyard; correct?
11         A.  Say that one more time.
12         Q.  From the neighboring yard where Officer
13    Gorman was, 49 Kosciusko Street, you could see over
14    the fence into the backyard of 53 Kosciusko Street;
15    correct?
16         A.  Correct.
17              MS. JONES:  One second.  Do you need to
18    move back over since the sun has moved?  I mean, you
19    don't have to.  I'm just -- because I hate being in
20    the sun.  Sorry.  If that's better.  Do what you want.
21              MR. SHIELDS:  Is that better light for
22    you, Ben?
23              THE VIDEOGRAPHER:  Yes.  Give me one
24    second.
25              MS. JONES:  And I'm keeping him on his
```



1          OFFICER JAVIER ALGARIN - BY MR. SHIELDS

2     toes.

3          THE VIDEOGRAPHER:  I'm good there.  Thank

4     you.

5          Q.  And prior to jumping the fence from 49

6     Kosciusko Street into the yard at 53 Kosciusko Street,

7     you did not observe a gun or any contraband on the

8     ground by looking over the fence; correct?

9          A.  Correct.

10          Q.  And prior to entering the yard from 49

11     Kosciusko Street into 53 Kosciusko Street, you did not

12     ask the suspect if he discarded any contraband in that

13     yard; correct?

14          MS. JONES:  Objection.

15          A.  Correct.

16          Q.  And you never saw the suspect discard any

17     contraband on the property; correct?

18          MS. JONES:  Objection.

19          A.  Correct.

20          Q.  And Gorman didn't tell you that he had

21     seen the suspect discard any contraband in the yard at

22     53 Kosciusko Street; correct?

23          MS. JONES:  Objection.

24          A.  Correct.

25          Q.  Gorman simply told you to backtrack



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    through the yard, and then you immediately jumped the
 3    fence; correct?
 4              MS. JONES:  Objection.
 5         A.   Correct.
 6         Q.   And you had no facts to support a
 7    reasonable belief that the suspect had discarded a gun
 8    in that yard; correct?
 9              MS. JONES:  Objection.
10         A.   Looking for contraband, not specifically a
11    gun.
12         Q.   Listen to my question and answer my
13    question, please.  You had no facts to support a
14    reasonable belief that the suspect had discarded a gun
15    in the yard; correct?
16              MS. JONES:  Objection.
17         A.   Specifically a gun, no.
18         Q.   And you had no facts to support a
19    reasonable belief that the suspect had discarded any
20    drugs in the yard; correct?
21              MS. JONES:  Objection.
22         A.   Other than that Officer Horowitz's
23    detainee had drugs on him.
24         Q.   So the answer is, no, you had no specific
25    facts to support a reasonable belief that the suspect
```



```
 1                OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2     had discarded guns -- or drugs in that yard; correct?
 3                    MS. JONES:  Objection.
 4               A.   Correct.
 5               Q.   And do you accept responsibility for
 6     entering Mr. Dempsey's backyard without a warrant?
 7                    MS. JONES:  Objection.
 8               A.   Correct.
 9               Q.   So, yes, you do accept responsibility for
10     entering Mr. Dempsey's yard without a warrant?
11                    MS. JONES:  Objection.
12               A.   Correct.
13               Q.   And do you accept responsibility for
14     entering Mr. Dempsey's backyard without his
15     permission?
16               A.   Correct.
17               Q.   And earlier we agreed that you could have
18     walked to his front door, and it would have only taken
19     15 to 20 seconds, and you could have asked his
20     permission to enter his yard; correct?
21                    MS. JONES:  Objection.
22               A.   Correct.
23               Q.   And earlier you agreed that that's
24     important so that you could let him know what was
25     going on in his backyard; correct?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                 MS. JONES:  Objection.
 3        A.   That was the theoretical setting, not
 4   necessarily pertaining to Mr. Dempsey.
 5        Q.   Here it would have been important to go
 6   knock on his front door to tell him what was going on
 7   in his backyard; correct?
 8        A.   Correct.
 9        Q.   And would you agree that if there's one
10   more -- more than one choice, it's always best to make
11   the safest choice?
12                 MS. JONES:  Objection.
13        A.   No.
14        Q.   Okay.  When are you allowed to make an
15   unsafe choice?
16        A.   When I have to save someone's life.
17        Q.   Okay.  Other than instances where you have
18   to save someone's life, would you agree that if
19   there's more than one choice, it's always best to make
20   the safest choice?
21                 MS. JONES:  Objection.
22        A.   Correct.
23        Q.   Earlier you said that you made a plan with
24   Officers DiSabatino, Gorman, and Horowitz; right?
25        A.   Correct.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   And that plan was that you believed the
 3    suspects would run through the backyards of Kosciusko
 4    Street, into the yards of Sobieski Street?
 5         A.   Correct.
 6         Q.   And have you devised similar plans in the
 7    past before this incident?
 8         A.   I don't remember.
 9         Q.   So you might have, but you don't remember?
10         A.   I do not remember.
11         Q.   And is that a common police tactic?
12         A.   Which part?
13         Q.   Is it a common police tactic to make a
14    plan with other officers to detain suspects?
15         A.   Yes.
16         Q.   And is it a common plan with other -- I'm
17    sorry.  Withdrawn.
18              Is it a common tactic to make a plan with
19    other officers where you expect suspects to run and to
20    station officers in a location to detain them?
21         A.   Yes.
22         Q.   Is it common to chase suspects through
23    people's yards?
24         A.   Yes.
25         Q.   How often during a typical week would you
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    say you chase suspects through people's yards?
 3              A.   Possibly once a week.
 4              Q.   And you said possibly.  So sometimes more?
 5              A.   Yes.
 6              Q.   And when is the last time that you chased
 7    a suspect through someone's yard?
 8              A.   Saturday night.
 9              Q.   Tell me about that incident.
10              MS. JONES:  Objection.
11              A.   Individuals were in Greece, the Town of
12    Greece.  They're armed with a handgun.  They
13    approached an elderly couple with this gun.  They
14    pistol-whipped them, assaulted them.  A neighbor
15    attempted to intervene.  Those individuals then
16    assaulted him.
17                   After the assault, those same individuals
18    went to the elderly couple's home.  Within that home,
19    they did take their personal belongings.  One of them
20    car keys.  And then after taking the car keys, they
21    proceeded to take the car, which is a white Buick
22    Encore.
23                   Later on that night, myself and my partner
24    found that Encore.  The Encore came to a stop.  One of
25    the occupants proceeded to flee from that vehicle
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2      which had led officers to several backyards.
 3              Q.   So you chased them through those
 4      backyards?
 5                   MS. JONES:  Objection.
 6              A.   Chased the one through those backyards,
 7      correct.
 8              Q.   And you detained and arrested that person?
 9              A.   No.
10              Q.   They were able to get away?
11              A.   Yes.
12              Q.   Did you have to jump any fences when you
13      chased them through those yards?
14              A.   Yes.
15              Q.   Did you see any dogs when you went through
16      those backyards?
17              A.   No.
18              Q.   Have you previously encountered dogs in
19      other situations when you went through people's
20      backyards?
21              A.   Yes.
22              Q.   Or front yards?
23              A.   Yes.
24                   THE VIDEOGRAPHER:  I'm going to refresh
25      this.  Okay?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MR. SHIELDS:  Yes.
 3                   THE VIDEOGRAPHER:  Okay.
 4                   MR. SHIELDS:  So now we're good for 30
 5      minutes?
 6                   THE VIDEOGRAPHER:  Yeah, we're good.  I've
 7      got it timed on here.
 8           Q.  On the date of the incident, as part of
 9      the plan that you made, did you consider what you
10      might do if you encountered a dog when you were
11      present in any of the yards?
12           A.  No.
13           Q.  And you previously stated that, as you've
14      gone through people's yards before, you have
15      encountered dogs; correct?
16           A.  Correct.
17           Q.  Lots of people in the city of Rochester
18      have dogs; correct?
19                   MS. JONES:  Objection.
20           A.  There's a large amount of dogs in the city
21      of Rochester, yes.
22           Q.  And can you estimate the percentage of
23      properties that you would say, in your experience as a
24      police officer, have dogs?
25                   MS. JONES:  Objection.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   I don't know for certain.  I'd like to say
 3    approximately 60, 65 percent.
 4         Q.   And we agreed earlier that the backyard of
 5    49 Kosciusko Street had a big dog cage; right?
 6         A.   Correct.
 7         Q.   And so that would indicate that a dog
 8    resided at 49 Kosciusko Street; right?
 9              MS. JONES:  Objection.
10         A.   A possibility of there being a dog at 49
11    Kosciusko Street.
12         Q.   And, obviously, there was a dog that
13    resided at 53 Kosciusko Street; right?
14         A.   Correct.
15         Q.   So it's fair to say that if you're in
16    someone's yard, because in your experience 60 to 65
17    percent of the households in Rochester have dogs,
18    you're more likely than not to be in someone's yard
19    that has a dog; correct?
20              MS. JONES:  Objection.
21         A.   Correct.
22         Q.   So that means that it's likely that you'll
23    encounter a dog if you're in someone's yard; correct?
24              MS. JONES:  Objection.
25         A.   No.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   Okay.  It's likely that if you enter a
 3    yard that a dog might live there; correct?
 4              MS. JONES:  Objection.
 5         A.   Correct.
 6         Q.   So it's possible that you would encounter
 7    a dog on that property; correct?
 8              MS. JONES:  Objection.
 9         A.   It's possible.
10         Q.   So on this day, you knew that it was
11    possible that you might encounter a dog; correct?
12              MS. JONES:  Objection.
13         A.   Correct.
14         Q.   And when a dog sees a stranger, often the
15    dog runs up to that person; correct?
16              MS. JONES:  Objection.
17         A.   No.  It can.
18         Q.   Some dogs run up to strangers that they
19    don't know on their property; correct?
20         A.   Correct.
21         Q.   And that's not necessarily indicative of a
22    dog attacking; correct?
23              MS. JONES:  Objection.
24         A.   Not always.
25         Q.   How many times before this incident had
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2   you encountered a dog during your duties as a police
 3   officer?
 4        A.   Several times.
 5        Q.   Had you ever previously shot a dog?
 6        A.   No.
 7        Q.   Had you ever previously -- withdrawn.
 8              Have you ever been attacked by a dog other
 9   than -- other than this incident, and not saying that
10   you were attacked in this incident, just at any other
11   time have you been attacked by a dog either as a
12   police officer or as a civilian?
13              MS. JONES:  Objection.
14        A.   I'm trying to think.
15              Yes, when I was younger, my dog.
16        Q.   I'm sorry.  I didn't hear everything you
17   said.  You said when you were younger, you were
18   attacked by a dog?
19        A.   Yeah, my dog.
20        Q.   You were attacked by your dog when you
21   were younger?
22        A.   Yeah.
23        Q.   And were you injured?
24        A.   No.  Seriously injured, no.
25        Q.   And what happened during that attack?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   He bit me.
 3         Q.   But you were okay?
 4         A.   Yes.
 5         Q.   And how old were you?
 6         A.   I don't know.  Maybe 5.
 7         Q.   And what did you do to the dog after it
 8    bit you?
 9         A.   Me, nothing.
10         Q.   Did your parents or anybody else
11    discipline the dog for biting you?
12         A.   I do not know.
13         Q.   Did you continue to live with that dog
14    after that incident?
15         A.   No.
16         Q.   What happened after that incident?
17         A.   That, I don't know.  It's a question till
18    this day.
19         Q.   Was it your family dog?
20         A.   Yes.
21         Q.   So is it fair to say that your family got
22    rid of that dog after that incident?
23              MS. JONES:  Objection.
24         A.   That's what I'm assuming happened.
25         Q.   All right.  So earlier you said that you
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2      didn't make any plan for what you would do if you
 3      encountered a dog on that day; correct?
 4              A.   Correct.
 5              Q.   And you earlier testified that you had
 6      recently finished your academy training; correct?
 7                   MS. JONES:   Objection.
 8              A.   My field training training.
 9              Q.   You had recently finished your training;
10      correct?
11              A.   Field training.
12                   MS. JONES:   Objection.
13              Q.   And immediately before field training is
14      your academy training; right?
15              A.   Correct, in March.
16              Q.   So you finished your academy training in
17      March, and then you did your field training from March
18      till -- did you say July?
19              A.   Yes.
20              Q.   So you recently just had gotten about 13
21      months of training with the RPD.  Is that fair to say?
22                   MS. JONES:   Objection.
23              A.   No.
24              Q.   How long is your academy training?
25              A.   Six months.
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   Okay.  And then field training is four
 3    months?
 4         A.   Correct.
 5         Q.   So ten months of training?
 6         A.   Correct.
 7         Q.   And then after that ten months of
 8    training, you've been an officer between July and
 9    October; correct?
10         A.   Correct.
11         Q.   And at the academy, did they train you to
12    make a plan for how to safely interact with a dog when
13    you entered a residential property?
14         A.   There was a class, interaction with dogs.
15         Q.   How long was that class?
16         A.   I don't remember.  Possibly half a day.
17         Q.   Okay.  Tell me everything you remember
18    about that class.
19         A.   It was through the Humane Society coming
20    into the classroom, basically, to state what the --
21    what their purpose is, where they're located, how to
22    get in contact with them, what they deal with, and
23    their experiences, what they have dealt with, and
24    their dog interactions of what they do and tactics
25    they might use, what -- where it could be they use a
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    baton or they use some other instrument.
 3            Q.  So you were trained to potentially use a
 4    baton or some other instrument in part of that
 5    training.  Is that what you're saying?
 6            A.  Correct.
 7            Q.  And do you remember how long that training
 8    lasted on that day?
 9            A.  Half a day.  So approximately three, four
10    hours.
11            Q.  Okay.  And did you -- did they teach you
12    that you could use OC spray or pepper spray with the
13    dog?
14            A.  No.
15            Q.  Okay.  So that wasn't part of that class?
16            A.  Not that I remember.
17            Q.  Okay.  And did you get any handouts when
18    you took that class?
19            A.  I don't remember.
20            Q.  Do you have any documents in your
21    possession, either at RPD or at home, relating to that
22    class?
23            A.  No.
24            Q.  At the academy, were you trained that you
25    could shoot a dog if it ran at you when you were on a
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    residential property?
 3                   MS. JONES:  Objection.
 4         A.  We were trained to protect ourselves from
 5    imminent threat.
 6         Q.  Okay.  And were you taught that if a dog
 7    is running at you without anything else that that
 8    constitutes an imminent threat?
 9         A.  No.
10         Q.  Okay.  What is generally the definition of
11    an "imminent threat"?
12         A.  A threat they believe is going to
13    seriously injure and/or kill you.
14         Q.  Okay.  Are you aware of any officer ever
15    sustaining serious injuries or death as a result of a
16    dog attack?
17                   MS. JONES:  Objection.
18         A.  Officer?  No.
19         Q.  Were you trained at the academy or during
20    field training that any officer had ever been -- any
21    RPD officer had ever sustained serious injuries or
22    died as a result of a dog attack?
23         A.  Not that I'm aware of.
24         Q.  Okay.  So you were never trained that a
25    dog running at you posed an imminent threat?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  Say that again.
 3         Q.  You were never trained that a dog running
 4    at you in and of itself constitutes an imminent
 5    threat?
 6              MS. JONES:  Objection.
 7         A.  No.
 8         Q.  As part of your training, were you told
 9    that you were allowed to shoot dogs?
10         A.  Under circumstances, yes.
11         Q.  Those circumstances would be if they posed
12    an imminent threat?
13         A.  Correct.
14         Q.  But you were also told that there's never
15    been a circumstance in the history of the RPD where a
16    dog had seriously injured or killed an officer;
17    correct?
18         A.  Incorrect.
19              MS. JONES:  Objection.
20         A.  That's not what I said.
21         Q.  Okay.
22         A.  I said none that I was aware of.
23         Q.  Okay.  So you don't remember at all, as
24    part of your training, ever learning that a dog had
25    seriously injured or killed an officer; correct?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3         A.  Correct, not that I'm aware of.  It wasn't
 4    specifically stated that no one has ever been injured
 5    by a dog in RPD.
 6         Q.  Were you trained that a dog could pose an
 7    imminent threat?
 8         A.  Yes.
 9         Q.  Okay.  And under those circumstances, you
10    were trained to shoot and kill the dog?
11         A.  If necessary.
12         Q.  Okay.  And sometimes it might not be
13    necessary?
14         A.  Correct.
15         Q.  Okay.  And sometimes you could use a baton
16    or pepper spray instead?
17         A.  A baton.  Never said pepper spray.
18         Q.  Okay.  So just a baton.
19              Were you trained that you could maybe kick
20    the dog?
21         A.  Yeah.
22         Q.  No?
23         A.  I said, "Yeah."
24         Q.  Oh, you said yes.  So you were trained
25    that you could use a baton or you could kick the dog?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.  (The witness indicated nonverbally.)
 3         Q.  And was that part of your Human Society
 4    training or something else?
 5         A.  I don't remember.
 6         Q.  Was that at the academy or something else?
 7         A.  Academy.
 8         Q.  And aside from the Humane Society
 9    training, do you remember any other training about
10    dealing with dogs during your police duties?
11         A.  I'm sorry.  Say it one more time.
12         Q.  Other than the Humane Society training,
13    when you were at the police academy, was there any
14    additional training about dog interactions?
15         A.  Yes, aggressive dog, to be able to fire
16    upon an aggressive dog if need be.
17         Q.  Was that part of your firearms training?
18         A.  Correct.
19         Q.  Okay.  So you've got Humane Society
20    training dealing with dogs and you've got firearms
21    training relating to dogs.  Is that accurate?
22         A.  Correct.
23         Q.  Anything else at the academy?
24         A.  Not that I remember.
25         Q.  Okay.  Any training after the academy
```



```
1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
2    before this incident specifically relating to
3    interactions with dogs?
4            A.   Not that I remember.
5            Q.   So before this incident, the only training
6    that you had gotten about interacting with dogs was
7    the Humane Society training and the firearms training.
8    Is that fair to say?
9            MS. JONES:   Objection to form.
10           A.   That I remember, yes.
11           Q.   And in the Humane Society training, did
12   they tell you that in certain circumstances you're
13   allowed to shoot a dog?
14           A.   I do not remember.
15           Q.   Tell me anything else you remember about
16   that Humane Society training.
17           A.   I've stated it.
18           Q.   So you've told me everything that you
19   remember about the Humane Society training?
20           A.   That I remember from six years ago, five
21   years ago, correct.
22           Q.   Okay.  And since that time, five or six
23   years ago at the academy, have you gotten any other
24   training about safely interacting with dogs during
25   your police duties?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   No.
 3         Q.   So in the past six years, you've gotten no
 4    training about interacting with dogs?
 5         A.   Correct.
 6         Q.   And as part of your training, would it be
 7    accurate to say that you were never told that you
 8    aren't allowed to shoot a dog?
 9         A.   I'm sorry?
10         Q.   As part of your training, were you ever
11    told that you are not allowed to shoot a dog?
12         A.   No.
13         Q.   And as part of your training, were you
14    ever trained on the use of force continuum applied to
15    dogs?
16         A.   Use of force continuum applied to dogs?
17         Q.   Correct.
18         A.   No.
19         Q.   And at the academy, were you provided any
20    training about how to avoid shooting a dog?
21         A.   I do not remember.
22         Q.   So you don't remember any specific
23    training about situations that you might encounter a
24    dog and how to make sure you don't shoot the dog?
25         A.   Well, not every encounter is a --
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2       Q.  I understand what you meant, so I was just
 3  switching to a different question.
 4       A.  But for the record, can we clarify it?
 5            MS. JONES:  Yes.
 6       Q.  I think the record gets -- sure.  So at
 7  the point when you pointed your gun at Mr. Dempsey,
 8  the gun was already out; correct?
 9       A.  Correct.
10       Q.  Because you had pulled it out when you
11  shot and killed Tesla; correct?
12       A.  Correct.
13       Q.  At the moment that you jumped the fence
14  from 49 Kosciusko Street into the backyard of 53
15  Kosciusko Street, you did not have any weapons in your
16  hands at that moment; correct?
17       A.  Correct.
18       Q.  You only pulled out your firearm after you
19  saw Tesla; correct?
20            MS. JONES:  Objection.
21       A.  After I saw Tesla charging, yes.
22       Q.  And when you saw Tesla, you could have
23  instead pulled out your OC spray; correct?
24            MS. JONES:  Objection.
25       A.  I could have.
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2            Q.   Did you also have a taser on you at the
 3   time?
 4            A.   No.
 5            Q.   Okay.  Did you also have a baton on you at
 6   the time?
 7            A.   Yes.
 8            Q.   Did you have any other weapons on you at
 9   the time?
10            A.   No.
11            Q.   So other options, in terms of weapons,
12   were only OC spray or a baton; correct?
13            A.   Correct.
14            Q.   Did you ever play baseball?
15            MS. JONES:  Objection.
16            Maybe you can help us with where this is
17   going.  It seems very far afield.
18            MR. SHIELDS:  I think Officer Algarin
19   probably understands my question.
20            MS. JONES:  Do you?
21            Q.   Did you ever play baseball, Officer
22   Algarin?
23            MS. JONES:  In his life?
24            Q.   Okay.  Yes.  In your life, did you ever
25   play on a baseball team?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  What's the relevance?
 3                   MR. SHIELDS:  Okay.  Just let me ask the
 4       question, and then you'll get the relevance, okay,
 5       instead of interrupting my deposition.
 6                   MS. JONES:  I think we're struggling
 7       with --
 8                   MR. SHIELDS:  I think you're struggling,
 9       and I think that you're speaking on the record, and
10       you need to let me ask my questions, unless you're
11       directing him not to answer.
12                   MS. JONES:  So we're struggling with
13       relevance here; right?
14                   MR. SHIELDS:  Okay.  It's very relevant.
15                   MS. JONES:  You're talking about things in
16       his personal life.  So if you can help us understand
17       how baseball is relevant, then I think --
18                   MR. SHIELDS:  Why don't you let me ask two
19       questions, and you'll get the relevance very quickly.
20                   MS. JONES:  Great.  Ask them both at the
21       same time.
22                   MR. SHIELDS:  No.  I'm going to ask one
23       question at a time so it's not a compound question.
24            Q.   Please tell me, Officer Algarin, in your
25       life did you ever play baseball on a team?
```



```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3         Q.  You can answer.
 4                   MS. JONES:  On a team?
 5                   Sure.  Go ahead and answer.
 6         A.  Yes.
 7         Q.  Okay.  And baseball requires you to swing
 8    a bat at a fast-moving ball; correct?
 9                   MS. JONES:  Objection.
10         A.  Correct.
11         Q.  Were you good at baseball?
12         A.  I was okay.
13         Q.  Did you play in high school?
14                   MS. JONES:  Objection.
15         A.  Yes.
16                   MS. JONES:  I think we're --
17         Q.  What was your batting average?
18                   MS. JONES:  Okay.  We're not answering
19    this.  Sorry.
20                   I'm instructing you not to answer.
21         Q.  And so you have to have some hand-eye
22    coordination to swing a bat and hit a ball; correct?
23                   MS. JONES:  Are you talking in general?
24         A.  What was your question?
25         Q.  You have to have pretty good hand-eye
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2   coordination in order to be able to swing the baseball
 3   bat to hit the fast-moving baseball; correct?
 4              MS. JONES:  Objection.
 5        A.   Correct.
 6        Q.   That's the same hand-eye coordination that
 7   you might need to swing a baton and hit a dog;
 8   correct?
 9              MS. JONES:  Objection.
10        A.   Correct.
11        Q.   Does a baseball travel faster than a dog
12   running?
13              MS. JONES:  Objection.
14        A.   I don't --
15        Q.   When you played baseball and you were
16   hitting, would the pitcher throw the ball faster than
17   Tesla was running at you?
18              MS. JONES:  Objection.
19        A.   No.
20        Q.   Were you a young child when you played
21   baseball?
22              MS. JONES:  You don't have to answer that.
23              Objection.
24              You don't have to answer that.
25        Q.   How old were you when you played baseball?
```



ALLIANCE
COURT REPORTING, INC.

Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                     MS. JONES:  Objection.
 3                     Don't answer that.
 4                     Elliot, really?
 5                     MR. SHIELDS:  He gave an answer.  He said
 6      that the pitchers wouldn't throw the ball faster than
 7      Tesla was running.  At most, Tesla was running --
 8           Q.   Can you estimate for me, Officer Algarin,
 9      how fast Tesla was running at you?
10                     MS. JONES:  That's relevant.
11           A.   I'm sorry.  We'll have to go back to your
12      question -- that question about Tesla and the
13      baseball.  Can you please say that question one more
14      time?  I may not have understood it.
15           Q.   So my question now is:  How fast would you
16      estimate Tesla was running at you?
17           A.   Speed-wise?
18           Q.   Correct, if you can estimate in miles per
19      hour.
20           A.   I do not -- do not know.
21           Q.   In miles per hour, would you estimate that
22      Tesla was running more slowly than a baseball gets
23      pitched?
24           A.   Say that one more time.
25           Q.   Let me withdraw that question.  It was a
```



| | |
|---|---|
| 1 | OFFICER JAVIER ALGARIN - BY MR. SHIELDS |
| 2 | bad question. |
| 3 | When you played baseball, how fast would |
| 4 | the pitchers pitch when you were batting? |
| 5 | MS. JONES:  Objection. |
| 6 | A.  70, 80 miles per hour. |
| 7 | Q.  And you would sometimes be able to hit a |
| 8 | baseball that was traveling at you at 70 to 80 miles |
| 9 | per hour.  Is that fair to say? |
| 10 | A.  Correct. |
| 11 | Q.  And do you think in this circumstance you |
| 12 | would have been able to hit Tesla with your baton as |
| 13 | she ran at you? |
| 14 | A.  No. |
| 15 | Q.  And why do you think you wouldn't have |
| 16 | been able to hit Tesla with your baton, if you can hit |
| 17 | a baseball that's traveling 70, 80 miles an hour at |
| 18 | you? |
| 19 | A.  Because the bat and baseball is in my hand |
| 20 | and ready to go, to swing, where the baton was not. |
| 21 | Q.  And the gun was not in your hand either |
| 22 | when Tesla began to run at you; correct? |
| 23 | A.  The gun was more accessible. |
| 24 | Q.  Where is the baton on your person?  Where |
| 25 | do you keep it or where did you keep it on that day? |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         A.   My left hip.
 3         Q.   Okay.  And does it take longer to take
 4    your baton out than your firearm?
 5         A.   Yes.
 6         Q.   Okay.  And why?
 7         A.   With the baton, not only do I have to
 8    reach across body to my left hip, I have to bring it
 9    out.  Not only bring it out, make sure it comes out
10    straight, because it gets snagged sometimes.  It is
11    collapsible.  So after you bring it out, it is only
12    about 10 inches close to a foot.  You have to whip it
13    so it can spring out to full length and then afterward
14    be able to get into a position to use it.
15         Q.   So you have an expandable baton?
16         A.   Correct.
17         Q.   And that takes a good amount of time,
18    because you pull it out and expand it before you can
19    use it?
20         A.   More time than I had.
21         Q.   And could you have kicked Tesla?
22         A.   Could I have?
23         Q.   Yes.
24         A.   I could have.
25         Q.   Do you work out?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2            A.   Sometimes.
 3            Q.   As part of your police training, are you
 4    required to pass a physical fitness test?
 5            A.   Yes.
 6            Q.   And as part of your police duties, you've
 7    testified that sometimes you have to chase suspects;
 8    correct?
 9            A.   Yes.
10            Q.   Sometimes you have to jump fences?
11            A.   Yes.
12            Q.   Sometimes you have to take large males
13    into custody that weigh more than you?
14            A.   Yes.
15            Q.   And sometimes you have to physically
16    restrain agitated large men.  Is that fair to say?
17            A.   Yes.
18            Q.   It's the nature of police duties when you
19    make an arrest.  Sometimes you have to use force
20    against people that you're taking into custody.  Is
21    that fair to say?
22            MS. JONES:  Objection.
23            A.   Sometimes.
24            Q.   And so would it be fair to say that
25    sometimes you take large men into custody that could
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    also potentially cause you physical injuries; right?
 3              MS. JONES:  Objection.
 4         A.   Yes.
 5         Q.   And you do that without shooting them;
 6    right?
 7              MS. JONES:  Objection.
 8         A.   Are we talking armed people, unarmed
 9    people?  We have to be a little more specific.
10         Q.   Sure.  Let's say unarmed people.
11         A.   Uh-huh.  It also depends on the
12    officer-to-subject factors.
13         Q.   Let's say there's an unarmed man that's
14    larger than you running at you and he's unarmed.
15         A.   Okay.
16         Q.   Would you be justified in shooting that
17    person?
18         A.   Again, officer-to-subject circumstances.
19         Q.   What other factors would you need to know
20    to know if you could shoot an unarmed person that was
21    running at you?
22         A.   Size.  Relevance to my size.  Larger --
23    that's very broad -- how much larger.  Is he athletic?
24    Is he muscular?  Is he huge?  Does he look like he
25    could bench press 500 pounds?  Does he look like he
```



```
 1             OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    can overpower me if he gets to me and my gun?  Does it
 3    look like, if I wrestle him, will he overpower me and
 4    take my gun?  Does he have any martial arts skills?
 5    Does he have any fighting skills?  Does his skills
 6    exceed my own?  Will he be able to wrestle me until
 7    the point I cannot reach my gun?  Is he going to put
 8    me in a choke hold?  Those kind of subject factors.
 9            Q.  And so those are all specific factors
10    where your life could potentially be in danger;
11    correct?
12            A.  Those are factors to consider when using
13    use of force.
14            Q.  Considering the deadly -- the use of
15    deadly force; correct?
16            A.  Correct.
17            Q.  And in this circumstance, was Tesla larger
18    than you?
19            A.  No.
20            Q.  And could Tesla have taken your gun
21    potentially?
22            A.  No.
23            Q.  Could Tesla have been a threat to your
24    life?
25            A.  Yes.
```



```
 1            OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2       Q.   Have you ever heard that in the entire
 3   history of policing in the United States that no
 4   officer has ever been killed during an attack by a
 5   dog?
 6       A.   I don't know about officers.  I know of
 7   people who have been killed or seriously injured by
 8   dogs.
 9       Q.   So you've never specifically heard that no
10   police officer in the history of the United States has
11   ever been killed during police duties by a dog?
12            MS. JONES:  Objection.
13       A.   Not that I know of.
14       Q.   That's not something that you learned in
15   your training?
16       A.   No.
17       Q.   And police officers generally have more
18   training on interacting with people in dangerous
19   situations than normal civilians; correct?
20            MS. JONES:  Objection.
21       A.   Yes.
22       Q.   That's the nature of police work?  Yes?
23       A.   Was that a question?
24       Q.   Yes.
25       A.   Is it the nature of police work?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   The nature of police work is that
 3    sometimes you have to interact with the public and
 4    sometimes those people are agitated?
 5         A.   Yes.
 6         Q.   How could you have done things differently
 7    to avoid shooting and killing Tesla?
 8              MS. JONES:  Objection.
 9         A.   I could have knocked on the door.
10         Q.   And you had the time -- you had the time
11    that you could have done that; right?
12         A.   Yes.
13         Q.   Because there was no emergency in his
14    backyard that required you to jump the fence?
15              MS. JONES:  Objection.
16         A.   I had time.
17         Q.   So the answer is, yes, there was no
18    emergency, so you had time to walk to his front
19    door --
20              MS. JONES:  Objection.
21         Q.   -- and ask for his permission to enter his
22    yard; correct?
23              MS. JONES:  Objection.
24         A.   Yes.
25         Q.   What else could you have done?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3              A.   That's it.
 4              Q.   Could you have announced "Police entering
 5    your property" or something similar prior to jumping
 6    his fence to warn him that you were entering his yard?
 7                   MS. JONES:  Objection.
 8              A.   Could I have yelled and just yelled that
 9    I'm entering your yard?
10              Q.   Yes.
11              A.   In a backyard full of houses?
12              Q.   Correct.
13              A.   Sure.
14              Q.   Or providing some other sort of warning
15    before entering his property?
16              A.   Sure.
17              Q.   And could you have used pepper spray on
18    Tesla?
19              A.   I don't believe it's effective.
20              Q.   Why do you believe that pepper spray is
21    not effective on dogs?
22              A.   Because I don't believe OC will be
23    effective on dogs.
24              Q.   Is OC effective on people?
25              A.   Yes, sometimes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.   Have you ever been trained that OC is not
 3    effective on dogs?
 4         A.   No.
 5         Q.   So no one has ever told you that OC spray
 6    is ineffective on dogs?
 7         A.   No.
 8         Q.   So that's just your personal belief?
 9         A.   Yes.
10         Q.   Have you ever tried to use OC -- withdraw
11    that.
12              Have you ever tried to use OC spray on a
13    dog?
14         A.   No.
15         Q.   And maybe we covered this before, could
16    you have tried to kick Tesla?
17         A.   Could I have tried?
18         Q.   Yes.
19         A.   Yes and no.  I could have tried to kick
20    Tesla, but that kick could have just given Tesla my
21    leg to bite me.
22         Q.   Have you ever been bitten by a dog before
23    while you were working as a police officer?
24         A.   No.
25         Q.   Were you ever trained any time about using
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2    any sort of less lethal force against dogs?
 3              A.   Baton.
 4              Q.   Other than the baton?
 5              A.   And the OC spray, I believe, from what I
 6    can remember.
 7              Q.   So you were trained on using OC spray?
 8              A.   I don't necessarily remember specifically.
 9              Q.   You might have been trained on OC spray,
10    but you don't remember?
11              A.   Exactly.
12              Q.   Okay.  And do you know why you would have
13    been trained to use OC spray against a dog?
14              A.   It may have been effective for some dogs,
15    like it is for some people.
16              Q.   So you would have been trained -- you
17    wouldn't be trained on something that's not effective;
18    right?
19              A.   OC spray is sometimes not effective.
20              Q.   Against people?
21              A.   Yes.
22              Q.   But you don't remember anything about the
23    training for when it may or may not be effective
24    against a dog.  Is that fair to say?
25              A.   Yes.
```



**ALLIANCE**

COURT REPORTING, INC.

*Videography · Remote · Deposition Suites*

www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  So, basically, you have a vague
 3    recollection of maybe being told that OC spray could
 4    work in some circumstances against a dog?
 5              MS. JONES:  Objection.
 6         A.  Yes.
 7         Q.  And that was at the academy, you said?
 8         A.  Yes.
 9         Q.  And would you agree that if there's more
10    than one choice that you can make, it's always best to
11    make the safest choice?
12              MS. JONES:  Objection.
13         A.  Again, it depends on the situation.  I
14    don't know.
15         Q.  If you could turn back time and do it all
16    over again, would you do anything different in this
17    incident?
18              MS. JONES:  Objection.
19         A.  I definitely don't wish I had to shoot
20    anything.
21         Q.  Okay.  I appreciate that, but that wasn't
22    my question.  My question was if you could turn back
23    time and do it all over again, would you do anything
24    different?
25              MS. JONES:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1             OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2        A.  Yeah, I would go to Charles Dempsey and
 3   let him know that I'm in his backyard.
 4        Q.  You would go and you would seek his
 5   consent prior to entering his backyard.  Is that what
 6   you mean?
 7        A.  Yes.
 8        Q.  You would have walked to his front door
 9   and knocked on his front door?
10             MS. JONES:  Objection.
11        A.  Yes.
12        Q.  And you would have done that because there
13   was no emergency requiring you to jump his fence
14   immediately into his yard instead of going to his door
15   and knocking and asking for his consent.
16             MS. JONES:  Objection.
17        Q.  Is that fair?
18             MS. JONES:  Objection.
19        A.  Yes.
20        Q.  After this incident, did you draft an
21   incident report?
22        A.  No.
23        Q.  After this incident, did you make any
24   written notes about the incident?
25        A.  I don't remember.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JAVIER ALGARIN - BY MR. SHIELDS
 2         Q.  If you made written notes about the
 3    incident, would they have been handwritten notes?
 4              MS. JONES:  Objection.
 5         A.  I don't remember.
 6         Q.  At the time of the incident, if you were
 7    to make notes, would it have been handwritten or on
 8    some electronic device?
 9              MS. JONES:  Objection.
10         A.  It depends on the notes.
11         Q.  If you're making notes as an officer -- do
12    you carry around, like, a spiral notepad with you?
13         A.  Yes.
14         Q.  Do you take notes in that spiral notepad?
15         A.  Yes.
16         Q.  Do you -- are there any rules about taking
17    notes in your spiral notepad?
18         A.  No.
19         Q.  You're not required to put certain things
20    in your notes every day?
21         A.  No.
22         Q.  There's no rule from RPD requiring you to
23    write certain things down in your notepad?
24         A.  No.
25         Q.  How about any other -- are there any --
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920