1

2                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF NEW YORK
3  - - - - - - - - - - - - - - - - - - - - - - - - -
   CHARLES DEMPSEY, individually, and L.D. by her
4  father and natural guardian, CHARLES DEMPSEY,

5          Plaintiffs,

6                              Index No. 19-cv-6780 (EAW)
   v.
7
   THE CITY OF ROCHESTER, a municipal entity, JAVIER
8  ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER
   RESPONSIBLE FOR TRAINING JAVIER ALGARIN,
9
           Defendants.
10 - - - - - - - - - - - - - - - - - - - - - - - - -

11
   Remote Deposition Upon Oral Examination of:
12
                   Officer Jason Horowitz
13

14

15
   Date:            February 8, 2023
16

17
   Time:            10:00 a.m.
18

19

20

21 Reported By:   Jayme C. Wintish

22                Alliance Court Reporting, Inc.

23                109 South Union Street, Suite 400

24                Rochester, New York 14607

25



```
 1
 2                    A P P E A R A N C E S
 3  Appearing Remotely on Behalf of Plaintiffs:
 4  Elliot D. Shields, Esq.
 5      Roth & Roth LLP
 6      192 Lexington Avenue, Suite 802
 7      New York, New York  10016
 8      eshields@rothandrothlaw.com
 9
10  Appearing Remotely on Behalf of Defendants:
11  Peachie L. Jones, Esq.
12      City of Rochester Law Department
13      City Hall, Room 400A
14      30 Church Street
15      Rochester , New York  14614
16      peachie.jones@cityofrochester.gov
17                    *       *       *
18
19
20
21
22
23
24
25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                S T I P U L A T I O N S
 2    WEDNESDAY, FEBRUARY 8, 2023;
 3              (Proceedings in the above-titled matter
 4              commencing at 10:04 a.m.)
 5                        *     *     *
 6              IT IS HEREBY STIPULATED by and between the
 7    attorneys for the respective parties that this
 8    deposition may be taken by the Plaintiff at this time
 9    pursuant to subpoena;
10              IT IS FURTHER STIPULATED, that all
11    objections except as to the form of the questions and
12    responsiveness of the answers, be reserved until the
13    time of the trial;
14              IT IS FURTHER STIPULATED, that pursuant to
15    Federal Rules of Civil Procedure 30(e)(1) the witness
16    requests to review the transcript and make any
17    corrections to same before any Notary Public;
18              IT IS FURTHER STIPULATED, that if the
19    original deposition has not been duly signed by the
20    witness and returned to the attorney taking the
21    deposition by the time of trial or any hearing in this
22    cause, a certified transcript of the deposition may be
23    used as though it were the original;
24              IT IS FURTHER STIPULATED, that the
25    attorneys for the parties are individually responsible
```



```
1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2   for their certified transcript charge, including any
3   expedite or other related production charges;
4              AND IT IS FURTHER STIPULATED, that the
5   Notary Public, JAYME C. WINTISH, may administer the
6   oath to the witness.
7                         *      *      *
8              THE COURT REPORTER:  Will counsel please
9   stipulate to me remotely swearing in the witness
10  located in New York State; that counsel will not
11  object to the admissibility of the transcript based on
12  proceeding in this way; and that the witness has
13  verified that he is, in fact, Officer Jason Horowitz.
14             MS. JONES:  Yes.
15             MR. SHIELDS:  Yes.
16  OFFICER JASON HOROWITZ,
17        called herein as a witness, first being sworn,
18        testified as follows:
19        EXAMINATION BY MR SHIELDS:
20        Q.  Good morning, Officer Horowitz.  My name
21  is Elliot Shields.  I represent the plaintiffs in this
22  lawsuit, and I'm going to be asking you some questions
23  today.
24             First, I'm just going to go over the
25  ground rules for the deposition.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   field trip at the Hall of Justice where we met with an
 3   ADA and they kind of put us through some scenarios.
 4        Q.   Okay.  And was that during the academy?
 5        A.   Yes.
 6        Q.   Since the academy have you gotten any
 7   training about testifying?
 8        A.   No.
 9        Q.   Okay.  I'm going to switch gears and ask
10   you questions about the incident.
11              Do you remember the date of the incident?
12        A.   Not off the top of my head.
13        Q.   If I said it was October 19th, 2018, does
14   that sound right to you?
15        A.   Yes.
16        Q.   Okay.  Can you just tell me everything you
17   remember about the incident?
18        A.   I remember responding to a vice call.
19   Essentially a vice call could be drug activity,
20   prostitution, drinking, people with handguns.
21        Q.   Okay.  So you responded.
22              Then what happened next?
23        A.   When we were responding, the officers that
24   were on the job, we all communicated together.
25        Q.   And how did you communicate?
```



```
1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2         A.   I believe we messaged -- either messaged
3    each other through -- we contacted each other either
4    through radio or phone calls.
5         Q.   Okay.  So it was a conversation?
6         A.   Yes.
7         Q.   Okay.  And what did you talk about?
8         A.   Well, we discussed the fact that we've
9    been picking up on the people -- the individuals in
10   question, the type of behavior that they'll display
11   when we pull down the street, which was they would
12   flee or retreat into the backyard and hop over a few
13   fences to the next street south of that location.  So
14   we came up with a plan to split up:  Two officers go
15   down Kosciusko, two officers go down Sobieski.
16        Q.   Okay.  So you devised a plan.
17             Is that what you said?
18        A.   Yes.
19        Q.   With the other officers?
20        A.   Yes.
21        Q.   Now, who are the other officers?
22        A.   Officer Gorman, Officer DiSabatino, and
23   Officer Algarin.
24        Q.   Okay.  And so what was the plan you guys
25   had devised?
```



1        OFFICER JASON HOROWITZ - BY MR. SHIELDS

2        A.   Officer Gorman and I, we would wait on

3   Sobieski Street, which is one block south of Kosciusko

4   Street.  And Officer DiSabatino and Officer Algarin

5   would go down Kosciusko Street, essentially showing

6   their presence, which would cause -- what we would

7   have believed and what ultimately happened -- the

8   suspects to retreat into the backyard and try to make

9   it to the next street south of Kosciusko, which is

10  Sobieski Street.

11       Q.   So the plan was basically Algarin and

12  DiSabatino pull up on Kosciusko, and you expected,

13  based on prior experience, the suspects to run south

14  to Sobieski Street where you would apprehend them with

15  Gorman?

16       A.   Yes.

17       Q.   And that's ultimately what happened?

18       A.   Yes.

19       Q.   All right.  Officer Gorman testified that

20  he had been working the day prior, and basically that

21  is what happened on the day prior.  They had run south

22  from Kosciusko through the yards to Sobieski Street.

23            Were you working that prior day with

24  Officer Gorman?

25       A.   I don't know if I was working with him on



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2     that certain case.
3              Q.  So you don't recall if you were working
4     the prior day?
5              A.  Correct.
6              Q.  Okay.  Prior to this incident, had you
7     witnessed these same suspects or others on Kosciusko
8     Street run through the backyards to Sobieski Street?
9              A.  Yes.
10             Q.  And when did you guys come up with a plan
11    on this day?
12             A.  The job came in shortly after roll call.
13    And when we saw the job waiting for an officer to take
14    it, we discussed it.
15             Q.  Can you describe what you mean when you
16    say "the job came in"?
17             A.  So when somebody calls 911, they speak to
18    an operator and the operator takes down the caller's
19    information -- whether they want to give it or not.
20    Sometimes it's a refused caller.  Sometimes they leave
21    their name and number.  But they give a general
22    description and a location of where the service call
23    would be.  And from there the operator puts the card
24    together and puts it in a hopper, which waits for an
25    officer to call dispatch for the job.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.  Okay.  So a 911 call comes in.  You said
 3    it gets put "in a hopper."  Now, the hopper, that's
 4    like a -- I don't know -- a list -- a waiting list or
 5    something?
 6         A.  Yes.
 7         Q.  Okay.  So it's in the waiting list.  You
 8    call dispatch.  You say, "I'll respond to this call"?
 9         A.  Yes.
10         Q.  Okay.  And so that's what happened on this
11    day.
12              And how did it come about that the four of
13    you all responded to this one call?
14         A.  We just all called dispatch and added
15    ourselves.  So typically for -- it's a priority job,
16    which means two officers have to go to it.  And we all
17    work together.  We all know what type of job call that
18    it was, so we all decided to go together.
19         Q.  Okay.  So this was a priority job --
20         A.  Yes.
21         Q.  -- because it was a vice call?
22         A.  Yes.
23         Q.  And when you say this call was a vice
24    call, do you remember if it was a call about drugs or
25    something else?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JASON HOROWITZ - BY MR. SHIELDS

2               MS. JONES:  Objection.

3               But go ahead.

4          A.  I don't remember.

5          Q.  Okay.  And when you say it was a vice

6     call, do you remember that from looking at your

7     paperwork previously in preparation for the

8     deposition?

9          A.  Yes.  Yes.  It was a vice call.  I don't

10    remember the description of the call or the -- the

11    complaint.

12         Q.  And this was your section that you'd

13    worked for some period of time before the incident;

14    right?

15         A.  Yes.

16         Q.  How long had you worked in the Clinton

17    section before the incident?

18         A.  I transferred from Lake section to Clinton

19    in, I think, January -- yes -- January 2018.  So

20    approximately nine months prior to the incident.

21         Q.  Okay.  And had you responded to this, I

22    guess, specific block of Kosciusko Street and Sobieski

23    Street more than once prior to this incident?

24         A.  Yes.

25         Q.  Can you estimate how many times?



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2              A.  We would respond to that location -- a
 3   call would come in, I would say, twice a shift for the
 4   males selling drugs, among other things.  Sometimes
 5   they had other details about the job.  It all depends
 6   on the caller.  But that's been a main trouble of that
 7   street, that certain location.  So I would say I
 8   probably responded to that location over 50 times.
 9              Q.  Prior to this incident?
10              A.  Yes.
11              Q.  In the nine or ten months prior to this
12   incident?
13              A.  Yes.
14              Q.  Okay.  And had you ever interacted with
15   these specific individuals who were arrested on the
16   date of the incident, previously?
17              A.  I've never -- prior to this incident, I
18   was never able to ID the individuals.  So no, I'm not
19   positive that I dealt with specifically them.
20              Q.  In the 50 or so times that you responded
21   to this location previously, on how many prior
22   occasions had they run through the yards on Kosciusko
23   Street?
24              A.  I would say about half of the times that
25   I've responded they've fled south of the location.
```



```
 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    Sometimes -- not always, but sometimes they would have
 3    access to the house at 61 Kosciusko.  And they would
 4    retreat into the house.
 5            Q.  Okay.  What would you do when they went
 6    inside the house?
 7            A.  At that point we can't do anything,
 8    especially if they lock the door.
 9            Q.  Okay.  You never went and got like a
10    search warrant or an arrest warrant?
11            A.  No.
12            Q.  Okay.  So basically you would give up and
13    leave at that point?
14            A.  Yes.
15            Q.  Okay.  And it was always the same house,
16    61 Kosciusko?
17            A.  It would be in the general area, give or
18    take a few addresses.  But 61, generally, would always
19    come in as the location.
20            Q.  And was that the residence directly next
21    door to where Officer Algarin shot my client's dog?
22                MR. JONES:  Objection.
23            Q.  If you know.
24            A.  I do not know.  There may be a house or
25    two in between.  I can't say for sure.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

 1            OFFICER JASON HOROWITZ - BY MR. SHIELDS

 2            Q.  And when you say they would run south, do

 3    you mean they would run through driveways and

 4    backyards from Kosciusko Street to the direction of

 5    Sobieski Street?

 6            A.  So the vacant lot that they would retreat

 7    to, and that would be their course of travel, there's

 8    a privacy fence, a 6-foot stockade fence.  Then there

 9    is also a couple of chain-link fences on the border of

10    these properties that they would ultimately have to

11    defeat in order to get to the vacant lot.

12            Q.  Had you ever previously stationed on

13    Sobieski Street to watch them run from Kosciusko

14    Street?

15            A.  Prior to this incident, no.

16            Q.  Okay.  How did you guys come up with this

17    new plan on this day?

18                 MS. JONES:  Objection.

19                 But go ahead.

20            A.  Based on our experience, we knew where

21    their flight of path would be.  So we made a decision

22    to set up that way, and we were able to apprehend both

23    suspects.

24            Q.  So after several months of prior

25    experiences, you said, "Hey, let's try this," and it



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   worked?
 3              A.  Yes.
 4              Q.  Okay.  I want to just go over your body
 5   camera video with you.  So I'm going to put that up
 6   and play it for you.
 7              (The following exhibit was marked for
 8              identification:  Number EXH 1.)
 9              MR. SHIELDS:  And Jayme, that will be
10   Exhibit 1.  But obviously, I don't think we can
11   include that in our PDF record.
12              Q.  Sorry.  I thought I had it up.  Let me
13   just pull it up.
14              And it looks to me -- I didn't ask you at
15   the beginning of the deposition -- at Alliance right
16   now, when you're looking at me, is that on a
17   television screen?
18              A.  Yes.
19              Q.  Okay.  Give me one second.  And I'm going
20   to display the exhibit and ask you -- make sure that
21   you can see it.
22              Okay.  Officer Horowitz, do you see what
23   looks like the beginning of your body-worn camera
24   recording?
25              A.  Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.   Okay.  And on the bottom right corner here
 3    where it says "00938_jh2559," is that an identifier
 4    that identifies this as your body-worn camera
 5    recording?
 6         A.   Yes.  The "00938" is the actual body
 7    camera.  And then the underscore.  And then it's my
 8    initials and IBM.
 9         Q.   Okay.  Great.  And it looks like it's
10    starting at 2018, 10/19.  So October 19th, 2018, at 17
11    hours, 6 minutes, and 36 seconds?
12         A.   Yes.
13         Q.   And it's 5:06 in non-military time?
14         A.   Yes.
15         Q.   Okay.  All right.  I'm just going to play
16    it.  And then I'll stop it and ask you some questions.
17    Okay?
18         A.   Yes.
19         Q.   All right.  We'll hit play from the
20    beginning.
21                   (Video was played.)
22         Q.   And when we first hit play, it's silent
23    because that's the prerecording; is that right?
24         A.   Yes.
25              MR. SHIELDS:  All right.  And right here
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    at -- I'm going to pause it 15 seconds into the video,
 3    which is 17 hours, 6 minutes, and 50 seconds.
 4         Q.  So this shows you parking.
 5              And can you just say for the record where
 6    you parked your car here?
 7         A.  I parked my car on Sobieski Street.
 8         Q.  Okay.  And kind of in the top right
 9    portion of the screen, there's a blue car parked in a
10    dirt-looking driveway; is that right?
11         A.  Yes.
12         Q.  Is that the -- is that next to the vacant
13    lot at 54 Sobieski Street?
14              MS. JONES:  Objection.
15              But go ahead.
16         A.  So that is considered the vacant lot.
17    That house's driveway is to the right, essentially,
18    east of the white house.  So that's actually an
19    illegally parked vehicle in a vacant lot.
20         Q.  Okay.  So that car right there is in the
21    vacant lot at 54 Sobieski Street?
22         A.  Yes.
23         Q.  Okay.  So I'm going to hit play again at
24    17 hours, 6 minutes, and 50 seconds.  And then I'll
25    pause again and ask you some questions.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2                      (Video was played.)
 3              MR. SHIELDS:  Okay.  So I'm pausing it at
 4    24 seconds into the video, 17 hours, 7 minutes, and
 5    zero seconds.
 6         Q.  It looks like you just started to run; is
 7    that right?
 8         A.  Yes.
 9         Q.  Okay.  And why did you just start to run
10    right there?
11         A.  I can go only on the assumption that there
12    was somebody entering the vacant lot at the north part
13    of the property.
14         Q.  Okay.  Do you have an independent
15    recollection of the incident and why you began to run?
16         A.  Yes.  It was -- we were told over radio by
17    the other officers that they were running southbound
18    toward Sobieski Street.  And I heard the individuals
19    on the fence line.
20         Q.  Okay.  Do you remember if you began to run
21    before you actually visually saw the individuals?
22         A.  Yes.  I ran before I actually physically
23    saw the individuals.  Yes.
24         Q.  Okay.  All right.  I'm going to hit play
25    again at 17 hours, 7 minutes, and zero seconds.  And
```



1              OFFICER JASON HOROWITZ - BY MR. SHIELDS

2    say, "Hearing this, I made my way to a vacant lot on

3    54 Sobieski Street, which borders the backyards of 49,

4    53, and 57 Kosciusko Street."

5              And then in 10, you say (as read):   I

6    observed a black male climb over the tall, wooden

7    stockade fence surrounding the backyard at 57

8    Kosciusko Street and jump into the vacant lot at 54

9    Sobieski Street.

10              So does that refresh your recollection

11   about some of the property addresses that we were

12   talking about that were displayed in the body camera

13   footage earlier?

14        A.   Yes.

15        Q.   Okay.  57 Kosciusko Street, that was the

16   property that we saw that had the tall, wooden fence;

17   is that right?

18              MS. JONES:  Objection.

19              But go ahead.

20        A.   It was half and half.  Half the yard was a

21   stockade fence and the other half was a chain-link,

22   which was in my body camera.

23        Q.   Okay.  Is it possible that the property

24   that you just described -- let me just pause and

25   withdraw that question.



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2              The fence that the guy jumped was 57
 3   Kosciusko Street; right?
 4              MS. JONES:  Objection.
 5              But go ahead.
 6         A.   It was kind of like an intersecting part
 7   of the property with 61, 57, and 54.  And it was at
 8   the southwest, the back left portion of the property
 9   at 61 and 57.  That intersection right there, I
10   believe, is where he defeated the fence and jumped
11   over.
12         Q.   Okay.  And then 53 Kosciusko Street, would
13   it be accurate to say, in the angle we looked at from
14   your body camera, would have been located to the left
15   of 57 Kosciusko Street?
16         A.   Yes.
17         Q.   Okay.  And then 49 Kosciusko Street would
18   have been to the left of 53 Kosciusko Street?
19         A.   Yes.
20         Q.   Okay.  And do you know if 53 Kosciusko
21   Street was the location where the dog was shot?
22         A.   I don't know.
23         Q.   All right.  Well, I'm just going to tell
24   you for the purpose to make this go faster that 53 is
25   where the dog was shot.  Okay?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JASON HOROWITZ - BY MR. SHIELDS

1

2      A.   Okay.

3      Q.   So the guy jumped the fence from 57.

4           So that would have been to the right of

5  the property where the dog was shot; right?

6      A.   My individual was the one, yes, that

7  jumped over the fence at 57.

8      Q.   Okay.  Okay.  So then in Paragraph 13, it

9  says that there was a second guy in a red sweatshirt.

10 He fled west through the backyards behind the

11 Kosciusko Street properties and was stopped by Gorman

12 in the backyard of 49 Kosciusko Street; right?

13     A.   Yes.

14     Q.   So that would have been to the left of the

15 property where the dog was shot; right?

16     A.   Yes.

17     Q.   Okay.  Okay.  And so here in Paragraph 15,

18 it says Officer Algarin was in the backyard of 53

19 Kosciusko Street.  And he called from the chain-link

20 fence separating 53 and -- 53 Kosciusko Street from 54

21 Sobieski Street asking whether the guy had a gun, and

22 he denied it.

23          We saw that in the body camera video;

24 right?

25     A.   Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2         Q.  And then in Paragraph 17 it basically says
3    that about half of the time when you do a foot
4    pursuit, the perpetrator discards contraband?
5         A.  Yes.
6         Q.  Okay.  Is that still true today?  Has
7    anything changed in your experience?
8              MS. JONES:  Objection.
9              But go ahead.
10        A.  I would say yes.  It is still true to the
11   day that about 50 percent of the time, if not more,
12   people that are fleeing discard property, contraband,
13   other assortment of things.
14        Q.  Okay.  And then in Paragraph 18, it says
15   "The police usually backtrack over the course of
16   flight to make sure that no contraband was discarded"?
17        A.  Correct.
18        Q.  Okay.  And is that like the policy of the
19   RPD to backtrack?
20             MS. JONES:  Objection.
21             But go ahead.
22        A.  That's typically common sense that goes
23   along with police work, that if you lose sight of an
24   individual, that you check the area that you lost
25   sight of them.
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.  So it would be your practice to backtrack?
 3              MS. JONES:  Objection.
 4              But go ahead.
 5         A.  Yes.
 6         Q.  Okay.  And did you receive any training
 7    about backtracking?
 8         A.  During the academy we would go over
 9    different scenarios, talking about in the flight of
10    path for an individual that's fleeing from the police,
11    if you happen to find contraband, whether it was drugs
12    or guns, and say it's in the backyard of someone's
13    house, you would have to confirm that that contraband
14    doesn't belong to the property owner.  And when we get
15    that confirmation that the property owner has no idea,
16    no recollection of that stuff being back there, it's
17    something that we would be able to charge the suspect
18    with, especially if it was the flight of path that he
19    was taking.
20         Q.  Okay.  And how would you normally get that
21    confirmation from the property owner?
22         A.  We would knock on the door, somehow
23    communicate with them.
24         Q.  Okay.  And when would you normally knock
25    on the door?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         A.   We would knock on the door after the
 3   evidence has been secured.
 4         Q.   Okay.  So first you would secure the
 5   evidence, and then you would talk to the property
 6   owner?
 7         A.   Correct.
 8         Q.   Okay.  And why would you do it in that
 9   order?
10         A.   Because if we leave the evidence behind,
11   for lack of better words, it could grow feet and walk
12   away.  Somebody may come by and take it.  Just the
13   preservation of the evidence.  We would typically have
14   to have a technician come down if it was a handgun.
15   And from there they would be able to lift prints and
16   do their procedures for the handgun.  If it's just
17   narcotics, we'd be able to collect it right away.
18         Q.   Okay.  Did you get any training on that?
19         A.   Training on collecting evidence?
20         Q.   Training on entering someone's yard while
21   backtracking to look for evidence?
22         A.   No.  We did not get training.
23         Q.   Okay.  No training at the academy?
24              MS. JONES:  Objection.
25              But go ahead.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

| | |
|---|---|
| 1 | OFFICER JASON HOROWITZ - BY MR. SHIELDS |
| 2 | A. Up until this incident we did not get |
| 3 | training on backtracking a person's flight path. |
| 4 | Q. After this incident did you get training |
| 5 | on backtracking a person's flight path? |
| 6 | A. We got training on -- what's the word I'm |
| 7 | thinking of? I believe it's "curtilage." I believe |
| 8 | it's areas of property that's not part of the house. |
| 9 | THE WITNESS: I don't want to sound silly, |
| 10 | but I think it's "curtilage"? |
| 11 | MS. JONES: I can't answer for you. |
| 12 | Q. Curtilage. |
| 13 | A. I was right. I was right. |
| 14 | Q. When did you receive training on entering |
| 15 | the curtilage of a property? |
| 16 | A. I don't remember, but it was either 2019 |
| 17 | or 2020. I don't remember though. |
| 18 | Q. Tell me everything you remember about the |
| 19 | training. |
| 20 | A. It had to do with searching somebody's |
| 21 | yard. It's -- it -- I believe the policy that they -- |
| 22 | or training covered that we treat the yard as a |
| 23 | building or a house. So that kind of encompasses all |
| 24 | of it. So same rules apply to searching a house as it |
| 25 | does the yard. And that's the training that we got |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2    later after the incident.
3              Q.  Was that a required training for everyone
4    in the department?
5              A.  That was roll call training.  There wasn't
6    any type of record of who received it.  It was an
7    overall PowerPoint presentation during our roll call.
8    Roll call is when all the officers meet at the
9    beginning of shift.  And we go over post assignments
10   and any updated news in our section and our
11   department.
12             Q.  Okay.  So just so I am getting this right,
13   2019 or '20, you don't remember when it was, but
14   around that period?
15             A.  Yes.
16             MS. JONES:  Objection.
17             Q.  And that occurred in a roll call, which is
18   the beginning of your shift; is that right?
19             A.  Yes.
20             Q.  And how long would this training have
21   lasted?
22             A.  Training to go through the whole
23   PowerPoint during roll call was around five minutes
24   long, presentation.
25             Q.  Okay.  So it was a PowerPoint that was



1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
2     presented for about five minutes long?
3              A.  Yes.
4              Q.  Okay.  And who would have done that
5     presentation for you?
6              A.  The supervisor conducting roll call.
7              Q.  Okay.  Do you remember who conducted your
8     roll call and presented this PowerPoint to you?
9              A.  I do not remember.
10             Q.  Is it like the same supervisor at the
11    beginning of every shift for you?
12             A.  No.  So every section has several
13    sergeants, supervisors, and they rotate who does roll
14    call.
15             Q.  Okay.  What else do you remember about
16    this roll call training about entering the curtilage
17    to a property?
18             A.  I don't remember any additional facts from
19    the roll call.
20             Q.  Okay.  Do you know if the roll call was
21    implemented in response to this incident?
22             A.  I don't know that.
23             Q.  Okay.  But it happened after this
24    incident?
25             MR. JONES:  Objection.



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2              Go ahead.
 3         A.   Yes.
 4         Q.   And prior to this incident you've never
 5    gotten training about entering the curtilage to a
 6    property?
 7              MR. JONES:  Objection.
 8              Go ahead.
 9         A.   No.
10         Q.   And you said basically your takeaway was
11    that the same rules apply for entering the curtilage
12    to a property as if you were entering a home.
13              Is that accurate?
14              MS. JONES:  Objection.
15              Go ahead.
16         A.   Yes.
17         Q.   Okay.  And so what -- what are those
18    factors that you have to consider before entering the
19    curtilage to a property?
20         A.   Hot pursuit.  If it was involved, then
21    chasing a suspect to go through their yard -- yard, it
22    doesn't count.  That is something that you can do.
23         Q.   I'm sorry.  I was a little confused by
24    your answer.
25              So a hot pursuit is a reason you can enter
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   someone's yard; correct?
 3           A.  Yes.
 4           Q.  And what is a "hot pursuit"?
 5           A.  Hot pursuit is when you basically have
 6   probable cause to detain somebody, and while doing so,
 7   they take off from you; they run.  And you can chase
 8   them on foot until you catch them.
 9           Q.  Okay.  Then after you catch them, the hot
10   pursuit is concluded?
11           A.  Yes.  Unless you lose them.
12           Q.  Unless you lose them.
13              So after you catch them, the hot pursuit
14   is concluded, and you no longer have the hot pursuit
15   exception to the warrant requirement to enter the
16   curtilage to a property; correct?
17              MS. JONES:  Objection.
18              But go ahead.
19           A.  Correct.
20           Q.  Okay.  And what other exceptions to the
21   warrant requirement are there to enter the curtilage
22   to a property?
23           A.  If you obtain a search warrant.
24           Q.  Okay.  The search warrant is the general
25   rule under the 4th Amendment; right?
```



```
 1                OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2                     MS. JONES:  Objection.
 3                     But go ahead.
 4           A.  Yes.
 5           Q.  So without a search warrant, what other
 6      circumstances could you enter someone's property?
 7           A.  In the scenario of life or death, an
 8      individual is injured.
 9           Q.  Okay.  So that would sort of fall into
10      sort of like hot pursuit; right?  You're going to stop
11      an imminent physical bodily danger to somebody?
12           A.  Yes.
13           Q.  Okay.  Any other reasons that you can
14      enter someone's property?
15           A.  Not that I can remember.  I know there are
16      several reasons, but I don't remember off the top of
17      my head.
18           Q.  Okay.  If you get their consent, you can
19      enter their property?
20           A.  Yes.
21           Q.  Okay.  And so in -- in this instance, do
22      you know if Officer Algarin got the property owner's
23      consent before he entered the property?
24           A.  I do not know.
25           Q.  But the hot pursuit had concluded at the
```



```
 1                OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    time that he entered the property?
 3                MS. JONES:  Objection.
 4                But go ahead.
 5         A.   I do not know.
 6         Q.   You had detained the suspect in 54
 7    Sobieski Street?
 8         A.   Yes.
 9         Q.   And Officer Gorman had detained the other
10    suspect in the red sweatshirt in the backyard of 49
11    Kosciusko Street?
12         A.   Yes.
13         Q.   Okay.  So the hot pursuit had concluded?
14                MS. JONES:  Objection.
15                But go ahead.
16         A.   Again, I don't -- I don't know where
17    Officer Algarin and Officer Gorman were.  I don't
18    remember if Officer Algarin made it to 49 Kosciusko
19    Street.  That's not something that I remember.
20         Q.   Okay.  If we assume that Officer Algarin
21    had joined Officer Gorman in the backyard of 49
22    Kosciusko Street after the individual in the red
23    sweatshirt had been handcuffed, then the hot pursuit
24    would have concluded before Officer Algarin jumped the
25    fence and went back into the backyard of 53 Kosciusko
```



```
 1               OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   Street?
 3               MS. JONES:  Objection.
 4               But go ahead.
 5        A.  So I'm confused.  You're saying if he made
 6   it to 49 where the arrest took place.  But then you
 7   said it would have stopped at 53.  I don't understand
 8   that.
 9        Q.  Yeah.  So that was a bad question.  I'll
10   withdraw it.
11               So if there were no officers in the
12   backyard of 53 Kosciusko Street -- that's a bad
13   question, so let me withdraw that.
14               You testified earlier that the hot pursuit
15   concludes when the suspects are detained; correct?
16        A.  Yes.
17        Q.  Okay.  And so then you would need a
18   different exception to the warrant requirement, such
19   as consent to enter the curtilage to the property;
20   correct?
21               MR. JONES:  Objection.
22               But go ahead.
23        A.  A lot of times when someone is taken --
24   detained or taken in custody, you just check the
25   grabbable, reachable area.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

| 1 | OFFICER JASON HOROWITZ - BY MR. SHIELDS |

1        OFFICER JASON HOROWITZ - BY MR. SHIELDS

2        Q.   Okay.  And if -- in your roll call

3    training, were you taught that the curtilage to an

4    area -- I'm sorry -- the curtilage to a property is

5    the grabbable, reachable area?

6        A.   No.  The curtilage is the property line --

7    it ends at the property line.

8        Q.   Okay.  So if it's separated by a fence,

9    that wouldn't be a grabbable, reachable area; right?

10       A.   I guess it depends.

11       Q.   Okay.  After you received the roll call

12   training in 2019 or 2020, have you chased suspects

13   through residential properties?

14       A.   Yes.

15       Q.   Okay.  How often does that occur?

16       A.   Personally?  Not very often.  I would say

17   once a week.

18       Q.   Okay.  Do other officers do it more than

19   you?

20       A.   Yes.

21       Q.   Okay.  Any reason why?

22       A.   Some officers take more jobs.  Depends on

23   the type of job that they're responding to.  If it's a

24   call for a man with a warrant, and he runs, that would

25   be one occasion.  Or if they observe something over



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2   camera footage, that could be one.  And when they go
 3   to -- approach an individual and he takes off.
 4   Anytime where probable cause exists and -- during an
 5   investigation -- say it's a domestic and the boyfriend
 6   says, "Yeah.  She just slashed my tires.  I saw her do
 7   it and now she's running in the backyard."  That's
 8   another occasion.  There is other officers that don't
 9   get in any foot chases.
10         Q.   For different reasons?
11         A.   Yes.
12         Q.   Some officers aren't as fit as you and
13   can't chase people down?
14              MS. JONES:  Objection.
15         A.   I wouldn't say I'm -- I wouldn't say I'm
16   fit, but there's some officers that prefer to just --
17   to take reports versus going to active scenes and
18   investigations and conduct proactive work.
19         Q.   When is the last time that you chased
20   somebody through curtilage to a property?
21         A.   I would say it was last week.
22         Q.   Okay.  Tell me about that incident?
23         A.   Not to get into too many details, but I
24   believe it was somebody that was going through a
25   mental health crisis.  And they tried leaving out the
```



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2         Q.   Is defensive tactics training include
 3    anything about interactions with dogs?
 4         A.   No.
 5         Q.   Okay.   Just people?
 6         A.   Yes.
 7         Q.   Have you ever done any trainings that were
 8    put out by private organizations?
 9         A.   No.
10              MS. JONES:   Objection.
11         Q.   Do you know if you ever received any of
12    the training from the Humane Society about
13    interactions with dogs?
14         A.   In the academy they came out, but it
15    wasn't about interactions with dogs.   It was about
16    living conditions of dogs and when to report them.
17    Some people have dog fighting obstacles or setups in
18    their backyard.   That would be something that you
19    would report to the Humane Society or -- like I said,
20    bad living conditions, dogs left out for an extended
21    period of time during cold weather, or no food or
22    water during, you know, warm weather days.
23         Q.   Okay.   I'm just going to put up an
24    exhibit, if I can find it, and just ask you a couple
25    questions.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

| 1 | OFFICER JASON HOROWITZ - BY MR. SHIELDS |
| 2 | Hold on.  I opened the PowerPoint, but I |

 1          OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2              Hold on.  I opened the PowerPoint, but I
 3    think for the purposes of making this an exhibit, it
 4    would be easier to open the PDF version.  Sorry.
 5              (There was a pause in the proceeding.)
 6              (The following exhibit was marked for
 7              identification:  Number EXH 5.)
 8              MR. SHIELDS:  So this will be Exhibit 5.
 9    And this is a PDF entitled -- let me put it up so we
10    can see it -- Roll Call Training, December 2019, LE
11    Dog Bite Prevention, Humane Society of Greater
12    Rochester.
13         Q.  So just looking at that cover page,
14    Officer Horowitz, do you recall whether or not you
15    received this roll call training?
16         A.  I don't recall.
17         Q.  Okay.  Do you remember ever receiving any
18    training from the Humane Society after you graduated
19    from the academy?
20         A.  No.
21         Q.  Okay.  And does this cover page of this
22    document look familiar to you?
23         A.  No.
24              MR. SHIELDS:  Okay.  And for the record,
25    this is Bates Number COR 001244 on the first page.



```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    And the last page is COR 1267.
 3              Q.  Let me just -- you know what I'm going to
 4    do?  I'm just going to scroll through the -- from the
 5    beginning with you and just ask you if it refreshes
 6    your recollection at all.  Okay?
 7              So page 2 here entitled "Officers will
 8    encounter a dog in at least one out of three
 9    residences," is that something that you were taught
10    ever, either at the academy or afterwards?
11              A.  I'm not familiar with this PowerPoint.  I
12    don't recall ever seeing it.
13              Q.  Okay.  All right.  So I'll just save us
14    some time.  Just in your -- aside from the PowerPoint,
15    were you ever -- in any of your training were you ever
16    told that you will encounter a dog in at least one out
17    of three residences?
18              A.  I don't remember that statistic.
19              Q.  In your experience as a police officer,
20    how many residences on average do you think have dogs
21    in the City of Rochester?
22              MS. JONES:  Objection.
23              Go ahead.
24              A.  I would say that's a fair statistic.  Like
25    I said, I've never heard of that before, but I would
```



         1                OFFICER JASON HOROWITZ - BY MR. SHIELDS
         2    agree with that statistic that one out of three
         3    residents has a dog.
         4          Q.   At least one out of three?
         5          A.   Yes.
         6          Q.   Some other officers have testified that it
         7    might be more than one out of three.
         8                Would you agree with that?
         9                MS. JONES:  Objection.
        10                But go ahead.
        11          A.   Yeah.  I could agree with that.  I guess
        12    it all depends on, you know, the calls of the day.
        13          Q.   In the Clinton section, do you think it's
        14    at least one out of three residences?
        15          A.   At least one out of three, yes.
        16          Q.   Okay.  I'm going to fast forward.
        17                Have you ever seen this page of the
        18    document marked COR 1250, which is entitled "Dog
        19    Postures" --
        20                MS. JONES:  Objection.
        21          Q.   -- either in this document or in any other
        22    document provided by the RPD?
        23          A.   No.
        24          Q.   At the academy did you review any
        25    documents regarding dog postures, either this document



| | |
|---|---|
| 1 | OFFICER JASON HOROWITZ - BY MR. SHIELDS |
| 2 | or something similar to it? |
| 3 | A.  Not that I can remember. |
| 4 | Q.  Did you ever get any training about |
| 5 | signals of increasing discomfort or stress or tension |
| 6 | or any warning signs? |
| 7 | A.  Not that I can remember. |
| 8 | Q.  Did you ever get any training about how to |
| 9 | recognize if a dog is fearful or aggressive such as |
| 10 | what's displayed in this page which is Bates Number |
| 11 | COR 1253? |
| 12 | MS. JONES:  Objection. |
| 13 | But go ahead. |
| 14 | A.  Not that I can remember. |
| 15 | Q.  How about -- have you ever received any |
| 16 | training about how to identify whether a dog is in an |
| 17 | offensive, aggressive posture such as what's displayed |
| 18 | in this page, which is Bates Number COR1255? |
| 19 | MS. JONES:  Objection. |
| 20 | But go ahead. |
| 21 | A.  I don't remember any pictures.  More of |
| 22 | just the physical cues.  Just bulletins, not actual |
| 23 | pictures. |
| 24 | Q.  Okay.  And that's from the academy? |
| 25 | A.  Yes. |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2           Q.  When you say a "bulletin," you mean like a
 3      training bulletin?
 4           A.  No.  It was like -- you've got the title
 5      of the topic and then you've got bulletins.
 6                What's another word for them?
 7           Q.  You mean bullet points?
 8           A.  Bullet points.  Yes.  We'll use that.
 9           Q.  Okay.  Were you ever trained at the
10      academy or afterwards about recognizing signs that a
11      dog might be present or live at a property such as
12      what's displayed in the document, Bates Number COR
13      1261?
14                MS. JONES:  Objection.
15                But go ahead.
16           A.  No.
17           Q.  Were you ever provided any training such
18      as what's described here on COR 1262 to announce your
19      arrival by basically making noise, jiggling the fence,
20      whistling, shaking keys, or inquiring about dogs
21      before entering, and asking for dogs to be secured?
22           A.  No.
23           Q.  Were you ever told anything or trained on
24      talking to the dog such as what's described here on
25      page Bates Number COR 1263?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3                   But go ahead.
 4         A.  No.
 5         Q.  Which would continue onto 1264 about
 6    talking to the dog.
 7                   Were you ever trained anything about
 8    what's displayed here on page COR 1264 about various
 9    different bite prevention tools?
10                   MS. JONES:  Objection.
11                   But go ahead.
12         A.  No.
13         Q.  And then earlier we discussed using, in
14    some circumstances, pepper spray or OC spray and you
15    described your training about the TASER 7.
16                   Other than that, did you receive any
17    training about using any other, I guess, chemical or
18    electronic repellents?
19         A.  No.
20         Q.  Were you ever given any training about
21    using the force continuum as it applies to a dog?
22                   MS. JONES:  Objection.
23                   But go ahead.
24         A.  No.
25         Q.  Okay.  When is the last time that you
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER JASON HOROWITZ - BY MR. SHIELDS
 2    responded to a residence where there was a dog?
 3              A.  Two nights ago.
 4              Q.  Can you just describe what happened in
 5    that instance?
 6              A.  An officer and I were going to a residence
 7    to deliver an order of protection.  And we went to the
 8    side door of the residence to knock on the door.  And
 9    as we were approaching, the door opened up and a dog
10    popped its head out and was barking at us.  And I was
11    able to retreat behind a car and draw my firearm.
12              Q.  Did you discharge your firearm?
13              A.  I did not.  Luckily, the resident had it
14    on a leash.  And they were just -- just by
15    coincidence, was taking the dog for a walk and opened
16    up the door at the same time that we were walking up
17    the driveway.
18              Q.  So basically, the resident had no idea
19    that you guys were arriving and was exiting their door
20    at the same time?
21              MS. JONES:  Objection.
22              But go ahead.
23              A.  Correct.
24              Q.  And is that, I guess, a common interaction
25    when you arrive at someone's residence, that there
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920