1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
CHARLES DEMPSEY, individually, and
L.D., by her Father and Natural
Guardian, Charles Dempsey,
                        Plaintiffs,
      -against-
THE CITY OF ROCHESTER, a Municipal
entity, et al.,


                  Defendants.


- - - - - - - - - - - - - - - - - - x


                  Video Conference
                  June 3, 2022
                  9:45 a.m.


      EXAMINATION BEFORE TRIAL of P.O. ADAM
GORMAN, a Defendant in the above-entitled action,
taken by the Plaintiff, held at the above
time and place, pursuant to Court Order,
taken before Robyn Lehrmann, a Notary Public
in and for the State of New York.



2

```
1
2     A P P E A R A N C E S :
3
4     ROTH & ROTH, LLP
              Attorneys for Plaintiffs
5             192 Lexington Avenue, Suite 802
              New York, New York 10016
6
      BY:   ELLIOT SHIELDS, ESQ.
7
8     LINDA KINGSLEY, CORPORATION COUNSEL
              Attorney for CITY OF ROCHESTER
9             30 Church Street
              Rochester, New York 14614
10
      BY:   PEACHIE JONES, ESQ.
11
12
13
14
15
16
17
18             S T I P U L A T I O N S
19
20         IT IS HEREBY STIPULATED AND AGREED by
21    and among counsel for the respective parties
22    hereto, that the sealing and certification of
23    the within deposition shall be and the same
24    are hereby waived;
25         IT IS FURTHER STIPULATED AND AGREED
```

3

1

2  that all objections, except to the form of

3  the question, shall be reserved to the time

4  of the trial;

5       IT IS FURTHER STIPULATED AND AGREED

6  that the within deposition may be signed

7  before any Notary Public with the same force

8  and effect as if signed and sworn to before

9  the Court.

10           * * * * * * * * * * * * *

11

12          THE REPORTER:  The attorneys

13         participating in the deposition

14         acknowledge that I am not

15         physically present in the

16         deposition room and that I will

17         be reporting this deposition

18         remotely.

19          They further acknowledge

20         that in lieu of an oath

21         administered in person, I will

22         administer the oath remotely.

23          The parties and their

24         counsel consent to this

25         arrangement and waive any

4

1
2          objections to this manner of
3          reporting.  Please indicate your
4          agreement by stating your name
5          and your agreement on the
6          record.
7                MR. SHIELDS:  Elliot
8          Shields, I agree.
9                MS. JONES:  Peachie Jones
10         for the City, I also agree. I
11         will request a copy of the
12         transcript.
13               MR. SHIELDS:  Peachie, can
14         you get in the video view so we
15         can see you during the
16         deposition?
17               MS. JONES:  You want me in
18         the video?
19               MR. SHIELDS:  Yes.
20               Off the record.
21               (A discussion was held off
22         the record.)
23               * * * * * * * * * * *
24
25

```
 1                    P.O. Adam Gorman
 2   to get to that level.
 3        A      So, basically, it is more
 4   specific facts to support that legal
 5   conclusion, right.
 6        A      I wouldn't say facts.  I would
 7   say -- I would say reasonable suspicion if
 8   you have --
 9               (Reporter Clarification.)
10        A      I don't think facts are the sole
11   factor for probable cause.  Circumstances and
12   your reasonable suspicion are major portions
13   of it and I just don't want that to be
14   overlooked in this case.
15        Q      The totality of the
16   circumstances, right?
17        A      Correct.
18        Q      Got it.
19               This just says it's the policy
20   of the department, under 3D, not to conduct a
21   warrantless search unless it meets the legal
22   criteria for the exception to the warrant
23   rule, right?
24        A      Correct.
25        Q      Prior to the incident in this
```

1              P.O. Adam Gorman

2    case, had you received any specific training

3    from the Rochester Police Department about

4    exigent circumstances, consent, and other

5    exceptions to the warrant rule?

6         A      I'm sorry.  I'm am out of cough

7    drops.  Yes.

8         Q      Was that field training or

9    something else?

10        A      Academy and field training.

11        Q      The academy isn't a specific RPD

12   training, right?  I guess that is what I

13   meant.  I am sorry for asking the unclear

14   question.

15               RPD would have been just field

16   training?

17        A      That and post-academy.

18        Q      Procedures during and following

19   warrantless searches, City of Rochester, 843

20   is the page.  So under "A" it says, following

21   any search, members will document their

22   actions.  This is especially important

23   because the reasonableness of the search and

24   seizure cannot be based on what was found as

25   a result of the search.  Instead it is

```
 1                    P.O. Adam Gorman
 2    measured by the facts and circumstances known
 3    to the member prior to the search and
 4    seizure, right?
 5                    So I am going to stop there.  So
 6    my first question is, after this incident,
 7    did you complete any paperwork?
 8          A       I don't think so.
 9          Q       When this says, "Following any
10    search members will document their actions,"
11    is there like a specific form that that is
12    referring to?
13          A       No.  There is no specific
14    search, I guess you would say.
15          Q       So do you know what this General
16    Order is referring to when it says document?
17    Is there a general rule about documenting
18    things like searches in a specific form?
19          A       It would be documented under --
20    in the narrative portion of your either
21    incident report or IA report.
22          Q       So, basically, this says that if
23    you do a search you have to do an IA report
24    or an incident report?
25          A       That is what I am gathering from
```

143

```
 1                    P.O. Adam Gorman
 2   it, yes.
 3        Q       You conducted a search in this
 4   case, right?
 5        A       Yes, I did.
 6        Q       But you didn't complete any
 7   forms?
 8        A       No, I did not.
 9        Q       So, technically, that would be a
10   violation of General Order 415, right?
11        A       That it would be.
12        Q       It says, "This is especially
13   important because the reasonableness must be
14   measured by the facts that you knew prior to
15   the search and not after."  Right?
16        A       That's correct.
17        Q       We already discussed what you
18   knew prior to searching the individual that
19   you stopped that he had run.
20        A       Correct.
21        Q       After you searched him, you
22   didn't find anything on him, right?
23        A       I did not find any illegal
24   objects on his person, no.
25        Q       No contraband on his person or
```

1                    P.O. Adam Gorman

2    anywhere else, right?

3         A       Correct.

4         Q       He was eventually released

5    without being given a ticket or charged with

6    a crime?

7         A       That is correct.

8         Q       I will have more questions about

9    that later, but I'm going to move on for now.

10                   Appendix one, exceptions to the

11    search warrant requirement.

12                   Have you read this General Order

13    all the way through before?

14        A       I would say, yes, I have.  I

15    have read a lot of them, but I can't narrow

16    it down to one specific day.

17        Q       What are the general

18    circumstances when you read general orders?

19    Like, why would you just sit down and read

20    one?

21        A       I am board.

22        Q       At work, like you have downtime?

23        A       Slow day, winter days, so open

24    up the books and go at it.

25        Q       Like, when you worked in the

```
 1                    P.O. Adam Gorman
 2    pizza shop, did they ever tell you time to
 3    lean is time to clean?
 4         A      I have actually heard that
 5    before, yes.
 6         Q      So it is like that for police
 7    officers?
 8         A      Yes.  Technically, if you are
 9    not actively doing police work you are only
10    allowed to read police material during work
11    hours.
12         Q      Got it.
13                Police would be general orders
14    or policies.
15                What else would that be?
16         A      Anything related to the job,
17    case law, if I am researching case law,
18    things of that nature.
19         Q      Let's go through this exception
20    for the search warrant requirements.  We have
21    the arrest warrant.  We're not worried about
22    that here.
23                The frisk exception, so when you
24    did the search of the individual that you
25    handcuffed, was that the frisk exception or
```

```
 1                    P.O. Adam Gorman
 2    with it with basically, like, the camera on
 3    and if you hit the button it will start
 4    recording and it will have that 30 seconds
 5    from before you hit record, but not audio?
 6          A      Correct.  I am going to use
 7    color coding because there is a light
 8    indicator that's on the camera.  If it is
 9    green, it is -- and if it is green status and
10    you hit record it will capture the previous
11    30 seconds of visual.
12          Q      Got it.
13                 And then at that point you would
14    see a green light on the camera itself?
15          A      Correct.
16          Q      Is that when you are walking
17    around normally your body camera is working?
18          A      Yes.
19          Q      In green?
20          A      Yes.
21          Q      Now, I will hit play and pause
22    it at some point and ask you some questions.
23                 My first question is, it sounded
24    like there was only about five seconds of
25    there not being any audio.  Is that normal?
```

1                      P.O. Adam Gorman

2          A       It is not abnormal.  All it

3    indicates to me is that the camera wasn't in

4    green status.

5          Q       So you just ran.

6                  Do you know what the property

7    address was that you just ran through?

8          A       I do not.

9          Q       Do you know why you were on

10   Sobieski Street at that point?

11         A       Yes.

12         Q       Why was that?

13         A       With the anticipation that the

14   suspected drug dealers were going to run

15   south through the yards towards Sobieski

16   Street as they have done in the past.

17         Q       So you guys had a plan basically

18   on this day?

19         A       Correct.

20         Q       So that was your, like, I don't

21   know, station, or whatever, and the other

22   officers went to the front and Kosciusko

23   Street?

24         A       Correct.

25         Q       The plan was to have the suspect

                         P.O. Adam Gorman

1

2      run through the backyard and Kosciusko Street

3      as you anticipated that is what they would do

4      and as they came through the yard your plan

5      was to go and apprehend them?

6              A       Correct.

7              Q       So that is what we thought with

8      you running through this yard here and

9      apprehending this guy right here, right?

10             A       Correct.

11             Q       We hit pause, for the record, at

12     1707 and 13 seconds.  There is activity 15

13     seconds into the video.  And I will hit play

14     again.  So I am just going to pause there.

15     So you said you did it yesterday too.

16                     Did you guys do a similar thing

17     the day before?

18             A       Similar, yes.  We were familiar

19     with these individuals at the time selling on

20     that corner, correct.  Yes.

21             Q       What happened on the day before?

22                     MS. JONES:  Objection.

23             A       From my recollection, on our

24     arrival they had ran south to Sobieski Street

25     through the same yards.

173

```
 1                    P.O. Adam Gorman
 2        Q       So that is how you guys devised
 3    a plan on this day?
 4        A       Correct.
 5        Q       Do you know what the officers on
 6    Kosciusko Street did?
 7        A       I do not.
 8        Q       On the previous day, had you
 9    arrived on Kosciusko Street and witnessed
10    them running?
11        A       Yes.
12        Q       So on the previous day, what
13    happened?  Did you drive your car and then
14    park and they ran or something else?
15                    MS. JONES:  Objection.
16        A       I vaguely remember just pulling
17    up and upon police arrival it was immediate
18    flight.
19        Q       Did you chase them through the
20    yards on the previous day as well?
21                    MS. JONES:  Objection.
22        A       I don't recall.
23        Q       So you might have, but you don't
24    recall?
25        A       Correct.
```

1                           P.O. Adam Gorman

2          Q        But they weren't apprehended on

3      the previous day, right?

4                           MS. JONES:   Objection.

5          A        I believe that's correct.

6          Q        Do you remember if on the

7      previous day it was a response to a 911 call

8      or if it was, what do we call it, proactive

9      policing when you stopped them?

10         A        I cannot tell you.

11         Q        So you don't recall?

12         A        Correct.

13         Q        I will hit play again here.   We

14     paused at 58 seconds into the video, which is

15     170757 on the bottom right.   I am going to

16     pause there.

17                  So when we first paused, it was

18     about 15 seconds into the video, right?

19         A        Correct.

20         Q        Then that is how long it took

21     you to go from the front on Sobieski to the

22     fence before you apprehended him, right?

23         A        Correct.

24         Q        Now, we are two minutes into the

25     video.   Does that look right to you?

```
 1                    P.O. Adam Gorman

 2          A      Yes.

 3          Q      Right before I paused, did you

 4   hear yourself ask Officer Algarin to

 5   backtrack?

 6          A      Yes.

 7          Q      So if it took you about 15

 8   seconds to get from Sobieski Street to the

 9   back of that fence, would it be fair to say

10   that it probably would take a similar amount

11   of time to get from the backyard to the front

12   of the house on Kosciusko Street?

13                    MS. JONES:   Objection.

14          A      Similar time frame, yes.

15          Q      So for at least a minute and 45

16   seconds, right, we know that the individual

17   that you apprehended was present in this

18   backyard, correct?

19          A      Correct.

20          Q      So for at least a minute and 45

21   seconds, there would have been any potential

22   contraband located in the backyard at the

23   house next door that was owned by my client,

24   correct?

25          A      Correct.
```

P.O. Adam Gorman

1

2     Q     So that is a longer amount of

3 time than it would have taken to just walk to

4 the front door, right, maybe knock, ask for

5 permission or consent to enter the backyard?

6     A     At the time I was searching him

7 was a longer time than it would have taken to

8 walk to the front door, yes.

9     Q     Before you asked Officer Algarin

10 to backtrack, do you know how many officers

11 had responded to the scene at that point?

12     A     Just the initial ones that were

13 there.

14     Q     Would that have been a couple of

15 more officers?  There was one other officer

16 with you on Sobieski Street and one other

17 officer with Algarin?

18     A     Yes.

19     Q     So there were two other

20 officers, right?

21     A     Correct.

22     Q     At that point, there could have

23 been another officer to watch over the

24 backyard and any potential contraband while

25 another officer asked for consent to enter

1                       P.O. Adam Gorman

2      the backyard?

3            A       No.

4            Q       Why not?

5            A       Because you don't put one

6      officer with two suspects.

7            Q       How many suspects were there?

8            A       There were two.

9            Q       There were two suspects and

10     there were four officers?

11           A       Total, yes.

12           Q       So there could have been one

13     officer with one suspect, a second officer

14     with a second suspect, a third officer

15     looking at the yard, and a fourth officer

16     knocking on the door?

17           A       Yes.

18           Q       That is something that could

19     have reasonably been done, correct?

20                   MS. JONES:  Objection.

21           A       Could have after a few moments

22     of orchestrating it, yes.

23           Q       Before you asked Algarin to

24     backtrack, as far as you were aware, there

25     were no other suspects that were in the area,

1                    P.O. Adam Gorman

2    correct, just the two people that had been

3    apprehended?

4        A       Not to my knowledge.

5        Q       So in that time Algarin or

6    another officer could have taken 15, 20

7    seconds to walk to the front door and ask for

8    consent, right?

9        A       Correct.

10       Q       I will keep playing here for a

11   second.  We are paused at exactly two minutes

12   into the video, or 170858 on the bottom

13   right.  I am going to pause right here.

14               In this yard you see this big

15   cage and a doghouse, right?

16       A       Correct.

17       Q       What would you have done if the

18   dog had just suddenly run out of that

19   doghouse at you?

20               MS. JONES:  Objection.

21       A       Depends on the manner of the

22   dog.

23       Q       If it had ran right at you and

24   barked, what would you have done?

25               MS. JONES:  Objection.

                    P.O. Adam Gorman

1

2        A        I think that is too hypothetical

3    and very vague.

4        Q        It would help if maybe you had

5    some prior simulation-based training to help

6    you deal with an incident like that, right?

7        A        No.  I mean, yes, but, no.

8        Q        The more exposure and training

9    that you have to specific types of threats,

10   the better you are able to deal with them in

11   real time, right?

12       A        Yes.

13       Q        So if you had more training

14   about interacting with potentially aggressive

15   dogs running at you, maybe you could make a

16   better decision in the moment, right?

17       A        Potentially.

18       Q        Because we agreed earlier that

19   the more training the better, right?

20       A        It doesn't hurt.

21       Q        In this instance, there was no

22   dog in this yard, right?

23       A        Correct.

24       Q        Before you jumped the fence and

25   entered this yard, is that something that you

180

```
 1                   P.O. Adam Gorman
 2    noticed, the doghouse?
 3         A      Not particularly, no.
 4         Q      You didn't really think about
 5    that before you came into this yard?
 6         A      No.
 7         Q      I will hit play.  We're at two
 8    minutes and three seconds into the video, or
 9    170903.  Let me ask you about that statement
10    that you just made.
11                Do you know who his cousins are?
12                MS. JONES:  Objection.
13         A      Not by name.
14         Q      Were you familiar with that guy
15    that you had stopped?
16         A      Yes.  I've seen him in the area
17    before.
18         Q      Did you know his name?
19         A      Not offhand, no.
20         Q      Do you know who his cousins
21    were?
22                MS. JONES:  Objection.
23         A      Again, all the personnel hanging
24    out in that area that day were all familiar
25    faces and known to stand there and sell
```

181

```
1                    P.O. Adam Gorman

2    drugs.

3         Q      Do you know what his cousins

4    look like?

5         A      Not anymore.

6         Q      Do you know why you said to him

7    whether it is you or your cousins?

8         A      Just to talk.

9         Q      Do you think his cousins were

10   other, I don't know, black men?

11                   MS. JONES:  Objection.

12        A      Do I think or do I know?

13        Q      Sure.  Do you know?  I mean, I

14   asked you if you knew who his cousins were.

15        A      Yes.  I know that people I seen

16   on that day were male blacks.

17        Q      Do you know if the other guy

18   that was stopped was his cousin?

19        A      The term I'd identify for

20   everyone here, the term "cousin" is very

21   commonly used as pal, friend, buddy,

22   acquaintance in the City of Rochester.  It

23   does not have to be direct familial

24   relationship to be a cousin or aunt or uncle.

25        Q      Did you ever review this
```

182

P.O. Adam Gorman

1

2       recording with your supervisor or anybody

3       else?

4              A       Not that I remember.

5              Q       Can you see how somebody might

6       perceive your statement, "Whether it is you

7       or your cousins out here dealing," that is

8       pretty racist?

9              A       No, not at all.

10             Q       So you don't see any reason why

11      somebody might think that what you said to

12      him could be perceived as racist by him or

13      somebody else?

14                     MS. JONES:  Objection.

15             A       Not in the slightest.

16             Q       Have you ever had any

17      conversations with supervisors or anybody

18      else about, I don't know, communicating with

19      members of the community in a way to ensure

20      that they don't perceive things that you say

21      as being racist?

22                     MS. JONES:  Objection.

23             A       Not particularly, no.

24             Q       Because some of the prior

25      training reports that we have gone over

1                    P.O. Adam Gorman

2      emphasize community relations and

3      communicating effectively, correct?

4           A      That's correct, yes.

5           Q      None of those prior training

6      reports or things that your supervisors had

7      spoken with you about regarding communicating

8      with people in the community effectively

9      involved any statements made by you that

10     could be perceived as potentially racist?

11          A      No.

12          Q      This is one of the things that

13     your supervisors were emphasizing is trying

14     to improve community relations, right?

15          A      Correct.

16          Q      So you want to, you know, maybe

17     use an interaction like this to have a

18     positive outcome, right.  And, for example,

19     encourage the person that you stopped to make

20     different choices?

21                    MS. JONES:  Objection.

22          A      Are you implying that I did not?

23          Q      What I am saying is that what

24     your supervisors and your different training

25     reports were emphasizing was trying to

184

```
 1                     P.O. Adam Gorman

 2    improve community relations through

 3    communications with individuals that you

 4    interact with on a daily basis, right?

 5         A       Yes.  That is fair ultimate

 6    wish.

 7         Q       Do you agree with their ultimate

 8    wish?

 9                     MS. JONES:  Objection.

10         A       Yes.

11         Q       One of your goals of patrolling

12    is having positive interactions with people

13    in the community to improve relations between

14    the police and people in the community?

15         A       Most definitely.

16         Q       Do you think your interaction

17    with this man here went towards achieving

18    that goal of improving relations between the

19    police and the community?

20         A       Yes, actually, I do.

21         Q       Can you kind of explain how you

22    think that that individual left this

23    interaction feeling better about the police?

24                     MS. JONES:  Objection.

25         A       Well, what I am inferring from
```

185

```
 1                    P.O. Adam Gorman
 2    your question is that I am acting in a racist
 3    manner towards these individuals, which is
 4    not the case.  And using common terms that is
 5    used within the City of Rochester makes them
 6    feel like I am more personable to them.  In
 7    addition to that, this man, whether he has
 8    had bad experiences with the police or not,
 9    his interaction went relatively smooth.  He
10    got detained and then he got let go.  That is
11    a pretty positive interaction to not have to
12    come out facing criminal charges.
13         Q     What criminal charges would you
14    have brought against him?
15         A     I don't know.  It depends on
16    what the officers on Kosciusko had seen.
17         Q     So based on your observations
18    and the fact that no contraband was
19    recovered, just based on your knowledge,
20    there was not probable cause to charge him
21    with a crime, correct?
22                    MS. JONES:  Objection.
23         A     No.  There was not probable
24    cause to charge him with a crime.  There was
25    reason to stop him and detain him.  But, no,
```

```
 1                    P.O. Adam Gorman
 2      not at this exact moment in the
 3      investigation.
 4           Q        That is my question, yes.  You
 5      let him go because after pat searching him,
 6      not finding any contraband, there was not
 7      evidence to support probable cause to believe
 8      that he had committed a crime, correct?
 9           A        No, there was.  He was
10      trespassing.  I have reason to believe he was
11      trespassing on multiple different properties
12      by cutting through them.
13           Q        You could have charged him with
14      trespass?
15           A        No, not without the owner's
16      consent or the owner's will, but that would
17      have been further investigative action that I
18      would have taken.
19           Q        You could have talked to my
20      client, Chuck Dempsey, and asked him if he
21      wanted him to be charged with trespassing,
22      but you didn't.
23           A        We hadn't gotten to that point.
24           Q        You didn't ask the owner of this
25      house where you detained him if he wanted him
```

```
 1                    P.O. Adam Gorman
 2    to be arrested for trespass?
 3                    MS. JONES:  Objection.
 4         A     I would have if we had been able
 5    to get to that point, yes.
 6         Q     As a part of your training by
 7    the RPD, have you ever done any implicit bias
 8    training?
 9         A     Yes, we have.
10                    MS. JONES:  Objection.
11         Q     Sorry.  I couldn't hear over the
12    objection.
13                    Is that, yes, you have?
14         A     Yes.
15         Q     Can you describe that training
16    for me?
17                    MS. JONES:  Objection.
18         A     The idea of the training is to
19    say that based on your upbringing, nature,
20    nurture, argument that you have some
21    conscious thoughts that can manifest into
22    actions based on different race, religion,
23    creed, or any other characterization, the
24    idea of the training is to make you aware
25    that those subconscious thoughts are there or
```

```
 1                    P.O. Adam Gorman
 2    can be there.
 3         Q      And do they teach you about how
 4    those subconscious thoughts can manifest in
 5    ways that you might say something that you
 6    don't think could be perceived as racist,
 7    might be perceived by other people as
 8    potentially being racist, right?
 9                    MS. JONES:  Objection.
10                    Elliot, there are not these
11                    type of allegations in the
12                    lawsuit.
13               MR. SHIELDS:  I am asking
14                    him about what he said to this
15                    particular person on this
16                    particular day and so it is a
17                    valid line of questioning.
18                    MS. JONES:  But it's not
19                    about the claims that was
20                    actually brought against Officer
21                    Gorman.
22               MR. SHIELDS:  And deposition
23                    questions are not limited in
24                    that way.  So I am going to have
25                    to ask you to stop making
```

```
 1                    P.O. Adam Gorman

 2                    speaking objections on the

 3                    record.  You have stated your

 4                    objection.  He can answer the

 5                    question.

 6          A         The term cousin, if you --

 7    Elliot, if you would like, you can define it

 8    for me.  The term cousin is in no way, shape,

 9    or form racist.  And if that's the term that

10    you are referring to, perception, sure, can

11    be -- as the saying goes, perception is

12    everything, but I can perceive anything I

13    want.  It doesn't make it true.

14          Q         When did you receive implicit

15    bias training with the Rochester Police

16    Department?

17                    MS. JONES:  Objection.

18          A         Prior to this date, I would say

19    the academy.

20          Q         Have you also received implicit

21    bias training after this date?

22                    MS. JONES:  Objection.

23          A         Yes.  Yes.

24          Q         Was that like an in-service

25    training or something else?
```

190

1                    P.O. Adam Gorman
2                    MS. JONES:   Objection.
3        A      I am quite sure it was
4   in-service training.
5        Q      So it would be like a day-long
6   training?
7                    MS. JONES:   Objection.
8        A      A portion thereafter, yes.
9        Q      When you do, like, an in-service
10  training, is that a day that you would
11  otherwise be working on patrol that instead
12  you take off and go to a training?
13       A      Yes.   Typically an eight-hour
14  in-service is counted as your work day or
15  your work hours and you are compensated, for
16  example, not going to work the night before.
17       Q      You don't remember the date you
18  might have done that in-service training?
19       A      No clue.
20                   MS. JONES:   Objection.
21       Q      I am going to continue playing
22  the video.   So we hit pause at two minutes
23  and 15 seconds into the video, or 170915.
24                   Just in that interaction right
25  there, can you tell me what you meant when

```
 1                    P.O. Adam Gorman
 2    you were saying to him that day, you know, "I
 3    am not new.  We have to stop it."
 4                    MS. JONES:  Is this still
 5                    playing?
 6                    MR. SHIELDS:  No.  I paused
 7                    it.
 8                    MR. JONES:  We are lagging.
 9                    I think we are a little behind
10                    you.
11                    MR. SHIELDS:  I'm sorry.
12        Q       Do you want me to repeat the
13    question?
14        A       No.  No.  When I expressed not
15    only do I understand the activities going on
16    out here, I am talking with him and trying to
17    avoid beating around the bush about the drug
18    activity that is going on.
19        Q       When you were talking about
20    that, do you mean specifically on Kosciusko
21    Street?
22        A       Correct.
23        Q       So for two days in a row on
24    Kosciusko Street you and other officers
25    basically drove the cars up and then this
```

```
1                    P.O. Adam Gorman
2    individual and other people ran from the
3    police when you pulled up.
4                    Is that fair to say?
5         A       Correct.
6         Q       The fact that that happened two
7    days in a row, does that go under the
8    totality of the circumstances evaluation of
9    whether you had suspicion to stop him or
10   suspicion or probable cause to conduct a
11   search?
12        A       That it does.
13        Q       I will keep playing now.
14                In the moment when he was
15   screaming about his daughter, what were you
16   thinking?
17        A       I didn't hear daughter.  I heard
18   dog.
19        Q       I am going to rewind a little
20   bit.
21                Did you hear him say "my
22   daughter"?
23        A       I did.
24        Q       Were you aware that his daughter
25   was watching the entire incident from right
```

193

1                    P.O. Adam Gorman

2    inside the back door there?

3         A      No, I was not.

4         Q      Did you ever come to learn that

5    after the incident?

6         A      I did.

7         Q      I just want to rewind a little

8    bit and ask you a couple of other questions.

9    We are rewinding to 259 in the video, or

10   170958 seconds.  He asked you to leave his

11   property, but did you ever do that?  Did you

12   ever leave his property?

13        A      No.

14        Q      And why not?

15        A      It was an active scene at this

16   point.

17        Q      By active scene you mean because

18   Officer Algarin had shot Tesler two times?

19        A      Correct.

20               I am assuming by Tesler you mean

21   the dog.

22        Q      His pet dog, Tesler, yes.

23               So is that like a police

24   department policy, once a firearm is

25   discharged, that makes it like an active

194

1                    P.O. Adam Gorman

2    crime scene?

3         A      Yes.

4         Q      So you have to stay there to

5    investigate the crime that another officer

6    had committed?

7                    MS. JONES:   Objection.

8         A      I would not call it a crime, no.

9    I will investigate the incident to determine

10   if a crime was committed.

11        Q      That is generally what happens

12   any time a firearm is discharged?

13        A      Yes.  Whether an officer or a

14   third-party civilian, whatever the case is,

15   yes.

16        Q      So legally you are saying even

17   though he asked you to leave his property you

18   didn't have the authority to leave his

19   property, you had to stay there?

20        A      Correct.

21        Q      Interesting.

22               And do you know if that is

23   written anywhere in the Rochester Police

24   Department policy?

25        A      To secure a crime scene, yes.

P.O. Adam Gorman

1       depositions, objections as to

2       relevance aren't really a basis

3       to instruct a witness not to

4       answer.

5       With respect to the question

6       of displaying the tattoos, you

7       know, I have never really had

8       that before.  Obviosly, I am a

9       law clerk and I can't really

10      make any determinations for you,

11      but what I can do is I can see

12      if I can get Judge Payson and

13      see if she has any further

14      insight.  She has a very full

15      calendar today, so I don't know

16      that I can get her.  And I

17      understand you are nearing the

18      end of the deposition; is that

19      correct?

20          MR. SHIELDS:  Correct.

21          MS. CORNETTA:  What I would

22      suggest is let me put you on

23      hold and I will see if I can get

24      Judge Payson to if she can give

1               P.O. Adam Gorman

2          me any insight into this issue.

3          You are free while I have you on

4          hold if you want to try to

5          continue the deposition, that is

6          fine with me and I will come

7          back on when I have some further

8          information for you.  If you

9          want to sit and wait that is

10         fine as well.  I don't think it

11         will be terribly long to

12         determine whether or not I can

13         get her.

14              So why don't I put you on

15         hold and you guys do what you

16         think is the most sufficient use

17         of your time and I will get back

18         on as soon as I have more

19         information.

20              MR. SHIELDS:  Great.  Thank

21         you so much.  We'll be waiting.

22              MS. CORNETTA:  I will get

23         back.

24              MS. JONES:  Are we going to

25         continue?

1                 P.O. Adam Gorman

2                 MR. SHIELDS:  Yes.  Let's

3                 keep going, so we can,

4                 hopefully, finish this up after

5                 they get back.

6         Q       Officer Gorman, in this

7    situation, right, that we watched in the

8    body-worn camera video where Officer Algarin

9    jumped the fence in my client's yard, you

10   guys obviously didn't have a warrant, right?

11        A       Correct.

12        Q       The exception for the other

13   warrants would have had to apply what we

14   covered earlier, right?

15        A       Correct.

16        Q       Why didn't you just ask Officer

17   Algarin to walk to the front door to ask for

18   permission and knock on the door?  Did you

19   ever think about that?

20        A       At the time, it did not cross my

21   mind.

22        Q       So earlier you had described

23   that on a prior day you had run a similar

24   operations where these same individuals had

25   run from you on Koskusco Street.

218

```
 1                    P.O. Adam Gorman
 2        A        Correct.
 3        Q        How frequent is that type of
 4   situation where people run from you into
 5   residential yards?
 6        A        In the City of Rochester, if
 7   someone runs, they are cutting through a
 8   residential yard.
 9        Q        So when someone runs and you
10   chase them, you are often also going through
11   a residential yard, right?
12        A        Correct.
13        Q        That is like a typical
14   situation?
15        A        Yes.
16        Q        This happens on a frequent
17   basis?
18        A        In terms of foot chases, yes.
19        Q        So if you say it's frequent in
20   terms of foot cases, that means more than
21   half of foot cases ends up going through
22   someone's residential yard?
23        A        Yes.
24        Q        How often would you say that
25   happens during a normal week?
```

```
1                    P.O. Adam Gorman

2         A        I couldn't even fathom to give

3    you a number.   There are too many platoons

4    and sections in the City.   I couldn't give

5    you a realistic number at all.

6         Q        I am sorry.   I mean, in your

7    experience, how often do you end up having to

8    do a foot chase through some residential

9    yards?

10        A        Me, personally, once every

11   couple of weeks.

12        Q        On average?

13        A        Yes.

14        Q        Would that be since you switched

15   to the first platoon or throughout your time

16   both on the third and the first?

17        A        If you did it altogether, I

18   would say once every couple of weeks.

19        Q        Is that something that would

20   have happened more frequently when you were

21   on the third platoon than when you were on

22   the first?

23        A        Yes.

24        Q        Have you previously encountered

25   dogs on peoples' property during foot chases?
```

220

1                    P.O. Adam Gorman

2        A        No, I don't think so, not during

3    the foot chase.

4        Q        How often during those foot

5    chances did you end up backtracking and going

6    through the route that you chase the person

7    to look for any discarded contraband?

8        A        On my personal foot chases are

9    you asking?

10       Q        Yes.  I am just asking about

11   your experience, you know, what you have

12   done.

13       A        I would say the majority of the

14   time.

15       Q        Would it be fair to say that a

16   majority of the time some of those times at

17   least would require you to jump over a fence

18   similar to what happened in this instance?

19       A        Yes.

20       Q        In any of those other instances,

21   have you ever gone to the property owner's

22   front door and asked for consent to enter

23   their property?

24       A        Prior to this date, not that

25   comes to mind.

221

1                        P.O. Adam Gorman

2          Q        After this date of incident,

3    have you ever done that, gone to the front

4    door and asked for someone's consent to enter

5    their property?

6          A        Yeah.

7          Q        Why did you do that after this

8    incident?

9          A        Typically, when looking for

10   discarded contraband, those items can be

11   obviously tossed relatively easily to a

12   significant distance, so multiple yards over.

13   And within the City limits, many people have

14   fences and some of those fences are either

15   impassible without damage to the fence,

16   injury to the officer, or just the height.

17   So there have been occasions where I go knock

18   on the door, ask them, hey, can you open up

19   the gate.  Or I hear a dog in the backyard

20   and I will say, hey, can you bring your

21   animals inside?  We're looking for something.

22         Q        So when you think there might be

23   a dog in the yard because there are

24   indications that in an instance after this

25   dog shooting where you have gone and knocked

239

1                    P.O. Adam Gorman

2     check.

3          Q      Just checking if they had any

4     open warrants?

5          A      Correct.

6          Q      Back here it says "PK" and "A"

7     were released.

8                  So that means, both of them were

9     just released from the scene, right?

10         A      I don't know if the man arrested

11    was released and issued an appearance ticket

12    on scene or at his office.

13         Q      The guy you stopped was released

14    from the scene?

15         A      Correct.

16         Q      You know, when I first read

17    this, I didn't know about the day before.  So

18    at the beginning of the incident report where

19    he is talking about, you know, how Officer

20    Horowitz said he had responded with you to

21    Sobieski Street, that was all planned in

22    advance, right?

23         A      Yes.

24         Q      Had you done that before, kind

25    of like camped out on Sobiesky Street and

240

```
1                    P.O. Adam Gorman
2      expected people to run through the yards?
3            A      I don't think so.
4            Q      You guys devised it that day
5      based on what had happened the prior day?
6            A      Yes.  Based on once we received
7      the 911 call, that is how we were going to
8      respond to the 911 call.
9            Q      So basically you made a plan to
10     flush them out through the yards and stop
11     them hopefully in one of those backyards?
12           A      No.  Just cut them off mid run.
13           Q      Yeah.
14                  Now, before you did that, did
15     you do any investigation into any of those
16     homes or yards to see whether any of them had
17     dogs?
18           A      No.  By the time we -- I pulled
19     up on Sobieski, the -- I mean, we were
20     already running.  That is why.
21           Q      Remember when you only saw the
22     five seconds?
23           A      Yes.  Because I just had
24     activated it and it only stayed in the green
25     status as we discussed earlier for about five
```

241

```
 1                    P.O. Adam Gorman
 2      seconds.
 3           Q      So basically before the camera
 4      turned on, you had just arrived at the scene
 5      in your car?
 6           A      Yes.
 7           Q      So it wasn't like you had hours
 8      to devise this plan.  You had the 911 call,
 9      responded, and at the same time you pulled up
10      on Sobieski Street, Officer Alagrin and
11      DeSabatino arrived on Kosciusko Street?
12           A      Correct.
13           Q      And those are streets that you
14      are familiar with; is that right?  You were
15      there the prior day?
16           A      Yes.
17           Q      I just want to go over the
18      incident report with you.  This will be
19      Exhibit J.
20                         (Incident report marked as
21                         Plaintiff's Exhibit J for
22                         identification, as of this
23                         date.)
24           Q      Can you see that on your screen,
25      Officer Gorman?
```