```
 1

 2                 UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
 3      - - - - - - - - - - - - - - - - - - - - - - - - - -
        CHARLES DEMPSEY, individually, and
 4      L.D., by her father and natural guardian,
        CHARLES DEMPSEY,
 5
                    Plaintiffs,
 6
                               Case No. 19:cv:6780
 7      v.

 8      THE CITY OF ROCHESTER, a municipal entity,
        JAVIER ALGARIN, ADAM GORMAN, "JOHN DOE" RPD
 9      OFFICER RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

10                  Defendants.
        - - - - - - - - - - - - - - - - - - - - - - - - - -
11

12      Deposition Upon Oral Examination of:

13                      Charles R. Dempsey III

14
        Location:       City of Rochester Law Department
15                      City Hall, Room 400A
                        30 Church Street
16                      Rochester, New York 14614

17

18      Date:           October 3, 2023

19

20      Time:           9:30 a.m.

21

22      Reported By:    SANDRA C. HEWLETT, RPR

23                      Alliance Court Reporting, Inc.

24                      109 South Union Street, Suite 400

25                      Rochester, New York 14607
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1
 2                    A P P E A R A N C E S
 3    Appearing on Behalf of Plaintiffs:
 4    Elliot D. Shields, Esq.
 5        Roth & Roth, LLP
 6        192 Lexington Avenue, Suite 802
 7        New York, New York  10016
 8        eshields@rothandrothlaw.com
 9
10    Appearing on Behalf of Defendants:
11    Peachie L. Jones, Esq.
12        City of Rochester Law Department
13        City Hall, Room 400A
14        30 Church Street
15        Rochester, New York  14614
16        peachie.jones@cityofrochester.gov
17
18                       *      *      *
19
20
21
22
23
24
25
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1                    S T I P U L A T I O N S
 2      TUESDAY, OCTOBER 3, 2023;
 3                (Proceedings in the above-titled matter
 4                commencing at 9:43 a.m.)
 5                            *       *       *
 6                     IT IS HEREBY STIPULATED by and between the
 7      attorneys for the respective parties that this
 8      deposition may be taken by the Defendants at this time
 9      pursuant to notice;
10                     IT IS FURTHER STIPULATED, that all
11      objections except as to the form of the questions and
12      responsiveness of the answers, be reserved until the
13      time of the trial;
14                     IT IS FURTHER STIPULATED, that pursuant to
15      Federal Rules of Civil Procedure 30(e)(1) the witness
16      requests to review the transcript and make any
17      corrections to same before any Notary Public;
18                     IT IS FURTHER STIPULATED, that if the
19      original deposition has not been duly signed by the
20      witness and returned to the attorney taking the
21      deposition by the time of trial or any hearing in this
22      cause, a certified transcript of the deposition may be
23      used as though it were the original;
24                     IT IS FURTHER STIPULATED, that the
25      attorneys for the parties are individually responsible
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    for their certified transcript charge, including any
 3    expedite or other related production charges in
 4    accordance with Rochester Rules;
 5              AND IT IS FURTHER STIPULATED, that the
 6    Notary Public, SANDRA C. HEWLETT, RPR, may administer
 7    the oath to the witness.
 8                        *      *      *
 9    CHARLES R. DEMPSEY III,
10              called herein as a witness, first being sworn,
11              testified as follows:
12              EXAMINATION BY MS. JONES:
13         Q.   Good morning.
14         A.   Good morning.
15         Q.   My name is Peachie Jones.  I'm an attorney
16    for the City of Rochester, as you know.  I thank you
17    for being here today so I can take your deposition.
18              So you were here yesterday for your
19    daughter's deposition, so you know the same ground
20    rules, but I will still go over them.  So you can ask
21    me any questions if you have them.
22              We have you placed under oath which means
23    you have to tell the truth, the whole truth.  Like I
24    said yesterday, you're not offending anybody.  Please
25    be honest so that we can have a good record for the
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    corner.  It's very old.
 3              Following that fence line, there is a
 4    flowering -- there is two flowering bush -- bushes.  I
 5    think a -- purple and white flowers.  Along the fence
 6    line continuing is -- you know, there are other
 7    flowers.  Tulips come up and stuff like this.
 8              There is a walkway, an old walkway that --
 9    like sidewalk bricks kind of, like concrete.  Along
10    the fence there.  And there is another -- there is a
11    cherry tree continuing north.  Along my neighbor's
12    chain-link fence there is a cherry tree.  And then
13    past the cherry tree is another bush that makes these
14    white flowers in like late July, August.  I don't know
15    the name of that either.  But I always appreciated
16    that.  And that's right along the back of my house of
17    which -- like right where the bush is, is -- is a door
18    to which -- which enters the basement of my home.
19              And then just, you know, a few feet from
20    there that begins my back porch.  The porch continues
21    until the -- the other side of my house where -- at
22    that point, at the other side of the porch is a stairs
23    that you come down and -- in an eastward direction.
24              And then the yard encases the land between
25    my next neighbor's house, which is then, you know,
```



```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2    continuing from -- if I was to be on the porch facing
 3    south.  We're now referring to my left and that would
 4    be my neighbor's house which is larger than my house
 5    as far as depth.  So at my back porch, my neighbor's
 6    house continues.
 7                Um, there is a space in between the two
 8    homes that's fenced in.  So that would -- that would
 9    include that in the yard.
10                And along that space is a sidewalk.  And
11    there's a -- a fence at the front of that.  And then
12    it's my neighbor's house.  And then my neighbor has a
13    wooden fence, like a taller-than-me wooden fence that
14    covers his -- entire property line between mine and
15    his home going all of the way back to the -- the metal
16    fence that was -- that I started talking about with
17    the bush.
18         Q.   Uh-huh.
19         A.   And inside of the center of the yard was a
20    tree that has since collapsed.  My friend told me not
21    to let that ivy grow up the tree.  "It's not good for
22    it."
23                I was like, "Hey, it looks cool."
24                Sure enough.  Ivy is not, you know, good
25    for a tree's health and that tree fell.
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  When did that tree fall down?
 3         A.  It was Halloween.  I don't remember which
 4    year exactly.  But I remember it being Halloween
 5    because it was scary.
 6         Q.  Was it standing at the time of the
 7    incident with Tesla?
 8         A.  I don't recall.
 9         Q.  Was there anything else in your yard
10    besides a tree?
11         A.  Yeah.
12         Q.  What else was in your yard?
13         A.  Are we referring to at the time of the
14    incident or are we referring to like over the years?
15    I spent a long time in that yard.
16         Q.  Sure.  We can talk about at the time of
17    the incident.
18              Was there anything inside your yard?
19              MR. SHIELDS:  Objection.
20         A.  There would have been -- obviously there
21    would have been the -- all of the stuff that we played
22    with the dog.  She would scatter toys and favorite
23    sticks.  There was a nice chunk from the cherry tree.
24    She would find that in a foot of snow.
25              There was a stone circle of which I would
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  Did you have a brace on your hand on the
 3   day of the incident?
 4         A.  A brace, like a medical brace?  Is that
 5   what you mean?
 6         Q.  Yes.
 7         A.  No.
 8         Q.  What had you been doing earlier that day?
 9              MR. SHIELDS:  Objection.
10         A.  Are you referring to like that morning?
11   Did I shampoo and wash my hair?  Or are you referring
12   to like in the moments before?
13         Q.  In the few hours before the incident.
14         A.  It was -- my daughter's birthday was that
15   weekend and I was preparing to take her out and she
16   wanted to go to this haunted house that was -- it was
17   Halloween time in October.  It is kind of the thing to
18   do.  And I was, you know, just doing my household
19   routine sort of during the day.  And I keep just
20   drawing on.  I will just tell you.
21              I remember after LD had come home, I
22   was -- I had just started to prepare food before I had
23   gone outside and the officer shot my dog.  And you're
24   asking more about what I was doing before then.  And
25   I -- I just keep going back to that, to the stove.
```



```
1                 CHARLES R. DEMPSEY III - BY MS. JONES
2    Just a routine day.
3               Q.  So what were you doing immediately
4    before -- so how did Tesla get outside?
5               A.  From the back door?
6               Q.  Yes.
7                   How did the back door open?  Who opened
8    the back door?
9               A.  I opened the back door.
10              Q.  Why did you open the back door?
11              A.  To exit.
12              Q.  Were you -- are you saying that you were
13   leaving the back door?
14              A.  Yes.
15              Q.  Why were you going outside?
16              A.  Because I was intending on having a
17   cigarette.
18              Q.  Did you know that Tesla was around you?
19              A.  Yes.
20              Q.  Was Tesla in front or behind you?  Or I
21   guess alongside you?
22                  MR. SHIELDS:  Objection.
23              Q.  So I guess where in -- where was Tesla in
24   relation to you?
25                  MR. SHIELDS:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2         A.  At what point?
3         Q.  When you first opened the door.
4         A.  In order for me to open the door, I would
5    have been in front of her.  And then when I opened the
6    screen door -- which was her habit of then clearing
7    the yard of squirrels and birds -- she had passed me
8    at that point.
9         Q.  Was it your understanding that Tesla was
10   going outside to clear the yard of birds and
11   squirrels?
12        A.  That's correct.  Until --
13        Q.  Did you see anyone in the backyard when
14   you opened the -- I will take a step back.
15             Did you see anyone in the backyard before
16   you opened the screen door?
17        A.  No.
18        Q.  Had the main door to the house, the
19   non-screen door -- had it been shut before you opened
20   the screen door?
21        A.  To exit?
22        Q.  Yes.
23        A.  Yes.  I had to open it before I had...
24        Q.  You had to open both doors to get outside?
25        A.  That's correct.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            CHARLES R. DEMPSEY III - BY MS. JONES
 2            Q.  When did you first see the officer in your
 3       backyard?
 4            A.  After I myself had stepped down from the
 5       house level to the porch level.
 6            Q.  Where was Tesla when you first saw the
 7       officer?
 8            A.  The bottom of the stairs, around the
 9       corner of the porch.  At which point I tried to tell
10       the officer that it was fine.  And that she would be
11       okay.
12            Q.  So what did you do or say after you saw
13       the officer?
14            A.  I shouted that she -- "She's fine.  It
15       will be okay."
16            Q.  You said all of those words?
17            A.  Yeah.  I don't recall the precise word
18       that I said, but I do recall saying "She's fine"
19       because that's what I would say to everyone and I
20       followed it up with a statement like "It's okay."
21            That officer was too quick to just grab
22       his gun and fire it.  I didn't -- there wasn't any
23       time for any communication.  I'm sorry for raising my
24       tone.
25            Q.  Where did Tesla go after you opened the
```



1          CHARLES R. DEMPSEY III - BY MS. JONES

2    door?  Well, she went down the stairs.

3              Where did she go -- after Tesla went down

4    the stairs?

5              MR. SHIELDS:  Objection.

6          A.  Into the yard.

7          Q.  Did Tesla head towards any specific part

8    of the yard?

9          A.  Towards the center of the yard.

10         Q.  From your perspective, did Tesla run

11   towards the officer?

12         A.  When you exit the porch down the stairs,

13   there's a wall, which is my neighbor's house and you

14   only have the option of going into the center of the

15   yard or back where you came.  So the officer, being in

16   the center of the yard, was in the direction that she

17   went.

18         Q.  When you say "center of the yard," are you

19   meaning center east to west as opposed to north/south?

20         A.  Yes.

21         Q.  Were you normally outside when Tesla would

22   chase squirrels and birds?

23              MR. SHIELDS:  Objection.

24         A.  Are you asking if I was normally outside

25   when I let Tesla outside?  That was her routine.  I



```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2      would be outside with her if I was outside to play
 3      fetch or to have a cigarette.  Then yes.  Was I
 4      outside every time she went outside?  No.
 5                Q.  Have you been outside on multiple
 6      occasions with Tesla when she is clearing the yard of
 7      squirrels and birds?
 8                A.  Yes.
 9                Q.  Can you describe her behavior when she
10      clears the yards of squirrels and birds, just
11      generally speaking?
12                MR. SHIELDS:  Objection.
13                A.  She sort of runs in the direction of the
14      squirrel, which was usually in the direction of the
15      tree, and then do a half circle around the tree and
16      realize that she had once again been duped by
17      squirrels.
18                Q.  So when you were describing your backyard
19      earlier, you named a lot of trees.
20                So -- any particular tree that she would
21      run in the direction of?
22                A.  The one in my memory reference -- I'm
23      referring to is the chestnut tree, which is the
24      largest in the yard.
25                Q.  I thought you said the chestnut tree was
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2    Tesla to the veterinarian sooner?
 3                MR. SHIELDS:  Objection.
 4          A.   Honestly, there was a part of me that
 5    really thought Animal Control would show up and be
 6    able to help me.
 7          Q.   And what did you believe that Animal
 8    Control was going to assist you with?
 9          A.   First aid kit the officers were refusing
10    to help me with.  And perhaps a ride to the Animal
11    Hospital.
12          Q.   Did you ask for those things from Animal
13    Control when they arrived?
14          A.   Yeah.
15          Q.   What did Animal Control say?
16          A.   "We'll give you a dirty blanket."
17               That's not what she said verbatim.  It is
18    just...
19          Q.   Did the Animal Control Officer communicate
20    anything else?
21          A.   I don't recall that -- the exact
22    conversation I had with the Animal Control Officer.  I
23    believe that they told me which Animal Hospital to go
24    to, I think.  Somebody told me which Animal Hospital
25    to go to.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  Which Animal Control hospital were you
 3    told to take Tesla to?
 4         A.  The one that is -- well, was -- it
 5    recently closed.  But it was near -- is on East
 6    Henrietta Road.
 7         Q.  Were there any other reasons that you
 8    didn't take Tesla to the vet sooner?  You were trying
 9    to stop bleeding.  Thought Animal Control would help.
10    You felt frozen for a little bit.
11              MR. SHIELDS:  Objection.
12         A.  I was surrounded by the officers that were
13    collected en masse around me and was just like a -- I
14    was -- I didn't feel safe to just get up and grab my
15    dog and go grab my keys and leave.  I didn't -- I
16    didn't -- I didn't feel comfortable with that for some
17    time.
18         Q.  Prior to this incident with Tesla, have
19    you had any negative interactions with the police?
20              MR. SHIELDS:  Objection.
21         A.  Throughout my life?
22         Q.  Yes.  At any point in your life.
23         A.  Could you describe the depth of
24    "negative"?  Because unfavorable -- is that what you
25    mean?  Or more like just...
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  Why don't you give me an example of a
 3    negative interaction and then I'll ask some follow-up
 4    questions.
 5              MR. SHIELDS:  Objection.
 6         Q.  Have you had any negative interactions
 7    with police in your lifetime?
 8              MR. SHIELDS:  Objection.
 9         A.  I don't recall.
10         Q.  Have you had any interactions with police
11    in your lifetime that contributed to the fear or
12    discomfort that you felt on the day of the incident
13    with Tesla?
14         A.  No.
15         Q.  So your feelings and interpretations of
16    the officers' conduct were based on their conduct that
17    day during that incident?
18         A.  In that moment, correct.  Yes.
19         Q.  What -- do you know the name of the
20    veterinarian that provided care to Tesla when you
21    arrived at the Animal Hospital?
22         A.  I do not.
23         Q.  Do you have records of Tesla's veterinary
24    care that she received at that Animal Hospital?
25              MR. SHIELDS:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2         A.  I don't believe.
3              By "records," you mean like receipts and
4   paperwork from the hospital?
5         Q.  Yes.
6         A.  Tesla was cremated and they were kind
7   enough to making like a paw print -- I don't know if
8   you're aware what that is, but they take a paw print
9   and press it into like a clay.  And I have -- I know
10  that there is papers with those prints, but I don't
11  know if they're actual medical records or just
12  associated with that.  But I know that there is
13  paperwork that I have there.
14        Q.  Do you have any receipts about the cost of
15  the cremation?
16        A.  No.
17        Q.  How much did the veterinary care that
18  Tesla received at the Animal Hospital cost?
19        A.  I don't recall.
20        Q.  Do you have any sort of estimate?
21        A.  No.
22        Q.  You can't tell me whether it was 500 or
23  5,000?
24        A.  No.
25        Q.  Are you seeking to be reimbursed for the
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2   veterinary care that Tesla received on that day?
 3         A.   The people at the veterinary hospital were
 4   so touched by the traumatic -- of the situation that
 5   they had granted me a -- a -- they had given me like a
 6   grant that they had or some sort of -- they had a --
 7   they used money that was donated.
 8         Q.   So did you pay any out-of-pocket costs for
 9   the veterinary care provided to Tesla on the day of
10   the incident?
11         A.   To the Animal Hospital?
12         Q.   Correct.
13         A.   No.
14         Q.   Did you pay for the cremation of Tesla?
15         A.   No.
16         Q.   Did you talk to anyone at the Animal
17   Hospital about Tesla's veterinary care that day?
18         A.   Yes.
19         Q.   Who did you talk to?
20         A.   The staff.  I don't know any names.
21         Q.   Do you know the position of the staff
22   members?
23         A.   There is front desk and there is behind
24   the door.  That is about as close as I could get.
25         Q.   What did -- what was the name of the
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    individual that was at the front desk that you spoke
 3    to?
 4              A.  I do not recall.
 5              Q.  What did the person at the front desk tell
 6    you?
 7              A.  She was sorry.  She was just at work.
 8              Q.  How many people did you talk to that were
 9    quote/unquote "behind the door"?
10              A.  Two, maybe three.
11              Q.  Could you distinguish between
12    veterinarians versus vet techs versus assistants of
13    those two to three people?
14              A.  No.  I mean I don't know.  I'm sure they
15    each had their own job roles, but I don't recall who
16    was who and what was what.
17              Q.  What did those people tell you about
18    Tesla -- Tesla's condition?
19              A.  She had multiple wounds and that there was
20    still a bullet inside of her.  They told me that to
21    remove it would be an extensive surgery and that she
22    had lost significant blood and that -- that they --
23    there was a period where I was alone and they came
24    back and they said that if we were to proceed, that
25    you -- you would be on the hook for the bills that
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    would exceed $15,000.  And at that time that was more
 3    money than I had ever had.  It -- so that was an
 4    impossible figure.
 5                   And I asked him if there was like any, you
 6    know -- if there was another way or -- or like -- that
 7    person told me that -- I asked them, "So you're
 8    telling me that she's going to die from this?"
 9                   And that person told me, "Yes."
10                   And so then -- so then they included to
11    put her down, that they would -- it would be best to
12    have her go down than to suffer this blood loss.
13         Q.   I'm sorry.
14                   Did you say that there would be more blood
15    loss through the surgery?
16         A.   Yeah.  When -- when you do surgery on an
17    animal or person, you cut them open.  There is lost
18    blood.  That's not what I said, but I would agree.
19         Q.   I'm sorry.  I was trying to understand
20    your last statement where you said they said it was
21    better to put her down than to suffer a blood loss.
22         A.   The bullet had traveled into her organs.
23    There were internal wounds that were bleeding that
24    couldn't be addressed with gauze that I was
25    requesting.  And it required an expensive surgery and
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 CHARLES R. DEMPSEY III - BY MS. JONES
 2      that was a low-percentage chance already.  I remember
 3      asking, "What are the chances?"
 4           Q.  Chances of surviving?
 5           A.  Of survival.  They told me it was low and
 6      if she did come through, she would never walk -- she
 7      would never be the same.
 8           Q.  Did the employees at the Animal Hospital
 9      tell you anything else about the location of the
10      bullet?
11           A.  There was multiple bullets.  They did --
12      when they x-rayed, they told me there was one inside
13      of her still, I believe.  From what I recall.
14           Q.  Yes.  So sorry I was unclear.
15                I was asking if there was additional
16      communication about the bullet that was still inside
17      of Tesla.
18           A.  I -- I feel like that was part of the
19      previous conversation that I just was referring to in
20      the last question.
21           Q.  Okay.  So there is no additional details?
22           A.  That was such a blur.  I just remember
23      crying in the parking lot.
24           Q.  Did the employees at the Animal Hospital
25      talk to you about the blood loss from Tesla?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2          A.  Yes.
 3          Q.  What did they say other than she lost a
 4     lot of blood?
 5          A.  The reason why she lost blood was gunshot
 6     wounds.
 7          Q.  They said that?
 8          A.  Yeah.
 9          Q.  Did they say anything else about the blood
10     loss?
11          A.  I don't recall.  I remember them saying
12     that at first they were worried it was worse and then
13     they were -- it -- I -- I don't know the specifics
14     about the blood loss conversation.
15          Q.  Would the surgery have had a higher chance
16     of success if she hadn't lost as much blood?
17          A.  I'm not a veterinarian.
18          Q.  Did they --
19          A.  I would assume.
20          Q.  Did they mention anything specifically
21     about whether the chance of success of the surgery was
22     related to her prior blood loss?
23          A.  I do remember that that was part of the
24     risk of the surgery, was the blood loss.  I remember
25     that being -- I mean you are asking me about a
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    conversation that I had in the room four years ago
 3    that I blocked out of my memory.  So I don't -- I
 4    don't recall.
 5          Q.  Yeah.  That's fine.  I just need to know
 6    what you do remember.  So that's why I'm asking that.
 7              Have you ever -- you said you're not a
 8    veterinarian, but have you taken any veterinary
 9    classes?
10              MR. SHIELDS:  Objection.
11          A.  No.  I mean I don't know what veterinary
12    classes is titled.  Everyone has to take English 101.
13          Q.  When you were at MCC, did you take
14    something like a vet tech class?
15          A.  No.  That is why I answered "No."
16          Q.  Have you taken a first aid class?
17          A.  I have had first aid training for -- I
18    have never taken a class.
19          Q.  When was the first aid training?
20          A.  Well, we learned first aid in the Boy
21    Scouts.  You know.  And the Elementary School that I
22    went to, you know, they had a -- they had this
23    traveling health professor that would come to the
24    classrooms and gave us a basic first aid lesson.  When
25    I was in middle school we learned CPR, first aid.
```



```
1              CHARLES R. DEMPSEY III - BY MS. JONES
2              You know, you get trained to ask
3    permission before you help somebody at the scene.
4    Stuff like that.  I just -- but those are instances
5    that I can recall.
6         Q.  When you were -- I think you described it
7    as shielding Tesla.
8              When you were laying with her in that
9    portion of the yard, do you remember how many wounds
10   there were on Tesla?
11        A.  She had blood coming from her face by her
12   ear.  And she had -- I remember that there were two
13   wounds on her chest.  And then there was another
14   that -- I want to say I was trying to hold three
15   different spots on her body.
16        Q.  Was blood oozing out -- I think that's the
17   word you used -- from all three of those spots?
18        A.  There was blood coming in all those spots.
19   Earlier when I used the term "ooze," it was a
20   reference to at one point I had released and there was
21   an ooze, like -- like the pressure had built up from
22   me stopping the blood from coming out and when I
23   released there -- I used the word "ooze" sort of.
24        Q.  Like a gush?
25        A.  Like a gush.
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         Q.  Was blood coming out prior to you applying
 3    pressure to the wounds?
 4         A.  Yes.  She left a trail of blood.
 5         Q.  Earlier you said that you could hear blood
 6    in her lungs.
 7              How do you know that that is what you were
 8    hearing?
 9         A.  I spent a lot of time cuddling with the
10    dog, laying my head on her body.  Laying her -- her
11    laying her head on my body.  I had heard her breathe
12    in the past.  I knew what it sounds like.  I was
13    comfortable with the sound.  I could fall asleep to
14    it.
15              And laying in the dirt, with my body, I
16    could hear the "hawk."  I could hear the -- I could
17    hear the difference.  I could hear the "hawk."  I
18    can't verbalize a word for that.  I could hear the
19    (sound representation).
20         Q.  A raspiness or is it called a glottal?
21              MR. SHIELDS:  Gurgling?
22         Q.  Yes.
23              Like a gurgle?
24         A.  It -- it was different.  It -- it sounded
25    like water in a place where it shouldn't be.  Or
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2     fluid.
 3              Q.  Did you stay at -- scratch that.
 4                  How long were you at the Animal Hospital?
 5              A.  Until it was pretty dark out.  I don't
 6     know the time.  It was October, so it gets dark around
 7     7.  I was probably -- I was there for some time.  Even
 8     after they had -- I didn't know what to do afterwards.
 9     My daughter had been taken to her grandmother's house
10     so I knew she was safe.  I didn't want to go home.  I
11     didn't know where to go.
12              Q.  Where did you sleep that night?
13              A.  I slept at a friend's house.
14              Q.  How many -- well, when did you next sleep
15     back at Kosciusko Street?
16              A.  Probably near November.  It had to be
17     almost November at that point.  I would say a long
18     week, maybe eight or nine days from that point.
19     Maybe.
20              Q.  Did you miss any work because of the
21     incident?
22              A.  I did.
23              Q.  How many shifts did you miss?
24              A.  I missed the rest of that week.
25              Q.  And --
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  Well, it was -- it was Friday and then --
 3    I remember I called in and then called again.  I don't
 4    recall how many days specifically I had called into
 5    work.  But -- again, this is like four years ago.
 6         Q.  Did you use paid leave for those absences?
 7         A.  I don't recall.  If I had the sick time,
 8    I'm sure they gave it to me, but I don't recall.
 9         Q.  Are you seeking to be compensated for your
10    missed work because of the incident?
11              MR. SHIELDS:  Objection.
12         A.  You're asking if I'm asking to be paid for
13    my hourly wage that I missed?  Is that what you're
14    saying?
15         Q.  Or -- yeah.  Yeah.
16              Are you seeking to be compensated for
17    that?  If so, I need to figure out how much that is.
18              So -- so are you seeking to be compensated
19    for the work you missed at -- or having to use your
20    paid leave for that time period?
21              MR. SHIELDS:  Objection.
22         A.  I never returned to work the same.  From
23    that.
24         Q.  Is that a "yes," "no" or "I need to think
25    about it"?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.  Yes.
 3         Q.  You work for the same employer as you did
 4    in 2018?
 5         A.  Yes.
 6         Q.  Do you know who at work you would contact
 7    to get a copy of your attendance and/or pay records
 8    for that time period?
 9         A.  Human Resources with the United Parcel
10    Service.
11         Q.  Is there a particular person in Human
12    Resources you would contact?
13         A.  Not whose name I know off the top of my
14    head.
15              MS. JONES:  Okay.  It's 12:45.  We can
16    stop for lunch since we're well past noon.
17                   Off the record.
18         (There was a discussion off the record.)
19         (The proceedings recessed at 12:45 p.m.)
20         (The proceedings reconvened at 1:48 p.m.;
21         appearances as before noted.)
22    CHARLES R. DEMPSEY III, resumes;
23         CONTINUING EXAMINATION BY MS. JONES:
24         Q.  Did you have a chance to talk to your
25    attorney over break?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2         A.   Yes.
 3         Q.   Did you want to add anything to your
 4    answers that we had before lunch or since we started
 5    this morning?
 6         A.   No.
 7         Q.   So your attorney just emailed me some
 8    documents.
 9              Do you recognize these?  Do you recognize
10    these documents?
11         A.   The header appears to be from the
12    veterinary hospital.
13         Q.   Have you seen these documents before?
14         A.   That looks like a -- it looks familiar.
15         Q.   Okay.
16              MR. SHIELDS:  For the record, I forwarded
17    an email from the veterinary emergency hospital of
18    records that we just got from the veterinary emergency
19    hospital during the lunch break.
20         Q.   Did you request these records from the
21    veterinary hospital?
22         A.   Yes.
23         Q.   When did you request these records from
24    the veterinary hospital?
25         A.   We just got them.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2          Q.  Is there -- when did you request these
 3     records from the veterinary hospital?
 4          A.  We just made a phone call to request them.
 5          Q.  Like earlier today?
 6          A.  Yes.
 7          Q.  Is this location still open?
 8          A.  Um, I believe they're in the process of
 9     changing that.
10          Q.  So I thought earlier you said that the
11     veterinary hospital you took Tesla to is now closed?
12          A.   In the news it was mentioned that the
13     emergency services for veterinary care there was
14     shutting down and that was the last option for people
15     in the City of Rochester area.  That's why it was
16     newsworthy.
17          Q.  When did you read that in the news?
18          A.  That was a few -- that was a few weeks
19     ago.  Maybe about a month or more.
20          Q.  So you saw it was shutting down?
21          A.  Yeah.  I didn't like go into depth, but I
22     recall --
23          Q.  Did you know -- or do you know if the
24     location is -- scratch that.
25               Is this the location of the veterinary
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    hospital that you took Tesla to?
 3                  MR. SHIELDS:  Objection.
 4         A.   "This" in reference to?
 5         Q.   The --
 6         A.   I can't see what you're --
 7         Q.   Sure.  I have the same records up I had a
 8    minute ago.
 9                  Is this the name of the hospital that you
10    took Tesla to on the date of the incident?
11         A.   Yeah.  I believe so.
12         Q.   Okay.  Okay.  I will show you a body-worn
13    camera video.  So this is a video of -- well, we have
14    his name as Lindauer, L-I-N-D-A-U-E-R.
15                  I'm going to show you this video because
16    it depicts again that part of -- where you were
17    holding Tesla in the corner of your yard.  And I would
18    like you to identify -- if it is in this video -- the
19    point where you felt -- I forget the words you used --
20    like surrounded -- not barricaded.
21                  Do you know what I'm referring to?  I
22    forget the word you actually used.
23         A.   I understand what you're referring to.
24                  MR. SHIELDS:  Objection.
25         Q.   So what word do you want to use for that
```



```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    time where you felt enclosed, kept?
 3              A.   That my liberties were impeded on --
 4              Q.   Yes.
 5              A.   -- to freely roam on my property?
 6              Q.   Yes.
 7                   You felt like you couldn't leave; is that
 8    fair?
 9              A.   I would assume the entirety of the video
10    before you play it, but --
11              Q.   Okay.  So -- so I will play it and we'll
12    see where we get to.
13                   (The video was played.)
14              Q.   Okay.  So this is the officer's body-worn
15    camera.
16                   Again, I have turned up the sound a little
17    bit.  This is a video ending in 00:15.  I've skipped
18    it ahead to 17 seconds in the video.  Right now the
19    time stamp in the lower right-hand corner is 17:31:41.
20    I'm just going to play it for a bit.  And if there is
21    ever a point in this body-worn camera video where you
22    felt like your liberties were -- as you say -- you
23    weren't at liberty to leave, let me know.
24                   (The video was played.)
25              A.   May I?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2           Q.  I'll pause it.
 3           A.  I can't see.
 4           Q.  Oh, sorry.
 5           A.  Thank you.
 6                (The video was played.)
 7           Q.  So he did take a few steps towards you
 8      though.  He's walking.
 9                (The video was played.)
10           Q.  Okay.  So I paused it at -- at 57 seconds
11      into the video.  17:14:22 is the time stamp.
12                So he has gotten a little closer to you.
13      Are you feeling like you're not at liberty to leave at
14      this point?
15                MR. SHIELDS:  Objection.
16           A.  That's correct.  There is an officer
17      standing over looking at me -- right there in the
18      video -- in the top left corner of the fence who's
19      looking down on me.
20           Q.  So it is not maybe this officer that's
21      making you feel --
22           A.  You're asking me about my feelings.
23                And that officer is approaching me into a
24      corner.  So he is cornering me.
25           Q.  So this officer at this point in time,
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MS. JONES
 2    given his location and the combination of the officer
 3    looking over the fence, that's what's making you feel
 4    like you cannot leave?
 5              A.  At that point in time, I'm trying to find
 6    help.
 7              Q.  No.  I -- I just want to -- so I feel like
 8    you're not answering my questions clearly.  I'm trying
 9    to make sure I'm understanding you correctly.
10              So am I understanding you correctly when I
11    say this officer in this position right here at
12    17:14:22, in combination with the officer looking over
13    the fence, makes you feel like you are not free to
14    leave?
15              MR. SHIELDS:  Objection.
16              A.  Yeah.
17              Q.  So I will push play.
18              (The video was played.)
19              Q.  Okay.  So I don't -- I paused it at
20    1:39:17:15 because he starts blocking his body-worn
21    camera with his arm.  I'm going to scoot forward.
22              Okay.  So I scooted the video forward to 2
23    minutes into the video at 17:15:24.  And I'm going to
24    push play again because we can actually see again.
25              (The video was played.)
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1           CHARLES R. DEMPSEY III - BY MS. JONES
 2   the same way.  We have talked about it on the highway.
 3           Like, "Oh, yeah.  I remember" -- just you
 4   remember -- and then sad, sad, sad.  Just kind --
 5           Q.  You don't take Savannah to the dog park?
 6           A.  Not to that doing park, no.
 7           Q.  Anything else you would like to share
 8   about how Tesla's death has affected you or your
 9   family?
10           A.  I stopped inviting people to my home after
11   that.
12           Q.  You mentioned that you didn't have people
13   at the fire pit anymore.
14           A.  Yeah.  Which, you know -- I stopped
15   engaging with people who were close to me at that
16   time, just entirely.  And -- you know, because of
17   that, those relationships drift on and, you know,
18   apart.  And I don't have those relationships that I
19   had before anymore.
20           I really prided myself in helping my
21   elderly neighbors back then.  And I just -- I watched
22   them die over the years and -- and I could have spent
23   more time helping them with their last years if I
24   hadn't been so secluded in my -- just...
25           I have a really hard time getting rid of
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2    things from back then.  With example, my car.
 3             Q.   Hmm.
 4             A.   I have gotten a new vehicle, as you asked.
 5    Yes, I have fewer flashbacks of the dog in the mirror
 6    in that vehicle.
 7             Q.   In the new vehicle?
 8             A.   In the new vehicle.  But I can't bring
 9    myself to get rid of the old vehicle because it's one
10    of the last pieces of Tesla I have left.
11                I'm still afraid to go into the yard
12    without inspecting it.  I -- I'm afraid to step
13    outside of my house without making sure that there is
14    not somebody out there that might kill me.  That's not
15    a comfortable feeling to have.  It's not.
16                I don't even -- I found myself afterwards
17    that I would -- I -- I found myself drawn deeply to
18    like -- for example, like a Facebook friend that
19    shared a picture of them with their dog.  I -- I found
20    myself so happy for them that they had that in their
21    life.  And I -- I get emotional sometimes when I
22    don't -- I don't get to -- when I'm left alone in
23    these thoughts of, you know, I should have taken that
24    bullet and, you know, what could -- how could I
25    have -- could I have carried her into the home away
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                CHARLES R. DEMPSEY III - BY MS. JONES
 2      from them?  Could -- could I -- what could I have done
 3      differently?
 4                Did I have to have that cigarette?  I
 5      smoke cigarettes.  I smoke a lot of cigarettes in a
 6      year.  Every time I light a cigarette -- not every
 7      single time I light a cigarette, but frequently, while
 8      I'm smoking a cigarette, I think about should I have
 9      had that cigarette?
10                You know, I was cooking little -- you
11      know, you ever have a cocktail wiener or, you know,
12      like a smoked sausage, small smoked sausage?  We were
13      cooking those.  I have not purchased those.  I avoid
14      that entire section in the Wegmans grocery with the
15      baloney and the ham.  That -- I avoid that entire
16      section of the grocery store.
17                Sometimes I stare at it.  When I end up
18      there, I just stare at it.  Why?
19                I -- I have been affected by loss of Tesla
20      every single day and I can continue to name these
21      things throughout the evening if that is what you
22      would like.  But it exceeds what I have said.
23                MS. JONES:  I don't have any more
24      questions.
25                MR. SHIELDS:  I just have a few.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          CHARLES R. DEMPSEY III - BY MR. SHIELDS

2          EXAMINATION BY MR. SHIELDS:

3          Q.  Before the officer entered your yard, did

4    you give him permission to enter your yard?

5          A.  No.

6          Q.  If the officer had walked to your front

7    door, knocked and explained the situation that they

8    wanted to enter your yard to search in your yard,

9    would you have given the officer permission?

10          A.  If he had knocked on my door and garnered

11    my attention and asked for permission to enter, would

12    I have told him yes?

13          Q.  Yes.

14          A.  Yes.

15          Q.  Before the officer entered your yard, did

16    he make any kind of announcement or warn you that he

17    was going to enter your yard before he entered your

18    yard?

19          A.  No.  I was unaware of his presence.

20          Q.  Earlier, Ms. Jones showed you the

21    body-camera video and the moment when the officer had

22    pointed his gun at you and then he put it down by his

23    side.

24               In the video, you weren't able to actually

25    see the officer holster his gun; correct?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2                 MS. JONES:  Objection.
 3            A.  Correct.
 4            Q.  So just by watching the video, there is no
 5    way to tell when the officer actually holstered his
 6    gun; correct?
 7                 MS. JONES:  Objection.
 8            A.  Yes.
 9            Q.  From your memory of the incident, do you
10    remember exactly when the officer holstered his gun?
11            A.  By "exactly," do you mean like
12    order-of-event exactly?
13            Q.  Like --
14            A.  Sorry.
15            Q.  So in the video what you see is the
16    officer pointing his gun at you and then putting it
17    down by his side.
18                 Could the officer have held the gun at his
19    side for some portion of time before he re-holstered
20    it?
21                 MS. JONES:  Objection.
22            A.  Time was moving very slowly at that point.
23    He could have.
24            Q.  Okay.  Sounds like you don't remember
25    exactly when he holstered the gun, if it was
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2    immediately after he put it down by his side, if he
 3    held it there for a while before holstering his gun or
 4    not?
 5              MS. JONES:  Objection.
 6         A.   Right.  I can't recall.
 7         Q.   Okay.  Ms. Jones asked you a series of
 8    questions about why you didn't bring Tesla to the
 9    Animal Hospital sooner.
10              One of those reasons was because the
11    officers told you that Animal Control was coming to
12    your home, correct?
13              MS. JONES:  Objection.
14         A.   Yes.
15         Q.   And was another reason because you didn't
16    feel you were free to leave when you were surrounded
17    by the officers?
18              MS. JONES:  Objection.
19         A.   Yes.
20         Q.   And Ms. Jones asked you why you didn't go
21    inside to see LD.
22              Was -- would LD have seen your shirt
23    covered in blood if you had gone inside at that point?
24              MS. JONES:  Objection.
25         A.   Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2         Q.  Is another reason that you didn't leave
 3   Tesla to go inside and see LD because you were afraid
 4   that Tesla would bleed out and die?
 5              MS. JONES:  Objection.
 6         A.  I was afraid of blood coming out of her
 7   and causing her death, yes.
 8         Q.  Did you stop taking the Prozac because the
 9   side effects were worse than the benefits or something
10   else?
11         A.  Yes.  I -- I -- I felt like it was more of
12   a negative than a positive.
13         Q.  Was that the same with the Celexa?
14         A.  Yeah.  I mean I -- I stopped the Celexa
15   because I ran out of Celexa and I was hoping that I
16   could go on without it.
17         Q.  Your deposition was previously scheduled
18   about a year ago, correct?
19         A.  Yes.
20         Q.  Did you watch the -- the video at that
21   time in preparation for the previously scheduled
22   deposition?
23         A.  I believe I did.
24         Q.  How did that make you feel?
25         A.  Angry, confused, upset.  I -- I felt
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2     like -- in this moment right now I'm reflecting on the
 3     video and I feel anger.
 4              Reflecting on it made me feel really sad
 5     about myself.
 6          Q.  When you say it makes you feel sad about
 7     yourself, is one of the reasons because of how
 8     emotional you are in the video?
 9              MS. JONES:  Objection.
10          A.  Yeah.  I was -- it made me feel like I
11     wasn't who my ego thinks I was.  Not the man I thought
12     I was, I guess.  You know, I gave -- I gave my best
13     "Hey" voice and they treated me like some kid.
14          Q.  Were you raised to view a man's role as
15     being strong and stoic and not expressing emotion?
16              MS. JONES:  Objection.
17          A.  My father was a marine and he raised me.
18     I was born a few years after he, you know, had left
19     the Marines.  So he had used I lot of what he learned
20     in the Marines to raise me on.  And being strong,
21     protective.  That just was -- that was an example that
22     I had.
23          Q.  In June 2019, there was a custody order
24     granting you and Felicia, your daughter's mother,
25     joint custody; correct?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2                  MS. JONES:  Objection.
 3         A.  Yes.
 4         Q.  So it's not like you had to give Felicia
 5    permission to see LD, correct?
 6                  MS. JONES:  Objection.
 7         A.  Yes.
 8         Q.  Earlier one of the things that you said in
 9    response to one of Ms. Jones' questions about your
10    daughter was that it wasn't until several years had
11    passed that you had an honest discussion about what
12    happened with LD and that she told you that she tried
13    to -- I think the words you used were "keep within her
14    struggles."
15                  So my question is do you mean that she
16    held in her emotions about the incident?
17                  MS. JONES:  Objection.
18         A.  We withdrew the detail -- we held back the
19    details of the moment and the after moment and how we
20    felt.  I mean yeah.  She held in her emotions.  She
21    held in -- we didn't talk about what we felt because
22    we both felt broken-hearted.  It was hard to share
23    that without coming right to the surface and I'm
24    choked up now referring to it.  I mean -- staring in
25    the eyes of my daughter and feeling the same way.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2     It's even harder.
 3            Q.  And another thing that was said in
 4     response to Ms. Jones' questions is that you --
 5     something like you felt bad about not being able to
 6     help LD process her feelings about the incident
 7     because you were dealing with your own feelings about
 8     the incident.
 9            Is that accurate?
10            A.  Yes.
11            Q.  And do you think that is something that
12     affected your relationship with LD?
13            A.  I do.  I do.
14            Q.  And Ms. Jones had asked you why you had
15     gone to see your primary care physician for a period
16     of time, I believe, between maybe after you were
17     prescribed the Celexa to present or something like
18     that.
19            Is the reason you didn't go see your PCP
20     in that time period because you simply weren't sick?
21     You didn't have a reason to go see your PCP?
22            MS. JONES:  Objection.
23            A.  Yeah.  I said before that I had gone in
24     because I had a really bad cold and I didn't go spend
25     time with my PCP because -- when I was a kid, you
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              CHARLES R. DEMPSEY III - BY MR. SHIELDS
 2    called a doctor when you break an arm.  I did that
 3    only once.
 4         Q.  So you wouldn't just like go regularly and
 5    have check-ins with your doctor if you weren't sick or
 6    if you didn't have an injury?
 7         A.  Yes.  Yes, I would not.
 8         Q.  When you became a driver with UPS, did you
 9    get training on interacting with dogs?
10         A.  I did.
11         Q.  When you were a driver with UPS, did you
12    have any weapons or anything else that you would carry
13    to help protect you if you had to interact with a dog
14    on someone's property?
15         A.  The UPS uniform includes nothing but, you
16    know, shirt, pants, socks if you're wearing shorts,
17    coat and the -- the UPS diad, which is like -- the new
18    ones are nicer and lighter than the old ones, but --
19    the UPS diad is about --
20              MS. JONES:  Like the handheld thing?
21    Handheld thing?
22         A.  Yeah.  That you would sign for an
23    electronic thing.  You would -- that was the only
24    thing that would -- that you would have other than a
25    package that you're carrying.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920