CONFIDENTIAL

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -

CHARLES DEMPSEY, individually, and L.D., by her father and natural guardian, CHARLES DEMPSEY,

Plaintiffs,

Case No. 19:cv:6780

v.

THE CITY OF ROCHESTER, a municipal entity, JAVIER ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -

Deposition Upon Oral Examination of:

LD

Location: City of Rochester Law Department
City Hall, Room 400A
30 Church Street
Rochester, New York 14614

Date: October 2, 2023

Time: 9:30 a.m.

Reported By: SANDRA C. HEWLETT, RPR

Alliance Court Reporting, Inc.

109 South Union Street, Suite 400

Rochester, New York 14607



A P P E A R A N C E S

Appearing on Behalf of Plaintiffs:

Elliot D. Shields, Esq.
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
eshields@rothandrothlaw.com

Also Present:

Charles R. Dempsey III

Appearing on Behalf of Defendants:

Peachie L. Jones, Esq.
City of Rochester Law Department
City Hall, Room 400A
30 Church Street
Rochester, New York 14614
peachie.jones@cityofrochester.gov

* * *

S T I P U L A T I O N S

MONDAY, OCTOBER 2, 2023;

(Proceedings in the above-titled matter commencing at 9:37 a.m.)

* * *

IT IS HEREBY STIPULATED by and between the attorneys for the respective parties that this deposition may be taken by the Defendants at this time pursuant to notice;

IT IS FURTHER STIPULATED, that all objections except as to the form of the questions and responsiveness of the answers, be reserved until the time of the trial;

IT IS FURTHER STIPULATED, that pursuant to Federal Rules of Civil Procedure 30(e)(1) the witness requests to review the transcript and make any corrections to same before any Notary Public;

IT IS FURTHER STIPULATED, that if the original deposition has not been duly signed by the witness and returned to the attorney taking the deposition by the time of trial or any hearing in this cause, a certified transcript of the deposition may be used as though it were the original;

IT IS FURTHER STIPULATED, that the attorneys for the parties are individually responsible

for their certified transcript charge, including any expedite or other related production charges in accordance with Rochester Rules;

AND IT IS FURTHER STIPULATED, that the Notary Public, SANDRA C. HEWLETT, RPR, may administer the oath to the witness.

* * *

LD,

called herein as a witness, first being sworn, testified as follows:

EXAMINATION BY MS. JONES:

Q. My name is Peachie. I'm an attorney for the City of Rochester. Thank you for being here today so I can take your deposition.

How old are you today?

A. 15.

Q. 15?

A. Uh-huh.

Q. Okay. You just agreed to tell the whole truth.

What does that mean to you?

A. Um, just to not lie and not over-exaggerate. To tell the truth.

Q. Do you think my shirt is the prettiest

LD - BY MS. JONES

cat could come with you to your mom's house?

A. No.

Q. Did your -- did either pet come with you to your grandmother's house?

A. No. I mean -- on visits occasionally, but no.

Q. Why didn't the pets come with you to your grandmother's house?

A. She has another cat who isn't very happy around like dogs.

Q. Okay. What about KitKat, the cat?

A. Same difference -- or same thing.

Q. The cat doesn't like other cats?

A. Yeah.

Q. That's terrible.

Um, who named KitKat, the cat?

A. I do not remember.

Q. All right. Let's talk about the incident.

What had you been doing that day?

A. That day, it was -- me and my dad were planning on going out for my birthday.

Q. Do you remember what the day -- do you remember the day the incident occurred?

A. October 19th, 2018.

LD - BY MS. JONES

Q. Is the 19th -- never mind.

Where did you go out to?

MR. SHIELDS: Objection.

A. We were planning on going out to a haunted house.

Q. So what had you been doing that morning of the incident?

A. I was going to school that day.

Q. What day of the week was this?

A. Friday.

Q. So what did you do after you got home from school?

A. After I got home, I was just in the living room watching TV.

Q. Who let Tesla out into the backyard?

A. My dad.

Q. Where were you when your dad let the dog out?

A. In the living room.

Q. From where you were sitting in the living room, could you see the back door from which your dad let Tesla out?

A. Yes.

Q. What -- what happened after your dad let

Tesla out?

A. I remember hearing him scream.

Q. What else did you hear?

A. I remember hearing some sort of loud noises, but the gunshots weren't until I ran up to the door.

Q. Do you remember what your dad screamed?

A. No. I do not remember. I think it was just "No."

Q. So after you heard him scream, what did you do?

A. I ran up to the back door.

Q. And then what? Or actually, one step back.

Where was your dad when you ran up to the back door?

A. Outside.

Q. Outside where?

A. In the backyard.

Q. He was no longer on the porch?

A. No.

Q. When did the gunshots occur?

A. By the time I was at the door looking outside.

LD - BY MS. JONES

Q. Sorry.

Do you remember if that was before or after you got to the back door?

Sorry.

Do you remember if the gunshots were before or after you got to the back door?

A. It was happening by the time I was at the back door.

Q. Like around the same time?

A. Yes.

Q. So what did you see as you got to the back door?

A. I saw the officer and -- in my backyard. I saw my dad upset and I saw the officer shooting the dog.

Q. So you got to the back door.

You saw the officer shooting the dog and your dad in the yard?

A. Yes.

Q. Then what happened after that?

A. Um --

Q. Or rather, what did you do after that?

A. I remember staying at the back door for a bit. I was a little bit shocked. I didn't know what

LD - BY MR. SHIELDS

A. I was in the process of doing so before I was like -- I was about to. But a staff walked in.

Q. Okay. And was the reason that that happened because you were triggered by watching the dog be shot in this movie?

A. Yes.

Q. Okay. And so that -- that incident seeing the dog shot triggered you and that was a couple of years after the incident had happened?

A. Yes.

Q. So would you say that it -- at least a couple years after the incident happened, you were still being triggered by certain things like seeing a movie where a dog is shot?

MS. JONES: Objection.

A. Yes.

Q. Okay. Were there other things that would still trigger you around that time that reminded you of the officer shooting and killing Tesla?

MS. JONES: Objection.

A. Yes.

Q. Like loud noises?

A. Right.

Q. And some of those things still affect you

LD - BY MR. SHIELDS

and trigger you today?

A. Correct.

MS. JONES: Objection.

Q. And one thing that you discussed a little bit was that at some point your dad moved houses from Kosciusko Street to somewhere else, correct?

MS. JONES: Objection.

A. Correct.

Q. And do you remember when that move occurred?

A. Not specifically.

Q. Okay. When you came home from Villa of Hope and moved in with your dad, did you move into the new house or did you move back to Kosciusko Street?

A. I think by then they were getting the new house.

Q. Okay. So after you left Villa of Hope, did you ever go back to Kosciusko Street?

A. No.

Q. Okay. Ms. Jones asked you a question about the incident itself. And she asked you, I think, if you were ever on the back porch itself at the same time as your dad.

But my question is, you never actually

LD - BY MR. SHIELDS

exited the door onto the back porch after Tesla was shot on the day of the incident; is that right?

A. Correct. I did not.

Q. Okay. You just ran up to the back door and could see out the window of the door?

A. Yes.

Q. Okay. And you said that you got to the back door and the first thing you saw was something like the officer with the gun in his hand and you knew that Tesla was shot. You got there about the same time as the shooting.

Is that what you said?

MS. JONES: Objection.

A. Yes.

Q. Do you remember exactly what you saw right when you got to the back door?

A. Exactly what I saw was the officer -- I don't remember if he was behind or inside of the fence, but I -- he was inside of the fence and he was holding a gun and my dad was, you know, there yelling and Tesla was there.

Q. Okay. And at some point did you see the officer point the gun at your dad?

A. Yes.

LD - BY MR. SHIELDS

Q. And when the officer was pointing the gun at your dad, was there kind of a direct line from where the officer is pointing the gun behind your dad back to you?

A. Um, can you -- what do you mean?

Q. Like let's say the officer had shot the gun at your dad and missed.

Would the bullet have traveled in your direction?

A. No.

Q. Okay. Do you remember hearing the officer yell at your dad?

A. No. Like I said, like the window was closed. I feel like it's faint, but -- I don't know.

Q. Then you said you kind of had like a frozen feeling at that point?

MS. JONES: Objection.

A. Yes.

Q. You said that you stood there for some period of time at the back door?

A. Yes.

Q. And then at some point Tesla came up onto the porch?

A. Yes.

LD - BY MR. SHIELDS

Q. Did you ever let Tesla into the house when she came back up on the porch?

A. No, I did not. Like I said, I was sort of in that state of -- afterward, I felt guilty like I should have. Like I should have tried to do something. But no, I didn't.

Q. Okay. And then after that, you said you went to the living room?

A. Yes.

Q. And at some point you saw out the window in the living room your dad holding Tesla and trying to stop her from bleeding out?

A. Yes.

Q. And you said at some point after that you went to your bedroom and you were making a lot of noise, slamming a door?

A. Yes.

Q. Did the door get damaged from you slamming it?

A. Yes.

Q. Can you describe the damage to the door?

A. Um, the door -- it didn't immediately fall off the hinges, but when I came back to the house, just a couple times moving the door, you could already

LD - BY MR. SHIELDS

tell it was a little loose and eventually just fell off.

Q. You were -- you were ten years old when this happened?

A. Yes.

Q. And when you were slamming the -- well, withdraw that.

The -- when the police came into the house and told you to be quiet, were you slamming the door at that point?

A. I think that's why they came. I was pretty loud, crying, screaming.

Q. Did the police do anything to try to console you?

A. No. They essentially came in and said, "Calm down. Stop making noise. Relax and stay in here."

And then left.

Q. Ms. Jones asked a series of questions about things that you told your therapist, Jennifer Bruno.

At the time that you saw Jennifer Bruno, that was in 2018 and 2019?

A. Yes.

LD - BY MR. SHIELDS

Q. How old were you in 2018, 2019?

A. 11.

Q. Okay. So you were 11 years old at the time that you were seeing Jennifer Bruno.

And did the time that you were, you know -- all of the questions Ms. Jones asked you about and the things you told her when you were 11 years old?

MS. JONES: Objection.

A. Yes.

Q. And did you ever -- been in therapy before?

A. Before that? No.

Q. And she asked you a series of questions about why you didn't bring up the fact that, you know -- continuously talking about Tesla having been shot in -- I think your testimony was that you would speak about what was on your mind at that time?

A. Yes.

Q. And subsequently after seeing Jennifer Bruno, you saw numerous other therapists; right?

A. Yes.

Q. With all of the therapists that you saw, did you talk about relationships in your life?