UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

------------------------------------------------>

CHARLES DEMPSEY, individually, and L.D. by her

father and natural guardian, CHARLES DEMPSEY,

                Plaintiffs,

                              Docket No.

       - against -          20-CV-6780

                              (EAW)(MWP)

THE CITY OF ROCHESTER, a municipal entity, JAVIER

ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER

RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

                Defendants.

-----------------------------------------------X



                Zoom Conference

                Long Island, New York

                August 22, 2023

                9:10 a.m.

          VIDEOTAPED DEPOSITION of LIEUTENANT

MICHAEL CUILLA, Witness, taken by Plaintiff,

pursuant to Federal Rules of Civil Procedure, and

Notice, held at the above-noted time and place,

before Emma Badger-DeRienzis, a Stenotype Reporter

and Notary Public within and for the State of New

York.



(1)
(2)      **A P P E A R A N C E S:**
(3)
(4)          ROTH & ROTH LLP
                  Attorneys for Plaintiffs
(5)              192 Lexington Avenue, Suite 802
                  New York, New York 10016
(6)
             BY:  ELLIOT DOLBY SHIELDS, ESQ.
(7)
(8)
             MUNICIPAL ATTORNEY
(9)          CITY OF ROCHESTER LAW DEPARTMENT
                  Attorneys for Defendants
(10)             30 Church Street, Rcom 400A
                  Rochester, New York 14614
(11)
             BY:  PEACHIE JONES, ESQ.
(12)
(13)
        ALSO PRESENT:
(14)
             KEVIN GONZALEZ - Videographer
(15)         NELLIE KLUZ - Videographer intern
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)


(1)

(2)          F E D E R A L   S T I P U L A T I O N S

(3)

(4)          IT IS HEREBY STIPULATED AND AGREED by and

(5)    between (among) counsel for the respective parties

(6)    herein, that filing and sealing being the same are

(7)    hereby waived.

(8)          IT IS FURTHER STIPULATED AND AGREED that all

(9)    objections, except as to the form of the question,

(10)   shall be reserved to the time of trial.

(11)         IT IS FURTHER STIPULATED AND AGREED that the

(12)   within deposition may be sworn to and signed before

(13)   any officer authorized to administer an oath, with

(14)   the same force and effect as if signed and sworn to

(15)   before the Court.

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)               VIDEO STIPULATIONS

(3)

(4)

(5)        IT IS HEREBY STIPULATED AND AGREED by and

(6)   between counsel for all parties present that

(7)   Pursuant to CPLR Section 3113(d) this deposition is

(8)   being conduced by Videoconference, that the Court

(9)   Reporter, all counsel, and the witness are all in

(10)  separate remote locations and participating via

(11)  Videoconference, (LegalView/Zoom/WebEx) meeting

(12)  under the control of Lexitas Court Reporting

(13)  Service, that the officer administrating the oath to

(14)  the witness need witness shall be sworn in remotely

(15)  by the Court Reporter after confirming the witness's

(16)  identity, that this Videoconference will not be

(17)  recorded in any manner, and that any recording

(18)  without the express written consent of all parties

(19)  shall be considered unauthorized, in violation of

(20)  law, and shall not be used for any purpose in this

(21)  litigation or otherwise.

(22)       IT IS FURTHER STIPULATED that exhibits may

(23)  be marked by the attorney presenting the exhibit to

(24)  the witness, and that a copy of any exhibit

(25)  presented to a witness shall be e-mailed to or

[Page 20]
August 22, 2023

(1)                    Lieutenant Michael Cuilla

(2)     later on in the deposition, but thank you for that.

(3)          **A    Yes.**

(4)          Q    So, Lieutenant Cuilla, I just want to put

(5)     up the -- Exhibit 1 one more time.  I'll be

(6)     referencing this document throughout the deposition.

(7)     So if we look at the matters for deposition,

(8)     Topic 1-A says, "All rules, regulations, methods,

(9)     policies, procedures and practices in effect or

(10)    customarily followed between January 1, 2013 and

(11)    present" regarding, A, "entering fenced in curtilage

(12)    of residential properties without a warrant."

(13)          So my question is, can you tell me

(14)    everything that was done to prepare you to testify

(15)    about Topic 1-A?

(16)               **MS. JONES:  Objection.  This is asked**

(17)               **and answered, but go ahead.**

(18)          **A    I was provided documentation by counsel.**

(19)    **We had meetings subsequent to that that as well was**

(20)    **done to prepare me specifically for that.**

(21)          Q    What documents were you provided that were

(22)    relevant to Topic 1-A?

(23)          **A    A copy of our general orders.**

(24)          Q    Which general orders?

(25)          **A    The order pertaining to searches.**

Lieutenant Michael Cuilla

(1)

(2)    Q    Do you know the number?

(3)    A    I do not recall the number.

(4)    Q    Were there any other documents that were

(5) provided to you to prepare you to testify about

(6) Topic 1-A, other than that one general order about

(7) searches?

(8)    A    Not that I recall.

(9)    Q    Now in 2019, after the Dempsey and Gerslin

(10) incidents, the RPD issued a new policy entitled

(11) "Warrantless Searches on Curtilage," correct?

(12)              MS. JONES:  Objection.

(13)              You can answer.

(14)    A    I'm afraid I don't understand what you

(15) mean by "new policy."

(16)    Q    I'm going to put up what we'll mark as

(17) Exhibit 2 for this deposition.  This is a

(18) document -- can you see this document on your screen

(19) entitled "Rochester Police Department Training

(20) Bulletin"?  It's dated 5/30/2019.  The training

(21) bulletin numbers L-65-19 and it says the subject is

(22) "Warrantless Searches on Curtilage."  Can you see

(23) that document on your screen, Lieutenant?

(24)    A    Yes.

(25)              MS. JONES:  Can you zoom in a little

(1)                    Lieutenant Michael Cuilla

(2)            for me, please?

(3)                 MR. SHIELDS:  Sure.  One second.

(4)                 MS. JONES:  Thank you.

(5)        Q    Lieutenant, this training bulletin says

(6)    "new," correct?

(7)        A    Yes.

(8)        Q    And so if there was a training bulletin

(9)    that had existed on the subject prior to the

(10)   issuance of this specific training bulletin, it

(11)   would specify that it was rescinding that prior

(12)   training bulletin; is that correct?

(13)       A    Yes.

(14)       Q    So my question is, this was issued in May

(15)   of 2019, correct?

(16)       A    Yes.

(17)       Q    And the two of the cases that we're here

(18)   to speak about today, the Charles Dempsey case and

(19)   the Erin Gerslin case, those both occurred in

(20)   September and October of 2018, correct?

(21)                 MS. JONES:  Objection.

(22)                 You can answer.  Answer unless I tell

(23)            you not to.

(24)       A    Yes.

(25)       Q    My original question was, in 2019, after

(1)          Lieutenant Michael Cuilla

(2)    the Dempsey and Gerslin incidents, the RPD issued a

(3)    new policy entitled "Warrantless Searches on

(4)    Curtilage," correct?

(5)          **MS. JONES:   Objection.**

(6)     **A     A training bulletin is not always new**

(7)    **policy.   It can simply be a clarification of current**

(8)    **policy.   It is considered training.**

(9)     Q     Now, prior to the issuance of this

(10)   training bulletin, the RPD did not have a written

(11)   policy specifically concerning warrantless searches

(12)   on curtilage, true?

(13)          **MS. JONES:   Objection.**

(14)    **A     Warrantless searches are covered under**

(15)   **state law.**

(16)    Q     Please just listen to my specific question

(17)   and answer it.  If you can't, tell me that you can't

(18)   answer it, okay?

(19)          Prior to the issuance of this training

(20)   bulletin, the RPD didn't have a specific written

(21)   policy concerning warrantless searches on curtilage,

(22)   true?

(23)          **MS. JONES:   Objection.**

(24)    **A     Not one that I'm aware of.**

(25)    Q     This new training bulletin or policy was

[Page 24]
August 22, 2023

(1)           Lieutenant Michael Cuilla

(2)    disseminated to officers at a roll call training,

(3)    true?

(4)              **MS. JONES:   Objection.**

(5)       **A    Yes.**

(6)       Q    Roll call training was provided in 2019,

(7)    true?

(8)       **A    Yes.**

(9)       Q    And can you just tell me what the

(10)   definition of curtilage is according to RPD policy?

(11)      **A    Curtilage is the area around a building or**

(12)   **home that is considered to be within the property's**

(13)   **lines.**

(14)      Q    That's codified in General Order 415; is

(15)   that correct?

(16)      **A    I apologize.  I'm not great with the**

(17)   **numbering of the general orders, just their content.**

(18)   **If that is the general order on searches, then that**

(19)   **would be correct.**

(20)      Q    Does the RPD teach its officers the

(21)   definition of curtilage?

(22)      **A    Yes.**

(23)      Q    Now, before 2019, did the RPD teach its

(24)   officers that people have a reasonable expectation

(25)   of privacy in the curtilage to their property?

(1)                    Lieutenant Michael Cuilla

(2)      A    Yes.

(3)      Q    When was that training provided?

(4)      A    It's provided in the academy.

(5)      Q    What did that academy training consist of?

(6)      A    There is an overview on searches including

(7) warrantless searches.

(8)      Q    How long is that training?

(9)      A    I do not recall.

(10)     Q    Is there any testing provided to ensure

(11) that officers understand the definition of curtilage

(12) and -- well, I'll leave it there.  Is there any

(13) testing provided to ensure that officers understand

(14) the definition of curtilage?

(15)     A    There is testing at the end of the

(16) training.  I can't recall specifically if a question

(17) about curtilage is on the testing, but the testing

(18) is for the training in its totality.

(19)     Q    What exactly do they teach at the academy

(20) about the definition of curtilage?

(21)     A    What the definition of curtilage is and

(22) people's rights regarding it.

(23)     Q    What do they teach officers about what

(24) people's rights are regarding curtilage, the

(25) curtilage to their property?

(1)            Lieutenant Michael Cuilla

(2)        **A    They have an expectation of privacy and**

(3)    **when they would or would n t need a search warrant**

(4)    **to search the area.**

(5)        Q    After officers graduate from the academy

(6)    and join the RPD, what training does the RPD provide

(7)    officers about the curtilage to somebody's property?

(8)        **A    There are subsequent inservice and roll**

(9)    **call trainings provided by the City, us; however,**

(10)   **you know, the topics vary.  So I'm not -- I do not**

(11)   **recall how many times curtilage has come up since**

(12)   **any individual has graduated the academy.**

(13)       Q    When is the last time that the RPD

(14)   provided a training to its officers specifically

(15)   regarding the legal requirements to enter the

(16)   curtilage to an individual's property?

(17)       **A    So as curtilage is considered a part of**

(18)   **someone's property, training regarding searches and**

(19)   **seizures generally or warrantless searches would all**

(20)   **touch upon curtilage.  However, I would not recall**

(21)   **whether or not curtilage was a specific point made**

(22)   **in the training, but curtilage and a person's**

(23)   **personal property have been interlinked in previous**

(24)   **trainings including this training bulletin.**

(25)       Q    So my question is, what has the RPD done

(1)                    Lieutenant Michael Cuilla

(2)      in terms of training between 2013 and today that

(3)      isn't at the academy?  So after officers graduate

(4)      from the academy between 2013 and today, what

(5)      specific training has been provided by the RPD to

(6)      its officers to ensure that they understand the

(7)      legal requirements to enter the curtilage to

(8)      somebody's property?

(9)          **A     So we offer inservice trainings yearly.**

(10)     **We offer roll call trainings, but a great majority**

(11)     **of training specific to things taught in the academy**

(12)     **that may have been forgotten would be addressed at**

(13)     **the supervisory level and at the section level.  So,**

(14)     **for example, if an officer was to violate the**

(15)     **policy, a supervisor would then offer them training.**

(16)         Q     When is the last time that a supervisor

(17)     offered someone training for violating the policy on

(18)     unlawfully entering the curtilage to somebody's

(19)     property?

(20)         **A     Not all training is documented.  There is**

(21)     **a lowest level of training, which is just verbal**

(22)     **counseling that would happen between a supervisor**

(23)     **and an officer and that takes place on a daily**

(24)     **basis.**

(25)         Q     So when is the last time that you know of

(1)            Lieutenant Michael Cuilla

(2)    that somebody was provided training by a supervisor

(3)    because they unlawfully entered the curtilage to

(4)    somebody's property?

(5)        A     The only time I would be made aware of it

(6)    is if it were documented.  If it's not documented,

(7)    if it's only a verbal counseling given by a

(8)    supervisor to their subordinate, I wouldn't be aware

(9)    of the last time.  However, if the question is the

(10)   last time I am personally aware or I'm aware as the

(11)   City of Rochester of the training, I do not recall.

(12)       Q     When you say you do not recall, you're

(13)   unaware is your answer, you're unaware of any time

(14)   in the past that somebody has been given specific

(15)   training because they were found to have unlawfully

(16)   entered the curtilage to somebody's property?

(17)            MS. JONES:  Objection.

(18)       A     No.  I would be aware, as some training is

(19)   documented in additional training forms, and

(20)   training is done remedially by Professional

(21)   Development Section as well as that section level.

(22)   So there are some trainings that are documented.  I

(23)   have not gone through all of that documentation.

(24)       Q     In preparation for your testimony today,

(25)   did you review any additional training forms

(1)                    Lieutenant Michael Cuilla

(2)    specifically concerning additional training provided

(3)    regarding entering the curtilage to somebody's

(4)    property?

(5)         A    No.

(6)                    MR. SHIELDS:  And, Ms. Jones, just to

(7)              the extent that -- I don't believe they've

(8)              been provided.  We call for production of

(9)              any additional training forms that

(10)             specifically concern an officer entering

(11)             or violating somebody's rights by

(12)             unlawfully entering the curtilage to their

(13)             property.

(14)                   MS. JONES:  Please follow up in

(15)             writing so we make sure we understand your

(16)             request.

(17)        Q    Lieutenant, before this training bulletin

(18)    in 2019, are you aware of the RPD ever holding a

(19)    specific training where it instructed its officers

(20)    that the fenced-in backyard to someone's property is

(21)    considered the curtilage to their property?

(22)                   MS. JONES:  Objection.

(23)             You can answer.

(24)        A    I am unaware of that specific training

(25)    other than what is taught in the academy.

(1)                    **Lieutenant Michael Cuilla**

(2)        Q      After the academy -- so let me back up.

(3)    So at the academy, are you aware of whether or not

(4)    the recruits are specifically trained that

(5)    somebody's fenced-in backyard is considered the

(6)    curtilage to their property?

(7)        A      I am aware they are specifically trained.

(8)        Q      What has the RPD done between 2013 and

(9)    today to ensure that recruits that graduate from the

(10)   academy and become officers remain aware that the

(11)   fenced-in backyard to somebody's property is

(12)   considered curtilage to their property and entitled

(13)   to Fourth Amendment protection?

(14)               **MS. JONES:   Objection.**

(15)       A      The Rochester Police Department, we

(16)   remediate any issues that arise from officers on the

(17)   section and platoon level unless the issue arose to

(18)   a higher degree in which case it would be handled by

(19)   the Professional Development Section or, if

(20)   discipline were required, by the chief's office.

(21)       Q      When you say remediate at the section and

(22)   platoon level, what does that mean?

(23)       A      That means that the supervisors are

(24)   charged with monitoring their officers' performance

(25)   and evaluating their ability to conduct themselves

(1)                    Lieutenant Michael Cuilla

(2)    discipline, right?  So when I hear the chief's

(3)    office is notified, to me, that usually -- my

(4)    understanding is that there might be discipline

(5)    imposed.  But my question is, why else would the

(6)    chief's office be potentially notified of an

(7)    incident?

(8)              MS. JONES:  Objection.

(9)        A    When an interdepartmental correspondence

(10)   is generated and submitted up the chain, if the

(11)   chain of command goes to the operations bureau of

(12)   the department, that would go up to the chief's

(13)   office and then would be assigned by the chief's

(14)   office back to the administrative bureau and come

(15)   back down to PDS.  So it is possible that if someone

(16)   would submit an IDC, that would go up into the

(17)   chief's office and then come back down to PDS,

(18)   although PDS does take the records of submission.

(19)       Q    And Professional Development Section

(20)   operations bureau would oversee like patrol

(21)   officers?

(22)       A    That is correct.

(23)       Q    If there is an instant where somebody

(24)   trespassed on the curtilage to a property and an IDC

(25)   was generated by the section level, that would go up

(1)                    Lieutenant Michael Cuilla

(2)    the chain and eventually make it to the chief's

(3)    office?

(4)                    MS. JONES:  Objection.

(5)        A    That is correct.

(6)        Q    Are you aware of any instances where an

(7)    IDC has ever been generated regarding an officer

(8)    allegedly trespassing on the curtilage to a

(9)    property?

(10)                   MS. JONES:  Objection.

(11)       A    I do not have the documentation for that

(12)   particular -- I'm not aware of the documentation,

(13)   but it may exist.

(14)                   MR. SHIELDS:  To the extent that

(15)               there are any IDCs that exist regarding

(16)               officers allegedly trespassing on the

(17)               curtilage to a property, we call for

(18)               production of those documents.

(19)                   MS. JONES:  Please follow up in

(20)               writing.

(21)       Q    Now, Lieutenant, under the Fourth

(22)   Amendment, officers are prohibited from walking

(23)   across someone's fenced-in backyard to get to a

(24)   neighboring property unless they have a warrant,

(25)   consent or exigent circumstances, true?

(1)                   Lieutenant Michael Cuilla

(2)              **MS. JONES:  Objection.**

(3)        **A      Warrant, consent, exigent circumstances,**

(4)   **yes.**

(5)        Q     And under the Fourth Amendment, there's no

(6)   difference between going into someone's fenced-in

(7)   backyard and searching for evidence versus simply

(8)   walking across their backyard to get to a

(9)   neighboring property, true?

(10)             **MS. JONES:  Objection.**

(11)       **A      As far as the governmental intrusion when**

(12)  **it comes to the suppression of evidence?**

(13)       Q     So my question is, under the Fourth

(14)  Amendment, a search occurs simply by an officer

(15)  entering someone's property, correct?

(16)             **MS. JONES:  Objection.**

(17)       **A      That is correct.**

(18)       Q     So there would be no difference between an

(19)  officer's reason for entering a fenced-in backyard,

(20)  whether it be entering the yard to traverse the yard

(21)  to get to the neighboring property or if they

(22)  entered the yard with a specific intent of searching

(23)  for contraband on that property, correct?

(24)             **MS. JONES:  Objection.**

(25)       **A      The question is if an officer enters a**

(1)                   Lieutenant Michael Cuilla

(2)    yard regardless of the reason, does it constitute a

(3)    search?

(4)        Q    Correct.

(5)        A    That's correct.

(6)        Q    The general order -- here, let's just do

(7)    this.  Let me put up as Exhibit 3, General

(8)    Order 415.  And so let me go up to the top here.  So

(9)    on your screen, Lieutenant, do you see Rochester

(10)   Police Department General Order No. 415 entitled

(11)   "Search Seizures:  By Dynamic Entries, Search

(12)   Warrant, Arrest Warrant, Without a Warrant"?

(13)       A    Yes.

(14)                 MS. JONES:  Can you zoom in again,

(15)            please, Elliot?

(16)       Q    Is this the document that you were

(17)   referencing earlier, Lieutenant?

(18)       A    Yes.

(19)       Q    So as I go through this, I'll reference

(20)   this document when I ask you some questions on these

(21)   topics, okay?  And so if we go down to the

(22)   definition of search, the RPD's policy on the

(23)   definition of search says, "A search is defined as

(24)   any activity by a government official, including a

(25)   police officer that invades any area in which a

(1)                 Lieutenant Michael Cuilla

(2)    person has a reasonable expectation of privacy.

(3)    This includes but is not limited to a physical entry

(4)    into an area, location or item."  And then it goes

(5)    on.  And then the last sentence says, "A search

(6)    deals with person's privacy rights and can occur

(7)    regardless of whether any items are actually seized

(8)    or taken by the police."  Did I read that correctly?

(9)         **A    Yes.**

(10)        Q    And so that's what I was referencing

(11)   before when I was asking of a search occurs

(12)   regardless of whether the specific intent of the

(13)   officers entering onto the property was to look for

(14)   a specific item on that property.  So my question is

(15)   now, what has the RPD done to train its officers on

(16)   the definition of search as articulated in General

(17)   Order No. 415?

(18)        **A    This topic is covered in the police**

(19)   **academy.**

(20)        Q    Other than the police academy, between

(21)   2013 and today, what trainings have been provided by

(22)   the RPD to its officers about the definition of a

(23)   search?

(24)        **A    The Rochester Police Department conducts**

(25)   **yearly inservice trainings as well as roll call**

(1)              Lieutenant Michael Cuilla

(2)     trainings, in addition to all of the remedial

(3)     trainings that I referred to previously, that may be

(4)     documented or may not be documented if it's done as

(5)     verbal counseling at the section level.  When we

(6)     talk about a topic like search, it's a large topic

(7)     and may be touched upon in other trainings that are

(8)     related.

(9)          Q    When is the last time that the RPD held an

(10)    inservice training specifically regarding the

(11)    definition of a search?

(12)         A    An eight-hour inservice training in

(13)    regards solely to the definition of the word search,

(14)    I cannot recall.  Most of our training covers a

(15)    variety of topics and touches upon many of these

(16)    issues.

(17)         Q    When is the last time that the RPD held an

(18)    inservice training that specifically included a

(19)    discussion of the definition of a search?

(20)         A    I cannot recall.

(21)         Q    In preparation for your testimony today,

(22)    did you review any training documents either

(23)    provided to officers at a roll call or an inservice

(24)    training that specifically discussed the definition

(25)    of a search?

(1)          Lieutenant Michael Cuilla

(2)   Circumstances," and that number is L-1597 and it

(3)   said it was issued in January 1997.

(4)          So, Lieutenant, my first question is, is

(5)   this a document that you reviewed in preparation for

(6)   today's deposition?

(7)          MS. JONES:  Sorry, Elliot, can you

(8)          zoom in again?

(9)      A   I do not recall.

(10)     Q   My next question is, when there's a

(11)  training bulletin that was issued decades ago, like

(12)  in 1997 as this one appears to have been, does the

(13)  department hold additional trainings or updated

(14)  trainings about these older training bulletins?

(15)     A   Trainings are updated when the training

(16)  bulletin occurs.  The training bulletins are given

(17)  out and conducted in roll call trainings.  If you're

(18)  asking if this training is referenced in any roll

(19)  call trainings or any conversations or verbal

(20)  counseling or any of that, I am unaware that that is

(21)  the case, but it may be.

(22)     Q   I guess my question is, like, would the

(23)  RPD hold an updated roll call training on this topic

(24)  and issue, this training bulletin, to its officers?

(25)     A   When this training bulletin is issued, the

(1)              **Lieutenant Michael Cuilla**

(2)    **RPD would train the officers in this new**

(3)    **information.**

(4)         Q    When is the last time that this training

(5)    bulletin that we marked as Exhibit 4 was provided to

(6)    its officers?

(7)         A    **This training bulletin is provided to its**

(8)    **officers on a continuous basis on the Rochester**

(9)    **Police Department web.**

(10)        Q    If an officer from the department wanted

(11)   to look at this training bulletin, they would

(12)   affirmatively have to go and search for it on the

(13)   RPD web themselves?

(14)        A    **Their sergeant may direct them to do so --**

(15)   **I apologize.  Any supervisor may direct them to do**

(16)   **so.**

(17)        Q    So when is the last time that the RPD held

(18)   either a roll call training or some other training

(19)   where this specific training bulletin was provided

(20)   to all of the officers who attended the training?

(21)        A    **On a department-wide basis, when was the**

(22)   **last time that this was provided?  The only time**

(23)   **that I would know it would have been provided was**

(24)   **when it was issued and then henceforth, it would be**

(25)   **provided on an individual basis for officers that**

(1)                    Lieutenant Michael Cuilla

(2)     needed it as a reminder for -- through remedial

(3)     training.

(4)         Q    Do you know if Officer Algarin ever got

(5)     this training?

(6)         A    This particular bulletin would be covered

(7)     in the academy training that he receives on the

(8)     Fourth Amendment search and seizure laws.   All

(9)     relevant case law is covered.   Now, when I say that,

(10)    I don't mean that they go through every relevant

(11)    case law that has ever existed, but they do cover

(12)    what is current for Fourth Amendment search and

(13)    seizure.   And if it were updated, it would come out

(14)    in a training bulletin that would be disseminated to

(15)    the department.

(16)                MR. SHIELDS:   I'm going to move to

(17)                strike that portion of the answer as

(18)                nonresponsive to my question.

(19)        Q    So just answer -- just listen to my

(20)    specific question --

(21)        A    Yes, sir.

(22)        Q    -- because it'll help us get out of here

(23)    more quickly.

(24)                So the specific question was, when was the

(25)    last time that this training bulletin, if ever, was

(1)            Lieutenant Michael Cuilla

(2)  provided to Officer Javier Algarin?

(3)            MS. JONES:  Objection, asked and

(4)         answered.

(5)      A    It was provided to him on a near constant

(6)  basis on the RPD web, which he has full access to.

(7)      Q    So there was never any specific training

(8)  where Officer Javier Algarin was provided this

(9)  specific document by one of his supervisors where

(10)  this document was sat down and discussed with Javier

(11)  Algarin about warrantless entries with or without

(12)  exigent circumstances, this document; is that true?

(13)            MS. JONES:  Objection.

(14)      A    No training that I'm aware of.

(15)      Q    Did Officer Adam Gorman ever get this

(16)  specific training bulletin as part of any training

(17)  that he attended after he graduated from the academy

(18)  with the Rochester Police Department?

(19)      A    Not that I am aware of.

(20)      Q    We discussed earlier that hot pursuit is

(21)  one of the reasons an officer may be permitted to

(22)  enter the curtilage to a residential property,

(23)  correct?

(24)      A    Yes.

(25)      Q    We agreed that hot pursuit falls under the

(1)              Lieutenant Michael Cuilla

(2)  emergency exceptions to the warrant requirement,

(3)  correct?

(4)      A    **Exigency, yes.**

(5)      Q    And the hot pursuit ends after the

(6)  officers catch or apprehend the person that they

(7)  were chasing, true?

(8)              MS. JONES:  **Objection.**

(9)      A    **Hot pursuit ends once the person is**

(10) **caught, yes.**

(11)     Q    After the person is caught, the hot

(12) pursuit is concluded, true?

(13)     A    **Yes.  The hot pursuit can also be ended if**

(14) **the person is lost.  It doesn't go on forever if we**

(15) **lose sight of him.**

(16)     Q    After the hot pursuit is concluded,

(17) there's no longer exigent circumstances that would

(18) permit entry into the curtilage of a residential

(19) property that the police chase somebody across,

(20) correct?

(21)              MS. JONES:  **Objection.**

(22)     A    **No.**

(23)     Q    Why would exigent circumstances still

(24) apply after the hot pursuit has concluded?

(25)     A    **If the suspect were to discard something**

[Page 77]
August 22, 2023

Lieutenant Michael Cuilla

(1)

(2) that could be deemed a danger to the public, the

(3) officers would have a duty to retrieve it prior to

(4) it causing harm to a member of the public and that

(5) would create an exigency.

(6)         Q    So if the suspect did not discard

(7) anything, there would not be an exigency to enter

(8) the curtilage to that property, correct?

(9)         MS. JONES:   Objection.

(10)        A    If the officer can articulate and

(11) reasonably suspect that the suspect may have

(12) discarded something that was a danger to the public,

(13) then there would be exigency until the officer was

(14) certain that that particular danger was not

(15) discarded.

(16)        Q    If the officer did not see the suspect

(17) discard anything on that property, then the officer

(18) would not have a reasonable basis to articulate any

(19) specific facts that would support probable cause to

(20) believe that something was discarded on that

(21) property, correct?

(22)        A    No.

(23)        Q    What's the police department's policy

(24) about being able to backtrack through residential

(25) properties that a felon, a fleeing person was chased

(1)                    Lieutenant Michael Cuilla

(2)    through?

(3)         A    If an officer can articulate that there is

(4)    reason to believe that the suspect may have

(5)    discarded something that is a danger to the public,

(6)    then the officer has a duty to retrieve that weapon,

(7)    specifically referring to a gun.  Your question

(8)    previously was would he have had to have -- I'm

(9)    sorry -- he or she have had to have seen a gun be

(10)   discarded, if the officers caught up with the

(11)   individual -- and I'm only giving an example here

(12)   for clarification purposes -- an individual had an

(13)   empty holster, that would be a reasonable suspicion

(14)   that that person may have been carrying a firearm

(15)   during the chase, then the officer would have a duty

(16)   to check to make sure that that firearm was not left

(17)   on someone's property.

(18)        Q    Let's take your example and say the

(19)   officer caught up with the person.  The officer did

(20)   not see anything discarded and the person did not

(21)   have a holster on their body.  Under those

(22)   circumstances, would an officer have a reason to

(23)   backtrack through a fenced-in curtilage to someone's

(24)   property to check for any hypothetically potentially

(25)   discarded weapon?

(1)              Lieutenant Michael Cuilla

(2)          MS. JONES:  Objection.

(3)      A    So there's a lot of other circumstances

(4)  that I would need to know to answer that question

(5)  correctly.  In addition would be the officer's

(6)  knowledge of the individual, the individual's

(7)  history of carrying weapons, what the individual was

(8)  doing prior to having fled.  If the call was for

(9)  shots being fired and this person matched the

(10)  description and is found with no gun, oftentimes,

(11)  suspects do not have holsters in the city of

(12)  Rochester.  They keep their firearms in their

(13)  pockets of their pants.  So that would be another

(14)  articulable reason.  The number of articulable

(15)  reasons is substantial as to why an officer may

(16)  believe reasonably that a person was armed with a

(17)  firearm and may have left it in the backyard.  In

(18)  addition, a knife or other dangerous instrument,

(19)  syringes are all things that create a danger to the

(20)  public.  If the officer believes that this person

(21)  has discarded something that could be dangerous to

(22)  the public, they have a duty to retrieve it as

(23)  opposed to it being retrieved by, let's say, a small

(24)  child or an unsuspecting homeowner.

(25)      Q    Let's say the hot pursuit concluded, the

(1)                 Lieutenant Michael Cuilla

(2)     officers did not see any guns or other contraband

(3)     potentially discarded.  The person stops -- was

(4)     being chased because they were suspected of selling

(5)     marijuana and they don't have anything on their

(6)     person after they're stopped.  Does the officer,

(7)     first, before entering the curtilage to the

(8)     property, have a duty to seek the consent of the

(9)     homeowner before entering their property?

(10)            **MS. JONES:  Objection.**

(11)    **A    Again, not knowing the knowledge of the**

(12)    **officer, the knowledge of the suspect, what I can**

(13)    **say is that the officer would have exigent belief**

(14)    **that a dangerous instrument, syringe, knife, gun**

(15)    **were left, were discarded during the chase, the**

(16)    **officer would have a duty to obtain that property**

(17)    **and would have the right to do so under exigency.**

(18)        Q    If the officer can see over the fence and

(19)    can't see anything on the ground, right, and the

(20)    officer has time to walk to the front door of the

(21)    person's property, knock on the front door and ask

(22)    their consent to enter their property, under those

(23)    circumstances, there would not be an immediate need

(24)    to enter the property prior to seeking their

(25)    consent, true?

(1)        Lieutenant Michael Cuilla

(2)        MS. JONES:  Objection.

(3)    A    Again, I agree again there may be some

(4) factors that would allow the officer to enter the

(5) property without consent and certainly legally under

(6) exigency.  I don't know enough about the property to

(7) say if the officer left it for long enough, that

(8) someone couldn't get to the discarded contraband in

(9) that time.  I do not know about who is or is not

(10) outside, the time of day, whether or not this a cut

(11) that people use that perhaps don't utilize the

(12) property, you know, along a path, you know, maybe

(13) children jump the fence pretty often.  I don't know

(14) enough about the neighborhood to say that this is a

(15) well traveled area or a backyard that people have a

(16) lot of access to or if there's some difficultly in

(17) getting to the front of the home that the officer

(18) would be better served by immediately trying to

(19) locate the contraband prior to it being picked up by

(20) an uninvolved third party.

(21)    Q    If the officer has the time and the

(22) opportunity to seek the homeowner's consent prior to

(23) entering their property, they're required to first

(24) ask the homeowner for consent to enter their

(25) property, true?

(1)          Lieutenant Michael Cuilla

(2)          MS. JONES:  Objection.

(3)     A    If the officer believes that there is no

(4)   immediate danger, then they would need consent or an

(5)   exigent circumstance to enter that property.

(6)     Q    When you say if the officer believes,

(7)   that's not the correct standard, right?  The correct

(8)   standard is under the totality of the circumstances

(9)   if the officer has objective facts to believe?

(10)    A    If they reasonably --

(11)         MS. JONES:  Objection.

(12)    Q    It's objective standard, not a subjective

(13)  standard, correct?

(14)         MS. JONES:  Objection.

(15)    A    They reasonably suspect, it's what a

(16)  reasonable officer would do.

(17)    Q    Considering the totality of the

(18)  circumstances, correct?

(19)    A    Yes, correct.

(20)    Q    If there is no emergency and the officers

(21)  don't have consent, then the warrantless entry is

(22)  not allowed, correct?

(23)         MS. JONES:  Objection.

(24)    A    Without exigent circumstances, consent or

(25)  a warrant, there are very few other search

(1)                Lieutenant Michael Cuilla

(2)    exceptions and certainly none that I think can apply

(3)    here.

(4)         Q     Even if there's probable cause to believe

(5)    that there's incriminating evidence on the property,

(6)    if there is not an emergency and there is not

(7)    consent, without a warrant, they're not allowed to

(8)    enter onto the property, true?

(9)              MS. JONES:   Objection.

(10)        A     Again, as I previously stated, it depends

(11)   on the nature of the evidence and whether or not

(12)   that poses a danger to the public or the homeowner.

(13)        Q     And so that would be the officer's

(14)   reasonable belief based on the totality of the

(15)   circumstances that there's potentially some sort of

(16)   evidence that may have been discarded on the

(17)   property, correct?

(18)        A     It would not suffice for it to be

(19)   evidence.  It would need to be dangerous for the

(20)   public for them to have the exigency exception.

(21)        Q     Any time that a police officer can

(22)   articulate facts that they believe a gun may have

(23)   been discarded on a property during a hot pursuit,

(24)   is it the RPD's policy that they have exigent

(25)   circumstances to immediately enter the property

(1)                    Lieutenant Michael Cuilla

(2)     prior to seeking the homeowner's consent to search

(3)     for any potentially discarded gun?

(4)         A    It is our policy and practice to

(5)     immediately secure any firearms that have been

(6)     discarded during a pursuit or during a struggle or

(7)     simply discarded by a suspect.

(8)              MR. SHIELDS:   That's not my question.

(9)         I'm going to move to strike that as

(10)        non-responsive.

(11)        Q    My question is, you don't know that

(12)    there's a gun that was discarded, okay?  We're going

(13)    to start with that premise.  Any time that an RPD

(14)    officer engages in a hot pursuit, traverses across a

(15)    property, then detains a suspect, doesn't see a gun

(16)    was discarded, but can say that they think there

(17)    might have been a gun that was discarded on a

(18)    property, is it the RPD's policy -- without having

(19)    any articulable facts supporting a reasonable

(20)    suspicion that a gun, in fact, was discarded other

(21)    than the fact that there was a hot pursuit across

(22)    the property, is it the RPD's policy that under

(23)    those circumstances, the exigent circumstances

(24)    exception applies and they're allowed to backtrack

(25)    through the property to search for any potentially

(1)                 Lieutenant Michael Cuilla

(2)     discarded gun?

(3)                     MS. JONES:  Objection.

(4)         A    They would need to have at least some

(5)     reasonable suspicion based on articulable facts.

(6)         Q    In order to have reasonable suspicion

(7)     based on articulable facts, there have to be more

(8)     than simply the fact that there was a hot pursuit

(9)     that the person ran from them when they attempted to

(10)    apprehend them, true?

(11)        A    That is true.

(12)                    MS. REPORTER:  Elliot, when it's a

(13)    good time to take a quick bathroom break,

(14)    please.

(15)                    MR. SHIELDS:  Sure.  Do you want to

(16)    take -- now is a good time.

(17)                    MS. REPORTER:  Great, thank you.

(18)                    MR. SHIELDS:  Sure.

(19)                    THE VIDEOGRAPHER:  Off the record,

(20)    Counsel?

(21)                    MR. SHIELDS:  Yes.

(22)                    THE VIDEOGRAPHER:  Going off the

(23)    record.  The time is 10:56 a.m.  Please

(24)    standby while I stop recording.

(25)                    (A brief recess was taken from

(1)                  Lieutenant Michael Cuilla

(2)          10:54 a.m. to 11:05 a.m.)

(3)                  THE VIDEOGRAPHER:  The time is now

(4)          11:07 a.m.  We are back on the record.

(5)      Q    Lieutenant -- it's lieutenant, right?

(6)      A    Yes.

(7)      Q    We just had an opportunity to take a break

(8)  for about 10 minutes.  During that break, did you

(9)  have an opportunity to speak with your attorney?

(10)     A    Yes.

(11)     Q    Did you speak about your testimony?

(12)     A    Somewhat, yes.

(13)     Q    Tell me everything you spoke about.

(14)               MS. JONES:  Sorry, I'm directing him

(15)          not to answer that.

(16)               MR. SHIELDS:  What's the basis of you

(17)          directing him not to answer that?

(18)               MS. JONES:  That was covered by

(19)          attorney/client privilege.

(20)               MR. SHIELDS:  And our position is

(21)          that you're not permitted to speak with

(22)          your deponent in the middle of the

(23)          deposition about the subject of his

(24)          testimony and that by doing so, you waived

(25)          the attorney/client privilege and anything

(1)          Lieutenant Michael Cuilla

(2)          you discuss is not protected.  I'm not

(3)          going to waste our time calling the court

(4)          right now about that so we'll preserve

(5)          that objection to bring up in the future.

(6)      Q    Let me ask you this, Lieutenant, after

(7)  having the opportunity to speak with your attorney,

(8)  are there any questions that you gave answers to

(9)  that you'd either like to clarify or change your

(10) answer to?

(11)     A    I'd like to clarify that the training

(12) that's given on these particular topics -- I know

(13) I've listed that we do several inservice trainings.

(14) To be more specific, we currently do two full-day

(15) in-services and four two-hour off the road

(16) in-services as well as 12 roll call trainings.  And

(17) any training given that touches on arrests or

(18) searches would touch on the topics that you listed.

(19) So it is most likely that this training is given two

(20) to three times per year to be more specific about

(21) these particular topics.

(22)     Q    Did you review any of those trainings in

(23) preparation for your testimony today?

(24)     A    No.

(25)     Q    Did you review any materials that might

(1)                 Lieutenant Michael Cuilla

(2)     have been used as those trainings in preparation for

(3)     your testimony today?

(4)         A     No.

(5)             MR. SHIELDS:  Just to the extent that

(6)             they haven't been provided, we call for

(7)             production of any of those materials given

(8)             to officers at any of the trainings that

(9)             Lieutenant Chula just referenced and I'll

(10)            follow up in writing.

(11)        A     I'd like to further clarify that many of

(12)    the requests made for training from the Professional

(13)    Development Section or from lieutenants is conducted

(14)    via e-mail as well.  So a lot of communications

(15)    throughout the department is either done through

(16)    face-to-face contact or e-mail.  A formal request

(17)    via additional training form or interdepartmental

(18)    correspondence is not required in order to get

(19)    assistance for an officer that may need remedial

(20)    training.  They can simply reach out to the section

(21)    commander of the Professional Development Section

(22)    directly and ask for some advice on the types of

(23)    remedial training that might be needed.

(24)            THE VIDEOGRAPHER:  Counsel, this is

(25)            the videographer.  I apologize for the

Lieutenant Michael Cuilla

interruption just briefly.

Lieutenant Cuilla, it looks like when you speak, the camera is shaking a lot. Maybe someone there is moving the desk, but the video recording is very shaky at the moment when you speak.

MS. JONES:  I'm sorry, that's probably me.  I'll try to be more still.

THE VIDEOGRAPHER:  Thank you so much, Counsel.  I apologize.

MS. JONES:  I'll also add that we, as the city, are still expecting the videographer to add other information pursuant to Federal Rules 30 once when we come from break in between these segments and --

MR. SHIELDS:  Okay.  We hired the videographer, we checked with the videographer.  We went over the federal rules with the videographer.  The videographer is compliant with the federal rules, just as he always complies with federal rules in his practice for his entire career and he's never put on any

(1)          Lieutenant Michael Cuilla

(2)     statements that the City is requesting

(3)     because they're not required by Federal

(4)     Rules Civil Procedure 30 so...

(5)          MS. JONES:  I just wanted to finish

(6)     and say that the City objects to the

(7)     propriety of these video recording since

(8)     you're not going to comply with Federal

(9)     Rules 30.  Thank you.

(10)     Q    Lieutenant, you said that there were, I

(11) believe you said two full-day inservices and then

(12) can you just remind me, you said four other some

(13) sort of training, then 12 some other training?

(14)     A    Four two-hour off the road inservices.  I

(15) say off the road because the officers aren't taken

(16) away from their shift to sit in two hours of

(17) training.  And then the roll call trainings are --

(18) they are monthly roll call training and that's in

(19) addition to any training bulletins that come out or

(20) updates to the general orders that are also

(21) administered in roll calls.

(22)     Q    Are you aware of any training bulletins

(23) that have come out since 2019 that specifically

(24) discussed curtilage to a person's property?

(25)     A    I am not.

Lieutenant Michael Cuilla

(1)

(2)     Q     Are you aware of any of these two full-day

(3) inservice for off the road trainings or 12 roll call

(4) trainings that have specifically discussed curtilage

(5) to an individual's property?

(6)     A     Insofar as the officers know that

(7) curtilage is part of a person's property, property

(8) is discussed.  The word curtilage may or may not be

(9) discussed.

(10)     Q     As we sit here today, you're not sure if

(11) the word curtilage or entry onto the curtilage to

(12) somebody's property is a topic specifically

(13) discussed in any of those trainings, true?

(14)          MS. JONES:  Objection.

(15)     A     Again, the officers are taught in the

(16) academy that curtilage is part of someone's property

(17) and it may henceforth be referred to as property, as

(18) officers are aware that curtilage is part of the

(19) property.

(20)     Q     I've taken about 20 depositions between

(21) these cases and almost every officer has testified

(22) that they believe, based on their training and

(23) experience, that there's a difference in the legal

(24) requirements for entering the curtilage to

(25) somebody's property versus entering their home

(1)            Lieutenant Michael Cuilla

(2) itself.  Those officers are confused about the legal

(3) requirements if that was their testimony, true?

(4)          MS. JONES:  Objection.

(5)     A    I can't testify as to their state of mind,

(6) but what you have stated is they are incorrect.

(7)     Q    They would be incorrect about that,

(8) correct?

(9)          MS. JONES:  Objection.

(10)    Q    After any of the testimony provided by any

(11) of these officers in these cases about their

(12) incorrect understanding about the legal requirements

(13) to enter the curtilage to somebody's property, did

(14) they receive any additional training after their

(15) depositions in these civil cases?

(16)    A    As this civil case is ongoing, I am

(17) unaware of what will occur at the end of this civil

(18) case once we had debriefed from this, but during the

(19) civil case, no, we have not discussed each other's

(20) testimony.

(21)    Q    As far as my question, my question is, if

(22) an officer were to testify about an incorrect legal

(23) understanding during a deposition of civil case, the

(24) Professional Development Section of the RPD would

(25) not be made aware of that fact that they were

(1)                    Lieutenant Michael Cuilla

(2)    incorrect about their legal understanding?

(3)              MS. JONES:   Objection.

(4)        A    PDS would need to be notified either by

(5)    the city attorney or at the end of the civil case

(6)    whatever the findings were.   The city attorney could

(7)    then advise the police department and we would then

(8)    remediate any issues that occurred.

(9)        Q    So you'd have to be notified first.   And

(10)   as far as you're aware, you weren't notified after

(11)   any of these depositions, correct?

(12)             MS. JONES:   Objection.

(13)       A    As this is an ongoing civil case, I'm not

(14)   entirely sure I could be notified but, no, I was not

(15)   notified at this time.   I, the City of Rochester,

(16)   we.

(17)       Q    No one from PDS was notified, correct?

(18)             MS. JONES:   Objection.

(19)       A    That's correct.

(20)       Q    Does the RPD teach its officers that the

(21)   mere possibility that there's contraband on a

(22)   property that could be removed or destroyed does not

(23)   create an emergency under the exigent circumstances

(24)   exception that would justify entry onto the

(25)   property?

(1)                    Lieutenant Michael Cuilla

(2)        **A    Yes, that is correct.**

(3)        Q    That's what General Order 415 says,

(4)    correct?

(5)        **A    Yes.**

(6)        Q    And if officers have a reasonable

(7)    opportunity to obtain the homeowner's consent prior

(8)    to entering the curtilage to their property, then

(9)    there's no emergency that would justify a

(10)   warrantless entry onto the property, correct?

(11)       **A    That is not correct.**

(12)       Q    How is that not correct?

(13)       **A    Your question was, if the officers had**

(14)   **time to obtain a homeowner's consent, there is no**

(15)   **emergency that would cause them to have exigency to**

(16)   **enter the property?**

(17)       Q    My question was, if officers have a

(18)   reasonable opportunity to obtain the homeowner's

(19)   consent prior to entering the curtilage to their

(20)   property, then there's not an emergency that would

(21)   justify the warrantless entry onto their property

(22)   without the homeowner's consent, true?

(23)       **A    That's correct.**

(24)       Q    If officers don't have a warrant and

(25)   there's no emergency, then they're not permitted to

(1)                   Lieutenant Michael Cuilla

(2)   enter the property unless they have consent from the

(3)   homeowner, correct?

(4)        **A     I apologize, Counsel.  You used the word**

(5)   **emergency to refer to exigent circumstances?**

(6)        Q     Well, emergency is part of the exigent

(7)   circumstances -- let me withdraw that.

(8)              Yes, for the purposes of your question.

(9)        **A     Then, yes, barring any exigent**

(10)  **circumstances, they would need consent or a warrant**

(11)  **or another exception to the search warrant that I'm**

(12)  **unaware of at this time.**

(13)       Q     And I just wanted to put back up

(14)  Exhibit 3, General Order 415, and ask just a couple

(15)  more questions about that.  So if we're looking at

(16)  the exigent circumstances exception again, there is

(17)  this highlighted portion right here, and it says,

(18)  "Simply because the evidence may be lost or

(19)  destroyed does not in itself justify a search under

(20)  the exigent circumstances."  That's the policy of

(21)  the RPD, correct?

(22)       **A     Correct.**

(23)       Q     Let me just take that down for now.  Now,

(24)  does the RPD teach its officers that the flight of a

(25)  misdemeanor suspect alone does not necessarily

Lieutenant Michael Cuilla

(1)

(2)  justify the warrantless entry into a home or its

(3)  curtilage?

(4)      A    Yes.

(5)      Q    Prior to 2019, did the RPD provide any

(6)  training to its officers about backtracking a

(7)  person's flight path through the curtilage to

(8)  residential property?

(9)      A    **That training would be covered under the**

(10) **Fourth Amendment training searches and seizures.**

(11)     Q    Is there any specific training about,

(12) quote, unquote, backtracking?

(13)     A    **I can't recall if that particular word is**

(14) **used in the training that discusses what is and is**

(15) **not an illegal search or warrantless search**

(16) **procedure.**

(17)     Q    Is backtracking a common practice in the

(18) RPD?

(19)     A    **Yes.**

(20)     Q    And it's RPD's policy and practice to

(21) backtrack through the curtilage to residential

(22) properties after a hot pursuit has concluded, true?

(23)              **MS. JONES:   Objection.**

(24)     A    **If they have reasonable suspicion that**

(25) **something was discarded that could be a danger to**

Lieutenant Michael Cuilla

(1)

(2) the public.

(3)     Q    We had just gone over the definition in --

(4) well, hold on.  Let me put it back up.  So General

(5) Order 415 as we just had looked at, right, it says,

(6) "Simply because the evidence may be lost or

(7) destroyed does not in itself justify a search under

(8) exigent circumstances," right?  So where in the

(9) general orders does it say that officers are

(10) permitted to enter a property if they believe that

(11) there might be something that could endanger the

(12) public?

(13)     A    That's part of New York state case law.

(14) The general orders do not articulate every policy

(15) that the Rochester Police Department is adherent to.

(16) That starts with the U.S. Constitution as

(17) interpreted by the U.S. Supreme Court, New York

(18) State Constitution as interpreted by the New York

(19) State Court as well as all relevant New York State

(20) laws.  Those are all, for the most part, not

(21) articulated in the general orders.

(22)     Q    What specific case law permits an officer

(23) to enter the curtilage to somebody's property if

(24) officers believe that there might be a dangerous

(25) object that was discarded on the property?

Lieutenant Michael Cuilla

(1)

(2)    A    I would probably have to look that up.

(3)    Q    Is that something that's taught at the

(4) academy, specific case law?

(5)    A    For the most part, we don't teach the

(6) officers the names of all specific case laws.  There

(7) are a few that stick out, but for the most part, we

(8) just teach what the case laws dictate to the police

(9) department.

(10)    Q    Are officers specifically told that if

(11) they believe some dangerous object was discarded

(12) onto a residential property during a hot pursuit

(13) that they're required to backtrack to collect that

(14) potentially dangerous thing that was discard?

(15)    A    Officers are specifically trained to

(16) retrieve any dangerous objects that might fall into

(17) the hands of the unsuspected public whether that's

(18) during a hot pursuit or during an altercation or

(19) simply discarded by a suspect while standing on a

(20) street corner.  The officers are trained not to just

(21) leave a gun or knife or syringes there on the street

(22) corner for anyone to find.

(23)    Q    We're talking about a backyard and the

(24) officers do not, in fact, know that there was a gun

(25) or syringe or a knife that was discarded and they

(1)                 Lieutenant Michael Cuilla

(2)     have the time and opportunity to obtain a warrant

(3)     before entering the property.  Are they required to

(4)     obtain a warrant before entering the property?

(5)          A     But first, I just want to make sure we're

(6)     clear that they didn't have to, in fact, know that

(7)     something has been discarded.  It is reasonable

(8)     suspicion, not knowledge.  Number two, they're not

(9)     required to obtain a warrant if they have consent;

(10)    they are not required to obtain consent if they have

(11)    exigency.  So as long as an exception of the search

(12)    warrant applies, they can use that exception to the

(13)    search warrant.

(14)         Q     So simply because the evidence may be lost

(15)    or destroyed, right, so simply because somebody

(16)    might come along and find the gun that they have

(17)    reasonable suspicion may have been discarded, that

(18)    alone doesn't provide exigency to enter the yard to

(19)    search for the potentially discarded gun according

(20)    to General Order 415, true?

(21)                MS. JONES:  Objection.

(22)         A     It's not that the gun will be lost.  It

(23)    will harm the public.  So that would be -- it's a

(24)    different exception to the search warrant under RPD

(25)    dictated by New York State case law.

[Page 100]
August 22, 2023

(1)          Lieutenant Michael Cuilla

(2)     Q    You're saying that there is this whole

(3)  other exception to the search warrant requirement

(4)  that isn't articulated specifically in the RPD's

(5)  written general orders, true?

(6)     **A    I am saying, yes, that there are**

(7)  **exceptions to the search warrant that are not**

(8)  **articulated in the RPD general orders, specifically**

(9)  **those to public safety as well as medical**

(10) **emergencies by the public, which is also not**

(11) **dictated in the general orders but is part of New**

(12) **York State case law.**

(13)    Q    Officer Horowitz testified that prior to

(14) the Dempsey incident, the RPD hadn't provided any

(15) training about backtracking along the flight path

(16) after the conclusion of a hot pursuit.  Was he

(17) mistaken about that?

(18)         **MS. JONES:  Objection.**

(19)    **A    Backtracking is a term used to indicate**

(20) **searching, so the training is under searching.  What**

(21) **word that Officer Horowitz used, it may or may not**

(22) **be specifically in the training, but a backtrack**

(23) **would be a search and the search training has been**

(24) **articulated previously.**

(25)    Q    So, yes, Officer Horowitz was mistaken is

Lieutenant Michael Cuilla

(1)

(2) the City's position because specific training about

(3) searches was provided; is that your testimony?

(4)        MS. JONES:  Objection.

(5)     A    That is correct, although he was correct

(6) in the fact that the word backtracking may not have

(7) been covered in the training specifically as there

(8) are many, many words used for searches that may not

(9) be covered in the training.

(10)     Q    Officer Algarin testified that every time

(11) a suspect is chased through a fenced-in backyard to

(12) a residential property, officers backtrack through

(13) the property to check for potentially discarded

(14) contraband or weapons.  Is that consistent with RPD

(15) policy?

(16)     A    There would have to be articulable reason

(17) to conduct that backtracking or search.

(18)     Q    My question is specifically was --

(19) assuming that that is what Officer Algarin testified

(20) to, his testimony would not be consistent with RPD

(21) policy, true?

(22)        MS. JONES:  Objection.

(23)     A    It might be difficult for Officer Algarin

(24) to split that particular hair.  Maybe having other

(25) circumstances in his mind as to officer's knowledge,

Lieutenant Michael Cuilla

(1)

(2) what caused the flight, the area that it's in, that

(3) would count for a reasonable suspicion.  I can't

(4) testify to his exact knowledge when it comes to what

(5) he was referring to.  So I would like not to say

(6) that he's incorrect.  He could be correct under

(7) particular circumstances.

(8)     Q    It would be a violation of the RPD's

(9) policy to backtrack through the property to check

(10) for potentially discarded contrabands or weapons

(11) unless an officer can articulate reasonable

(12) suspicion to believe that a potentially dangerous

(13) weapon or something that could endanger the public

(14) was discarded by the person, correct?

(15)     A    That is correct.

(16)     Q    It would be a violation of RPD policy to

(17) not make that determination and instead to simply

(18) backtrack every time that a suspect is chased

(19) through the fenced-in backyard to residential

(20) property, correct?

(21)          MS. JONES:  Objection.

(22)     A    That is correct.

(23)     Q    And Officer Algarin was never disciplined

(24) as a result of entering Mr. Dempsey's backyard to

(25) backtrack, correct?

Lieutenant Michael Cuilla

(1)

(2)     A     That's correct.

(3)     Q     And Officer Algarin was never required to

(4) undergo any retraining on backtracking after this

(5) incident, correct?

(6)     A     That is correct.

(7)     Q     And Officer Algarin's backtracking through

(8) Mr. Dempsey's backyard at 53 Kosciusko Street, that

(9) was consistent with RPD practice, true?

(10)    A     That is correct.

(11)    Q     And Algarin backtracking through

(12) Mr. Dempsey's backyard at 53 Kosciusko Street, that

(13) was consistent with -- or that was inconsistent with

(14) General Order 415, correct?

(15)        MS. JONES:  Objection.

(16)    A     I do not know that to be true based on the

(17) circumstances.  A supervisor on the scene may have

(18) -- a supervisor on the scene believed that it was

(19) consistent with our policies, training and New York

(20) State law.

(21)    Q     Where did Officer Algarin ever justify the

(22) backtrack by articulating a reasonable suspicion

(23) that the suspect had discarded something on the

(24) property that created an exigency?

(25)    A     I would have to refresh my recollection of

Lieutenant Michael Culla

(1)

(2)     his report, as well as I do not know what he did or

(3)     did not articulate to a supervisor or any court

(4)     testimony after that.

(5)          Q     Did you review any of those documents

(6)     prior to coming here to testify today?

(7)          A     Yes.  In addition to the nearly five hours

(8)     of meeting with counsel, I reviewed all of the

(9)     documents over the course of many, many, many, many

(10)    hours.  That's my need for caffeine today.

(11)         Q     As we sit here today, you don't remember

(12)    exactly what his justification was, but you remember

(13)    that Sergeant Rudolph, his supervisor, determined

(14)    that his actions were consistent with RPD policy?

(15)         A     Yes.

(16)         Q     I want to move on to the next topic on the

(17)    30(b)(6) Notice.  I'm just going to put that up so

(18)    we can review it together.  So we're at 1-D.  So

(19)    "All rules regulations, methods, policies,

(20)    procedures and practices in effect or customarily

(21)    followed between January 1, 2013 and present

(22)    regarding:  The training, supervision and discipline

(23)    of officers who enter residential properties

(24)    unlawfully."  So we've covered this a little bit

(25)    already, but some additional questions.  Other than

(1)                    Lieutenant Michael Cuilla

(2)    what we've discussed already, what training do

(3)    officers receive to ensure that they don't

(4)    unlawfully enter the curtilage to a residential

(5)    property?

(6)         A    So as I previously stated, all the types

(7)    of trainings that officers receive that are

(8)    multi-faceted, these are very broad topics that

(9)    we're referring to that touch upon these particular

(10)   trainings.  Any training that's going to be related

(11)   to the Fourth Amendment searches is going to touch

(12)   upon these topics.  The officers make the link to

(13)   curtilage and property after they've had that

(14)   defined for them in the academy.  So whether or not

(15)   we reiterate the definition of what is or is not

(16)   property, we do touch upon the training regarding

(17)   searches and unlawful searches and gathering of

(18)   evidence.  One of the many sources of this

(19)   information would be the court system, you know, as

(20)   officers continuously gather evidence and use those

(21)   evidences in court cases.  Judges make

(22)   determinations, those determinations are then

(23)   reported back to the Rochester Police Department and

(24)   that too informs our training as to what the

(25)   officers need.  So if, for example, we started

(1)              Lieutenant Michael Cuilla

(2)   **that's a lot of the training regarding dogs that are**

(3)   **attacking or an imminent threat or destructive,**

(4)   **injured or threatening is regarding -- is similar to**

(5)   **how an officer would react being charged by a person**

(6)   **with a knife.**

(7)        Q    Does the RPD teach its officers that in

(8)   the history of the RPD, there has never been an

(9)   officer that was seriously injured as a result of a

(10)  dog attack?

(11)       **A    No.   That does not come up in the**

(12)  **training.**

(13)       Q    Has the RPD ever taught any of its

(14)  officers in the training that since 1932, no officer

(15)  in the entire United States has ever been killed as

(16)  a result of a dog attack?

(17)            **MS. JONES:   Objection.**

(18)       **A    No.   That has not come up in the training.**

(19)       Q    Can you tell me -- going back to less

(20)  lethal options, what are officers trained with

(21)  regard to the use of OC spray against a dog?

(22)       **A    Officers are not trained to utilize OC**

(23)  **spray against a dog specifically.   They are made**

(24)  **aware that it could be an option if the dog has not**

(25)  **yet become an imminent threat.**

(1)          **Lieutenant Michael Cuilla**

(2)       Q    We'll talk about imminent threat in a

(3)   minute here, but I want to just follow up on what

(4)   you just said a little bit.  Are officers taught at

(5)   the dog bite prevention course by Mr. DiDomenico

(6)   that OC spray is a viable option to use against a

(7)   dog that either appears like it might begin

(8)   attacking or is attacking?

(9)       **A    So possibly, DiDomenico gives officers**

(10)  **options to deal with animals that may be at**

(11)  **different levels of aggression.  However, once**

(12)  **officers determine that the animal was attacking or**

(13)  **an imminent threat to a person or destructive,**

(14)  **injured or threatening, then the officers are**

(15)  **trained to utilize their firearm.**

(16)      Q    Are officers taught about the use of a

(17)  beanbag gun against dogs?

(18)      **A    No.**

(19)      Q    Have you ever been trained or taught -- or

(20)  has the RPD ever trained or taught it officers, you

(21)  included, that a beanbag gun is a potential less

(22)  lethal option that could be used against a dog?

(23)      **A    A beanbag gun is, for the most part, not**

(24)  **readily available to officers when encountering**

(25)  **dogs.  If a plan were to be made and enough time was**

(1)                    Lieutenant Michael Cuilla

(2)     **present, then the beanbag gun would then be**

(3)     **suboptimal.  In a situation where an officer has a**

(4)     **beanbag gun and is being charged by an animal, I**

(5)     **guess we would rely on the officer to use their best**

(6)     **judgment.  But training an officer to utilize a**

(7)     **beanbag gun versus a dangerous dog is not trained.**

(8)          Q     For example, officers sometimes have to

(9)     respond to scenes where there's a call about a loose

(10)    dog, true?

(11)         **A     Yes.**

(12)         Q     Does the RPD have any kind of policy that

(13)    when responding to a scene of a loose dog, that an

(14)    officer who has a beanbag gun in their car is

(15)    required to respond to that scene?

(16)         **A     No.**

(17)         Q     Have you ever -- let me withdraw that.

(18)              One thing that you had mentioned a few

(19)    minutes ago was that in firearms training, officers

(20)    are taught to place an object between themselves and

(21)    the dog; is that right?

(22)         **A     Officers are taught in the firearms that**

(23)    **when being -- when someone has a knife, that**

(24)    **distance and having objects between them, objects**

(25)    **meaning things like a fire hydrant or a car or**

(1)                Lieutenant Michael Cuilla

(2)     something that would impede the person from reaching

(3)     them, would be beneficial and give them more time,

(4)     but not to use their hands which may be needed to

(5)     reach the tools on their belt to grab an object, no,

(6)     the officers are not trained to do that.

(7)          Q    Are officers trained to use objects such

(8)     as a backpack to hold between themselves and a dog

(9)     that might be charging at them to put off or block

(10)    the dog if it's charging at them?

(11)         A    Officers are not trained to have their

(12)    hands occupied when they may need to utilize the

(13)    tools on their belt.  So they are trained to keep

(14)    their hands unoccupied so that they can utilize the

(15)    tools that they've been given, as opposed to using

(16)    makeshift barriers or weapons.  Again, although that

(17)    is the training, you know, if an officer is under a

(18)    threat by a suspect and they want to grab a table

(19)    lamp to strike them with, that's the most readily

(20)    available tool that would keep the officer from

(21)    getting harmed or a third party from being harmed, I

(22)    would expect the officer to grab whatever is at

(23)    hand.  That is the training.

(24)         Q    When dealing with dogs specifically, not

(25)    people, are officers ever taught that if there is

(1)           Lieutenant Michael Cuilla

(2)     more than one officer, that one officer should have

(3)     their firearm ready and the other officer should

(4)     have a less lethal option ready to deal with the

(5)     aggressive dog?

(6)         **A      When there is time to make a plan, when we**

(7)     **talk about things like executing a search warrant**

(8)     **and officers are making a plan to go to a place**

(9)     **where they know there to be aggressive dogs, the**

(10)    **practice would be to have animal control come to the**

(11)    **call.  Obviously, that is not feasible for every**

(12)    **loose dog call.  It's not feasible for every just**

(13)    **general run-of-the-mill domestic call.  So most of**

(14)    **the time, officers encounter dogs they are not**

(15)    **planning to do so.  So if officers have time to**

(16)    **plan, then they are encouraged to utilize the**

(17)    **resources that are available to them like animal**

(18)    **control.  There are no less lethal options that we**

(19)    **have that we train specifically for canines.**

(20)        Q    So my -- the short answer to my question

(21)    sounds like if there is two officers at a scene,

(22)    let's say it's a response to a loose dog call, they

(23)    show up, one of them is Taser certified, there's no

(24)    requirement that the Taser certified officer attempt

(25)    to use their Taser, and that the other officer have

(1)                    Lieutenant Michael Cuilla

(2)     their firearm ready if necessary?

(3)              **MS. JONES:  Objection.**

(4)         **A     We train officers not to utilize a Taser**

(5)     **for use with dogs.**

(6)         Q     I'm going to ask you some follow-up

(7)     questions on that in a second.  Before we talk about

(8)     Tasers, officers are not trained on the use of

(9)     catchpoles, correct?

(10)        **A     I'm sorry, catchpoles?**

(11)        Q     Correct.

(12)        **A     No.  Officers are not trained on the use**

(13)    **of catchpoles.**

(14)        Q     Why aren't officers equipped or trained on

(15)    the use of catchpoles?

(16)        **A     They don't have access to catchpoles.**

(17)        Q     Why don't officers have access to

(18)    catchpoles?

(19)        **A     Because I, the City of Rochester, did not**

(20)    **purchase them catchpoles.**

(21)        Q     Why did the City of Rochester not purchase

(22)    catchpoles and train its officers to use catchpoles?

(23)        **A     I would imagine that is -- I, as the City**

(24)    **of Rochester, would say that it has to do with**

(25)    **budgeting both the time of the officers and what**

(1)              **Lieutenant Michael Cuilla**

(2)     **they can and cannot be trained in as well as the**

(3)     **feasibility of where they would carry that equipment**

(4)     **and cost versus benefit.**

(5)         Q     Is the City aware that other

(6)     municipalities have implemented policies that every

(7)     officer in their department is required to carry a

(8)     catchpole in their car, that some other police

(9)     departments require all officers to have the

(10)    training and have catchpoles in their vehicles?

(11)              **MS. JONES:  I'm objecting.  That's**

(12)              **outside the scope of this deposition.**

(13)              **MR. SHIELDS:  Whatever.  I'm done**

(14)              **fighting with you so...**

(15)              **MS. JONES:  I'll also say that the**

(16)              **decision as to why we do not -- do or do**

(17)              **not have catchpoles in every officer's car**

(18)              **is also outside of the scope of this**

(19)              **deposition.  So for you to supplement that**

(20)              **is also belated.**

(21)              **MR. SHIELDS:  Your belated deposition**

(22)              **-- your objection is late.  And so, you**

(23)              **know, I object to you raising it after the**

(24)              **officer already answered the question.**

(25)         Q     Lieutenant, I'm sorry.  Now, Lieutenant,

(1)              Lieutenant Michael Cuilla

(2)     some officers in the Rochester Police Department are

(3)     equipped with Tasers, true?

(4)         **A**     **Yes.**

(5)         Q     Let's just put up what we'll mark for this

(6)     deposition as Exhibit 7.  This is a document that

(7)     was exchanged by the City of Rochester a couple of

(8)     weeks ago.  And so my first question, Lieutenant, is

(9)     this a document that you recognize?

(10)        **A**     **Yes.  That's part of Axon's training**

(11)    **materials.**

(12)        Q     As we go through this, it's a six-page

(13)    document.  And on the third of the six pages,

(14)    basically, this Axon training material explains that

(15)    Tasers are effective on dogs, true?

(16)            **MS. JONES:  Objection.**

(17)        **A**     **It does explain that, yes.**

(18)        Q     You said that this document came from or

(19)    it's a portion of a larger training that's provided

(20)    by Axon, which is the company that bought Taser,

(21)    correct?

(22)            **MS. JONES:  Objection.**

(23)        **A**     **Yes.**

(24)        Q     Is that training that -- just the overall

(25)    training that this document -- that this portion was

(1)          Lieutenant Michael Cuilla

(2)     taken from, is that larger training something that

(3)     is provided to officers in the RPD who are equipped

(4)     and Taser certified?

(5)          **A    Yes.**

(6)          Q    Is this portion of the training about how

(7)     Tasers can be effectively used against animals, is

(8)     that portion of the training provided to RPD

(9)     officers who are Taser certified and equipped to

(10)    carry a Taser?

(11)         **A    Insofar as we make them aware of Axon's**

(12)    **findings, but it is not Rochester policy.  We advise**

(13)    **our officers not to use a Taser with a dog.**

(14)         Q    Why do you advise officers not to use a

(15)    Taser with a dog?

(16)         **A    One, it is -- the Taser is a weapon**

(17)    **designed for use against humans.  As we stand**

(18)    **upright, we provide a large target area, and both**

(19)    **probes need to hit for the weapon to be effective.**

(20)    **And dogs are horizontal, so oftentimes that can lead**

(21)    **to missed probes.  I see the mention in the training**

(22)    **as to sometimes when animals -- it is not effective**

(23)    **against animals.  That's number one.  Number two,**

(24)    **not mentioned in this training is that the Taser may**

(25)    **also be lethal to animals.  Certainly, it's not a**

(1)               Lieutenant Michael Cuilla

(2)   **nonlethal weapon.  So it is both not completely**

(3)   **nonlethal towards the animal and less effective at**

(4)   **stopping the behavior that the officers looking to**

(5)   **stop.**

(6)        Q    When you say it's not completely

(7)   nonlethal, what you mean is that in some

(8)   circumstances shooting an animal with a Taser could

(9)   kill them, correct?

(10)       **A    That's correct.  So we receive extensive**

(11)  **training for where to target the person, the human,**

(12)  **to not raise the risk of cardiac arrest.  But that**

(13)  **is certainly not provided here in this training.  If**

(14)  **we were even to utilize it, which again it is not as**

(15)  **effective.  That is two of the reasons why we would**

(16)  **not need a Taser against a dog.**

(17)       Q    So a Taser, in some instances, could kill

(18)  the dog, true?

(19)       **A    That's true.**

(20)       Q    And a firearm, in some instances, could

(21)  also kill the dog, true?

(22)       **A    True.**

(23)       Q    A firearm, in more instances than a Taser,

(24)  is likely to kill the dog, true?

(25)                    **MS. JONES:  Objection.**

[Page 160]
August 22, 2023

(1)                    **Lieutenant Michael Cuilla**

(2)        **A    I wouldn't have the statistics on it.   I**

(3)   **don't know what it would be.   I don't know how many**

(4)   **dogs that have been tased versus shot.   However,**

(5)   **what I can say is that a firearm has been shown to**

(6)   **be far more effective at stopping dangerous dogs.**

(7)        Q    I just want to put up what we'll mark as

(8)   Exhibit 8 for this deposition.   And looking at this

(9)   document, Lieutenant, it's a Taser International

(10)  document dated August 8, 2003.   And so my first

(11)  question is, is this a document that you've ever

(12)  seen before?

(13)       **A    I don't recall.**

(14)              **MS. JONES:   Can you zoom in, Elliot,**

(15)          **please?**

(16)       Q    This highlighted portion says, "Over the

(17)  past several years, we have completed additional

(18)  animal training and have received 37 field reports

(19)  of the advanced Taser M26 being used in field

(20)  applications on animals.   Of these 37 incidents, the

(21)  M26's use was reported to have been successful in 34

(22)  cases and 92 percent success rate."   Do you see it

(23)  says that?

(24)       **A    Yes.**

(25)       Q    Is that a statistic that the City was ever

(1)              **Lieutenant Michael Cuilla**

(2)       **A     I don't recall.**

(3)       Q     Has the Rochester Police Department ever

(4)  consulted with Buffalo Police Department about the

(5)  Buffalo Police Department's policies and practices

(6)  regarding the shooting of dogs?

(7)              MS. JONES:  I'm directing him not to

(8)              answer.  This goes to the creation and the

(9)              background of our policies.  This is not

(10)             what the substance of our policy is.

(11)             MR. SHIELDS:  This isn't about the

(12)             creation of policies.  This is a question

(13)             about, hey, what's your policy, is it

(14)             influenced by what your sister city did

(15)             over in Buffalo?

(16)             MS. JONES:  Yeah.  Like, how we

(17)             create or determine what our policy is,

(18)             that's exactly what you're asking and it's

(19)             outside the scope of this deposition.

(20)             MR. SHIELDS:  Absolutely not.  So I'm

(21)             going to go ahead and ask all my questions

(22)             and you can direct him not to answer and

(23)             we can raise it with the court later.

(24)       Q     Lieutenant, are you aware that in 2014 the

(25)  City of Buffalo implemented new training and

(1)                 Lieutenant Michael Cuilla

(2)    policies in response to several high-profile dog

(3)    shootings that received widespread media attention?

(4)                 **MS. JONES:  Objection.  You don't**

(5)                 **have to answer because that's outside the**

(6)                 **30(b)(6).**

(7)                 **MR. SHIELDS:  No, it's not.**

(8)         Q    But, Lieutenant, are you aware that --

(9)    whether the RPD ever considered implementing any new

(10)   policies of its own in training officers like they

(11)   did in the Buffalo Police Department?

(12)                **MS. JONES:  I'm not -- I'm objecting**

(13)                **to that too because I think it still goes**

(14)                **to how we determine what our policy is as**

(15)                **opposed to the substance of the actual**

(16)                **policy.**

(17)        Q    In correcting the substance of any of the

(18)   Rochester Police Department's policies, did it ever

(19)   look to any other jurisdictions such as the city of

(20)   Buffalo to consider whether they were going to make

(21)   any changes or updates to the Rochester Police

(22)   Department policies?

(23)                **MS. JONES:  Yeah, I'm directing him**

(24)                **not to answer that either for the same**

(25)                **reasons I've stated.**

(1)              **Lieutenant Michael Cuilla**

(2)                   **MR. SHIELDS:  Sure, we can do that**

(3)          **right now.**

(4)                   **THE VIDEOGRAPHER:  Going off the**

(5)          **record.  The time is 2:46 p.m.**

(6)                   **(A brief recess was taken from**

(7)          **2:46 p.m. to 3:01 p.m.)**

(8)                   **THE VIDEOGRAPHER:  The time is now**

(9)          **3:01 p.m.  We are back on the record.**

(10)     Q    Lieutenant Cuilla, we just took a short

(11) break.  During that break, did you have an

(12) opportunity to speak with your attorney?

(13)     **A    I did.**

(14)     Q    Did you speak with your attorney about any

(15) of your testimony?

(16)     **A    No.**

(17)     Q    I can't really hear you.  I don't know if

(18) you --

(19)     **A    I apologize.  No.**

(20)     Q    So we're discussing some training

(21) materials.  Has the City of Rochester

(22) ever provided -- well, let me withdraw that

(23) question.

(24)          Is the City of Rochester aware that

(25) there's free training provided by the Department of

(1)                  Lieutenant Michael Cuilla

(2)    Justice Community Oriented Policing Services about

(3)    how to safely interact with dogs?

(4)               **MS. JONES:  Objection.  Elliot, if**

(5)               **you just rephrase your question, that**

(6)               **might make it permissible under the scope.**

(7)        Q    Has the City of Rochester ever provided

(8)    training to its officers that was developed by the

(9)    Department of Justice Community Oriented Policing

(10)   Services?

(11)              **MS. JONES:  Objection.**

(12)       **A    Not that I'm aware of.**

(13)       Q    Has the City ever amended its training

(14)   materials for encounters with dogs based upon any

(15)   interactions that officers had with dogs?

(16)              **MS. JONES:  Objection.  Elliot, now**

(17)              **we're back to the creation and**

(18)              **development.  Just ask --**

(19)              **MR. SHIELDS:  Absolutely, no, it**

(20)              **doesn't.  And first of all, it goes to the**

(21)              **body-worn camera policy that we agreed**

(22)              **upon for number 5.**

(23)              **MS. JONES:  Maybe you can rephrase**

(24)              **it.  By now you're just asking generally**

(25)              **if they've changed our training based on**

Lieutenant Michael Cuilla

(1)

(2)     prior situations.  That goes to how we

(3)     develop our training.  So maybe if you

(4)     rephrase it --

(5)         MR. SHIELDS:  It actually falls under

(6)     what we agreed to for number 5, "make

(7)     recommendations for changes in policies

(8)     and procedures, make recommendations for

(9)     changes in training."

(10)        MS. JONES:  Maybe you can restate

(11)    your question because that's not what I

(12)    thought you asked.  I thought you said has

(13)    the City ever changed its training based

(14)    on prior incidents with officers.

(15)    Q     After reviewing the body-worn camera

(16)    videos of any interactions that an officer had with

(17)    a dog, has the City made any recommendations for

(18)    changes in training?

(19)        MS. JONES:  Hold on.

(20)        MR. SHIELDS:  If I don't hear an

(21)    objection, I'm going to ask

(22)    Lieutenant Cuilla to answer the question.

(23)    A     Not that I'm aware of.

(24)    Q     To follow up on that topic number 5 that

(25)    we agreed to, 5-C, it says "make any recommendations

(1)              Lieutenant Michael Cuilla

(2)    for changes in training" and then in parentheses,

(3)    "including any specific changes that have been

(4)    made."  So my follow-up question is, after reviewing

(5)    any body-worn camera videos of incidents involving

(6)    officers discharging their firearms at a dog, has

(7)    the City of Rochester made any specific changes to

(8)    its training?

(9)         **A    Not that I'm aware of.**

(10)        Q    Has the City of Rochester utilized

(11)   body-worn camera recordings of incidents where

(12)   officers discharged their firearms at dogs to review

(13)   the incidents to determine whether the officer's

(14)   actions were objectively reasonable under the

(15)   circumstances?

(16)        **A    Yes.**

(17)        Q    Can you explain to me what the policy is

(18)   for the Rochester Police Department in terms of

(19)   reviewing the body-worn camera recordings of the

(20)   incidents where officers have shot dogs to determine

(21)   whether or not the officer's actions were

(22)   objectively reasonable under the circumstances?

(23)        **A    The policy on the body-worn camera review**

(24)   **is to review the body-worn camera as well as the**

(25)   **subject resistance report or incident report**

Lieutenant Michael Cuilla

(2)  **depending on if it's a firearm incident against a**

(3)  **dog.  That's all to be reviewed by the supervisor to**

(4)  **determine if there's any need for remedial training**

(5)  **or if that there were any violations of policy.**

(6)      Q    So other than the supervisor, is anyone

(7)  else required to review the body-worn camera video?

(8)      **A    When it is submitted to PSS, PSS may**

(9)  **choose to review the body-worn camera footage as**

(10) **well.**

(11)     Q    Is there a requirement when an officer

(12) discharges their firearm at a dog that PSS review

(13) the body-worn camera video?

(14)     **A    Not that I'm aware of.**

(15)     Q    Is there a requirement that the supervisor

(16) must review the body-worn camera video within a

(17) certain period of time?

(18)     **A    Not that I'm aware of.  They have to**

(19) **review the incident within a certain period of time**

(20) **and body-worn camera review would be part of that.**

(21)     Q    What periods of time do they have to

(22) review the incident?

(23)     **A    For just the general use of force,**

(24) **department policy is 10 days.**

(25)     Q    When you say just a general use of force,

(1)                    Lieutenant Michael Cuilla

(2)    you mean like against the person where a subject

(3)    resistance report would have to be completed?

(4)         **A    Yes, a subject resistance report.**

(5)         Q    Is an incident report in a case where an

(6)    officer discharges their firearm at a dog, is there

(7)    any different or a specific period of time that that

(8)    incident report is required to be completed?

(9)              **MS. JONES:   Objection.**

(10)        **A    There may be in the general orders that**

(11)   **specific guidelines as to how long an incident**

(12)   **report should take to review, but I'm unaware if it**

(13)   **articulates an exact amount of time.**

(14)        Q    When a supervisor reviews a body-worn

(15)   camera recording of an incident where an officer had

(16)   shot a dog, are they required to document that

(17)   review on any specific form?

(18)        **A    No.   The review of the body-worn camera**

(19)   **footage is documented in the system.**

(20)        Q    When you say it's documented in the

(21)   system, what do you mean?

(22)        **A    There's a log of who used body-worn camera**

(23)   **footage.**

(24)        Q    Other than the log that shows who viewed

(25)   the footage, is the officer required to, for

(1)                  Lieutenant Michael Cuilla

(2)     example, make a note somewhere that the officer's

(3)     actions complied with their training and the RPD's

(4)     policies?

(5)          **A    Once your supervisor signed off on the**

(6)     **report, if there is any violation of policies that**

(7)     **the supervisor believes needs to be documented, they**

(8)     **document it on the form, as I've mentioned**

(9)     **previously.**

(10)         Q    The method for basically reviewing whether

(11)    an officer's actions complied with training and

(12)    policies, if it were to go up the chain of command,

(13)    would be just the documentation in the report

(14)    itself, correct?

(15)                 **MS. JONES:   Objection.**

(16)         **A    If the supervisor adds any additional**

(17)    **training forms or an IDC, that could be passed along**

(18)    **the chain as well.**

(19)         Q    Does the RPD track the effectiveness of

(20)    its policies and training?

(21)         **A    Generally, yes.**

(22)         Q    How does it track the effectiveness of its

(23)    policies and training?

(24)                 **MS. JONES:   Objection.**

(25)         Q    You can answer.

Lieutenant Michael Cuilla

(1)

(2)        MS. JONES:  I'm sorry, which topic

(3)    are you on?

(4)        MR. SHIELDS:  Tracking the number of

(5)    dogs shot by officers.

(6)        MS. JONES:  Hold on.

(7)        MR. SHIELDS:  1-J.

(8)        MS. JONES:  Do you want to break your

(9)    question as more specific to that or are

(10)   you just talking about -- it sounds like

(11)   you're talking generally.

(12)       MR. SHIELDS:  Sure.  I was going to

(13)   ask a general question, then specific

(14)   questions.

(15)   Q    So how does the department track generally

(16)   the effectiveness of its policies and training?

(17)       MS. JONES:  Elliot, I think you need

(18)   to ask a specific question about tracking

(19)   the number of dogs shot by officers.

(20)       MR. SHIELDS:  First, I'm asking him

(21)   generally how it works.

(22)       MS. JONES:  I'm directing him not to

(23)   answer because it's outside the scope of

(24)   the 30(b)(6).

(25)   Q    Lieutenant Cuilla, how does the RPD track

(1)               Lieutenant Michael Cuilla

(2)     the effectiveness of any policies and training

(3)     regarding -- how does the RPD track the

(4)     effectiveness of any policies and training regarding

(5)     using force against dogs?

(6)                   MS. JONES:   (Inaudible.)

(7)                   MS. REPORTER:   I can't hear you,

(8,           Ms. Jones.

(9)                   MS. JONES:   Yeah, I'm sorry, I'm

(10)          trying to think to myself.  Can you repeat

(11)          your question?

(12)     Q     Lieutenant Cuilla, how does the RPD track

(13)    the number of dogs shot by officers?

(14)     A     PSS keeps track of it in a system called

(15)    LERMS, L-E-R-M-S.

(16)     Q     Who tracks the number of dogs shot by

(17)    officers at PSS?

(18)     A     Who within the section of the Professional

(19)    Development Section, it's under the supervision of

(20)    the commanding officer of the Professional

(21)    Development Section, whoever he designates to track.

(22)     Q     How do they track the number of dogs that

(23)    are shot by police?

(24)     A     It's inputted into the system as a firearm

(25)    discharge and the incident can be searched as a

(1)           **Lieutenant Michael Cuilla**

(2)    **firearm discharge and looked up to see which**

(3)    **incidents have to do with dogs and which incidents**

(4)    **have to do with deer or other animals.**

(5)        Q    Why does the RPD track the number of

(6)    instances where dogs are shot by officers?

(7)        **A    The RPD tracks all --**

(8)            **MS. JONES:  Objection.  No, I think**

(9)            **that's outside the scope still.**

(10)           **MR. SHIELDS:  I can absolutely ask**

(11)           **him why they track the number of dogs shot**

(12)           **by police.**

(13)           **MS. JONES:  I don't think so.**

(14)           **MR. SHIELDS:  What's the point of**

(15)           **tracking --**

(16)       Q    Lieutenant Cuilla, what is the point of

(17)   tracking the number of dogs that have been shot by

(18)   police?

(19)           **MS. JONES:  I still think that's**

(20)           **outside the scope.**

(21)           **MR. SHIELDS:  I'm calling the court**

(22)           **again and let's go off the record.**

(23)           **THE VIDEOGRAPHER:  Going off the**

(24)           **record.  The time is 3:14 p.m.**

(25)           **(A brief recess was taken from**

(1)           **Lieutenant Michael Cuilla**

(2)           **3:14 p.m. to 3:29 p.m.)**

(3)                **THE VIDEOGRAPHER:  The time is now**

(4)           **3:29 p.m.  We are back on the record.**

(5)                **MR. SHIELDS:  Thank you.  We just had**

(6)           **a conference with Judge Peterson about the**

(7)           **question regarding why the RPD tracks the**

(8)           **number of dogs shot by officers and**

(9)           **Judge Peterson ruled that he believed that**

(10)          **was outside of the scope of the deposition**

(11)          **notice.  So we're going to move on from**

(12)          **that question.**

(13)     Q    So, Lieutenant Cuilla, my next question

(14)  is, going back to the body-worn camera recordings,

(15)  under what circumstances would the City consider

(16)  making recommendations for changes in policies and

(17)  procedures if it reviewed a body-worn camera

(18)  recording of an officer shooting a dog?

(19)     **A    Changes in policies and procedures are**

(20)  **submitted to the chief and the chief makes that**

(21)  **ultimate determination.**

(22)     Q    The question is, under what circumstances

(23)  might some change in policy be submitted to the

(24)  chief?  You know, for example, if an officer shot

(25)  five dogs in a month, is that a -- and the RPD

(1)                 Lieutenant Michael Cuilla

(2)     sergeant reviewed those instances, determined that

(3)     maybe the officer shouldn't be disciplined, but he

(4)     was complying with RPD policy, but maybe they

(5)     determined, oh, that's too many dogs that were shot

(6)     in a month period, maybe we should change our

(7)     policy.  Is that an instance where that proposed

(8)     policy change might be made to the chief?

(9)                 **MS. JONES:  Objection.**

(10)          **A    If a sergeant felt that there needs to be**

(11)     **a policy change regardless of what inspires that**

(12)     **sergeant, they would codify that on an**

(13)     **interdepartmental correspondence submitted to their**

(14)     **supervisor up to the chain of command to the chief**

(15)     **of police.**

(16)                 **MR. SHIELDS:  We just call for**

(17)                 **production of any interdepartmental**

(18)                 **correspondence regarding any proposed**

(19)                 **policy changes regarding how officers**

(20)                 **interact with dogs that were prompted by**

(21)                 **review of any body-worn camera recordings.**

(22)                 **MS. JONES:  Just follow up in**

(23)                 **writing.**

(24)          Q    Between 2013 and present, how has the RPD

(25)     tracked the number of dogs shot by officers?

(1)                 Lieutenant Michael Cuilla

(2)              **MS. JONES:   Objection.**

(3)      **A     When a dog is shot by an officer, an**

(4)   **incident report is generated and that report gets**

(5)   **submitted to PSS.   They input it into a system**

(6)   **called LERMS.   That's L-E-R-M-S.**

(7)      Q     Does LERMS create any kind of statistical

(8)   analysis of the number of dogs that are shot by

(9)   police?

(10)     **A     No.**

(11)     Q     Does LERMS create any kind of report about

(12)   the number of dogs shot by police?

(13)     **A     You can put out a listing of all the**

(14)   **firearm discharges and then sift through those to**

(15)   **see which ones were dogs that were shot by police.**

(16)   **Again, you'd have to obviously sift out treating**

(17)   **incidents to the animals simply being injured versus**

(18)   **animals that were aggressive.**

(19)     Q     Do you know when the RPD began tracking

(20)   the number of dogs shot by police?

(21)     **A     As far back as 30 years ago, it's been a**

(22)   **policy of the Rochester Police Department to**

(23)   **generate an incident report when an animal is shot**

(24)   **by police, any firearm discharged at an animal.   So**

(25)   **that's prior to -- far enough back that I would not**

(1)                  Lieutenant Michael Cuilla

(2)    know where that began.

(3)        Q    Are there any reporting requirements

(4)    regarding tracking the number of dogs shot by the

(5)    police?

(6)        A    Reporting by the officer to the City or

(7)    reporting by the City to another agency?

(8)        Q    Reporting by the City to another agency.

(9)        A    There are not.

(10)       Q    Reno DiDomenico testified that for a

(11)   number of years the City would provide him with

(12)   statistics about the number of dogs shot by police.

(13)   Does the City still provide Mr. DiDomenico with

(14)   reports about the number of dogs that are shot by

(15)   police?

(16)       A    We would only do so upon his request.

(17)       Q    Do you know why the City was providing

(18)   Mr. DiDomenico with this tracking of the number of

(19)   dogs shot by police?

(20)            MS. JONES:   Objection.

(21)       A    If we know as per the statistics, you

(22)   know, as a law enforcement officer, we would provide

(23)   them with statistics, but that would have to be

(24)   cleared through the chief's office.

(25)       Q    Do you know if Reno has made any changes

(1)              Lieutenant Michael Cuilla

(2)     to the training that he provides to the RPD between

(3)     2013 and the present?

(4)              **MS. JONES:  Objection.**

(5)          **A    I am unaware of any changes Reno has made**

(6)     **to his training.**

(7)          Q    Reno provides his training currently at

(8)     the police academy, correct?

(9)          **A    That is correct.**

(10)         Q    Do you know if Reno has updated his

(11)    training at all based on any review, either by Reno

(12)    or by the City, of body-worn camera recordings of

(13)    incidents where officers have shot dogs?

(14)             **MS. JONES:  Objection.**

(15)         **A    I am unaware of him modifying his training**

(16)    **in any way due to any situation.**

(17)         Q    Other than the training provided by Reno,

(18)    has there been any training changes as a result of

(19)    officer's -- or a supervisor's review of an officer

(20)    shooting a dog, so an officer's review of body-worn

(21)    camera incident where an officer shot a dog?

(22)             **MS. JONES:  Objection.**

(23)         **A    No.  Not in my estimation have we changed**

(24)    **our policy due to body-worn camera review of a**

(25)    **shooting incident from a dog shooting.**

(1)                **Lieutenant Michael Cuilla**

(2)        Q     And maybe it was a bad question, but my

(3)    question I meant to ask was, has the RPD made any,

(4)    not policy changes, but changes in any training

(5)    after reviewing a body-worn camera incident

(6)    involving a dog shooting?

(7)        **A     No, not that I'm aware of.**

(8)        Q     I'm going to ask about topic 1-K, which is

(9)    the requirement to fill out an incident report

(10)   and/or a firearm discharge report any time an

(11)   officer discharges their firearm.  So my first

(12)   question is -- I guess I -- I called it a firearm

(13)   discharge report.  Is that a -- is that a separate

(14)   form from an incident report?

(15)       **A     No.  The incident report is used to report**

(16)   **incidents, that includes crime reports, missing**

(17)   **persons reports.  That is all the same form.  The**

(18)   **general form is called an incident report.**

(19)       Q     So, for example, if I requested firearm

(20)   discharge reports from the City, that would really

(21)   just be incident reports that reported incidents

(22)   where a firearm was discharged?

(23)       **A     That's correct.**

(24)       Q     And when a firearm is discharged, is the

(25)   incident report always completed by the supervisor?

```
(1)                 Lieutenant Michael Cuilla

(2)        A    You mean if it's ever completed by the

(3)    person who discharged the firearm?

(4)        Q    Correct.

(5)        A    No.   It would be completed by a

(6)    supervisor.   I am not certain it is always completed

(7)    by their supervisor, but a supervisor would complete

(8)    that.

(9)        Q    Do you know why the requirement to fill

(10)   out an incident report is -- that it's filled out by

(11)   the supervisor and not the officer that discharged

(12)   the firearm?

(13)            MS. JONES:   Objection.   I'm

(14)            instructing him not to answer.

(15)       Q    What are the policies of the RPD regarding

(16)   the requirement to fill out an incident report for a

(17)   firearm discharge report any time that an officer

(18)   discharges their firearm?

(19)       A    I could --

(20)            MS. JONES:   Objection.

(21)       A    I could reference the GO.   I can't recite

(22)   it from memory, but in general, it is that a

(23)   supervisor will complete the report for an officer

(24)   that has discharged their firearm at an animal.

(25)       Q    This topic isn't limited to when an
```

(1)              Lieutenant Michael Cuilla

(2)     officer discharges their firearm at an animal.  So

(3)     the question is, is there a difference in the

(4)     reporting requirements when a firearm is discharged

(5)     at a person versus when a firearm is discharged at

(6)     an animal?

(7)          **A    Is there a difference -- I'm sorry.  Maybe**

(8)     **I -- is there a difference in the reporting**

(9)     **requirements when a firearm is discharged at a**

(10)    **person versus when a firearm is discharged at an**

(11)    **animal?**

(12)         Q    Correct.

(13)         **A    Yes, there is a difference in the**

(14)    **reporting requirement.**

(15)         Q    What is that difference?

(16)         **A    There are several differences that occur**

(17)    **at the scene, as well as the differences of**

(18)    **severity.  Do you mean just the differences in how**

(19)    **the report is written?**

(20)         Q    Or if an officer discharges their firearm

(21)    at a person, are they required to fill out some

(22)    other report other than an incident report?  Are

(23)    they required to put -- fill out some other report

(24)    about their firearm discharge?

(25)         **A    So the officer, when -- of course, if it's**

Lieutenant Michael Cuilla

(2) **used against a person, an officer is required to**

(3) **fill out a subject resistance report.  And they're**

(4) **not required to fill out a subject resistance report**

(5) **if the firearm -- if force is used against an**

(6) **animal.  An animal is not recognized as a subject.**

(7) **It is a piece of property.**

(8)      Q    Just to make sure I'm clear, so when an

(9) officer discharges a firearm against a dog, the

(10) officer does not fill out any paperwork documenting

(11) their own actions, true?

(12)      **A    That is correct.**

(13)      Q    But when an officer discharges a firearm

(14) in other circumstances, like at a person -- well,

(15) let me withdraw that.

(16)           As opposed to the situation where an

(17) officer discharges their firearm at a person, the

(18) officer would be required to fill out what happened

(19) from their own perspective in a subject resistance

(20) report, correct?

(21)      **A    I have to refresh my recollection of the**

(22) **GO when an officer shoots a person.  I'm unsure just**

(23) **because of my recollection of whether or not they**

(24) **have to fill out a subject resistance report as**

(25) **there may be a criminal investigation and there may**

(1)                    Lieutenant Michael Cuilla

(2)     be different requirements.

(3)          Q     Yesterday, Officer Leach testified that

(4)     there was some kind of follow-up report that's

(5)     required to be completed by officers if they

(6)     discharged their firearm at a person.  He didn't say

(7)     subject resistance report, but he said that there

(8)     was some writing that had to be created.  Does that

(9)     sound accurate?

(10)          MS. JONES:  Objection.

(11)          A     It does sound accurate, but I think it'd

(12)    be best to reference the GO about this particular

(13)    incident as the laws have been updated that all

(14)    shootings against people are not handled by the --

(15)    first, by the district attorney's office, so there

(16)    may be different reporting requirements.  The GO

(17)    would have the most recent information.

(18)          Q     Do you know which general order that would

(19)    be?

(20)          A     That would be the general order dictating

(21)    use of deadly force.

(22)          Q     So that's 340, does that sound right?

(23)          A     That sounds correct.

(24)          Q     Let me just put that out.  So that is

(25)    Exhibit 12 that we had already marked.  Let me ask

(1)              Lieutenant Michael Cuilla

(2)    you, Lieutenant, here under procedures -- subheading

(3)    8, procedures, if we go down here, it says, "if

(4)    firearm discharges accidental or unintentional and

(5)    did not injure anyone" -- so that's not what we're

(6)    looking at, right, because --

(7)        A    No.

(8)        Q    Let's see.  So it would be B, "if a

(9)    discharge" -- "the supervisor will respond, call for

(10)   medical assistance, secure the scene, manage the

(11)   scene."  It says, "Immediately prepares and submits

(12)   an incident report, subject resistance report and

(13)   any of the reports as so directed by the RPD."  So,

(14)   I, is that where it would be?

(15)       **A    So, I, that would be the member's**

(16)   **supervisor.  That would be the member's supervisor**

(17)   **would fill out the report.**

(18)       Q    And then if we go down to D, "If a firearm

(19)   discharges directly to an animal, the member's

(20)   supervisor will submit an incident report," correct?

(21)       **A    Yes.**

(22)       Q    And then it also requires D-2, "the

(23)   member's section, platoon commanding officer will

(24)   respond to the scene of the incident and direct a

(25)   thorough investigation and notify PSS."  And then

(1)                  Lieutenant Michael Cuilla

(2)     "the commanding officer of PSS will make a

(3)     determination based on the circumstances of the

(4)     situation as to whether or not to respond to the

(5)     scene and/or make further notifications and document

(6)     any nonresponse to the scene by PSS and make it part

(7)     of the incident file," correct?

(8)          **A**     **Correct.**

(9)          Q     Can you just explain what 3-B means?

(10)         **A     If PSS does not respond to the scene, they**

(11)    **have to document why they did not respond to the**

(12)    **scene.**

(13)         Q     How would they go about documenting that

(14)    they did not respond to the scene?

(15)         **A     They would submit an attachment to their**

(16)    **incident report.**

(17)         Q     So if there was a dog shooting incident

(18)    and the supervisor created an incident report and

(19)    PSS did not respond to the scene, then an addendum

(20)    would be attached to that incident report explaining

(21)    why PSS didn't respond to the scene?

(22)         **A     Showing the PSS did not respond to the**

(23)    **scene, yes.**

(24)         Q     If that addendum was not created, that'd

(25)    be a violation of the policy?

(1)             Lieutenant Michael Cuilla

(2)       **A     Yes.   Their nonresponse has to be**

(3)   **documented.  I'm unsure if it would suffice in**

(4)   **practice for the supervisor to add that nonresponse**

(5)   **to their report.  PSS may feel that that meets that**

(6)   **requirement to document their nonresponse if it is**

(7)   **documented by the supervisor filling out the**

(8)   **incident report.**

(9)       Q    So you're saying maybe it's not a

(10)  separate --

(11)      **A     It may not need to be a separate incident**

(12)  **report -- I'm sorry.  A separate addendum in**

(13)  **practice.  It may be documented by that supervisor**

(14)  **on the report as requested by PSS.**

(15)      Q    So it says, "the commanding officer of PSS

(16)  will make a determination if they're going to

(17)  respond or not and then document any nonresponse."

(18)  So you're saying that that could be read to mean

(19)  maybe the commanding officer of PSS is notified and

(20)  say, yeah, we're not going to come to the scene and

(21)  then the supervisor could put that in the report by

(22)  himself or herself?

(23)      **A     Yes, if requested to do so by the**

(24)  **commanding officer of PSS.**

(25)      Q    Let's go back to Exhibit 1, the Notice.

(1)                    Lieutenant Michael Cuilla

(2)     The next topic is "training received by each of

(3)     individually named defendant police officers

(4)     relevant to the claims and defenses in this action."

(5)     Were you prepared, before coming to testify to this

(6)     deposition today, to testify about that topic?

(7)          **A    I was.**

(8)          Q    Let's go up through each case, defendant

(9)     by defendant.  In the Marianne Anniszkiewicz case,

(10)    the two named defendant officers are Jennifer

(11)    Trenton and Brian Cala.  And so can you tell me, in

(12)    terms of the claim for unreasonable search of the

(13)    curtilage, what is the training that both of those

(14)    officers received about that topic?

(15)         **A    They received the search and seizure**

(16)    **training as dictated in the academy by DCJS.  They**

(17)    **would receive refreshers throughout their field**

(18)    **training as well as any relevant inservice training**

(19)    **that has touched upon that topic, a roll call**

(20)    **training that touched upon that topic since their**

(21)    **hire date.**

(22)         Q    What are the dates of all of the inservice

(23)    trainings that they received on those topics?

(24)         **A    I am unaware of the exact dates of all of**

(25)    **the inservice trainings that Brian Cala has received**

(1)              Lieutenant Michael Cuilla

(2)     since 1997 or Jennifer Trenton has received since

(3)     2004.  They are biyearly.

(4)          Q    When is the last time that Brian Cala

(5)     received any training about the search of the

(6)     curtilage to a property?

(7)          A    If it's the last time that Brian Cala

(8)     received training regarding searches -- I'm sorry.

(9)     Specifically, the training -- does the training have

(10)    to solely be about that topic or just touched on the

(11)    topic of searches, illegal searches, warrantless

(12)    searches?

(13)         Q    The claim in the case is unreasonable

(14)    search of the curtilage to the property.  So the

(15)    training would have to concern search of the

(16)    curtilage of a property.

(17)         A    Then I would have to just refer to their

(18)    previous training bulletin.

(19)         Q    The last time that the City is aware that

(20)    Officer Cala received any training about the search

(21)    to a curtilage would be the training from 2019?

(22)         A    Yes.

(23)         Q    That was just like a five-minute roll call

(24)    training?

(25)              MS. JONES:  Objection.

(1)                    **Lieutenant Michael Cuilla**

(2)        **A    It was a roll call training.**

(3)        Q    On average, how long do roll call

(4)   trainings last for?

(5)                    **MS. JONES:   Objection.**

(6)                    **You can answer now.**

(7)        **A    Eight to ten minutes.**

(8)        Q    Is that something that's like a policy

(9)   about roll call training, the length of time that

(10)  they're supposed to last?

(11)                   **MS. JONES:   I'm sorry, can you repeat**

(12)                   **that?**

(13)       Q    Is there a policy about how long a roll

(14)  call training is supposed to last for?

(15)       **A    Roll call itself lasts for 15 minutes.**

(16)  **The training has to fit within that timeframe.**

(17)  **However, multiple days can be utilized for that**

(18)  **training.  So you might run a training with several**

(19)  **compartments to it.  The last time we did the De**

(20)  **Bour training was split up into several parts and**

(21)  **part one, which was eight to ten minutes, was**

(22)  **delivered in -- within the first week.  We try to**

(23)  **catch every officer that applied to that roll call.**

(24)  **Part two was delivered the next week and part three**

(25)  **delivered the third week and so on and so forth.  So**

(1)              **Lieutenant Michael Cuilla**

(2)    **the training can actually be rather lengthy over**

(3)    **time.**

(4)        Q    The training bulletin that we marked as

(5)    Exhibit 2 from 2019 that was entitled "Warrantless

(6)    Searches on Curtilage."  It was a two-page document.

(7)    Is that the type of roll call that would have been

(8)    more like eight minutes or more like a series of

(9)    days like you just testified to about the De Bour

(10)   training?

(11)       **A    That would be up to the supervisors.  If**

(12)   **they believe that the officers understood the**

(13)   **training within the eight to ten minutes, then they**

(14)   **wouldn't bring it up in roll call again other than**

(15)   **to reiterate it.  However, really, any roll call**

(16)   **training officers are going to get at least more**

(17)   **than once, however many times the supervisors do the**

(18)   **roll calls, however many times it takes to hit all**

(19)   **of the officers as well as make sure the officers**

(20)   **have an understanding.**

(21)       Q    Officer Cala, before the 2019 roll call

(22)   training, when is the last time before that that he

(23)   had received any training regarding the search of a

(24)   curtilage?

(25)       **A    For a specific search to curtilage, again,**

(1)                 Lieutenant Michael Cuilla

(2)     I would have to check every training that has

(3)     occurred to see if any -- make any mention of that

(4)     particular search because, again, the training

(5)     wouldn't be titled "searches to curtilage," although

(6)     it may touch upon that fact.  However, the last time

(7)     that I am fully aware that Officer Cala had received

(8)     that training would be the prior training bulletin.

(9)         Q    When is the last time that Officer Cala

(10)    received any training about the search of a

(11)    curtilage prior to the incident at issue in the

(12)    Marianne Anniszkiewicz case in which he's named as a

(13)    defendant?

(14)        A    The 2018 incident?

(15)        Q    Give me one second and I'll confirm the

(16)    date for you.  Correct, that incident occurred on

(17)    June 10, 2018.

(18)        A    Again, that training would be -- so if

(19)    that predates the latest training bulletin that you

(20)    have on warrantless searches and seizures, there

(21)    could be any update to the general order that

(22)    occurred in that time.  Prior to that, he would have

(23)    received it again in the academy in field training.

(24)        Q    As we sit here today, you're unsure of

(25)    when the last time that Officer Cala received any

(1)                  Lieutenant Michael Cuilla

(2)    training prior to the June 10, 2018 incident on

(3)    searching a curtilage to a property, correct?

(4)              **MS. JONES:   Objection.**

(5)         **A     I am certain that Officer Cala was**

(6)    **trained.   I am certain on the first time he was**

(7)    **trained and then he was trained fully.   However, I**

(8)    **am uncertain as to the last time his training was**

(9)    **refreshed on that particular topic.**

(10)        Q     As we sit here today, you can't say

(11)   whether or not between Officer Cala's academy

(12)   training and the training he received in 2019,

(13)   whether he received any training at all about the

(14)   search of a curtilage, true?

(15)             **MS. JONES:   Objection.**

(16)        **A     That is correct.   I cannot confirm whether**

(17)   **he received any training on that particular topic.**

(18)        Q     Before June 10, 2018, when is the last

(19)   time that Officer Cala received any training about

(20)   the legal claim is unlawful seizure of personal

(21)   property, which in regular language means

(22)   discharging his firearm at a dog?

(23)        **A     If it comes to unlawful seizure of**

(24)   **personal property, again, I was not -- I did not**

(25)   **look through all of the training that occurred since**