```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------x
CHARLES DEMPSEY, individually, and L.D. by her
father and natural guardian, CHARLES DEMPSEY,
                Plaintiff(s),
                Index No. 19-CV-6780(EAW)
        -against-
THE CITY OF ROCHESTER, a municipal entity, JAVIER
ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER
RESPONSIBLE FOR TRAINING JAVIER ALGARIN,
                Defendant(s).
-----------------------------------------x


                June 9, 2023
                11:08 a.m.


        VIDEO CONFERENCED EXAMINATION BEFORE
TRIAL of Defendant by SERGEANT JASON RUDOLPH,
pursuant to Order, before Laura B. Lowenthal, a
Notary Public within and for the State of New
York.
```

```
(1)
(2)     A P P E A R A N C E S:
(3)
        ROTH & ROTH, LLP
(4)     Attorneys for Plaintiff(s)
           192 Lexington Avenue, Suite 802
(5)        New York, New York 10016-6823
(6)     BY: ELLIOT DOLBY-SHIELDS, ESQ.
           E-mail:  eshields@rothandrothlaw.com
(7)
(8)     CITY OF ROCHESTER LAW DEPARTMENT
        Attorneys for Defendant(s)
(9)        30 Church Street
           Rochester, New York 14614
(10)
        BY: PEACHIE L. JONES, ESQ.
(11)       E-mail:  peachie.jones@cityofrochester.gov
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

(1)
(2)             **S T I P U L A T I O N S:**
(3)             **IT IS STIPULATED AND AGREED** by and
(4)  between the attorneys for the respective parties
(5)  herein, and in compliance with Rule 221 of the
(6)  Uniform Rules for the Trial Courts:
(7)  THAT the parties recognize the provision of Rule
(8)  3115 subdivisions (b), (c) and/or (d).  All
(9)  objections made at a deposition shall be noted by
(10) the officer before whom the deposition is taken,
(11) and the answer shall be given and the deposition
(12) shall proceed subject to the objections and to
(13) the right of a person to apply for appropriate
(14) relief pursuant to Article 31 of the C.P.L.R.;
(15)             THAT every objection raised during a
(16) deposition shall be stated succinctly and framed
(17) so as not to suggest an answer to the deponent
(18) and, at the request of the questioning attorney,
(19) shall include a clear statement as to any defect
(20) in form or other basis of error or irregularity.
(21) Except to the extent permitted by CPLR Rule 3115
(22) or by this rule, during the court of the
(23) examination persons in attendance shall not make
(24) statements or comments that interfere with the
(25) questioning.

(1)
(2)            THAT a deponent shall answer all
(3)    questions at a deposition, except (i) to preserve
(4)    a privilege or right of confidentiality, (ii) to
(5)    enforce a limitation set forth in an order of a
(6)    court, or (iii) when the question is plainly
(7)    improper and would, if answered, cause
(8)    significant prejudice to any person.  An attorney
(9)    shall not direct a deponent not to answer except
(10)   as provided in CPLR Rule 3115 or this
(11)   subdivision.  Any refusal to answer or direction
(12)   not to answer shall be accompanied by a succinct
(13)   and clear statement on the basis therefore.  If
(14)   the deponent does not answer a question, the
(15)   examining party shall have the right to complete
(16)   the remainder of the deposition.
(17)           THAT an attorney shall not interrupt
(18)   the deposition for the purpose of communicating
(19)   with the deponent unless all parties consent or
(20)   the determining whether the question should not
(21)   be answered on the grounds set forth in Section
(22)   221.2 of these rules, and, in such event, the
(23)   reason for the communication shall be stated for
(24)   the record succinctly and clearly.
(25)

(1)           Sergeant J. Rudolph
(2)      A    On the S.W.A.T. team.
(3)      Q    So you were the assistant --
(4)      A    I was an assistant team leader of
(5)  small, we have smaller teams within the team, an
(6)  assistant team leader of a smaller element on the
(7)  team and then I was a team leader of a smaller
(8)  element on the team and then I was the team's
(9)  assistant commander and now I am the S.W.A.T.
(10) team commander.
(11)     Q    So you were an assistant team leader
(12) for the entry team, for the sniper team, for
(13) which team?
(14)     A    For the entry team.
(15)     Q    Then you were the team leader for the
(16) entry team?
(17)     A    Yes.
(18)     Q    And then assistant commander; is that
(19) what you said?
(20)     A    Correct.
(21)     Q    Now you're the commander?
(22)     A    Correct.
(23)     Q    When were you promoted to assistant
(24) commander?
(25)     A    Early 2019.

```
(1)                   Sergeant J. Rudolph
(2)        Q     Any other roles either with the
(3)   S.W.A.T. team or with the RPD generally that you
(4)   have had that we have not discussed?
(5)        A     No.
(6)        Q     So let's talk about the incident,
(7)   first I want to put up your Incident Report so we
(8)   will mark that as Exhibit 1 for this deposition.
(9)              (Whereupon, Plaintiff's Exhibit 1,
(10)             Incident Report, bates stamped DEMPSEY
(11)             2120-2122, 3 pages, was marked for
(12)             identification.)
(13)       Q     Sergeant, on your screen do you see a
(14)  Incident Report?
(15)       A     I do, sir.
(16)       Q     Is this the same Incident Report that
(17)  you reviewed in preparation for the deposition?
(18)       A     It is.
(19)       Q     A three page document?
(20)       A     Yes.
(21)       Q     It was dated October 19, 2018;
(22)  correct?
(23)       A     Correct.
(24)       Q     So let's go down to the narrative
(25)  section here.
```

```
(1)                    Sergeant J. Rudolph
(2)              In the beginning basically it says
(3)    that the officers that responded to report VICE
(4)    activity at 62 Kosciusko Street. They were
(5)    familiar with the area. Basically they chased the
(6)    suspects through the backyards and then detained
(7)    them; is that an accurate summary of the
(8)    beginning of the report?
(9)         A     It is.
(10)        Q     And then it goes on to say that
(11)   Algarin began to backtrack through the
(12)   Plaintiff's backyard at 53 Kosciusko Street;
(13)   right?
(14)        A     Yes.
(15)        Q     In these circumstances was Algarin's
(16)   entry into the Plaintiff's backyard to backtrack
(17)   consistent with RPD practices and policies?
(18)              MS. JONES:    Objection.
(19)        A     Yes.
(20)        Q     Are RPD officers taught that they're
(21)   permitted to enter into the curtilage of a
(22)   residential home to backtrack after the
(23)   conclusion of a hot pursuit of a fleeing suspect?
(24)              MS. JONES:    Objection.
(25)        A     You have more details to that?  Every
```

(1) **Sergeant J. Rudolph**
(2) **situation is different.**
(3)     Q    Sure.
(4)     So in this instance at the time that
(5) Algarin had gone back, according to your report,
(6) right, so we are just looking at what your report
(7) says at this time, at the time that your report
(8) documents Officer Algarin beginning to backtrack
(9) both of the suspects had been detained and they
(10) were in handcuffs; right?
(11)     **A**    **Correct.**
(12)     Q    Under those circumstances where both
(13) suspects had been detained and they were
(14) handcuffed at that point the pursuit had
(15) concluded; right?
(16)     **A**    **Correct.**
(17)     Q    So the question is under those
(18) circumstances is it consistent with RPD's
(19) policies and practices for Algarin to have
(20) backtracked into a different property that was
(21) enclosed by a fence?
(22)     **MS. JONES:    Objection.**
(23)     **A**    **In this situation as the details are**
(24) **presented, yes.**
(25)     Q    Algarin testified that he was

(1)             Sergeant J. Rudolph
(2)    affirmatively trained to backtrack through
(3)    residential properties following the conclusion
(4)    of a hot pursuit, were you also trained to do
(5)    that type of backtracking?
(6)             **MS. JONES:  Objection.**
(7)        **A    Yes, but again under the circumstances**
(8)    **of this which it should be noted that because of**
(9)    **the possibility of weapons in this job for the**
(10)   **VICE activity we would send somebody through a**
(11)   **yard on the flight path to ensure that there is**
(12)   **not a weapon that may have been discarded that**
(13)   **may pose a risk to the public or other people in**
(14)   **that area.**
(15)        Q    So that is the policy of the RPD after
(16)   the conclusion of a chase, of a foot chase, you
(17)   send somebody back along the path of that foot
(18)   chase to look for any possible weapons or drugs
(19)   that may have been discarded even if none of the
(20)   officers actually saw any guns or weapons
(21)   actually be discarded?
(22)            **MS. JONES:  Objection.**
(23)       **A    The policy is not so finite as to**
(24)   **that, it is always situationally depended upon**
(25)   **the facts of the case at that time.**

(1)           Sergeant J. Rudolph
(2)           So no, there is not a hard written
(3)   rule to go through a backyard every single time
(4)   but if there are other things that are presented
(5)   here and mentioned of weapons then yes, we would
(6)   send somebody down the path, the flight path, of
(7)   which the person ran.
(8)       Q    In here where was the mention of
(9)   weapons?
(10)      A    Correct.
(11)      Q    Where was the mention of weapons?
(12)      A    In this case here?
(13)           I am trying to understand what you're
(14)  asking, sir.
(15)      Q    You just told me that in this case the
(16)  reason that they backtracked was because of the
(17)  possibility of weapons; right?
(18)      A    Correct.
(19)      Q    Where did that possibility of weapons
(20)  come from?
(21)      A    From the initial call about drug sales
(22)  and the possibility of weapons.
(23)      Q    So you're saying that the 9-1-1 caller
(24)  said that there was a possibility of weapons?
(25)           MS. JONES:   Objection.

```
(1)                    Sergeant J. Rudolph
(2)     assuming that the answer is the same, no?
(3)              MS. JONES:    Objection.
(4)         A     You're asking me if anybody on this
(5)     list if I have spoken to them about viewing the
(6)     camera, that is what you're asking?
(7)         Q     Let me withdraw that really bad
(8)     question.  Let's take it step by step.
(9)               Have you ever spoken with any in PSS
(10)    only about the body-worn camera video?
(11)             MS. JONES:    Objection.
(12)        A     Not to my recollection.
(13)        Q     Have you ever spoken with any
(14)    supervisors or anyone above you in the chain of
(15)    command about the incident?
(16)        A     About the incident, I can't recall.
(17)              Again, chain of command that day was
(18)    Lieutenant Person as the commanding officer for
(19)    the City.  So yes, I spoke to him to answer your
(20)    question correctly, I spoken to him about the
(21)    incident as that was the proper notification.
(22)        Q     But other than Lieutenant Person you
(23)    don't recall speaking to anybody above you in the
(24)    chain of command about the incident?
(25)             MS. JONES:    Correct.
```

```
(1)                    Sergeant J. Rudolph
(2)       A     Correct, not that I can recall.
(3)       Q     Officer Algarin testified that he was
(4)  never disciplined or required to undergo any
(5)  additional training as a result of the incident;
(6)  is that your understanding also?
(7)             MS. JONES:   Objection.
(8)       A     To the best of my recollection I don't
(9)  recall him getting any additional training.
(10)      Q     As his direct supervisor that is
(11) something that you would have been aware of;
(12) correct?
(13)            MS. JONES:   Objection.
(14)      A     Yes.
(15)      Q     So if the incident was reviewed by
(16) supervisors and PSS and he was never disciplined
(17) or required to undergo any additional training
(18) that would mean that the supervisors in PSS
(19) determined that his actions were lawful and
(20) appropriate and complied with RPD policies and
(21) procedures?
(22)            MS. JONES:   Objection.
(23)      A     I don't know the exact routing of how
(24) they handle and what they do with every single
(25) case once they review it.
```

(1) **Sergeant J. Rudolph**
(2) **If there is anything that gets**
(3) **directed back my way to either further look at or**
(4) **provide additional training to then I would be**
(5) **notified and in this case I do not recall that.**
(6)     Q    If they had determined, if someone had
(7) determined that his actions were either unlawful
(8) or violated RPD's policy that is something that
(9) you would have been notified of; correct?
(10)           **MS. JONES:**   **Objection.**
(11)     **A**    **Not every time. Again, within our**
(12) **professional standard section there are a couple**
(13) **of avenues in which they can go down on a case by**
(14) **case basis as far as what they want to do.**
(15)           **There are a few instances where it**
(16) **could come my way but there is also instances**
(17) **where I would not be notified.**
(18)     Q    So if Officer Algarin said that he was
(19) never notified by PSS and if your testimony is
(20) that you don't remember ever being notified that
(21) anyone found his actions to be in violation of
(22) any policy or rule then that would mean that the
(23) supervisors that reviewed the incident and PSS
(24) didn't find that he violated any policies of the
(25) RPD; is that fair to say?

(1)              Sergeant J. Rudolph
(2)         **MS. JONES:   Objection.**
(3)      **A    Again, I can't speak to the**
(4) **conversations or the stuff that PSS produces and**
(5) **if what ever Officer Algarin told you that is if**
(6) **he said he heard nothing and you say that then**
(7) **that is what happened then.**
(8)      Q    Basically I guess just to make sure I
(9) understand everything, and I will take this down,
(10) if PSS finds an officer violated a policy there
(11) is a notification process; right, he would have
(12) been notified?
(13)         **MS. JONES:   Objection.**
(14)      **A    In most cases I would say yes, he**
(15) **would be notified.**
(16)      Q    Are there exceptions to that?
(17)      **A    Again, not knowing every single avenue**
(18) **because I never worked in PSS, not knowing every**
(19) **single approach they take I can't answer that and**
(20) **say absolutely no.**
(21)      Q    In this instance part of that review
(22) that was done by you --
(23)         Withdrawn.
(24)         Do you know if PSS and/or any other
(25) supervisors reviewed the portion of the incident

(1)              Sergeant J. Rudolph
(2) where Officer Algarin backtracked through Mr.
(3) Dempsey's backyard?
(4)     **A    I can't speak to the other reviews**
(5) **that would have happened.**
(6)     Q    But that was part of your review?
(7)     **A    My review of the situation, yes, as**
(8) **outlined in the Incident Report.**
(9)     Q    We discussed earlier that RPD policy
(10) and training requires in circumstances like this
(11) that officers backtrack through the backyards
(12) after a suspect has been detained to look for
(13) potentially guns or contraband that has been
(14) discarded?
(15)         **MS. JONES:   Objection.**
(16)    **A    There is not policy that says every**
(17) **single time you backtrack through a backyard. We**
(18) **have to take in totality of the circumstances**
(19) **surrounding the incident.**
(20)    Q    So it would be more like the practice
(21) that the RPD has is when you consider the
(22) totality of the circumstances based on your
(23) experience in the field you backtrack under
(24) certain circumstances to check for any discarded
(25) guns or weapons?

```
(1)                 Sergeant J. Rudolph
(2)        A     On a case by case basis.
(3)        Q     Does RPD policy and training require
(4)   officers to try to get consent of the homeowner
(5)   prior to entering their property?
(6)        A     Before entering a property there are
(7)   exceptions to as far as like a search warrant and
(8)   you're getting consent or things of that nature
(9)   but in this situation again them backtracking to
(10)  ensure there are no weapons in that immediate
(11)  path is the reasoning for the backtracking.
(12)       Q     Does RPD policy otherwise require
(13)  officers to warn the homeowner prior to entering
(14)  their property as part of their backtracking?
(15)       A     There is nothing that outlines that
(16)  specifically.
(17)       Q     Are there any general orders or other
(18)  written policies that provide guidance to
(19)  officers as to when backtracking through the
(20)  curtilage to a property is permissible?
(21)       A     We would follow just the general order
(22)  and investigations basically falling into the
(23)  realm of search warrant requirements and things
(24)  of that nature.
(25)       Q     So the rule is about searches?
```

(1)                     Sergeant J. Rudolph

(2)      **A**     **Yes, in the general orders, yes,**

(3) **searches, search warrants that I don't have the**

(4) **general order off the top of my head but it is**

(5) **outlined in the investigation section.**

(6)      Q     Are you aware that on the date of the

(7) incident Algarin, Gorman, Horowitz and DiSabatino

(8) had made a plan to chase the suspected drug

(9) dealers through the residential backyards?

(10)            **MS. JONES:**    **Objection.**

(11)      **A**     **I don't know of any plan.**

(12)      Q     So basically all of them testified,

(13) well I didn't take DiSabatino's deposition,

(14) anyway, every officer that testified talked about

(15) how they had devised a plan where Officer Algarin

(16) and Officer DiSabatino drove up on Kosciusko

(17) Street and Officer Gorman and Horowitz waited

(18) behind the vacant lot on Sobieski Street because

(19) of their prior knowledge and interactions with

(20) people who were suspected drug dealers on the

(21) street running through the backyards.  And so

(22) after they got the 9-1-1 call they said alright,

(23) Algarin and DiSabatino, we are going to come up

(24) on Kosciusko, Gorman and Horowitz are going to

(25) wait on Sobieski expecting the suspected drug

(1)              Sergeant J. Rudolph
(2)    dealers to run through those yards so that they
(3)    can be detained, were you ever made aware that
(4)    they had devised that plan prior to responding to
(5)    the 9-1-1 call?
(6)         A     Not that I can recall.
(7)         Q     Is there any specific RPD general
(8)    order that deals with entering the curtilage to a
(9)    property?
(10)              MS. JONES:   Objection.
(11)        A     Again, that would be as we have
(12)   situations come up, right, and you reflect that
(13)   from what were generally is outlined in that
(14)   search warrants section and searches and that
(15)   section of the GO.
(16)        Q     If a misdemeanor suspect flees into
(17)   the curtilage of private property are officers
(18)   allowed to chase them on to that private
(19)   property?
(20)        A     A misdemeanor suspect you said flees
(21)   into a property?
(22)        Q     Correct.
(23)              MS. JONES:   Objection.
(24)        A     As in the outside or are you talking
(25)   about go into a house?