C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -
ERIN GURSSLIN,

            Plaintiff,

                          Civil Action No. 20-cv-6508

v.

THE CITY OF ROCHESTER, a municipal entity, POLICE
OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA
KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON
SPRINGER,

            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - -

Video-recorded Deposition Upon Oral Examination of:

                  Officer Jonathan P. Laureano

Location:      Alliance Court Reporting, Inc.
               109 South Union Street, Suite 400
               Rochester, New York  14607

Date:          February 27, 2023

Time:          10:00 a.m.

Reported By:   KIMBERLY A. BONSIGNORE

               Alliance Court Reporting, Inc.

               109 South Union Street, Suite 400

               Rochester, New York  14607



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 A P P E A R A N C E S
 2   Appearing Remotely on Behalf of Plaintiff:
 3   Elliot D. Shields, Esq.
 4       Roth & Roth LLP
 5       192 Lexington Avenue, Suite 802
 6       New York, New York  10016
 7       eshields@rothandrothlaw.com
 8
 9   Appearing on Behalf of Defendants:
10   Peachie L. Jones, Esq.
11       City of Rochester Law Department
12       City Hall, Room 400A
13       30 Church Street
14       Rochester, New York  14614
15       peachie.jones@cityofrochester.gov
16
17   Also Present:
18   Kenneth Williamson, Videographer
19       Alliance Court Reporting, Inc.
20       109 South Union Street, Suite 400
21       Rochester, New York  14607
22
23                     *      *      *
24
25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

```
 1              S T I P U L A T I O N S
 2    MONDAY, FEBRUARY 27, 2023;
 3              (Proceedings in the above-titled matter
 4              commencing at 10:40 a.m.)
 5                      *     *     *
 6              IT IS HEREBY STIPULATED by and between the
 7    attorneys for the respective parties that this
 8    deposition may be taken by the Plaintiff at this time
 9    pursuant to notice;
10              IT IS FURTHER STIPULATED, that all
11    objections except as to the form of the questions and
12    responsiveness of the answers, be reserved until the
13    time of the trial;
14              IT IS FURTHER STIPULATED, that pursuant to
15    Federal Rules of Civil Procedure 30(e)(1) the witness
16    requests to review the transcript and make any
17    corrections to same before any Notary Public;
18              IT IS FURTHER STIPULATED, that if the
19    original deposition has not been duly signed by the
20    witness and returned to the attorney taking the
21    deposition by the time of trial or any hearing in this
22    cause, a certified transcript of the deposition may be
23    used as though it were the original;
24              IT IS FURTHER STIPULATED, that the
25    attorneys for the parties are individually responsible
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

4

```
 1              P R O C E E D I N G S
 2   for their certified transcript charge, including any
 3   expedite or other related production charges in
 4   accordance with Rochester Rules;
 5              AND IT IS FURTHER STIPULATED, that the
 6   Notary Public, KIMBERLY A. BONSIGNORE, may administer
 7   the oath to the witness.
 8                   *       *       *
 9              THE VIDEOGRAPHER:  We are on the record.
10              The time is 10:40 a.m., on Monday,
11   February 27, 2023.
12              My name is Ken Williamson for Alliance
13   Court Reporting located at 109 South Union Street,
14   Rochester, New York.
15              We are located today at Alliance Court
16   Reporting.  The deponent is here, and we do have an
17   attorney on Zoom, so it is a hybrid deposition.
18              We are about to begin the video-recorded
19   deposition of Officer Jonathan Laureano, in the matter
20   of Erin Gursslin, plaintiff, versus the City of
21   Rochester, a municipal entity, Police Officer Jeremy
22   Nellist, Police Officer Joshua Kelly, Commander Fabian
23   Rivera, and Lieutenant Aaron Springer, defendants.
24              Today's matter is being videotaped on
25   behalf of the plaintiff.
```

The time stamps appearing in the left margin are:
10:39:36 (line 8), 10:39:36 (line 9), 10:39:45 (line 10), 10:39:50 (line 11), 10:39:53 (line 12), 10:39:56 (line 13), 10:39:59 (line 14), 10:39:59 (line 15), 10:40:07 (line 16), 10:40:10 (line 17), 10:40:15 (line 18), 10:40:17 (line 19), 10:40:23 (line 20), 10:40:25 (line 21), 10:40:29 (line 22), 10:40:34 (line 23), 10:40:36 (line 24), 10:40:40 (line 25).



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|          | 1  | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|----------|----|-----------------------------------------------|
| 11:04:46 | 2  | to put ourselves or the public in danger. |
| 11:04:49 | 3  | Q.  And you're never allowed to make a choice |
| 11:04:53 | 4  | that would unnecessarily endanger yourself or the |
| 11:04:57 | 5  | public; correct? |
| 11:04:59 | 6  | MS. JONES:  Objection. |
| 11:04:59 | 7  | A.  No.  I would say that's incorrect.  I |
| 11:05:05 | 8  | mean, we're forced into -- difficult decisions like |
| 11:05:06 | 9  | that I would say just comes with our line of work. |
| 11:05:10 | 10 | Q.  Okay.  So when are you allowed to |
| 11:05:13 | 11 | unnecessarily make a choice that would endanger |
| 11:05:20 | 12 | yourself or the public? |
| 11:05:21 | 13 | A.  Well, not the public, but myself.  I guess |
|          | 14 | if we could isolate that and break that down a little |
| 11:05:26 | 15 | bit, myself, I would have to make a choice over my |
| 11:05:28 | 16 | well-being versus, for example, somebody in the |
| 11:05:31 | 17 | public. |
| 11:05:31 | 18 | Like my safety doesn't matter if there's |
| 11:05:33 | 19 | an innocent life, potentially, that could be harmed. |
| 11:05:37 | 20 | I would have to disregard my own personal safety or |
| 11:05:40 | 21 | the safety of my partner because we're obligated to |
| 11:05:44 | 22 | preserve life and property. |
| 11:05:46 | 23 | Q.  Okay.  So sometimes, as a police officer, |
| 11:05:51 | 24 | you have to make a choice that might put yourself in |
| 11:05:54 | 25 | danger; correct? |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

| | | |
|---|---|---|
| | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
| 11:05:56 | 2 | MS. JONES:  Objection. |
| 11:05:57 | 3 | A.  Yes. |
| 11:05:57 | 4 | Q.  But you're not allowed to make a choice |
| 11:05:59 | 5 | that would unnecessarily put the public in danger; |
| 11:06:03 | 6 | correct? |
| 11:06:04 | 7 | MS. JONES:  Objection. |
| 11:06:04 | 8 | A.  I mean, we would try to avoid that |
| 11:06:07 | 9 | absolutely at all costs.  I... |
| 11:06:09 | 10 | Q.  Okay.  I was just trying to break down |
| 11:06:11 | 11 | your answer to my question. |
| 11:06:14 | 12 | A.  Sure. |
| 11:06:14 | 13 | Q.  Okay.  And you're never allowed to use |
| 11:06:22 | 14 | deadly force unless you reasonably believe that your |
| 11:06:26 | 15 | life or the life of another person is in danger; |
| 11:06:30 | 16 | correct? |
| 11:06:30 | 17 | MS. JONES:  Objection. |
| 11:06:31 | 18 | A.  Yes. |
| 11:06:32 | 19 | Q.  How many times have you discharged your |
| 11:06:37 | 20 | firearm while performing your duties as an RPD |
| 11:06:40 | 21 | officer? |
| 11:06:40 | 22 | A.  Four. |
| 11:06:44 | 23 | Q.  Okay.  And how many of those times have |
| 11:06:50 | 24 | been at a dog? |
| 11:06:51 | 25 | A.  Four. |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

11:06:52   2          Q.   Okay.  I'm aware of the incident in 2015,

11:07:02   3   the incident in 2020, and the incident in 2021.  Was

11:07:08   4   there an additional incident?

11:07:10   5          A.   There were two.

11:07:10   6          Q.   I'm sorry.  There were two additional

11:07:13   7   incidents?

11:07:13   8          A.   Outside of what you just said, yes.

11:07:15   9          Q.   Okay.  What are the other two incidents?

11:07:18   10          A.   The other two were sometime between, I'd

11:07:23   11   say, 2011 and 2014.  I can't give you the exact month,

11:07:28   12   but it was in that time frame.

11:07:30   13          Q.   Okay.  I'm sorry.  Are you saying that the

11:07:34   14   first one was sometime between 2011 and 2014, or --

11:07:39   15          A.   I'm saying the two that you're unaware of

11:07:41   16   were -- those occurred in that time window.

11:07:44   17          Q.   One was in 2011 and one was in 2014, or

11:07:49   18   both were sometime in that time period?

11:07:51   19          A.   Correct, the second.

11:07:52   20          Q.   Okay.  Tell me everything you remember

11:07:54   21   about the first incident.

11:07:56   22          A.   There were -- we stepped out with a

11:08:00   23   suspicious on I believe it was Harris Street, and

11:08:06   24   before I could really do any type of investigation

11:08:12   25   into what we were looking into, an individual and my



ALLIANCE
COURT REPORTING, INC.

Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1    OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

11:08:16  2   partner -- an individual started backpedaling up a

11:08:20  3   driveway, my partner jumped over a fence, and I turned

11:08:24  4   around and there were two aggressive dogs that were on

11:08:27  5   the sidewalk rapidly approaching me.

11:08:29  6        Q.  Okay.  What happened next?

11:08:33  7        A.  I discharged one round directly at the

11:08:38  8   dogs, and it landed directly in between two of them,

11:08:42  9   and they -- that startled them and they ran away.

11:08:47  10       Q.  So on that incident, the shot that you

11:08:50  11  fired did not strike either of the dogs?

11:08:53  12       A.  No, sir.

11:08:54  13       Q.  Okay.  After that incident, was it

11:09:00  14  reviewed by your supervisor?

11:09:03  15       A.  We --

11:09:03  16       MS. JONES:  Objection.

11:09:04  17       A.  Our supervisor responded to the scene to

11:09:08  18  ask what happened, so I briefed him.  And after that,

11:09:13  19  I returned to my duties.

11:09:19  20       Q.  Okay.  Did PSS review that incident?

11:09:22  21       A.  I can't say, but I'm sure that report was

11:09:28  22  forwarded to the proper individuals, but I did not

11:09:33  23  hear from PSS regarding that incident.

11:09:36  24       Q.  Okay.  So no one from PSS ever reached out

11:09:40  25  to you to ask you about what happened?



1    OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

11:09:42   2         MS. JONES:  Objection.

11:09:43   3    A.  No, sir.

11:09:43   4    Q.  Okay.  Did you ever write any notes or

11:09:48   5  reports regarding that incident?

11:09:49   6    A.  No, sir.  Reporting would be done by a

11:09:56   7  supervisor.

11:09:58   8    Q.  And I just want to back up to your

11:10:02   9  beginning of the description.

11:10:04   10        You said that you were on Harris Street

11:10:06   11  and you had stepped out to talk to someone; is that

11:10:09   12  right?

11:10:09   13    A.  Yes, sir.

11:10:10   14    Q.  When you say you stepped out to talk with

11:10:12   15  someone, does that mean you were in your car and you

11:10:15   16  got out to speak with somebody on the street?

11:10:18   17    A.  Yes, sir.

11:10:18   18    Q.  Okay.  And why did you get out to speak

11:10:21   19  with that person?

11:10:23   20    A.  Because there was -- there are certain

11:10:28   21  areas in the city that would be considered hotspot

11:10:31   22  areas.  That was a hotspot area, meaning that there

11:10:34   23  was a lot of crime that takes place, specifically

11:10:38   24  violent crime.  So I was addressing individuals in

11:10:42   25  that area.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

|  |  |
|---|---|
|  | 1 |

OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

11:10:42  2       Q.   Okay.  And do you remember what time of

11:10:44  3   day it was?

11:10:44  4       A.   I was working afternoon, so sometime

11:10:49  5   between 3 and 11.

11:10:51  6       Q.   And do you remember if it was light out or

11:10:56  7   not?

11:10:56  8       A.   It was light out, but I couldn't tell you

11:10:59  9   exactly what time it was.

11:11:00  10      Q.   Okay.  And you said one of the guys ran

11:11:07  11  into the property, and your partner ran after him; is

11:11:11  12  that right?

11:11:11  13          MS. JONES:  Objection.

11:11:11  14      A.   So the one individual starts backpedaling

11:11:16  15  just up the driveway, like he was -- he had a look

11:11:22  16  of -- I don't know -- fright and was backpedaling,

11:11:27  17  like he had seen a ghost.

11:11:30  18          And my partner proceeded to jump over a

11:11:32  19  fence, I believe, onto a different property, which --

11:11:34  20  you know, my back was turned to those dogs, so I had

11:11:37  21  no idea what they were trying to get out of the way of

11:11:40  22  at the time.

11:11:41  23      Q.   Okay.  Do you know what happened to the

11:11:45  24  individual that your partner was chasing?

11:11:48  25      A.   So he was jumping to get away from what I



|          | 1  | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|----------|----|
| 11:11:54 | 2  | hadn't seen that was behind me.  There was no actual |
| 11:11:58 | 3  | foot pursuit because, like I said, he was backpedaling |
| 11:12:02 | 4  | up the driveway to get away from something, not us. |
| 11:12:07 | 5  | Q.  Got it. |
| 11:12:08 | 6  | So basically the guy saw the dogs, started |
| 11:12:11 | 7  | backpedaling, and then your partner jumped the fence |
| 11:12:14 | 8  | to get away from the dogs too? |
| 11:12:16 | 9  | A.  Correct. |
| 11:12:16 | 10 | Q.  Got it. |
| 11:12:18 | 11 | And then you shot at the dogs, and they |
| 11:12:20 | 12 | ran away, and you didn't see them again? |
| 11:12:22 | 13 | A.  No, I didn't.  I think they ran like -- |
| 11:12:25 | 14 | they ran across the street, and then I lost track of |
| 11:12:28 | 15 | them.  I'm not sure if Animal Control was able to |
| 11:12:33 | 16 | locate them. |
| 11:12:33 | 17 | Q.  Okay.  Was that after you were done with |
| 11:12:36 | 18 | your field training? |
| 11:12:37 | 19 | A.  Yes. |
| 11:12:41 | 20 | Q.  Okay.  All right.  And were you ever told |
| 11:12:52 | 21 | that anything you did during that incident was |
| 11:12:56 | 22 | inconsistent with RPD policy or training? |
| 11:12:58 | 23 | A.  No. |
| 11:12:59 | 24 | Q.  Okay.  Did you have pepper spray on you at |
| 11:13:04 | 25 | the time? |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1        OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

11:13:04   2           A.   Yes.

11:13:04   3           Q.   Did you consider using your pepper spray

11:13:10   4   instead of your firearm?

11:13:11   5           A.   No.

11:13:11   6           Q.   Did you have any other tools at your

11:13:15   7   disposal, like a baton?

11:13:17   8           A.   Yes.

11:13:19   9           Q.   Did you consider using your baton instead

11:13:24  10   of your firearm?

11:13:24  11           A.   No.

11:13:25  12           Q.   Okay.  Did you have any other nonlethal

11:13:34  13   options at your disposal, like a Taser?

11:13:38  14           A.   No, I did not.

11:13:39  15           Q.   Okay.  No, you didn't have a Taser or, no,

11:13:43  16   you didn't have anything else?

11:13:44  17           A.   No notable.

11:13:47  18           Q.   Okay.  And can you tell me about the

11:13:53  19   second time you shot a dog?

11:13:54  20           MS. JONES:   Sorry.  Before we keep going,

21   Elliot, the subpoena that you issued for Officer

11:13:58  22   Laureano only said that you wanted him to testify

11:14:00  23   about SWAT incidents he was involved in in which a dog

11:14:04  24   was shot.  So this is not a SWAT incident because it

11:14:08  25   clearly preceded when he joined SWAT in 2020.



Confidential

33

|       | 1  | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|-------|----|-----|
| 11:14:13 | 2  | Do you intend to exceed the scope of your |
| 11:14:16 | 3  | subpoena? |
| 11:14:16 | 4  | MR. SHIELDS:  I can ask as many questions |
| 11:14:19 | 5  | as I want, Peachie. |
|       | 6  | Q.  Okay.  Can you tell me about the second |
| 11:14:23 | 7  | time you shot a dog, please? |
| 11:14:23 | 8  | MS. JONES:  Because you don't -- hold on. |
| 11:14:25 | 9  | So I'm just going to note for the record that you are |
| 11:14:27 | 10 | exceeding the scope of your subpoena. |
| 11:14:29 | 11 | These other SWAT incidents, I guess, I'll |
| 11:14:32 | 12 | let us put on the record because it does kind of apply |
| 11:14:35 | 13 | to this case.  But if we go too far afield of this, |
| 11:14:38 | 14 | I'm going to object and instruct him not to answer. |
| 11:14:41 | 15 | MR. SHIELDS:  First of all, how am I |
| 11:14:43 | 16 | supposed to know about these other incidents when you |
| 11:14:44 | 17 | never produced any records about these incidents?  I |
| 11:14:47 | 18 | can ask him any questions I want about anything that's |
| 11:14:49 | 19 | relevant in the lawsuit.  That's the rules for the |
| 11:14:51 | 20 | deposition. |
| 11:14:52 | 21 | MS. JONES:  No.  No.  It's supposed to be |
| 11:14:53 | 22 | described in the subpoena. |
| 11:14:54 | 23 | MR. SHIELDS:  It's incorrect. |
| 11:14:56 | 24 | MS. JONES:  Okay.  Well, I guess, we |
| 11:14:59 | 25 | disagree about that.  But, again, if we go too far |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1         OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

11:15:04   2   afield of the subpoena, I'm going to direct him not to

11:15:07   3   answer.

11:15:07   4         MR. SHIELDS:  Peachie, I'm asking him

11:15:10   5   questions directly related to the claims and defenses

11:15:12   6   in the lawsuit.  You never told me about these two

11:15:14   7   other incidents.  I obviously have the ability to ask

11:15:16   8   him about these two other incidents.

11:15:18   9         MS. JONES:  They occurred in 2011 and

11:15:21   10  2014.  That's far outside of the scope of your

11:15:24   11  Molineux.

11:15:24   12        MR. SHIELDS:  I'm sorry.  That just shows

11:15:25   13  that you have no clue about the law in Molineux.

11:15:29   14        MS. JONES:  There is no need to have

15  personal attacks here, Elliot.  Okay?  I'm just

11:15:32   16  stating you're far afield of the description in your

11:15:34   17  subpoena.

18        MR. SHIELDS:  Okay.

11:15:34   19        MS. JONES:  So I ask that you keep it to

11:15:36   20  your subpoena.

11:15:36   21        MR. SHIELDS:  I understand your objection.

11:15:38   22  Let me just ask my questions so we can finish the

11:15:39   23  deposition.  It started late today.  Okay?

11:15:42   24        Q.  All right.  Officer Laureano, can you

11:15:46   25  please tell me about the second time that you shot a



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS             |
| 11:15:48 | 2  | dog.                                                     |
| 11:15:48 | 3  | A.  The second incident, again, occurred in             |
| 11:15:55 | 4  | that time frame that I've already stated.  And it was   |
| 11:15:58 | 5  | an aggressive dog that was behind, I believe -- was     |
| 11:16:05 | 6  | either a vacant house, or maybe a half-vacant           |
| 11:16:09 | 7  | structure, and was -- I had received numerous 911       |
| 11:16:14 | 8  | calls.                                                  |
| 11:16:16 | 9  | So I went there, and Animal Control met                 |
| 11:16:18 | 10 | us, and just -- Animal Control was trying to do their   |
| 11:16:22 | 11 | thing.  The dog became aggressive and charged Animal    |
| 11:16:29 | 12 | Control.  I don't remember the particular individual    |
| 11:16:29 | 13 | who was -- who responded from Animal Control.  But      |
| 11:16:33 | 14 | they became aggressive, charged the handler, and I      |
| 11:16:36 | 15 | discharged one round.  Actually, I discharge two        |
| 11:16:40 | 16 | rounds in the direction of the dog.                     |
| 11:16:45 | 17 | And the dog was unharmed.  The rounds                   |
| 11:16:52 | 18 | struck a safe backstop, and it scared the dog enough    |
| 11:16:56 | 19 | to run back behind the house to not continue to charge  |
| 11:16:59 | 20 | aggressively.  And it ran towards two other officers    |
| 11:17:03 | 21 | where, I believe, a Taser was deployed, and it was      |
| 11:17:07 | 22 | successful.                                             |
| 11:17:11 | 23 | Q.  Okay.  So it was a vacant house.  You               |
| 11:17:20 | 24 | showed up.  The dog ran at you.  That was outside of    |
| 11:17:24 | 25 | the house?                                              |



1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

11:17:26   2          A.  Right.  So when we get a call for any

11:17:29   3   aggressive dog or loose dog, it's -- we're never going

11:17:32   4   to get a call for a dog that's, you know, on the

11:17:34   5   property where it's supposed to be.

11:17:37   6          Q.  Okay.  Before you went to the house, did

11:17:40   7   you call Animal Control?

11:17:41   8          A.  Yes.

11:17:42   9          Q.  And did Animal Control come to the house

11:17:47  10   too?

11:17:47  11          A.  Yes, sir.

11:17:48  12          Q.  Were they there when you shot the dog

11:17:51  13   or -- or shot at the dog?

11:17:53  14          A.  Right.  The reason I discharged my firearm

11:17:57  15   is because it was aggressively charging at the

11:17:59  16   individual who had responded from Animal Control.

11:18:02  17          Q.  Okay.  So you missed the dog.  It ran

11:18:06  18   away.  It ran at another officer, who shot a Taser at

11:18:10  19   it, and that was successful?

11:18:12  20          A.  Right.  It ran up against a fence it was

11:18:14  21   trying to navigate over, where the officer had a

11:18:19  22   little bit of a height advantage, and was able to

11:18:22  23   deploy a Taser with some cover.

11:18:24  24          Q.  Okay.  So the officer was on the other

11:18:26  25   side of the fence.  Is that what you're saying?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

37

|  |  |  |
|--|--|--|
| | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
| 11:18:28 | 2 | A.  Right. |
| 11:18:30 | 3 | Q.  And do you know who that other officer |
| 11:18:33 | 4 | was? |
| 11:18:33 | 5 | A.  Yes. |
| 11:18:34 | 6 | Q.  Who was that? |
| 11:18:35 | 7 | A.  Officer Thomas Lisle. |
| 11:18:54 | 8 | Q.  Okay.  Now, could this be the incident, |
| 11:18:58 | 9 | that you're talking about, in 2015? |
| 11:19:00 | 10 | MS. JONES:  Objection. |
| 11:19:03 | 11 | A.  Yeah.  I mean, I don't know the exact year |
| 11:19:11 | 12 | it happened.  It was sometime between, I would say, |
| 11:19:12 | 13 | the time frame I gave you.  If it went maybe a year |
| 11:19:17 | 14 | past, maybe 2011 to 2015, perhaps it may fall within |
| 11:19:21 | 15 | that window. |
| 11:19:22 | 16 | Q.  Okay.  So let me just back up. |
| 11:19:25 | 17 | You said that there were a total of four |
| 11:19:29 | 18 | times; right?  Four different incidents where you |
| 11:19:33 | 19 | discharge a firearm at a dog? |
| 11:19:35 | 20 | A.  Four -- |
| | 21 | Q.  Okay. |
| 11:19:35 | 22 | A.  -- correct. |
| 11:19:35 | 23 | Q.  That would make sense because I said that |
| 11:19:39 | 24 | I was aware of three of them. |
| 11:19:41 | 25 | MR. SHIELDS:  And so let me just, for the |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

38

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  |     OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS       |
| 11:19:42 | 2  | record, put up this incident report that's Bates -- I |
| 11:19:45 | 3  | mean, that's CR2015-00075296, that's Bates-numbered |
| 11:19:59 | 4  | COR DEM 03142, and this will be Exhibit 1 for this |
| 11:20:08 | 5  | deposition. |
|       | 6  |          (The following exhibit was marked for |
|       | 7  |          identification:  Number EXH 1.) |
| 11:20:16 | 8  |     Q.  Okay.  Officer, on your screen, can you |
| 11:20:18 | 9  | see this incident report with that CR number I just |
| 11:20:23 | 10 | read, report date 4/1/2015, and the incident address |
| 11:20:31 | 11 | was 72 Council Street? |
| 11:20:34 | 12 |     A.  Yes. |
| 11:20:34 | 13 |     Q.  Okay.  Is that big enough for you to read |
| 11:20:39 | 14 | it on your screen? |
| 11:20:40 | 15 |     A.  It is. |
| 11:20:41 | 16 |     Q.  Okay.  So I'm just going to fast-forward |
| 11:20:43 | 17 | to the Narrative section on the third page.  I'm going |
| 11:20:46 | 18 | to ask you to read that over, and then let me know |
| 11:20:49 | 19 | when you're done reading it. |
| 11:21:14 | 20 |     A.  Yep. |
| 11:21:17 | 21 |     Q.  Okay.  So does this report refresh your |
| 11:21:21 | 22 | recollection of whether or not this was the second |
| 11:21:25 | 23 | incident that you were testifying about? |
| 11:21:28 | 24 |     A.  Yes. |
| 11:21:29 | 25 |     Q.  Okay.  And is it in fact that second |



1      OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

11:21:34   2    incident that you were testifying about?

11:21:35   3          A.  Yes, sir.

11:21:37   4          Q.  Okay.  So you didn't strike the dog, but

11:21:47   5    the other officer hit it with the Taser, Officer

11:21:52   6    Lisle, and that was effective; correct?

11:21:55   7              MS. JONES:  Objection.

11:21:59   8          A.  Yes, that was a successful deployment of

11:22:03   9    the Taser.

11:22:04   10         Q.  Okay.  And so would that indicate to you

11:22:06   11   that it was unnecessary for you to have fired your

11:22:10   12   gun?

11:22:12   13         A.  No.

11:22:13   14         Q.  Okay.  Why was it necessary for you to

11:22:16   15   fire your gun?

11:22:18   16         A.  Because we were on two different sides of

11:22:20   17   the house.  Officer Lisle could not be two places at

11:22:25   18   once, and Officer Lisle had deadly force coverage with

19   Officer Goodfriend.

11:22:27   20              So if the Taser deployment were to fail,

11:22:29   21   there was an immediate end to what would have been the

11:22:38   22   aggressive dog -- or the threat with deadly force

11:22:40   23   coverage.  So if it failed, and the dog was still able

11:22:40   24   to try to navigate over the fence, then Officer

11:22:42   25   Goodfriend would have discharged his weapon.



ALLIANCE
COURT REPORTING, INC.

Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

40

|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |

11:22:45  2    Q.   Okay.  And did you have any less-lethal

11:22:49  3  options on your person at the time that you discharge

11:22:54  4  your firearm?

11:22:54  5    A.   Yes.

11:22:55  6    Q.   Okay.  What were those less-lethal options

11:22:58  7  that you had on your person?

11:22:59  8    A.   I had my OC spray and my baton.

11:23:07  9    Q.   Okay.  And so you chose to use the firearm

11:23:12  10  instead of the OC or the baton?

11:23:15  11    A.   I did because I did not have anybody to

11:23:17  12  provide me with any deadly coverage.  I was the only

11:23:21  13  officer on that side of the house, where there were

11:23:24  14  two other officers on the other side of the house,

11:23:27  15  which would essentially be the fourth side.

11:23:28  16        So I was on the 2 side of the house, and I

11:23:31  17  was covering the individual from Animal Control who

11:23:37  18  had responded.  So he didn't have anybody with him.  I

11:23:41  19  was the only one that was covering him and protecting

11:23:43  20  him.

11:23:43  21    Q.   Okay.  And when the dog charged and you

11:23:49  22  discharged your firearm, were you afraid?

11:23:51  23    A.   No.

11:23:52  24    Q.   You were not afraid?

11:23:53  25    A.   No, I was not afraid.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

41

|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
| 11:23:56 | 2 | MS. JONES:  Objection. |
| 11:23:58 | 3 | Q.  When the dog charged, did you believe it |
| 11:24:01 | 4 | was an imminent threat to you or to someone else? |
| 11:24:05 | 5 | A.  I believed that the -- yes, I believed at |
| 11:24:10 | 6 | the time it was an imminent danger.  And it was a |
| 11:24:14 | 7 | threat to not only myself, but more importantly the |
| 11:24:16 | 8 | individual who I was covering, which was the Animal |
| 11:24:18 | 9 | Control operator.  So that was my biggest priority at |
| 11:24:21 | 10 | that moment. |
| 11:24:22 | 11 | Q.  Did the Animal Control operator have a |
| 11:24:25 | 12 | catch pole? |
| 11:24:26 | 13 | A.  Yes. |
| 11:24:27 | 14 | Q.  Okay.  Did he ever try to use the catch |
| 11:24:31 | 15 | pole? |
| 11:24:31 | 16 | A.  He was attempting to.  I believe he was in |
| 11:24:34 | 17 | the process of preparing it and prepping it, as he was |
| 11:24:37 | 18 | walking up, and that's when the officer began to |
| 11:24:40 | 19 | charge aggressively at the Animal Control operator. |
| 11:24:44 | 20 | Q.  The dog charged, you mean?  I'm sorry.  I |
| 11:24:47 | 21 | think you said officer. |
| 11:24:48 | 22 | A.  Oh, did I say "officer"?  Oh, dog.  Yeah, |
| 11:24:53 | 23 | I meant the dog.  Yep. |
| 11:24:55 | 24 | Q.  What did the Animal Control officer do |
| 11:25:00 | 25 | after you discharge your firearm? |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1    OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

11:25:02   2    A.  He just remained there to see what the dog

11:25:07   3  would do next with me.

11:25:10   4    Q.  Did he indicate that he was fearful that

11:25:15   5  the dog was going to attack him before you discharge

11:25:18   6  your firearm?

11:25:19   7    A.  No, he did not specifically say "I'm

11:25:22   8  fearful."  But --

11:25:23   9    Q.  Okay.

11:25:24  10    A.  -- it was one of those

11:25:28  11  you-can-read-the-room-type scenarios, where he was

11:25:30  12  clearly caught off guard and was not prepared for, in

11:25:34  13  that very moment, the dog to aggressively come as he

11:25:37  14  did.

11:25:37  15    Q.  Okay.  So you perceived the dog, based on

11:25:43  16  your training, to have been an imminent threat to you

11:25:48  17  or the Animal Control officer?

11:25:50  18    A.  Yes.

11:25:51  19    Q.  Okay.  And what training have you received

11:25:56  20  before that incident to determine whether or not the

11:25:59  21  dog is an imminent threat?

11:26:04  22    A.  It would probably be the training I

11:26:07  23  received from the academy and the rest of -- that

11:26:10  24  would be based on just the experiences leading up to

11:26:14  25  the many encounters with aggressive dogs leading up to



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

43

|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|---|---|---|
| 11:26:20 | 2 | that moment. |
| 11:26:21 | 3 | Q.  Okay.  Had you ever received specific |
| 11:26:24 | 4 | training about judging any objective factors that a |
| 11:26:32 | 5 | dog displays to determine whether what you perceive to |
| 11:26:38 | 6 | be a threat is an actual threat? |
| 11:26:40 | 7 | MS. JONES:  Objection. |
| 11:26:44 | 8 | A.  The department did training on that some |
| 11:26:49 | 9 | time ago. |
| 11:26:50 | 10 | Q.  Okay.  What do you remember from that |
| 11:26:52 | 11 | training? |
| 11:26:52 | 12 | A.  Some photos of aggressive dogs and just |
| 11:27:00 | 13 | more of a recognition on -- you know, things, again, |
| 11:27:05 | 14 | that we would already have been -- were already taught |
| 11:27:09 | 15 | about the growl -- you know, how they are as far as |
| 11:27:14 | 16 | posture or demeanor, like growling and like -- I don't |
| 11:27:25 | 17 | know -- lunging. |
| 11:27:25 | 18 | If you want to call it growling, like |
| 11:27:28 | 19 | lunging like when they snap their jaws.  There's |
| 11:27:30 | 20 | traits that are exhibited that are quite apparent when |
| 11:27:36 | 21 | a dog is not happy to see you, I'd say. |
| 11:27:41 | 22 | Q.  Okay.  If the traits are so apparent, what |
| 11:27:46 | 23 | was the point of the training? |
| 11:27:47 | 24 | MS. JONES:  Objection. |
| 11:27:48 | 25 | A.  I would say that there can never be too |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|          | 1  | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|----------|----|-----------------------------------------------|
| 11:27:52 | 2  | much training, and refreshers are always good. |
| 11:27:55 | 3  | Q.  Did the training help you to recognize |
| 11:27:59 | 4  | these signs of a dog's aggressiveness, aside from what |
| 11:28:09 | 5  | you've learned during your experience working in the |
| 11:28:09 | 6  | field as a police officer? |
| 11:28:10 | 7  | A.  I mean, I wouldn't say that it was |
| 11:28:12 | 8  | anything I hadn't heard before, but it was -- like I |
| 11:28:15 | 9  | said, served as a good reinforcement because there are |
| 11:28:19 | 10 | individuals who transfer, you know, go to |
| 11:28:21 | 11 | administrative positions who are off the road for some |
| 11:28:25 | 12 | time, and they come back to the road.  Sometimes |
| 11:28:27 | 13 | people forget things or lose things, and that's why |
| 11:28:32 | 14 | you have in-services. |
| 11:28:33 | 15 | Q.  Okay.  Did the training include anything |
| 11:28:35 | 16 | about how to avoid shooting a dog that you perceive to |
| 11:28:41 | 17 | be aggressive? |
| 11:28:41 | 18 | A.  I believe it did.  I don't recall |
| 11:28:43 | 19 | specifically what that was, but I don't believe it -- |
| 11:28:47 | 20 | I'm not sure if it deviated too much again from what |
| 11:28:49 | 21 | we were already taught about time, distance, and |
| 11:28:53 | 22 | cover. |
| 11:28:54 | 23 | Q.  Okay.  With any of the instances that you |
| 11:29:00 | 24 | shot at a dog, were you ever disciplined? |
| 11:29:05 | 25 | A.  No. |



Confidential

|  |  |  |
|--|--|--|
|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
| 11:29:05 | 2 | Q.  At any of the times where you discharge |
| 11:29:09 | 3 | your firearm at a dog, were you ever required to |
| 11:29:13 | 4 | receive any additional training? |
| 11:29:14 | 5 | A.  No. |
| 11:29:16 | 6 | Q.  Okay.  And, Officer Laureano, there's a |
| 11:29:29 | 7 | set of rules that RPD officers have to follow; right? |
| 11:29:32 | 8 | MS. JONES:  Objection. |
| 11:29:32 | 9 | A.  There are many rules, sir. |
| 11:29:34 | 10 | Q.  Okay.  What are the RPD's rules called? |
| 11:29:37 | 11 | MS. JONES:  Objection. |
| 11:29:38 | 12 | A.  Well, there's General Orders. |
| 11:29:40 | 13 | Q.  Okay.  Are there a different set of rules |
| 11:29:43 | 14 | for the SWAT team? |
| 11:29:45 | 15 | A.  General Orders still apply. |
| 11:29:47 | 16 | Q.  Okay.  Are there additional rules for the |
| 11:29:51 | 17 | SWAT team in addition to the General Orders? |
| 11:29:53 | 18 | A.  There are rules that are different for |
| 11:30:00 | 19 | operators on the team, depending on, you know, our |
| 11:30:05 | 20 | assignment.  But Article 35 still exists, General |
| 11:30:08 | 21 | Orders still exists, and they apply. |
| 11:30:11 | 22 | Q.  Okay.  So I guess I'm just trying to |
| 11:30:15 | 23 | figure out if there's a name for any specific SWAT |
| 11:30:18 | 24 | rules, like if there's, like, a General Order manual |
| 11:30:23 | 25 | for the SWAT team that's only specific to the SWAT |



1       OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

2   that would be silly.

11:56:15   3           We take them into custody and more

11:56:17   4   often -- most oftentimes, in the overwhelming majority

11:56:21   5   of the times, you can see it, whatever is discarded,

11:56:23   6   because it doesn't go far.  You can see it from

11:56:24   7   wherever you're standing.  It's plain view at that

11:56:27   8   point.

11:56:28   9           So we're not going to just be like, okay,

11:56:30  10   I'm going to get a search warrant for something I can

11:56:32  11   clearly see that doesn't belong to this person, that I

11:56:35  12   saw this person discard, or is with an article of

11:56:38  13   clothing that maybe that person had shed and wrapped

11:56:40  14   up something with and then, you know, dropped

11:56:43  15   somewhere along the way, and you can clearly see that

16   it's been recently discarded.

11:56:47  17           So, again, there is a fair degree of

11:56:49  18   common sense, and there's also the exception that I

11:56:53  19   would say falls under hot pursuit.  As a courtesy, I

11:56:56  20   will let the homeowner know why we're there, but I

11:56:59  21   will not stop to say do I have consent to take this

11:57:02  22   thing that I saw this person discard onto your

11:57:07  23   property or, you know, draft a search warrant for

11:57:09  24   discarded property.

11:57:11  25       Q.  Okay.  And can you explain the open fields



1        OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

11:57:18   2    exception?

11:57:18   3        A.   Sure.   If something's in plain view or

11:57:19   4    something's that open field.

11:57:22   5        Q.   I'm sorry.   I'm sorry.   Let me withdraw

11:57:24   6    that.

11:57:24   7        What I meant was "plain view" because

11:57:27   8    that's what you said; right?   The plain view of

11:57:28   9    something is in plain view.

11:57:29  10        A.   I did.   I took you to mean just that.   So

11:57:32  11    I mean, yes, plain view.

11:57:33  12        Q.   Okay.

11:57:35  13        A.   Plain view.   I'm walking down, conducting

11:57:37  14    directed patrol in a hotspot, for example, and I'm

11:57:42  15    walking by a car -- right? -- and the vehicle is

11:57:49  16    parked in a city street, and I look inside the vehicle

11:57:52  17    that's parked on a city street and can clearly see a

11:57:54  18    gun on the center console, just sitting there.   The

11:57:58  19    vehicle has no owner.   Let's say it's a rental car.

11:58:01  20    It comes back to an LLC, it comes back to Enterprise,

11:58:05  21    what have you, now we have a vehicle that is sitting

11:58:07  22    on a city street in a hotspot area that's known for

11:58:09  23    high crime, violent crime, and there's -- what you can

11:58:13  24    clearly see is a handgun on the center console.

11:58:17  25        I would wait and I would see, you know,



1      OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

11:58:17   2   who's coming back, who is the owner.  And if I can't

11:58:21   3   find the owner, I draft a search warrant for that

11:58:25   4   vehicle.  That's plain view.

11:58:26   5      Q.  I'm sorry.  I asked a bad question.  What

11:58:31   6   I'm really interested in is if you can explain how the

11:58:35   7   plain view exception would work in the context of

11:58:39   8   entering the curtilage to someone's property.

11:58:42   9      A.  I would say because of everything that we

11:58:46   10  have already gone over, it's something that happened

11:58:50   11  during the course of a, you know, foot pursuit, it was

11:58:55   12  an observation that was directly made by an officer,

11:59:00   13  and then verified.

11:59:02   14      So I can see that whatever it was that he

11:59:08   15  had he discarded, you know, whether he was taken into

11:59:10   16  custody or not, but, you know, most especially when

11:59:14   17  he's taken into custody, we're still going to -- we're

11:59:15   18  going to do a backtrack regardless.

11:59:16   19      We're going to walk back the path of

11:59:17   20  flight.  And if we see something in plain view,

11:59:20   21  something that was not moved or disturbed, wherever he

11:59:23   22  was last seen to have discarded whatever unknown

11:59:25   23  object, I'm not going to draft a search warrant.

11:59:28   24      It doesn't mean it's wrong to do that,

11:59:29   25  it's just an extra step that is unnecessary because it



ALLIANCE
COURT REPORTING, INC.

Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
| 11:59:32 | 2 | doesn't have to do with that property because we |
| 11:59:37 | 3 | weren't there for that property. |
| 11:59:38 | 4 | Does that make sense?  Am I explaining |
| 11:59:42 | 5 | that confusing -- |
| 11:59:43 | 6 | Q.  Yeah.  And I don't mean to interrupt you. |
| 11:59:43 | 7 | It does make sense.  I just had a couple of follow-up |
| 11:59:47 | 8 | questions there. |
| 11:59:47 | 9 | One, you said that you're going to do a |
| 11:59:50 | 10 | backtrack regardless; right? |
| 11:59:55 | 11 | MS. JONES:  Objection. |
| 11:59:57 | 12 | A.  If observations are made of -- |
| 11:59:59 | 13 | Q.  If observations are made of somebody, in a |
| 12:00:01 | 14 | foot pursuit, takes to jumping multiple fences into, |
| 12:00:04 | 15 | let's say, four backyards, you're going to jump |
| 12:00:08 | 16 | backyard, backyard, backyard, stop the guy; right? |
| 12:00:09 | 17 | And you're not sure if he discarded anything as he |
| 12:00:15 | 18 | jumped over the fences and went through four separate |
| 12:00:20 | 19 | backyards, you're going to backtrack through those |
| 12:00:24 | 20 | four yards; correct? |
| 12:00:27 | 21 | MS. JONES:  Objection. |
| 12:00:28 | 22 | A.  I would agree that if somebody is running |
| 12:00:32 | 23 | and fleeing unlawfully, and you don't see a discarded |
| 12:00:37 | 24 | item, but they were making, for example, some type of |
| 12:00:41 | 25 | overt or furtive movement, to retrieve unknown said |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

74

1        OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

12:00:45    2    item, but you didn't actually see what it was, then it

12:00:48    3    is not unreasonable to conduct a backtrack for

12:00:50    4    anything that's of evidentiary value.

12:00:52    5           Because more often than not people tend

12:00:56    6    not to just run for no reason, it's usually because of

12:00:59    7    a multitude of reasons, but one of those reasons being

12:01:05    8    that they don't want to be caught with whatever they

12:01:07    9    may have on their person.

12:01:09   10        Q.   Okay.  And so my question then is, the

12:01:16   11    Fourth Amendment applies to entering the curtilage to

12:01:20   12    those people's properties; correct?

12:01:22   13           MS. JONES:  Objection.

12:01:22   14        A.   I do not believe the Fourth Amendment

12:01:27   15    applies at that point because it's still an ongoing

12:01:28   16    investigation, and because hot pursuit applies, we're

12:01:33   17    not going any further outside of what we just did.

12:01:35   18           If I were to start taking some path that

12:01:37   19    grossly deviates from the path of that individual,

12:01:41   20    clearly has nothing to do with that investigation,

12:01:43   21    that would be separate than me just walking back the

12:01:46   22    way that I came, and just looking left and looking

12:01:50   23    right and scanning.

12:01:51   24           I'm not going to start opening doors and

12:01:53   25    doing things that maybe would -- I don't know if



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|  |  |  |
|---|---|---|
|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
| 12:01:55 | 2 | you're alluding to that as far as, like, looking in |
| 12:01:57 | 3 | and looking under and in between versus just simply |
| 12:02:03 | 4 | looking left, right, a quick scan.  Because if |
| 12:02:06 | 5 | anything is going to be discarded, it will be obvious. |
| 12:02:09 | 6 | Q.  So my question is, you've got to have a |
| 12:02:12 | 7 | lawful basis to enter the curtilage to their property; |
| 12:02:17 | 8 | correct? |
| 12:02:17 | 9 | MS. JONES:  Objection. |
| 12:02:18 | 10 | A.  If it's a search warrant -- for the |
| 12:02:22 | 11 | purposes of searching and seizing, you need a search |
| 12:02:26 | 12 | warrant if there's an investigation pertaining to that |
| 12:02:28 | 13 | property, if you have any inkling to the individuals, |
| 12:02:33 | 14 | the property owner or the individuals who reside at |
| 12:02:34 | 15 | that -- if there's something specifically directing |
| 12:02:37 | 16 | you there. |
| 12:02:37 | 17 | If it's just normal courses and the |
| 12:02:40 | 18 | functions that you're conducting as a police officer, |
| 12:02:42 | 19 | especially those that fall under exceptions of search |
| 12:02:47 | 20 | warrant, no, you do not need a search warrant.  And |
| 12:02:48 | 21 | there are many. |
| 12:02:48 | 22 | Q.  All right.  So I'm going to move to strike |
| 12:02:50 | 23 | your answer as nonresponsive.  I'm just going to ask |
| 12:02:54 | 24 | that you listen to my question. |
| 12:02:55 | 25 | A.  Okay. |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1      OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

12:21:03   2   does not in itself justify a search under exigent

12:21:07   3   circumstances.  The more serious the crime, the more

12:21:09   4   likely the courts are to recognize the situation as a

12:21:12   5   true emergency justifying the search based on exigent

12:21:17   6   circumstances.

12:21:17   7            "Probable cause must exist leading one to

12:21:21   8   believe:  1, a crime, misdemeanor or felony, has been

12:21:27   9   or is being committed and, 2, that if immediate action

12:21:31   10  is not taken, the crime will be completed, or you have

12:21:34   11  reasonable suspicion that you or others will suffer

12:21:38   12  physical injury or death, or you have reason to

12:21:40   13  believe that the evidence of the crime will be

12:21:42   14  destroyed or otherwise lost.  If a minor offense has

12:21:48   15  occurred and the sole purpose for the warrantless

12:21:52   16  entry is to make an arrest or serve an appearance

12:21:53   17  ticket for that offense, the exigent circumstances

12:21:57   18  exception would not be applicable."

12:21:59   19           And it says, "Assume you cannot use this

12:22:02   20  exception in other than extremely unusual

12:22:05   21  circumstances, for example:  1, to enter the home in

12:22:10   22  pursuit of an armed fleeing felon or, 2, where you are

12:22:12   23  legally at a premises investigating a minor matter and

12:22:15   24  you hear what happens or to be seems to be sounds,

12:22:18   25  conversations, or the like, leading you to conclude



|  |  |  |
|--|--|--|
|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
| 12:22:20 | 2 | that a serious physical injury crime is occurring, or |
| 12:22:26 | 3 | about to occur, and you may enter the premises and |
| 12:22:29 | 4 | terminate said crime." |
| 12:22:31 | 5 | Okay.  So I'm going to stop there.  So |
| 12:22:36 | 6 | that's -- is that your understanding of RPD's policy |
| 12:22:39 | 7 | on when exigent circumstances applies, Officer |
| 12:22:43 | 8 | Laureano? |
| 12:22:43 | 9 | A.  You read it verbatim so, yes, sir. |
| 12:22:46 | 10 | Q.  Okay.  And how would that apply to |
| 12:22:49 | 11 | backtracking? |
| 12:22:52 | 12 | A.  That would fall, I believe, under hot |
| 12:22:58 | 13 | pursuit and pursuit of a fleeing armed felon.  But if |
| 12:23:04 | 14 | you don't know it for sure to be armed, for example, |
| 12:23:07 | 15 | if you see what appears to be -- or you can't -- you |
| 12:23:11 | 16 | can't stop mid-stride to confirm what you just saw, |
| 12:23:14 | 17 | you have to conduct some sort of backtrack to recover |
| 12:23:18 | 18 | what would be of evidentiary value. |
| 12:23:21 | 19 | It would be neglectful, I think, to just |
| 12:23:25 | 20 | not look at all and to assume that simply because he |
| 12:23:29 | 21 | did not have it on his person that that's where the |
| 12:23:32 | 22 | investigation stops. |
| 12:23:34 | 23 | Q.  Okay.  But you said that you're not |
| 12:23:39 | 24 | required first to go ask for consent; right? |
| 12:23:43 | 25 | MS. JONES:  Objection. |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

1       OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

12:23:43   2       A.   I'm not sure I said that you don't have to

12:23:49   3   ask for consent, or the way that you're saying it, I'm

12:23:53   4   not sure I said it verbatim that way.  But I would say

12:23:57   5   that you need consent if you're going to search

12:24:01   6   somebody's property.

12:24:02   7            If you're doing something that is on their

12:24:05   8   property for -- like you're investigating that

12:24:08   9   property.  If I'm chasing a bad guy, like we already

12:24:13  10   did -- we already discussed, you know, yards one

12:24:14  11   through three, or one through five, and I look over

12:24:17  12   after taking them into custody, and I just peek over

12:24:21  13   the fence at what -- I saw a throwing motion,

12:24:23  14   discarding something, and I look and I happen to see

12:24:24  15   something, I'm not going to say, hey, do I have

12:24:28  16   consent to take this piece of property that I saw, you

12:24:30  17   know, Mr. Smith throw that I clearly know that is not

12:24:35  18   a place that he resides at and this -- this is not

12:24:38  19   something that belongs to you because I can see that

12:24:41  20   this is clearly not a normal place in your yard, you

12:24:46  21   wouldn't just leave a piece of property laying right

12:24:49  22   there in the middle of your yard.  I think that would

12:24:49  23   be unreasonable to request consent for the course of a

12:24:54  24   criminal investigation that you're conducting that you

12:24:57  25   had direct knowledge of and direct observation of.



Confidential

93

|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |

12:24:59  2      I think that if I need -- if I deviated

12:25:02  3  from his flight of path, I think then maybe that could

12:25:07  4  apply.  But if I'm right there, or a yard or two away,

          5  and I happen to peek up over a fence -- and

12:25:12  6  oftentimes, a chain-link fence, you don't need to look

12:25:15  7  up.  Just look, you can see very clearly if anything

12:25:19  8  was discarded or not.

12:25:21  9      Q.  Okay.  Didn't we discuss earlier that a

12:25:27  10  Fourth Amendment search occurs when you intrude on

12:25:32  11  someone's reasonable expectation of privacy?

12:25:35  12      MS. JONES:  Objection.

12:25:37  13      A.  We discussed that in the example that you

12:25:40  14  gave pertaining to the tarp, yes.

12:25:43  15      Q.  Were you taught, in your training at the

12:25:48  16  RPD, that someone has a reasonable expectation of

12:25:53  17  privacy in the curtilage to their property?

12:25:56  18      A.  Yes.

12:25:57  19      Q.  Okay.  And were you taught that the Fourth

12:26:01  20  Amendment applies equally to the curtilage to

12:26:04  21  someone's property as it does to the home itself?

12:26:06  22      MS. JONES:  Objection.

12:26:09  23      A.  Yes.  We trained in the Fourth Amendment

12:26:12  24  as it pertains to property and curtilage.

12:26:15  25      Q.  Is the RPD's practice to backtrack the



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
| 12:26:18 | 2 | flight of path of a fleeing felon to look for |
| 12:26:23 | 3 | discarded property? |
| 12:26:25 | 4 | MS. JONES:  Objection. |
| 12:26:28 | 5 | A.  That is common practice because the reason |
| 12:26:31 | 6 | that we're pursuing them -- again, it would be |
| 12:26:34 | 7 | situationally dependent.  I wouldn't have to conduct a |
| 12:26:37 | 8 | search if I spot somebody who has a warrant, and I |
| 12:26:38 | 9 | know they have a warrant for their person signed by a |
| 12:26:42 | 10 | judge, I don't have to conduct a search of the |
| 12:26:45 | 11 | environment, their path of flight, or whatever. |
| 12:26:45 | 12 | If they're running from, let's say, a |
| 12:26:47 | 13 | stolen vehicle, and I can see them -- maybe it was |
| 12:26:51 | 14 | taken in a robbery, or used in some type of crime |
| 12:26:55 | 15 | involving weapons, and I see them running from that |
| 12:26:59 | 16 | vehicle, holding their side, making overt motions, and |
| 12:27:01 | 17 | as I'm pursuing them, I see them attempting to discard |
| 12:27:06 | 18 | something, or throwing motions, then yes, it is common |
| 12:27:08 | 19 | practice to conduct a backtrack because at that point |
| 12:27:10 | 20 | it would still fall under hot pursuit because I was |
| 12:27:13 | 21 | only there because of their actions. |
| 12:27:15 | 22 | Q.  Okay.  So after the pursuit concludes and |
| 12:27:20 | 23 | the person is taken into custody, you can still |
| 12:27:23 | 24 | backtrack through their properties without obtaining |
| 12:27:28 | 25 | consent of the property owner? |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1    OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

12:27:30  2    MS. JONES:  Objection.

12:27:32  3    A.  Yes, because property -- the consent

12:27:35  4  wasn't obtained before that because it still falls

12:27:39  5  under hot pursuit.  It still applies.  However, as a

12:27:44  6  common practice, along with -- many other officers in

12:27:47  7  the RPD will still let the individual know, so long as

12:27:50  8  it's not a vacant structure, make some attempt to

12:27:53  9  knock on a door.

12:27:54  10    Because at the end of the day, I still

12:27:56  11  have to -- I still have to say, hey, I know for sure

12:28:00  12  that I saw X, Y, and Z discard this on your property.

12:28:03  13  I just want to make sure that you're aware of it, A,

12:28:04  14  and, B, do you recognize this to be yours; right?

12:28:08  15    Because maybe, for whatever reason, I saw

12:28:10  16  them throw it and it landed in a different yard and

12:28:12  17  maybe I was mistaken.  So that's a quick way to

12:28:17  18  mitigate that, but I don't need to ask for consent.

12:28:21  19    Q.  Would it -- I'm sorry.  Go ahead.

12:28:21  20    A.  I said I don't need to ask for consent to

12:28:23  21  do that while I'm still in the course of that

12:28:25  22  investigation.

12:28:27  23    Q.  Would it be unreasonable not to ask for

12:28:32  24  consent before entering someone's property after the

12:28:36  25  hot pursuit has concluded?



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

96

| | | |
|---|---|---|
| | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
| 12:28:40 | 2 | A.  Would it be unreasonable not to? |
| 12:28:43 | 3 | Q.  Correct. |
| 12:28:44 | 4 | A.  It would depend.  I would say no because |
| 12:28:48 | 5 | of what just had occurred.  But as a courtesy, we do. |
| 12:28:52 | 6 | But it is not necessary, especially if I can simply |
| 12:28:56 | 7 | just look with my eyes and see and confirm visually |
| 12:28:59 | 8 | what I had observed. |
| 12:29:01 | 9 | Q.  Okay.  So it's not required by the Fourth |
| 12:29:04 | 10 | Amendment? |
| 12:29:04 | 11 | MS. JONES:  Objection. |
| 12:29:06 | 12 | A.  That would fall under the exception of the |
| 12:29:08 | 13 | Fourth Amendment as it pertains to search and seizure |
| 12:29:12 | 14 | if it's a direct observation. |
| 12:29:13 | 15 | Q.  And that exception that you're citing |
| 12:29:15 | 16 | would be the exigent circumstances exception? |
| 12:29:18 | 17 | MS. JONES:  Objection. |
| 12:29:19 | 18 | A.  It could be the exigent circumstances |
| 12:29:23 | 19 | exception, if it wasn't directly observed or was in |
| 12:29:27 | 20 | plain view or an abandoned property, if it hasn't been |
| | 21 | discarded. |
| 12:29:30 | 22 | Maybe it was -- again, situationally |
| 12:29:32 | 23 | dependent.  Maybe he's running and he stuffs -- you |
| 12:29:35 | 24 | know, he stuffs it, you know, along the fence and |
| 12:29:38 | 25 | maybe it's not laying in the backyard and as easily -- |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
           1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS
01:11:00   2               MS. JONES:  Objection.
01:11:01   3          A.  Yes, we still have to adhere to the same
01:11:08   4     rules and regulations.
01:11:09   5          Q.  Okay.  And is the SWAT team allowed to
01:11:12   6     enter someone's fenced-in yard without a warrant,
01:11:17   7     consent, or exigent circumstances?
01:11:18   8               MS. JONES:  Objection.
01:11:19   9          A.  Again, I would say yes, for the reasons
01:11:23  10     that I've already stated.
01:11:24  11          Q.  Okay.  So the answer is, yes, the SWAT
01:11:30  12     team is allowed to enter someone's yard, fenced-in
01:11:33  13     backyard, the curtilage to their property, without a
01:11:37  14     warrant, consent, or exigent circumstances?
01:11:39  15               MS. JONES:  Objection.
01:11:39  16          A.  Is that a question?
01:11:48  17          Q.  Yeah, that was a question.  I was just
01:11:54  18     confirming that was your answer.  Correct?
01:11:58  19               MS. JONES:  Objection.
01:11:58  20          A.  Yes, for the reasons I've already stated.
01:12:01  21          Q.  Okay.  And if you're entering someone's
01:12:07  22     residential property, you should be particularly
01:12:10  23     careful; correct?
01:12:11  24               MS. JONES:  Objection.
01:12:11  25          A.  You should always be careful, yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

121

| | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|---|---|---|
| 01:12:16 | 2 | Q.  Has anyone ever gotten mad at you when |
| 01:12:22 | 3 | you're on their property? |
| 01:12:24 | 4 | MS. JONES:  Objection. |
| 01:12:24 | 5 | A.  People have gotten mad at us for simply |
| 01:12:30 | 6 | being on the street.  So I would say, yes, they have |
| 01:12:36 | 7 | been upset at times. |
| 01:12:39 | 8 | Q.  They've been upset at times because you |
| 01:12:45 | 9 | enter onto their property and you didn't ask for their |
| 01:12:48 | 10 | consent first? |
| 01:12:49 | 11 | MS. JONES:  Objection. |
| 01:12:50 | 12 | A.  I was referring to our presence.  Specific |
| 01:12:53 | 13 | to your question, no, I've never seen that personally. |
| 01:12:57 | 14 | That has not happened to me, where someone's been |
| 01:13:00 | 15 | upset if I cut through their property. |
| 01:13:03 | 16 | Q.  Okay.  Have people been upset with you for |
| 01:13:07 | 17 | being present on their property? |
| 01:13:09 | 18 | A.  Yes, people have been upset for being on |
| 01:13:13 | 19 | their property. |
| 01:13:14 | 20 | Q.  Have people ever been upset with you for |
| 01:13:21 | 21 | being on their property and they were -- it was |
| 01:13:27 | 22 | unexpected?  They didn't realize that you were there, |
| 01:13:30 | 23 | then they realized you were there, and they said, |
| 01:13:33 | 24 | "What are you doing here?" |
| 01:13:35 | 25 | MS. JONES:  Objection. |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
|          | 1  | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS                     |
| 01:13:36 | 2  | A.   That's happened a few times.                                |
| 01:13:37 | 3  | Q.   Okay.  What do you do when that happens?                    |
| 01:13:43 | 4  | A.   Simply explain to them why we're there.                     |
| 01:13:47 | 5  | Q.   And you testified earlier that there were                   |
| 01:13:56 | 6  | four times that you had discharged your firearm at               |
| 01:14:00 | 7  | dogs during your police duties.  Were all of those               |
| 01:14:04 | 8  | times while you were present at a residential                    |
| 01:14:08 | 9  | property?                                                        |
| 01:14:12 | 10 | A.   Three out of the four were.                                 |
| 01:14:14 | 11 | Q.   Okay.  Where was the fourth incident?                       |
| 01:14:17 | 12 | A.   The very first incident we spoke of with                    |
| 01:14:20 | 13 | the two dogs was when I was on a city sidewalk and               |
| 01:14:23 | 14 | they were loose dogs.  They were aggressively charging           |
| 01:14:26 | 15 | me.                                                              |
| 01:14:27 | 16 | Q.   Got it.                                                     |
| 01:14:28 | 17 | That was in a residential neighborhood?                          |
| 01:14:31 | 18 | A.   Yes.                                                        |
| 01:14:32 | 19 | MR. SHIELDS:  Okay.  Okay.  So I want to                         |
| 01:14:39 | 20 | go through the other two incidents.  So first I want             |
| 01:14:45 | 21 | to talk about the incident CR Number 2020000151628              |
| 01:14:59 | 22 | and -- let's see.  So that is the 30 DeJonge Street.             |
| 01:15:05 | 23 | And I'll start with the incident report, which we'll             |
| 01:15:08 | 24 | mark as Exhibit 3 for this deposition.  I'll put that            |
| 01:15:12 | 25 | up.                                                              |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

123

|  |  |  |
|---|---|---|
|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|  | 2 | (The following exhibit was marked for |
|  | 3 | identification:  Number EXH 3.) |
| 01:15:25 | 4 | Q.  And, Officer Laureano, do you see that |
| 01:15:30 | 5 | incident report on your screen? |
| 01:15:31 | 6 | A.  Yes. |
| 01:15:32 | 7 | Q.  Okay.  And I'm going to go to -- that's |
| 01:15:34 | 8 | Bates number -- the plaintiff produced this report. |
| 01:15:37 | 9 | So it's Dempsey 2293, the one that we're looking at. |
| 01:15:43 | 10 | And the date is July 7, 2020, correct, for |
| 01:15:51 | 11 | this incident? |
| 01:15:51 | 12 | A.  Yes, sir. |
| 01:15:51 | 13 | Q.  Okay.  So I'm just going to go down to the |
| 01:15:55 | 14 | Narrative section here, and then ask you a few |
| 01:15:59 | 15 | questions. |
| 01:15:59 | 16 | Okay.  And is this a report that you |
| 01:16:06 | 17 | reviewed in preparation for this deposition? |
| 01:16:09 | 18 | A.  Yes, sir. |
| 01:16:10 | 19 | Q.  Okay.  So I'm not going to ask you to read |
| 01:16:14 | 20 | all through it before I start asking you questions. |
|  | 21 | Okay? |
|  | 22 | A.  Okay. |
| 01:16:17 | 23 | Q.  So the incident report says that the |
| 01:16:21 | 24 | team -- the SWAT team was executing a high-risk search |
| 01:16:25 | 25 | warrant for 30 DeJonge Street, that you entered the |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

124

|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|---|---|---|
| 01:16:30 | 2 | fence, and there were guys standing in the front yard |
| 01:16:32 | 3 | with a pit bull; correct? |
| 01:16:34 | 4 | MS. JONES:  Objection. |
| 01:16:34 | 5 | A.  Yes. |
| 01:16:44 | 6 | Q.  Okay.  Now, where did the SWAT team enter |
| 01:16:49 | 7 | into the property at 30 DeJonge Street? |
| 01:16:53 | 8 | A.  The front yard. |
| 01:16:55 | 9 | Q.  Okay.  Before you entered the front yard, |
| 01:16:58 | 10 | did you ask the guys to put the dog away? |
| 01:17:02 | 11 | A.  No. |
| 01:17:02 | 12 | Q.  Okay.  Why not? |
| 01:17:04 | 13 | A.  The dog was already out and we -- I don't |
| 01:17:10 | 14 | know how familiar you are with high-risk search |
| 01:17:13 | 15 | warrants, or how we deploy, but we're not going to |
| 01:17:17 | 16 | slow down the execution of a high-risk search warrant |
| 01:17:22 | 17 | and stop everything, like, "Hey, do you have a dog? |
| 01:17:25 | 18 | Can you put it away?" because that would create a big |
| 01:17:29 | 19 | risk to everyone there. |
| 01:17:30 | 20 | Because we don't know who's in the house, |
| 01:17:33 | 21 | who's on the property, what they have and what their |
| 01:17:35 | 22 | intentions are and -- we're slowing down our ability |
| 01:17:38 | 23 | to be effective if we just stop everything for just |
| 01:17:43 | 24 | having -- just having knowledge of the presence of a |
| 01:17:46 | 25 | dog. |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

125

1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

2                Q.   Okay.

01:17:49   3          A.   I don't know if that makes sense.

01:17:51   4          Q.   Sure.

01:17:53   5               Can you describe how the entry was made?

01:17:58   6          A.   I don't know how the entry was made.  I

01:18:01   7     wasn't on entry.  I was on containment.

01:18:06   8          Q.   You were on containment?

01:18:09   9          A.   Yes, sir.

01:18:10   10         Q.   Okay.  So before you entered the gate to

01:18:13   11    the yard, can you take me from the -- let me back up.

01:18:17   12    Let me withdraw that question.

01:18:18   13               Was there a prewarrant briefing before you

01:18:23   14    went to the property?

01:18:24   15         A.   Yes.

01:18:25   16         Q.   Okay.  And was there anything discussed

01:18:28   17    about how to deal with any dogs that might be on the

01:18:32   18    property at that briefing?

01:18:35   19         A.   Somebody would bring a catch pole.

01:18:39   20    Usually somebody in the back of the entry stack.

01:18:43   21         Q.   Okay.  Did someone bring a catch pole on

01:18:51   22    that occasion?

01:18:52   23               MS. JONES:   Objection.

01:18:53   24         A.   I believe one was brought, but it was

01:18:57   25    brought up maybe as all of this was happening.  It was



|          | 1  | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|----------|----|-----|
| 01:18:58 | 2  | very fast. |
| 01:18:59 | 3  | Q.  Okay.  Do you remember any discussions at |
| 01:19:06 | 4  | the briefing specifically regarding whether or not |
| 01:19:09 | 5  | there were any dogs at the property? |
| 01:19:11 | 6  | A.  I believe that was part of the brief that |
| 01:19:17 | 7  | there was a dog at the property. |
| 01:19:19 | 8  | Q.  Okay. |
| 01:19:19 | 9  | A.  Or a dog was observed. |
| 01:19:22 | 10 | Q.  Were there any plans made for what to do |
| 01:19:25 | 11 | if you guys encountered the dog, other than the catch |
| 01:19:29 | 12 | pole? |
| 01:19:30 | 13 | MS. JONES:  Objection. |
| 01:19:31 | 14 | A.  No, there weren't specific plans that were |
| 01:19:36 | 15 | made.  However, we usually will disregard a dog if it |
| 01:19:47 | 16 | is chained, if it is crated, if it's otherwise in a |
| 01:19:51 | 17 | position where it is not going to be cumbersome or in |
| 01:19:56 | 18 | our way.  We just -- we walk right by the dog. |
| 01:19:58 | 19 | It's only -- the catch poles are only for |
| 01:20:02 | 20 | in the event of an aggressive dog, which if we have |
| 01:20:06 | 21 | any information about a dog being present, we'll |
| 01:20:09 | 22 | always bring it with us. |
| 01:20:11 | 23 | Q.  Okay.  Is there ever any discussion during |
| 01:20:15 | 24 | a prewarrant briefing about, well, if the catch pole |
| 01:20:22 | 25 | is in the back of the stack, and the dog starts |



Confidential

|   |   |
|---|---|
| | 1 |

OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:20:26  2   approaching the officers in the front of the stack,

01:20:29  3   what the officers in the front of the stack should do

01:20:31  4   to avoid shooting the dog?

01:20:34  5        MS. JONES:  Objection.

01:20:38  6        A.  The officers who are moving to their

01:20:43  7   assigned positions, their final assigned positions,

01:20:46  8   again, more often than not will completely disregard

01:20:49  9   that dog.  And it's usually overwhelming for the dog

01:20:52  10  because it's like a sensory overload.

01:20:55  11        They're not going to start attacking

01:20:56  12  people right off the bat.  They're usually alarmed,

01:20:58  13  there's a little bit of a standoff, and we continue to

01:21:01  14  move.  And if need be, we'll call for a catch pole.

01:21:05  15  Usually there's enough time.

01:21:06  16        Q.  Okay.  What happened -- tell me everything

01:21:12  17  you remember about this incident at 30 DeJonge Street.

01:21:16  18        MS. JONES:  Objection.

01:21:17  19        A.  We pulled up to the location to execute

01:21:22  20  the high-risk search warrant.  I was assigned to

01:21:25  21  containment.  As I was making my way to my containment

01:21:28  22  point, there were numerous individuals that were in

01:21:30  23  the driveway just off of the house.

01:21:33  24        I assisted another officer, who was --

01:21:37  25  another team member in addressing that group.  I



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

128

1        OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:21:42  2   believe it was three males.  And the dog was very

01:21:45  3   close to the chain-link fence, almost appeared to

01:21:49  4   be -- as if it was chained to the fence or chained to,

01:21:51  5   like, something.  I don't know.  Maybe like a chair.

01:21:53  6            And as we were giving instructions to the

01:21:58  7   males that were on the ground to have them comply with

01:22:01  8   what we needed, the dog came off of the fence, and we

01:22:06  9   quickly realized that there is no chain on this dog,

01:22:08  10  in effect a loose dog in the yard, and was quickly

01:22:11  11  becoming aggressive.

01:22:14  12            So the dog came off the fence, began to

01:22:21  13  lower its center, began to growl.  It sounded

01:22:26  14  extremely aggressive in the way that it was growling,

01:22:30  15  its demeanor.  Everything was showing signs that it

01:22:33  16  was not backing down.

01:22:34  17            It continued to approach.  It took, like,

01:22:36  18  a little lunge step, and I let it get to about -- I

01:22:40  19  don't know -- maybe the 3-foot mark -- 2 1/2-, 3-foot

01:22:44  20  mark, and then it took that second lunge towards me

01:22:47  21  and another team member.  I had a good angle, and it

01:22:52  22  was pointed in a safe direction, so I shot the dog

01:22:56  23  because there was just no time.  People were still

01:22:59  24  making their way to their positions.

01:23:02  25            It was an immediate compromise, which



1    OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:23:05 2 would have prompted the entry team to make an

01:23:09 3 immediate entry.  So the time to utilize a catch

01:23:12 4 pole -- I mean, we're talking a span of, like, several

01:23:15 5 seconds.  It was very quickly.

01:23:20 6    Q.  Did you ever ask the three males in the

01:23:23 7 driveway to secure the dog?

01:23:27 8    A.  No.  Because, as I stated, the dog

01:23:32 9 appeared to be -- at that moment, when we first were

01:23:33 10 addressing the males, it appeared to already have been

01:23:35 11 secured, just the way it was sitting against the

01:23:37 12 fence.  It had a collar on and it looked like it

01:23:40 13 was -- it looked like it was against the fence.  And

01:23:44 14 I -- it wasn't moving at first.  So we assumed that it

01:23:46 15 was chained to the fence.

01:23:47 16    It wasn't until several moments had

01:23:50 17 passed -- it came off the fence very quickly.  By

01:23:53 18 then, the males are adhering to our commands, and the

01:23:56 19 dog is very, very agitated.  Very aggressive.

01:23:59 20    Q.  Okay.  So before the team entered the

01:24:04 21 yard, you didn't do anything to learn whether the dog

01:24:06 22 was chained to the fence; correct?

01:24:08 23    MS. JONES:  Objection.

01:24:09 24    A.  Can you -- what do you mean by "learned"?

01:24:12 25    Q.  You didn't walk over and take a look



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1       OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:24:15   2   closely to see is this dog actually chained or not.

01:24:20   3       A.  No.  There was no time -- there was no

01:24:22   4   time to do that.  Once we're on set, we move to our

01:24:26   5   assigned positions, and the rest of the team --

01:24:31   6   containment gets set.  You know, the other team calls

01:24:36   7   "Set," and we execute the warrant.

01:24:38   8       We're not, again, going to stop the whole

01:24:41   9   execution of the warrant because we want to confirm

01:24:43   10  whether or not there's a leash on the dog.  The dog is

01:24:45   11  still on the property.  Regardless, that dog might

01:24:48   12  have a really long lead even if it was chained.  We're

01:24:50   13  not going to stop the execution of the warrant.

01:24:53   14      Q.  Okay.  Was there anything else done in the

01:25:02   15  planning stages to discuss what could be done to avoid

01:25:07   16  shooting the dog if it was encountered on the

01:25:12   17  property?

01:25:12   18      A.  The only steps that could have been taken,

01:25:15   19  if time had allowed, would be the utilization of a

01:25:19   20  catch pole and perhaps maybe the deployment of, like,

01:25:22   21  a 40-millimeter round from a member of the less-lethal

01:25:26   22  team, if time allowed.  Which, in that particular

01:25:29   23  case, it did not.

01:25:30   24      Q.  Okay.  And why, in that particular case,

01:25:33   25  did time not allow to take these additional steps to



Confidential

131

1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:25:36   2     avoid shooting the dog?

01:25:37   3               MS. JONES:  Objection.

01:25:38   4          A.  As I already stated, sir, it happened

01:25:44   5     within seconds.  So by the time we could make that

01:25:48   6     request, the dog had already made a couple aggressive

01:25:54   7     movements and was approaching -- was approaching us

01:25:57   8     and was a threat at that point.

01:25:59   9               Had it just remained seated and -- I guess

01:26:04   10    I've already described that sometimes they're more

01:26:06   11    alarmed and they're standoffish, they're aggressive,

01:26:09   12    but it's just posturing, and they're not really

01:26:11   13    looking to get into anything.  They're just looking to

01:26:13   14    let us know that we're not welcome.  And there's time

01:26:15   15    at that point to call for a less-lethal deployment, or

01:26:18   16    a catch pole, because we know the dog's, you know, not

01:26:23   17    imminently a threat.  It's not charging anybody and

01:26:27   18    it -- we have time.  In that moment, we did not have

01:26:28   19    time.  We had several seconds, and it was over as

01:26:31   20    quickly as it began.

01:26:32   21         Q.  What would have happened if the whole

01:26:34   22    team, before entering the gate, had paused, pointed

01:26:39   23    their guns at the three individuals in the driveway,

01:26:43   24    and said "Secure that dog" before entering the gate to

01:26:47   25    go up to the front door and enter the house?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

| | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|---|---|---|
| 01:26:50 | 2 | MS. JONES:  Objection. |
| 01:26:50 | 3 | A.   That would have created -- that would have |
| 01:26:53 | 4 | created -- the team would have been bogged down.  It |
| 01:26:58 | 5 | would have created a bottleneck.  As you enter the |
| 01:26:59 | 6 | property, it would have bottlenecked the whole team. |
| 01:27:00 | 7 | It would have stopped the whole team, and it would |
| 01:27:02 | 8 | have exposed the whole team to whatever angles that |
| 01:27:05 | 9 | were coming from the open doorway to the windows to, |
| 01:27:07 | 10 | you know, whoever potentially may have been behind the |
| 01:27:10 | 11 | yard.  It would have given a chance for individuals to |
| 01:27:14 | 12 | jump out, to escape. |
| 01:27:17 | 13 | There's a lot that can happen when -- and, |
| 01:27:19 | 14 | like I said, we were compromised the minute we pulled |
| 01:27:23 | 15 | up.  There's a lot that can go wrong, and we don't -- |
| 01:27:27 | 16 | we're not going to stop all of that just so we can |
| 01:27:27 | 17 | say, "Hey, man, is your dog" -- "Is your dog okay?  Is |
| 01:27:31 | 18 | it friendly?  Is it chained?  Can we move now?" |
| 01:27:33 | 19 | Like we don't do that because you're |
| 01:27:35 | 20 | sacrificing a tremendous amount of security and the |
| 01:27:39 | 21 | safety of your team for -- just to make sure the dog |
| 01:27:46 | 22 | is okay.  And that is not something that we would do |
| 01:27:49 | 23 | in violation of our tactics, techniques, and |
| 01:27:53 | 24 | procedures. |
| 01:27:57 | 25 | MR. SHIELDS:  Okay.  And just for the |



|   | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|---|---|---|
| 01:27:58 | 2 | record, I want to put up the -- okay.  Well, actually, |
| 01:28:02 | 3 | I guess I have the Zoom up still.  Huh? |
| 01:28:05 | 4 | So just to make it easier for me, because |
| 01:28:10 | 5 | I had all of these premarked for myself, I'm going to |
| 01:28:13 | 6 | put this Google Maps picture up as Exhibit 4. |
|   | 7 | (The following exhibit was marked for |
|   | 8 | identification:  Number EXH 4.) |
| 01:28:19 | 9 | Q.  And I'm just going to ask you, Officer |
| 01:28:22 | 10 | Laureano, does this look like the Google Maps picture |
| 01:28:27 | 11 | of the location for 30 DeJonge Street? |
| 01:28:32 | 12 | A.  It appears to be, yes. |
| 01:28:33 | 13 | Q.  Okay.  And can you tell me on this -- on |
| 01:28:41 | 14 | this map, where did you guys stage when you pulled up |
| 01:28:46 | 15 | to the property before entering the property? |
| 01:28:49 | 16 | A.  Well, we pulled up to what would be the |
| 01:28:53 | 17 | 1-4 corner, the one side of the house facing the |
| 01:28:54 | 18 | street, and then you could work clockwise from there. |
| 01:28:58 | 19 | So we pulled up to what would be the 1-4 corner, right |
| 01:29:00 | 20 | at the sidewalk area, right at the end of the |
| 01:29:04 | 21 | driveway. |
| 01:29:04 | 22 | Q.  Okay.  So you just parked right in front |
| 01:29:07 | 23 | of the house, basically? |
| 01:29:10 | 24 | MS. JONES:  Objection. |
| 01:29:10 | 25 | A.  More offset, but towards the front, yeah. |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

| | | |
|---|---|---|
| | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
| 01:29:14 | 2 | Q.  Okay.  It wasn't like you parked on Joseph |
| 01:29:18 | 3 | and then walked around.  You guys drove right up to |
| 01:29:24 | 4 | the front on this instance; is that right? |
| 01:29:26 | 5 | MS. JONES:  Objection. |
| 01:29:27 | 6 | A.  For that day, yes. |
| | 7 | (The following exhibit was marked for |
| | 8 | identification:  Number EXH 5.) |
| 01:29:29 | 9 | Q.  Okay.  And then Exhibit 5, I want to just |
| 01:29:34 | 10 | put up this Google Map street view picture and ask |
| 01:29:42 | 11 | you, Officer Laureano, does Exhibit 5 depict the |
| 01:29:48 | 12 | property at 30 DeJonge Street in a -- I don't know -- |
| 01:29:55 | 13 | similar fashion to what it looked like on the night of |
| 01:29:58 | 14 | the search warrant? |
| 01:29:59 | 15 | A.  Yes. |
| 01:29:59 | 16 | Q.  Okay.  And so you guys just -- when you |
| 01:30:05 | 17 | say that you entered the gate, it was the gate that |
| 01:30:07 | 18 | was in front of the driveway here? |
| 01:30:10 | 19 | A.  Yes, sir. |
| 01:30:11 | 20 | Q.  Okay.  And when you saw the dog, you |
| 01:30:16 | 21 | mentioned that it was near the fence.  Can you tell me |
| 01:30:20 | 22 | which fence it was near, if you can see it in this |
| 01:30:24 | 23 | picture? |
| 01:30:25 | 24 | MS. JONES:  Objection. |
| 01:30:26 | 25 | A.  Yep.  Yes, I can. |



Confidential

135

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
|         | 1  | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS             |
| 01:30:30| 2  | Q.   Okay.  Which fence was it?                          |
| 01:30:34| 3  | A.   It's the fence to the right that goes              |
| 01:30:37| 4  | alongside that house that's in yellow there, a little    |
| 01:30:42| 5  | bit before those green garbage totes.                    |
| 01:30:46| 6  | Q.   Okay.  The fence on the right.                     |
| 01:30:57| 7  | MS. JONES:  Objection.                                   |
| 01:31:05| 8  | MR. SHIELDS:  Okay.  I'm just trying to                 |
| 01:31:06| 9  | make sure I don't get confused with my exhibit          |
| 01:31:10| 10 | numbers.                                                 |
| 01:31:10| 11 | Okay.  I just want to go back.                          |
| 01:31:12| 12 | So we had 30 DeJonge incident report.                  |
| 01:31:28| 13 | Kim, was that 3?                                        |
| 01:31:28| 14 | MS. JONES:  That's what I have.                         |
| 01:31:30| 15 | MR. SHIELDS:  Okay.  And then the                      |
| 01:31:31| 16 | satellite is 4, and so the street view is 5.            |
| 01:31:37| 17 | Okay.  I'm just making sure I've got it                 |
| 01:31:39| 18 | right.  Okay.                                           |
| 01:31:49| 19 | Q.   And how long after you entered the gate           |
| 01:31:52| 20 | did you shoot the dog?                                   |
| 01:31:54| 21 | A.   Probably within 10 seconds, maybe less.           |
| 01:31:59| 22 | Q.   Okay.  And what did the dog do immediately         |
| 01:32:07| 23 | before you shot it?                                      |
| 01:32:09| 24 | MS. JONES:  Objection.                                   |
| 01:32:12| 25 | A.   So, as I previously stated, it came off           |



1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:32:16   2    the fence in an aggressive posture.  It was getting

01:32:20   3    low and it was -- it was slowly walking towards us.

01:32:23   4    It paused.  Take another step.  I backed up as much as

01:32:30   5    I could without walking away because I'm covering the

01:32:33   6    guys that are behind me and next to me.

01:32:35   7          The dog then took, like, a really

01:32:38   8    aggressive, like, lunge when it was about -- I don't

01:32:42   9    know -- maybe 2 to 3 feet away.  And, you know, that's

01:32:44   10   about as close as I let it get before I discharge my

01:32:50   11   weapon and -- striking the dog pretty much right at

01:32:56   12   that corner.

01:32:56   13         Q.  Okay.  And is there anything that you

01:33:01   14   think you could have done to avoid shooting the dog?

01:33:06   15         A.  In that instance, with the limited space I

01:33:09   16   had and how aggressive that dog became, as quickly as

01:33:13   17   it became aggressive, no, that was unavoidable.

01:33:18   18         Q.  What would have happened if you didn't

01:33:21   19   shoot the dog?

01:33:22   20         MS. JONES:  Objection.

01:33:24   21         A.  It would have bit my buddy or myself.

01:33:29   22         Q.  Okay.  That's what you think would have

01:33:33   23   happened based on your training and experience?

01:33:35   24         MS. JONES:  Objection.

01:33:36   25         A.  No.  That's what would have happened.  Not



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

137

| | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|---|---|---|
| 01:33:39 | 2 | that I think it would have happened.  It would have |
| 01:33:42 | 3 | happened. |
| 01:33:43 | 4 | Q.  Okay.  At the time when you shot the dog, |
| 01:33:46 | 5 | had it already tried to bite you? |
| 01:33:47 | 6 | A.  No.  It was going into either -- it would |
| 01:33:55 | 7 | become aggressive either offensively or in the defense |
| 01:33:58 | 8 | of one of those individuals that was on the ground, |
| 01:34:00 | 9 | but it was going to bite. |
| 01:34:01 | 10 | All the signs were there.  And we, again, |
| 01:34:03 | 11 | gave it about as much distance as we could, and it |
| 01:34:10 | 12 | continued to aggressively advance on us.  So there was |
| 01:34:13 | 13 | no other alternative at that moment. |
| 01:34:17 | 14 | Q.  And when you're on the entry team or the |
| 01:34:24 | 15 | containment team, are you in full tactical gear? |
| 01:34:29 | 16 | A.  Yes. |
| | 17 | Q.  You've got a bulletproof vest on? |
| | 18 | A.  We have armored plates, yes. |
| 01:34:33 | 19 | Q.  Okay.  Were you wearing gloves? |
| 01:34:34 | 20 | A.  Yes. |
| 01:34:36 | 21 | Q.  Okay.  What would have happened if you had |
| 01:34:41 | 22 | just kicked the dog? |
| 01:34:42 | 23 | MS. JONES:  Objection. |
| 01:34:43 | 24 | A.  Well, it was a pretty big dog.  I think |
| 01:34:45 | 25 | that would have made it a little upset if I kicked it. |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1        OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:34:49  2        Q.  Okay.  Was there a member of the

01:34:53  3  less-lethal team there?

01:34:55  4        A.  There was -- there were less-lethal

01:35:00  5  members of the less-lethal team that were present, but

01:35:02  6  they were making their way to other points that they

01:35:06  7  were assigned to.

01:35:06  8        Q.  So there was no less-lethal person near

01:35:10  9  you when you shot the dog?

01:35:11  10       A.  At that moment, no.

01:35:12  11       Q.  Okay.  Have you ever been bit by a dog

01:35:19  12  before?

01:35:20  13       A.  Close, but no.

01:35:21  14       Q.  Okay.  What happened in those other times

01:35:27  15  that were close?

01:35:30  16       A.  I was able to get to my vehicle or get to

01:35:33  17  a position where I could put a barrier in between me

01:35:36  18  and the aggressive dog.  And that happened, you know,

01:35:41  19  only a handful of times in, you know, 12 years or so

01:35:46  20  that I've been doing this.  So -- and that was on

01:35:48  21  patrol, like I said, not specific to a SWAT operation.

01:35:53  22       Q.  Were you ever taught de-escalation

01:35:58  23  techniques, such as using certain body language or

01:36:03  24  saying certain things to dogs to de-escalate a

01:36:07  25  situation with an aggressive dog?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

139

1      OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:36:09  2      A.  Yes.

01:36:10  3      Q.  Okay.  When were you taught that?

01:36:14  4      A.  A little bit in the academy.  Like I said,

01:36:19  5  it wasn't -- it was just a few blocks of instructions,

01:36:21  6  but more on field training with more seasoned officers

01:36:26  7  who had experience dealing with aggressive dogs.

01:36:29  8          So it was a combination of both and, I

01:36:32  9  would say, whatever little bit of reinforcement

01:36:36  10  through in-service training.

01:36:38  11      Q.  Okay.  Did you attempt to use any

01:36:40  12  de-escalation techniques during the incident at 30

01:36:45  13  DeJonge Street?

01:36:45  14      A.  No.  I didn't have time to use

01:36:48  15  de-escalation techniques because the dog was on us, as

01:36:53  16  fast as we were -- as we were addressing those

01:36:57  17  individuals.  As quickly as we addressed those

01:37:00  18  individuals, the dog was on us.  So there was no time

01:37:00  19  to try to use any type of de-escalation tactic with

01:37:04  20  that aggressive dog in that moment.

01:37:07  21      Q.  After this incident, was there an after

01:37:17  22  action briefing?

01:37:17  23      A.  Yes.

01:37:18  24      Q.  Okay.  Was the dog shooting discussed at

01:37:24  25  the after action briefing?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

140

1      OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:37:24   2          A.  Yes.

01:37:25   3          Q.  Okay.  And what do you remember about

01:37:28   4  that?

01:37:28   5          A.  I remember it was brought up, and I

01:37:33   6  remember the assistant team commander had asked for my

01:37:37   7  input as to what I saw, as to what led me to take that

01:37:41   8  action.  I explained it, as I've explained it to you,

01:37:44   9  and that was the end of it.

01:37:46  10          Q.  Okay.  And who was the assistant team

01:37:51  11  commander?

01:37:51  12          A.  Sergeant Brandon Ince.  Now lieutenant.

01:37:57  13          Q.  Okay.  And was the incident also discussed

01:38:04  14  with the rest of the SWAT team?

01:38:06  15          A.  The entire team for that operation was

01:38:11  16  present for the debrief.

01:38:13  17          Q.  Okay.  Including the commander?

01:38:16  18          A.  Yes.

01:38:16  19              MS. JONES:  Objection.

01:38:19  20              THE WITNESS:  Sorry.

01:38:20  21          Q.  I'm sorry.  That was a "yes"?

01:38:22  22          A.  Yes.

01:38:23  23          Q.  I'm sorry.  I just couldn't hear you

01:38:26  24  because the objection was at the same time.

01:38:28  25              And was everything found to be within RPD



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

|         | 1  | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
| 01:38:38 | 2  | policy? |
| 01:38:38 | 3  | A.  Yes, sir. |
| 01:38:39 | 4  | Q.  Okay.  Did the commander or anyone else |
| 01:38:44 | 5  | ever talk to you about the dog shooting? |
| 01:38:47 | 6  | MS. JONES:  Objection. |
| 01:38:48 | 7  | A.  I think they asked me if I was okay.  You |
| 01:38:52 | 8  | know, just -- but nothing more than that. |
| 01:38:55 | 9  | Q.  Okay.  Were you required to, like, have an |
| 01:38:58 | 10 | appointment with a psychiatrist or anything? |
| 01:39:00 | 11 | MS. JONES:  Objection. |
| 01:39:01 | 12 | A.  No. |
| 01:39:02 | 13 | Q.  No mental health treatment as a result of |
| 01:39:07 | 14 | the firearm discharge? |
| 01:39:07 | 15 | MS. JONES:  Objection. |
| 01:39:08 | 16 | Don't answer that. |
| 01:39:11 | 17 | MR. SHIELDS:  The whole thing is marked |
| 01:39:13 | 18 | confidential.  He has to answer the question.  It's |
| 01:39:16 | 19 | relevant to the deposition. |
| 01:39:17 | 20 | MS. JONES:  He's already said that he |
| 01:39:20 | 21 | wasn't told to meet with a psychologist as part of the |
| 01:39:24 | 22 | dog shooting. |
| 01:39:25 | 23 | MR. SHIELDS:  There's different types of |
| 01:39:28 | 24 | therapists that you can see that are different from -- |
| 01:39:28 | 25 | I think I said specifically psychiatrist, which is a |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

142

1        OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:39:31   2   very specific kind of doctor.

01:39:35   3        Q.  So I just wanted to know, did you have to

01:39:36   4   get any type of counseling at all, grief counseling,

01:39:40   5   or whatever, as a result of the firearms discharge?

01:39:43   6        MS. JONES:  You can answer that.

01:39:45   7        A.  No.

01:39:46   8        Q.  And after the briefing, there's an after

01:39:57   9   action report that's created; correct?

01:39:59  10        MS. JONES:  Objection.

01:40:00  11        A.  After the execution of the warrant,

01:40:06  12   there's an after action, not the briefing.

01:40:08  13        Q.  And did you ever see the after action

01:40:11  14   report that was written up for the 30 DeJonge Street

01:40:15  15   incident?

01:40:18  16        A.  I did some time ago, yes.

01:40:21  17        Q.  Okay.  Was there any -- well, let me

01:40:25  18   withdraw that.

01:40:25  19        What's the purpose of the after action

01:40:29  20   briefing and the after action report?

01:40:31  21        MS. JONES:  Objection.

01:40:32  22        A.  So I think you're confusing -- so the

01:40:35  23   operational brief is what we do prior to any type of

01:40:40  24   rehearsal or execution of a high-risk search warrant.

01:40:43  25        After the execution, we will reconvene for



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:40:47    2    a debrief, which is -- which is our after action, and

01:40:51    3    then a report will be generated as a result of what we

01:40:54    4    speak about, what we discuss, improvements, things of

01:41:00    5    note, during that debrief in an after action report.

01:41:03    6          Q.   So, yeah, I'm trying to focus on the

01:41:07    7    afterwards now.

01:41:07    8          So you said there's a meeting and then a

01:41:09    9    report, correct, afterwards?

01:41:11   10          MS. JONES:   Objection.

01:41:11   11          A.   Yes.

01:41:12   12          Q.   Okay.   And what's the purpose of the after

01:41:14   13    action review, briefing, and the report?

01:41:19   14          MS. JONES:   Objection.

01:41:22   15          A.   We use it for -- to document why we were

01:41:27   16    there.   For the purposes of what we were tasked to do,

01:41:35   17    how we executed it, how did it go, what could we learn

01:41:40   18    from it, and then we document that and we forward it

01:41:44   19    up.

01:41:44   20          Q.   Okay.   And when you say you forward it up,

01:41:48   21    do you know who it goes to?

01:41:49   22          A.   It goes through our chain of command to

01:41:51   23    the assistant team commander and team commander, and

01:41:55   24    that information is then given to, I would say, the

01:42:01   25    commanding officer of SOD.



**ALLIANCE**
COURT REPORTING, INC.

*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

144

|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|---|---|---|

01:42:04  2      Q.  Okay.  So it would go to the SWAT

01:42:08  3  commander, and then the SWAT commander would put it to

01:42:12  4  the commanding officer of SOD?

01:42:15  5      A.  I believe that's where it would go next in

01:42:18  6  the chain of command because we fall under SOD.

01:42:21  7      Q.  Okay.  And do you remember at the meeting,

01:42:24  8  or in the after action report, if there was anything

01:42:29  9  about the dog shooting incident?

01:42:34  10      A.  No.  Yeah, we -- just to answer that

01:42:38  11  question -- or to restate it.  Yes, we spoke about it

01:42:43  12  during the debrief.

01:42:44  13      Q.  Okay.  And then do you know if anything

01:42:48  14  that you spoke about in the debrief made it into the

01:42:51  15  report itself?

01:42:53  16      A.  I did not do the after action report, but

01:42:56  17  I would assume that that would be a notable incident

01:43:00  18  that should have been in the after action report at --

01:43:01  19  in some point.

01:43:02  20      Q.  Okay.  Do you know if -- well, I guess you

01:43:05  21  don't know if it was in the report, right, because you

01:43:07  22  didn't see it?

01:43:08  23      A.  I glanced at some -- I'd already reviewed

01:43:13  24  it, but -- like at the time you're saying it was

25  written, or after the fact?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:43:18   2          Q.   After the fact, have you ever reviewed the

01:43:23   3    after action report for the 30 DeJonge Street

01:43:25   4    incident?

01:43:25   5          A.   Yeah.  I glanced at it, yes.

01:43:28   6          Q.   Okay.  And did it say anything about the

01:43:31   7    dog shooting incident?

01:43:31   8          A.   I believe that was touched on somewhere.

01:43:34   9    I do recall seeing it somewhere in the after action.

01:43:38   10         Q.   Okay.  And did it say anything about, for

01:43:41   11   example, how to avoid shooting a dog in the future

01:43:45   12   under similar circumstances?

01:43:48   13         A.   I would have to look at the report.

01:43:50   14         Q.   Okay.  Is that something that you remember

01:43:54   15   being discussed at the after action briefing?

01:43:57   16         A.   No.  But we have had training on that, and

01:44:01   17   that is a part of our training yearly as a team

01:44:05   18   because we encounter more dogs than the average patrol

01:44:11   19   officer.

01:44:11   20         Q.   Okay.  Tell me everything about your

01:44:12   21   yearly training about how to avoid shooting dogs.

01:44:16   22         A.   As I've discussed already, it's still in

01:44:19   23   keeping with the policy that we already have.  If we

01:44:22   24   can avoid it, we'll walk right by the dog.

01:44:23   25              If we can distract it with some type of



Confidential

146

|  |  |
|--|--|
| | 1 |

OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:44:28   2   NFD, which is essentially, you know, a flash-bang, we

01:44:33   3   can use an NFD.

01:44:34   4          Oftentimes, just the sound of the chain

01:44:38   5   saw running, if we're cutting a door, or if we hit a

01:44:40   6   door hard with a ram, the sound of that -- that

01:44:42   7   violent sound, along with a flash-bang at the primary

01:44:45   8   point of entry, or at the threshold of a doorway,

01:44:47   9   will -- oftentimes that will immediately take the

01:44:50   10   fight or aggressiveness out of most dogs.

01:44:52   11          If we can't use that, then we can -- we'll

01:44:54   12   try a catch pole.  We'll try a Taser.  We'll try a

01:44:58   13   40-millimeter deployment.  We will do what we can, if

01:45:03   14   time allows, to avoid shooting a dog.

01:45:06   15      Q.   And when you have these trainings, they're

01:45:18   16   SWAT-specific trainings; correct?

01:45:19   17          MS. JONES:  Objection.

01:45:20   18      A.   Yes, for -- as it pertains to the

01:45:25   19   execution of high-risk search warrants, yes, it

01:45:29   20   applies specifically to us.

01:45:30   21      Q.   And have you ever had a training where you

01:45:32   22   use a real live dog?

01:45:36   23      A.   No.  I think -- you know, we avoid that

01:45:40   24   for obvious reasons.

01:45:42   25      Q.   Okay.  Have you ever had a training



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1    OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:45:47  2   using -- for example, a training simulator for, like,

01:45:53  3   a shoot/don't shoot scenario involving a dog?

01:45:58  4        A.   The only scenarios, like a shoot/no shoot

01:46:04  5   involving a dog would be, like, PRISM, which used to

01:46:06  6   be kind of a simulation like what you're saying that

01:46:08  7   is no longer being utilized.

01:46:12  8        I don't believe it's actually working

01:46:15  9   anymore, and that was many years ago, but that was the

01:46:15  10  closest thing that we had to do that.  And that was

01:46:18  11  not something -- I wasn't on the team back then.  That

01:46:21  12  was more designated for patrol officers.

01:46:23  13       Q.   Okay.  So on the entry team, did you ever

01:46:27  14  have any kind of reality-based, you know, high-stress

01:46:35  15  situation involving how to make the decision whether

01:46:42  16  or not to shoot a dog during the execution of a

01:46:45  17  high-risk search warrant?

01:46:47  18       A.   For reality-based training, no.  We use --

01:46:51  19  we'll do, like, dry runs, and then we'll use -- we'll

01:46:56  20  implement two-dimensional targets, 2D targets, which

01:46:58  21  are paper targets on a backer, and then we'll

01:47:00  22  implement force-on-force with live role players.

01:47:05  23       But again utilizing, like, a real dog, we

01:47:09  24  would not do that.  And a paper target of a dog -- I

01:47:17  25  mean, I haven't seen that yet.  But, no, we wouldn't



```
         1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS
01:47:22 2   do that.
01:47:23 3          We have done that before in firearms
01:47:25 4   training.  The Firearms Training Unit did that when we
01:47:26 5   were in the academy, but that's about it.
01:47:29 6          Q.  Okay.  And was Sergeant Rudolph the
01:47:48 7   commanding officer at the time of that incident?
01:47:51 8          MS. JONES:  Objection.
01:47:55 9          A.  He's the commander of our SWAT team,
01:48:02 10  commanding officer on scene.  I'm not sure if
01:48:04 11  temporary commander or Captain Koonmen was there at
01:48:07 12  the time, but -- I mean, I think that he would take --
01:48:11 13  he would take the commanding officer on scene.  If he
01:48:13 14  was not present, it would be Commander Rudolph.
01:48:16 15         Q.  Okay.  I'm sorry.  That was a bad
01:48:18 16  question.
01:48:18 17         The SWAT team commander at the time of
01:48:22 18  that incident was Sergeant Rudolph?
01:48:24 19         A.  Yes.
01:48:26 20         MR. SHIELDS:  Okay.  And let's talk about
01:48:45 21  the other incident where you shot a dog.
01:48:49 22         So I'm going to put up what will be
01:48:52 23  Exhibit 6.  So it's going to be the incident report
01:48:56 24  for the Incident CR Number 2021-00189988.
01:49:08 25         One second.  I'll throw that up.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|   |   |   |
|---|---|---|
|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|  | 2 | (The following exhibit was marked for |
|  | 3 | identification:  Number EXH 6.) |
| 01:49:20 | 4 | Q.  And, Officer Laureano, is that what you |
| 01:49:21 | 5 | see on the screen right now? |
| 01:49:23 | 6 | A.  Yes. |
| 01:49:25 | 7 | Q.  Okay.  This incident occurred on -- excuse |
| 01:49:29 | 8 | me -- August 29, 2021; is that right? |
| 01:49:32 | 9 | A.  Yes. |
| 01:49:33 | 10 | Q.  At 14 Forbes Street? |
| 01:49:36 | 11 | A.  Yes. |
| 01:49:37 | 12 | Q.  Okay.  And did you review this incident |
| 01:49:40 | 13 | report in preparation for your deposition today? |
| 01:49:43 | 14 | A.  Yes. |
| 01:49:44 | 15 | Q.  Okay.  Can you just tell me everything you |
| 01:49:48 | 16 | remember about this incident? |
| 01:49:49 | 17 | MS. JONES:  Objection. |
| 01:49:49 | 18 | A.  A similar circumstance.  A high-risk |
| 01:49:57 | 19 | search warrant at a location.  We're looking for a |
| 01:50:02 | 20 | specific individual.  Weapons were believed to be |
| 01:50:07 | 21 | present. |
| 01:50:08 | 22 | Instead of -- the only difference, I would |
| 01:50:10 | 23 | say, instead of pulling up to the location, due to the |
| 01:50:13 | 24 | time that we're executing the warrant, 0500, as |
| 01:50:18 | 25 | time-stamped there, we actually patrolled in on foot |



|    |    |
|----|----|
| | 1 |

        OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:50:21   2   due to the fact we could still utilize the cover of

01:50:24   3   darkness to our advantage.

01:50:30   4        So we walked up.  I was assigned to

01:50:38   5   containment that day as well.  We knew that there

01:50:42   6   would potentially be an encounter with a dog in the

01:50:44   7   rear of the yard.  And there was a crate, I believe,

01:50:46   8   at the 3-4 corner that was up against a wooden

01:50:52   9   stockade fence.  And that was of no concern to us

01:50:54  10   because, if it was crated, there's a good chance, you

01:50:57  11   know, it would be on some type of chain.

01:51:01  12        So there was a discussion that I had with

01:51:03  13   the individual who I was teamed up with at that

01:51:08  14   containment point, that we would pause before reaching

01:51:10  15   our containment point at the 3-4 corner because we

01:51:12  16   didn't want to wake the dog.

01:51:13  17        We didn't want to disturb him.  So we come

01:51:13  18   to a stop right around the 2-3 corner.  We kind of get

01:51:17  19   a beat on our containment point.  We call "Set."  That

01:51:21  20   would initiate the other teams to call "Set," which

01:51:26  21   would then be followed by a breach.

01:51:30  22        So we came to the 2-3 corner.  There was

01:51:36  23   also the breach and -- the whole team was behind us.

01:51:39  24   We were covering them as we advanced down the driveway

01:51:40  25   or up the driveway.



1    OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:51:42   2            As we reached the 2-3 corner, the door for
01:51:43   3    the breach and hold was almost right at that corner.
01:51:46   4    Just a few feet up from the actual corner of the
01:51:48   5    house, there's a small porch on the 3 side of the
01:51:52   6    house that connects to the 2-3 corner, and underneath
01:51:55   7    the porch, a dog came out.  So there was a second dog
01:51:58   8    that we were unaware of.

01:52:00   9            It came out.  It was very aggressive
01:52:06  10    immediately.  It was growling and giving us a couple
01:52:14  11    of low deep barks.  His posture was lowering itself.
01:52:21  12    It was doing kind of a slow walk.  And the individual
01:52:27  13    who was next to me was Sergeant Ryan Romig, and he
01:52:31  14    advised me to not pull the trigger unless I absolutely
01:52:34  15    had to.  The reason being is we did not want to
01:52:37  16    compromise the team.

01:52:37  17            The dog -- he transitioned, I believe, to
01:52:44  18    his 40-millimeter weapon because at that time he was
01:52:47  19    part of the less-lethal team.  So he had his launcher.
01:52:50  20    I had my rifle.  And we had, essentially, no space.
01:52:54  21    We were between a car -- a tight space between the
01:52:58  22    car, the side of the house, and a chain-link fence.

01:53:02  23            So the dog -- and the breach and hold team
01:53:05  24    was behind us, which we were covering.  So the dog
01:53:07  25    was -- we were just side-to-side, face-to-face with



Confidential

152

|     |     |
| --- | --- |
| | 1 |
| 01:53:10 | 2 |
| 01:53:13 | 3 |
| 01:53:15 | 4 |
| 01:53:20 | 5 |
| 01:53:24 | 6 |
| 01:53:25 | 7 |
| 01:53:31 | 8 |
| 01:53:32 | 9 |
| 01:53:33 | 10 |
| 01:53:38 | 11 |
| 01:53:43 | 12 |
| 01:53:47 | 13 |
| 01:53:49 | 14 |
| 01:53:53 | 15 |
| 01:53:56 | 16 |
| 01:54:00 | 17 |
| 01:54:04 | 18 |
| 01:54:06 | 19 |
| 01:54:11 | 20 |
| 01:54:13 | 21 |
| 01:54:16 | 22 |
| 01:54:26 | 23 |
| 01:54:29 | 24 |
| 01:54:33 | 25 |

OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

this dog.  It took off very quickly and charged us.

And I probably waited till it got, again,

right around that, like, 2-foot mark -- 2- to 3-feet

mark in front of me.  And it was full speed coming,

and that's when, I would say, simultaneously we both

shot the dog.  Him with his 45-millimeter launcher,

and me with my rifle.

The dog then retreated to -- where it had

come out of, its little space there underneath that

porch.  It became docile.  It whimpered.  We called --

we came -- we made our way to our set position that we

had originally spoke about, the 2-3 corner.

We kept -- maintained visual on the 3 side

of the house, 3 of the yard.  The other dog was fine.

It was chained.  And the one we knew about was of

really no -- was really no threat to us.  But

that did -- that was a compromise because of that shot

that had went off -- or two shots.  And that initiated

the breach at that point.

And then from there, I just stood by until

we were done.  I briefed -- I briefed -- I believe it

was either -- I can't remember if it was Sergeant

Flanagan or Sergeant Ince, but I briefed one of them

about the shooting.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

1    OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:54:34    2    My casing was located directly where I

01:54:37    3    said I was standing.  It was right next to where I was

01:54:39    4    standing, very close to it, and that was it.

01:54:46    5    Q.  How come you didn't wait for Sergeant

01:54:50    6    Romig to shoot the less-lethal before you pulled the

01:54:56    7    trigger?

01:54:57    8    A.  I was.  I think we were both waiting

01:55:00    9    for -- we were both hopeful that the dog was going to

01:55:05    10   be more standoffish and more -- more agitated than --

01:55:10    11   you know, we knew it was aggressive, but we were

01:55:12    12   hoping that it was going to kind of keep itself at a

01:55:14    13   distance.

01:55:15    14   Aggressive dogs will size you up.  They'll

01:55:19    15   pace.  They'll look.  They might take a dash in.  They

01:55:22    16   might scamper back.  They do different things.  But

01:55:22    17   this dog did that for, like, a split second.  Kind of

01:55:29    18   stood up, lowered its center.

01:55:31    19   We couldn't move because of our

01:55:33    20   positioning and covering the breach and hold element.

01:55:36    21   So I think that it was -- you know, the dog just made

01:55:39    22   the decision that, if we were moving, it was going to

01:55:41    23   charge.  I was hopeful that it wouldn't.

01:55:43    24   I think Sergeant Romig was as well.  I

01:55:48    25   don't know -- I think that he was -- he could have --



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

154

| | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |

01:55:51   2   I think he was -- in his mind, probably wanted to

01:55:54   3   deploy that at the last possible second.  It just

01:55:57   4   happened to be when it was right up on us.  It was

01:55:59   5   very fast movement by the dog.

01:56:01   6          And so not hearing him discharging his

01:56:07   7   40-millimeter launcher, I didn't know if it was -- if

01:56:10   8   there was any -- it was experiencing any type of issue

01:56:12   9   or what, but it got close enough, where I'm, like,

01:56:15   10  "Okay.  This dog is about to bite us."  And it was,

01:56:18   11  again, like a couple of feet in front of us when we

01:56:20   12  both pulled the trigger.

01:56:22   13      Q.  All right.  So Sergeant Romig never told

01:56:25   14  you, "Don't shoot.  I'm going to" -- "If the dog

01:56:30   15  charges at us, I'll discharge the less-lethal weapon

01:56:33   16  first."  That never happened?

01:56:36   17          MS. JONES:  Objection.

01:56:36   18      A.  No.  The directive that I received from

01:56:40   19  Sergeant Romig was "Do not shoot that dog unless you

01:56:41   20  absolutely have to."

01:56:43   21      Q.  Okay.

01:56:43   22      A.  Because --

01:56:44   23      Q.  And you were aware that Sergeant Romig had

01:56:48   24  put away his rifle and taken out his less-lethal

01:56:53   25  launcher?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1     OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:56:54  2      A.  He didn't say he was doing it, but I was

01:56:57  3  aware because I could hear him transitioning.  So I

01:57:00  4  didn't have to look at him just to confirm he was

01:57:02  5  doing that.

01:57:03  6      Q.  So you knew that before you pulled the

01:57:06  7  trigger there was a less-lethal option available that

01:57:11  8  Sergeant Romig was prepared to use?

01:57:12  9      A.  Yes.

01:57:13  10     Q.  Okay.  And prior to the execution of the

01:57:21  11  search warrant, were there any plans made at the

01:57:24  12  prewarrant briefing, or otherwise, for how to handle

01:57:28  13  any dogs that might be encountered on the property?

01:57:31  14     A.  Yes.  As I previously stated, we had a

01:57:37  15  brief game plan of how we were going to go about that,

01:57:40  16  knowing that there was a dog further in the backyard

01:57:41  17  and more than likely is chained to something, being in

01:57:45  18  some type of crate.

01:57:46  19      That's why we were going to stop at the

01:57:49  20  2-3 corner, to not go all the way to the 3-4 corner,

01:57:53  21  which we could clearly see from that point, to

01:57:56  22  disturb, upset, or agitate the dog.  We didn't want to

01:58:00  23  make that dog go crazy, to alert anybody inside that

01:58:02  24  location, and have an unneeded compromise.

01:58:06  25      That was for that specific dog that we had



Confidential

156

1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

01:58:11   2   obtained information that would most likely be on the

01:58:13   3   property, not that there was a second dog at that

01:58:18   4   corner that we had stopped at.

01:58:21   5          Q.  Is there any rule that requires, either

01:58:26   6   members of the SWAT team or members of the RPD

01:58:30   7   generally, to use a less-lethal option first before

01:58:34   8   discharging a firearm at a dog?

01:58:39   9          A.  It's encouraged, yes.  We would absolutely

01:58:43  10   try to make the effort to utilize a less-lethal

01:58:47  11   option, if time allows for it.

01:58:49  12          Q.  Okay.  Is there a rule that requires a

01:58:53  13   less-lethal option to be used prior to discharging a

01:58:58  14   firearm at a dog?

01:59:01  15          A.  Yes, if time allows for it, if we have the

01:59:05  16   opportunity to do so.  So we don't just shoot the

01:59:09  17   dogs.  We either create distance, we create space, we

01:59:14  18   gravitate towards cover.

01:59:16  19          If we have somebody that is fortunate

01:59:19  20   enough to have some type of, you know, Taser on them,

01:59:21  21   we could try that.  As far as -- you know, that's

01:59:26  22   really kind of the only other option besides, I would

01:59:28  23   say, outside of beanbag.  But that takes time to get.

01:59:33  24          So that would be something that would have

01:59:36  25   to come from another officer, you know, an additional



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|          | 1  | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|----------|----|-----------------------------------------------|
| 01:59:41 | 2  | resource. |
| 01:59:41 | 3  | Q.  Okay.  Are you aware of what was done |
| 01:59:46 | 4  | before the incident to determine if there was one dog |
| 01:59:49 | 5  | or more than one dog that resided at the property? |
| 01:59:53 | 6  | A.  Yes.  Again, that was something that I had |
| 01:59:57 | 7  | discussed with Sergeant Romig prior to. |
| 02:00:01 | 8  | MR. SHIELDS:  Okay.  Just for the record, |
| 02:00:03 | 9  | I want to put up what will be Exhibit 7, and that's |
| 02:00:09 | 10 | the SWAT operation order for 14 Forbes Street, and I |
| 02:00:22 | 11 | just have one or two questions on this. |
|          | 12 | (The following exhibit was marked for |
| 02:00:24 | 13 | identification:  Number EXH 7.) |
| 02:00:24 | 14 | Q.  And, Officer Laureano, do you see what's |
| 02:00:26 | 15 | been marked as Exhibit 7 for this deposition on your |
| 02:00:30 | 16 | screen, the SWAT Operation Order for the high-risk |
| 02:00:34 | 17 | search warrant on August 21, 2021, at 14 Forbes |
| 02:00:38 | 18 | Street? |
| 02:00:38 | 19 | A.  Yes. |
| 02:00:39 | 20 | MR. SHIELDS:  Okay.  And for the record, |
| 02:00:39 | 21 | the first page -- the first Bates-numbered page for |
| 02:00:45 | 22 | this document is City of Rochester GUR 1359.  And I'm |
| 02:00:50 | 23 | going to go down to the fourth page of this PDF, and |
| 02:00:59 | 24 | this page is Bates-numbered COR GUR 1362. |
| 02:01:03 | 25 | Q.  And, Officer Laureano, so my question |



1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

02:01:07   2    is -- this page says "No Intel on Dogs."  So I guess

02:01:14   3    what I'm wondering is, if there had been intelligence

02:01:20   4    that was gathered prior to the execution of the search

02:01:25   5    warrant about dogs having resided at the property, it

02:01:29   6    would have been in this document; right?

02:01:32   7          MS. JONES:  Objection.

02:01:32   8          A.  You're correct that usually, when we

02:01:35   9    gather intel, that is part of our intelligence

02:01:38  10    gathering and that usually is included in an

02:01:40  11    operations brief.  However, we do always do our best,

02:01:44  12    even up until the day before the warrant, to even

02:01:49  13    double and triple check, touch base with people,

02:01:51  14    whether it would be the case agent or we do an

02:01:56  15    additional scout of the location.

02:01:58  16          But last-minute intel is oftentimes used

02:02:01  17    as well, so that might not be an operational brief.

02:02:05  18    We might receive last-minute intel, you know, the hour

02:02:09  19    before, and that might not be in there.  So it doesn't

02:02:14  20    mean that necessarily that -- that is oftentimes

02:02:18  21    included, but sometimes it is left out due to

02:02:21  22    last-minute intel.

02:02:22  23          Q.  Okay.  Do you know if that happened in

02:02:24  24    this case?

02:02:25  25          A.  Yes, I do know because we discussed the



Confidential

159

1           OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

02:02:32  2  dog, if in the instance there was a dog, because --

02:02:37  3  there was a kennel observed and believed to be a dog

02:02:41  4  on the property.

02:02:42  5         I don't know why it didn't make its way

02:02:44  6  into that briefing.  The only reason I can think of it

02:02:48  7  would be last-minute intel.  But we were aware of the

02:02:50  8  dog because we came up with a game plan of how to deal

02:02:55  9  with the dog prior to deploying.

02:02:57  10      Q.  Okay.  So just so I'm clear, you're saying

02:03:04  11  that when you discussed the kennel on the property,

02:03:06  12  that's not like when you deployed and you started to

02:03:11  13  enter the property and then you saw the kennel?  This

02:03:15  14  was before deploying?

02:03:16  15      A.  Yes.

02:03:16  16      MS. JONES:  Objection.

02:03:17  17      Q.  Do you know how far in advance of the

02:03:24  18  execution of the warrant these operations orders are

02:03:28  19  put together?

02:03:30  20      A.  That would depend, honestly, on when we're

02:03:36  21  tasked with coming up with a plan for whatever.  You

02:03:41  22  know, whatever -- I guess specific discipline, whether

02:03:46  23  it be SIS or Major Crimes or GRANET or, you know, ATF,

02:03:52  24  or whoever gives it to us.

02:03:54  25        We might get it a month in advance, a week



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

160

|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|---|---|---|
| 02:03:56 | 2 | in advance, a day in advance.  It really honestly all |
| 02:04:01 | 3 | depends on when we're given it.  So I can't speak to |
| 02:04:05 | 4 | when that information was received. |
| 02:04:10 | 5 | Q.  Okay.  But here sometime between the |
| 02:04:15 | 6 | operations order and execution of the warrant, you had |
| 02:04:18 | 7 | this discussion specifically about the fact that there |
| 02:04:21 | 8 | is a kennel on the property, so you knew that there |
| 02:04:24 | 9 | was at least one dog on the property; correct? |
| 02:04:26 | 10 | MS. JONES:  Objection. |
| 02:04:27 | 11 | A.  We were aware that there was the strong |
| 02:04:31 | 12 | likelihood of at least one dog based on the |
| 02:04:34 | 13 | last-minute intel that was received.  And that's why |
| 02:04:38 | 14 | we had come up with a plan to halt at the 2-3 corner, |
| 02:04:44 | 15 | and not go all the way to our final assault position |
| 02:04:47 | 16 | because we didn't want to have any type of negative |
| 02:04:51 | 17 | interaction with the dog or upset the dog. |
| 02:04:53 | 18 | Q.  Okay.  And was that plan about not giving |
| 02:04:58 | 19 | away the fact that you guys were executing the warrant |
| 02:05:01 | 20 | and tipping off the people inside, or was that plan |
| 02:05:04 | 21 | about how to deal with the dog in a nonlethal manner |
| 02:05:11 | 22 | to avoid shooting the dog? |
| 02:05:12 | 23 | MS. JONES:  Objection. |
| 02:05:13 | 24 | A.  Both. |
| 02:05:16 | 25 | Q.  Okay.  And what was the -- what was the |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|   | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|---|---|---|
| 02:15:27 | 2 | going to be docile, or you assume that that |
| 02:15:29 | 3 | less-lethal round is going to be effective -- you |
| 02:15:31 | 4 | know, you're going on the assumption that it's all |
| 02:15:32 | 5 | going to be okay, and that's how people get hurt. |
| 02:15:35 | 6 | Q.  On the night of 14 Forbes Street, were you |
| 02:15:50 | 7 | wearing your tactical armor plate and your vest? |
| 02:15:54 | 8 | A.  Yes, sir. |
| 02:15:54 | 9 | MS. JONES:  Objection. |
| 02:15:56 | 10 | Q.  And you had a helmet on? |
| 02:15:58 | 11 | A.  Yes. |
| 02:15:58 | 12 | Q.  And gloves? |
| 02:16:02 | 13 | MS. JONES:  Objection. |
|   | 14 | A.  Yes. |
| 02:16:02 | 15 | Q.  Is there any other body armor that you |
| 02:16:05 | 16 | wear? |
| 02:16:06 | 17 | A.  No.  The only ballistic protection we have |
| 02:16:09 | 18 | is our rifle plates and our Kevlar helmet. |
| 02:16:10 | 19 | Q.  Okay.  And have you ever heard of an |
| 02:16:14 | 20 | officer being seriously injured by a dog? |
| 02:16:19 | 21 | A.  I have heard of officers being injured, |
| 02:16:24 | 22 | but I've seen firsthand what can happen to just |
| 02:16:28 | 23 | regular citizens or regular civilians. |
| 02:16:31 | 24 | Q.  Okay.  So have you ever heard of an RPD |
| 02:16:35 | 25 | officer sustaining serious injuries as a result of a |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

171

|  | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |
|---|---|---|

02:16:38   2   dog attack?

02:16:39   3         A.   No.   And I think that would be a testament

02:16:41   4   to our training.

02:16:42   5         Q.   Okay.   Have you ever heard that no police

02:16:47   6   officer, in the history of the United States, has ever

02:16:50   7   been killed by a dog?

02:16:52   8         A.   Have I ever heard of that?

02:16:54   9         Q.   Have you ever heard the fact that no

02:16:57  10   police officer in the United States has ever been

02:17:00  11   killed by a dog?

02:17:03  12         A.   I have not.   But if that's true, that's a

02:17:06  13   good thing.

02:17:08  14         Q.   I agree that's a good thing.

02:17:10  15              Now, just to be clear, you've never been

02:17:17  16   disciplined for any of these four incidents where you

02:17:20  17   shot at a dog; correct?

02:17:21  18         MS. JONES:   Objection.

02:17:22  19         A.   No, I have not.

02:17:26  20         Q.   Are there any other instances where you

02:17:30  21   have used less-lethal force against a dog?

02:17:38  22         A.   No, not less-lethal.   But, you know, for

02:17:40  23   the close encounters where I was almost bit, I was

02:17:42  24   just -- like I said, just to gravitate towards cover,

02:17:44  25   use barriers, withdrew, because time allowed it.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

02:17:49   2          Q.   And you have never been required to get

02:17:53   3   any additional training on interactions with dogs;

02:17:56   4   correct?

02:17:56   5          MS. JONES:   Objection.

02:17:57   6          A.   No, I have not.

02:17:59   7          Q.   Okay.   Since the academy, other than your

02:18:09   8   SWAT retaining, what training have you received about

02:18:12   9   interactions with dogs?

02:18:15   10         A.   Honestly, just what I received from the

02:18:20   11  academy.   Outside of SWAT, just what I received from

02:18:23   12  the academy and in-service training, and it was more

02:18:25   13  of a refresher.   So -- and I guess, if you want to add

02:18:31   14  to it, just the experiences, the real experiences that

02:18:33   15  I've had on patrol, that you learn very quickly how to

02:18:40   16  deal with.   How to deal with -- how to recognize an

02:18:43   17  aggressive dog and how to deal with it.

02:18:44   18         Q.   Okay.   And when you say your in-service

02:18:47   19  training, is there a specific in-service training that

02:18:52   20  you're referring to?

02:18:53   21         A.   There was one that I was given a while ago

02:18:56   22  so -- I don't recall when.   It was obviously sometime

02:19:02   23  between the time I was off of probation and on my own

02:19:07   24  till the time -- till now.

02:19:09   25         But it was, again from what I can recall,



Confidential

173

1      OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

02:19:13   2   a bit of a refresher from what we had learned in the

02:19:16   3   academy.  I don't recall that there was anything

02:19:20   4   eye-opening that I took from it.

02:19:22   5      Q.  Okay.  Is there anything else specific

02:19:27   6   that you remember from that training?

02:19:30   7      A.  Again, just photos of some dogs that they

02:19:33   8   had of some aggressive-looking dogs, some signs to

02:19:37   9   look for.  Nothing -- again, I don't remember all

02:19:42   10   of -- every slide.  It was some time ago.

02:19:46   11      Q.  And you said it was sort of a refresher

02:19:49   12   from what you learned at the academy?

02:19:51   13      MS. JONES:  Objection.

02:19:52   14      A.  To me, it was a refresher.  I took it as a

02:19:56   15   refresher because it was consistent with what I had

02:20:00   16   learned at the academy and also on the road.  So...

02:20:05   17      Q.  Okay.  And do you remember if there was

02:20:06   18   any discussion about the use of less-lethal options

02:20:14   19   against dogs at that training?

02:20:16   20      A.  There most likely was.  Again, I couldn't

02:20:20   21   say specifically what slide it would have been or

02:20:23   22   where in the presentation:  beginning, middle, end.

02:20:26   23   I'm sure there was something that spoke to that.

02:20:29   24      I mean, it's always an option if you have

02:20:32   25   the resources that are available to you.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

174

| | 1 | OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS |

02:20:37   2      Q.   Does the annual firearms training involve

02:20:43   3   dog shooting scenarios?

02:20:45   4      A.   No, because the annual firearms training

02:20:51   5   usually consists of a qualifier, and sometimes -- if

02:20:55   6   we're not just doing qualifier, we'll do some type of

02:20:59   7   reality-based training.

02:21:00   8          Again, we don't use dogs for reality-based

02:21:03   9   training, but on occasion they might throw it in there

02:21:06   10  just as some type of tactical course on the range,

02:21:10   11  where you'll be introduced -- you'll shoot targets,

02:21:11   12  and one of them may be a two-dimensional target of a

02:21:14   13  dog that's coming at you, you know, on a back or

02:21:18   14  something like that.  And, you know, they'll put you

02:21:20   15  somewhat close so you don't have much time to react.

02:21:24   16          And that's about the only time that I can

02:21:26   17  think we've done something like that, and that was

02:21:28   18  many years ago.

02:21:29   19     Q.   Okay.

02:21:31   20     A.   It's not every year.

02:21:33   21     Q.   Is there any other training that you've

02:21:35   22  received, either with the RPD or anywhere else, about

02:21:44   23  interactions with dogs?

02:21:45   24          MS. JONES:  Objection.

02:21:46   25     A.   No.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

175

        1        OFFICER JONATHAN P. LAUREANO - BY MR. SHIELDS

02:21:49  2            MR. SHIELDS:  Okay.  I think that that is

02:21:52  3    all of my questions for now.  Your attorney might have

02:21:57  4    follow-up questions for you.  I'm not sure.

02:22:04  5            MS. JONES:  Give me one second to look.

02:22:23  6            Nope, no further questions.

02:22:26  7            MR. SHIELDS:  Okay.  Great.

02:22:27  8            THE VIDEOGRAPHER:  Okay.  This will

02:22:28  9    conclude today's testimony.  The time is 2:22 p.m.  We

02:22:35  10   are off the record.

        11                    (TIME:  2:22 p.m.)

        12                    *      *      *

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920