```
             UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -
CHERYL COX,

          Plaintiff,

                Case No. 6:22-cv-6207(FPG)(MJP)
v.

CITY OF ROCHESTER, DAKOTA VANBREDERODE,

          Defendants.
-----------------------------------------------------
CHARLES DEMPSEY, Individually, and L.D., by her
father and natural guardian, CHARLES DEMPSEY,

          Plaintiff,

v.

THE CITY OF ROCHESTER, a municipal entity, JAVIER
ALGARIN, ADAM GORMAN, "JOHN DOE" RPD OFFICER
RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - -

  Remote Deposition Upon Oral Examination Of:

               James W. Crosby, PhD

 Date:         June 12, 2024

 Time:         12:00 p.m.


 Reported By:  CHRISTINE VIGNA

               Alliance Court Reporting, Inc.

               109 South Union Street, Suite 400

               Rochester, New York 14607
```



*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1
 2                    A P P E A R A N C E S
 3    Appearing Remotely on Behalf of Plaintiffs:
 4    Elliot D. Shields, Esq.
 5         Roth & Roth LLP
 6         192 Lexington Avenue, Suite 802
 7         New York, New York  10016
 8         eshields@rothandrothlaw.com
 9
10    Appearing Remotely on Behalf of Defendants:
11    Peachie L. Jones, Esq.
12         City of Rochester Law Department
13         City Hall, Room 400A
14         30 Church Street
15         Rochester, New York  14614
16         peachie.jones@cityofrochester.gov
17                     *     *     *
18
19
20
21
22
23
24
25
```



```
 1                  S T I P U L A T I O N S
 2          WEDNESDAY, JUNE 12, 2024;
 3                  (Proceedings in the above-titled matter
 4                  commencing at 12:04 p.m.)
 5                          *     *     *
 6                  IT IS HEREBY STIPULATED by and
 7                  between the attorneys for the respective
 8                  parties that this deposition may be taken
 9                  by the Plaintiff at this time pursuant to
10                  notice;
11                  IT IS FURTHER STIPULATED, that all
12                  objections except as to the form of the
13                  questions and responsiveness of the
14                  answers, be reserved until the time of the
15                  trial;
16                  IT IS FURTHER STIPULATED, that
17                  pursuant to Federal Rules of Civil
18                  Procedure 30(e)(1) the witness requests to
19                  review the transcript and make any
20                  corrections to same before any Notary
21                  Public;
22                  IT IS FURTHER STIPULATED, that if the
23                  original deposition has not been duly
24                  signed by the witness and returned to the
25                  attorney taking the deposition by the time
```



```
 1              S T I P U L A T I O N S
 2         of trial or any hearing in this cause, a
 3         certified transcript of the deposition may
 4         be used as though it were the original;
 5              IT IS FURTHER STIPULATED, that the
 6         attorneys for the parties are individually
 7         responsible for their certified transcript
 8         charge, including any expedite or other
 9         related production charges;
10              AND IT IS FURTHER STIPULATED, that
11         the Notary Public, CHRISTINE VIGNA, may
12         administer the oath to the witness.
13                    *     *     *
14              THE COURT REPORTER:  Will the
15         attorneys participating in this matter
16         acknowledge that I am not physically
17         present with the witness and that I will be
18         stenographically reporting this from a
19         remote location;
20              And will you also verify that the
21         witness is, in fact, James W. Crosby, PhD;
22              In addition will you stipulate that
23         in lieu of an oath administered in person,
24         I will administer the oath remotely under
25         penalty of perjury to the witness
```



```
 1              JAMES W. CROSBY, PHD - BY MS. JONES
 2      that --
 3           A.   Okay.
 4           Q.   -- sounds familiar.
 5                And you are saying pole, like P-O-L-E
 6      and not P-O-L-L?
 7           A.   Pole, P-O-L-E, correct.
 8           Q.   And how do law enforcement officers
 9      know which alternative control measures are best
10      used in a given set of circumstances?
11           A.   That entirely or largely depends on
12      two things.  The officer's understanding and
13      training to use the various tools and which of those
14      tools the officer has present and available to them.
15           Q.   Does which alternative control
16      measure is best depend on any other factors?
17           A.   It can depend on things such as your
18      purpose in interacting with the animal.  If you are
19      capturing an animal as an animal control officer or
20      a police officer doing duties that require capturing
21      a dog, a domestic dog, for instance, a control pole
22      would be far superior to, for instance, a Taser.
23                Because a Taser is not a -- or any
24      other conducted-electrical weapon is not intended to
25      be for capture.  It's for defense and deterrence.
```



ALLIANCE COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            JAMES W. CROSBY, PHD - BY MS. JONES
 2     So your mission of what you're doing would
 3     significantly affect which tool or tools you
 4     would -- would be more effective and more practical.
 5            Q.   Okay.  I have a few questions about
 6     Tasers.  Do you believe that Tasers are effective
 7     non-lethal options to use on aggressive dogs?
 8            A.   Absolutely.  Not only do I believe
 9     so, but I have physically observed and been present
10     when they have been used and have observed that they
11     have been, in my experience, 100 percent effective
12     on deterring an animal from approaching the officer
13     that was deploying the Tasers or, frankly, anybody
14     else in the immediate neighborhood.
15                 Oh, bless you.
16            Q.   Thank you.  So you may have to repeat
17     some of what you just said.
18                 My question is, what's the basis of
19     your belief that Tasers are effective on aggressive
20     dogs?
21            A.   To begin with, I have physically
22     observed and been present when Tasers have been
23     deployed against dogs that were showing aggressive
24     behavior.  I've also viewed videos of dogs that have
25     been -- where Tasers have been directly deployed.
```



```
 1            JAMES W. CROSBY, PHD - BY MS. JONES
 2                 I'm also aware that both the National
 3       Animal Control Association and the International
 4       Association of Chiefs of Police, among other
 5       agencies, recommend Tasers as defensive, not
 6       capture, tools for domestic dogs and recognize them
 7       as being highly effective and dependable.
 8                 That includes things such -- or
 9       agencies such as the Los Angeles Police Department,
10       the New York Police Department, Miami Police -- or
11       Miami-Dade Police Department.  They're recognized as
12       quite effective, especially when the officers have
13       been taught the proper way to deploy them against
14       the dog, just like you have to be taught to deploy
15       them against a person.
16            Q.   How many times have you been
17       physically present when someone has used a Taser on
18       a dog?
19            A.   At least twice, maybe three times.
20            Q.   Can you tell me about the first of
21       those situations?
22            A.   In all three cases, it was where an
23       aggressive -- dogs were showing offensively
24       aggressive behavior trying to bite.  And the police
25       officers in all three cases deployed their Tasers.
```



```
 1              JAMES W. CROSBY, PHD - BY MS. JONES
 2     The Tasers in all three cases did make proper
 3     contact with the dog.
 4              The dog at those -- in each of those
 5     cases dropped immediately to the ground honestly
 6     screaming and twitching from the electrical impulse.
 7     And in all three cases, as soon as the officer
 8     released the trigger, in other words, terminated the
 9     electrical stimulation, the dogs very energetically
10     jumped up and ran away from us or the officer.
11              I've also seen it used on about a
12     250-pound wild pig that was charging myself, two of
13     my animal control officers and a police officer when
14     I was running animal control out in West Florida.
15     Again, the officer -- the pig charged and actually
16     was able to get a tusk -- or the protruding lower
17     teeth hooked into one of my officer's pants.  The
18     officer -- the police officer thankfully Tased him
19     and hit him immediately.
20              And in that case, the pig screamed,
21     levitated straight up in the air and departed
22     towards the body of water there at high, high, high
23     speed and was never seen in that city park again.
24         Q.   How large were the dogs that you saw
25     someone use a Taser effectively on?
```



```
 1              JAMES W. CROSBY, PHD - BY MS. JONES
 2         A.   Large dogs in probably the 60 to 100
 3    pound range.
 4         Q.   Have you ever reviewed any studies
 5    that test whether Tasers are effective on dogs?
 6         A.   Yes.  I don't remember the exact
 7    study right now, but I have seen research.  And
 8    again, I've also seen the policy statements by
 9    various state animal control associations and the
10    National Animal Control Association regarding
11    the -- the effectiveness of conducted electrical
12    weapons against domestic dogs.
13         Q.   What do you remember about the
14    studies that you've reviewed in the past about
15    Tasers and dogs?
16         A.   The studies I've seen have basically
17    been -- they have not been experimental.  They
18    haven't been, for instance, where ethics were
19    violated by deliberately Tasing dogs to see what
20    happens.  They've been based on anecdotal surveys of
21    Taser usage across fairly large samples.  So, you
22    know, across different departments.
23              And in those cases where both probes
24    have made contact as is proper with the animal, I'm
25    aware of zero cases where the animal did not respond
```



```
 1             JAMES W. CROSBY, PHD - BY MS. JONES
 2    again by initial -- with dogs, initially dropping to
 3    the ground.  And then when the impulse was removed,
 4    heading for the skyline.
 5             Q.   Did those studies report on how many
 6    occasions both probes don't make contact?
 7             A.   No.  I haven't seen any -- any
 8    studies on that.  There's -- there is guidance in
 9    the policies that if one is using a Taser designed
10    for human targets, that one properly deploys it by
11    turning it sideways so that the probes deploy left
12    and right because a dog is generally oriented left
13    and right.  Whereas, people are up and down.
14                  There are now Tasers available that
15    are designed for use against animals and already
16    have the probes designed to deploy horizontally
17    rather than vertically.
18                  MR. SHIELDS:  Can we take a bathroom
19             break at some point?  It doesn't have to be
20             right now.
21                  MS. JONES:  Sure.  I just have a few
22             more questions on Tasers.
23                  THE WITNESS:  Okay.
24             Q.   Do you remember how many data points
25    or anecdotes were included in those studies that you
```

