UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------x
CHARLES DEMPSEY, Individually, and
L.D., by Her Father and Natural
guardian, CHARLES DEMPSEY,
                    Plaintiffs,

                                        Case No.
   - against -                     6:19-cv-6780


THE CITY OF ROCHESTER, a Municipal
Entity, JAVIER ALGARIN, "JOHN DOE"
RPD Officer Responsible For Training
Javier Algarin,
                    Defendants.
-------------------------------------------x
                    Zoom Recorded Videoconference
                    May 31, 2023
                    10:01 a.m.


          RECORDED VIA ZOOM - EXAMINATION
BEFORE TRIAL of RENO DiDOMENICO, taken by
Plaintiffs, pursuant to Article 31 of the
Civil Practice Law and Rules of Testimony,
and Order, held at the above-noted time and
place, before Michelle Conero, a Stenotype
Reporter and Notary Public within and for the
State of New York.

```
(1)
(2)      A P P E A R A N C E S:
(3)
(4)        ROTH & ROTH, LLP
                Attorneys for Plaintiff
(5)             192 Lexington Avenue, Suite 802
                New York, New York  10016
(6)             Phone:  212-425-1020
                E-mail:  eshields@rothandrothlaw.com
(7)        BY: ELIOT DOLBY SHIELDS, ESQ.
(8)
(9)
(10)       CITY OF ROCHESTER LAW DEPARTMENT
                Attorneys for the Defendants
(11)            30 Church Street, Room 400a
                Rochester, New York 14614-1224
(12)            Phone:  585-428-7992
                E-mail:  peachie.jones@cityofrochester.gov
(13)       BY: PEACHIE L. JONES, ESQ.
(14)
(15)
(16)
(17)     A L S O   P R E S E N T:
(18)         JAMES CROSBY
(19)         BLESSING IKWUNZE
(20)
(21)
(22)
(23)
(24)
(25)
```

(1)

(2)                FEDERAL STIPULATIONS

(3)

(4)          IT IS HEREBY STIPULATED AND AGREED

(5)    by and between (among) counsel for the

(6)    respective parties herein, that filing and

(7)    sealing being the same are hereby waived.

(8)

(9)          IT IS FURTHER STIPULATED AND AGREED

(10)   that all objections, except as to the form of

(11)   the question, shall be reserved to the time

(12)   of the trial.

(13)

(14)          IT IS FURTHER STIPULATED AND AGREED

(15)   that the within deposition may be sworn to

(16)   and signed before any officer authorized to

(17)   administer an oath, with the same force and

(18)   effect as if signed and sworn to before the

(19)   Court.

(20)

(21)

(22)

(23)                     oOo

(24)

(25)

(1)

(2)                     VIDEO STIPULATIONS

(3)          IT IS HEREBY STIPULATED AND AGREED by

(4)     and between counsel for all parties present that this

(5)     deposition is being conducted by Videoconference,

(6)     that the Court Reporter, all counsel, and the

(7)     witness are all in separate remote locations and

(8)     participating via Videoconference Zoom meeting

(9)     under the control of Lexitas Court Reporting

(10)    Service, that the witness shall be sworn in

(11)    remotely by the Court Reporter after confirming

(12)    the witness's identity.

(13)         IT IS FURTHER STIPULATED that exhibits may

(14)    be marked by the attorney presenting the exhibit to

(15)    the witness, and that a copy of any exhibit presented

(16)    to a witness shall be e-mailed to or otherwise in

(17)    possession of all counsel prior to any questioning

(18)    of a witness regarding the exhibit in question. All

(19)    parties shall bear their own costs in the conduct of

(20)    this deposition by Videoconference.

(21)

(22)

(23)                        oOo

(24)

(25)

(1)    **RENO DiDOMENICO**

(2)    **but they also did the -- he did a program for**

(3)    **law enforcement and first responders.**

(4)         Q       Okay.  You said that program was at

(5)    Alfred?

(6)         **A       Correct.**

(7)         Q       And did that program -- was it

(8)    specific to dogs or did it include other

(9)    animals as well?

(10)        **A       It was pretty much dogs, if I**

(11)   **remember correctly.  I mean, you're talking**

(12)   **like the summer, maybe, of 2013.**

(13)        Q       Okay.  Did you attend any other

(14)   trainings about dog behavior?

(15)        **A       For this course, no.**

(16)        Q       Okay.  Did you use any other

(17)   resources, like written materials or research?

(18)        **A       Yeah.  Well, the only other thing**

(19)   **was the Department of Defense was also pretty**

(20)   **hot on teaching law enforcement about dog**

(21)   **encounters and they came out with a handbook.**

(22)   **Do you want the title of it?**

(23)        Q       That would be great, if you have it

(24)   handy.

(25)        **A       It's The Problem of Dog-Related**

(1)   **RENO DiDOMENICO**

(2)   **Incidents and Encounters.**

(3)        Q      Okay.  And can you tell me about

(4)   that?

(5)        **A      It's just a handbook for law**

(6)   **enforcement.  It discusses how to, you know --**

(7)   **why it's important to understand the importance**

(8)   **of not just shooting a dog, that there's ways**

(9)   **to calm a dog down.  They give statistics on --**

(10)  **some of those are in the PowerPoint, but they**

(11)  **give statistics on, you know, how many dog**

(12)  **bites there are and how many people actually**

(13)  **die from dog bites a year.  So it's kind of**

(14)  **trying to tell the officer, or whoever is**

(15)  **reading the book, that, you know, it's not**

(16)  **going to be the worst thing if you get bit by a**

(17)  **dog.  It's basically a buildup of trying to**

(18)  **change the mentality of officers from just**

(19)  **shooting the dog and that there's other options**

(20)  **you can do.**

(21)        Q      And how did you incorporate that

(22)  into the PowerPoint?

(23)        **A      So in the first part -- so**

(24)  **basically what I did -- and again, this was**

(25)  **just an awareness course.  This isn't -- I'm**

(1)     RENO DiDOMENICO

(2)     not going to make anybody an expert in dog

(3)     behavior.  This was, hey, these are some things

(4)     you can do out there.  It wasn't -- I say this

(5)     right from the beginning, this is not a do not

(6)     shoot the dog.  This is a there's options,

(7)     because everyone is usually trained to just

(8)     shoot dogs.  There are some options to think

(9)     about.  So basically knowing cops, you have to

(10)     make -- get them on the same page as you to

(11)     make them reassured.  So that's how that was

(12)     used.  So I used a portion of that pamphlet to

(13)     show them that, you know, you're going to be

(14)     encountering dogs out there, that there are dog

(15)     bites out there and, you know, it's not going

(16)     to be the worst thing in the world if you do

(17)     get bit, but, you know, shooting a dog in a

(18)     nonemergency-type situation is not beneficial

(19)     for you.  There's other options you can do.

(20)          Q     Did you -- so I have some follow-

(21)     ups on that.  You said that usually everyone is

(22)     just trained to just shoot the dog.  Is that

(23)     what you said?

(24)          A     Correct.

(25)          Q     So is it your understanding that

(1)    RENO DiDOMENICO

(2)    that was your training at the sheriff's

(3)    department?

(4)         A     Well, I mean, I shouldn't really

(5)    have said that.  But basically that's the

(6)    mentality.  The mentality is if there's a dog

(7)    attacking or acting aggressive, you shoot it.

(8)    I mean, that's -- now, is that what actually

(9)    happens out in the real world?  No.  Cops can

(10)   use common sense.  But for certain situations

(11)   -- like for myself and even some people that

(12)   I've taught, they would say, I would take a

(13)   bite before I shot a dog.  So, you know, not

(14)   every cop thinks that way, but for the main

(15)   part, you revert to training.  You're trained

(16)   to do something.  If you're trained, hey, a dog

(17)   comes at you or a dog attacks you, you shoot

(18)   the dog.  My thing was, well, before that dog

(19)   attacks you, there's things you can do before

(20)   you shoot the dog.  So basically it's an

(21)   awareness course for officers.  I'm not

(22)   teaching them to be experts in dog behavior or

(23)   handling dogs.  I'm teaching them how to be

(24)   safe in the field.

(25)        Q     So basically you're teaching them

(1)    RENO DiDOMENICO

(2)    how to be safe in the field and tools for

(3)    avoiding shooting the dog?

(4)         **A      Mm'hm'.  Correct.**

(5)         **MS. JONES:  Objection.**

(6)         Q      Okay.  I'm going to come back to

(7)    that a little more later.  Based on the

(8)    trainings that you attended -- well, let me

(9)    back up, actually.  I'll withdraw that.  Now,

(10)   you said Department of Defense.  I think it

(11)   might have been the Department of Justice.  Is

(12)   that right?

(13)        **A      Yeah, probably.**

(14)        Q      Okay.  And did you ever watch the

(15)   videos that the Department of Justice released

(16)   with that --

(17)        **A      Yes.**

(18)        Q      -- encounter training?  Are those

(19)   videos incorporated into your PowerPoint at all

(20)   or any of your trainings?

(21)        **A      No.**

(22)        Q      Okay.  Do you give the handouts

(23)   from the Department of Justice with any of your

(24)   trainings?

(25)        **A      No.**

(1)     **RENO DiDOMENICO**

(2)     **some friends who were command officers and**

(3)     **said, hey -- I didn't give names, but I said,**

(4)     **you have some guys who just aren't receptive of**

(5)     **this.  That was pretty much it.**

(6)         Q     Did that happen after the training

(7)     that you gave to the RPD in 2014 with any

(8)     officers?

(9)         **A     That officers tell me that?**

(10)        Q     Correct.

(11)        **A     I get that in every class.  Yeah.**

(12)    **There's just some people are afraid of dogs and**

(13)    **they're just like I'm afraid -- deathly afraid**

(14)    **of dogs, I was bit when I was younger.  You get**

(15)    **that in every class.  Again, I've taught this**

(16)    **to over a thousand officers in New York State,**

(17)    **and I get it in every situation.**

(18)        Q     Are there any specific slides or

(19)    sections in the training that you feel are

(20)    particularly important for deescalation or

(21)    avoidance?

(22)        **A     Any slides?  No.  I go through --**

(23)    **you know, being a former DARE officer, I'm kind**

(24)    **of animated when I teach.  So when we get to**

(25)    **the slide on how to deal with dogs and how to**

(1)     **RENO DiDOMENICO**

(2)     **talk the dog down, it's just a slide with**

(3)     **writing in it.  It says asking what's**

(4)     **appeasement and confidence, and I demonstrate**

(5)     **how to avoid a dog by going through this little**

(6)     **act.**

(7)          Q     And do you think the training could

(8)     have done more to emphasize deescalation and

(9)     avoidance of using lethal force?

(10)         **A     I don't think so.**

(11)         Q     How much of the training or what

(12)    percentage of the training is devoted to the

(13)    use of nonlethal force versus lethal force?

(14)         **A     It usually lasts anywhere between**

(15)    **an hour and a half to two hours depending on**

(16)    **questions, and I would say using nonlethal**

(17)    **force is probably a good forty minutes of the**

(18)    **training.**

(19)         Q     So about half?

(20)         **A     About half.  A little less maybe.**

(21)         Q     And just going back to what you

(22)    were saying before about having provided the

(23)    training to thousands of officers.  That's not

(24)    something that you listed in your resume, is

(25)    it?

(1)    RENO DiDOMENICO

(2)         **A      No.**

(3)         Q      Okay.  How often do you provide

(4)    this training?

(5)         **A      I probably do it -- I do it at two**

(6)    **different academies, the Monroe County and**

(7)    **Genesee Community College Regional Academy.**

(8)    **For awhile -- before COVID, I was probably**

(9)    **going around at least once a year doing**

(10)   **in-service to other police departments or**

(11)   **people invited me to conferences.**

(12)        Q      And, I'm sorry, you said you did

(13)   the police academy for Monroe County and there

(14)   was another one?

(15)        **A      Genesee Community College.  They**

(16)   **have a regional police academy.**

(17)        Q      And how long have you been doing

(18)   the training at the Monroe County Police

(19)   Academy?

(20)        **A      They implemented it -- I don't have**

(21)   **exact dates -- probably 2017-ish.  I don't**

(22)   **know.  I should just say -- it was a couple**

(23)   **years after I trained the City, so it was**

(24)   **either '16 or '17.**

(25)        Q      Okay.  So would that be every

(1)    **RENO DiDOMENICO**

(2)    **running off the porch and starts doing that,**

(3)    **pacing back and forth, barking, he's warning**

(4)    **you to stay off his property. Inhibited bite**

(5)    **might be as you're approaching the dog, he**

(6)    **might be snapping at you, usually at a low**

(7)    **level.  An uninhibited bite is a dog that's**

(8)    **coming at you and bites you, okay.  And then a**

(9)    **lethal is a dog that's trying to knock you down**

(10)   **and get to your face and kill you.  That's what**

(11)   **their continuum is.  I'm not telling the**

(12)   **officer when to shoot at that point.  I'm**

(13)   **telling them what the dog's continuum is in**

(14)   **that situation.**

(15)        Q     So what you say here in the last

(16)   line at the bottom is that bluffing or

(17)   threatening behavior is used in most encounters

(18)   than actual attacks.  It sounds like more often

(19)   times when a dog is expressing some kind of

(20)   aggression, that it's not actually attacking.

(21)   Is that what that means?

(22)        **A     Yes, in certain terms.  Again, it**

(23)   **talks about body language.  This kind of refers**

(24)   **back to the New York City incident where --**

(25)   **this is all explained in the lecture, where the**

(1)     RENO DiDOMENICO

(2)     dog turns and goes after the elderly woman.

(3)     Never bit her, just bluff charged and snapped

(4)     at her.  Never bit her.  And then he turned

(5)     around, redirected his aggression to the

(6)     officer, and basically did the same thing to

(7)     the officer and charged him.  Okay.  And again,

(8)     those are shown -- those videos were picked out

(9)     purposely to show that, yes, he's justified in

(10)    that situation to shoot that dog because the

(11)    dog charged him.  As somebody who is more

(12)    familiar with dogs and just saw what that dog

(13)    did, I might consider that a bluff charge.  I

(14)    may just use a baton, because a baton might

(15)    work on that dog before shooting.  So we -- all

(16)    those videos I revert back to as learning

(17)    exercises.  Just because a dog is charging you

(18)    doesn't necessarily mean that dog is going to

(19)    attack you.  It might be just telling you to

(20)    back off, you're in my space, back off, this is

(21)    my area.  You have to be able to read that dog.

(22)    If you feel that dog is going to attack and you

(23)    shoot it, that's what you document and that's

(24)    what you put down.  But if you feel it's a

(25)    bluff charge, you might end up getting bit.

(1)  **RENO DiDOMENICO**
(2)  **Again, that's where a lot of officers say, I**
(3)  **might take that bite, because they don't want**
(4)  **to shoot the dog.**
(5)      Q    Do you teach officers how to tell
(6)  the difference between an attack and a bluff
(7)  charge?
(8)      **A    I can tell them, but it's**
(9)  **perception. If I feel threatened -- it's just**
(10) **like any deadly physical force situation.  If I**
(11) **feel threatened at that point, I'm justified to**
(12) **shoot that person or dog, right.  It's the**
(13) **officer's perception.  I can tell them what to**
(14) **look for, but in that situation the officer has**
(15) **to make that determination.**
(16)     Q    So just like any other deadly
(17) physical force situation except --
(18)     **A    Right.**
(19)     Q    -- the fact that -- well, let me
(20) back up.  Do you -- do you teach officers in
(21) your training that no police officer has ever
(22) been killed by a dog attack since 1913 in the
(23) entire United States?
(24)     **A    Well, I don't teach them that, but**
(25) **I teach them about, just like I told you, from**

(1)   RENO DiDOMENICO

(2)   the pamphlet, that, you know, there's so many

(3)   dog bites a year and only fifteen people die

(4)   per year on average from dog bites. So

(5)   basically I'm telling them, if you get bit,

(6)   it's not the worst thing in the world.  Yeah,

(7)   you're going to go to the hospital and probably

(8)   get a sick day or two, but you're not going to

(9)   end up in the hospital.  You're not going to be

(10)  mauled.  Most likely you're just going to be

(11)  bit.  Again, we discuss the difference between

(12)  uninhibited bites and lethal.  Again, the dog

(13)  is attacking you and trying to kill you, and

(14)  that's when you shoot it.  That's basically

(15)  what I express to them.  And then you go back

(16)  to the Nampa video, when we were talking about

(17)  that, and we discuss what type of dogs.  They

(18)  were lunging, charging dogs that were jumping

(19)  on the officer, and we discuss that's a lethal

(20)  dog so they see what a lethal dog looks like

(21)  compared to the New York City dog that was

(22)  coming in low and coming in at the officers and

(23)  displaying bluff charging.  So we discuss that.

(24)       Q      Okay.  So those are the videos that

(25)  you use to illustrate the differences?

(1)      **RENO DiDOMENICO**

(2)      **are you going to talk to him.  We talk about a**

(3)      **wagging tail, what a wagging tail means. A**

(4)      **wagging tail doesn't mean friendly.  He might**

(5)      **be telling you he's excited.**

(6)           Q     So I have a question about the

(7)      offensive aggression picture.  On the slide it

(8)      doesn't say anything about that dog actually

(9)      being in the act of attacking or charging.

(10)     Correct?

(11)          **A     Yes.**

(12)          **MS. JONES:   Objection.**

(13)          Q     I'm sorry.  I missed your answer

(14)     because she --

(15)          **A     Yes.**

(16)          Q     It doesn't say that.  Correct?

(17)          **A     It doesn't say that.**

(18)          Q     Okay.

(19)          **A     I say it.**

(20)          Q     Okay.  You say that verbally to the

(21)     officers at the --

(22)          **A     Yes.**

(23)          Q     So let me ask you a question.  My

(24)     question is, let's say a dog is not charging

(25)     and it's not running at the officer, but it's

(1)   RENO DiDOMENICO

(2)   showing all of those signs.  Would that be a

(3)   situation where an officer is justified in

(4)   shooting?

(5)        **A     I would say no at that point,**

(6)   **because the dog is not charging them.  If that**

(7)   **dog is charging you and it has these**

(8)   **characteristics, that's an offensive,**

(9)   **aggressive dog.**

(10)        Q     Is there a difference in, let's

(11)  say, the distance that a dog is approaching an

(12)  officer from in terms of making the

(13)  determination if that dog is charging or

(14)  attacking?  For example, if an officer sees the

(15)  dog coming at them from twenty feet away versus

(16)  if the dog is coming at them from five feet

(17)  away.

(18)        **A     We don't talk about it.  I don't**

(19)  **talk about it.  I basically just go into, if a**

(20)  **dog is looking like that and it's charging you**

(21)  **and you feel justified in shooting the dog, you**

(22)  **have a justification to shoot that dog.**

(23)        Q     Okay.  Is there any --

(24)        **A     But, I mean, if you see that dog**

(25)  **and it's twenty feet away and it ain't charging**

(1)    **RENO DiDOMENICO**

(2)    **you, you have other options.**

(3)         Q    So if the dog is ten feet away and

(4)    it looks like that and it's not charging and it

(5)    barks, are you justified in shooting?

(6)              **MS. JONES:  Objection.**

(7)         **A    Again, it all depends on the**

(8)    **officer and what he feels is a threat.  So my**

(9)    **answer to them would be, you're still in a**

(10)   **standoff mode.  If somebody asked me that**

(11)   **question, I would tell them, you're still in a**

(12)   **standoff mode.  When we talk about offensive,**

(13)   **aggressive, I tell them, that dog is charging**

(14)   **you, it's running at you.  I mean, that's why I**

(15)   **kind of use that German shepherd picture**

(16)   **compared to the others.  That dog looks like**

(17)   **he's running at you.**

(18)        Q    Yeah.  What if a dog approaches you

(19)   and stops and then barks and you yell at it and

(20)   it barks again --

(21)        **A    Mm'hm'.**

(22)        Q    -- but it doesn't charge at you.

(23)   Is that a shoot situation?

(24)             **MS. JONES:  Objection.**

(25)        **A    I'm going to go back to my answer**

(1)    RENO DiDOMENICO

(2)         **A       Yeah.**

(3)              MS. JONES:  Objection.

(4)         **A       Yeah.  Not to get into that whole**

(5)    **thing, but yeah.  She basically said, it's too**

(6)    **much work for me, I'm not going to go and teach**

(7)    **every day, you know, for two hours.  I don't**

(8)    **have time for this.  So I ended up doing it.**

(9)         Q       Got it.  And you had had some prior

(10)   law enforcement experience in doing trainings

(11)   for officers when you were --

(12)        **A       Right.**

(13)        Q       -- a deputy.  Correct?

(14)        **A       Yes.**

(15)             MS. JONES:  Objection.

(16)        Q       Okay. If we keep going through

(17)   these stress signals, these are just additional

(18)   slides on animal behavior that you breeze

(19)   through during the training?

(20)        **A       Yup.  Yeah.  Basically on this one**

(21)   **I'm just kind of showing you that direct stare**

(22)   **and what a dog looks like once you approach**

(23)   **with an open mouth, which is also used in the**

(24)   **Department of Justice video.  They show that,**

(25)   **too.**

(1)   **RENO DiDOMENICO**

(2)        Q      Not this particular picture but a

(3)   similar picture?

(4)        **A      A video.  Yeah, a similar video in**

(5)   **Chicago.  It's that same philosophy or the same**

(6)   **thing.**

(7)        Q      And I forget if I asked you before,

(8)   but now that you mentioned the videos from

(9)   Chicago and the Department of Justice, did you

(10)  watch the videos as you put together this

(11)  presentation?

(12)            **MS. JONES:  Objection.**

(13)       **A      Yeah, I reviewed -- I reviewed some**

(14)  **of them.  I didn't -- I don't want to say I**

(15)  **didn't like them, but I -- I felt it could be**

(16)  **done better.**

(17)       Q      So is that one of the reasons why

(18)  you didn't just show the Department of Justice

(19)  videos instead?

(20)       **A      Yes.**

(21)       Q      Okay.

(22)       **A      And again, I didn't want the**

(23)  **presentation to be too long.**

(24)       Q      Do you remember how long the

(25)  Department of Justice videos were?

(1)  RENO DiDOMENICO

(2)       **A      It depends on the video.  I think**

(3)  **some are like 30 seconds and some are like a**

(4)  **minute.**

(5)       Q      If we keep going forwards,

(6)  additional stress signals.  What do these show?

(7)  Stressed dogs?

(8)       **A      Stress signs, that diverted gaze.**

(9)  **You may be talking to the dog, but the dog is**

(10)  **going to look away from you or keep an eye on**

(11)  **you.  Talking about watch the whites of the**

(12)  **dog's eyes if they're stressed out.  You don't**

(13)  **normally see the whites of a dog's eye unless**

(14)  **they're stressed and their eyes are really**

(15)  **wide, so we kind of go into that.**

(16)            **MR. SHIELDS:  Okay.  And for the**

(17)        **record, that's slide 35 of 51.**

(18)       Q      We'll go forward to 36.  Just other

(19)  stress signals.  It says, "Shake off,

(20)  scratching, yawning, excessively sniffing the

(21)  ground."  Okay.  Anything else that you

(22)  normally mention about that one?

(23)       **A      No.  Just basically look for the**

(24)  **signs.  Like if you're talking to a dog owner**

(25)  **and it's starting to become -- your voices**

(1)   **RENO DiDOMENICO**

(2)   **question for it.**

(3)         Q      Are there certain questions that

(4)   always come up?

(5)         **A      Yeah.  If I run into a dog, I'm**

(6)   **calling you.  That's what -- how do I call you**

(7)   **when I run into a dog, basically.  But no.**

(8)   **Usually they're pretty satisfied at that point.**

(9)         Q      Now, do you teach officers that if

(10)  they respond to a scene and there's a loose dog

(11)  or problems with dogs, that they should call

(12)  animal control?  Is that anything that you

(13)  discuss with them?

(14)        **A      Well, if they find the dogs on**

(15)  **routine patrol on their own, yeah, they should**

(16)  **call animal control, which they normally do.**

(17)  **If a call comes into 911 in Monroe County, a**

(18)  **call comes into 911 that it's a loose dog**

(19)  **running loose, they always send a police and**

(20)  **contact animal control.  They're always being**

(21)  **dispatched anyway.  I'm talking about Monroe**

(22)  **County.  In the City, it's the same way, but**

(23)  **normally the city police are so busy, it's just**

(24)  **animal control responding to check on that**

(25)  **loose, stray dog.  Unless the animal control**

(1)    **RENO DiDOMENICO**

(2)    **officer gets there and it's a real aggressive**

(3)    **dog that they might feel, you know, then they**

(4)    **might wait for the police before they interact**

(5)    **with it.  But in the City, the city police**

(6)    **don't normally go to loose dogs unless it's**

(7)    **after hours, and then they respond.**

(8)         Q    Okay.  Now I'm just going to go

(9)    over some other questions, and we might have

(10)   covered some of them earlier.  Other than the

(11)   videos that we discussed, do you talk about how

(12)   to differentiate between a dog that's attacking

(13)   versus simply bluffing or threatening?

(14)        **A    Like I said, I just mention it in**

(15)   **that New York City video where the bluff charge**

(16)   **is.  I don't show a video.  I don't show a**

(17)   **picture.  I don't -- I just basically explain**

(18)   **to them what a bluff charge is.**

(19)        Q    Okay.  Because in the videos that

(20)   I've seen from the RPD, it seems like a lot of

(21)   shootings happen in situations where officers

(22)   are approaching a dog, and that would be an

(23)   easy thing for officers to mistake.  So I guess

(24)   my question is, is that something that is

(25)   really emphasized in the training, how to make

(1)   RENO DiDOMENICO

(2)   that differentiation and how to recognize when

(3)   it's an appropriate shoot versus a don't shoot

(4)   situation?

(5)        A    I wouldn't say it's emphasized at

(6)   all, no.  I mean, it's talked about, but it's

(7)   not emphasized.  It's just, again, be aware

(8)   that some dogs will charge you or come up to

(9)   you in a bluff charge.  That's pretty much what

(10)  is discussed.  It's not, well, this is what a

(11)  bluff charge looks like, this is how you react

(12)  to it, because, again, I'm not that officer.  I

(13)  may look at that and -- I may look at that and

(14)  say, that's a bluff charge.  Another officer

(15)  may look at that and say, that dog is attacking

(16)  you.  We don't discuss it because I don't want

(17)  them to say, well, he told me it was a bluff

(18)  charge and I got, you know, three or four

(19)  stitches in my leg because I didn't shoot the

(20)  dog.  So we don't discuss it.  It's up to the

(21)  officer.

(22)       Q    Okay.  And similarly, does the

(23)  training discuss or emphasize how to

(24)  differentiate between a dog that poses an

(25)  actual imminent danger to an officer versus a

(1)    RENO DiDOMENICO

(2)    dog that does not but could be mistaken to be

(3)    posing an actual imminent danger?

(4)         A        Again, it's kind of the same thing.

(5)    I mean, it's what that officer is perceiving.

(6)    I don't think you can teach it.  Again, I'm not

(7)    a behaviorist.  Maybe there is a way to teach

(8)    it.  But I don't think you can teach what

(9)    somebody is perceiving.  You can tell them

(10)   about it, you can give them some

(11)   characteristics of what an animal may act like

(12)   or may not act like, but not everything is a

(13)   hundred percent, and I tell them that in the

(14)   training as well.  Even though I'm telling you

(15)   this is what this dog's characteristics are,

(16)   that doesn't necessarily mean that's how the

(17)   dog is going to behave.  You have to perceive

(18)   it yourself, how you feel.

(19)              We had a dog here one time at

(20)   Lollypop that would bark, wouldn't growl, it

(21)   would just bite you.

(22)              You know, you -- it's -- the

(23)   personality of a dog is just like the

(24)   personality of a person.  You can't give every

(25)   scenario of what can happen.  That person has