# The Problem of Dog-Related Incidents and Encounters

Cynthia Bathurst

Donald Cleary

Karen Delise

Ledy VanKavage

Patricia Rushing





The opinions contained herein are those of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice. References to specific agencies, companies, products, or services should not be considered an endorsement by the authors or the U.S. Department of Justice. Rather, the references are illustrations to supplement discussion of the issues.

The Internet references cited in this publication were valid as of the original date of this publication. Given that URLs and websites are in constant flux, neither the authors nor the COPS Office can vouch for their current validity.

Recommended citation: Bathurst, Cynthia, Donald Cleary, Karen Delise, Ledy VanKavage, and Patricia Rushing. 2015. *The Problem of Dog-Related Incidents and Encounters*. Washington, DC: Office of Community Oriented Policing Services.

ISBN: 978-1-935676-31-7
First published 2011
Revised 2015

# The Problem of Dog-Related Incidents and Encounters

**Cynthia Bathurst, Ph.D.**
*Principal Director, Safe Humane Chicago*
*National Director, Project Safe Humane, Best Friends Animal Society*

**Donald Cleary**
*Director, Communications and Publications*
*National Canine Research Council, LLC*

**Karen Delise**
*Director of Research*
*National Canine Research Council, LLC*

**Ledy VanKavage, Esq.**
*Sr. Legislative Attorney, National Manager, Pit Bull Terrier Initiatives*
*Best Friends Animal Society*

**Patricia Rushing, Ed.D.**
*Center for Public Safety and Justice*
*Institute of Government and Public Affairs*
*University of Illinois*

# **Contents**

**About COPS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**Letter from the Director** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**Acknowledgments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**CHAPTER 1. The Problem of Dog-Related Incidents
and Encounters** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Dog-Related Incidents and Encounters Covered in This Guide . . . . . . 1

General Description of Dog-Related Incidents and Encounters . . . . 2

*Extent of Dog Ownership in the Community* . . . . . . . . . . . . . . . . . . . . . . . . . .2

*Types of Dog-Related Incidents and Encounters* . . . . . . . . . . . . . . . . . . . . . .2

*Frequency of Dog Shootings by Police Officers* . . . . . . . . . . . . . . . . . . . . . . .6

Factors Contributing to Dog-Related Incidents and Encounters . . . 6

*Reckless, Uneducated, or Inhumane Owners* . . . . . . . . . . . . . . . . . . . . . . . . .6

*Insufficiently Trained Police Officers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Harms Resulting From Dog-Related Incidents and Encounters . . . . 7

**CHAPTER 2. Understanding Your Local Problem** . . . . . . . . . . . . . . . . . . . .9

Asking the Right Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Measuring Your Effectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**CHAPTER 3. Responses to the Problem of Dog-Related Incidents
and Encounters** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

General Considerations for an Effective Response Strategy . . . . . . 13

*Developing Effective Strategies Within the Agency* . . . . . . . . . . . . . . . . . . . . 13

*Forming Partnerships in the Community* . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Responding Properly to the Media* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Specific Responses to Dog-Related Incidents . . . . . . . . . . . . . . . . . 16

*Effective Police Responses When Encountering Dogs* . . . . . . . . . . . . . . . 16

*Effective Police Responses When Investigating Dog-Related Incidents* . . . 30

*Responses With Limited Effectiveness* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**Endnotes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Suggested Reading** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42



**The Office of Community Oriented Policing Services (COPS Office)** is the component of the U.S. Department of Justice responsible for advancing the practice of community policing by the nation's state, local, territory, and tribal law enforcement agencies through information and grant resources.

Community policing is a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques, to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime.

Rather than simply responding to crimes once they have been committed, community policing concentrates on preventing crime and eliminating the atmosphere of fear it creates. Earning the trust of the community and making those individuals stakeholders in their own safety enables law enforcement to better understand and address both the needs of the community and the factors that contribute to crime.

The COPS Office awards grants to state, local, territory, and tribal law enforcement agencies to hire and train community policing professionals, acquire and deploy cutting-edge crime fighting technologies, and develop and test innovative policing strategies. COPS Office funding also provides training and technical assistance to community members and local government leaders and all levels of law enforcement. The COPS Office has produced and compiled a broad range of information resources that can help law enforcement better address specific crime and operational issues, and help community leaders better understand how to work cooperatively with their law enforcement agency to reduce crime.

- Since 1994, the COPS Office has invested more than \$14 billion to add community policing officers to the nation's streets, enhance crime fighting technology, support crime prevention initiatives, and provide training and technical assistance to help advance community policing.

- To date, the COPS Office has funded approximately 125,000 additional officers to more than 13,000 of the nation's 18,000 law enforcement agencies across the country in small and large jurisdictions alike.

- Nearly 700,000 law enforcement personnel, community members, and government leaders have been trained through COPS Office-funded training organizations.

- To date, the COPS Office has distributed more than 8.57 million topic-specific publications, training curricula, white papers, and resource CDs.

COPS Office resources, covering a wide breadth of community policing topics— from school and campus safety to gang violence—are available, at no cost, through its online Resource Center at www.cops.usdoj.gov. This easy-to-navigate website is also the grant application portal, providing access to online application forms.

# Letter from the Director

Dear colleagues,

In the United States, dogs are an integral part of society, which means police engage with dogs quite often in the line of duty. There are a variety of circumstances where a dog could be involved in a police call, and it is critical that police departments not only develop effective departmental strategies advocating for the proper handling of dog-related incidents and encounters, but also proactively create tactical-response strategies, ensuring humane treatment of dogs and safety for the public and officers.

The COPS Office understands the importance of dog-related incidents and encounters for the public, law enforcement, and dog owners alike. With the number of dog fatalities by law enforcement on the increase, as well as concerns for officer safety, law enforcement officers must advance beyond automatically using their weapons when encountered by a dog. There are many other ways to ensure public and officer safety through diffusing dog encounters.

With *The Problem of Dog-Related Incidents and Encounters*, law enforcement officers have a valuable resource to help them improve incidents involving dogs—internally, externally, and with political audiences—and to build the knowledge, skills, and awareness necessary to succeed in these encounters. This publication offers an in-depth look into developing effective strategies in assessing a dog's environment; what dog posture, vocalization, and facial expressions mean; options for distracting and escaping from a dog; defensive options in dealing with a dog; asking the right questions in dog investigations; and effective gathering of dog evidence and report writing. Presented here are important findings as well as powerful recommendations for agencies to improve their dog encounter processes and illustrate those processes to the public in a way that promotes safety for officers, the public, and dogs they encounter.

By developing effective strategies in dog relations and communicating these strategies to all officers and the public, law enforcement will gain the advantage of strong relationships with internal, external, and political audiences. Some of you may remember that I served as a law enforcement dog handler for several years during the 1970s, and I know this would have been a wonderfully useful publication to have back then. I am proud to be able to share this resource with you now, and hope you all reap its benefits.

*Bernard K. Melekian*

Bernard K. Melekian, Director
Office of Community Oriented Policing Services

iii

# Acknowledgments

*The Problem of Dog-Related Incidents and Encounters* was developed under the auspices of the University of Illinois Center for Public Safety and Justice, Institute of Government and Public Affairs, and made possible by a grant from the National Canine Research Council, LLC.

The authors wish to thank Susan Patterson of the University of Illinois; Kara Gilmore, Manager and General Counsel of the National Canine Research Council; Cliff Froehlich; and Janis Bradley for their generous assistance in the completion of this project.

# CHAPTER 1. The Problem of Dog-Related Incidents and Encounters

Americans love dogs. There is roughly one dog for every four people in the United States, and they live in a variety of relationships with humans. Because dogs are so much a part of American society, police routinely deal with them in the line of duty, and not just when responding to calls about inhumane treatment or animal abuse or when dogs are seen to present a danger to people. In fact, officers encounter dogs in the course of almost every kind of police interaction with the public, from making traffic stops and serving warrants to interviewing suspects and witnesses and even pursuing suspects.

A problem-solving policing approach to dog-related incidents and encounters should recognize the complexity of the human-canine relationship; the need for education concerning the human-animal bond and its well-documented benefits; and the need to regulate reckless and inhumane owner behavior to encourage public awareness of risk factors and to address human and animal behavior problems within the context of applicable statutes, rules, and regulations. The goal is safe, humane communities.

## Dog-Related Incidents and Encounters Covered in This Guide

This guide discusses the tools, practices, and procedures that contribute to effective responses to dog-related incidents and encounters where dogs happen to be present. Primary goals include ensuring public and officer safety and considering community needs and demands.

Although dog-related incidents and encounters may also be related to inhumane care and animal cruelty (including animal hoarding situations and dog fighting), this guide does not directly address them. Each of those requires its own analysis and response. Nor does it directly address public-policy issues (such as dog breed discrimination) or departmental policies that fail to incorporate effective practices.

1

## General Description of Dog-Related Incidents and Encounters

### *Extent of Dog Ownership in the Community*

There are approximately 77.5 million owned dogs in the United States.[1] Indeed, dogs are likely to be encountered in 39 percent of residential locations. A recent poll revealed that approximately 53.5 percent of owners consider their dogs family members, another 45.1 percent view them as companions or pets, and less than 1.5 percent consider them mere property.[2]

Of course, all owners do not maintain their dogs to the same level of positive, humane care. Owners may keep dogs exclusively on chains, in kennels, or in yards and deny them the opportunity for positive interaction with human beings. They may have obtained dogs for negative functions such as guarding, protection, or irresponsible breeding.

### *Types of Dog-Related Incidents and Encounters*

An officer may encounter a dog in a wide array of situations. Most often, officers are called to respond to situations in which dogs are central to the incident:

RESIDENT DOGS ARE DOGS whose owners maintain them exclusively on chains, in kennels, or in yards; or dogs obtained for negative functions (such as guarding, fighting, protection, and irresponsible breeding). Because resident dogs are maintained in ways that segregate them from normal human interactions, they cannot be expected to exhibit the same behaviors as companion animals or family pets that have been afforded the opportunity to interact with humans on a daily basis and in positive and humane ways. 🐾

- Reckless dog owners and serious dog-related incidents or threats to public safety

- Loose or stray dogs that may be perceived as threats to public safety

- Disputes between neighbors involving dogs

However, officers also encounter dog owners and dogs in a host of other settings:

- Traffic incidents (e.g., dogs in cars at routine traffic stops or traffic accidents, dogs on the street injured by vehicles)

- Residential settings (e.g., dogs encountered in homes and apartments when responding to calls for service, serving warrants, or investigating other situations)

SERIOUS BITES ARE RELATIVELY RARE, AND NO PARTICULAR BREED is more likely to be responsible for serious bites:

- In 2007, of the 2,158 bites reported to the County of San Diego Department of Animal Services, only 7.4 percent were classified as "serious." (*Source:* San Diego Department of Animal Services, Dog Bite Data from Jan. 1–Dec. 31, 2007.)

- In a two-year period, from 2007–2008, there were 2,301 bites reported to the Indianapolis Department of Public Safety–Animal Control. Only 165, or 7.2 percent, of these reported bites were classified as "severe." The 165 severe bites were inflicted by 34 different breeds of dogs. (*Source:* Indianapolis Department of Public Safety– Animal Control, Dog Bite Data from Jan.1, 2007–Dec. 31, 2008.)

- In 2007, only 10 (5.5 percent) of all reported dog bites in Washington, D.C., were classified as "severe." The 10 severe bites were inflicted by nine different breeds of dogs. (*Source:* Government of District of Columbia, Bureau of Community Hygiene, Animal Disease Prevention Division, Dog Bite Data from Jan. 1–Dec. 31, 2007.)

- Commercial settings (e.g., dogs guarding a gated industrial facility)
- Streets and parks (e.g., dogs on leads, dogs running loose, dogs locked in a vehicle on a hot day)
- Public places (e.g., service dogs in restaurants)

### Dog Bites

The overwhelming majority of dog bites are minor, causing either no injury at all or injuries so minor that no medical care is required. Fewer than 2 percent of the individuals visiting an emergency room complaining of a dog bite require hospitalization. By way of comparison, in 2009, almost five times as many people went to an emergency room because they had been assaulted by another person as people who went because they had been bitten by a dog. Approximately 5.7 percent of those assaulted by another person were thereafter hospitalized.[3]

The Problem of Dog-Related Incidents and Encounters

DESPITE POPULAR BELIEF, THERE IS NO DOG-BITE "EPIDEMIC."
There is no national system in the United States for tallying reports of dog bites.
The often-repeated estimates of a nationwide total of dog bites are derived from
telephone surveys, the first of which was conducted in 1994. From among the
5,328 persons who responded to this survey, interviewers obtained reports
of 196 dog bites believed to have occurred within the 12 months prior to the
interview. Only 38 of those sought medical attention.

However, even as the canine population has steadily increased over the past
three decades, the number of reported dog bites has drastically decreased. For
example, New York City has seen reports of dog bites decrease from more than
37,000 per year in the early 1970s to fewer than 3,600 in 2009 (*Sources:* D.
Harris, et al. 1974. "Dog Bites—An Unrecognized Epidemic." Bulletin of New
York Academy of Medicine, 50, no. 9, October; New York City Department of
Health and Mental Hygiene.)



**Actual Number of Reported Dog Bites 1971 & 2005**

4

In fact, dogs are seldom dangerous. According to Janis Bradley, author of "Dogs Bite, but Balloons and Slippers Are More Dangerous," more people are killed by lightning each year than by dogs. Despite the increase in the number of dogs and people in the United States, dog bite-related fatalities are exceedingly rare and have not increased over the last two decades: 25 were reported in 1990 as compared to 24 in 2008. Although the number of fatalities fluctuates, it remains low from year to year.[4]

There is no scientific evidence that one kind of dog is more likely to bite or injure a human being than another kind of dog. The American Veterinary Medical Association (AVMA) Task Force on Canine Aggression and Human-Canine Interaction has strongly cautioned against using statistics to target particular breeds as more likely to bite: "Dog bite statistics are not really statistics, and they do not give an accurate picture of dogs that bite."[5]

Most factors that trigger aggression in dogs toward unfamiliar people and can result in bites fall squarely on owners and include the following:

- **Lack of socialization.** Isolated dogs that have not had regular, positive interaction with people may be uncertain, fearful, or aggressive when encountering people or other animals.

- **Lack of supervision and restraint.** Dogs left alone on the premises are likely to see an intruder as a threat. This is made worse if the dog is chained and thus unable to flee.

- **Reproductive status.** Available public-health reports show that more bites are inflicted by unsterilized dogs.

- **Pain and illness.** Dogs who are in pain from injury, disease, or neglect are more likely to see any approach or contact with a human as a threat of more pain.

- **Abuse.** Dogs who have reason to fear humans may try to drive away the threat.

5

THERE IS NO DOCUMENTED CASE OF A POLICE OR PEACE OFFICER
dying as the result of a dog bite-related injury. 🐾

### *Frequency of Dog Shootings by Police Officers*

In most police departments, the majority of shooting incidents involve animals, most frequently dogs. For example, nearly three-fourths of the shooting incidents in Milwaukee from January 2000–September 2002 involved shots fired at dogs, with 44 dogs killed by officers during that period.[6] Information furnished by various California law enforcement agencies indicated that at least one-half of all intentional discharges of a firearm by an officer from 2000–2005 involved animals.[7]

It is in the interests of every department to reduce such occurrences. Departments should review firearm-discharge reports to determine the frequency of the incidents and the circumstances involved and then take steps to reduce the number of incidents.

## **Factors Contributing to Dog-Related Incidents and Encounters**

### *Reckless, Uneducated, or Inhumane Owners*

- Owners who allow dogs to run at large

- Owners who leave tethered or chained dogs unattended

- Owners who neglect or abuse dogs, either failing to provide for their basic health, shelter, and sustenance needs or actively abusing them

- Owners who keep dogs in a chronically unclean, unhealthy environment

- Owners who train or keep dogs exclusively for purposes of personal or property protection

- Owners who are largely absent

- Owners who irresponsibly breed dogs

- Owners who keep a large number of dogs in a small space

- Owners who fight dogs

6

- Owners who fail to sequester females in heat from males

- Owners who fail to sequester female dogs nursing young puppies

- Owners who are ignorant of laws or available resources

## *Insufficiently Trained Police Officers*

- Officers who make judgments concerning a dog they encounter based on its presumed breed or physical appearance rather than its behavior

- Officers who view a dog running toward them as a threat (the dog could be friendly and merely greeting the officer)

- Officers who are unaware of leash laws or the laws governing potentially dangerous, dangerous, or vicious dogs in their city or state

- Officers who lack knowledge of available animal welfare resources

- Officers who lack skills in handling dogs or reading dog body language

- Officers who lack needed canine-communication skills

## **Harms Resulting From Dog-Related Incidents and Encounters**

From the police perspective, the most obvious harm that can result from a dog-related incident is the injury to an officer when a dog bites.

If a responding officer shoots at a dog, however, other harms can result, including bystanders and other officers being shot by friendly fire. For example, in Detroit in 2010, an animal control officer was injured when a police officer fired at two dogs that were running at large.[8] An even more dramatic incident occurred on July 23, 2006, when New York police officers were called to mediate a tenant-landlord dispute. When a dog at the building began biting the leg of an officer, 26 shots were fired at the dog, and three officers were grazed by bullets.[9]

When an officer kills or injures a dog that is not a serious threat, other significant harms can result. Such incidents often do serious damage to community trust in the department and profession. Controversy particularly arises when an officer's assessment of "imminent danger" is challenged by witnesses, the dog's owner, or a video record of the incident.

IN 1998, OFFICERS FROM THE San Jose (California) Police Department raided two homes owned by Hell's Angels motorcycle club members and killed three dogs. The city paid the motorcycle club nearly \$1 million as a result. Two other departments—Santa Clara and Gilroy— also paid for their involvement in the event. The grand total in damages reached nearly \$1.8 million. City appeals were struck down by the courts, which cited Fourth Amendment violations, a failure to consider an alternative for "isolating" the dogs in the week-long planning of the raid, and a failure to use less lethal weapons. (*Source:* Lisa Spahr, "The Canine Factor: To Shoot or Not to Shoot," Subject to Debate, a publication of the Police Executive Research Forum, January 2007.) 🐾

The killing or injuring of a dog also opens the officer and the department to lawsuits and other legal actions, including 42 USC 1983 claims (deprivation of property without due process) and internal affairs investigations. For example, in 2002, a Chicago woman whose dog was fatally shot when it lunged at a Chicago police officer was awarded \$120,000.[10]

Trained officers can mitigate the harms to themselves, fellow officers, bystanders, and the community perception by learning to defuse potentially harmful situations.

A video of a real-time example of a safe, effective use of the Taser®—which ensures the safety of the officers, bystanders, and dogs and provides an opportunity for effective community policing as well—can be viewed at www.liveleak.com/view?i=a1d_1192690532.

8

# CHAPTER 2. Understanding Your Local Problem

The information provided in the previous chapter about the problem of dog-related incidents and encounters is a generalized description. Officers must combine the basic facts with a more specific understanding of their own local problem. Officers will also need to address incidents involving police shootings of dogs, apart from other dog-related incidents in the community, in order to focus on the department-level training that is needed. With that information, and in collaboration with local stakeholders as appropriate, the police department can help develop a plan to improve the current situation and make the community safer and more humane.

## Asking the Right Questions

The following are examples of questions that should be addressed in understanding local problems related to dog ownership and dogs:

- What are the existing reckless owner/dangerous dog ordinances and state laws? Are problem dogs required to be microchipped or permanently identified? Are problem dogs required to be sterilized? Are persistently reckless owners or convicted felons prevented from owning or residing with dogs?

- Are current laws being enforced uniformly? Are current policies realistic, fair, and enforceable? Have the proper resources been provided for successful implementation (e.g., animal care and control funding, police training in animal behavior)?

- What are the current dog ordinances? Are dogs required to be licensed? Is there differential licensing for dogs that offers an economic incentive for neutering/spaying? Are dogs required to be leashed? Is tethering of dogs restricted to times that the owner is present?

- What animal care and control services are available to the community? Do police officers have access to those services?

- Have the local stakeholders been identified (e.g., dog owners, veterinarians, veterinary technicians, humane societies, animal control, dog trainers, behaviorists, animal-business owners, teachers, medical professionals, public officials, community members)? Is there an advisory council of those stakeholders?

9

- Does department policy recognize that dog-related incidents are a function of reckless ownership practices?

- What dog-bite data currently exist in the community? Can the bite data be broken down geographically to ascertain specific areas of concern, even specific addresses?

- Does the department recognize that media characterizations of dogs are often contradicted by animal scientists?

- Does the department recognize that breed identifications contained in available reports are subjective and usually inaccurate[11] and are not a basis for an officer to make a decision in the field?

- Is the connection between domestic violence incidents and dog-bite incidents incorporated into departmental practices?

- Is there an effort to educate the public on the community standards for pet ownership?

- How often do police officers discharge firearms in dog-related incidents? How many dogs have been killed? Have fellow officers or community members been injured in these incidents? Have lawsuits resulted from these incidents?

THE CITY OF CALGARY, ALBERTA, HAS APPLIED A COMMUNITY-oriented approach to animal control that could serve as a potential model for others. Calgary focuses on pet owners and has written a law that codifies its four principles of responsible pet ownership: license and provide permanent identification for pets; spay and neuter pets; provide training, socialization, proper diet, and medical care for pets; and do not allow pets to become a threat or nuisance. Calgary promotes compliance with these principles with education, programs, collaboration, and, when necessary, enforcement, with strict and meaningful penalties.

For information about Calgary Animal and Bylaw Services, see www.calgary.ca/CSPS/ABS/Pages/home.aspx, accessed August 1, 2012. ❖

## Measuring Your Effectiveness

Measurement allows police departments to determine to what degree their efforts have succeeded and suggests how a department might modify its responses and policies if they are not producing the intended results. Measures of the problem should be taken both before and after the implementation of responses to evaluate them objectively. Any observations of increases or decreases in key numbers, such as those listed below, must be understood in the context of other factors, such as departmental policy, change in laws or procedures, media campaigns, and seasonal variations.

The following may be useful questions leading to general measures of the effectiveness of police efforts in the community:

- Is there an increase in the number of inter-agency responses?

- Is there an increase in the quality or availability of animal services in the community?

- Is there an increase in the number of dogs licensed or otherwise permanently identified in your community?

- Is there a reduction in the number of complaints or calls for service?

- Is there a reduction in the number of incidents where officers encounter loose or stray dogs?

- Is there a reduction in the number of disputes involving canines and neighbors?

- Is there a reduction in the number of dog-related incidents?

- Is there a reduction in the number of stray dogs in the community?

- Is there an increase in the number of loose dogs picked up and returned to their owners?

Departments will need to take into account that increased attention to dog-related incidents may result in a short-term *increase* in some numbers where a *reduction* is the outcome sought.

The effectiveness of the efforts within the police department should also be measured:

• Is there a reduction in the number of firearm discharges?

• Are available police reports more focused on the role of the owner in most dog-related incidents?

• Is there access to information on properties whose residents may be keeping their dogs in such a way as to create a risk to officer safety?

# CHAPTER 3. Responses to the Problem of Dog-Related Incidents and Encounters

## General Considerations for an Effective Response Strategy

### *Developing Effective Strategies Within the Agency*

Effective departmental strategies mean that departmental leadership not only advocates for the proper handling of dog-related incidents and encounters but also proactively creates tactical-response strategies. Basic and in-service training should include the following:

- Training on dog behavior by qualified professionals

- Partnering with animal control and other animal services

- Training in appropriate use of nonlethal tools and the force continuum

- Information on local resources

- Organizational policies and procedures that facilitate appropriate outcomes

### *Forming Partnerships in the Community*

Law enforcement may be the lead agency for the response to and reporting of dog-related calls. Therefore, it is prudent to establish an inventory of the resources that may be available to provide expertise and assistance and to develop collaborative partnerships with these resources in the community, providing a foundation for proactive problem solving and effective police response.

Law enforcement organizations that advocate the principles of community policing understand that public safety issues such as dog-related incidents cannot be resolved by the police in a vacuum. Collaborative partnerships and the local multidisciplinary teams will engage and promote ownership of the solutions to issues involving reckless or inhumane owners and their dogs. A little enforcement presence at the early stages can encourage an owner to take corrective actions.

13

Assemble the team based on the stakeholders in the community. Representation on a local multidisciplinary team might include animal control, animal advocates, humane investigators, veterinarians, the medical community, media, and members of the community. Involving the community in anticipation of dog-related issues prepares stakeholders for a collective response to an event, as predetermined by law enforcement personnel.

## STEPS IN THE SARA PROBLEM-SOLVING MODEL

- **SCANNING:** Identifying the problem

- **ANALYSIS:** Learning as much as possible about the problem to identify causes

- **RESPONSE:** Looking for long-term, creative, specific solutions

- **ASSESSMENT:** Evaluating the effectiveness of the response 🐾

Central to the goal of addressing dog-related incidents is promoting the use of the scanning, analysis, response and assessment (SARA) problem-solving process. The application of the SARA problem-solving model empowers community members by accurately and proactively identifying and resolving problematic dog-related issues.

### *Responding Properly to the Media*

Police who effectively deal with the media report only the known facts and the nature of the investigation, using the interaction as an opportunity to educate the public about responsible pet ownership.

For instance, if a dog-related incident or encounter results in a death, the department should be careful not to term it a dog bite-related fatality until the coroner has determined the cause of death. (Such incidents are extremely rare. Only one person in 10 million dies in a dog-related incident per year.[12] Very few officers or even departments will ever be called on to deal with a fatal event.) An exclusively fact-based approach will save the department from potential embarrassment, avoid problems in prosecution, and build community trust.

A good example of what to avoid occurred in 2007, when between August 3 and 6 more than 300 entertainment and media outlets publicized police allegations that dogs belonging to actor Ving Rhames had mauled to death his friend, who was the dogs' live-in caretaker. On August 7, the Los Angeles County Coroner ruled that the dogs had *not* caused the death of the man, and that although the man "sustained bite and claw marks," the injuries were "superficial and not sufficient to cause his

14

death." Many of the articles and quotes attributed to police about this "dog death that wasn't" can still be found on the Internet.[13]

Similarly, the agency should not attempt to identify the dog by breed. Breed identification of dogs of unknown pedigree is extremely unreliable and, in many cases, later investigation will require a retraction.[14] For example, in March 2007 in Friendswood, Texas, police originally reported that a dog believed to have killed a woman was a "pit bull."[15] Subsequent to this report, a family member informed the authorities that the dog was a mix between an American bulldog and a Catahoula. A correction was then published.

An agency can avoid unnecessary complications by precisely describing a dog's appearance, along with any identifying collar, harness, etc. (e.g., a black, 100-pound, long-haired, intact male dog).

POLICE AND THE GENERAL PUBLIC COME TO WRONG CONCLUSIONS because incidents involving certain types of dogs receive a disproportionate amount of coverage. Consider how the media reported two incidents that occurred in December 2008:

- In Coconino County, Arizona, an elderly woman was killed by one or two dogs reported to be Labradors. The sheriff's office issued a press release to all media. However, this incident was reported in only one local newspaper. (*Sources:* Coconino County Sheriff's Office Media Release, December 2, 2008; Arizona Daily Sun, Flagstaff, Arizona, December 3, 2008)

- In Riverside County, California, a man was killed by his grandson's two dogs, both of which were reported to be "pit bulls." The incident was reported in at least 285 media outlets, both nationally (in 47 states) and internationally (in eight other countries). MSNBC, Forbes, USA Today, Fox News, CBS News, and ABC News all picked up the story. (*Source:* Google search conducted by National Canine Research Council on December 21, 2008, using location, victim's name, and keywords to capture articles dealing exclusively with this incident.) 🐾

15

Careful handling of media attention is especially necessary when a dog is shot. Police shootings of any kind are almost always high-profile events, and the shooting of a dog has a set of issues and sensitivities all its own because such a high percentage of dog owners now regard their animals as either family members or companions.[16] Determinations about whether the shooting was justified should be avoided until a thorough investigation has been conducted.

## Specific Responses to Dog-Related Incidents

### *Effective Police Responses When Encountering Dogs*

Dogs use their teeth to get food, manipulate objects, establish and maintain social relationships, and protect themselves and their group from danger. Their teeth are their main tools for interacting with the world, much like a human's hands. Even when they use their teeth to settle conflicts with other dogs and with humans, most use only a fraction of the pressure of which they are capable. This is called *bite inhibition* and is comparable to a human pulling his punches. Even when a threat escalates to tooth contact—most often because the dog's non-contact warning signals have not been heeded—the objective is still usually to drive the intruder away with minimum damage and risk to the dog and others. Almost all dogs will try to bluff or threaten before resorting to actual contact. In this sense, their approach is similar to the force continuum used by police officers. (See "Applying Force in Dog-Related Incidents and Encounters: A Continuum" on page 26.)

Dogs do bite, however, so a careful assessment needs to be made when first encountering a dog. How an officer reads and responds to a dog's behavior is often the most important factor in determining whether a dog will bite, attack, or withdraw. It is equally important to assess the dog's environment. Many dogs, like people, can be territorial.

### *Assessing the Risk*

Before doing a careful assessment of the environment, an officer should assess the risk by first giving attention to the behavior of the dog(s) and the situation:

• An injured dog (e.g., from a traffic accident): Even a friendly, well-socialized dog may bite if injured. Dogs do not understand that a person touching them when they are in pain is trying to help. Therefore, injured dogs should be muzzled before being handled or moved (improvise a muzzle using leashes, belts, or even first aid gauze).



*Photo Credit:* Best Friends Animal Society, "Best Friends' ABCs of Dog Life" (www.bestfriends.org/theanimals/pdfs/dogs/ABCsofDogLife.pdf)

*Gauze can serve as a makeshift muzzle for an injured dog.*

- A frightened dog: Fearful dogs are usually low to the ground with their tail tucked between their legs. Their ears may be flat on their head. The best strategy would be to not approach this dog.

- An approaching dog: Most dogs happily greet a new human. Some will be so enthusiastic about greeting that they will do this at a full run and then launch themselves at the officer. Absent any of the warning signals described below, an approaching dog is almost always friendly. A dog who feels threatened will usually try to keep his distance.

- A barking and lunging dog: This dog is usually restrained by a barrier (e.g., fence, door) or a tie-out (e.g., chain, rope, leash). The restrained dog that barks and lunges at the approaching officer is the highest risk to bite if the officer enters the area the dog can access. The best strategy with a restrained dog is to maintain as great a distance as possible. Still, only a minority of such dogs will actually bite, and even fewer will bite with force. Some dogs will bark and lunge out of simple frustration at not being able to access people and dogs, and the behavior will not occur if the dog is at liberty. The dog straining at the end of a chain or rope may simply be trying to greet the person, particularly if the dog is not barking or displaying any of the warning signs below. The unrestrained dog who barks and snarls and growls

17

but does not approach or stops approaching before actual contact is clearly communicating a warning, not an intent to bite. The dog is only likely to bite if the warning is not successful in driving away the intruder—in other words, if the officer continues to approach the dog or fails to retreat despite the warning.

• A dog stimulated by quick movement: Most dogs will chase any rapidly moving object. Thus, a running officer or member of the public is likely to be chased by any dog in the vicinity, and chasing behavior can then escalate to grabbing and biting. This is not aggression, in the sense of responding to a threat, but rather a game for the dog; it's a response to the same impulse that causes a dog to chase a tennis ball or a toy. Running in an area that a dog can access therefore should be avoided whenever possible.

### Assessing the Environment

There are numerous signs that indicate a dog may be present. These include the following:

• Signs, posters, or window stickers that alert people to the presence of a dog

• Food or water bowls in the yard

• Dog toys or bones

• Worn trails along the fence line

• Chains or tie-outs

• Dog waste

• Barking, whining, or growling

If an officer determines that a dog is present and there's sufficient time, animal control should be called to handle the dog. If that's not an option, the officer should take several steps to minimize risk.

First, the officer should recognize that dogs are territorial and may defend their turf. They often use the same landmarks as people to decide where their territory starts and stops, including fences, gates, sidewalks, and houses.

Therefore, if the officer is entering a yard and sees signs of a dog, the dog should always be alerted to the officer's presence when possible. This can be done by calling out to the dog in a friendly voice and then waiting to assess the dog's response. Many dogs will have learned that certain sounds, such as gate latches opening and footsteps on porches, predict the approach of a person. If there are signs of a dog, the officer should try to amplify such noises (in case of a sleeping

dog) and wait several seconds after making such noises to see whether a dog appears and what the response is. Only the most desperately fearful (or deaf) dog will fail to make an appearance when indicators of a human approach are heard. It's a rare canine who can't be bothered to investigate a new human. Being alert to these possibilities puts the officer in a better position to control the encounter. The extremely fearful dog who is hiding may escalate to trying to drive the intruder away if the officer inadvertently approaches the hiding place, so it's advisable to be aware of places where dogs might seek refuge, such as behind debris and bushes, under porches and in crawl spaces, and, most obviously, in dog houses or shelters.

Dogs will often become upset and even protective of their family when people in their presence are behaving in an agitated or confrontational way. So questioning a suspect or even a witness in the vicinity of an unrestrained dog is unwise. When entering a residence, the owner should be asked to contain the dog. Asking the person to put the dog in the bathroom works best because bathrooms usually have doors, whereas bedrooms sometimes do not. When practical, the owner should be asked to contain a dog that is in the yard before the officer enters the area.

### A HIGHLY PUBLICIZED SHOOTING OF A DOG NAMED PATTON

during a traffic stop in Tennessee resulted in a state law requiring that highway patrol officers receive training in dog behavior. The Smoaks, a North Carolina family traveling through Tennessee, had stopped for gas. Mr. Smoak had left his wallet on top of the car. As the Smoaks drove off, money started flying off the car. Someone called the police, incorrectly stating that there might have been a robbery. Police officers stopped the Smoaks' car and handcuffed Mr. Smoak, his wife, and their child. The Smoaks asked the officers to please shut the car door to secure Patton; when they did not, Patton came out of the car, wagging his tail. A Cookeville police officer shot and killed the dog in front of the vacationing family. The family later filed a Section 1983 civil suit over the death of Patton. The suit was settled out of court for $77,000. A video of the incident can be viewed at www.youtube.com/watch?v=Lv0T2X1dXcI. (*Source:* Fred Brown, "Dog's Blood Stains City's Name," KNOX, January 11, 2003, available at www.knoxnews.com/archives, accessed December 5, 2010.) 🐾

Dogs may also consider the vehicles in which they are traveling to be part of their territory or may simply be eager to exit the car for any number of reasons. In traffic stops, it's consequently important to make certain the dog is controlled. This often can be accomplished by hooking the dog's leash or collar to the safety belt. If a dog bolts into traffic, an accident can result. Therefore, if the owner exits the car, the officer should ensure that the windows are rolled up enough to prevent escape, while providing sufficient air, and that the doors are closed.

### *Assessing the Dog's Behavior: Warning Signals versus Friendliness*

Dogs are extremely adept at reading human body language. They follow our gaze, investigate things we show interest in, and quickly learn human behaviors that predict both safety and fun for them, as well as any likelihood of a human attacking them. Most also see a few common human behaviors as threatening.

Dogs respond to us by communicating through their own body postures, facial expressions, and vocalizations. Without staring at it, the officer should look at the entire dog, checking both for behaviors that show the dog is uncomfortable and feeling threatened and for behaviors that signal comfort and friendliness. An officer should look quickly at the whole dog to get an overall impression of the dog's state of mind. Staring at the dog's face should be avoided, as this can create an eye-contact challenge.



*Photo Credit:* Janis Bradley

*This dog's posture says, "I'd like to play." An officer may approach walking normally.*

20



*Photo Credit: Safe Humane Chicago*

*Remo, a victim of cruelty from a dog fighting bust, has the posture of a dog saying, "I'm relaxed and happy." An officer may let such a dog approach.*

### Body postures

- Is the dog loose and wriggly or is it stiff? Full body wags mean the dog is friendly. The dog that solicits attention by wriggling, curving the body almost into a "C" shape, and approaching with head low and to the side is anxious for attention but a little afraid.

- A dog that approaches slowly with legs and tail held stiffly is warning that a decision hasn't been made as to whether the human is safe or dangerous. The dog may be ready to escalate if the officer does anything that appears threatening.

- Dogs that stop their approach or change direction, although probably wary, are demonstrating an inclination to retreat rather than to try to drive away a threat.

- Dogs that show noninteractive behaviors (e.g., stopping to scratch or lick themselves) are either nonsocial or showing stress. They are unlikely to escalate to warning signals if they are not approached.

- Tail position and wagging are complex aspects of dog body language and should not be relied on as strong indicators of likely behavior. The only exceptions are a tail tucked tightly between the legs and under the body, which indicates a very frightened dog, and a rapidly, loosely wagging tail when shown with the full body wag described above, which is a reliable indicator of friendliness without fear.

21



*Photo Credit:* Best Friends Animal Society, "Best Friends' ABCs of Dog Life" (www.bestfriends.org/theanimals/pdfs/dogs/ABCsofDogLife.pdf)

*This dog's posture clearly says, "I'd like to be friends."*

### Facial expressions (mouth and eyes)

- Dogs warn ("please don't make me bite you") by tensing their lips to expose their teeth in what we commonly call a snarl. They either pucker the lips forward to show a lot of front teeth or pull the lips tightly back, exposing a larger number of teeth but not up to the gumline. The latter expression indicates more fear, but either may escalate to biting if not heeded. Friendly, comfortable dogs often have their mouths open in an expression dog professionals call "play face." The mouth is relaxed, and the dog often pants. A dog giving a warning almost never pants.

- Yawning or lip-licking usually means a dog is anxious or uncomfortable. As with all fear communications, these can escalate to a warning if the dog is pressured. Continuing to approach may pressure the dog.

- Dogs often warn by holding a direct gaze, especially if doing so while also moving (or standing still) stiffly as described above. Many will also respond to direct eye contact from humans as a threat.

- Dogs that guard their resources (e.g., sleeping spaces, food, bones, toys, and sometimes people) will often freeze extremely stiffly and show the whites of their eyes to warn people and other dogs to leave their stuff alone. This is quite different from a dog that is simply resting or standing still. It looks like a sudden freeze-frame shot in a movie. Such a dog is extremely unlikely to escalate unless pressed by the officer approaching closely or attempting to remove the possessions, in which case the dog will probably emphasize displeasure by growling.

22

### Vocalizations

- Dogs bark for many reasons: to express frustration at the squirrel up the tree, to alert the household to visitors, to solicit play or ask for goodies. Dogs even bark out of boredom. So barking by itself is not enough to constitute a warning signal. If it is accompanied by lunging, snarling (see "Facial Expressions" above), and growling, the dog is clearly trying to warn away a threat.

- Whining indicates that the dog is requesting something or is uncomfortable.

- Growling is one of the dog's clearest warning signals. A growling dog should never be approached.

It is generally true that a dog whose tail, body, head, and sometimes ears are low or who is yawning or licking lips may be fearful or worried. The impression may be that the dog is leaning back away from the officer. Approaching this dog would be a further threat, but even with these dogs, a wriggly body means "wants to greet anyway."

THREATENING OR WARNING behavior is not necessarily a predictor of biting behavior. An officer should not assume the animal is always going to bite or attack. There are other reasons that a dog shows upsetting behavior. From the dog's perspective, the officer often appears as dangerously unpredictable to the dog as the dog appears to the officer. Moreover, behavior motivated by fear of strangers will often be mitigated if the animal is removed from an abusive situation and given opportunities for normal socialization. It is more useful to think of a dog as behaving aggressively in this situation right now than to think of it as an aggressive dog. 🐾

High tail, head, body, and sometimes ears as well generally mean a dog is confident; such dogs look as though they're leaning forward toward the officer or standing tall. With the "high" or "forward" dog, a stiff body means "keep away," and a wriggly or relaxed body with relaxed, open mouth means "eager to greet."

Dogs who stare at an officer without moving or show the whites of their eyes are indicating that they are agitated or fearful or feel threatened.

Again, in all instances, avoid an extended look or stare to determine these things. Giving distance, averting looks, or turning eyes, shoulder, or body away signal there is no challenge.

23

The Problem of Dog-Related Incidents and Encounters



*This dog is saying, "You look threatening. Please back off." An officer should not approach or make eye contact, and should use either a passive stance or retreat.*



*This dog is saying, "You scare me. Please don't make me bite." An officer should not approach or make eye contact.*



*This dog is saying, "Please don't make me warn you." An officer should let this dog make the move to approach and should always watch for abrupt cessation of panting and closing mouth with stiffening or freezing of body.*



*This dog is saying, "Please don't hurt me. I'm being as small as I can." An officer should wait to allow this dog to approach and should not stare.*

*Illustration Credit:* Janis Bradley

24

## *Reacting to Dogs*

### Officer behavior on initial encounter

First rule: If you have an animal control or animal services agency, engage their help as soon as possible.

The use of a weapon is seldom required in dog-related incidents or encounters. This subsection is intended to give an overview of how an officer should proceed when a dog is present.

Despite the seemingly complex description of dog behavior in the previous section, two simple strategies will keep officers safe in the vast majority of encounters with dogs.

The first strategy is to use treats to prevent and defuse overtly threatening encounters. Many high-value treats, such as bits of dried liver, are readily available and can be easily stored in a pocket in a small plastic bag. A handful of these can be tossed in a smooth underhand motion (an overhand throw is likely to be perceived as an impending blow) to a dog at a distance. The food will scatter and take the dog a bit of time to collect. This simple tactic is likely to win over the suspicious and mildly fearful dog and to distract and sometimes even win over the overtly warning one. It is the ultimate in de-escalation and also provides valuable information, as a dog that will not eat tasty treats is very frightened. The only time this tactic is not advised is with multiple dogs in the same space, as competition over the food can spark a fight. Hand-feeding any but the most overtly friendly dogs is not advised, however, as drawing a fearful dog closer may make the dog feel more threatened.

The second strategy is to turn the body to the side, look down, and keep the hands close to the body. This approach says "I'm no threat" to the dog, according to "Bark, Stop, Drop, and Roll," a video by the Tennessee Highway Patrol and the American Humane Association. It's the best way to handle dogs that approach in a nonthreatening manner and to prevent fearful signals from escalating to warning signals and warnings from escalating to bites. In addition, it says "I'm no fun" to the overenthusiastic greeter, thus causing a dog to lose interest and not be an impediment to officers doing their job. Some dogs will nip, either in play or as a warning, if a person turns his back completely, so this sideways orientation is preferred.

25

Thus, when encountering a dog, officers should stop all forward movement and turn their bodies to the side. Officers should drop their eyes and watch the dog using peripheral vision. Under no circumstances should an officer stare at a dog. A direct stare is often seen as a threat. When passing by a restrained dog, the officer should toss treats as described above, even if the dog is barking and lunging.

The officer should speak calmly to the dog in a friendly tone while scanning the surroundings for escape routes that will not bring the officer closer to the dog and for barriers that can be used for protection in case of escalation. If the dog is overtly warning by barking or growling, the officer should toss treats to move the dog farther away. Some dogs respond to verbal cues, so saying "Sit" in a pleasant tone and then tossing treats if the dog responds can sometimes distract the dog and defuse the situation.

Most importantly, the officer should never run. A human cannot outrun a dog and, as already noted, many dogs respond to people, animals, and objects that are running or moving quickly by chasing, catching, and even biting. This is play for the dog, not fear or hostility, but serious injury can result. This impulse explains why bicyclists, joggers, skateboarders, and skaters are often involved in problematic encounters with dogs, whether as a result of bites or, more commonly, falls.

### Officer behavior if bitten

In the rare event of a bite, the officer should avoid the impulse to pull away. Such an action can increase injury, changing a less serious puncture into a deep laceration.

If a dog has bitten the hand, the officer should move into the bite, forcing the hand into the dog's mouth. The dog will instinctively release the hand.

If knocked down, the officer should curl into a ball with hands locked behind the neck and arms to protect the neck and throat, with face and front toward the ground to protect vital organs. Most dogs will lose interest if the person attacked stops moving.

## *Applying Force in Dog-Related Incidents and Encounters: A Continuum*

The force-continuum concept for police interactions with people was introduced in response to public and professional concern about excessive use of force by some departments or individuals in dealing with potentially violent or dangerous suspects. One of the principles of such a continuum is that an appropriate response is proportionate to the potential risk to the officer and the public.

Force-continuum principles can also be applied to dogs. Officers should understand that no single dog presents a plausible risk of fatality to an able-bodied adult accompanied by other humans. In fact, only a very few dogs of the very largest types can match the force potential of even an unarmed human. A dog's teeth can only be characterized as "weapons" in the sense that human fists can be so characterized.

Departments should adopt written policies on proper responses to situations involving potentially dangerous animals that reflect a force-continuum approach. It should be emphasized that the necessity to shoot a dog is rare in most situations.

THE USE OF FORCE CONTINUUM
as it relates to people: physical presence, verbal commands, chemical agents, hands-on control, impact weapons, and deadly force.

THE USE OF FORCE CONTINUUM
as it relates to animals: physical presence, verbal commands, mechanical repellants (baton, bite stick), improvised dog repellants, chemical repellants, electronic repellants (stun gun, Taser®), physical capture, chemical capture, and deadly force. 🐾

To ensure force is used properly in dog encounters, law enforcement agencies should provide officers with the following:

• Training on dog behavior

• Access to animal control or services

• Training in appropriate use of nonlethal tools

• Up-to-date equipment that can be used as an alternative to lethal force

When lethal force is used against dogs, departments should require thorough reporting and investigation of incidents and accurate reporting to the public and media.

### Distractions and escape options

If a dog encounter turns threatening—in other words, if the dog is actively giving warning signals as described above—officers should first see whether any distractions are available. Many dogs are distracted by food or play toys such as a ball. It is difficult to overstate the usefulness of routinely carrying dog treats as described above: a handful of treats tossed to the dog can allow enough time for the officer to back away to the police vehicle.

It's also helpful to put an object, such as a chair or garbage can, between the officer and the dog.

If a dog continues to warn while approaching despite the officer adopting the passive stance described above, tossing treats, and discreetly moving away from the dog, the officer should attempt to move to a location that the dog cannot reach (e.g., the inside of the police vehicle) rather than risk a bite.

### Defensive options

When a bite has occurred and the dog continues to bite (rather than biting and then immediately retreating), or a bite clearly cannot otherwise be avoided and the dog is large enough to inflict significant injury, defensive options may be needed. These should be

- effective;
- safe and humane;
- easily deployable;
- acceptable or defensible to the observing public;
- no risk to the observing public.

### Commonly available items

There are several items commonly available in police vehicles that can be used to stop a dog that is biting or to prevent an imminent bite when other means to defuse the situation have been exhausted:

- Flashlights, clipboards, and road flares: All of these items can be used for blocking or redirecting a dog attack. In addition, fast-opening umbrellas often scare dogs. An open umbrella can serve as a shield, and a closed umbrella can be used as a bite stick.

- Batons: A baton can be used for blocking or redirecting a dog attack or used as a bite stick. However, it should be noted that the motions involved in opening a baton are seen as threatening by some dogs.

- Fire extinguishers: A fire extinguisher produces noise, cold, a bad taste, and an expanding cloud—a combination that frightens dogs. Many police departments use fire extinguishers effectively when going in on drug raids if they believe a dog might be on the premises.

- Bullhorns or air horns: Any item that will produce a loud noise is useful.

### Chemical repellants and disabling agents

- Citronella spray (such as Direct Stop or SprayShield) is effective on dogs but not people. Dogs are averse to both the taste and odor.

- Oleoresin capsicum (OC), or pepper spray, is highly effective on dogs. In a study conducted with the Baltimore Police Department, dogs were sprayed with OC in 20 incidents where the animals posed a danger to officers. Officers sprayed dogs at distances greater than those from which they sprayed people, with the majority sprayed from a distance of 3 to 8 feet. Ten of the dogs weighed between 25 and 50 pounds, and six weighed more than 50 pounds. OC was effective nearly 100 percent of the time, and no officers using OC were injured.[17]

- Some departments have found PepperBall a useful tool when executing search warrants in drug houses where dogs may be present.

### Electrical disabling device

- When using a Taser® on dogs, officers must deploy it differently than when using it on people. Most of a dog's body mass is horizontal, or parallel to the ground. Because of this, shooting a Taser® from a vertical position in the hand—the position employed when aiming at a person—will cause the Taser® to spread perpendicular to the body mass of a dog rather than parallel to it. To properly use the Taser® on a dog, it needs to be held sideways, so that the probes spread horizontally when fired, in line with the body mass of the dog. In addition, because a dog is smaller than a person, an officer firing a Taser® must be closer to a dog than to a person, preferably less than 10 feet, with 10 to 12 feet serving as the practical maximum range.[19]

- A Taser® can cause serious injury or death to an animal and so should be used sparingly.

### Tranquilizer guns

Tranquilizer guns should only be used on rare occasions when a dog cannot be safely captured in other ways. They are of no use in disabling an animal that is already biting. These tools require special training and permits for access to the tranquilizing agents. The drugs are somewhat slow-acting, and there is often a risk of losing track of dogs that have been darted.

29

### Lethal force

Lethal force is a last resort and rarely necessary. If lethal force is used, an investigation should be conducted, and it should include any other prior shooting incidents that the officer may have had involving dogs.

## *Effective Police Responses When Investigating Dog-Related Incidents*

Dog-related incidents should be investigated in the same manner as any other incident to which police are called. This is essential to understanding the local problem and preventing other incidents. It is only through adequate investigation that the officer and department will have the information needed for prevention and effective response.

### *Asking the Right Questions*

Police officers need to ask a series of pertinent questions when investigating dog-related incidents, particularly serious dog-bite incidents, to inform subsequent decisions about the disposition of the dog and about criminal and civil liability. Information collected will also help guide future public policy decisions to prevent such incidents. These questions should be informed by the knowledge that any abuse observed or discovered may be an indicator of other abuses in a family or community.

### Questions about the dog owners

- Where did you get this dog?
- Why did you choose this dog?
- Why do you have a dog?
- How long have you had the dog?
- Is the dog licensed?
- Where does the dog sleep?
- Where does the dog stay when you are home? When you are absent?
- How do you contain the dog?
- Have you trained the dog? Has anyone else?
- Do you discipline the dog? How?
- When did you last take the dog to a veterinarian? For what?

### Questions about the dog

- Has your dog injured anyone by biting them previous to this incident? Was the injury treated by a physician?

- How old is your dog?

- Who are the previous owners of your dog?

- Is your dog on any medication?

- Has your dog ever been injured?

- How is the dog's hearing and eyesight?

- Is your dog spayed or neutered?[20]

- Is your dog in heat?

### Questions about the incident

- Where did the incident take place?

- Who was present (including people and other animals)?

- Was anyone interacting directly with the dog immediately before the incident?

- What was the victim doing immediately before the incident?

- What was everyone doing in the few minutes before the incident?

- What did the victim do when the incident occurred?

- What did everyone present do?

- How long did the incident last?

- How did it end?

- What did the dog do when the incident was over?

IN 2005, HAMTRAMCK, Michigan, police responded to a call of a dog bite-related fatality. The sergeant arrived on the scene and determined it was necessary to shoot the dogs. However, he noticed that after the dogs had died, they both excreted bright-green fecal matter. Observing and noting the unusualness of this was instrumental in prompting a necropsy to be done on the dogs. It was determined that the aggressiveness of the dogs may have been due in part or in whole to rodenticide poisoning. The dogs had been abandoned in the basement of a home without food or water and had resorted to eating rat poison in an effort to survive. (*Sources:* Karen Delise, personal interview with responding officer; necropsy and laboratory results from Diagnostic Center for Population and Animal Health, Lansing, Michigan, at request of Michigan State Police.) 🐾

ACCORDING TO THE AMERICAN HUMANE ASSOCIATION,

"A correlation between animal abuse, family violence, and other forms of community violence has been established.…In many communities, human services, animal services, and law enforcement agencies are sharing resources and expertise to address violence. Professionals are beginning to engage in cross training and cross-reporting through inter-agency partnerships." (*Source:* www.americanhumane.org/interaction/support-the-bond/fact-sheets/understanding-the-link.html, accessed on July 12, 2011). 🐾

In addition to the above, the officers should also look for answers to several other important questions:

- Are signs of abuse present?

- Are signs of neglect present?

- Are other dogs present? If so, what is their physical condition? Are there any puppies onsite?

- Is there any evidence of domestic violence?

### *Making a Record of the Incident*

The officer should interview witnesses and gather evidence to determine what was going on immediately before and during the incident.

### *Gathering the Evidence*

Officers responding to a serious bite or a dog bite-related fatality should collect items that link an individual dog to the victim and help re-create the actions between the dog and others at the scene of the incident.

Physical evidence is especially important in the following cases:

- A person who has been seriously injured is unable to identify the exact dog.

- An incident happens in a setting where there are multiple dogs (in pack situations, it's important to identify the individual dog or dogs responsible for the injuries).

- A dog owner refuses to cooperate with an investigation.

Items to collect include clothing fibers, victim's hair, fur, blood, soil, grass, and dog DNA (which can be extracted from blood, clothing, or skin wounds on the victim;



*When gathering evidence, photos should be taken of the dog or dogs in the environment in which they were kept.*

dog feces or hair; or items with which the dog has come in contact such as fences or gates and collars, tags, leashes, and chains).

Photos should be taken that thoroughly record the incident, including the dog, the scene, and the environment. For example, photos of the dog should be taken from all angles, including the top. Photos should also be taken of the dog's environment and how the dog was maintained (i.e., doghouse, food, water bowl, any restraints).

The officer should talk to previous owners, if possible, to determine past treatment of the dog.

If euthanasia of the animal is ordered, a necropsy should be performed on the dog. Pertinent forensic evidence includes the following:

- Saliva

- Stomach contents

- Toxicology from the dog and the victim

- Bite-wound analysis (to identify the species of animal that caused the injury and to discriminate between bite injuries and other sharp force wounds)

- Bite impressions (to determine whether the right dog has been apprehended)

33

MANY EYEWITNESSES HAVE problems correctly identifying dogs, even dogs that may have allegedly bitten them. In a high-profile case involving singer Vanessa Carlton, a dog named Bella was acquitted of biting Carlton because the bite wound on her leg didn't match a mold of Bella's teeth. (*Source:* Howard Frank, "Pit Bull Accused of Biting Vanessa Carlton Wins Reprieve," Pocono Record Writer, July 8, 2010, available at www.poconorecord.com/apps/pbcs.dll/article?AID=/20100708/NEWS/7080315/-1/NEWS01, accessed August 1, 2012. 😺

## *Writing the Report*

The following areas should be addressed when writing a report on a dog-related incident (these are important elements both for responding effectively to the incident at hand and for understanding and preventing others in the future):

- **Description of the dog's appearance:** Dogs should be identified in the same way that an officer identifies property and human suspects. In the academy, officers are taught not to list gold rings as gold because they don't know if they are in fact made from gold. Such rings are instead described as yellow or gold-colored. Similarly, dogs should be identified by their physical characteristics, not their perceived breed. For example, the dog may be a short-haired, muscular, reddish-brown female dog with cropped ears and tail, weighing approximately 50 pounds.

- **Description of the dog's environment:** The conditions in which the dog lived should be noted. Were the surroundings clean or dirty? How much dog waste was in evidence? Were food, water, and shelter available? Was the dog tethered?

- **Description of the dog's care:** The dog's general state should be assessed. Was the dog a family dog in good health? Were there signs that the dog was unsocialized or neglected? Did the dog have any obvious medical conditions or injuries?

- **Description of the dog's behavior:** The manner in which the dog behaved while in the officer's presence should be recorded. What did the dog do when the officer entered or the dog first saw the officer? Did the dog approach the officer in a friendly way (see "Assessing the Dog's Behavior: Warning Signals vs. Friendliness" on page 20)? Did the dog exhibit threatening or fearful body language? Did the dog remain close to the owners or go off on its own? If confined out of sight, was the dog barking and lunging at the door or quiet?

A GOOD EXAMPLE OF EFFECTIVE EVIDENCE GATHERING IS A
2007 case in Steuben County, New York, in which a child was killed by his father's dog.
The investigating detective determined the following:

- The father had owned the dog less than a week.

- The unsterilized dog was just over 1 year old and had already had five different owners.

- The dog was chained to a junk pile.

The detective then tracked down all previous owners, including one who had left the
dog in the basement and frequently failed to feed the dog. He discovered that the father
had previously been charged with owning a dangerous dog after the child was bitten in
the neck and that the father had been advised by Child Protective Services not to allow
his child to be unsupervised with the dog. Because of the detective's work, the father
was charged with endangering the welfare of a child. (*Source:* National Canine Research
Council, available at nationalcanineresearchcouncil.com/uploaded_files/tinymce/
New%20York%20Tragedy.pdf, accessed August 3, 2011.) 🐾

These questions are meant only as prompts. The officer should describe
specifically and in as much detail as possible what was observed.

## *Responses With Limited Effectiveness*

There are a variety of police responses to dog-related incidents and
encounters that will almost inevitably yield poor results:

- **Assuming cause of injury or fatality:** To avoid reaching incorrect
  conclusions, officers should investigate fatalities that appear to be
  caused by dogs as they would any potential homicide or assault.

- **Attempting to identify the dog by breed, unless the owners have
  produced proof of purebred registration:** Breed identification of
  dogs of unknown origin is likely to be incorrect. Misidentification of
  breed can hinder investigations. For example, if law enforcement is
  trying to find the owner and police identify the dog as a pit bull but the
  owner and neighbors have always thought the dog was a Labrador,
  the chances of locating the dog's owner are vastly diminished. Breed
  misidentification in a police report may also lead to reasonable doubt
  and impeachment on the witness stand.

35

AN INACCURATE PHYSICAL DESCRIPTION CAN DERAIL AN OFFICER'S courtroom testimony, so it's important that an officer is certain that s/he can describe the dog by its physical characteristics. Here is a brief list of useful identifiers:

**Coats:** tight ringlets, short and straight, long shiny, relaxed curls, course.

**Colors:** light tan, grey, straw, pale cream, reddish brown, brindle, black, red, white.

**Muzzle:** long, medium, snub-nosed.

**Tails:** curls over back, hangs down, gentle curve, without tail.

**Ears:** long and thin, pink and cropped, folded-over tips, short, folded at side of head, long and thick.

**Unique identifiers:** missing or deformed limb, missing eye, missing toe, docked or partially amputated tail, dark spots on belly or tongue, torn or cropped ears, scars and location of scars, missing teeth, missing hair.

**Size:** approximate weight and height at the point where the neck meets the back. 

- **Shooting the dog:** Shooting a dog should always be the option of last resort. The safety of fellow officers and bystanders is put at risk in such situations, and when a law enforcement officer shoots a dog that does not constitute a serious threat, community trust is eroded and the department is opened to potential lawsuits and other legal action.

Other inadequate responses include the following:

- **Handling the incident in a phone conversation:** Failure to observe the scene of an incident or the dogs allegedly involved can lead to incorrect conclusions and inadequate reporting, particularly regarding determinations of who is involved and what factors contributed. Leaving the incident to animal control may close the call for service but may also close the opportunity to address the issue with the owner. It is also a missed opportunity to build good community relationships.

IT IS IMPOSSIBLE TO BREED-LABEL DOGS OF UNKNOWN HISTORY and genetics solely on the basis of their appearance. In surveys conducted by Dr. Victoria Voith and colleagues from Western University, adoption agency personnel were asked to identify by visual inspection the breed or breeds of dogs whose origin they did not know. In only 25 percent of the dogs was at least one of the breeds proposed by the adoption agencies also detected as a predominant breed by DNA analysis. In 87.5 percent of the adopted dogs, breeds were identified by DNA analyses that were not proposed by the adoption agencies. It is likely that identification by law enforcement officers is also usually incorrect. (*Source:* V. Voith, E. Ingram, K. Mitsouras, et al., "Comparison of Adoption Agency Identification and DNA Breed Identification of Dogs," *Journal of Applied Animal Welfare Science*, July 2009.)

Attempts at breed identification can result in conflicting reports between agencies. Often, police are the first to be interviewed and quoted by the media in cases involving a dog-related incident, and it is not uncommon for the officers to attempt to identify the breed of dog involved. It is also not uncommon for animal control to later identify the same dog as a different breed/type. For example, in June of 2008, a small child was injured by a dog that the Los Angeles Police Department (LAPD) described to the media as a pit bull. The following day, the Los Angeles County Department of Animal Services issued a statement that the dog was not a pit bull but appeared to be a "shepherd mix." Thereafter, LAPD referred all inquiries on the case to Animal Services. To avoid conflicting information between agencies, police officers should focus on identifying the correct dog involved in the attack and an accurate description of the dog and its behavior; officers should not attempt to identify the breed. (*Sources:* Tami Abdollah, "1-Year-Old Boy Bitten by Pit Bull in Pacoima," Los Angeles Times, June 5, 2008; For the Record correction of article, Los Angeles Times, June 6, 2008.)

IN JANUARY 2003, WHILE jogging in the Dan Ryan Woods, Chicago resident Anna Cieslewicz was set upon and killed by two loose, roaming dogs. Police officers canvassed the area, with both the news media and the police describing the canvass as an attempt to locate the owners of two "pit bulls." However, subsequent detailed examination of the dogs revealed that neither conformed to the standards of the breeds commonly known as "pit bull." Inaccurate breed identification may have thwarted police efforts to locate the owner or owners, who were never apprehended. Had police described the dogs only in terms of their easily recognizable physical characteristics (i.e., size, color, weight, coat thickness, head shape), as with a human suspect, their attempts to locate the owners might have been successful. (*Sources:* S. Chan, "Pit Bull Owners Sought in Chicago," CBS News, January 13, 2003, available at www.cbsnews.com/stories/2003/01/13/eveningnews/main536337.shtml, accessed December 5, 2010; findings and testimony of Karen Delise, expert witness for the Cook County Forest Preserve.) 🐾

- **Handling the dog(s) ineffectively or inhumanely:** The mishandling of a dog may result in injury to the officer, residents, and the animal. Dog owners have a protected property right in their dogs, and courts in some jurisdictions now recognize dogs as family members. In addition, police knowledge of and tolerant handling of dogs can create goodwill in the community and lead to helpful communication.

- **Handling the scene ineffectively:** Mishandling or failing to secure the scene can lead to inadequate reporting and impeachment on the stand in court. It ignores the importance of assessing collateral damage.

- **Failing to document the incident or gather evidence:** Report writing creates a history of an incident, without which prosecution cannot take place. In addition, there is no way to document a pattern of incidents without adequate reporting. Such failures also leave no recourse in civil or criminal proceedings.

- **Failing to cite the owner or charge the offense(s):** With no record of an incident, there is no clear way to prevent future incidents or understand the local problem. It neglects the need to make the local environment inhospitable to reckless owners and safe for community residents. It does nothing to change owner behavior.

- **Failing to follow recidivists:**
  Reckless owners are often
  recidivists—if one dog is removed
  from them, they simply acquire
  another. Knowing who the recidivists
  are and checking on them is essential
  to preventing future incidents and to
  ensuring safe, humane communities.

- **Failing to use and enforce quality-
  of-life ordinances such as building
  and zoning violations, noise
  ordinances, and licensing:** Such
  approaches can effectively address a
  dog-related problem.

- **Failing to have inter-agency
  response systems:** Cooperation
  among agencies can not only improve
  responses to dog-related problems but
  also identify issues related to family
  violence. For example, social service
  professionals recognize that abusers

THE OFFICE OF JUVENILE
Justice and Delinquency Prevention
points out that reporting of "abuse of
sentient creatures" provides valuable
"contact information for additional
resources concerned with violence
perpetrated against animals and people."
(*Source:* Frank R. Ascione, "Animal Abuse
and Youth Violence," Office of Juvenile
Justice and Delinquency Prevention
Juvenile Justice Bulletin, September
2001, available at www.ncjrs.gov/
pdffiles1/ojjdp/188677.pdf, accessed
December 5, 2010.) 🐾

kill, harm, or threaten children's pets to coerce them into sexual abuse
or to force them to remain silent about abuse. Disturbed children kill
or harm animals to emulate their parents' conduct, to take out their
aggressions on another victim, or even to prevent the abuser from
killing the pet.[21]

# Endnotes

1   "2009–2010 APPA National Pet Owners Survey," American Pet Products Association website, accessed December 5, 2010, http://americanpetproducts.org/pubs_survey.asp.

2   *U.S. Pet Ownership and Demographics Source Book, 2007 edition* (Schaumburg, IL: American Veterinary Medical Association, 2007).

3   "Nonfatal Injury Data," Centers for Disease Control and Prevention website, accessed December 5, 2010, http://www.cdc.gov/injury/wisqars/nonfatal.html.

4   "Types of Dog Bites," National Canine Research Council website, accessed August 3, 2011, http://nationalcanineresearchcouncil.com/dogbites/types-of-dog-bites.

5   American Veterinary Medical Association Task Force on Canine Aggression and Human-Canine Interactions, "A Community Approach to Dog Bite Prevention," Journal of the American Veterinary Medical Association 218, no. 11 (June 1, 2001): 1732–1749.

6   Kristin Kappelman, A*nalysis of Use of Force Incidents Against a Canine in the Milwaukee Police Department: January 1, 2009 to December 31, 2009* (Milwaukee, WI: Fire and Police Commission, 2010), http://www.city.milwaukee.gov/ImageLibrary/Groups/cityFPC/agendas2/100902_NB_A.pdf.

7   Lisa Spahr, "The Canine Factor: To Shoot or Not to Shoot," *Subject to Debate,* January 2007.

8   T. Asher, "Anti-Cruelty Society Worker Shot on Detroit's East Side," myFoxdetroit.com, last updated September 2, 2010, http://www.myfoxdetroit.com/story/18474732/anti-cruelty-society-worker-shot-on-detroits-east-side.

9   Fernanda Santos, "4 Officers Hurt (One by Pit Bull) as Police Fire 26 Shots to Kill Dog in Bronx," *The New York Times,* July 24, 2006, http://www.nytimes.com/2006/07/24/nyregion/24pitbull.html?_r=0.

10  Kate Schott, "Dog is Slain by Police Officer; Woman Wins Civil Rights Claim," *Chicago Daily Law Bulletin,* March 6, 2002.

11  Victoria L. Voith, Elizabeth Ingram, Katherine Mitsouras and Kristopher
    Irizarry, "Comparison of Adoption Agency Breed Identification and DNA Breed
    Identification of Dogs," *Journal of Applied Animal Welfare Science* 12, no. 3
    (2009), 253–262.

12  "CDC Wonder," Centers for Disease Control and Prevention website, accessed
    December 5, 2010, http://wonder.cdc.gov.

13  "Media Mauls Dogs First, then Snaps Back at Actor," PRWeb press release,
    August 16, 2007, http://nationalcanineresearchcouncil.com/uploaded_files/
    tinymce/Ving%20Rhames%20NCRC%20Press%20Release.pdf.

14  Voith et al., "Comparison of Adoption Agency Identification" (see note 11).

15  "Dog Suspected in Mauling Not a Pit Bull," Galveston Daily News,
    March 21, 2007, http://www.galvnews.com/news/article_96e81ad5-d9d2-
    5626-ada4-bd317cb3415f.html.

16  Spahr, "The Canine Factor" (see note 7).

17  Steven M. Edwards, John Granfield, and Jamie Onnen, "Evaluation of Pepper
    Spray," National Institute of Justice Research in Brief, February 1997, https://
    www.ncjrs.gov/pdffiles/162358.pdf.

18  Anthony Barnett, "The Myth of the Taser-Proof Put Bull," Game Dog Guardian
    website, accessed December 5, 2010, http://www.gamedogguardian.com/
    education-and-resources/taser-proof-pit-bull-myth.

19  According to the National Canine Research Council in 2007, in 97 percent of
    dog bite-related fatalities, the owners failed to sterilize their dog.

20  F.R. Ascione, *Children and Animals: Exploring the Roots of Kindness and Cruelty*
    (West Lafayette, IN: Purdue University Press, 2005).

# Suggested Reading

American Veterinary Medical Association Task Force on Canine Aggression and Human-Canine Interactions, "A Community Approach to Dog Bite Prevention," *Journal of the American Veterinary Medical Association* 218, no. 11 (June 1, 2001): 1732–1749.

Bradley, Janis. 2007. *Dog Bites: Problems and Solutions*. Ann Arbor, MI: Animals & Society Institute.

Corona Research. 2009. *Dog Bites in Colorado: Report of Dog Bite Incidents Reported to Animal Control July 2007 – June 2008*. Coalition for Living Safely With Dogs. http://www.livingsafelywithdogs.org/mm_frameset_about_us.htm.

Gorant, Jim. 2010. *The Lost Dogs: Michael Vick's Dogs and Their Tale of Rescue and Redemption*. New York: Gotham Books.

Harris, David. 2005. *Good Cops: The Case for Preventative Policing*. New York: The New Press.

Horowitz, Alexandra. 2009. *Inside of a Dog: What Dogs See, Smell, and Know.* New York: Scribner.

Schaffner, Joan (editor). 2009. *A Lawyer's Guide to Dangerous Dog Issues*. Chicago: American Bar Association.

Americans love dogs. There is roughly one dog for every four people in the United States, and they live in a variety of relationships with humans. Because dogs are such a part of American society, police routinely encounter them in the line of duty, not just when responding to calls about inhumane treatment or when dogs are seen to present a danger to people. Officers encounter dogs in the course of almost every kind of police interaction with the public, from making traffic stops and serving warrants, to interviewing suspects and witnesses, and even pursuing suspects.

*The Problem of Dog-Related Incidents and Encounters* discusses tools, practices, and procedures that contribute to effective responses to dog-related incidents and encounters where dogs are present. Primary goals include ensuring public and officer safety and considering community needs and demands.



U.S. Department of Justice
Office of Community Oriented Policing Services
145 N Street NE
Washington, DC 20530

To obtain details about COPS Office programs,
call the COPS Office Response Center at 800-421-6770.

Visit the COPS Office online at www.cops.usdoj.gov.

e051116358
ISBN: 978-1-935676-31-7
First published 2011
Revised 2015