1

2                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
3      - - - - - - - - - - - - - - - - - - - - - - - - -
       MARIANNE ANNISZKIEWICZ,
4
                Plaintiff,
5      v.
                          Index:  20-cv-6629 (FPG)(MWP)
6

7      THE CITY OF ROCHESTER, a Municipal Entity, POLICE
       OFFICER BRIAN CALA, SERGEANT JENNIFER TRENTON,
8

9                Defendants.
       - - - - - - - - - - - - - - - - - - - - - - - - -
10

11     Deposition Upon Oral Examination of:

12                    Officer Brian Cala

13

       Location:        The Powers Building
14                      16 West Main Street, 8th Floor
                        Rochester, New York 14614
15

16

       Date:            November 8, 2022
17

18

       Time:            10:00 a.m.
19

20

21

22     Reported By:  CHRISTINE VIGNA

23                   Alliance Court Reporting, Inc.

24                   109 South Union Street, Suite 400

25                   Rochester, New York 14607



```
 1

 2                    A P P E A R A N C E S

 3    Appearing on Behalf of Plaintiff:

 4    Elliot D. Shields, Esq.

 5        Roth & Roth LLP

 6        192 Lexington Avenue, Suite 802

 7        New York, New York  10016

 8        eshields@rothandrothlaw.com

 9

10    Appearing on Behalf of Defendants:

11    Peachie L. Jones, Esq.

12        City of Rochester Law Department

13        City Hall, Room 400A

14        30 Church Street

15        Rochester, New York  14614

16        peachie.jones@cityofrochester.gov

17                    *      *      *

18

19

20

21

22

23

24

25
```



```
 1              S T I P U L A T I O N S
 2    TUESDAY, NOVEMBER 8, 2022;
 3              (Proceedings in the above-titled matter
 4              commencing at 10:05 a.m.)
 5                      *      *      *
 6              IT IS HEREBY STIPULATED by and between the
 7    attorneys for the respective parties that this
 8    deposition may be taken by the Plaintiff at this time
 9    pursuant to notice;
10              IT IS FURTHER STIPULATED, that all
11    objections except as to the form of the questions and
12    responsiveness of the answers, be reserved until the
13    time of the trial;
14              IT IS FURTHER STIPULATED, that pursuant to
15    Federal Rules of Civil Procedure 30(e)(1) the witness
16    requests to review the transcript and make any
17    corrections to same before any Notary Public;
18              IT IS FURTHER STIPULATED, that if the
19    original deposition has not been duly signed by the
20    witness and returned to the attorney taking the
21    deposition by the time of trial or any hearing in this
22    cause, a certified transcript of the deposition may be
23    used as though it were the original;
24              IT IS FURTHER STIPULATED, that the
25    attorneys for the parties are individually responsible
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2              MS. JONES:  Objection.
 3         A.  -- would say that based on the training
 4    that we've received that you could encounter a dog in
 5    one out of three residences.  So 33 percent of
 6    residences according to training.
 7         Q.  Okay.  And what training are you referring
 8    to?
 9         A.  In the PowerPoint presentation that I
10    reviewed regarding aggressive dogs.
11         Q.  Okay.  Before you reviewed that PowerPoint
12    training, based on your experience is that consistent?
13              MS. JONES:  Objection.
14         A.  I -- again, I would have no way of being
15    100 percent accurate in answering that question.
16         Q.  When's the last time that you responded to
17    a residence and there was a dog present?
18         A.  Probably a week ago.
19         Q.  And before that?
20         A.  There's dogs present pretty consistently.
21         Q.  So multiple times a week would you say?
22         A.  I would.
23              MS. JONES:  Objection.
24         Q.  More than half of the calls to residences?
25              MS. JONES:  Objection.
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         A.   I -- I don't know.  I can't honestly
 3    answer that question.  I don't know.
 4         Q.   Okay.  In your 24 years with the Rochester
 5    Police Department, have you ever heard of an officer
 6    being disciplined for shooting a dog?
 7              MS. JONES:  Objection.
 8              MR. SHIELDS:  That's an improper
 9    objection.
10              What's objectionable?  Can you please
11    explain?
12              MS. JONES:  That's not within his
13    knowledge.  He doesn't work for the PSS.  That's not a
14    fair question.
15              MR. SHIELDS:  I asked if he had ever
16    heard.  Can you please listen to my question before
17    you make an objection that is unreasonable.  Because
18    I'm not going to let you just make objections
19    throughout the deposition that are completely -- you
20    need to state -- you need to state objection
21    relevance, objection outside the scope of his
22    knowledge.
23              MS. JONES:  That's what I stated in the
24    past and you told me not to say that.  Earlier I said
25    asked and answered and you said not to.
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2              MR. SHIELDS:  You need to say objection
 3    asked and answered.  That's all you're allowed to say
 4    when you object.
 5              You can't make a speaking objection.  And
 6    you can't just say objection, objection, objection,
 7    objection because that disrupts the flow of my
 8    questioning.
 9              You're not allowed to do that.
10              MS. JONES:  So saying more doesn't
11    interrupt the flow of your question?
12              MR. SHIELDS:  You say objection hearsay,
13    objection privileged.  That's it.  That's a clear and
14    concise way to state an objection.
15         Q.   I'm sorry, Officer.
16              Can you please answer my question or do
17    you want me to ask it again?
18         A.   I have not.
19         Q.   And in your 24 years of experience with
20    the RPD, have you ever heard of an officer being
21    required to get additional training as a result of
22    shooting a dog?
23              MS. JONES:  Objection.
24         A.   I have not.
25         Q.   And following this incident, you weren't
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2   disciplined, correct?
 3          A.   That is correct.
 4          Q.   Following this incident, you weren't
 5   required to get any additional training, correct?
 6          A.   That's correct.
 7              MS. JONES:  Objection.
 8          Q.   Following the four prior incidents where
 9   you shot dogs before this incident, you were never
10   disciplined or required to get additional training,
11   correct?
12              MS. JONES:  Objection.
13          A.   Yes.  That's correct.
14              MS. JONES:  You're asking a lot of leading
15   questions if you want to know why I'm objecting.
16              MR. SHIELDS:  I can ask leading questions.
17   That's completely proper in my deposition.  I'll ask
18   questions however I want to ask questions.
19              MS. JONES:  I'm just letting you know why
20   I'm objecting.
21              MR. SHIELDS:  You can't object to me
22   asking leading questions.  They're proper questions.
23              MS. JONES:  The form of the question is a
24   valid objection.
25              MR. SHIELDS:  That's an invalid objection
```



1              OFFICER BRIAN CALA - BY MR. SHIELDS

2      assuming that I am.  It looks like I'm retreating away

3      from the dog.

4              Q.  And now we're at 11:42 and 11 seconds.

5                  Okay.  It looks like the dog is shot at

6      this point, right?

7              A.  I guess you can't see in the video.

8              Q.  So you can't see in the video the dog

9      crouching at all.

10                 But you can see in the video that the dog

11     had paused for a second, correct?

12             A.  Correct.

13             Q.  And do you think in that one second if you

14     hadn't had your gun out but something else that the

15     dog would have attacked you after it paused?

16             A.  I don't -- are you implying the dog

17     attacked me because I had my gun out or if I had a

18     baton in my hand the dog wouldn't have attacked?

19             Q.  You know what, that was a bad question.

20                 But what I want to know is when the dog

21     paused, if you handled the situation differently at

22     that moment, do you think you could have avoided

23     shooting the dog?

24                 MS. JONES:  Objection.

25             A.  Well, it's hard to tell what would have



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1               OFFICER BRIAN CALA - BY MR. SHIELDS
 2   happened after that moment.  So whether I struck the
 3   dog or -- I don't know if that would have been
 4   effective in ceasing the dog's aggression or -- and
 5   the dog would have been shot anyway or if the dog
 6   wouldn't have been shot.  It's impossible to know
 7   that.
 8          Q.  The dog wasn't charging at you, right?  It
 9   stopped its forward movement, right?
10          MS. JONES:  Objection.
11          A.  In that one second which is not when I
12   shot the dog.
13          Q.  So you paused?
14          A.  Correct.
15          Q.  The dog paused.
16              And you believed after that that the dog
17   was going to attack you?
18          A.  That's correct.
19          Q.  And why did you believe that?
20          A.  Because of the -- because of the dog's
21   aggression and the fact that he looked as
22   though -- the dog looked as though the dog was going
23   to lunge towards my direction.
24          Q.  And have you ever been trained on how to
25   handle a situation like this where a dog is
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1              OFFICER BRIAN CALA - BY MR. SHIELDS
2    approaching you to avoid shooting the dog?
3           A.  Only that you could potentially deploy
4    other options.
5           Q.  Did you ever get any training on how to
6    use different body language or speak to the dog in a
7    calm manner to try to get it to stop any perceived
8    aggression?
9           A.  I believe that was part of the Humane
10   Society training.
11          Q.  Do you remember what they told you about
12   that?
13          A.  I don't recall right now.  What you are
14   alluding to sounds familiar.
15          (The following exhibit was marked for
16          identification:  Number EXH 10.)
17          Q.  All right.  Let's put up the Humane
18   Society training and just go through that a little
19   bit.  That will be Exhibit 10 for this deposition.
20          And this is entitled "Dog Bite Prevention
21   for Law Enforcement."  And it's put on by the Humane
22   Society of Greater Rochester; is that right?
23          A.  Yes.
24          Q.  And before I start asking questions
25   specifically, do you remember when you took that



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    training?
 3              A.  I don't.
 4              Q.  Okay.  This PowerPoint is entitled "2014."
 5    Do you know if it was in 20 -- in or around 2014?
 6              A.  I -- I believe it was prior to this
 7    incident.  I don't know what year it was.
 8              Q.  Do you remember who the instructor was at
 9    the training?
10              A.  No.  I know that it was a Humane Society
11    officer.
12              Q.  When you say "officer," are they like
13    deputized officers?
14              A.  They are peace officers.
15              Q.  Does that mean they can carry a gun?
16              A.  Yes.
17              Q.  So let's just go through slides.
18              All right.  So this is the second page.
19    Reno DiDomenico, R-E-N-O, D-i-D-O-M-E-N-I-C-O, is the
20    officer on the second page.
21              Do you remember whether that might have
22    been the officer --
23              A.  Yes.  I believe it was.
24              Q.  -- the officer that held the training?
25              I'm sorry.  I was trying to make the
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  OFFICER BRIAN CALA - BY MR. SHIELDS
 2    record clear.
 3              A.  Yes.  Yes.
 4              Q.  This third page is just a bunch of
 5    officers with dogs.
 6                  The fourth page "Objectives.  Know the
 7    common dog encounter scenarios that lead to dog bites.
 8    Give four signs or actions to perform to determine
 9    whether dogs are on the property.  Identify how to
10    avoid dog bites.  Recognize three physical signs of
11    aggressive dogs.  Be familiar with improvised tools
12    for dealing with aggressive dogs.  Known techniques to
13    minimize personal injury in the event you are
14    attacked."
15                  So after reading the title of the
16    PowerPoint and the objectives, is it fair to say that
17    the main focus of this training was on avoiding dog
18    bites?
19                  MS. JONES:  Objection.
20              A.  That -- it appears to be part of it.
21              Q.  If we just go back to the first page, the
22    title of the program is "Dog Bite Prevention for Law
23    Enforcement," correct?
24              A.  Okay.  Yes.
25              Q.  And before we go through all the slides,
```



```
 1                 OFFICER BRIAN CALA - BY MR. SHIELDS
 2      is that what you recall the focus of the training to
 3      be?
 4             A.  I -- I guess so.  I don't...
 5             Q.  As opposed to something else like hey,
 6      this training is about specifically dog behavior?
 7             A.  Right.  How to avoid -- sure.  How to
 8      avoid being bit by a dog while in the performance of
 9      your duties.
10             Q.  That's the main focus of the training,
11      correct?
12             A.  It appears to be based on the title.
13             Q.  Thank you.
14                 Okay.  And is this the slide that you were
15      referring to earlier?
16             A.  Yes, it was.
17             Q.  Which says in slide number 5 "Officers
18      will encounter a dog in at least one of three
19      residences."
20                 Now, do you remember if that is specific
21      to the County of Monroe, to the City of Rochester, to
22      the United States of America or something else?
23             A.  I don't know what the context of that
24      statement is.
25             Q.  Okay.  And this training, do you know if
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  OFFICER BRIAN CALA - BY MR. SHIELDS
 2       this was given just for Rochester Police Department
 3       Officers or were there other agencies there as well?
 4              A.  No.  There were no other agencies there at
 5       the time that I received the training.  But it could
 6       potentially be given to other agencies.  I don't know
 7       if it was or wasn't.
 8              Q.  Okay.  So just based on this slide, we
 9       don't know if that one-in-three number on slide number
10       5 is referring to specifically the City of Rochester
11       or a different geographic area, correct?
12              A.  That is correct.
13              Q.  Okay.  So slide number 6 says "Problems
14       for Law Enforcement, Consequences of Inappropriate
15       Action."  First bullet point "Unnecessary injury of
16       killing of animals who are not a threat.  Risk of
17       self-inflicted injury, friendly fire, or bystander
18       injury.  Negative public image of officers,
19       departments, and profession as a whole.  Lawsuits and
20       legal actions."
21                  Do you remember that slide from the
22       training?
23              A.  Yes.  I guess.  This training was a long
24       time ago.
25              Q.  Do you agree that those are all various
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2     problems and consequences that could happen from
 3     shooting a dog?
 4              A.  Yes, I do.
 5              Q.  The seventh slide says "Officer
 6     Liability."  And it's a cartoon from the Simpsons with
 7     a caption that says "I am a public servant so I'm not
 8     permitted to use my own judgment in any way."
 9                   Now, do you know why that slide was
10     included?  Do you remember any commentary that was
11     made about that slide?
12              A.  No, I don't.
13              Q.  Do you agree that you're not permitted to
14     use your own judgment in any way as a police officer?
15              A.  No.  I don't agree with that.
16              Q.  Because, in fact, you have to do the exact
17     opposite, right, you have to use your own judgment
18     every day?
19              A.  Correct.
20              Q.  This slide only talks about New York State
21     law, correct?
22              A.  That's what it appears to be discussing,
23     yes.
24              Q.  It doesn't talk about any prohibitions
25     under the United States Constitution?
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         A.  That's correct.
 3         Q.  And that's slide number 8 of 51.
 4              And then this slide number 9 talks about
 5    the Fourth Amendment, correct?
 6         A.  Yes.
 7         Q.  And it talks about the fact that the
 8    destruction of a pet can be classified as an unlawful
 9    seizure, correct?
10         A.  Yes.
11         Q.  Do you understand that to be one of the
12    claims in this case?
13         A.  Yes.
14         Q.  And then slide number 10 discusses
15    immunity.  Do you understand that immunity is one of
16    the defenses that you're asserting in this case?
17         A.  Yes.
18         Q.  And can you tell me, you know, what you
19    base that immunity defense on?
20              MS. JONES:  Objection.
21              But go ahead.
22         A.  The fact that in the performance of my
23    duties I was attacked by a dog and I felt that it was
24    proper to shoot it at that point.
25         Q.  So you felt that your actions were
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    reasonable under the circumstances?
 3         A.  That's correct.
 4         Q.  Based on your training and experience?
 5         A.  Yes.
 6         Q.  Well, I'm not going to ask you questions
 7    about that slide because I think that's a mistake of
 8    law on number 11.
 9              "Individual Officer Immunity," two-prong
10    test.  Have you ever learned this two-prong test about
11    immunity before other than this training?
12         A.  I'm sure it's been discussed.
13         Q.  So in general, it says, you know, even if
14    you violated a constitutional right, if your actions
15    were reasonable under the circumstance, you would be
16    entitled to immunity?
17         A.  No.
18         Q.  Well, I guess that was my legal
19    interpretation of -- so I mean, this slide
20    specifically says to be accurate "Individual Officer
21    Immunity.  Officer subject to two-prong test.  1,
22    officer action violated constitutional right.  2,
23    under the circumstances, a reasonable official would
24    have known that his or her conduct violated the
25    right."
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER BRIAN CALA - BY MR. SHIELDS
2              Did I read that accurately?
3         A.  Yes, you did.
4         Q.  And do you agree that's the test that you
5    were taught as an RPD officer?
6         A.  Yes.
7         Q.  And then the thirteenth slide has a
8    white -- and it looks like an envelope almost with an
9    X.  Do you remember whether or not there was a video
10   that might have been played?
11        A.  It may have been.  I don't know what that
12   could possibly be other than that.
13        Q.  Do you remember watching videos
14   specifically at the training?
15        A.  I don't.
16        Q.  Okay.  Then slide number 15, it says "Why
17   do dogs bite?"  It says "Excitement/play.
18   Possession/Protection.  Fear.  Accidental.  Attention.
19   Sick/Injured.  Dangerous dog."
20             Do you remember talking about those topics
21   at the training?
22        A.  Yes.
23        Q.  And was it ever discussed at the training
24   that if someone -- if a dog encountered someone on the
25   property, they might be excited?
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         A.  Yes.
 3         Q.  And they might approach you?
 4         A.  Yes.
 5         Q.  Okay.  Were you taught that -- what were
 6    you taught to do if an animal appears to be excited
 7    and approached you?
 8         A.  To attempt to put something between you
 9    and the animal or attempt to back away from the
10    animal.
11         Q.  Anything else?
12         A.  Again, not that I recall right now.
13         Q.  Okay.  Did they discuss the incidents or
14    the numbers of police officers that suffer injuries
15    from interacting with dogs?
16         A.  I don't recall that being a topic.
17         Q.  Okay.  And now we're on slide 16.  And
18    that's entitled "Animal Force Continuum," correct?
19         A.  Yes.
20         Q.  It says "Dogs use force to protect
21    themselves or others they believe are in their pack.
22    Dogs use only as much force as necessary.  Vocal
23    warning.  Inhibited bite.  Uninhibited bite.  Lethal,"
24    right?
25         A.  Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                OFFICER BRIAN CALA - BY MR. SHIELDS
 2           Q.  And then it talks about the factors on
 3      slide 17 that contribute to dog bites.  And one of
 4      those factors is training, right?
 5           A.  Correct.
 6           Q.  And do you remember what training that's
 7      referring to?
 8           A.  I believe that's referring to the training
 9      of the animal.
10           Q.  Not the training of the officer?
11           A.  Correct.
12           Q.  Okay.  And another factor is victim
13      behavior, correct?
14           A.  That's correct.
15           Q.  And do you remember what was discussed
16      about victim behavior at the training?
17           A.  Not specifically.
18           Q.  You don't remember if they said anything
19      like if you yell at the dog, it's more likely that it
20      will attack you?
21                MS. JONES:  Objection.
22           A.  I don't remember them saying that.
23           Q.  Okay.  You don't remember them saying
24      anything about how to behave in a way that might help
25      calm the animal down?
```



```
 1                    OFFICER BRIAN CALA - BY MR. SHIELDS
 2              A.   I'm sure that was mentioned based on the
 3         prior slide.  I don't specifically remember that, but
 4         it appears to be part of the training on the prior
 5         slide.
 6              Q.   Where it says "vocal warning"?
 7              A.   Correct.
 8              Q.   Now, when it says "vocal warning," do you
 9         think that's talking about the dog barking?
10              A.   That might not be the slide that I'm
11         referring to.  I thought there was something on a
12         prior slide.
13              Q.   For the record, we're just scrolling up
14         through the prior slides right now.
15              A.   Go forward one.
16              Q.   We can keep going through them.  We went
17         back to the beginning from slide 17.  You didn't see
18         what you thought you were referring to?
19              A.   Go to like 3 or 4.
20                   Next one maybe.  No.  Objectives.
21                   I don't see it on there.  I'm sorry.
22              Q.   Okay.  But you reviewed this before coming
23         today, correct?
24              A.   Yes.
25              Q.   So maybe it's in a subsequent slide?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         A.  It could be.
 3         Q.  Okay.  This is back to slide 17 "Factors
 4    Contributing to Dog Bites."  Let's see.  So we were
 5    just talking about victim behavior, right?
 6         A.  Correct.
 7         Q.  Let's keep going forward.  "Dog postures."
 8    Do you remember discussing this slide and the
 9    different dog postures at the training?
10         A.  Yes.
11         Q.  And what do you remember learning about at
12    the training?
13         A.  The slide was presented.  And I just
14    remember going over each picture as a general
15    reference for different dog postures as it relates
16    to -- and how to interpret what the dog means when the
17    dog does -- is in different postures.
18         Q.  And when you go to someone's house and you
19    encounter a dog, is there one posture over another
20    that the dog usually takes when it sees you?
21         A.  A lot of times they're in the alert
22    posture.
23         Q.  Okay.  Because there's a stranger entering
24    the property?
25         A.  That's correct.  I'm assuming.
```



```
 1                   OFFICER BRIAN CALA - BY MR. SHIELDS
 2              Q.  And the next slide is "Overall Posture"?
 3              A.  Yes.
 4              Q.  And then slide 20 is blacked out.  Do you
 5         think that might have been a video there?
 6              A.  Potentially.
 7              Q.  And then "Signals of Increasing
 8         Discomfort/Stress/Tension.  Warning Signs."
 9                   Do you remember anything about that slide?
10              A.  Not in particular.
11              Q.  It says "Aggression.  Stop what you are
12         doing.  Growling.  Snarling.  Showing teeth.  Lunging.
13         Snapping.  Biting."
14                   Do you remember anything about that slide?
15              A.  Just that those are indicators of
16         aggression in a dog.
17              Q.  And then the next slide is "Fear
18         Aggression.  Low body.  All teeth showing.  Crouched,
19         hunched posture, tail tucked."
20                   Do you remember that slide?
21              A.  Vaguely.
22              Q.  Okay.  The next slide says "Fear
23         Aggression.  Low body.  All teeth showing.  Crouched.
24         Hunched posture.  Tail tucked."  Which I think was the
25         same as before with just a different picture, right?
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         A.  It appears to be.
 3         Q.  And then the next slide says "Offensive
 4    Aggression.  Posture erect.  Weight forward.  Tail up.
 5    Mouth puckered.  Front teeth showing."
 6         A.  Yes.
 7         Q.  Do you remember any discussions from the
 8    training about that slide?
 9         A.  Not in particular.
10         Q.  The next slide says the same thing just
11    with another different picture of a dog, correct?
12         A.  Correct.
13         Q.  And then the next slide says "Things can
14    change very quickly.  Dogs can give conflicting
15    signals."  But then there's another
16    blacked-out-looking screen, correct?
17         A.  Yes.
18         Q.  Do you remember whether or not that might
19    have been a video?
20         A.  I can only assume that it was.
21         Q.  But you don't remember any videos that you
22    watched?
23         A.  No.
24              MS. JONES:  Objection.
25         Q.  Okay.  The next slide says "Appeasement,"
```



```
 1                    OFFICER BRIAN CALA - BY MR. SHIELDS
 2     correct?  And that's slide 28 that we're at right now.
 3              A.  Yes.
 4              Q.  Okay.  And there's another picture of a
 5     dog showing -- with a little commentary with written
 6     words about indicators of appeasement?
 7              A.  Yes.
 8              Q.  And then the next one is
 9     "Appeasement/Fear."  It's another picture of a dog
10     with words and the dog looks like it's laying on its
11     back?
12              A.  That's correct.
13              Q.  And then slide 30 is "Stressed, Anxious,
14     Fearful."  And it's a dog pictured again with various
15     commentary; is that right?
16              A.  Yes, it is.
17              Q.  Do you remember any specific discussions
18     about this slide from the training?
19              A.  I can't, no.
20              Q.  Slide 30 appears to be another video
21     that's not attached to the PDF; is that right?
22              A.  Potentially.
23              Q.  The title of that is "Fear, Active
24     Appeasement"?
25              A.  Yes.
```



| | |
|---|---|
| 1 | OFFICER BRIAN CALA - BY MR. SHIELDS |
| 2 | Q.  The next one is titled "Fearful, Defensive |
| 3 | Threat."  And it's another blacked-out slide; is that |
| 4 | right? |
| 5 | A.  Yes. |
| 6 | Q.  And then the next slide, 33, is entitled |
| 7 | "Stress Signals, Lip Licking."  And there's some |
| 8 | pictures of dogs licking their lips? |
| 9 | A.  Correct. |
| 10 | Q.  The next one is "Stress Signals, mouth |
| 11 | open and relaxed to closed and tense."  And two |
| 12 | pictures of different dogs, correct? |
| 13 | A.  Yes. |
| 14 | Q.  And then 35 "Stress Signals, head turns, |
| 15 | diverting gaze.  Whale eye.  Showing the whites of |
| 16 | their eyes." |
| 17 | Do you remember any specific discussions |
| 18 | about that slide? |
| 19 | A.  No. |
| 20 | Q.  Do you remember anything about the |
| 21 | discussion about show -- what it would show -- what |
| 22 | the whale eye means, showing the white of their eyes? |
| 23 | A.  I don't. |
| 24 | Q.  "Other Stress Signals" on slide 36. |
| 25 | "Shake off.  Scratch.  Yawning.  Excessively sniffing |



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    the ground."
 3              Do you remember any discussions about that
 4    slide?
 5         A.  I can't say that I do.
 6              MS. JONES:  Can we take a break now that
 7    we're done with stress signals?
 8              MR. SHIELDS:  Yeah.  That works for me.
 9    And it's 12 o'clock.  We're probably going to go for a
10    little while longer.  I don't know if you want to get
11    some food or what you want to do.
12              I'm fine to keep going.
13              THE WITNESS:  I'm good to go through.
14              MS. JONES:  Okay.  Let me just step
15    outside for a second.
16         (The proceeding recessed at 12:00 p.m.)
17         (The proceeding reconvened at 12:10 p.m.;
18         appearances as before noted.)
19    OFFICER BRIAN CALA, resumes;
20         CONTINUING EXAMINATION BY MR. SHIELDS:
21         Q.  Officer, so we're back on the record now.
22    We just took a short break, right?
23         A.  Correct.
24         Q.  Did you have an opportunity to speak with
25    your attorney during the break?
```



1             OFFICER BRIAN CALA - BY MR. SHIELDS

2          A.  I did.

3          Q.  Are there any answers to any questions

4     that you already gave that you want to change your

5     answer to?

6          A.  No.

7          Q.  Okay.  Thank you.

8               So back to Exhibit 10, the Humane Society

9     training.  We're on slide 37 and the title is "Do you

10    approach these two dogs the same way?"  Pepper and

11    Baby, the picture of the two dogs, do you remember any

12    discussion about this slide?

13         A.  I don't specifically remember any

14    discussion about it, no.

15         Q.  Okay.  And slide 38 is a video apparently

16    on YouTube.  Do you remember watching this video on

17    YouTube?

18         A.  I don't.

19         Q.  In preparation for your testimony today,

20    did you click on the link and watch the video on

21    YouTube?

22         A.  No, I didn't.

23         Q.  Slide 39 says "Best Practices For

24    Approaching Dogs On the Job."  So it looks like that's

25    an intro to the next section.  So the next slide is



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2   slide 40.  It says "The Signs."  And there's five
 3   pictures; is that right?
 4        A.  Yes.
 5        Q.  Do you remember any specific discussions
 6   about this slide at the training?
 7        A.  No.
 8        Q.  Okay.  It says "The Encounter" on slide
 9   41.  "Announce your arrival.  Jiggle fence.  Whistle.
10   Shake keys.  Inquire about dogs before entering.  Ask
11   for dog to be secured."
12              Do you remember any specific discussions
13   from the training about this slide?
14        A.  I really don't.  I really don't remember
15   too much about it.
16        Q.  But Sergeant Trenton did jiggle the fence,
17   right?
18        A.  That's correct.
19        Q.  Did she do any of the other things or did
20   either of you do any of the other things?
21        A.  No.
22        Q.  Okay.  You testified earlier that you
23   don't remember whether there was any discussion of how
24   long to wait before entering the yard after jiggling
25   the fence; is that right?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         A.  That's correct.
 3         Q.  "Talk to the dog" on slide 42.
 4    Communicate safely and appeasement.  I'm sorry.
 5    "Communicate Safety and Appeasement.  If a dog
 6    approaches and is non-threatening, allow him to
 7    investigate you.  Continue to speak to her.  Do not
 8    attempt to pet the dog."
 9              Do you remember any discussion about that
10    slide?
11         A.  I don't.
12         Q.  Okay.  And then slide 43 "Talk to the dog.
13    Communicate confidence or threat.  If dog is
14    displaying threatening behavior, speak in forceful
15    tone.  Give commands like sit or stay.  If the dog
16    continues threatening, try to appear larger.  Speak in
17    low, loud voice 'back off.'"
18              Do you remember any discussions about that
19    slide?
20         A.  No.
21         Q.  Slide 44 "Bite Prevention Tools."  It
22    lists physical repellents.  "Bite stick.  Baton.  ASP,
23    umbrellas.  Improvised, flashlight.  Stick.  Rolled-up
24    magazine.  Clipboard.  Road flare."
25              Do you remember any specific discussions
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER BRIAN CALA - BY MR. SHIELDS
2    of that slide?
3         A.   Just -- all I remember about the -- is
4    that slides were gone over.  I don't remember any
5    specific instruction.
6         Q.   Okay.  You don't remember anything that
7    you learned from this slide?
8              MS. JONES:  Objection.
9         A.   I -- I don't remember the specific
10   discussion about it.
11        Q.   You remember that you went to the training
12   and that this slide was displayed?
13        A.   That's correct.  I do remember seeing this
14   slide.
15        Q.   And then 45 is "Bite Prevention Tools."
16   And it lists chemical repellents like OC or citronella
17   spray.
18              Then it lists electronic repellents.  It
19   says "Ultrasonic.  Stun guns.  Taser."  And then it
20   says "Improvised, CO2 fire extinguisher."
21        A.   Correct.
22        Q.   Do you remember any specific discussion
23   about these tools listed on this slide?
24        A.   Just that they were presented as tools.
25        Q.   Okay.  And just another question.  Under
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    electronic repellents, what would ultrasonic be?  What
 3    does that mean?
 4           A.  I don't know what that's referring to.
 5           Q.  And slide 46 appears to be a video that is
 6    not attached, correct, or it's a blank slide?
 7           A.  It's a blank slide.  It could be a video.
 8           Q.  And then slide 47 says "Suggested
 9    Practice.  Force continuum.  Respond in a calm,
10    friendly behavior.  Respond with confidence or threat.
11    Use chemical repellents like OC, pepper ball.  Use
12    physical repellents like baton, bite stick, fire
13    extinguisher, taser."  And then "lethal force" at the
14    bottom.
15              Do you remember any specific discussion of
16    that slide?
17           A.  No specific instructions, no.
18           Q.  And then slide 48 "Quick Assessment."  It
19    says "Questions to ask.  Has dog already bitten
20    someone?  Where is the dog?  Where is the owner?  Are
21    there bystanders?  How is the dog moving?  What is the
22    dog's body language?  How is dog responding to your
23    commands?  What defenses do you have available?  Do I
24    have an escape option?"
25              Do you remember any specific discussions
```



 1                OFFICER BRIAN CALA - BY MR. SHIELDS
 2    of that slide?
 3           A.  No specific, no.
 4           Q.  And then slide 48 -- I'm sorry.  Slide 49,
 5    it says "If You Are Bitten.  Do not pull away, may
 6    cause more injury.  Move in to the bite, dog's
 7    instinctual reflex is to release.  If knocked down,
 8    curl into a ball to protect your neck and throat.  Try
 9    not to scream or move."
10           Do you remember any specific discussions
11    of slide 49?
12           A.  Just -- no.  Just that it was presented.
13           Q.  Slide 50 again says "Video."  And it has
14    that same white box with an X across it, correct?
15           A.  Yes.
16           Q.  Okay.  And then the last slide is 51.  It
17    says "Questions and Discussion."
18           Do you remember any specific questions or
19    discussion from the training?
20           A.  No.
21           (The following exhibit was marked for
22           identification:  Number EXH 11.)
23           Q.  All right.  Thank you, Officer.
24           And next I want to put up what will be
25    marked as Exhibit 11.  And that is -- if we go to the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

                    OFFICER BRIAN CALA - BY MR. SHIELDS

1   postures and it being discussed what those different

2   postures meant.

3        Q.   Okay.  Do you remember the substance of

4   those discussions?

5        A.   I just remember that being part of the

6   training.

7        Q.   Okay.  Do you remember why that was part

8   of the training?

9        A.   So to inform you as to what -- what is an

10  aggressive dog and what is not an aggressive dog.

11       Q.   Before -- before that training, could you

12  identify an aggressive dog versus a non-aggressive

13  dog?

14       A.   Yes.  I believe so.

15       Q.   Did the training help you identify

16  situations where maybe you had misidentified a dog as

17  being aggressive?

18       A.   It potentially could, yes.

19       Q.   Do you remember specifically after the

20  training any situations where you encountered a dog

21  and said to yourself well, actually this dog is not

22  being aggressive, I learned that in the training?

23       A.   I'm sure.  I have encountered dogs

24  hundreds of times since that training.  So I'm sure



```
 1                    OFFICER BRIAN CALA - BY MR. SHIELDS
 2     that's a fair statement.
 3              Q.  Okay.  So you think you learned something
 4     from that training?
 5              A.  Yes.
 6              Q.  Okay.  But you don't remember specifically
 7     what was discussed about that slide?
 8              A.  I don't remember the specific
 9     conversations that may or may not have taken place in
10     2014 regarding it.
11              Q.  And then the next part of your answer in
12     interrogatory 3 you say "At an in-service with
13     live-fire exercises, the department simulated an
14     attacking dog as part of the exercise."
15                   So my first question about that is, when
16     they say "simulated," how did they simulate the
17     attacking dog?
18              A.  There was -- there was a water jug that
19     was attached to a rope.  And the firearms instructor
20     would pull -- pull the rope and the -- the jug was the
21     dog.
22              Q.  So the way that it was simulated, there
23     was a fast-moving --
24              A.  It was a fast-moving target approaching
25     you on the ground to simulate the attacking dog.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         Q.  Got it.
 3              Just to be clear so I understand,
 4    simulating a dog charging at you?
 5         A.  Correct.
 6         Q.  And you had to shoot and hit the jug as it
 7    moved towards you in a rapid fashion?
 8         A.  Correct.
 9         Q.  Anything else from that in-service
10    training?
11         A.  No.  That was -- that's all I remembered
12    about that.
13         Q.  Okay.  And that in-service training with
14    the attacking dog exercise, did that involve any
15    instruction about how to use any less-than-lethal
16    force against a dog?
17         A.  No.
18         Q.  Did it involve any other training or
19    instructions about how to avoid shooting a dog?
20         A.  No.
21         Q.  So the training was just limited to
22    accurately firing your gun at a dog that's charging at
23    you?
24         A.  Correct.
25         Q.  And then the last part of your answer for
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    interrogatory number 3 says "I will add that when I
 3    was in field training, I was taught to survey an area
 4    for a dog.  You would look for footprints in the snow,
 5    a chain, food, water bowl or something similar that
 6    indicated that a dog resides there.  I have relayed
 7    the same instruction each time I was a field training
 8    officer."
 9              Okay.  So is that everything that you
10    listed there about surveying an area for a dog or is
11    there more that you might do?
12         A.  You may check -- you might check the
13    perimeter of the yard.
14         Q.  Okay.  Anything else?
15         A.  Not that I can think of right now.  Aside
16    from shaking the fence or approaching.
17         Q.  So basically you're saying when you
18    approach a property, you should check for signs that
19    there might be a dog there, right?
20         A.  Correct.
21         Q.  And the reason you would check is so that
22    you're prepared before you enter the property, right?
23         A.  Correct.
24              MS. JONES:  Objection.
25         A.  That's correct.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         Q.   Okay.  So were you trained to do anything
 3    else when you enter a fenced-in residential property
 4    to ensure the safety of dogs and people?
 5              MS. JONES:  Objection.
 6         A.   Other than announce your presence as a
 7    police officer, entering -- entering either -- whether
 8    a house or -- not necessarily on property, but it
 9    could depend on the situation.
10         Q.   But you didn't do that here, right?
11         A.   No.
12         Q.   I want to go back to the top to
13    interrogatory number 1.
14              Interrogatory number 1 says "Identify all
15    writings you created related to the incident including
16    notes and reports and the location where said writings
17    are stored.  If copies of said writings are stored in
18    multiple locations such as both electronically or more
19    than one paper location, so state.  If any writings
20    you created was destroyed, so state."
21              And your answer was "I do not remember
22    writing anything down regarding the incident."
23              Is that -- is that still your answer,
24    Officer Cala?
25         A.   Yeah.  I do not remember writing anything
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1            OFFICER BRIAN CALA - BY MR. SHIELDS
2    down.  I know that the supervisor completes the
3    incident report.  So I know that I definitely did not
4    complete an incident report.  I don't remember taking
5    any notes at the time of the incident.
6            Q.  Okay.  You don't remember taking any
7    notes?
8            A.  No.
9            Q.  I'm just going to tell you -- if you want
10   to watch it, we can watch some of your body-camera
11   footage which shows that you've got a little notepad
12   and you're taking notes.  I just have some questions
13   about that.
14            First, did you look for any notes from
15   your notepad when you were responding to this
16   question?
17            A.  I can tell you that I don't have a notepad
18   if it's not the current notepad that I'm using.  So
19   I -- I did not look for any notes.
20            Q.  Okay.  So you see part of the question
21   says "If any writing you created was destroyed, so
22   state"?
23            A.  Right.  If I remembered taking notes, I
24   would have stated that there was -- that it was
25   destroyed or whatever the case may be.



1          OFFICER BRIAN CALA - BY MR. SHIELDS

2              But I believe what you're saying.  If

3    you're saying it's on video, it's on the video.  I

4    don't remember taking notes.  It's not to say that I

5    didn't take notes.

6          Q.  Okay.  So you said that if you took notes

7    in the notepad that you had on the date of this

8    incident in 2018 that you'd no longer have it; is that

9    correct?

10         A.  That's correct.

11         Q.  What do you do with the notepad when

12   you're done with it?

13         A.  I discard it.

14         Q.  Is there any rule for the RPD that

15   requires you to maintain those notes?

16         A.  We're supposed to maintain notes for cases

17   and turn them over as discovery.  I do that if I make

18   an arrest in a case.  I did not retain the notebook.

19         Q.  Okay.  So your personal practice is to

20   discard the notebook when it's completed?

21         A.  Correct.

22         Q.  There is no rule from the RPD or the city

23   that requires you to maintain possession of the

24   notebooks?

25              MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2                   I think you already asked this.
 3              Q.  The city provides you with those
 4    notebooks, correct?
 5              A.  Correct.
 6              Q.  Do you have one on you right now?
 7              A.  I don't.  This isn't the shirt I normally
 8    wear.
 9              Q.  In the shirt you normally wear, where do
10    you store your notepad?
11              A.  In my left pocket.  I'm sorry.  The
12    front -- front right pocket.
13              Q.  Front right pocket underneath your name
14    tag?
15              A.  Correct.
16              Q.  And that's something that you carry with
17    you every day when you're on duty?
18              A.  Correct.
19              Q.  It's something that you use every day
20    you're on duty?
21                   MS. JONES:  Objection.
22              A.  Not necessarily.
23              Q.  Okay.  Is there any requirement for the
24    information -- and by "requirement," I mean is there
25    any rule or policy of the city regarding what
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 OFFICER BRIAN CALA - BY MR. SHIELDS
 2    information you're required to write down in the
 3    notepad?
 4            A.  No.
 5            Q.  When it's the end of your shift, what do
 6    you do with your current notepad?
 7            A.  I typically wear a vest.  My vest cover
 8    that retains my bulletproof vest, it stays in that
 9    vest cover.
10            Q.  It's like in your locker or something?
11            A.  Correct.
12            Q.  When you say -- going back to your prior
13    answer about if you make an arrest and you have to
14    save those notes related to that incident, what do you
15    do?
16            A.  I rip them out of the notebook and include
17    them with the package that goes to the district
18    attorney's office.
19            Q.  So the small little page itself that would
20    be in the notebook would go to the DA?
21            A.  Correct.
22            Q.  How long do those little notebooks usually
23    last you before you fill them up?
24            A.  It depends.  I don't know.
25            Q.  Do other officers, to your knowledge, have
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    different practices from you?  Do they maintain their
 3    notebooks like in their locker or anything?
 4              MS. JONES:  Objection.  Hypothetical.
 5         A.  I've known people that keep them and I've
 6    known people that haven't kept them.
 7         Q.  So different people have different
 8    practices.  And that's allowed by the RPD rules and
 9    regulations, right?
10              MS. JONES:  Objection.
11         A.  I don't -- I don't know.
12         Q.  I mean, you testified that different
13    people do different things, right?
14         A.  Correct.
15         Q.  And is your answer then that you don't
16    know what the rules and regulations of the RPD require
17    regarding maintaining those notebooks?
18              MS. JONES:  Objection.
19         A.  No.  It's not my testimony.
20         Q.  Okay.  I'm sorry.  I just want to make
21    sure I understand.
22              The RPD does not require you to maintain
23    them?
24         A.  No.  They do.
25         Q.  The RPD requires that you maintain all of
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER BRIAN CALA - BY MR. SHIELDS
2    your notebooks?
3         A.   Yes.
4         Q.   So if you throw out your notebooks, then
5    that's a violation of the RPD's policies?
6         A.   That's correct.
7         Q.   So you should have been able to produce
8    your notebook in this case, but you can't because you
9    threw it out?
10        A.   That's right.
11        Q.   And that's a violation of the RPD's
12   policies?
13        A.   That's right.
14        Q.   Do you still do that with all of your
15   notebooks?
16        A.   I'm not on the road currently.
17        Q.   And when you were on the road, were you
18   still throwing out the notebooks?
19        A.   As of?
20        Q.   The last time that you were on the road.
21        A.   No.  I have my current notebook.
22        Q.   So you're saying that the RPD's policies
23   only require you to maintain your current notebook?
24             MS. JONES:  Objection.
25        A.   No.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

| | |
|---|---|
| 1 | OFFICER BRIAN CALA - BY MR. SHIELDS |
| 2 | Q.  All right.  I think I understand your |
| 3 | answer.  But to make sure I understand, you're |
| 4 | supposed to maintain all of them? |
| 5 | MS. JONES:  Is this a joke? |
| 6 | MR. SHIELDS:  Absolutely not a joke. |
| 7 | MS. JONES:  I think you asked this like 20 |
| 8 | times. |
| 9 | MR. SHIELDS:  I'm still literally confused |
| 10 | or I wouldn't be continuing to ask. |
| 11 | MS. JONES:  This is hilarious. |
| 12 | Q.  Can I -- this is probably going to be the |
| 13 | same exact thing I just asked.  Just so I'm clear -- |
| 14 | MS. JONES:  Really? |
| 15 | Q.  -- you're supposed to maintain copies of |
| 16 | the notebooks.  And if you don't, then -- and you |
| 17 | throw them out, that's a violation of RPD's policies? |
| 18 | A.  My understanding -- |
| 19 | MS. JONES:  Objection. |
| 20 | Asked and answered.  You can answer. |
| 21 | A.  -- my understanding is that you should |
| 22 | retain them for two years. |
| 23 | Q.  Okay.  Do you know where the two-year time |
| 24 | limit came from? |
| 25 | A.  I don't.  I believe it's in the general |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                    OFFICER BRIAN CALA - BY MR. SHIELDS
2      orders somewhere, but I'm not sure.
3              Q.  All right.  And if this lawsuit was filed
4      within two years of this incident, then you should
5      have had -- you should have maintained and found that
6      notebook still, right?
7              A.  Yes.
8              Q.  All right.  Thank you.
9                    So let's move on to interrogatory number 2
10     which says "Describe every instance where you
11     discharged a firearm during the line of duty including
12     the date, the intended target, a person versus a dog
13     or something else, your assignment at the time, the
14     weapon discharged, whether the discharge was found to
15     have been justified and/or whether the discharge was
16     found to have violated any departmental policy."
17                   So first let's talk about the dogs.
18                   So your answer was "I have discharged my
19     firearm five times in incidents involving dogs."  So
20     before we read the rest of it, that's four times
21     before this incident and then the fifth would be this
22     incident; is that -- is that right?
23             A.  It is.
24             Q.  Okay.  So then the next paragraph of your
25     answer says "Two involved vicious dogs that were loose
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1                 OFFICER BRIAN CALA - BY MR. SHIELDS
 2    and chasing people on Mason Street.  Both times the
 3    dog ended up coming at me and I discharged my firearm
 4    at the dog."  So questions about that first.
 5                 So these are two separate incidents?
 6         A.   Yes.
 7         Q.   Okay.  Tell me everything that you
 8    remember about the first incident.
 9         A.   We're going back 20 years, so I don't -- I
10    responded to a call for dogs -- two dogs chasing
11    people on Mason Street.  I responded there and I was
12    in the area looking for potential victims.  And one of
13    the dogs came out of a driveway and charged at me.
14    And I fired one round at the dog killing the dog.
15         Q.   Do you remember the date?
16         A.   I don't.  It's -- like I said, this
17    was -- this was at least 20 years ago.
18         Q.   Okay.  So you were a newer officer at the
19    time?
20         A.   Yes.
21         Q.   About how many years on the job were you?
22              MS. JONES:  Objection.
23         A.   I -- I really don't recall the date of the
24    incident.
25         Q.   Before or after 911?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

1            OFFICER BRIAN CALA - BY MR. SHIELDS
2          A.   Before.
3          Q.   Do you remember what kind of dog it was?
4          A.   Pit Bull.
5          Q.   You just fired one round?
6          A.   Correct.
7          Q.   Do you remember where you shot the dog on
8     its body?
9          A.   I don't.
10         Q.   And do you know if the dog died?
11         A.   Yes, it did.
12         Q.   Did you suffer any physical injuries?
13         A.   No.
14         Q.   Do you know if the dog had injured anyone
15    else?
16         A.   I don't believe so.
17         Q.   And other than the incident occurring on
18    Mason Street, do you remember anything else about the
19    location or the address?
20         A.   No.
21         Q.   After the incident, were there any
22    internal investigations?
23         A.   Yes.
24         Q.   Is that standard or something else?
25         A.   Standard.



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         Q.  And do you know the outcome of that
 3    investigation?
 4         A.  I was found exonerated.
 5         Q.  Did they provide you with any paperwork
 6    that said exonerated?
 7         A.  Yes.
 8         Q.  That was conducted by PSS?
 9         A.  Correct.
10         Q.  And would that be in your personnel file,
11    do you know?
12         A.  It should be, yes.
13         Q.  Did you have to write any reports or
14    anything related to that incident?
15         A.  I -- I believe I -- there was -- there was
16    a point in time when it changed from the officer
17    writing the report for a dog shot to a supervisor
18    writing the report.  So I can't tell you 100 percent.
19    I believe I may have written a report for that one.
20         Q.  As part of the PSS investigation, did you
21    have to give any testimony?
22         A.  Not in that case, no.
23         Q.  Okay.  Anything else that you remember
24    about that first incident on Mason Street?
25         A.  No.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER BRIAN CALA - BY MR. SHIELDS

2          Q.  Tell me everything you remember about the

3     second incident on Mason Street.

4          A.  It was a similar call, a dog loose in the

5     neighborhood chasing people.  I responded.  And it was

6     a similar situation.  I got out of my car and was

7     attempting to identify who the caller was so I could

8     speak to the caller.  At which point, I was approached

9     aggressively by a German Shepherd and fired two

10    rounds -- I'm sorry -- fired four rounds at the dog

11    striking it twice.

12         Q.  Do you remember the date of the incident?

13         A.  I don't.

14         Q.  But it was after the first one?

15         A.  It was after the first one.

16         Q.  Was it before or after 911?

17         A.  It was before.

18         Q.  So in your first three years on the job,

19    you shot two dogs at least?

20              MS. JONES:  Objection.

21         A.  That's correct.

22         Q.  Other than saying it was on Mason Street,

23    do you remember anything about the address or the

24    location?

25         A.  It was at an intersection of -- it was at



```
 1                    OFFICER BRIAN CALA - BY MR. SHIELDS
 2      the intersection of Tacoma Street.
 3              Q.   And when you shot the dog, were you in the
 4      street or something else?
 5              A.   I was in the street.
 6              Q.   And going back to the first incident, were
 7      you in the street or something else?
 8              A.   I was in the street.
 9              Q.   And did that second dog die?
10              A.   Yes.
11              Q.   Okay.  Were you injured in the second
12      incident?
13              A.   No.
14              Q.   Was anyone else injured?
15              A.   Not that I'm aware of.
16              Q.   And did PSS investigate that incident?
17              A.   Yes.
18              Q.   And what was the outcome of that
19      investigation?
20              A.   The same as the first.
21              Q.   And did you have to testify in that PSS
22      investigation?
23              A.   No.
24              Q.   And do you remember if you wrote any
25      reports for that investigation or that incident?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                    OFFICER BRIAN CALA - BY MR. SHIELDS
 2            A.   I don't.  I would imagine that I may have
 3      at that period of time, but I don't remember 100
 4      percent.
 5            Q.   Do you remember any other officers that
 6      might have witnessed that incident?
 7            A.   Sergeant Beth Laird.
 8            Q.   L-A-I-R-D?
 9            A.   Correct.
10            Q.   Is Sergeant Laird still with the
11      department?
12            A.   Yes.
13            Q.   And same question for the first incident,
14      any officers that witnessed the first incident?
15            A.   No.
16            Q.   Anyone other than Sergeant Laird that
17      witnessed the second incident?
18            A.   No.
19            Q.   Anything else that you remember about that
20      second incident?
21            A.   No.
22            Q.   Okay.  Now, according to your
23      interrogatory response, you say -- the third incident
24      says "Another incident occurred on Elser Terrace off
25      Maple Street.  It was a loose dog call.  An individual
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1                OFFICER BRIAN CALA - BY MR. SHIELDS
 2   was trapped in their car because every time the
 3   individual tried to exit, the dog would approach.  I
 4   attempted to escort the person out of the car to
 5   inside the location, but could not."
 6                Okay.  So same general questions.  First,
 7   can you just tell me everything that you remember
 8   about that third incident?
 9                A.  I responded to a call on Elser Terrace
10   where a female was in her vehicle after going
11   shopping.  She called and said she couldn't get out of
12   her car because there was an aggressive Pit Bull that
13   wouldn't let her out of her car.
14                The dog was circling around the car upon
15   my arrival, so we just told the woman to stay in the
16   car.  At some point during that incident, the dog
17   backed off and went southbound on Elser Terrace
18   and -- and was out of site.
19                At that point, we attempted to get the
20   woman out of her car, myself -- when I say "we,"
21   myself and who is now Lieutenant Rob Wilson was on
22   scene for this.  And we attempted to escort her to her
23   house so that she can get inside the house.  At which
24   point the dog reappeared from a yard.  We were on the
25   sidewalk and we both fired at the animal.
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         Q.   How far away was the dog when you fired at
 3    the animal?
 4         A.   Within 21 feet.
 5         Q.   Okay.  So it could have been closer than
 6    20 feet?
 7         A.   Definitely could have been closer.
 8         Q.   What was the dog doing when you fired at
 9    it?
10         A.   The dog was charging towards the two of us
11    again in an aggressive manner and barking and teeth
12    exposed.  And we fired multiple rounds at the dog
13    killing the dog.
14         Q.   Okay.  Do you remember how many rounds you
15    fired?
16         A.   I want to say three.
17         Q.   Do you remember how many Lieutenant Wilson
18    fired?
19         A.   I don't.
20         Q.   Did the dog die?
21         A.   Yes.
22         Q.   Do you remember the date of the incident?
23         A.   I don't.
24         Q.   Before or after 911?
25         A.   Probably after.  I could tell you it was
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2    prior to 2004.
 3              Q.  Okay.  How do you know it was before 2004?
 4              A.  Because we went through a reorganization
 5    in 2004.  So I know that when I was working with
 6    Lieutenant Wilson in that section of the police
 7    department that was prior to 2004.
 8              Q.  What section were you working at the time?
 9              A.  Maple section.
10              Q.  Were you injured in that incident?
11              A.  No, I wasn't.
12              Q.  Was anyone else injured in that incident?
13              A.  No.
14              Q.  And did PSS conduct an investigation?
15              A.  Yes.
16              Q.  And what was the conclusion?
17              A.  Same as the first three.
18              Q.  This is the third one.
19              A.  I'm sorry.  The first two then.
20              Q.  Okay.  Did you have to testify?
21              A.  No.
22              Q.  And do you remember if you wrote any
23    reports for this incident?
24              A.  I don't.
25              Q.  Were there any other officers that
```



```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2   witnessed this incident other than Lieutenant Wilson?
 3         A.   No.
 4         Q.   Do you know of any other witnesses --
 5         A.   No.
 6         Q.   -- other than the woman?
 7         A.   I don't know.  Again, I don't remember.
 8   This was a long time ago.  I don't remember if she was
 9   listed as a witness or if she ran in the house.  I
10   don't recall.
11         Q.   For that interrogatory response in the
12   prior incidents that we talked about, did you review
13   any documents to answer those questions?
14         A.   No, I didn't.
15         Q.   So that's just from your memory?
16         A.   Correct.
17         Q.   And the fourth incident occurred on
18   Campbell Park or Wetmore Park?
19         A.   I'm not sure which street it was.
20         Q.   It says "An animal control officer called
21   for assistance while attempting to capture a loose and
22   aggressive Pit Bull.  The dog came aggressively at the
23   animal control officer and then it bit him."
24              So same questions.  Tell me everything you
25   remember about that incident.
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1                    OFFICER BRIAN CALA - BY MR. SHIELDS
 2              A.   Animal control was attempting to take into
 3    custody a dog that was loose in the neighborhood.
 4    They called for police assistance just due to the
 5    nature of -- the aggressive nature of the dog.  I
 6    responded.  He told me to just, you know, be his cover
 7    because he was having trouble taking the dog into
 8    custody.
 9                    The dog charged at the animal control
10    officer, which he was able to deflect the dog due to
11    him having a stick.  And the dog then turned its focus
12    towards me.  And I fired one round at the dog striking
13    it in the foot.
14              Q.   Okay.  So you shot one round and it hit
15    the dog in the foot.
16                    Was that immediately after the animal
17    control officer was able to deflect the dog with the
18    stick?
19              A.   Yes.  All one fluid motion.
20              Q.   And the dog charged at the animal control
21    officer and then he deflected it with the stick?
22              A.   Correct.
23              Q.   So you've seen somebody use less lethal
24    force against a dog and not -- to avoid being attacked
25    by a dog?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

1            OFFICER BRIAN CALA - BY MR. SHIELDS

2            A.  I have.

3            Q.  In any other instance have you seen

4    somebody use less lethal force with a dog to avoid

5    being attacked?

6            A.  No.

7            Q.  That's the only time?

8            A.  Yup.

9            Q.  Okay.  Do you remember the date of that

10   incident?

11           A.  I don't.

12           Q.  But it was after the third incident?

13           A.  Correct.

14           Q.  It was after the reorganization?

15           A.  That's correct.

16           Q.  So sometime after 2004?

17           A.  Yes.  That's my best estimate.

18           Q.  Okay.  Do you think it was before 2010?

19               MS. JONES:  Objection.

20           A.  I really -- I really don't know.

21           Q.  So it could have been after 2010?

22           A.  Yeah.  It could have been after.

23           Q.  It was before 2016?

24               MS. JONES:  Objection.

25               He said he doesn't remember.



```
 1                   OFFICER BRIAN CALA - BY MR. SHIELDS
 2            A.  I don't -- I don't remember.
 3            Q.  2016 is when RPD began wearing body-worn
 4     cameras.
 5            A.  So it was prior to body-worn cameras.
 6            Q.  So somewhere between 2004 and 2016?
 7            A.  What was the first year?
 8            Q.  2004.
 9            A.  2004 and 2016, correct.  That's correct.
10            Q.  Do you remember anything else about the
11     location or the address?
12            A.  I don't even remember which street it was.
13     I want to say it was one of those two streets.  I know
14     it was in that general vicinity.
15            Q.  What was your assignment at the time?
16            A.  I was assigned to Lake section, second
17     platoon.
18            Q.  What's the time for second platoon?
19            A.  6:45 a.m. to 3 p.m.
20            Q.  So it was during the day?
21            A.  Correct.
22            Q.  Were you injured in that incident?
23            A.  No.
24            Q.  Did the dog live?
25            A.  Yes.
```



ALLIANCE
COURT REPORTING, INC.

Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER BRIAN CALA - BY MR. SHIELDS
 2         Q.  Was anyone else injured?
 3         A.  No.
 4         Q.  PSS did an investigation?
 5         A.  Correct.
 6         Q.  And what was the conclusion?
 7         A.  Exonerated.
 8         Q.  And did you testify?
 9         A.  No.
10         Q.  Do you remember writing any reports?
11         A.  No.
12         Q.  You don't remember or you definitely
13    didn't?
14         A.  I definitely didn't.  Because I would say
15    by that time the procedure had changed.
16         Q.  And since PSS investigated all these
17    incidents, do you think that should be in your
18    personnel file?
19         A.  Yes.
20         Q.  Do you know if the PSS investigations are
21    just because they were firearm discharges?
22              MS. JONES:  Objection.
23         A.  My understanding of it is anytime a
24    discharge takes place, that's -- there's an
25    investigation.  So I don't know if that's the only
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920