UNTIED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

---------------------------------------------X

VICTORIA PRESTON,

       Plaintiff,

-against- Index No. 22-CV-6525

THE CITY OF ROCHESTER, MITCHELL LEACH,

       Defendants.

---------------------------------------------X

             August 21, 2023

             9:00 A.M.

             LEXITAS LEGAL VIEW

EXAMINATION BEFORE TRIAL of MITCHELL LEACH,
a Defendant in the above-entitled action,
held at the above time and place pursuant to
Notice,taken before Peter Toth, a reporter and
Notary Public within and for the State of New
York.

(2)   A P P E A R A N C E S
(3)        ROTH & ROTH, LLP
               Attorneys for Plaintiff
(4)        192 Lexington Avenue, Suite 802
           New York, New York 10016
(5)        BY: ELLIOT DOLBY SHIELDS, ESQ.
(6)
           CITY OF ROCHESTER LAW DEPARTMENT
(7)            Attorneys for Defendants
           THE CITY OF ROCHESTER AND MITCHELL LEACH
(8)        City Hall Room 400A
           30 Church Street
(9)        ROCHESTER, NEW YORK 14614
           BY: PEACHIE JONES, ESQ.
(10)
(11)
           ALSO PRESENT: Videographer Gil Perez
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

(2)          F E D E R A L     S T I P U L A T I O N S

(3)              IT IS HEREBY STIPULATED AND AGREED

(4)      by and between the attorneys for the

(5)      respective parties herein, that the

(6)      sealing, filing and certification of the

(7)      within deposition be waived.

(8)

(9)              IT IS FURTHER STIPULATED AND AGREED

(10)     that all objections, as to the form of the

(11)     question, shall be reserved to the time of the trial.

(12)

(13)             IT IS FURTHER STIPULATED AND AGREED

(14)     that the within deposition may be sworn to

(15)     and signed before any officer authorized to

(16)     administer an oath, with the same force and

(17)     effect as if signed and sworn to before the Court.

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

```
(1)                    M. Leach                    4

(2)  M I T C H E L L   L E A C H, the witness

(3)        herein, having been duly sworn by a

(4)        Notary Public of the State of New York,

(5)        was examined and testified as follows.

(6)  EXAMINATION BY

(7)  MR. SHIELDS :

(8)        Q     State your name for the record,

(9)  please.

(10)       A     Officer Mitchell Leach.

(11)       Q     State your address for the record,

(12) please.

(13)       A     185 Exchange Boulevard, Rochester,

(14) New York 14607.

(15)             VIDEOGRAPHER:  Good morning.  The

(16)       time now is approximately 0909.  Today's

(17)       date is August 21, 2023.  This is Media 1

(18)       in the video deposition of Mitchell Leach

(19)       in the matter of Preston, Victoria versus

(20)       the City of Rochester, Mitchell Leach,

(21)       Index number 22-cv-6525.

(22)             My name is Gil Perez, I'm the legal

(23)       videographer with Sherek Video in

(24)       association with Lexitas New York

(25)       Tri-state.
```

M. Leach                                    41

(1)

(2)     **A      Yes.**

(3)     Q       In the police academy in firearms

(4) training did you have shoot don't shoot

(5) scenarios involving dogs?

(6)     **A      No.**

(7)     Q       In the police academy and firearms

(8) training did you have scenarios where you were

(9) presented with the option of either using your

(10) firearm or using less lethal force against a

(11) dog?

(12)    **A      No.**

(13)    Q       And then after the academy you

(14) testified that you had four months of field

(15) training; is that right?

(16)            **MS. JONES:   Objection.**

(17)    **A      April, May June, July -- four**

(18) **months, yes.**

(19)    Q       And is there any additional

(20) training in between the police academy before

(21) you begin your field training?

(22)    **A      I mean we finish the police academy**

(23) **and then it's like two weeks of post academy.**

(24)    Q       Okay.

(25)    **A      And then which is still the academy**

M. Leach                                    42

(1)

(2)   you are just -- you're just not in field

(3)   training.

(4)         Q       Is post academy like RPD specific

(5)   training, or is it something else?

(6)         A       It's RPD specific training based

(7)   you work with, I think we do -- we got CS gas

(8)   training and we got extra swat training and

(9)   stuff like that.

(10)        Q       Okay.  When you say you got CS gas

(11)  training what do you mean?

(12)        A       CS gas is something that the mobile

(13)  field force uses.  It's a nonlethal like gas

(14)  that you use for like riots on people, and we

(15)  got exposed to it as a part of the post

(16)  academy.

(17)        Q       Okay.  Were you ever taught that CS

(18)  gas could be used against a dog?

(19)        A       No.  We don't carry CS gas on our

(20)  person or in our vehicle or anything like

(21)  that.

(22)        Q       So that's something that's

(23)  different than your OC spray?

(24)        A       Yes.

(25)        Q       At the police academy were you

M. Leach                              43

(1)

(2)  taught that OC spray could be used against a

(3)  dog?

(4)        A    I don't recall -- but, yeah, I

(5)  don't recall about going over OC spray

(6)  specifically against the dog.

(7)        Q    In the post academy training were

(8)  you taught anything about how to interact with

(9)  dogs that you might encounter during your

(10) police duties?

(11)       A    Not to my recollection, sir, no.

(12)       Q    Okay.  During your field training

(13) were you taught anything about interacting

(14) with dogs that you might encounter during your

(15) police duties?

(16)       A    My field training officers I don't

(17) remember what specific field training officer,

(18) but would go over like, you know, we walk up

(19) to a house and we go into a backyard because

(20) it would be the rear door that we would have

(21) to make contact with the caller.  And it would

(22) always be like, hey, make sure you rattle the

(23) fence, you know, shake your keys acknowledge

(24) your presence just in case there's a dog in

(25) the backyard, you know, and let that dog

August 21, 2023

M. Leach                                    **44**

(1)

(2)  either find out if there's a dog back there

(3)  and the dog runs up to the fence so we don't

(4)  go in the backyard before and enter that's

(5)  dog's yard, if that makes sense.

(6)       Q       Okay.  Anything else that your

(7)  field training officers taught you?

(8)       A       No, sir.

(9)       Q       Did you ever encounter a dog at a

(10) residential property during your field

(11) training?

(12)      A       Yes.

(13)      Q       And can you tell me about that

(14) experience?

(15)      A       I don't remember any specifics.  I

(16) know that I had jobs where I would see dogs,

(17) you know, like on FTO or you know I'd drive

(18) down the street and see a dog and it says like

(19) within my daily shift, you know.

(20)      Q       So was there ever a time during

(21) your field training when you responded to a

(22) residence and a dog ran up to you?

(23)      A       No.

(24)      Q       During your field training did your

(25) FTOs ever discuss with you the use of less

August 21, 2023

M. Leach                              45

(1)

(2)    lethal options against a dog that approaches

(3)    you or runs at you?

(4)         A    No.

(5)         Q    Okay.  In your experience working

(6)    as an officer for about five years now what

(7)    percentage of residential properties in the

(8)    city have dogs would you say?

(9)         MS. JONES:  Objection.

(10)        A    I don't know the -- I mean

(11)   number-wise or percentile-wise I don't feel

(12)   comfortable going over with -- not feel

(13)   comfortable but like I don't know the specific

(14)   percentile, you know, that have dogs.

(15)        Q    Okay.  In your experience working

(16)   as an officer for five years or so, what

(17)   percentage of calls that you respond to at

(18)   residential properties have dogs?

(19)        A    Percentage-wise I don't know like a

(20)   specific percentage.  I'd say some of them do,

(21)   some of them don't.  I can't say like whether

(22)   it's more or less of the calls that I go to

(23)   like have dogs, probably calls that I go to I

(24)   would say less residents have dogs that I

(25)   interact with or anything like that.

August 21, 2023

M. Leach                                              46

(1)

(2)    Q      Do you interact with dogs at

(3)    residential properties on a daily base?

(4)         A      I wouldn't say a daily basis.

(5)         Q      On a weekly basis?

(6)         MS. JONES:  Objection.

(7)         THE WITNESS:  Well, how would you

(8)    say like interact, could you be more,

(9)    like, specific with that portion of it?

(10)        MR. SHIELDS:  Sure.

(11)   Q      When you respond to a residential

(12)   property how often are you aware that there is

(13)   a dog that resides at the property?

(14)        THE WITNESS:  Aware, like, before I

(15)   go there or when I get there?

(16)        MR. SHIELDS:  When you get there.

(17)   A      You say how often, I mean, maybe

(18)   like once or twice a week.

(19)   Q      And when you have to enter the

(20)   property or when the property owner opens the

(21)   door how often do those dogs approach you?

(22)   A      Out of the once or twice a week

(23)   that we're talking about that I interact with

(24)   dogs at the residence they usually don't

(25)   because I ask them, you know, before they come

M. Leach                                    47

(1)

(2)  to the door if they can put their dog away.

(3)       Q     Okay.  So, for example, if you show

(4)  up to a house and you knock on the door and

(5)  you hear the dog barking on the other side

(6)  what you'll do is you'll ask the resident to

(7)  put the dog away?

(8)       A     Yes, sir.

(9)       Q     And that's something that you were

(10) trained to do as an officer?

(11)           MS. JONES:  Objection.

(12)      A     I mean, I don't think it's like

(13) something we have to do, but like train-wise

(14) or like how I feel comfortable doing it, I ask

(15) people to put their dog away.

(16)      Q     Okay.  And in your five years

(17) working for the RPD have you ever heard of an

(18) officer being disciplined for shooting a dog?

(19)      A     No, I have not.

(20)      Q     Okay.  In your five years working

(21) as an RPD officer have you ever heard of an

(22) officer required to get additional training of

(23) any kind because they shot a dog?

(24)      A     To my knowledge, no, I have not.

(25)      Q     Okay.  In your time working as an

August 21, 2023

M. Leach                                              48

(1)

(2)     RPD officer how many dogs have you shot?

(3)          A     My time working as a RPD officer

(4)     the incident that we are talking about today

(5)     if that would be one, then I have discharged

(6)     my firearm on that dog and then another one,

(7)     so two dogs total.

(8)          Q     So this incident we're here talking

(9)     about today that happened on February 14,

(10)    2020; is that right?

(11)         A     Yes.

(12)         Q     And then the other incident, if you

(13)    remember, was that the following year in

(14)    August, August 20, 2021?

(15)         A     Do you remember the address?  I

(16)    believe that's when its happened, the date

(17)    that it happened.

(18)              MR. SHIELDS:  I will ask you more

(19)         questions about it later so we can

(20)         confirm that.

(21)              THE WITNESS:  Okay.

(22)         Q     But that sounds about the right

(23)    time frame?

(24)         A     Yeah, that's about correct, yes.

(25)         Q     And then following this incident

M. Leach                                    49

(1)

(2)  that happened in February 2020, you were never

(3)  disciplined or required to get any additional

(4)  training, correct?

(5)         MS. JONES:  Objection.

(6)     A    No, sir.

(7)     Q    And then following the other

(8)  incident in August 2021 where you shot a dog,

(9)  you were never disciplined or required to get

(10) any additional training, correct?

(11)        MS. JONES:  Objection.

(12)    A    No, sir.

(13)    Q    And just going back to your academy

(14) training, were you trained that you could

(15) shoot a dog if you were afraid?

(16)        MS. JONES:  Objection.

(17)    A    No, not afraid, not based off

(18) emotion, no, sir.

(19)    Q    What were you trained in terms of

(20) being allowed legally to shoot a dog?

(21)    A    The dog was attacking, about to

(22) attack myself or a third party.

(23)    Q    And were you ever taught that if

(24) you had time to consider using some other less

(25) lethal options instead of shooting that you

M. Leach                                    50

(1)

(2)   were required to use that less lethal option

(3)   first before you resorted to deadly force?

(4)       A    If we had time in like, yes, based

(5)   on the totality of the circumstance.

(6)       Q    So, yes, you were taught that if

(7)   you had a problem --

(8)       A    Yes.

(9)       Q    -- you were required to use less

(10)  lethal force before resorting to deadly force?

(11)      A    Yes.

(12)      Q    At the academy were you ever

(13)  trained on the use of force continuum against

(14)  a dog?

(15)      A    Yes.

(16)      Q    And I might have asked this before,

(17)  but were you trained on the use of OC spray

(18)  against the dog --

(19)           MS. JONES:  Objection.

(20)      Q    -- at the academy?

(21)      A    Against the dog we most likely

(22)  were, but I don't recall the actual like

(23)  training or what was taught in that class if

(24)  there was a class; I don't remember.

(25)      Q    Were you taught that you could use

M. Leach                                100

(1)

(2) be commonsense that like to me that they would

(3) have probably brought it up in the class.  But

(4) I don not recall, I am not going to go on the

(5) record with something I completely don't

(6) remember.

(7)        Q       Okay.  So as we sit here today

(8) basically you just don't remember specifically

(9) if that was a specific topic from the Humane

(10) Society training, correct?

(11)             MS. JONES:  Objection.

(12)             THE WITNESS:  Yeah, we're talking

(13)        about the one I received in the academy,

(14)        correct?

(15)        Q       Okay, let's take it step-by-step.

(16) So first with the one that you received at the

(17) academy you don't remember specifically if

(18) they discussed tasers being an option that

(19) could work against a dog?

(20)        A       Not to my recollection, no.

(21)        Q       Okay.  In the role call training

(22) that you received post academy where you went

(23) over the Humane Society Power Point do you

(24) remember in that one if they specifically

(25) discussed the use of a taser potentially being

M. Leach                                              101

(1)

(2)     an effective less lethal option against a dog?

(3)     A       No, sir.

(4)     MR. SHIELDS:  All right I want to

(5)     switch gears and talk a little more about

(6)     the incident.

(7)     Q       So on February 14, 2020, you were

(8)     working as a Rochester police department

(9)     officer, correct?

(10)    A       Yes, sir, I was.

(11)    Q       And what was your assignment or

(12)    command at the time?

(13)    A       Clinton section second platoon

(14)    which would be day shift.

(15)    Q       And Second platoon can you just

(16)    remind me of the hours that, that day shift

(17)    consists of?

(18)    A       So 7 a.m. to 3:15 p.m.

(19)    Q       And who were your partners that

(20)    day?

(21)    A       Officer Ortiz was my partner that

(22)    day.  His first name is Alexis; A-L-E-X-I-S.

(23)    Q       And do you remember what your

(24)    vehicle was that day?

(25)    A       I do not recall, sir.

M. Leach                                    102

(1)

(2)          Q      And at some point on February 14,

(3)   2020, did you respond to 1100 Norton Street in

(4)   City of Rochester?

(5)          A      Yes, sir.

(6)          Q      Do you remember what time that was?

(7)          A      I do not recall the time, sir.  No.

(8)          Q      And is that location within your

(9)   assigned area?

(10)         A      Assigned area meaning the Clinton

(11)  section, yes sir.

(12)         Q      Do you have more kind of specific

(13)  assigned areas within your section?

(14)         A      Beats, yeah, we have car beats, you

(15)  know, Officer Ortiz was 237 that day, which is

(16)  the beat of where this incident occurred, and

(17)  I was 227.  And, you know, for no specific

(18)  reason he was just my partner.  And we don't

(19)  go to jobs alone like 911 calls alone and I

(20)  was backing him up on that call.

(21)         Q      Okay.  So that means that he was

(22)  the primary officer because that was within

(23)  his beat, and you showed up?

(24)         A      Yeah, that be the only reason he'd

(25)  be considered the primary officer because it

M. Leach

103

(1)
(2) was in his like beat of assignment.

(3)      Q      Okay.  And so when you say that you
(4) were his partner does that mean any call that
(5) you went to that day or any call that he went
(6) to that day you would both respond to?

(7)      A      Not any, just if somebody needed a
(8) backup.  I mean there might be times where,
(9) like, sir, we are not assigned specific
(10) partners, you know, unless you're riding two
(11) people with one car on a tour.  And that's
(12) just how it goes, you back somebody up and I
(13) just happened to be his backup that day.

(14)      Q      And were you directed to go to 1100
(15) Norton Street over the radio, or something
(16) else?

(17)      A      Yes, it was over the radio.  It was
(18) a radio call, yes, sir.

(19)      Q      And what were you doing immediately
(20) before you got that radio call or picked up
(21) the job?

(22)      A      I don't remember what I was doing
(23) before I took the job.

(24)      Q      Okay.  Before you arrived at 1100
(25) Norton Street, what information had you

M. Leach

104

(1)
(2) received about that job?

(3)    A    That job protective services needed

(4) assistance with a child removal and that was

(5) all we were given.

(6)    Q    Is that the type of call that

(7) you've responded to before this call on

(8) February 14, 2020?

(9)    A    No, I had never dealt with a child

(10) removal process; I was pretty new on the job,

(11) so I hadn't been to that call before.

(12)    Q    Okay.  And so that's all the

(13) information you got, it was child removal and

(14) you got that form the radio; is that right?

(15)    A    Yes.

(16)    Q    Okay.  And so what happened after

(17) you got that radio call, what happened next?

(18)    A    We drove up and spoke with the CPS

(19) workers the two females that I believe they

(20) were on scene, you know, at the same time we

(21) were, like, when we got there they may have

(22) gotten there a little before.  And they just

(23) told us that they had a removal order to

(24) remove the child to, due to unsafe

(25) circumstances inside the home and they needed

M. Leach

105

(1)
(2)  officer assistance.

(3)       Q     Okay.  So you arrived at 1100
(4)  Norton Street and you parked your car
(5)  somewhere in the vicinity of that home, and
(6)  you exited the cars and spoke with the CPS
(7)  workers; is that right?

(8)       A     Yes, sir.

(9)       Q     And they were -- had they entered
(10) the home prior to your arrival, or were they
(11) waiting for you outside?

(12)      A     I think they were waiting for us
(13) outside.

(14)      Q     Do you remember anything else about
(15) that conversation that you had with them prior
(16) to going to the house?

(17)      A     No, sir.

(18)      Q     Okay.  All right.  So after you
(19) spoke with the two CPS workers, did you
(20) approach and knock on the door?

(21)      A     Yes.

(22)      Q     Okay.  And did you knock on the
(23) front door, or something else?

(24)           MS. JONES:  Objection.

(25)      A     It was like the side door of the

(1)                          M. Leach                    113

(2)    that's why when you were in the home speaking

(3)    with Ms. Preston you heard the dog scraping at

(4)    the door you didn't make any additional plan

(5)    for how to deal with the dog if it escaped

(6)    from the bathroom, correct?

(7)              MS. JONES:  Objection.

(8)    A     No, sir.

(9)              MR. SHIELDS:  I'm sorry, your

(10)   answer was no, you didn't?

(11)   A     No.

(12)   Q     Okay.  And had you ever received

(13)   any kind of training either at the academy or

(14)   during your field training or anything else

(15)   about making plans in circumstances like this

(16)   when you're inside of a home and there's a dog

(17)   secured in case maybe the dog escaped?

(18)   A     No, sir.

(19)             MR. SHIELDS:  All right. I want to

(20)   put up what we'll mark as Exhibit 4 for

(21)   this deposition.  And that's going to be

(22)   the incident report for this February 14,

(23)   2020.

(24)             (Incident report was marked as

(25)   Plaintiff's Exhibit(s) 4 for

(1)                          M. Leach                   114

(2)           identification, as of this date.)

(3)           Q      And Officer Leach, on your screen

(4)      do you see the incident report?

(5)           A      I do.

(6)           Q      Okay.  Do you recognize that as the

(7)      incident report from this incident that we are

(8)      here to talk about today?

(9)           A      Yes, sir.

(10)          Q      So my question is I am going to

(11)     scroll down to the narrative section.

(12)                 So the report was completed by

(13)     Sergeant Osipovitch; is that right?

(14)          A      Yes.

(15)     BY MR. SHIELDS:  O-S-I-P-O-V-I-T-C-H.

(16)          Q      So my first question is Sergeant

(17)     Osipovitch drafted the report, where did he

(18)     get the information in the report?

(19)          A      So I gave him that information in

(20)     the report on scene.  I asked to speak with

(21)     him on scene, and him and I had a conversation

(22)     on scene at 1100 Norton Street about what

(23)     happened right when he arrived on scene.

(24)          Q      Okay.  And so when you're on scene

(25)     where you discharged your firearm the first

```
(1)                    M. Leach                    115

(2)    thing you have to do is contact your sergeant

(3)    correct?

(4)              MS. JONES:   Objection.

(5)         A    I mean, first thing we have to do

(6)    is call over the radio and make sure everybody

(7)    else is good, you know.  And then, you know,

(8)    the boss responds as a -- I mean you can say

(9)    it if we're going to talk about like an

(10)   administrative looking in then a supervisor

(11)   would have to respond, yes, sir.

(12)        Q    Okay.  So he came to the scene and

(13)   you told him what happened?

(14)        A    Yes, I told him what happened.

(15)        Q    So I just wanted to ask about this

(16)   highlighted portion, so let's just maybe I'll

(17)   start reading from the sentence before.

(18)             The aggressive dog then turned

(19)   towards Officer Leach who was standing, still

(20)   standing in the kitchen.  The dog barked and

(21)   immediately charged at Officer Leach

(22)   attempting to bite his leg.  Officer Leach

(23)   tried to kick the leg in an attempt to divert

(24)   it and scare it away but it was unsuccessful.

(25)   The dog continued to attack Officer Leach and
```

```
(1)                    M. Leach                    116

(2)    began biting his right ankle and boot.  Due to

(3)    the nature and small size of the apartment

(4)    Officer Leach was unable to move to any

(5)    position that would prevent the dog from

(6)    having access in attacking him or other

(7)    occupants of the home.  Fearing for his

(8)    immediate safety Officer Leach drew his

(9)    department issued duty weapon Glock model 21

(10)   45 caliber SN number UBS677 fully loaded with

(11)   Winchester auto plus P.45 cal ammunition and

(12)   fired six shots, six rounds in a downward

(13)   trajectory towards the animal.

(14)           So Officer Leach, that portion that

(15)   I just read that's all information that you

(16)   gave to Sergeant Osipovitch at the scene?

(17)       A    Yes, sir.

(18)       Q    And of those six shots do you know

(19)   how many actually hit the dog?

(20)       A    I do not, no.

(21)       Q    You were never made aware like

(22)   after an evidence technician came and

(23)   collected the bullets or anything?

(24)           MS. JONES:  Objection.

(25)       A    I know an evidence technician came
```

(1)                    M. Leach                    175

(2)        **A      Yes.**

(3)        Q      Okay.  Do you know if there's any

(4)    differences in those two different review

(5)    processes between when you fire your weapon at

(6)    a person versus when you fire your weapon at a

(7)    dog?

(8)            **MS. JONES:  Objection.**

(9)        **A      Well, the district attorney reviews**

(10)    **it and it goes into civil court obviously, or**

(11)    **not civil but, you know, criminal court as a,**

(12)    **you know, a discharge of a firearm at a**

(13)    **person.  So I was given a letter of immunity**

(14)    **by the Monroe County district attorney.**

(15)        Q      And that letter of immunity that

(16)    basically allowed you to testify against that

(17)    criminal defendant without having to face any

(18)    potential criminal liability yourself for

(19)    discharging your firearm?

(20)            **MS. JONES:  Objection.**

(21)            **And just to be sure this is all**

(22)        **marked confidential still.**

(23)            **MR. SHIELDS:  This is all**

(24)        **confidential.**

(25)        **A      Yes, sir.**

Lexitas Court Reporting
800-678-0166

(1)                    M. Leach                    176

(2)          Q     And another difference would be --

(3)    so I'm not really worried about the criminal

(4)    case, I'm just trying to figure out in terms

(5)    of internally at the RPD, in terms of their

(6)    review of your firearm discharge, did you have

(7)    to, for example, give a statement to PSS?

(8)          A     Yes.

(9)          Q     Now, with your firearm discharge

(10)   that we're here to talk about in the Victoria

(11)   Preston case from February 14, 2020, in that

(12)   instance did you have to give a statement to

(13)   PSS?

(14)         A     No, I do not believe so.

(15)         Q     Okay.  For either the February 14,

(16)   2020 incident where you shot at a dog or the

(17)   August 20, 2021 incident where you shot at a

(18)   dog did you ever have to speak with anybody

(19)   from PSS?

(20)         A     No, sir.

(21)         Q     Did you ever speak with any

(22)   supervisors other than the two supervisors

(23)   that we spoke about on those days about those

(24)   incidents?

(25)         A     No, sir.

(1)                          **M. Leach**                      177

(2)          Q        To the extent of your involvement

(3)      in any review of those firearm discharges was

(4)      only speaking with the supervisor for those

(5)      days?

(6)          **A        Yes, sir.**

(7)          Q        Okay.  All right, let's move on to

(8)      the next question in the interrogatories,

(9)      Number 5.

(10)             So Number 5 says describe all

(11)     training provided to you by the City and/or

(12)     RPD regarding interacting with dogs so that

(13)     you encounter on residential properties while

(14)     performing your duties as a police officer.

(15)             So my question is, is there any

(16)     additional training that you have received

(17)     that we have not spoken about already today?

(18)         **A        No, sir.**

(19)         Q        So Number 6 says state whether at

(20)     the time of the incident you were carrying OC

(21)     spray, pepper spray, a taser and or a baton.

(22)     And I think you already answered that no, you

(23)     were not carrying a taser, but, yes, you were

(24)     carrying OC spray and a baton, correct?

(25)         **A        Yes, sir.**

(1)                          M. Leach                    178

(2)        Q      Okay.  Let's move on to Number 7.

(3)    State whether you have ever owned a dog and if

(4)    so identify each and every dog that you have

(5)    owned, the breed, and how long you owned it.

(6)             So let's just break that down, so

(7)    first have you ever owned a dog?

(8)        A      **Yes.**

(9)        Q      Okay.  Do you currently own a dog?

(10)       A      **I do.**

(11)       Q      What kind of dog do you own right

(12)   now?

(13)       A      **I own two dogs, a Dachshund and a**

(14)   **Shih Tzu.**

(15)       Q      Have you owns dogs for your entire

(16)   life?

(17)            **MS. JONES:  Objection.**

(18)       A      **I was twenty years old when I owned**

(19)   **my first dog.**

(20)       Q      Okay.  And how old are you now?

(21)       A      **Twenty-eight.**

(22)       Q      So you've been a dog owner for,

(23)   approximately, eight years at this point?

(24)       A      **Yes. I grew up with dogs I didn't**

(25)   **own them, my parents owned the dogs, but I**

August 21, 2023

| | |
|---|---|
| (1) | **M. Leach** 179 |
| (2) | **owned my own dog when I was twenty.** |
| (3) | Q      Okay.  So you also grew up with |
| (4) | dogs before you owned your first dog? |
| (5) | **A      Yes, sir.** |
| (6) | Q      What types of dogs did you grow up |
| (7) | with? |
| (8) | **A      German shepherds, labs, Shih Tzus,** |
| (9) | **pit bulls, pretty much -- yeah, and that's** |
| (10) | **pretty much it.** |
| (11) | Q      So you're familiar with dogs and |
| (12) | how they behave generally? |
| (13) | **A      Yes, sir.** |
| (14) | Q      And in your time growing up with |
| (15) | dogs and since you own dogs on your own for |
| (16) | the past eight years is it fair to say that if |
| (17) | a stranger is on the dog's property that dog |
| (18) | might approach them? |
| (19) | **A      Yes.** |
| (20) | **MS. JONES:  Objection.** |
| (21) | Q      And in all of your time growing up |
| (22) | with dogs and as a dog owner have any of your |
| (23) | dogs approached people who were on their |
| (24) | properties? |
| (25) | **A      Yes.** |

(1)                          M. Leach                        180

(2)        Q      And have they ever seriously

(3)   injured anybody that they approached on the

(4)   property?

(5)        A      No.

(6)        Q      Have they ever bitten anybody?

(7)        A      No.

(8)        Q      All right.  And the last question

(9)   here was just state whether any supervisor or

(10)  member of PSS ever interviewed you regarding

(11)  the incident and if so the date of the

(12)  interview.  And so I believe your answer to

(13)  that one would have been Sergeant Osipovitch

(14)  spoke with you at the scene of the incident on

(15)  February 14, 2020?

(16)       A      Yes, sir.

(17)              MS. JONES:  Objection.

(18)       Q      And I missed Number 9 down here on

(19)  the next page.  It says state whether you were

(20)  ever reprimanded in any way either formally or

(21)  informally related to this incident and I

(22)  believe your answer previously was, no,

(23)  correct?

(24)              MS. JONES:  Objection.

(25)       A      Yes, sir.

(1)                     M. Leach                    181

(2)              MR. SHIELDS:  All right.  Give me

(3)       one second to look at these document

(4)       requests and see if I have any questions

(5)       about those.

(6)          Q      So if we're just talking about like

(7)       personnel and PSS files my question is, since

(8)       you began working as an officer have you ever

(9)       other than the shooting incident that we spoke

(10)      about, have you ever been interviewed by PSS

(11)      for any reason?

(12)             MS. JONES:  Objection.

(13)      A       Yes.

(14)         Q      Okay.  And what were the

(15)      circumstances of those PSS interviews?

(16)             MS. JONES:  Objection.  So we are

(17)      marking this as confidential.

(18)             MR. SHIELDS:  Sure, to the extent

(19)      that it's entitled to confidentiality and

(20)      that it's not, for example, part of the

(21)      public disciplinary portal.

(22)             MS. JONES:  So, yeah, he's been

(23)      exonerated from several incidents and

(24)      those we have posted online.  So to the

(25)      extent you are talking about those

(1)                        M. Leach                    182

(2)          exonerated incidents with the public this

(3)          should all just be marked confidential.

(4)               MR. SHIELDS:   Okay.   Sure.

(5)     CONFIDENTIAL FOR YOUR EYES ONLY.

(6)          Q     So Officer Leach, your attorney

(7)     just indicated that you had several incidents

(8)     that you were apparently investigated by a PSS

(9)     Core that you were exonerated; is that

(10)    accurate?

(11)              MS. JONES:   Objection.

(12)         A     Yes, sir.

(13)         Q     Did those incidents all include or

(14)    conclude with a finding of exonerated or

(15)    something else that was just different from

(16)    substantiated?

(17)              MS. JONES:   Objection.

(18)         A     Exonerated.

(19)         Q     And were those use of force, or

(20)    something else?

(21)         A     Two of them were use of force

(22)    incidents.

(23)         Q     Okay.  And basically those are

(24)    things that should be included in your

(25)    personnel file or your professional standard

(1)                          M.  Leach                    183

(2)      section 5?

(3)          A     Yes, sir.

(4)              MR. SHIELDS:  And so obviously,

(5)      Ms. Jones, those haven't been produced

(6)      yet and so we call for production of

(7)      those files.

(8)              MS. JONES:  Like I said, if you

(9)      could follow-up in writing, that would be

(10)     very helpful.

(11)             MR. SHIELDS:  Well, I mean, we're

(12)     going over the document requests so they

(13)     were already produced and we're calling

(14)     for them to be produced now again since

(15)     they haven't been produced yet.

(16)             MS. JONES:  Do you need anything

(17)     different then what's just here on this

(18)     RFD?

(19)             MR. SHIELDS:  I'm asking him about

(20)     the documents that should have already

(21)     been produced.

(22)             MS. JONES:  You are not asking me

(23)     for what's listed in the RFP.

(24)             MR. SHIELDS:  I'm just asking you

(25)     to produce the response to the RFP.

M. Leach                                    184

(1)

(2)                MS. JONES:  Okay.

(3)        Q       Officer Leach, how many times have

(4)    you had incidents that were investigated by

(5)    PSS that concluded with the finding of

(6)    exonerated?

(7)        A       I don't know the specific number,

(8)    sir, I can't say that.

(9)        Q       But you remember that at least two

(10)   of them were incidents involving the use of

(11)   force?

(12)       A       Yes.

(13)       Q       Can you tell me about the first of

(14)   the two incidents involving use of force?

(15)               THE WITNESS:  What do you want to

(16)       know about it, sir?

(17)       Q       Just tell me everything that you

(18)   remember about the incident?

(19)       A       The first one was on Herald Street

(20)   in the City of Rochester.  The defendant, you

(21)   know, punched his girlfriend in the face, she

(22)   had it in her face, pushed his nine-year-old

(23)   daughter down the stairs, knocked her

(24)   unconscious.  We went to take him into

(25)   custody.  I used a vulgar word if you want to

(1)                     M. Leach                    185

(2)     say, I used the F word.  If you want to put it

(3)     in quotations I said "fuck."  And we went to

(4)     go take him into custody and he fought with

(5)     us.  And I was exonerated of all use of force

(6)     complaints.  And they sustained my language

(7)     since I used the F bomb one time on the

(8)     defendant and that was my sustain like

(9)     substantiated for the PSS officer.  I was

(10)    exonerated from all use of force.

(11)         Q      Okay.  As a result of the finding

(12)    of sustained for using the vulgar language,

(13)    were you either disciplined or required to

(14)    undergo any new training or anything like

(15)    that?

(16)         A      Not to my recollection.

(17)         Q      Okay.  And can you describe the

(18)    force, the physical force that you used during

(19)    that incident to take that individual into

(20)    custody?

(21)              MS. JONES:   Objection.

(22)              You can answer.

(23)         A      It was a minor use of force.  I

(24)    think I punched him twice.

(25)         Q      In his body or in his head?

(1)                    M. Leach                    186

(2)        A        In his head.

(3)        Q        Two punches to the head you

(4)   considered to be mild uses of force?

(5)               MR. SHIELDS:  This is all

(6)        confidential, Peachie.

(7)        Q        So then two punches to the head is

(8)   something that you would consider or that RPD

(9)   would considers a minor use of force?

(10)              MS. JONES:   Objection.

(11)       A        Use of force, I'd say use of force

(12)  not serious use of force, but we will say use

(13)  of force if we're talking about it in like

(14)  terms.

(15)       Q        And do you know if that individual

(16)  had to receive any medical treatment for that?

(17)       A        I think he went to the hospital but

(18)  it wasn't because of the punches it was for I

(19)  think he was OC sprayed by another officer to

(20)  which he had to go to the hospital for.

(21)       Q        Okay.  And is that one of the

(22)  incidents that you testified to PSS about?

(23)       A        Yes.

(24)       Q        And is part of that -- well, let me

(25)  withdraw that question.

(1)                         M. Leach                    187

(2)              Do you know if that individual made

(3)      a specific complaint about the use of force?

(4)         A     No, I think it was brought on by

(5)      the mayor's office at the time.

(6)         Q     Do you know why the mayor's office

(7)      initiated that review?

(8)              MS. JONES:  Objection.

(9)         A     No, sir.

(10)        Q     Like, do you know if that

(11)     individual complained to the mayor's office,

(12)     or something else?

(13)             MS. JONES:  Objection.

(14)        A     No, I know he didn't complain to

(15)     the mayor's office.  I knew the mayor's office

(16)     initiated that request.

(17)        Q     Okay.  So the mayor's office became

(18)     aware of the incident and they initiated the

(19)     request somehow?

(20)             MS. JONES:  Objection.

(21)        A     Yes.

(22)        Q     And were other officers involved in

(23)     that use of force incident, or was it -- well,

(24)     that's my question.

(25)             Were other officers involved in

(1)                    M. Leach                    188

(2)    that use of force incident?

(3)        A    Yes.

(4)        Q    How many other officers?

(5)        A    I don't know at least three other

(6)    officers I know for a fact; I don't know after

(7)    that.

(8)        Q    And tell me about the second use of

(9)    force incident that was found to be exonerated

(10)   by PSS?

(11)       MS. JONES:    Objection.

(12)       A    It was I forgot the -- I think it

(13)   was on Evergreen Street in the City of

(14)   Rochester.  My partner made a traffic stop.  I

(15)   went to go back him up.  We had gotten into a

(16)   use of force with the driver who had decided

(17)   to fight my partner.  He started fighting with

(18)   my partner when my partner had him in one

(19)   single handcuff and he started swinging the

(20)   handcuff at my partner.  My partner was

(21)   fighting with him.  I ran over as he was

(22)   swinging the handcuffs and I pinched the

(23)   defendant twice in the head and took him into

(24)   custody -- or sorry, once in the head and took

(25)   him into custody.

(1)                      M. Leach                    189

(2)        Q     Do you know if that was an incident

(3)    where --

(4)             MS. JONES:  Mark as confidential.

(5)             MR. SHIELDS:  This whole thing is

(6)        you know, why don't we just say, okay, no

(7)        longer confidential when it's up, okay,

(8)        because I agree, yes.

(9)        Q     So do you know if that's an

(10)   incident where the man that you punched filed

(11)   a complaint or something else?

(12)       A     No, that one he filed the

(13)   complaint, I know that, yes, sir.

(14)       Q     Okay.  And that's another incident

(15)   where you testified to PSS?

(16)       A     Yes, sir.

(17)       Q     And other than the use of force,

(18)   were there any other issues that arose in that

(19)   incident that was investigated by PSS?

(20)             MS. JONES:  Objection.

(21)       A     Not from me, no, sir.

(22)       Q     All right.  Do you know if you ever

(23)   spoke with anybody from the Locust club about

(24)   this incident on February 14, 2020?

(25)             MS. JONES:  Objection.

|       |     | M. Leach                               | 190 |

(1)                          M. Leach                    190

(2)     A       No.

(3)             MR. SHIELDS:   L-O-C-U-S-T.

(4)     Q       And, for the record, Officer Leach,

(5)     the Locust club is the RPD's police union,

(6)     correct?

(7)     A       Yes, sir.

(8)     Q       And you are a member of the union?

(9)     A       Yes, sir.

(10)            MR. SHIELDS:   All right. I am going

(11)    to put up the next exhibit what will be

(12)    marked as Exhibit 11 for this deposition.

(13)    So officer this is it's called the file

(14)    history activity for the body worn camera

(15)    from the incident.

(16)            (File history activity was marked

(17)    as Plaintiff's Exhibit(s) 11 for

(18)    identification, as of this date.)

(19)    Q       Can you see that on your screen?

(20)    A       Yes, sir.

(21)    Q       So this is a document that was

(22)    produced in discovery.

(23)            Have you ever seen a document like

(24)    this before?

(25)    A       No, sir.

(1)                    **M. Leach**                    191

(2)        Q     Okay.  So basically this shows the

(3)   activities with respect to the body worn

(4)   camera reporting in the I believe you called

(5)   the C3 Sentinel; is that right the body worn

(6)   camera system?

(7)        **A     Yes, sir.**

(8)        Q     So I just want to -- what I want to

(9)   do is ask you questions just basically about

(10)  who this shows having reviewed the recording.

(11)  Okay?  So first it shows you uploaded it on

(12)  the date of the incident around 4:51 p.m.,

(13)  you see that?  And then above that entry is

(14)  the same day at 8:38 p.m. it shows Augustin

(15)  Gonzalez viewed the video.

(16)            So my question is just going to be

(17)  do you know who Augustin Gonzalez is?

(18)       **A     Yes, Augustin Gonzalez is a**

(19)  **sergeant in the RPD.**

(20)       Q     And at the time of the incident was

(21)  he one of your supervisors?

(22)       **A     No, sir.**

(23)       Q     Do you have any idea why Augustin

(24)  Gonzalez viewed your video on the night of the

(25)  incident?

(1)                         M. Leach                      192

(2)      **A      No, sir.**

(3)      Q      Did you ever speak with Augustin

(4)  Gonzalez about the incident?

(5)      **A      He asked if I was okay that -- like**

(6)  **that night like as I was leaving, and that was**

(7)  **it.**

(8)      Q      Okay.  So you saw him on the night

(9)  of the incident at the police station or

(10) whatever it's called?

(11)     **A      As I was leaving I was going home**

(12) **and he asked if I was okay, I said yes**

(13) **sergeant I'm all right.  And he said all right**

(14) **see you, and that was it.**

(15)     Q      Okay.  That's the extent of the

(16) conversation that you had, had?

(17)          **MS. JONES:   Objection.**

(18)     **A      Yes.**

(19)     Q      And when he asked if you were all

(20) right, obviously, he was asking about the

(21) incident where you had shot the dog?

(22)          **MS. JONES:   Objection.**

(23)     **A      Yes, sir.**

(24)     Q      And before that, had you spoken

(25) with him at all about the incident where you

(1)                      M. Leach                    193

(2)    had shot the dog?

(3)              **MS. JONES:   Objection.**

(4)       **A     No, sir.**

(5)       Q     But basically you knew when he was

(6)    asking you if you were all right what he was

(7)    asking about, about the dog shooting incident?

(8)              **MS. JONES:   Objection.**

(9)       **A     Yes, sir.**

(10)      Q     Okay.  All right.  And then above

(11)   that it says the following day you viewed your

(12)   body camera again in the morning at about 7:15

(13)   a.m.

(14)             Do you remember doing that?

(15)      **A     I'm sure I did if -- I'm sure I**

(16)   **watched it the next day, but yeah, I did it.**

(17)   **But, I mean, I don't remember as to why I**

(18)   **would have done it.**

(19)      Q     Is it something that I guess is

(20)   normal for you to do to review body camera

(21)   videos from the previous day?

(22)      **A     Yes, sir, I do it all the time.**

(23)      Q     Even when it's not like something

(24)   that you're doing to help you fill out a

(25)   report?

(1)                          M. Leach                    194

(2)          **A**      **Yes, sir.**

(3)          Q      And then above that it says that

(4)    Sergeant Osipovitch viewed the video later on

(5)    February 15, 2020 at about 9:44 a.m.

(6)              So my question there is on -- well,

(7)    my first question is, is Sergeant Osipovitch

(8)    was he at the time like your direct

(9)    supervisor?

(10)         **A**      **Yes, sir.**

(11)         Q      So you would have the same direct

(12)   supervisor like not -- that's not something

(13)   that would change on a day-to-day basis,

(14)   correct?

(15)         **A**      **No, my direct supervisor -- sorry.**

(16)         **MS. JONES:   Objection.**

(17)         **Go ahead.**

(18)         **A**      **My direct supervisor it lasts for**

(19)   **however long that they're in the section for**

(20)   **and how long I'm in the section for.**

(21)         Q      It's like as long as you and that

(22)   sergeant are assigned to the same like section

(23)   then that's your supervisor?

(24)         **A**      **Yes, sir.**

(25)         Q      On that day the day following the

(1)                    M. Leach                    195

(2)      incident, did you have any further

(3)      conversations with Sergeant Osipovitch about

(4)      the incident?

(5)           **A      No, not to my recollection, sir.**

(6)           Q      And then the next four entries it

(7)      looks like are from Sergeant Gonzalez, he's a

(8)      sergeant you said, right?

(9)           **A      Yes, sir.**

(10)          Q      And that those times that he viewed

(11)     it were again February 15th and then three

(12)     times it looks like on February 16th.

(13)          Did you have any conversations on

(14)     any of those days with Sergeant Gonzalez about

(15)     the incident?

(16)          **A      No.**

(17)          Q      And then after that it looks like

(18)     the next person was February 17th, Jeffrey

(19)     Koehn; am I saying that right?

(20)          **A      Koehn, Jeff Koehn he was a retired**

(21)     **captain at the time he was the captain of**

(22)     **Clinton section, so he was the highest, you**

(23)     **know, supervisor that I was, you know, privy**

(24)     **to speaking with other than, you know, it**

(25)     **being higher then the chief's office, so he's**

```
(1)                      M. Leach                    196

(2)      like our, you know, captain in the whole

(3)      Clinton section.

(4)               MR. SHIELDS:  And for the record

(5)          it's K-O-E-H-N.

(6)          Q      And did you ever speak with Captain

(7)      Koehn about the incident?

(8)          A      No, not really.  I mean just like

(9)      Sergeant Gonzalez he acted like he asked if I

(10)     was okay, but other than that, that we didn't

(11)     speak about the incident, really, no, sir.

(12)         Q      Okay.  And then it shows that you

(13)     viewed it a few times again on February 18th.

(14)              Do you remember any particular

(15)     reason why you would have viewed it again a

(16)     couple of times on February 18th?

(17)         A      No, sir.

(18)         Q      And then again above that

(19)     February 22nd shows Augustin Gonzalez, did you

(20)     ever speak at that time with Sergeant Gonzalez

(21)     about the incident?

(22)         A      No, sir, I never really spoke to

(23)     Sergeant Gonzalez about the incident other

(24)     than when he asked me if I was okay about it.

(25)     We were working totally different shifts.
```

(1)                    M. Leach                    197

(2)     He's been on third platoon forever.  I mean,

(3)     he just got day shift, obviously, but he

(4)     wasn't my boss at that time.

(5)          Q     Okay.  And then it shows Ben Reaves

(6)     is he a sergeant?

(7)          A     Yes, he would have been a sergeant

(8)     at that time.  I think he was working Clinton

(9)     days, but he wasn't my, you know, immediate

(10)    supervisor.

(11)         Q     Do you remember speaking with

(12)    Sergeant Reaves about the incident?

(13)         A     No, sir.

(14)               THE WITNESS:  R-E-A-V-E-S.

(15)         Q     And could you have potentially

(16)    spoken with Sergeant Reaves maybe as part of

(17)    like an evaluation?

(18)               MS. JONES:  Objection.

(19)         A     No, sir.

(20)         Q     Okay.  Above that it shows

(21)    April 24, 2020 Thomas Wild (phonetic), do you

(22)    know who Thomas wild is?

(23)         A     He's an officer in the Clinton

(24)    section.  I don't know work with him right

(25)    now.  I've never spoken with him about the