```
                        CONFIDENTIAL
 1

 2            UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - - - - - - - - - - - - - -
     ERIN GURSSLIN,
 4
              Plaintiff,
 5
                           Civil Action No. 20-cv-6508
 6   v.

 7   THE CITY OF ROCHESTER, A MUNICIPAL ENTITY, POLICE
     OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA
 8   KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON
     SPRINGER,
 9
              Defendants.
10   - - - - - - - - - - - - - - - - - - - - - - - - -

11   Video-recorded Deposition Upon Oral Examination of:

12               Sergeant Ryan J. Romig

13
     Location:    Alliance Court Reporting, Inc.
14                109 South Union Street, Suite 400
                  Rochester, New York 14607
15

16
     Date:        February 17, 2023
17

18
     Time:        10:00 a.m.
19

20

21

22   Reported By:   CHRISTINE VIGNA

23                  Alliance Court Reporting, Inc.

24                  109 South Union Street, Suite 400

25                  Rochester, New York 14607
```



*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1
 2                A P P E A R A N C E S
 3   Appearing Remotely on Behalf of Plaintiff:
 4   Elliot D. Shields, Esq.
 5       Roth & Roth LLP
 6       192 Lexington Avenue, Suite 802
 7       New York, New York 10016
 8       eshields@rothandrothlaw.com
 9
10   Appearing on Behalf of Defendants:
11   Peachie L. Jones, Esq.
12       City of Rochester Law Department
13       City Hall, Room 400A
14       30 Church Street
15       Rochester, New York 14614
16       peachie.jones@cityofrochester.gov
17
18   Also Present:
19   Kenneth Williamson, Videographer
20       Alliance Court Reporting, Inc.
21       109 South Union Street, Suite 400
22       Rochester, New York  14607
23
24                     *     *     *
25
```



Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              S T I P U L A T I O N S
 2   FRIDAY, FEBRUARY 17, 2023;
 3           (Proceedings in the above-titled matter
 4           commencing at 10:20 a.m.)
 5                   *     *     *
 6             IT IS HEREBY STIPULATED by and between the
 7   attorneys for the respective parties that this
 8   deposition may be taken by the Plaintiff at this time
 9   pursuant to subpoena;
10             IT IS FURTHER STIPULATED, that all
11   objections except as to the form of the questions and
12   responsiveness of the answers, be reserved until the
13   time of the trial;
14             IT IS FURTHER STIPULATED, that pursuant to
15   Federal Rules of Civil Procedure 30(e)(1) the witness
16   requests to review the transcript and make any
17   corrections to same before any Notary Public;
18             IT IS FURTHER STIPULATED, that if the
19   original deposition has not been duly signed by the
20   witness and returned to the attorney taking the
21   deposition by the time of trial or any hearing in this
22   cause, a certified transcript of the deposition may be
23   used as though it were the original;
24             IT IS FURTHER STIPULATED, that the
25   attorneys for the parties are individually responsible
```



**Confidential**

4

P R O C E E D I N G S

for their certified transcript charge, including any expedite or other related production charges;

    AND IT IS FURTHER STIPULATED, that the Notary Public, CHRISTINE VIGNA, may administer the oath to the witness.

\*   \*   \*

10:20:09  THE VIDEOGRAPHER: We are on the record. The time is 10:20 a.m. on Friday, February -- excuse me -- Friday, February 17, 2023. My name is Ken Williamson of Alliance Court Reporting located at 109 South Union Street, Rochester, New York. Today we are located at Alliance Court Reporting.

We are about to begin the video-recorded deposition of Sergeant Ryan Romig in the matter of Erin Gursslin, Plaintiff versus The City of Rochester, a municipal entity, Police Officer Jeremy Nellist, Police Officer Joshua Kelly, Commander Fabian Rivera, Lieutenant Aaron Springer, Defendants.

Today's matter is being recorded on behalf of the Plaintiffs. Counsel, please state your appearances for the record and please begin with the noticing attorney.

MR. SHIELDS: Elliot Shields for the Plaintiff.



ALLIANCE COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
|          | 1  | SERGEANT RYAN J. ROMIG - BY MR. SHIELDS                            |
| 11:27:46 | 2  | A.  So just to kind of give you, I guess, a                        |
| 11:27:55 | 3  | brief overview, when a target package is given to our              |
| 11:28:00 | 4  | commander, meaning that -- whether it be our major                 |
| 11:28:04 | 5  | crimes unit or our narcotics unit -- when they decide              |
| 11:28:07 | 6  | that they have enough to write a search warrant and                |
| 11:28:10 | 7  | they write the search warrant and it gets signed by a              |
| 11:28:13 | 8  | judge, they do what's called a high-risk worksheet                 |
| 11:28:15 | 9  | that -- it's a check sheet that determines whether or              |
| 11:28:17 | 10 | not that warrant meets the criteria to use SWAT or                 |
| 11:28:20 | 11 | not.                                                               |
| 11:28:21 | 12 | Once they have that, the mission is given                          |
| 11:28:24 | 13 | to the commander who assigns that mission to a team                |
| 11:28:27 | 14 | leader.  That team leader will then grab a sniper team             |
| 11:28:31 | 15 | leader, a breaching team leader, a less lethal team                |
| 11:28:34 | 16 | leader and they'll all brainstorm a plan.  So they'll              |
| 11:28:41 | 17 | assign out the sniper tasks.  They'll assign out the               |
| 11:28:42 | 18 | less lethal tasks.  They'll assign out the breacher                |
| 11:28:45 | 19 | tasks.  And all those members will go put together                 |
| 11:28:48 | 20 | their portions of the -- of the operations order.  The             |
| 11:28:51 | 21 | team leader will put it all together into a package.               |
| 11:28:55 | 22 | When they think it's good to go, they send it to the               |
| 11:28:59 | 23 | commander who approves it and then sends it up the                 |
| 11:29:02 | 24 | chain of command for further approval.                             |
| 11:29:04 | 25 | Q.  Okay.  Just so I understand, once the                          |



```
            1         SERGEANT RYAN J. ROMIG - BY MR. SHIELDS
11:29:07    2    high-risk search warrant is approved, the team
11:29:10    3    leaders, the various team leaders get together and
11:29:13    4    make an overall general plan for the operation.  Then
11:29:17    5    once they agree on that, they provide that to the
11:29:21    6    commander who signs off with the final approval?
11:29:25    7              MS. JONES:  Objection.
11:29:25    8              But go ahead.
11:29:27    9         A.   Yes.
11:29:29   10         Q.   Okay.
11:29:29   11         A.   Well, I don't -- I'll say this.
11:29:33   12    It -- it -- I believe it goes higher than him, but
11:29:36   13    you'd have to ask him that to know.  I believe that
11:29:38   14    the approval process doesn't stop at him.  But again,
11:29:43   15    I'm not him.  I'm not the commander, so I don't know.
11:29:46   16         Q.   In terms of the snipers choosing their
11:29:49   17    operating position, that's something that they would
11:29:53   18    choose and then discuss with the other team leaders;
11:29:56   19    is that correct?
11:29:58   20              MS. JONES:  Objection.
11:29:59   21              But go ahead.
11:30:00   22         A.   Yes.  They would choose a final operating
11:30:06   23    position and then they would put it into the plan and
11:30:09   24    then it would get approved by the team leader.  And
11:30:12   25    then it would get approved by the commander and so on
```



|  |  |
|---|---|
| 1 | SERGEANT RYAN J. ROMIG - BY MR. SHIELDS |
| 11:30:14   2 | and so forth. |
| 11:30:15   3 | Q.  And part of that planning process would |
| 11:30:18   4 | include the infil and exfil from their final operating |
| 11:30:23   5 | position? |
| 11:30:24   6 | A.  Again, I'm not a sniper, so that question |
| 11:30:26   7 | would probably be better for them.  I don't really |
| 11:30:29   8 | know the answer to it. |
| 11:30:30   9 | Q.  But you just told me that all of the team |
| 11:30:33  10 | leaders get together and discuss the plan prior to |
| 11:30:36  11 | presenting it to the commander, correct? |
| 11:30:37  12 | A.  Yes. |
| 11:30:38  13 | MS. JONES:  Objection. |
| 11:30:39  14 | Q.  So that's something that you have |
| 11:30:40  15 | discussed with the sniper team leaders on prior |
| 11:30:44  16 | occasions? |
| 11:30:44  17 | A.  Well, infil and exfil is usually pretty |
| 11:30:50  18 | straightforward so it's not usually something that |
| 11:30:51  19 | gets discussed.  It's -- it's typically just parking a |
| 11:30:56  20 | car.  It's not usually something that, at least in my |
| 11:31:02  21 | experience, really needs a whole lot of discussion. |
| 11:31:07  22 | Q.  Have you ever had a situation where the |
| 11:31:10  23 | snipers discussed needing to cross over a neighboring |
| 11:31:16  24 | property to get to their final operating position? |
| 11:31:19  25 | A.  No. |



```
              1         SERGEANT RYAN J. ROMIG - BY MR. SHIELDS
11:31:20      2         Q.   Is it common that the final operating
11:31:24      3    position would be on a neighboring property to the
11:31:28      4    target location?
11:31:29      5              MS. JONES:  Objection.
11:31:32      6         A.   I can't speak to whether or not it's
11:31:35      7    common.  Again, I'm not a sniper.  I know they use a
11:31:39      8    variety of different, for lack of a better term, hide,
11:31:46      9    places to go for their final operating position,
11:31:49     10    observation positions.  But I don't know how they
11:31:55     11    choose them or -- or why or how often.
11:31:56     12         Q.   Are you aware that in at least some
11:31:59     13    circumstances the snipers' operating position is on a
11:32:05     14    different neighboring property near the target
11:32:08     15    location?
11:32:09     16         A.   Am I aware that that has happened in
11:32:11     17    operations ever?
11:32:13     18         Q.   Correct.
11:32:13     19         A.   Yes.
11:32:14     20         Q.   That's something that you've discussed
11:32:18     21    with the sniper team?
11:32:21     22              MS. JONES:  Objection.
11:32:25     23         A.   It's something that I've observed.  I
11:32:28     24    don't know that I've ever had a conversation with them
11:32:30     25    about it, but it's something that I've observed.
```



|  |  |
|---|---|
| | 1  SERGEANT RYAN J. ROMIG - BY MR. SHIELDS |
| 11:32:33 | 2  Q. And what warrant exception permits them to |
| 11:32:38 | 3  do that? |
| 11:32:39 | 4  A. I -- I don't know what you mean by that. |
| 11:32:42 | 5  Again, sometimes they're in backyards. I don't know |
| 11:32:49 | 6  if they're asking -- if they're talking to the owners. |
| 11:32:53 | 7  I don't know if they're vacant backyards. I just know |
| 11:32:57 | 8  that I have observed them in backyards on barricaded |
| 11:33:01 | 9  gunman calls in a variety of SWAT functions. |
| 11:33:05 | 10  So as far as the specifics of each |
| 11:33:07 | 11  individual situation where I've seen them in a |
| 11:33:09 | 12  backyard, I'm sure some of them would fall under like |
| 11:33:11 | 13  a public safety exemption in the necessity of the |
| 11:33:16 | 14  barricaded gunman or the hostage situation. And I'm |
| 11:33:20 | 15  sure some of them, they talked to the owner of the |
| 11:33:22 | 16  house. But again, I'm not a sniper. I wasn't there. |
| 11:33:25 | 17  It's just an observation that I've made. |
| 11:33:26 | 18  Q. But you'd agree that generally there must |
| 11:33:33 | 19  be a Fourth Amendment exemption for them to enter onto |
| 11:33:37 | 20  one of those neighboring properties? |
| 11:33:38 | 21  MS. JONES: Objection. |
| 11:33:39 | 22  Go ahead. |
| 11:33:40 | 23  A. I mean, I've already kind of, I think, |
| 11:33:41 | 24  discussed and made my position on that clear. I think |
| 11:33:47 | 25  there are reasons why somebody might do that, but |



ALLIANCE COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
           1          SERGEANT RYAN J. ROMIG - BY MR. SHIELDS
11:33:53   2     I -- I don't know -- I really don't know what you want
11:33:58   3     me to say other than what I've already said.
11:34:01   4          Q.   Okay.  Going back to your academy
11:34:10   5     training, did you learn anything about interacting
11:34:13   6     with dogs during your academy training?
11:34:16   7          A.   I'm sure I did.  I -- but if you're -- I
11:34:22   8     don't really remember any specific training from the
11:34:24   9     academy.  It was quite a long time ago.
11:34:27  10          Q.   You did the academy in 2007?
11:34:29  11          A.   Yes.
11:34:29  12               MS. JONES:  So it sounds like we're moving
11:34:32  13     away from SWAT, so I think the confidentiality can
11:34:38  14     stop from SWAT-related questions from two questions
11:34:40  15     ago.
11:34:40  16          Q.   Tell me everything you remember about
11:34:44  17     training regarding interacting with dogs from the
11:34:48  18     academy.
11:34:49  19          A.   From the academy, I don't remember any of
11:34:56  20     it.  I remember an in-service from a few years back
11:35:00  21     that we did with some clarity.  But the academy, I
11:35:07  22     don't remember.
11:35:07  23          Q.   Okay.  Did you get firearms training at
11:35:11  24     the academy?
11:35:12  25          A.   Yes.
```



**Confidential**

66

|   |   |
|---|---|
| | 1    SERGEANT RYAN J. ROMIG - BY MR. SHIELDS |
| 11:35:13 | 2        Q.   Did that include anything about |
| 11:35:16 | 3    discharging your weapon at a dog? |
| 11:35:19 | 4        A.   I know that they had situational targets |
| 11:35:29 | 5    that were a depiction of an aggressive dog.  But as |
| 11:35:35 | 6    far as like a block of instruction with a PowerPoint |
| 11:35:39 | 7    and an instructor that's -- I don't know.  I don't |
| 11:35:43 | 8    remember. |
| 11:35:43 | 9        Q.   Okay.  So you remember something from the |
| 11:35:46 | 10   academy regarding shooting at aggressive dog targets? |
| 11:35:53 | 11            MS. JONES:  Objection. |
| 11:35:57 | 12       A.   I guess I would say that at some point in |
| 11:36:02 | 13   my police career I have seen a target that was in the |
| 11:36:06 | 14   shape of an aggressive dog that was designed for |
| 11:36:10 | 15   reality-based training.  Whether that was in the |
| 11:36:13 | 16   academy or sometime since, I guess I don't know.  But |
| 11:36:20 | 17   that's -- that's really all I have.  I mean, it was |
| 11:36:23 | 18   again 2007.  It was quite a while ago.  I don't |
| 11:36:28 | 19   remember much from it. |
| 11:36:29 | 20       Q.   Okay.  So you don't remember anything from |
| 11:36:31 | 21   the academy about training with dogs? |
| 11:36:35 | 22            MS. JONES:  Objection. |
| 11:36:35 | 23       A.   Other than what I've just said to you, |
| 11:36:41 | 24   yeah, I don't. |
| 11:36:42 | 25       Q.   Did you get any training at the academy |



ALLIANCE COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
           1         SERGEANT RYAN J. ROMIG - BY MR. SHIELDS
11:36:46   2    about dog behavior?
11:36:47   3         A.   I don't know if I'm conflating in my brain
11:36:55   4    the in-service training or the academy.  So I know
11:36:58   5    that I've learned about dog behavior, but I don't know
11:37:00   6    if -- if I'm remembering it from the in-service or the
11:37:04   7    academy.  I would imagine it's from the in-service
11:37:07   8    which was much more recent.
11:37:09   9         Q.   Okay.  So since the academy -- and not
11:37:13  10    talking about any SWAT training -- have you gotten
11:37:19  11    any -- tell me all the training that you've received
11:37:21  12    about interacting with dogs.
11:37:24  13         A.   There was an off-the-road in-service.  I
11:37:28  14    don't remember what year it was.  Somebody from either
11:37:32  15    animal control or the Humane Society came in and they
11:37:38  16    talked about how to identify an aggressive dog based
11:37:43  17    on their body posture, their body language.  They
11:37:46  18    talked about, you know, some potential ways to try to
11:37:55  19    keep the dog at bay.  That's really the most I
11:38:02  20    remember about it --
11:38:04  21         Q.   Okay.
11:38:05  22         A.   -- so --
11:38:06  23         Q.   Was that training geared towards dealing
11:38:12  24    with quote/unquote aggressive dogs?
11:38:14  25         A.   The parts I remember of it had to do with
```



```
             1      SERGEANT RYAN J. ROMIG - BY MR. SHIELDS
11:38:23     2   identifying the body language of an animal, whether it
11:38:27     3   be playful, scared, defensive, aggressive.  And then
11:38:32     4   some ways to mitigate the risk if -- if the dog is
11:38:36     5   being aggressive toward you.
11:38:38     6           I don't remember if they covered anything
11:38:41     7   else as far as, you know, response to dogs.
11:38:52     8   The -- that's all I remember about that in-service.
11:38:55     9           The only other kind of things that I
11:39:00    10   remember is, in SWAT school when they talk about
11:39:05    11   scouting, they talk about the signs that a dog might
11:39:08    12   be living in a home.  So, you know, dog feces,
11:39:13    13   doghouses, be aware of dog signs, fences, dog bowls,
11:39:20    14   leashes, you know, the sort things to be on the
11:39:23    15   lookout for when you're scouting a location that might
11:39:26    16   be indicative of a dog being present.
11:39:29    17           Q.  Okay.  So I want to talk about the SWAT
11:39:34    18   training separately in a minute.  But going back to
11:39:39    19   training that you've received post-academy, did you
11:39:46    20   receive any training about the things you just
11:39:52    21   mentioned regarding scouting separate from your
11:39:56    22   training with the SWAT team?
11:39:59    23           A.  I don't know if they covered that in the
11:40:04    24   in-service.  I also know they sent out some roll call
11:40:08    25   trainings, but I don't remember the details of them.
```



```
                    1       SERGEANT RYAN J. ROMIG - BY MR. SHIELDS
11:40:14            2       Q.  Okay.  In the Humane Society training that
11:40:20            3   you mentioned, did they discuss when it may be lawful
11:40:25            4   or unlawful to shoot a dog?
11:40:27            5       A.  I don't remember if they discussed it
11:40:34            6   during that training.
11:40:35            7       Q.  Okay.  And does the annual firearms
11:40:44            8   training involve dog-shooting scenarios?
11:40:52            9       A.  So the -- the annual firearms training can
11:40:56           10   differ from time to time.  So that would be a better
11:40:59           11   question for somebody from our firearms training unit.
11:41:03           12   My memory, I don't remember ever shooting dog
11:41:08           13   scenarios in our firearms training.
11:41:10           14       Q.  Okay.  But you mentioned earlier that you
11:41:11           15   did remember some sort of -- I don't know what you
11:41:14           16   called it.
11:41:15           17       A.  A -- a situational target or a
11:41:19           18   reality-based target shaped like with a picture of an
11:41:23           19   aggressive dog on it.  I know that those exist, yes.
11:41:26           20       Q.  Okay.  Do you know if you've ever had a
11:41:28           21   firearms training, a situational training with that
11:41:34           22   target or is that just something that you know exists
11:41:37           23   generally?
11:41:38           24            MS. JONES:  Objection.
11:41:38           25            But go ahead.
```



```
              1         SERGEANT RYAN J. ROMIG - BY MR. SHIELDS
11:41:39      2         A.   Again, it was a long time ago.  I do
11:41:43      3    believe at some point in my police career I've shot at
11:41:46      4    that target, but it's -- it's a lot -- a lot of
11:41:49      5    trainings over a long, long career, so...
11:41:51      6         Q.   Okay.  And I just want to put up the
11:41:58      7    PowerPoint from the training that you mentioned and
11:42:03      8    see if it's the same training that we're talking
11:42:06      9    about.  Okay?
11:42:07     10         A.   Okay.
11:42:08     11              MR. SHIELDS:  This will be Exhibit 3 for
11:42:10     12    this deposition.  And like the other exhibits I've put
11:42:19     13    up before, it's got a different number.
11:42:19     14              MS. JONES:  Okay.  I think we're on 4,
11:42:22     15    because we had three pictures before.
11:42:25     16              MR. SHIELDS:  Thank you.  You're right.
11:42:26     17    So this will be Exhibit 4 for this deposition.
             18              (The following exhibit was marked for
             19              identification:  Number EXH 4.)
11:42:30     20         Q.   And, Sergeant, on the screen, do you see a
11:42:35     21    page that says "Dog Bite Prevention For Law
11:42:38     22    Enforcement"?
11:42:39     23         A.   I do.
11:42:40     24         Q.   With an aggressive-looking dog on the
11:42:43     25    cover?
```

