CONFIDENTIAL
1

2              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF NEW YORK
3   - - - - - - - - - - - - - - - - - - - - - - - - -
    ERIN GURSSLIN,
4
              Plaintiff,
5
                              Civil Action No. 20-cv-6508
6   v.

7   THE CITY OF ROCHESTER, a municipal entity, POLICE
    OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA
8   KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON
    SPRINGER,
9
              Defendants.
10  - - - - - - - - - - - - - - - - - - - - - - - - -

11
    Video-recorded Deposition Upon Oral Examination of:
12
                    Officer Jeremy Nellist
13

14  Location:        Alliance Court Reporting, Inc.
                     109 South Union Street, Suite 400
15                   Rochester, New York  14607

16

17  Date:            February 24, 2023

18

19
    Time:            10:00 a.m.
20

21

22  Reported By:   KIMBERLY A. BONSIGNORE

23                   Alliance Court Reporting, Inc.

24                   109 South Union Street, Suite 400

25                   Rochester, New York  14607



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

**Confidential**

```
 1                A P P E A R A N C E S

 2    Appearing Remotely on Behalf of Plaintiff:

 3    Elliot D. Shields, Esq.
          Roth & Roth LLP
 4        192 Lexington Avenue, Suite 802
          New York, New York  10016
 5        eshields@rothandrothlaw.com

 6
      Appearing on Behalf of Defendant:
 7
      Peachie L. Jones, Esq.
 8        City of Rochester Law Department
          City Hall, Room 400A
 9        30 Church Street
          Rochester, New York  14614
10        peachie.jones@cityofrochester.gov

11
      Also Present:
12
      Peter H. Colucci, Videographer
13        Alliance Court Reporting, Inc.
          109 South Union Street, Suite 400
14        Rochester, New York  14607

15

16                    *      *      *

17

18

19

20

21

22

23

24

25
```



Confidential

```
 1                   S T I P U L A T I O N S
 2    FRIDAY, FEBRUARY 24, 2023;
 3              (Proceedings in the above-titled matter
 4              commencing at 10:13 a.m.)
 5                        *      *      *
 6              IT IS HEREBY STIPULATED by and between the
 7    attorneys for the respective parties that this
 8    deposition may be taken by the Plaintiff at this time
 9    pursuant to notice;
10              IT IS FURTHER STIPULATED, that all
11    objections except as to the form of the questions and
12    responsiveness of the answers, be reserved until the
13    time of the trial;
14              IT IS FURTHER STIPULATED, that pursuant to
15    Federal Rules of Civil Procedure 30(e)(1) the witness
16    requests to review the transcript and make any
17    corrections to same before any Notary Public;
18              IT IS FURTHER STIPULATED, that if the
19    original deposition has not been duly signed by the
20    witness and returned to the attorney taking the
21    deposition by the time of trial or any hearing in this
22    cause, a certified transcript of the deposition may be
23    used as though it were the original;
24              IT IS FURTHER STIPULATED, that the
25    attorneys for the parties are individually responsible
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

4

|  |  |
|---|---|
| | 1 |

                    P R O C E E D I N G S

2   for their certified transcript charge, including any

3   expedite or other related production charges in

4   accordance with Rochester Rules;

5           AND IT IS FURTHER STIPULATED, that the

6   Notary Public, KIMBERLY A. BONSIGNORE, may administer

7   the oath to the witness.

10:13:01   8                *      *      *

10:13:01   9           THE VIDEOGRAPHER:  Good morning.  We are

10:13:28  10   on the record at 10:13 a.m.  Today is Friday, February

10:13:34  11   24, 2023.

10:13:36  12           My name is Peter Colucci of Alliance Court

10:13:39  13   Reporting, located at 109 South Union Street, Suite

10:13:43  14   400, in Rochester, New York.  We are at the offices of

10:13:46  15   Alliance Court Reporting.

10:13:46  16           We are about to begin the video-recorded

10:13:49  17   deposition of Jeremy Nellist in the matter of Erin

10:13:53  18   Gursslin versus the City of Rochester et al.

10:13:56  19           Would the attorneys please announce their

10:14:01  20   appearances for the record?

10:14:02  21           MR. SHIELDS:  For the Plaintiff Erin

10:14:05  22   Gursslin, Elliot Shields, Roth & Roth LLP.

10:14:07  23           MS. JONES:  And Peachie Jones for -- with

10:14:10  24   the City of Rochester, for all defendants.

10:14:13  25           THE VIDEOGRAPHER:  The court reporter



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

105

|          | 1  | OFFICER JEREMY NELLIST - BY MR. SHIELDS |

12:07:15   2      Q.   Okay.   When's the first time that you

12:07:19   3   noticed Ms. Gursslin?

12:07:22   4      A.   After we shot the dog.

12:07:26   5      Q.   Okay.   If Ms. Gursslin testified that she

12:07:33   6   was following the dog and talking to it right up to

12:07:39   7   the time when you shot the dog, and that she was

12:07:41   8   standing about 3 feet behind the dog when you shot it,

12:07:45   9   do you think she was mistaken?

12:07:46   10          MS. JONES:   Objection.

12:07:47   11      A.   Yes.

12:07:48   12      Q.   Okay.   If she was 3 feet behind the dog,

12:07:53   13   do you think you would have noticed her?

12:07:55   14          MS. JONES:   Objection.

12:07:56   15      A.   Yes.

12:07:56   16      Q.   Okay.   And you testified that it was dark

12:07:58   17   outside?

12:08:00   18      A.   It was dark, yes.

12:08:01   19      Q.   And you testified that you didn't see any

12:08:03   20   light come on?

12:08:05   21          MS. JONES:   Objection.

12:08:05   22      A.   Correct.

12:08:06   23      Q.   And you testified that you didn't see any

12:08:09   24   poop on the ground because it was dark outside?

12:08:11   25          MS. JONES:   Objection.



|   |   |
|---|---|
| | 1 |

          1         OFFICER JEREMY NELLIST - BY MR. SHIELDS

12:08:12   2       A.  Correct.

12:08:13   3       Q.  And you testified -- well, let me withdraw

12:08:16   4  that.

12:08:17   5          So you jump the fence, and you see the dog

12:08:23   6  running at you, and then you shoot the dog.  Is that

12:08:26   7  what happened?

12:08:27   8       A.  No.

12:08:27   9       MS. JONES:  Objection.

12:08:28  10       Q.  Okay.  So what happened?

12:08:30  11       A.  So Josh jumped over the fence first.  He

12:08:34  12  was in the yard, I passed him all the gear, and then I

12:08:39  13  jumped over the fence.  And then we picked up our gear

12:08:43  14  and began to walk out.

12:08:45  15          And as we got to the point of the yard,

12:08:49  16  that's when the dog charged at us.  So we were in the

12:08:53  17  yard briefly before the dog ever came at us.

12:08:58  18       Q.  Okay.  So how long were you in the yard

12:09:01  19  before you noticed the dog?

12:09:03  20       A.  About 30 seconds.

12:09:06  21       Q.  Okay.  And in that 30 seconds, you never

12:09:09  22  noticed the light come on?

12:09:10  23       A.  No.

12:09:11  24       Q.  And in that 30 seconds, you never heard

12:09:14  25  Ms. Gursslin talking to Nina?



|  | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
| 12:09:15 | 2 | MS. JONES:  Objection. |
| 12:09:16 | 3 | A.  No. |
| 12:09:17 | 4 | Q.  Okay.  Where was Nina located in the yard |
| 12:09:21 | 5 | when you first noticed her? |
| 12:09:22 | 6 | A.  She was about 4 to 5 feet from us, running |
| 12:09:30 | 7 | directly at us. |
| 12:09:31 | 8 | Q.  Okay.  So in that 4 to 5 feet, you were |
| 12:09:36 | 9 | able to pull out your gun and shoot? |
| 12:09:38 | 10 | A.  No. |
| 12:09:39 | 11 | Q.  Okay.  So what happened? |
| 12:09:41 | 12 | A.  So initially the dog charged at Josh, who |
| 12:09:45 | 13 | was in front of me because we were in a single-file |
| 12:09:48 | 14 | line.  Josh used his rifle bag and put it in front of |
| 12:09:56 | 15 | him as a barrier between him and the dog. |
| 12:09:57 | 16 | The dog could not get through the rifle |
| 12:10:02 | 17 | bag.  Josh actually used it, from what I could see, as |
| 12:10:05 | 18 | a shield, moving it around to -- as a barrier between |
| 12:10:09 | 19 | him and the dog. |
| 12:10:11 | 20 | The dog then went around to our right and |
| 12:10:17 | 21 | came in through some shrubbery that we were up against |
| 12:10:23 | 22 | that was between us and the dog. |
| 12:10:27 | 23 | Q.  I mean, what were you doing when Josh had |
| 12:10:31 | 24 | the bag and was using it as a shield? |
| 12:10:37 | 25 | A.  I was actually just -- I don't remember |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|            | 1  | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
|------------|----|-----------------------------------------|
| 12:10:43   | 2  | exactly what I did because it happened so fast.  I |
| 12:10:46   | 3  | think I kind of grabbed my bag too.  I had gear in my |
| 12:10:49   | 4  | hand. |
| 12:10:51   | 5  | Q.  Okay.  And what did you -- what did you |
| 12:10:54   | 6  | do? |
| 12:10:55   | 7  | MS. JONES:  Objection. |
| 12:10:57   | 8  | A.  I just kind of stood there. |
| 12:10:59   | 9  | Q.  Okay.  Did you see Ms. Gursslin while you |
| 12:11:03   | 10 | were standing there? |
| 12:11:05   | 11 | A.  No. |
| 12:11:05   | 12 | Q.  Okay.  Did you hear Ms. Gursslin while you |
| 12:11:07   | 13 | were standing there? |
| 12:11:08   | 14 | MS. JONES:  Objection. |
| 12:11:09   | 15 | A.  No. |
| 12:11:09   | 16 | Q.  Then what happened next? |
| 12:11:12   | 17 | A.  The dog left where Josh was, came in at a |
| 12:11:18   | 18 | different location.  I saw Josh draw his handgun, and |
| 12:11:25   | 19 | I drew mine at the same time.  And he shot first, and |
| 12:11:28   | 20 | then I shot roughly a quarter of a second behind him, |
| 12:11:33   | 21 | as the dog was coming at us through the shrubbery. |
| 12:11:38   | 22 | And then I started identifying ourselves as police |
| 12:11:41   | 23 | officers. |
| 12:11:41   | 24 | Q.  Okay.  Why did you start identifying |
| 12:11:45   | 25 | yourselves as police officers? |



Confidential

109

|  | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
|---|---|---|
| 12:11:47 | 2 | A.  So that if there was anyone else in the |
| 12:11:51 | 3 | yard, they knew police was back there. |
| 12:11:52 | 4 | Q.  Okay.  So did you start identifying |
| 12:11:56 | 5 | yourself after you saw Ms. Gursslin? |
| 12:11:57 | 6 | MS. JONES:  Objection. |
| 12:11:58 | 7 | A.  I started identifying ourselves after the |
| 12:12:02 | 8 | shots were fired. |
| 12:12:03 | 9 | Q.  Okay.  And you saw Ms. Gursslin |
| 12:12:05 | 10 | immediately after the shots were fired? |
| 12:12:06 | 11 | A.  Yes. |
| 12:12:07 | 12 | Q.  Okay.  Where was Ms. Gursslin? |
| 12:12:10 | 13 | A.  Coming through the yard. |
| 12:12:12 | 14 | Q.  Okay.  She was close to you? |
| 12:12:15 | 15 | MS. JONES:  Objection. |
| 12:12:15 | 16 | A.  She was approaching us, yes. |
| 12:12:18 | 17 | Q.  She was behind that little white picket |
| 12:12:22 | 18 | fence that divided the backyard? |
| 12:12:24 | 19 | MS. JONES:  Objection. |
| 12:12:25 | 20 | A.  I don't remember exactly where she was. |
| 12:12:27 | 21 | Q.  Okay.  She wasn't, like, by the side door; |
| 12:12:30 | 22 | right? |
| 12:12:30 | 23 | MS. JONES:  Objection. |
| 12:12:31 | 24 | A.  I don't recall exactly where she was, no. |
| 12:12:33 | 25 | Q.  Okay.  Did you have any idea where the dog |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

120

```
            1        OFFICER JEREMY NELLIST - BY MR. SHIELDS
12:37:20    2    that you want to change after having the opportunity
12:37:23    3    to speak with your attorney?
12:37:24    4        A.   No.
12:37:25    5        Q.   Okay.  Were there any answers that you
12:37:28    6    want to clarify after speaking with your attorney?
12:37:31    7        A.   No.
12:37:33    8        MR. SHIELDS:  So I'm just going to take a
12:37:34    9    step back.  There's a couple pictures I want to show
12:37:38   10    you and just ask you some quick questions about.
12:37:41   11        So the first one we will mark as Exhibit 6
12:37:46   12    for this deposition.  Let me put it up.
12:37:46   13        (The following exhibit was marked for
12:37:46   14        identification:  Number EXH 6.)
12:38:00   15        Q.   Okay.  And, Officer Nellist, do you see
12:38:06   16    the picture that's depicted on the screen right now?
12:38:09   17        A.   Yes.
12:38:09   18        Q.   Okay.  Would this be a picture from where
12:38:11   19    you set up the final operating position on the night
12:38:14   20    of the incident?
12:38:15   21        A.   I don't know if it exactly looked like
12:38:18   22    that, but that's in the area that we were.
12:38:20   23        Q.   Okay.  So aside from the snow on the
12:38:24   24    ground and maybe some objects in the area, that's
12:38:28   25    generally where you had set up on the night of the
```



Confidential

121

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | OFFICER JEREMY NELLIST - BY MR. SHIELDS                 |
| 12:38:31 | 2  | incident; is that right?                               |
| 12:38:32 | 3  | MS. JONES:  Objection.                                  |
| 12:38:32 | 4  | A.  Yes.                                                |
| 12:38:34 | 5  | MR. SHIELDS:  Okay.  And I'm just going to              |
| 12:38:39 | 6  | go right to another picture that we'll mark as Exhibit  |
| 12:38:42 | 7  | 7.                                                      |
| 12:38:47 | 8  | Hold on.  I'm just going to -- okay.                    |
| 12:38:52 | 9  | So Exhibit 7 is looking from the other way              |
| 12:38:55 | 10 | towards that back corner.                               |
| 12:38:55 | 11 | (The following exhibit was marked for                   |
| 12:38:55 | 12 | identification:  Number EXH 7.)                         |
| 12:38:59 | 13 | Q.  Does this generally depict the area where           |
| 12:39:02 | 14 | your final operating position was set up also?          |
| 12:39:05 | 15 | A.  Yes.                                                |
| 12:39:05 | 16 | MS. JONES:  Objection.                                  |
| 12:39:07 | 17 | Q.  And that would have been -- I don't know.           |
| 12:39:11 | 18 | Can you see -- it looks like a trash barrel at the      |
| 12:39:13 | 19 | corner.  Would you have been around on the opposite     |
| 12:39:18 | 20 | side?  Between the back of the structure and the        |
| 12:39:21 | 21 | fence, is that where you were located?                  |
| 12:39:23 | 22 | A.  Yes.                                                |
| 12:39:25 | 23 | Q.  All right.                                          |
| 12:39:27 | 24 | MS. JONES:  Elliot, if we're going to have              |
| 12:39:31 | 25 | more questions on this picture, can you zoom in a       |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

122

```
              1            OFFICER JEREMY NELLIST - BY MR. SHIELDS
12:39:35      2    little more.  Thank you.
12:39:37      3            MR. SHIELDS:  That was going to be the end
12:39:40      4    of my questions about it.
12:39:41      5        Q.  But, I guess, you guys were just kind of
12:39:44      6    around the corner in this picture, maybe behind where
12:39:47      7    the tires were; is that right?
12:39:49      8            MS. JONES:  Objection.
12:39:50      9        A.  Yes.
12:39:51     10            MR. SHIELDS:  Okay.  I'm going to pull
12:39:55     11    those down for now.
12:39:58     12            Okay.  And then I have a couple questions
12:40:01     13    about your interrogatory responses.  So I want to mark
12:40:06     14    the interrogatory responses as Exhibit 8, and I'll put
12:40:14     15    those up.
12:40:14     16            (The following exhibit was marked for
12:40:14     17            identification:  Number EXH 8.)
12:40:27     18        Q.  Okay.  And, Officer Nellist, do you see on
12:40:29     19    your screen what we've marked as Exhibit 8, a document
12:40:33     20    entitled "Defendant Jeremy Nellist's Responses to
12:40:40     21    Plaintiff's First Set of Interrogatories"?
12:40:42     22        A.  Yes.
12:40:42     23        Q.  I want to fast-forward down here to number
12:40:51     24    6, which says "Describe every instance where you have
12:40:56     25    discharged a firearm during the line of duty,
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

123

|            | 1  | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
|------------|----|------------------------------------------|
| 12:40:58   | 2  | including the date, the intended target, a person |
| 12:41:01   | 3  | versus a dog or something else, your assignment at the |
| 12:41:04   | 4  | time, the weapon discharged, whether the discharge was |
| 12:41:08   | 5  | found to have been justified and/or whether the |
| 12:41:11   | 6  | discharge was found to have violated any department |
| 12:41:15   | 7  | policy." |
| 12:41:15   | 8  | So the response first asserted some legal |
| 12:41:19   | 9  | objections, and then said "Without waiving the |
| 12:41:24   | 10 | objections, defendant states that, aside from the |
| 12:41:27   | 11 | incident at issue in this suit, he has discharged his |
| 12:41:30   | 12 | firearm in the line of duty four times; three at |
| 12:41:36   | 13 | aggressive dogs, and one time at a person during a |
| 12:41:37   | 14 | SWAT operation.  All firearm discharges were found to |
| 12:41:40   | 15 | have been justified and consistent with department |
| 12:41:42   | 16 | policy." |
| 12:41:43   | 17 | So my first question is, you've described |
| 12:41:49   | 18 | one other incident in about 2000 -- you said between |
| 12:41:54   | 19 | 2008 and 2013 it occurred, where you discharged your |
| 12:41:59   | 20 | firearm at a dog.  Were there any other times, aside |
| 12:42:03   | 21 | from that incident, where you discharged your firearm |
| 12:42:07   | 22 | at a dog? |
| 12:42:07   | 23 | A.  Yes. |
| 12:42:07   | 24 | Q.  Okay.  When was the next time? |
| 12:42:10   | 25 | A.  I don't remember the exact date.  It was |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

124

|   |   |   |
|---|---|---|
| | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
| 12:42:13 | 2 | after the first one.  I believe -- I can't remember |
| 12:42:20 | 3 | which one was first, but I'll just go into one of |
| 12:42:24 | 4 | them. |
| 12:42:25 | 5 | I got a -- I was working midnights and I |
| 12:42:29 | 6 | got a call for two aggressive dogs killing each other |
| 12:42:34 | 7 | inside of a house. |
| 12:42:36 | 8 | Q.  Okay.  Was that before or after there were |
| 12:42:41 | 9 | body cameras? |
| 12:42:41 | 10 | MS. JONES:  Objection. |
| 12:42:42 | 11 | A.  Before body cameras. |
| 12:42:44 | 12 | Q.  Okay.  So would that have been -- so I've |
| 12:42:52 | 13 | got all the -- most of the body -- or most of the |
| 12:42:56 | 14 | incident reports for dog shootings from 2013 to |
| 12:43:00 | 15 | present, and I don't think I saw an incident report |
| 12:43:02 | 16 | for that incident. |
| 12:43:04 | 17 | A.  It was -- |
| 12:43:04 | 18 | Q.  Would that -- so my question is, do you |
| 12:43:07 | 19 | know if that incident occurred before 2013? |
| 12:43:11 | 20 | A.  I believe it did, yes. |
| 12:43:12 | 21 | Q.  Okay.  And do you think the other incident |
| 12:43:15 | 22 | occurred before 2013 also that you described earlier |
| 12:43:19 | 23 | before the break? |
| 12:43:20 | 24 | MS. JONES:  Objection. |
| 12:43:20 | 25 | A.  Yes. |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|  | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
|--|---|--|
| 12:43:21 | 2 | Q.  Okay.  And then this indicates -- your |
| 12:43:27 | 3 | interrogatory response number 6 indicates that there's |
| 12:43:29 | 4 | a third incident as well; is that right? |
| 12:43:31 | 5 | A.  Yes. |
| 12:43:33 | 6 | Q.  Okay.  Did that incident also occur before |
| 12:43:36 | 7 | 2013? |
| 12:43:36 | 8 | A.  Yes. |
| 12:43:37 | 9 | MS. JONES:  Objection. |
| 12:43:38 | 10 | Q.  Okay.  So between 2008 and 2013, you had |
| 12:43:43 | 11 | three incidents where you shot dogs? |
| 12:43:47 | 12 | MS. JONES:  Objection. |
| 12:43:47 | 13 | A.  Yes. |
| 12:43:47 | 14 | Q.  And then since 2013, have you had any |
| 12:43:51 | 15 | other incidents where you shot dogs, other than |
| 12:43:54 | 16 | Ms. Gursslin's dog? |
| 12:43:56 | 17 | A.  No. |
| 12:43:56 | 18 | Q.  Okay.  Can you describe the third incident |
| 12:43:59 | 19 | that occurred between 2008 and 2013? |
| 12:44:04 | 20 | A.  You're talking the one other than the 911 |
| 12:44:10 | 21 | call? |
| 12:44:10 | 22 | Q.  Correct.  So you first described the 911 |
| 12:44:13 | 23 | call with the dog in the cage, and then you said the |
| 12:44:15 | 24 | two dogs in the basement attacking each other.  And |
| 12:44:18 | 25 | then there was a third one; correct? |



Confidential

144

|  | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
|---|---|---|
| 01:08:32 | 2 | A. Yes. |
| 01:08:34 | 3 | Q. Okay. Can you describe that? |
| 01:08:38 | 4 | A. Well, it's basically taking a deep breath, |
| 01:08:43 | 5 | not losing your composure, and we train that in |
| 01:08:47 | 6 | training, where they put you in stressful locations. |
| 01:08:50 | 7 | And that's part of the selection process, in order to |
| 01:08:53 | 8 | make the team, is how you handle -- how you perform |
| 01:08:56 | 9 | under stress. |
| 01:09:00 | 10 | Q. So it's an important part of being part of |
| 01:09:06 | 11 | the SWAT team; correct? |
| 01:09:07 | 12 | A. Yes. |
| 01:09:09 | 13 | Q. So you guys are basically supposed to be |
| 01:09:12 | 14 | the cream of the crop from the RPD; right? |
| 01:09:14 | 15 | MS. JONES: Objection. |
| 01:09:15 | 16 | A. Yes. |
| 01:09:16 | 17 | Q. And did any of those stressful situations |
| 01:09:25 | 18 | ever involve interactions with dogs? |
| 01:09:27 | 19 | A. No. |
| 01:09:32 | 20 | Q. Okay. And then before there was a third |
| 01:09:47 | 21 | thing that you had discussed about training with dogs, |
| 01:09:51 | 22 | and I think you said it was securing the dogs? |
| 01:09:53 | 23 | A. Yes. |
| 01:09:54 | 24 | Q. Okay. And that's different from the catch |
| 01:09:57 | 25 | pole training? |



1      OFFICER JEREMY NELLIST - BY MR. SHIELDS

01:09:59   2      A.  Yes.

01:10:00   3      Q.  Okay.  Can you tell me everything about

01:10:03   4  the training regarding securing dogs?

01:10:05   5      A.  Yes.  So securing of dogs would be placing

01:10:10   6  them in an area that has already been cleared for

01:10:13   7  people.  If we are unable to secure them outside to a

01:10:20   8  leash, we'll secure them in small spaces, like

01:10:25   9  bathrooms, in order for the search team, or whoever we

01:10:31  10  are serving the warrant for, to be able to come in and

01:10:35  11  search the location.

01:10:37  12      We will secure the dog, as best as we can,

01:10:41  13  in an area that they can't get out of, either locking

01:10:45  14  them in a room that the search team isn't going to

01:10:49  15  have to go in and search for anything, a/k/a -- like

01:10:49  16  an empty bedroom with nothing in it, we'll secure a

01:10:55  17  dog in that.  A bathroom.  Or we -- if there's a place

01:10:58  18  to secure it outside, like a leash or a doghouse,

01:11:03  19  we'll take it outside and tie it up.

01:11:05  20      Q.  Did you ever get any training about how to

01:11:11  21  avoid shooting a dog that's running at you that you

01:11:15  22  deem to be aggressive?

01:11:16  23      A.  No.

01:11:19  24      Q.  And I think I asked this before, but I

01:11:30  25  don't remember the answer.  At the academy, did you



Confidential

146

```
            1              OFFICER JEREMY NELLIST - BY MR. SHIELDS
01:11:33    2    learn anything about interacting with dogs?
01:11:36    3         A.   Actually, yeah, I thought of one thing, if
01:11:39    4    we go back to the previous question.
01:11:41    5         Q.   Okay.
01:11:42    6         A.   If you have time and space before the dog
01:11:48    7    is on you, you can either use OC spray, which I have
01:11:54    8    deployed on a dog before and found to be not
01:11:58    9    effective, or you can use your baton and use it as a
01:12:02   10    shield, if you have time and reaction space to do so.
01:12:07   11         Q.   Okay.  Have you only used your pepper
01:12:13   12    spray on the one prior occasion that you described
01:12:17   13    earlier?
01:12:18   14         A.   Yes.
01:12:18   15         Q.   Okay.  You've never used it on any other
01:12:18   16    occasions against a dog?
01:12:22   17         A.   Correct.
01:12:22   18              MS. JONES:  Objection.
01:12:23   19         Q.   Have you ever used your baton during an
01:12:26   20    interaction with a dog?
01:12:26   21         A.   I have not used my baton, but I have used
01:12:31   22    other means as a way to block myself from a dog.
01:12:37   23         Q.   Okay.  What other means have you used?
01:12:40   24         A.   On the entry team -- I was on a
01:12:46   25    break-and-rake team, where we were assigned to break
```



Confidential

147

```
                1        OFFICER JEREMY NELLIST - BY MR. SHIELDS
01:12:50        2    out a window as a distractionary technique for the
01:12:55        3    entry team to make entry.  And as we were breaking the
01:12:59        4    window, the dog attempted to come out the window at
01:13:03        5    us, and I used the break-and-rake tool to push the dog
01:13:11        6    back into the house.
01:13:14        7        Q.  What did you call the tool?
01:13:19        8    Break-and-rake?
01:13:19        9        A.  Break-and-rake.
01:13:21       10        Q.  Break-and-rake.  Okay.
01:13:25       11            So that's a specific tool to, like, break
01:13:28       12    a window?
01:13:29       13        A.  Yes.
01:13:29       14        Q.  Okay.  And so that was effective to avoid
01:13:31       15    having to shoot the dog?
01:13:33       16        A.  Yes.
01:13:33       17        Q.  Okay.  Anything else?
01:13:39       18        A.  No.
01:13:40       19        Q.  Okay.  Have you ever had a situation where
01:13:44       20    you, like, ran away from a dog and jumped over a
01:13:47       21    fence?
01:13:48       22            MS. JONES:  Objection.
01:13:48       23        A.  As a child, I ran away from the neighbor's
01:13:54       24    dog, and I made it about 15 feet before he bit my calf
01:13:58       25    and tore it open.  So I have run away from a dog.
```



Confidential

148

|  | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
|---|---|---|
| 01:14:02 | 2 | Q.  Okay.  So when you were a kid, you were |
| 01:14:07 | 3 | attacked by a neighbor's dog? |
| 01:14:08 | 4 | A.  Yes. |
| 01:14:08 | 5 | Q.  Okay.  Did that leave a lasting fear of |
| 01:14:11 | 6 | dogs with you? |
| 01:14:12 | 7 | A.  No. |
| 01:14:13 | 8 | MS. JONES:  Objection. |
| 01:14:16 | 9 | Q.  Do you own any dogs yourself? |
| 01:14:18 | 10 | A.  Yes. |
| 01:14:18 | 11 | Q.  Okay.  Is that the dog that you identified |
| 01:14:34 | 12 | in your interrogatory response as Siren? |
| 01:14:36 | 13 | A.  The dog that I personally own? |
| 01:14:40 | 14 | Q.  Is this yours?  It says -- yeah, that was |
| 01:14:44 | 15 | my question.  In your interrogatory response, number |
| 01:14:48 | 16 | 16, you said that you own an English springer spaniel |
| 01:14:55 | 17 | named Siren? |
| 01:14:56 | 18 | A.  Yes, I do. |
| 01:14:58 | 19 | Q.  So that's your current dog? |
| 01:15:00 | 20 | A.  Yes. |
| 01:15:01 | 21 | Q.  So prior to that, you had another springer |
| 01:15:04 | 22 | spaniel named Dixie? |
| 01:15:06 | 23 | MS. JONES:  Objection. |
| 01:15:06 | 24 | A.  Yes. |
| 01:15:07 | 25 | Q.  And I'm not familiar with an English |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

149

| | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
| 01:15:12 | 2 | Springer.  Is that a small dog or a big dog? |
| 01:15:17 | 3 | A.   Medium-sized dog. |
| 01:15:21 | 4 | Q.   Okay.  In your experience, as a dog owner, |
| 01:15:24 | 5 | do dogs normally greet people if they enter onto your |
| 01:15:31 | 6 | property? |
| 01:15:31 | 7 | MS. JONES:  Objection. |
| 01:15:31 | 8 | A.   My dog does, yes. |
| 01:15:33 | 9 | Q.   It would run up to somebody if they came |
| 01:15:35 | 10 | into your yard? |
| 01:15:36 | 11 | MS. JONES:  Objection. |
| 01:15:37 | 12 | A.   Yes. |
| 01:15:40 | 13 | Q.   And that could be scary for some people; |
| 01:15:44 | 14 | right? |
| 01:15:45 | 15 | MS. JONES:  Objection. |
| 01:15:46 | 16 | A.   Depending on the demeanor, yes. |
| 01:15:50 | 17 | Q.   Did any of your dogs ever attack anybody |
| 01:15:55 | 18 | when they entered onto your property? |
| 01:15:57 | 19 | A.   No. |
| 01:15:59 | 20 | Q.   But it's a normal thing that a dog would |
| 01:16:04 | 21 | do, to run up to somebody that goes into the -- their |
| 01:16:07 | 22 | yard? |
| 01:16:07 | 23 | MS. JONES:  Objection. |
| 01:16:08 | 24 | A.   Yes. |
| 01:16:08 | 25 | Q.   Did you ever receive any training since |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

150

```
           1        OFFICER JEREMY NELLIST - BY MR. SHIELDS
01:16:13   2    you started with the RPD for how to deal with dogs
01:16:16   3    that run up to you when you're on their property?
01:16:19   4            MS. JONES:  Objection.
01:16:20   5        A.  We were taught on how to identify an
01:16:25   6    aggressive dog from a nonaggressive dog.
01:16:28   7        Q.  Okay.  How do you identify a dog as
01:16:33   8    aggressive versus nonaggressive if it's running at you
01:16:36   9    when you enter onto its property?
01:16:39  10        A.  Usually an aggressive dog would either be
01:16:44  11    growling or snarling at you, how fast that it's
01:16:49  12    running -- actually running at you.  A playful dog or
01:16:53  13    a nonaggressive dog would be barking [sic] its tail,
01:16:58  14    kind of trotting or slowly running towards you.
01:17:00  15        Q.  Did you ever watch any live dogs running
01:17:07  16    to identify whether it's aggressive or nonaggressive?
01:17:09  17            MS. JONES:  Objection.
01:17:10  18        A.  Any training videos or --
01:17:14  19        Q.  I'm talking about live dogs.  Like real
01:17:18  20    dogs.
01:17:18  21            MS. JONES:  Objection.
01:17:19  22        A.  I mean, I have experience with it.
01:17:22  23        Q.  Sure.  But in any training that you've
01:17:25  24    received since you started with the RPD, did you ever
01:17:27  25    do any trainings with real live dogs in person, where
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|   |   |
|---|---|
| | 1 |

```
                 1            OFFICER JEREMY NELLIST - BY MR. SHIELDS
01:17:33         2    the focus of the training was identifying whether or
01:17:36         3    not the dog was aggressive?
01:17:38         4            A.  I used to be a decoy for our K-9 program,
01:17:45         5    where I would go out and put on a decoy suit and let
01:17:49         6    the dogs -- I actually went to a decoy school.  So my
01:17:54         7    personal interactions with our own K-9s.
01:17:59         8            Q.  Okay.  So tell me about that.  So that's
01:18:03         9    to train the RPD's police dogs?
01:18:07        10            A.  Yes.
01:18:10        11            MS. JONES:  Objection.
01:18:11        12            Q.  Okay.  And so that's your -- when did you
01:18:15        13    do that decoy training?
01:18:17        14            A.  About four or five years ago.
01:18:22        15            Q.  Okay.  Was it before or after this
01:18:25        16    incident in 2018?
01:18:27        17            A.  I don't recall.
01:18:29        18            Q.  Okay.  Was the purpose of that training to
01:18:36        19    just train the dog or was that also to train you and
01:18:40        20    other officers on identifying whether the dog was
01:18:44        21    aggressive or nonaggressive?
01:18:46        22            MS. JONES:  Objection.
01:18:46        23            A.  The school was for the decoy handler on
01:18:54        24    how to properly decoy for a dog because, if you decoy
01:18:58        25    not properly, you can injure the dog, and it was also
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

152

```
                1      OFFICER JEREMY NELLIST - BY MR. SHIELDS
01:19:05        2    for training purposes.
01:19:06        3              There was a guy that came up that was
01:19:08        4    working with the dog, so it was kind of like a
01:19:11        5    two-tier thing.  It was for the dogs and it was also
01:19:14        6    for the decoys.
01:19:15        7         Q.   Okay.  What is the role of a decoy?
01:19:18        8    That's a term I'm unfamiliar with.
01:19:19        9         A.   To be able to catch the dog properly.
01:19:22       10         Q.   Okay.  So to catch the RPD K-9 dog?
01:19:26       11         A.   Correct.
01:19:27       12         Q.   And that's in the field, like if you go
01:19:31       13    out to some 911 call where it's determined that you
01:19:36       14    need to bring the K-9?
01:19:38       15         A.   No.  I went to the school strictly for
01:19:43       16    training purposes and I thought it would also help my
01:19:46       17    package because at the time one of my aspirations was
01:19:50       18    to be a K-9 officer.
01:19:52       19         Q.   So you went to that training because you
01:19:55       20    wanted to be a K-9 officer?
01:19:58       21              MS. JONES:  Objection.
01:20:00       22         A.   Yes, and I liked working with the dogs.
01:20:04       23         Q.   But you never became a K-9 officer; is
01:20:07       24    that right?
01:20:07       25              MS. JONES:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

153

|  |  |  |
|--|--|--|
|  | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
| 01:20:07 | 2 | A.  I've put in three separate times, but have |
| 01:20:08 | 3 | not had enough seniority in order to get the position. |
| 01:20:11 | 4 | Q.  So it's something that might happen in the |
| 01:20:13 | 5 | future still? |
| 01:20:14 | 6 | A.  Correct. |
| 01:20:15 | 7 | Q.  Okay.  You've mentioned videos.  Have you |
| 01:20:34 | 8 | ever watched any videos that specifically discussed -- |
| 01:20:41 | 9 | any training videos that specifically discuss how to |
| 01:20:41 | 10 | identify whether a dog that's running at you is |
| 01:20:47 | 11 | aggressive or nonaggressive? |
| 01:20:49 | 12 | A.  No. |
| 01:20:50 | 13 | Q.  Okay.  In any of the trainings, was there |
| 01:20:58 | 14 | ever a discussion about how to identify dogs that are |
| 01:21:02 | 15 | running at you as aggressive or nonaggressive? |
| 01:21:05 | 16 | A.  Yes. |
| 01:21:06 | 17 | Q.  Okay.  Tell me everything you remember |
| 01:21:09 | 18 | about that. |
| 01:21:10 | 19 | MS. JONES:  Objection. |
| 01:21:13 | 20 | A.  The demeanor of the dog.  The way its body |
| 01:21:18 | 21 | language is.  The speed that it's running at you.  Is |
| 01:21:24 | 22 | it growling or snarling as it runs at you.  The |
| 01:21:29 | 23 | position of its tail, and -- generally the speed at |
| 01:21:34 | 24 | which it's coming at you, and its demeanor and the |
| 01:21:39 | 25 | noises that it's making. |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

154

|   | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
|---|---|---|
| 01:21:41 | 2 | Q.  Okay.  Are any of those factors that |
| 01:21:44 | 3 | you've just listed more important than the other ones? |
| 01:21:48 | 4 | A.  I think it all goes in -- they all play |
| 01:21:52 | 5 | into each other on identifying an aggressive dog |
| 01:21:54 | 6 | versus a nonaggressive dog. |
| 01:21:56 | 7 | Q.  And is that training that you're referring |
| 01:22:05 | 8 | to right now the 2014 PowerPoint that you said that |
| 01:22:11 | 9 | you reviewed in preparation for the deposition today? |
| 01:22:14 | 10 | A.  Yes. |
| 01:22:15 | 11 | Q.  Okay.  And what else do you remember from |
| 01:22:19 | 12 | that training? |
| 01:22:20 | 13 | A.  They also do know how to identify a |
| 01:22:30 | 14 | nonaggressive dog or a dog that is just being |
| 01:22:32 | 15 | defenseful. |
| 01:22:34 | 16 | Q.  Okay.  And is that just based on, like, |
| 01:22:35 | 17 | the dog's body postures or something else? |
| 01:22:39 | 18 | MS. JONES:  Objection. |
| 01:22:39 | 19 | A.  Yes, dog's body posture. |
| 01:22:42 | 20 | Q.  Okay.  If a dog was standing in an |
| 01:22:48 | 21 | aggressive posture approximately 10 feet away from |
| 01:22:52 | 22 | you, but it wasn't charging at you, would you be |
| 01:22:55 | 23 | justified in shooting that dog? |
| 01:22:58 | 24 | A.  No. |
| 01:22:59 | 25 | Q.  And you say "no" based on your training |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

155

|  |  |  |
|--|--|--|
|  | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
| 01:23:09 | 2 | and experience? |
| 01:23:09 | 3 | A.  Yes. |
| 01:23:09 | 4 | Q.  That would be against RPD policy? |
| 01:23:12 | 5 | A.  Yes. |
| 01:23:13 | 6 | Q.  Okay.  Would that be -- well, you're not a |
| 01:23:16 | 7 | sergeant; is that right? |
| 01:23:17 | 8 | A.  Correct. |
| 01:23:18 | 9 | Q.  Okay.  So you would have never had the |
| 01:23:21 | 10 | situation where you would be in a position to say that |
| 01:23:27 | 11 | somebody that did that should be disciplined? |
| 01:23:29 | 12 | MS. JONES:  Objection. |
| 01:23:30 | 13 | A.  Yeah, I'm not in -- I'm not a supervisor. |
| 01:23:35 | 14 | Q.  Okay.  Other than that 2014 training and |
| 01:23:45 | 15 | the PowerPoint, what other non-SWAT trainings have you |
| 01:23:52 | 16 | gotten about interacting with dogs? |
| 01:23:55 | 17 | A.  Just general, on the road, dealing with |
| 01:24:02 | 18 | dogs. |
| 01:24:04 | 19 | Q.  Okay.  So that's not, like, a specific |
| 01:24:06 | 20 | training that you're required to get from the RPD, |
| 01:24:09 | 21 | though; right? |
| 01:24:10 | 22 | MS. JONES:  Objection. |
| 01:24:11 | 23 | A.  Correct. |
| 01:24:12 | 24 | Q.  That's just your experience as an officer? |
| 01:24:15 | 25 | MS. JONES:  Objection. |



| | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
|---|---|---|
| 01:24:15 | 2 | A.  Yes. |
| 01:24:16 | 3 | Q.  Okay.  Are there any other instances where |
| 01:24:37 | 4 | you've used less-lethal force against a dog that we |
| 01:24:41 | 5 | haven't talked about? |
| 01:24:41 | 6 | A.  No. |
| 01:24:49 | 7 | Q.  Based on your experience, what percentage |
| 01:25:02 | 8 | of residential properties in Rochester have dogs? |
| 01:25:06 | 9 | A.  I don't know. |
| 01:25:09 | 10 | Q.  When's the last time that you responded to |
| 01:25:12 | 11 | a property and there was a dog there? |
| 01:25:14 | 12 | A.  I don't know because I am in the Tactical |
| 01:25:25 | 13 | Unit.  A couple weeks ago we assisted our Narcotics |
| 01:25:30 | 14 | Unit with a search warrant, and there was dogs inside |
| 01:25:35 | 15 | the location. |
| 01:25:35 | 16 | Q.  Okay.  How about before that? |
| 01:25:39 | 17 | A.  I don't recall. |
| 01:25:39 | 18 | Q.  What do you do as a member of the Tact |
| 01:25:45 | 19 | Unit?  What's your general daily job duties? |
| 01:25:49 | 20 | A.  We provide support to our Homicide Unit, |
| 01:25:55 | 21 | our Narcotics Unit.  We go after high-profile |
| 01:26:02 | 22 | suspects, a/k/a shooting suspects, wanted people.  We |
| 01:26:06 | 23 | generally don't do 911 calls. |
| 01:26:09 | 24 | Q.  Okay.  So you're not responding to |
| 01:26:16 | 25 | somebody requesting help generally? |



Confidential

157

|       |    |                                                    |
|-------|----|----------------------------------------------------|
|       | 1  | OFFICER JEREMY NELLIST - BY MR. SHIELDS             |
| 01:26:18 | 2  | A.   Correct.                                   |
| 01:26:19 | 3  |          MS. JONES:   Objection.                |
| 01:26:20 | 4  | Q.   Okay.  Since you joined the RPD, have you  |
| 01:26:30 | 5  | ever heard of an RPD officer being disciplined for |
| 01:26:35 | 6  | shooting a dog?                                 |
| 01:26:35 | 7  |          MS. JONES:   Objection.                |
| 01:26:36 | 8  | A.   No.                                        |
| 01:26:37 | 9  | Q.   Since you joined the RPD, have you ever    |
| 01:26:41 | 10 | heard of an RPD officer being required to get   |
| 01:26:44 | 11 | additional training because they shot a dog?    |
| 01:26:48 | 12 |          MS. JONES:   Objection.                |
| 01:26:52 | 13 | A.   No.                                        |
| 01:26:53 | 14 | Q.   Okay.  Since you joined the RPD, have you  |
| 01:26:55 | 15 | ever heard of anyone being disciplined for entering |
| 01:26:59 | 16 | the curtilage to a residential property?        |
| 01:27:02 | 17 |          MS. JONES:   Objection.                |
| 01:27:03 | 18 | A.   No.                                        |
| 01:27:03 | 19 | Q.   Have you ever heard of anybody being       |
| 01:27:05 | 20 | disciplined for entering -- for trespassing on the |
| 01:27:10 | 21 | home -- in, like, the actual home?              |
| 01:27:12 | 22 |          MS. JONES:   Objection.                |
| 01:27:12 | 23 | A.   No.                                        |
| 01:27:15 | 24 | Q.   Okay.  And have you ever heard of anybody  |
| 01:27:19 | 25 | being required to receive additional training about |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

158

```
          1        OFFICER JEREMY NELLIST - BY MR. SHIELDS
01:27:23  2    the legal requirements for entering the curtilage to a
01:27:26  3    property?
01:27:27  4        A.   No.
01:27:27  5        Q.   What has the department done to try to
01:27:36  6    reduce the number of dogs that are shot?
01:27:38  7        A.   They put out that in-service training with
01:27:46  8    the PowerPoint.
01:27:48  9        Q.   Has that in-service training with the
01:27:51 10    PowerPoint only been given that one time?
01:27:55 11        A.   I believe it was sent out a few years
01:27:58 12    after that as like -- kind of like over -- like a roll
01:28:02 13    call training, just as an email refresher.
01:28:05 14        Q.   So that would have been in -- well,
01:28:07 15    withdrawn.
01:28:07 16             Roll call trainings happen at the
01:28:11 17    beginning of the shift and they're, like, five or ten
01:28:14 18    minutes long; is that right?
01:28:15 19             MS. JONES:   Objection.
01:28:16 20        A.   Yes.
01:28:16 21        Q.   And do you have time to go through the
01:28:20 22    whole PowerPoint during a roll call training?
01:28:24 23        A.   If it's a slow night, yes.
01:28:28 24        Q.   Okay.  So that would be you, and the other
01:28:31 25    officers that also start at the beginning of the same
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

159

|  |  |  |
|---|---|---|
|  | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
| 01:28:35 | 2 | shift, and a supervisor that would review the |
| 01:28:38 | 3 | PowerPoint? |
| 01:28:39 | 4 | A.  Yes. |
| 01:28:39 | 5 | MS. JONES:  Objection. |
| 01:28:41 | 6 | Q.  Do you remember actually doing that? |
| 01:28:44 | 7 | A.  No. |
| 01:28:46 | 8 | Q.  Okay.  To your knowledge, what is the |
| 01:28:54 | 9 | review process when a dog is shot? |
| 01:28:56 | 10 | A.  What do you mean, "the review process"? |
| 01:29:01 | 11 | Q.  For example, the sergeant or the |
| 01:29:05 | 12 | supervisor writes the incident report; correct? |
| 01:29:09 | 13 | MS. JONES:  Objection. |
| 01:29:09 | 14 | A.  Yes. |
| 01:29:10 | 15 | Q.  Okay.  And as part of that process, the |
| 01:29:15 | 16 | supervisor would speak with the officer that |
| 01:29:18 | 17 | discharged the firearm? |
| 01:29:19 | 18 | A.  Correct. |
| 01:29:20 | 19 | Q.  Okay.  And you discharged your firearm |
| 01:29:29 | 20 | four times at dogs; right? |
| 01:29:30 | 21 | A.  Yes. |
| 01:29:31 | 22 | Q.  So in those four instances, other than |
| 01:29:35 | 23 | speaking with the supervisor that filled out the |
| 01:29:37 | 24 | incident report, did you do anything else as part of |
| 01:29:40 | 25 | the review of the firearm discharge? |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

160

|  | 1 | OFFICER JEREMY NELLIST - BY MR. SHIELDS |
|---|---|---|
| 01:29:42 | 2 | MS. JONES:  Objection. |
| 01:29:43 | 3 | A.  No. |
| 01:29:46 | 4 | Q.  Okay.  So, for example, like nobody from |
| 01:29:49 | 5 | PSS ever came and interviewed you about the discharge? |
| 01:29:54 | 6 | MS. JONES:  Objection. |
| 01:29:54 | 7 | A.  Correct. |
| 01:29:54 | 8 | Q.  Okay.  And you said before that you never |
| 01:29:59 | 9 | were disciplined by the RPD as part of that -- any of |
| 01:30:04 | 10 | those four firearm discharges? |
| 01:30:08 | 11 | MS. JONES:  Objection. |
| 01:30:09 | 12 | A.  Correct. |
| 01:30:10 | 13 | Q.  And if it was a disciplinary process, that |
| 01:30:12 | 14 | would be conducted through PSS; is that right? |
| 01:30:15 | 15 | MS. JONES:  Objection. |
| 01:30:15 | 16 | A.  Yes. |
| 01:30:16 | 17 | Q.  Okay.  Do you have any idea if the |
| 01:30:23 | 18 | Professional Development Section reviews firearm |
| 01:30:31 | 19 | discharge incidents, like dog shootings? |
| 01:30:35 | 20 | A.  I don't know. |
| 01:30:36 | 21 | Q.  Okay.  Do you know if the review process |
| 01:30:43 | 22 | for a dog shooting is scrutinized as closely as when |
| 01:30:47 | 23 | force is used against a person? |
| 01:30:51 | 24 | MS. JONES:  Objection. |
| 01:30:51 | 25 | A.  I don't know. |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

|        |    |                                                           |
|--------|----|-----------------------------------------------------------|
|        | 1  | OFFICER JEREMY NELLIST - BY MR. SHIELDS                    |
| 01:30:54 | 2 | Q.  Have you ever been disciplined for using            |
| 01:30:58 | 3 | force against the person?                                 |
| 01:30:59 | 4 | A.  No.                                                   |
| 01:31:00 | 5 | Q.  Have you ever been a defendant in a                   |
| 01:31:06 | 6 | lawsuit other than this lawsuit?                          |
| 01:31:09 | 7 | A.  No.                                                   |
| 01:31:12 | 8 | Q.  Does the RPD require officers to use                  |
| 01:31:20 | 9 | de-escalation techniques in situations with aggressive    |
| 01:31:26 | 10 | people?                                                  |
| 01:31:26 | 11 | A.  Yes.                                                 |
| 01:31:26 | 12 | Q.  Does the RPD require officers to use                 |
| 01:31:29 | 13 | similar de-escalation techniques in situations with      |
| 01:31:34 | 14 | aggressive dogs?                                         |
| 01:31:37 | 15 | A.  If there is time to react to a dog, then            |
| 01:31:43 | 16 | you use some of the techniques that I've already         |
| 01:31:48 | 17 | discussed.  The baton, maybe pepper spray, if there's    |
| 01:31:54 | 18 | time.                                                    |
| 01:31:54 | 19 | Q.  Did you ever learn how to use, for                  |
| 01:31:57 | 20 | example, body language with a dog that you perceive as   |
| 01:32:03 | 21 | aggressive to de-escalate with the dog?                  |
| 01:32:10 | 22 | A.  Yes.  I've learned, like, speak loudly at           |
| 01:32:15 | 23 | the dog, tell him to stay.  That's about it.             |
| 01:32:21 | 24 | Q.  Okay.  And when did you learn those                 |
| 01:32:26 | 25 | techniques?                                              |

