UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------X
CHERYL COX,

                              PLAINTIFF,


      -against-              Index No.:
                            22-cv-6207
CITY OF ROCHESTER,

                              DEFENDANT.
------------------------------------------------X

                    DATE:  July 25, 2023
                    TIME:  10:00 a.m.
                       ZOOM MEETING


      EXAMINATION BEFORE TRIAL of the
Defendant, THE CITY OF ROCHESTER, BY DAKOTA
VANBREDERODE, taken by the Plaintiff,
pursuant to Order, before Libby Kohler, a
Notary Public of the State of New York.

```
(1)
(2)      A P P E A R A N C E S:
(3)
(4)      ROTH & ROTH LLP
            Attorneys for the Plaintiff
(5)         CHERYL COX
            192 Lexington Avenue, Suite 802
(6)         New York, New York 10016
            BY:  ELLIOT D. SHIELDS, ESQ.
(7)         eshields@rothandrothlaw.com
(8)
(9)      CITY OF ROCHESTER LAW DEPARTMENT
            Attorneys for the Defendant
(10)        THE CITY OF ROCHESTER
            CITY HALL, Room 400A
(11)        Rochester, New York 14614
            BY:  PEACHIE L. JONES, ESQ.
(12)        Peachie.jones@cityofrochester.gov
(13)
(14)
                      *         *         *
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

(1)

(2)          **S T I P U L A T I O N S:**

(3)   **IT IS STIPULATED AND AGREED by and between**

(4)   **the attorneys for the respective parties**

(5)   **herein, and in compliance with Rule 221 of**

(6)   **the Uniform Rules for the Trial Courts:**

(7)   **THAT the parties recognize the provision of**

(8)   **Rule 3115 subdivisions (b), (c) and/or (d).**

(9)   **All objections made at a deposition shall**

(10)  **be noted by the officer before whom the**

(11)  **deposition is taken, and the answer**

(12)  **Shall be given and the deposition shall**

(13)  **proceed subject to the objections and to**

(14)  **the right of a person to apply for**

(15)  **appropriate relief pursuant to Article 31**

(16)  **of the CPLR;**

(17)  **THAT every objection raised during a**

(18)  **deposition shall be stated succinctly and**

(19)  **framed so as not to suggest an answer to**

(20)  **the deponent and, at the request of the**

(21)  **questioning attorney, shall include a clear**

(22)  **Statement as to any defect in form or other**

(23)  **basis of error or irregularity. Except to**

(24)  **the extent permitted by CPLR Rule 3115 or**

(25)  **by this rule, during the course of the**

(1)
(2)     examination persons in attendance shall not
(3)     Make statements or comments that interfere
(4)     with the questioning.
(5)     THAT a deponent shall answer all questions
(6)     at a deposition, except (i) to preserve a
(7)     privilege or right of confidentiality, (ii)
(8)     to enforce a limitation set forth in an
(9)     order of a court, or (iii) when the
(10)    question is plainly improper and would, if
(11)    answered, cause significant prejudice to
(12)    any person. An attorney shall not direct a
(13)    deponent not to answer except as provided
(14)    in CPLR Rule 3115 or this subdivision. Any
(15)    refusal to answer or direction not to
(16)    answer shall be accompanied by a succinct
(17)    and clear statement on the basis therefore.
(18)    If the deponent does not answer a question,
(19)    the examining party shall have the right to
(20)    complete the remainder of the deposition.
(21)    THAT an attorney shall not interrupt the
(22)    deposition for the purpose of communicating
(23)    with the deponent unless all parties
(24)    consent or the determining whether the
(25)    question should not be answered on the

```
(1)                    D. VANBREDERODE

(2)        A.      Yes, there was.

(3)        Q.      What kind of car?

(4)        A.      I'm not sure exactly what kind

(5)   of car it was.

(6)        Q.      It was just one car or multiple

(7)   cars?

(8)        A.      There were multiple cars.

(9)        Q.      So you said that you knocked

(10)  and then you stepped back.  Where did you

(11)  step back to?

(12)       A.      We stepped back to the rear of

(13)  the driveway.

(14)       Q.      Okay, and you said it was

(15)  because of what you heard on the other side

(16)  of the door.  Is that right?

(17)       A.      Yes.  We heard an aggressive

(18)  dog behind the door.

(19)       Q.      You heard a dog that you

(20)  perceived to be aggressive?

(21)            MS. JONES:  Objection.

(22)       A.      We observed or heard a dog that

(23)  was barking in a manner that I deemed to be

(24)  concerning.

(25)       Q.      At that point you didn't see
```

```
(1)                    D. VANBREDERODE
(2)    the dog at all?
(3)        A.    I don't believe at that point I
(4)    saw the dog, no.
(5)        Q.    So, the first thing that
(6)    happened was you knocked on the door,
(7)    right?
(8)            MS. JONES:  Objection.
(9)        Q.    You nodded your head.  One
(10)   thing that we need you to do is just answer
(11)   verbally.  So, the first thing you did was
(12)   you knocked on the door.  Is that right?
(13)       A.    Yes.
(14)       Q.    Then, after that you heard the
(15)   dog?
(16)       A.    Yes.
(17)       Q.    The dog was barking?
(18)           MS. JONES:  Objection.
(19)       A.    Yes.
(20)       Q.    And then when you stepped back
(21)   you went into the backyard of the home?
(22)           MS. JONES:  Objection.
(23)       A.    No.  We remained on the
(24)   driveway just in a further back position.
(25)       Q.    When you say in the driveway in
```

(1)                    D. VANBREDERODE

(2)   a further back position, were you going

(3)   towards the street or were you going

(4)   towards the backyard of the house?

(5)        **A.    We were going towards the**

(6)   **backyard.**

(7)             **MS. JONES:   Objection.**

(8)        Q.    What happened next?

(9)        **A.    At that point we maintained our**

(10)  **position in that area and Officer Paszko**

(11)  **gave some verbal commands to the occupant**

(12)  **of the house to secure the dog, and he**

(13)  **informed her that the police were there and**

(14)  **that we would have to have the dog secured**

(15)  **obviously.**

(16)       Q.    At that point when Officer

(17)  Paszko gave commands to the homeowner to

(18)  secure the dog were you able to see the

(19)  homeowner at that point?

(20)       **A.    No.**

(21)       Q.    She was still inside of the

(22)  house?

(23)       **A.    She was behind the door.**

(24)       Q.    The homeowner is my client Ms.

(25)  Cox.  Is that right?

```
(1)                    D. VANBREDERODE

(2)              MS. JONES:  Objection.

(3)        A.    I'm not sure if she's the

(4)   homeowner.  I'm not sure.

(5)        Q.    The woman that was at the

(6)   house?

(7)        A.    I actually never spoke to her

(8)   at any point in my life.

(9)        Q.    On the night of the incident

(10)  when Officer Paszko asked her to secure the

(11)  dog, what did she say in response?

(12)       A.    I'm not sure what she responded

(13)  to Officer Paszko.

(14)       Q.    You heard her respond?

(15)              MS. JONES:  Objection.

(16)       A.    I don't recall.

(17)       Q.    What, if anything, did you do

(18)  to ensure that Taz was secure?

(19)       A.    We cautiously approached the

(20)  house.

(21)       Q.    What did you do to ensure that

(22)  Taz was secured?

(23)       A.    I cautiously approached and

(24)  Officer Paszko, like I said, he yelled,

(25)  "Police.  Secure the dog."  It was very
```

(1)                    **D. VANBREDERODE**

(2) **loud.**

(3)        Q.     What, if anything, did Paszko

(4) do to ensure that Ms. Cox secured the dog?

(5)            **MS. JONES:   Objection.**

(6)        **A.     He told her with loud commands**

(7) **to secure the dog and that was how he made**

(8) **sure that she knew that the dog had to be**

(9) **secured.**

(10)        Q.     Did you hear Ms. Cox say

(11) anything in response to Officer Paszko?

(12)            **MS. JONES:   Objection.**

(13)        **A.     I did not have that**

(14) **conversation with her so I was not**

(15) **listening for a response from her, but**

(16) **Officer Paszko did have a conversation with**

(17) **her when he gave her the command.**

(18)        Q.     Did you ever hear Ms. Cox say

(19) that he's okay or that he was friendly?

(20)            **MS. JONES:   Objection.**

(21)        **A.     No.**

(22)        Q.     Did you ever see Officer Paszko

(23) do anything else to ensure that Ms. Cox

(24) secured her dog?

(25)        **A.     I saw him cautiously**

```
(1)              D. VANBREDERODE
(2)    approaching and observing the house.
(3)        Q.    You said you never went to the
(4)    side door and spoke to Ms. Cox yourself?
(5)            MS. JONES:  Objection.
(6)        A.    Yes.
(7)        Q.    What did you do after Officer
(8)    Paszko approached the side door?
(9)        A.    I walked by the side door.
(10)       Q.    Did you walk around the cars on
(11)   the other side from the door or did you
(12)   walk closer to the door?
(13)           MS. JONES:  Objection.
(14)       A.    I walked around the car that
(15)   was parked directly in front of the door.
(16)   There was not a lot of room.
(17)       Q.    When you say there wasn't a lot
(18)   of room, what do you mean?
(19)       A.    The car was parked very close
(20)   to the side door and there was already, if
(21)   I remember correctly, some people there.
(22)   It would have been very tight.
(23)       Q.    You're saying you went around
(24)   the other side of the car?
(25)       A.    Yes.
```

(1)                    **D. VANBREDERODE**

(2)              **MS. JONES:   Objection.**

(3)       Q.    If the car was parked with the

(4)    front end of the car facing the back of the

(5)    house you walked around the driver's side

(6)    of the car?

(7)       **A.    Yes.**

(8)       Q.    Did Paszko walk with you around

(9)    that side or where was he at that time?

(10)             **MS. JONES:   Objection.**

(11)      **A.    I'm not sure where he was at**

(12)   **that point.**

(13)      Q.    At that point when you walked

(14)   around that side of the car, had Officer

(15)   Brock arrived?

(16)             **MS. JONES:   Objection.**

(17)      **A.    I believe he did, yes.**

(18)      Q.    What was Officer Brock doing at

(19)   that time?

(20)      **A.    He was attempting to make**

(21)   **contact with the person who called 911.**

(22)      Q.    How was he attempting to make

(23)   contact with her?

(24)      **A.    He was at the side door.**

(25)      Q.    Was he speaking with Ms. Cox at

(1)                    D. VANBREDERODE

(2)    the side door at that time?

(3)        **A.    Yes.**

(4)        Q.    As you walked to the front of

(5)    the house, were you speaking with Paszko?

(6)        **A.    Yes, I was.**

(7)        Q.    What do you remember about that

(8)    conversation?

(9)        **A.    I remember that as I was**

(10)   **walking I did observe the large aggressive**

(11)   **dog in the door, and I explained that to**

(12)   **Officer Paszko that it was a very large**

(13)   **dog, and I explained to him that a lot of**

(14)   **times these dogs tend to escape in**

(15)   **situations like this.**

(16)       Q.    Did you hear Officer Brock

(17)   talking to Ms. Cox at all about the dog?

(18)       **A.    No.**

(19)       Q.    Did you hear Ms. Cox inform

(20)   Officer Brock that Taz doesn't bite?

(21)       **A.    No.**

(22)       Q.    Did you hear Ms. Cox inform

(23)   Officer Brock that he was friendly and he

(24)   wanted to play?

(25)       **A.    No.**

(1)                **D. VANBREDERODE**

(2)        Q.     Did you hear either the

(3)   specific words or the tone of the

(4)   conversation between Officer Brock and Ms.

(5)   Cox?

(6)        **A.     I do remember that Ms. Cox was**

(7)   **very animated.  She was speaking at a very**

(8)   **high volume.**

(9)        Q.     Do you know if that was when

(10)  she was talking about the dog or about the

(11)  underlying incident that she had called

(12)  about?

(13)       **A.     When she was speaking loud it**

(14)  **was definitely not about the dog.  I'm not**

(15)  **sure specifically what she would have been**

(16)  **speaking about.**

(17)       Q.     Were you aware that she was

(18)  also speaking with Officer Brock about the

(19)  dog?

(20)       **A.     No.**

(21)       Q.     How did you feel before the dog

(22)  got out?

(23)       **A.     I was concerned with the**

(24)  **situation that the dog was not, in my**

(25)  **opinion, secure in an effective way.**

(1)                    **D. VANBREDERODE**

(2)        Q.      Were you afraid?

(3)        **MS. JONES:   Objection.**

(4)        **A.      I was concerned.**

(5)        Q.      You were concerned that the dog

(6)   might get out?

(7)        **A.      I was concerned that the dog**

(8)   **might end up possibly injuring someone who**

(9)   **was on scene based upon the dog's**

(10)  **appearance and its actions.**

(11)       Q.      What did you do in response to

(12)  that concern that you had?

(13)       **A.      I attempted to obtain a**

(14)  **superior position in an an effort to**

(15)  **hopefully prevent a bad situation from**

(16)  **happening if the dog was to escape.**

(17)       Q.      In preparation for today's

(18)  deposition, did you review your body-worn

(19)  camera recording?

(20)       **A.      Yes, I did.**

(21)       Q.      Did that refresh your

(22)  recollection of your conversation with

(23)  Officer Paszko?

(24)       **A.      Yes, it did.**

(25)       Q.      Do you remember saying to him

```
(1)                    D. VANBREDERODE
(2)    that dogs always get out?
(3)         A.    Yes, I do.
(4)         Q.    Do you remember saying that
(5)    dogs always get out before you walk up onto
(6)    the porch?
(7)         A.    Yes, I do.
(8)         Q.    What were you trained to do in
(9)    a situation like that where you were
(10)   fearful that the dog might get out?
(11)            MS. JONES:   Objection.
(12)        A.    We were trained that when --
(13)   the dog was secured at that point, so at
(14)   that point we were not trained to do
(15)   anything if the dog was secure.  At that
(16)   point the dog was secure.
(17)        Q.    But you were afraid, you said
(18)   you were concerned that the dog might get
(19)   out, right?
(20)        A.    Correct.
(21)        Q.    What were you trained to do in
(22)   a situation like that where you were
(23)   concerned that the dog might get out?
(24)        A.    There's a lot of things we're
(25)   concerned about that we can't prevent.
```

(1)                  **D. VANBREDERODE**

(2)    **It's just the way it goes.   At that point**

(3)    **the dog was secured so there was nothing I**

(4)    **could have done to prevent what happens in**

(5)    **the future at that point.**

(6)         Q.    Did you prepare in any way

(7)    before the dog got out for what might

(8)    happen if the dog did get out?

(9)         **A.    Yes, I did.**

(10)        Q.    Were you trained in ways to

(11)   safely deal with dogs in situations like

(12)   this?

(13)        **A.    I was attempting to obtain a**

(14)   **superior position which is what I was doing**

(15)   **earlier when I retreated back to the car.**

(16)   **I like to be in situations where if a dog**

(17)   **were to get out I have a place I can either**

(18)   **hop up onto or get behind something,**

(19)   **something that I do to try and prevent in**

(20)   **certain situations.**

(21)        Q.    Were you trained to go to an

(22)   open area like a yard?

(23)        **A.    Depends on the situation.**

(24)        Q.    What would that depend on?

(25)        **A.    If there's an electric fence.**

(1)                    **D. VANBREDERODE**

(2)    **There's many situations.  If there was**

(3)    **cover.  Things like that.**

(4)         Q.    Okay.  What situations would

(5)    you go to an open area in?  Why would you

(6)    do that instead of something else?

(7)              **MS. JONES:  Objection.**

(8)         **A.    Because in many situations**

(9)    **there's a lot of options and you have to**

(10)   **determine what would be the best course of**

(11)   **action.**

(12)        Q.    Were you trained to go to an

(13)   enclosed area like a front porch?

(14)        **A.    We were not trained**

(15)   **specifically on exactly where to retreat**

(16)   **to.  It's more of how to get a little bit**

(17)   **of a tactical advantage.  It's not one**

(18)   **specific spot that you're supposed to go**

(19)   **to.**

(20)        Q.    What do you mean by tactical

(21)   advantage?

(22)        **A.    I'm in a position where you are**

(23)   **able to observe the threat in a certain**

(24)   **way.  There could be a situation where you**

(25)   **want to retreat somewhere where like I said**

(1)              **D.  VANBREDERODE**

(2)     **before, you can jump up onto something or**

(3)     **you can use something as barrier.   There's**

(4)     **numerous different reasons why you would**

(5)     **try and get a superior advantage point.**

(6)        Q.    Did you say vantage point or

(7)     advantage point?

(8)        **A.     Yes.   I meant to say vantage**

(9)     **point.**

(10)       Q.    And vantage point would mean a

(11)    spot where you can observe or see the

(12)    threat, here being the dog, right?

(13)           **MS. JONES:   Objection.**

(14)       **A.     Correct.   It would have been a**

(15)    **good spot I could observe and also give me**

(16)    **an advantage in case something were to**

(17)    **happen.**

(18)       Q.    From the porch, could you see

(19)    the side door?

(20)       **A.     Yes, I could.**

(21)       Q.    When you were standing on the

(22)    front porch you could see the side door?

(23)       **A.     Yes.   I was looking around the**

(24)    **porch.**

(25)       Q.    You were like peering around

(1)                    D.  VANBREDERODE

(2)     the corner of the house?

(3)         **A.     Yes.**

(4)         Q.     Why were you doing that?

(5)         **A.     Maintain visual on the dog.**

(6)         Q.     Because you were fearful that

(7)     the dog wasn't actually secured and might

(8)     get out?

(9)             **MS. JONES:  Objection.**

(10)        **A.     I was concerned with how the**

(11)    **individual secured the dog.**

(12)        Q.     Or didn't secure the dog?

(13)            **MS. JONES:  Objection.**

(14)        **A.     She secured the dog, but in my**

(15)    **opinion it was not a properly secured dog.**

(16)        Q.     You were taking that vantage

(17)    point because you were afraid that the dog

(18)    might get out out, right?

(19)            **MS. JONES:  Objection.**

(20)        **A.     Yes.**

(21)        Q.     What was your plan if the dog

(22)    did get out?

(23)        **A.     I was going to observe its**

(24)    **actions further.  I created space by**

(25)    **getting up onto the porch where I would be**

(1)                    **D. VANBREDERODE**

(2)     **able to further observe the dog and**

(3)     **determine what my course of action would**

(4)     **be.**

(5)          Q.     Was your firearm out at that

(6)     point?

(7)          **A.     No.**

(8)          Q.     What was in your hands, if

(9)     anything?

(10)         **A.     Nothing.**

(11)         Q.     What other tools did you have

(12)    on your person at that time?

(13)         **A.     I had handcuffs.  I had a**

(14)    **flashlight.  I had a tourniquet.  I had a**

(15)    **radio.  I had gloves.  I had a baton, and I**

(16)    **had OC spray.**

(17)         Q.     Did you consider reaching for

(18)    any of those other tools instead of your

(19)    firearm?

(20)         **A.     No, I did not.**

(21)         Q.     Why not?

(22)         **A.     Because none of those tools are**

(23)    **effective in certain situations.**

(24)         Q.     Can you explain that a little

(25)    more?

(1)                    D.  VANBREDERODE

(2)        **A.        Every tool has a different**

(3)    **purpose, and you don't really know**

(4)    **specifically what tool you will need or**

(5)    **what tool would be effective in certain**

(6)    **situations.**

(7)        Q.     Is that something that you are

(8)    taught during your training?

(9)        **A.     Yes.**

(10)       Q.     You were taught that none of

(11)   those other tools were effective in

(12)   responding to a dog that was running at

(13)   you?

(14)            **MS. JONES:  Objection.**

(15)       **A.        They are not effective for**

(16)   **certain situations.  Every tool is very**

(17)   **different.  Like I said I had probably**

(18)   **seven or eight different tools.**

(19)       Q.     You had these other options but

(20)   what you chose was your gun?

(21)       **A.        None of the other options were**

(22)   **adequate for the situation.**

(23)       Q.     Yes or no.  You had the other

(24)   tools but you chose your gun?

(25)            **MS. JONES:  Objection.**

(1)                    **D. VANBREDERODE**

(2)         **A.     Yes.**

(3)         Q.     Did you ever consider that the

(4)    enclosed front porch area might be more

(5)    dangerous than retreating to the open front

(6)    yard?

(7)         **A.     No.**

(8)         Q.     Did you ever consider that the

(9)    enclosed front porch area gave you nowhere

(10)   to retreat to?

(11)        **A.     There was nowhere to retreat to**

(12)   **in any situation there.**

(13)        Q.     Did you ever consider that the

(14)   open front yard area would have given you

(15)   more room to run away or dodge side to side

(16)   to avoid the dog?

(17)        **A.     I considered it, but ultimately**

(18)   **it was not a better position in any way.**

(19)        Q.     Is that something that you ever

(20)   dealt with in your training, the decision

(21)   to retreat to an enclosed area versus an

(22)   open area?

(23)        **A.     Not specifically in that**

(24)   **description, but we were trained on how to**

(25)   **retreat.  It wasn't a specific area that**

(1)                    **D. VANBREDERODE**

(2)  **was favored over another.**

(3)       Q.     What were you trained in terms

(4)  of how to retreat?

(5)       **A.     To get to a position that you**

(6)  **felt was a better position.**

(7)       Q.     What kind of training were you

(8)  given about what positions are better than

(9)  others?

(10)      **MS. JONES:   Objection.**

(11)      **A.     It was left to the discretion**

(12) **of the officer to determine because every**

(13) **situation has a different house, a**

(14) **different yard, a different fence, a**

(15) **different -- it's a whole different**

(16) **environment every time.**

(17)      Q.     What training were you given

(18) about how to determine whether one position

(19) was better than another?

(20)      **A.     It was more of a discretionary**

(21) **tool.  You know, it depends on the**

(22) **situation.  It wasn't one specific area**

(23) **that you would retreat to.**

(24)      Q.     Were you not provided any

(25) training about how to determine whether one

```
(1)                  D.  VANBREDERODE
(2)   position is better than another?
(3)             MS.  JONES:   Objection.
(4)        A.     I don't think they could train
(5)   us for every situation.   Every situation is
(6)   different.
(7)        Q.     Did you train on different
(8)   scenarios to where to retreat to and
(9)   situations like this where a dog is running
(10)  at you?
(11)       A.     Yes.
(12)       Q.     Tell me about those different
(13)  situations that you trained for.
(14)       A.     We were instructed that
(15)  vehicles and things that you could jump on
(16)  to avoid dogs can be a good position.
(17)       Q.     Did you consider jumping on the
(18)  vehicle in the driveway?
(19)       A.     I did at the beginning of the
(20)  encounter.   That's why, like I said
(21)  previously, that's why I went back to the
(22)  car that was further back in the driveway.
(23)  It was a four-door sedan.   It would have
(24)  been a good position to jump up on.
(25)       Q.     Did you ever consider that it
```

(1)                D.  VANBREDERODE

(2)   might  be  dangerous  to  place  yourself  in  a

(3)   location  where  you  couldn't  escape  from?

(4)        **A.     No.   I  don't  believe  I  could**

(5)   **have  escaped  even  if  I  was  in  the  open  yard**

(6)   **or  any  other  spot  there.   Dogs  are  very**

(7)   **fast  in  my  experience.**

(8)        Q.     Have  you  ever  been  attacked  by

(9)   a  dog  before?

(10)        **A.     Can  you  clarify?   Do  you  mean**

(11)   **was  I  bit?   Was  I  chased  or  was  I  --**

(12)   **there's  been  numerous  instances  where  I've**

(13)   **dealt  with  aggressive  dogs.**

(14)        Q.     Was  that  before  or  after  this

(15)   incident?

(16)        **A.     Before  and  after.**

(17)        Q.     Before  this  incident,  had  you

(18)   ever  previously  shot  a  dog?

(19)        **A.     No.**

(20)        Q.     Before  this  incident,  had  a  dog

(21)   ever  approached  you  while  you  were

(22)   performing  your  duties  as  a  police  officer?

(23)        **A.     Yes.**

(24)        Q.     Why  didn't  you  shoot  the  dog  in

(25)   those  prior  instances  when  they  approached

(1)                    D.  VANBREDERODE

(2)    you?

(3)        **A.     Because it was a different**

(4)    **situation and different owners tend to have**

(5)    **different methods of calling back or**

(6)    **securing or managing their dogs.**

(7)        Q.     In those prior instances the

(8)    dog ran up to you?

(9)        **A.     They ran in the vicinity and**

(10)   **towards me yes.**

(11)       Q.     What did you do to avoid the

(12)   dog in those instances?

(13)       **A.     I would shut a door.  Mostly I**

(14)   **would close a door.**

(15)       Q.     In those other instances there

(16)   were physical barriers between you and the

(17)   dog?

(18)       **A.     Yes.**

(19)       Q.     Here, were there any other

(20)   physical barriers that you could have

(21)   placed between yourself and the dog?

(22)       **A.     No.**

(23)       Q.     Why didn't you go around to the

(24)   other side of the car?

(25)       **A.     Because the vehicle obviously**

(1)                    **D. VANBREDERODE**

(2)    **doesn't cover the entire length of the yard**

(3)    **or the driveway which was probably 50 to 70**

(4)    **feet.  The motor vehicle was probably 8 to**

(5)    **10 feet long.  It definitely was not**

(6)    **comparable to a door or something like**

(7)    **that.  It wasn't a very good object.**

(8)         Q.    If you were so afraid of the

(9)    dog why didn't you just go sit in your

(10)   patrol car?

(11)             **MS. JONES:  Objection.**

(12)        **A.    I don't think I was afraid of**

(13)   **the dog and I did not sit in my car because**

(14)   **we were called to the scene and we have an**

(15)   **obligation to answer calls and respond.**

(16)        Q.    Did Officer Brock and Officer

(17)   Paszko have the situation under control?

(18)        **A.    No.**

(19)        Q.    How did they not have the

(20)   situation under control?

(21)        **A.    Because shortly after the dog**

(22)   **escaped.**

(23)        Q.    They did not ensure that the

(24)   dog was properly secured at the side door?

(25)             **MS. JONES:  Objection.**

(1)                    **D. VANBREDERODE**

(2)        **A.      We were unable to secure the**

(3)    **dog for her.   We were not going to touch**

(4)    **her dog or go into her house and secure it**

(5)    **for her.   That wouldn't have been our job**

(6)    **at that point, but we did instruct her to**

(7)    **secure the door dog and unfortunately I**

(8)    **don't think she really understood.**

(9)        Q.    Did you review Officer Brocks

(10)   body camera from his interaction with Ms.

(11)   Cox?

(12)       **A.      Yes, I did.**

(13)       Q.    Did you hear him having a

(14)   friendly conversation with Ms. Cox about

(15)   the dog?

(16)       **A.      I wouldn't characterize it like**

(17)   **that, but I do remember that they had a**

(18)   **conversation about a dog.**

(19)       Q.    Did you hear Ms. Cox say he's

(20)   friendly.   He just wants to play?

(21)       **A.      Yes.   I did hear that.**

(22)       Q.    Then she let the dog out,

(23)   right?

(24)       **A.      She did.**

(25)       Q.    Officer Brock didn't do

D. VANBREDERODE

(1)

(2) anything to prevent her from letting the

(3) dog out?

(4) **A.    He at no point instructed her**

(5) **that it was okay to do that.  She**

(6) **simultaneously opened the door as she was**

(7) **saying that, that it was a friendly dog**

(8) **which obviously is not appropriate in my**

(9) **opinion.**

(10) Q.    What was inappropriate in your

(11) opinion?

(12) **A.    The fact that Officer Paszko**

(13) **instructed her to secure the dog and then a**

(14) **short time after she says it's friendly and**

(15) **as she's saying that she opened the door**

(16) **and let it out.**

(17) Q.    Are there PD rules and policies

(18) required that the duty of the officers that

(19) respond to the scene is to ensure that the

(20) dog is properly secured?

(21) **MS. JONES:  Objection.**

(22) **A.    We informed her to secure the**

(23) **dog and she did, but again I'm not going to**

(24) **go into her house and grab her dog and**

(25) **secure him in a better way.  That's not**

(1)                    **D. VANBREDERODE**

(2)    **something I would do is enter someone's**

(3)    **house and do that without their permission**

(4)    **like that.**

(5)         Q.    Would you ever consider telling

(6)    her, ma'am, your dog might escape.   We

(7)    don't want to have to have an encounter

(8)    with your dog.   Can you please close the

(9)    inner door to your house so that it doesn't

(10)   exit and approach us in the driveway.   Is

(11)   that something you might do?

(12)              **MS. JONES:   Objection.**

(13)         **A.    If I remember correctly she**

(14)   **said that the dog was fine which led me to**

(15)   **believe that she properly secured it in her**

(16)   **mind.**

(17)         Q.    If the homeowner is telling you

(18)   that the dog is fine, the dog is friendly

(19)   and you have nothing to worry about, does

(20)   that give you an indication about whether

(21)   if the dog escapes you might be in some

(22)   sort of danger or not?

(23)              **MS. JONES:   Objection.**

(24)         **A.    The first time I reviewed**

(25)   **Officer Brock's body cam was yesterday,**

(1)                    **D.  VANBREDERODE**

(2)   **which  was  two  years  after  the  incident,  so**

(3)   **I  didn't  know  that  she  had  claimed  that  it**

(4)   **was  a  friendly  dog  until  two  years  after  I**

(5)   **was  involved  with  the  dog.**

(6)        Q.     How  far  were  you  standing  away

(7)   from  Officer  Brock  when  he  was  having  the

(8)   conversation  with  Ms.  Cox  on  the  side  door?

(9)        **A.     Maybe  ten  feet.**

(10)       Q.     Was  that  close  enough  to  hear

(11)  their  conversation  at  that  time?

(12)            **MS.  JONES:   Objection.**

(13)       **A.     No.**

(14)       Q.     Now,  isn't  it  true  that  when

(15)  you  walked  up  onto  the  front  the  porch  you

(16)  walked  all  the  way  over  to  the  side  of  the

(17)  front  porch  so  you  lost  visual  contact  with

(18)  the  side  door  for  some  time?

(19)            **MS.  JONES:   Objection.**

(20)       **A.     I  would  have  to  double-check  my**

(21)  **camera  specifically.   I'm  not  really  sure.**

(22)       Q.     Okay.   Now,  assuming  what  I

(23)  told  you  is  what  your  body  camera  shows,

(24)  why  would  you  have  done  that,  walked  all

(25)  the  way  up  to  the  front  porch?

```
(1)                D. VANBREDERODE

(2)          MS. JONES:  Objection.

(3)      A.    I am not sure that I did do

(4)  that, but maybe if I did do that it would

(5)  have been to scope out the situation and

(6)  get a layout of the land.

(7)      Q.    If you did do that that would

(8)  have been dangerous because you would have

(9)  lost visual contact with the side door and

(10) you wouldn't have been able to see the dog

(11) if it escaped, right?

(12)         MS. JONES:  Objection.

(13)     A.    There would have been other

(14) officers who hopefully could have handled

(15) the situation in my absence.

(16)     Q.    At some point, the dog did in

(17) fact get out?

(18)     A.    Yes, it did.

(19)     Q.    How did you feel when the dog

(20) got out?

(21)     A.    I was very concerned.

(22)     Q.    Why were you very concerned?

(23)     A.    Because of the manner in which

(24) the dog was acting, how it appeared and

(25) specifically how it was chasing after
```

(1)                **D.  VANBREDERODE**

(2)  **Officer Paszko.**

(3)        Q.     Can you describe what the dog

(4)  was doing after it got out?

(5)        **A.     It approached Officer Paszko.**

(6)  **It was standing in an aggressive running**

(7)  **stance in the direction of Officer Paszko**

(8)  **and then it pursued him and began to chase**

(9)  **him.**

(10)       Q.     The dog came out and then it

(11)  took an aggresive stance.   Is that what

(12)  you're saying?

(13)              **MS.  JONES:   Objection.**

(14)       **A.     It had an aggressive stance**

(15)  **while it was actively running.   He didn't**

(16)  **stop when he got out.   He actively got out**

(17)  **and had an aggressive run.**

(18)       Q.     What visual queues tell you

(19)  that the dog was being aggressive?

(20)       **A.     The stance of the dog.   How he**

(21)  **appeared to be in an aggressive stance and**

(22)  **the fact that other officers were also**

(23)  **concerned in trying to fully get away from**

(24)  **the dog.**

(25)       Q.     When you say aggressive stance,

(1)                    D.  VANBREDERODE

(2)    what  do  you  mean?

(3)         **A.     The dog appeared to be in an**

(4)    **aggressive stance as I was trained.  It had**

(5)    **all of its legs like it was in an**

(6)    **aggressive stance, and his head was below**

(7)    **its body.  It was in a running stance.**

(8)         Q.    He was running with his head

(9)    below its body.  Is that what you said?

(10)        **A.     Yes.**

(11)        Q.    His head was tucked between his

(12)   legs?

(13)             **MS. JONES:  Objection.**

(14)        **A.     I wouldn't say that**

(15)   **specifically.**

(16)        **A.     Could you describe what an**

(17)   **aggressive running stance is?**

(18)             **MS. JONES:  Objection.**

(19)        **A.     The dog was running and it did**

(20)   **not appear to be playing in any way.**

(21)        Q.    The dog was running.  Is that

(22)   what you mean?

(23)        **A.     Yes.**

(24)             **MS. JONES:  Objection.**

(25)        Q.    Were you ever taught how to

(1)                    D. VANBREDERODE

(2)    differentiate between a dog that's running

(3)    and being aggressive verses a dog that's

(4)    running and not attacking?

(5)              **MS. JONES:  Objection.**

(6)    **A.      Yes.**

(7)        Q.      Can you tell me how to

(8)    differentiate between a dog that's simply

(9)    running at you and a dog that's running at

(10)   you to attack?

(11)   **A.      You can look at the tail, the**

(12)   **ears of a dog.  That can help you to**

(13)   **determine the mood of the dog and how it's**

(14)   **behaving.**

(15)       Q.      Okay.  Is that something that

(16)   you were taught in your training?

(17)   **A.      Yes.  It was.**

(18)             **MS. JONES:  Objection.**

(19)       Q.      Is that something you observed

(20)   on the night of the incident?

(21)   **A.      Yes.  I did observe a couple**

(22)   **factors.**

(23)       Q.      What factors did you observe?

(24)   **A.      I observed that the dog's tail**

(25)   **was not wagging like most.  We learned in**

(1)                    **D. VANBREDERODE**

(2)    **the academy and in training after that that**

(3)    **if a dog has a wagging tail there's a good**

(4)    **chance it's friendly and in a playful mood.**

(5)    **Another indicator that I would have looked**

(6)    **for would have been the ears, but due to**

(7)    **the dark situation there was not a lot of**

(8)    **light and the fact the dog was running I**

(9)    **didn't have time to analyze that, but that**

(10)   **is something that I was trained to look out**

(11)   **for.**

(12)        Q.    The dog ran a total of about 10

(13)   feet from the side door to the front porch?

(14)            **MS. JONES:   Objection.**

(15)        **A.    It would have ran probably a**

(16)   **little further than that.**

(17)        Q.    During that time you're saying

(18)   that you didn't have time to observe its

(19)   tail or its ears or any of those other

(20)   signs?

(21)            **MS. JONES:   Objection.**

(22)        **A.    The tail did not appear to be**

(23)   **wagging, but I was unable to observe the**

(24)   **ears.**

(25)        Q.    What other signs are there that

```
 (1)                  D. VANBREDERODE
 (2)    a dog is either being aggressive or not
 (3)    being aggressive if it's approaching you?
 (4)         A.    I really wouldn't be able to
 (5)    speak in any other characteristics.
 (6)         Q.    When the dog approached you on
 (7)    the night of the incident, it was not
 (8)    barking, correct?
 (9)              MS. JONES:  Objection.
(10)         A.    It was barking moments prior.
(11)         Q.    When the dog was approaching
(12)    you on the night of the incident, it was
(13)    not barking, correct?
(14)              MS. JONES:  Objection.
(15)         A.    Do you mean in the initial
(16)    approach or when it was pursuing Officer
(17)    Paszko?
(18)         Q.    After the dog exited the door
(19)    from the house it didn't bark at all,
(20)    correct?
(21)              MS. JONES:  Objection.
(22)         A.    Correct.
(23)         Q.    After the dog exited the door
(24)    from the house it didn't growl at all,
(25)    correct?
```

```
(1)                    D.  VANBREDERODE

(2)              MS. JONES:   Objection.

(3)         A.      Correct.

(4)         Q.      Following  this  incident,  were

(5)    you  required  to  get  any  sort  of  additional

(6)    training?

(7)         A.      No.

(8)         Q.      What  was  the  review  process

(9)    that  took  place  as  far  as  you  know  to

(10)   review  your  actions  after  this  incident?

(11)        A.      The  case  would  have  been

(12)   reviewed  from  my  sergeant  and  then

(13)   ultimately  I  do  believe  that  the  lieutenant

(14)   of  my  section  would  have  also  reviewed  it.

(15)   Beyond  that  it's  out  of  my  scope.   I  don't

(16)   know  specifically  who  reviewed  it  after

(17)   that,  but  someone  from  the  patrol  level  it

(18)   would  have  been  the  sergeant  and  the

(19)   lieutenant.

(20)        Q.      The  sergeant  would  have  been

(21)   Benjamin  Caruso?

(22)        A.      Yes.

(23)        Q.      Who  was  the  lieutenant?

(24)        A.      I  believe  at  the  time  it  was

(25)   Lieutenant  Williams,  but  at  that  point  we
```

(1)                    **D. VANBREDERODE**

(2)    **had a lot of different lieutenants on a**

(3)    **temporary basis.  I would have to confirm**

(4)    **but I'm pretty sure it was him.**

(5)         Q.    After the incident, did you

(6)    ever speak with Sergeant Caruso about the

(7)    incident?

(8)         **A.    I did speak to him.**

(9)         Q.    On one occasion or more than

(10)   one occasion?

(11)        **A.    It probably would have been one**

(12)   **occasion.  I don't know.  I mean, it's been**

(13)   **so long.  I don't know if I said two things**

(14)   **to him about it or one thing, but we**

(15)   **definitely didn't have a lot of in depth**

(16)   **conversation about it on a regular basis**

(17)   **after it occurred.**

(18)        Q.    For example, there's not like a

(19)   process for sitting down and having a

(20)   discussion any time that there's a firearm

(21)   discharge?

(22)             **MS. JONES:  Objection.**

(23)        **A.    Every time that there's a**

(24)   **firearm discharge you have to notify the**

(25)   **supervisor and explain to them the incident**

```
(1)                    D.  VANBREDERODE

(2)      and that all pretty much happened on the

(3)      scene and that's what we do.

(4)          Q.      That's the same as any other

(5)      use of force incident, right?  Any time

(6)      there is a subject resistance report the

(7)      supervisor comes to the scene and you

(8)      report about the use of force to them?

(9)          A.      Yes.

(10)         Q.      Is that the same process that

(11)     took place here with the firearm discharge?

(12)         A.      Yes, it is.

(13)         Q.      Was there anything that

(14)     happened additionally here with the firearm

(15)     discharge that would be in addition to

(16)     anything that would normally happen with an

(17)     SRR?

(18)             MS.  JONES:   Objection.

(19)         A.      Repeat the question, please.

(20)         Q.      Basically my question is, is it

(21)     the same process as any other SRR?

(22)         A.      I guess it wouldn't be the

(23)     exact same process.   No.   It's a different

(24)     situation to some extent.

(25)         Q.      I guess that was a bad
```

(1)                    D. VANBREDERODE

(2)    question, but really what I'm trying to get

(3)    at is, was there anything in addition to

(4)    just speaking with Sergeant Caruso at the

(5)    scene that was required to take place

(6)    because a firearm was discharged?

(7)        **A.    I believe he would have**

(8)    **notified the captain who was working that**

(9)    **night, and we had a crime scene technician**

(10)   **come out to take photographs which is**

(11)   **pretty standard procedure.**

(12)       Q.    As far as you know, not really.

(13)   Right?

(14)       **MS. JONES:  Objection.**

(15)       **A.    Not really what?**

(16)       Q.    What I'm trying to say is,

(17)   whether there's a specific rule or policy

(18)   that outlines any kind of specific review

(19)   procedure every time that has to be

(20)   followed when there's a firearm discharge?

(21)       **A.    There is.  Having the**

(22)   **technician come out to take photos is a**

(23)   **pretty big step there.  Obviously, they're**

(24)   **documenting something that can be printed**

(25)   **out, uploaded on files forever.  It's**

(1)                    **D. VANBREDERODE**

(2)     **evidence there.  Pulling the supervisor out**

(3)     **is a good way to review the situation and**

(4)     **have them on scene.  It's a good standard**

(5)     **of reviewing and securing evidence.  My**

(6)     **body cam was obviously secured and uploaded**

(7)     **and tagged appropriately.  It's definitely**

(8)     **a lot of things in place that the city does**

(9)     **to make sure that the situation is**

(10)    **documented and it's a big deal.  If you**

(11)    **discharge a gun there are a lot of things**

(12)    **in place to document it.**

(13)         Q.    Other than speaking with

(14)    Sergeant Caruso, did you have conversations

(15)    with Lieutenant Williams about the

(16)    incident?

(17)         **A.    No.**

(18)         Q.    Other than Sergeant Caruso, did

(19)    you have any conversations about the

(20)    incident with any other supervisors?

(21)         **A.    I believe Sergeant Williams was**

(22)    **on scene, but I don't think he was the one**

(23)    **I spoke to.  I think he just happened to**

(24)    **come to the scene after he heard what**

(25)    **happened.  I don't think I really spoke to**

**D. VANBREDERODE**

(1)

(2) **him.   I don't think anyone else -- I don't**

(3) **know specifically who was on scene but I**

(4) **directed all my attention towards Sergeant**

(5) **Caruso.**

(6)      Q.    After you left the scene that

(7) night, did you have any conversations with

(8) any supervisors about the incident?

(9)      **A.    No.**

(10)      Q.    At any time, did you speak with

(11) anyone from PSS, the Professional Standards

(12) Section, about the incident?

(13)      **A.    No.**

(14)      Q.    I want to put up another

(15) exhibit.  It will be Exhibit 2 and this is

(16) going to be the view history for your body

(17) camera recording from the incident.

(18) Officer Vanbrederode, do you see the file

(19) history activity view all activity document

(20) on your screen?

(21)      **A.    Yes, I do.**

(22)      Q.    Have you ever seen a document

(23) like this before?

(24)      **A.    Not in this format, but when**

(25) **you're logged into the body camera system**

(1)                    **D. VANBREDERODE**

(2)   **you can see who's viewed the photos.**

(3)        Q.    When you're logged into the

(4)   system on the computer you can sort of see

(5)   this data in the middle of the page that

(6)   lists the names of the people who have

(7)   viewed the video and the date and time?

(8)        **A.    Yes.**

(9)        Q.    So, this shows that on the

(10)  night of the incident you viewed the video

(11)  or you uploaded it and then you viewed it

(12)  twice.  Is that right?

(13)       **A.    Looks like twice.**

(14)       Q.    And then it looks like the

(15)  following morning, I guess it's really just

(16)  an hour and a half later, Sergeant Caruso

(17)  viewed the file.  Is that right?

(18)       **A.    Yes.**

(19)       Q.    Were you with Sergeant Caruso

(20)  when he viewed the file or do you remember

(21)  ever reviewing the video with him?

(22)            **MS. JONES:  Objection.**

(23)       **A.    I don't think we reviewed it**

(24)  **together, no.**

(25)       Q.    And then later that day it was

(1)                    D. VANBREDERODE

(2)      reviewed by Danielle Gasparo.   Do you know

(3)      what who that is?

(4)           **A.    Yes.**

(5)           Q.    Do you know why Danielle

(6)      Gasparo would have reviewed the video?

(7)           **A.    I'm not super close with her,**

(8)      **but the only reason I could speculate on is**

(9)      **that at the time she was Naser Zenelovic's,**

(10)     **I guess kind of a secretary.  He was a**

(11)     **captain and she was like his coordinator,**

(12)     **so like the officer assigned to the**

(13)     **captain.  So, I don't know.  Maybe she was**

(14)     **prepping it for him to get the right video**

(15)     **and send it to him.  I don't know.  She was**

(16)     **his, I guess, chief of staff almost, if you**

(17)     **will, for the captain there.**

(18)          Q.    So, Naser Zenelovic was the

(19)     captain and she was assigned under him as

(20)     one of his like assistants?

(21)          **A.    Correct.**

(22)          Q.    And then right above that it

(23)     shows that a couple hours later on February

(24)     11th Captain Zenelovic viewed the video

(25)     also?

(1)                    D. VANBREDERODE

(2)        **A.      Yes.**

(3)        Q.      Was Captain Zenelovic like

(4)   above you in the chain of command in terms

(5)   of the Clinton section or do you know why

(6)   he would have been someone that reviewed

(7)   the video?

(8)        **A.      He was definitely above me**

(9)   **obviously.  He was a captain of the**

(10)  **investigations unit.  I don't know.  I**

(11)  **assume he was a captain and he heard what**

(12)  **happened and wanted to review it.  I don't**

(13)  **know.  I never really asked him why.  I**

(14)  **wouldn't really ask a captain that, but he**

(15)  **is the captain above me in the chain of**

(16)  **command.**

(17)       Q.      Prior to today, were you aware

(18)  that he had reviewed the video?

(19)       **A.      I did know that, yes.**

(20)       Q.      Have you ever spoken with

(21)  either Officer Digaspari or Captain

(22)  Zenelovic about this incident or their

(23)  review of the video?

(24)       **A.      I do believe that the only**

(25)  **thing Zenelovic said to me was the day**

(1)                    **D.  VANBREDERODE**

(2)     **after I saw him in the hallway and he asked**

(3)     **me if I shot a dog or something to that**

(4)     **effect and I said yes.**

(5)          Q.    That's the extent that you

(6)     remember from that conversation?

(7)          **A.    Yes.  It was like I walked by**

(8)     **him and he's like, did you shoot a dog?**

(9)     **Yes.  And then he kept walking and I**

(10)    **assumed he just probably reviewing the case**

(11)    **but he asked me if I did.**

(12)         Q.    Other than that there were no

(13)    discussions about the facts of the incident

(14)    itself?

(15)         **A.    No.**

(16)         Q.    And then above that entry it

(17)    shows that on February 25, 2021 you again

(18)    reviewed the video?

(19)         **A.    Yes, I did.**

(20)         Q.    Do you remember why you went

(21)    back and reviewed the video again at that

(22)    time?

(23)         **A.    It wasn't anything specific.   I**

(24)    **mean it was just the fact it was the first**

(25)    **time in my life I ever shot anything that**

(1)                    **D. VANBREDERODE**

(2)   **was alive.  I've never shot an animal**

(3)   **before.  I mean, I just wanted to really**

(4)   **review the case.  I wasn't really sure**

(5)   **exactly what the process was.  I assumed it**

(6)   **probably would end up, you know, here we**

(7)   **are two years later, I'm giving the**

(8)   **deposition here, so I mean it's important**

(9)   **that you really know everything that**

(10)  **happened.  I just reviewed my videos.**

(11)  **Still to this day I'll go back and review**

(12)  **videos.  It's just a perk of having the**

(13)  **body cameras.  It really gives us a good**

(14)  **opportunity to refresh our memories and**

(15)  **review.**

(16)       Q.    And learn from your past

(17)  action?

(18)       **A.    I definitely wouldn't say**

(19)  **learn, no.  If we're talking about this**

(20)  **case I wouldn't say that but obviously I**

(21)  **mean, if you're talking about every body**

(22)  **camera I ever created sure I could learn**

(23)  **something from reviewing them, yes.**

(24)       Q.    Reviewing the camera generally

(25)  could help you to learn from your past

(1)                    D.  VANBREDERODE

(2)    actions?

(3)         **A.      In certain situations, yes.**

(4)         Q.      But in this situation you don't

(5)    feel reviewing the camera could help you

(6)    learn?

(7)         **MS. JONES:   Objection.**

(8)         **A.      No.**

(9)         Q.      The next entry above your

(10)   viewing the camera, or the recording, on

(11)   February 25th is on March 11th.  It looks

(12)   like it says Robert Wetzel and it says

(13)   export in the file.  Do you know who Robert

(14)   Wetzel is?

(15)        **A.      I know of him.  I know he's a**

(16)   **sergeant assigned to the headquarters.   I**

(17)   **don't know if he's in the body cam unit.   I**

(18)   **don't know.  He's just a sergeant that I'm**

(19)   **aware of.  I've never really interacted**

(20)   **with him ever.**

(21)        Q.      And then, if we just go up the

(22)   rest of the list of names, do you know Mian

(23)   Salidan?

(24)        **A.      He is the civilian body cam.  I**

(25)   **don't know what his title is.  He's the guy**