```
 1
 2                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 3     - - - - - - - - - - - - - - - - - - - - - - - - - - -
       CHERYL COX,
 4
                 Plaintiff,
 5
                 Civil Action No. 22-cv-6207 (FPG)(MJP)
 6     v.
 7     CITY OF ROCHESTER, et al,
 8               Defendants.
       - - - - - - - - - - - - - - - - - - - - - - - - - - -
 9
10     Remote Deposition Upon Oral Examination of:
11                    Officer Kenneth A. Pinckney
12
13
14     Date:          February 1, 2023
15
16     Time:          10:00 a.m.
17
18
19
20
21
22     Reported By:   SANDRA C. HEWLETT, RPR
23                    Alliance Court Reporting, Inc.
24                    109 South Union Street, Suite 400
25                    Rochester, New York 14607
```



```
 1
 2                    A P P E A R A N C E S
 3    Appearing Remotely on Behalf of Plaintiff:
 4    Elliot D. Shields, Esq.
 5        Roth & Roth LLP
 6        192 Lexington Avenue, Suite 802
 7        New York, New York  10016
 8        eshields@rothandrothlaw.com
 9
10    Appearing Remotely on Behalf of Defendants:
11    Peachie L. Jones, Esq.
12        City of Rochester Law Department
13        City Hall, Room 400A
14        30 Church Street
15        Rochester, New York  14614
16        peachie.jones@cityofrochester.gov
17
18                    *       *       *
19
20
21
22
23
24
25
```



1                    S T I P U L A T I O N S

2    WEDNESDAY, FEBRUARY 1, 2023;

3              (Proceedings in the above-titled matter

4              commencing at 10:06 a.m.)

5                         *      *      *

6              IT IS HEREBY STIPULATED by and between the

7    attorneys for the respective parties that this

8    deposition may be taken by the Plaintiff at this time

9    pursuant to notice;

10             IT IS FURTHER STIPULATED, that all

11   objections except as to the form of the questions and

12   responsiveness of the answers, be reserved until the

13   time of the trial;

14             IT IS FURTHER STIPULATED, that pursuant to

15   Federal Rules of Civil Procedure 30(e)(1) the witness

16   requests to review the transcript and make any

17   corrections to same before any Notary Public;

18             IT IS FURTHER STIPULATED, that if the

19   original deposition has not been duly signed by the

20   witness and returned to the attorney taking the

21   deposition by the time of trial or any hearing in this

22   cause, a certified transcript of the deposition may be

23   used as though it were the original;

24             IT IS FURTHER STIPULATED, that the

25   attorneys for the parties are individually responsible



```
 1           OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2           Q.  And when you say "recruit" -- "Recruit
 3    Class 69 and Recruit Class 70," is that referring only
 4    to RPD recruit classes or is that generally for the
 5    whole region, everybody that is at the Academy at that
 6    time?
 7           A.  So it's a regional Academy.  They involve
 8    RPD when we have a hire and we have our recruits
 9    inside, but in those -- both of those classes we had
10    recruits from Canandaigua, Geneva, all of the
11    neighboring agencies.  They can put their recruits
12    through our Academy.  It is the DCJS certification
13    appropriate for the entire State of New York.
14           Q.  Okay.  So that makes sense, but when you
15    talk about a "Recruit Class," are you talking about
16    just the -- so I understand that it's -- the -- the
17    people that are attending might also go to different
18    agencies; right?
19           A.  Right.
20           Q.  But the Recruit Class 69 and 70, are those
21    recruit classes specifically for RPD?  Those numbers?
22           A.  No.  So that -- those are the -- the
23    identifiers as far as -- if you go out to the PSCF --
24    like I was Recruit Class 53.  My class was not just
25    RPD.  53 covered that session, that six months of that
```



```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2      Police Academy training.
 3              Q.   So it refers to the session?
 4              A.   What's that?
 5              Q.   The 69 and 70 refers to the session of the
 6      training?
 7              A.   Correct.
 8              Q.   Okay.  Got it.
 9                   So maybe moreover than other officers,
10      you're familiar with the Academy training?
11              A.   Yes.
12              Q.   Okay.  And the Academy is six months long?
13              A.   Roughly, yeah, six months.
14              Q.   Okay.  And then after the Academy, there
15      is a Field Training Officer portion of the training?
16              A.   Yes.
17              Q.   When you were in that two-year assignment,
18      did you do any of the Field Training Officer training
19      or just the Academy training?
20              A.   I just became certified as a Field
21      Training Officer last year so I did participate in
22      that for Class 70 which I had recruited.
23              Q.   So when did you finish the temporary
24      two-year assignment at the Police Academy?
25              A.   June of last year.  Which would be 2022.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2         Q.   Okay.  Okay.  And -- I'm sorry.
 3              Can you remind me what your assignment is
 4    now again?
 5         A.   Goodman Section Second Platoon.
 6         Q.   The Academy, 6 months, 40 hours a week?
 7         A.   Yes.
 8         Q.   And so you said it teaches laws that are
 9    generally applicable throughout New York State, right?
10              MS. JONES:  Objection.
11              Go ahead.
12         A.   So --
13         Q.   Go ahead.
14         A.   DCJS and New York State, they have a
15    curriculum of hours that a recruit is mandated to go
16    through before they're deemed certified to do police
17    officer work or law enforcement work in the State of
18    New York.  They accomplish that at the Academy.
19         Q.   Okay.  Of those DCJS required hours, is
20    there anything that has to do specifically with
21    interactions with dogs?
22         A.   There are.
23         Q.   Okay.  Can you describe that for me?
24         A.   That exposure-to training comes up in
25    firearms.  Our firearms training at the Academy.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1           OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
2           Q.   Okay.  And can you describe that firearms
3      training for interactions with dogs?
4           A.   During that, we discuss the ability to hit
5      or encounter moving objects, especially with a speed
6      of a dog.  Weaponry that may better allow for that
7      accuracy and things to consider when encountering a
8      dog.
9           Q.   Okay.  And that's all in the firearms
10     training?
11          A.   Primarily, yes, sir.
12          Q.   Okay.  So when you say "primarily," does
13     that mean there is more than just the firearms
14     training?
15          A.   We have opportunities where outside
16     agencies like the Humane Society and stuff, they come
17     in and talk to the recruits and give them that
18     exposure, as well, as far as other resources that are
19     available to them in these cases or these incidents.
20          Q.   Okay.  So when you were in your two-year
21     period with Recruit Classes 69 and 70, did the Humane
22     Society come in and do a training?
23          A.   They would have been involved in the --
24     what we call our post-Academy period where it is just
25     an opportunity for these agencies to come and present
```



```
 1         OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2    their material to the recruits, yes.
 3         Q.   Okay.  So you said they would have been.
 4              Do you remember them actually coming in
 5    and doing that?
 6         A.   Class 69 was during the height of COVID.
 7    I do not recall the -- the agencies being present
 8    during that class.
 9         Q.   Okay.  How about Class 70?
10         A.   I do not recall specifically the day that
11    they came.  I just know that typically they are
12    involved in that recruit process, but I do not recall
13    Class 70, as well.
14         Q.   Okay.  Now, how about if we go back to
15    your Academy training.
16              Do you remember any specific training
17    regarding interactions with dogs at the Academy?
18         A.   In my Academy training I remember our
19    firearms -- outdoor firearms training relating to
20    engaging an aggressive, approaching dog.
21         Q.   Okay.  So you said aggressive, approaching
22    dogs.
23              That's what the firearms training deals
24    with?
25         A.   Yes, sir.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS

1

2          Q.   Okay.  And was the firearms training at

3     the Academy the same when you went to the Academy as

4     it was for Class 69 and Class 70?

5          A.   Yes.

6          Q.   Okay.  And just for the record, you began

7     with the RPD in 2010, so does that mean you went to

8     the Academy in 2009?

9          A.   No, sir.  I went to the -- my hire date is

10    August 30th of 2010.

11         Q.   Okay.  So "hire date" means the date you

12    started at the Academy?

13         A.   Yes, sir.

14         Q.   Okay.  In addition, at the Academy you're

15    talking about use of force generally; right?

16         A.   Yes, sir.

17         Q.   Did they teach you shouldn't ever do

18    anything that could put yourself or your fellow

19    officers in danger?

20         A.   I don't understand your question.

21         Q.   Okay.  At the Academy did they teach you

22    shouldn't take any actions that could put yourself

23    unnecessarily in danger of physical harm?

24         A.   We're taught that I'm responsible for the

25    action that I do take.  I understand in my position



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2     that I may be placed in positions that could
 3     potentially put me in physical harm or death.
 4              Q.  Are you taught that you're not supposed to
 5     take actions that would unnecessarily put yourself in
 6     danger of, you know, sustaining physical harm or
 7     death?
 8              A.  That our aim should be to minimize, yes,
 9     physical harm to myself or to anyone else.
10              Q.  Okay.  And so you wouldn't be allowed to
11     make a choice that would unnecessarily endanger a
12     member of the public?
13              A.  Correct.
14              Q.  And are you taught that you're never
15     allowed to use deadly physical force unless you
16     reasonably believe that your life or the life of
17     another person is in danger?
18              A.  As it applies to a human or to a dog?
19     Because with a dog, there are added stipulations for
20     animals.
21              Q.  Okay.  So let's start with a human.
22              A.  Yes.  There is an imminency or perception
23     of imminency of deadly physical force to myself or
24     to -- to a citizen or a third party.
25              Q.  And how is it different for dogs?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1           OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2           A.  For animals in general -- an animal that's
 3    destructive, injured can also be terminated with the
 4    added approval of a Supervisor if -- if there is time
 5    in doing so.
 6           Q.  Okay.  Anything else?  Because you just
 7    said like -- you just said if an animal is injured,
 8    you can get the approval of a Supervisor to basically
 9    put it out of its misery?
10           A.  If it is safe to do so, yes.  In a timely
11    fashion.  For instance, if someone hits a deer and a
12    deer is injured, a Supervisor -- we would attempt to
13    get a Supervisor involved.
14           Q.  Okay.  How about like -- how about a
15    situation with a dog?
16           A.  If a dog is running, is attacking or
17    threatening attack or if it's injured, destructive of
18    property or another citizen, then yes, we can use
19    lethal force.
20           Q.  Okay.  I will ask you some more questions
21    about that in a little bit.
22           Okay?
23           A.  Yes.
24           Q.  At the Academy, did you learn anything
25    about dog behavior?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2              A.  Yes.
 3              Q.  What did you learn about dog behavior at
 4      the Academy?
 5              A.  Recognition of a dog's posture.
 6              Q.  And that was part of the firearms
 7      training?
 8              A.  Both in firearms and we have had a
 9      training bulletin since then to cover that.
10              Q.  Okay.  But just at the Academy, it was
11      just about the -- it was just during the firearms
12      training with the aggressive dogs?
13              A.  Yes, sir.
14              Q.  And then you said since the Academy, there
15      has also been a training bulletin?
16              A.  Yes, sir.
17              Q.  Okay.  Can you describe the training
18      bulletin for me?
19              A.  Yep.  The training bulletin just added on
20      to pretty much things that we should try to accomplish
21      when encountering a dog.  And then remembering --
22      recognition of a dog's posture so we can say --
23      interpreting playful, submissive dog versus an
24      aggressive, dominant dog and guidelines we should
25      follow in encountering both those types of dogs.
```



```
 1            OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2            Q.  Did you receive any like classroom-type
 3      training when you received the training bulletin?
 4            A.  I don't recall.
 5            Q.  Okay.  And when we talk about a training
 6      bulletin, that's basically a piece of paper?
 7            A.  Our -- most of our policy is in electronic
 8      form.  But you could print out a piece of paper.  But
 9      it is administered electronically to us.
10            Q.  And do you remember actually receiving
11      that training bulletin?
12            A.  I remember receiving training related to
13      our encounter with dogs, yes.
14            Q.  All right.  So when -- I don't know if
15      that answer -- I don't think that answer was
16      responsive to my question.  Because I -- I guess my
17      question is, the training bulletin is like a -- a
18      document; correct?
19            A.  Correct.
20            Q.  And so your answer was that you were --
21      you remember receiving the training, correct?
22            A.  Correct.
23            Q.  Now, when you say receive the "training,"
24      were you referring to receiving the document?
25            A.  Yes.  So a lot -- now, the way a lot of
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2     information is disseminated is they will send -- email
 3     us all the -- the form and then we have to acknowledge
 4     that -- usually the Sergeant will outline, give us a
 5     summary what is covered in the document and then we
 6     have to acknowledge that we pretty much accept the
 7     guidelines given in the document.
 8              Q.  Okay.  So you get the document.  You send
 9     some sort of an acknowledgment.
10              Would that acknowledgment be an email
11     response saying "received"?
12              A.  It's in like an electronic signature.
13     When you usually click on it, it opens up like another
14     window.  Again, if you wanted to -- it provides the
15     full documentation in electronic form for you to
16     review and then you acknowledge that -- pretty much "I
17     read and accept the terms of the training bulletin" or
18     the policy.
19              Q.  Okay.  So that sounds like it might be
20     similar to signing an electronic contract sort of?
21              A.  Right.  That is usually -- understand --
22     with respect from that point forward as far as this
23     training bulletin is dictating.
24              Q.  So there is nothing to specifically
25     document that you actually read it, other than your
```



1          OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
2     electronic signature; is that fair?
3          A.   No.  Checking a box that says "I read and
4     accept the documentation."
5          Q.   Okay.  So aside from clicking the button
6     that says you read and accept the documentation, for
7     this dog training bulletin, there was no sit-down
8     instructions with, for example, someone from the
9     Humane Society; is that correct?
10          MS. JONES:  Objection.
11          Go ahead.
12          A.   I don't recall someone from the Humane
13     Society giving that training to me.
14          Q.   Okay.  Did you ever receive any Humane
15     Society training about interacting with dogs?
16          A.   I have not received any training -- I do
17     not recall any training from someone from the Humane
18     Society giving -- how to encounter dogs.  I do not
19     recall that.
20          Q.   In general, does the RPD have yearly
21     training requirements?
22          A.   Yes, sir.
23          Q.   And what are the yearly training
24     requirements?
25          A.   We are required to qualify with both



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2     pistol, shotgun and beanbag or any other equipment
 3     that you're certified and authorized to use and
 4     then -- that's how you do the qualification.
 5              Q.  Okay.  Other than the firearms training,
 6     are you required to have any additional subjects that
 7     you're trained on on a yearly basis?
 8              A.  The firearms training is -- is what I have
 9     been put through yearly.  I don't know what the
10     requirements or time frames are for every training
11     that they put us through.  I just know that the
12     qualification with firearms is the one that we go
13     through every year.
14              Q.  Okay.  Periodically, are there other
15     in-service trainings on different subjects?
16              A.  Yes, sir.
17              Q.  Okay.  Can you tell me what different
18     subjects you recall receiving in-service training on?
19              A.  Um, body-worn camera.  There have been
20     refreshers on defensive tactics as it has changed
21     throughout the years.  Um, those are the main two that
22     come to my mind.  As far as -- as far as trainings,
23     they're usually related to the core firearms,
24     defensive tactics and things of that such.
25              Q.  Okay.  And you don't recall ever receiving
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2      in-service training on any type of interactions with
 3      dogs?
 4              A.  I do not.
 5              Q.  Or like an aggressive dog training?
 6              A.  I don't recall that.
 7              Q.  Okay.  At the Academy were you taught
 8      the -- in the firearms training that you could shoot
 9      the dog if you were afraid?
10              A.  We were taught that we could use lethal
11      force on a dog when it is attacking or threatening
12      attack, imminent -- sorry -- danger to myself or
13      another person.
14              Q.  Okay.  And were you taught how to
15      recognize whether the dog was being aggressive?
16              A.  We were taught how to recognize -- signs
17      in the posture of a dog that might give cues as to
18      what the dog -- I can't say thinking coming out of a
19      dog's head, but those cues or postures that
20      distinguish it between being submissive or aggressive.
21              Q.  So were you taught that if they're in an
22      aggressive posture, that you're allowed to shoot the
23      dog?
24              A.  If that posture is threatening, imminent
25      danger to myself or another person, then yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2         Q.   Okay.  So if the dog is in an aggressive
 3    posture but not charging, are you allowed to shoot the
 4    dog?
 5         A.   The action of not -- that action of
 6    charging would fall under attacking.  The threat of
 7    imminent danger can just be in that posture toward --
 8    can be in -- can be characterized in that posture
 9    towards myself or another person.
10         Q.   Okay.  So I'm sorry.  Let me back up.
11              If they're in an aggressive posture but
12    not moving, are you allowed to shoot the dog?
13         A.   If -- yes.  If I reasonably believe that
14    that posture and focus is providing a threat of
15    imminent danger to myself or another person, I'm
16    allowed to shoot that dog.
17         Q.   Okay.  Now, were you taught how to
18    differentiate between a dog that is running at you but
19    not -- not attacking and a dog that is running to you
20    and maybe is just excited?
21              MS. JONES:  Objection.
22              You can answer.
23         A.   I do not recall being taught the
24    difference in an approaching dog and their -- their
25    telltale sign.  The training we were given -- for
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1          OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2   instance, like ears up, ears down, head up, head down
 3   give signs on whether a dog is submissive or
 4   aggressive.
 5          Q.  Okay.  In your -- in your experience as an
 6   officer, have you had interactions with dogs that have
 7   run up to you that you didn't perceive as them
 8   attacking you?
 9          A.  Yes.
10          Q.  Okay.  And in those situations, you didn't
11   shoot the dog?
12          A.  I did not.
13          Q.  Other than the Cedarwood Terrace incident,
14   have you ever shot a dog?
15          A.  I have not.
16          Q.  At the Academy were you ever trained on
17   the use of force continuum against dogs?
18          A.  They do read through, yes, the use of
19   force continuum that goes through our firearms
20   training.
21          Q.  Okay.  And so were you taught that you can
22   use less lethal options against a dog?
23          A.  I was taught there are measures we should
24   try to take in place to try to prevent, again, the use
25   of lethal force against a dog, yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1           OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2           Q.  Okay.  In your 12 years with the RPD, are
 3    you aware of other incidents where dogs have been
 4    shot?
 5           A.  I'm aware.  Yes.
 6           Q.  Have you ever been at another incident as
 7    a witness where a dog was shot by an officer?
 8           A.  I have not.
 9           Q.  Okay.  Do you know any other officers by
10    name who have shot a dog?
11           A.  I do.
12           Q.  Okay.  Who -- what other officers are you
13    aware of who shot dogs?
14           A.  Officer Bernard McDonald.  Officer Javier
15    Algarin.  Officer Cody Goodfriend.
16           Q.  I'm sorry.
17                What was that -- Cody what?
18           A.  Goodfriend.
19           Q.  I'm sorry.  I thought you at first meant a
20    guy named Cody who was your good friend.
21                But is it --
22           A.  I'm sure -- I think he is of Indian
23    descent -- or Native American descent.  I'm sorry.
24           Q.  Do you know how to spell Cody Goodfriend's
25    name?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2            A.   Yes.  Cody is C-O-D-Y.  Goodfriend is
 3      exactly how it sounds.  G-O-O-D-F-R-I-E-N-D.
 4            Q.   Okay.  And anyone else?
 5            A.   Those are the -- that I recall right now,
 6      those would be ones that I recall.
 7            Q.   Okay.  And how are you aware of the
 8      incident with Officer McDonald shooting a dog?
 9            A.   I just -- I don't recall the year, but I
10      just know he shot a dog before.  I was not a witness
11      to it.  I don't know the incident or what.  I just
12      know that he shot a dog.
13            Q.   Are you aware because generally in the
14      department somebody was talking about it or something
15      else?
16            MS. JONES:  Objection.
17            You can answer.
18            A.   No.  I'm aware because I know these
19      officers.  Bernard McDonald was in my Recruit Class.
20      Cody Goodfriend was in my Recruit Class.  I don't know
21      the ins and outs of their incidents, but I know they
22      have shot dogs.
23            And also from your collection of lawsuits
24      that you're pursuing right now, that they are also
25      listed in those -- that Bernard was named in that
```



```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2      list.
 3              Q.   Okay.  How about have you ever spoken with
 4      Officer McDonald about that incident?
 5              A.   I have not.
 6              Q.   Okay.  And how about Officer Algarin?
 7              A.   I have not.
 8              Q.   And how are you aware of the incident
 9      involving Officer Algarin?
10              A.   Anytime there is an officer-involved
11      incident, there is usually an email disseminated by
12      the -- a thing called our Sixth Floor Command Staff.
13      We would say -- the sixth floor of the Public Safety
14      Building is where the command staff is.  But an email
15      release, usually like a media release, giving a
16      general outline that we also give to the media as far
17      as an incident where an officer had to discharge a
18      firearm.
19              Q.   Okay.  So anytime an officer shoots a dog,
20      there would be a notification from the command staff?
21              A.   Anytime an officer uses a firearm, an
22      officer-involved incident where deadly physical force
23      is used, there is usually some kind of media release
24      and that's sent to the entire Department.  That media
25      release by -- I don't know who is in that position,
```



```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2    but our PIO.  Our Public Information Officer.  I'm
 3    sorry.
 4              Q.  So would there ever be a situation where
 5    there would be a command staff notification only to
 6    RPD officers that didn't also go to the media?
 7              A.  I don't believe so.
 8              Q.  Okay.
 9              A.  Usually a media release.
10              Q.  Okay.  And there is a media release
11    anytime, to your knowledge, that there is a use of
12    deadly physical force?
13              A.  Anytime there is any significant critical
14    incident, I believe the command staff has to give some
15    kind of information to the media.  And again, we're
16    included in that -- that -- that email listing of that
17    media release.
18              Q.  Okay.
19              A.  It wouldn't just apply to shootings.  Any
20    critical incident would fall under that.
21              Q.  Okay.
22              A.  Again, I'm not in that position.  I don't
23    know their criteria or standards that are put through
24    that information.
25              Q.  Okay.  With Officer Algarin, do you
```



```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2     specifically remember receiving that news media
 3     release for command staff?
 4              A.  I don't know -- I don't recall that
 5     specific release.  I don't.
 6              Q.  Okay.  Have you ever spoken with Officer
 7     Algarin about that incident?
 8              A.  I have not.
 9              Q.  Okay.  Is -- do you -- do you speak with
10     Officer Algarin with any frequency?
11              A.  I do.
12              Q.  Okay.  Are you friends?
13              A.  We're both Defensive Tactics Instructors
14     for the Department.
15              Q.  Okay.  So you have a close-working
16     relationship?
17              MS. JONES:  Objection.
18              Go ahead and answer.
19              A.  I have a professional relationship with
20     him.  I don't know -- I don't have any relationship
21     with him outside of work.  Given he's a Defensive
22     Tactics Instructor, we have been together at the
23     Academy, teaching defensive tactics.
24              Q.  Okay.  As a Defensive Tactics Instructor,
25     do you give any training about interactions with dogs?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2         A.  We do not.
 3         Q.  And how about the incident with Cody
 4    Goodfriend, when he shot the dog?  How -- how were you
 5    aware of that incident?
 6         A.  I don't know the ins and outs of his
 7    incident.  I just know he has also shot a dog.
 8         Q.  Okay.  Have you spoken with him about that
 9    incident?
10         A.  I have not.
11         Q.  Okay.  So basically, it sounds like there
12    is just kind of a general understanding within the
13    department when an incident like a dog-shooting
14    incident happens; is that fair?
15              MS. JONES:  Objection.
16              You can answer.
17         A.  Can you repeat that for me so I can
18    understand?
19         Q.  Sure.
20              So I think your testimony was basically
21    that when there is a critical incident like a firearm
22    discharge, generally there is a command staff release
23    and that's how members of the Department become aware
24    of that incident?
25         A.  Yes, sir.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1               OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2          Q.   Okay.  And then after that, you -- is
 3     that -- is that disseminated to members of the
 4     Department via email or something else?
 5          A.   Through email.
 6          Q.   Okay.  And do you have an RPD-issued cell
 7     phone?
 8          A.   I do not.
 9          Q.   Okay.  So if you got a Department email,
10     how would you check that?
11          A.   On a computer.
12          Q.   Okay.  Do you have like an assigned
13     computer at the RPD or something else?
14          A.   We have computers at -- in our sections,
15     in our Section Office that we can log into.  We're
16     given City log-ins that we can access our emails from
17     those portals.
18          Q.   Okay.  So are those like internal emails
19     or could you also check that email, for example, on
20     your home computer?
21          A.   Um, I'm sure especially with the COVID
22     pandemic passing, that there's some kind of remote
23     access to those emails.  Especially -- the City has
24     like a City Gateway where you can check your pay stub,
25     your elections, all that stuff through --
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2      electronically.  So yes, you can also access your
 3      email that way, as well.
 4              If you were on an extended vacation --
 5      because -- we have a -- we're expected to check our
 6      email every 48 hours.  Um, so if you're on vacation
 7      somewhere, if you can get to a terminal that can
 8      access that website, you would again be able to check
 9      your email.
10          Q.  Okay.  If you have a smartphone like an
11      iPhone, can you check your City email on your iPhone?
12          A.  I believe our IT Department has to give
13      you permission or access to do that, but yes, I do
14      know that that capability is possible.
15          Q.  So just to be clear -- like for example, I
16      know that the New York City Police Department issues
17      every RP -- every NYPD an iPhone.
18              RPD does not do that, correct?
19          A.  They do not.
20          Q.  Based on your 12 years of experience, have
21      you ever heard of an officer being disciplined in any
22      way for shooting a dog?
23          A.  I have not.
24          Q.  Okay.  Based on your 12 years of
25      experience, have you ever heard of an officer being
```



```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2     required to undergo additional training of any kind
 3     because they shot a dog?
 4              A.  I have not.
 5              Q.  Okay.  And so in the Cedarwood Terrace
 6     incident, after you shot the dog, you were not
 7     disciplined or required to get any additional
 8     training; correct?
 9              A.  I was not.
10              MS. JONES:  Objection.
11              A.  I was not.
12              Q.  Okay.  And what is the general attitude
13     within the Department about incidents where dogs have
14     been shot?
15              A.  The general attitude?  I don't believe
16     there is a general attitude as far as dogs within the
17     Police Department.
18              Q.  Okay.  For example, is there a perception
19     that people in the city keep aggressive dogs?
20              A.  No.
21              Q.  Okay.  Is there any kind of -- have you
22     ever had any discussions with anyone in the Police
23     Department about the need to reduce the number of dogs
24     that have been shot?
25              A.  No.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1          OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2          Q.   Okay.  Do you think dog-shooting incidents
 3     are scrutinized as closely as incidents where force is
 4     used against a person?
 5          A.   I do.
 6          Q.   Okay.  Can you describe that process?
 7          A.   I'm not a Supervisor, so again -- I'm sure
 8     their documentation and what that goes through is
 9     probably covered in policy.  I'm not -- but I know
10     that -- again, there are -- there is policy related to
11     what we're authorized in and -- in discharging our
12     firearms so that would include that.
13          Q.   What -- can you describe after the
14     Cedarwood Terrace incident, what the -- what --
15     what -- the review process that occurred, to your
16     knowledge?
17          A.   Sergeant Robert Osipovitch responded to
18     the scene that day and he completed an incident report
19     related to that incident.
20          Q.   Okay.  Did anything -- anything else
21     happen, to your knowledge?
22          A.   Technician responded to process the scene.
23     And then depositions were taken from the witness that
24     was at the scene.
25          Q.   Okay.  Anything else?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1          OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2          A.  That's what I recall.
 3          Q.  Okay.  So you said Osipovitch came to the
 4   scene.
 5               Do you know if you ever reviewed your
 6   body-camera footage?
 7          A.  As a Supervisor, he reviewed -- they
 8   review our body-cam footage.
 9          Q.  Okay.  So do you know specifically in this
10   incident if he reviewed your body-camera footage?
11          A.  I was not present while he was reviewing
12   any body-cam footage, so no, I don't know when he did
13   that or how that was accomplished.  I just know as --
14   a Supervisor is expected to review our body-cam.
15          Q.  You know he is expected to do it, but you
16   don't know if he specifically did it in this instance?
17          A.  Right.  There would be no check, as far as
18   me as an officer, checking to see if my Supervisor
19   viewed any body-cam footage.  That would come from
20   above his chain.  But I know that, for instance, we --
21   we regularly receive emails when we forget to tag an
22   incident or we tag it improperly and that's usually
23   through the Supervisor.
24          Q.  Okay.  In this instance, did Osipovitch
25   ever speak with you about your body-camera footage?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2         A.   No.
 3         Q.   Okay.  In this incident did anybody ever
 4    speak with you about your body-camera footage?
 5         A.   No.
 6         Q.   Do you know if PSS ever reviewed the
 7    incident at Cedarwood Terrace in any way?
 8         A.   I do not.
 9         Q.   Okay.  Do you know if the Professional
10    Development Section ever reviewed the Cedarwood
11    Terrace incident in any way?
12         A.   I do not.
13         Q.   Okay.  When there is a use of force
14    incident against a person, does PSS review that
15    incident?
16         A.   PDS reviews use-of-force incidents.
17         Q.   I'm sorry.
18              Did you say "PDS" or "PSS"?
19         A.   Yep.  Professional Development Section
20    Sergeant would review all uses of forces.
21         Q.   Okay.  What about the Professional
22    Standards Section?  Did they review use-of-force
23    incidents?
24         A.   I don't know that.
25         Q.   Okay.  I'm going to write down a question
```



```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2      I will ask you in a minute.
 3                   (There was a pause in the proceedings.)
 4              Q.   So you have never been disciplined in any
 5      way for shooting a dog because the only dog you ever
 6      shot was in the Cedarwood Terrace incident; is that
 7      correct?
 8                   MS. JONES:   Objection.
 9              A.   That is correct.
10              Q.   Have you ever been disciplined in any way
11      for using force against a person?
12              A.   No, sir.
13              Q.   Okay.  Have you ever had a force incident
14      with a person where you had to speak with either PDS
15      or PSS?
16              A.   Yes.
17              Q.   Okay.  So those force incidents were
18      reviewed by -- I'm sorry.  Let me withdraw that
19      question.
20                   Was it -- were those prior force incidents
21      reviewed by PDS?
22              A.   They were reviewed by the Professional
23      Development Section.
24              Q.   Okay.  And how many times have you spoken
25      with the Professional Development Section in regards
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2      to use-of-force incidents?
 3              A.   Once.
 4              Q.   Okay.  That was force that you used or
 5      someone else?
 6              A.   That I used in response to the force being
 7      used by the subject.
 8              Q.   Okay.  But in this instance, on Cedarwood
 9      Terrace, you didn't speak with PDS; correct?
10              A.   Correct.
11              Q.   And what was the outcome of the incident
12      where you spoke with PDS about the force incident with
13      the person?
14              A.   That was pretty much additional training,
15      other options available and different -- and other
16      potential different outcomes given the incident.
17              Q.   Okay.  And when did that incident occur?
18              A.   Um, I don't recall the year at this point,
19      but it occurred during my time on Goodman Section
20      Third Platoon.
21              Q.   Okay.  Have there ever been incidents
22      where you didn't use force where you were -- maybe
23      your Supervisor criticized you for not using force?
24              A.   No.
25              Q.   Okay.  Have you ever been told that you
```



```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2      should be more hands-on or more aggressive with
 3      subjects?
 4              A.   No.
 5              Q.   Have you ever been sued in a lawsuit
 6      before?
 7              A.   Yes.
 8              Q.   Do you remember how many times?
 9              A.   Once.
10              Q.   Was that the Quintin Keene case?
11              A.   Which case is that, sir?  I'm sorry?
12              Q.   Quintin Keene was the name of the
13      Plaintiff and the other officer sued was Mario Masic?
14              A.   No.
15              Q.   What is the name of the case that you
16      remember?
17              A.   It would be Darvon Harring.
18              Q.   Okay.  What happened there?
19              A.   He alleged -- pretty much he made -- he
20      was already in prison.  He was suing alleging false
21      accusations about what occurred during his arrest.
22              Q.   Okay.  Do you know what the conclusion of
23      that lawsuit was?
24              A.   I do not.
25              Q.   I had mentioned Officer Mario Masic
```



```
 1            OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2    before.
 3               Did you know Officer Masic?
 4         A.   I do know who Mario Masic is.
 5         Q.   Did you ever work with him?
 6         A.   I did.
 7         Q.   And he is no longer with the Department?
 8         A.   Yeah.  I was told that he retired from the
 9    Department.
10         Q.   Do you know why --
11         A.   I remember -- or I remember his departure
12    from the Department.  Yes.
13         Q.   Okay.  And do you know why he departed
14    from the Department?
15         A.   I do not.
16         Q.   Did you know Officer Masic for having a
17    reputation for using excessive force?
18         A.   I do not.
19         Q.   Okay.  Were you friends with Officer
20    Masic?
21               MS. JONES:  Objection.
22         A.   Just like other officers, I had a
23    professional relationship with him.  I have never hung
24    with him outside of work.  I don't know him that way,
25    no.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2         Q.  Did you know him by any nicknames?
 3         A.  No.
 4         Q.  You never heard that he had a -- the
 5   nickname "Cowboy"?
 6         A.  I have never heard anyone call Mario Masic
 7   "Cowboy."
 8         Q.  Okay.  Does the RPD have a requirement to
 9   use de-escalation techniques with interactions with
10   people?
11         A.  Yes.
12         Q.  Okay.  Does the RPD require use of similar
13   de-escalation techniques in situations with aggressive
14   dogs?
15         A.  Similar, yes.
16         Q.  Can you describe that for me?
17         A.  Yes.  Again, we would -- just as you would
18   with any other crime scene management, try to cordon
19   off the area to prevent other people from coming in.
20              So pretty much containment for -- of -- of
21   the animal or individual.  And then depending on what
22   is going on inside that crime scene, that can adjust.
23   But they're very similar.  Basic crime scene
24   management is the same goal, if you will.  Containment
25   and security, safety.
```



```
1           OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
2           Q.  And the containment techniques that you
3   were talking about, where did you learn that
4   specifically as it relates to dogs?
5           A.  I wouldn't -- I did not learn that
6   specifically as it comes to dogs.  Just basic crime
7   scene management as you would, for instance in a motor
8   vehicle accident where we needed to shut down
9   interactions, blocking off the road or putting up tape
10  to reduce vehicular pedestrian traffic is a common
11  thing we do on a day-to-day basis, responding to calls
12  for service.
13          Q.  Did you ever learn any techniques about
14  de-escalation specifically related to dogs -- for
15  example, ways to speak to a dog?
16          A.  No, sir.
17          Q.  Okay.  Or commands to give to a dog?
18          A.  No.
19          Q.  How about like -- I don't know,
20  distractionary techniques or ways to calm a dog?
21          A.  No, sir.
22          Q.  Okay.  Were you ever taught to like carry
23  a snack to offer to a dog to distract it or calm it
24  down?
25                  MS. JONES:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
2                    You can answer.
3              A.  No, sir.
4              Q.  And I think before you said if a dog is
5      running at you, that would be considered charging and
6      you're permitted to shoot the dog?
7              A.  If it is attacking or presenting imminent
8      danger to myself or another person, I'm authorized
9      yes, to use a firearm on a dog.
10             Q.  And I'm sorry.  Some of these are
11     repetitive.  I'm jumping around my little outline
12     here.
13                   As you -- but I think you testified
14     earlier that you did not receive any training about
15     differentiating between a dog running at you in a
16     playful manner versus a dog running at you in an
17     aggressive or attacking manner?
18             A.  As you showed in that -- the training
19     bulletin that you provided, those different body
20     languages, head up, versus head down, posturing are
21     the indications we're given to distinguish those.
22             Q.  Okay.  Now, those were still images in
23     that training bulletin; correct?
24             A.  Correct.
25             Q.  Have you ever reviewed any videos about
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2     interactions with dogs?
 3              A.   No.
 4              Q.   Okay.  So the RPD never gave you any
 5     training that involved videos about interactions with
 6     dogs, correct?
 7              MS. JONES:  Objection.
 8              A.   I have not gone through any video training
 9     related to dogs.
10              Q.   Okay.  Have you ever used any kind of
11     simulator training as it relates to dogs?
12              A.   I have not.
13              Q.   Does the RPD have a simulator for
14     different scenarios that you might encounter as a
15     police officer?
16              A.   It actually belongs to the Monroe County
17     Sheriff's Office, but we have -- we did go through
18     that training in the Police Academy.
19              Q.   And is that just firearms training or
20     something else?
21              A.   Um, I don't know the capabilities of the
22     technology, but typically it is shoot/no shoot
23     scenarios, interacting with a virtual scene.
24              Q.   Okay.  What training do you remember doing
25     on the simulator?
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2         A.   Um, it wasn't really a training.  It was
 3    more of an exposure -- scenario exposure where we're
 4    given like a laser -- laser gun and then we interact
 5    with the -- where we can talk to the screen.  And
 6    based on, I guess, their program or their ability to
 7    manipulate that interaction, it -- it talks about --
 8    they measure reaction time.
 9              For instance, if a lethal threat were
10    presented -- and they also can record your movement
11    inside the room for -- if you need retraining as far
12    as finding cover and other options that may need to be
13    revisited.
14         Q.   Okay.  So would that be like a shoot/don't
15    shoot-situation?
16         A.   Yes.
17         Q.   Okay.  But it didn't involve a dog in any
18    way, right?  Just a person?
19         A.   Again, I don't know if dog simulations are
20    in that technology, but I have never gone on any
21    scenario on PRISM that interacted with a dog.
22         Q.   And you just said "on PRISM."  So PRISM is
23    what you -- PRISM is the simulator that the Monroe
24    County Sheriff's office has?
25         A.   Yes.  I don't know what that acronym
```



1    OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS

2  stands for.  I just always known it as the PRISM

3  system.

4        Q.  Okay.  So, again, I'm sorry for asking

5  some questions that are similar.  Jumping around my

6  outline.

7            But if you perceive a dog as a threat,

8  you're trained in firearms that you're allowed to

9  shoot the dog?

10       A.  Yes.  If I -- if I have reason to believe

11 that that threat is presenting imminent danger to

12 myself and another person, I can use a firearm on a

13 dog.

14       Q.  Okay.  And were you given specific

15 training about how to identify whether the dog is

16 presenting an imminent danger?

17       A.  We were given, again, the stills that you

18 provided -- that you showed before for identifiers in

19 doing posture.  But no, if you're relating to the

20 Academy, I don't recall anything further, like I said,

21 than that training bulletin that was provided to us.

22       Q.  If you interact with a dog that looks like

23 it is in an aggressive posture, are you taught that

24 you're required to try to de-escalate before resorting

25 to using your firearm?



1          OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS

2               A.   I believe that any -- speaking for myself,

3     that is -- that is, again -- depends on that officer.

4     Background, different experiences with dogs.  Like you

5     can't -- what -- what you or I may be willing to put

6     yourself through related to a dog in your experience

7     when you're interacting with a dog doesn't dictate the

8     appropriate response for every officer given their

9     background, their fears or whatever they're

10    encountering.

11               Q.   So I appreciate your answer and I will

12    just have to move to strike that as not responsive to

13    my question.  So I will just ask my question again.

14               So if -- so the question is about what

15    you're taught or trained by RPD.

16               So if you encounter a dog and it's in an

17    aggressive posture, are you required by your RPD

18    policies and training to try to de-escalate the

19    situation with the dog prior to using your firearm?

20               A.   There is no requirement of that.

21               Q.   Okay.  And I'm just going to put up

22    another exhibit because we have referred to it and I

23    just want to make sure we're on the same page.

24               This is going to be General Order 340,

25    "Use of deadly physical force" and it's marked as City



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1           OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2    of Rochester, 1.
 3                   And again, Peachie, I apologize for not
 4    knowing offhand which case that came from, but I
 5    believe it's Anniszkiewicz.
 6               (The following exhibit was marked for
 7               identification:  Number EXH 2.)
 8           Q.  Officer Pinckney, can you see the document
 9    entitled "Use of deadly physical force" on the screen?
10           A.  Yes, sir.
11           Q.  I'm going to --
12               MS. JONES:  Can you zoom in a little bit,
13    Elliott?
14               MR. SHIELDS:  Is that better?  Here one
15    second.
16           Q.  Can you see that?
17           A.  Yes.
18               MS. JONES:  It's actually worse.  But --
19    yeah.  Thank you for zooming.  We're good.
20           Q.  Is that the document that you were
21    referring to earlier, Officer Pinckney?
22           A.  Yes, sir.
23           Q.  And I'm just going to zoom down to page 3.
24    So we have the highlighted portion under B1, which
25    says "Members may use a firearm against animals when
```



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1          OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2    they are:  Attacking or presenting an imminent danger
 3    to any person."
 4               So that -- so that is the section you were
 5    referring to earlier about RPD policy regarding use of
 6    a firearm against an aggressive dog?
 7          A.  Yes, sir.
 8          Q.  And since the Academy, have you received
 9    any specific like in-person or classroom training
10    about this section of General Order 340?
11          A.  I have not.
12          Q.  Okay.  So I will take that down.
13               And are you trained that there is factors
14    that you must consider before deciding whether or not
15    to discharge your firearm at a dog?
16          A.  There are -- yes.  There are factors to
17    consider, yes.
18          Q.  Can you just take me through some of
19    those?
20          A.  Anytime you are discharging a firearm,
21    if -- you have to think about your environment and
22    what that -- where that round could go.  We're
23    responsible for -- for that round, if you will, when
24    it leaves that firearm.
25               So an analysis of the foreground.  These
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2    are basic like fundamentals for firearms.  Foreground,
 3    know your target, what is in front of it and what is
 4    beyond it.
 5              Q.  So, for example, if you're in a vacant lot
 6    versus a crowded neighborhood, that would be one
 7    factor to consider?
 8              A.  Yes.
 9              Q.  Time of day?
10              A.  I wouldn't say time of day would be a
11    factor unless there is a visibility -- where I work in
12    the city, most of the roads are well lit.  So I don't
13    think the time of day would be that much of a factor.
14              Q.  Could time of day affect whether people
15    are on the street or in their house?
16              A.  Um, yes.  Typically people are more active
17    during daytime hours versus maybe overnight hours.
18              Q.  So maybe generally whether there are
19    people around?
20              A.  Yes.
21              Q.  Whether there is other non-lethal options
22    available to you?
23              A.  Correct.
24              Q.  And I know you said in the Academy you
25    were never taught that you were required to use
```



```
 1          OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2    non-lethal options; is that accurate?
 3                MS. JONES:  Objection.
 4          A.   For a dog that is attacking or again
 5    presenting imminent danger to myself or another, I'm
 6    authorized to use a firearm.
 7          Q.   And -- have you ever heard the OC spray
 8    might work against a dog?
 9                MS. JONES:  Objection.
10                Go ahead.
11          A.   Yes.  I actually happened to be an Aerosol
12    Spray Restraint Instructor as well as my defensive
13    tactics training.  And dogs, including asthmatics and
14    elderly, are populations where it can be -- have a
15    reaction to OC.
16          Q.   Is that something that you teach your
17    students in defensive tactics?
18          A.   It is not a training to use OC spray
19    against a dog.  But that -- these are groups that OC
20    spray could be effective against.
21          Q.   Okay.
22          A.   There is training where -- there is no
23    drill or no instruction that goes through on how to
24    pepper-spray a dog.
25          Q.   That is just something you know because
```



```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2     you're an OC spray instructor -- Aerosol Instructor?
 3              A.  Yes, sir.
 4              Q.  And is that something that you read in
 5     like training materials?
 6              A.  As going through my certifications as an
 7     ASR instructor, that was taught in the class.
 8              Q.  And where did you take that class?
 9              A.  At the Public Safety training facility.
10              Q.  Okay.  So they teach the aerosol
11     instructors that OC spray might be effective against
12     dogs, but general RPD officers don't receive that
13     training; is that fair?
14              A.  Every officer, at least for the Rochester
15     Police Department, goes through an OC -- sorry --
16     aerosol spray exposure in the Academy.  And again,
17     that is a part of the PowerPoint slide of the
18     presentation given during that training.
19              Q.  Okay.  So let me back up.  You said
20     because you're an instructor, you know that OC spray
21     might be effective against a dog; is that right?
22              A.  Correct.
23              Q.  Before you got that instructor training,
24     had you ever been taught that OC spray might be
25     effective against a dog?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

        OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS

1

2          A.  I would have received that -- I received

3     that presentation during my Police Academy, as well.

4          Q.  So it is the same presentation at the

5     Academy that you get when you go to your OC Aerosol

6     Instructor training?

7          A.  The standard I'm held to as an instructor

8     is different from probably a recruit.  But yes, the

9     presentation is what is administered at the Academy.

10          Q.  Okay.  But do you remember from your

11     Academy training being told OC training might be

12     effective against a dog?

13          A.  Yes, that it could be used against a dog.

14          Q.  And do you remember that being taught for

15     the Class 69 and 70 Recruit Classes, too?

16          A.  Yes.

17          Q.  So it is taught that it might be

18     effective, but there is no requirement to use it;

19     is --

20          A.  Right.  It's an option.  It's an

21     alternative, but there is no requirement to use it.

22          Q.  Okay.

23          A.  Due to the range required for the

24     application of OC spray, which is 2 to 3 feet.

25          Q.  So is it not effective if you spray it



```
1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
2      from further than 2 to 3 feet?
3              A.  There is many factors that can affect
4      that.  Wind -- wind control and heat.  But for -- but
5      as far as our application when applying OC spray, 2 to
6      3 feet is the range, minimum range you want to be from
7      your subject.
8              Q.  Okay.  Is there any -- is there any
9      prohibition on spraying from too close?
10             A.  Yes.  It can cause -- spraying from inside
11     of that 2-foot range could cause damage to the eye of
12     a subject or to -- I don't know how it applies to
13     canines, but as far as our spraying inside that range
14     could cause damage to the eye because it's a
15     pressurized can.
16             Q.  So there is kind of a sweet spot of 2 to
17     3 feet that you are supposed to spray from?
18             A.  Ideally, yes.  Again, given wind travel
19     and other conditions that may affect that range -- if
20     you're spraying into the wind, it could heavily reduce
21     that range.
22             Q.  Got it.
23             And would you agree if an officer has more
24     than one choice in how to handle a situation, they're
25     required to go with the safer choice?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2                   MS. JONES:  Objection.
 3                   You can answer.
 4         A.   I believe they're to go with the choice
 5    that would minimize injury to themselves and the
 6    subject involved and reduce, again, potential injury
 7    or danger to anyone else in the area.
 8         Q.   Okay.  Shooting a gun is always dangerous,
 9    right?
10                   MS. JONES:  Objection.
11                   You can answer.
12         A.   If the necessary safety precautions aren't
13    taken, it can be a dangerous incident.
14                   For instance, at a firearms range,
15    shooting downrange that should be -- as long as all of
16    the necessary precautions are taken, that's a pretty
17    safe activity.
18         Q.   Were you ever trained that a taser might
19    work on dogs?
20         A.   I'm not taser certified, so I don't have
21    any outside taser experience or training.
22         Q.   So does that mean that you have to be
23    taser certified to carry a taser on your person?
24         A.   Yes, sir.
25         Q.   Okay.  Is that just like a choice that you
```



```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2      can make?
 3              A.   I don't believe -- sorry.  Yes.  If you
 4      want to pursue that.  But the City also wants as many,
 5      you know -- they go through -- as of right now, there
 6      is no requirement for me to carry a taser.
 7              Q.   But if you wanted to, you could become
 8      taser certified and get one?
 9              A.   I -- the way I understand it is the City
10      purchases a certain number of tasers and how -- they
11      want them spread across the city or throughout the
12      platoons and sections.  And then as officers become
13      involved -- those become available for that section,
14      those officers can voluntarily go through taser
15      training.
16              Q.   So it is voluntary right now?
17              A.   Yes.
18              Q.   Okay.  All right.  So let's talk a little
19      bit more about the incident and I want to put up the
20      incident report which will be Exhibit 3.
21              (The following exhibit was marked for
22              identification:  Number EXH 3.)
23              Q.   Officer Pinckney, are you seeing on your
24      screen the incident report for CR
25      number 2019-00189267?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2         A.  Yes, sir.
 3         Q.  And this is the incident report that you
 4    reviewed in preparation for the deposition today?
 5         A.  Yes, sir.
 6         Q.  And a couple of questions before we get to
 7    the narrative.
 8              First, the witness, Rondell Breedlove,
 9    listed here on the first page which is marked as COR
10    201, did you ever speak with that witness at the
11    scene?
12         A.  Yes, I did.
13         Q.  Did you make any documentation of your
14    conversation with that witness?
15         A.  I did not.
16         Q.  Do you carry around one of those little
17    notepads with you?
18         A.  I do.
19         Q.  You didn't take any notes in your notepad?
20         A.  I did not.
21         Q.  Is there a requirement by RPD to take down
22    notes when you speak to witnesses?
23         A.  The purpose of the notepad is for your own
24    recollection.  If you're able to gather information
25    without use of a pad, then you do so.  When you go
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2     back to write your report, you know that information.
 3     So it's not a requirement.  It is based on the
 4     officer's need to recall.
 5              Q.  So for contrast, New York City, for
 6     example, requires that certain information be
 7     memorialized in what they refer to as their "memo
 8     books."
 9                   There is no similar requirement for the
10     RPD, correct?
11              A.  Correct.
12              Q.  Above Rondell Breedlove there is a
13     Timothy J. Moore.
14                   Did you speak with Timothy J. Moore?
15              A.  I did not, but I recognize his name from
16     the incident that day.
17              Q.  It says "PK."
18                   That means person with knowledge?
19              A.  Yes.
20              Q.  Was Mr. Moore the dog owner?
21              A.  I believe so, yes.
22              Q.  Okay.  I will go down to page 2 of 4.  Now
23     it says (as read):  Seized evidence.  Body-worn camera
24     video.  2216.
25                   Is that your body-camera video?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2            A.  Yes.
 3            Q.  And then if you don't mind, could you
 4   review the narrative section and then tell me when
 5   you're done reviewing it?
 6            (There was a pause in the proceedings.)
 7            A.  Okay.
 8            Q.  And there is just one line on this second
 9   page -- or fourth page.
10            A.  Okay.
11            Q.  I will just leave it up in case I have
12   other questions specifically about it.
13                 So in this incident you were responding to
14   a call for a loose dog; is that correct?
15                 MS. JONES:  Objection.
16            A.  Yes.
17            Q.  That's what -- what -- the incident report
18   says that you were -- "On the above date, Officer
19   Pinckney responded to the area of 755 Cedarwood
20   Terrace for the report of a loose, aggressive
21   Rottweiler in the street."
22                 Correct?
23            A.  Yes, sir.
24            Q.  Before going to the property, what did you
25   do to prepare to interact with this loose, aggressive
```



```
 1            OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2     doing?
 3            A.  As far as my response, sir, to the scene?
 4            Q.  Yes.
 5            A.  Initial response is first included with
 6     locating the dog and confirming what has been given in
 7     the call.
 8            Q.  So like before you went to the scene, did
 9     you call Animal Control?
10            A.  No.
11            Q.  Is there any requirement that when you
12     respond to a scene involving a loose dog, that you
13     contact Animal Control?
14            A.  Um, no.  Upon confirmation that the dog
15     is -- is unrestrained, uncontained or unconfined, we
16     would then notify Animal Control to respond to deal
17     with the dog.
18            Q.  And you did not have a catch pole, right?
19            MS. JONES:  Objection.
20            Go ahead.
21            A.  I did not.
22            Q.  And I think you said earlier if you wanted
23     to get a catch pole, you wouldn't have been able to do
24     so; right?
25            MS. JONES:  Objection.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2            A.  I'm not trained in a catch pole.  I don't
 3     know where I would retrieve a catch pole from.  No.
 4            Q.  Okay.  But you testified earlier that
 5     Animal Control has catch poles?
 6            A.  An Animal Control Officer, yes, would have
 7     a catch pole.  I believe they would have a catch pole
 8     in their equipment.  But I couldn't speak to an Animal
 9     Control Officer as far as what they're required to
10     carry in their vehicle.
11            Q.  Do you know if any RPD officers are
12     trained in the use of catch poles?
13            A.  I don't know.
14            Q.  Okay.  So as you were going to the scene,
15     what was your plan to do when you arrived?
16            A.  To gain a visual of the dog to confirm the
17     call we were there for.  Many times we get to the
18     scenes and the owners have already responded and
19     confined or controlled the dog and then you don't have
20     to even interact with the dog or anyone at all.  So it
21     is confirmation, as far as the call and then to
22     investigate further if need be.
23            Q.  In the incident report it says that
24     "Officers attempted to push the dog towards the yard
25     of 755 Cedarwood Terrace and keep it contained until
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1          OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2               Is that the subject dog that you ended up
 3     shooting?
 4          A.  Yes, sir.
 5          Q.  Do you know what it is barking at?
 6          A.  I don't recall from this body-cam angle
 7     what it was barking at.
 8          Q.  We paused at 2:16 in the hours, or 20
 9     hours, 8 minutes and 56 seconds.  I will hit play
10     again.
11               (The video was played.)
12          Q.  Now, was that you or Officer Gaudio saying
13     "Don't go behind my car"?
14          A.  That was me.
15          Q.  All right.  We paused at 2:26 in the video
16     or 20 hours, 9 minutes and 5 seconds.
17               (The video was played.)
18          Q.  Okay.  When you said -- well, let me
19     withdraw that.
20               Was that you who said "I got it right
21     here"?
22          A.  Yes, sir.
23          Q.  And when you said "I got it right here,"
24     where was the dog?
25          A.  This Impala, it is at the front driver's
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

           OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 1
 2    side quarter panel, the other side of my car.
 3           Q.  On the -- on the grassy area between the
 4    sidewalk and the street?
 5           A.  And the street.  At the front of my police
 6    vehicle.
 7           Q.  Okay.  So it had exited that grassy area
 8    and gone into the street at that point?
 9           A.  At that curb.  So my vehicle was obviously
10    blocking traffic.  But it was at the front of my -- I
11    recall -- I remember it being at the front of my
12    police vehicle, looking at me.
13           Q.  So it's standing at the front of the
14    vehicle looking at you at that point?
15           A.  Yes, sir.
16           Q.  Okay.  All right.  So we paused at 2
17    minutes 39 seconds into the video or 20 hours, 9
18    minutes and 19 seconds and I'm going to hit play
19    again.
20           (The video was played.)
21           Q.  All right.  So I will just pause at 2
22    minutes 58 seconds into the video or 20 hours, 9
23    minutes and 38 seconds.
24           And did you just hear yourself say "He is
25    still on the sidewalk"?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1           OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS

2                A.  Yes, sir.

3                Q.  All right.  Now I will hit play again.

4                (The video was played.)

5                Q.  So I paused at 3 minutes, 21 seconds into

6       the video or 20 hours, 10 minutes and 1 second in.

7                     What we just heard was you shooting the

8       dog?

9                A.  I didn't -- I'm sorry.  I don't know with

10      the sound -- I didn't hear the shotgun go off, but

11      judging by my body movement, yes, that is me, firing

12      the shotgun.

13               Q.  Okay.

14               A.  But --

15               Q.  I can play it again, but after you saw

16      your body movement shoot the gun, did you hear the dog

17      squeal?

18               A.  Again, you -- I think every time you stop

19      and play it, there is a delay in the audio.  We

20      haven't heard anything up to this point.  I seen my

21      body movement, but I haven't heard the gun go off or

22      anything afterwards.

23               Q.  Okay.  So I will rewind it a few seconds

24      and then play it again until a few seconds after this

25      and then I will pause it.



```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2         A.   Thank you.
 3         Q.   No.  Thank you for telling me that.
 4              So I will rewind it to maybe a couple more
 5    seconds -- 3:15 into the video or 20 hours, 9 minutes
 6    and 54 seconds.  I will hit play.
 7              (The video was played.)
 8         Q.   Okay.  So now I pause it at 3 minutes and
 9    26 seconds into the video or 20 hours, 10 minutes and
10    6 seconds.
11              Were you able to hear the audio that time?
12         A.   I did not hear -- again, we didn't get
13    that on this end of the connection.  I apologize.  We
14    did not.
15         Q.   Interesting.  Also good to know.
16              But -- but you were able to see everything
17    that played?
18         A.   I seen my body again jerk.  And again,
19    given my recollection of this day -- it was me
20    discharging the dog.
21         Q.   And between earlier when we -- when you
22    said the dog was on the sidewalk, and when you
23    discharged the firearm and shot the dog, did the dog
24    advance towards you at all?
25         A.   Repeat that for me again.  I'm sorry.
```



```
 1            OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2            Q.  So between where we paused earlier and I
 3       asked if you heard yourself say that the dog was on
 4       the sidewalk --
 5            A.  Correct.
 6            Q.  -- between that point and when you shot
 7       the dog, did the dog advance towards you in any way?
 8            A.  No, sir.
 9            Q.  Okay.  So the dog would have been on the
10       sidewalk when you shot it then?
11            A.  It was in the grassy area, at the base of
12       the driveway, again, between the sidewalk and the
13       curbing.
14            Q.  Okay.  And you shot it -- can you just say
15       why you shot the dog?
16            A.  Yes, sir.  So again, I said the dog was
17       retreating.  The dog moved away and then turned and
18       started barking again in the direction of myself and
19       Officer Gaudio, presenting that assertive, dominant
20       position at the curbside.
21                 Based off the behavior that it just
22       performed in coming around our vehicle or its ability
23       to break off our cover, I reasonably believed there
24       was an imminent danger to myself and Officer Gaudio.
25            Q.  Okay.  And did anybody from the Police
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
2    Department ever ask you about why you shot the dog?
3              A.   No.
4              Q.   So Sergeant Osipovitch never asked you why
5    you shot the dog?
6              A.   I don't recall that.  I would have -- for
7    sake of his incident report, I would have walked him
8    through or there would have been a debriefing because
9    he was not present.  But he -- he is tasked with
10   writing an incident report or the details from this
11   incident.  So again, I would have walked him through
12   this incident that led up to me discharging the dog.
13             Q.   I will take down the video.
14                  Did you make any -- did you have to write
15   any reports about this incident?
16             A.   No, sir.
17             Q.   Did you make any type of written record
18   whatsoever about the incident?
19             A.   No, sir.
20             Q.   Did you ever -- I don't know -- text or
21   email anyone about the incident?
22             A.   No, sir.
23             Q.   Now the incident report doesn't indicate
24   that dog was attacking you.
25                  Is that your recollection what the
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2     incident report says?
 3              A.  Um, I don't recall that.  You would have
 4     to bring -- if you could bring up the incident report,
 5     I would like to refresh my memory.
 6              Q.  Not a problem.  Give me one second.  So
 7     we're putting up the incident report again which we
 8     marked as Exhibit 3.
 9                  Okay.  And just let me know when you're
10     ready.
11              A.  I'm ready.
12              Q.  So is it fair to say that the incident
13     report doesn't give any reason why you shot the dog?
14     For example, it doesn't say that the dog was charging
15     at you?
16              A.  It does not say that dog was charging at
17     me.
18              Q.  Okay.  I'm sorry.  I paused because I saw
19     Ms. Kingsley entered the room.
20                  It doesn't say any other justification for
21     why the dog was shot.
22                  Is that -- is that fair to say?
23              A.  It does not.
24              Q.  Do you remember Officer Osipovitch -- I'm
25     sorry -- Sergeant Osipovitch asking you for any
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2      justification for why you shot the dog?
 3              A.  Yes.  On scene.  Yes.
 4              Q.  Do you remember what you told him?
 5              A.  Yes.  That we came -- we came for the
 6      report of an aggressive dog.  That we observed this
 7      dog being aggressive and charging at other citizens
 8      and that that -- that I was the one who discharged the
 9      dog.
10              Q.  After the incident, before preparing for
11      today's deposition, did you review your body-worn
12      camera footage?
13              A.  I did.
14              Q.  Is that standard practice in an incident
15      like this?
16              A.  For any type of use of force, um, we
17      are -- we are allowed to review our body-cam footage
18      so that we can give accuracy to the event.
19              Q.  Like for filling out an incident report,
20      you can review your body-camera footage to fill out
21      the incident report more accurately?
22              A.  Yes.  There may be something that happened
23      that the camera captured that we didn't capture or --
24      or we didn't recall.  So we can refer to our body cam
25      to be accurate and to do our documentation.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1            OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS

2            Q.  After you reviewed your body-camera

3     footage of the incident, did you review the incident

4     report?

5            A.  I reviewed this incident report yesterday,

6     which would have been since reviewing that body-cam

7     footage.

8            Q.  I'm sorry.  That was a bad question.

9            I guess what I meant was, immediately

10    after the incident when Officer Osipovitch completed

11    the incident report which is dated August 11th, 2019,

12    did you review the incident report within, I don't

13    know, a week of August 11, 2019?

14           A.  I have had no -- I have not read or seen

15    this incident report until yesterday.

16           Q.  Okay.  Thank you.

17           Sometimes in a use-of-force incident,

18    there will be a PSS number written on the incident

19    report.

20           Are you aware of that?

21           A.  I don't know that.

22           Q.  Okay.  As you looked at and reviewed this

23    incident report, there is no similar handwritten PSS

24    number on it; is that fair to say?

25           A.  I do not see any indication for PSS on
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1          OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS

2     this documentation.

3          Q.  All right.  Thank you.  I will take that

4     down.

5          Do you think there is anything you could

6     have done to avoid shooting the dog?

7          MS. JONES:  Objection.

8          A.  Given the -- again, the posture in that

9     moment, I interpreted an imminent danger to Officer

10    Gaudio, who was at the rear of my vehicle, at which

11    time -- at which point I discharged the dog.

12          MR. SHIELDS:  I will move to strike as

13    non-responsive.

14          Q.  But is there anything you could have done

15    differently other than shooting the dog?

16          A.  At that point, based off the training

17    bulletin that was given, we are there to observe the

18    dog's behavior until hopefully Animal Control can

19    arrive and intervene.

20          Q.  Do you know if Animal Control was called?

21          A.  They were.

22          Q.  And did you have any updates on how long

23    it might have been before they arrived?

24          A.  An hour.

25          Q.  And do you know how long you were at the


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2    scene before you shot the dog?
 3            A.  I do not.  Just based off the time that we
 4    reviewed in this body-cam footage, I would say about
 5    half an hour.
 6            Q.  Okay.  So it would have been about another
 7    half-hour before Animal Control estimated they would
 8    be able to arrive at the scene?
 9            A.  No.  It would have been another hour.
10            Q.  Oh, okay.
11            So when did you get the notification that
12    it would be an hour before Animal Control would be
13    able to arrive?
14            A.  I received that communication from Officer
15    Elmore via radio it would be another hour before
16    Animal Control could respond.
17            Q.  To your recollection, that was shortly
18    before you shot the dog?
19            A.  Yes.
20            Q.  Okay.  On the day of the incident, did you
21    have pepper spray on you?
22            A.  Yes.
23            Q.  But you didn't consider using it that day?
24            A.  I would not.
25            Q.  And did you have a baton on you?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2              A.  I do.
 3              Q.  Okay.  Did you have any other less lethal
 4       weapons on you or in your car?
 5              A.  No.
 6              Q.  Did you have beanbags for your shotgun?
 7              A.  Um, I can't recall the -- the kit of
 8       everyone, but at that point beanbags weren't in every
 9       single patrol vehicle in our fleet.
10              Q.  Are beanbags now in every patrol vehicle
11       in the fleet?
12              A.  Yes.  I know they made extreme effort to
13       put beanbags in every patrol vehicle given other
14       incidents that have happened since then.
15              Q.  Do you know when that happened?
16              A.  I don't know when that went into effect.
17       I just know that they changed -- they put beanbags
18       into more patrol vehicles.
19              Q.  Okay.  Have you ever been taught that you
20       could use a beanbag shot in your shotgun against a
21       dog?
22              A.  No.
23              Q.  Okay.  If you had had a beanbag round on
24       you that day, would you have considered using that
25       instead of the buckshot?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1            OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2            A.  I would not.
 3            Q.  Okay.  Again, for what you said earlier,
 4    about the wider range or -- whatever you call it with
 5    the buckshot?
 6                 MS. JONES:  Objection.
 7                 Go ahead.
 8            A.  Given again the aggressive posture of the
 9    dog, the behaviors that I witnessed, I would not
10    elect -- I would not have elected for a beanbag gun if
11    it was present.
12            Q.  Were you wearing a bulletproof vest on
13    that day?
14            A.  Yes, sir.
15            Q.  Okay.  And how -- what is your height and
16    weight, Officer Pinckney?
17            A.  I'm 5'10".  215 pounds.
18            Q.  And how big was the dog?
19            A.  I don't know about the weight, but based
20    off of my visual, I would say about 85, 90 pounds to
21    bring it into a large breed dog.
22            Q.  Have you ever been injured by a dog while
23    on duty?
24            A.  I have.
25            Q.  Can you describe that incident for me?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1           OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2           A.  I was responding -- while I was assigned
 3      in Genesee Section Third Platoon, I responded to an
 4      address to do a missing person report.  Upon entering
 5      that home, I was aware there was a Pit Bull inside the
 6      home in which the owner of that residence assured me
 7      that their dog did not bite, would not be a threat to
 8      me.
 9                I entered that home and began my interview
10      for the missing person report.  The dog was operating
11      inside its own domicile residence.  At one point the
12      dog came up to me, sniffing my groin region and I was
13      bit by that dog.
14           Q.  And did you miss time from work because of
15      that injury?
16           A.  I did go to Highland Hospital for
17      treatment, given antibiotics.  I don't recall if --
18      our days are off days.  I don't recall that time frame
19      or if I -- how much work or if I missed any work from
20      that incident, but know it was minimal.  I was just
21      given antibiotics.
22           Q.  Did you -- well, obviously you did not
23      shoot that dog after it bit you, correct?
24           A.  I did not.
25           Q.  Did you do anything else?  Did you hit the
```



```
 1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
 2     dog or anything?
 3              A.   I punched him in the nose.
 4              Q.   Was that effective?
 5              A.   It was.
 6              Q.   So when did that incident happen?
 7              A.   Again, I don't recall the year or the date
 8     or the exact date, but it was when I was assigned in
 9     Genesee Section, Third Platoon hours.
10              Q.   I'm sorry.  I don't remember.
11                   So was that before or after the incident
12     on Cedarwood Terrace?
13              A.   Before.
14              Q.   Okay.  So from your experience before the
15     incident on Cedarwood Terrace, you were aware that
16     using other force options against a dog might be
17     effective to deter the dog from attacking?
18              A.   Um, in that situation, I would give my
19     reaction as a spontaneous reaction to being bit or
20     struck.  The tools that I had at the time were my
21     hands initially.  I did draw, but I was able to place
22     the -- I did draw and retreat where I was able to
23     place the screen door of that home between me and that
24     dog.  But if that dog had continued forward, we might
25     have potentially had a different outcome.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              OFFICER KENNETH A. PINCKNEY - BY MR. SHIELDS
2         Q.  Couple loose ends.
3              At your firearms training, do you go
4    through a scenario where there is like a jug attached
5    to a rope that is being pulled to simulate a
6    fast-moving dog that you shoot at?
7         A.  Yes, sir.
8         Q.  Other than that, is there additional
9    training about shooting at dogs?
10             MS. JONES:  Objection.
11        A.  No, sir.
12        Q.  Okay.  So that is basically what you do on
13   a yearly basis for shooting a dog, a fast-moving
14   target?
15        A.  No.  I have not done that training since
16   my Academy time.  As far as the shooting of a dog.
17             What we do is our service -- our service
18   qualification every year with our service pistol and
19   then we do qualifications to be qualified with the
20   beanbag gun, the shotgun.  Those are all done in the
21   lane of our indoor range.
22        Q.  Okay.  The last thing you said -- you said
23   those are all done in the lane of the -- of the range?
24        A.  Yes.  So at the PS -- at the Public Safety
25   Training Facility, the Rochester Police Department has
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920