UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

-----------------------------------------X

ALEXANDRIA BARNES,

                                    PLAINTIFF,

        -against-          Case No.:
                           22-CV-6524

THE CITY OF ROCHESTER, WHITNEY

CELENTANO,

                                    DEFENDANTS.

-----------------------------------------X

                    DATE: August 8, 2023

                    TIME: 10:35 A.M

            DEPOSITION of the Defendant,

WHITNEY CELENTANO, taken by the Plaintiff,

pursuant to a Court Order and to the

Federal Rules of Civil Procedure, held via

Videoconference, before Stacey Kondrk, a

Notary Public of the State of New York.

(1)

(2)   **A P P E A R A N C E S:**

(3)

(4)   ROTH & ROTH, LLP
         Attorneys for the Plaintiff
(5)      ALEXANDRIA BARNES
         192 Lexington Avenue, #802
(6)      New York, New York 10016
         BY: ELLIOT SHIELDS, ESQ.
(7)      eshields@rothandrothlaw.com

(8)

(9)   CITY OF ROCHESTER
         Attorneys for the Defendants
(10)     THE CITY OF ROCHESTER AND
         WHITNEY CELENTANO
(11)     30 Church Street, Room 400A
         Rochester, New York 14614
(12)     BY: PEACHIE JONES, ESQ.
         peachie.jones@cityofrochester.gov

(13)

(14)

(15)

(16)                  *          *          *

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)    F E D E R A L   S T I P U L A T I O N S

(3)

(4)

(5)    IT IS HEREBY STIPULATED AND AGREED by and

(6)    between the counsel for the respective

(7)    parties herein that the sealing, filing and

(8)    certification of the within deposition be

(9)    waived; that the original of the deposition

(10)   may be signed and sworn to by the witness

(11)   before anyone authorized to administer an

(12)   oath, with the same effect as if signed

(13)   before a Judge of the Court; that an

(14)   unsigned copy of the deposition may be used

(15)   with the same force and effect as if signed

(16)   by the witness, 30 days after service of

(17)   the original & 1 copy of same upon counsel

(18)   for the witness.

(19)

(20)   IT IS FURTHER STIPULATED AND AGREED that

(21)   all objections except as to form, are

(22)   reserved to the time of trial.

(23)

(24)        *     *     *     *

(25)

(1)
(2)                    VIDEO STIPS
(3)
(4)          IT IS HEREBY STIPULATED AND AGREED by
         and between counsel for all parties present
(5)      that this deposition is being conducted by
         Videoconference, that the Court Reporter,
(6)      all counsel, and the witness are
         all in separate remote locations and
(7)      participating via Videoconference
         (LegalView/Zoom/WebEx) meeting under the
(8)      control of Lexitas Court Reporting Service,
         that the officer administering the oath to
(9)      the witness need witness shall be sworn in
         remotely by the Court Reporter after
(10)     confirming the witness's identity,
         that this Videoconference will not be
(11)     recorded in any manner, and that any
         recording without the express written
(12)     consent of all parties shall be
         considered unauthorized, in violation of
(13)     law, and shall not be used for any purpose
         in this litigation or otherwise.
(14)
             IT IS FURTHER STIPULATED that exhibits
(15)     may be marked by the attorney presenting
         the exhibit to the witness, and that a copy
(16)     of any exhibit presented to a witness shall
         be emailed to or otherwise in possession of
(17)     all counsel prior to any questioning
         of a witness regarding the exhibit in
(18)     question. All parties shall bear their own
         costs in the conduct of this deposition by
(19)     Videoconference.
(20)
                 *      *      *      *      *
(21)
(22)
(23)
(24)
(25)

(1)                     **CELENTANO**

(2)     **I was driving.**

(3)         Q.    So 35 Charlie, what does that

(4)     designate?  Does the number and letter mean

(5)     something?

(6)         **A.    So Charlie is three platoon, so**

(7)     **if your number ends with a C you're doing**

(8)     **three platoon shift.**

(9)         Q.    And then does the number mean

(10)    anything?

(11)        **A.    Just the number that you're**

(12)    **assigned, your car number.**

(13)        Q.    So that doesn't indicate, for

(14)    example, the geographic location or area

(15)    within the Goodman section that you're

(16)    assigned to?

(17)            **MS. JONES:  Objection.**

(18)        **A.    Typically, you're assigned a**

(19)    **certain area.  As patrol cars you're kind**

(20)    **of like a roaming car.  You can go all over**

(21)    **Goodman section, help out wherever you can.**

(22)        Q.    So that's what your assignment

(23)    was that day?

(24)        **A.    Yes.**

(25)        Q.    At some point on February 1,

```
(1)               CELENTANO
(2)  2020 did you respond to 17 Webster Crescent
(3)  in the City of Rochester?
(4)       A.    Yes, I did.
(5)       Q.    Do you remember what time?
(6)       A.    I believe it was around 6:40
(7)  p.m.
(8)       Q.    Was it dark outside?
(9)       A.    Yes, it was.
(10)      Q.    Was that within your assigned
(11) area or section I guess within the Goodman
(12) section?
(13)      A.    Yes, it was.
(14)      Q.    Were you directed to go there
(15) over the radio or something else?
(16)           MS. JONES:  Objection.
(17)      A.    Yes, over the radio.
(18)      Q.    What were you doing immediately
(19) before you got that radio call or picked up
(20) the job?
(21)      A.    I don't recall.
(22)      Q.    Do you remember anything that
(23) you were doing on that day prior to going
(24) to 17 Webster Crescent?
(25)      A.    I don't.
```

(1)                    **CELENTANO**

(2)       Q.    What information did you

(3)   receive before arriving at 17 Webster

(4)   Crescent?

(5)       **A.    A neighbor had called and there**

(6)   **was a loose Pitbull.  I'm sorry.  It might**

(7)   **have been a loose dog.  Just a loose dog.**

(8)       Q.    What else do you remember about

(9)   the call?

(10)      **A.    I don't remember anything else**

(11)  **about the call.**

(12)                **MS. JONES:  Objection.**

(13)      Q.    So before you arrived at 17

(14)  Webster Crescent the only thing that you

(15)  knew that was that you were showing up for

(16)  a 911 call from a neighbor about a loose

(17)  dog?

(18)      **A.    Correct.**

(19)      Q.    Had there been any complaints

(20)  that the dog was doing anything or acting

(21)  aggressively?

(22)      **A.    I don't recall.**

(23)      Q.    How often do you respond to

(24)  these kind of calls for loose dogs in the

(25)  City?

```
(1)                    CELENTANO

(2)        A.     It's hard to put a number on

(3)   it, but pretty often.

(4)        Q.     So prior to this incident you

(5)   had responded to other calls for loose

(6)   dogs?

(7)        A.     Many times.

(8)        Q.     Did other officers respond to

(9)   17 Webster Crescent with you?

(10)       A.     Yes.

(11)       Q.     Who is that?

(12)       A.     Officer Ian Fry.

(13)       Q.     Do you remember who arrived

(14)  first?

(15)       A.     We drove there together,

(16)  separate cars, but his car was in front of

(17)  mine, so technically, he got there first.

(18)       Q.     Were you together before you

(19)  got the call to go to this incident?

(20)       A.     I don't recall.

(21)       Q.     Do you recall if you met up on

(22)  the way and drove together?

(23)       MS. JONES:  Objection.

(24)       A.     I don't recall.

(25)       Q.     Who is the primary officer?
```

(1)                    CELENTANO

(2)        **A.     I believe that he was.**

(3)        Q.     What does that mean if someone

(4)   is designated as the primary officer?

(5)        **A.     If he was 215 Charlie which is**

(6)   **what I remember him being that day that**

(7)   **would have been his assigned area and I**

(8)   **would have been the backup officer.**

(9)        Q.     Before you arrived what plan

(10)  did you make for how to safely deal with

(11)  the loose dog?

(12)       **A.     Typically, when we respond to**

(13)  **those we will drive out and just see what**

(14)  **we have.  A lot of times the dog will be**

(15)  **put back in the house.  We won't find the**

(16)  **dog, so you really don't know until you get**

(17)  **there.**

(18)            **MR. SHIELDS:  I'm going to move**

(19)        **to strike the answer as nonresponsive**

(20)        **to my question, so if you can just**

(21)        **listen to my question.**

(22)       Q.     Before you arrived what plan,

(23)  if any, did you make for how to safely deal

(24)  with the loose dog?

(25)            **MS. JONES:  Objection.**

(1)                    **CELENTANO**

(2)        **A.    So we will drive up and we will**

(3)    **look for the dog, see if we can find the**

(4)    **dog, try to get a hold of an owner.  If we**

(5)    **can get a hold of the owner that's best**

(6)    **case scenario, but again, you have to drive**

(7)    **there to see what you have, because you may**

(8)    **not even find the dog.**

(9)              **MR. SHIELDS:  Again, I'm going**

(10)          **to move to strike for your answer**

(11)          **just not being responsive exactly to**

(12)          **my question.**

(13)        Q.    The question is on this day not

(14)    what you normally do or typically do, but

(15)    on this day what plan did you make before

(16)    you arrived for how to safely deal with the

(17)    loose dog?

(18)              **MS. JONES:  Objection.**

(19)        **A.    Just look for the dog and try**

(20)    **to find the owner and get the dog inside.**

(21)        Q.    When you drove up before you

(22)    exited your vehicle did you drive around

(23)    the neighborhood to look for the dog while

(24)    you were still in your car?

(25)              **MS. JONES:  Objection.**

(1)                    **CELENTANO**

(2)        **A.      No, I did not.**

(3)        Q.      Do you know if Officer Fry did

(4)  that?

(5)        **A.      I don't know.**

(6)        Q.      So what is the RPD policy about

(7)  responding to calls for loose dogs?

(8)        **A.      We did call animal control**

(9)  **previously, but animal control had just**

(10) **prior to this incident had changed their**

(11) **hours to only day shift, so you would only**

(12) **call them if you did find the dog and you**

(13) **needed their assistance.**

(14)       Q.      So my question was what is the

(15) RP policy about responding to calls for

(16) loose dogs and then your answer was that

(17) the animal control had changed their hours.

(18) Are you saying that you're supposed to call

(19) animal control, but you only do that if

(20) it's between 9:00 and 5:00?

(21)            **MS. JONES:  Objection.**

(22)       **A.      Correct.  At that point you're**

(23) **to assess the situation before calling**

(24) **them.**

(25)       Q.      So other than calling animal

CELENTANO

(1)
(2) control what is the RP policy about
(3) responding to calls for loose dogs?
(4)      **A.     I guess I'm not really**
(5) **understanding the question.  As far as -- I**
(6) **can answer as far as what we would do**
(7) **safety wise, but other than that I'm not**
(8) **sure.**
(9)      Q.     For example, is there a policy
(10) by the RPD that prior to responding to a
(11) call for a loose dog you have to devise a
(12) plan for how to safely interact with the
(13) dog before you exit your car?
(14)           **MS. JONES:  Objection.**
(15)      **A.     Not that I know of.**
(16)      Q.     Is there some kind of policy
(17) that you have to have specialized equipment
(18) like a catch pole to help you safely
(19) dealing with the dog?
(20)      **A.     No, I never been given any**
(21) **equipment.**
(22)      Q.     Have you ever been trained on
(23) the use of a catch pole?
(24)      **A.     No, I have never been trained**
(25) **on that.**

(1)                    **CELENTANO**

(2)        Q.    Do you have any other

(3)    specialized tools in your car for dealing

(4)    with dogs when responding to a scene for a

(5)    call for a loose dog?

(6)              **MS. JONES:  Objection.**

(7)        **A.    I do not.**

(8)        Q.    For example, other officers

(9)    have testified that one thing they been

(10)   trained on is using some sort of barrier to

(11)   put in between themselves and a dog in a

(12)   situation where they're responding to a

(13)   call involving a dog.  Do you carry any

(14)   kind of shield or anything that you're

(15)   trained to use to place between yourself

(16)   and the dog?

(17)       **A.    No.**

(18)       Q.    On the night of the incident

(19)   you previously testified that the policy

(20)   regarding calling animal control had

(21)   changed, so does that mean that on the

(22)   night of the incident because it was after

(23)   5:00 p.m. you didn't call animal control

(24)   before you arrived at the scene?

(25)             **MS. JONES:  Objection.**

(1)                    **CELENTANO**

(2)        **A.    That's correct.  I did not.**

(3)        Q.    Now, after that policy changed

(4)    did the RPD provide any kind of additional

(5)    or specialized training about dealing with

(6)    dogs when you're unable to call animal

(7)    control to respond to the scene?

(8)        **A.    I don't recall.**

(9)        Q.    Do you remember when that

(10)   policy changed?

(11)       **A.    I don't have an exact date.  I**

(12)   **know it was pretty soon right before.  It**

(13)   **was right before the incident it had just**

(14)   **changed.**

(15)       Q.    So this incident was in

(16)   February of 2020, so maybe it was some time

(17)   in 2019?

(18)       **MS. JONES:  Objection.**

(19)       **A.    That's possible.  I just don't**

(20)   **know the date.**

(21)       Q.    Had there been instances prior

(22)   to this one where you had called animal

(23)   control prior to responding to a call for a

(24)   loose dog?

(25)       **A.    I don't remember.**

(1)                    **CELENTANO**

(2)        Q.     So it's possible that you don't

(3)    remember?

(4)              **MS. JONES:  Objection.**

(5)        **A.     Yes.**

(6)        Q.     But that is what the policy was

(7)    previously, right?

(8)        **A.     Not necessarily.  Every call is**

(9)    **different.  Like I said typically, we would**

(10)   **wait to call them unless we really needed**

(11)   **them.  There is not very many of them and**

(12)   **like I said a lot of times you will go and**

(13)   **the dog will already be put back in the**

(14)   **house or you wouldn't locate the dog at**

(15)   **all, so we wouldn't call them.**

(16)       Q.     So if this incident had

(17)   occurred between the hours of 9:00 and 5:00

(18)   would you have called animal control before

(19)   going to the scene?

(20)       **A.     Probably not.**

(21)       Q.     Animal control has catch poles,

(22)   correct?

(23)       **A.     I believe so.**

(24)       Q.     Had you ever responded to a

(25)   scene where animal control showed up in

```
(1)                    CELENTANO

(2)    response to the presence of a loose or

(3)    aggressive dog?

(4)         A.    Yes.

(5)         Q.    Had you ever seen them use a

(6)    catch pole?

(7)         A.    Yes.

(8)         Q.    And they're able to control the

(9)    dog using a catch pole?

(10)        A.    Yes.

(11)        Q.    Did the RPD ever train you in

(12)   the use of any other techniques for

(13)   controlling a loose or aggressive dog?

(14)        A.    Not that I recall.

(15)        Q.    Did the RP ever train you in

(16)   the use of nonlethal tools to use when

(17)   encountering a loose or aggressive dog?

(18)        A.    Not that I recall.

(19)        Q.    What is the first thing that

(20)   you did when you arrived at 17 Webster

(21)   Crescent?

(22)        A.    I actually saw the dog cross

(23)   the street past my partner's car, so I got

(24)   out and I went to knock on the door to see

(25)   if I can get the owner out.
```

(1)                          **CELENTANO**

(2)        Q.     When you say you saw the dog

(3)   cross the street towards your partner's

(4)   car, so let me just -- so you parked on the

(5)   street, right, and you exited the door?

(6)   You exited your car, is that the first

(7)   thing that you did?

(8)              **MS. JONES:  Objection.**

(9)              **MR. SHIELDS:  I'm sorry.  Let**

(10)        **me withdraw that.**

(11)        Q.     Did you see the dog before you

(12)   exited your car or did you see the dog

(13)   after you exited your car?

(14)        **A.     I saw the dog before I exited**

(15)   **my car.**

(16)        Q.     Was the dog at that point on

(17)   the same side of the street opposite from

(18)   Ms. Barnes' house or on the same side of

(19)   the street that the cars were parked?

(20)              **MS. JONES:  Objection.**

(21)        **A.     On the same side of her house**

(22)   **coming across the street, so it came from**

(23)   **her yard.**

(24)        Q.     At that point you exited your

(25)   car and walked up to the front door of the

(1)                    CELENTANO

(2)    house?

(3)         **A.      Correct.**

(4)         Q.     What did the dog do when you

(5)    walked up to the front door of the house?

(6)         **A.     That is when the dog approached**

(7)    **my partner.**

(8)         Q.     When the dog approached your

(9)    partner at first it was wagging it's tail?

(10)        **A.     I didn't see it wagging it's**

(11)   **tail, but he put his hand out to see if the**

(12)   **dog was friendly.**

(13)        Q.     Do you know if he said anything

(14)   to the dog when he put his hand out to see

(15)   if it was friendly?

(16)        **A.     I don't recall.**

(17)        Q.     What happened next?

(18)        **A.     I was banging on the door and I**

(19)   **saw the dog charge my partner and he had to**

(20)   **slide up onto the top of his police car to**

(21)   **get away from it.**

(22)        Q.     When you say the dog charged

(23)   him what do you mean?

(24)        **A.     You can hear the dog growl,**

(25)   **ears go back, and it jumped right up and**

(1)                    **CELENTANO**

(2)    **that's when he slid on top of his car.**

(3)         Q.    So you saw the ears go back

(4)    from where you were standing?

(5)         **A.    Yes.**

(6)         Q.    The dog was already physically

(7)    at your partner, right, because he had his

(8)    hand out and he was sniffing him?

(9)              **MS. JONES:  Objection.**

(10)        **A.    Yes.**

(11)        Q.    When you say charged you mean

(12)   the dog just kind of jumped up?

(13)             **MS. JONES:  Objection.**

(14)        **A.    Yes, it looked like it tried to**

(15)   **jump right on him.**

(16)        Q.    When you say charged normally

(17)   that makes me think that the dog is some

(18)   distance away and it runs at you.  That's

(19)   not what happened here, right?

(20)             **MS. JONES:  Objection.**

(21)        **A.    He charged in the direction**

(22)   **upwards like he was jumping at him trying**

(23)   **to get at him and attack him.**

(24)        Q.    He jumped, right?

(25)             **MS. JONES:  Objection.**

(1)                       **CELENTANO**

(2)        **A.      Yes.**

(3)        Q.     Now, Officer Fry didn't get

(4)   bitten, correct?

(5)              MS. JONES:  Objection.

(6)        **A.      Correct.  He was able to jump**

(7)   **on top of his police car to get away.**

(8)        Q.     After the dog made physical

(9)   contact with him?

(10)       **A.      After it lunged at him, yes.**

(11)       Q.     So the dog jumped up on Officer

(12)  Fry?  Officer Fry was uninjured, but he

(13)  jumped on top of his car, right?

(14)             MS. JONES:  Objection.

(15)       **A.      He was unable.  The dog didn't**

(16)  **get to him.  He was able to jump on his car**

(17)  **fast enough.**

(18)       Q.     The dog jumped on Officer Fry

(19)  and then Officer Fry jumped on the hood of

(20)  his car, right?

(21)             MS. JONES:  Objection.

(22)       **A.      No, the dog lunged at him and**

(23)  **he slid up on top of his car so.**

(24)       Q.     You're saying the dog didn't

(25)  jump up and make physical contact with

(1)              CELENTANO

(2)  Officer Fry before he got onto his car?

(3)        **A.    It tried to, but he was able to**

(4)  **jump on the car fast enough.**

(5)        Q.    So as far as you know, was

(6)  there any physical contact between the dog

(7)  and Officer Fry?

(8)        **A.    I don't believe so.**

(9)        Q.    When the dog jumped up at

(10)  Officer Fry you ran down off the porch

(11)  towards the dog?

(12)            **MS. JONES:  Objection.**

(13)        **A.    I did.**

(14)        Q.    Why did you do that?

(15)        **A.    My first instinct was to help**

(16)  **my partner.**

(17)        Q.    What happened next?

(18)        **A.    The dog charged and came**

(19)  **towards me.**

(20)        Q.    So the dog ran over to the

(21)  steps of the porch, right?

(22)        **A.    Correct.**

(23)        Q.    And you ran up and you started

(24)  knocking on the door, again, right?

(25)        **A.    Correct.**

(1)                    **CELENTANO**

(2)       Q.     And the dog stopped and was

(3)   wagging it's tail on the stairs?

(4)            **MS. JONES:  Objection.**

(5)       **A.     No, the dog was growling at me**

(6)   **with it's ears back.**

(7)       Q.     Before the dog growled at you

(8)   with it's ears back there was a period of

(9)   time when it was just standing on the porch

(10)  and wasn't growling and wasn't barking,

(11)  correct?

(12)           **MS. JONES:  Objection.**

(13)      **A.     Not that I recall.  I was**

(14)  **banging on the door trying to get the**

(15)  **owner.**

(16)      Q.     When the dog jumped up at

(17)  Officer Fry you pulled out your gun; is

(18)  that right?

(19)      **A.     Correct.**

(20)      Q.     Did you pull out your pepper

(21)  spray?

(22)      **A.     I did not.**

(23)      Q.     You had pepper spray on your

(24)  person at the time?

(25)      **A.     Yes, I did.**

(1)                          **CELENTANO**

(2)        Q.    And you had a taser on your

(3)   person at the time?

(4)        **A.    Yes, I did.**

(5)        Q.    And you had a baton on your

(6)   person at the time?

(7)        **A.    Yes, I did.**

(8)        Q.    But earlier you testified that

(9)   you were never taught by the RPD that any

(10)   of those nonlethal options might be

(11)   effective against a dog?

(12)        **A.    Correct.**

(13)        Q.    Do you think that that's part

(14)   of the reason that you pulled out your gun

(15)   and instead of your pepper spray, your

(16)   taser, and your baton?

(17)            **MS. JONES:  Objection.**

(18)        **A.    That's the way that I have been**

(19)   **trained.  Things happen very fast and**

(20)   **instinct go right back to your training and**

(21)   **I went right for my gun.**

(22)        Q.    So your training was in a

(23)   situation involving a dog that you perceive

(24)   to be aggressive to use your firearm?

(25)        **A.    Correct.**

(1)                    **CELENTANO**

(2)        Q.    All right, so when the dog came

(3)    up onto the porch in your memory it was

(4)    barking and growling the whole time?

(5)        **A.    Yes.**

(6)        Q.    Now, did you ever think to

(7)    possibly pull out your pepper spray instead

(8)    of your gun or you just went for your gun,

(9)    because that's what you were trained to do?

(10)        **MS. JONES:  Objection.**

(11)        **A.    I went right for my gun.**

(12)    **That's what I was trained to do.**

(13)        Q.    Have you ever heard of an

(14)    officer using pepper spray to repel a dog

(15)    that they perceive to be aggressive?

(16)        **A.    No, I have not.**

(17)        Q.    Have you ever heard that pepper

(18)    spray can work against dogs to prevent them

(19)    from attacking?

(20)        **A.    No, I have not.**

(21)        Q.    Did you try to use any verbal

(22)    deescalation techniques with the dog when

(23)    it approached you on the porch?

(24)        **A.    Yes, I did.**

(25)        Q.    Can you describe those for me?

(1)                    **CELENTANO**

(2)    **door, but the way my body cam is facing in**

(3)    **the video I can see the dog was wagging**

(4)    **it's tail right there.**

(5)         Q.    Where we're paused right now at

(6)    44 seconds into the video is this the point

(7)    where you said that Officer Fry held out

(8)    it's hand for the dog to see if it was

(9)    friendly?

(10)        **A.    I believe it's just around**

(11)   **there or just after that.  Yes.**

(12)        Q.    All right, so I'm going to hit

(13)   play, again, here at 44 seconds into the

(14)   video and then again, I will pause and ask

(15)   you some more questions.

(16)        **A.    Okay.**

(17)        Q.    So we just paused it at 58

(18)   seconds into the video.  Can you tell us

(19)   what happened between 44 seconds and 58

(20)   seconds into the video?

(21)        **A.    Yes, that's where I saw him try**

(22)   **to charge Officer Fry and that's when I**

(23)   **stepped down off the porch.**

(24)        Q.    And then what happened next?

(25)        **A.    And then I blinked my eye and**

(1)                          **CELENTANO**

(2)    **he was at my feet.  I mean it was a matter**

(3)    **of seconds that that dog crossed the**

(4)    **street.**

(5)         Q.    So the dog crossed the street

(6)    and approached the stairs, right?

(7)         **A.    Correct.**

(8)         Q.    And then how many seconds was

(9)    it on the stairs before it growled and

(10)   barked?

(11)        **A.    That I don't know.**

(12)        Q.    I will just rewind it for a few

(13)   seconds and we can go over that part

(14)   together.  I rewound it to let's see.

(15)   We're back to say 47 seconds into the video

(16)   and I'm going to try to pause it when the

(17)   dog gets to the stairs, okay.  We paused it

(18)   at 49 seconds.  The dog is running across

(19)   out of the street into the beginning of the

(20)   yard before the sidewalk; is that right?

(21)             **MS. JONES:  Objection.  Just**

(22)        **for the record we can't see the**

(23)        **timestamp of the video on our screen.**

(24)        **I don't see it on mine, so all of**

(25)        **this 47 seconds and 49 seconds and 51**

(1)                    **CELENTANO**

(2)        **seconds we're just I guess her**

(3)        **testimony is based on your**

(4)        **statements, because we can't see any**

(5)        **independent timestamp.  We only see**

(6)        **the timestamp in the lower right-hand**

(7)        **corner with the 2020 February 2,**

(8)        **18:51:08.**

(9)                **MR. SHIELDS:  Okay.**

(10)       Q.    At this point in the video at

(11)  18 hours 51 seconds and 8 seconds into the

(12)  video you see the dog just exiting the

(13)  street onto the snowy portion of the front

(14)  yard on the other side of the sidewalk?

(15)       **A.    Yes.**

(16)       Q.    I'm going to hit play and then

(17)  pause it again another few seconds.  All

(18)  right, so I paused it at 18:51 and 10

(19)  seconds.  At this point you see the dog on

(20)  the bottom of the stairs?

(21)       **A.    Correct.**

(22)       Q.    You yelled at the dog to get

(23)  back, get back and it looks like you're

(24)  pointing your gun at the dog at that point?

(25)       **A.    Yes.**

(1)                    **CELENTANO**

(2)         Q.    All right, so I'm going to hit

(3)    play and we will try to count how many

(4)    seconds it is before you shoot, okay.  So

(5)    we're at 18:51:10.  I'm just going to hit

(6)    play.  So I paused it at 18:51:15 and the

(7)    dog had just growled and barked for the

(8)    first time, right?

(9)              **MS. JONES:  Objection.**

(10)       **A.    No, that's not correct.  It was**

(11)   **growling.  I could hear it growling at my**

(12)   **partner.**

(13)        Q.    But after it approached and

(14)   stopped on the stairs it was paused on the

(15)   stairs for about five seconds before it

(16)   growled and barked?

(17)             **MS. JONES:  Objection.**

(18)       **A.    No, it was growling before**

(19)   **that.  You can hear it in it's voice.  It**

(20)   **just hadn't barked yet.**

(21)        Q.    Between 18:51:10 and 18:51:15

(22)   you're saying the dog was growling and

(23)   barking?

(24)       **A.    A low growl in it's voice.**

(25)   **Yes, you can hear it.**

(1)                    **CELENTANO**

(2)         Q.    Okay.   I missed that, so maybe

(3)    we can just rewind that, again.   Okay, so I

(4)    rewound it back to 18:51:10 and I'm just

(5)    going to play that section, again.   Okay,

(6)    so before 18:51:15 you're saying the dog

(7)    was growling?

(8)         **A.    Yes, you can hear it in it's**

(9)    **throat.   You can hear it growling.**

(10)        Q.    Now, can you describe for me

(11)   the growling sound that you're talking

(12)   about, because maybe it's just a difference

(13)   of how we imagine a dog growling?

(14)             **MS. JONES:   Objection.**

(15)        **A.    It sounds just like the**

(16)   **growling at the 15 seconds.   It was just**

(17)   **lower and raspier.**

(18)        Q.    Because what I thought I heard

(19)   was like kind of a high pitch whistling

(20)   kind of sound, that's not what you're

(21)   describing?

(22)             **MS. JONES:   Objection.**

(23)        **A.    No, I didn't hear that.**

(24)        Q.    So you're describing like a low

(25)   guttural like roaring sound?

(1)                    CELENTANO

(2)        **A.    Yes.**

(3)        Q.    So at that point you were

(4)    fearful that the dog was going to attack

(5)    you?

(6)            **MS. JONES:   Objection.**

(7)        **A.    Yes.**

(8)        Q.    During that five seconds you

(9)    never considered any other use of any

(10)   nonlethal option like pepper spray?

(11)       **A.    No, I didn't.**

(12)       Q.    I just want to play the video

(13)   through to the end and then I will ask you

(14)   some other questions, okay.  So I'm hitting

(15)   play again at 57 seconds into the 2 minute

(16)   and 40 second video or 18 hours 51 minutes

(17)   and 15 seconds on the timestamp.  I'm just

(18)   going to pause here at 18 hours 51 minutes

(19)   42 seconds into the video.  It looks like

(20)   you're kind of elevated here.  Can you tell

(21)   us what you're doing at this point?

(22)       **A.    I opened up my car door and I**

(23)   **stood on the ledge just so I can see all**

(24)   **around.**

(25)       Q.    Got it.  I'm going to hit play

(1)                    CELENTANO

(2)    again at 18 hours 51 minutes and 42

(3)    seconds.  So I'm going to hit pause here at

(4)    18 hours 51 minutes and 54 seconds.  Did

(5)    you hear what you just said in the video?

(6)    **A.    Yes, I did.**

(7)    Q.    What did you say?

(8)    **A.    I said I'm about to tase him.**

(9)    Q.    So you considered using your

(10)   taser on the dog at that point?

(11)   **A.    I actually don't remember even**

(12)   **saying that.  I think I was shook up from**

(13)   **the incident and I was thinking in my head**

(14)   **I haven't hit the dog, so what else can I**

(15)   **do.  What else is going to work on the dog.**

(16)   **I don't even remember that happening, but**

(17)   **obviously, I said it so.**

(18)   Q.    Using your taser on the dog

(19)   before when you were on the porch wasn't

(20)   something that had crossed your mind,

(21)   though?

(22)            **MS. JONES:  Objection.**

(23)   **A.    No, it did not.**

(24)   Q.    Is using a taser on a dog

(25)   something that you were ever trained by the

(1)                    CELENTANO

(2)   RPD?

(3)        **A.      Not that I can recall.**

(4)        Q.      I'm going to hit play again at

(5)   18 hours 51 minutes and 54 seconds into the

(6)   video.  So the video ended it looks like

(7)   the timestamp is 18 hours 53 seconds or 18

(8)   hours 53 minutes and 00 seconds and on this

(9)   last screen here it looks like you got your

(10)  cell phone out; is that right?

(11)       **MS. JONES:  Objection.**

(12)       **A.      Yes, that's correct.**

(13)       Q.      Do you remember who you either

(14)  called or text after you took your phone

(15)  out?

(16)       **A.      I believe I tried calling my**

(17)  **boss to just give him a heads up.  I didn't**

(18)  **know that the dog had been struck yet, but**

(19)  **I know that I discharged my firearm and we**

(20)  **typically will call our supervisor and let**

(21)  **them know.**

(22)       Q.      Is that your personal cell

(23)  phone or an RPD issued cell phone?

(24)       **A.      That's our personal cell phone.**

(25)  **We only have personal cell phones.**

(1)                        **CELENTANO**

(2)        Q.     So that's an I-phone or

(3)   something else?

(4)        **A.     That's an I-phone.**

(5)        Q.     Now, is it policy to use your

(6)   personal cell phone to call your boss after

(7)   an incident like this?

(8)             **MS. JONES:  Objection.**

(9)        **A.     I'm not sure if that's written**

(10)  **policy, but we always have been told you**

(11)  **contact your supervisor letting them know**

(12)  **what's going on.**

(13)       Q.     And they will tell you either

(14)  use your personal cell phone to do that or

(15)  make a call over the radio?

(16)            **MS. JONES:  Objection.**

(17)       **A.     I don't recall what the actual**

(18)  **rule is, but we always just give our boss a**

(19)  **heads up.**

(20)       Q.     When you give your boss the

(21)  heads up you do that on your personal cell

(22)  phone?

(23)            **MS. JONES:  Objection.**

(24)       **A.     Not always, but sometimes, yes,**

(25)  **we do.**

(1)                    **CELENTANO**

(2)        Q.    No one has ever told you hey,

(3)    you got to use your RPD issued radio for

(4)    this, you can't use your personal cell

(5)    phone?

(6)              **MS. JONES:  Objection.**

(7)        **A.    No.**

(8)        Q.    Do you ever in addition to

(9)    making telephone calls send text messages

(10)   to other officers about incident related

(11)   issues?

(12)             **MS. JONES:  Objection.**

(13)       **A.    I'm sorry.  Do you mean right**

(14)   **when it occurs or do you mean do we ever**

(15)   **talk about things after?**

(16)       Q.    Sure.  Like both.

(17)       **A.    There have been many times when**

(18)   **we talked about incidents over text**

(19)   **messages.  I mean yes.  Yes.**

(20)       Q.    On the night of this incident

(21)   do you remember if you notified your boss

(22)   or let me back up?  Your boss this night

(23)   would have been Sergeant Osipovitch?

(24)       **A.    Yes.**

(25)       Q.    Do you remember if you

(1)                  CELENTANO

(2)    contacted Sergeant Osipovitch by making a

(3)    telephone call versus sending a text

(4)    message?

(5)         A.    **I believe I called him.**

(6)         Q.    The RPD also gives all of it's

(7)    officers E-mail accounts; is that right?

(8)         **MS. JONES:   Objection.**

(9)         A.    **Yes, that's correct.**

(10)        Q.    Do you get your RPD E-mail on

(11)   I-phone?

(12)        A.    **I do.   I don't know if I did at**

(13)   **that point.**

(14)        Q.    Since you were able to link

(15)   your RPD E-mail on your I-phone you use

(16)   your I-phone to send RPD related E-mails?

(17)        A.    **Yes.   I don't know if I did at**

(18)   **that point.   I do now.**

(19)        Q.    Let me take this video down.

(20)   Following this incident you were never

(21)   disciplined in any way, right?

(22)        A.    **Following this incident after**

(23)   **this incident.   Not for this incident, no.**

(24)        Q.    That's what I mean.   Following

(25)   this incident because of this incident you

(1)                    CELENTANO

(2)     were never disciplined in any way, correct?

(3)          **A.     No.  Actually, I was told by**

(4)     **the firearms unit that they wanted to use**

(5)     **this video for training, because it was so**

(6)     **textbook and well done.**

(7)          Q.     Other than being notified by

(8)     firearms about this incident, have you ever

(9)     previously in any of your training seen any

(10)    RPD body camera used by any training unit

(11)    within the RPD?

(12)         **A.     In relation to a dog or just in**

(13)    **general?**

(14)         Q.     In general.

(15)         **A.     Yes.**

(16)         Q.     What kind of incident were

(17)    those?

(18)         **A.     I can't recall a specific**

(19)    **incident.**

(20)         Q.     Basically, what you're saying

(21)    is sometimes including in this incident the

(22)    training unit within the RPD will review a

(23)    body camera and then say we're going to

(24)    show this to the entire department as what

(25)    to do, how to handle a situation properly?

```
(1)                    CELENTANO
(2)        A.     Yes, sometimes they do that.
(3)        Q.     Do they ever use body cameras
(4)    in any other ways, for example, to say this
(5)    is how an officer made a mistake in how not
(6)    to handle a situation?
(7)        A.     Yes, absolutely.
(8)        Q.     So you have seen basically body
(9)    worn cameras in trainings by the RPD of RPD
(10)   officers who did something improper?
(11)        MS. JONES:  Objection.
(12)        A.     I wouldn't say specifically
(13)   RPD.  I would say body cam footage in
(14)   general of police officers.
(15)        Q.     My question is specific to RPD
(16)   incidents like this one.  Here you said it
(17)   was reviewed by firearms, you did a great
(18)   job, we want to use this in our trainings,
(19)   right?
(20)        MS. JONES:  Objection.
(21)        A.     Correct.
(22)        Q.     So the question is have you
(23)   also seen RPD body worn cameras used in
(24)   training by the RPD of incidents where they
(25)   said this officer made a mistake, he should
```

CELENTANO

(1)
(2) have handled it differently in some sort of
(3) way in the context of a training?
(4)         **MS. JONES:  Objection.**
(5)     **A.     Yes.**
(6)     Q.    Do you remember any specific
(7) incidents where that occurred?
(8)     **A.     Yes, I do.**
(9)     Q.    Can you tell me about that?
(10)     **A.     I remember off the top of my**
(11) **head there was one that was domestic**
(12) **related and how the officer handled it and**
(13) **I don't remember what year that was.  I**
(14) **just remember that we used it as a training**
(15) **of kind of what not to do.**
(16)     Q.    So that was one example.  Do
(17) you remember any other specific examples?
(18)     **A.     I don't.**
(19)     Q.    Do you remember any examples
(20) good or bad other than this incident that
(21) involved interactions with a dog?
(22)         **MS. JONES:  Objection.**
(23)     **A.     I don't.**
(24)     Q.    So as far as you know, this is
(25) the only RPD body worn camera incident