UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHARLES DEMPSEY, *individually*,
and L.D., *by her father and*
*natural guardian, CHARLES DEMPSEY*,

                    Plaintiffs,

          v.

THE CITY OF ROCHESTER*, a municipal*
*entity*, JAVIER ALGARIN, ADAM
GORMAN, and "JOHN DOE" RPD
OFFICER RESPONSIBLE FOR
TRAINING JAVIER ALGARIN,

                    Defendants.
_____

**DECISION AND ORDER**

6:19-CV-06780 EAW

## **INTRODUCTION**

On October 19, 2018, defendant Rochester Police Department ("RPD") Officer Javier Algarin ("Algarin") shot and killed plaintiff Charles Dempsey's ("Dempsey") black labrador retriever, Tesla, in the backyard of the home Dempsey shared with his minor child, plaintiff L.D. (collectively with Dempsey, "Plaintiffs"). Plaintiffs bring the instant lawsuit pursuant to 42 U.S.C. § 1983 and New York state law, alleging defendants the City of Rochester (the "City"), Algarin, RPD Officer Adam Gorman ("Gorman"), and John Doe, an RPD officer responsible for training Algarin[1] (collectively "Defendants"), are liable for damages arising from the entry into Plaintiffs' yard and the death of Tesla. Presently before

---

[1]     The parties have not addressed the continued presence of a John Doe defendant in this case in their motion papers. The issue will need to be addressed before the matter proceeds to trial.

the Court are Defendants' motion for summary judgment on all of Plaintiffs' claims (Dkt. 95) and Plaintiffs' motion for partial summary judgment (Dkt. 96). For the reasons that follow, Defendants' motion is granted in part and denied in part and Plaintiffs' motion is denied.

## FACTUAL BACKGROUND

Before recounting the factual background of this matter, the Court addresses a procedural matter. This District's Local Rules of Civil Procedure require a party moving for summary judgment to submit, " a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Loc. R. Civ. P. 56(a)(1). The opposing party must then submit "a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs[.]" *Id.* at 56(a)(2). "Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." *Id.*

In this case, with respect to numerous paragraphs of Plaintiffs' statement of undisputed facts submitted in connection with their motion for partial summary judgment, Defendants failed to comply with Local Rule 56. Instead of substantively responding to Plaintiffs' assertions, Defendants simply assert that the paragraphs at issue are "immaterial to the issues in this motion for summary judgment." (*See*, *e.g.*, Dkt. 97-4 at ¶¶ 4-9, 13, 18, 28, 54, 56-57, 69, 75). It is, of course, the Court's function to determine what facts are and are not material in deciding a motion for summary judgment. Moreover, unilaterally

declaring an asserted fact immaterial is not "specifically controvert[ing]" that fact. Accordingly, to the extent they are supported by the record, the Court deems the factual assertions contained in the paragraphs to which Defendants have offered an "immaterial" response admitted for purposes of the instant motion. *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005).

On October 19, 2018, Plaintiffs resided at 53 Kosciusko Street in Rochester, New York, along with Tesla, their black labrador retriever. (Dkt. 95-29 at ¶ 1; Dkt. 96-1 at ¶ 1; Dkt. 97-4 at ¶ 1; Dkt. 98-1 at ¶ 1). The RPD received a 911 call about open-air drug sales occurring at 61 Kosciusko Street. (Dkt. 95-29 at ¶ 2; Dkt. 98-1 at ¶ 2). Algarin, Gorman, and RPD Officers Ryan Disabatino ("Disabatino") and Jason Horowitz ("Horowitz") responded to the report. (Dkt. 96-1 at ¶ 3; Dkt. 97-4 at ¶ 3).

Horowitz, Gorman, Algarin, and Disabatino devised a plan to intercept the suspects. (Dkt. 96-1 at ¶ 4; *see* Dkt. 97-4 at ¶ 4). Based on prior observations, they anticipated that the suspects would attempt to flee south through the backyards of Kosciusko Street properties. (Dkt. 96-1 at ¶¶ 4-5; *see* Dkt. 97-4 at ¶¶ 4-5). Algarin and Disabatino were assigned to drive up Kosciusko Street, causing a police presence that would prompt the suspects to flee south towards Sobieski Street, where Horowitz and Gorman were waiting to intercept them. (Dkt. 96-1 at ¶ 6; *see* Dkt. 97-4 at ¶ 6).

As Algarin and Disabatino arrived at 61 Kosciusko Street, at least two suspects fled south down the driveway and through the backyard of 57 Kosciusko Street, heading towards Sobieski Street. (Dkt. 96-1 at ¶¶ 9-10; *see* Dkt. 97-4 at ¶¶ 9-10). Gorman detained one suspect in the backyard of 49 Kosciusko Street, while Horowitz detained another

suspect in a vacant lot located at 54 Sobieski Street. (Dkt. 96-1 at ¶¶ 11, 16; Dkt. 97-4 at ¶¶ 11, 16). Both 49 Kosciusko Street and 54 Sobieski Street are separated from 53 Kosciusko Street by a chain-link fence. (Dkt. 96-1 at ¶¶ 18, 21; Dkt. 97-4 at ¶¶ 18, 24).

Algarin entered Plaintiffs' backyard by jumping a tall wooden fence from 57 Kosciusko Street. (Dkt. 96-1 at ¶¶ 22-23; Dkt. 97-4 at ¶¶ 22-23). From Plaintiffs' backyard, Algarin could see over the chain link fence into both 49 Kosciusko Street and 54 Sobieski Street. (*See* Dkt. 95-16 at 17:07:21-17:07:33).[2] He began walking around and searching Plaintiffs' yard. (*Id.* at 17:07:33-17:08:05). He leaned on the chain-link fence between Plaintiffs' backyard and 54 Sobieski Street, and said, "where'd he say he threw the gun?" (*Id.* at 17:08:05-17:08:07). He then said, "bro, save me time, I don't want to call a dog." (*Id.* at 17:08:11-17:08:14). He asked, "where is it?" and continued discussing the possible presence of a gun. (*Id.* at 17:08:15-17:08:21). He then walked over to the chain-link fence between Plaintiffs' backyard and 49 Kosciusko Street, while saying, "so why we running?" (*Id.* at 17:08:22-17:08:30). He jumped the chain-link fence into the property at 49 Kosciusko Street and approached Gorman and the suspect whom Gorman had detained. (*Id.* at 17:08:31-17:08:35). He had an exchange with Gorman and the suspect about why the suspect had fled, and helped Gorman search the suspect. (*Id.* at 17:08:36-17:08:49). Gorman then said to Algarin, "you wanna backtrack," to which Algarin replied, "where'd you see him jump?" (*Id.* at 17:08:50-17:08:54).

---

[2]    The Court's recitation of Algarin's actions during this critical period come from its own review of footage from his body-worn camera. Both sides have submitted copies of the footage from Algarin's body-worn camera. For ease of reference, the Court has referred to the copy submitted by Defendants, which appears first on the docket.

Algarin walked along the chain-link fence, then stepped on a children's picnic table and jumped the fence back into Plaintiffs' backyard. (*Id.* at 17:08:54-17:09:30). A few seconds after Algarin re-entered Plaintiffs' backyard, Plaintiffs' backdoor opened and Tesla exited onto the back porch. (*Id.* at 17:09:30-17:09:33). Tesla began to run towards Algarin, who yelled "whoa, whoa, whoa," and stepped backwards. (*Id.* at 17:09:34). Tesla continued to run towards Algarin, who pulled out his firearm and shot her twice. (*Id.* at 17:09:34-17:09:36). After Algarin shot Tesla, Gorman jumped the fence into Plaintiffs' backyard. (Dkt. 96-1 at ¶ 58; Dkt. 97-4 at ¶ 58).

Dempsey, who was on the back porch of his home, began to scream. (Dkt. 95-16 at 17:09:36-17:09:37). He began to run towards his pet, who was crying in pain, and Algarin screamed "get down, get down," and pointed his gun at Dempsey. (*Id.* at 17:09:38-17:09:41). Dempsey walked towards Algarin, yelling, and Algarin repeatedly yelled, "get back," and pulled out his pepper spray and pointed it at Dempsey. (*Id.* at 17:09:42-17:09:54). Dempsey continued to yell, asking Algarin why he had shot the dog and what was wrong with him. (*Id.* at 17:09:54-17:09:57). Dempsey then yelled at Algarin to get out of his yard and to leave his property, while Algarin continued to yell "get back" and point his pepper spray at Dempsey. (*Id.* at 17:09:57-17:10:06). Algarin and another officer then instructed Dempsey to "grab [his] dog." (*Id.* at 17:10:07-17:10:14).

L.D. ran to the back door of the house after hearing her father yell, and saw her father and Algarin through the window of the back door, including seeing Algarin point a gun at her father. (Dkt. 96-1 at ¶ 53; Dkt. 97-4 at ¶ 53). L.D. also saw Tesla walk up onto the porch after having been shot, but did not let the dog into the house because of her

emotional state.  (Dkt. 96-1 at ¶ 56; Dkt. 97-4 at ¶ 56).  L.D. remained at the doorway for a short time, processing what she had seen, and was visibly shaken and distressed by the events.  (Dkt. 96-1 at ¶¶ 56-57; Dkt. 97-4 at ¶¶ 56-57).

Dempsey was eventually permitted to take Tesla to a veterinary hospital, but despite the efforts made to save her, she died from the gunshot wounds inflicted by Algarin.  (Dkt. 96-1 at ¶ 75; Dkt. 97-4 at ¶ 75).

## PROCEDURAL BACKGROUND

The operative pleading in this matter is the second amended complaint (Dkt. 31), which was filed on consent after the Court issued a Decision and Order resolving prior competing motions to dismiss and for summary judgment filed by the parties (Dkt. 30).  Discovery closed on May 29, 2024.  (Dkt. 89).  The claims asserted in the second amended complaint are: (1) "municipal liability" against the City pursuant to *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978); (2) unreasonable search of Plaintiffs' curtilage against Algarin and Gorman under § 1983; (3) unlawful seizure of Tesla against Algarin and Gorman under § 1983; (4) unlawful seizure of Dempsey and L.D. against Algarin under § 1983; (5) failure to intervene against Gorman under § 1983; (6) assault against Algarin under New York state law; and (7) trespass against Algarin and Gorman under New York state law.  (Dkt. 31 at ¶¶ 97-218).

The parties filed the instant motions on August 9, 2024. (Dkt. 95; Dkt 96). They thereafter filed responses to the opposing parties' motions (Dkt. 97; Dkt. 98), and replies in further support of their own motions (Dkt. 99; Dkt. 100).[3]

## DISCUSSION

## I. Legal Standard

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may

---

[3]    Defendants argue that Plaintiffs' opposition papers, which were filed on September 9, 2024, were untimely. (Dkt. 99 at n.1). Defendants are wrong. On May 22, 2024, Magistrate Judge Marian W. Payson, to whom the case had been referred for non-dispositive matters, entered an Order providing that dispositive motions were due by no later than August 9, 2024, and that opposition papers were to be filed within 30 days of the filing of any motions. (Dkt. 91). Plaintiffs' motion for summary judgment was filed on August 9, 2024. (Dkt. 95). Thirty days from that date was September 8, 2024, which was a Sunday. Pursuant to Federal Rule of Civil Procedure 6(a)(1)(C), where a time period stated in days ends on "a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday." Plaintiffs had until the end of the day on September 9, 2024, to file their opposition papers. They met that deadline.

meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.    The Parties' Motions for Summary Judgment

Defendants move for summary judgment on all of Plaintiffs' claims. (Dkt. 95). Defendants make the following arguments in support of their motion: (1) Plaintiffs have failed to plead adequate facts to support a claim for unlawful search; (2) the search of Plaintiffs' backyard was permitted by the "hot pursuit" and "imminent destruction of evidence" exceptions to the warrant requirement and was reasonable under the circumstances; (3) Algarin's shooting and killing of Tesla was a reasonable seizure under the Fourth Amendment; (4) Gorman had no role in the seizure of Tesla; (5) Algarin did not

seize either of Plaintiffs; (6) Gorman had no opportunity to intervene prior to any constitutional violation; (7) Algarin is entitled to qualified immunity for the seizure of Tesla and for the search of Plaintiffs' backyard; (8) Algarin cannot be liable for trespass because law enforcement officers are permitted to engage in otherwise trespassory acts; (9) Algarin did not assault Dempsey; and (10) Plaintiffs cannot establish any theory of municipal liability for the purported constitutional claims. (Dkt. 95-1).

Plaintiffs move for partial summary judgment. (Dkt. 96). They seek summary judgment on their second and eighth claims, for unlawful search and trespass. (Dkt. 96-2). They further seek summary judgment on their first claim for municipal liability under *Monell*. (*Id.*). But municipal liability is "an extension of liability, not an independent cause of action[.]" *Soto v. City of New York*, 132 F. Supp. 3d 424, 459 (E.D.N.Y. 2015). Accordingly, the Court construes this portion of Plaintiffs' motion as seeking summary judgment on the unlawful search claim as that claim is asserted against the City.

The Court begins its analysis with the claims as to which both sides seek summary judgment: the unlawful search claim and the trespass claim. For the reasons below, the Court concludes that no party is entitled to summary judgment on these claims.

The Court then considers Plaintiffs' remaining claims and finds that Defendants are entitled to summary judgment on: (1) the unlawful seizure of Tesla claim as asserted against Gorman; (2) the unlawful seizure of L.D. claim against all Defendants; and (3) the failure to intervene claim against Gorman except to the extent it is based on the entry into Plaintiffs' yard. The Court finds that genuine issues of material fact preclude summary judgment on all other claims asserted by Plaintiffs.

### A.    <u>Unlawful Search Claim</u>

"The Fourth Amendment prohibits unreasonable searches and seizures." *United States v. Amerson*, 483 F.3d 73, 77 (2d Cir. 2007). "A 'search' occurs for purposes of the Fourth Amendment if the police seek information by intruding on a person's reasonable expectation of privacy or by means of trespassing upon one's person, house, papers, or effects." *United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020). "The core premise underlying the Fourth Amendment is that warrantless searches of a home are presumptively unreasonable." *United States v. Simmons,* 661 F.3d 151, 156-57 (2d Cir. 2011). "As relevant to this case, 'police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.'" *Harris v. O'Hare*, 770 F.3d 224, 231 (2d Cir. 2014), *as amended* (Nov. 24, 2014); *see also Dalessandro v. Cnty. of Nassau*, 758 F. App'x 165, 167 (2d Cir. 2019) ("Warrantless entry is justified when there is both probable cause and exigency.").

"The curtilage—that is, the 'area adjacent to the home and to which the activity of home life extends'—is considered part of a person's home and enjoys the same protection against unreasonable searches as the home itself." *United States v. Alexander*, 888 F.3d 628, 631 (2d Cir. 2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 7 (2013)). Accordingly, "a search of the curtilage that occurs without a warrant based on probable cause or an exception to the warrant requirement violates the Fourth Amendment." *Id*. It is "clearly established that a fenced-in side or backyard directly abutting a single-family house constitutes curtilage." *Harris*, 770 F.3d at 240.

In their motion for summary judgment, Defendants do not contest that Plaintiffs' fenced-in backyard was curtilage protected by the Fourth Amendment. (Dkt. 95-1 at 8). Instead, they: (1) attack the adequacy of Plaintiffs' pleading; and (2) contend that exigent circumstances permitted Algarin's warrantless entry into Plaintiffs' backyard. (*Id*. at 8-13). The first of these arguments is easily disposed of. As the Second Circuit recently explained, "[t]he different standards generally applicable to motions to dismiss and for summary judgment serve distinct purposes, each tailored to addressing the unique considerations that arise at successive stages of the litigation." *Lugo v. City of Troy*, 114 F.4th 80, 89 (2d Cir. 2024). As such, it is a reversible procedural error for the Court to "resolve[] a summary-judgment motion as a pleadings motion[.]" *Id*. At this stage of the proceedings, the adequacy of Plaintiffs' pleadings is not the relevant inquiry. The Court will not grant summary judgment on this basis.

As to Defendants' argument regarding exigent circumstances, the Court notes as a threshold matter that "probable cause <u>plus</u> exigent circumstances" were required to allow Algarin to enter Plaintiffs' curtilage without a warrant. *Harris*, 770 F.3d at 231 (emphasis added). The existence of probable cause "is the first requirement for a warrantless search on the basis of exigent circumstances." *Id*. at 232.[4] Defendants' motion for summary

---

[4]    *Harris* involved a factual scenario somewhat similar to the one presented here. The police had apprehended a drug dealer who they had seen drop heroin on the ground. 770 F.3d at 227. The drug dealer told the police that two guns were stashed under the driver's seat of an abandoned car in the rear yard of a particular residence. *Id*. The police, without a warrant, entered the plaintiffs' property, where they encountered the plaintiffs' dog, who had been playing outside with the minor child plaintiff. *Id*. One of the officers shot and killed the dog. *Id*.

judgment makes no mention of probable cause; that phrase appears nowhere in their memorandum of law. (*See generally* Dkt. 95-1). This failure alone prevents the Court from entering summary judgment in Defendants' favor on the unlawful search claim. *See Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115 (2d Cir. 2017) ("[W]hen a defendant moves for summary judgment, it is the *defendant* who must show entitlement to judgment, notwithstanding that, at trial, the plaintiff will have the burden of proving every element of its claim." (emphasis in original)).

This same failure prevents the Court from finding that Algarin is entitled to qualified immunity on the unlawful search claim. "A government official is entitled to immunity from suit whenever (1) his conduct did not violate clearly established law, or (2) it was objectively reasonable for the official to believe that his action did not violate such law." *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019). The Court "must look to both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances the[n] confronting a defendant, would have understood that his actions were unlawful." *Ford v. McGinnis*, 352 F.3d 582, 596-97 (2d Cir. 2003) (quotation omitted). Qualified immunity is an affirmative defense and "a decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (quotation omitted).

Defendants' qualified immunity argument focuses solely on the "permissible scope and nature of searches incident to and following hot pursuit[.]" (Dkt. 95-1 at 24). But Defendants ignore the fact that it was well-established in November 2018 that "police officers need either a warrant or <u>probable cause plus exigent circumstances</u> in order to make a lawful entry into a home." *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (emphasis added).[5] In other words, if Algarin did not have probable cause, the entry was unlawful notwithstanding any exigent circumstances, and a reasonable officer would have known that at the time of incident at issue. By failing to address the issue of probable cause, Defendants have not borne their burden of demonstrating Algarin's entitlement to qualified immunity.

While Defendants have not demonstrated their entitlement to summary judgment on the unlawful search claim, the Court is equally unpersuaded that Plaintiffs are entitled to summary judgment in their favor.[6] Plaintiffs argue that neither probable cause nor exigent circumstances justified Algarin's second entry into their backyard. (Dkt. 96-2 at 17-18). Defendants, consistent with their own summary judgment papers, fail to address the matter of probable cause at all. But Defendants' failure does not relieve the Court of its duty to examine Plaintiffs' submission "to determine if [they have] met [their] burden of

---

[5]    Counsel for Defendants was indisputably aware of this case law, which was cited by the Court in an earlier Decision and Order in this very case. (*See* Dkt. 30 at 20).

[6]    Defendants have argued that the Court should deny Plaintiffs' motion for summary judgment based on Plaintiffs' purported failure to comply with this District's Local Rules of Civil Procedure. (*See* Dkt. 97 at 3-5). Because the Court denies Plaintiffs' motion on the merits, it need not and does not address this argument.

demonstrating that no material issue of fact remains for trial." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation omitted).  The Court finds that they have not.

"Probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Dalessandro*, 758 F. App'x at 167 (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).  "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Harris,* 770 F.3d. at 232 (citation and alteration omitted).  Algarin has submitted a sworn declaration in which he avers he believed there was a reasonable probability that drugs or other contraband were present in Plaintiffs' backyard, because individuals involved in drug dealing will commonly discard drugs and other contraband, including weapons, during flight. (*See* Dkt. 95-19 at ¶ 24).  The body-worn camera footage supports Algarin's claim that he believed a firearm had been discarded during the flight, as he can be heard asking, "where'd he say he threw the gun?"  He then directly asks one of the suspects, "where is it?"

And while Plaintiffs argue that Algarin had already been in their yard and had not seen any dangerous items during that time, Algarin has also stated that Plaintiffs' backyard was overgrown with weeds and small trees and that there were overturned chairs and rain gutters lying on the ground, making it difficult to discern whether there was any discarded contraband.  (*Id*. at ¶ 21).  On this record, and construing the facts in the light most favorable to Defendants (as one must when considering Plaintiffs' motion), the Court

concludes that a reasonable jury could find that Algarin had probable cause.  *See generally Harris*, 770 F.3d at 233.

The Court further finds that genuine issues of material fact exist regarding the presence of exigent circumstances.  Specifically, the Court finds that there are genuine issues of material fact as to whether Algarin's second entry into Plaintiffs' backyard was part of the "hot pursuit" of the suspects, or if the pursuit had ended at that point.

The Supreme Court "has identified several exigencies that may justify a warrantless search of a home."  *Kentucky v. King*, 563 U.S. 452, 460 (2011).  One such exigency is the hot pursuit of a fleeing felon.  *See id.*  A hot pursuit requires "some sort of a chase," *United States v. Santana*, 427 U.S. 38, 43 (1976), which must be "immediate and relatively continuous from the scene of a crime," *United States v. Webster*, 79 F. Supp. 3d 417, 422 (E.D.N.Y. 2015).  *See also Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) ("the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime").  "A slight delay" does not necessarily end a hot pursuit.  *Webster*, 79 F. Supp. 3d at 422 (finding that the officer's "calling for backup did not interrupt [the] hot pursuit," because it was "a continuation of [the officer's] attempts to locate the armed individual he saw on the garage"); *see also United States v. Acosta-Soto*, No. CRIM.A 08CR10193DPW, 2009 WL 3432442, at *5 (D. Mass. Oct. 21, 2009) (concluding that law enforcement "should not be penalized for a momentary pause in which to determine whether continued hot pursuit would be necessary to secure evidence which might be destroyed").

In viewing Officer Algarin's body-worn camera footage, one could conclude that his actions were "relatively continuous" during the incident. After he observes that the suspects have been detained and are being searched by his fellow officers, he continues to move around, asking about a discarded firearm, and seemingly searching the immediate area. In *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1987), the Supreme Court upheld law enforcement's contemporaneous search of various areas of a home into which a suspected armed robber had fled. *Id*. at 299 ("[T]he seizures occurred prior to or immediately contemporaneous with Hayden's arrest, as part of an effort to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived.").

While a reasonable jury could agree with Plaintiffs that the exigent circumstances had ended at the time Algarin re-entered their yard, the Court does not find that a reasonable jury would be required to make such a finding. Accordingly, summary judgment in favor of Plaintiffs on this claim is not warranted.[7] This conclusion includes Plaintiffs' unlawful search claim against the City, because municipal liability under *Monell* requires an underlying constitutional violation. *See Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019).

---

[7]     Because the Court reaches this conclusion, it need not reach Defendants' alternative argument that Algarin did not actually engage in a search when he entered Plaintiffs' yard the second time. (*See* Dkt. 99 at 6-7). But this argument lacks merit. It is undisputed that Algarin re-entered Plaintiffs' yard for the express purpose of searching for contraband. That his search was abruptly ended by Tesla's entry into the backyard does not change the fact that his purpose was to seek information/evidence. This case is thus unlike *Gursslin v. City of Rochester*, No. 20-cv-06508-EAW, 2024 WL 4198154, at *5-7 (W.D.N.Y. Sept. 16, 2024).

The Court also finds that the City has not demonstrated that it is entitled to summary judgment on Plaintiffs' unlawful search claim.  Under *Monell,* "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 691).  "Official municipal policy includes . . . practices so persistent and widespread as to practically have the force of law."  *Id.*

Plaintiffs have produced significant evidence from which a reasonable jury could conclude that the City had an unlawful policy or practice of "backtracking" into residents' curtilage to search for and seize evidence in the absence of exigent circumstances and probable cause.  This evidence includes testimony from Lieutenant Michael Cuilla ("Cuilla"), who was designated as a witness by the City pursuant to Federal Rule of Civil Procedure 30(b)(6).  Cuilla testified that it is the RPD's policy and practice to backtrack through the curtilage of residential properties after a hot pursuit has ended, if the officers have "reasonable suspicion that something was discarded that could be a danger to the public."  (Dkt. 96-23 at 42-43).  Algarin testified at his deposition that he was trained to "backtrack" during his field training.  (Dkt. 96-8 at 113-14).  Algarin defined "backtracking" as "[t]aking the flight path of a suspect to see if he had discarded any contraband," and stated that it was "common" to jump a fence into the backyard of a residential property in order to backtrack.  (*Id*. at 114-15).  Were a juror to conclude that Algarin's re-entry into Plaintiffs' backyard violated the Fourth Amendment, that same juror could easily conclude that Algarin's actions were taken pursuant to an official municipal policy.

- 17 -

For all these reasons, the Court finds that neither Plaintiffs nor Defendants have established their entitlement to summary judgment on the unlawful search claim, and denies the competing motions as to this claim.

### B.    Trespass Claim

The Court turns next to Plaintiffs' trespass claim, because both sides have also sought summary judgment thereon.  Defendants make two arguments in support of their request for summary judgment on this claim.  First, they argue that "[a] search is not a trespass, just as a trespass is not a search" and that "[b]ecause . . . Algarin searched the yard, his actions cannot be considered trespass."  (Dkt. 95-1 at 25).  This argument is nonsensical and the case that Defendants cite in support of it—*United States v. Jones*, 565 U.S. 400 (2012)—says no such thing.  To the contrary, *Jones* states that "[a] trespass . . . is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved <u>by such a trespass</u> or invasion of privacy."  *Id.* at 408 n.5 (emphasis added).  Nowhere does *Jones* suggest that a search and a trespass cannot co-exist—it simply makes clear that these concepts are legally distinct.

Second, Defendants argue that even if a trespass occurred, "Algarin cannot be liable, because law enforcement officers are permitted to commit otherwise-trespassory acts when in furtherance of their duties."  (Dkt. 95-1 at 26).  It is true that under New York state law, "law-enforcement officials have a privilege to enter private property to perform their legal duties."  *Reynolds v. United States*, 927 F. Supp. 91, 96 (W.D.N.Y. 1996).  "But the scope of that privilege is still constrained by the Fourth Amendment."  *Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 142 (N.D.N.Y. 2024).  Accordingly, a trespass claim will generally

survive where an unreasonable search claim survives. *Id*. In other words, the genuine issues of material fact that precluded summary judgment on the unreasonable search claim preclude summary judgment on the trespass claim.

This conclusion extends to Plaintiffs' request for summary judgment on the trespass claim. Plaintiffs' argument with respect to the trespass claim is a reiteration of their arguments regarding the unreasonable search claim. (*See* Dkt. 96-2 at 20 ("Plaintiffs are entitled to summary judgment against Algarin and Gorman on their trespass claim under New York State law for all the reasons stated above, as they clearly entered Mr. Dempsey's property without justification or permission.")). The Court's analysis of those arguments applies with equal force here. The Court will not grant summary judgment to either side on the trespass claim.

### C.    Unreasonable Seizure of Tesla Claim

The Court turns next to Plaintiffs' claim that the seizure of Tesla was unreasonable under the Fourth Amendment. Only Defendants seek summary judgment on this claim. For the reasons below, the Court finds that genuine issues of material fact exist with respect to Algarin and the City. But no reasonable jury could find that Gorman was personally involved in the seizure of Tesla, and so he is entitled to summary judgment on this claim.

"[T]he unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Carroll v. Cnty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013). In assessing reasonableness, a court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion and determine

whether the totality of the circumstances justified the particular sort of seizure." *Id*. (quotation and alterations omitted).

Killing a person's pet dog is "a severe intrusion given the emotional attachment between a dog and an owner." *Id*.; *see also Ray v. Roane*, 948 F.3d 222, 227 (4th Cir. 2020) ("private interests in dogs—and family pets especially—are highly significant since dogs have aptly been labeled Man's Best Friend, and certainly the bond between a dog owner and his pet can be strong and enduring" (quotations omitted)). As such, "when a dog is seized—and especially, as here, where it is killed, not merely injured or detained— the intrusion on the owner weighs heavily in favor of finding the seizure unreasonable[.]" *Matteson v. Hall*, No. 18-CV-6772, 2019 WL 2192502, at *7 (W.D.N.Y. May 21, 2019) (quotation omitted and collecting cases).

But on the other hand, ensuring officer safety is a significant governmental interest. *Carroll*, 712 F.3d at 651. Accordingly, "in some circumstances, it is reasonable for an officer to shoot a dog that he believes poses a threat to his safety or the safety of the community." *Id*. "Though an officer need not wait to be mauled or attacked before employing force in self-defense, the officer may not utilize deadly force against a dog unless there is an actual basis to believe that the dog posed an imminent threat." *Azurdia v. City of New York*, No. 18-CV-04189-ARR-PK, 2019 WL 1406647, at *8 (E.D.N.Y. Mar. 28, 2019) (quotation omitted). Relevant factors in ascertaining reasonableness include the context in which the officer encountered the dog, the dog's behavior and temperament, the dog's breed, whether the owner was available and willing to assert control over the dog, whether non-lethal means were available to control the dog, and whether there was time to

find an alternative solution to control the dog. *See Matteson*, 2019 WL 2192502, at *8; *see also Strong v. Perrone*, No. 17-CV-6183-FPG, 2020 WL 1445877, at *3 (W.D.N.Y. Mar. 25, 2020).

The Court easily concludes that there are genuine issues of material fact regarding the reasonableness of Algarin's actions in shooting and killing Tesla. Multiple factors support a finding of unreasonableness, including that Algarin was in Plaintiffs' fenced-in backyard without a warrant or consent, that Tesla was a labrador retriever (a breed known for being family dogs and not for viciousness), and that Dempsey was present in the backyard.

Defendants argue that Tesla approached Algarin in an aggressive manner and that he did not have time to retreat over the fence or use a non-lethal method (such as a baton or pepper spray). (Dkt. 95-1 at 15-16). But Defendants fail to recognize that their characterization of the facts is in the light most favorable to their position, which is not appropriate on a motion for summary judgment. The Court has viewed the body-worn camera footage, and it does not find that a reasonable jury would have to conclude that Tesla was acting in an aggressive manner. She ran towards Algarin, that much is clear. But merely running is not an act of aggression by a dog, and the case law certainly does not support the proposition that law enforcement may enter a citizen's curtilage and shoot and kill that citizen's dog for doing nothing more than running. *See Strong*, 2020 WL 1445877, at *4 (explaining that it was "critically important" whether the plaintiff's dog had bared her teeth, as the defendant police officer claimed, because "moving quickly" and "low to the ground" was "relatively benign" behavior by a dog).

- 21 -

A jury is needed to assess the credibility of Algarin's claim that Tesla was acting in an aggressive manner as she approached him. Dempsey, who witnessed the incident, will testify that she was not, and the body-worn camera footage is not dispositive. That is sufficient to create a genuine issue of material fact. *See Douglas v. Portuondo*, 232 F. Supp. 2d 106, 115 (S.D.N.Y. 2002) ("The determination of how much weight to accord eyewitness testimony given that witness' opportunity to observe the events at issue and in light of any circumstantial evidence that corroborates or refutes such testimony is a matter of credibility.").

There are also genuine issues of material fact regarding whether Algarin had time to retreat or employ non-lethal methods of restraint. Defendants argue that Algarin "did not have the opportunity to plan any response to an aggressive dog" because he first learned of Tesla's presence when she exited the house and ran down the stairs. But "being startled by [a dog's] presence does not provide [an officer] with carte blanch" and a jury can conclude, under appropriate circumstances, that an officer "hastily and unnecessarily shot a dog that was not showing signs of aggression." *Strong*, 2020 WL 1445877, at *6. Given how easily Algarin had previously jumped over the chain-link fence, a reasonable jury could conclude that retreat was an option.

The reasonableness of a Fourth Amendment seizure is a fact-intensive inquiry, and the record before the Court does not support the conclusion that Algarin's actions were reasonable as a matter of law. Nor does the Court find that Algarin is entitled to qualified immunity. Defendants argue that it was "objectively reasonable for Officer Algarin to believe he would not violate the law by discharging his firearm to protect himself against

imminent harm from a dog." (Dkt. 95-1 at 24). But this argument presupposes that Tesla was acting in an aggressive manner and that Algarin was accordingly justified in shooting her. It was clearly established at the time of Tesla's death that the killing of a pet without justification violates the Fourth Amendment. *See Strong*, 2020 WL 1445877, at *6 ("It is further clearly established that killing a pet without justification constitutes a Fourth Amendment violation." (quotation omitted)); *Matteson*, 2019 WL 2192502, at *8 ("At the time of [the dog's] death, the law clearly established that the fatal seizure of a pet dog without justification constituted a Fourth Amendment violation."). As the Court has already explained, there are genuine issues of material fact as to whether Tesla was acting aggressively and whether Algarin could have retreated. Summary judgment on the basis of qualified immunity is not warranted.

There are also genuine issues of material fact regarding municipal liability on Plaintiffs' claim that Tesla was unreasonably seized. Official municipal policy may be established by showing "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 277 (S.D.N.Y. 2010); *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). As another judge in this District has explained:

> The Second Circuit has identified four requirements for demonstrating that a municipality's failure to train amounted to deliberate indifference. First, the municipal policymaker must know to a moral certainty that employees will confront a given situation. Second, the situation must either present employees with the type of difficult choices . . . that training or supervision would make less difficult, or employees must have a history of mishandling the situation. Third, the wrong choice by employees must frequently cause

- 23 -

the deprivation of a citizen's constitutional rights.  And fourth, at the summary judgment stage, plaintiffs must identify a specific deficiency in the municipality's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.

*Ellis v. Washington*, 409 F. Supp. 3d 148, 154 (W.D.N.Y. 2019) (internal citations and quotations omitted).

Defendants contend that Plaintiffs cannot show that this standard is satisfied here, because: (1) Plaintiffs have not identified a specific individual City policymaker; (2) unconstitutional seizures of dogs do not frequently occur in the City; and (3) the City's training regarding dog encounters is sufficient.  (Dkt. 95-1 at 28-32).  The Court is unpersuaded by these arguments.

As to the first argument, a police department itself may serve as a municipal policymaker for purposes of a claim of deliberate indifference in failing to train.  *See Feerick v. Sudolnik*, 816 F. Supp. 879, 887 (S.D.N.Y. 1993) (stating that the New York Police Department was "undoubtedly" a municipal policymaker where it was alleged to have inadequately trained its officers), ), *aff'd*, 2 F.3d 403 (2d Cir. 1993).  Plaintiffs were not required to name a specific individual policymaker within the RPD.

As to the second argument, Defendants argue that only a "miniscule percentage of [City] residents potentially have their pet dogs shot in RPD encounters."  (Dkt. 95-1 at 29).  But this is irrelevant to the Court's inquiry.  *City of Canton* is instructive.  There, the Court explained:

City policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons.  The city has armed its officers with firearms, in part to allow them to accomplish this task.  Thus, the need to

train officers in the constitutional limitations on the use of deadly force, see *Tennessee v. Garner,* 471 U.S. 1, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

489 U.S. at 390 n.10. The fact that only a "miniscule percentage" of the population of Canton would ever be a fleeing felon did not enter into the calculus. What mattered was that the police were certain to encounter situations in which they had to decide whether it was permissible to use deadly force on a fleeing felon.

Similarly, there can be no question that the RPD knows to a moral certainty that its officers will encounter citizens' dogs while performing their duties. And the RPD has armed its officers with firearms to keep themselves and the public safe. A reasonable jury could certainly conclude that it was so obvious that officers needed to be trained in the use of lethal force on pet dogs that the failure to provide such training amounted to deliberate indifference.

Finally, as to Defendants' third argument, Plaintiffs' expert has opined that the RPD's training on dog encounters is woefully deficient. (*See* Dkt. 98-14). Defendants have not moved in this case to exclude the testimony of Plaintiffs' expert, and it would not be appropriate for the Court to weigh his credibility on a motion for summary judgment. *See Lucente v. Int'l Bus. Machines Corp.,* 310 F.3d 243, 254 (2d Cir. 2002).

Plaintiffs also contend that they can establish municipal liability based on a failure to discipline, and that this is another reason to deny Defendants' motion. (*See* Dkt. 98 at 30-32). Because the Court has already found genuine issues of material fact as to municipal

liability, it need not and does not reach this argument. Thus, the City is not entitled to summary judgment on Plaintiffs' claim that Tesla was unreasonably seized.

But Gorman is entitled to summary judgment on this claim. To be held liable under § 1983, a defendant must have violated the plaintiff's constitutional rights "through the official's own individual actions[.]" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Here, it is undisputed that Gorman was not in Plaintiffs' backyard when Tesla was shot, and he played no role in the decision to use lethal force against her.

Plaintiffs' arguments to the contrary are unpersuasive. They claim that Gorman "directly participated" in the seizure of Tesla because of his "instruction to Algarin to 'backtrack' through Plaintiffs' yard[.]" (Dkt. 98 at 14). Initially, it is an exaggeration to say that Gorman instructed Algarin to backtrack through Plaintiffs' yard. Gorman asked Algarin if he wanted to backtrack, he did not tell him he had to do so. In any event, Gorman's suggestion that Algarin backtrack does not mean that Gorman was a participant in the seizure of Tesla. "Direct participation requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Steele v. New York*, No. 5:20-CV-00220, 2021 WL 1110769, at *10 (N.D.N.Y. Mar. 23, 2021) (quotation omitted). No reasonable jury could find that Gorman intentionally participated in Algarin's shooting of Tesla on the undisputed facts of this case, and Plaintiffs have cited no cases in which a defendant has been found to have directly participated in a constitutional violation under comparable circumstances. The Court grants Gorman summary judgment on this claim.

**D.**     **Unreasonable Seizure of Plaintiffs Claim**

The Court next considers Plaintiffs' claim that they were unreasonably seized by Algarin. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quotation and citation omitted). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). The Second Circuit has explained:

> Pertinent factors identifying a police seizure can include the threatening presence of several officers; *the display of a weapon*; physical touching of the person by the officer; *language or tone indicating that compliance with the officer was compulsory*; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 340 (2d Cir. 2000) (emphasis added and citations and quotations omitted); *see also Ozga v. Elliot*, 150 F. Supp. 3d 178, 188 (D. Conn. 2015) ("On the other hand, an encounter with the police may become so circumstantially coercive that it amounts to a seizure. Among the circumstantial factors that may bear on whether a show-of-authority seizure has occurred is 'the threatening presence of several officers,' or 'the display of a weapon,' or the 'physical touching of the person by the officer,' or 'language or tone indicating that compliance with the officer was

compulsory,' or 'a request by the officer to accompany him to the police station or a police room.'") (quoting *Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007)).

A reasonable jury could conclude that Dempsey was seized by Algarin. The body-worn camera footage shows that Dempsey started running towards his injured dog, and Algarin pointed a gun at him and screamed "get down, get down." Algarin then pointed pepper spray at Dempsey while repeatedly yelling, "get back." While Defendants have pointed to facts from which a jury could conclude that this did not amount to a seizure, the Court disagrees that this conclusion is compelled as a matter of law. "Temporary detention of individuals . . . by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996).

But the Court agrees with Defendants that no reasonable juror could find that L.D., who was in the house throughout the incident, was seized by Algarin. Plaintiffs argue that "[w]hen Algarin intentionally pointed the gun at Mr. Dempsey, he also unintentionally pointed the gun at L.D., who was standing behind Mr. Dempsey just inside the back door." (Dkt. 98 at 14). Plaintiffs have cited no evidence to support the claim that the gun was pointed at L.D. They cite to "¶¶ 69-70" of an unidentified document for this proposition. (Dkt. 98 at 14). It appears they are referring to paragraphs 69 and 70 of Dkt. 98-1, but these paragraphs state only that L.D. was at the back door and saw Algarin point the gun at her father. Plaintiffs' argument regarding "transferred intent" (*see* Dkt. 98 at 14-15) accordingly misses the mark. L.D. was not seized by virtue of the fact that a gun was pointed at her father and she was in the vicinity. Absent some proof that L.D. herself had

a gun pointed at her, she cannot have been seized under the theory proffered by Plaintiffs. Defendants are entitled to summary judgment on this claim by L.D.

### E.    Failure to Intervene Claim

Defendants next seek summary judgment on Plaintiffs' claim for failure to intervene, which is asserted against Gorman.  "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  Therefore, "liability attaches where (1) the officer had a realistic opportunity to intervene to prevent the harm; (2) a reasonable person in the officer's position would have known that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable steps to intervene." *Gochnour v. Burri*, No. 6:15-CV-06174, 2018 WL 10944594, at *3 (W.D.N.Y. July 9, 2018).

Defendants argue that Gorman had no opportunity to intervene in any alleged constitutional violation.  (Dkt. 95-1 at 21-23).  In opposition, Plaintiffs contend that "Gorman had a realistic opportunity to prevent Algarin's unlawful entry into Mr. Dempsey's yard and the shooting of Tesla."  (Dkt. 98 at 15).  The Court agrees that a reasonable jury could find this to be the case with respect to the entry into Plaintiffs' yard, but disagrees with respect to the shooting of Tesla.

As to the entry into Plaintiffs' yard, it was Gorman who suggested to Algarin that he backtrack.  While Defendants contend that Gorman had his back to Plaintiffs' yard at the moment that Algarin jumped fence (*see* Dkt. 95-1 at 22), the body-worn camera footage

shows Algarin asking Gorman where the suspect had crossed and then walking along the fence, seemingly looking for a good entry point. A reasonable jury could conclude that Gorman should have realized at that point that Algarin intended to jump the fence and intervened to stop him from doing so.

But no reasonable jury could conclude that Gorman had a reasonable opportunity to stop Algarin from shooting Tesla. Gorman was not near Algarin when Tesla entered the backyard, and the shooting occurred in a matter of seconds. The Court accordingly denies summary judgment on the failure to intervene claim solely to the extent it is based on the entry into Plaintiffs' yard.

### F.    <u>Assault Claim</u>

Finally, the Court considers Plaintiffs' claim that Algarin assaulted Dempsey. Under New York law, assault consists of "physical conduct placing the plaintiff in imminent apprehension of harmful contact." *Bastein v. Sotto*, 299 A.D.2d 432, 433 (2d Dept. 2002). Algarin pointed both a gun and pepper spray at Dempsey while screaming at him to "get down" and "get back." A reasonable jury could find that this amounted to an assault. Defendants' motion for summary judgment on this claim is denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 95) is granted in part and denied in part and Plaintiffs' motion for partial summary judgment (Dkt. 96) is denied. Defendants' motion is granted as to the following claims: (1) the unlawful seizure of Tesla claim as asserted against Gorman; (2) the unlawful seizure of L.D. claim against all Defendants; and (3) the failure to intervene claim against Gorman

except to the extent it is based on the entry into Plaintiffs' yard. Defendants' motion is otherwise denied.

      SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: January 2, 2025
      Rochester, New York