# Law Enforcement Dog Encounters Training (LEDET)

*A toolkit for law enforcement*

James W. Crosby
Chelsea Rider



COPS
Community Oriented Policing Services
U.S. Department of Justice

# Law Enforcement Dog Encounters Training (LEDET)

*A toolkit for law enforcement*

James W. Crosby
Chelsea Rider





This project was supported by cooperative agreement / grant number 2016-CK-WX-K032, awarded by the Office of Community Oriented Policing Services, U.S. Department of Justice. The opinions contained herein are those of the author(s) or contributor(s) and do not necessarily represent the official position or policies of the U.S. Department of Justice. References to specific agencies, companies, products, or services should not be considered an endorsement by the author(s), contributor(s), or the U.S. Department of Justice. Rather, the references are illustrations to supplement discussion of the issues.

The Internet references cited in this publication were valid as of the date of publication. Given that URLs and websites are in constant flux, neither the author(s), contributor(s), nor the COPS Office can vouch for their current validity.

Recommended citation:

Crosby, James, and Chelsea Rider. 2019. *Law Enforcement Dog Encounters Training (LEDET): A Toolkit for Law Enforcement*. Washington, DC: Office of Community Oriented Policing Services.

Published 2019

# Contents


Letter from the Director of the COPS Office . . . . . v
Acknowledgements . . . . . vii
Introduction to the Toolkit . . . . . 1
Executive Summary . . . . . 3
  Contents . . . . . 3
Literature Review: Changing the Narrative . . . . . 5
  Introduction . . . . . 5
  Popular literature and reporting . . . . . 6
  Law enforcement literature . . . . . 11
  Legal publications and decisions . . . . . 16
  Dog bites and behavior . . . . . 23
Current State Legislation . . . . . 31
  Tennessee: General Patton Act of 2003 . . . . . 31
  Colorado: Dog Protection Act . . . . . 31
  Illinois: Illinois Police Training Act . . . . . 32
  Texas: Canine Encounter Training Program . . . . . 32
  Nevada: Certification and Training: Peace Officers . . . . . 32
  Ohio: House Bill 64 . . . . . 33
  Model legislation . . . . . 33
Policy Considerations . . . . . 39
  Georgia Association of Chiefs of Police - Standard Operating Procedure 11.6: Use of Force When Dealing with Animals . . . . . 40
  Los Angeles Police Department – Use of Force Tactics Directive 7: Dog Encounters . . . . . 43
  Austin Police Department – Policy 202: Firearms Discharge Situations - § 202.3.2: Reporting a Firearm Discharge against a Dangerous and Threatening Animal . . . . . 46
  Chicago Police Department - General Order G03-02: Use of Force . . . . . 47
  Baltimore Police Department – Policy 1115: Use of Force . . . . . 47
  Las Vegas Metropolitan Police Department – 6/002.00 USE OF FORCE . . . . . 48
  Denver Sheriff's Department – Department Order 5011: Use of Force Policy . . . . . 49
Decoding Canine Body Language Quick Reference Guide . . . . . 53
  Mouth . . . . . 54
  Tails . . . . . 54
  Fur . . . . . 54
  Overall posture . . . . . 55
References . . . . . 57

Literature review . . . . . . . . . . 57
Legal citations . . . . . . . . . . 61
Current state legislation . . . . . . . . . . 62
Policy considerations . . . . . . . . . . 63
Decoding canine body language . . . . . . . . . . 63
About the National Law Enforcement Center on Animal Abuse . . . . . . . . . . 65
About the National Sheriffs' Association . . . . . . . . . . 67
About the COPS Office . . . . . . . . . . 69



# Letter from the Director of the COPS Office

Colleagues:

Everywhere people live and work, dogs are beside them—as household pets, service animals, and working dogs. And that means that every law enforcement officer, whether they serve in a small rural department or on a large urban force, will inevitably encounter dogs in the course of their duties. Despite this, only a handful of states, and relatively few agencies, train officers in dog behavior, dog handling skills, or applicable laws relating to dogs. But when news of a lethal dog encounter spreads on social media, it can have significant consequences for law enforcement agencies.

This toolkit, and its companion curriculum *Law Enforcement Dog Encounters Training,* are intended to prepare law enforcement with the knowledge and resources they need to keep dog encounters safe for everyone involved. Agency executives will find model training policies and state legislation related to dog encounter training, while front-line personnel will find references on understanding dog behavior and body language. In addition, anyone who speaks to the media should find the overview of reporting on dog encounters very useful.

On behalf of the COPS Office, I would like to thank the authors for their hard work, and the National Sheriffs' Association for championing this series.

Sincerely,

Phil Keith
Director
Office of Community Oriented Policing Services



# Acknowledgements

The Law Enforcement Dog Encounters Training toolkit was developed with the enthusiastic support of former National Sheriffs' Association Deputy Executive Director and Chief Operating Officer, John Thompson. Since 2014, Mr. Thompson has been a visible champion for better treatment of animals by law enforcement; he was integral in initiating FBI tracking of animal cruelty crimes. Mr. Thompson currently serves at the Executive Director of the National Animal Care and Control Association.

Additionally, the authors would like to thank April Doherty, co-chair of the National Coalition on Violence Against Animals (NCOVAA), for her input and suggestions in the completion of this project.

Lastly, we would like to thank Nazmia Comrie, Senior Program Specialist with the Office of Community Oriented Policing Services (COPS Office), for her patience and input while this toolkit and its complementary training curriculum were developed.





# Introduction to the Toolkit

The use of force by law enforcement, deadly or otherwise, has become a major issue before the public. As human cases have become more visible, so, too, have cases where law enforcement officers have used deadly force against companion dogs.

Reports allege that thousands of companion dogs are victims of the use of deadly or unnecessary force by law enforcement officers every year. Companion dogs are perceived as more than property, and the effects of these shootings ripple deeply across communities. Social media disperses such reports widely, and public perception of law enforcement can be profoundly impacted by a single dog shooting. Law enforcement agencies face loss of public trust when these incidents occur.

The problem is multifaceted: How many companion canines are shot by law enforcement personnel every year? Why do law enforcement personnel shoot dogs? Are current levels of investigation, documentation, and oversight adequate to provide proper accountability?

Social media usage has increased the coverage of incidents where law enforcement personnel have shot and killed a family dog. Various Facebook pages have emerged dedicated to increasing awareness about the issue and calling for changes in law enforcement protocol regarding the use of force against dogs. Dog owners across the country are demanding increased training for law enforcement officers in dealing with the dogs they may come in contact with during their daily work activities. Only six states—Tennessee, Colorado, Illinois, Texas, Nevada, and Ohio—currently require that law enforcement officers be trained to recognize common canine behavioral characteristics and know how to determine which level of force is appropriate when responding to a dog encounter.

The purpose of this toolkit is to arm law enforcement agencies and officers with the information, tools, and resources necessary to handle dog encounters, from prevention all the way through dealing with the aftermath of an unfortunate deadly dog encounter.





# Executive Summary

The purpose of this toolkit is to provide law enforcement agencies and executives with the information, tools, and resources necessary to handle dog encounters, from prevention all the way through dealing with the aftermath of an unfortunate deadly dog encounter.

## Contents

### *An extensive literature review: Changing the Narrative*

The literature review is a comprehensive guide to available resources from popular and law enforcement literature, legal decisions, and behavioral research.

- The popular literature section outlines how these situations are reported, both in traditional news and on social media. It compares some of the more prominent pieces that have been published and points out problems with current reporting on these encounters.
- The law enforcement literature section reviews specific publications geared towards the law enforcement field, including articles, policies, and recommendations. It also outlines some of the current training programs that are currently available for law enforcement.
- The legal decisions section examines how court decisions shape legal causes of action implementing current legislative principles and attitudes. It summarizes the cases, highlights the relevant points of law, and discusses some prominent, high-dollar judgments and settlements, as well as pointing out how these cases can affect law enforcement agencies. The section also briefly discusses how the doctrine of qualified immunity impacts litigation.
- The behavioral research section dissects the broad arena of dog behavior, focusing on aggressive behaviors, why dogs bite, and how to respond to various behavioral cues. It pulls the most relevant pieces from research and presents them in easy-to-understand statements.

### *Current state legislation through 2018*

This section covers the six states that currently have legislation mandating that law enforcement personnel receive training in handling dog encounters. The earliest legislation of this type is Tennessee's General Patton Act of 2003, and the most recent is Ohio's 2015 bill. The bills range in content from short-but-broad statements mandating training, as in Illinois and Texas, to more detailed legislation outlining what the training needs to cover, as in Tennessee and Colorado. Nevada's legislation directs agencies to create policies to guide training, while Ohio's law requires the state's attorney general to create the rules guiding training.

This section also includes model legislation for any state interested in enacting legislation addressing dog encounter training. The model, the Humane Canine Response Training Act, was created by the Animal Law Resource Center. It is included merely as a sample for states seeking to enact their own laws and does not represent an endorsement by the NSA or the COPS Office of the information and recommendations contained within.

## *Policy considerations*

The section of policy considerations offers various policies from different levels of law enforcement. The policies included range in length and give executives a variety of topics to consider when creating their own policies. It is generally recommended that your agency policy include the following elements:

- an introductory statement that the safety of the officer and other individuals on the scene should always take priority over the life or lives of any companion animals that may be encountered;
- a requirement that law enforcement officers within the agency use the least amount of force necessary when dealing with companion animals;
- a statement that lethal or deadly force should only be used when the safety of the responding law enforcement officer, other individuals on the scene, or even other animals on the scene is at risk;
- recommended procedures for handling canines or companion animals on different types of calls, whether routine, non-emergency calls for service or responding to an emergency call.

## *"Decoding Canine Body Language"*

This is a two-page quick-reference resource intended to augment the training curriculum. It goes through the six different parts of a dog to observe in order to have a safe encounter with the animal. This reference is not intended to act as a stand-alone reference and should only be used after the training has been provided.

## *Training curriculum*

Information on the training curriculum, *Law Enforcement Dog Encounters Training (LEDET)*, is available at https://www.sheriffs.org/nlecaa/ledet-curriculum. It is intended to provide eight hours of coursework, separated into ten individual modules. The modules cover dog behavior, recognizing signals, understanding mission purpose and strategy, situational awareness, keys to a safe encounter, process and tactics, using deadly force, and reasonability.



# Literature Review: Changing the Narrative

*Improving Law Enforcement Dog Encounters to Reduce Lethal Incidents*

## Introduction

There is an extensive body of literature, both popular and academic, on the risks, effects, and prevention of dog bites and aggressive dog behavior toward humans and animals.[1] Organizations such as the American Society for the Prevention of Cruelty to Animals (ASPCA),[2] the Humane Society of the United States (HSUS),[3] the American Humane Association (AHA),[4] the American Veterinary Medical Association,[5] and many others provide extensive training materials both for the public and for employees of industries such as utilities and the postal service on how to interact safely with dogs and reduce or prevent dog bites. The ASPCA has issued a position statement that strongly encourages similar training be developed and implemented for law enforcement personnel.[6]

Similarly, in the legal world, case law and precedent is rapidly being set as the place of animals in society evolves. The line between dogs as property and dogs as sentient beings is wavering.[7] Dogs are increasingly seen in the law as having not only simple replacement economic value but as repositories of emotional investment and familial feelings, resulting in the awarding of noneconomic damages in judgments or settlements for the loss of a dog.[8]

---

1. Centers for Disease Control and Prevention, "Nonfatal Dog Bite Related Injuries Treated in Hospital Emergency Departments – United States, 2001," *Morbidity and Mortality Weekly Report* 52, no. 26 (2003): 605–610, cdc.gov/mmwr/preview/mmwrhtml/mm5226a1.htm.
2. "Dog Bite Prevention," American Society for the Prevention of Cruelty to Animals (ASPCA), accessed April 8, 2019, https://www.aspca.org/pet-care/dog-care/dog-bite-prevention.
3. "End Dogfighting Unit: Lesson Two: Dog Bite Prevention," Humane Society of the United States, accessed April 8, 2019, https://www.humanesociety.org/sites/default/files/docs/dogfighting-lesson-two-bite-prevention.pdf.
4. "American Humane Offers Tips to Stay Safe during National Dog Bite Prevention Week," American Humane Association, accessed April 8, 2019, https://www.americanhumane.org/press-release/american-humane-offers-tips-to-stay-safe-during-national-dog-bite-prevention-week/.
5. "Dog Bite Prevention," American Veterinary Medical Association, accessed April 8, 2019, https://www.avma.org/public/Pages/Dog-Bite-Prevention.aspx.
6. ASPCA, "Position Statements on Law Enforcement Response to Potentially Dangerous Dogs," accessed April 8, 2019, https://www.aspca.org/about-us/aspca-policy-and-position-statements/position-statements-law-enforcement-response.
7. Gary Francione, "Animals as Property," Michigan State University Animal Legal and Historical Center, 2 Animal L I (1996), https://www.animallaw.info/article/animals-property.
8. Christopher D. Seps, "Animal Law Evolution: Treating Pets As Persons in Tort and Custody Disputes," *University of Illinois Law Review* Volume 2010: 1339–1374.

This literature review will present an overview of four general topics and their exposition in various forms of media—popular literature and reporting, law enforcement literature, legal publications and decisions, and research into dog bites and behavior. This review is intended as a foundation for the development of a progressive training program for law enforcement that incorporates current perceptions and legal positions and provides law enforcement agencies across the country with information to establish humane, consistent, and legally defensible policy and practices regarding their encounters with domestic dogs.

## Popular literature and reporting

### *Social media and the internet*

Media coverage of law enforcement shootings of dogs has increased dramatically because of the greater saturation of social media and the evolution of the twenty-four-hour news cycle. Some of these stories garner interest rivalling the attention paid to law enforcement shootings of humans.

A Google search for the phrase "dog shot by police" returns about 128 million page results and the following top suggested searches:[9]

- Dog shot by police recorded on video
- Dog shot by police officer
- Police shoot dog in front of owner
- Police dog shooting statistics
- Cop shoots dog video
- Dog shot videos
- Dog shot 40 times
- Police shoot dog for no reason

The tone of these search strings hints at the direction of much of the coverage, which typically casts the officer in a negative light. Few searches are focused on "officer saves innocent life by shooting dog."

9. As of November 12, 2018 at 12:33 p.m. EST.

Instead, "police murder dog" results in over 96.3 million page hits, and the following suggested searches:[10]

- Police shoot dog for no reason
- Cops shoot dog leave note
- Police dog shooting statistics
- Can police shoot your dog?
- Police shoot dog in front of owner
- Shooting a dog to put it down
- *Brown* v. *Battle Creek Police Department*
- Shooting a dog on your property

The top links provided include the following:

- "Court rules it was reasonable for cop to shoot dog for barking"[11]
- "Court: Police can shoot dog if it moves or barks when a cop enters home"[12]
- "Dogs that Cops Killed: The Furriest Collateral Damage in our Wars on Drugs, Peace and Liberty"[13]
- "Police kill family dog at child's birthday party"[14]
- "Police can shoot your dog for no reason"[15]

In contrast, a Google search for "police high speed pursuit deaths" showed only 34.9 million results.[16]

These searches draw results from—and direct attention to—items on both social and traditional media. On the social media front, a search of Facebook on March 25, 2017, revealed that the top 20 pages revealed when searching the terms "dogs shot by police" had a total of 47,841

10. As of November 12, 2018 at 1:23 p.m. EST
11. Hilary Hanson, "Court Rules It Was 'Reasonable' for Cop to Shoot Dog for Barking," *Huffpost Crime*, December 22, 2016, http://www.huffingtonpost.com/entry/court-rules-it-was-reasonable-for-cop-to-shoot-dog-for-barking_us_585c4bc9e4b0eb586485d619.
12. "Court: Police Can Shoot Dog If It Moves or Barks When Cop Enters Home," *Washington Examiner*, December 20, 2016, http://www.washingtonexaminer.com/court-police-can-shoot-dog-if-it-moves-or-barks-when-cop-enters-home/article/2610097.
13. Dogs that Cops Killed, accessed June 17, 2017, https://dogmurders.wordpress.com/.
14. "Police Kill Family Dog at Child's Birthday Party," *Tulsa World*, July 22, 2016, http://www.tulsaworld.com/homepagelatest/police-kill-family-dog-at-child-s-birthday-party/article_93e8776a-cdf6-5c82-b98c-c7c1b-dc4c5eb.html.
15. Nathan J. Robinson, "Police Can Shoot Your Dog for No Reason. It Doesn't Have to Be That Way," *Washington Post*, November 13, 2015, https://www.washingtonpost.com/posteverything/wp/2015/11/13/police-can-shoot-your-dog-for-no-reason-it-doesnt-have-to-be-that-way/?utm_term=.80cebc2f7e79.
16. Google.com, search term "police high speed pursuit deaths police," May 31, 2019 at 2:37 p.m.

likes.[17] Mainline news organizations and outlets have similarly seized on these stories; a search for "dog shot by police" under "News" on Google showed 49.4 million results.[18] News coverage tries to attract readers' attention with eye-catching hooks for stories—hooks which may not present the entire story. Even the full story may include inaccuracies, or allegations that later prove to be untrue. With social media attention, these inaccuracies may be spread widely, and seriously harm the reputations of both individual agencies and the field of law enforcement.

Some negative publicity, however, has been earned. On November 24, 2012, Officer Robert Price of the Commerce City (Colorado) Police Department shot a dog known as Chloe. Local, and later national, media responded with extensive coverage;[19] one Google search for terms related to the case resulted in about 622,000 responses.[20] The case entered litigation, and in January 2016, the Commerce City Police Department settled for $262,500 in damages plus approximately $125,000 in legal costs.[21] Court documents show that Chloe was restrained by an animal control officer at the time of the shooting and that Chloe presented no credible threat to the public when shot.[22] This story played out very publicly in *The Denver Post,*[23] *CBS News,*[24] *Fox 31 Denver,*[25] and even the popular tabloid-style program *Inside Edition.*[26] The *Denver Post* revisited the incident years later in March 2015, when Colorado legislators began the process of establishing required training in dog encounters for Colorado law enforcement, a law that passed May 12, 2013.[27] The damage to the reputation of the Commerce City Police Department will undoubtedly linger beyond the end of active news reporting on this incident.

Any discussion of law enforcement use of deadly force against dogs must include agencies' public response to these incidents. A publication from the Police Executive Research Forum and the COPS Office, *Social Media and Tactical Considerations for Law Enforcement*,[28] gives

17. Facebook.com, search term "dogs shot by police," March 25, 2017 at 4:15 p.m.
18. Google.com, search term "dogs shot by police," May 31, 2019 at 2:39 p.m.
19. Jesse Paul, "Commerce City Pays $262,500 To Family Whose Dog Was Killed by Cop," *Denver Post*, January 25, 2016, updated July 27, 2016, http://www.denverpost.com/2016/01/25/commerce-city-pays-262500-to-family-whose-dog-was-killed-by-cop/.
20. Results of Google search string "Chloe shot by police Colorado" as of June 17, 2017 at 2:20 p.m. EDT.
21. Civil Action No: 1:13-cv-03090-REB-BNB GARY BRANSON, Plaintiff *v.* COMMERCE CITY POLICE OFFICER ROBERT PRICE, in his official and individual capacity, COMMERCE CITY COMMUNITY SERVICES OFFICER ARICA BORES, in her official and individual capacity, COMMERCE CITY POLICE OFFICER CHRISTOPHER CASTILLO, in his official and individual capacity, and CITY OF COMMERCE CITY, COLORADO, Defendants.
22. Civil Action No: 1:13-cv-03090-REB-BNB GARY BRANSON, Plaintiff (see note 21).
23. Yesenia Robles, "Commerce City Cop Acquitted In Shooting Death Of Chloe The Dog," *Denver Post,* October 2, 2013.
24. "Owner of Dog That Was Shot by Officer Gets $262,500.00 From Commerce City, Largest Ever," *CBS Denver 4, January 25, 2016,* https://denver.cbslocal.com/2016/01/25/owner-of-dog-that-was-shot-by-police-officer-gets-262500-from-commerce-city/.
25. Chris Halsne, "Settlement Reached in Police Killing of Dog, Called Largest In U.S. History," *Fox News 31, Denver*, January 25, 2016,updated January 26, 2016, https://kdvr.com/2016/01/25/settlement-reached-in-police-killing-of-dog/.
26. "Police Shooting Dogs," *Inside Edition,* April 29, 2014, https://www.insideedition.com/investigative/8203-police-shooting-dogs.
27. Ivan Moreno, "Police Training for Dog Encounters in Colorado Becomes Law," *Denver Post*, May 12, 2013, updated October 27, 2016, http://www.denverpost.com/2013/05/12/police-training-for-dog-encounters-becomes-law/.
28. Office of Community Oriented Policing Services, *Social Media and Tactical Considerations for Law Enforcement* (Washington, DC: Office of Community Oriented Policing Services, 2013), https://ric-zai-inc.com/Publications/cops-p261-pub.pdf.

an overview of general principles regarding social media and operational matters, including managing public response to high-interest events. The shooting of a dog in Chester, Pennsylvania, in 2015 illustrates how out-of-control social media attention can cause problems far beyond the location of the shooting.[29] On December 10, 2015, Christie Fry says Chester Police officers entered her backyard where her dog, Bear, was securely hooked to his tie-out. Statements from officers on the scene claim that Bear escaped from his tie-out and knocked one of the officers over. Fry then states that one of the officers told her, "Well you don't have a dog anymore. He's done now!" as he laughed in her face. The Chester Police Department isn't located in Chester County, but in nearby Delaware County. Nonetheless, Sheriff Carolyn Welsh of the Chester County Sheriff's Office reported that her department, which was not involved in the shooting at all, received a high volume of negative social media attention accusing their officers of killing this animal. Sheriff Welsh herself was threatened and the agency had to shut down all social media, monitor email, and expend a large amount of time and effort defending their agency, even though their agency was not involved. Interestingly, in 2014, one of Sheriff Welsh's deputies, Corporal Kurt Hansen, himself was involved in a potentially deadly encounter with a dog while on patrol. In this incident, Corporal Hansen was able to push the dog away, even though he sustained two bites that required hospitalization.[30] Local media did report Corporal Hansen's actions and the citations that he received as a result.[31]

## *Editorial and persuasive publications*

Editorials and opinion pieces have often followed law enforcement use of deadly force against dogs. The shooting of Rosie, a four-year-old Newfoundland dog, in 2010 gained news coverage,[32] the publication of petitions on popular internet petition sites, and high exposure across Facebook. The Des Moines (Washington) Police Department was roundly criticized and an eventual financial settlement was reached.[33] Yet opinion pieces, then and now, still feature the case.

A publication entitled "Gunned Down,"[34] published in May 2013 on the web site petsadviser.com, has seen wide distribution. It describes problematic shootings including the shooting of a 20-pound Terrier mix named Reese while on leash for a walk, a German Shepherd dog shot while tied to his porch in South Carolina, a dog named Capone shot by police in Camden, New Jersey while one officer is alleged to have cried "Don't shoot him!", and others. In support of its criticism of these cases, the publication cites upper-level staff of organizations such as the

29. "Laughing Cops Take Turns Shooting 1-Year-Old Puppy," Lady Freethinker [blog], accessed June 17, 2017, https://ladyfreethinker.org/laughing-cops-take-turns-shooting-puppy-for-barking/.
30. Kathleen Brady Shea, "Tools, Training Aim to Curb Dog Fatalities," *Chadds Ford Live*, Oct. 15, 2016, https://chaddsfordlive.com/2016/10/15/tools-training-aim-to-curb-dog-fatalities/.
31. Kathleen Brady Shea, "Dog Attack Spurs Citations, Possible Policy Change," *Unionville Times*, April 4, 2014; "Chesco Sheriff's Deputy Honored for Actions," *Mercury* (Pottstown, PA), May 7, 2014.
32. Jennifer Sullivan, "Des Moines to Pay $51,000 Over Fatal Shooting of Dog," *Seattle Times*, February 21, 2013, https://www.seattletimes.com/seattle-news/des-moines-to-pay-51000-over-fatal-shooting-of-dog/.
33. Sullivan, "Des Moines to pay $51,000" (see note 32).
34. "Gunned Down: Why Are So Many Dogs Being Shot by Police?" Petful Special Report, last updated May 2013, http://www.petful.com/gunned-down-report-new.pdf.

Animal Legal Defense Fund explaining that many shootings are the result of poor training of law enforcement officers and "less than objective" reviews of shootings by internal agency investigations.[35] It also features an entire page that shows the faces of 115 dogs killed by law enforcement shootings—a dramatic tableau.

## *Movies and videos*

Many videos of law enforcement use of deadly force against dogs have become popular, and even viral, across social media platforms. These videos vary in quality and content, but typically present a negative narrative towards law enforcement officers. They range from cell phone camera video to recordings made without the knowledge of the officers involved, such as home surveillance and public CCTV footage.

A more detailed and higher quality piece is the documentary movie *Of Dogs and Men*, produced by Ozymandias Entertainment, Inc.[36] This full-length feature film shows a fairly balanced presentation of cases. Law enforcement officers and deputies, notably from the Gwinnett County (Georgia) Sheriffs' Office K9 Unit, address the varying factors in the decision to use deadly force against domestic dogs. Fact checking seems to be high quality, and although some officers have taken the production to be anti-police, review by experts on both sides of the issue have indicated that the overall message is clear and compelling: law enforcement officers must be provided better training and tools with which to deal with domestic dogs, and better policies and practices must be implemented.

## *Conclusions*

Public perception of law enforcement encounters can profoundly affect law enforcement–community relationships. Although press coverage does exist that covers positive encounters between dogs and law enforcement, such as the many stories of "officer saves puppy," the news of a fatal dog encounter with law enforcement travels rapidly and widely. Negative stories and social media can affect an agency's ability to efficiently do its job, both through the distraction of dealing with media and social media attention and through the negative effects on community trust.

---

35. "Dog Shot by Cops: Companion Animals and Law Enforcement," Animal Legal Defense Fund, accessed June 17, 2017, http://aldf.org/resources/when-your-companion-animal-has-been-harmed/dogs-shot-by-cops-companion-animals-and-law-enforcement/.
36. Michael Ozias, dir., *Of Dogs and Men*, released August 1, 2016, Ozymandias Entertainment Inc. and Just Add Firewater LLC.

## Law enforcement literature

### *Overview*

Law enforcement agencies and advisory publications have addressed the question of law enforcement use of deadly force against dogs. One base document often referred to is *The Problem of Dog-Related Incidents and Encounters*, (Bathurst, et. al. 2011) published in 2011 by the COPS Office and supported by a grant from the National Canine Research Council, LLC.[37] Authored by Dr. Cynthia Bathurst, Ledy VanKavage, Patricia Rushing, Donald Cleary, and Karen Delise, this extensively researched report examines the factors that have contributed to the state of law enforcement use of force against animals. They provide both reasons for officer decisions and potential tools and training to reduce the use of deadly force, including an examination of the efficacy of less-lethal and nonlethal tools and strategies. The document also provides methods for assessing the effectiveness of training and policies regarding use of force.

In 2009, the Los Angeles (California) Police Department issued Directive No. 7, "Dog Encounters,"[38] as part of its policy manual. This policy describes the hazards of encountering dogs during police calls and explicitly sets out escalating levels of force: voice command, oleoresin capsicum spray (also known as OC spray or pepper spray), TASER, baton, kicking, fire extinguishers, bean bag projectile weapons, and finally deadly force. This policy set an early standard for the use of less-lethal and nonlethal means by a major U.S. law enforcement agency.[39]

The publication *Effective Animal Safety Enforcement (E.A.S.E.),*[40] produced in 2012 by the Pit Bull Legal News Network, illustrates the public perception of use of deadly force by law enforcement. This document also recognizes some of the training efforts undertaken by law enforcement agencies including Austin and Fort Worth, Texas; Monroe County, New York; and Cobb County, Georgia. Precedent-setting legal cases referenced include *San Jose Charter of Hells Angels Motorcycle Club* v *City of San Jose* (California); *James W. Smoak et al.* v *Eric Hall et al.* (Tennessee); *Calvo* v *County of Prince George* (Maryland); *Russel* v *Chicago Police Department, City of Chicago* (Illinois); and *Roger Jenkins, Sandra Jenkins* v *Frederick County Sheriff's Department, State of Maryland*.

---

37. Cynthia Bathurst, Donald Cleary, Karen Delise, Ledy VanKavage, and Patricia Rushing, *The Problem of Dog-Related Incidents and Encounters* (Washington, DC: Office of Community Oriented Policing Services, 2011), https://ric-zai-inc.com/ric.php?page=detail&id=COPS-P206.
38. Los Angeles Police Department, "Directive No. 7: Dog Encounters," in *Los Angeles Police Department Policy Manual* (Los Angeles, CA: Los Angeles Police Department, 2009.)
39. The complete directive is found in the "Policy Considerations" section of this Toolkit.
40. Pit Bull Legal News Network, *E.A.S.E.: Effective Animal Safety Enforcement* (PBLNN Publications, n.p. 2012), https://s3-us-west-2.amazonaws.com/docs.puppycidedb.com/literature/PitBulletinLegalNewsNetwork-EffectiveAnimalSafetyEnforcement.pdf.

Law enforcement publications also recognize the importance of this issue. For example, in Spring 2004, the magazine *Tactical Edge*, produced by the National Tactical Officers' Association, published Krista Kurvers and Gary Maddox's "Dogs and Tactical Response."[41] In this early article, members of the Tactical Officers' Association were familiarized with basic dog behavior, uses of less-lethal and nonlethal tools when dealing with dogs, and considerations for said use in tactical raids. The article reminds officers of the need to use only the force absolutely required to accomplish their mission and to do so in a humane and lawful manner.

The popular law enforcement website *Police One* hosts the video "Roll Call: Reality Training: Dealing with Aggressive Dogs."[42] The video offers advice for officers on subjects such as the proper and safe use of oleoresin capsicum spray to safely deter aggressive animals in the video.

*Police: The Law Enforcement Magazine* published the October 2014 article "Can Police Stop Shooting Dogs?"[43] It addresses law enforcement's use of deadly force against dogs, covering high-profile cases such as the Commerce City case. The article stresses the importance of officers looking for other, less-lethal and nonlethal means to keep themselves, and the public, safe during dog encounters. Another article by the same author, "A Use of Force Continuum for Dealing with Dogs," appears in the November 2014 issue.[44] This article describes the use of less-lethal and nonlethal force options and suggests the application of human use of force continuum standards for encounters with domestic dogs.

Krista Kurvers, one of the authors of "Dogs and Tactical Response," (see note 41), returned to the topic of law enforcement dog encounters in 2013 with *Dealing With Dogs for Law Enforcement Officers,* focusing on less-lethal and nonlethal options.[45]

*Sheriff Magazine,* published by the National Sheriffs' Association, addressed the need for moderation and consideration of the use of deadly force by in a 2014 article, "Officer Involved Shootings with Dogs."[46] This article also reported that Colorado, Tennessee, Ohio, and Illinois had, as of publication, established requirements for training law enforcement officers in dog encounters. Additional online resources from the association can be found at https://www.sheriffs.org/dog_encounters.

---

41. Krista Kurvers and Gary Maddox, "Dogs and Tactical Response: A Guide for Safe, Successful and Humane Encounters," *The Tactical Edge,* Spring 2014: 90–98.
42. "Roll Call: Reality Training: Dealing with Aggressive Dogs," PoliceOne.com, video, posted June 1, 2014, https://www.policeone.com/less-lethal/articles/7246250-Reality-Training-Dealing-with-aggressive-dogs/.
43. David Griffith, "Can Police Stop Shooting Dogs?", *Police: The Law Enforcement Magazine,* October 29, 2014.
44. David Griffith, "A Use of Force Continuum for Dealing with Dogs," *Police: The Law Enforcement Magazine,* November 4, 2014.
45. Krista Kurvers, *Dealing with Dogs for Law Enforcement Officers* (Longmont, CO: Code 3 Associates Inc., 2013).
46. Nancy Blaney, "Officer Involved Shootings with Dogs," *Sheriff Magazine,* September/October 2014.

Anticipation and pre-planning, especially in high-risk situations such as search warrants, allow consideration of possibilities long before the event occurs. The International Association of Chiefs of Police (IACP) recognized the need for planning, including for potential dog threats, in its 2005 model search warrant policy.[47] In 2015, the IACP produced a model policy specifically regarding interactions with canines. These models can serve as adaptable templates for policy formation.[48]

The ASPCA has issued a formal policy statement that strongly encourages the training of law enforcement officers in dog related encounters.[49]

## *Existing training programs for law enforcement*

Dog encounter training programs for law enforcement officers do exist. The first major training program was developed by the National Canine Research Council and Safe Humane Chicago in the wake of the COPS Office report *The Problem of Dog-Related Incidents and Encounters.*[50] This program, entitled Police & Dog Encounters: Tactical Strategies and Effective Tools to Keep Our Communities Safe and Humane,[51] includes five roll-call video trainings and has been widely disseminated. It covers such topics as using and understanding canine body language cues, officer posture and positioning when dealing with dogs, and factors that tend to increase the likelihood an officer may be negatively perceived by a dog. The video training series also includes scenes of Chicago law enforcement personnel working with a dog training expert and illustrates specific example interactions between officers and dogs. These videos are available through the COPS Office Training Portal.[52]

Over time, other programs have been developed and expanded to address the issue, including many state-level curricula developed in response to legislative mandates. The State of Colorado instituted mandatory training for law enforcement officers under the Colorado Dog Protection Act of 2013.[53] To fulfill this requirement, the Colorado Association of Animal Control Officers created an online training program. The program uses photos and descriptions of situations to inform officers of potential triggering situations and recommends methods of less-lethal and nonlethal force.[54]

---

47. International Association of Chiefs of Police, *IACP Model Policy, Executing Search Warrants 0205* (Alexandria, VA: IACP Policy Center, 2005).
48. International Association of Chiefs of Police, *IACP Model Policy, Law Enforcement Interactions with Canines* (Alexandria, VA: IACP Policy Center, 2015).
49. "Position Statements on Law Enforcement Response to Potentially Dangerous Dogs," ASPCA, accessed April 10, 2019, https://www.aspca.org/about-us/aspca-policy-and-position-statements/position-statements-law-enforcement-response.
50. Bathurst et al., *The Problem of Dog-Related Incidents* (see note 37).
51. *Police & Dog Encounters – Tactical Strategies and Effective Tools to Keep Our Communities Safe and Humane,* DVD produced by the COPS Office, Safe Humane Chicago, and the National Canine Research Council, 2013. Free copies of the DVD are available by contacting NCRC directly.
52. The COPS Training Portal is available at https://learn.copstrainingportal.org/. You will need to create an account to access the videos if you do not already have one.
53. Colorado State Statutes, Chapter 208, "Concerning the creation of the 'Dog Protection Act," https://leg.colorado.gov/sites/default/files/images/olls/2013a_sl_208.pdf.
54. This online program can be accessed by visiting http://dogprotection.caaco.org/. Please note that the program is best viewed with a browser that has Adobe Flash installed.

The State of California developed a video training series in 2015 for peace officers under the California Commission on Peace Officers' Standards and Training (POST).[55] That training is scenario-based. In the breaks after each of the five scenarios, the videos also include on-camera discussion between officers participating in the training, intended to spark discussion between viewing students, and short interviews with select subject matter experts—law enforcement commanders, K9 officers, SWAT officers, and canine behavior experts. Rather than exploring details of when and how to deploy deadly force against dogs, the trainings stress that avoidance and prevention are the key for law enforcement officers to keep themselves, the public, and animals safe. Interested agencies may contact the California POST Commission to obtain a copy of the training program, which includes the videos as well as printable instructor and trainee documents.[56]

The Texas Commission on Law Enforcement (TCOLE) has a four-hour training course abstract available online.[57] It covers topics like dangerous dog determinations and owner responsibilities, dog behavioral cues, situational awareness, and nonlethal options for dealing with dogs on the scene. The abstract also covers conflict avoidance and de-escalation principles, as well as applying the common use of force continuum taught to entry-level law enforcement officers to dogs. The abstract is intended to be a guide for agencies to develop their own courses to meet the Texas legislative mandate passed in 2015.[58]

Many non-profit organizations have created training programs as well.[59] For example, Dr. Randall Lockwood, Senior Vice President for Forensic Sciences and Anti-Cruelty Projects of the American Society for the Prevention of Cruelty to Animals, has conducted training in the mid-Atlantic area, and the Society for the Prevention of Cruelty to Animals Los Angeles (spcaLA) created a four-hour course for California law enforcement.[60]

Programs such as the NCRC-Safe Humane Chicago training and state-level curricula are well-organized and based on valid and accepted behavioral science. They are aimed at the avoidance of conflict and an understanding of proper evaluation of dog encounter situations.

---

55. *"Dog Encounters: Keeping Officers Safe,"* DVD produced by the California Commission on Peace Officers' Standard and Training, 2015.
56. Information on ordering the Dog Encounters: Keeping Officers Safe training program can be found at https://post.ca.gov/post-Training-Videos. There is a $99 cost for non-California law enforcement agencies.
57. "Canine Encounters," [Abstract of training curriculum], Texas Commission on Law Enforcement, Course 4065, January 2016. Available at http://www.tcole.texas.gov/content/canine-encounters.
58. Tex. Occ. Code § 1701.261(a)(1)-(7) (2015), https://texas.public.law/statutes/tex._occ._code_section_1701.261.
59. The Humane Society of the United States, "Oklahoma Law Enforcement Officers Receive Training on Handling Dog Encounters and Veterinary Crime Scene Analysis," press Release, May 15, 2017, https://www.humanesociety.org/news/oklahoma-law-enforcement-officers-receive-training-handling-dog-encounters-and-veterinary.
60. Society for the Prevention of Cruelty to Animals Los Angeles, "spcaLA presents Dog Behavior for Law Enforcement Seminar to Local, State, and National Law Enforcement Personnel," press release, January 17, 2017, https://spcala.com/press-release/spcala-presents-dog-behavior-for-law-enforcement-seminar-to-local-state-and-national-law-enforcement-personnel/.

Private contract training also exists, of varying degrees of competence. Curricula focused on recommendations for less-lethal and nonlethal methods are often presented with awareness and forethought; those focused on how law enforcement officers should use varying levels of offensive force to deter dogs often lack sound understanding of basic canine behavioral science. Caution should be exercised when using a private company to provide this training. Look for instructors that are current or former law enforcement officers of the agency's state, and check whether the company's program or curriculum has been reviewed and accepted by the state's law enforcement accreditation commission and what previous students have said about the company and its program.

Lack of a consistent standard has contributed to reputation loss in law enforcement agencies across the country. As noted in the ASPCA's position statement on these encounters,

> "[p]olicies that require only that an officer "feel" threatened set a very low threshold for justifying the killing of dogs. In virtually all cases we have examined, internal reviews of dog shootings have ruled them to be justifiable under existing policies, even though several cases have resulted in substantial civil judgments against police departments for wrongful destruction. Such incidents not only jeopardize the lives of companion animals, but also undermine the reputation of law enforcement agencies in the community."[61]

The Law Enforcement Dog Encounters Training (LEDET) program developed by the National Sheriffs' Association and the COPS Office is based in law enforcement tactical training recognition, canine behavioral science, and input from experts in the legal, law enforcement operations, and canine behavior fields. This training program comprises a toolkit for law enforcement executives and a companion training curriculum, which can be coupled with virtual training being offered by a private training contractor. The LEDET program seeks to set a national standard for law enforcement dog encounter training.[62] It includes modules on the importance of the issue and public perception; basics of canine behavior and signaling; situational and tactical awareness for officers, including decision-making and threat perception factors; tactical recommendations; and investigative and documentary needs, focusing on competent investigation and transparency.

## *Conclusions*

A single, coherent, standardized training program for law enforcement–dog encounters does not currently exist. Public and agency expectations for officers' and deputies' responses in dog encounters differ greatly. Agency policies and practices vary widely, even across small areas.

61. ASPCA, "Position Statements on Law Enforcement Response" (see note 49).
62. National Sheriffs' Association, "National Law Enforcement Center On Animal Abuse, National Sheriffs' Association, and Virtra Launch New Law Enforcement Training Program to Reduce Animal Injury in Police Encounters," press release, June 5, 2018, https://www.sheriffs.org/National-Law-Enforcement-Center-Animal-Abuse-National-Sheriffs-Association-and-VirTra-Launch-New-Law.

Case 6:19-cv-06780-MJP Document 160-16 Filed 12/22/25 Page 26 of 80



This has created a confusing landscape of mixed standards and has contributed to increasingly successful civil action against agencies across the country. This confusion illustrates the need for an agreed-upon standard of training and plans of action, consistent and adaptable to local ordinances, laws, and department policies, that can aid agencies and officers in safely, humanely, and lawfully interacting with dogs under a range of circumstances.

## Legal publications and decisions

Historically, the courts have identified companion animals as property, despite many dog owners considering them part of their family. And while there are laws in place to protect the welfare of companion animals (all 50 states have felony animal cruelty statutes), these laws are not intended to give animals a legal status greater than that of property. There is a shift occurring in the judicial system, however. While historically, few courts would allow requested relief to consider the emotional distress caused by injury or death of the animal or the intrinsic value of the animal to the owner, case decisions within the past decade have seen tort claims seeking non-economic damage—including those for emotional distress—recognized as valid by the courts. Settlements and judgments reaching the hundreds of thousands of dollars have been awarded in favor of families whose companion animals have been shot by law enforcement.

### *Notable cases, judgments, and settlements*

A 2016 Michigan case brought nationwide attention to the issue of law enforcement shooting dogs when the court found Battle Creek officers were justified in shooting two dogs while executing a search warrant. As the Sixth Circuit Court of Appeals noted,

> …the standard we set out today is that a police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety.[63]

However, it's important to note that not all courts have sided with law enforcement agencies in these cases. Additional cases garnered attention after awarding the families of dogs shot six- and seven-figure settlements or judgments. In Anne Arundel County, Maryland, a jury awarded Michael Reeves $1.26 million dollars—$500,000 in economic damages, and $760,000

---

63. Brown v. Battle Creek Police Dept., 844 F.3d 556 (6th Cir. 2016).

in noneconomic damages—for the shooting of his dog, Vernon, by a county police officer.[64] In February 2017, a Connecticut family settled with the Hartford Police Department for $885,000 for the 2006 shooting of their St. Bernard.[65] These are just a few of the numerous cases being litigated across the country.

Typically, causes of action involving dog encounters brought against law enforcement officers or agencies are either brought as tort claims under state law or as federal civil rights claims under 42 U.S.C. § 1983.

## *Tort claims: IIED and NIED*

Tort law is simple in that each individual tort has elements that must be met in order for an individual to be held liable for that tort. Tort claims have rarely been successful for plaintiffs bringing suit against a law enforcement officer who has killed a family dog. Under intentional infliction of emotional distress (IIED), a plaintiff must prove that a defendant's conduct was extreme and outrageous and intentionally or recklessly caused the plaintiff's severe emotional distress. This can be difficult in officer-involved dog shootings: issues arise for plaintiffs either in proving intentionality (or recklessness) or in showing the defendant-officer's conduct was extreme and outrageous. Intentionality cannot be inferred merely from an officer knowingly shooting a dog in front of the dog's owner.

Furthermore, in *Kautzman* v. *McDonald*, the court granted summary judgment against the plaintiffs and found that the defendant-officers could not have been acting intentionally because they were responding to a citizen complaint and did not know that the dogs involved belonged to the plaintiffs.[66] IIED claims also require that the plaintiff show the defendant's behavior was extreme and outrageous. This can be hard to do when the defendant is working under the authority of law, because when the officer's actions are weighed against the officer's responsibility for public safety the actions may not go "beyond the pale of human decency."[67] The conduct may seem rash or unjustified, but still not rise to the level of being extreme and outrageous under the law.[68] Finally, the plaintiff must show that the severe emotional distress is a direct result of either physical injury to him- or herself or someone close to the plaintiff, or from fear for his or her personal safety, not just from grieving the death of a family dog.[69]

---

64. Rachael Pacella, "Jury Awards $1.26M to Glen Burnie Family Whose Dog Was Shot by Police," *Capital Gazette,* May 10, 2017, http://www.capitalgazette.com/news/for_the_record/phac-cn-vern-lawsuit-0510-20170509-story.html, last accessed July 11, 2017.
65. Tony Fay, "Hartford Paying $885K to Family Whose Dog Was Killed by Cops," WWLP News, February 28, 2017, https://www.wwlp.com/news/connecticut/hartford-paying-885k-to-family-whose-dog-was-killed-by-cops/1043199013.
66. 621 N.W.2d 871, 877 (N.D. 2001).
67. 621 N.W.2d 871, 877 (N.D. 2001) at 876.
68. See also Brooks v. U.S., 29 F. Supp. 2d 613, 618 (N.D. Cali. 1998) (explaining that although the officer's conduct "may have been distressing" to the plaintiffs, it was insufficient to prove IIED).
69. Kaiser v. U.S., 761 F. Supp. 150, 156 (D.D.C. 1991).

However, within the past fifteen years, the courts have begun to recognize IIED claims resulting from the loss of a family dog. In *Brown* v. *Muhlenberg Township*, the facts indicated that the defendant-officer intentionally acted extremely and outrageously and caused severe emotional distress to the owner. The officer involved shot a three-year-old dog five times for no justifiable reason while ignoring the dog's owner, who was screaming and pleading with the officer not to shoot the dog. The court believed this was a clear indication that the officer was aware of the owner's emotional state, and yet he still proceeded to maliciously fire five bullets at the dog.[70] Furthermore, in *Ammon* v. *Welty*, the Kentucky Court of Appeals noted that claims for intentional infliction of emotional distress revolve around the conduct of the defendant and not the target of such conduct, so just because the alleged victim is a dog does not preclude the claim.[71] While a seemingly insignificant case, it shows how the courts have begun to recognize the emotional value of a family dog to an owner.

On the other hand, as of 2018, there have been no reported cases of successful negligent infliction of emotional distress (NIED) claims against a law enforcement officer involved in a lethal canine encounter, due to the courts' unwillingness to recognize the relationship between a dog and his or her owner as familial. Typically, NIED claims do not require any showing by the plaintiff of the defendant's intent to cause distress, but it does require that the defendant places the plaintiff in danger or fear of bodily harm, which results in the emotional distress. These claims may also be brought against a defendant who negligently caused serious bodily harm to a person with whom the plaintiff shares a close family relationship, such as a child, sibling, parent, or grandparent, but as noted above, courts have not recognized a family relationship between an owner and his or her dog that would make NIED claims applicable

## *Civil rights claims under 42 U.S.C. § 1983*

A majority of the cases brought over the last ten to fifteen years involving the law enforcement shooting deaths of dogs are civil rights claims under 42 U.S.C. § 1983. Under § 1983, a government employee, acting under the color of law, may be held liable for violating the constitutional rights of an individual. Typically, these claims are either Fourth Amendment unlawful seizure claims or Fourteenth Amendment due process claims. The success of these claims, particularly the Fourth Amendment claims, are bolstered by two federal cases: *Brown,* as noted above, and *San Jose Charter of Hells Angels Motorcycle Club* v. *City of San Jose*.[72] As the court noted in *Viilo* v. *Eyre*, "…*Brown* and *Hells Angels* clearly establish that it is unreasonable for officers to kill a person's pet unnecessarily…"[73] The crux of a successful Fourth Amendment unlawful seizure claim is a showing that an officer's actions are unreasonable.[74] If this can be

70. 269 F.3d 205 (3rd Cir. 2001).
71. 113 S.W.3d 185, 188 (Ky. 2002).
72. San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962 (9th Cir. 2005).
73. 547 F.3 707, 710 (7th Cir. 2008).
74. See Tennessee v. Garner, 471 U.S. 1 (1985).

shown, then a court should readily be able to determine that the officer's actions violated the victim's Fourth Amendment rights. Even though these decisions still view the dog as property, that the courts have found the actions unreasonable or unnecessary speaks to the evolving recognition that dogs are deserving of some protection in the courts.

Often, Fourteenth Amendment claims are brought alongside the Fourth Amendment claims. These claims tend to argue that the law enforcement officers failed to provide notice or hearing prior to the seizure of property (the shooting death of a dog). As noted in *Brown*, process (notice and hearing) must be served prior to the seizure or deprivation. The court also pointed out, however, that often in law enforcement shooting deaths the conduct is "random and unauthorized," which makes process prior to deprivation near impossible. As this is often the case, a state should provide a sufficient post-deprivation remedy. Because of the "random and unauthorized" nature of the officer's actions, a Fourteenth Amendment claim is harder to prove and most § 1983 claims focus on the Fourth Amendment.

## *Litigation awarding non-economic damages for the loss of a dog*

Another area of litigation relevant to reducing incidences of officer-involved dog deaths is that of courts awarding non-economic damages to dog owners for the injury or loss of a dog. Because dogs are viewed as property under the law, damage awards have typically been limited to the market value of the dog at the time of the dog's death. This valuation takes into consideration factors like the purchase price, if any, of the dog; the age and health of the dog; the breed and pedigree of the dog; and any special training, usefulness, or other economic value of the dog.

Non-economic damages are those in addition to the market value of the dog or reimbursable costs related to reasonable veterinary treatment, such as compensation for loss of sentimental value or companionship or an award of punitive damages. Since dogs are legally classified as property, courts have traditionally been reluctant to award damages for mental pain and anguish related to property loss. However, various courts have shown willingness to at least consider non-economic damages for the loss of a dog. Numerous courts have allowed a plaintiff to present evidence attesting to the actual value of the dog to the owner, above and beyond the dog's market value. In 2004, a California jury awarded $39,000 in damages for loss due to veterinary malpractice—only $10 of that was for the dog's market value.[75] An Oregon jury awarded $56,400 to the Greenup family in 2006 after their neighbor intentionally ran over their 14-year-old dog.[76] In 2009, a jury awarded a California couple over $200,000 when their small dog was injured by a neighbor, and that amount included both non-economic

---

75. Scott R. Nolen, "California Dog Owner Awarded $39,000 in Veterinary Malpractice Suit," *JAVMA* [Journal of the American Veterinary Medical Association] *News*, April 15, 2004, https://www.avma.org/News/JAVMANews/Pages/040415e.aspx.
76. Jessica Golden, "Judge Says Pet is Property, Not Companion," ABC News, May 25, 2006, http://abcnews.go.com/US/print?id=2005581.

damages and damages for emotional distress.[77] A Colorado woman was awarded $65,000 in 2012 after her dog was hit by a car when a cleaning company left a door open, which allowed the dog to escape.[78]

In specific cases of dogs being shot by law enforcement officers, notable judgments and settlements have reached in the hundreds of thousands of dollars; these awards are usually based on the actions of the law enforcement officer involved. These cases demonstrate an increased willingness by the judicial system to award non-economic damages for these encounters:[79]

### Iberia Parish, Louisiana: $75,000 (2018)

A New Iberia family agreed to a $75,000 settlement against an already-beleaguered sheriff and one of his deputies for the 2015 death of their dog, Tank. Two Iberia Parish deputies were responding to a call of a loose dog, which turned out to be Tank. Bodycam footage from one of the deputies records him saying, "Dog, you're about to die, you understand me? You're about to die," before chuckling.[80]

### Anne Arundel County Police, Maryland: $1,260,000 (2017)

In perhaps the highest award for the shooting death of a dog, an Anne Arundel jury awarded Michael Reeves $500,000 in economic damages and an additional $760,000 in noneconomic damages for the 2014 shooting death of his dog, Vernon, by an Anne Arundel County police officer. The officer claimed that while he was investigating a burglary in the area, he was confronted by Vernon and shot him twice. Reeves' family was not involved in the burglary or the subsequent investigation, but simply lived in the area. The Anne Arundel County Police cleared the officer of all wrongdoing, but the jury sided with Reeves and found his constitutional rights were violated and that the officer acted with gross negligence. Evidence presented at the trial showed that the angle bullets entered Vernon's body contradicted the officer's testimony that the dog was attacking him. Months later, an Anne Arundel County judge reduced the jury's award to just $207,500 because state law capped damage awards.[81]

---

77. Denise Johnson, "California Allows Emotional Distress Damages in Dog's Death," *Claims Journal,* September 18, 2012, http://www.claimsjournal.com/news/west/2012/09/18/213735.htm.
78. Jenna Greene, "Setting Precedent, Judge Awards Owner of Deceased Dog $65,000 for Emotional Distress," *National Law Journal,* April 20, 2012, http://www.nationallawjournal.com/id=1202549698990/Setting-precedent,-judge-awards-owner-of-deceased-dog-65,000-for-emotional-distress-?slreturn=20140321044829.
79. There are more cases detailed under the heading "Exemplar Case Summaries."
80. Michael Kunzelman, "Dog Owners Get $75K in Pact Over Deputy's Canine Killing," *U.S. News, April 4, 2018,* https://www.usnews.com/news/best-states/louisiana/articles/2018-04-04/dog-owners-get-75k-in-pact-over-deputys-canine-killing.
81. Pacella, "Jury Awards $1.26M to Glen Burnie Family" (see note 64).

### Frederick County Sheriff's Office, Maryland: $620,000 (2013)

In April 2012, a Maryland jury awarded the Jenkins family $620,000 for the 2010 shooting of their dog, Brandi, by a Frederick County deputy. Dash cam footage showed the dog "bounded" towards the deputy when he arrived at the residence but stopped shortly after the deputy pulled his firearm. He then shot her, although the footage shows her acting friendly and non-aggressive. Brandi survived after the owners were allowed to take her to the veterinarian following the shooting.[82] After the Jenkins family left to care for Brandi, the deputies entered the home without permission to execute an arrest warrant for the Jenkins' son. The deputies named in the lawsuit appealed the verdict, claiming part of the award—for emotional damages—was impermissible, as state law did not allow emotional damages for the destruction of property. The court, however, upheld the award, in contrast to previous legal precedents that valued animals only for their market worth. While the verdict was reduced by $400,000, the reduction was in damages awarded for the deputies' alleged trespassing, which the court overturned, and not a reduction in damages for emotional distress.[83]

### Conclusion

Litigation outcomes vary by state, but an obvious trend has emerged over the past few years. More and more courts and juries are awarding hefty verdicts for these incidents, and many agencies opt for substantial settlements in lieu of litigation. The best route to avoid litigation starts by training officers to prevent these encounters, while also giving them the tools and resources necessary to justify the reasonableness of their actions.

## *Of note: Qualified immunity*

The legal doctrine of qualified immunity is commonly raised by law enforcement officers as a defense to civil rights claims that their actions violated an individual's constitutional rights. Under this doctrine, courts must first determine whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[84] If there was no violation, the analysis ends and the individual's claim against the officer fails.

---

82. Derek Valcourt, "Court Awards Frederick Co. Family Damages after Sheriff's Deputies Shoot Their Dog," *CBS Baltimore,* April 4, 2012, http://baltimore.cbslocal.com/2012/04/04/court-awards-frederick-co-family-damages-after-sheriffs-deputies-shoot-their-dog/.
83. Danielle Gaines, "Appeals Court: Emotional Damages Allowed in Dog Shooting Case," *Frederick News-Post,* December 19, 2014, https://www.fredericknewspost.com/news/crime_and_justice/courts/appeals-court-emotional-damages-allowed-in-dog-shooting-case/article_ec02c09f-f82b-5de0-adc1-e507796e1764.html.
84. Saucier v. Katz, 533 U.S. 194, 201 (2001).

However, if there was a violation, the courts must then determine whether that right was clearly established.[85] In *Anderson* v. *Creighton*, the Supreme Court ruled, "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[86] In other words, would it be clear to a reasonable officer in a similar situation that his actions are unlawful? Is there something—a law or court case, for example—that serves to put officers on notice regarding the reasonableness of certain actions? The burden is on the plaintiffs to show that the defendants are not entitled to the protection of qualified immunity.[87]

In the area of law enforcement-dog encounters, the qualified immunity question typically takes a two-step analysis: was the shooting of the dog an unreasonable seizure under the Fourth Amendment, and has it been clearly established that citizens enjoy Fourth Amendment protection from having their dogs unreasonably seized? In the 2016 case *Brown* v. *Battle Creek Police Department*, the Sixth Circuit Court acknowledged that, while no legal decision was made by either the U.S. Supreme Court or the Sixth Circuit Court itself regarding these encounters, every other Circuit Court, as well as a district court within the Sixth Circuit, has ruled that the unreasonable killing of a dog is a violation of the Fourth Amendment's protection of personal property.[88] The court argued that this clearly established the Fourth Amendment right of people from having their dogs unreasonable seized, and officers would not be protected by qualified immunity if their actions were found to be unreasonable. Similar courts have made the same observation, indicating a wide acceptance within the judicial system of that right, and qualified immunity would only apply if the officer's actions were not unreasonable.[89]

The best way to avoid litigation is ensure the officer's reasoning for his or her actions is sound and rational; based on facts, training, and experience; and that the officer can clearly state his or her reasoning. A Seventh Circuit case outlined the standard in determining reasonableness in these situations: "[T]he use of deadly force against a household pet is reasonable only if the pet poses an [imminent] danger and the use of force is unavoidable."[90] While courts have differed in what behaviors pose an imminent threat, they have made it clear that "[w]e analyze [the] question [of whether a pet constitutes an imminent threat] from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"[91] This analysis must take into account the use of force standard outlined in the landmark Supreme Court case *Tennessee* v. *Garner* that balances the nature of the intrusion (seizure) against the government interest used to justify it.[92]

---

85. Saucier v. Katz (see note 84).
86. Anderson v. Creighton, 483 U.S. 635, 640 (1987).
87. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).
88. 844 F.3d 556 (6th Cir. 2016).
89. See, e.g., Fuller v. Vines, 36 F.3d 65 (9th Cir. 1994); Brown v. Muhlenberg Township, 269 F.3d 205 (3rd Cir. 2001).
90. Viilo v. Eyre, 547 F.3d 707, 710 (7th Cir. 2008)
91. Robinson v. Pezzat, 818 F.3d 1, 8 (D.C. Cir. 2016).
92. 471 U.S. 1, 8-9 (1985).

## Dog bites and behavior

Media discussions of dog aggression often focus heavily on dog breeds, and attempt—based on sparse evidence--to quantify which breeds are most likely to bite. Many breeds have gained reputations as biters; a simple internet search about dog bites and "most dangerous dogs"[93] returned a rolling list of images that ranged from German Shepherds, Rottweilers, Boxers, and Pit Bulls, to rarities such as the Basenji, Caucasian Shepherd, and Bully Kutta.

But the research-based literature paints a different story. The American Veterinary Medical Association's (AVMA) Task Force on Canine Aggression and Human-Canine Interactions explains dog bite statistics as follows:

> Dog bite statistics are not really statistics, and they do not give an accurate picture of dogs that bite. Invariably the numbers will show that dogs from popular large breeds are a problem. This should be expected, because big dogs can physically do more damage if they do bite, and any popular breed has more individuals that could bite. Dogs from small breeds also bite and are capable of causing severe injury. There are several reasons why it is not possible to calculate a bite rate for a breed or to compare rates between breeds. First, the breed of the biting dog may not be accurately recorded, and mixed-breed dogs are commonly described as if they were purebreds. Second, the actual number of bites that occur in a community is not known, especially if they did not result in serious injury. Third, the number of dogs of a particular breed or combination of breeds in a community is not known, because it is rare for all dogs in a community to be licensed, and existing licensing data is then incomplete. Breed data likely vary between communities, states, or regions, and can even vary between neighborhoods within a community.[94]

The several publications by Sacks et al.[95] and Quinlan and Sacks[96] expand on this statement and illustrate the difficulties in trying to assign "most dangerous" status within the tiny population of dogs that cause fatal human injury. The fatalities they studied involved dog breeds ranging from Pomeranians to Great Danes and many dogs which could not be identified as any specific

---

93. Google.com, search term "most dangerous dogs," May 31, 2019 at 3:01 p.m.
94. Task Force on Canine Aggression and Human-Canine Interactions, "A Community Approach to Dog Bite Prevention," *Journal of the American Veterinary Medical Association* 218, no. 11 (2001): 1732–49, https://www.avma.org/public/Health/Documents/dogbite.pdf.
95. In particular, J.J. Sacks, Leslie Sinclair, Julie Gilchrist, Gail Golab, and Randall Lockwood, "Breeds of Dogs Involved in Fatal Human Attacks in the United States between 1979 and 1998," *Journal of the American Veterinary Medical Association* 217, no. 6 (2000): 836–840, and J.J. Sacks, R.W. Sattin, S.E. Bonz, "Dog Bite-Related Fatalities from 1979 through 1988," *Journal of the American Medical Association* 262, no 11 (1989):1489–1492.
96. K.P. Quinlan and J.J. Sacks, "Hospitalizations for Dog Bite Injuries" [letter], *Journal of the American Medical Association* 281 (1999): 232–233.

breed.[97] Other publications by the same authors illustrate the rarity of life-threatening attacks by dogs, regardless of breed, despite officers' unfounded prejudices and the assumptions they may make based on dogs' physical appearance.[98]

The U.S. Centers for Disease Control studied the frequency of reported bites and the number of cases that required medical intervention, from emergency room visits to hospital admissions.[99] They found that, although nearly 4.5 million dog bites are reported every year in the United States, life-threatening or fatal bites are rare. Fewer people face life-threatening injury from dog attacks than from lightning strikes and drowning in their own bathtubs. Various other studies examining the range of severity of dog bite wounds likewise show that most bites are non-life threatening and non-disabling.[100] Other publications address the seriousness of dog bite injuries and occurrence and length of hospitalizations in patients that have been bitten by dogs.[101] This information should help inform agencies in developing of policies and procedures and allow officers to better understand the true threat level presented by a dog.

But although life-threatening bites may be extremely rare, aggressive and biting behaviors are not. Behavioral texts by such authors like Adam Miklosi and Suzanne Hetts explain the most common basic reasons for aggressive display.[102] The reference guide *Aggression in Dogs* gives a wide overview of the subject, with treatment and training protocols that can help illustrate the reasons dogs respond with an aggressive display to certain stimuli.[103] Both Miklosi and Hetts explain in detail aggression-triggering situations, such as defense, territorial protection, resource access, and inadequate socialization to strangers and other dogs. Law enforcement officers can learn to recognize these triggering situations and adapt or alter their approach, body language, tone of voice, and other factors to make themselves less likely to be bitten.

Other authors, such as Steven Lindsay, break down aggression triggers in much more detail.[104] Although many layers of behavior can be analyzed, four major trigger groups are most relevant for daily use by law enforcement in the course of duty:

---

97. Quinlan and Sacks, "Hospitalizations for Dog Bite Injuries" (see note 96).
98. J.J. Sacks, Randall Lockwood, Janet Hornreicht, and Richard Sattin, "Fatal Dog Attacks, 1989-1994," *Pediatrics* 97, no. 6 (1996): 891–5, https://www.ncbi.nlm.nih.gov/pubmed/8657532; J.J. Sacks, Marcie-Jo Kresnow, and Barbara Houston, "Dog Bites: How Big a Problem," *Injury Prevention* 2, no. 1 (1996): 52–4, https://www.ncbi.nlm.nih.gov/pubmed/9346056.
99. Centers for Disease Control and Prevention, Nonfatal Dog Bite–Related Injuries" (see note 5).
100. Michael Callam, "Dog Bite Wounds," *Journal of the American Medical Association* 244, no. 20 (1980): 2327–2328, https://www.doi.org/10.1001/jama.1980.03310200063032; K.L.M. Overall and Molly Love, "Dog Bites to Humans—Demography, Epidemiology, Injury, and Risk," *Journal of the American Veterinary Medical Association* 218, no.12 (2001): 1925–34, https://doi.org/10.2460/javma.2001.218.1923
101. Quinlan and Sacks, "Hospitalizations for Dog Bite Injuries (see note 96).
102. Adam Miklosi, *Dog Behavior, Evolution, and Cognition* (Oxford, UK: Oxford University Press, 2007); Suzanne Hetts, *Pet Behavior Protocols* (Lakewood, CO: American Animal Hospital Association Press, 1999).
103. Brenda Aloff, *Aggression in Dogs: Practical Management, Prevention, and Behavior Modification* (Wenatchee, WA: Dogwise Publishing, 2001).
104. Steven R. Lindsay, *Handbook of Applied Dog Behavior and Training, Volume 1: Adaptation and Learning* (Ames, IA: Blackwell Professional Publishing, 2000); Steven R. Lindsay, *Handbook of Applied Dog Behavior and Training, Volume 2: Etiology and Assessment of Behavior Problems* (Ames, IA: Blackwell Professional Publishing, 2001); Steven R. Lindsay, *Handbook of Applied Dog Behavior and Training, Volume 3: Procedures and Protocols* (Ames, IA: Blackwell Professional Publishing, 2005).

- fear/defense
- territory/resource protection
- social conflict resolution
- predation

The most common trigger is fear/defense. A dog presented with a perceived threat has three options for obtaining safety and survival: freeze, flight, or fight. Of these, flight or running away is usually the most effective and primary choice. An animal, canine or otherwise, that runs away and avoids a threat will live another day. An animal may, if flight is perceived as risky, freeze in place to avoid drawing attention, hoping the perceived threat will continue past without noticing them. Fight is usually reserved as a last option. An animal that fights may survive that encounter but may be injured to the level that it can no longer adequately compete with other organisms and thus loses survival advantage.

Like fear, protection of territory or resources is easily understood. An animal's territory is usually a place of safety and refuge from danger;[105] it may contain resources for survival, such as food, water, and shelter. Another animal entering the territory, or one perceived as a potential competitor for resources, may be confronted aggressively in order to limit the incursion or competition. Dogs may perceive humans, including law enforcement officers, as competitors even though there is no real contest for resources.

Social conflict resolution, sometimes referred to as "dominance," is a factor in dog-dog conflict, but is rarely the basis for human-dog conflict. Although any other animal, including humans, may be seen as a threat or a competitor for food and shelter, dogs do not perceive humans as if they are dogs. We do not smell, look, or act correctly to be seen as other dogs.

Predation is the rarest of the aggression triggers, as few dogs perceive humans to be suitable prey: the balance of potential risk and energy expenditure versus the nutritional value of smaller, easier targets usually limits predation behavior unless the human is very small (infants particularly), elderly, or otherwise impaired. And, indeed, victim profiles of fatal dog attacks on humans show that the most common victims are small children, followed by the elderly.[106]

105. Mikloski, *Dog Behavior, Evolution, and Cognition* (see note 102).
106. Sacks, Sattin, and Bonz, "Dog Bite-Related Fatalities from 1979" (see note 95); Quinlan and Sacks, "Hospitalizations for Dog Bite Injuries (see note 96); "Breeds of Dogs Involved" (see note 95); Centers for Disease Control and Prevention, "Dog Bite–Related Fatalities – United States, 1995-1996," *Morbidity and Mortality Weekly Report* 46, no. 21 (1997): 463–467; John C. Wright, "Canine Aggression Toward People: Bite Scenarios and Prevention," *Veterinary Clinics of North America: Small Animal Practice* Volume 21, no 2 (1991): 299–314.

By understanding the basic purpose of a dog's aggressive display, law enforcement officers can anticipate and prepare for potential negative contact. Janis Bradley, writing for the Animals and Science Institute, gives a solid overview of canine aggression and bites that illustrates many factors that contribute to a dog's likelihood of biting.[107]

Understanding the body language of domestic dogs and learning how to communicate clearly is an essential part of avoiding, defusing, and de-escalating encounters with dogs. Roger Abrantes and Turid Rugaas provide detailed explanation of the postures and positions that dogs use to communicate threat, safety, and negotiability of situations.[108] This knowledge, coupled with an appreciation of the behavioral purposes of aggressive behavior, helps create a stable platform from which officers can be trained and equipped to deal with encounters in a safer, more positive manner. Rugaas particularly illustrates the value of learning to exchange understandable signals with dogs to not only avoid conflict, but to allow at least a temporary cooperative relationship.

## *Dog bite prevention literature*

There is an extensive literature on dog bite prevention. Organizations such as the American Society for the Prevention of Cruelty to Animals, Humane Society of the United States, American Humane Association, and the American Kennel Club produce training materials, videos, and other publications. These materials cover topics such as conduct when confronted by a dog and strategies when bitten. Much of this literature is produced for the general public, but members of law enforcement can use many of the same prevention strategies.

Other sources of dog bite prevention literature include the American Veterinary Medical Association (AVMA)'s and the American Medical Association (AMA)'s journals, as well as specialty publications such as Elsevier's *Veterinary Clinics of America: Small Practice*. Major cooperative projects such as the AVMA's "A Community Approach to Dog Bite Prevention," published in the *Journal of the American Veterinary Medical Association*, explore the concept of community dog bite prevention in detail.[109] Law enforcement agencies should consider becoming part of this multiagency effort, not only for public safety but for the safety of dogs and their own officers.

107. Janis Bradley, *Dog Bites: Problem and Solutions (Revised 2014)* (Ann Arbor, MI: Animals and Society Institute, 2014).
108. Roger Abrantes, *Dog Language: An Encyclopedia of Canine Behavior* (Wenatchee, WA: Dogwise Publishing, 1997); Roger Abrantes, *The Evolution of Canine Social Behavior* (Wenatchee, WA: Dogwise Publishing, 2004); Turid Rugaas, *On Talking Terms with Dogs: Calming Signals* (Wenatchee, WA: Dogwise Publications, 2005).
109. Task Force on Canine Aggression, "A Community Approach to Dog Bite Prevention" (see note 94).

Some studies from other fields may also assist officers in predicting what situations are more likely to produce negative dog encounters. For example, a 2009 study in the *Journal of Forensic Science* found that persons with certain personality characteristics are more likely to own or keep dogs that may display human-aggressive behavior.[110]

## Conclusions

There is an extensive scientific and popular literature on dog behavior. Understanding why dogs behave aggressively, and how to recognize aggressive behavior, can help officers avoid negative dog encounters, and can prepare them to effectively use other-than-lethal force when dog aggression cannot be avoided or averted. Training in both active and passive strategies for avoiding dog bites combined with heightened awareness of the reasons that dogs and humans come into conflict, can substantially reduce the risk of injury or death to officers, the public, and dogs.

## Exemplar case summaries

### City of Detroit, Michigan: $225,000 (2018)

The Detroit City Council agreed to pay Kenneth Savage and Ashley Franklin $225,000 to settle the duo's civil rights lawsuit, filed in July 2017. Savage and Franklin filed the lawsuit after three of their dogs were shot and killed during a 2016 marijuana raid at their residence. They alleged Detroit police officers shot their dogs while they were contained behind an 8-foot fence so that the officers could confiscate marijuana plants located in the backyard. Although Savage and Franklin had a permit to grow marijuana, the search warrant filed by DPD alleges they were in violation of that permit because the plants were visible outside. Franklin alleges that when she asked to see the warrant, the officer responded, "If you keep asking for a warrant, we are gonna kill those dogs and call child protective services to pick up your kid."[111]

### City of Atlanta, Georgia: $25,000 (2018)

In early 2018, the Atlanta City Council's Public Safety Committee approved a $25,000 settlement with the Rodriguez family, whose dog Jane, a Labrador retriever, was shot and killed by an Atlanta police officer in November 2013. On the morning of November 10, the Rodriguez family was in the processing of saying goodbye to visiting family when their 11-year old niece mistakenly dialed 911. Two APD officers responded, and Kelley Rodriguez answered the door thinking it was a family member returning to retrieve forgotten items. When she opened the door, Jane and the family's other dog, Lucy, ran out towards the officers as they were leaving the property. According to the Rodriguez family, Officer Brian Carswell turned around and fired a shot, hitting Jane in the head.

110. Laurie Ragatz, William Fremouw, Tracy Thomas, and Katrina McCoy, "Vicious Dogs: The Antisocial Behaviors and Psychological Characteristics of Owners," *Journal of Forensic Science* 54, no. 3 (2009): 699–703, https://doi.org/10.1111/j.1556-4029.2009.01001.x.

111. C.J. Ciaramella, "Detroit to Pay $225,000 after Cops Shoot Three Dogs in Marijuana Raid," *Reason,* March 22, 2018, https://reason.com/blog/2018/03/22/detroit-will-pay-225000-settlement-after.

Officer-Trainee Derek Daniel also drew his weapon on Lucy but did not shoot. The family alleges the officers prevented them from tending to the medical needs of Jane until a supervisor arrived on the scene to authorize her to be taken for medical care. She died a short time later.[112]

### City of Evanston, Illinois: $50,000 (2017)

Evanston aldermen approved a $50,000 settlement to the Larks family for the 2015 shooting death of their German Shepherd, Chance. The lawsuit claimed Trinette Lark called police about an argument between her son and fiancé, but by the time Evanston officers arrived, the dispute was settled and she asked the officers to leave. While searching the property, two officers entered the basement with their guns drawn, where Chance was tied to a pole to finish drying after a bath. The officers then shot Chance five times and subsequently refused to let the family know what they had done, to obtain medical care for Chance, or to let the family even see him. Police Commander Joseph Dugan claims that Chance rushed through the door when the officers opened it. As the officers attempted to retreat, one fell and Chance rushed him, resulting in the shots being fired at Chance. Chance later died from his injuries.[113]

### San Bernardino County, California: $98,000 (2017)

San Bernardino County agreed to a $98,000 settlement for the June 2016 shooting death of the Blackmore family's dog, Buddy. San Bernardino County Sheriff's deputies were responding to a domestic call in the area but were not given a specific address. As the deputies walked down the Blackmore's driveway, the family's dogs barked excitedly and as Buddy approached one of the deputies, the deputy shot him through the neck. The deputies then proceeded to detain two individuals who were at the residence and would not allow either man to help Buddy, who later died at the veterinarian's office. Officials from the sheriff's office alleged that Buddy acted aggressively towards the deputy, which caused him to shoot.[114]

### City of Hartford, Connecticut: $885,000 (2017)

The Hartford City Council approved a settlement of $885,000 to Glen Harris for the 2006 shooting of his Saint Bernard. Harris filed a federal civil rights lawsuit, alleging two Hartford police officers entered his yard, without a warrant and based on a bad tip, then shot one of his dogs in front of his young daughter.[115]

---

112. David Pendered, "Atlanta to Settle Case of Family's Labrador Retriever Dog Shot, Killed by Police in 2013," SaportaReport [blog], January 10, 2018, https://saportareport.com/atlanta-settle-case-family-labrador-retriever-dog-shot-killed-police-2013/.
113. Genevieve Bookwalter, "Evanston To Pay Family $50,000 after Police Fatally Shot Pet Dog," *Chicago Tribune,* October 5, 2017, http://www.chicagotribune.com/suburbs/evanston/news/ct-police-dog-shooting-settlement-tl-1005-20171005-story.html.
114. Baker, Paola, "Family of Dog Fatally Shot by Deputies in Hesperia Awarded $98K." *Daily Press* (Victorville, CA), September 15, 2017, http://www.vvdailypress.com/news/20170914/family-of-dog-fatally-shot-by-deputies-in-hesperia-awarded-98k.
115. Fay, "Hartford Paying $885K to Family" (see note 65).

## City of Sparta, Missouri: $6,000 (2016)

Elizabeth Womack accepted a $6,000 settlement offer from the City of Sparta after the city's police chief caught and shot her dog, Chase, in November 2015. Chase had gotten loose and then-Police Chief Andrew Spencer used a catch pole to catch him, and then subsequently shot him after being unable to find anywhere to take the dog and being rushed by another call to respond to. "Due to the higher priority call and the imminent destruction of the dog, I decided it was best to destroy the dog and respond to the accident," wrote Spencer. Under Missouri law, stray or loose dogs are to be held for five days before being rehomed or destroyed. Spencer, and two other Sparta officers, resigned shortly after the incident.[116]

## City of Detroit, Michigan: $100,000 (2016)

The City of Detroit approved a $100,000 amount to settle a 2015 civil rights lawsuit filed by Darryl Lindsay, who alleged a DPD officer shot and killed his dog, Babycakes, while she was tethered on a 10-foot steel cable leash. The lawsuit claims that in January 2015, a large number of DPD officers showed up to Lindsay's property to search for a suspect, who was not found at the residence. Dash cam footage shows the officer walk up to Babycakes, pause, then shoot her twice in the chest. She later died from her wounds. The officer attempted to claim the dog was charging towards him, but the dash cam footage—which also picked up a statement by another office on the scene saying "That dog got shot and had nothing to do with it!"—proved otherwise.[117]

## Commerce City, Colorado: $262,000 (2016)

Commerce City agreed to pay Gary Branson $262,000 for the November 2012 shooting of his dog, Chloe, that was captured on video by Branson's neighbor. Commerce City police officers and an animal control officer responded to a loose dog call. The video shows the officers backing Chloe into Branson's garage and then shows the animal control officer emerge with Chloe contained on a catch pole. At that point, one of the police officers removes his firearm and shoots her. In addition to the civil trial, the officer who shot Chloe was charged with felony animal cruelty but found not guilty by a jury.[118]

---

116. Giacomo Bologna, "Sparta Pays $6,000 Settlement to Owner of Dog Shot by Police Chief," *Springfield News-Leader,* December 6, 2016, https://www.news-leader.com/story/news/local/christian-county/2016/12/06/sparta-pays-6000-settlement-owner-dog-shot-police-chief/95061676/.
117. Mark Hicks, "Detroit Pays $100,000 to Settle Dog Fatal-Shooting Case," *Detroit News,* February 26, 2016, https://www.detroitnews.com/story/news/local/detroit-city/2016/02/26/detroit-pays-settle-dog-fatal-shooting-case/80970782/.
118. Karen Morfitt, "Attorney: Settlement In Dog Shooting Case Sets A Precedent," *CBS Denver,* January 26, 2016, http://denver.cbslocal.com/2016/01/26/attorney-settlement-in-dog-shooting-case-sets-a-precedent/. (Also references under "Social Media and the Internet" in the Literature Review.)

## City of Des Moines, Washington: $51,000 (2013)

The Wright family, of Des Moines, Washington, agreed to a $51,000 settlement from the city after their Newfoundland, Rosie, was shot and killed in November 2010. The Wrights' lawsuit claimed that officers were responding to a concerned neighbor's call that Rosie was loose and might get hurt; the Wrights were not home at the time. Over the course of an hour, the officers attempted to corral Rosie, but ultimately ended up shooting her four times with a rifle. Audio from one of the dash cams on scene caught the officers' conversation, which included a discussion about what to do with Rosie once she was caught. The audio also picked up the first shot taken at Rosie, followed by another officer exclaiming "Nice!" and three more shots being fired at Rosie.[119]

119. Jennifer Sullivan, "Des Moines To Pay $51,000 over Fatal Shooting of Dog," *Seattle Times,* February 21, 2013, https://www.seattletimes.com/seattle-news/des-moines-to-pay-51000-over-fatal-shooting-of-dog/.

# Current State Legislation

Various states have attempted to pass legislation mandating that certified law enforcement officers receive training on animal encounters, or on dog encounters specifically. Currently, however, there are only six states with such laws on their book: Tennessee, Colorado, Illinois, Texas, Nevada, and Ohio.

## Tennessee: General Patton Act of 2003

The General Patton Act of 2003, signed into law on June 15, 2004, is the first known piece of state legislation that requires law enforcement officers to be trained in handling animals. The act was passed after Cookeville Police Officer Eric Hall shot the Smoak family's dog, named General Patton, during a traffic stop on New Year's Day 2003.[120] The mandated training covers basic behavioral characteristics and traits, including those which can indicate aggression; recognizing situations and environments in which an animal is more likely to become aggressive and how to control the situation to protect the officer and others; and ways to control and neutralize an aggressive animal using the least amount of force necessary to protect the officer and others.[121]

## Colorado: Dog Protection Act

Colorado's Dog Protection Act was signed into law in May 2013.[122] It requires law enforcement officers to receive training on handling dog encounters while on duty including on "assessing what dog posture, barking and other vocalizations, and facial expressions typically signify; the options for distracting and escaping from a dog, options for safely capturing a dog; and defensive options in dealing with a dog."[123] The training must be provided by either a qualified animal behavior expert or a licensed veterinarian.[124]

---

120. Tenn. S. 374, 103d Gen. Assembly (June 15, 2004) (enacted) (available at http://www.capitol.tn.gov/Bills/103/ Bill/SB0374.pdf). The General Patton Act refers to Tennessee Code Annotated § 38-8-116, but subsequent revisions have codified the training requirement in Tenn. Code Ann. § 38-8-117, Training in animal and canine behavior.
121. Tenn. Code Ann. § 38-8-117(b)(1)-(3) (2015) (available at https://law.justia.com/codes/tennessee/2015/title-38/chapter-8/part-1/section-38-8-117).
122. Katy Moeller, "Dog Shootings by Police Prompt Mandatory Training in Other States," *Idaho Statesman*, March 5, 2014 http://magicvalley.com/news/local/dog-shootings-by-police-prompt-mandatory-training-in-other-states/article_7fffa720-a3ee-11e3-8f11-001a4bcf887a.html.
123. Colo. Rev. Stat. § 29-5-112(4) (2013) (available at http://codes.findlaw.com/co/title-29-government-local/co-rev-st-sect-29-5-112.html).
124. Colo. Rev. Stat. § 29-5-112(4) (2013) (see note 123).

## Illinois: Illinois Police Training Act

Also in 2013, Illinois Governor Pat Quinn signed House Bill 3388 into law, which amended the Illinois Police Training Act to include both animal fighting awareness as well as humane response.[125] The law reads, "This training shall also include a humane response component that will provide guidelines for appropriate law enforcement response to animal abuse, cruelty, and neglect, or similar condition, *as well as training on canine behavior and nonlethal ways to subdue a canine.*"[126]

## Texas: Canine Encounter Training Program

On May 18, 2015, Texas Governor Gregg Abbott signed House Bill 593 into law.[127] The law requires at least four hours of classroom and practical training for newly hired law enforcement officers in seven areas related to dog encounters: handling canine-related calls and anticipating unplanned encounters with canines; recognizing and understanding canine behavior; state laws related to canines; canine conflict avoidance and de-escalation; applying the use of force continuum to canines; using nonlethal methods and tools to avoid and defend against canine attacks; and a general overview of interacting with other animals.[128]

## Nevada: Certification and Training: Peace Officers

Senate Bill 147 was signed into law on May 20, 2015, by Nevada Governor Brian Sandoval.[129] The bill directed law enforcement agencies to create policies that determine when certain certified peace officers are required "to be trained in effective responses to incidents involving dogs or where dogs are present"[130] and specified four fundamentals: differentiating between aggressive and nonthreatening dog behaviors; nonlethal methods of handling potentially

---

125. Dawn Turner Trice and Jeremy Gorner, "Are Police Too Quick on the Draw against Dogs?", *Chicago Tribune,* August 6, 2013, http://articles.chicagotribune.com/2013-08-06/news/ct-met-cops-shooting-dogs-20130806_1_police-shootings-police-officer-rottweiler.
126. 50 Ill. Comp. Stat. § 705/10.14 (2013) (available at http://www.ilga.gov/legislation/ilcs/documents/005007050k10.14.htm).
127. M. Carolyn Miller, "Canine Encounter Training Mandated for Texas Law Enforcement," blog post, American Animal Hospital Association, September 23, 2015, http://www.aaha.org/blog/NewStat/post/2015/09/23/302002/Canine-encounter-training-mandated-for-Texas-law-enforcement.aspx.
128. Tex. Occ. Code § 1701.261(a)(1)-(7) (2015) (see note 58). Note that HB 593 references Tex. Occ. Code § 1701.253 as being amended to include the canine encounters training, but on the bill's effective date, September 1, 2015, the codified bill was found in § 1701.261.
129. Nev. Rev. Stat. § 289.595 (2015) (available at https://www.leg.state.nv.us/NRS/NRS-289.html#NRS-289Sec595).
130. Nev. Rev. Stat. § 289.595 (2015) at § 289.595(1) (see note 129).

dangerous dogs; the role and capabilities of local animal control agencies; and any related subjects the Commission deems appropriate.[131] The law allows Nevada agencies to decide which officers within the agency are required to take the training and directs them to consider job description, work environment, and duties of the officer. Additionally, the law commands the Nevada Peace Officers' Standards and Training Commission to adopt regulations that outline the minimum standards for such training programs.[132]

## Ohio: House Bill 64

Included in Ohio's 2015 budget appropriations bill was a requirement that the Ohio Attorney General create rules that govern the training of Ohio peace officers on "companion animal encounters and companion animal behavior."[133] The training requirements mirror most of Texas' requirements, and include handling companion animal-related calls or unplanned encounters with companion animals; identifying and understanding companion animal behavior; state laws related to companion animals; avoiding companion animal attacks; and using nonlethal methods to avoid companion animal attacks.[134] Note that the Ohio legislation refers to companion animals, versus other laws' reference to dogs specifically. The requirement is codified in Ohio Revised Code § 109.747: Rules governing training of peace officers on companion animal encounters and companion animal behavior.[135]

## Model legislation

If a state is interested in enacting similar legislation, the Animal Law Resource Center has created a model, referred to as the Humane Canine Response Training Act.[136] This model legislation is included merely as a sample for states seeking to enact their own and does not represent an endorsement by the NSA or the COPS Office of the information and recommendations contained within.

131. Nev. Rev. Stat. § 289.595 (2015) at § 289.595(3)(a)-(d) (see note 129).
132. Nev. Rev. Stat. § 289.595 (2015) at § 289.595(4) (see note 129).
133. OH H.B. No. 64, 131st Gen. Assembly (June 30, 2015) (enacted) (available at https://www.legislature.ohio.gov/download?key=2947&format=pdf).
134. OH H.B. No. 64, 131st Gen. Assembly (June 30, 2015) (see note 133).
135. Ohio Revised Code § 109.747: Rules governing training of peace officers on companion animal encounters and companion animal behavior (2015) (available at http://codes.ohio.gov/orc/109.747).
136. Animal Law Resource Center, "Human Canine Response Training Act," accessed April 15, 2019, http://www.animallaw.com/HumaneCanineResponseTrainingAct.htm.

**Humane Canine Response Training Act**

Section 1 – Purpose

The shooting of dogs by police officers has escalated as so many people now keep dogs as companion animals. Many of the shootings have been lethal, involving an excessive use of force, even though a number of tragic outcomes could have been avoided with proper training in dealing with animal encounters. Police officers who have not been afforded the opportunity to learn how to react around dogs tend to be more easily frightened of a possible attack and will see aggressive behavior where there is only curiosity or benign intent on the part of the dog. Too often, the mere presence of a dog at the scene of an investigation can bring out a "shoot first" mentality in even veteran police officers, resulting in the death of someone's beloved companion animal.

This bill requires law enforcement agencies to include a humane response component in officer training that will provide guidelines for appropriate law enforcement response to animal abuse, cruelty, and neglect, or similar conditions, as well as training on canine behavior and nonlethal ways to subdue a canine.

Section 2 – Definitions

For the purposes of this act:

- "Dog" means any canine animal owned for domestic, companionship, service, therapeutic, assistance, sporting, working, ranching, or shepherding purposes.
- "Dog owner" means a person owning, possessing, harboring, keeping, having guardianship of, having financial or property interest in, or having control or custody of a dog.
- "Licensed veterinarian" means a person who is licensed to practice veterinary medicine in this state.
- "Law enforcement agency" means a municipal police department, county sheriff's office, or a state police department.
- "Law enforcement officer" means any officer in a law enforcement agency. The term does not include an animal control officer, code enforcement officer, or a deputy sheriff who is assigned exclusively to work in jails, court security, or administration.

Section 3 – New Provision

- Humane Response Training
  - Requirements
    - Each law enforcement agency is required to provide to its officers training pertaining to encounters with dogs in the course of duty. This training must include a visual and participatory component as well as comprehension testing of written policies and procedures as listed in Section 3(A)(c).
- Training Program
  - In establishing the Training Program, a law enforcement agency shall adopt any minimum training curricula developed by the state Law Enforcement Training and Standards Board or other agency as required in Section 3 (B)(b).
  - The Training Program must be wholly or principally provided or overseen by either a qualified animal behavior expert or licensed veterinarian.
  - In order to reduce the costs of providing the training program, a law enforcement agency may develop its own online or video-based training or utilize such training developed by the state Law Enforcement Training and Standards Board.
  - A law enforcement agency may collaborate with other law enforcement agencies, the [state or local] veterinary medical association, as well as nonprofit organizations engaged in animal welfare, to develop the Training Program.
  - The curricula, qualifications, and online or video-based instruction described in this sub-section must be readily accessible by law enforcement agencies on each agency's internal website.
- Written Policies and Procedures for Encounters with Dogs
  - In addition to the Training Program in Section 3(A)(b), each law enforcement agency shall adopt written policies and procedures that are developed by the state Law Enforcement Training and Standards Board. The policies and procedures developed by the state Law Enforcement Training and Standards Board shall serve as a baseline for law enforcement agencies.
  - This component shall be integrated into basic training for law enforcement officers no later than [60 days] after development of a program by the state Law Enforcement Training and Standards Board.
  - Law enforcement officers shall be tested for comprehension of these policies and procedures during training.

- This section is not intended to apply to situations in which a dog is shot accidentally, including when a local law enforcement officer intends to fire at a person but inadvertently shoots a dog.
- Humane Response Training Curriculum
- The state Law Enforcement Training and Standards Board shall, within 6 months after passage of this Act:
  - Develop minimum training curricula that law enforcement agencies must use to fulfill the training requirement in Section 3(A)(b), including:
    1. Minimum written policies and procedures designed to address encounters with dogs occurring in the course of duty and the use of force against such dogs;
    2. The appropriate minimum qualifications, including education, experience, or skills that an animal behavior expert or licensed veterinarian providing the training requirement in Section 3(A)(b) must possess; and
    3. The development of online or video-based training that may be utilized by law enforcement agencies to fulfill the training requirement in Section 3(A)(b).

Or

  - Approve the adoption of a training curriculum, including the elements in Section 3 (B) (a), above, from an independent outside agency or organization. This curriculum shall address:
    - The identification and meaning of common canine behaviors, and differentiating between dogs that are exhibiting behavior that puts local law enforcement officers or other persons in imminent danger and dogs who are not engaging in such behavior;
    - The alternatives to lethal use of force against dogs;
    - The reasonable opportunity for a dog owner to control or remove his or her dog from the immediate area. This opportunity must take into account the totality of the circumstances, including: the officer's own safety and the safety of other persons in the area, the availability of nonlethal equipment, the feasibility of so allowing a dog owner to act considering the totality of the circumstances, including the presence of an animal control officer, or whether the call is at a location at which illegal narcotics are suspected to be manufactured or trafficked, or any exigencies that may be present, such as when the local law enforcement officer is responding to a call that asserts or suggests that a person has been bitten by a dog or is in physical danger.

- The state Law Enforcement Training and Standards Board may, in developing their curriculum, consult with:
  - Licensed veterinarians;
  - Representatives of animal welfare agencies;
  - Animal behaviorists or animal behavior experts;
  - Members of the veterinary medical association, with expertise in canine behavior or other animal behavior;
  - Representatives of the [state] association of animal control officers;
  - Representatives of the [state] associations of chiefs of police, preferably someone with experience working in a K-9 unit;
  - Sheriffs or deputy sheriffs representing county sheriffs;
  - A representative of the Fraternal Order of Police; and
  - Members of the state or local bar association, including attorneys with expertise and experience in animal law and dog shooting cases.





# Policy Considerations

The following agency policies on dog encounters can be used as guidelines when creating a policy or standard operating procedure within your own agency. They are provided here as examples. Remember, it is your agency's chief law enforcement executive's responsibility to ensure that solid policies are in place and officers are trained on the policy's content.

It is generally recommended that an agency's policy include the following elements:

- An introductory statement that the safety of the officer and other individuals on the scene should always take priority over the lives of any companion animals that may be encountered;
- A requirement that law enforcement officers within the agency use the least amount of force reasonably necessary when dealing with companion animals;
- A statement that lethal or deadly force should only be used when the safety of the responding law enforcement officer, other individuals on the scene, or even other animals on the scene is at risk;
- Recommended procedures for handling canines or companion animals on different types of calls—both emergency responses and routine, non-emergency calls for service.

## Georgia Association of Chiefs of Police – Standard Operating Procedure 11.6: Use of Force When Dealing with Animals

STANDARD OPERATING PROCEDURE FROM GEORGIA ASSOCIATION OF CHIEFS OF POLICE

ISSUED____________ EFFECTIVE _____________

S.O.P. 11-6: USE OF FORCE WHEN DEALING WITH ANIMALS

**I. PURPOSE**

Provide members of the department guidelines for encounters with potentially dangerous animals such as dogs, cats, birds or other domestic animals or reptiles.

**II. POLICY**

It is the policy of this department to use the least amount of force necessary when encountering an animal. As with other use of force options, deadly force will only be used to defend the officer, other person or animal from being bitten by a vicious animal. The department recognizes that not all domestic animals, especially dogs, are inherently vicious. However, some are vicious by nature or may be protecting their area and officers should be aware of signs, warnings and visual/audio cues as to the intent of the animal.

**ATTENTION CEO:** THIS POLICY IS DESIGNED TO PROTECT DOMESTIC PETS FROM BEING INTENTIONALLY SHOT BY OFFICERS FOR NO APPARENT REASON OTHER THAN THE, IN THIS CASE, A DOG APPEARED TO BE AGGRESSIVE TOWARDS THE OFFICER(S). COURTS HAVE RULED THAT THE UNNECESSARY SHOOTING OF AN ANIMAL MAY CONSTITUTE A SEIZURE UNDER THE 4TH AMENDMENT TO THE CONSTITUTION THUS MAKING THE DEPARTMENT AND OFFICER LIABLE. THE DEPARTMENT SHOULD CONSIDER TRAINING OFFICERS ON THE BEHAVIORAL TRAITS OF DOGS. EACH OFFICER, HOWEVER, WILL HAVE HIS/HER INTERPRETATION ON WHAT CONSTITUTES A VICIOUS ANIMAL.

**ATTENTION CEO:** THE AGENCY SHOULD CONSIDER EQUIPPING PATROL VEHICLES AT A MINIMUM AT THE SUPERVISOR LEVEL SPECIALIZED EQUIPMENT TO ENABLE THE OFFICERS TO TAKE CONTROL OF A VICIOUS ANIMAL. TRANQUILIZER GUNS ARE A VERY SPECIALIZED PIECE OF EQUIPMENT THAT ARE USUALLY ONLY CARRIED BY A TRAINED ANIMAL CONTROL OFFICER. CAREFUL CONSIDERATION SHOULD BE USED IF THE AGENCY CONSIDERS THIS. SPECIALIZED TRAINING SHALL BE REQUIRED IF ISSUED.

**ATTENTION CEO:** IF THE AGENCY HAS ACCESS TO AN ANIMAL CONTROL UNIT, THEN A STATEMENT SHOULD BE INSERTED STATING THAT THE ANIMAL CONTROL SHALL BE CALLED PRIOR TO THE OFFICER ATTEMPTING TO DO SO HIM/HERSELF.

## III. DEFINITIONS

A. DEADLY FORCE: Any force that is likely to cause serious bodily harm or death.

B. NON-DEADLY FORCE: All uses of force other than those likely to cause serious bodily harm or death.

C. IMMINENT: Impending or about to occur.

D. SPECIALIZED WEAPONS/TOOLS: OC Spray, TASER, Control Pole, Food Treats, Tranquilizer Gun.

## IV. PROCEDURE

**A. Calls for Service, Routine/Non-Emergency.** When an officer is dispatched to a call for service that is non-emergency in nature and is encountered by a vicious animal the following shall be followed;

1. If the caller is at the home and the officer can speak directly to the person, the officer will ask the owner to restrain the animal and keep it on a leash, in a pen or other secure space that allows security for the officer while working the call for service.

2. If direct contact cannot be made by the officer, the officer will ask the dispatcher to contact the caller by phone and have him/her come out to take control of the animal prior to the officer leaving a place of safety (car, hardened structure). Should contact by phone fail, the officer should leave the scene and stand by a short distance away in the event contact is made allowing the officer to handle the call. If no contact is made the officer will resume normal patrol and periodically have the dispatcher call in an attempt to make contact with the complainant.

**B. Calls for Service, Welfare Checks and Emergencies.** When an officer receives a call of an emergency nature or welfare check the following applies;

1. On a welfare check, if the vicious animal is out of the residence, and the officer does have control equipment, he/she shall request another officer to assist in taking control of the animal in the quickest manner possible. Once the animal is secured, the welfare check will continue.

**NOTE:** Officers should always be aware of a second animal in the area and be vigilant at all times.

2. If the animal is inside the house, the same procedures outlined above will be followed. If no one can be seen inside from the outside by the officer then the officer will not enter a residence without a second officer present who can take control of the animal.

3. If a person can be seen and the officer has knowledge of a medical emergency either from dispatch or personal knowledge (previous calls) then the officer is authorized to use the necessary force to save the human life.

**NOTE:** Human life will always take priority over that of an animal.

**NOTE:** Deadly force is authorized only if the potential for receiving an injury from the animal is imminent.

4. In the event of an emergency call where it is necessary for the officer to save a human life or prevent further injury, the officer is authorized to use the necessary force to save a human life over that of an animal. See note above.

**C. Search Warrants.**

**ATTENTION CEO:** THE SENSITIVE NATURE OF SEARCH WARRANTS, THE EXECUTION OF SAME AND OFFICER SAFETY SHOULD ALWAYS BE CONSIDERED. ACCORDINGLY, GOOD INTELLIGENCE SHOULD BE GATHERED AND DISSEMINATED TO OFFICERS PRIOR TO THE EXECUTION OF A SEARCH WARRANT REGARDING THE PRESENCE OF ANIMALS AND WHAT ACTIONS MAY BE TAKEN.

1. When an officer/s attempt to conduct a search warrant that is a regular search warrant, officer safety will always take precedent. Similarly, the preservation of evidence is important as well. Any vicious animals encountered pose a serious concern to both of the above. Not all animals are necessarily vicious just because it is barking, snarling or growling. Officers should be aware of this and try to control the animal as stated in paragraph A above.

2. Prior to the execution of a search warrant, as much intelligence shall be gathered regarding the existence of potentially vicious animals. The officer in charge of the investigation will brief all officers accompanying him/her as to the presence of animals on the property.

3. The only time an officer is allowed to use deadly force in the execution of a search warrant is when the potential for receiving injury from the animal is imminent.

4. When an officer/unit is attempting to execute a "no knock" search warrant, the OIC will gather and disseminate intelligence regarding the presence of potentially vicious animals at the site.

**NOTE:** Many criminals have dogs present to provide prior warning to the presence of others on their property. Some also use these animals to protect any illegal substances being stored there as well.

5. The commander of the unit executing the no knock warrant shall have a plan for dealing with vicious animals encountered when attempting the execution of the warrant. The plan shall have specific details on what types of specialized weapons shall be used against a vicious animal. Deadly force is authorized only in the event of an imminent injury by a vicious animal.

Source: "Standard Operating Procedure 11.6: Use of Force When Dealing with Animals (Duluth, GA: Georgia Association of Chiefs of Police, 2014), (pp. 21-3), https://gachiefs.com/wp-content/uploads/2016/05/Chapter-11-Use-of-Force-2014-REVISED.doc.

## Los Angeles Police Department – Use of Force Tactics Directive 7: Dog Encounters

### PURPOSE

During the course of their duties, officers may come into contact with dogs. Dogs vary infinitely with respect to size, body type, color, and hair quality. They can vary in weight, ranging from the smallest companion dog of 1.5 lbs. to that of the huge working breeds that may weigh over 200 lbs.

This Directive was developed to provide information regarding canine behavior and present officers with tactical options for dealing with a hostile dog.

### PROCEDURES

An officer's main concern upon arriving at the scene of a call is safety. Look for these clues that indicate a dog is present at the location: "Beware of Dog" signs, animal toys, food or water dishes, bones, a dog house or pen, animal paths in the grass, and the sight or smell of animal waste. Officers must decide whether there is an urgent need to enter the location where a dog may be present or if there is sufficient time to contain the area until the animal is secured. For assistance, contact the Department of Animal Services at [xxx-xxx-xxxx] and/or Metropolitan Division's K-9 Unit at [xxx-xxx-xxxx].

The sight of a uniform may agitate a dog. If officers must approach, be aware the dog may view this as an aggressive action or encroachment, and become hostile. Dogs tend to regard their owner's property as their territory and may defend it by growling, barking, or assuming aggressive body language.

Dogs communicate through body language. Observe the dog's demeanor for change. Facial expression, ear posture, tail carriage, hackle (hair on back) display, and body stance signal a dog's state of fear, excitement, aggression or submission. The signs of potential hostility in a dog include bared teeth, flattened ears, erect tail, stiff legs and bristling back hair.

## HOSTILE DOGS

The increasing number of stray dogs, the limited resources of the Los Angeles City Department of Animal Services, and the fact that some dogs are being bred to achieve larger, more vicious breeds, increases the potential for violent dog encounters. The main fear regarding a dog attack is the possibility of being bitten, which can cause viral or bacterial infections.

### Defensive Tactics Against Hostile Dogs

Officers confronted by a hostile dog should remain still, face the animal, and employ the following tactics should the dog advance.

**Voice Commands:** Look directly at the dog and in a loud and firm voice state, "No" or "Down." Be aware that dogs are unpredictable; even if it does initially retreat, it may still attack.

**Oleoresin Capsicum Spray:** Another option against a hostile dog is Oleoresin Capsicum (OC) spray. The OC canister delivers a stream that has an effective range of 3-12 feet. At close range (less than three feet) the OC may not become fully activated, decreasing its effectiveness. When sprayed in a dog's face, the OC spray temporarily causes closing of the eyes and shortness of breath. A one-second blast of OC is generally sufficient to fend off a small dog.

**TASER:** The TASER is effective when used on dogs; however, striking a moving target with both probes is difficult. When using the TASER on a dog, aim directly at its body mass. Turn the weapon sideways to limit the spread of the TASER probes and fire. If the probes do not make contact with the animal, the TASER can be used as a "stun" weapon with the expended cartridge in place or without a cartridge.

**Baton:** Should voice commands or OC spray prove to be inadequate, officers may utilize baton techniques as a means of defense against an attacking dog. A continuous forward-reverse spin movement can deter an approaching animal. This creates a safety zone that may enable an officer to retreat to a safe location. If necessary, the dog should be struck in the nose or throat, its most sensitive areas.

Another option is to extend the baton straight out. The dog may focus its aggression on the baton rather than the officer. Hold the baton in the weak hand, leaving your gun hand free should the situation escalate to the point where lethal force is necessary.

**Kicks:** The use of kicking techniques against a hostile dog is not recommended. The dog will likely bite the leg and pull the officer off balance or cause the officer to fall.

**Fire Extinguishers:** Generally, a CO2 fire extinguisher has been found to be an effective deterrent when sprayed directly at the dog's face and should be considered a useful tool.

**Beanbag Shotgun:** Generally, the Beanbag Shotgun should not be used on animals. In planned events where a dog's presence is known, containment teams should not rely on the use of the Beanbag Shotgun as part of a tactical plan to be deployed on the animal. In exigent circumstances, the Beanbag Shotgun may be utilized to control a vicious dog. The primary target is the body mass.

**Lethal Force:** The size and speed of an animal can increase the potential of a missed shot and the possibility of an officer or bystander being critically injured by a bullet intended for the dog. An officer is authorized to use lethal force when it's reasonable to protect him/herself or other person(s) from immediate threat of death or serious bodily injury. Consideration should be given to the background and the possibility of a ricochet. The primary target is the body mass. Officers may not use lethal force against a dog to protect property, including other animals.

## CONCLUSION

Unexpected confrontations with a dog require officers to be aware of their surroundings and be prepared to act quickly and appropriately to a dog's approach. There is no single tool that is the ideal solution. Generally, the use of voice commands will calm most dogs. In addition, the use of OC spray, a baton, or fire extinguisher can be effective on aggressive dogs. By remaining alert and using common sense, officers can avoid most hostile dog injuries.

### Points to Remember:

- All dogs can bite
- Look for clues that a dog is present at the location
- Voice commands, OC, and baton are options to defend against a hostile dog
- Kicks are not recommended
- Generally, TASER and Beanbag shotgun should not be used
- Fire Extinguishers may be an effective deterrent
- Lethal force may not be used against a dog to protect property, including other animals

Source: "Use of Force Tactics Directive 7: Dog Encounters" (Los Angeles, CA: Los Angeles Police Department, 2009), https://www.sheriffs.org/sites/default/files/LAPD%20Directive%207%20Dog%20Encounters.pdf.

The Georgia and Los Angeles examples illustrate stand-alone policies. Dog encounter policy directives or SOPs may also be included within your agency's overall policy on use of force, as in the following examples.

### Austin Police Department – Policy 202: Firearms Discharge Situations - § 202.3.2: Reporting a Firearm Discharge against a Dangerous and Threatening Animal

*Reporting a Firearm Discharge against a Dangerous and Threatening Animal*

The following reporting guidelines will be followed for the destruction of a dangerous or attacking animal.

(a) Employees who destroy an attacking or dangerous animal will notify their supervisor or another on-duty supervisor in the absence of their immediate supervisor, as soon as practical.

(b) The supervisor, or designated acting supervisor, will respond to the scene and conduct an on-scene investigation of the incident, interview witnesses, and insure digital photographs are taken and downloaded into the Digital Crime Scene Management System.

(c) The involved employee(s) are required to complete an incident report entitled Dangerous Animal - Firearm Used (3434-7) detailing the event and the reason(s) for selecting deadly force over other force options.

(d) Investigating supervisors will complete a supplement to the incident report detailing their investigation and findings.

(e) The investigating supervisor will notify, via e-mail, each member of the involved employee's chain of command up to the Commander when the investigation is ready for review. This notification will include the incident report number. Each member of the chain-of-command through the commander shall add a Versadex case note to the incident report indicating they have reviewed the incident.

(f) The chain-of-command will determine what, if any, corrective action is needed.

(g) Employees are not required to be placed on restricted duty.

Source: "Policy 202: Firearms Discharge Situations - § 202.3.2: Reporting a Firearm Discharge against a Dangerous and Threatening Animal (Austin, TX: 2019), p. 61, http://www.austintexas.gov/sites/default/files/files/Police/General_Orders.pdf.

## Chicago Police Department - General Order G03-02: Use of Force

**Sec. III. Use of Force – When Authorized**

**C. Use of Deadly Force: Necessary to Prevent Death or Great Bodily Harm.** The following additional policies apply to the use of deadly force:

> 6. A sworn member is justified in using deadly force to stop a dangerous animal only when the animal reasonably appears to pose an imminent threat to the safety of the sworn member, another person, or another animal and no reasonably effective alternatives appear to exist.

Source: "General Order G03-02: Use of Force" (Chicago, IL: Chicago Police Department, 2017), directives.chicagopolice.org/directives/data/a7a57be2-128ff3f0-ae912-8fff-44306f3da7b28a19.html.

## Baltimore Police Department – Policy 1115: Use of Force

**DANGEROUS ANIMALS**

1. Members are permitted to use force to stop a dangerous animal in circumstances where the animal reasonably appears to pose an imminent threat to human or animal safety and alternative options are not available or would likely be ineffective.

2. Members shall conduct pre-raid surveillance prior to executing a Search and Seizure Warrant, in an effort to determine if a dangerous animal may be present at the location to be searched.

3. Members shall develop a reasonable contingency plan to control/avoid a dangerous animal prior to confronting the animal when given advance notice that a dangerous animal may be encountered (e.g., dog pole, fire extinguisher, etc.).

Source: "Policy 1115: Use of Force" (Baltimore, MD: Baltimore Police Department, 2018), p. 6, https://www.baltimorepolice.org/1115-use-force.

## Las Vegas Metropolitan Police Department – 6/002.00 USE OF FORCE

IX. AUTHORIZED FORCE TOOLS, TECHNIQUES AND EQUIPMENT

E. Oleoresin Capsicum Spray:

Approved Use

3. OC spray may be used on vicious or aggressive animals when those animals interfere with the safety of the officers or citizens.

D. Firearms:[137]

Approved Use

5. Destroying Injured or Dangerous Animals - Officers may destroy an injured or dangerous animal under the following circumstances: a. In self-defense; b. To prevent serious harm to the officer or others; or c. When the animal is so badly injured as to require humane relief from further suffering.

NOTE: A seriously wounded or injured animal may be destroyed only after all attempts have been made to request assistance from the agency (Humane Society, animal control, game warden, etc.) responsible for the disposal of animals. The destruction of vicious animals involves the same rules set forth for self-defense and the defense and safety of others. (See policy 5/109.08 for an exception regarding the Humane Disposal of Animals at Resident Locations.) Also, if the animal's owner is present, the owner will be allowed, at his option, to transport the animal to veterinary care.

**5/109.01 POST USE OF FORCE PROCEDURES A.S. 26.1.1**

III. Investigative Responsibilities: Use of Deadly Force or Force Involving Serious Bodily Injury

C. Incident Responsibilities

The following guidelines for notifications are to be made by Communications dependent upon the type of incident:

2. A Non-Injury or Property Damage Intentional Discharge of a Firearm Incident (which includes an intentional discharge at anything other than a person, such as a dog; see Department Manual Section 5/109.08 for an exception regarding Humane Disposal of Animals at Resident Locations):

a. The officer's immediate supervisor;

b. The watch commander;

137. While labeled as section D, the firearms section of the LVMPD actually appears between sections L and N of the Authorized Force Tools, Techniques, and Equipment heading.

c. The officer's bureau commander;

d. Major Crimes or Violent Crimes details;

e. Crime Scene Investigations Section;

f. CIRT;

g. Risk Manager.

Source: "6/002.00: Use of Force," (Las Vegas, NV: Las Vegas Metropolitan Police Department, n.d.), pp. 10, 22, and 28. https://cops.usdoj.gov/pdf/use-of-force.pdf.

## Denver Sheriff's Department – Department Order 5011: Use of Force Policy

12. USE OF FORCE ON ANIMALS

The Denver Sheriff Department understands that all animals, especially the domesticated animal population of its citizens, have a right to life and further recognizes the complexity of human-animal relationships. The Department specifically recognizes that it is a policy of the State of Colorado to prevent, whenever possible, the shooting of canines by law enforcement officers in the course of performing their official duties.

**A. Domesticated Animals**

(1) If time and circumstances permit, deputies shall give the domesticated animal's owner or caretaker a reasonable opportunity to control or remove his or her animal from the immediate area before taking any enforcement action.

(2) When making this determination, deputies shall take the following into account:

(a) Their own safety;

(b) The safety of other persons in the area;

(c) The availability of nonlethal devices;

(d) The feasibility of allowing the owner to control or remove the animal, considering the totality of the circumstances, including whether an animal control officer is present and whether the call is at a location that is listed in the dangerous dog registry (created in C.R.S. § 35-42-115) or a location at which illegal narcotics are suspected to be manufactured or trafficked; and

(e) Any exigencies that may be present, such as knowledge that a person has already been bitten by the animal or is in physical danger.

(3) In order to formulate the most appropriate response to an animal related incident or situation, deputies should be mindful that often the size and/or breed of the animal are inappropriate indicators of imminent danger of attack. Therefore, deputies shall formulate an initial assessment of the situation based upon the specific behavioral traits of the animal and the surrounding environment.

(4) The initial assessment shall include the deputy's recognition of the facts that domesticated animals are accustomed to human interaction and it is common for a domesticated animal to run towards, jump, and/or make an audible sound in order to greet a human.

(5) When determining the most appropriate response, deputies must also differentiate between common behaviors associated with domesticated animals and behaviors that put the officer and/or other persons in imminent danger of attack. Common canine behaviors include the following:

- Canines that are frightened often are low to the ground and have their tail tucked between their legs and their ears may be flat against the head.
- Canines that are barking/lunging and restrained by a barrier (e.g., fence, chain, rope) are often the highest risk to bite due to the canine feeling frustration at not being able to access the human and/or feeling territorial over the space. The best strategy in such circumstances is to maintain a safe distance.
- An unrestrained canine that communicates by barking/lunging is conveying a warning, not necessarily intent to bite; however, if the warning is not heeded, the canine may be likely to bite.
- Canines are stimulated by quick movement and will chase any rapidly moving object. Thus, running from a canine stimulates chasing behavior and may escalate to grabbing and biting. Often, this is not aggression, but rather a game for the canine.

- Canines that are snarling (tensing their lips to expose their teeth) and growling are conveying the clearest and strongest of warnings. A growling canine should not be approached.

(6) When deputies have sufficient advance notice that a potentially dangerous domesticated animal may be encountered, such as when serving a warrant, deputies shall develop a plan for dealing with the animal without the use of lethal force.

(7) When a deputy reasonably believes, based upon the totality of the circumstances, that an animal poses an immediate threat of injury to the officer or another individual, the deputy shall use the minimum amount of force necessary to bring the animal under control. If time and circumstances permit, a deputy shall attempt to diffuse potentially harmful situations with an animal without the use of lethal force. Nonlethal options may include:

- The use of a baton to block or redirect an attack.
- The use of authorized chemical agents.
- The use of a TASER so long as it is appropriately discharged. A TASER must be discharged differently with canines than with humans because the canine's body mass is parallel to the ground. Therefore, to properly use the device, it must be held sideways so that the probes fire horizontally and in line with the canine's body. [Note: A TASER should be used sparingly as it can cause serious injury or death to the animal.]

**C. Use of Lethal Force on Animals**

A deputy may resort to the use of lethal force to control a vicious or dangerous animal if the plan for dealing with the animal without the use of lethal force has failed or becomes impracticable, and the animal is exhibiting behavior which puts a deputy or another individual in imminent danger to life or which requires a humane ending to its suffering from serious injuries. When a deputy discharges a firearm in order to kill an animal, the deputy shall maintain his/her firearm in its condition at the conclusion of the event, making no changes to the firearm except to make it safe.

Source: "Department Order 5011: Use of Force Policy" (Denver, CO: Denver Sheriff's Department, 2016), pp. 27–30, https://www.denvergov.org/content/dam/denvergov/Portals/744/documents/Updated %20DSD%20 UOF%20POLICY%20(Final).pdf.





# Decoding Canine Body Language Quick Reference Guide

When approaching an unfamiliar dog, officers should take note of six different characteristics—eyes, ears, mouth, tails, fur, and overall posture—and alter their behavior based on those characteristics.[138]

## Eyes

When approaching a dog, an officer should take note of both the size of the dog's eyes and the direction of its gaze. Generally, larger than normal eyes indicate the dog may be feeling threatened or frightened and should be approached cautiously. Smaller than normal eyes, or eyes that appear to be squinting, are usually nonthreatening and could indicate the dog is frightened or in pain. As for the direction of its gaze, some dogs may look directly at an individual without any threatening or challenging intent; however, when that direct stare is accompanied by noticeably tense facial features or body language, officers should proceed cautiously and not look directly back at the dog. Looking away does not mean an officer surrenders his dominance, but is a way for the officer to appear less threatening. If the dog looks away, it may also be attempting to appear less threatening—though looking away could also indicate the dog is scared of interacting with humans, and officers should be wary of any additional signs of aggression. Lastly, officers should be cautious when a dog looks at them from the corners of its eyes to an extent that most of the whites of the dog's eyes are visible, particularly if the dog appears to be guarding something or someone; this usually indicates an imminent act of aggression.

## Ears

There are generally five positions at which a dog may hold its ears. If a dog appears to be holding his ears naturally with no visible tension or distress, it is generally relaxed and nonthreatening. If the ears are held high on the head, it signals that the dog is alert to what is going on around it; often the ears will also be pointed toward whatever is alerting the dog. While this alert stance is not generally an indication of a threat, officers should be cognizant of how they approach an alert dog, as the dog could respond aggressively. If the ears are held up and forward, this is an indication that a dog is feeling aggressive, and officers should be cautious when approaching. When the dog's ears are pulled back, this is an attempt by the dog to communicate friendliness or a nonthreatening attitude. Lastly, if the ears are completely pulled back against the dog's head, it indicates either fear or submission. This is a signal to proceed cautiously, as frightened dogs may act aggressively out of fear.

138. American Society for the Prevention of Cruelty to Animals, "Canine Body Language," https://www.aspcapro.org/sites/default/files/canine-body-language-aspca_0.pdf.

## Mouth

The positioning of a dog's jaw and lips, and how prominently it displays its teeth, are all behavioral cues as to its attitude. Friendly and approachable dogs typically will have a relaxed mouth, closed or slightly open; any display of teeth is incidental to the dog's mouth being open. Frightened dogs, too, will have a closed mouth, but they may also stick their tongues out or lick, or they may pull their lips back in what looks like a grin. These are all indicators that the dog is acting submissively and is not intending to be a threat towards anyone or anything. An aggressive dog, on the other hand, will usually display its teeth to some extent, sometimes accompanied by a wrinkling of the muzzle or growling. Officers who notice this positioning should approach cautiously, if at all.

## Tails

It is a mistaken assumption that a wagging tail always indicates a friendly dog. Aggressive dogs may wag their tails, and friendly dogs may not wag their tails at all. Additionally, some dogs, such as Boston terriers, don't have much tail to wag, while breeds such as greyhounds have a tail naturally positioned in a way that may be interpreted as frightened. In general, however, a wagging tail often does indicate friendliness or fear. Friendly dogs will gently wag their tails side-to-side, or more forcefully if the dog is excited. Frightened dogs sometimes tuck their tails between their rear legs; the closer to the belly of the dog, the more frightened it probably is. When a dog holds its tail high *and* appears to wag it tensely; this indicates aggression or dominance. An officer should interpret the positioning and movement of the tail in combination with the other factors to get a better indication of how the dog is feeling.

## Fur

A dog's fur may not be much of a method of communication, but officers should take precautions when they notice the fur along a dog's spine and in between its shoulder blades is raised or sticking up. This is an indication that the dog is frightened, nervous, or aggressive. If the dog's fur is raised, officers should approach slowly and cautiously and observe the dog's other traits to determine whether it is afraid or angry.

## Overall posture

Dr. Stanley Coren, a psychologist known for his research on dog behavior, presented the eight most relevant and useful dog postures in an article for *Modern Dog*. These are relaxed and approachable, alert, dominant and aggressive, fearful and aggressive, stressed and distressed, fearful and worried, extremely fearful, and playful.[139] Learning these simplified postures allows officers to make a quick assessment of any potential threat posed by the dog.

For visual references, please visit https://www.sheriffs.org/Decoding-Dogs.

139. Stanley Coren, "How To Read Your Dog's Body Language," *Modern Dog,* accessed April 15, 2019, http://moderndogmagazine.com/articles/how-read-your-dogs-body-language/415.





# References

## Literature review


Abrantes, Roger. 1997. *Dog Language: An Encyclopedia of Canine Behavior*. Wenatchee, WA: Dogwise Publishing.

Abrantes, Roger. 2004. *The Evolution of Canine Social Behavior*. Wenatchee, WA: Dogwise Publishing.

Aloff, Brenda. 2001 *Aggression in Dogs: Practical Management, Prevention, and Behavior Modification*, Wenatchee, WA: Dogwise Publishing.

Baker, Paola. 2017. "Family of Dog Fatally Shot by Deputies in Hesperia Awarded $98K." *Daily Press* (Victorville, CA), September 14, 2017. http://www.vvdailypress.com/news/20170914/family-of-dog-fatally-shot-by-deputies-in-hesperia-awarded-98k.

Bathurst, Cynthia, Donald Cleary, Karen Delise, Ledy VanKavage, and Patricia Rushing. 2011. *The Problem of Dog-Related Incidents and Encounters*. (Washington, DC: Office of Community Oriented Policing Services.) https://ric-zai-inc.com/ric.php?page=detail&id=COPS-P206.

Blaney, Nancy. 2014. "Officer Involved Shootings with Dogs." *Sheriff Magazine*: September/October 2014.

Bologna, Giacomo. 2016. "Sparta Pays $6,000 Settlement to Owner of Dog Shot by Police Chief." *Springfield News-Leader,* December 6, 2016. https://www.news-leader.com/story/news/local/christian-county/2016/12/06/sparta-pays-6000-settlement-owner-dog-shot-police-chief/95061676/.

Bookwalter, Genevieve. 2017. "Evanston To Pay Family $50,000 After Police Fatally Shot Pet Dog." *Chicago Tribune,* October 5, 2017. http://www.chicagotribune.com/suburbs/evanston/news/ct-police-dog-shooting-settlement-tl-1005-20171005-story.html.

Bradley, Janis. 2014. *Dog Bites: Problem and Solutions.* Ann Arbor, MI: Animals and Society Institute.

Callam, Michael. 1980. "Dog Bite Wounds." *Journal of the American Medical Association* 244 (20): 2327–2328.

Centers for Disease Control and Prevention (CDC). 1997. *Dog-bite-related fatalities–United States, 1995-1996. Morbidity and Mortality Weekly Report* 46 (21): 463–467.

Centers for Disease Control and Prevention. 2003. "Nonfatal Dog Bite–Related Injuries Treated in Hospital Emergency Departments – United States, 2001." *Morbidity and Mortality Weekly Report* 52 (26): 605–610. cdc.gov/mmwr/preview/mmwrhtml/mm5226a1.htm.

Ciaramella, C.J. 2018. "Detroit to Pay $225,000 after Cops Shoot Three Dogs in Marijuana Raid." *Reason*, March 22, 2018. https://reason.com/blog/2018/03/22/detroit-will-pay-225000-settlement-after.

Dunn, Lora. 2016. "Major Settlement in Case of Dog Shooting by Colorado Officer." Animal Legal Defense Fund, January 26, 2016. http://aldf.org/blog/major-settlement-in-case-of-dog-shooting-by-colorado-officer/.

Fay, Tony. 2017. "Hartford Paying $885K to Family Whose Dog Was Killed by Cops." WWLP News, February 28, 2017. https://www.wwlp.com/news/connecticut/hartford-paying-885k-to-family-whose-dog-was-killed-by-cops/1043199013.

Francione, Gary. 1996. "Animals as Property." Michigan State University Animal Legal and Historical Center, 2 Animal L I. https://www.animallaw.info/article/animals-property.

Gaines, Danielle. 2014. "Appeals Court: Emotional Damages Allowed in Dog Shooting Case." *Frederick News-Post*, December 19, 2014. https://www.fredericknewspost.com/news/crime_and_justice/courts/appeals-court-emotional-damages-allowed-in-dog-shooting-case/article_ec02c09f-f82b-5de0-adc1-e507796e1764.html.

Golden, Jessica. 2006. "Judge Says Pet is Property, Not Companion." ABC News, May 25, 2006. http://abcnews.go.com/US/print?id=2005581.

Greene, Jenna. 2012. "Setting Precedent, Judge Awards Owner of Deceased Dog $65,000 for Emotional Distress." *National Law Journal,* April 20, 2012. http://www.nationallawjournal.com/id=1202549698990/Setting-precedent,-judge-awards-owner-of-deceased-dog-65,000-for-emotional-distress-?slreturn=20140321044829.

Hermann, Peter. 2012. "Frederick County Jury Awards Couple $620,000 for Pet Shot by Police." *Baltimore Sun,* April 3, 2012. http://www.baltimoresun.com/news/maryland/crime/blog/bal-frederick-county-jury-awards-couple-620000-for-pet-shot-by-police-20120403,0,7588027.story.

Hetts, Suzanne. 1999. *Pet Behavior Protocols.* Lakewood, CO: American Animal Hospital Association Press.

Hicks, Mark. 2016. "Detroit Pays $100,000 to Settle Dog Fatal-Shooting Case." *Detroit News*, February 26, 2016. https://www.detroitnews.com/story/news/local/detroit-city/2016/02/26/detroit-pays-settle-dog-fatal-shooting-case/80970782/.

International Association of Chiefs of Police. 2005. *IACP Model Policy, Executing Search Warrants 0205.* Alexandria, VA: IACP Policy Center.

International Association of Chiefs of Police. 2015. *IACP Model Policy, Law Enforcement Interactions with Canines* Alexandria, VA: IACP Policy Center.

Johnson, Denise. 2012. "California Allows Emotional Distress Damages in Dog's Death." *Claims Journal,* September 18, 2012. http://www.claimsjournal.com/news/west/2012/09/18/213735.htm.

Juhl, Wesley. https://thehill.com/blogs/floor-action/scheduling/462548-this-week-congress-races-to-prevent-shutdown-as-recess-looms# 2017. "Las Vegas Police Settle Lawsuit Involving Fatal Dog Shooting for $199K." *Las Vegas Review-Journal,* March 27, 2017. https://www.reviewjournal.com/news/las-vegas-police-settle-lawsuit-involving-fatal-dog-shooting-for-199k/.

Kunzelman, Michael. 2018. "Dog Owners Get $75K in Pact Over Deputy's Canine Killing." *U.S. News,* April 4, 2018. https://www.usnews.com/news/best-states/louisiana/articles/2018-04-04/dog-owners-get-75k-in-pact-over-deputys-canine-killing.

Kurvers, Krista. 2013. *Dealing with Dogs for Law Enforcement Officers*. Longmont, CO: Code 3 Associates Inc.

Kurvers, Krista and Gary Maddox. 2014. "Dogs and Tactical Response: A Guide for Safe, Successful and Humane Encounters." *The Tactical Edge*, Spring 2014.

Larabee, Mark. 2006. "Cat-Owner Suit Seeks $1.4 Million in Pet Death." *Oregonian*, July 7, 2006.

Lindsey, Steven R. 2000. *Handbook of Applied Dog Behavior and Training, Volume 1: Adaptation and Learning*. Ames, IA: Blackwell Professional Publishing.

———. 2001. *Handbook of Applied Dog Behavior and Training, Volume 2: Etiology and Assessment of Behavior Problems.* Ames, IA: Blackwell Professional Publishing.

———. 2005. *Handbook of Applied Dog Behavior and Training, Volume 3: Procedures and Protocols.* Ames, IA: Blackwell Professional Publishing.

Los Angeles Police Department. 2009. "Directive No. 7: Dog Encounters." In *Los Angeles Police Department Policy Manual.* Los Angeles, California: Los Angeles Police Department. https://www.sheriffs.org/sites/default/files/LAPD%20Directive%207%20Dog%20Encounters.pdf.

Lovelace, Ryan. 2017. "8th Circuit Rules It Was 'Reasonable' for State Trooper to Shoot and Kill Loose Dog on the Highway." Washington Examiner, September 18, 2017. https://www.washingtonexaminer.com/8th-circuit-rules-it-was-reasonable-for-state-trooper-to-shoot-and-kill-loose-dog-on-the-highway.

Miklosi, Adam. 2007. *Dog Behavior, Evolution, and Cognition.* Oxford, UK: Oxford University Press.

Morfitt, Karen. 2016. "Attorney: Settlement In Dog Shooting Case Sets A Precedent." *CBS Denver,* January 26, 2016. http://denver.cbslocal.com/2016/01/26/attorney-settlement-in-dog-shooting-case-sets-a-precedent/.

Nolen, Scott R. 2004. "California Dog Owner Awarded $39,000 in Veterinary Malpractice Suit." *JAVMA* [Journal of the American Veterinary Medical Association] *News*, April 15, 2004. https://www.avma.org/News/JAVMANews/Pages/040415e.aspx.

Office of Community Oriented Policing Services. 2013. *Social Media and Tactical Considerations for Law Enforcement.* Washington, DC: Office of Community Oriented Policing Services. https://ric-zai-inc.com/Publications/cops-p261-pub.pdf.

Overall, K.L.M., and Molly Love 2001. "Dog Bites to Humans—Demography, Epidemiology, Injury, and Risk," *Journal of the American Veterinary Medical Association* 218, no.12 (2001): 1925–34.

Ozias, Michael, dir. 2016. *Of Dogs and Men*. Released August 1, 2016. Ozymandias Entertainment Inc. and Just Add Firewater LLC.

Pacella, Rachael. 2017. "Jury Awards $1.26M to Glen Burnie Family Whose Dog Was Shot by Police." *Capital Gazette*. http://www.capitalgazette.com/news/for_the_record/phac-cn-vern-lawsuit-0510-20170509-story.html.

Pendered, David. 2018. "Atlanta to Settle Case of Family's Labrador Retriever Dog Shot, Killed by Police in 2013." SaportaReport [blog], January 10, 2018. https://saportareport.com/atlanta-settle-case-family-labrador-retriever-dog-shot-killed-police-2013/.

Petful.com. 2013. *Gunned Down: Why Are So Many Dogs Being Shot by Police? Petful Special Report.* Last updated May 2013. http://www.petful.com/gunned-down-report-new.pdf.

Pit Bull Legal News Network. 2012. *E.A.S.E.: Effective Animal Safety Enforcement.* N.p: PBLNN Publications. https://s3-us-west-2.amazonaws.com/docs.puppycidedb.com/literature/PitBulletinLegalNewsNetwork-EffectiveAnimalSafetyEnforcement.pdf.

Quinlan, K.P., and J.J. Sacks. 1999. "Hospitalizations for Dog Bite Injuries" [letter]. *Journal of the American Medical Association* 281: 232–233.

Ragatz, Laurie. William Fremouw, Tracy Thomas, and Katrina McCoy. "Vicious Dogs: The Antisocial Behaviors and Psychological Characteristics of Owners." *Journal of Forensic Science* 54 (3): 699–703, https://doi.org/10.1111/j.1556-4029.2009.01001.x.

Reese, Sarah. 2016. "Judge Tosses Suit against Hammond Cop Who Shot Dog." *Northwest Indiana Times,* October 21, 2016. http://www.nwitimes.com/news/local/lake/judge-tosses-suit-against-hammond-cop-who-shot-dog/article_235aa46f-a2a0-5a33-a984-eecfcf4044be.html.

Rugaas, Turid. 2005. *On Talking Terms with Dogs: Calming Signals.* Wenatchee, WA: Dogwise Publications.

Sacks, J.J., Marcie-Jo Kresnow, and Barbara Houston. 1996. "Dog Bites: How Big a Problem." *Injury Prevention* 2 (1): 52–4. https://www.ncbi.nlm.nih.gov/pubmed/9346056.

Sacks, J.J., Randall Lockwood, Janet Hornreicht, and Richard Sattin. 1996. "Fatal Dog Attacks, 1989-1994." *Pediatrics* 97 (6): 891–5. https://www.ncbi.nlm.nih.gov/pubmed/8657532.

Sacks, J.J., Richard Sattin, and S.E. Bonz. 1989. "Dog Bite-Related Fatalities From 1979 Through 1988." *Journal of the Americal Medical Association* 262 (11): 1489–1492.

Sacks, J.J., Leslie Sinclair, Julie Gilchrist, Gail C. Golab, and Randall Lockwood. 2000. "Breeds of Dogs Involved in Fatal Human Attacks in the United States between 1979 and 1998." *Journal of the American Veterinary Medicine Association* 217 (6): 836–840.

Seps, Christopher D. 2010. "Animal Law Evolution: Treating Pets as Persons in Tort and Custody Disputes." *University of Illinois Law Review* 2010: 1339–1374.

Sullivan, Jennifer. 2013. "Des Moines to Pay $51,000 over Fatal Shooting of Dog." *Seattle Times,* February 21, 2013. https://www.seattletimes.com/seattle-news/des-moines-to-pay-51000-over-fatal-shooting-of-dog/.

Task Force on Canine Aggression and Human-Canine Interactions. 2001. "A Community Approach to Dog Bite Prevention," *Journal of the American Veterinary Medical Association* 218 (11): 1732–49. https://www.avma.org/public/Health/Documents/dogbite.pdf.

Valcourt, Derek. 2012. "Court Awards Frederick Co. Family Damages after Sheriff's Deputies Shoot Their Dog." *CBS Baltimore, April 4, 2012*. http://baltimore.cbslocal.com/2012/04/04/court-awards-frederick-co-family-damages-after-sheriffs-deputies-shoot-their-dog/.

Winslow, Ben. 2017. "Judge Sides with SLCPD in Shooting of Geist the Dog." *Fox13 Salt Lake City,* February 17, 2017. http://fox13now.com/2017/02/17/judge-sides-with-slcpd-in-shooting-of-geist-the-dog/.

Wisely, John. 2016. "Detroit Police to Pay $100,000 for Shooting a Dog." *Detroit Free Press,* February 25, 2016. freep.com/story/news/local/michigan/detroit/2016/02/25/detroit-police-pay-100000-shooting-dog/80946756/.

Wright, John C. 1991. "Canine Aggression Toward People: Bite Scenarios and Prevention." *Veterinary Clinics of North America: Small Animal Practice* 21 (2): 299–314.

## Legal citations

### *Cases*

Ammon v. Welty, 113 S.W.3d 185 (Ky. 2002).

Anderson v. Creighton, 483 U.S. 635 (1987).

Brooks v. Jenkins, 220 Md. App. 444 (2014).

Brooks v. U.S., 29 F. Supp. 2d 613, 618 (N.D. Cali. 1998).

Brown v. Battle Creek Police Dept., 844 F.3d 556 (6th Cir. 2016).

Brown v. Muhlenberg Township, 269 F.3d 205 (3rd Cir. 2001).

Fuller v. Vines, 36 F.3d 65 (9th Cir. 1994).

Kautzman v. McDonald, 621 N.W.2d 871 (N.D. 2001).

Kaiser v. U.S., 761 F. Supp. 150 (D.D.C. 1991).

Mitchell v. Forsyth, 472 U.S. 511 (1985).

Robinson v. Pezzat, 818 F.3d 1 (D.C. Cir. 2016).

San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962 (9th Cir. 2005)

Saucier v. Katz, 533 U.S. 194 (2001).

Smoak v. Eric Hall; David Bush; Jeff Phann; Tim McHoo; Brian Brock; Jerry Andrews, Lieutenant, 460 F.3d 768 (6th Cir. 2006)

Tennessee v. Garner, 471 U.S. 1 (1985).

Viilo v. Eyre, 547 F.3d 707 (7th Cir. 2008).

## *Constitutional provisions*

U.S. Const. amend. IV

U.S. Const. amend. XIV

## *Statutes*

42 U.S.C. § 1983

# Current state legislation

50 Ill. Comp. Stat. § 705/10.14 (2013). http://www.ilga.gov/legislation/ilcs/documents/005007050k10.14.htm.

Animal Law Resource Center. 2019."Human Canine Response Training Act." Accessed April 15, 2019. http://www.animallaw.com/HumaneCanineResponseTrainingAct.htm.

Cali. AB-1199 (2017-2018).

Colo. Rev. Stat. § 29-5-112(4) (2013). http://codes.findlaw.com/co/title-29-government-local/co-rev-st-sect-29-5-112.html.

Miller, Carolyn. 2015. "Canine Encounter Training Mandated for Texas Law Enforcement." Blog post. American Animal Hospital Association, September 23, 2015. http://www.aaha.org/blog/NewStat/post/2015/09/23/302002/Canine-encounter-training-mandated-for-Texas-law-enforcement.aspx.

Moeller, Katy. 2014. "Dog Shootings by Police Prompt Mandatory Training in Other States." *Idaho Statesman*, March 5, 2014. http://magicvalley.com/news/local/dog-shootings-by-police-prompt-mandatory-training-in-other-states/article_7fffa720-a3ee-11e3-8f11-001a4bcf887a.html.

Nev. Rev. Stat. § 289.595 (2015). https://www.leg.state.nv.us/NRS/NRS-289.html#NRS289Sec595.

OH H.B. No. 64, 131st Gen. Assembly (June 30, 2015) (enacted). https://www.legislature.ohio.gov/download?key=2947&format=pdf.

Ohio Revised Code § 109.747: Rules governing training of peace officers on companion animal encounters and companion animal behavior (2015). http://codes.ohio.gov/orc/109.747.

Tenn. S. 374, 103d Gen. Assembly (June 15, 2004) (enacted). http://www.capitol.tn.gov/Bills/103/ Bill/SB0374.pdf.

Tenn. Code Ann. § 38-8-117(b)(1)-(3) (2015). https://law.justia.com/codes/tennessee/2015/title-38/chapter-8/part-1/section-38-8-117.

Trice, Dawn Turner, and Jeremy Gorner. 2013. "Are Police Too Quick on the Draw against Dogs?" *Chicago Tribune*, August 6, 2013, http://articles.chicagotribune.com/2013-08-06/news/ct-met-cops-shooting-dogs-20130806_1_police-shootings-police-officer-rottweiler.

Tex. Occ. Code § 1701.261(a)(1)-(7) (2015). https://texas.public.law/statutes/tex._occ._code_section_1701.261.

## Policy considerations

Austin Police Department. 2019. "Policy 202: Firearms Discharge Situations - § 202.3.2: Reporting a Firearm Discharge against a Dangerous and Threatening Animal." Austin, TX: Austin Police Department. http://www.austintexas.gov/sites/default/files/files/Police/General_Orders.pdf.

Baltimore Police Department. n.d. "Policy 1115: Use of Force." Baltimore, MD: Baltimore Police Department. https://www.baltimorepolice.org/1115-use-force.

Chicago Police Department. 2017. "General Order G03-02: Use of Force." Chicago, IL: Chicago Police Department. http://directives.chicagopolice.org/directives/data/a7a57be2-128ff3f0-ae912-8fff-44306f3da7b28a19.html.

Denver Sheriff's Department. 2016. "Department Order 5011: Use of Force Policy." Denver, CO: Denver Sheriff's Department. https://www.denvergov.org/content/dam/denvergov/Portals/744/documents/Updated %20DSD%20UOF%20POLICY%20(Final).pdf.

Georgia Association of Chiefs of Police. 2014. "Standard Operating Procedure 11.6: Use of Force When Dealing with Animals." Duluth, GA: Georgia Association of Chiefs of Police. https://gachiefs.com/wp-content/uploads/2016/05/Chapter-11-Use-of-Force-2014-REVISED.doc.

Las Vegas Metropolitan Police Department. n.d. "6/002.00 Use of Force." Las Vegas, Nevada: Las Vegas Metropolitan Police Department. https://cops.usdoj.gov/pdf/use-of-force.pdf.

Los Angeles Police Department. 2009. "Directive No. 7: Dog Encounters." In *Los Angeles Police Department Policy Manual.* Los Angeles, California: Los Angeles Police Department. https://www.sheriffs.org/sites/default/files/LAPD%20Directive%207%20Dog%20Encounters.pdf.

## Decoding canine body language

American Society for the Prevention of Cruelty to Animals. n.d. "Canine Body Language." https://www.aspcapro.org/sites/default/files/canine-body-language-aspca_0.pdf.

Coren, Stanley. "How to Read Your Dog's Body Language." 2019. *Modern Dog.* Accessed April 15, 2019. http://moderndogmagazine.com/articles/how-read-your-dogs-body-language/415.

National Sheriffs' Association. 2019. "Decoding Canine Behavior." Accessed May 10, 2019. https://www.sheriffs.org/Decoding-Dogs.





# About the National Law Enforcement Center on Animal Abuse

The National Law Enforcement Center on Animal Abuse was established by the National Sheriffs' Association to provide law enforcement officers information on the realities of animal abuse and to promote their proactive involvement in the enforcement of animal abuse laws in their communities. Through our partners, the Center will serve as an information clearinghouse and forum for law enforcement on the growing problem of animal abuse and its link to other types of crimes, including violence against humans. NLECAA intends to bring greater awareness to, and understanding by, our nation's law enforcement officers on the oftentimes misunderstood nature of animal abuse crimes and their link to violence against humans. Additionally, NLECAA seeks to train and education officers on how to handle officer-dog encounters more safely.

Visit https://www.sheriffs.org/nlecaa for more information.

# About the National Sheriffs' Association

The National Sheriffs' Association (NSA) is one of the largest associations of law enforcement professionals in the United States, representing more than 3,000 elected sheriffs across the nation, and a total membership of more than 20,000. NSA is a non-profit organization dedicated to raising the level of professionalism among sheriffs, their deputies, and others in the field of criminal justice and public safety. Throughout its seventy-eight year history, NSA has served as an information clearinghouse for sheriffs, deputies, chiefs of police, other law enforcement professionals, state governments, and the federal government.





# About the COPS Office

The **Office of Community Oriented Policing Services (COPS Office)** is the component of the U.S. Department of Justice responsible for advancing the practice of community policing by the nation's state, local, territorial, and tribal law enforcement agencies through information and grant resources.

Community policing begins with a commitment to building trust and mutual respect between police and communities. It supports public safety by encouraging all stakeholders to work together to address our nation's crime challenges. When police and communities collaborate, they more effectively address underlying issues, change negative behavioral patterns, and allocate resources.

Rather than simply responding to crime, community policing focuses on preventing it through strategic problem-solving approaches based on collaboration. The COPS Office awards grants to hire community policing officers and support the development and testing of innovative policing strategies. COPS Office funding also provides training and technical assistance to community members and local government leaders, as well as all levels of law enforcement.

Since 1994, the COPS Office has invested more than $14 billion to add community policing officers to the nation's streets, enhance crime fighting technology, support crime prevention initiatives, and provide training and technical assistance to help advance community policing. Other achievements include the following:

- To date, the COPS Office has funded the hiring of approximately 130,000 additional officers by more than 13,000 of the nation's 18,000 law enforcement agencies in both small and large jurisdictions.
- Nearly 700,000 law enforcement personnel, community members, and government leaders have been trained through COPS Office–funded training organizations.
- To date, the COPS Office has distributed more than eight million topic-specific publications, training curricula, white papers, and resource CDs and flash drives.
- The COPS Office also sponsors conferences, round tables, and other forums focused on issues critical to law enforcement.

COPS Office information resources, covering a wide range of community policing topics such as school and campus safety, violent crime, and officer safety and wellness, can be downloaded via the COPS Office's home page, www.cops.usdoj.gov. This website is also the grant application portal, providing access to online application forms.



The use of force by law enforcement, deadly or otherwise, has become a major issue before the public. As human cases have become more visible, so have cases where law enforcement officers have used deadly force against companion dogs.

The purpose of this toolkit is to provide law enforcement agencies and officers with the information, tools, and resources necessary to handle dog encounters, starting with prevention all the way through dealing with the aftermath of an unfortunate deadly dog encounter.

COPS
Community Oriented Policing Services
U.S. Department of Justice

U.S. Department of Justice
Office of Community Oriented Policing Services
145 N Street NE
Washington, DC 20530

To obtain details about COPS Office programs, call the COPS Office Response Center at 800-421-6770.

Visit the COPS Office online at **www.cops.usdoj.gov**.

National Sheriffs' Association
NLECAA1450 Duke Street
Alexandria, VA 22314
www.sheriffs.org/nlecaa

e031913908
Published 2019