UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CHARLES DEMPSEY and LEONA DEMPSEY,

Plaintiffs,

-against-

THE CITY OF ROCHESTER, a municipal entity,
JAVIER ALGARIN, "JOHN DOE" RPD OFFICER
RESPONSIBLE FOR TRAINING JAVIER ALGARIN,

Defendants.

**Case No.: 19-cv-6780 (MJP)**

## MEMORANDUM OF LAW IN SUPPORT OF

## PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES AND COSTS

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

    I.    THE DEGREE OF SUCCESS OBTAINED WARRANTS A FULL FEE AWARD ....... 2

        A.   Legal Standard ................................................................................................... 2

        B.   Plaintiffs Achieved an Overwhelming Degree of Success ............................................. 2

        C.   The *Monell* Victory Is Particularly Significant Because It Answers the Question of "Why" ................................................................................................................ 4

        D.   The Importance of the Verdict Extends Well Beyond This Case .................................. 4

        E.   The Only Comparable Successes in the Western District Were Achieved by Other New York City Attorneys ............................................................................................... 6

    II.   COUNSEL'S REQUESTED HOURLY RATES ARE REASONABLE ......................... 7

        A.   Legal Standard ................................................................................................... 7

        B.   Out-of-District Rates Are Warranted for Elliot Dolby-Shields ($700/hour) ................. 7

        C.   Out-of-District Rates Are Warranted for David Roth ($1,125/hour) .......................... 16

        D.   The Rate for Paralegal Zoya Charania ($250/hour) Is Reasonable .............................. 17

    III.  THE HOURS EXPENDED WERE REASONABLE AND NECESSARY TO ACHIEVE THE RESULTS OBTAINED ...................................................................... 17

        A.   Legal Standard ................................................................................................... 17

        B.   Overview of the Work Performed .......................................................................... 18

        C.   Defendants' Litigation Conduct Necessitated Additional Work .................................. 18

        D.   Pre-Suit Investigation and Article 78 Proceedings (2018–2019) ................................ 19

        E.   Federal Complaint and Dispositive Motions (2019–2020) ........................................ 19

        F.   Fact Discovery (2021–2023) ............................................................................... 20

        G.   Expert Retention and Preparation (2023–2026) ...................................................... 21

        H.   Second Round of Dispositive Motions (2024) ......................................................... 21

        I.   Opposition to Motion to Bifurcate Trial (2025) ...................................................... 22

        J.   Pretrial Motions and Trial Preparation (December 2025 – January 2026) ................... 23

        K.   Trial (January 13–30, 2026) ................................................................................ 24

        L.   Fee Application and Other Post Trial Work ............................................................ 24

    IV.  THE LODESTAR SHOULD NOT BE REDUCED .................................................... 25

CONCLUSION ........................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182 (2d Cir. 2008) ............................................................................................................................... 7, 14

*B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138 (2015) ................................................ 5

*Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132 (2d Cir. 2008) .......................... 1

*Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997) ................................................................ 14

*Boyd v. City of Buffalo*, No. 22-cv-519 (LJV)(JJM) ................................................................ 6, 7

*City of Canton v. Harris*, 489 U.S. 378 (1989) ....................................................................... 3, 6

*City of Riverside v. Rivera*, 477 U.S. 561 (1986) .................................................................. 4, 6, 9

*Clarke v. Frank*, 960 F.2d 1146 (2d Cir. 1992) ......................................................................... 18

*Farbotko v. Clinton County*, 433 F.3d 204 (2d Cir. 2005) ........................................................... 8

*Grant v. Martinez*, 973 F.2d 96 (2d Cir. 1992) ......................................................................... 18

*Harger Da Silva v. New York City Transit Authority, Metropolitan Transportation Authority, and Raqia Shabazz*, No. 17-CV-4550 (FB)(VMS) (E.D.N.Y.) ................................................. 10, 17

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ..................................................................... 1, 2, 3, 25

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) .......................................................... passim

*Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400 (1968) .......................................................... 5

*NLRB v. Schmidt*, No. 23-MC-51 (VEC), 2024 WL 967225 (S.D.N.Y. Mar. 5, 2024) ................ 8

*Owen v. City of Independence*, 445 U.S. 622 (1980) ................................................................... 4

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) .................................................................. 5

*Roth & Roth, LLP v. Long Island R.R. & Metro. Transp. Auth.*, Index No. 158366/22 (Sup. Ct. N.Y. Cnty. Sept. 25, 2024) ....................................................................................................... 8

*Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170 (2d Cir. 2009) ................................. 7, 14, 15, 16

*Torcivia v. Suffolk Cnty.*, 437 F. Supp 3d 239 (E.D.N.Y. 2020) ................................................ 25

*Walker v. City of Buffalo*, No. 22-cv-520 (LJV)(JJM) ................................................................ 6

*Williamsburg Fair Hous. Comm. v. N.Y.C. Hous. Auth.*, 493 F. Supp. 1225 (S.D.N.Y. 1980) ... 19

*Xeriant, Inc. v. CURO Aerospace Corp.*, No. 23-cv-09200 (LAK) (S.D.N.Y. Jan. 22, 2026)16, 17

**Statutes**

42 U.S.C. § 1983 .................................................................................................................. 4, 14, 16

42 U.S.C. § 1988(b) ............................................................................................................. 1, 4, 5, 9

Court of Claims Act § 8-b ............................................................................................................ 11

Federal Rule of Civil Procedure 12(b)(6) .................................................................................... 19

Federal Rule of Civil Procedure 56 .............................................................................................. 19

Federal Rule of Civil Procedure 56.1 ..................................................................................... 19, 22

**INTRODUCTION**

After a seven-year battle and a thirteen-day jury trial before Magistrate Judge Mark W. Pedersen, the jury returned a verdict in Plaintiffs' favor on the central claims in this action. The jury found Defendant Officer Algarin liable for violating Plaintiffs' Fourth Amendment rights by conducting an unlawful search of the curtilage of their home, for the unconstitutional seizure and shooting of Plaintiffs' dog Tesla in violation of the Fourth Amendment, and for trespass under New York state law. Critically, the jury also found the City of Rochester liable on all four *Monell* claims—holding that the City maintained an unconstitutional policy or custom with respect to both warrantless searches and dog encounters, and that the City failed to adequately train its officers on both subjects. The jury thus found municipal liability on two independent theories of *Monell* liability across two distinct sets of constitutional violations—a result that is, to counsel's knowledge, unprecedented in this District. The jury awarded Plaintiffs a total of $125,000 in compensatory damages. While Plaintiffs did not prevail on their claims against Defendant Officer Gorman or on the assault claim against Defendant Algarin, this Court's fee analysis must focus on the "overall relief obtained by the plaintiff in relation to . . . the overall litigation." *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008). Here, Plaintiffs achieved an extraordinary result: they proved not merely that Officer Algarin violated their constitutional rights, but that the *City itself* bore responsibility through its policies and its deliberate indifference to training—the very claims that defendants most aggressively contested and that juries most rarely sustain.

As the prevailing party in this civil rights action, Plaintiffs are entitled to an award of reasonable attorney's fees and costs. *See* 42 U.S.C. § 1988(b); *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)

1

. For the reasons set forth below, Plaintiff respectfully requests that the Court award attorney's fees calculated at the following hourly rates: $700 per hour for Elliot Dolby-Shields, $1,125 per hour for David Roth, and $250 per hour for paralegal, Zoya Charania, yielding a total lodestar of $1,076,487.50 for the 1,783.7 hours reasonably expended on this litigation, plus costs and expenses in the amount of $70,703.58.

## ARGUMENT

### I. THE DEGREE OF SUCCESS OBTAINED WARRANTS A FULL FEE AWARD

#### A. Legal Standard

The starting point for determining reasonable attorney's fees is the lodestar—the product of a reasonable hourly rate and the number of hours reasonably expended on the litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The most critical factor in determining the reasonableness of a fee award is the degree of success obtained. *Id* . at 436. Where a plaintiff has obtained excellent results, the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised. *Id.* at 435.

#### B. Plaintiffs Achieved an Overwhelming Degree of Success

The verdict in this case represents an extraordinary and overwhelming degree of success. The jury found for Plaintiffs on the vast majority of claims submitted, including claims that are exceedingly difficult to prove and rarely succeed at trial. Specifically, the jury found:

1. Officer Algarin conducted an unlawful search of the curtilage to Plaintiffs' home in violation of the Fourth Amendment;

2. The City of Rochester maintained an unconstitutional policy or custom with respect to warrantless searches (first *Monell* claim);

3. The City of Rochester failed to adequately train its officers regarding warrantless searches of the curtilage to single family homes (second *Monell* claim);

2

4. Officer Algarin committed an unconstitutional seizure by shooting and killing the family dog, Tesla, in violation of the Fourth Amendment;

5. The City of Rochester maintained an unconstitutional policy or custom with respect to police encounters with dogs (third *Monell* claim);

6. The City of Rochester failed to adequately train its officers regarding encounters with dogs (fourth *Monell* claim); and

7. Officer Algarin committed trespass under New York state law.

The success achieved here is not merely significant—it is historic. Winning on both *Monell* theories of municipal liability at trial is a feat that is nearly unheard of in the Western District of New York, and extraordinarily rare in any federal court. *Monell* claims are notoriously difficult to prove, requiring a plaintiff to demonstrate that the constitutional violation was caused by an official municipal policy, custom, or failure to train that amounts to deliberate indifference. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Courts routinely grant summary judgment dismissing *Monell* claims, and the few that survive to trial rarely result in plaintiff verdicts. To prevail on both theories across two sets of facts—yielding four separate *Monell* findings—underscores the exceptional quality of the litigation and the extraordinary skill of Plaintiffs' counsel.

Nor should the Court reduce the fee award because Plaintiffs did not prevail on the claims against Officer Gorman or on the assault claim against Algarin. All claims arose from the same nucleus of operative facts—the officers' warrantless entry onto the Dempsey property and the shooting of the family dog—and Plaintiffs' counsel was required to develop the same evidence regardless of whether those particular claims succeeded. *See Hensley*, 461 U.S. at 435 ("Where a plaintiff has obtained excellent results, his attorney should recover a fully

3

compensatory fee."). Moreover, the unsuccessful claims were interrelated with the successful ones: the evidence regarding Gorman's conduct was necessary to establish the timeline and circumstances of the incident, was relevant to the *Monell* claims, and the assault claim involved the same encounter that gave rise to the successful trespass and Fourth Amendment claims.

**C. The *Monell* Victory Is Particularly Significant Because It Answers the Question of "Why"**

The *Monell* claims in this case were not incidental add-ons to an individual liability case. They were the heart of the civil rights case. While the individual officer claims established *what* happened—officers unlawfully entered the Dempsey property and shot and killed the family dog—the *Monell* claims answered the far more important question: *why* did this happen?

The answer, as the jury found, is that this happened because of the City of Rochester's unlawful municipal policies and customs regarding the use of force against animals, warrantless entries onto private property, and the City's deliberate indifference in failing to adequately train its officers on these constitutional requirements. The *Monell* verdict transformed this case from an isolated incident of police misconduct into a systemic indictment of the City's practices and policies. This is the true purpose of § 1983 litigation—not merely to compensate individual victims, but to reform unconstitutional government practices. *See Owen v. City of Independence*, 445 U.S. 622, 651 (1980). It is precisely this type of litigation that § 1988 was designed to encourage. *See City of Riverside v. Rivera*, 477 U.S. 561, 574–75 (1986).

**D. The Importance of the Verdict Extends Well Beyond This Case**

The significance of the *Monell* verdict in this case extends well beyond the compensation awarded to the Dempsey family. The jury's findings will have far-reaching consequences—both in the courts and in the community—that further underscore the importance of the result achieved and the reasonableness of a full fee award.

First, the *Monell* findings with respect to the City's Fourth Amendment violations—specifically, its unconstitutional policies and inadequate training regarding police encounters with dogs—will have preclusive effect in subsequently filed, related dog-shooting cases against the City of Rochester. The jury's findings that the City maintained an unconstitutional policy or custom and that the City failed to adequately train its officers on the constitutional requirements governing encounters with animals are factual determinations that were actually litigated, necessarily decided, and essential to the judgment in this case. Under the doctrine of collateral estoppel, the City will be precluded from relitigating these *Monell* issues in the related pending cases. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979); *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015). This preclusive effect means that the extensive *Monell* litigation pursued by Plaintiffs' counsel in this case will directly benefit plaintiffs in the related cases, sparing them the enormous burden and expense of re-proving the City's systemic failures from scratch. The work performed here will, in effect, serve as the foundation for vindicating the constitutional rights of other victims of the City's unlawful policies. This is precisely the type of "private attorney general" function that § 1988 is designed to incentivize and reward. *See Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968).

Second, both sets of *Monell* findings—regarding dog encounters *and* regarding unlawful entries onto private property to conduct searches following the conclusion of a hot pursuit—should lead to concrete changes in the City of Rochester's policies and practices. Indeed, one of the Plaintiffs' central goals in pursuing this litigation was to compel precisely this kind of systemic reform—a goal for which any reasonable paying client would willingly pay top dollar. (*See* Declaration of Plaintiff Charles Dempsey). The verdict sends an unequivocal message that the City's practices are constitutionally deficient and must be reformed. Municipal defendants

cannot continue to maintain unconstitutional policies after a jury has expressly found those policies to violate the Fourth Amendment. The practical effect of this verdict should be the adoption of new training protocols, revised use-of-force policies regarding animal encounters, and clearer guidelines governing when officers may lawfully enter private property. These reforms will not only protect individuals like the Dempseys but will also ensure the safety of the broader Rochester community. *See City of Canton v. Harris*, 489 U.S. at 390 (recognizing that the failure to train can reflect "deliberate indifference" to the rights of persons with whom the police come into contact, and that holding municipalities liable serves to incentivize proper training). The importance of the verdict to the community at large—and not merely to the named plaintiffs—is a factor that strongly supports a full and unreduced fee award. *See City of Riverside v. Rivera*, 477 U.S. at 574-575 ("[T]he damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future. . . . Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards.").

## E. The Only Comparable Successes in the Western District Were Achieved by Other New York City Attorneys

To counsel's knowledge, the only other attorneys to achieve a comparable degree of success in the Western District of New York in recent years are also from New York City. Joel Rudin of Joel B. Rudin, P.C., a New York City practitioner, tried the wrongful conviction cases of *Walker v. City of Buffalo*, No. 22-cv-520 (LJV)(JJM), in March 2025, and *Boyd v. City of Buffalo*, No. 22-cv-519 (LJV)(JJM), in November 2025. In those cases, Mr. Rudin prevailed on claims that included *Monell* municipal liability. In fact, Mr. Rudin had asked Mr. Shields to assist in that trial by presenting the *Monell* evidence against the County of Erie, but decided against it at the last minute due to a motion in limine filed by the County (See *Walker* docket at

232, *Boyd* docket at 238), and a Court conference with Judge Merideth Vacca where the County stated if Mr. Shields was permitted to testify, the County would seek to voir dire the jury about whether they were familiar with Mr. Shields because of his frequent television interviews about high profile civil rights cases in Rochester. Notably, Mr. Shields worked for Mr. Rudin for approximately one year before accepting a position with Roth & Roth, LLP.

That the only attorneys achieving this level of success in federal civil rights trials in the Western District are traveling from New York City is powerful evidence of the dearth of local counsel with the requisite skill, willingness, and financial resources to fund and try cases of this complexity. This fact strongly supports the application of out-of-district rates, as discussed below.

## II.   COUNSEL'S REQUESTED HOURLY RATES ARE REASONABLE

### A. Legal Standard

The reasonable hourly rate is the rate a paying client would be willing to pay, bearing in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008). While the "forum rule" presumptively sets the relevant community as the district where the court sits, a litigant may justify out-of-district rates by demonstrating that a reasonable client would have selected out-of-district counsel because local counsel lacked the requisite expertise or, if they possessed it, were unwilling or unable to take the case. *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 175–76 (2d Cir. 2009).

### B. Out-of-District Rates Are Warranted for Elliot Dolby-Shields ($700/hour)

Plaintiff requests a rate of $700 per hour for Elliot Dolby-Shields, the lead trial attorney in this case. This rate is supported on multiple independent bases.

#### 1. *Judge Bluth's Finding in 2024 That $675 Is a Reasonable Rate*

7

In 2024, Justice Arlene D. Bluth of the New York State Supreme Court, New York County, found that $675 per hour is a reasonable rate for Mr. Shields' legal services. *See Roth & Roth, LLP v. Long Island R.R. & Metro. Transp. Auth.*, Index No. 158366/22 (Sup. Ct. N.Y. Cnty. Sept. 25, 2024), transcript annexed as **Exhibit "B"** to Shields Declaration, ECF No. 55-5. That determination was made in 2024 in the context of a fee application in an Article 78 proceeding involving similar governmental accountability issues. Justice Bluth's finding constitutes persuasive evidence that $700 per hour is a reasonable market rate for Mr. Shields' services, as that decision was issued in 2024, and a modest increase of $25 since 2024 is typical to account for inflation and increased experience and skill. While this Court is not bound by a state court determination, it is well-established that fee awards from other courts are relevant evidence of prevailing market rates. *See Farbotko v. Clinton County*, 433 F.3d 204, 209 (2d Cir. 2005).

### 2. *The Fitzpatrick Matrix Supports the Requested Rate*

The Fitzpatrick Matrix, developed and maintained by the Civil Division of the United States Attorney's Office for the District of Columbia, provides reliable, data-driven evidence of prevailing market rates for attorneys in complex federal litigation. *See NLRB v. Schmidt*, No. 23-MC-51 (VEC), 2024 WL 967225, at *2–4 (S.D.N.Y. Mar. 5, 2024). Under the current Fitzpatrick Matrix, an attorney with Mr. Shields' approximately 14 years of experience commands a rate of approximately $711–$730 per hour. See **Exhibit "C"** to Shields Declaration. The requested rate of $700 is therefore at or slightly below the Fitzpatrick Matrix rate.

### 3. *Recent Judicial Approval of Substantially Higher Rates in Less Complex Litigation*

The requested rates are further supported by the rates recently approved by Judge Kaplan in *Xeriant, Inc. v. CURO Aerospace Corp.*, No. 23-cv-09200 (LAK) (S.D.N.Y. Jan. 22, 2026),

*See* **Exhibits "D" and "E"** to Shields Declaration. In that case, Judge Kaplan awarded fees to Gibson, Dunn & Crutcher LLP at the following rates: $1,650 per hour for partners Barry Goldsmith and Marshall King; $1,100 per hour for of-counsel M. Jonathan Seibald; $1,000 per hour for senior associate Brian Richman; $850 per hour for associate Zachary Copeland; $800 per hour for associate Edward Ferguson; $750 per hour for associate Elizabeth Fosburgh; and $200 per hour for paralegals. Judge Kaplan approved those rates notwithstanding his finding that the underlying contract dispute was not complex.

The comparison is instructive. If a federal court approves rates of $750 to $1,650 per hour for associates and partners at a large corporate firm litigating a straightforward contract case, then the rates sought here—$700 for lead counsel and $1,125 for senior partner—are eminently reasonable for attorneys who tried and won a thirteen-day federal civil rights jury trial involving four *Monell* claims. Civil rights litigation is at least as demanding as, if not more demanding than, corporate commercial litigation. It requires mastery of constitutional law, extensive discovery against institutional defendants, the development of pattern-and-practice evidence, expert witness coordination, and the skill to present complex systemic evidence to a lay jury. The societal importance of this work—vindicating constitutional rights and compelling reform of unconstitutional government practices—is at least as great as, if not greater than, enforcing private contractual obligations. Civil rights attorneys should not be compensated at a lower rate than their corporate counterparts for work that is equally or more complex and that further serves the broader public interest. *See City of Riverside v. Rivera*, 477 U.S. at 576 ("Congress enacted § 1988 specifically because it found that the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process.").

#### 4. *Mr. Shields' Track Record and Qualifications Justify the Rate*

Mr. Shields' qualifications, experience, and extraordinary recent results demonstrate that $700 per hour is a reasonable rate for his services:

a) *The Da Silva Verdict.* Immediately before the Dempsey trial, Mr. Shields, together with his senior partner David Roth, served as lead trial counsel in *Harger Da Silva v. New York City Transit Authority, Metropolitan Transportation Authority, and Raqia Shabazz*, No. 17-CV-4550 (FB)(VMS) (E.D.N.Y.), which resulted in an $81.7 million verdict on November 20, 2025—one of the largest personal injury verdicts in the country in a double-amputation case. That case involved issues directly parallel to *Monell* litigation: it was a negligence claim directly against the New York City Transit Authority for its institutional decision not to install protective barriers or take other safety measures to prevent passengers from falling onto subway tracks and being struck by trains. It involved extraordinarily complex issues of absolute governmental immunity and qualified immunity under New York State law, which Plaintiff's counsel successfully defeated at trial. The jury found the Transit Authority 99.99% at fault and awarded $10 million for future medical expenses, $1.7 million for diminution in future earning capacity, $20 million for past pain and suffering, and $50 million for future pain and suffering.

b) *The Johnson Verdict.* Immediately after the *Dempsey* trial, the very next week, Mr. Shields tried *Johnson v. City of Rochester*, No. 21-cv-6683 (EAW)(CDH), which commenced on Monday, February 2, 2026, and concluded with a verdict on Friday, February 6, 2026. The jury returned a unanimous verdict in Plaintiff's favor on every single claim—false arrest, malicious prosecution, and denial of the due process right to a fair trial—and awarded $375,000 in compensatory damages. Winning two

consecutive federal civil rights jury trials is unprecedented. It is believed to be the first time any attorney has tried and won back-to-back federal civil rights jury trials in the Western District of New York, if not in the Second Circuit.

c) Mr. Shields' trial record extends beyond federal civil rights litigation. In *Miller v. State of New York*, Claim No. 135854 (Ct. Cl.), Mr. Shields served as lead trial counsel in a wrongful conviction case brought under Court of Claims Act § 8-b on behalf of Anthony Miller, who had been wrongfully convicted of robbery in Monroe County and imprisoned for nearly six years for a crime he did not commit. Mr. Shields co-counseled the case with Donald M. Thompson, Esq., of Easton Thompson Kasperek Shiffrin LLP in Rochester, who second-seated Mr. Shields at trial. *See* Declaration of Donald M. Thompson ¶¶ 24–26. After a bench trial before Judge J. Scott Odorisi, the Court found by clear and convincing evidence that Mr. Miller did not commit the crime for which he was convicted and that he did not by his own conduct cause or contribute to his conviction. *Miller v. State of New York*, Claim No. 135854, Decision and Order at 11, 16 (Ct. Cl. Oct. 1, 2024) (Odorisi, J.), **Exhibit H** to the Shields Declaration. The Court credited the claimant's testimony, found that the show-up identification procedure was "unduly suggestive," and concluded that the claimant's trial proof "clearly and convincingly disproved [his] responsibility for the robbery." *Id.* at 14–16. The Court awarded Mr. Miller $3,048,000 in damages, including $1,650,000 for past damages and $1,398,000 for future mental and emotional distress. *Id.* at 19. The *Miller* verdict—obtained on the demanding clear-and-convincing-evidence standard—further demonstrates the exceptional trial skill and preparation that Mr. Shields brought to the *Dempsey* litigation.

11

d) *Professional Leadership and Community Service.* Mr. Shields is a Board Member of the New York County Lawyers' Association ("NYCLA"), one of the oldest and most prestigious bar associations in the nation. He has served as Chair of NYCLA's Civil Rights Committee for over ten years, during which he has worked to advance civil rights through the organized bar. *See* Shields Declaration. In 2025, Mr. Shields was awarded the NYCLA Eppler Prize for a report he drafted for NYCLA's Supreme Court Committee, titled *New York County Lawyers Association Supreme Court Task Force Issues Second Report to Biden's Commission on SCOTUS Calling for Even More Comprehensive Reforms*, which called for comprehensive reforms to the United States Supreme Court—including term limits, an enforceable code of ethics, and structural changes to the Court—in a submission to the Presidential Commission on the Supreme Court of the United States. *See* NYCLA, *New York County Lawyers Association Supreme Court Task Force Issues Second Report to Biden's Commission on SCOTUS Calling for Even More Comprehensive Reforms*, available at https://www.nycla.org/resource/board-report/new-york-county-lawyers-association-supreme-court-task-force-issues-second-report-to-bidens-commission-on-scotus-calling-for-even-more-comprehensive-reforms/. The Eppler Prize, named for Past NYCLA President Klaus Eppler, is an award given annually to a NYCLA Committee in recognition of a report that had or may have the greatest impact in effecting improvements in the law or the judicial system, and is one of the most prestigious awards given by the Association.

e) Additionally, Mr. Shields serves as a board member of For The Struggle, Inc. ("FTS"), a 501(c)(3) nonprofit organization headquartered at 2209 LaSalle Street,

Charlotte, North Carolina 28216 (www.ftsinc.org). FTS is dedicated to fighting systemic issues of economic and social injustice by responding to issues identified by impacted communities. FTS focuses on empowering historically Black communities in Charlotte through several programs, including: (i) the Elder Response Initiative, which provides free home repairs and senior feeding programs to seniors in historically and predominantly Black neighborhoods; (ii) The Eatmon Project, focused on voter education, engagement, and youth impact curriculum teaching about issues of racial and social injustice; and (iii) SaluteU, which provides education and resources to at-risk youth. Mr. Shields' deep commitment to civil rights work extends well beyond the courtroom.

### 5. *No Local Counsel Has the Expertise, Willingness, or Resources to Try These Cases*

The factual circumstances of Mr. Dempsey's retention of counsel powerfully demonstrate the dearth of qualified local attorneys willing to handle complex civil rights cases in this District. When Mr. Dempsey first sought legal representation, he contacted multiple attorneys in the Rochester area. None were willing to take on a case of this magnitude—one involving not only individual officer liability claims but, critically, *Monell* claims for municipal liability premised on both a policy or custom theory and a failure-to-train theory. *See* Declaration of Charles Dempsey. Unable to find local representation, Mr. Dempsey was ultimately referred to Roth & Roth, LLP by Donald Thompson, a respected criminal attorney and civil rights advocate based in Rochester. Significantly, Mr. Thompson himself was unaware of any local attorney with the experience, willingness, or resources to pursue these claims—let alone one who could try and win *Monell* claims against a municipality. *See* Declaration of Donald Thompson. This is not surprising. As the Supreme Court has recognized, *Monell* claims are among the most difficult to

13

establish in all of federal civil rights law. See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) (noting the 'rigorous standards of culpability and causation' required for municipal liability).

Under the framework established by the Second Circuit in *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182 (2d Cir. 2008), and *Simmons v. New York City Transit Authority*, 575 F.3d 170 (2d Cir. 2009), the Court must consider whether the case is 'of such complexity and difficulty that only an out-of-district attorney could handle it' and whether local counsel lacked the 'willingness and ability' to take the case. *Simmons*, 575 F.3d at 175. The 'reasonable, paying client' standard asks what rate 'a reasonable, paying client would be willing to pay,' bearing in mind 'that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively.' *Arbor Hill*, 522 F.3d at 190. Here, where one of Mr. Dempsey's primary objectives was reforming the City of Rochester's unconstitutional policies and practices—a goal he would have been willing to pay top dollar to achieve—a reasonable, paying client in Mr. Dempsey's position would have willingly paid the out-of-district rates sought here to secure counsel capable of prevailing on the *Monell* claims that were essential to that objective.

The inability of Mr. Dempsey to secure local representation was not for lack of trying—it reflects a structural reality of civil rights practice in this District. Complex *Monell* litigation requires not merely familiarity with Section 1983 doctrine but years of specialized experience in municipal liability, the financial capacity to fund years of discovery and weeks of trial, and the willingness to advance substantial costs—including expert fees, extensive travel, trial technology, and the opportunity cost of being away from one's practice for the duration of a multi-week trial—with no guarantee of recovery. These are not resources that can be found

14

among the small local plaintiff-side civil rights bar. As the Second Circuit recognized in *Simmons*, where 'an attorney from outside of the community would be justified in charging a higher rate due to the unique nature of the case,' out-of-district rates are warranted. 575 F.3d at 175–76.

The pattern of civil rights litigation in the Western District of New York confirms this reality. Complex federal civil rights cases, particularly those involving *Monell* claims, are overwhelmingly tried by attorneys from New York City. The cases litigated in this District demonstrate a consistent pattern of retaining out-of-district counsel, including:

- *Howard v. City of Rochester*, No. 23-cv-6561 (FPG)(MJP) (W.D.N.Y.) (Elliot Shields and Clyde Rastetter, NYC)

- *Miller v. City of Rochester*, No. 22-cv-6069 (FPG)(MJP) (W.D.N.Y.) (Elliot Shields, NYC)

- *Owens v. County of Monroe*, No. 21-CV-6445 (FPG)(CDH) (W.D.N.Y.) (Elliot Shields, NYC)

- *Boyd v. City of Buffalo*, No. 22-cv-519 (LJV)(JJM) (W.D.N.Y.) (Law Offices of Joel Rudin, PC and Wilmer Cutler Pickering Hale and Dorr, LLP, NYC)[1]

- *Walker v. City of Buffalo*, No. 22-cv-520 (LJV)(JJM) (W.D.N.Y.) (Law Offices of Joel Rudin, PC and Wilmer Cutler Pickering Hale and Dorr, LLP, NYC)

- *Epps v. City of Buffalo*, No. 19-cv-281 (LJV)(LGF) (W.D.N.Y.) (Robert Rickner, NYC)[2]

- *Warney v. County of Monroe*, No. 04-CV-6289 (W.D.N.Y.) (Neufeld, Scheck & Brustin, NYC)

---

[1] Notably, before Mr. Shields was hired by Roth & Roth, LLP, he worked for Joel Ruden for approximately one year.
[2] Notably, Mr. Ricker and Mr. Shields are the co-chairs of the NYCLA Civil Rights and Liberties Committee.

- *Peacock v. City of Rochester*, No. 13-cv-6046 (W.D.N.Y.) (Neufeld, Scheck & Brustin, NYC)

- *Hall et al v. Warren et al.*, No. 21-cv-6296 (FPG) (W.D.N.Y.) (Elliot Shields as lead counsel, with multiple NYC law firms)

This is not a coincidence. It is a direct reflection of the fact that complex *Monell* litigation in this District requires specialized expertise that local counsel cannot provide. The consistent retention of New York City attorneys for these cases reflects the market reality that local counsel lacks both the expertise and the economic capacity to take on this work.

Moreover, the rates sought here are entirely consistent with—and indeed substantially below—rates approved in this Circuit for comparable work. As discussed above, Judge Kaplan recently approved rates of $1,650 per hour for partners at Gibson Dunn in a contract dispute that was, by the Court's own characterization, not complex. See *Xeriant, Inc. v. CURO Aerospace Corp.*, No. 23-cv-09200 (LAK) (S.D.N.Y. Jan. 22, 2026). Mr. Shields' requested rate of $700 per hour is less than half of the rate approved for Gibson Dunn partners and well below the rates approved for even mid-level associates at that firm. A reasonable, paying client seeking to reform unconstitutional municipal policies—the very purpose of Section 1983—would not expect to pay less than a client engaged in a routine commercial dispute. Out-of-district rates are therefore warranted. See *Simmons*, 575 F.3d at 175–76.

## C. <u>Out-of-District Rates Are Warranted for David Roth ($1,125/hour)</u>

Plaintiff requests a rate of $1,125 per hour for David Roth, the senior partner and owner of Roth & Roth, LLP. Mr. Roth is a seasoned civil rights and complex litigation attorney who reviewed all important motions filed in this case before they were filed, discussed and developed critical case strategy with Mr. Shields throughout the litigation, and spoke extensively with Mr. Shields about trial strategy in the weeks and months leading up to trial.

Mr. Roth's rate is justified by, among other things, the extraordinary results achieved in *Da Silva v. MTA*, where Mr. Roth served as co-lead trial counsel alongside Mr. Shields. As noted above, the $81.7 million verdict in *Da Silva* was one of the highest verdicts in the nation in a double-amputation case. The litigation required overcoming complex governmental immunity defenses under New York State law—the same type of sophisticated legal work that informed the strategy in this case.

Mr. Roth's rate of $1,125 per hour is consistent with prevailing market rates for senior partners at New York City firms engaged in complex civil rights and personal injury litigation. The Fitzpatrick Matrix supports rates in excess of $1,000 per hour for attorneys with Mr. Roth's level of experience. Indeed, his rate is substantially below the $1,650 per hour rate Judge Kaplan approved for partners at Gibson Dunn in a far less complex matter. See *Xeriant, Inc. v. CURO Aerospace Corp.*, No. 23-cv-09200 (LAK) (S.D.N.Y. Jan. 22, 2026).

### D. The Rate for Paralegal Zoya Charania ($250/hour) Is Reasonable

Plaintiff requests a rate of $250 per hour for paralegal, Zoya Charania. Ms. Charania performed substantial work on this case, including editing motions, conducting legal research, preparing deposition video compilations for trial, drafting motions in limine, and preparing exhibits and trial materials. Her work was essential to the successful litigation of this case, and her rate is well within the range approved by courts in this Circuit for experienced paralegals in complex civil rights litigation and exceeds by only $50 the $200 per hour rate approved for paralegals at Gibson Dunn. See *Xeriant*, No. 23-cv-09200.

### III. THE HOURS EXPENDED WERE REASONABLE AND NECESSARY TO ACHIEVE THE RESULTS OBTAINED

### A. Legal Standard

17

In reviewing the reasonableness of the hours expended, the court looks to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties. *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992). The determination should not be based on what appears necessary in hindsight, but on whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures. *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992).

## B.  Overview of the Work Performed

This case was litigated over approximately seven years, from the initial FOIL requests in late 2018 through the jury verdict on January 30, 2026. The total hours expended by each timekeeper are as follows:

| Attorney/Paralegal | Hours | Rate | Lodestar |
|---|---|---|---|
| Elliot Dolby-Shields | 1,420.9 | $700.00 | $933,660.00 |
| David Roth | 60.1 | $1,125.00 | $68,512.50 |
| Zoya Charania | 290 | $250.00 | $72,500.00 |
| Ben Wittwer | 3.3 | $550.00 | $1,815.00 |
| **TOTAL** | **1,783.7** | | **$1,076,487.50** |

## C.  Defendants' Litigation Conduct Necessitated Additional Work

Throughout this litigation, Defendants' counsel engaged in a pattern of conduct that forced Plaintiffs' counsel to expend time and resources on matters that should have been unnecessary. Among other things, Defendants repeatedly delayed and obstructed discovery, requiring Plaintiffs' counsel to draft multiple pre-conference letters, litigate discovery disputes before the Magistrate Judge, and file motions to compel. Defendants raised objections to deposition scheduling that required additional correspondence and court intervention. Defendants contested the admissibility of pattern evidence and *Monell*-related discovery at every turn, requiring extensive briefing on motions in limine that, in several instances, the Court ultimately

18

resolved in Plaintiffs' favor. These obstructionist tactics are reflected throughout the billing records and increased the total hours expended. A prevailing plaintiff should not bear the cost of a defendant's litigation strategy designed to increase the plaintiff's burden. *See Williamsburg Fair Hous. Comm. v. N.Y.C. Hous. Auth.*, 493 F. Supp. 1225, 1245 (S.D.N.Y. 1980) ("A defendant cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.").

### D.  Pre-Suit Investigation and Article 78 Proceedings (2018–2019)

Prior to filing the federal complaint, Plaintiffs' counsel undertook extensive pre-suit investigation, including filing FOIL requests for incident records relating to the Rochester Police Department's pattern of shooting dogs, filing an Article 78 Petition in New York State Supreme Court to compel production of body-worn camera footage and other records, and conducting legal research on pre-action discovery. This pre-suit work was essential to developing the factual basis for the federal complaint and, in particular, the *Monell* claims. Mr. Shields reviewed the body-worn camera footage with Mr. Roth numerous times at many different speeds, which confirmed the unlawful nature of the officers' entry and shooting, and informed the decision to include *Monell* claims in the federal complaint.

### E.  Federal Complaint and Dispositive Motions (2019–2020)

Plaintiffs' counsel drafted and filed the original federal complaint in October 2019, a First Amended Complaint in December 2019, and a Second Amended Complaint in December 2020 adding Officer Gorman to the caption. Counsel also opposed Defendants' motion to dismiss under Rule 12(b)(6) and/or for summary judgment under Rule 56 and cross-moved for partial summary judgment—drafting dozens of versions of the opposition and cross-motion memoranda, Rule 56.1 statements, and supporting declarations. This work involved extensive

legal research on curtilage, warrantless entry, hot pursuit, and the constitutional standards governing the use of force against animals.

### F. **Fact Discovery (2021–2023)**

Fact discovery in this case was extensive and hard-fought. Plaintiffs' counsel drafted and served multiple sets of discovery demands, engaged in numerous meet-and-confer sessions with defense counsel, prepared for and attended multiple court conferences with Magistrate Judges Payson and Pedersen and took or defended numerous depositions, including the depositions of Officers Algarin and Gorman, the City's 30(b)(6) witness (Michael Cuilla), family members Sherry Dempsey, Charles Dempsey, and Leona Dempsey, and numerous non-party witnesses. Counsel also subpoenaed and reviewed records from educational institutions, medical providers, child protective services, and the Rochester City School District.

### *F. Monell Discovery (2022–2023)*

The *Monell* discovery in this case was particularly extensive, hard-fought, and essential to the ultimate victory on the *Monell* claims. This discovery was further complicated by the fact that it was conducted jointly with five other cases against the City of Rochester involving similar patterns of unconstitutional conduct: *Anniszkiewicz v. City of Rochester*, No. 20-cv-6629 (FPG)(MWP); *Barnes v. City of Rochester*, No. 22-cv-6524; *Cox v. City of Rochester*, No. 22-cv-6207 (FPG)(MJP); *Gursslin v. City of Rochester*, No. 20-cv-6508 (EAW)(MJP); *McGill v. City of Rochester*, No. 22-cv-6523; and *Preston v. City of Rochester*, No. 22-cv-6525. Coordinating discovery across six cases required Plaintiff's counsel to manage overlapping schedules, reconcile differing discovery needs, and ensure that each deposition elicited testimony relevant not only to the individual case but to the broader *Monell* claims. Plaintiff's counsel:

1. Identified, subpoenaed, and deposed numerous Rochester Police Department officers regarding their encounters with dogs and their training (or lack thereof)

on the use of force against animals, warrantless entries, and related constitutional standards—structuring each deposition to obtain testimony relevant both to the individual officer's conduct in the specific case and to the systemic patterns of inadequate training and unconstitutional policy underlying the *Monell* claims across all six cases;

2. Conducted the Rule 30(b)(6) deposition of the City of Rochester regarding its policies, customs, and training programs;

3. Reviewed hundreds of documents produced by the City, including internal affairs files, personnel records, training materials, and incident reports for dozens of other dog-shooting incidents;

4. Filed multiple motions and letters regarding the City's deficient and delayed *Monell* discovery responses;

5. Prepared a comprehensive *Monell* summary chart documenting the pattern of constitutional violations across numerous incidents, which was critical to organizing *Monell* evidence and testimony at trial; and

6. Prepared and presented a *Monell* deposition video compilation, based on the *Monell* summary chart, which was admitted into evidence and played during Plaintiff's direct case at trial, which dramatically illustrated the systemic pattern of inadequate training and unconstitutional conduct across the Department.

This *Monell* discovery consumed hundreds of hours but was indispensable to the historic result. Without this exhaustive effort, the *Monell* claims—which, as discussed above, are the heart of the civil rights case—could not have been proven.

G. **Expert Retention and Preparation (2023–2026)**

Plaintiff's counsel retained and prepared three expert witnesses: Dr. James Crosby, a nationally recognized expert on police encounters with dogs; Dr. Vilardo-Lyons, a child psychologist who evaluated Leona Dempsey; and Dr. Prince, a psychologist who evaluated Charles Dempsey. Counsel spent substantial time reviewing expert reports, preparing experts for deposition and trial testimony, and opposing Defendants' motions to preclude each of these experts. All three experts testified at trial and were critical to the verdict.

H. **Second Round of Dispositive Motions (2024)**

In August 2024, Defendants moved for summary judgment on all remaining claims. (Dkt. 95.) Plaintiffs cross-moved for partial summary judgment on the unlawful entry and trespass claims, and on the *Monell* claim regarding unlawful entries into the curtilage of a property after the conclusion of a hot pursuit. (Dkt. 96.) Plaintiffs' cross-motion was supported by three volumes of exhibits and extensive briefing on the law of curtilage, hot pursuit, and *Monell* liability. Defendants opposed Plaintiffs' cross-motion (Dkt. 99) and Plaintiffs filed a reply (Dkt. 101). Plaintiffs likewise opposed Defendants' motion (Dkt. 98), and Defendants replied. This second round of dispositive motions required substantial additional legal research, drafting, and factual development—including preparation of Rule 56.1 statements, supporting declarations, and multiple rounds of briefing on both motions. On January 2, 2025, the Court issued a 31-page Decision and Order denying the vast majority of both motions and allowing nearly all of Plaintiffs' claims to proceed to trial. (Dkt. 104.) The City obtained summary judgment only on the unlawful seizure of Tesla claim against Officer Gorman, the unlawful seizure of Leona Dempsey claim, and a narrow aspect of the failure-to-intervene claim against Officer Gorman. *Dempsey v. City of Rochester*, No. 19-cv-6780, 2025 WL 30982 (W.D.N.Y. Jan. 2, 2025). All other claims—including the unlawful entry, trespass, assault, unreasonable seizure, failure-to-intervene, and all four *Monell* claims—survived summary judgment and proceeded to trial, where Plaintiffs prevailed.

## I.  <u>Opposition to Motion to Bifurcate Trial (2025)</u>

In early 2025, the City moved to bifurcate trial in this case and three related cases— *McGill v. City of Rochester*, No. 22-cv-6523; *Gursslin v. City of Rochester*, No. 20-cv-6508 (EAW)(MJP); and *Preston v. City of Rochester*, No. 22-cv-6525—seeking to sever the *Monell* claims from the individual liability claims and try them separately. (Dkt. 119.) Plaintiffs opposed

the motion, arguing that the individual liability and *Monell* claims involved substantially overlapping evidence and that bifurcation would result in duplicative proceedings, wasted judicial resources, and prejudice to Plaintiffs. (Dkt. 121.) The City filed a reply. (Dkt. 122.) Successfully opposing this motion required substantial briefing and legal research on the standards governing bifurcation under Rule 42(b) and the specific interplay between individual liability and *Monell* claims. Magistrate Judge Holland issued a 21-page Decision and Order denying the City's motion in all four cases, finding that the *Monell* and individual liability claims were "intertwined" and that the evidence relevant to the *Monell* claims—including the pattern of unconstitutional conduct, the City's training deficiencies, and its policies and customs—was also relevant to the individual officers' state of mind, the reasonableness of their conduct, and the question of qualified immunity. (Dkt. 131.) The Court further found that bifurcation would not promote judicial economy because "a substantial amount of evidence would have to be presented during both phases of trial." *Id.* Had Plaintiffs not prevailed on this motion, the *Monell* claims would have been tried separately from the individual liability claims, substantially undermining the presentation of the case and the jury's ability to understand the systemic nature of the constitutional violations at issue.

J. **Pretrial Motions and Trial Preparation (December 2025 – January 2026)**

The pretrial phase of this case was extraordinarily intensive. In the approximately six weeks between the final pretrial conference and the start of trial, Plaintiff's counsel:

1. Drafted and filed ten motions in limine, including motions regarding deposition testimony, summary charts, expert testimony, leading questions, requesting specific dollar amounts in summation, precluding effect-on-taxpayers evidence, attorney-conducted voir dire, and precluding family court records;

2. Opposed multiple defense motions in limine, including motions to preclude each of Plaintiff's three expert witnesses and a motion to bifurcate the *Monell* claims from the individual claims;

3. Reviewed and opposed Defendants' proposed jury instructions;

4. Drafted proposed jury instructions on damages, municipal liability, and all substantive claims;

5. Prepared detailed examination outlines for every witness—including direct examination outlines for Horowitz, Algarin, Gorman, Rudolph, Crosby, Chuck Dempsey, Leona Dempsey, Ben Dempsey, Sherry Dempsey, Dr. Prince, and Dr. Lyons, and cross-examination outlines for defense witnesses DiSabatino and DiDomenico;

6. Reviewed and designated deposition transcripts of over twenty officers for use at trial;

7. Prepared and organized over 205 trial exhibits;

8. Prepared the *Monell* deposition compilation video and summary chart for trial presentation;

9. Prepared voir dire questions and the joint statement of the case;

10. Traveled to Rochester and conducted witness preparation sessions with all Plaintiffs' witnesses; and

11. Drafted, revised, and practiced opening and closing statements.

**K. Trial (January 13–30, 2026)**

Mr. Shields served as the sole trial attorney for Plaintiffs throughout the 13-day trial. He conducted jury selection, delivered the opening statement, examined every Plaintiff witness, cross-examined defense witnesses, argued all evidentiary issues and motions during trial (including opposing Defendants' renewed motion for directed verdict and motion to dismiss the *Monell* claims), participated in the charge conference, delivered the closing argument, and was present throughout jury deliberations.

During trial, Mr. Shields also spent extensive time each evening and weekend preparing for the next day's witnesses, researching legal issues raised during trial, revising examination outlines, and preparing responses to the Court's questions regarding jury instructions.

**L. Fee Application and Other Post Trial Work**

24

Plaintiffs' counsel also seeks compensation for preparation of the instant fee application and will submit a supplemental declaration for additional fees incurred in responding to any opposition to the instant fee application made by defendants. In awarding for so-called 'fees on fees,' "[c]ourts have held that up to thirty hours [may] be reasonably spent in preparing and defending [a] fee application." *Torcivia v. Suffolk Cnty.*, 437 F. Supp 3d 239, 257 (E.D.N.Y. 2020).

Plaintiffs' counsel will also seek additional fees for opposing any post-trial motions and/or appeals filed by Defendants challenging the verdict in this case and will submit supplemental and/or separate fee applications associated with that work as well.

## IV.    THE LODESTAR SHOULD NOT BE REDUCED

Given the overwhelming degree of success obtained—a verdict for Plaintiffs on the vast majority of claims, including all four *Monell* claims—there is no basis for any reduction of the lodestar. *See Hensley*, 461 U.S. at 435 ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee."). Every category of work described above was directly related to the claims on which Plaintiff prevailed, and all hours expended were reasonable and necessary.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court award attorney's fees in the amount of $1,076,487.50, plus costs and expenses in the amount of $70,703.58, for a total award of $1,133,356.08, calculated as follows:

| Elliot Dolby-Shields | 1,420.9 hours × $700/hr | = $933,660.00 |
| David Roth | 60.9 hours × $1,125/hr | = $68,512.50 |
| Zoya Charania | 290 hours × $250/hr | = $72,500.00 |

| Ben Wittwer | 3.3 hours × $550/hr | = $1,815.00 |
| Costs and Expenses | | = $70,703.58 |
| **TOTAL** | | = $1,147,191.08 |

Plaintiff further requests that such amount be ordered paid within thirty (30) days of the Court's order.

Dated: New York, New York
February 17, 2026

Respectfully submitted,

*Elliot Shields*

_____
Elliot Dolby-Shields, Esq.
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
(212) 425-1020

26