**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| JOHN WALKER, JR. | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 1:22-cv-520** |
| | ) | |
| - against - | ) | |
| | ) | |
| THE COUNTY OF ERIE, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JOEL B. RUDIN IN SUPPORT OF PLAINTIFF'S**
**APPLICATION FOR ATTORNEYS' FEES AND COSTS**

I, Joel B. Rudin, an attorney duly admitted to practice in the State of New York and in the United States District Court for the Western District of New York, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following statements are true:

1.      I am the principal in the Law Offices of Joel B. Rudin, P.C. ("Rudin Law"), am fully familiar with the facts and circumstances of this case, and I make this declaration in support of Plaintiff's application for fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

2.      Our firm is a leader in pursuing *Monell* claims for misconduct by prosecutors— the sole claim John Walker was able to pursue against Erie County due to the absolute immunity of the individual prosecutors who handled his criminal case. Most of the leading precedents on proving police or prosecutorial misconduct under § 1983 in the context of wrongful convictions in the Second Circuit, as well as in New York State, are in cases we handled. Rudin Law also has been a leader, for more than 30 years, in the private criminal defense bar in New York State in challenging wrongful convictions through post-conviction litigation. Without our expertise, and our ability to put together the team of lawyers that so successfully litigated this case, the extraordinary result we achieved would not have been possible.

1

3.      For the reasons set forth below and in the accompanying declarations of attorneys James Grable, Nick Brustin, and Spencer Durland, we should be compensated based upon our customary rates charged to clients in New York City. The compensation, based upon the hours of work reasonably performed at our customary billing rates, is reasonable under the unique circumstances of this case. Our requested compensation takes into account the prior settlement with the City of Buffalo and that much of the work performed prior to Mr. Walker's trial for Mr. Walker also benefited Darryl Boyd before his sad passing.

4.      Plaintiff requests a total of $2,156,020.69 in attorney's fees and $217,748.64 in costs and expenses incurred by my firm from November 2, 2021, through April 30, 2025. I discuss our methodology to arrive at this figure—a substantial reduction from our total fees, costs, and expenses—below. A chart of the rates and hours billed by attorneys and paralegals in my firm is attached as Exhibit 1. A chart of costs and expenses is attached as Exhibit 2. The time records of attorneys in my firm include myself (Exhibit 3), David Rudin (Exhibit 4), and Partha Sharma (Exhibit 5). Time records of paralegals in my firm include Siduri Beckman (Exhibit 6), Thelo Coleman (Exhibit 7), and Amariah Thurston (Exhibit 8). Plaintiff intends to supplement this request for fees and costs incurred by my firm after April 30, 2025, on a periodic basis, as the Court deems appropriate.

### Background of the Rudin Law Firm

5.      By way of background, I am a 1974 graduate of Cornell University and a 1978 graduate of New York University School of Law. From 1978–81, I was an associate for a five-attorney New York City criminal defense firm, Fisher & Fraser, which mostly handled complex federal criminal trials and appeals. From 1981–85, I was a partner in Rudin & Levitt, also a criminal defense firm that handled state and federal trials and appeals. After several years in solo

practice, I formed another partnership, Mass & Rudin, in 1987 and remained in that partnership until we dissolved it in 1991. Ever since, I have been the principal in my own law firm. In recent years I have generally employed three to four associates, a paralegal, and an office manager/assistant.

6.      Until the 1990s, my firm's practice included a mix of private and court-appointed state and federal criminal defense clients. I was on the 18-B panel in Manhattan and the Criminal Justice Act Panel for the Eastern and Southern Districts of New York. The knowledge I gained about how criminal cases are constructed by police and prosecutors and challenged by criminal defense attorneys proved indispensable as, beginning in the 1990s, I moved into litigating plaintiffs' wrongful conviction cases under Section 1983. The personal knowledge I had of how criminal cases were prosecuted and defended in the 1970s proved indispensable as well to understanding police and prosecutorial practices in Buffalo during that same period.

7.      In my criminal defense practice, I handled numerous state and federal criminal trials through verdict. I also developed a robust and highly successful appellate and post-conviction practice. Besides arguing numerous cases in the state and intermediate federal appellate courts, I participated as attorney of record in three criminal cases decided by the United States Supreme Court: *Rodriguez v. United States,* 480 U.S. 522 (1987); *Gomez v. United States,* 490 U.S. 858 (1989); and *Peretz v. United States,* 501 U.S. 923 (1991). *Rodriguez*, a sentencing decision, was decided in my client's favor by summary order based on my *cert.* petition; I briefed and orally argued the latter two cases. *Gomez* is the leading decision restricting the authority of federal magistrate judges to conduct felony trial *voir dire* over a defendant's objection. I won it unanimously, overturning the contrary decisions of the Second Circuit and

nine other Circuit Courts. In *Peretz*, I lost a similar case, 5-4, because defense counsel had explicitly consented to the procedure.

8. In the late 1980s, in addition to trying and handling appeals of many state and federal criminal matters, I developed a substantial post-conviction practice. I succeeded in overturning four of the five infamous false Bronx daycare center sexual abuse convictions from 1985–86, either through direct appeal or collateral attack, launching my career reinvestigating and challenging wrongful convictions. *See, e.g.*, *Grady v. Artuz*, 931 F. Supp. 1048 (S.D.N.Y. 1996) (Koeltl, J.); *People v. Beauchamp*, 74 N.Y.2d 639 (1989); *People v. Ramos*, 201 A.D.2d 78 (1st Dep't 1994); Larry McShane, *For Wrongly Accused Day-Care Workers, Freedom Is No Panacea*, L.A. Times (Jan. 5, 1997), https://tinyurl.com/3k95ny87. The fifth conviction in that tragically misguided series of Bronx prosecutions was overturned based upon the precedent set in my *Beauchamp* case. *See People v. Algarin*, 166 A.D.2d 287 (1st Dep't 1990). All these convictions resulted from a combination of overzealous sex crime investigators and prosecutors, public hysteria, restrictive discovery practices and *Brady* violations, and inadequately prepared or overwhelmed defense counsel.

9. Many of my post-conviction cases over my many years of criminal defense practice involved *Brady* violations and prosecutorial reliance on false or misleading evidence and argument. Litigating these cases on direct appeal and collateral attack helped me develop an expertise that has proven vital in litigating wrongful conviction cases under Section 1983.

10. The first such win was the high-profile Alberto Ramos case, one of the Bronx daycare cases, where I showed at an evidentiary hearing that the prosecutor had suppressed evidence showing that the alleged crime had not occurred at all. *See People v. Ramos,* 201 A.D.2d 78 (1st Dep't 1994). After evidentiary hearings developed proof of *Brady* violations in

two additional cases, I won 440 appeals to vacate the convictions in the New York Court of Appeals. *See People v. Bond*, 95 N.Y.2d 840 (2000); *People v. Colon*, 13 N.Y.3d 343 (2009). My five-year representation of Jabbar Collins in his highly-publicized case led to District Judge Dora Irizarry's grant of federal habeas relief in 2010 after we showed pervasive *Brady* violations by the leading trial prosecutor in the Brooklyn D.A.'s Office, the Chief of the Rackets Bureau, Michael Vecchione. *Collins v. Ercole*, 08-cv-1359, Dkt. 55 (E.D.N.Y. June 9, 2010); A.G. Sulzberger, *Facing Misconduct Claims, Brooklyn Prosecutor Agrees to Free Man Held 15 Years*, N.Y. Times (June 8, 2010), https://tinyurl.com/45wasnsd.

11.     In *People v. Sinha,* 84 A.D.3d 35 (1st Dep't 2011), *aff'd on other grounds*, 19 N.Y.3d 932 (2012), I convinced the Appellate Division to reverse a bribery conviction in the interest of justice, without any showing of materiality or prejudice, because of the flagrant nature of the Manhattan D.A.'s *Brady* violation. *Sinha* was followed in 2013 by the grant of a 440 motion, vacating a Queens murder conviction, because the prosecutor had withheld thousands of dollars of witness payments to a key witness. *See People v. Bedi*, Ind. No. 4107/96 (Sup. Ct. Queens Cnty. Mar. 13, 2013); Andrew Keshner, *Judge Faults Queens D.A., Vacates Murder Conviction*, N.Y.L.J. (Mar. 19, 2013), https://tinyurl.com/26brddup; Michael Powell, *Misconduct by Prosecutors, Once Again*, N.Y. Times (Aug. 13, 2012), https://tinyurl.com/46mfhrxc. I won another *Brady* reversal in the New York Court of Appeals in *People v. Negron,* 26 N.Y.3d 262 (2015). In three felony cases, I convinced trial-level state courts to dismiss serious felony indictments because of the prosecution's reliance on false or misleading testimony or its failure to present exculpatory evidence in the grand jury. *See People v. Negron,* Ind. No. 398/05 (Sup. Ct. Queens Cnty. Sept. 6, 2017) (attempted murder); *People v. Greenspan,* Ind. No. 2758-2015

5

(Sup. Ct. Suffolk Cnty. Jan. 11, 2021) (murder); *People v. King*, 76 Misc. 3d 1225(A) (Sup. Ct. Queens Cnty. 2022) (rape). In each of these cases, I had won the defendant's criminal appeal.

12. In the 1990s and for much of the next decade, I was the first and the only private criminal defense attorney in New York City to also develop a practice regularly handling complex Section 1983 wrongful conviction civil lawsuits, most of which sought compensation not only from individual defendants but also from New York City on *Monell* theories. At the time, the only other firm in New York State that regularly handled such work was the law firm founded by Barry Scheck and Peter Neufeld from the Innocence Project, but it did not handle *Monell* claims involving prosecutorial misconduct in New York City and rarely elsewhere. For many years after I began this work, I was literally the *only* private attorney who would file and seriously pursue *Monell* claims against the City of New York for the policies and practices of District Attorneys' Offices, mostly on a failure-to-discipline theory, and after my successes in this field were publicized, other attorneys would literally copy the civil complaints I had filed, although few of them seriously pursued the *Monell* claims in discovery and the ones who did largely relied on the discovery I had compelled New York City to provide. I brought cases involving *Brady* violations by the Brooklyn, Queens, Bronx, and Manhattan District Attorneys' Offices. Other criminal defense attorneys would not take on such matters because it was exceedingly difficult to continue handling criminal cases against these same offices and because the cases were so time-consuming and complex.

13. The first such case I handled was one of the Bronx daycare center cases, that of Alberto Ramos. Shortly before Mr. Ramos's Bronx conviction was vacated for pervasive *Brady* violations in 1992 after he had served seven years in prison, the Second Circuit decided *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992). It held that a New York municipality could be

sued for a county district attorney's unlawful policies, customs, or practices which cause *Brady* violations by prosecutors who themselves are immune from suit. *Walker,* however, did not discuss how such liability might be established. We figured out the solution in the *Ramos* case. After a difficult battle with the City of New York, we won a landmark decision holding that *Monell* liability could be established by showing a District Attorney's persistent failure to discipline prosecutors for *Brady* and other constitutional violations and ordering the Bronx District Attorney to disclose personnel records for 85 prosecutors. *See Ramos v. City of New York,* 285 A.D.2d 284 (1st Dep't 2001). These records showed an almost complete lack of discipline. When the *Ramos* case was settled in 2003 for $5 million, it was at the time the largest civil damage award in a wrongful conviction case in New York State history. *See* Andrea Elliott, *City Gives $5 Million to Man Wrongly Imprisoned in Child's Rape*, N.Y. Times (Dec. 16, 2003), https://tinyurl.com/3cpm9mvy. The *New York Times* covered the case extensively because of how it exposed the lack of discipline at such a large urban district attorney's office. *See* Andrea Elliott, *Prosecutors Not Penalized, Lawyer Says*, N.Y. Times (Dec. 17, 2003), https://tinyurl.com/3ydbu2fp. My handling of the case became the subject of a full chapter in a lawyering skills textbook written by Stephen Gillers, one of the nation's foremost legal ethics experts and then vice dean of NYU Law School. *See* Stephen Gillers, *In the Pink Room*, *in* Legal Ethics Stories (Deborah L. Rhode & David J. Luban, eds., 2006).

14. Following the *Ramos* settlement, I brought similar cases against New York City for misconduct by prosecutors in Brooklyn and Queens. After the Second Circuit's decision in *Su v. Filion*, 335 F.3d 119 (2d Cir. 2003), granting habeas relief due to a *Brady* violation and the dismissal of the case, we brought our first Section 1983 *Monell* claim in federal court, modeled after *Ramos*, and won a $3.5 million settlement after the district court granted disclosure of

7

personnel records of prosecutors who committed misconduct in several dozen reported cases and the evidence showed none of them were disciplined by the Queens D.A.'s Office. *See* Corey Kilgannon, *City to Pay $3.5 Million to Wrongfully Imprisoned Queens Man*, N.Y. Times (Oct. 17, 2008), https://tinyurl.com/bdf8b3zp; Jim Dwyer, *Prosecutor Misconduct, at a Cost of $3.5 Million*, N.Y. Times (Oct. 21, 2008), https://tinyurl.com/mryefby7. Meanwhile, attorneys at McDermott Will & Emery brought in our firm to handle a similar litigation involving the Brooklyn D.A.'s Office after the grant of habeas relief for a *Brady* violation in *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001), and midway in discovery we settled for $3 million.

15.     The discovery of prosecutors' personnel records which I obtained in these and subsequent lawsuits, showing the utter lack of discipline for *Brady* and other violations, was unique in the country. No other outsider, and certainly no plaintiff's counsel, had ever succeeded in obtaining access to such records. Although we settled each of these cases, I was determined to expose the absence of discipline at such offices, and of prosecutors generally, in an effort to reform the system.

16.     Initially, I did so through testimony at a public hearing of the New York State Task Force on Wrongful Convictions, which was prominently cited in that body's official report. *See* Final Report of the New York State Bar Association's Task Force on Wrongful Convictions 31 (2009), https://tinyurl.com/475r2k6c.

17.     I also did so in an *amicus* brief, on behalf of the National Association of Criminal Defense Lawyers ("NACDL"), the American Civil Liberties Union, and the Cato Institute, seeking to uphold the plaintiff's verdict in *Connick v. Thompson*, which Justice Ruth Bader Ginsburg cited in her dissenting opinion. *See Connick v. Thompson*, 563 U.S. 51, 101 n.17 (2011).

18.     I then published an article, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined By Their Offices Or The Bar: Three Case Studies That Prove That Assumption Wrong*, 80 Fordham L. Rev 537 (2011), which drew upon the discovery I had obtained to show—contrary to the Supreme Court majority's assumption in *Connick v. Thompson*, 563 U.S. 51 (2011), and *Imbler v. Pachtman*, 424 U.S. 409 (1976)—that prosecutors are *not* disciplined for professional misconduct, including *Brady* violations. The article was published following an all-day symposium at Fordham Law School on Section 1983 liability for police and prosecutorial misconduct at which I presented, along with Judge Pierre Leval of the Second Circuit, renowned Supreme Court litigator Paul Clement, and leading scholars in the field.

19.     My *Fordham Law Review* article was thereafter cited in numerous prosecutorial training programs and, according to the deposition testimony of Robert J. Masters, counsel to former Queens District Attorney Richard Brown, led to the formation of an office-wide ethics panel at that office named the Committee on Professional Standards. *See* Deposition Testimony of Robert J. Masters, *Ricardo Benitez v. City of New York, et al.*, 17-cv-3827 (SJ) (SJB) (E.D.N.Y.), Feb. 25, 2020, at 5–6 (relevant excerpt attached as Exhibit 9).

20.     Thereafter, I continued to handle cases involving misconduct by prosecutors in New York City and won many of the leading federal decisions in the field. In *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000), I convinced the Second Circuit to reverse the dismissal of our lawsuit and hold that prosecutors could be sued in their investigative capacity for fabricating evidence even though, in presenting such evidence, they enjoyed absolute immunity. The *Zahrey* case was brought against a federal and several New York State prosecutors in their personal capacities and led to what may be only federal court judgment anywhere in the country against individual prosecutors for evidence fabrication. In *Collins v. City of New York*, 923 F. Supp.2d

462 (E.D.N.Y. 2013), Judge Block upheld our *Monell* claim under a failure-to-discipline theory involving the Brooklyn D.A.'s Office. Judge Johnson issued a less elaborate but similar decision in *Benitez v. City of New York*, 2018 WL 2973387 (E.D.N.Y. June 13, 2018), a case involving the Queens D.A.'s Office.

21.     The most significant *Monell* decision was handed down in *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019). This is now the leading Second Circuit decision on municipal liability under *Monell* for prosecutorial misconduct. In that case, New York City convinced the district court to dismiss the plaintiff's *Monell* claim and, on appeal, challenged the Second Circuit's *Walker* decision based upon an intervening Supreme Court decision. However, the Second Circuit, reversing the lower court, became the first to hold that a municipality could be held liable not only for causing prosecutors to violate *Brady* but for summation misconduct as well. That decision made this lawsuit possible.

22.     I have had an active appellate practice litigating additional cutting-edge issues under Section 1983, including police liability for evidence fabrication and malicious prosecution as well as the application of absolute and qualified immunity principles. I was co-counsel with Supreme Court litigator Neal Katyal (who argued the case) in *McDonough v. Smith*, 588 U.S. 109 (2019), a Supreme Court decision holding that the statute of limitations for evidence fabrication cases doesn't begin to run until the favorable conclusion of the underlying criminal prosecution. The Second Circuit's contrary decision, which the Supreme Court reversed, would have required criminal defendants to bring evidence fabrication claims while their criminal cases were still ongoing, a virtually impossible scenario. Without this decision, Plaintiffs Walker's and Boyd's lawsuits in this case would have been time-barred.

10

23.	Other leading civil rights appeals I have handled include *Smalls v. Collins*, 10 F.4th 117 (2d Cir. 2021) (reversing the district court and holding that a "favorable termination" of a criminal case does not require a showing of innocence); and *Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014) (en banc) (reversing the district court and holding that a plaintiff who pleads guilty to a reduced charge may still sue under § 1983 for damages resulting from a *Brady* violation in relation to his since-overturned initial conviction).

24.	Lower court cases that I handled and that were discussed during this case include *Collins v. City of New York*, *supra* (denying City's motion to dismiss *Monell* claim and relying on post-incident ratification to prove the existence of an unlawful policy or practice), *Taylor v. City of New York*, 2021 WL 848966 (E.D.N.Y. Mar. 4, 2021) (upholding *Russo* claim), *Nnodimele v. Derienzo*, 2016 WL 3561708 (E.D.N.Y. June 27, 2016) (holding that innocence is relevant only to damages, not liability, and that defense counsel ineffectiveness provides no defense to a *Brady* violation claim), and *Fraser v. City of New York,* 2023 WL 144448 (S.D.N.Y. Jan. 10, 2023) (also rejecting defense counsel ineffectiveness as a defense to a *Brady* claim).

25.	My firm has achieved some of the highest settlements in New York State for wrongful convictions, most containing *Monell* claims involving prosecutorial misconduct, including $19 million for Jaythan Kendrick in 2023 (Queens D.A.'s Office); $15.45 million for William Vasquez in 2017 (Brooklyn D.A.'s Office); $13 million for Jabbar Collins in 2013 (Brooklyn D.A.'s Office); nearly $20 million in total for four Queens plaintiffs in 2019–21, including $8 million for Kareem Bellamy; $9 million for Danny Colon and Anthony Ortiz (Manhattan D.A.'s Office); and seven figure payouts for approximately a dozen additional clients.

26.     My firm also has been a leader in bringing *Monell* claims for police misconduct in connection with criminal investigations and prosecutions, which also was highly relevant to this case, which also included, until settlement, such a *Monell* claim. In *Fraser v. City of New York,* 20-cv-4926 (S.D.N.Y.), my firm became the first in New York State, to my knowledge, to win an unfair trial claim against a municipality on a *Monell* theory. Together with Bloch & White LLP, a firm we retained to co-try the case, we succeeded in showing that, as late as 2014, the New York City Police Department had an illegal policy to not disclose "mere" impeachment, as opposed to exculpatory, evidence under *Brady.* The jury awarded our client, who had spent 1 ½ years in state prison, $1.5 million against New York City on the *Brady*-related *Monell* claim and an additional $425,000 in punitive damages against individual detectives for fabricating the underlying case. In addition, in a much simpler case than this one, our firms collected a total of $1.7 million in attorneys' fees.

27.     As a vice chair of the *amicus* committee of the National Association of Criminal Defense Lawyers, I have submitted briefs, joined by other leading public interest organizations, on cutting-edge criminal defense and civil rights issues to the U.S. Supreme Court, the Second Circuit, and the New York Court of Appeals, including cases involving civil liability for prosecutorial misconduct. These cases have included *Connick v. Thompson*, 563 U.S. 51 (2011); *Van De Kamp v. Goldstein*, 555 U.S. 335 (2009) (involving absolute immunity of supervisors at prosecutors' offices); *Pottawattamie County v. McGhee*, 558 U.S. 1103 (2010) (settled after oral argument by Paul Clement) (involving individual liability of prosecutors for misconduct in an investigative capacity, as in the *Zahrey* case); *Simon v. City of New York*, 727 F.3d 167 (2d Cir. 2013), and 893 F.3d 83 (2d Cir. 2018) (upholding claims against, and rejecting absolute and qualified immunity defenses by, individual prosecutors for misusing material witness warrants to

12

hold witnesses for unlawful custodial interrogation). Most recently, on May 20, 2025, my firm filed an *amicus* brief in the New York Court of Appeals on behalf of the NACDL and the Innocence Project in *People v. Savion Robinson*, APL-2024-00073, arguing against any investigative interrogation exception to the *Miranda* rule.

28.     My other publications include: *Suing for Prosecutorial Misconduct*, The Champion (Mar. 2010); Blum, Koeleveld, Rudin & Schwartz, *Municipal Liability and Liability of Supervisors: Litigation Significance of Recent Trends and Developments*, 29 Touro L. Rev. 93 (2012); *Reversing the Malcolm X Convictions: How It Happened, How Far We've Come, How Far We Need To Go*, N.Y. State Bar Ass'n (Dec. 2, 2021), https://tinyurl.com/ydc2aeer.

29.     I also have presented on several panels about civil rights law sponsored by the Practicing Law Institute, appearing with various federal judges; Dean Erwin Chemerinsky of Berkeley Law School; Professor Martin Schwartz of Touro Law School, the author of the leading civil rights treatise; and other practitioners and scholars. I have spoken at various area law schools about wrongful conviction litigation, including Yale, Cornell, NYU, Fordham, Brooklyn, St. John's, and University at Buffalo, and to aspiring investigative journalists at the Columbia Graduate School of Journalism. I have also presented at programs held by the New York City Bar Association, the New York County Lawyers Association, the Nassau County Bar Association, the New York Council of Defense Lawyers, and the annual White Collar Conference of the National Association of Criminal Defense Lawyers in Washington, D.C.

30.     As discussed in more detail below, our firm's successes in litigating wrongful conviction cases could not have occurred without the exceptional work of our associates. All of our associates have attended top law schools, clerked for federal judges, or both, and have been dedicated to representing individual clients resisting the awesome power of the government.

13

**The Instant Fee Application**

31.     Our firm became involved in this case after we were recommended by Peter Neufeld, a principal at Neufeld Scheck & Brustin and a co-founder of the Innocence Project, and Adele Bernhard, another civil rights litigator and a professor at New York Law School in New York City. Mr. Neufeld explained that the case involved potential *Monell* claims that my firm was uniquely qualified and willing to handle and that his firm already was handling another Buffalo wrongful conviction case. We were then contacted by John Walker and Darryl Boyd and met with them in New York in November 2021.

32.     Mr. Walker told us that Paul Cambria, who had represented Mr. Walker and Mr. Boyd *pro bono* at their 440 hearing earlier in 2021, had turned down their civil case but had not indicated there was any other local law firm that would be qualified to handle such a case or would be willing to do so. That was why he and Mr. Boyd had reached out to Barry Scheck and Peter Neufeld.

33.     Mr. Walker and Mr. Boyd presented us with a disorganized collection of police materials and portions of the trial transcripts from their cases. We collected limited additional materials to the extent they were available, did some preliminary research about the Buffalo Police Department and the Erie County D.A.'s Office ("ECDA"), interviewed the two clients, and determined to tentatively accept the case. However, developing the evidence necessary to prove our case was a daunting task. We knew how to go about it because of our prior experience in such matters, but this case was the most challenging of all.

34.     A State Supreme Court justice in Buffalo already had denied our clients' *Brady* claim, based upon certain police documents they had obtained through a Freedom of Information Law application, on the basis that there was insufficient evidence the material had not previously

14

been disclosed by prosecutors and that the evidence, even if newly discovered, was not material to the outcome. The original assigned prosecutor, Timothy Drury, who had become a Supreme Court justice in his own right and was highly respected in the Buffalo area, had sworn in an affidavit that he would have disclosed the evidence raised in the prior 440 motion and cited his contemporaneous statement at a pretrial hearing that he had disclosed "all the *Rosario* material." While the convictions had been overturned in 2021 based upon the finding of another judge that an exculpatory photograph of the crime scene had not been disclosed, he made his finding reluctantly, giving the defendants the "benefit of the doubt" despite the sworn testimony of two former prosecutors, Drury and David Henry, that there was no such photograph. Even if *Brady* violations could be proven in a civil case, proving that such violations resulted from a policy, custom, or practice of the Erie County D.A.'s Office was highly uncertain after the passage of nearly 50 years, the death of numerous potential defendants and witnesses, and the absence of readily available documentation regarding policies and practices of the era.

35.     Realizing the enormity of the task of developing evidence and then presenting it at trial if the matter did not settle, I enlisted as co-counsel Ross Firsenbaum and his firm, WilmerHale, and, initially as local counsel, Hoover & Durland in Buffalo. WilmerHale was willing to assign a team of lawyers and other staff to the case. Mr. Firsenbaum, besides being able to offer the invaluable services of such a large law firm, was one of the few other lawyers in New York City, and almost certainly the only "Big Law" attorney, with experience handling *Monell* litigation involving prosecutorial misconduct, having won the vacatur of the wrongful murder conviction of Dewey Bozella and then having successfully litigated his *Monell* claim, based upon the unlawful *Brady* policies of the Dutchess County District Attorney. Hoover & Durland had an excellent reputation as a criminal defense and civil litigation firm, and I knew of

15

Tim Hoover as the past president of the New York State Association of Criminal Defense Lawyers, an organization in which I had been active. Ultimately, due to the massive amount of work in the case and the excellent work Tim Hoover and Spencer Durland already had done, I asked them to come in fully as co-counsel and they agreed.

36.     I knew, from my experience handling *Monell* claims, how to go about investigating this case and developing the evidence, but the task was extremely challenging nonetheless. First, we had to prove the nondisclosure of the *Brady* material. None of the original trial files of defense counsel were available. Mr. Walker's defense counsel was deceased (and Mr. Boyd's counsel, Mark Hulnick, died before he could be deposed). The D.A.'s Office over the years had insisted disclosure was made. We carefully reviewed the hearing and trial transcripts, however, and saw that the prosecutors would make a record of *Rosario* material they disclosed after the direct examination of the People's witnesses. Since none of the *Brady* material was disclosed on the record at the Boyd or Walker trials, we had a good faith basis for believing it hadn't been disclosed at all, but this was subject to deposition testimony that might undermine this inference. I then managed, at their depositions, to get former ADAs Drury and Henry to admit that their practice was to make a record of all pretrial and trial disclosures and that they had no record or memory of disclosing to counsel for Boyd or Walker the materials at issue in this case. While the record showed that Mr. Drury, under pressure from co-defendant Darryn Gibson's counsel, had disclosed four such documents, I got him to admit his practice to obtain the return of such material after defense counsel had the opportunity to use it for cross-examination, which assisted us in proving non-disclosure to Boyd and Walker, whose attorneys were not present during Gibson's trial.

16

37. As for the policy and practice or *Monell* evidence, we pursued several theories: the failure-to-discipline theory I had successfully employed in most of my other *Monell* cases, a theory of inadequate training and supervision, and a theory that the Office had affirmatively unlawful policies and practices. There was no prior public or documentary evidence of this, however, and it would have to be developed during our investigation and at depositions, if at all. I made several trips to Buffalo, accompanied by other attorneys on our team, and interviewed numerous attorneys in an effort to develop evidence of policies and practices during the relevant time period. Our team also attempted to locate and interview witnesses who might have knowledge of the underlying facts of our clients' case.

38. Finding court decisions providing notice of acts of misconduct was much more difficult in this case than in my firm's other cases, because there were far fewer appellate decisions finding *Brady* violations in the 1970s than in later years, and few lower court decisions were officially reported at all. I asked David Rudin to comprehensively research published court decisions finding *Brady* violations, summation misconduct, and related misconduct by prosecutors, and I also asked a firm paralegal to scour Buffalo newspaper archives for articles about trial court decisions, a task that took a great deal of time. Our paralegal found more than a dozen such cases, many of which involved *Brady* violations. We then attempted to establish that these decisions and articles provided notice to the District Attorney of apparent misconduct; that he failed to take adequate remedial action; that this failure gave rise to the inference either of an unlawful policy, custom, or practice permitting such violations or of deliberate indifference to them when they occurred; and finally that such policy or policies were causally related to the misconduct that we alleged occurred in our clients' cases. Ultimately, we succeeded in developing deposition testimony from former District Attorney Edward Cosgrove, former trial

17

prosecutors Drury and Henry, and Mr. Henry as a County 30(b)(6) witness, that there was no real overall disciplinary policy, that specific instances of misconduct were not disciplined, and that Mr. Cosgrove or his top executives would have been aware of the behavior found in the court decisions or reported in the newspaper articles. While this Court disagreed with some of our approach, it was persuaded by our argument under the ancient records exception to the hearsay rule to admit some of the documents for the truth, and we relied upon this evidence to argue the existence of a widespread, unlawful custom or practice.

39.     Proving the existence of an affirmatively unlawful policy, custom, or practice required great experience and expertise. The County denied possession of any documentary material bearing upon the Office's *Brady* and summation policies and practices. However, over the years I had deposed several dozen high-level executives at D.A.'s offices, including three District Attorneys, and line prosecutors, and I had expertise in obtaining admissions helping to prove such a claim. Through carefully constructed questioning at depositions, the result of dozens of hours of preparation, I succeeded in eliciting testimony from Mr. Henry, who was Mr. Walker's trial prosecutor and also testifying as a 30(b)(6) witness on behalf of Erie County, that, in 1977, the Office, as a matter of policy or practice, only recognized *Brady* to apply where there was a specific request, and only to exculpatory evidence. He also testified to instances in which he did not disclose even exculpatory evidence if he claimed not to believe it.

40.     Further, I obtained Mr. Henry's crucial admission that, consistent with Criminal Procedure Law § 240.20 in effect at the time, he viewed police reports containing witness statements as "exempt property" that was not subject to disclosure (even though the New York Court of Appeals had held shortly before Mr. Walker's trial that this rule was superseded by the *Rosario* requirement). This admission explained why he did not disclose witness statements that

18

contained much of the *Brady* material at issue in this case, and completely undermined the defense, adopted by County expert Kevin Gagan, that the *Brady* material must have been disclosed pursuant to *Rosario*. I knew to pursue this line of questioning based upon my own criminal defense experience from the late 1970s.

41. Finally, I elicited testimony from both Mr. Drury and Mr. Henry that their *Brady* disclosure decisions in the Boyd and Walker cases were consistent with the Office's policies and practices, which supported the inferences that such policies and practices were unlawful and that they were a cause of the misconduct in our case.

42. I succeeded in discrediting the County's *Monell* expert, Kevin Gagan, during his deposition, and in showing, through the police detectives who were still alive and available to be deposed, how the undisclosed *Brady* documents could have been used to cross-examine the police witnesses. The Gagan deposition, like the others I took of police detectives and ex-prosecutors, resulted from an enormous amount of preparation, including the careful organizing of lines of questioning based upon the voluminous case and *Monell* materials that we had accumulated through our own investigation and during document discovery. Knowing from my own experience how I would want to develop such questioning, I prepared the examination outlines myself.

43. Finally, also resulting from my experience in post-conviction criminal and civil representation and in *Monell* litigation involving prosecutorial misconduct, I was able to identify three excellent expert witnesses to provide opinions in our clients' cases. I knew Professor Steven Zeidman to be an extraordinarily diligent, talented, and knowledgeable clinical and criminal procedure professor who had substantial expertise in the State's criminal justice system. I thought he would be an excellent witness even though (or perhaps because) he had little

19

experience as a paid expert, and he in fact excelled. I also knew of Professor Alan Hirsch, an expert in police interrogation tactics and the reliability of police conducted interrogations, and Dr. Sanford Drob, a forensic psychologist with whom I had worked in other matters to evaluate clients' damages from wrongful conviction, and both gave highly effective and convincing testimony in the case.

44. Partha Sharma and David Rudin of my office researched and prepared memoranda on numerous of the complex legal issues presented by or which we anticipated being raised by the defense in this case. David spent an enormous amount of time developing the facts supporting our D.A. *Monell* claim and organizing them for use in opposing summary judgment, and for use at trial. David also spent countless hours helping our clients deal with their medical and other personal issues and in preparing them, mentally and physically, for the rigors of testimony, and he and WilmerHale's associates worked with them to prepare their deposition and trial testimony. This preparation proved essential in defending their depositions, which I handled; in preserving their direct examinations for trial at such depositions due to their ill health; and, in Mr. Walker's case, at trial, where his in-court testimony was skillfully handled by Mr. Durland. Providing daily support to Darryl Boyd after he was diagnosed with, and was dying from, pancreatic cancer, and for Mr. Walker as he suffered from heart and back issues and then lung cancer, was traumatic for the lawyers on our team.

45. The lawyers in my firm were fully involved in preparing the summary judgment papers we ultimately submitted in opposition to the City's and the County's motions. We drafted arguments on several important issues and I reviewed all our papers and worked on editing them, as did the other principal attorneys on our team. I was also involved in strategizing and editing

all our motions to compel discovery and to expedite the trials, although WilmerHale's team took primary responsibility for drafting such submissions and following up on them.

46.     I participated in mediation sessions with the County, but the County's offers were either non-existent or on the level of a nuisance settlement so insultingly low it was difficult to convey to our clients. Beginning in November 2021, I assisted Mr. Walker and Mr. Boyd in obtaining litigation funding to support them financially during the litigation. My firm's track record of success in wrongful conviction cases gave the litigation funder confidence in making a non-recourse investment in the form of regular monthly payments which ultimately totaled hundreds of thousands of dollars given how long the case took. But as the years passed and Mr. Walker and Mr. Boyd were required to renew one agreement after another, in 2024 the funder declined to enter into another agreement. Mr. Boyd, who had been diagnosed with Stage IV pancreatic cancer in late 2023, relied on the financing for the expenses of weekly flights, hotels, and clinical treatment at NewYork-Presbyterian Hospital and NYU Langone Hospital in New York City, as his oncologist in Buffalo had told him that there was nothing more he could do for him. These circumstances, along with Mr. Boyd's desire to know during his life that he had provided for his family, and Mr. Walker's own fragile health and financial need, compelled both clients to settle with the City—the only party that was receptive to our overtures and would engage in serious negotiations. They accepted settlements far below the value of their cases in the knowledge they could pursue a full recovery against the County. They would have preferred to settle at once with all parties, but the County's settlement "offer" amounted to nuisance value and we discontinued the insulting and demeaning "negotiation."

47.     Rudin Law also devoted a substantial amount of attorney and paralegal time identifying records that needed to be sent to each of the Plaintiff's expert witnesses, Sanford

21

Drob, Alan Hirsch, and Steven Zeidman, assisting them in reviewing such records, and commenting upon their draft reports. These witnesses had to review thousands of pages of case material each for their initial draft and final reports. Professor Zeidman in particular had to prepare to testify about the facts presented in a vast criminal case record and developed in thousands of pages of depositions, and about the state of the law that existed in 1976–77 and under present-day principles. Professor Hirsch had to carefully study all the police documentation and the hearing, trial, and deposition testimony of numerous relevant witnesses. Dr. Drob had to review voluminous health and prison records as well as our clients' deposition testimony. The experts had to review much of the same case materials, months later, when they were preparing to testify at trial and meeting with Plaintiff's counsel for that purpose. As noted in the accompanying memorandum of law, the experts' fees are not compensable under § 1988 and had to be borne by Rudin Law. This was a significant financial investment and risk, making it all the more important that reimbursement for compensable expenses is full.

48. We also retained and paid the fees of a fourth expert, Christopher Puckett, a retired Buffalo detective and crime scene reconstruction expert, to study the crime scene and to test the viability of the trial testimony given by Tyrone Woodruff claiming that the five boys lay in wait at Simpson's Store and then walked or jogged to intersect Crawford after he had crossed the street from the Golden Nugget Bar and was walking up the driveway to the side door to his house. This story would have been potentially discredited by Puckett's report and testimony, and this would have supported the testimony of Woodruff that it was police and prosecutor coercion that caused him to adopt it. While we made a litigation judgment at trial not to present Mr. Puckett's testimony, retaining and working with him was a reasonable expense in preparing our

22

case against not just the City of Buffalo and the individual defendants but against the County under our *Monell* theory as well.

49.     Trial was a rewarding experience but exhaustive. David Rudin and I spent full days in court each day, then returned to our hotel and worked through the night, alongside seven attorneys from WilmerHale and Mr. Durland, preparing for the next day's testimony and for dealing with the various legal issues that each side briefed, and the Court grappled with.

50.     Mr. Firsenbaum's declaration further explains how we developed our case and presented it. This Court, having considered our written and oral arguments concerning the County's summary judgment motion and countless other legal issues that arose before and during trial, and having observed how we handled the case in front of the jury, is in an excellent position to determine the level of skill that this case required and how our performance and ultimate success should affect our compensation under Section 1988.

51.     Finally, we are submitting with this application our fee records, redacted to protect confidential attorney-client work product and any other privileged information. We are mindful that this application is being made while Defendant County is moving to vacate the jury's verdict and for a new trial, is otherwise planning to appeal and seek a new trial, and is planning to contest at a second trial the claims of Plaintiff Estate of Darryl Boyd. The redactions we have made are intended to allow the Court and the opposing party to review and evaluate the reasonableness of the time we spent on this case. To the extent the Court believes it needs any unredacted records in adjudicating any dispute about specific entries, we would of course submit them *in camera* so the Court can review them.

52.     As detailed in Exhibits 1 and 3–8 to this declaration, our time records reflect 8101.8 billable hours, which, at our customary hourly rates and without any discounts, would

amount to a charge of $4,368,737.50. For the reasons explained in Mr. Firsenbaum's declaration, we are discounting by 15 percent for work performed through December 5, 2024, the date of Mr. Walker's and Mr. Boyd's settlement with the City of Buffalo, to reflect the portion of the total recovery that was paid by the City. We are also applying a 50 percent discount for fees incurred through March 3, 2025, to advance Mr. Walker's overall lawsuit, because they also were incurred on behalf of Mr. Boyd, whose case, now through his Estate, remains to be tried. At the March 3, 2025, final pretrial conference, the Court stayed Mr. Boyd's case and directed that Mr. Walker's trial would be held first. Accordingly, starting from March 4, 2025, we view the entirety of our fees as chargeable to the Walker matter. Finally, we are applying a further discount of 50 percent to travel time.

53.     While generally speaking I did not try to separate by client attorney time for our two clients, believing that all such work was interrelated and not fairly severable, our firm's paralegals and associates did try to do so more actively than I did. Where they did so, we are keeping their designations and not charging for time entries allocated to Mr. Boyd's case, while charging 100 percent for entries designated as relating to Mr. Walker only.

54.     We are also not charging for our time spent forming the estates of deceased Buffalo police officers in order to sue them, time spent in relation to serving them, and time spent negotiating and effecting a settlement with the City of Buffalo.

55.     Applying the aforementioned reductions, we are seeking a total of $2,156,020.69 from the County of Erie, a total reduction of $2,212,716.81, or 50.65%.

**Hourly Rates Requested**

**Joel B. Rudin**

56.     I am requesting compensation at the rate my law firm charges for comparable work in New York City because, as discussed above, my law firm is uniquely qualified to handle complex wrongful conviction litigation involving *Monell* claims, local law firms in Buffalo lack experience handling such matters, and our expertise enabled our team of lawyers to achieve an exceptional result.

57.     The declarations of attorneys Grable, Brustin, and Durland support my understanding that local law firms lack the experience or the willingness to handle such a complex *Monell* claim involving the Erie County District Attorney's Office, particularly one involving events that occurred nearly 50 years ago, and to undertake the financial risk. My office could not find any such matter successfully handled by a Buffalo area law firm, and the cases we did find were brought by out-of-District counsel. *See, e.g.*, *Renay Lynch v. Town of Amherst and County of Erie*, 25-CV-75 (LJV) (D.A.-related *Monell* claim brought by three New York City law firms); *Valentino Dixon v. City of Buffalo and County of Erie, et al.*, 19-CV-1678 (WMS) (filed by Manhattan law firm Neufeld Scheck & Brustin LLP, with Easton Thompson Kasperek Shiffrin LLP of Rochester as local counsel); *Miller v. County of Monroe*, 23-CV-6649 (FPG) (DA-related *Monell* claim brought by Elliot Shields of Roth & Roth in Manhattan). While a handful of *Monell* claims have been made against the Buffalo Police Department in other cases, none were anywhere near as complex or difficult as the *Monell* claims that we have litigated in this case.

58.      Further, our rate is justified due to the extraordinary success we obtained in this unusually complex case.

59. My rate of $950 per hour is what I charge private hourly clients. Several redacted bills, documenting the rates our firm charges civil and criminal clients for each of our attorneys, are attached. Exhibit 10. My rate (and those of my firm's associates) is commensurate with what civil rights attorneys in New York with comparable experience and success charge. The supporting declaration of one such attorney, Nick Brustin, states that, if anything, my requested rate is below what other attorneys with commensurate experience charge and should receive.

60. I have only been involved in one other matter where my attorney's fees were contested and resolved by court decision rather than settlement. In the *Zahrey* case, my client, in 2009, after 12 years of litigation, accepted a settlement pursuant to Fed. R. Civ. P. 68 under which attorneys' fees were contested by New York City and decided by the court. *Zahrey v. City of New York,* 98-cv-4546, Dkt. 264 (E.D.N.Y. June 8, 2010). Magistrate Judge James Francis, sitting in the Southern District of New York, conducted a comprehensive analysis and, in a decision dated June 8, 2010 (copy annexed as Exhibit 11), awarded me the rate of $575/hour (I had requested $625). In 2025 dollars, that hourly rate would be about $850. However, there, Judge Francis took into account that, when I took on that civil case in 1997, I had little experience handling civil rights litigation and mostly was a criminal defense attorney. Since 2010, my experience and success handling civil rights cases has greatly expanded, and so a higher relative rate is justified.

61. In evaluating the requested rates, the Court also should consider my firm's substantial overhead, which is figured into the hourly rates we charge. This overhead includes a high Manhattan office rent; electricity; furniture; furnishings; computers; other equipment; cleaning services; the salaries of an office manager, associates, and paralegals; other fringe benefits such as retirement contributions, health, malpractice, unemployment, and liability

26

insurance; Westlaw and copier contracts; accounting charges; and various other expenses. Many of these expenses, especially rent and salaries, are far higher in Manhattan than in Western New York.

62.     While Section 1988 is intended to encourage lawyers to take on difficult, uncertain, and legally complex civil rights cases, compensation at the billing rates of upstate law firms would result in my law firm losing money on such cases and discourage future representations rather than, as the statute intends, encourage them. Not only would upstate billing rates discourage a firm such as mine from accepting such matters, but so would the extraordinary costs and expenses that are required. Such expenses in this case are detailed below. The extraordinary risk that we took included the investment of thousands of hours of attorney and paralegal time and costs and expenses exceeding half a million dollars, a substantial portion of which went to paying experts for their time—a cost that we cannot recoup under Section 1988, as noted in the accompanying memorandum of law. The fact that the attorney time and compensable expenses will not be paid or reimbursed unless and until the County's appeal is defeated (and that expert witness fees will not be compensated at all) should be considered in determining a reasonable hourly rate. Our investment has been made over more than three years and the County's appeal likely will delay the case's final resolution for another two years. Should the appeal be successful, we will then have to retry the case and, assuming we're successful, endure the wait of still another appeal.

63.     Also relevant is that we had to relocate to Rochester for a month to handle the pretrial and trial proceedings and that, for many months before the trial, we were preoccupied with the huge amount of work that was necessary to prepare for trial and did not have time to handle other work. Before, during, and since trial, I have turned down or referred to other

27

attorneys many inquiries about new cases because of the lack of time to handle such matters alongside this one.

**David Rudin**

64.    Plaintiff seeks a billing rate of $525 per hour for David Rudin, a graduate of NYU School of Law (J.D. 2017). This is the rate we charge, and clients have paid, for David Rudin's services. Beginning in Fall 2021, David Rudin conducted extensive factual investigation on Mr. Walker's and Mr. Boyd's cases, including interviewing our clients and fact witnesses to the underlying incidents in the case and ECDA misconduct in other prosecutions around the time of the Crawford homicide trials. He also researched still other cases of ECDA misconduct, and reviewed court decisions and the underlying records from those cases for use in the complaints and later in depositions, discovery motions, summary judgment, and trial. He drafted discovery correspondence with defendants, the argument section of Plaintiff's bifurcation opposition, letter-motions to the court regarding discovery, and motions to unseal a criminal court file supportive of Plaintiff's *Monell* claim, necessitated by the County's vigorous opposition in both state and federal court. He assisted Joel Rudin with multiple depositions, including preparing Mr. Walker for his deposition, and deposed three witnesses.

65.    After fact discovery, David Rudin drafted the declaration supporting Plaintiff's motion to set an expedited trial date based on the strength of the evidence developed in discovery, worked with Plaintiff's experts on their expert reports, and drafted a substantial portion of the summary judgment opposition L.R. 56.1 statement and a section of the memorandum of law. Leading up to trial, David Rudin drafted multiple *in limine* briefs and responses, worked on Plaintiff's exhibit list, drafted Plaintiff's proposed summary chart of *Monell* evidence for trial, and ensured Plaintiff's trial exhibits were properly authenticated.

28

During trial, he researched and drafted legal memoranda to preclude the County's efforts to introduce inadmissible evidence and argument, and drafted submissions supporting applications by Plaintiff.

66.     David Rudin obtained a B.A. from Brown University in 2012 and a J.D. from New York University School of Law in 2017, *cum laude*, where he was a clinic student at the New York Civil Liberties Union, an editor on the *N.Y.U. Review of Law and Social Change*, a Ford Foundation Public Interest Fellow, and received the Flora S. and Jacob L. Newman Prize for Most Outstanding Note for the *N.Y.U. Review of Law and Social Change*. After graduating, he clerked for Chief Judge Janet C. Hall, District of Connecticut, in 2017–2018. He was then an associate and senior associate at WilmerHale LLP from 2018 to 2021.

67.     Since joining Rudin Law in 2021, David Rudin has focused on federal Section 1983 civil rights lawsuits involving wrongful convictions or excessive force containing *Monell* claims, and New York State Unjust Conviction Act cases. He also has been involved in post-conviction work, including conducting a reinvestigation with a conviction review unit of a 1996 wrongful conviction, and obtaining the resentencing of a client serving an excessive sentence. He was part of the trial team that won a jury verdict of $1.925 million, including a successful *Monell* claim, in *Fraser v. City of New York*, 20-cv-4926 (S.D.N.Y.). He was the principal lawyer responsible for securing a $2.1 million settlement in *Hooper v. City of New York*, 24-cv-6311 (S.D.N.Y.), a wrongful conviction case containing a *Monell* claim, and substantial recoveries in multiple police excessive force lawsuits. In a 2023 Unjust Conviction Act trial, *Taylor v. State*, Claim No. 130027, he delivered the opening argument, examined five witnesses, including the claimant, and delivered part of the closing argument. He recently argued before the Appellate

29

Division, Second Department, in an appeal in *Negron v. State*, No. 2021-05132. He was recognized as a 2025 New York Metro Super Lawyers Rising Star.

68.     Previously, at WilmerHale, David Rudin worked on complex civil litigation and criminal investigations, including a breach of contract and antitrust trial in Delaware Chancery Court, a major bankruptcy litigation, and dispositive and discovery briefing in numerous other federal court litigations. He also worked on civil rights and wrongful conviction cases, including post-conviction challenges to a wrongful murder conviction, a challenge to a sex offender's civil confinement, a Supreme Court *amicus* brief on behalf of more than 170 voting rights and other organizations opposing the addition of a citizenship question to the 2020 census, and a federal lawsuit seeking the release of Massachusetts prisoners exposed to COVID-19. For the COVID-19 litigation, he was named a Boston Bar Association President's Award honoree. He also assisted in voting rights litigation on behalf of the 2020 Biden Campaign.

**Partha Sharma**

69.     Plaintiff seeks a billing rate of $375 per hour for Partha Sharma, a graduate of Yale Law School (J.D. 2023), which is the rate our firm charges private clients for his services. Partha Sharma began working on this case upon starting at the firm in September 2023, in the middle of fact discovery. He performed extensive legal research to develop Plaintiff's theories of recovery against the City of Buffalo and the County of Erie, in particular Plaintiff's *Monell* theories, and trial strategies. He also worked with Joel Rudin in relation to the expert analysis and report of Alan Hirsch, and assisted David Rudin in drafting the declaration supporting Plaintiff's motion to set an expedited trial date. At the summary judgment stage, Partha Sharma drafted a substantial portion of Plaintiff's 56.1 factual statement and contributed a significant amount of the legal research underlying Plaintiff's memorandum of law. Leading up to trial,

Partha Sharma drafted many *in limine* briefs and responses; drafted Plaintiff's opposition to the County's motion for reconsideration of the summary judgment decision; worked to ensure authentication of Plaintiff's trial exhibits; assisted in the development of Plaintiff's proposed jury charge; and worked on drafting Plaintiff's objections to the County's designations of Mr. Boyd's deposition testimony. During trial, he researched legal issues and drafted a submission concerning the admissibility of evidence.

70. Partha Sharma was particularly well-qualified to work on this case because of his past professional experience. He obtained a B.A. from Columbia University in 2017 and a J.D. from Yale Law School in 2023. Between college and law school, from 2017 to 2020, he was Rudin Law's paralegal, a role in which he worked on numerous civil cases arising out of wrongful convictions and other harms suffered by individuals in the criminal legal system. Relevant especially to this case, he worked for well over a year on thoroughgoing *Monell* discovery concerning the Queens County District Attorney's Office, reviewing tens of thousands of pages of personnel files, training materials, policy materials, and other records of the Office; conducting extensive factual investigation to discover misconduct by Queens prosecutors across a wide array of cases, including through connecting with defense attorneys who handled such cases; synthesizing discovery into a memorandum of several hundred pages; and assisting in Joel Rudin's depositions of high-level executives of the Queens D.A.'s Office, including Acting D.A. John Ryan, through, among other things, managing hundreds of exhibits during depositions.

71. At Yale Law School, Partha Sharma continued to do related work, serving as a teaching assistant to Professor Dan. M. Kahan for first-year criminal law; as a research assistant to Emily Bazelon, in which capacity he helped launch the Prison Letters Project; and as a member of the Criminal Justice Advocacy Clinic, where he worked on a project concerning

conviction integrity review. During his first law school summer, he was a Fair and Just Prosecution summer fellow at the Conviction Integrity Unit of the Philadelphia D.A.'s Office, a role in which he regularly met with a First Assistant to the D.A., conducted policy analysis for the Office, and worked on litigation by the Conviction Integrity Unit, including a high-profile motion by the D.A.'s Office to hold the Philadelphia Police Department in contempt for failure to disclose potential *Giglio* material to the Office. He also interned for Rudin Law, working mostly on two criminal cases in a pre-trial posture. In his second law school summer, he worked on civil rights litigation at the NAACP Legal Defense and Educational Fund. Inc.

72. Since returning to the firm in 2023, Partha Sharma has worked with firm principal Joel Rudin on two other Section 1983 wrongful conviction lawsuits asserting *Monell* claims against the City of New York (one of which recently culminated in a settlement), and a New York State Unjust Conviction Act action. He is also part of a team currently litigating a *Monell* claim against the New York City Housing Authority. He recently drafted an *amicus* brief for the National Association of Criminal Defense Lawyers and the Innocence Project in the Court of Appeals case *People v. Robinson*, APL-2024-00073. He also prepared the briefing in a currently pending CPLR Article 78 proceeding against the New York County D.A.'s Office.

**Paralegals Siduri Beckman, Thelo Coleman, and Amariah Thurston**

73. Working almost exclusively on the firms' civil rights cases, the above three paralegals, all top graduates from demanding universities planning careers in law, organized, summarized, and analyzed document discovery; digested deposition and trial transcripts; prepared internal memoranda on a wide range of issues; proofread, organized, and filed documents; and provided other invaluable services. Plaintiff seeks a rate of $200 per hour for the paralegals based upon the firm's present billing rate.

74. **Siduri Beckman** worked on this case from 2021 to 2022, when she left Rudin Law to attend Iowa Law School. She is a 2020 graduate of Yale University, where she was a Human Rights Scholar in the Schell Center, worked with the Urban Improvement Corps and the Yale University Prison Project, and interned with the Louisiana Capital Assistance Center in New Orleans and the Fair and Just Prosecution Project in Philadelphia working on introducing procedural and sentencing reform in prosecutors' offices nationwide. She did essential work in this case obtaining and analyzing documentary materials and assisting the attorneys in the preparation of pleadings.

75. **Thelo Coleman** worked on this case from 2022 to 2024, when he left Rudin Law to attend UC Berkeley Law School. He graduated from Yale University *summa cum laude* in 2022 with a B.A. in history. He received the Charles Garside Jr. Cup for distinction in his major. In 2021, he interned at the Lawyers' Committee for Civil Rights Under Law in Washington, D.C., and throughout his college years he tutored, mentored, or taught middle and high school students in New Haven. He did essential work in this case obtaining and analyzing documentary materials, including the newspaper articles reporting on misconduct by Erie County prosecutors; assisting with depositions; preparing deposition digests; analyzing the evidence supporting Mr. Walker's *Monell* claims; and assisting the attorneys with the summary judgment opposition papers, the bifurcation opposition, and other submissions.

76. **Amariah Thurston** is the firm's current paralegal and worked on this case from 2024 through the present. She graduated *magna cum laude* from Columbia University and was inducted into the *Phi Beta Kappa* academic society for distinction as top 10 percent of her graduating class. In 2023, she interned with the Family Law Center at the YWCA of Central Alabama. She did essential work assisting the attorneys with the preparation of Plaintiff's trial

33

exhibit list, a summary chart of *Monell* evidence, and witness examinations, as well as other trial preparation, and then attended and assisted at the trial.

## Costs and Expenses

77.     Undersigned counsel incurred $339,837.64 in costs and expenses in this case (not including substantial fees paid to expert witnesses for their time) as detailed in Exhibit 2. These include filing fees, process servers, deposition videography and transcript fees, the cost of transcripts (including daily copy of the trial transcript), FedEx, fees incurred in obtaining records from other parties, reproduction of documents for trial, local counsel fees, the fees of a jury consulting company and a trial audiovisual presentation specialist, travel costs, lodging, meals during out-of-town travel and trial, Westlaw charges, a private investigator, and other expenses.

78.     Consistent with our general approach to this application, we have applied a 15% discount to expenses incurred through December 5, 2024, the date of the settlement with the City of Buffalo. We have also applied a 50% discount for expenses through March 3, 2025, the date on which it was decided that Mr. Boyd's case would be stayed and Mr. Walker's case would proceed to trial first.

79.     We have not tried to review each individual expense incurred in preparing the cases for our two Plaintiff-clients in order to segregate them by client, but instead have discounted them on a percentage basis, as explained above, for several reasons. First, the facts underlying our claims against the City defendants and against the County were plainly intertwined, as were the facts and legal issues related to our two clients. We had to investigate and develop all such facts having in mind the commonality of our misconduct claims, the relative culpability of the defendants, causation claims and defenses, and the apportionment defense that the County ultimately raised but which could have been raised by the City Defendants had we

settled with the County first. Thus, except as otherwise specified below, all depositions, travel-related expenses, and other expenditures related to both plaintiffs and both sets of defendants, and Mr. Walker is entitled to be reimbursed for them.

80. This is also true with respect to damages. Development of each of our clients' damage claims also involved interrelated issues and considerations. Many of the circumstances of our clients' damage claims also potentially affected their credibility, including their involvement in various criminal or disciplinary incidents and alleged parole infractions, and they were each going to testify at both of their trials, so the credibility of one potentially affected the trial of the other. Further, comparative damages potentially affected settlement negotiations.

81. Second, the time that would be necessary to review every individual expense would not be cost effective. It would be difficult to justify the reasonableness of billing for attorney and paralegal time analyzing each individual expense and whether it potentially related to both plaintiffs, or only one. Based upon my review of such records of expenses and of how we prepared our two cases, such expenses on behalf of the two clients were essentially equal.

82. Based upon the overall approach of this application, regarding the mediation efforts of the court-appointed mediator, Michael Brady, while the County was participating in mediation, we are applying the 50 and the 15 percent reductions. From the point that the County no longer participated, we are not seeking any reimbursement of payments to him. (We are only seeking $996.63 of the $6,230 we paid to him.) Similarly, we are not seeking reimbursement for costs associated with serving a Notice of Claim upon the City of Buffalo and the amended complaint upon individual defendants.

35

83.     We are not seeking reimbursement for over $10,000 in expenses necessary to form the estates of the deceased detective-defendants and to serve those estates, for over $7,000 in Westlaw charges, and for in-house copying charges.

84.     My firm retained a local Buffalo investigative firm, Corporate Screening & Investigative Group, LLC, ("CSI") to locate and interview potential witnesses to the Crawford homicide investigation and witnesses with information relevant to Plaintiff's *Monell* claims. CSI's work—leveraging their investigations expertise, location in Buffalo, and relatively low hourly rate—was far more cost effective than the fees and travel expenses our firm would have incurred without them. Our firm paid CSI a total of $11,854.36 for its investigative work on the case. Applying the aforementioned reductions, we are seeking reimbursement for $5,038.10.

85.     Deposition expenses were substantial, totaling $35,219. My firm paid for the expenses of transcribing 19 depositions. We also paid for videorecording 11 of those depositions, which was necessary to preserve testimony from witnesses who were elderly and in poor health, particularly given the uncertainty of when the case would go to trial. This precaution proved necessary, as D.A. Cosgrove and Mr. Boyd passed away prior to trial and the jury was only able to see their testimony through video. (Mr. Hulnick passed away suddenly before his testimony could be preserved, also showing the need for videorecording certain testimony in this case.) Plaintiff and the County also played the video from other depositions at trial. After applying reductions, we are seeking reimbursement for only $16,635.58.

86.     Prior to January 1, 2024, my firm paid out of pocket fees due Hoover & Durland, whom we had retained as local counsel, under a fee agreement that provided for a portion of the firm's fees to be paid as incurred and the balance if a damage award was recovered. The payments totaled $11,130. We then entered into a new agreement with the firm under which it

36

would be co-counsel and would be compensated, as would my firm, if the case went to trial, pursuant to 42 U.S.C. Section 1988. The above out-of-pocket expense was necessary as local counsel was needed to obtain local court records; to provide a local contact for our clients; to provide a meeting place for our clients and witnesses; to facilitate our factual investigation, especially because of its contacts with local attorneys; and to educate us about local court rules and customs. The amount for which we are seeking reimbursement after applying reductions is $4,730.25.

87.     We are seeking reimbursement in the amount of $11,992.81 for flights, $43,148.54 for hotel stays, $5,817.61 for meals during out-of-town travel and trial, and $2,549.01 for taxis and rideshares. These include a trip by Mr. Walker and Mr. Boyd to New York City to meet with me at the beginning of the case, and trips by my firm to Buffalo, Rochester, and Atlanta for investigative purposes early in the case, numerous depositions, mediations, court conferences, and trial. The largest number of flights were for depositions, requiring nine separate trips to Buffalo for which I was accompanied by one other member of my office for assistance. During trial, my law firm paid for the hotel, meals, and travel expenses of myself, David Rudin, and paralegal Amariah Thurston, as well as our client, John Walker, his aide, and his son, both of whom were essential for his mobility. My firm also paid for expenses of this kind for co-counsel Spencer Durland, a jury consultant for *voir dire*, and out-of-town witnesses Tyrone Woodruff, Sanford Drob, Alan Hirsch, and Steven Zeidman. The amounts we are seeking after applying reductions have been reduced from a total of $84,964.65.

88.     The services of a jury consultant, whose fees total $103,365, also were essential. Plaintiff's counsel used the consultant Magna Legal Services, an agency that had worked successfully with WilmerHale in the past, initially to survey potential local jurors to gauge their

37

attitudes in relation to various factors present in this case and to report on their findings. The jury consultant team then assisted counsel during *voir dire* to research the social media accounts of prospective jurors and in subjectively evaluating each juror. The jury that resulted was intelligent and attentive throughout the case and returned a highly favorable verdict, and the jury consultant proved essential in selecting this jury. The amount we are seeking after applying a reduction—for the fees associated with work through March 3, 2025—is $69,635.

89.     As indicated in Exhibit 2, we also incurred numerous incidental expenses, including filing fees, FedEx and copying expenses, and the like. The copying charges were considerable because we had to use an outside vendor to make several copies of thousands of pages of potential exhibits and had to revise these binders throughout the trial. My firm paid a portion of Impact Trial Consulting's bills in the amount of $9,017.82 for work described in Mr. Firsenbaum's declaration. *See* Firsenbaum Decl. ¶ 275.

90.     For the reasons set forth in the accompanying Memorandum of Law, the above costs and expenses were reasonable and are recoverable as a matter of law.

WHEREFORE, for the reasons set forth above and in the accompanying Memorandum of Law, the undersigned respectfully requests that the requested fees, costs, and expenses be ordered to be paid by the Defendants.

_____
JOEL B. RUDIN, ESQ.

Dated:     May 30, 2025
           New York, New York

38